UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CASSANDRA SOCHA,

        Plaintiff,

v.

CITY OF JOLIET, an Illinois Municipal corporation, EDWARD GRIZZLE, and JOHN DOES 1-20

        Defendants.

Case No. 18-cv-5681

Honorable Jorge L. Alonso

**CITY OF JOLIET'S LOCAL RULE 56.1 STATEMENT OF UNCONTENSTED MATERIAL DACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

    Defendant, CITY OF JOLIET, a municipal corporation (hereafter the "City"), by and through its attorneys, Tressler LLP, pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1(d)(1), hereby submit its undisputed material facts as to which there are no genuine issues in support of its Motion for Summary Judgment against Plaintiff Cassandra Socha ("Plaintiff"). In support thereof, Defendant states as follows:

**LIST OF EXHIBITS**

1. Exhibit A – Plaintiff's Deposition
2. Exhibit B – Edward Grizzle's Deposition
3. Exhibit C – May 18, 2018 Search Warrant
4. Exhibit D – Edward Grizzle's Sworn Affidavit
5. Exhibit E – Jeffrey German's Deposition
6. Exhibit F – Christopher Botzum's Deposition
7. Exhibit G – Alan Roechner's Deposition
8. Exhibit H – Jeremy Harrison's Deposition

9. Exhibit I – Donald McKinney's Deposition

10. Exhibit J – Michael Devito's Deposition

11. Exhibit K - Doug Kein's Forensic Examination Report

12. Exhibit L – Robert Brown's Deposition

13. Exhibit M - Tim Powers' Deposition

14. Exhibit N – Lorinda Lamken's Affidavit

15. Exhibit O – Joliet Police Department's General Orders

## STATEMENT OF FACTS

*Parties, Jurisdiction, and Venue*

1. Jurisdiction and venue are not disputed as this action is properly before this Court. ECF. No. 66, ¶¶ 5-6.

2. Plaintiff is employed by the City of Joliet's Department of Police as a Patrol Officer. [*See* Plaintiff's Deposition Transcript, ("Exhibit A") at 22: 9-11].

3. The City of Joliet is a local governmental entity. ECF. No. 66, ¶ 2.

4. Defendant Edward Grizzle is employed by the City of Joliet's Department of Police as a Detective. ECF. No. 66, ¶ 10.

5. Plaintiff and another patrol officer employed by the City's Department of Police named Nicholas Crowley ("Crowley") were "affianced" and "cohabited." ECF. No. 66, ¶¶ 8-9.

*The Crowley Case*

6. Plaintiff met Nick Crowley when she first became employed at the Joliet Police Department. When the Plaintiff first began a relationship with Nick Crowley, they were both patrol officers with the City. [Ex. A, 16: 12-15; 27: 4-14].

7. On or about July 16, 2017, Plaintiff and Nick Crowley got into an argument at the Plaintiff's home. During the argument, the television and refrigerator broke, and as a result of that evening, Nick Crowley was charged with reckless discharge of a firearm in Will County after a bullet was found in the ceiling. [Ex. A, 40: 6-24; 44: 11-14].

8. Plaintiff's neighbor, Maria Gatlin, provided a statement to the Joliet police supportive of these criminal charges, and gave testimony against Nick Crowley in his criminal trial. [Ex. A, 4-11; Ex. D, 35: 18-22].

9. Defendant Edward Grizzle ("Grizzle") was the detective assigned by the City to investigate the matter alleged in Crowley's criminal case. [Ex. A, 40: 5-8].

10. Plaintiff was called to testify in the criminal case on May 14, 2018. After she testified on May 14, 2018, but prior to Crowley's acquittal on May 22, Plaintiff sent a threatening text message to Maria Gatlin. [Ex. A, 63-68].

### *Search of Plaintiff's Cellphone was Authorized*

11. On May 17, 2018, Gatlin arrived at the Joliet police department and met with Detective Grizzle, showing him a screenshot of the text message. In order to obtain forensic evidence of the text message, including verifying that Plaintiff sent it, Gatlin volunteered to allow her phone to be forensically examined by the JPD and Detective Jeffrey German performed a forensic download of Gatlin's phone using the Cellebrite forensic tool to obtain the original text message received by Gatlin from Plaintiff. [Ex. B, 34: 4-24].

12. Based upon the text messages she sent to another witness during the trial of Crowley, Grizzle, as the detective assigned to investigate the matter, worked with Appellate Prosecutor Lorinda Lamken to obtain a search warrant on May 18, 2018 from the Hon. Sarah Jones

of the Will County Circuit Court who authorized the search of the Plaintiff's cell phone from which the text message was sent. [Ex. B, 27: 19-24; Ex. C].

13. In support of the search warrant approved by Judge Jones, Grizzle submitted a detailed affidavit which also attached and incorporated the contents of the criminal complaint relevant to plaintiff and set forth facts to establish: (1) probable cause to believe that the primary user of the phone had engaged in the charged criminal offense; and (2) that the cell phone contained or constituted evidence, fruits, or instrumentalities of those crimes. [Ex. D].

14. The supporting affidavit of Grizzle highlighted Plaintiff's use of the cell phone as part of, and in furtherance of, the crimes under investigation. In particular, the supporting affidavit advised as to the specific terms of a text message sent from plaintiff to the witness in an ongoing grand jury indictment in Will County. [Ex. D].

15. The supporting affidavit requested that the court issue the search warrant allowing for the search for specified material on plaintiff's rose gold Apple iPhone, namely, "evidence of the offense of harassment via electronic communications, intimidation…" Among the categories of information to be extracted and analyzed, the search warrant authorizes electronic communications, digital images or videos, e-mails, voice mail, buddy lists, chat logs, instant messaging, and text messages. [Ex. C].

16. Hon. Sarah Jones reviewed and authorized the search warrant for Plaintiff's cell phone. [Ex. C].

17. Appellate Prosecutor Lamken subsequently provided an affidavit supporting both the pursuit of the search warrant as well as the materials sought. [Ex. N].

*Cell Phone Data Download Process*

18. Cellebrite is a forensic tool used to extract and analyze phone records and computer records. Cellebrite was used by the City in the Spring of 2018 to view data taken from phones during investigations. [Ex. E, 23: 14-22].

19. Lantern is a software made by Katana Forensics which works similarly to Cellebrite. It can extract phone data, analyze, and also create viewable reports. Lantern was used in conjunction with Cellebrite in the Spring of 2018. [Ex. E, 23-24: 1-9].

20. At the time, the City had a single Cellebrite system that was located on a computer in the investigations unit area and Lantern was on an Apple Mac laptop that was separate from the Cellebrite computer, located in the major case room. [Ex. E, 29- 31; 1-24].

21. Both the Cellebrite and Lantern machines were kept within a secure area of the investigation's unit, which was not accessible to anyone other than investigators and supervisors. [Ex. E, 32: 2-24; 33: 1-20].

22. The investigations room required keycode access and both machines were password protected. The forensic machines were not connected to any common network drives, and the data stored on each respective machine could only be accessed by physically accessing the machines. In May-June 2018, only investigators, supervisors, and IT would have the password to access the Cellebrite system. [Ex. E, 30: 10-16; 33: 1-24].

23. Cellebrite Physical Analyzer is a computer program that is used to process cellular device extractions and create reports on notable items located within the digital evidence. The physical analyzer also supports the extractions of iPhones and at the time of this event was the standard process for extracting iPhone digital data. [Ex. E, 27: 1-24; Ex. F, 46: 3-7].

24. When data is extracted to the Cellebrite Physical Analyzer Software, it will be unique to that device and there will be a summary identifying the device, the name of the device, the serial number, and the unique ID that Apple uses to identify the phone. [Ex. E, 38: 3-24].

25. Detective Jeffrey German and Lt. Chris Botzum were the only two detectives formally trained in the Cellebrite system in May 2018. The formal training sessions were conducted by Cellebrite at various police stations across Illinois. [Ex. E, 26: 1-11; 44: 7-15].

26. On May 18, 2018, pursuant to a lawful search warrant, Detective Christopher Botzum conducted a forensic download of Plaintiff's cellphone using the Cellebrite and Lantern systems. The physical analyzer software parsed the data into categories including text messages, photographs, and videos from Plaintiff's phone, and the data was saved in a place on the Cellebrite to which only a few limited individuals had access to. [Ex. F, 52: 23-24; 57: 3-24].

27. There was no ability for only "part" of the data to be downloaded (i.e. only downloading text messages). Once downloaded, the forensic programs allowed for a reader report to be run that would parse out the data (separate into text messages, images, videos, applications, etc.) to allow for the user to effectively navigate and review the data. [Ex. E, 41-43; 80].

28. To protect Plaintiff's privacy, Detective Botzum purposefully did not include Plaintiff's name on the file containing the contents of her phone. [Ex. F, 54: 3-21].

*Cell Phone Data Storage*

29. Once phone data was extracted using the Cellebrite or Lantern machines, the cell phone would either be returned to its owner or retained for further investigation. Phones that were retained by the police department would be stored subject JPD's applicable general orders. [Ex. O].

30. The City had in place a general order that outlined the collection and storage of physical evidence – General Order 16-1. For the Plaintiff's investigation, the original physical evidence (Plaintiff's iPhone) was returned to her when the extraction was completed. [Ex. O].

31. Once data is extracted, only those who had the computer password AND know how to use Cellebrite would be capable to open saved data and run a report. Once a report is generated, it is not accessible to every detective's computer. Access to data is limited to access of the specific computer (including access to investigations room) and then knowledge of using Cellebrite or Lantern. [Ex. E; 32-34].

32. Data from extractions, also known as the "digital evidence", was stored on the computers housing the forensic programs and would not be entered into the BEAST system, or physical central evidence. [Ex. E, 46:12-24, 47: 1-19].

*Possession of Flash Drives*

33. Joliet Police Department General Order 10-6, in place at the time of Plaintiff's investigation, covered departmental policies related to criminal investigation organization and administration (the division that handled Plaintiff's investigation). [Ex. O, pg. 2].

34. Section 4 of GO 10-6 allowed for the investigator assigned to the case to have access to the investigative files, which includes "working copies" of phone extractions. Specifically, Section 4.2 of GO 10-6 reads "Investigative case files shall only be accessible to law enforcement personnel at the discretion of the assigned investigator or an investigation supervisor." [ Ex. O, pg. 3].

35. The data extracted from Plaintiff's phone onto the Cellebrite could be copied onto a flash drive, DVD, or Blu-ray. [Ex. E, 67: 8-12].

36. A flash drive was created on or about May 18, 2018 for Grizzle with the contents of the data extracted from Plaintiff's phone. Grizzle downloaded the contents of the flash drive onto his computer in order to complete his investigation with the extraction data on his computer. [Ex. B, 65: 20-24; 66: 1-4].

37. Section 4.3 of GO 10-6 allowed for the storage of evidence in special circumstances. Specifically, GO 10-6, Section 4.3 reads: "It is recognized that some criminal investigations contain sensitive information, which may compromise the eventual outcome of the inquiry. The Investigation Division Deputy Chief may authorize that original reports involving such cases are maintained within the Investigation Division safe. The Investigations Division Deputy Chief is responsible for the auditing and return to the Records Section any cases maintained in this fashion". [Ex. O, pg. 3].

38. After downloading the flash drive of the extracted data onto his computer, Grizzle gave a flash drive containing the contents of Plaintiff's phone to Alan Roechner who served in a supervisory capacity as Deputy Chief of Investigations at the time. [Ex. G, 44: 1-10].

39. Pursuant to Section 4.3 of GO 10-6, Deputy Chief Roechner kept the flash drive in a locked cabinet in his office to protect Plaintiff's privacy while the investigation was pending. This was consistent with past practice at the City for criminal investigations involving police officers and no one except the Deputy Chief himself had access to the password to gain access to his cabinet. [Ex. G, 41-46].

*Removal of Cell Phone Data from JPD Computers*

40. Plaintiff's data was then deleted from the Cellebrite on or about June 8, 2018. At which point, the images, data, and videos could no longer be accessed on Cellebrite. The only way

to access the extracted data from Plaintiff's phone after it was deleted was from the flash drive. [Ex. E, 76: 1-24, 77: 1-8].

41. Prior to deleting the extracted data from Cellebrite, another flash drive was made by Detective Gavin in order to preserve the data. Similarly, this second flash drive was presented to Deputy Chief Roechner and locked in his cabinet. [Ex. G, 63: 1-24; 64: 1-18].

42. On August 2, 2018, more than two months after the City took steps to remove the Data from its computers, Plaintiff raised issue with her phone data with the City for the first time, when Plaintiff asked her supervisor for permission to leave work early because she had heard rumors related to the contents of her phone data. Ex. H, 20: 16-24; 21: 1-12].

### *Data from Plaintiff's Phone Was Only Found on Authorized Devices*

43. On August 23, 2018, the JPD requested the Chicago Regional Crime laboratory ("RCFL") to investigate the presence of Plaintiff's data on JPD electronic devices. On August 24, RCFL personnel came to JPD and "imaged" the hard drives and electronic devices in the investigations unit. [Ex. G, 76: 13-19; 79].

44. The RCFL's reports indicated that Plaintiff's phone data was located on only two devices – Grizzle's and German's computers. There were no phones that showed any evidence of ever containing Plaintiff's phone data. [Ex. F, 56: 7-54, Ex. K, pg. 8].

### *Personal Photos and Videos from Plaintiff's Phone Were Not Published*

45. Plaintiff used her phone to take sexually explicit photographs and videos of both her and Crowley. The videos depicted the Plaintiff performing various sex acts. [Ex. A, 136: 20-24; 137: 1-3].

46. At the time the data was extracted from Plaintiff's phone, Detective McKinney was a relatively new Detective working for the City who had received informal training from Detective

German on the Cellebrite and would routinely work on the system to better familiarize himself with it. [Ex. I, 13: 20-24; 14: 1-7; 21: 1-10).

47. Given Officer McKinney's inexperience with the Cellebrite system, he would be encouraged to engage in informal and independent self-education on the Cellebrite program as often as possible in order to gain experience with the program. This includes opening older extractions, running a report via the physical analyzer, and exploring the contents of the phone data by utilizing Cellebrite's various functions. [Ex. K, pg. 15].

48. Detective German was aware that McKinney was beginning the process of engaging in formal Cellebrite training to become Cellebrite certified and that McKinney would use the Cellebrite computer for an investigation or other reasons, which included training. [Ex. E, 44: 16-24].

49. Detective German gave McKinney the Cellebrite password. [Ex. I, 15: 1-3].

50. At some point between May-June 2018, Detective McKinney opened an unidentified media folder containing Plaintiff's images and viewed a photograph which depicted nude breasts from the shoulders down. [Ex. I, 32: 10-23].

51. Detective McKeon, who was on the phone, was sitting directly next to Detective McKinney at the time and Detective McKinney called McKeon's attention to the photograph of naked breasts. [Ex. I, 33: 1-22].

52. Detective McKinney then viewed a second photograph, which depicted Plaintiff's face. Upon realizing the photograph belonged to the Plaintiff, Detective McKinney immediately closed out and logged off Cellebrite. [Ex. I, 35: 7-24].

53. Detective McKinney and Detective McKeon are the only two employees from the City who have admitted to seeing a sexually explicit photograph from Plaintiff's personal phone.

Neither one of these detectives reviewed any additional photographs and never reviewed any videos contained on Plaintiff's phone. [Ex. I, 38: 13-17].

54. Rather than protect the Plaintiff's privacy and file under a "Doe," the original complaint, as filed by Plaintiff's counsel, lists Plaintiff's full name as Cassandra Socha. Plaintiff is aware that this lawsuit is now a matter of public record. [Ex. A, 221: 1-8].

*Alleged Publication is Based on Rumors and Hearsay*

55. Officer Michael Devito had a meeting in July 2018 with Detective David Jackson regarding concerns centered on the treatment of a female subordinate and the mishandling of evidence where Jackson shared rumors of sexual/nude images from Plaintiff's cell phone. [Ex. J, 8: 6-21].

56. Shortly after the meeting with Detective Jackson, Officer Devito advised Plaintiff in person about rumors circulating regarding images and videos on her cell phone. [Ex. J, 37: 19-23].

57. Plaintiff received two anonymous letters in her work mailbox at the police department containing rumors and allegations that intimate videos and photographs were being viewed and shared by members of the department. The author(s) of letters remains unknown, and the letters could not be authenticated. [Ex. A, 126: 8-34; 127: 1-12; 130: 4-11; 135, 9-17].

58. Officer McKinney and Officer McKeon are the only two individuals to physically see Plaintiff's photographs at the Joliet Police Department. [Ex. E, 63: 1-24; Ex. I].

59. Plaintiff did not share the anonymous letter with anyone at the Joliet Police Department and she did not make a formal report to Deputy Chief Roechner or anyone else at the City nor did she address these concerns directly with Detective Grizzle. [Ex. A, 140: 1-23].

60. Plaintiff has no first-hand knowledge that anyone has ever seen private images that were on her cell phone at the Joliet Police Department. [Ex. A, 105: 14-20].

61. Other than the events alleged, she has not experienced any interaction with any member, past or current, of the Joliet Police Department in which she was not treated professionally or with respect. [Ex. A, 224: 1-16].

*Plaintiff and Crowley disseminated the Photos and Videos prior to JPD's Investigation*

62. Forensic examination of the Plaintiff's phone data confirmed the following:

   a. The cell phone data (sms data) disclosed in discovery has not been altered, damaged or destroyed since it was originally extracted from Plaintiff's cell phone in May of 2018.

   b. Plaintiff's phone contained twenty-six (26) images of Plaintiff in various stages of undress.

   c. Plaintiff's phone contained four (4) videos of Plaintiff in various stages of undress or involved in sexual activity.

   d. Plaintiff sent nineteen (19) images or videos of herself in various stages of undress or engaged in sexual activity via outgoing text message on thirty-one (31) occasions.

   e. Plaintiff received nine (9) images or videos of herself in various stages of undress or engaged in sexual activity via incoming text message on ten (10) occasions.

   f. The images or videos originated on four (4) different phone devices: an iPhone 5. iPhone SE, iPhone 6, and iPhone 7 plus.

   g. All images or videos described herein was created prior to May 17, 2018 (date of JPD's seizure of Plaintiff's phone).

      h. Every transmission (outgoing or incoming) of the images or videos occurred prior to May 17, 2018 (date of JPD's seizure of Plaintiff's phone).

[Ex. K, pg. 9].

***The City of Joliet and Supervisory Officers Had No Knowledge That Plaintiff's Images Were Shared***

63. Deputy Chief Robert Brown was a watch commander on the night B shift from May-June 2018. He has been employed with the City for 21 years and is currently the Chief of Police for the City. [Ex. L, 7: 9-14].

64. Chief Brown has no personal knowledge regarding any of the allegations in this lawsuit as he has not seen any of the personal photographs or videos of Plaintiff, nor does he personally know that any of the detectives in the investigations unit viewed or shared any private photographs from Plaintiff's cell phone. [Ex. L, 10: 1-10].

65. Sgt. Tim Powers worked for the Joliet Police Department for twenty-four years. During this time, he supervised both the Plaintiff and Crowley. [Ex. M, 9: 1-24].

66. Both Chief Brown and Sgt. Powers denied any knowledge of a watch commander meeting taking place at or near the time of the Plaintiff's Investigation in May or June 2018. [Ex. M, 14-18].

WHEREFORE, Defendant the City of Joliet prays for an order of this Court granting Defendant's Motion for Summary Judgment, to enter judgment in Defendant's favor, and for such other and further relief as this Court deems just, fair, and proper.

Dated: November 21, 2022

                                                       Respectfully submitted,

                                                       */s/ John O'Driscoll*

John O'Driscoll
Darcy Proctor
James Hess
TRESSLER LLP
550 E Boughton Rd #250
Bolingbrook, IL 60440
312-627-4000
jodriscoll@tresslerllp.com
dproctor@tresslerllp.com
jhess@tresslerllp.com

Attorney for City of Joliet

**CERTIFICATE OF SERVICE**

I hereby certify that on, I electronically filed the foregoing paper with the Clerk of the Court using the ECF System which will send notification to all counsel of record via the Court's CM/ECF system.

/s/John M. O'Driscoll (#6237793)
John M. O'Driscoll

Attorney for City of Joliet