1          IN THE UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF ILLINOIS
2               EASTERN DIVISION

3  CASSANDRA SOCHA,        )
                     )
4        Plaintiff,  )
                     )
5   -vs-         )  No. 18 CV 05681
                     )
6  CITY OF JOLIET, a municipal   )
  corporation; EDWARD GRIZZLE,  )
7  and JOHN DOES 1-20,        )
                     )
8        Defendants.   )

9

10      The deposition of CASSANDRA SOCHA called by

11  the Defendant Edward Grizzle for examination, taken

12  pursuant to notice and pursuant to the Federal Rules

13  of Civil Procedure for the United States District

14  Courts pertaining to the taking of depositions, taken

15  before Lisa M. Walas, Certified Shorthand Reporter,

16  appearing remotely via LegalView, at 5614 South

17  74th Avenue, Summit, Illinois, commencing at

18  10:00 a.m on the 4th day of May, A.D., 2021.

19

20

21

22

23

24

**EXHIBIT A**

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 2..5

Page 2

```
 1  APPEARANCES:
 2     LAW OFFICES OF HALL ADAMS LLC
       MR. HALL ADAMS (via videoconference)
 3     33 North Dearborn Street
       Suite 2350
 4     Chicago, Illinois  60602
       Phone: (312)445-4902
 5     E-mail: hall@adamslegal.net
 6        On behalf of the Plaintiff;
 7     TRESSLER LLP
       MS. DARCY L. PROCTOR (via videoconference)
 8     MR. JOHN M. O'DRISCOLL (via videoconference)
       233 South Wacker Drive
 9     61st Floor
       Chicago, Illinois  60606
10     Phone:  (312)627-4000
       E-mail:  dproctor@tresslerllp.com
11              jodriscoll@tresslerllp.com
12        On behalf of the Defendant City of Joliet;
13     KNIGHT, HOPPE, KURNIK & KNIGHT, LTD.
       MR. MATTHEW CLARK (via videoconference)
14     5600 North River Road
       Suite 600
15     Rosemont, Illinois  60018
       Phone:  (847) 261-0700
16     E-mail:  mclark@khkklaw.com
17        On behalf of the Defendant Edward Grizzle.
18  ALSO PRESENT:  Ms. Taja Reynolds (via videoconference)
               Mr. Mike Atkus (via videoconference)
19
20          * * * * *
21
22
23
24
```

Page 3

```
 1           I N D E X
 2
   WITNESS                    PAGE
 3
   CASSANDRA SOCHA
 4
      Direct Examination by Mr Clark ....... 4
 5
      Cross-Examination by Ms. Proctor ...... 167
 6
      Redirect Examination by Mr. Clark ..... 250
 7
 8
          E X H I B I T S
 9
   DEFENDANT EXHIBIT              PAGE
10
      Exhibit No. 1 (Search warrant) ........ 75
11
      Exhibit No. 2 (Plaintiff's Mandatory
12         of Initial Discovery Responses) .... 115
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1        The deposition of CASSANDRA SOCHA is being
 2  conducted remotely via LegalView.  Today's date is
 3  May 28, 2021, and the time is 10:00 a.m.
 4        The witness is located at 5614 South
 5  74th Avenue, Summit, Illinois.  My name is Lisa M.
 6  Walas.
 7        At the conclusion of today's deposition, I
 8  will ask that counsel place their orders on the
 9  record.
10        Thank you.
11          (Witness sworn.)
12  WHEREUPON:
13        CASSANDRA SOCHA,
14  called as a witness herein, having been first duly
15  sworn, was examined and testified as follows:
16          DIRECT EXAMINATION
17  BY MR. CLARK:
18     Q.  Ms. Socha, my name is Matt Clark.  I am an
19  attorney representing Ed Grizzle in the case.  Good
20  morning.  Could you please state your name for the
21  record, spelling your last name?
22     A.  Sure.  Cassandra Socha, S O C H A.
23     MR. CLARK:  Let the record reflect that this
24  deposition is being taken pursuant to notice and
```

Page 5

```
 1  agreement of the parties, pursuant to all applicable
 2  federal rules of Civil Procedure and the Northern
 3  District of Illinois Rules.
 4     Q.  Ms. Socha, have you ever given a deposition
 5  before?
 6     A.  Yes.
 7     Q.  How many depositions have you given?
 8     A.  Two.
 9     Q.  And what was the nature of the first
10  deposition you gave?
11     A.  I was in a lawsuit for a car accident.
12     Q.  Were you plaintiff or defendant in that
13  case or a witness?
14     A.  Defendant.
15     Q.  And when did that lawsuit take place?
16     A.  Maybe 2005, 2006.
17     Q.  Was this in Cook County?
18     A.  Yes.
19     Q.  Who was your attorney for that lawsuit?
20     A.  I didn't have an attorney.  It was State
21  Farm.
22     Q.  Was there an actual lawsuit filed or was it
23  just an accident in which you gave a recorded
24  statement?
```

EXHIBIT A

Page 6

1    A.  No, I'm pretty sure she filed – I don't
2    really remember.  I'm pretty sure she filed a lawsuit.
3    She had a settlement.
4        Q.  And who was she?
5        A.  The driver of the other car.
6        Q.  And what was the driver of the other car's
7    name?
8        A.  I have no idea.  I don't remember.
9        Q.  And then what was the second deposition you
10   gave?
11       A.  Through the City of Joliet.
12       Q.  And when did you give that deposition?
13       A.  2016, 2017, maybe.
14       Q.  And were you a plaintiff or a defendant in
15   that case?
16       A.  Defendant.
17       Q.  And what were the nature of the
18   allegations?
19       A.  That, I don't remember either.
20       Q.  Do you recall what kind of case it was in
21   summary of your testimony?
22       A.  It was – I know it was an arrest.  It was
23   a drug arrest and there was a foot chase involved in
24   it.  It was just basically about the summary of what

Page 7

1    happened prior to his arrest.
2        Q.  Okay.  Do you know what the result of that
3    lawsuit was?
4        A.  He was – The City settled.
5        Q.  And do you recall the name of the
6    plaintiff?
7        A.  I think Torres was the last name, maybe.
8        Q.  Okay.  You're generally familiar with the
9    deposition process, but just let me go over a couple
10   rules.  First of all, I'm going to be asking a series
11   of questions today and I need to have you give me
12   verbal responses either yes or no and you can't shake
13   your head or say uh-huh because the court reporter
14   needs to be able to take all the information down.
15   Okay?
16       A.  Yes.
17       Q.  The court reporter can only take down one
18   of us at any given time.  I admit that sometimes I
19   have a tendency to ask long-winded questions.  If I do
20   so, just allow me to finish those questions before you
21   start to give your answer.  That way the court
22   reporter can take down whatever is said here today.
23   Okay?
24       A.  Yes.

Page 8

1        Q.  If you don't understand any question I ask,
2    please don't hesitate to ask me to rephrase and I'm
3    more than happy to do so.  Okay?
4        A.  Okay.
5        Q.  Finally, we are via Zoom today, so every
6    once in a while there's technological breakdowns; and
7    if you have any problems hearing us or kind of have
8    problems, just bring it to our attention, we'll do the
9    best we can to resolve those.  All right?
10       A.  Sure.
11       Q.  We're probably going to be here for a
12   little while today; so if you do need to take a break,
13   just don't hesitate to let us know.  I would only ask
14   that you answer the question that's posed to you
15   before we take a break.  All right?
16       A.  Okay.
17       Q.  In preparation for today's deposition, did
18   you review any documents?
19       A.  Yes.
20       Q.  What documents did you review?
21       A.  I reviewed the complaint that my attorney
22   prepared for me, interrogatories, the deposition list.
23       Q.  Any other documents?
24       A.  No, not that – No.

Page 9

1        Q.  With respect to the complaint that you
2    reviewed, had you seen that complaint before?
3        A.  After it was prepared, yes.
4        Q.  Do you recall the last time you saw that
5    complaint?
6        A.  Saturday.
7        Q.  Outside of meeting with your attorney or
8    discussing anything with your attorney, I don't want
9    to know about that, but have you discussed this
10   deposition with anyone else?
11       A.  No.
12       Q.  In terms of the lawsuit itself, have you
13   had conversations with anyone regarding the lawsuit?
14       A.  No.
15       Q.  All right.  What is your date of birth?
16       A.  1/13/1985.
17       Q.  Where do you currently reside?
18       A.  City of Joliet.
19       Q.  And what's the address?
20       A.  3727 Mustang Road and the zip is 60435.
21       Q.  How long have you lived at that address?
22       A.  Six years.
23       Q.  So since 2015; is that right?
24       A.  January 2015.

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Page 10

1   Q.   And who do you live at that address with?
2   A.   I live there with my husband Nick Crowley
3   and our two sons.
4   Q.   How old are your sons?
5   A.   My oldest is almost two and then the
6   youngest is three months.
7   Q.   Congratulations.
8   A.   Thank you.
9   Q.   When did you marry Nick Crowley?
10  A.   April 19, 2019.
11  Q.   How long had you been dating or been in a
12  relationship with Nick Crowley prior to getting
13  married?
14  A.   Since the end of 2014, approximately.
15  Q.   What's your highest level of education?
16  A.   I have an associate's degree.
17  Q.   When did you obtain that associate's
18  degree?
19  A.   2007. It's in my office.
20  Q.   Just for the record, are you looking at the
21  diploma on your wall?
22  A.   It's on my mom's wall in her office.
23  Q.   And what was your associate's degree in?
24  A.   Liberal studies.

Page 11

1   Q.   And where did you receive your liberal
2   studies degree?
3   A.   Morton College in Cicero.
4   Q.   When did you first become employed with the
5   police department?
6   A.   Which police department?
7   Q.   Any police department.
8   A.   I was hired in 2007, I believe, as a
9   part-time dispatcher -- I'm sorry -- I was training as
10  a dispatcher in the Village of McCook and then I went
11  on to the police academy through that village.
12  Q.   Where did you attend the police academy?
13  A.   Cook County Sheriff's.
14  Q.   And how long were you with the Village of
15  McCook?
16  A.   Just under seven years.
17  Q.   And after you were employed with the
18  Village of McCook -- Or strike that.
19       When you worked for Village of McCook, were
20  you only a dispatcher or did you also serve as a
21  patrol officer?
22  A.   No. I trained as a dispatcher and then I
23  was hired as a police officer so I didn't dispatch any
24  longer.

Page 12

1   Q.   And what year did that occur?
2   A.   2008, January 2008.
3   Q.   What duties and responsibilities did you
4   perform for the Village of McCook?
5   A.   As far as what position?
6   Q.   Well, let's start with your first position.
7   When you were hired with the Village of McCook in
8   2008, what position were you hired into?
9   A.   I was hired in 2007 and I was hired -- I
10  helped in the clerk's office. That was just
11  paperwork, talking to some people that came to the
12  window or passing it off to the actual clerk of the
13  Village. And then the other days that I didn't work
14  in the clerk's office, I was in the radio room
15  training as a dispatcher. And then I became a police
16  officer.
17  Q.   Okay. And when you became a police
18  officer, what position were you hired into?
19  A.   A patrol officer.
20  Q.   And what duties and responsibilities did
21  you have as a patrol officer for the Village of
22  McCook?
23  A.   Patrolling the Village, traffic stops -- I
24  mean, it wasn't really a busy town -- answering the

Page 13

1   calls that we had for the businesses, mostly alarm
2   calls, a lot of accidents.
3   Q.   And did you serve as a patrol officer until
4   2014?
5   A.   Yes.
6   Q.   Did you attempt to have any additional
7   promotions or seek any other opportunities with the
8   Village of McCook at that time?
9   A.   I did. I took the sergeant's exam.
10  Q.   Do you recall what year you took the
11  sergeant's exam?
12  A.   Probably 2013.
13  Q.   And do you recall how you did or where you
14  were on the list?
15  A.   They didn't rank you by numbers. I just
16  made the list. I didn't get promoted; but being on
17  the list, I was enabled to be officer in charge on a
18  shift.
19  Q.   And I believe you said that was 2013?
20  A.   I -- I believe so.
21  Q.   Were you ever subject to any discipline
22  while working for the Village of McCook?
23  A.   No.
24  Q.   Did you ever -- or were you ever subject

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 14..17

Page 14

1 with a citizen's complaint while working for the
2 Village of McCook?
3    A.  No.
4    Q.  Who was your supervisor when you left the
5 Village of McCook in 2014?
6    A.  Mario DePasquale.
7    Q.  Can you spell Mario's last name for me?
8    A.  Sure.  D E P A S Q U A L E.
9    Q.  And is he still with the Village of McCook?
10   A.  I believe so, but he's under federal
11 indictment.
12   Q.  Do you know for what?
13   A.  He was caught up in this whole scheme
14 that's going on with the red light cameras and stuff
15 like that.  There's a complaint, I don't remember
16 exactly what the complaint said, but I believe that
17 they were taking money, like shaking down businesses.
18   Q.  Have you been called as a witness for
19 anything related to that indictment?
20   A.  No.  I think that was way after I was
21 there.
22   Q.  You left the Village of McCook in 2014?
23   A.  Yes.
24   Q.  And why did you leave the Village of McCook

Page 15

1 in 2014?
2    A.  I applied for the City of Joliet and was
3 hired.
4    Q.  Was there any reason that you were looking
5 for a new position away from the Village of McCook?
6    A.  I just wanted a better opportunity, a
7 bigger department.
8    Q.  And what kind of better opportunities did
9 you see with the City of Joliet Police Department?
10   A.  That I would be able to grow as a patrol
11 officer, possibly rise up in the ranks.  There was –
12 There's different units in the City of Joliet rather
13 than the Village of McCook.
14   Q.  What units does the City of Joliet Police
15 Department have?
16   A.  They have an evidence unit, tactical,
17 investigations, a neighborhood orienting policing
18 team.  They have a drug unit – I think I got it
19 all – traffic.
20   Q.  What was the process in order to obtain
21 employment with the Joliet Police Department?
22   A.  There was a written test that we had to
23 take.  After – If you passed the written test, you
24 were called back for an oral interview, I believe.

Page 16

1 And then if you did well on the oral interview, you
2 had to go for a physical exam and psychological.
3    Q.  In terms of the written test, what was the
4 nature of the written test?
5    A.  Maybe – Gosh, it was a while ago.  Writing
6 maybe, English.  I can't really recall exactly.
7    Q.  In 2014, when you're interviewing for the
8 Joliet Police Department, did you know Nick Crowley at
9 that time?
10   A.  No.  And I believe that I interviewed prior
11 to 2014.
12   Q.  Is it fair to say you met Nick Crowley when
13 you first became employed at the Joliet Police
14 Department?
15   A.  Yes.
16   Q.  You indicated that you had an oral
17 interview to obtain your employment with the Joliet
18 Police Department.  Do you recall who you interviewed
19 with?
20   A.  No.
21   Q.  Do you recall how many people you
22 interviewed with?
23   A.  Maybe four to five.
24   Q.  Do you recall if Ed Grizzle was one of

Page 17

1 those four to five people that you interviewed with?
2    A.  No.
3    Q.  And just to clarify, he was not or you
4 don't recall?
5    A.  I don't recall.
6    Q.  When did you first become employed with the
7 Joliet Police Department in 2014?
8    A.  April 14th.
9    Q.  At what position were you hired into?
10   A.  Patrol officer.
11   Q.  When you were first hired with the Joliet
12 Police Department, did you receive any additional
13 training?
14   A.  To be become a patrol officer, there or ...
15   Q.  Let me rephrase.  When you were hired on
16 April 14th of 2014 as a police officer for the Joliet
17 Police Department, was it a probationary status?
18   A.  Yes.
19   Q.  And how long did the probationary status
20 last for?
21   A.  I believe it's a year.
22   Q.  And when you were first hired on as a
23 probationary status officer, did you have a field
24 training officer?

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021                                                                                    Pages 18..21

Page 18

1    A.   I had a couple – a few, actually, yeah.
2    Q.   Okay.  Do you recall who your field
3  training officers were with the Joliet Police
4  Department after you were hired on April 14th of 2014?
5    A.   Yes.
6    Q.   Who were those people?
7    A.   The first one I had was Sherri Blackburn,
8  the second I had was Brian Matchiak, the third I
9  believe was Anthony Adams, and the fourth was Michael
10 Paulie.  I may have those two flip-flopped, but those
11 are the last two that I had.
12   Q.   Could you spell Brian's last name for me?
13   A.   M A T C H I A K.
14   Q.   And when you were first hired with the
15 Joliet Police Department, who was your direct
16 supervisor?
17   A.   As far as my chief?
18   Q.   Well, who did you report to on a daily
19 basis?
20   A.   Well, it varied.  It would depend on the
21 shift that I was working.  Like, when I started and I
22 was working with Sherri Blackburn, she was in NOPP, so
23 I believe that supervisor would have been Robert
24 Desiderio, but I can't recall have it changed.

Page 19

1    Q.   Did you ever report directly to Ed Grizzle?
2    A.   No, not that I remember.
3    Q.   How long did you have an FTO?  Was it the
4  entire probationary time or was there a smaller period
5  of time in which you had an FTO?
6    A.   No, it's a smaller period of time.
7    Q.   Do you recall how long that was?
8    A.   I think the group that I got hired with, we
9  got released in August of 2014.
10   Q.   Do you recall – Strike that.
11        You were hired with a group of officers in
12 April of 2014?
13   A.   Yes.
14   Q.   Do you recall which officers you were hired
15 with?
16   A.   Yes.
17   Q.   What are their names?
18   A.   I was hired with Stan Lowery (phonetic),
19 Luis Ayala, Tim Shaughnessy, Paul Schumann, and David
20 Gillespie.
21   Q.   After you were released from the FTO
22 program in August of 2014, what duties and
23 responsibilities did you assume?
24   A.   Patrol officer.

Page 20

1    Q.   And what were your duties and
2  responsibility as a patrol officer?
3    A.   That was patrolling whatever area I was
4  assigned to, answering my calls, proactively
5  patrolling.
6    Q.   How many areas is Joliet divided up in?
7    A.   There's – The east side has – the east
8  side has six areas plus a cover car, the central
9  district has six as well as a cover car, and then the
10 west side of Joliet, six as well plus a cover car.
11   Q.   Were you patrolling one particular area or
12 would you patrol all areas?
13   A.   When I was first off of FTO in August, I
14 was a relief car.  So that means I just was plugged in
15 wherever they needed an officer.  And then I believe
16 the beginning of 2015, I was assigned Sector 22 in the
17 central district.
18   Q.   Do you recall who your supervisor was in
19 August of 2014?
20   A.   No.
21   Q.   Did you receive – While you were a
22 probationary officer for the Joliet Police Department
23 in 2014, 2015, did you receive any additional
24 training?

Page 21

1    A.   There was a two-week period after we got
2  hired that we had to go through.  It was a classroom
3  setting just, kind of, to learn Joliet in and outs.  I
4  know we did a physical training, like a defensive
5  tactics training.  Obviously, we had to certify with
6  our duty weapons.  I mean, I could be missing, but
7  that's what I can recall.
8    Q.   Fair enough.  Is there an officer at the
9  Joliet Police Department that keeps track of all your
10 training?
11   A.   I believe so, yes.
12   Q.   Do you know who that is?
13   A.   I believe now it would be Sergeant Veronda.
14   Q.   Would it be fair to say that as far as you
15 know, all your training records are with that
16 sergeant?
17   A.   Yes.
18   Q.   Did you receive any – Strike that.
19        How did you become aware that you're no
20 longer a probationary officer through the City of
21 Joliet Police Department?
22   A.   It's your hire date.  I mean, I'm still
23 employed.  So the anniversary of your hire date is,
24 like, you know, you made it.

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021                                                                Pages 22..25

Page 22

1    Q.    Did you receive a notification from
2    someone?
3    A.    I didn't.
4    Q.    No one sent congratulations, you're now –
5    you passed probationary and now you're a full-time
6    officer?
7    A.    No.  I think just the group I was in, we
8    finally got a raise, so ...
9    Q.    Okay.  Since 2015, have you served as a
10   patrol officer the entire time?
11   A.    I have.
12   Q.    And who is your current supervisor?
13   A.    That would be Lieutenant Jose.
14   Q.    Can you spell Joe's last name?
15   A.    His first name is Andrew.
16   Q.    Okay.  Thank you.
17   A.    And his last name is Jose, J O S E.
18   Q.    Okay.  And when you were hired in 2015 as a
19   patrol officer, who was your supervisor at that time?
20   A.    In 2015?
21   Q.    Yes.
22   A.    Maybe Kevin LaBolle (phonetic).
23   Q.    Were you assigned in 2015 to a particular
24   shift or would that rotate?

Page 23

1    A.    No.  I was assigned to a particular shift.
2    Q.    What shift were you assigned to in 2015?
3    A.    I believe that was Night A and then I
4    worked 1900 to 0700 hours.
5    Q.    And how long did you remain on that shift,
6    approximately?
7    A.    Maybe till the end of 2018.
8    Q.    A lot of the events in describing your
9    complaint occurred in May or June of 2018; is that
10   fair?
11   A.    Yes.
12   Q.    At that time in May or June of 2018, what
13   shift were you on?
14   A.    I was on Night B.
15   Q.    And what is Night B?
16   A.    It's just the other shifts.  There's
17   four shifts.  It's Days A, Days B, Nights A, Nights B.
18   Q.    In shift Night B, when would you serve as a
19   patrol officer?
20   A.    The time?
21   Q.    Correct.
22   A.    I served from 1800 hours to 0600.
23   Q.    And in May or June of 2018, when you were
24   on the Night B shift, who was your supervisor?

Page 24

1    A.    That would have been either
2    Lieutenant Jeremy Harrison or Lieutenant Robert Brown.
3    Q.    Is Lieutenant Brown still with the Joliet
4    Police Department?
5    A.    He is.
6    Q.    When did you first meet Nick Crowley?
7    A.    Sometime in 2014.
8    Q.    Was he on the same shift as you?
9    A.    No.  The majority of 2014 I was in training
10   so I wasn't on one particular shift until I was
11   released in August.
12   Q.    I'm sorry.  Before I forget, have you had
13   any additional training in securing a warrant since
14   you started work for the Joliet Police Department?
15   A.    I did a – When I did a cross-training in
16   tact, I think I was shown how to write up a warrant.
17   If you ask me now how to do it, I don't know.
18   Q.    As your duties and responsibilities
19   of police officer, is securing warrants something you
20   typically don't do?
21   A.    Myself?
22   Q.    Yes.
23   A.    I – No.  I haven't – I don't secure – I
24   haven't secured a search warrant, if that's what

Page 25

1    you're asking me, as a patrol officer.
2    Q.    Have you ever worked in the investigations
3    unit?
4    A.    I have not.
5    Q.    Have you testified at criminal trials?
6    A.    Yes.  I had to think of that.  Yeah.
7    Q.    Okay.  About how many?
8    A.    Not many.
9    Q.    Would you say more than five?
10   A.    No.
11   Q.    Do you recall the last time you testified
12   at a criminal trial?
13   A.    I do.
14   Q.    When was that?
15   A.    2018.
16   Q.    Is that the Nick Crowley trial?
17   A.    Yes.
18   Q.    Okay.  As part of your duties and
19   responsibilities as an officer of the Joliet Police
20   Department, have you had an opportunity to testify at
21   a criminal trial?
22   A.    I can't – I don't think so.
23   Q.    Do you have any experience in working in –
24   within internal investigations while you've been

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 26..29

Page 26

1 employed for the City of Joliet?
2    A.   No.
3    Q.   Have you been trained on the Cellebrite
4 computer system?
5    A.   No.
6    Q.   Would you know how to operate the
7 Cellebrite computer system?
8    A.   No.
9    Q.   Are you familiar with the Lantern computer
10 system?
11    A.   I am not.
12    Q.   Have you heard of it before?
13    A.   Not until 2018.
14    Q.   Is it fair to say as your duties and
15 responsibilities as a patrol officer, you didn't have
16 occasion to operate the Cellebrite and Lantern system;
17 is that fair?
18    A.   Yes.
19    Q.   Have you ever had any experience of
20 downloading a phone as part of either the Cellebrite
21 or Lantern systems or part of any duty and
22 responsibility you may have had as a Joliet police
23 officer?
24    A.   No.

Page 27

1    Q.   When you first began your relationship with
2 Nick Crowley, what was his position?
3    A.   Patrol officer.
4    Q.   Is Nick Crowley still a patrol officer with
5 the Joliet Police Department?
6    A.   Yes.
7    Q.   Would it be fair to describe that you guys
8 were co-workers at the time?
9    A.   At what time?
10    Q.   When you first began dating.
11    A.   Yes.
12    Q.   And as of today, do you and Nick Crowley
13 both have the same position or rank?
14    A.   We do.
15    Q.   Was there a point in time that you and Nick
16 Crowley as part of your relation started to live
17 together?
18    A.   Yes.
19    Q.   Do you recall when that was, approximately?
20    A.   2015, 2016.
21    Q.   And where did you and Nick Crowley live
22 together, at what residence?
23    A.   The address on Mustang.
24    Q.   And that's the same address you currently

Page 28

1 reside in, correct?
2    A.   Yes.
3    Q.   Nick Crowley moved into your house?
4    A.   Yes.
5    Q.   I should clarify.  The residence on
6 Mustang, is that a house or an apartment?
7    A.   It's a townhouse.
8    Q.   And is that a townhouse you own or pay a
9 mortgage to?
10    A.   Yes.
11    Q.   At to the point in 2016, did you begin to
12 seek counseling or therapy related to relationship
13 issues with Nick Crowley?
14    A.   I wouldn't say it was a relationship issue,
15 but yes, I did.
16    Q.   How would you describe it?
17    MR. ADAMS:   Let me object to form.  You have
18 yet – It's pretty vague.
19    MR. CLARK:   Okay.
20 BY THE WITNESS:
21    A.   There was just – I just didn't – There –
22 Well, he had – He was divorced and I didn't know how
23 to navigate that being a single woman.
24    Q.   Who was Nick Crowley's ex-spouse?

Page 29

1    A.   Her name is Brittany.
2    Q.   Does she work at the Joliet Police
3 Department?
4    A.   No.
5    Q.   Did Nick Crowley have any children from
6 that marriage?
7    A.   Yes.
8    Q.   How many children did he have?
9    A.   Two.
10    Q.   How old are they right now?
11    A.   12 and 9.
12    Q.   Do they currently live with you as well?
13    A.   They do not.
14    Q.   In terms of starting counseling, was that
15 something you did on your own or is that something you
16 did with Nick or how did that come about?
17    A.   We did it together.
18    Q.   It was a couples therapy or did Nick see
19 one counselor and you saw another?
20    A.   No.  We both saw one.
21    Q.   And who was that counselor?
22    A.   Her name was Nicole Thompson.
23    Q.   And where was Nicole Thompson located?
24    A.   That office was in Plainfield, Illinois.

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 30..33

Page 30

1   Q.   Is that the first time you had seen a
2 counselor or therapist?
3   A.   No.
4   Q.   When was the first time you saw a counselor
5 or a therapist?
6   A.   When I was 17.
7   Q.   How old are you now?
8   A.   36.
9   Q.   Why did you see a counselor when you were
10 17?
11   A.   I was just having a little bit of trouble
12 with the fact that my father had passed away.
13   Q.   Do you recall the name of that therapist or
14 counselor?
15   A.   Dawn Valdez.
16   Q.   Do you remember where Dawn Valdez was
17 located or her offices?
18   A.   I don't believe she's in practice any
19 longer.
20   Q.   How long did you go to counseling or
21 therapy at that time when you were 17?
22   A.   I think I saw Dawn on and off until I was
23 maybe in my 20s.
24   Q.   Did you ever receive any type of

Page 31

1 psychological diagnosis at that time when you were 17?
2   A.   Not that I remember.
3   Q.   Were you taking any medications at that
4 time when you saw Dawn as a counselor when you were
5 17?
6   A.   No.
7   Q.   How often would you see Dawn when you were
8 at – when you were 17 or in your 20s?
9   A.   That was a long time ago. Like, I don't –
10 Maybe once every other week.
11   Q.   I think you indicated that you don't think
12 Dawn is in practice anymore, but do you recall where
13 her office was located?
14   A.   She – I know she moved a couple of times.
15 I think she was in – I think she was in Burr Ridge –
16 No. She was in Hinsdale, Oak Brook Terrace, maybe.
17 The last time I had communication with her, she was in
18 Joliet.
19   Q.   Do you recall if Dawn was part of a group
20 or organization? Hospital?
21   A.   Uh-uh.
22   Q.   Was she in practice by herself, do you
23 recall?
24   A.   I don't remember.

Page 32

1   Q.   Prior to 2016, before seeing Nicole
2 Thompson, other than Dawn, had you had any other
3 counseling or therapy?
4   A.   No.
5   Q.   How did you come to find out about Nicole
6 Thompson or how did you select her as a counselor?
7   A.   She was a Google search – I'm sorry. I
8 take that back. The practice was a Google search and
9 then the practice just placed us with Nicole for the
10 first opening.
11   Q.   How often would you see Nicole in 2016?
12   A.   I believe she was every other week too.
13   Q.   Every other week, was that also with Nick?
14   A.   Not all the time.
15   Q.   How often would Nick attend the counseling
16 sessions?
17   A.   I don't recall that.
18   Q.   Other than how to navigate issues with
19 Nick's divorce, what other issues did you cover
20 securing the sessions?
21   A.   Just – Just the issues that I still had
22 regarding my father and my brother.
23   Q.   What was the issue you had with your
24 brother?

Page 33

1   A.   My brother died in a car accident that I
2 was on-scene for.
3   Q.   And when did that occur?
4   A.   2012.
5   Q.   Did you see any counselor for your
6 brother's death after he died in 2012?
7   A.   I believe I saw Dawn, but I didn't – but
8 there wasn't – I saw Dawn once, I believe, and then I
9 went to a counselor that work had sent me to, the
10 Village had sent me to.
11   Q.   And at that time, that would have been
12 Manooka – I'm sorry – McCook?
13   A.   Yeah, uh-huh. Yes.
14   Q.   Was that part of, like, an employee
15 program, an EAP program?
16   A.   They didn't ask me to go to it, I asked to
17 go to it.
18   Q.   And do you know how often you went to the
19 program that you asked to go to in 2012?
20   A.   Just once. It wasn't a program.
21   Q.   In 2016 when you started to go to – Strike
22 that.
23      When – In 2016 when you went to see
24 Nicole, did you have any psychological diagnoses given

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 34..37

Page 34

1  at that time?
2      A.  I don't remember.
3      Q.  In 2016 when you started to see Nicole for
4  counseling, were you prescribed any medication?
5      A.  No.
6      Q.  In 2016 when you started to see – or when
7  you saw Nicole for counseling, do you recall if Nick
8  Crowley had any diagnosis given at that time?
9      A.  Not that I know.
10     Q.  Were there ever any issues of domestic
11  abuse discussed?
12     A.  No.
13     Q.  Prior to July 16th of 2017, did you
14  socialize with any other officers on the Joliet Police
15  Department?
16     A.  Can you ask that one more time, please?
17     Q.  Sure.  Prior to July 16th of 2017 or about
18  that time frame, did you have any friends that you
19  socialized with that worked for Joliet Police
20  Department?
21     A.  I'm sure.
22     Q.  Do you recall who those individuals would
23  have been?
24     A.  Are you asking about a specific date or are

Page 35

1  you asking about just in general?
2      Q.  We'll start with in general.  Who were your
3  friends on the department?
4      A.  Not many.  I go to work to work.
5      Q.  Fair enough.
6      A.  There wasn't a – I don't – I still don't
7  make it a point to socialize outside of work that
8  often with work people.
9      Q.  Do you have any friends on the Joliet
10  Police Department?
11     A.  As of right now?
12     Q.  Yeah.
13     A.  Yes.
14     Q.  Who are those people?
15     A.  I'm friends with Officer Wright,
16  Officer Michelle Banas, Officer Brandy Dalton.
17     Q.  Were you friends with those individuals in
18  2017 as well?
19     A.  No.
20     Q.  And when did you become friends with those
21  officers?
22     A.  Officer Banas and I became friends when I
23  crossed-trained in tact and Officer Wright and Officer
24  Dalton when I went to their – the shift that they

Page 36

1  were on.
2      Q.  And what – Approximately, what years or
3  dates would those have been?
4      A.  I think I did the – I think I did the tact
5  cross-training in 2017, and then 2018 is when I went
6  to the other shift.
7      Q.  Okay.  So – I'm sorry – in 2018 you
8  became friends with which officers?
9      A.  Officer Dalton and Officer Wright.
10     Q.  Prior to July of 2017, did you have
11  occasion to work with Ed Grizzle at all?
12     A.  Prior to what date?
13     Q.  July of 2017.
14     A.  Yes.
15     Q.  How often would you work with Ed Grizzle
16  prior to July of 2017?
17     A.  Not often.  No, not often now that I think
18  about it now.
19     Q.  Approximately, how many times did you work
20  with Ed Grizzle prior to July of 2017?
21     A.  I'd estimate maybe – I don't know.  I
22  don't know.  I don't know.  There's – There's a
23  department of almost 300.  Maybe four, five times.
24     Q.  Prior to July of 2017, based on those four

Page 37

1  or five times that you worked with Ed Grizzle, did you
2  have any opinion as far as what kind of police officer
3  he was?
4      A.  No.
5      Q.  Prior to July of 2017, did you feel like –
6  did you have an opinion that Ed Grizzle did his job in
7  a confident manner?
8      A.  I didn't have an opinion either way.
9      Q.  Do you recall those four or five times that
10  you worked with Ed Grizzle – do you recall any of the
11  specifics of those occasions?
12     A.  No.
13     Q.  Prior to July of 2017, outside of the
14  confines of those four or five times you worked with
15  Ed Grizzle, did you ever talk to Ed?
16     A.  Yes.
17     Q.  Were you friendly with Ed or how would you
18  describe the nature of your relationship with Ed
19  Grizzle before July of 2017?
20     A.  He was a sergeant so it was a supervisory
21  role.
22     Q.  Prior to July of 2017, did Ed Grizzle have
23  an opportunity to supervise you in any capacity?
24     A.  I would say over a training manner, yes.

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 38..41

Page 38

1    Q.  And is it your under- -- Strike that.
2        Did Ed Grizzle perform training duties for
3  the Joliet Police Department?
4    A.  He did.
5    Q.  What training duties did Ed Grizzle perform
6  that you attended?
7    A.  The defensive tactic, I don't know if
8  that's what he calls it or if it's called that, but
9  that portion of the training.
10   Q.  Prior to July of 2017, did you have any
11  opinions of how Ed Grizzle performed as a defensive
12  tactic supervisor?
13   A.  No.
14   Q.  Prior to July of 2017, did you socialize
15  with Maria Gatlin?
16   A.  Yes.
17   Q.  How long had you socialized or been friends
18  with Maria Gatlin prior to July of 2017?
19   A.  Maybe about 15 years.
20   Q.  And how did you know Maria Gatlin?
21   A.  She was a police officer in the town that I
22  grew up in.
23   Q.  Which town was that?
24   A.  Summit.

Page 39

1    Q.  How would you describe the nature of your
2  relationship prior to July of 2017 with Maria Gatlin?
3  Close friends? Talked on a weekly basis?
4    A.  We were close friends, but we didn't speak
5  weekly, no.
6    Q.  What happened on July 16, 2017, that caused
7  officers to come to your townhome?
8    A.  Nick and myself got into an argument.
9    Q.  Did you call the police?
10   A.  I did not, no.
11   Q.  Do you know who did?
12   A.  My mother called.
13   Q.  What's your mother's name?
14   A.  Patricia.
15   Q.  And what's Patricia's last name?
16   A.  Socha, S O C H A.
17   Q.  And do you know why Patricia Socha called
18  the police on July 16, 2017?
19   A.  I can't really answer for my mom.
20   Q.  Did you ever talk to your mom about why she
21  called the police on July 16, 2017?
22   A.  I'm sure at some point we had that
23  discussion, yeah.
24   Q.  Did you inform her about the domestic

Page 40

1  disturbance on that night?
2    A.  The argument that Nick and I had? Yes.
3    Q.  Do you recall what you told your mother
4  about the argument you and Nick had?
5    A.  I do not.
6    Q.  What happened -- When you say you had an
7  argument with Nick that night, what happened?
8    A.  We got into an argument.
9    Q.  Do you recall what it was about?
10   A.  I mean, it -- it was about a variety of
11  things, I'm assuming, but I can't recall specifics.
12   Q.  During the course of that argument, was
13  your TV broken?
14   A.  The TV was broken, yes.
15   Q.  During the course of the argument, was the
16  refrigerator broken?
17   A.  Yes.
18   Q.  Do you recall the argument? Was there
19  glass on the floor?
20   A.  I don't remember if there was glass on the
21  floor.
22   Q.  During the argument, did you hear a gun
23  fire?
24   A.  I heard something. I don't know if it was

Page 41

1  gunfire.
2    Q.  What did you hear?
3    A.  I don't remember. It was a while ago and
4  there was -- I was pretty intoxicated to go back that
5  far.
6    Q.  When you say you were "pretty intoxicated,"
7  do you mean while you were having an argument with
8  Nick, you were intoxicated at that time?
9    A.  Yes.
10   Q.  Was Nick Crowley intoxicated on July 16,
11  2017?
12   A.  I can't speak for somebody else's ...
13   Q.  The evening of July 16, 2017, prior to your
14  argument with Nick, had you been out to dinner or out
15  to a bar?
16   A.  We were out at a bar.
17   Q.  And that's where -- At the bar is where you
18  became intoxicated; is that fair to say?
19   A.  Sure.
20   Q.  Was Nick Crowley also drinking at the bar?
21   A.  I believe so.
22   Q.  Was anyone -- Strike that.
23    Do you recall which bar this was at?
24   A.  I don't.

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021 — Pages 42..45

Page 42

1     Q.   Do you recall if you were with anyone else
2 at that bar besides you and Nick?
3     A.   Yes.
4     Q.   Who were you there with?
5     A.   There were other co-workers at the bar.
6     Q.   Who were the other co-workers?
7     A.   I believe Officer Blackmore was there,
8 Officer Busse, Officer Emph --
9     Q.   What was the last one you said after Busse?
10     A.   Emph.
11     Q.   Can you spell that for me?
12     A.   Sure. E M P H.
13     Q.   I'm sorry. I didn't mean to cut you off.
14     A.   That's okay. I don't recall any --
15 anybody -- I don't remember who else was there. I'm
16 sorry.
17     Q.   That's fine. Are those officers friends of
18 Nick's?
19     A.   In what capacity? I mean, I don't -- I
20 mean ...
21     Q.   Well, before, you listed three officers to
22 me that you were friends with and you didn't include
23 any of those officers. So I guess I'm wondering, are
24 those officers friends of Nick's then?

Page 43

1     A.   I believe we all worked on the same shift
2 together, so it's not uncommon for people on the same
3 shift to go out as, like, a shift thing; and I believe
4 that's what that was that night. I mean, I don't --
5 you know.
6     Q.   Who are -- If you know, who are Nick
7 Crowley's friends on the Joliet Police Department?
8     A.   I don't -- I don't know. He'd have to
9 answer that for himself.
10     Q.   Do you know if Nick Crowley socializes with
11 anyone from the Joliet Police Department ever?
12     A.   As far as going out?
13     Q.   Sure.
14     A.   No.
15     Q.   And just to clarify, you don't know or he
16 doesn't, Nick Crowley does not go out with other
17 officers?
18     A.   He doesn't -- I mean, he doesn't go out. I
19 mean, we don't have the lifestyle to go out.
20     Q.   You weren't sure if you heard a shot. You
21 heard a noise, correct?
22     A.   Uh-huh, yes. Sorry.
23     Q.   And that back -- Before that evening on
24 July 16, 2017, do you recall if you had any bullets in

Page 44

1 your ceiling?
2     A.   The date was what again? I'm sorry.
3     Q.   July 16th of 2017, do you recall if you had
4 any bullets in your ceiling in your townhome?
5     A.   I don't believe I did.
6     Q.   After the evening of July 16, 2017, did you
7 become aware that you did have a bullet in your
8 ceiling?
9     A.   Yes.
10     Q.   That -- Strike that.
11     As a result of that evening, you're aware
12 that Nick Crowley was charged with reckless discharge
13 of a firearm; is that fair?
14     A.   Yes, he was charged.
15     Q.   And as a result of that evening's events,
16 you're aware that Nick Crowley was charged with
17 domestic battery with you as a victim; is that right?
18     A.   Yes.
19     Q.   During that argument, did you result with a
20 cut on your nose as a result of that argument?
21     A.   No.
22     Q.   As a result of that argument, did you have
23 a swelling and a cut under your right eye?
24     A.   No.

Page 45

1     Q.   As a result of that argument, do you recall
2 having swelling under your left eye?
3     A.   It wasn't a result of an argument, I was
4 bit by the dog.
5     Q.   On that evening, were your injuries
6 photographed?
7     A.   The evening of what -- What evening?
8     Q.   I'm sorry. On the evening of July 16,
9 2017, did you have those injuries photographed, do you
10 recall?
11     A.   Not on that evening, no.
12     Q.   Do you recall when you had photographs of
13 your injuries taken?
14     A.   The next day in the morning.
15     Q.   Do you recall who took them?
16     A.   No, I do not.
17     Q.   Do you recall telling any officer that your
18 injuries occurred during your altercation with Nick?
19     A.   No, I don't.
20     Q.   Do you recall talking with Officer Kazak
21 (phonetic) on the evening or this may be morning hours
22 of July 16, 2017?
23     A.   I know he was there, but I don't believe we
24 spoke.

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 46..49

Page 46

1    Q.   Do you recall Ed Grizzle being on the scene
2  that evening of July 16, 2017?
3    A.   Not on July 16th, no.
4    Q.   When did Ed – Strike that.
5         At some point in time, Ed Grizzle became
6  assigned to this case involving the altercation
7  between you and Nick?
8    A.   Yes.
9    Q.   Do you recall when that was?
10   A.   I believe it was the next day.
11   Q.   And how did you become aware that Ed
12 Grizzle had been assigned to the case involving Nick
13 Crowley?
14   A.   When I went to the police station.
15   Q.   When did you go to the police station?
16   A.   The next afternoon.
17   Q.   Why did you go to the police station the
18 next afternoon?
19   A.   I had to meet with internal affairs and
20 then I was to go see Grizzle when I was done with
21 internal affairs.
22   Q.   With respect to internal affairs, do you
23 recall who you met with?
24   A.   Marc Reid and Tad Jensen.

Page 47

1    Q.   Are you aware if an internal affairs
2  investigation occurred as a result of that incident?
3    A.   Can you ask that one more time?  I'm sorry.
4    Q.   Do you know if an internal affairs
5  investigation occurred as a result of your
6  conversation with Lieutenant Reid and the sergeant?
7    A.   An internal affairs investigation was
8  already underway prior to my conversation.
9    Q.   Nick Crowley was the subject of that
10 internal investigation?
11   A.   Yes.
12   Q.   Do you know what the results of that
13 internal investigation were?
14   A.   I don't, no.
15   Q.   Do you know if Nick Crowley has ever been
16 disciplined by the Joliet Police Department?
17   A.   He has.
18   Q.   Do you know when he was disciplined by the
19 Joliet Police Department?
20   A.   2018.
21   Q.   Do you know if Nick Crowley was disciplined
22 in 2018 as a result of an internal investigation in
23 which stemmed from your argument with Nick Crowley?
24   A.   I believe so.

Page 48

1    Q.   Do you know if he was suspended or what the
2  results of that internal investigation were?
3    A.   I believe he was suspended.
4    Q.   Do you recall how long Nick Crowley was
5  suspended for?
6    A.   No.
7    Q.   Do you recall if it was more or less than
8  30 days?
9    A.   I don't recall.
10   Q.   When – After an internal – After you met
11 with Lieutenant Reid in the internal affairs division,
12 I think you indicated you met with Ed Grizzle; is that
13 right?
14   A.   Yes.
15   Q.   And what did you and Ed Grizzle talk about
16 on July 17, 2017?
17   A.   I believe – I don't – I don't recall
18 really speaking to him much.  I think he did most of
19 the talking.
20   Q.   Do you recall what Ed Grizzle said to you
21 during that meeting?
22   A.   No.  I – No.  I believe he was speaking
23 about his dog and trying to relate something with his
24 dog, but that's all that I can remember.  I don't

Page 49

1  remember specifically.
2    Q.   Do you recall Ed Grizzie giving you any
3  opinions related to Nick Crowley during that meeting?
4    A.   No.
5    Q.   Do you recall if Ed Grizzle indicated that
6  he believed the charges to be true?
7    A.   I don't recall.
8    Q.   Was it your opinion that Ed Grizzle thought
9  the allegations – or the criminal charges to be true?
10   MR. ADAMS:  I'm going to object to lack of
11 foundation.
12 BY THE WITNESS:
13   A.   No.
14   Q.   I'm sorry.  You don't recall?
15   A.   You asked me if I had an opinion and I
16 don't have an opinion.
17   Q.   All right.  Fair enough.  During the course
18 of the investigation, did you have opportunities to
19 meet with Ed Grizzle again regarding the allegations
20 of the criminal charges filed against Nick Crowley?
21   A.   In the same setting that was – that we're
22 speaking about prior?
23   Q.   Yes.
24   A.   No.

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 50..53

Page 50

1   Q.   Well, let me – Okay. Let me ask it this
2  way: With respect to the argument between you and
3  Nick that occurred on July 16, 2017, you met with Ed
4  Grizzle the next day, correct?
5   A.   Yes.
6   Q.   Okay. And I believe the trial related to
7  Nick Crowley started in early May of 2018; is that
8  right?
9   A.   I believe so.
10   Q.   Between July 17th of 2017 and I believe you
11  testified on May 14th of 2018, how many times did you
12  speak with Ed Grizzle regarding the criminal charges
13  filed against Nick Crowley?
14   A.   I think we didn't speak about the charges
15  that were filed.
16   Q.   Okay. Let me clarify. Not to be
17  specifically related to the charges that were filed
18  necessarily, but did you have any conversations with
19  Ed Grizzle regarding Nick Crowley and the incident
20  that occurred on July 16, 2017?
21   A.   No.
22   Q.   So would it be fair to say that the one and
23  only time you met with Ed Grizzle to relate to what
24  occurred on the evening of July 16, 2017, was the next

Page 51

1  day?
2   A.   That's not what you asked originally, but
3  there was other – there was another time – well,
4  there was a couple different times, specifically that
5  I remember.
6   Q.   How many times were there with Ed Grizzle?
7   A.   When he served me with a subpoena for a
8  Grand Jury and then when he served the search warrant
9  for my cell phone.
10   Q.   Okay. So that makes sense that there was
11  three times that you talked with Ed Grizzle relating
12  to Nick Crowley – the day after the incident on
13  July 17th, the time that he served the subpoena for
14  the Grand Jury, and the time that he served the search
15  warrant for your phone – is that fair to say?
16   A.   That I can remember specifically, yes.
17   Q.   Do you recall having any conversations
18  between July 17, 2017, and May 14, 2018, with Ed
19  Grizzle in which he expressed an opinion as to the
20  guilt or innocence of Nick Crowley?
21   A.   Well, he did – he was at the house. I
22  take that back. He did come to the house afterwards.
23  I don't remember what day it was. He came back with
24  an evidence tech to my residence.

Page 52

1   Q.   At that time did he express an opinion as
2  to the guilt or innocence of Nick Crowley?
3   A.   I don't recall.
4   Q.   The evidence tech that came to your house
5  after the incident, was that to remove the bullet from
6  your ceiling in your townhouse?
7   A.   I believe so.
8   Q.   When Ed Grizzle came to your house with the
9  evidence technician to remove the bullet from the
10  ceiling in your townhouse, do you recall having any
11  conversations with Ed Grizzle at that time?
12   A.   I believe he told me the final charges.
13   Q.   With respect to the charges against Nick
14  Crowley, did you have an opinion as to whether or not
15  charged should have been filed?
16   A.   I did.
17   Q.   What was your opinion?
18   A.   They shouldn't have been filed.
19   Q.   Why did – Strike that.
20      Did you always have the opinion that
21  charged should not have been filed against Nick
22  Crowley?
23   A.   Always as of when?
24   Q.   Let's see. When Ed Grizzle told you what

Page 53

1  the final charges were filed against Nick Crowley, it
2  was your opinion that those charges should not have
3  been filed; is that fair to say?
4   A.   Yes.
5   Q.   Did that opinion ever change?
6   A.   No.
7   Q.   After Nick Crowley was arrested – Strike
8  that.
9      On July 16, 2017, you and Nick Crowley
10  lived together; is that fair to say?
11   A.   Yes.
12   Q.   Did anyone else live with you on July 16,
13  2017?
14   A.   No.
15   Q.   After Nick Crowley was arrested and charges
16  were filed against him, where did Nick Crowley live
17  after that?
18   A.   He lived with his mother.
19   Q.   What's Nick Crowley's mother's name?
20   A.   Cynthia Crowley.
21   Q.   And where does Cynthia Crowley live?
22   A.   Grant Park, Illinois.
23   Q.   And I should clarify. Is that where
24  Cynthia Crowley lived on or about July 16th of 2017?

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 54..57

Page 54

1   A.   Yes.
2   Q.   Does Cynthia Crowley still live there
3   today?
4   A.   She does.
5   Q.   Who else lives with Cynthia Crowley?
6   A.   Her husband.
7   Q.   Is that Nick's dad?
8   A.   It is.
9   Q.   And what's his name?
10  A.   Robert.
11  Q.   And when did Nick Crowley live with Cynthia
12  and Robert Crowley in 2017?
13  A.   When did he live?
14  Q.   Strike that.  Yeah, bad question, my fault.
15       Between July 16th of 2017 and Nick
16  Crowley's trial which began on or around, let's say,
17  May 13, 2018, did Nick Crowley live with his parents?
18  A.   He did.
19  Q.   Between July 16th of 2017 and May 13th of
20  2018, did Nick Crowley ever reside with you?
21  A.   No.
22  Q.   Was there a no contact order in place
23  between you and Nick Crowley at that time or order of
24  protection?

Page 55

1   A.   No.
2   Q.   Why did Nick Crowley live with his parents
3   during the time frame of July 16, 2017, until May 13th
4   of 2018?
5       MR. ADAMS:  Object to lack –
6   BY THE WITNESS:
7   A.   I take that back.
8   Q.   Okay.  What do you take back?
9   A.   No.  We – No, he couldn't – we couldn't
10  reside together, but there was – we could speak.  I'm
11  sorry.  I needed to clarify that.
12  Q.   Fair enough.  When you say you "couldn't
13  reside together," why could you not reside together?
14  A.   That's what the judge had ordered when a
15  motion was brought up.
16  Q.   And then you indicated that you could speak
17  to Nick Crowley; is that right?
18  A.   Can ask you that one more time?  I'm sorry.
19  Q.   Sure.  Between July 16th of 2017 and
20  May 13th of 2018, the judge ordered that you could not
21  reside together, but you were allowed to speak to Nick
22  Crowley; is that right?
23  A.   Yes.
24  Q.   How often would you and Nick Crowley speak

Page 56

1   during the time frame of July 16, 2017, through
2   May 13th of 2018?
3   A.   Daily.
4   Q.   Would you see each other in person?
5   A.   Yes.
6   Q.   How often would you and Nick Crowley see
7   each other in person between July 16, 2017, and
8   May 13, 2018?
9   A.   Maybe a couple times a week.
10  Q.   During that time frame between July 16th of
11  2017 and May 13th of 2018, did you and Nick Crowley
12  ever discuss Ed Grizzle?
13  A.   Not that I recall.
14  Q.   Between July 16th of 2017 and May 13, 2018,
15  did you ever express opinions regarding the nature of
16  the investigation or criminal charges filed against
17  Nick Crowley?
18  A.   I may have, but I don't recall.
19  Q.   It's fair to say, though, you thought the
20  charges shouldn't be brought, right?
21  A.   Say that one more time, sir.
22  Q.   It's fair to say that you thought the
23  charges shouldn't have been brought?
24       MR. ADAMS:  Objection, asked and answered.

Page 57

1   BY THE WITNESS:
2   A.   Yes.
3   Q.   I'm sorry.  I didn't hear you.
4   A.   I said yes.  I'm sorry.
5   Q.   Okay.  After Nick Crowley was arrested on
6   July 16, 2017, did you ever have conversations with
7   Maria Gatlin?
8   A.   Yes.
9   Q.   How often did you and Maria Gatlin have
10  conversations after Nick was arrested on July 16,
11  2017?
12  A.   Not often.
13  Q.   Between July 16, 2017, and May 13, 2018,
14  would you say that you had more or less than
15  five conversations with Maria Gatlin?
16  A.   I don't think I could put a number on that,
17  sir.  Maybe five, maybe more than five.
18  Q.   Between July 16, 2017, and May 13, 2018,
19  would you and Maria Gatlin ever text each other?
20  A.   We could have text, yes.
21  Q.   Do you recall doing so?
22  A.   Yes.
23  Q.   Between July 16th of 2017 and May 13th of
24  2018, would you and Maria Gatlin ever exchange

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 58..61

Page 58

1 photographs?
2      A.   In between that time period?
3      Q.   Yes.
4      A.   We could have, but I don't remember.
5      MR. CLARK: Okay. I think that –
6 BY THE WITNESS:
7      A.   Can I –
8      MR. CLARK: (Continuing.) – I am going to change
9 topics, so maybe this will be a good time for a
10 five-minute break.
11 BY MR. CLARK:
12     Q.   I'm sorry. Ms. Socha, you were going to
13 say something?
14     A.   Yes. I was just going to ask for a break
15 because I have to nurse my son, if you don't mind.
16     Q.   Sure. How long do you need for that?
17     A.   Maybe about ten minutes. Is that okay?
18     Q.   Yep.
19     A.   Okay.
20     MR. CLARK: We will shoot for being back on the
21 record at about 11:26.
22           (A short recess was taken.)
23 BY MR. CLARK:
24     Q.   Okay. Ms. Socha, prior to the criminal

Page 59

1 trial of Nick Crowley, did you ever share the opinion
2 with anyone that Nick Crowley should not have been
3 charged?
4      A.   Not that I remember.
5      Q.   On the evening of July 16, 2017, or the
6 next day, did you discuss the events and incidents
7 with Maria Gatlin?
8      A.   Can you give me the date that you asked for
9 about again?
10     Q.   Sure. Let me strike that.
11          Did you ever discuss with Maria Gatlin the
12 incident that occurred on July 16, 2017?
13     A.   Yes.
14     Q.   When did you have that conversation or
15 discussion with Maria Gatlin?
16     A.   The morning.
17     Q.   That would be July 17th?
18     A.   Yes.
19     Q.   And what did you tell Maria Gatlin that had
20 occurred on the evening of July 16, 2017?
21     A.   I don't recall specifics, but I know that I
22 told her that Nick and I had gotten into an argument.
23     Q.   Prior to – Strike that.
24          After that morning, July 17, 2017, did you

Page 60

1 have any other discussions with Maria Gatlin about the
2 incidents that occurred on July 16, 2017, with the
3 argument involving Nick Crowley?
4      A.   You're asking after that morning? I'm
5 sorry.
6      Q.   Yes.
7      A.   Possibly, but I don't remember when.
8      Q.   Prior to the trial of Nick Crowley, did you
9 know if Maria Gatlin was going to be a witness?
10     A.   No.
11     Q.   When did you find out that Maria Gatlin was
12 going to be a witness at the trial of Nick Crowley?
13     A.   When I saw her at the Grand Jury.
14     Q.   When was the Grand Jury, do you recall?
15     A.   I don't recall.
16     Q.   How long after the incident on July 16,
17 2017, was the Grand Jury? A month? Two months,
18 approximately?
19     A.   I don't – I don't remember.
20     Q.   When you saw Maria Gatlin at the Grand
21 Jury, did you have any conversation with her about the
22 incident that occurred on July 16, 2017?
23     A.   I don't believe so.
24     Q.   Prior to the trial of Nick Crowley, did you

Page 61

1 have any conversation with Nick Crowley's attorney,
2 the criminal defense attorney?
3      A.   I don't recall.
4      Q.   Do you recall who Nick Crowley's criminal
5 defense attorney was?
6      A.   Tomczak.
7      Q.   Do you recall conversations with Tomczak
8 after the criminal trial, after Nick Crowley was
9 acquitted, that your testimony had been helpful?
10     A.   I don't recall that specifically, no.
11     Q.   Do you recall Nick Crowley's criminal
12 defense attorney Tomczak ever speaking to you about
13 the merits or if your testimony was favorable for the
14 defense or the acquittal of his client?
15     A.   I don't recall that conversation, no.
16     Q.   Prior to the criminal trial – Strike that.
17          Nick Crowley's criminal trial was started
18 on or around May 13, 2018; is that fair?
19     A.   Okay. Sure.
20     Q.   Do you recall that you testified at that
21 criminal trial, yes?
22     A.   Yes.
23     Q.   And according to the complaint, you
24 testified on May 14, 2018; is that fair to say?

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 62..65

Page 62

1   A.  According to the complaint? I'm sorry.
2   Q.  Yeah.
3   A.  Okay. Yes.
4   Q.  Do you know if you were the first witness
5 to testify at the criminal trial?
6   A.  I believe I was.
7   Q.  Do you know who else testified at the
8 criminal trial?
9   A.  I believe there were officers that
10 testified. I know Maria Gatlin testified. I can't
11 remember who else.
12   Q.  Did you know the substance of what Maria
13 Gatlin was going to testify at the trial of Nick
14 Crowley?
15   A.  No.
16   Q.  Did you at some point in time learn whether
17 or not Maria Gatlin's testimony was helpful or harmful
18 to Nick Crowley's case?
19   A.  No.
20   Q.  Did you ever know which day Maria Gatlin
21 testified during the criminal trial? For example, did
22 you know she testified the day after you?
23   A.  No. Do you mean do I know it now? Is that
24 what you're asking?

Page 63

1   Q.  At the time.
2   A.  No.
3   Q.  During the criminal trial of Nick Crowley,
4 do you recall having any conversations with Ed
5 Grizzle?
6   A.  No.
7   Q.  During the course of the trial, do you
8 recall sending Maria Gatlin a text?
9   A.  Once the trial was concluded, I did, yes.
10   Q.  Do you recall - So you don't recall
11 sending a text to Maria Gatlin during the course of
12 the trial itself?
13   A.  The trial as far as I'm concerned was
14 concluded, testimonies were complete.
15   MR. ADAMS: Matt, if you want my guidance on
16 this, I'm happy to share it, but I don't want to –
17   MR. CLARK: No, go ahead.
18   MR. ADAMS: You know, the judge took the matter
19 under advisement for a period of several days before
20 ruling and I think that's what Cassie refers to here.
21 The evidence had closed, but the judge hadn't
22 announced his verdict.
23   MR. CLARK: Okay. Very good. Thank you.
24 BY MR. CLARK:

Page 64

1   Q.  And it's your understanding that the judge
2 announced his verdict on May 22, 2018, right?
3   A.  I don't remember the specific date, but if
4 you're saying that's that it, okay.
5   Q.  If your complaint says in this federal
6 lawsuit that the verdict was announced on May 22,
7 2018, you wouldn't dispute that; is that fair?
8   A.  The complaint that my attorney prepared?
9 Yes.
10   Q.  Do you recall sending Maria Gatlin a text
11 on May 16, 2018?
12   A.  Yes.
13   Q.  Do you recall what the text read or said?
14   A.  I don't.
15   Q.  I believe the text read as follows, it's a
16 long paragraph, so just allow me: I think it's safe
17 to say at this point I have seen your true colors and
18 who are as a human being. I use that term loosely. I
19 also use the term mother loosely when I talk about
20 you. At one point maybe I did speak of you that way,
21 but my God now I know why your own kids don't now
22 besides Josh, but that's probably only we see you but
23 literally bailed that criminal out of jail and used
24 your police influence to help him out up to and

Page 65

1 committing a burglary to help him. I am sure that he
2 can testify to that. Wow. If you are charged, that
3 would be a felony. I forgot about the insurance
4 fraud. What happened to the (inaudible) Intrepid
5 again? Stolen, right? Or did Dave Kline get rid of
6 it for you? How much did insurance pay out again?
7 Poor (inaudible). My goodness, that poor kid. He
8 would have had a better life in a fucking foster home
9 than being with you dysfunctional animals. All he was
10 a paycheck and mixed kid you and Bruce could never
11 have. It clearly has shown throughout that poor kid
12 was a burden to you both, but quick to use him when
13 you didn't get your way during scheduling at the
14 station. You're a fucking scammer and a joke. Didn't
15 you ever think all your female problems was a sign
16 telling you you were unfit to be a mother? No doubt I
17 believe all the shit you said your older son would say
18 about you. Your own husband and his family hated your
19 child, but you chose to stand by him. Kind of gross
20 if you ask me. I mean, I've never given birth to a
21 child, but I know I wouldn't choose a dude over my
22 spawn. Looking back concurrently, you're nothing but
23 miserable, miserable in every aspect of your life down
24 to your neighbors who fucking hate you. Gee, it was

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 66..69

Page 66

1  never you, always them.  Again, I wondered why no one
2  from Summit gave a fuck about you when you got fired,
3  but I don't know – I did know.  Now, having read that
4  text, is that the text you authored?
5      A.  Yes.
6      Q.  And do you recall why you sent that to
7  Maria Gatlin?
8      A.  That text message wasn't supposed to be
9  sent.  It actually wasn't even finished and it was a
10  way for me to just get out the disappointment and the
11  hurt that I felt for Maria from breaking a confidence
12  in our friendship that we had.
13      Q.  What confidence did Maria break?
14      A.  It was just I called her as a friend and I
15  called her because I was upset about an argument that
16  Nick and I had had and she broke that confidence.  I
17  wasn't calling her to do anything but just be my
18  friend.
19      Q.  Do you think she was concerned about your
20  well-being as your friend?
21      A.  No.
22      Q.  Why not?
23      MR. ADAMS:  I'm going to object to lack of
24  foundation.  You're asking this witness someone else's

Page 67

1  state of mind.
2      MR. CLARK:  Fair enough.
3  BY MR. CLARK:
4      Q.  Did Maria ever indicate to you why she
5  testified in the manner that she did?
6      A.  I haven't spoken to Maria so I don't know.
7      Q.  When is the last time you spoke to Maria?
8      A.  Probably the day of the Grand Jury when she
9  said – when there was niceties exchanged.
10      Q.  Was this text that I just read the last
11  communication that you had with Maria?
12      A.  Yes.
13      Q.  Did Maria respond to this text?
14      A.  No.
15      Q.  What part of the text did you not complete?
16      A.  The text wasn't complete.  It wasn't – I
17  mean, it cut off at the end where your – I don't
18  recall what I was going to say after that, but I know
19  that I wasn't finished with the text when I – when it
20  was sent.
21      Q.  You sent this text, right?
22      A.  Inadvertently, yes.  It wasn't meant to be
23  sent.
24      Q.  You typed it in your phone?

Page 68

1      A.  I did.
2      Q.  You typed in the contact of Maria or
3  Maria's phone number?
4      A.  I did.
5      Q.  You typed it on the phone with the phone
6  number (708) 717-3652?
7      A.  I did.
8      Q.  And you knew she was a witness at least via
9  the Grand Jury, right?
10      A.  Yes.
11      Q.  In that text, you accuse her of a felony?
12      A.  It's what she had done, yes.
13      Q.  In that text, you accuse her of insurance
14  fraud?
15      A.  It's what happened, yes.
16      Q.  When you say you "inadvertently" sent it,
17  what do you mean by that?
18      A.  Well, I hit the send button when I was
19  still typing.
20      Q.  Do you know if Maria was upset by that text
21  message?
22      MR. ADAMS:  Object to lack of foundation.
23  BY THE WITNESS:
24      A.  I don't.

Page 69

1      Q.  Do you know who Maria shared that text
2  with?
3      MR. ADAMS:  Object, lack of foundation.
4  BY THE WITNESS:
5      A.  I do not.
6      Q.  Do you know if Maria shared that text with
7  a prosecutor, Lorinda Lamken?
8      A.  Well, I do now as far as – since the
9  complaint has been drawn up by my attorney, yes.
10      Q.  When was the first time you learned that
11  Maria had spoke to Prosecutor Lorinda Lamken?
12      A.  When the discovery was released.
13      Q.  And when you say "when the discovery was
14  released," you mean the discovery in this present
15  lawsuit that you filed?
16      A.  Yes.
17      Q.  Do you know about any conversations that
18  Lorinda Lamken would have had with Ed Grizzle?
19      A.  Just from discovery.
20      Q.  And, again, just to clarify, you mean
21  discovery from the litigation that you filed here in
22  federal court?
23      A.  That my attorney had filed on by behalf,
24  yes.

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 70..73

1   Q.  Are you aware of any conversations Ed
2 Grizzle had with any judge in securing a warrant with
3 your home?
4   A.  Again, just from discovery.
5   Q.  And, again, just to clarify, discovery from
6 this litigation, correct?
7   A.  Yes.
8   Q.  Are you aware of any conversations that Ed
9 Grizzle had with Appellate Prosecutor Lorinda Lamken
10 with the securing of a warrant?
11   A.  Just from this discovery in this
12 litigation.
13   Q.  Are you aware of any conversations or
14 information that Ed Grizzle provided to any judge in
15 securing the warrant?
16   A.  Can ask you that again?
17   Q.  Sure. Are you aware of any conversations
18 or testimony or information that Ed Grizzle provided
19 to any judge with respect to the issuance of the
20 search warrant of your phone?
21   A.  Again, I would just have to go back to the
22 discovery in this litigation.
23   Q.  It would be fair to say that prior to
24 filing your federal lawsuit, you had no idea what

1 occurred or what was said in terms to any judge in
2 order to obtain a search warrant for your personal
3 phone?
4   A.  I never saw the affidavit for the search
5 warrant, I saw just the search warrant the day that
6 Grizzle served it. So I wouldn't know what it said.
7   Q.  I know you didn't know what the affidavit
8 said, but no one told you what was provided or what
9 information was provided to any judge; is that fair?
10   A.  No.
11   Q.  Okay. Did someone tell you what
12 information was provided to the judge to secure the
13 search warrant prior to the filing of this lawsuit?
14   A.  No, I don't know how I would know that
15 anyway.
16   Q.  Well, for example, have you had any
17 conversations with Lorinda Lamken about what Ed
18 Grizzle said in securing the search warrant of your
19 personal phone?
20   A.  Have I had conversations with her?
21   Q.  Yes.
22   A.  No.
23   Q.  Have you had conversations with Maria
24 Gatlin about what Ed Grizzle and she may have talked

1 about just prior to obtaining the search warrant for
2 your personal phone?
3   A.  No.
4   Q.  Have you had any conversations with Ken
5 Gray about what Ed Grizzle may or may not have told a
6 judge in securing a search warrant for your personal
7 phone?
8   A.  No.
9   Q.  Have you spoken to Judge Carlson – I'm
10 sorry. Strike that.
11   Yeah, have you had any conversations with
12 Judge Carlson about any conversations that Ed Grizzle
13 and he may have had in securing a search warrant for
14 your personal cell phone?
15   A.  No.
16   Q.  Have you had any conversations with
17 Judge Sarah Jones as to what Ed Grizzle said to her
18 prior to her signing a search warrant for your
19 personal phone?
20   A.  No.
21   Q.  Outside of the confines of the discovery in
22 this lawsuit, do you have any knowledge to date what
23 Ed Grizzle said to anyone in order to secure the
24 search warrant for your personal cell phone?

1   A.  No.
2   Q.  After Nick Crowley was acquitted on
3 May 22nd, did Nick Crowley then resume living at your
4 residence?
5   A.  Yes.
6   Q.  Did you and Nick Crowley have any
7 conversations about – at that time about Ed Grizzle
8 and his involvement in the criminal trial of Nick
9 Crowley?
10   A.  Maybe, but I don't recall.
11   Q.  Did Nick Crowley share with you at that
12 time any opinions about Ed Grizzle and his involvement
13 in his criminal trial?
14   A.  Not that I recall.
15   Q.  Did you have any opinions at that time
16 after Nick Crowley's acquittal on May 22, 2018, as to
17 Ed Grizzle's involvement with Nick Crowley's criminal
18 trial?
19   A.  I could have, but I don't remember what
20 they would have been.
21   Q.  As we sit here today, do you have an
22 opinion as to Ed Grizzle's involvement with Nick
23 Crowley's criminal trial?
24   A.  Maybe.

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 74..77

Page 74

1    Q.   What opinion may those be?
2    A.   That he was going a little above and
3    beyond.
4    Q.   How so?
5    A.   As far as obtaining a search warrant for my
6    cell phone.
7    Q.   Anything else?
8    A.   No.
9    Q.   During the criminal trial of Nick Crowley
10   prior to his acquittal, did you have any conversations
11   with Ed Grizzle about Nick Crowley's criminal trial?
12   A.   No.
13   Q.   Prior to the search warrant – Strike that.
14       Prior to Ed Grizzle providing you with a
15   search warrant, were you aware of private images on
16   your cell phone?  And by private images, I think we've
17   been using that term to mean any private images which
18   include naked – or any photos of yourself, Nick
19   Crowley, and any videos that the two of you may have
20   engaged in any sex acts.
21   A.   Yes.
22   Q.   Prior to Sergeant Grizzle providing you
23   with a copy of the search warrant, had you shared –
24   or strike that – was anyone else aware of the private

Page 75

1    images on your phone?
2    MR. ADAMS:  Let me object to the form.  Are you
3    including or not including Crowley?
4    MR. CLARK:  Including Crowley.  I can reask it.
5    BY MR. CLARK:
6    Q.   Outside of yourself and Nick Crowley, prior
7    to Sergeant Grizzle providing you with the search
8    warrant, was anyone else besides yourself and Nick
9    Crowley aware of the private images on your phone?
10   A.   No.
11   Q.   It would be fair to say then that prior to
12   Detective Grizzle – I'm sorry – Sergeant Ed Grizzle
13   preparing the search warrant, Sergeant Grizzle was
14   unaware of any private images on your cell?
15   A.   Right.
16   MR. CLARK:  Lisa, can you mark as Defendant
17   Exhibit 1 the search warrant and screen share that?
18       (Screen share of Exhibit No 1.)
19   BY MR. CLARK:
20   Q.   Officer Socha, if I can have you look at
21   that search warrant, there should be three pages.
22   A.   Uh-huh.
23   MR. CLARK:  And, Lisa, can she scroll down or do
24   you need to do that?

Page 76

1    THE COURT REPORTER:  I think I do.
2       (Discussion off the record.)
3    BY MR. CLARK:
4    Q.   I'm going to ask you, is this the – what
5    Sergeant Grizzle gave to you?  I'll just lead with the
6    answer that Exhibit 1 is Exhibit A to your complaint,
7    anticipate what this is, but I'll let you take a look
8    and answer the question.
9    A.   Okay.
10      (Witness peruses document.)
11   MR. CLARK:  Lisa, if I can have you go up to
12   maybe the second page.
13   BY MR. CLARK:
14   Q.   Okay.  Ms. Socha, the phone number that you
15   can read in Exhibit 1 in paragraph, I guess it's A1,
16   (708) 717-3652, that was your phone?
17   A.   Yes.
18   Q.   Do you still have that phone?
19   A.   The phone number?
20   Q.   Well, let's start with the phone.  Do you
21   still have that same phone?
22   A.   I do have the phone, yeah.
23   Q.   And do you still use that phone as part of
24   your normal daily routine or are you just saying for

Page 77

1    the lawsuit?
2    A.   I do not.
3    Q.   And do you still have the same cell phone
4    number?
5    A.   I do.
6    Q.   Have you transferred the contents of what
7    was on the iPhone rose gold to your current phone?
8    A.   I believe – I don't know if it all – if
9    it's all transferred over.  This is, I think, my
10   second or third phone since this iPhone.  Apple has a
11   great way of making it so you have to get a new phone,
12   like, every year.  So I know this is, like, my second
13   or third phone since that rose gold phone.
14   Q.   The private images that are at issue in
15   this case, are they on your current phone as well?
16   A.   I believe some are, yes.
17   Q.   With respect to Exhibit No. 1, do you
18   recall this being the search warrant that
19   Sergeant Grizzle provided you on May 18, 2018?
20   A.   I believe it is, yes.
21   Q.   Is there something about this search
22   warrant that you believe to be false?
23   A.   I'm sure we can go in the whole harassment
24   and intimidation part.

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 78..81

Page 78

1    Q.   Anything else?
2    A.   I mean, just looking, nothing with the body
3    of it here, but they're -- I mean, they're looking for
4    a text message that they already were in possession
5    of, so ...  And why are they going through all of the
6    contents of my phone for a text message that was
7    already obtained?
8    Q.   And when you say that there's nothing in
9    the body of this document that says that, it's just
10   your own speculation why did they need to do this; is
11   that fair?
12   MR. ADAMS:  I'll object to the form, specifically
13   to the use of the word speculation.
14   BY MR. CLARK:
15   Q.   Is it your opinion that they did not need
16   your phone because they already had the text message;
17   is that correct?
18   A.   Correct.
19   Q.   You were present during Officer German's
20   deposition, yes?
21   A.   I was.
22   Q.   Did you hear his testimony as to why both
23   phones were needed?
24   A.   I mean, I was on mute and I was still

Page 79

1    dealing with the kids in the house, so I wasn't
2    really -- Can you refresh my memory as to why, or no?
3    Q.   Yeah.  Do you think -- Do you recall
4    Officer German testifying that the need for both
5    phones is because text messages can be made up from
6    sender to sender, right?
7    A.   Oh, I understand that.  Okay.  I can gather
8    that, yes.
9    Q.   So do you think it's reasonable then that
10   both phones are secured to make sure that the text
11   message went from one phone to another?
12   A.   No.
13   Q.   Why not?
14   A.   Well, if I'm going off of the discovery,
15   there was already -- Maria had already given the text
16   message and they had already had Maria's cell phone
17   and so they grabbed it from her cell phone that came
18   from my telephone number.  So I understand when you're
19   saying that messages could be made up, but that's not
20   what I believe happened in this case.
21   Q.   Okay.  When you said you take offense with
22   harassment via electronic communications and
23   intimidation, what you mean is that you don't believe
24   what you did constitutes harassment via electronic

Page 80

1    communications or intimidation; is that fair to say?
2    A.   Right, there was no intent.
3    Q.   Any other reason you believe that phrase to
4    be substantially false or incomplete?
5    A.   Can you repeat that one more time, please?
6    Q.   Sure.  Any other reason you believe that
7    phrase, harassment via electronic communications or
8    intimidation, can be substantially false or
9    incomplete?
10   MR. ADAMS:  I'll object to the lack of
11   foundation.  In this context, you're asking for a
12   legal conclusion.
13   BY MR. CLARK:
14   A.   You can answer.
15   A.   In my -- In this case, in my opinion, no,
16   there was no intent on harassment or intimidation.
17   Q.   Do you recall when Sergeant Grizzie served
18   this search warrant to you?
19   A.   I do.
20   Q.   It was on May 18, 2018?
21   A.   If that's the date signed, yes, uh-huh.
22   Q.   Where were you located at the time?
23   A.   I was in the police station.
24   Q.   Were you on duty?

Page 81

1    A.   I was.
2    Q.   Do you recall what time that occurred?
3    A.   It was probably right after roll call.  I
4    was called back into the station.
5    Q.   And when you said you were "called back
6    into the station," that was -- how were you called
7    back into the station?
8    A.   A co-worker came and knocked on my squad
9    car window and stated that the lieutenant needed to
10   see me.
11   Q.   Do you recall which co-worker?
12   A.   It was Officer Dalton.
13   Q.   And by "lieutenant," do you mean
14   Lieutenant Brown?
15   A.   I do.
16   Q.   Was Lieutenant Brown your supervisor at the
17   time?
18   A.   Like I said, it was either Lieutenant Brown
19   or Lieutenant Harrison.
20   Q.   Where was your squad car parked at the time
21   or located at the time?
22   A.   On the street in front of the employee
23   entrance.
24   Q.   So you just had to walk back into the

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 82..85

Page 82

1 station; is that fair?
2    A. I had to walk back in, right.
3    Q. And where did you go?
4    A. I went into the watch commander's office
5 where I was led into a conference room.
6    Q. Who else was present?
7    A. When I -- Lieutenant Brown walked me in and
8 then Grizzle was in the conference room sitting at
9 a -- on a chair.
10    Q. Was anyone else present?
11    A. No.
12    Q. And what did Sergeant Grizzle say to you?
13    A. He didn't say anything. He slid over the
14 pieces of paper that had the warrant on them.
15    Q. Did you read the warrant at that time?
16    A. Briefly.
17    Q. And what did you say to Sergeant Grizzle?
18    A. I don't recall specifics, but I believe he
19 stated he needed my cell phone after that.
20    Q. Did you provide Sergeant Grizzle with the
21 cell phone?
22    A. Not immediately, but I did, yes.
23    Q. Between the time you provided
24 Sergeant Grizzle with your cell phone and not

Page 83

1 immediately, did the two of you have conversations
2 with it?
3    A. I asked him what he -- what it was the
4 search warrant was in relation to and he told me that
5 if he wanted to -- if I wanted to speak to him, I had
6 to go to investigations.
7    Q. Did Sergeant Grizzle say anything else?
8    A. He told me that he needed my cell phone and
9 then I asked for what and he said I had to go to
10 investigations if I wanted to know for what.
11    Q. Did Lieutenant Brown say anything during
12 this visit?
13    A. He asked to see the search warrant, I
14 believe, and then he looked at it and he said it's a
15 valid search warrant and that I had to give my phone
16 up.
17    Q. Did you say anything to Lieutenant Brown
18 about that?
19    A. I told him that I didn't trust Grizzle,
20 that I know that what they were going to do with my
21 cell phone when they took it upstairs, that Grizzle
22 had -- I believe this was the day that I came back to
23 work and that he had ample time to come and serve me
24 with a search warrant at my home instead of again

Page 84

1 parading me in front of my peers and embarrassing me
2 yet again with this. And that's how that went.
3    Q. When you say "yet again," what do you mean?
4 Had Grizzle embarrassed you in front of your peers
5 previously?
6    A. Yes, when he served me with the warrant --
7 I'm sorry -- not with the warrant, with the subpoena
8 with Grand Jury. I again was called out of roll call,
9 paraded in front of my superiors, my bosses, and the
10 room right outside of the watch commander's office
11 and served with a subpoena to go testify. And again,
12 he had ample opportunity when he served other
13 people -- others at their home the search warrant and
14 he couldn't -- or I'm sorry -- not the search warrant,
15 but the subpoena, but he chose to do it both of these
16 when I was at work in my work capacity.
17    Q. Do you know if it is Joliet Police
18 Department custom and practice to serve warrants at
19 Joliet police officers at work?
20    A. I mean, I don't know.
21    Q. Do you know of other Joliet police officers
22 that have been served with subpoenas to testify at
23 Grand Jury that received that warrant -- that subpoena
24 at their homes?

Page 85

1    A. Other Joliet Police Department members?
2    Q. Yes.
3    A. I don't know.
4    Q. Do you know of other Joliet Police
5 Department officers that have received a search
6 warrant for their own personal items at their home?
7    A. I don't know.
8    Q. Other than the serving of the subpoena for
9 the Grand Jury when you said Grizzle yet again
10 embarrassed you in front your peers, were there any
11 other incidents that Grizzle had embarrassed you in
12 front of peers?
13    A. It was the time with the search warrant and
14 then the subpoena for Grand Jury.
15    Q. Fair to say those are the only two times?
16    A. Yes.
17    Q. You indicated that you didn't trust Grizzle
18 when you spoke earlier. Why did you not trust
19 Grizzle?
20    A. Because I knew what was on my cell phone, I
21 knew what happens up in investigations when they dump
22 phones.
23    Q. You said before, though, Grizzle didn't
24 know that you had any private images on your phone

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 86..89

Page 86

1 when he served the search warrant, true?
2    A. True.
3    Q. Were there other – Strike that.
4      Were there any other reasons you didn't
5 trust Grizzle when you made that comment on May 18,
6 2018?
7    A. No.
8    Q. You just indicated you knew what they do up
9 in investigations when they dump phones. Is that what
10 you just said?
11    A. That's what I said, yes.
12    Q. What did you mean by that?
13    A. That they're not – All the times that we
14 stick specifically to what we're looking for, not we,
15 but investigations is looking for, I've witnessed it
16 myself.
17    Q. What did you witness?
18    A. There was a time when I was in tact, the
19 cross-training, and the room that had the machine to
20 download the phone, they were – there's a –
21 investigators in the room, I don't recall who, looking
22 at stuff and talking about pictures that were on
23 someone's phone.
24    Q. Do you recall when this occurred?

Page 87

1    A. No.
2    Q. And when you say "the machine," are you
3 referring to the Cellebrite bracket machine or the
4 Lantern machine?
5    A. I don't know which one.
6    Q. And was this in the investigations area of
7 the Joliet Police Department that this occurred?
8    A. In the – Yeah, in the investigations
9 department or division, yes.
10    Q. You don't recall who else was present?
11    A. No, sir.
12    Q. Do you recall what year this occurred?
13    A. I think it was – Like I said, when I was
14 in cross-training in tact for two weeks, so 2017.
15    Q. You indicated that they were talking about
16 pictures on the phone, I think that's what you said;
17 is that right?
18    A. They were talking about pictures that were
19 on the – whatever phone that they had – that they
20 had searched.
21    Q. So did they make reference to – Strike
22 that.
23      Did you see the pictures?
24    A. I did not.

Page 88

1    Q. What were their comments about the pictures
2 that they were talking about?
3    A. I don't recall.
4    Q. Were they talking about private images?
5    A. I don't recall the content of it.
6    Q. Was there any other occasion that you were
7 witness to investigations talking about a cell
8 phone – talking about the cell phone and pictures?
9    A. No.
10    Q. Were there any other reasons you didn't
11 trust Grizzle or the investigations unit to handle
12 your phone?
13    A. Specifically because of that reason and I
14 had no idea what the process entailed, but I knew that
15 they were going to get all of my stuff on my phone,
16 and lo and behold.
17    Q. During – Strike that.
18      When you provided Sergeant Grizzle with
19 your phone in the conference room with
20 Lieutenant Brown, did you indicate at that time that
21 you had private images on your phone?
22    A. I believe I said something along the line
23 that there was stuff on there that I didn't want them
24 to see or anybody to see, and I would assume most

Page 89

1 people.
2    Q. Did you specifically indicate during that
3 conversation with Sergeant Grizzle and
4 Lieutenant Brown that you had naked photos –
5 photographs or pictures on your phone?
6    A. I did not.
7    Q. When you had the conversation with
8 Sergeant Grizzle and Lieutenant Brown on that occasion
9 on May 18, 2018, did you indicate that you had videos
10 of yourself and/or others in sex acts?
11    A. I did not.
12    Q. Is it fair to say that it's your testimony
13 that Sergeant Grizzle and Lieutenant Brown had no idea
14 that there was any private images on your phone
15 whatsoever?
16    MR. ADAMS: Object, lack of foundation as to what
17 they knew.
18 BY THE WITNESS:
19    A. I can't answer for what they knew, but I
20 did have a conversation with Lieutenant Brown after
21 Grizzle took my phone.
22    Q. After Grizzle took your phone, what was
23 your conversation with Lieutenant Brown?
24    A. Lieutenant Brown stated something in

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021                                         Pages 90..93

Page 90

1  regards to he'd be careful as to what was on his cell
2  phone and I just said that there was pictures of when
3  I -- progress pictures from when I was working out,
4  and I never said anything about my photos being nude
5  or anything like that, but I just said that, you know,
6  it was -- just that was a private time in my life that
7  I was trying to accomplish something and I don't think
8  anybody should have been privy to that.
9      Q.   When were those pictures from?
10     A.   Anywhere from 2015 on.
11     Q.   The phone that you gave to Sergeant Grizzle
12  on May 18, 2018, it's fair to say it had pictures that
13  dated back to 2015; is that fair?
14     A.   Yeah.
15     Q.   The conversation you had with
16  Lieutenant Brown after, was anyone else present for
17  when you said that you had pictures of your progress
18  from working out?
19     A.   No.
20     Q.   Had Sergeant Grizzle already left the
21  conference room?
22     A.   Yes.
23     Q.   What did Lieutenant Brown say to you after
24  you said you didn't want people looking at your

Page 91

1  progress photos?
2      A.   I don't recall what he said after that.
3      Q.   When you -- Strike that.
4      So Sergeant Grizzle left the conference
5  room before you did?
6      A.   Yes.  I seen him in the conference room and
7  then I was in there by myself for a little bit and
8  then Lieutenant Brown came in and asked if I wanted to
9  wait until my phone was completed or if I wanted to go
10  home and they would call me or -- it was either go
11  home or you go back on the street, I don't remember which
12  one it was, until the phone was done and I opted to
13  stay in the conference room until the phone was
14  completed.
15     Q.   How long was that?
16     A.   It was a couple of hours because they --
17  Lieutenant Brown would give me a status check and said
18  that there was something going on with the machine and
19  I just -- I just had to wait, so I waited until they
20  deemed that it was done.
21     Q.   Lieutenant Brown gave you your cell phone
22  back?
23     A.   I believe it was Lieutenant Brown.  I don't
24  recall exactly who.

Page 92

1      Q.   At any point in time did you get mad and
2  storm out of the conference room?
3      A.   I did.
4      Q.   When did that occur?
5      A.   Before Grizzle took my cell phone.
6      Q.   Why did you storm out of the conference
7  room before Sergeant Grizzle took your cell phone?
8      A.   Because I was upset again that I was
9  brought in and embarrassed.  I was again in front of
10  my peers and superiors that I had to walk past and
11  then be served a search warrant at work.  When I don't
12  have a normal 9:00 to 5:00, I have to be a certain way
13  when I'm at work and then to be presented with this.
14     Q.   Who else besides Lieutenant Brown knew that
15  you were being provided a search warrant?
16     A.   I don't know.
17     Q.   When -- Strike that.
18     How -- After you stormed -- After you got
19  mad and stormed out of the conference room, did
20  someone chase after you or call you to come back in or
21  what happened and what was said?
22     A.   Lieutenant Brown did.
23     Q.   And what did Lieutenant Brown say to get
24  you back into the conference room?

Page 93

1      A.   He told me that I had to come back in or I
2  was going to be arrested.
3      Q.   Was anyone else present for that comment by
4  Lieutenant Brown?
5      A.   Grizzle was there.
6      Q.   Anyone else?
7      A.   I believe just those two.
8      Q.   After you left the conference room after
9  receiving your phone back, did anyone talk to you
10  about the search warrant on that day?
11     A.   I don't understand the question.  Can you
12  ask it again.  I'm sorry.
13     Q.   Sure.  It was a bad question.  After you
14  received your phone back after waiting for a couple of
15  hours, you left the conference room, right?
16     A.   After I got my phone back?
17     Q.   Yes.
18     A.   I believe I went home for that night.
19     Q.   Okay.  Did you talk with anyone at the
20  Joliet Police Department about what had occurred in
21  the conference room?
22     A.   I spoke to my union rep.
23     Q.   Who was your union rep?
24     A.   Mike DeVito.

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 94..97

Page 94

1  Q.  And when did you speak to Mike DeVito?
2  A.  That evening.
3  Q.  Was it in person or by phone?
4  A.  In person.
5  Q.  When you left the conference room with your
6  phone, about what time was it?
7  A.  I believe maybe 9:30, 10:00 o'clock.
8  Q.  Between 9:30, 10:00 o'clock on May 18, 2018
9  and until the time you spoke with Mike DeVito in
10  person, did you speak to anyone else about what had
11  occurred with the search warrant or your cell phone?
12  A.  I didn't have any way to talk to anybody.
13  Q.  It's fair to say that when you left the
14  conference room, you went straight home and you didn't
15  talk to anyone else at the Joliet Police Department?
16  A.  I went -- Right, yes.
17  Q.  How can -- Strike that.
18  The conversation with Mike DeVito, you said
19  that was in person, where did that occur?
20  A.  In the same room that I was in when the
21  search warrant was given to me.
22  Q.  So it's fair to say that you returned back
23  to the Joliet Police Department to have this
24  conversation with Mike?

Page 95

1  A.  I never left. I don't think you
2  understand.
3  Q.  No, I guess I don't. Can you clarify for
4  me?
5  A.  I stayed in the conference room the entire
6  time until my phone was completed and given back to
7  me. I never left. And the only time I did leave was
8  to go back home at about 9:30, 10:00 o'clock.
9  Q.  I see. How did -- And then your
10  conversation with Mike DeVito then occurred before you
11  went home or after you were at home?
12  A.  No. It was before I went home.
13  Q.  And how did you contact Mike DeVito?
14  A.  Lieutenant Brown asked if I wanted to speak
15  to a union rep and I said yes.
16  Q.  And what did you tell Mike DeVito?
17  A.  I just said that I was served with a search
18  warrant and he said, Okay, we know, and then he's,
19  like -- I believe he told me to reach out to Tomczak
20  in the morning, but I can't be sure.
21  Q.  And why did you reach out to
22  Tomczak in the morning, if you know?
23  MR. O'DRISCOLL: I'm going to object to
24  foundation. You're asking her again what someone else

Page 96

1  said.
2  BY THE WITNESS:
3  A.  I don't know.
4  Q.  When Mike DeVito indicated that we know
5  that you were served with a search warrant, did he
6  indicate who we were -- we was, we were?
7  A.  No. I'm assuming because Lieutenant Brown
8  called him and was witness to what happened.
9  Q.  Did he recommend that you file a union
10  grievance?
11  A.  The conversation was just what I told you,
12  that's all that it was.
13  Q.  Have you ever filed a union grievance over
14  what occurred?
15  A.  No.
16  Q.  Why not?
17  A.  I don't know what grievance there would be
18  to file.
19  Q.  Did you contact Attorney Tomczak?
20  A.  I did.
21  Q.  And when did you contact Attorney Tomczak?
22  A.  The question is what? I'm sorry.
23  Q.  I'm sorry. When did you contact
24  Attorney Tomczak?

Page 97

1  A.  I think he and I spoke the next morning.
2  Q.  And what did you tell Attorney Tomczak?
3  MR. O'DRISCOLL: I'm going to object and I'm
4  going to instruct the witness not to answer that
5  question inasmuch as she sought out Tomczak for legal
6  advice, it's a privileged conversation.
7  BY MR. CLARK:
8  Q.  Let me ask it. Were you contacting
9  Attorney Tomczak for legal advice?
10  A.  I was.
11  Q.  Was Mike -- Did Mike DeVito indicate that
12  you should contact Attorney Tomczak for legal advice?
13  A.  No. The conversation was just what I told
14  you it was.
15  Q.  Okay. After you spoke with -- Strike that.
16  Did you retain Attorney Tomczak as a
17  defense counsel?
18  A.  I did not. He --
19  MR. O'DRISCOLL: Cassie, you don't have to tell
20  anything --
21  BY MR. CLARK:
22  Q.  Yeah, you don't have to tell me what he
23  said.
24  A.  Okay. I'm sorry. Can you ask that again

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 98..101

Page 98

1 one more time? I'm sorry.
2    MR. CLARK: Lisa, can you reread the question,
3 please?
4    MR. ADAMS: And the answer.
5      (From the record above, the court
6      reporter read the following:
7      "Q. Did you retain
8      Attorney Tomczak as a defense
9      counsel?
10      "A. I did not. He –".)
11 BY MR. CLARK:
12    Q. After speaking with Attorney Tomczak, what
13 did you do next in connection with the search warrant,
14 if anything?
15    A. We didn't do anything.
16    Q. Did you have any conversations with anyone
17 about the search warrant and your cell phone besides
18 whatever you said to Attorney Tomczak?
19    A. I'm sure I had. I don't remember what it
20 was.
21    Q. Do you recall who?
22    A. I'm sure Nick and I had conversation about
23 it.
24    Q. Besides Nick, anyone else that you can

Page 99

1 recall?
2    A. No.
3    Q. With respect to your conversation with
4 Nick, what did you say to him about the contents of
5 your cell phone?
6    A. Like, what was on my cell phone?
7    Q. Yes.
8    A. Is that what you're asking?
9    Q. Yes.
10    A. As far as, like – I don't understand the
11 question.
12    Q. Let me ask it this way: Did you discuss
13 with Nick Crowley that you had private images on your
14 phone on I guess it would be May 19, 2018?
15    A. Nick knew that the images were on my phone.
16    Q. Okay. But did you have a conversation
17 about that at that time?
18    A. I'm sure we had.
19    Q. And did you express concern?
20    A. Of course.
21    Q. And did you express to Nick Crowley the
22 base of your concern?
23    A. The base of my concern was that these
24 images were on my phone and that somebody else was in

Page 100

1 possession of it?
2    Q. Yes.
3    A. Yes.
4    Q. Did you say anything else to – For
5 example, you mentioned another time in investigations
6 that you just testified to a little bit earlier. Did
7 you have any conversations about that incident with
8 Nick Crowley on May 19, 2018?
9    A. I may have, but I don't remember the whole
10 conversation that he and I had.
11    Q. Do you recall having any conversations with
12 Nick Crowley on May 19, 2018, about not trusting Ed
13 Grizzle?
14    A. I don't remember.
15    Q. The contents of your phone, do you recall
16 how many private images you would have had on that
17 phone?
18    A. No.
19    Q. Do you recall how many – I guess let me
20 break that down. Do you recall how many photographs
21 of either you or Nick being naked or nude that were on
22 the phone?
23    A. No.
24    Q. Do you recall how many videos of you and/or

Page 101

1 Nick engaged in sex acts were on the phone?
2    A. No.
3    Q. Do you think it's more than a hundred?
4    A. I don't really know.
5    Q. Do you think it's more than 50?
6    A. I really couldn't give you a number on it.
7    Q. Was there a particular photograph of a
8 private image that you were concerned about?
9    A. All of my private images particularly
10 concerned me and somebody else seeing them.
11    Q. Was there any specific one in particular?
12    A. All of my private images concerned me.
13    Q. Were there any specific videos that you
14 were concerned with?
15    A. All of my private images and videos on my
16 cell phone concerned me.
17    Q. Do you recall if on your phone on May 18th
18 of 2018 were the photographs delineated by date?
19    A. I believe so.
20    Q. Do you recall how many photographs you had
21 on your phone at the time on May 18th of 2018?
22    A. I do not.
23    Q. Do you think it was more than a thousand?
24    A. Again, I couldn't put a number on it.

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 102..105

Page 102

```
1    Q.   Do you take a lot of photographs?  It could
2  be of anything:  recipes, scenery, birds, friends,
3  family.
4    A.   I don't think I take any more than anybody
5  else would take.
6    Q.   Fair to say you take a lot of photos?
7    A.   I wouldn't characterize it that way either.
8    Q.   Did – During your conversation with Nick
9  Crowley on May 19th of 2018, did Nick Crowley express
10 any concern about his private images being with the
11 Joliet Police Department?
12   A.   I don't remember.
13   Q.   In terms of these private images, were they
14 all taken on your phone or were some of the images
15 taken on Nick's phone and sent to you?
16   A.   I don't remember that either.  They're on
17 my phone.
18   Q.   Did you ever send Nick Crowley private
19 images or naked photos perhaps or videos?
20   A.   I may have.
21   Q.   Did Nick Crowley ever send you naked
22 pictures or videos from his phone to yours?
23   A.   He may have.
24   Q.   Do you know if Nick Crowley ever told
```

Page 103

```
1  anyone that he had naked images of you on his phone?
2    A.   I don't believe so.
3    Q.   Why don't you believe so?
4    A.   Because I don't believe that he told
5  anybody.
6    Q.   Did you ever ask him?
7    A.   Of course, I asked him.
8    Q.   What did he say?
9    A.   He said no.
10   Q.   Did anyone – Strike that.
11        Did anyone ever take any private images
12 photographs or videos of you and Nick besides either
13 you or Nick?
14   A.   No.
15   Q.   Do you recall when you first took your
16 first private image of either yourself or Nick?
17   A.   No.
18   Q.   Do you think that would have been before
19 2016?
20   A.   Yes.
21   Q.   Do you know why you were taking private
22 images?
23   A.   Images of myself or him or of what?
24   Q.   Yeah.  Why would you take private images of
```

Page 104

```
1  yourself?
2    A.   I mean, I was young, we were in a
3  relationship, we were in a fun relationship.  It's
4  what we, you know – There's nothing wrong with it
5  between two consenting adults that don't share it and
6  don't expect it to be ever looked at by anybody else
7  but ourselves.
8    Q.   That's something that you did in the
9  confines of your relationship; is that fair to say?
10   A.   It is.
11   Q.   Have you done that in any other
12 relationship?
13   A.   I have not.
14   Q.   Do you know if Nick Crowley has done that
15 in any other relationship?
16   A.   I can't speak for him.
17   Q.   Has Nick ever Crowley ever said that he
18 has?
19   A.   He has not.
20   Q.   When you took private images of yourself
21 and shared them with Nick Crowley, did you expect them
22 not to be shared with anyone else?
23   A.   Right.
24   Q.   Did you ever tell Nick Crowley that?
```

Page 105

```
1    A.   Of course.
2    Q.   What did Nick Crowley say?
3    A.   I believe there was an understanding that
4  we don't share each other's images with other people.
5    Q.   Did Nick Crowley say that?
6    A.   No.  I just said there was an
7  understanding, but ...
8    Q.   You were present for McKinney's deposition,
9  correct?
10   A.   Yes.
11   Q.   And you heard McKinney indicate that he had
12 seen a picture of breasts, correct?
13   A.   Yes.
14   Q.   And then he said he saw a picture – the
15 next picture of that was a picture of your face?
16   A.   I heard that, yes.
17   Q.   Outside that testimony, do you have any
18 firsthand knowledge that anyone has seen your private
19 images?
20   A.   No.
21   Q.   I'm going to turn to a slightly different
22 topic, but similar.  Is this a good time for a break?
23   THE WITNESS:  Can I go check?
24   MR. ADAMS:  I defer to the witness and the court
```

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021                                                      Pages 106..109

Page 106

1  reporter both. I don't know, Cassie, if you're on any
2  particular schedule where you think you'll need a
3  break to nurse again any time soon. That might
4  dictate.
5      MR. CLARK: Yeah.
6      THE WITNESS: Yeah, I was just going to see if I
7  can go check really quick. I mean, he was crying a
8  little bit ago, but I haven't heard him. So can I go
9  check really quick?
10     MR. CLARK: We can just take a five-minute break.
11     MS. PROCTOR: Let's take five.
12     THE WITNESS: Okay.
13         (A short recess was taken.)
14 BY MR. CLARK:
15     Q.  Before we continue, I should have asked you
16 this at the beginning: Ms. Socha, you said you're in
17 your mother's office, I think?
18     A.  Yes.
19     Q.  Is anyone else present in the room?
20     A.  No. It's just me.
21     Q.  Can anyone else hear the contents of this
22 deposition?
23     A.  No.
24     Q.  Do you have any notes or any documents in

Page 107

1  front of you that pertains to this lawsuit?
2      A.  No. I mean, like, this stuff is on my
3  computer, but you can't see it, I just see your face
4  and the four screens, the four people or five.
5      Q.  You haven't prepared any written notes that
6  you were referring to during –
7      A.  Oh, no.
8      Q.  It's fair to say you haven't kept a journal
9  of these events?
10     A.  For the deposition?
11     Q.  For any of the allegations.
12     A.  No.
13     Q.  Or do you have any notes related to the
14 deposition?
15     A.  No.
16     MR. ADAMS: For form purposes, Matt, your
17 previous question and answer was a double negative. Is
18 it fair to say and she answered no and I'm sure that
19 isn't what was intend by either.
20     MR. CLARK: Okay.
21 BY MR. CLARK:
22     Q.  Ms. Socha, you have not prepared any
23 documents for this deposition?
24     A.  No, I have not.

Page 108

1      Q.  During the course of the events as laid out
2  in your complaint, you have not made a journal or a
3  diary of the events?
4      A.  No.
5      Q.  And I notice you have an AirPod on – or
6  AirPods. Is that how you hear the computer?
7      A.  That's how I hear, yeah.
8      Q.  Fair to say that you're not having any
9  instruction from any other witness or any other
10 person; is that fair?
11     A.  No, I'm not.
12     MR. ADAMS: Hey, Matt, I can't even screen share.
13 You give me too much credit.
14     MR. CLARK: You know, I don't know. I'll give
15 you lots of credit. You screen shared and I had to
16 take the easy way out so, you know, I think you're up
17 on it.
18 BY THE WITNESS:
19     A.  Do you need a visual of the room?
20     Q.  No, that's fine. Thank you, though.
21     A.  Okay.
22     Q.  But I will since we're talking about –
23 Well, let me ask you this: How did you first
24 become – Strike that.

Page 109

1      Are you aware as to whether or not other
2  officers in the department of Joliet Police Department
3  have seen private images of you from your cell phone?
4      A.  Can you ask that again, please?
5      Q.  Yes. Are you aware as to whether or not
6  other officers in the Joliet Police Department have
7  seen private images from your cell phone?
8      A.  It's a confusing question because of how I
9  was told that people have.
10     Q.  Let me ask it that way. When were you
11 first told that other individuals in the Joliet Police
12 Department have seen private images of your cell
13 phone?
14     A.  I received a letter in my mailbox.
15     Q.  And when you say in your "mailbox," are you
16 referring to your private residence?
17     A.  I'm sorry. My work mailbox.
18     Q.  And where is your work mailbox located?
19     A.  In the police department.
20     Q.  Where in the police department?
21     A.  In what we call the commons. It's in,
22 like, the general – it's where all the mailboxes are
23 by the watch commander's office by the roll call room.
24     Q.  Is the common area where your mailbox is

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 110..113

Page 110

1 located, can anyone see who gets – can anyone put
2 anything in any other person's mailbox?
3    A. Are you saying, like, if I can put
4 something in someone's mailbox?
5    Q. Correct.
6    A. Yes.
7    Q. So it's fair to say that the note could
8 have been placed in a mailbox by anyone as opposed to
9 having a Joliet Police Department officer that does
10 it?
11    A. It was mailed through the United States
12 Postal Service to my attention.
13    Q. Thank you. In the Joliet Police
14 Department, do you have a desk or an office?
15    A. I do not.
16    Q. In the Joliet Police Department, do you
17 have a locker?
18    A. I do.
19    Q. Is it fair to say that's where you would
20 keep your private items that you may have before and
21 after your shift?
22    A. No, I don't. No.
23    Q. What do you keep in your locker?
24    A. I don't utilize my locker. I have a

Page 111

1 take-home squad car so I have all of my police stuff
2 at home and just get dressed at home and then go in
3 that way to work.
4    Q. In May or June of 2018, did you also have a
5 squad car – a take-home car?
6    A. I did.
7    Q. Does Nick Crowley have a take-home car?
8    A. Yes.
9    Q. In relation to the common area where the
10 mailboxes are located, where in the department is the
11 investigations room?
12    A. Upstairs.
13    Q. Do you ever have occasion to go upstairs to
14 the investigations room?
15    A. I have, yes.
16    Q. How often on a weekly basis would you say
17 you go to the investigations room upstairs?
18    A. I wouldn't say weekly.
19    Q. Would you say once a month?
20    A. No. It would be on a – if I would get
21 called up there for what they call a blind
22 administrator, I've gotten called sometimes up there
23 for.
24    Q. What's a blind administrator?

Page 112

1    A. If there is a case where an individual
2 needs to see a lineup, somebody who is unfamiliar with
3 the case at hand has to administer the lineup.
4    Q. And so the lineup is conducted upstairs?
5    A. Right.
6    Q. How often would you say that occurs?
7    A. I don't know how often it occurs. I think
8 I've done it maybe three or four times.
9    Q. On or around May or June of 2018, do you
10 recall going upstairs for a blind administrator?
11    A. No.
12    Q. Are – What's upstairs in the Joliet Police
13 Department?
14    A. The records division, investigation,
15 there's a conference room, dispatch is up there and
16 administration.
17    Q. Are those areas all separated by a wall or
18 doors or are they altogether?
19    A. Yes.
20    Q. They're all separated?
21    A. They're separated.
22    Q. And so in order to go into investigations
23 unit, you actually have to enter through a door, like,
24 I don't know if it's titled investigations, but you

Page 113

1 know you're going into the investigations room?
2    A. Yes.
3    Q. Inside the area of the investigations unit,
4 what's in it, what's inside that door?
5    A. Desks and computers and interview rooms.
6    Q. The blind administrative, does that take
7 place in that unit area?
8    A. Yes. It would take place in an interview
9 room.
10    Q. When you go into the investigations unit in
11 May or June of 2018, would you have known where the
12 Cellebrite machine is located?
13    A. No.
14    Q. In May or June of 2018, would you have
15 known where the Lantern machine is located?
16    A. No.
17    Q. Are there any administrative assistants
18 that have either a desk or space in the investigations
19 unit?
20    A. I believe so, yes.
21    Q. Do you know any of the administrative
22 individuals that have space in or a desk in the
23 investigations unit?
24    A. I'm sorry. I heard nothing you asked.

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021
Pages 114..117

Page 114

1    Q.   Okay.  Sorry.  Would you know any
2  administration individuals that would have space in
3  the investigations area?
4    A.   I'm sorry.  You're choppy again.  I don't
5  know if it's my phone or – Can I have that one more
6  time?  I'm sorry.
7    Q.   Yeah, absolutely.  Do you know anyone, an
8  administrative individual, that has space in the
9  investigations room?
10   A.   Yeah, there's secretaries in there.
11   Q.   And who are those secretaries?
12   A.   I know one is a Gloria Coral and I think
13  the other one – I think her first name is Kim, maybe.
14  I could be wrong.  She's a blond-headed woman.
15   Q.   Okay.  What about Sherri Gregory?  Do you
16  know who that is?
17   A.   No.
18   Q.   Have you ever talked to any of the
19  administrative individuals – Gloria, Kim, or
20  anyone – about the allegations of your lawsuit?
21   A.   No.
22   MR. CLARK:  Lisa, can I mark as Exhibit No. 2,
23  and can you screen share Plaintiff's Mandatory Initial
24  Discovery Responses?

Page 115

1        (Screen share Exhibit No. 2.
2  BY MR. CLARK:
3    Q.   Okay.  Ms. Socha, we're looking at page 1
4  of Exhibit No. 2.  Before I go to the document, let me
5  just ask you:  How many conversations have you had
6  with Michael DeVito about the allegations of your
7  case?
8    A.   I had no conversations regarding this case.
9    Q.   Let me clarify.  Have you ever had a
10  conversation with Michael DeVito about private images
11  and people seeing private images within the Joliet
12  Police Department?
13   A.   I have.
14   Q.   How many conversations?
15   A.   Once.
16   Q.   When did that conversation occur?
17   A.   Sometime in 2018.  I'm not sure of the
18  exact date.
19   Q.   Fair enough.  Do you recall if you had a
20  conversation with Michael DeVito in 2018 prior to
21  filing a lawsuit?
22   A.   Yes.
23   Q.   Do you recall having a conversation with
24  Michael DeVito in 2018 shortly after you learned that

Page 116

1  other officers may have seen your private images?
2    A.   After I learned?  I'm sorry.  Can you ask
3  that one more time, please?
4    Q.   Yeah, sure.  Do you recall having a
5  conversation with – Let me ask it this way:  Do you
6  recall having conversations with Mike DeVito in May of
7  2018 of other officers seeing private images?
8    A.   I don't believe it was in those months, no.
9    Q.   Where did this conversation take place?
10   A.   At the union office.
11   Q.   Where is the union office located?
12   A.   In Joliet on Bluff Street, I believe.
13   Q.   How did you know to come to the union
14  office on Bluff Street to have a conversation with
15  Michael DeVito?
16   A.   I was contacted.  I don't remember how.
17  Either he called me or another union member contacted
18  me.
19   Q.   Would that be Tom Banas?
20   A.   Yes.
21   Q.   Would it be fair to say that either Tom or
22  Michael called you to come to the union office?
23   A.   Yes.
24   Q.   During that conversation, did either

Page 117

1  Michael or Tom indicate why?
2    A.   No.
3    Q.   Would it be unusual for you to go to the
4  union office to talk with Mike or Tom?
5    A.   I don't – I mean, I don't – Like, as far
6  as me being in trouble?  I don't –
7    Q.   How often –
8    A.   There was no issue.  I didn't have any –
9  Go ahead.
10   Q.   I'm sorry.  How often have you had
11  conversations with Mike or Tom at the union office
12  prior to this one?
13   A.   Maybe a couple of times before that.
14   Q.   The couple of times before this
15  conversation with Michael or Tom, the couple of times
16  you reference, what did they involve, generally?
17   A.   I don't – I don't really recall.
18   Q.   When you went to the union office on Bluff
19  Street, you had a conversation with Michael and Tom?
20   A.   Officer Banas really didn't say anything,
21  he was kind of just there.  It was more
22  Officer DeVito.
23   Q.   Okay.  And was anyone else present?
24   A.   No.

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 118..121

Page 118

1   Q.   Where did this conversation occur?
2   A.   In the union office.
3   Q.   Were there any recordings of this
4   conversation?
5   A.   No, not that I know.
6   Q.   Do you know if there were any notes of this
7   conversation?
8   A.   Not that I know of.
9   Q.   And what did Michael DeVito tell you during
10  that conversation?
11  A.   He stated that he was told that the images
12  and the video on my cell phone that had been extracted
13  would be viewed and disseminated amongst members of
14  the police department.
15  Q.   Was that the first time that you had heard
16  that?
17  A.   From an actual person?  Yes.
18  Q.   And I think you made reference you received
19  a note in your mailbox at work, that was the first
20  time that you had any indication that anyone had seen
21  the private images of you from your cell phone?
22  A.   Right.
23  Q.   Between the time you received that note in
24  the mail and your conversation with Michael about it,

Page 119

1   about how long of a time had passed?
2   A.   I don't remember.
3   Q.   Do you think it was more than a month?
4   A.   I don't think so.
5   Q.   Did Michael tell you who had told him that
6   images or videos on your cell phone had been extracted
7   and disseminated?
8   A.   He did not.
9   Q.   Did you ask him?
10  A.   No.
11  Q.   Why the no?
12  A.   Because it just seemed that he was told in
13  confidence.
14  Q.   How long did this conversation last?
15  A.   I don't remember.
16  Q.   Did Michael DeVito tell you any specifics
17  as to the contents of the images or video that had
18  been extracted and disseminated?
19  A.   He did.
20  Q.   What did he tell you?
21  A.   He described a video that was on my cell
22  phone.
23  Q.   And what was the video on your cell phone
24  that he described?

Page 120

1   A.   It depicted myself giving oral sex to Nick.
2   Q.   Did Michael DeVito indicate that he had
3   seen that video?
4   A.   He did not.  He said he didn't see it.
5   Q.   And I think you indicated that Tom Banas
6   said nothing during this conversation?
7   A.   I don't – Yeah, I don't believe he said
8   anything.
9   Q.   Is there – Strike that.
10       Was there on your cell phone in May or June
11  of 2018 video on your phone depicting you giving oral
12  sex to Nick?
13  A.   There was.
14  Q.   Did Michael indicate any other specific
15  videos or photographs that had been seen by his source
16  and confidence?
17  A.   Not that I recall, no.
18  Q.   Did Michael DeVito indicate to you about
19  any comments that were made with respect to the video
20  depicting you giving oral sex to Nick?
21  A.   Not that I recall.  I remember I got a
22  little upset so I don't remember.
23  Q.   Was that the first time that someone had
24  told you they had – someone had seen this private

Page 121

1   image or video?
2   A.   Other than the letter?
3   Q.   Yes.
4   A.   No.
5   Q.   Did Michael DeVito – I'm sorry.  No?  Who
6   else had indicated to you that they had seen the video
7   depicting you giving oral sex to Nick?
8   A.   I wasn't specifically saying that, but it
9   was Lieutenant Harrison after I had gotten into an
10  accident.
11  Q.   Do you recall when the accident was?
12  A.   It was in the summer of 2018.
13  Q.   And what did Lieutenant Harrison say to
14  you?
15  A.   He asked if I was upset regarding stuff
16  that was found on my phone.
17  Q.   At that time, had you received that
18  anonymous note from your mailbox?
19  A.   No.
20  Q.   Was Lieutenant Harrison – was that the
21  first time from any source that you learned that
22  officers at the Joliet Police Department may have seen
23  private images of you from your cell phone?
24  A.   I believe so.

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 122..125

Page 122

1    Q.   Let me ask it this way –
2    A.   I mean, it all – Go ahead.
3    Q.   I was going to say, the first indication
4    that someone might have viewed contents of your cell
5    phone was from Lieutenant Harrison, the second was the
6    anonymous note, and the third was your conversation
7    with Michael DeVito; does that sound right?
8    A.   Lieutenant Harrison didn't say anything
9    specifically about images.  He just asked if I was
10   upset about my cell phone contents or something along
11   those lines after I had gotten into an accident on my
12   way to work.
13   Q.   Where did that conversation take place?
14   A.   And then I –
15   Q.   Go ahead.  I'm sorry.
16   A.   That's all right.  In the watch commander's
17   office.
18   Q.   And you were about to say "and then"?
19   A.   And then shortly after that, I believe I
20   got the letter in my mailbox that was mailed and then
21   I was contacted by either DeVito or Batis at the time.
22   Q.   So Lieutenant Harrison didn't indicate to
23   you that there were private images, just contents of
24   cell phone; is that fair?

Page 123

1    A.   I can't remember specifically what he had
2    said, but it was about my – he asked if I was upset
3    about my cell phone in some way that – in some way
4    like that.  I can't really quote it specifically.
5    Q.   Okay.  But he didn't make reference to
6    private images, true?
7    A.   I can't say either – I can't say either
8    way.  I don't remember, but he made mention of my –
9    of my cell phone.
10   Q.   Okay.  If Lieutenant Harrison would have
11   indicated to you that people were in possession of
12   private images, you would have asked him about it,
13   right?
14   A.   Maybe.  I don't know.
15   Q.   If Lieutenant Harrison had indicated to you
16   that other officers would have seen your private
17   images, you would have taken action and reported it?
18   A.   Reported it to whom?
19   Q.   A supervisor, someone within the Joliet
20   Police Department.
21   MR. ADAMS:  I'm going to object to form.  The way
22   it's phrased it calls for speculation.  Why don't you
23   just ask her if she did that?
24   BY MR. CLARK:

Page 124

1    Q.   Did you – After your conversation with
2    Lieutenant Harrison about the contents of your cell
3    phone, did you report it to anyone?
4    A.   I did not.
5    Q.   And I think you indicated the anonymous
6    note or letter was received in your mailbox shortly
7    after your conversation with Lieutenant Harrison?
8    A.   If I remember correctly, yes.
9    MR. CLARK:  Lisa, can I have you go to – I think
10   it's page 6 of this document.
11   THE COURT REPORTER:  (Complying.)
12   BY MR. CLARK:
13   Q.   Ms. Socha, I'm going to have you take a
14   look at page 6, 7, 8, 9, 10, 11, 12 of that document
15   and ask you questions.  I'll tell you what my question
16   is going to be.  Which note did you receive in the
17   mail?  So I guess I can ask you this right now.
18   Pages 6 and 7 appear to be part of the same note.
19   When you said you received a note in the mail, did you
20   receive pages 6 and 7?
21   (Witness peruses document.)
22   BY THE WITNESS:
23   A.   I don't believe this was the letter I
24   received.

Page 125

1    Q.   Okay.
2    A.   I don't –
3    THE WITNESS:  Can you scroll back up, please?
4    (Witness peruses document.)
5    BY THE WITNESS:
6    A.   I don't believe this was the letter that I
7    received.  I believe this is a letter that was sent to
8    Hall.
9    Q.   And if you look at page 8, it does appear
10   to be, like, a copy of an envelope from the Hall Adams
11   Law Offices.
12   MR. CLARK:  Lisa, if I can have you scroll down
13   and you can stop right there.
14   THE COURT REPORTER:  (Complying.)
15   BY MR. CLARK:
16   Q.   So to the best of your recollection,
17   pages 6 and 7 belong to the contents or with the
18   contents of page 8 in a letter sent to Hall Adams; is
19   that fair?
20   A.   Sure.  I mean, that – Yeah.
21   Q.   I can't – I can't read it, but maybe
22   you'll know.  It looks like the date stamp of that
23   letter is September 4, 2020, but –
24   A.   2018.

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 126..129

Page 126

1  Q. 2018?
2  A. 2018.
3  Q. Okay.
4  MR. CLARK: So let me have you go to pages 9, 10,
5  11, and 12.
6  THE COURT REPORTER: (Complying.)
7  BY MR. CLARK:
8  Q. The question is, it's either, I guess, on
9  pages 11 and 12, which letter did you receive in the
10  U.S. mail at the Joliet Police Department?
11  A. This letter on page 11.
12  Q. Okay.
13  MR. CLARK: Can I – Lisa, can I have you go back
14  to page 9, that has the Joliet Police Department on
15  it?
16  THE COURT REPORTER: (Complying.)
17  BY MR. CLARK:
18  Q. Okay. Ms. Socha, is this – you made
19  reference to an anonymous letter and it was sent via
20  U.S. mail. To the best of your recollection, is this
21  the envelope that contained that letter?
22  A. Yes.
23  Q. Do you recognize the handwriting of Joliet
24  police Cassandra Socha, Number 162?

Page 127

1  A. No.
2  Q. Do you know who sent this letter to you?
3  A. I do not.
4  Q. Did you ask Michael DeVito if he sent you a
5  letter?
6  A. I never disclosed I got a letter.
7  Q. Did you ever tell Nick Crowley you got a
8  letter?
9  A. I did.
10  Q. Did you tell Nick Crowley at the time you
11  received the letter?
12  A. I did.
13  Q. And I can't see – My copy doesn't have
14  what date you received the letter, but do you know
15  what date you received the letter?
16  A. I don't remember what date, no.
17  Q. Do you have –
18  A. I think it said it on the envelope. I'm
19  sorry. Go ahead.
20  Q. That's what I was going to ask. Do you
21  have the original envelope?
22  A. I do not.
23  Q. Do you know where the original envelope is?
24  A. Hall has it.

Page 128

1  MR. CLARK: Hall, do you know the dates or, I
2  mean, can we have an inspection of that envelope
3  because I can't tell any date?
4  MR. O'DRISCOLL: You certainly can have
5  inspection of it. I don't think – There's no way
6  that I can think of to display it here that would make
7  it clear. I'll read for you the – as much of the
8  date stamp as is legible, and it's 2 July 2000– and
9  at that point, as you see, there are three stamps on
10  the letter?
11  MR. CLARK: Yes.
12  MR. O'DRISCOLL: The inner most stamp cuts off
13  the last two digits of the year on the date stamp; but
14  based upon context, of course, one presumes it's 2018.
15  MR. CLARK: Okay.
16  MR. O'DRISCOLL: But what you see here is 2000
17  and a smudge.
18  MR. CLARK: Great.
19  MR. O'DRISCOLL: And, of course, you are welcome
20  any time you want to come in and look at it.
21  MR. CLARK: All right. Thank you.
22  Okay. Lisa, can we go down to page 10?
23  THE COURT REPORTER: (Complying.)
24  BY MR. CLARK:

Page 129

1  Q. Ms. Socha, do you know what page 10 is?
2  A. That wrapped the letter enclosed in the
3  envelope.
4  Q. Does the stamp – It looks to me like it's
5  a stamp. Was that a stamp or was that handwritten?
6  A. No. It – if I remember right, they were
7  glitter stickers.
8  MR. O'DRISCOLL: Matt, if you'd like, I can take
9  a stab at this, or not, if you want. Inside the
10  postmarked envelope, there was another envelope in
11  which the letter itself was contained. The letter –
12  The envelope inside the envelope is the one that had
13  this Cassandra just the way you see it spelled with
14  glued-on glitter and it's purple and pinkish red.
15  And, again, you're welcome to come in and look at it.
16  It's just what I've described it.
17  BY MR. CLARK:
18  Q. Ms. Socha, you've heard what your counsel
19  described as the envelope. Is that true and accurate
20  to the best of your recollection?
21  A. Yes.
22  Q. Do you know anyone that uses glitter that
23  might send you this letter?
24  A. No.

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 130..133

Page 130

1　Q.　Okay. And then let me have you –
2　MR. CLARK: Lisa, if you go down to page 12.
3　BY MR. CLARK:
4　Q.　Ms. Socha, page 12, was that also in the
5　envelope or is this a separate note from a different
6　occasion?
7　A.　I believe this is a second letter that I
8　received, I believe.
9　Q.　And when did you receive a second letter?
10　A.　I know it was – I don't know. July,
11　August sometime.
12　Q.　Did you receive the second letter after
13　your conversation with Michael DeVito?
14　A.　I don't know that either. I'm sorry. I
15　don't recall that.
16　Q.　When you say you received a second letter,
17　did it come to you in the U.S. mail again?
18　A.　I don't believe so.
19　Q.　How did you receive the second letter?
20　A.　This was in my work mailbox.
21　Q.　So page – I'm sorry. Page 12 of Exhibit 2
22　was a note that was in your work mailbox?
23　A.　Yes.
24　Q.　Was it in an envelope?

Page 131

1　A.　I don't recall. I know it had – It was
2　a – Yeah, I don't think so. No, there was no
3　envelope. I don't remember, to be honest. I don't.
4　Q.　Was it just one page that you received?
5　A.　I think there was an attorney information
6　attached to it.
7　Q.　Was the attorney info attached to it your
8　current counsel's information?
9　A.　No.
10　Q.　Do you recall what attorney information was
11　attached to page 12 of Exhibit 2?
12　A.　I don't.
13　MR. ADAMS: Leamer and leamer.
14　THE WITNESS: Yeah, right.
15　　Is it possible for me to ask for a break?
16　MR. CLARK: Sure.
17　MR. ADAMS: What do you need, Cassie?
18　THE WITNESS: Like, ten minutes? I'm sorry.
19　MR. ADAMS: Okay.
20　MR. CLARK: Yes.
21　MS. PROCTOR: Why don't we take 15 or are we just
22　going to keep moving through this and not break for
23　lunch? What does the group think?
24　MR. CLARK: That's fine with me.

Page 132

1　MR. ADAMS: Whatever the witness and the reporter
2　need. I'm a team player that way.
3　THE WITNESS: I just have to feed – I mean, I
4　can feed him here.
5　MR. ADAMS: No, we don't want you to do that.
6　MR. CLARK: No, that's right.
7　MS. PROCTOR: No, no, that's fine. I was
8　thinking we probably might break, you know, in the
9　middle of this if that's even where we're at, you
10　know, for just a quick bite; but if we could just take
11　15 minutes. Sandra, would that work for you? It
12　certainly will work on my end.
13　THE WITNESS: That's fine.
14　MS. PROCTOR: I'm someone who needs to eat fairly
15　regularly.
16　THE WITNESS: That's fine.
17　　(A short recess was taken.)
18　BY MR. CLARK:
19　Q.　Ms. Socha, between the time receiving of
20　the search warrant by Sergeant Grizzle and you
21　receiving the first anonymous note which is page 11,
22　who else have you told you had been served with a
23　search warrant for your personal cell phone?
24　A.　I think I had a – I think I told my mom

Page 133

1　because she was trying to reach me the day that it was
2　served and she couldn't get a hold of me.
3　Q.　Have you ever had any conversation with any
4　officer at the Joliet Police Department that you had
5　been served with a search warrant for your cell phone?
6　A.　No, not that I recall.
7　Q.　Okay. Before, you indicated that page 11
8　that's up on the screen right now was your first
9　indication that someone had seen private images other
10　than Lieutenant Harrison had made reference to a cell
11　phone, correct?
12　A.　Yes.
13　Q.　And then I think we believe that you
14　received this letter on or about July 2nd of 2018.
15　Does that sound about right?
16　A.　Yes.
17　Q.　Okay. And where did you read the note?
18　A.　I believe I opened it right by my mailbox,
19　I think, or I went outside and read it. I don't
20　remember exactly.
21　Q.　How did you react?
22　A.　I was upset. I kind of, like – My breath
23　was kind of taken away. It was quite embarrassing to
24　read what was written.

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 134..137

**Page 134**

1    Q.   Was anyone else present when you were
2 reading the letter?
3    A.   No.
4    Q.   Did you say anything?
5    A.   No.
6    Q.   Have you shared this letter with any other
7 officer in the police department?
8    A.   Just Nick.
9    Q.   Do you recall when you showed Nick this
10 letter?
11    A.   The evening I was at home or the morning.
12 I don't – We worked overnight so I don't know if it
13 was in the morning when we both got off.
14    Q.   Did you call him before your shared the
15 contents of this note with him?
16    A.   Yes.
17    Q.   And did the two of you talk by way of
18 phone?
19    A.   Yes.
20    Q.   Where did you speak with him?
21    A.   Outside of the police department.
22    Q.   Do you know where Nick was at the time?
23    A.   I believe he was at the substation that we
24 have.

**Page 135**

1    Q.   What's the substation?
2    A.   There's two police stations. There's the
3 main station where I was at and then he was at the
4 substation which is considered the west station off of
5 Caton Farm Road.
6    Q.   Okay. It's addressed to Cassandra. Do
7 people in the department call you Cassandra or Socha?
8    A.   Both.
9    Q.   Both. So the fact that they used the name
10 Cassandra doesn't lead you to identify any particular
11 officer; is that fair?
12    A.   No, it doesn't.
13    Q.   Have you ever found out who sent this note
14 to you?
15    A.   I have not.
16    Q.   Have you asked anyone?
17    A.   I have not.
18    Q.   Did you ever ask Nick if he sent the note
19 to you?
20    A.   I did not.
21    Q.   This was the first indication that you
22 received that any of the private images of your cell
23 phone were being shared with anyone at the department;
24 is that true?

**Page 136**

1    A.   Yes.
2    Q.   Did you ask any investigators at the
3 department if they had seen the contents of your cell
4 phone at that time?
5    A.   No.
6    Q.   Have you ever asked any investigators if
7 they had seen the contents of your cell phone –
8    A.   No.
9    Q.   – your private images?
10      With respect to internal affairs, have you
11 asked anyone in internal affairs if they had seen the
12 contents and the private images of your cell phone?
13    A.   No.
14    Q.   Have you asked any of the staff members if
15 they've seen the contents of the private images of
16 your cell phone?
17    A.   No.
18      It indicates in the – Strike that.
19      Are there pictures on your – Strike that.
20      In May or June of 2018, were there pictures
21 of – on your cell phone of private images of you
22 giving Nick head?
23    A.   Yes.
24    Q.   Were there private images, pictures, or

**Page 137**

1 videos that says deep throating Nick's penis?
2    A.   I believe so, yes.
3    Q.   Were there images or videos on your cell
4 phone in May or June of 2018 of you spitting on his
5 penis while giving him head?
6    A.   Yes.
7    Q.   Were there pictures in May or June of 2018
8 on your private cell phone of you fucking him?
9    A.   Yes.
10    Q.   So when you read this letter or note, you
11 believed the contents of these pictures or videos to
12 be true; is that fair?
13    A.   Yes.
14    Q.   Did you speak to any supervisors if they
15 had viewed these contents of private images of your
16 cell phone in May or June of 2018?
17    A.   I did not.
18    Q.   What did you do with this note?
19    A.   I'm sorry?
20    Q.   What did you do with this note?
21    A.   I folded it back how it was, took it with
22 me in my squad car because I had to work that night,
23 and then I brought it home and I showed Nick as he's
24 clearly involved in this, he's depicted in these

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 138..141

Page 138

1  images, and then I believe again I – I think I spoke
2  to Tomczak again.
3      Q.  So after talking with Nick, your first
4  contact was to Mike Tomczak – Jeff Tomczak? Sorry.
5      A.  Yes.
6      Q.  Okay.
7      MR. ADAMS:  Jeff probably throws better too.
8  BY MR. CLARK:
9      Q.  Were you seeking legal advice when you
10  contacted the attorney contact?
11     A.  I was seeking some sort of advice. I mean,
12  my – the contents of some of the things that were on
13  my phone have been clearly depicted in this and I
14  didn't know what to – where to go from there because
15  obviously I couldn't go to any members of the police
16  department as they're clearly involved.
17     Q.  So what did you do? Who did you go to?
18     A.  I just said I went to Tomczak.
19     Q.  After Tomczak.
20     A.  Like, that day? I mean, your question is
21  kind of broad.
22     Q.  Okay. With respect to going to Tomczak –
23  Let me get the date clear. When did you go speak with
24  Attorney Tomczak?

Page 139

1      A.  The morning I – The morning after I
2  received this letter.
3      Q.  After speaking with Attorney Tomczak the
4  morning after receiving this letter, did you make a
5  report to anyone within the Joliet Police Department?
6      A.  No, because like I said, they were clearly
7  involved in the viewing of this.
8      Q.  Did Attorney Tomczak contact anyone at the
9  Joliet Police Department, to the best of your
10  knowledge?
11     A.  No.
12     Q.  Did you – Who did you report the contents
13  of this letter to after speaking with
14  Attorney Tomczak?
15     A.  Reported to the police department?
16     Q.  Anyone.
17     A.  I didn't report it –
18     Q.  Who did you –
19     A.  I didn't report it to anybody, I contacted
20  my attorney Hall Adams.
21     Q.  Okay. So you admit you never reported this
22  to the Joliet Police Department?
23     MR. ADAMS:  Asked and answered.
24  BY THE WITNESS:

Page 140

1      A.  No.
2      Q.  Are you aware of any investigation that was
3  conducted as a result of you receiving this letter?
4      A.  Nobody knew I got the note.
5      Q.  And I don't want to know the conversations
6  with Hall Adams, but did you ever share this note with
7  the FBI?
8      A.  No.
9      Q.  Did you ever make a report to Deputy
10  Chief Roechner?
11     A.  No.
12     Q.  Did you ever have a conversation with
13  Sergeant Grizzle, Ed Grizzle about the contents of
14  this letter?
15     A.  No.
16     Q.  Why not?
17     A.  There's – I mean, there's no reason to do
18  that. People were involved in spreading my images
19  around and the content of my cell phone that was meant
20  to be private and he is in a supervisory role, and it
21  states in this letter that supervisors, internal
22  affairs and members have seen and trolled through my
23  phone the contents of it.
24     Q.  Did you believe this to be Ed's fault?

Page 141

1      A.  I believe there's culpability on Grizzle's
2  part, absolutely.
3      Q.  Why?
4      A.  Had the search warrant not been executed
5  and the phone dumped the way that it was, this stuff
6  never would have been able to be leaked or viewed.
7      Q.  Do you think Ed Grizzle has seen these
8  photos or videos?
9      A.  I believe he has seen.
10     Q.  Why?
11     A.  I don't think that after going through and
12  dumping a cell phone that you – you know, knowing
13  that I have a concern about it, I think the curiosity
14  probably got the best of some people.
15     Q.  Do you know who?
16     A.  I'm sorry?
17     Q.  Do you know who was curious about it or got
18  the best of them?
19     A.  I don't know.
20     Q.  Now, going back to the document page 11 of
21  Exhibit 2, it says that comment are said that you fuck
22  like a porn star and the way you give head and fuck
23  Nick no man should ever leave you alone. Have you
24  ever heard anyone make that comment to you?

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 142..145

Page 142

1   A.  No.
2   Q.  Have you ever heard it just through
3  passing?
4   A.  No.
5   Q.  The next sentence reads:  The search
6  warrant should have never revealed any of this
7  information.  It should have only been for text
8  messages and phone calls.  Do you see that sentence?
9   A.  I do.
10   Q.  Had you expressed that concern with anyone
11  prior to receiving this note?
12   A.  No.
13   Q.  Do you have an idea who might have sent
14  this note to you?
15   A.  I don't.
16   Q.  I think – Strike that.
17       Did you ever talk with Nick to determine
18  who might have sent this note to you?
19   A.  I'm sure we've had discussions, but never
20  came up with anybody.
21   Q.  Do you know who Nick thinks might have sent
22  you this note?
23   A.  No.
24       MR. CLARK:  If we can go to page 12 of Exhibit 2.

Page 143

1       THE COURT REPORTER:  (Complying.)
2  BY MR. CLARK:
3   Q.  Ms. Socha, I just want to clarify, you're
4  not sure when you received page 12, this note?
5   A.  I'm not sure of the exact date, if that's
6  what you're asking, but I know that this was after the
7  letter that I received via U.S.P.S.
8   Q.  Did you ask Michael DeVito about any of
9  these notes?
10   A.  No.
11   Q.  Did you tell Michael DeVito that you
12  received any of these notes?
13   A.  No.
14   Q.  Who have you told about these notes?
15   A.  Just Tomczak and my attorney and Nick.
16   Q.  Looking at page 12, the second sentence, it
17  says:  There are several supervisors as well as the DC
18  investigations.  At that time you received the note,
19  who was the DC investigations?
20   A.  Roechner.
21   Q.  Have you ever heard that Roechner has
22  viewed your private images?
23   A.  In the other – In another letter that was
24  sent that I read that it said that.

Page 144

1   Q.  The letter you said that was sent to Hall
2  Adams?
3   A.  Yes.
4   Q.  Any other source that has indicated that
5  the DC of investigations, Roechner, had seen private
6  images of you from your cell phone?
7   A.  Nobody has told me that, no.
8   Q.  Have you ever heard the rumor that Roechner
9  had scrubbed his personal computer?
10   A.  Yes.
11   Q.  Where did you hear those rumors?
12   A.  At the police station.
13   Q.  Who told you that?
14   A.  I couldn't tell you.
15   Q.  Do you recall –
16   A.  I don't recall.
17   Q.  – when you were told that?
18   A.  No.
19   Q.  Was it before or after you filed your
20  lawsuit?
21   A.  Afterwards.
22   Q.  Ms. Socha, on occasion I see you kind of
23  dart your eyes up to the left.  Are you looking at
24  something?

Page 145

1   A.  I don't have anything on my thing.  What's
2  coming across is my gmail e-mail and it's beeping in
3  my ear.
4   Q.  Okay.  Thank you.
5       On page 12, the first sentence of the
6  second paragraph reads:  The person responsible of
7  disclosing the photos is the same one who obtained
8  warrant for your phone along with other supervisors
9  involved in this case.  And you never had a
10  conversation with Ed Grizzle about this; is that
11  right?
12       MR. ADAMS:  Objection –
13  BY THE WITNESS:
14   A.  I did not.
15       MR. ADAMS:  (Continuing.) – asked and answered.
16  BY MR. CLARK:
17   Q.  The next sentence:  It is no big secret
18  throughout investigations that this is being conducted
19  while on duty.  Before this – I'm sorry.  Before the
20  first note, you had never heard that before, had you?
21   A.  Can you repeat that?  I didn't hear you at
22  all.  I'm sorry.
23   Q.  Sure.  The first part of the second
24  sentence – I'm sorry.  Yeah, the first part of the

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 146..149

Page 146

1  second sentence reads: It is no big secret throughout
2  investigations that this is being conducted while on
3  duty. Outside of the first note that we sent through,
4  you had never heard that rumor or secret before; is
5  that fair?
6      A.  Yes.
7      Q.  The next sentence, the first part reads:
8  You have been made out to be the bad guy in all of
9  this. What do you think that means?
10     A.  I think exactly what it reads.
11     MR. ADAMS: Objection as to speculation. You're
12  asking her to assume some anonymous author.
13     MR. CLARK: Fair enough.
14  BY MR. CLARK:
15     Q.  How did you take it when someone made the
16  assertion that you had been made out to be the bad guy
17  in all of this?
18     A.  That it makes me look – That it makes me
19  look bad. I mean, there's no other way to interpret
20  it.
21     Q.  What makes you look bad?
22     A.  Whatever has been – being done behind my
23  back.
24     MR. ADAMS: Objection. You're asking her to

Page 147

1  construe what somebody else meant.
2      MR. CLARK: No, I'm asking her how she took it.
3      MR. ADAMS: You're asking her, Matt, respectfully
4  what this author meant by that. That's what the
5  question is.
6      MR. CLARK: Okay. She answered so we can move
7  on.
8  BY MR. CLARK:
9      Q.  Were you aware that an Inspector General
10  investigation took place?
11     A.  I was not.
12     Q.  Did you ever become aware of the fact that
13  an Inspector General investigation took place?
14     A.  When the discovery was released.
15     Q.  As part of this litigation?
16     A.  Yes.
17     MR. CLARK: If I can go to pages 6 and 7 of this
18  exhibit, Lisa.
19     THE COURT REPORTER: (Complying.)
20  BY MR. CLARK:
21     Q.  Okay. Do you know if Chris Botzum – Or is
22  it Botzum?
23     A.  It's Botzum.
24     Q.  (Continuing) – Chris Botzum, if he's ever

Page 148

1  seen any private images of you?
2      A.  I don't know.
3      Q.  Do you know if Jeffrey German has ever seen
4  any private images of you?
5      A.  I don't know.
6      Q.  Do you know if Michael Banas has ever seen
7  any private images of you?
8      A.  I don't know.
9      Q.  Do you know if Brian Benton has ever seen
10  any private images of you?
11     A.  I don't know.
12     Q.  Do you know if Marc Reid has ever seen any
13  private images of you?
14     A.  I don't know.
15     Q.  Do you know if James Rouse has ever seen
16  any private images of you?
17     A.  I don't know.
18     Q.  Do you know if Darrell Gavin has ever seen
19  any private images of you?
20     A.  I don't know.
21     Q.  Do you know if Robert Brown has ever seen
22  any private images of you?
23     A.  I don't know.
24     Q.  Do you know if Jerry Harrison has ever seen

Page 149

1  any private images of you?
2      A.  I don't know.
3      Q.  Do you know if Tab Jensen has ever seen any
4  private images of you?
5      A.  I don't know.
6      Q.  Do you know if Nick Crowley knows if any of
7  those individuals have ever seen any private images of
8  you?
9      A.  I don't know.
10     Q.  Has Nick Crowley ever told you that he is
11  aware of officers seeing private images of either you
12  or him?
13     A.  He has not told me that, no.
14     Q.  Have you ever had a conversation with
15  Detective Dave Jackson about seeing your private
16  images?
17     A.  I haven't, no.
18     Q.  Are you aware that Nick Crowley has had
19  conversations with Detective Jackson about seeing
20  private images?
21     A.  I believe he has talked to Dave Jackson.
22     Q.  Has Nick Crowley told you what Dave Jackson
23  told him?
24     A.  No.

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 150..153

Page 150

1   Q.  Nothing at all or no specifics?

2   A.  No specifics. I mean, I know that they

3 have -- they've had conversations.

4   Q.  Do you believe that any officer -- Strike

5 that.

6       Since May or June of 2018, have you

7 attempted to obtain any different positions within the

8 department?

9   A.  No. Nothing has come up. I mean,

10 there's -- there hasn't been really openings, I don't

11 believe, as far as my recollection.

12   Q.  Are you aware of the time frame of Darrell

13 Gavin being promoted to deputy chief of

14 investigations?

15   A.  Do I know when?

16   Q.  No. Did you know that occurred?

17   A.  Yes.

18   Q.  Do you have any basis on how or as to why

19 that occurred?

20   A.  Why he was promoted?

21   Q.  Right, yes.

22   A.  No.

23   Q.  Are you aware that Sergeant Grizzle was

24 reassigned to the Tri-County Auto Theft Task Force?

Page 151

1   A.  I am.

2   Q.  Do you know why that occurred?

3   A.  I don't know why.

4   Q.  Do you know if Philip Bergner was

5 reassigned to the FBI Cyber Crimes Unit?

6   A.  Yeah, I believe he was temporarily or for a

7 short term.

8   Q.  Do you know why that occurred?

9   A.  No.

10   Q.  Did you know that Jeremy Harrison was

11 reassigned to lieutenant of Joliet Narcotics Unit?

12   A.  Yes.

13   Q.  Do you know why that occurred?

14   A.  I do not.

15   Q.  Did you know that Mike Batis was promoted

16 to deputy chief?

17   A.  Yes.

18   Q.  Do you know why that occurred?

19   A.  I don't know why.

20   Q.  Do you know that Tim Powers was reassigned

21 to the Tactical Unit?

22   A.  I do.

23   Q.  Do you know why that occurred?

24   A.  I do not.

Page 152

1   Q.  At some point in time did you become aware

2 of an FBI raid?

3   A.  Yes.

4   Q.  When did that FBI raid occur?

5   A.  I believe after the lawsuit that was filed

6 on my behalf was entered.

7   Q.  Do you know how the FBI became aware of

8 your lawsuit?

9   A.  I don't know.

10   Q.  Have you ever spoken to anyone at the FBI?

11   A.  No.

12   Q.  Do you know any of the results as a result

13 of the FBI raid?

14   A.  The only thing that I know is based off the

15 discovery that I got from this litigation.

16   Q.  What did you learn?

17   A.  It's Chinese to me, but that there was --

18 there was an investigation that was spearheaded after

19 the lawsuit was filed on my behalf.

20   Q.  Who is Deb Del Re?

21   A.  She was a nurse practitioner that I saw in

22 conjunction with Nicole.

23   Q.  And as nurse practitioner, what did she do?

24   A.  Nurse practitioner in psychiatry?

Page 153

1   Q.  Yeah.

2   A.  Yeah, that's what she did.

3   Q.  Okay. Let me ask a better question then.

4 For counseling sessions, you had seen Nicole; is that

5 right?

6   A.  Yes.

7   Q.  Why would you see Deb Del Re?

8   A.  I went to see Deb after I asked for a

9 recommendation. I was having trouble sleeping and a

10 little anxious and so Nicole referred Deb Del Re --

11 her to me.

12   Q.  And was Deb Del Re able to help you with

13 sleeping issues?

14   A.  Yes.

15   Q.  And how did she do so?

16   A.  I was prescribed a low dose of Lexapro and

17 also an antihistamine, I guess there's -- an

18 antihistamine rather than taking a narcotic to help

19 individuals sleep that she prescribed which I took.

20   Q.  As a result of -- Strike that.

21       With respect to the viewing of your private

22 images, have you spoken to that with Counselor Nicole?

23   A.  Yes.

24   Q.  How many times?

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 154..157

Page 154

1    A.   I would assume – I think every time that
2  we had met from the time that I had discovered this
3  until we no longer saw each other.
4    Q.   Why did you stop seeing Nicole?
5    A.   Because I got pregnant and it was just
6  difficult to manage the time to go see her because she
7  had limited availability.  And then after I had my
8  son, my first son, I did go back and see her for a
9  little – I'm sorry.  I take that back.  I did see her
10 while I was pregnant.  I'm sorry.  I stopped seeing
11 her shortly after I had my son.  I'm sorry.  I did go
12 back and see her for a while and then she left the
13 practice.
14   Q.   And had you seen any other counselor since?
15   A.   I have not.
16   Q.   What kind of problems or issues did you
17 report to Nicole after you learned that the contents
18 of your cell phone and private images may have been
19 seen by others?
20   A.   I just let her know how upset I was, how I
21 was pretty sure that the career path that I had chosen
22 was no longer available for me.  The way that people I
23 felt viewed me was no longer the way that I had once
24 thought it was.  I had a lack of drive to go to work.

Page 155

1  This is something – You know, I chose to leave a
2  place that I was comfortable in to go to a completely
3  different place, being the Joliet Police Department,
4  to better myself and, you know, I had people who were
5  my supervisors, people who were supposed to be mentors
6  to me degrade me, embarrass me.  I've been exploited.
7  I don't know who has seen my body and who hasn't seen
8  my body when I go to work.  You know, when I would go
9  on calls, I feel like I would have to hide my name
10 because my name was all over the press down there.
11   Q.   Why was your name in the press?
12   A.   Because after this lawsuit was filed on my
13 behalf, I'm sure that somebody in this police
14 department leaked it to one or several of the agencies
15 down there and they ran stories about it.
16   Q.   You indicated that your career path that
17 you wanted to choose was no longer there, correct?
18   A.   That's how I felt, how I feel.
19   Q.   What was the career path you're making
20 reference to?
21   A.   Just to be able to go into – if I wanted
22 to go into a different unit had the opportunity arose
23 or, you know, become in a supervisory role had I felt
24 confident enough to take that step and I'll tell you

Page 156

1  that there has been a sergeant's exam that has come
2  and gone and I've let it pass.  I passed the
3  sergeant's exam when I was in another police
4  department.  I took on a supervisory role there and
5  it's just I didn't – You know, to have to be over
6  people, you have to have confidence.  And the
7  confidence that I feel as though I once exuded has
8  been taken from me.
9    Q.   When was the sergeant's exam that you
10 passed on?
11   A.   I'm sorry.  There may have been two.  I
12 couldn't tell you the exact dates or the years, but I
13 know it's – it's been since 2018.
14   Q.   Are sergeant's exams in the Joliet Police
15 Department offered every other year?
16   A.   I don't know how they're offered, to be
17 honest with you.
18   Q.   Did you tell anyone that you had passed on
19 sitting for the sergeant's exam on one or two
20 occasions because of the viewing of the private
21 images?
22   A.   No, but I know that Nicole – not
23 specifically, but I know Nicole and I have had
24 discussions regarding jobs in the police department

Page 157

1  that I just was – didn't take or didn't try for.
2    Q.   Were there any other opportunities to go to
3  different units that you've passed on?
4    A.   I don't know.  I mean, I would have to go
5  back and look at the exact dates that if there was
6  anything offered, but there are certain, like, years
7  that people have to commit and you have to wait until
8  these people exhaust these years and then – You know,
9  like, just for example, like, investigations, you have
10 to give a two-year commitment, but it's, like,
11 life-long.  So you can be an investigator for the
12 duration of your career once you get into
13 investigations.  But seeing as how this all has
14 happened in investigations, there would be no – I
15 mean, I couldn't even stomach going in there to apply
16 for that.
17   Q.   Is it fair to say that you haven't applied
18 for any position since May or June of 2018 that you
19 haven't received?
20   A.   Can you repeat that one more time?
21   Q.   Sure.  Since May or June of 2018, have you
22 applied for any different positions within the
23 Department of Joliet?
24   A.   No.

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 158..161

**Page 158**

1  Q.  You indicated that you're upset because of
2  how you have – or are viewed, but as we sit here
3  today you don't know which officers have seen or
4  viewed any of the videos of private images; is that
5  true?
6  A.  Right.
7  Q.  And how did that change or how did your
8  internal mechanism change from the time before it came
9  to the attention that private images may have been
10  viewed until after?
11  A.  I didn't under- – Are you asking me how
12  I – I don't understand how you're asking me.  Are you
13  asking how I process this?
14  Q.  Well, you indicated that after you learned
15  about private images being viewed that you had a lack
16  of drive to go to work, right?
17  A.  Right.
18  Q.  How does that manifest itself in terms of
19  what's actually changed?
20  A.  I no – I can recall specifically there was
21  an article, I think, that was printed, I don't
22  remember exactly which one, but it – this keeps
23  coming up with the press down here when somebody leaks
24  something, when somebody says something to somebody

**Page 159**

1  and my name is thrown into it or the article is about
2  myself.  And I know that I have called in sick more
3  than I ever did before.  I'm not one to call in sick
4  just to hang out.  I know I've stayed home for an
5  entire weekend.  I know that sometimes when articles
6  leak, I have left work when I was on the desk working
7  light duty because I was pregnant and an article came
8  out.  And, you know, I get text messages of my face in
9  the newspaper, my family sends me a picture.  I don't
10  think you'd feel any better.
11  Q.  I'm sorry.  When you say you've received
12  text messages when your face is in the paper, what do
13  you mean by that?
14  A.  People will send me screen shots and – of
15  my face in the newspaper or a newspaper article or an
16  on-line article.
17  Q.  Is that in connection with your performance
18  of your job or this lawsuit?
19  A.  It's in connection with this lawsuit, but
20  it goes hand-in-hand when I'm in uniform and I'm on
21  the front page of the Herald newspaper.
22  Q.  Who has sent you a text screen shot?
23  A.  It's been other officers.
24  Q.  Which officers?

**Page 160**

1  A.  I couldn't – I couldn't tell you.  Right
2  now, I don't have them on my phone.
3  Q.  Did you delete them?
4  A.  Yeah.
5  Q.  When the officers send you the screen shot
6  of your photograph on newspapers, are any comments
7  made?
8  A.  I don't really comment back.  I just say
9  okay.  That's about it.
10  Q.  Do the officers that have sent you the text
11  messages – do they make any comments about the
12  photograph?
13  A.  Not that I can recall.
14  Q.  Have you been diagnosed with any disorder
15  as a result of the viewing of the private images?
16  A.  I'd have to look at both Deb Del Re's and
17  Nicole's notes to tell you.
18  Q.  Do you recall ever being diagnosed with
19  depression?
20  A.  I believe so.
21  Q.  Do you take any medication as a result of
22  being diagnosed with depression or having depression?
23  A.  Do I or did I?
24  Q.  Did you.

**Page 161**

1  A.  I did.
2  Q.  What were you prescribed?
3  A.  Lexapro.
4  Q.  And when did you start to take that
5  medication?
6  A.  I couldn't be sure.  2018.
7  Q.  When did you stop?
8  A.  I stopped when I found out I was pregnant.
9  Q.  Just the first time?
10  A.  Yes.  Sorry.
11  Q.  Have you taken any medication for
12  depression since then?
13  A.  No, because I've been breast feeding for
14  two years.  I'm still breast feeding.
15  Q.  Do you have any thoughts or feelings of
16  depression since you stopped taking that medication?
17  A.  I have bouts of it, yes.
18  Q.  How do those bouts of depression manifest
19  themself?
20  A.  I mean, I cry.  I can't really sleep
21  because it's not doable.  I – Migraines.  I know that
22  I did have a migraine for a while.  You know, I'm
23  quick to anger sometimes.  I mean, I guess, you know,
24  it's classic depression definition.

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 162..165

Page 162

1  Q.  How often do you cry?
2  A.  When this gets – It's when this litigation
3  or when this – when the whole – everything gets
4  brought up again regarding this lawsuit and the stuff
5  that happened around it,
6  Q.  How often can't you sleep as a result of
7  your private images being viewed?
8  A.  Well, a while.  I mean, I don't – I mean,
9  I couldn't tell you.  It's often, but it's – I don't
10 know.
11 Q.  Once a month?
12 A.  So I mean, it's kind of hard to pinpoint it
13 when I have a newborn.  So I don't really – I don't
14 really – I don't know.  Before this, it was a while.
15 You know, it's just when things get, like, put in
16 front of my face again.  Like, that letter that you
17 made me read and then you repeated it back, that's –
18 there's that, so ...
19 Q.  How often do you have migraines?
20 A.  I'm sorry?
21 Q.  How often do you have migraines?
22 A.  I haven't had one for a while.  I think
23 in – I don't even know what month this is.  Last – I
24 don't know.

Page 163

1  Q.  Do you think it's been more than
2  two months?
3  A.  Since I had a migraine?
4  Q.  Yeah.
5  A.  I don't – I couldn't – I mean, honestly,
6  these last three months have been a blur since the
7  baby.
8  Q.  Fair enough.  You indicated that you're
9  quick to anger.  Can you give me an example of how
10 you've been quick to anger?
11 A.  I don't know.  Like, snapping kind of, kind
12 of snappy.
13 Q.  Does that occur on a regular basis?
14 A.  No.  I mean, I – No.  I think it's just
15 most of this gets centered around this stuff that gets
16 brought up.  I mean, with all due respect, I – I –
17 You know, like I said, I've been pregnant and then I
18 had my baby so it's kind of hard to gauge my patience
19 last couple of months from what you're asking me.
20 Q.  Fair enough.  Before you had your most
21 recent child, did you differentiate the two?
22 A.  Well, yeah.
23 Q.  And how could you differentiate being quick
24 to anger before you had your child?

Page 164

1  A.  Well, it would be – it would be, like,
2  little things.  I don't know.  You know, I couldn't
3  get my shoe on or something.  I mean, it's just little
4  stuff that would just – that wouldn't set you off if
5  you weren't upset about something and then this set
6  you off.
7  Q.  You're not currently seeing a counselor; is
8  that right?
9  A.  I'm not.
10 Q.  Have you been diagnosed with PTSD?
11 A.  I believe I was – I'm sorry.  I did see
12 somebody after – I did see somebody in the same
13 practice.  It's just the schedules again didn't line
14 up once they were met, so I couldn't continue to see
15 her.  I think I saw her once or twice, maybe once.
16 Q.  When did you see her?
17 A.  I'm sorry?
18 Q.  When did you see her?
19 A.  October.
20 Q.  Of which year?
21 A.  2020.
22 Q.  And I think you indicated that was someone
23 in the same practice as Nicole?
24 A.  Yeah.

Page 165

1  Q.  Are there any – Strike that.
2  After learning that private images may have
3  been viewed, were you put on any other medications?
4  A.  No.  I – Like I said, just the Lexapro and
5  antihistamine.
6  Q.  Do you believe your reputation has been
7  damaged?
8  A.  I do.
9  Q.  How so?
10 A.  I've been in this profession long enough to
11 know that unless you're pretty squeaky clean, any kind
12 of mishap or anything like this follows you for the
13 entirety of your career.
14 Q.  Has anyone told you that?
15 A.  No.  This is my feeling, again, for being
16 in this profession long enough to know better.
17 Q.  Other than what you just told me in the
18 last 20, 30 minutes, and I appreciate your patience,
19 has there been any other way that you – that you can
20 tell me that you suffered emotional distress as a
21 result of your private images being viewed?
22 A.  I mean, I'll tell you that it is hard for
23 me even though – it's hard for me to be intimate with
24 Nick even though I know it's, like, oh, yeah, you have

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 166..169

Page 166

1  two kids. Well, that's not – it's just hard. I
2  feel, like, maybe – I don't feel as comfortable in my
3  own skin anymore. I don't feel comfortable in my
4  uniform. I don't feel comfortable – I didn't feel
5  comfortable being pregnant and being in the police
6  station. I mean, I didn't even show that I was
7  pregnant with my first child to anybody. I tried to
8  hide it. I tried to hide the second one. And I
9  shouldn't have tried to hide my kids.
10  Q.  Okay. Anything else that you can tell me?
11  A.  No.
12  MR. CLARK: I think I'm done with my line of
13  questioning. You know, I'm going to turn it over to
14  the City attorney. Maybe now is a good time for a
15  break as well, but I don't know if you think so.
16  MS. PROCTOR: Yeah, I'm going to have some
17  questions. So maybe can we take 10 – a 10-minute
18  break and resume? Will that work for everyone? Okay.
19  We'll see everyone in about 10 minutes.
20  (A short recess was taken.)
21
22
23
24

Page 167

1  CROSS-EXAMINATION
2  BY MS. PROCTOR:
3  Q.  Officer Socha, my name is Darcy Proctor and
4  I represent the City of Joliet in this matter. So
5  just like Officer Grizzie's counsel had an opportunity
6  to ask you questions, it's now my turn, it's part of
7  the process. Let me just ask you a couple things.
8  The – Would you agree that your lawsuit against the
9  City of Joliet for which we're here for today was
10  filed on August 21st of 2018?
11  A.  Yes, ma'am.
12  Q.  Okay. And attorney Hall Adams filed this
13  lawsuit on your behalf, correct?
14  A.  Yes, ma'am.
15  Q.  Okay. When did you first – And I don't
16  want to know what you talked about to be clear, but
17  when did you first consult with Mr. Hall Adams?
18  A.  Are you looking for a date?
19  Q.  Yes.
20  A.  He would probably have a better record of
21  that, but I believe July or August in 2018.
22  Q.  Okay. So when we were going through some
23  of the exhibits earlier, you know, we talked
24  specifically about a letter that at least was

Page 168

1  postmarked – I think it was July 2nd of 2018. Do you
2  recall talking about that letter, Officer Socha?
3  A.  Yes, ma'am.
4  Q.  Okay. So did you meet with Hall Adams,
5  either meet or consult with by phone – again, I don't
6  want to know what you discussed – at some point after
7  July 2, 2018, and before your lawsuit was filed on
8  August 21st of 2018?
9  A.  Yes, ma'am.
10  Q.  Okay. And to be clear, there were
11  three people that you told about having received this
12  letter on or around July 2, 2018, and those
13  three people included Officer Crowley – Nicholas
14  Crowley, Attorney Tomczak, and Attorney Hall Adams,
15  correct?
16  A.  Yes.
17  Q.  Okay. You didn't share that information
18  with anybody else –
19  A.  No.
20  Q.  – the fact that you received the letter or
21  what the contents of the letter were that you received
22  on or around July 2nd of 2018, correct?
23  A.  No.
24  Q.  Okay. Did you review and approve the

Page 169

1  factual allegations contained in your complaint filed
2  on August 21, 2018, before it was actually filed with
3  the federal court?
4  A.  Yes.
5  Q.  And at the time your lawsuit was filed on
6  August 21, 2018, did you verify the truth of the
7  allegations contained in that document you filed which
8  is known as your civil complaint? Did you verify
9  those altercations?
10  MR. ADAMS: I'm going to object and instruct her
11  not to answer. That would call for her to disclose
12  attorney-client privilege. It's not a verified
13  pleading, and the only portions of which she might
14  have verified that is me.
15  MS. PROCTOR: I don't disagree with – I don't
16  agree with that, Hall, but let me try it another way.
17  Okay.
18  BY MS. PROCTOR:
19  Q.  Officer Socha, did you review the factual
20  allegations contained in your civil complaint before
21  it was filed on August 21st of 2018?
22  MR. ADAMS: Objection, asked and answered.
23  BY MS. PROCTOR:
24  Q.  I believe you said yes, correct? I'm just

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021                                                    Pages 170..173

Page 170

1   trying to set some context. Yes?
2       A.  Yes. I reviewed what my attorney had
3   prepared, yes.
4       Q.  Okay. And were the allegations contained
5   in your complaint -- the factual allegations contained
6   in your complaint -- And to be clear, we have close to
7   23 pages of allegations, not all are factual, but many
8   of them are factual allegations. And my question to
9   you is, are the factual allegations contained in your
10  original complaint and any amended complaint that was
11  filed on your behalf true?
12      A.  Yes.
13      Q.  Specifically paragraph 29 of your amended
14  complaint, which for the record was filed on July 31,
15  2019, states that senior leaders and/or supervisors of
16  the City's Department of Police have been aware of and
17  acquiesced and participated in the viewing,
18  dissemination, and re-recording of the private images
19  on plaintiff's iPhone. Is that allegation true or
20  false, to the best of your knowledge?
21      A.  True.
22      Q.  On what do you base that allegation? What
23  is the factual basis to support the allegation that I
24  just read to you in paragraph 29 of your first amended

Page 171

1   complaint, if you know?
2       A.  I'm going to go off of the letters that
3   were received, ma'am.
4       Q.  Okay. Other than the letters that were
5   received which I'm not going to go through those again
6   because Mr. Grizzle's counsel already covered that,
7   but other than the letters that have been received and
8   produced to the parties in this litigation, you don't
9   have any other information concerning the
10  allegation -- to support in your view the allegation
11  that I just read in paragraph 29 of the first amended
12  complaint, true?
13      A.  True.
14      Q.  Okay. I want to -- You also identified
15  almost -- other than yourself, 24 potential witnesses
16  that you indicate have some knowledge or information
17  concerning these matters, and I don't know any other
18  way other than to go through the list and just sort of
19  ask you about each of these witnesses. So let's start
20  with Detective Dave Jackson. Can you tell us,
21  Officer Socha, what, if any, knowledge or information
22  do you have that Detective Dave Jackson either viewed
23  your private images including photographs and videos
24  or was aware that such images were being viewed by

Page 172

1   members of the Joliet Police Department?
2       A.  I don't have knowledge that he's viewed any
3   of my private images.
4       Q.  Do you have any knowledge that he was aware
5   that any past or present member of the Joliet Police
6   Department viewed your private images that we've been
7   discussing today?
8       A.  Can you ask that one more time? I'm sorry.
9       Q.  Sure. What, if any, knowledge or
10  information do you have that Detective Dave Jackson
11  was aware that your private images were being viewed
12  by members of the Joliet Police Department?
13      A.  I don't have any direct knowledge from Dave
14  Jackson of that.
15      Q.  Well, when you say "direct knowledge,"
16  that's -- what do you mean by that?
17      A.  I mean exactly what I said. I don't have
18  any direct -- David Jackson and I haven't spoken about
19  that, if that's what you're asking.
20      Q.  Well, yeah, I -- Look, you filed this
21  lawsuit against the City of Joliet, correct?
22      A.  Yes, ma'am.
23      Q.  All right. And you've also, you know,
24  identified close to 24 different witnesses who may or

Page 173

1   may not have knowledge concerning the events that
2   we've been discussing today. Okay. So I'm just
3   trying to set a context. And my question to you is,
4   what knowledge, if any -- what knowledge or
5   information, if any, do you have that
6   Detective Jackson either viewed or was aware that your
7   private images were viewed?
8       A.  I don't have any.
9       Q.  I'd like to talk next about Darrell Gavin,
10  who according to your supplemental disclosures in this
11  lawsuit which were made on or around September 4th of
12  2020, you state that Darrell Gavin, Deputy Chief of
13  Investigations, is -- has knowledge regarding the
14  handling, viewing, circulation, reproduction, and
15  downloading of images from your iPhone. So my
16  question to you is, what -- can you identify for me
17  what knowledge, if any, or information you have, if
18  any, to support that representation in your discovery?
19      A.  I don't have any.
20      Q.  So to be clear, you have no knowledge or
21  information that Deputy Chief Gavin either viewed or
22  was aware that your private images were viewed at any
23  point in time by any member of the Joliet Police
24  Department, correct?

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 174..177

Page 174

1     A.   Well, I do if we go off of the letters that
2 have been sent.
3     Q.   Okay. Well, other than what's in these
4 purported letters. Okay. Other than what's in the
5 purported letters, let's just put those aside, do you
6 have any other knowledge or information that Darrell
7 Gavin viewed or was aware that your private images
8 were viewed by any member of the Joliet Police
9 Department including Darrell Gavin?
10     A.   No.
11     Q.   What, if any, knowledge or information do
12 you have that Philip Bergner either viewed or was
13 aware that your private images were being viewed by
14 any member of the Joliet Police Department at any
15 point in time?
16     A.   I don't.
17     Q.   I'm sorry. Your answer just kind of cut
18 out on me. I'm sorry. I didn't hear it.
19     A.   Oh, I'm sorry. I don't.
20     Q.   Okay. What, if any, knowledge or
21 information do you have that Marc Reid viewed or was
22 aware that your private images were viewed by any
23 member of the Joliet Police Department at any point in
24 time?

Page 175

1     MR. ADAMS: I'm going to pose an objection to
2 form and just ask for clarification. Do all these
3 questions regarding the list of witnesses all mean to
4 exclude the letters as you did with a couple of the
5 earlier witnesses?
6     MS. PROCTOR: Yes.
7     MR. ADAMS: Okay.
8 BY MS. PROCTOR:
9     Q.   Do you understand that, Officer Socha?
10 Okay. Let's just put the letters aside, or you can
11 just tell me. I'm going to ask you about a witness,
12 and if the only basis for including them in your
13 discovery disclosures in the case is what's in these
14 purported letters, then just tell me that, just tell
15 me that. All right?
16     A.   Okay.
17     Q.   So let's talk about – I think we were
18 on – I think we were on Marc Reid, correct?
19     A.   Yes.
20     Q.   Okay. So what, if any, knowledge or
21 information do you have that Marc Reid either viewed
22 your private images or was aware that these images
23 were being viewed by any member of the Joliet Police
24 Department?

Page 176

1     A.   From the letters.
2     Q.   Okay. So no information other than the
3 information contained in these purported letters,
4 correct?
5     A.   Yes.
6     Q.   All right. What, if any, knowledge or
7 information do you have that Jeremy Harrison has any
8 knowledge regarding the viewing, circulation,
9 reproduction, and downloading of images on your
10 iPhone?
11     A.   I don't except for the letters and – yeah.
12     Q.   Is there anything else or just the contents
13 of –
14     A.   I mean – Go ahead.
15     Q.   – the letters?
16     A.   I don't know what happened to the ...
17     Q.   Can you hear me okay, Officer Socha, or
18 did – we lost each other?
19     A.   No. I can hear you, but I can't see you.
20     Q.   Do you want to just take a minute?
21     A.   Okay. I don't – You're not on my screen.
22 Okay. I can hear you. I'm sorry. Go ahead.
23     Q.   Should we go forward?
24     A.   Yes, ma'am.

Page 177

1     MR. ADAMS: You were finishing an answer, Cassie.
2 BY MS. PROCTOR:
3     Q.   Yes, and I –
4     MR. ADAMS: Cut her off.
5 BY MS. PROCTOR:
6     Q.   Yeah, and I didn't mean to. Shall we have
7 it read back or –
8     A.   Yes, ma'am.
9     Q.   – do you want to just start over? You
10 tell me.
11     A.   Either one is fine.
12     Q.   Okay. What, if any, knowledge or
13 information do you have that Jeremy Harrison either
14 viewed or had – or was aware that your personal or
15 private images were being viewed by any member of the
16 Joliet Police Department?
17     A.   Other than the letter, I don't have any.
18     Q.   What, if any, knowledge or information do
19 you have that Mike Batis, B A T, like in Tom, I S,
20 like in Sam, either himself viewed or was aware that
21 other members of the Joliet Police Department were
22 viewing your private images?
23     A.   Other than the letter, I don't.
24     Q.   What, if any, knowledge or information do

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 178..181

Page 178

1  you have that Tim Powers either himself viewed or was
2  aware that other members of the Joliet Police
3  Department were viewing your private images?
4      A.  Other than the letter, I don't – Letters.
5      Q.  Thank you.
6      A.  You're welcome.
7      Q.  What, if any, knowledge or information do
8  you have that Carlos Matlock either himself viewed or
9  was aware that any member of the Joliet Police
10  Department had viewed your private images at any point
11  in time?
12      A.  I don't.
13      Q.  I believe Officer Grizzle's counsel asked
14  you earlier about Donald McKinney.  And, again, you
15  were present for Detective McKinney's deposition,
16  correct?
17      A.  Yes, ma'am.
18      Q.  You attended it via Zoom?
19      A.  Yes.
20      Q.  Okay.  So just – So I don't leave
21  Detective McKinney out, I'm just going to ask you the
22  same question with respect to McKinney.  So my
23  question is, what, if any, knowledge or information do
24  you have that Detective McKinney either viewed or was

Page 179

1  aware that your private images were being viewed by
2  other members of the Joliet Police Department?
3      A.  He wasn't listed in any of the letters as
4  far as I know; however, I can't recall who.  But I
5  know that there were rumors that stated that he had
6  seen my private images that I – yeah, that he had
7  seen them.  But that's what I heard and I don't recall
8  from who, but that was the knowledge that I had of
9  that.
10      Q.  Okay.  The rumors that you just mentioned
11  that McKinney had seen your private images, can you
12  identify with any specificity what the – you know,
13  who is the source of those rumors?
14      A.  No.  If – No.  If I could, I would
15  because ...
16      Q.  Because what?
17      A.  Because it was a while ago when I – when
18  this had come out.
19      Q.  When did you first hear of these rumors
20  concerning McKinney that you just testified to?
21      A.  I want to say maybe 2019.  I couldn't put
22  an exact date on it, but I know that it obviously was
23  after the lawsuit was filed on my behalf.
24      Q.  Okay.  So the rumors that you've mentioned

Page 180

1  were – you became aware of those at some point after
2  your lawsuit was filed.  And, again, it was originally
3  filed on August 21st of 2018.  But again you don't –
4  you can't remember who shared this information with
5  you or with any more specificity when you heard these
6  alleged rumors?
7      A.  No, ma'am.
8      Q.  What, if any, knowledge or information do
9  you have that Brad McKeon had any knowledge or
10  information – excuse me.  Let me rephrase it.  What,
11  if any, knowledge or information do you have that
12  Detective Brad McKeon either viewed himself or was
13  aware that other members of the Joliet Police
14  Department were viewing your private images at any
15  point in time?
16      A.  I didn't have any until the discovery in
17  this litigation.
18      Q.  Okay.  And, you know, specifically what
19  discovery are you referring to that shed light on this
20  matter?
21      A.  It was the handwritten notes that were
22  released.
23      Q.  Okay.  Are you referring to the handwritten
24  notes by the Inspector General, if you know?

Page 181

1      A.  I believe so.
2      Q.  Okay.  Other than the handwritten notes
3  that were shared with you by your counsel as notes
4  being produced by the parties in this litigation,
5  other than those notes, do you have any other
6  knowledge or information to indicate what role, if
7  any, Brad McKeon played in the events which are the
8  subject of your lawsuit?
9      A.  No.
10      Q.  What, if any, knowledge or information do
11  you have that Alan Roechner viewed your private
12  images?
13      A.  Other than the letters, I don't have any.
14      Q.  What knowledge, if any, do you have that
15  Alan Roechner was aware that your private images were
16  being viewed by other members of the Joliet Police
17  Department?
18      A.  Other than the letters, I don't.
19      Q.  What, if any, knowledge or information do
20  you have that Marc Reid either viewed himself or was
21  aware that others within the Joliet Police Department
22  were viewing your private images at any point in time?
23      A.  Other than the letters, I don't.
24      Q.  What, if any, knowledge or information do

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 182..185

Page 182

1  you have that Tab Jensen either viewed himself or was
2  aware that your private images were being viewed by
3  members of the Joliet Police Department at any point
4  in time?
5      A.   Same answer as far as the letters go.
6      Q.   Okay.  None other than –
7      A.   The letters.
8      Q.   – the purported letters?
9           Okay.  What, if any, knowledge or
10  information do you have that Brian Benton either
11  viewed himself or was aware that members of the Joliet
12  Police Department had viewed your private images at
13  any point in time?
14     A.   Just from the letters.
15     Q.   What, if any, knowledge or information do
16  you have that Sergeant Shawn Stachelski – and that's
17  spelled, first name is S H A W N, last name is
18  S T A C H E L S K I – what knowledge or information
19  do you have that Sergeant Stachelski either viewed
20  himself or was aware that other members of the Joliet
21  Police Department had viewed your private images?
22     A.   I'm sorry.  I don't mean to be rude, but
23  it's a female.
24     Q.   Thank you for clarifying that.  Okay.

Page 183

1  Let's start over.  Can you tell us, Officer Socha,
2  what, if any, knowledge or information Sergeant Shawn
3  Stachelski may have concerning the viewing of private
4  images?
5      A.   I don't have any.
6      Q.   Okay.  What, if any, knowledge or
7  information do you have with respect to Chris Regis'
8  role as Office of Inspector General may have
9  concerning the factual allegations alleged in your
10  lawsuit?
11     A.   Just from the letters and, again, from the
12  discovery that was shown to me through this
13  litigation.
14     Q.   Can you be any more specific about what
15  discovery you became aware of through your counsel
16  that would shed any light on Chris Regis' involvement
17  in the events in question?
18     A.   The letters – I'm sorry – not the
19  letters.  I'm so sorry.  The handwritten notes that
20  were given and then I believe there may be – was an
21  audio recording of an interview between himself and
22  Grizzle.
23     Q.   Okay.  Other than those pieces, do you have
24  any knowledge or information regarding what, if any,

Page 184

1  other factual piece Chris Regis can speak to in this
2  lawsuit?
3      A.   No, ma'am.
4      Q.   What, if any, knowledge or information do
5  you have that Detective Jeff German either himself
6  viewed or was aware that any member of the Joliet
7  Police Department may have viewed your private images
8  at any point in time?
9      A.   I just knew that he was involved in the
10  downloading of the contents of my cell phone the day
11  that it happened.
12     Q.   Other than his involvement in that process,
13  what, if any, other role did Detective Jeff German
14  play in the events that are the subject of your
15  lawsuit?
16     A.   I don't know.
17     Q.   What, if any, knowledge or information do
18  you have that Mitchell Banas, B A N A S, either viewed
19  himself or is aware that your private images may have
20  been viewed by members of the Joliet Police
21  Department?
22     A.   Okay.  Again, I'm not trying to be rude,
23  but there is no Mitchell Banas.
24     Q.   Oh, well that's –

Page 185

1      A.   So I don't know if that was a typo, but it
2  was supposed to be a Tom Banas.
3      Q.   Okay.  Do you know what, and it may have
4  been, I'm just looking at paragraph 23 of plaintiff's,
5  which is you, Supplemental Rule 26(a)(1) disclosures.
6  So the last name Banas, B A N A S, is that Tom Banas?
7      A.   Yes, ma'am.
8      Q.   Okay.  And is Tom Banas – is he currently,
9  if you know, a patrol officer in the City of Joliet?
10     A.   Yes.
11     Q.   Okay.  And I believe you talked about him
12  earlier, he was present for this meeting between you
13  and Officer Mike DeVito, correct?
14     A.   Yes.
15     Q.   Was Banas present for the entire
16  meeting with Mike DeVito that you spoke of earlier?
17     A.   Yes.
18     Q.   Well, can you be any more specific about
19  what knowledge or information, if any, Tom Banas may
20  have concerning the allegations you allege in this
21  lawsuit?
22     A.   I would just go off of what he had
23  overheard when DeVito and I were speaking.
24     Q.   Well, what do you think he overheard?

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021                                                                    Pages 186..189

Page 186

1    A.   He overheard what Mike told me.
2    Q.   And remind me, what did Mike tell you in
3  this meeting?
4    A.   He told me that the private images on my
5  phone were being viewed and disseminated in
6  investigations and then he described the video that
7  was on my phone – a video that was on my phone.
8    Q.   Okay. To be clear, though, Mike DeVito
9  never revealed this alleged source of the information,
10 correct?
11   A.   No, ma'am. No, ma'am.
12   Q.   And this meeting with DeVito, I believe, at
13 least your counsel has represented, that this was in
14 or around early July of 2018; is that accurate, if you
15 know?
16   A.   It was sometime in the summer of 2018, July
17 or August, the summer of 2018. I'm sorry. I don't
18 remember the exact date.
19   Q.   Okay. Although you don't remember the
20 exact date, let's approach it this way: Was it before
21 or after you filed this lawsuit on August 21st of
22 2018?
23   A.   It was before.
24   Q.   Okay. And although you don't remember the

Page 187

1  exact date, was it before or after you consulted with
2  Attorney Hall Adams?
3    A.   It was after.
4    Q.   How did you come to consult with Hall
5  Adams?
6    MR. ADAMS:  I'm going to object.
7  BY MS. PROCTOR:
8    Q.   Did someone recommend you?
9    MR. ADAMS:  I'm going to object.
10      Don't answer that Cassie. That's
11 privileged information.
12   MS. PROCTOR:  Okay.
13 BY MS. PROCTOR:
14   Q.   I mean, did you Google Mr. Adams?
15   A.   No.
16   Q.   Okay. Is this the first matter that
17 Mr. Adams has handled for you?
18   A.   Yes.
19   Q.   Just a couple more names, Officer Socha.
20 What, if any, knowledge or information do you have
21 that Lieutenant Joseph Egizio, and that's spelled
22 E G I Z I O, has with respect to the allegations in
23 your lawsuit?
24   A.   I don't.

Page 188

1    Q.   And what, if any, knowledge or information
2  do you have that Christopher Botzum, if I'm
3  pronouncing it correctly, either viewed your private
4  images or is aware that your private images may have
5  been viewed by other members of the Joliet Police
6  Department?
7    A.   I don't have knowledge except for his
8  involvement in the downloading of the contents of my
9  cell phone the night the search warrant was executed.
10   Q.   Okay. Now, you have since married Nicholas
11 Crowley, correct?
12   A.   Yes.
13   Q.   When did you get married?
14   A.   April 19, 2019.
15   Q.   Did you have a formal wedding?
16   A.   No.
17   Q.   Did you get married at city hall?
18   A.   We got married at a courthouse.
19   Q.   At the Will County Courthouse?
20   A.   No.
21   Q.   Which courthouse did you get married at?
22   A.   Du Page County.
23   Q.   Okay. Why Du Page County?
24   A.   Because I didn't want people to look up a

Page 189

1  record and then again publicize everything in the
2  newspaper in Will County.
3    Q.   Okay. And know, Officer Socha, that things
4  we speak of, like private matters like this, are
5  confidential pursuant to a confidential order –
6    A.   Okay.
7    Q.   – so I just wanted to share that
8  information with you.
9       Did you have a small family gathering to
10 celebrate your wedding to Mr. Crowley?
11   A.   My mom was present. His family lives kind
12 of far away from it, so she wanted to be there because
13 she was –
14   Q.   She's your mother?
15   A.   No. She was going through chemotherapy at
16 the time.
17   Q.   Okay.
18   A.   I'm sorry.
19   Q.   So that was a special day for her too.
20      Do you need to take minute? We can if you
21 want to just take five.
22   A.   No. Keep going.
23   Q.   All right. I understand.
24      Okay. Other than your mom, yourself, and

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 190..193

Page 190

1 Mr. Crowley, was there anybody else, you know, present
2 for your marriage?
3 A. No. She was our witness or whatever you
4 call it.
5 Q. Okay. I understand. Now, you have dated
6 Mr. Crowley since – I was a little unclear on when
7 you first started dating, and I know that was way back
8 at the beginning of your deposition. Was it 2015? I
9 know you started out with Joliet in 2014.
10 A. Yeah. I don't think we – You know, I
11 think we're too old for an exact date. The end of
12 2014 because – Yeah, end of 2014.
13 Q. Okay. How old are you today,
14 Officer Socha?
15 A. Well, 36.
16 Q. You're 36 years old. Okay. And you've got
17 two children now, correct?
18 A. Uh-huh, yes.
19 Q. Okay. And your oldest child is two?
20 A. He's going to be two.
21 Q. Okay. And when was he born?
22 A. June 7, 2019.
23 Q. Okay.
24 MR. ADAMS: V-Day.

Page 191

1 THE WITNESS: Yes.
2 BY MS. PROCTOR:
3 Q. Yes. And what is his first name?
4 A. Jacob.
5 Q. Okay. And then you have a
6 three-month-year-old infant?
7 A. Yes.
8 Q. Okay. I remember how hard those days were
9 as a working mom.
10 And what is it, a boy or a girl?
11 A. Boy.
12 Q. Boy, little boy. And what is your baby's
13 name?
14 A. His first name is Jackson.
15 Q. Jackson. Okay. And he's healthy,
16 everybody good?
17 A. Yes.
18 Q. Okay. Who helps you care for your children
19 when you're working?
20 A. Right now I'm not, I'm on maternity leave.
21 Q. Okay.
22 A. But my mother did.
23 Q. So your mother –
24 A. Yes.

Page 192

1 Q. Your mother helps? Okay. Tell me –
2 A. And my sister.
3 Q. And your sister. You plan on returning to
4 the City of Joliet, correct?
5 A. Yes.
6 Q. Do you have a mentor in the department,
7 maybe not even a formal one, but just someone that you
8 can go to for advice, career advice?
9 A. I mean, not really.
10 Q. Okay. Anyone that comes close to serving
11 in that role for you or no, you just haven't foraged
12 that kind of a relationship with anybody?
13 A. Not really, no.
14 Q. Okay. I know we talked about it toward the
15 end of Mr. Clark's questioning, but I just want to
16 follow up on a couple of things. Other than what
17 you've already testified to, Officer Socha, can you be
18 any more specific on what, if any, career
19 opportunities that you have been denied that you
20 attribute to the events which are the subject of this
21 lawsuit?
22 A. None.
23 Q. Other than what you've already testified
24 to, correct?

Page 193

1 A. Correct.
2 Q. Okay. How would you describe your marital
3 relationship to Crowley now?
4 MR. ADAMS: I'm going to object to that and tell
5 the witness to use your discretion in answering if she
6 sees fit or not. It's totally irrelevant. And to the
7 extent it implicates privileged communications between
8 spouses, they're just that, they're privileged. And I
9 leave it to the witness.
10 MS. PROCTOR: You are way wrong, Hall. Look,
11 unless you want to withdraw your damages claim, this
12 is fair game. So are you instructing your witness not
13 to – Are you instructing your witness not to answer
14 my question?
15 MR. ADAMS: I told her to use her discretion.
16 It's not a matter of sensitivity to me, maybe to her.
17 MS. PROCTOR: Okay.
18 MR. ADAMS: I don't believe it is remotely
19 connected to our damage claim. You don't see it in
20 the pleadings or the discovery responses.
21 BY MS. PROCTOR:
22 Q. You're making a claim for emotional
23 distress damages in this lawsuit, correct,
24 Officer Socha?

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 194..197

Page 194

1    A.   Yes, ma'am.
2    MR. ADAMS: I'm sorry. I thought you're asking
3  me.
4    MS. PROCTOR: No, it's directed to the witness.
5  BY THE WITNESS:
6    A.   Yes, ma'am.
7    Q.   Okay. So I'm going to ask you if you can
8  describe what your current marital relationship is
9  with your husband.
10   MR. ADAMS: Same objections and same guidance to
11 the witness.
12 BY THE WITNESS:
13   A.   It's a marriage as ...
14   Q.   Can you be any more specific than that?
15   A.   I mean, we have a marriage just like would
16 seem anybody else has a marriage.
17   Q.   Well, how would you describe – I mean, how
18 would you describe it?
19   MR. ADAMS: Objection, asked and answered.
20   MS. PROCTOR: No, I don't believe the witness has
21 answered it.
22   MR. ADAMS: Maybe not as descriptively as you
23 might have liked, but she's answered the question as
24 best as she's able to.

Page 195

1    MS. PROCTOR: Okay. And do you know what, can we
2  just, like, moving forward not have speaking
3  observations, unless you're going to assert some type
4  of attorney-client privilege, and I'm giving you fair
5  amount of leeway? But speaking objections are not,
6  you know – just try not to do those.
7  BY MS. PROCTOR:
8    Q.   So I mean, are you currently having any
9  marital issues with your husband?
10   MR. ADAMS: Same objection.
11 BY THE WITNESS:
12   A.   I mean, we're in a marriage, ma'am. I
13 don't know what you think a marital issue as being. I
14 can't ...
15   Q.   Well, how would you describe your marriage:
16 Good, bad –
17   MR. ADAMS: Objection, asked and answered.
18 BY MS. PROCTOR:
19   Q.   (Continuing.) – somewhere in between??
20 I'm really looking for some descriptors.
21   MR. ADAMS: Objection. It's asked and answered.
22 BY MS. PROCTOR:
23   Q.   So you can go ahead and answer again.
24   A.   Okay. I mean, it's a marriage like anybody

Page 196

1  else has a marriage.
2    Q.   Are you happy?
3    A.   In respect to what?
4    Q.   In your marriage.
5    A.   Yes.
6    Q.   Now, you've gone to marital counseling,
7  correct?
8    A.   I wasn't married when we went to
9  counseling, no.
10   Q.   Okay. And that's a good point, and I
11 appreciate that. I know you did go to, I believe, you
12 testified to some – I believe we referred to it as
13 couples counseling with – is it Nicole –
14   A.   Yeah.
15   Q.   – – is who is the therapist?
16       Okay. What are Nicole's credentials, if
17 you know?
18   A.   I don't know.
19   Q.   Okay. You don't know whether she's – Is
20 she a psychiatrist or a counselor or social worker or
21 a professional counselor? I mean, do you know
22 anything about her credentials?
23   A.   I know she has her doctorate, but I don't
24 know – I mean, I don't know how to read those

Page 197

1  initials.
2    Q.   Well, what are the initials?
3    A.   I don't know them either.
4    Q.   Okay. And she is associated with Edgewood
5  Clinical Services?
6    A.   She was. I don't believe she's with them
7  any longer.
8    Q.   When did she leave them?
9    A.   That, I don't – I don't know either. I
10 tried to make an appointment with her and I was routed
11 to go to somebody else.
12   Q.   So just to be clear, when was the last time
13 you saw Nicole for the couples counseling that you
14 testified to earlier? I'm a bit unclear on that.
15   A.   I don't remember the last time that we went
16 together.
17   Q.   Can you identify it maybe by year?
18   A.   Maybe 2018. I don't – I couldn't ...
19   Q.   Because, you know, we have some –
20 we have some of your mental health counseling records
21 and I don't believe I – I don't believe the couples
22 counseling records were included in that and that's
23 what I'm trying to get at just a time frame on. The
24 couples counseling that you had, was it always with

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 198..201

**Page 198**

1 Nicole at Edgewood Clinical Services?
2 A. Yes.
3 Q. Okay. Have you and Nick Crowley seen any
4 other therapist at any time for counseling concerning
5 your relationship either before or, you know, during
6 your marriage?
7 A. You mean – Yes. What –
8 Q. Okay.
9 A. I believe – I don't – I'd have to look at
10 the records, I don't really remember.
11 Q. Okay. Well, who did you and Nick see for
12 counseling services concerning your relationship other
13 than Nicole?
14 A. There – It was – Her name was Danielle, I
15 think.
16 Q. All right. And was Danielle also
17 associated, if you know, with Edgewood Clinical
18 Services?
19 A. Yes.
20 Q. Other than Danielle and Nicole – Do you
21 know Danielle's last name, by the way?
22 A. I don't. I don't. I think we went
23 together for this matter and then I went by myself
24 with her, but she wasn't – she wasn't a good fit for

**Page 199**

1 myself.
2 Q. For you. Okay. And how many times did you
3 and Nicholas Crowley see Nicole for relationship
4 counseling, roughly?
5 A. I don't know. I'd have to look at the
6 notes or the records for that.
7 Q. Was it helpful?
8 A. Yes.
9 Q. Okay. And was your individual therapy with
10 Nicole helpful to you?
11 A. Yes.
12 Q. Okay. Would you like to return to therapy?
13 A. I would.
14 Q. Have you made an effort to track down
15 Nicole to maybe resume therapy with her assuming she's
16 still practicing?
17 A. I wouldn't know how to do that. The
18 practice was kind of shut in how they answered when I
19 tried to reach out for her again.
20 Q. I'll talk to Hall, he might be able to help
21 you out, track her down. They don't fall off the face
22 of the earth, they can be found.
23 A. Right.
24 Q. Is that not a priority right now for you

**Page 200**

1 given that you're a new mom and you're dealing with
2 other things in your life?
3 A. It is a priority for me. It's just hard to
4 find the time to do it. You know, I'm basically by
5 myself. This is, like, the longest I've been way from
6 both of my kids, so ...
7 Q. And when is your – Like, do you have a set
8 date that you're returning from maternity leave?
9 A. July 20th or the 21st.
10 Q. Okay. Other than your mother and your
11 sister, do you have anybody else helping you with the
12 children currently?
13 A. No.
14 Q. And what shift is your husband currently
15 working?
16 A. He works 7:00 a.m. to 7:00 p.m.
17 Q. Okay. Can you say with absolute certainty,
18 Officer Socha, whether or not Nicholas Crowley ever
19 shared any of the contents, the sexually explicit
20 contents, that presumably were on his cell phone in
21 part at any point in time with any person?
22 MR. ADAMS: Object to form and to lack of
23 foundation.
24 BY MS. PROCTOR:

**Page 201**

1 Q. Do you understand the question?
2 A. Are you asking me if he's shared the
3 content on his phone with anybody?
4 Q. Correct.
5 A. Regarding myself?
6 Q. We've been talking all day about the
7 sexually explicit photographs and videos. Can we
8 agree on that?
9 A. Okay. I just want to make sure.
10 Q. Yeah, right. And you told us earlier that
11 you believe that some of that information you shared
12 with Mr. Crowley and vice versa on your respective
13 cell phones; did I get that correct?
14 A. Uh-huh, yes.
15 Q. All right. So now my question to you is,
16 can you say with absolute certainty one way or the
17 other that Nicholas Crowley never shared that
18 information with a third party?
19 A. I can.
20 Q. You can. You're 100 percent certain?
21 A. I'm certain.
22 Q. And that's based on him telling you what?
23 A. That he hasn't shared it.
24 Q. And you believe him, correct?

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021                                          Pages 202..205

Page 202

1     A.   Yes, ma'am.
2     Q.   Do you have any way of proving that?
3     A.   I don't.
4     Q.   Bear with me, I'm going through my notes.
5   Okay?
6     A.   That's okay.
7     Q.   I'm just trying to move things along a
8   little bit.
9          You mentioned when you were an officer in
10  McCook that you requested counseling services to help
11  you deal with the death of your brother, correct?
12    A.   I did.
13    Q.   And I think you said you went one time.
14  Did I hear that right?
15    A.   I did.
16    Q.   Do you have any – Can you – Do you have
17  any identifying information about where you went for
18  those counseling services?
19    A.   It was through an organization called
20  Pillars, P I L L A R S.
21    Q.   Yeah, I'm familiar with it. And is that
22  in, like, the Berwyn area more or less, or was it?
23    A.   No. I went to the one in LaGrange.
24    Q.   Okay. All right. And you believe you went

Page 203

1   on one occasion?
2     A.   I'm pretty sure, yes.
3     Q.   Okay. The – Do you have a primary care
4   physician?
5     A.   No.
6     Q.   Have you ever had a primary care physician
7   or a family doctor for you?
8     A.   I have.
9     Q.   Okay. What's his or her name?
10    A.   It was Dr. David Levy, L E V Y.
11    Q.   And where did Dr. Levy practice?
12    A.   The practice was called Archer Family
13  Medical in Chicago.
14    Q.   Okay. And are you still under the care of
15  Dr. Levy?
16    A.   No. I mean, I moved away from the area,
17  so ...
18    Q.   Okay. When were you last treated by
19  Dr. Levy?
20    A.   Maybe 2014, 2015, maybe.
21    Q.   Okay. Have you seen any – You know,
22  putting your therapists aside, have you been under the
23  care of any medical doctor?
24    MR. ADAMS:  To be clear, you want all the

Page 204

1   pregnancy ob-gyn, all that stuff too, Darcy?
2     MS. PROCTOR:  Well, let's talk about general
3   practitioners.
4   BY MS. PROCTOR:
5     Q.   I mean, do you – Other than Dr. Levy, do
6   you – you know, in the last ten years, have you been
7   under the care of any medical doctor aside from your
8   ob-gyn physicians?
9     A.   A primary physician, is that what you're
10  asking?
11    Q.   Yes, right.
12    A.   No. If I became ill or I needed to see a
13  doctor, I would go to a clinic, like a – I don't know
14  what those – What are those clinics called?
15    Q.   Like, an immediate care or walk-in clinic?
16    A.   Yes. Yes.
17    Q.   Is there a – Do you go have a go-to
18  immediate care or walk-in clinic that you will go to
19  for when you're sick?
20    A.   It would obviously be whichever one would
21  have the appointment available.
22    Q.   Do you try to stay in and around the Joliet
23  area or do you go elsewhere?
24    A.   No. I try to stay in the Joliet area.

Page 205

1     Q.   Okay. In the last five years, have you
2   gone to a walk-in clinic?
3     A.   Yeah, I have. I'm sorry. I'm trying to
4   think of years here. Yeah.
5     Q.   And when was that?
6     A.   Maybe 2000- – I know that I was having
7   sinus infections so I was going to the physician's
8   immediate care.
9     Q.   Which one?
10    A.   They were reoccurring so I went to one on
11  Houbolt. There's one on Larkin, I think. I went to
12  the one on Black and Larkin and then –
13    Q.   And that's in the City of Joliet?
14    A.   Those both are, yeah. And there was one on
15  Plainfield.
16    Q.   Okay. In the last ten years, have you
17  received any kind of medical health treatment or
18  prescriptions of medicine for any mental health issue
19  from any other treating physician?
20    A.   Other than Deb Del Re?
21    Q.   So – Oh, Deb Del Re is the – is that the
22  nurse practitioner that can prescribe –
23    A.   Yes.
24    Q.   – medication?

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021                                                        Pages 206..209

Page 206

1    Okay. Other than Deb Del Re, yes.
2    A.  No.
3    Q.  Now, did I hear you right, were you on
4    Lexapro before the events that are the subject of this
5    lawsuit?
6    A.  I don't recall when I started the Lexapro.
7    I know that I was on the antihistamine. I can't
8    remember the -- It started with an H that she
9    prescribed because it was -- instead of prescribing
10   somebody with anxiety, a Xanax or something of that
11   caliber, she wanted to do a histamine.
12   Q.  Are you referring to -- is it hydroxyzine
13   which is like a --
14   A.  Could be.
15   Q.  -- can be used to treat anxiety, something
16   like that?
17   A.  I believe so.
18   Q.  Okay. So just to be clear, before May of
19   2018, you were taking medications to deal with
20   anxiety, correct?
21   A.  I don't know the time frame. I'd have
22   to -- or it could have started in May. I don't
23   remember when I started on the medication.
24   Q.  I mean, you don't know one way or the other

Page 207

1    when you started --
2    MR. ADAMS: I object.
3    BY MS. PROCTOR:
4    Q.  (Continuing.) -- on any medication to deal
5    with anxiety? Okay. Let's just maybe be a little bit
6    broader. Do you know when you first -- when were you
7    first prescribed any medication that deal with
8    anxiety?
9    A.  That's what I'm saying. I don't remember
10   when it was first prescribed.
11   Q.  Well, other than the hydroxyzine and then
12   you mentioned Lexapro, you know, what is Lexapro used
13   to treat, if you know?
14   MR. ADAMS: Object, foundation.
15   BY MS. PROCTOR:
16   Q.  If you know.
17   A.  Depression.
18   Q.  And you can't be any more clear on when you
19   started on the Lexapro, correct?
20   A.  If I -- I mean, if I say maybe -- I don't
21   know the exact date. I know that's hard -- it's hard
22   to pinpoint. We're going back a while, so ... 2018.
23   Q.  Do you know how long you received services
24   from Edgewood Clinical Services, like when it started

Page 208

1    and when it ended? Just to give me a ballpark.
2    A.  I know Nicole ended in 2019, but the -- the
3    other female, I think, was 2020. 2016, 2015, maybe.
4    Q.  And do you have any memory of being on any
5    medication for anxiety or any other mental health
6    issue in the year 2015?
7    A.  No.
8    Q.  Same question for 2016?
9    A.  No. No, because I didn't --
10   Q.  Go ahead.
11   A.  I didn't see anybody to be able to
12   prescribe me medicine. Nicole wasn't able to
13   prescribe medication. That's why I was referred to
14   the nurse practitioner.
15   Q.  Okay. And other than believing it was
16   sometime in 2018, you don't really have any
17   information to shed any light on when you first were
18   prescribed any medication to deal with anxiety or any
19   other mental health issue, correct?
20   A.  I mean, I can go back and look at my EOBs,
21   but I -- 2018 sounds about right.
22   Q.  Any more -- Can you be any more specific
23   about when in 2018 you started on -- I think it was
24   the Lexapro, to your memory?

Page 209

1    A.  No. I don't want to say a date and then be
2    incorrect.
3    Q.  Okay. Well, why don't we look at it like
4    this: Was it before or after the events in May and
5    June of 2018 that are the subject of the lawsuit?
6    A.  Probably around that time frame.
7    Q.  Around -- So before or not?
8    A.  I don't know. I don't want to give you an
9    answer either way and be incorrect.
10   Q.  Okay. Well, why were you prescribed the
11   Lexapro, if you know?
12   A.  I think she did that in the combination. I
13   can't -- I mean.
14   Q.  She you're referring to is Debbie --
15   A.  Deb Del Re.
16   Q.  The nurse practitioner?
17   A.  Yes.
18   Q.  Okay.
19   A.  And the antihistamine, I think, was for
20   sleeping.
21   Q.  Did it help?
22   A.  Sometimes.
23   Q.  Are you still on the Lexapro?
24   A.  No.

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021                                    Pages 210..213

Page 210

1    Q.   When did you stop taking it?
2    A.   I stopped taking it when I was pregnant –
3    when I found out I was pregnant.
4    Q.   And when was that?
5    A.   October of 2018.
6    Q.   Okay.  You mentioned earlier that I believe
7    it was the day after you received the letter
8    postmarked July 2nd of 2018 that I think you said the
9    next morning you went to see Attorney Tomczak.  Again,
10   I'm not going to ask you what you discussed, but I
11   just want to set – put some context out here.  Did I
12   get that correctly?
13   A.   Yes.
14   Q.   Okay.  And let me ask you this:  Did
15   Attorney Tomczak take any legal action on your behalf?
16   A.   As far as notifying anybody?
17   Q.   Just any legal action on your behalf.
18   MR. ADAMS:  I'll object to form.  I think she's
19   asked for clarification.
20   BY MS. PROCTOR:
21   Q.   Okay.  Well, I'm trying – I don't want
22   to – I'm trying to be careful and not have any issues
23   with asking you about attorney-client privilege
24   communication.  Let me just back up a little bit.  I

Page 211

1    think you told us earlier that the day after the
2    search warrant was issued and your cell phone was
3    searched, you contacted Attorney Tomczak the next
4    morning, correct?  Okay.  That's – Correct?
5    A.   I don't – I know I saw him the next
6    morning.  I believe I – Maybe I spoke to him that
7    night and we had the meeting to go meet each other in
8    the morning.
9    Q.   Okay.  So with respect to the search
10   warrant is my question, did Attorney Tomczak take any
11   legal action on your behalf in relation to the search
12   warrant?
13   A.   No.
14   Q.   Did he challenge the scope of the search
15   warrant in any way?
16   A.   To my – I don't know.  I guess I don't
17   understand what you're asking me.  If he did it – I
18   mean, I don't – I guess I don't understand what
19   you're asking me.  Did he take it to scope to anybody
20   besides myself?
21   Q.   What I'm asking is whether Attorney Tomczak
22   took any legal action on your behalf concerning the
23   search warrant?
24   MR. ADAMS:  And I'll object just to form relating

Page 212

1    to the phrase legal action as to which the witness has
2    expressed some confusion.
3    BY THE WITNESS:
4    A.   No.
5    Q.   Do you know whether Attorney Tomczak
6    contacted Appellate Prosecutor Lamken –
7    A.   I don't know.
8    Q.   – on your behalf?
9    Do you know whether Attorney Tomczak
10   contacted any member of the Joliet Police Department
11   on your behalf concerning the search warrant?
12   A.   I don't know.
13   Q.   You told us earlier about your mailbox in
14   the Joliet Police Department and I just want to ask
15   you a couple of follow-up questions on that.  Can you
16   describe for me what your mailbox looked like?  And
17   this is, again, in July because I don't know if it's
18   changed.  Let's just focus May, June, July, August of
19   2018, during that time frame.  What did – Can you
20   describe what your mailbox looked like?
21   A.   It's just a piece of silver metal with a
22   lock on it and a slit that has – that you can put
23   stuff through.
24   Q.   Okay.  So you have to access it with a

Page 213

1    lock, correct?
2    A.   What?
3    Q.   You have to access it with a key?
4    A.   In order for whomever is assigned it, yes.
5    I believe there's a universal key too.  I don't know
6    who's in possession of that.
7    Q.   Okay.
8    A.   I'm sorry.  I take that back.  The
9    sergeant, he was, like, an equipment sergeant, I know
10   that he has the keys.  Like, he would be the one who
11   would give the keys out.  So he may have had a key.
12   But in order to access it, like, you have your own key
13   and then there is a hole in order to put mail into.
14   Did I answer that right?
15   Q.   Well, I think so.  So if someone wanted to
16   put a letter in your mailbox, they would just put it
17   through the slot, correct?
18   A.   Yes.
19   Q.   All right.  And you had a key to access
20   your mailbox, correct?
21   A.   Yes.
22   Q.   And you received that key, I'm assuming,
23   when you were hired –
24   A.   Yes.

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 214..217

Page 214

1  Q.  – from the equipment person?
2      Okay.  And whether the equipment person
3  does or does not have a master key, you don't really
4  have any personal knowledge of that, correct?
5  A.  No.
6  Q.  Okay.  And what was the name of the
7  equipment officer or person when you were hired, if
8  you recall?
9  A.  Sergeant Moeller, M O E L L E R.
10  Q.  Okay.  And was Sergeant Moeller working at
11  the Joliet Police Department, if you know, in May,
12  June, July, August of 2018, if you know?
13  A.  He was.  I know he just retired when I
14  was – Yeah.
15  Q.  Okay.  Did you have a good relationship
16  with Sergeant Moeller?
17  A.  I don't really have a relationship with
18  him.
19  Q.  Okay.
20  A.  Yeah.
21  Q.  Okay.  He was – You really didn't – It
22  sounds like you didn't have any relationship with him?
23  A.  No.
24  Q.  Okay.  You told us earlier that you make it

Page 215

1  a point to not, like – Before the incidents that
2  we've been talking about, but when you were hired at
3  the Joliet Police Department, you made it a point to
4  not socialize with people you work with; is that fair
5  to say?
6  A.  Yeah.  Like, I didn't go out of my way to
7  go to someone's house or go to events that, you know,
8  like, the police department.  Like, it just wasn't
9  anything that I really – I don't know.  I just never
10  really did it.
11  Q.  Okay.  But, you know – But because you
12  were dating a fellow officer, correct, Nicholas
13  Crowley, you certainly did do certain social things
14  with other members maybe that worked on your shift,
15  okay, after work, right?
16      MR. ADAMS:  Object to –
17  BY THE WITNESS:
18  A.  I didn't really hang out – I mean, if
19  you're – I didn't really hang out after work.  On
20  different days, maybe, like, if a Christmas party came
21  up for a shift, I would go to that.
22  Q.  Well, you know, we talked a little earlier
23  about the night at the bar which, you know, led to the
24  prosecution concerning Crowley.  Do you recall that

Page 216

1  night, right?
2  A.  Yes.
3  Q.  I don't want to rehash that again, but now
4  you said there were other officers present that night
5  and the bar.  I think you gave us the name of it,
6  maybe you did, maybe you didn't.  I mean, do you
7  remember the name of the bar you were at that night?
8  A.  I don't.
9  Q.  You don't.  Was it in Joliet?
10  A.  No.
11  Q.  Do you know where it was?
12  A.  I believe it was in New Lenox.
13  Q.  Okay.
14  A.  Or Frankfurt.
15  Q.  What brought you to the bar in New Lenox or
16  Frankfurt?  Did someone live near there?
17  A.  Not that I know of.
18  Q.  Okay.  Had you been there before?
19  A.  No.
20  Q.  Was that your first and only time there?
21  A.  Yes.
22  Q.  And can you recall the name of any of the
23  officers who were present at the bar on the night
24  we're talking of other than you and Crowley?

Page 217

1  A.  Just the ones that I gave to the other
2  attorney.
3  Q.  I don't know if you gave names.  I may have
4  missed them.  So if you could just indulge me again,
5  who was present that night?  What other officers were
6  present?
7  A.  I remember Officer Blackmore was there and
8  Officer Emph.  Do you need me to spell it again?
9  E M P H.
10  Q.  No, no.  It's coming back to me and that's
11  fine.  Okay.  So you've shared with us as best you can
12  the names of the officers who were present that night.
13      Okay.  Were those officers that you and
14  Nicholas Crowley hung out with on a regular basis?
15  A.  I believe that was the first – at least
16  that was the first time that I've hung out with them
17  outside of work.
18  Q.  Okay.  Are you close with anybody at the
19  Joliet Police Department, any fellow officer other
20  than Nicholas Crowley?
21  A.  Yeah.  I gave a couple names.
22  Q.  Okay.  And I think you told us earlier that
23  you've received text messages from other officers when
24  there might be articles concerning your lawsuit in the

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 218..221

Page 218

1 newspaper. Do you remember that line of questioning?
2    A.  Yes.
3    Q.  Okay. The officers that shared that
4 information with you, are those your closer friends on
5 the department that were sharing that information with
6 you?
7    A.  No.
8    Q.  Who, if you know, shared that information
9 with you, the names of the officers, if you know?
10    A.  I don't. I don't recall those names.
11    Q.  Okay. Do you know why they were sharing
12 the information with you?
13    A.  No.
14    Q.  How did they get your private cell phone
15 number, if you know?
16    A.  Well, the people on shift or on shifts or,
17 you know, I've worked different shifts, we've
18 exchanged telephone numbers for work purposes when
19 we're at work if something has to be done or when
20 we're at work and it can't be done over the radio.
21    Q.  Okay. I understand. And I know you
22 described to us the way it makes you feel when you
23 see -- you know, when you -- when this information is
24 shared with you. Have you ever complained to anyone

Page 219

1 within the Department of Joliet about receiving those
2 texts from co-workers?
3    A.  No.
4    Q.  Did you ever tell co-workers to stop?
5    A.  No. I don't believe they were in
6 harassing -- in a harassing nature. I don't think
7 that that's what that --
8    Q.  Okay. You don't think that that was the
9 intent, and I'm glad you clarified that because then I
10 misunderstood you.
11    A.  Oh, I'm sorry.
12    Q.  No, that's my fault. To the extent you
13 were receiving messages that maybe had your picture
14 because the lawsuit was reported -- the lawsuit may
15 have been reported upon in the paper, those were not
16 done in a harassing way to you; do I understand that
17 correctly?
18    A.  Right.
19    Q.  Okay. Thank you. Thank you very much for
20 clarifying that.
21      Officer Socha, do you regret putting these
22 sexually explicit images on your cell phone?
23    A.  No.
24    Q.  Now, your lawsuit was filed in your name.

Page 220

1 Are you aware of that? I mean, you're listed in a
2 public document as a plaintiff and you're listed as
3 Cassandra Socha. You're aware of that, correct?
4    A.  Yes.
5    Q.  Okay. And you're aware that when lawsuits
6 are filed, they become matters of public record,
7 correct?
8    A.  Yes.
9    Q.  And you're aware that journalists have
10 public access to court filed documents, correct?
11    A.  I am.
12    Q.  Okay. And you are aware that there's been
13 multiple newspaper articles reporting on the lawsuit
14 that you filed and Attorney Hall Adams filed on your
15 behalf, correct?
16    A.  Yes, ma'am.
17    Q.  Okay. And you're also aware that your
18 attorney made comments to reporters concerning the
19 allegations in your lawsuit, correct?
20    A.  Yes.
21    Q.  And do these news reports cause you
22 continued embarrassment and anxiety?
23    A.  They do.
24    Q.  And is it your view that any anxiety that

Page 221

1 you're continuing to have, that the sole cause are the
2 events at issue in this lawsuit?
3    A.  Can you clarify that a little bit? I'm
4 sorry.
5    Q.  Yeah. I mean, you -- I know you told us
6 earlier that you're feeling really overwhelmed right
7 now. I mean, you're a new mom and, you know, there's
8 a lot going on with your life. Would you agree with
9 that?
10    A.  Right now, yes.
11    Q.  Okay. And I think you kind of gave us your
12 own definition of, you know, that you showing, I
13 guess, classic depression signs by definition. You
14 testified to something like that?
15    A.  Yes.
16    Q.  Okay. I mean -- But you're not getting
17 any -- I mean, is that a self-diagnosis that you've
18 made for yourself?
19    A.  I haven't self-diagnosed myself with
20 anything. I just know how I feel. And I mean, I've
21 been -- I've been to therapy where they've, you
22 know -- they've said that I have depression and then
23 the PTSD that I testified too as well.
24    Q.  You know, I just wanted to talk a little

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 222..225

Page 222

1　bit about the PTSD. I mean, do you understand what
2　PTSD is, just generally speaking?
3　　A.　I do. And even when I went to go see the
4　counselor after my brother was killed, that's exactly
5　what he stated. So it's not – I know I'm not
6　unfamiliar with it.
7　　Q.　Okay. So you were diagnosed – You were
8　previously diagnosed with PTSD in relation to your
9　being killed, and I think that related to – and I
10　don't want to get too deep into it – that you
11　witnessed the car accident and you came upon the
12　scene; is that fair to say?
13　　A.　I didn't witness it happening. But yeah, I
14　was called to the scene unrelated. We didn't know
15　that – didn't know that it was my brother.
16　　Q.　Okay. So the traumatic event in that case
17　was what, if you could describe it in your own words?
18　　A.　I mean, do you want me to tell you the
19　trauma that I endured from seeing my brother in an
20　accident?
21　　Q.　No. And that's what I'm just trying to
22　understand is that was the trauma. Now, what I'm
23　unclear on is, have you been diagnosed with PTSD
24　following the events which are the subject of this

Page 223

1　lawsuit and any feelings that you may be having?
2　　A.　I believe I have.
3　　Q.　Okay. And what I'm trying to understand is
4　if you know what the traumatic event was.
5　　A.　To pinpoint this?
6　　Q.　Yes.
7　　A.　If I – I mean – And you're asking me to
8　tell myself, not what a doctor has said?
9　　Q.　Well, what has a doctor said, if you know?
10　　A.　I don't know what a doctor has said. I'm
11　just telling you I don't know that there's necessarily
12　one specific thing or one specific event in this
13　entire thing that has happened, but it's the
14　culmination of it all.
15　　Q.　Okay. And we've already talked about that,
16　Officer Socha, and I don't intend to get into that
17　again. Okay?
18　　A.　I appreciate it.
19　　Q.　Unless there's something that you would –
20　something else you would like to say concerning your
21　feelings, okay, that we haven't already discussed.
22　　A.　No, not right now.
23　　Q.　Not that you can think of as you sit here
24　today. Has anybody – You know, I know you told us

Page 224

1　earlier, you know, that you feel that your – you
2　know, that your reputation has been damaged by these
3　events. And I want to ask you whether anyone, either
4　past or current member of the Joliet Police
5　Department, has said anything to you directly that
6　makes you feel that they think anything less of you?
7　　A.　Not that I can recall, no.
8　　Q.　Have you experienced any interaction with
9　any member, past or current of the Joliet Police
10　Department, where they did not treat you
11　professionally or with respect?
12　　　　MR. ADAMS: Object to form. Presumably other
13　than the events alleged?
14　　　　MS. PROCTOR: Right.
15　BY THE WITNESS:
16　　A.　Not that I can recall, no.
17　　Q.　Why did you feel you had to hide the fact
18　that you were pregnant at work as it relates to
19　this – you know, to the allegations or any of the
20　damages you're claiming in the lawsuit, just to make
21　it a little bit more specific, if you know? If you
22　know.
23　　A.　Okay. I'm going to try and not to again
24　get her emotional speaking, but both times I was

Page 225

1　pregnant I had to report to Darrell Gavin and request
2　to work light duty and going off of the letters that
3　were produced and the things that were written about
4　what Darrell Gavin had said or heard or what have
5　you –
6　　Q.　Allegedly, but yes, allegedly.
7　　　　MR. ADAMS: Let her answer without your –
8　　　　MS. PROCTOR: Okay. You're right.
9　BY MS. PROCTOR:
10　　Q.　I didn't mean to interrupt you.
11　　A.　That's okay. So I would hope that you can
12　appreciate as the sensitive context that's inside of
13　this lawsuit that he had said heard or disseminated
14　that to go and ask him for permission to work another
15　position while I'm pregnant with my first child and
16　then again with my second child. In no way am I
17　embarrassed by my children. Don't misconstrue that.
18　It's the fact that we all know how babies are made and
19　we all know the context of this lawsuit that's been
20　filed on my behalf. And to go and ask somebody that
21　and to feel I have to hide that is awful and you
22　shouldn't have to do that and I felt that I had to do
23　that because of whom I had to report to and who I had
24　to ask that favor of.

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021                                    Pages 226..229

Page 226

1    Q.  Well, was it – did you request light
2    duty – you know, did you have a medical note for the
3    need for light duty due to your pregnancy?
4    A.  Are you saying, like, did I have a
5    complication with my pregnancy?
6    Q.  I don't really want to – No, I'm not
7    really asking you that.  The request for light duty,
8    was that done under doctor's orders or, you know, at
9    the direction of your physician?
10   A.  Right, I asked my physician to draft a
11   letter to ask for – if I could work light duty
12   instead of me going on the street and having to put
13   all the gear on, physically fight people, answer these
14   calls, work overnight.  So yes, my physician wrote the
15   letter on my behalf both times.
16   Q.  And was that request honored by the
17   department?
18   A.  Yes.
19   MS. PROCTOR:  Now, I'd like to just take five for
20   a bathroom break and review my notes, but I think I'm
21   just about done.  Okay.  Does that work for everybody?
22   MR. ADAMS:  That's fine.
23   THE WITNESS:  Yes.
24   MR. CLARK:  Sounds good.

Page 227

1    BY MS. PROCTOR:
2    Q.  All right.  Officer Socha, did someone
3    within the Joliet Police Department refer you to
4    Attorney Hall Adams?  Officer Socha, can you hear me
5    okay?
6    A.  Hello?
7    Q.  Yes, I don't think you heard my last
8    question.
9                 (Audio distortion.)
10   BY MS. PROCTOR:
11   Q.  Yeah, I'm having a hard time.  I can hear
12   you, but you sound far away.  Do you want to maybe
13   just say your name?  We've been doing pretty good.
14   A.  I'm sorry.  I did not hear your question at
15   all.  I heard nothing.
16   Q.  Okay.  My question is, did someone from the
17   Joliet Police Department refer you to Attorney Hall
18   Adams?
19   A.  No.
20   Q.  Did Attorney Tomczak refer you to Hall
21   Adams?
22   MR. ADAMS:  Objection.  That's attorney-client
23   privileged communication.
24   MS. PROCTOR:  I don't think it is.  I'm not

Page 228

1    asking what was discussed.  I'm asking about a
2    referral.
3    MR. ADAMS:  I'm directing the witness not to
4    answer the question.  A referral is legal advice.
5    BY MS. PROCTOR:
6    Q.  Are you – Do you understand the question,
7    Officer Socha?
8    A.  Yes, ma'am.
9    Q.  Okay.  And are you following your
10   attorney's advice?
11   A.  I am.
12   Q.  Okay.  And you're refusing to answer the
13   question, correct?
14   A.  I'm taking my attorney's advice.
15   Q.  Okay.  Other than Hall Adams, are you aware
16   of any other attorneys representing you in this
17   lawsuit?
18   A.  No.
19   Q.  Does Mr. Adams have co-counsel?
20   A.  I don't believe so.
21   Q.  Okay.  Is there a referring attorney
22   involved who will get money if you win your lawsuit,
23   if you know?
24   MR. ADAMS:  Objection.  That's privileged.

Page 229

1    Don't answer it.
2    BY MS. PROCTOR:
3    Q.  Do you have a contingent fee arrangement
4    with Mr. Adams?
5    MR. ADAMS:  Same objection.
6    Don't answer it.
7    That's privileged.  That's an
8    attorney-client communication.
9    BY MS. PROCTOR:
10   Q.  Do you understand the question,
11   Officer Socha?
12   A.  Yes, ma'am.
13   Q.  And are you taking your attorney's advice?
14   A.  Yes, ma'am.
15   Q.  Officer Socha, are you – you told us
16   earlier that you're at your – you are at your
17   mother's home, is it in Summit –
18   A.  Yes.
19   Q.  – taking today's deposition?
20   What room are you in?  Are you in an
21   enclosed room?
22   A.  I am.
23   Q.  How would you describe the room?
24   A.  It's a small room.  It's her office.  It's

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021                                    Pages 230..233

Page 230

1  been turned into her office.
2      Q.  Okay.  And are you participating in this
3  deposition via Zoom on a laptop computer?
4      A.  I am.
5      Q.  Is it your personal laptop computer?
6      A.  It is.
7      Q.  Are there any other computers in the room
8  in which you're taking today's deposition?
9      A.  Her work computer.
10     Q.  And is her work computer – As you're
11 looking at our screen, is it to your left?
12     A.  It's to my left.  Do you want to see it?
13     Q.  Sure.
14     A.  Okay.
15     Q.  Okay.  It's a desktop computer?
16     A.  It is.
17     Q.  Okay.  Other than the desktop computer, are
18 there any other computer devices in the room with you
19 such as an iPad or any other device?
20     A.  No.  Her printer.
21     Q.  Okay.  And have you referred to any other
22 device during the course of this deposition?
23     A.  No.
24     Q.  Okay.  Because right now, like, as you're

Page 231

1  sitting at your laptop, I'm going to ask you to look
2  directly into the camera.  Do you see where the camera
3  is, is that on top of the laptop?
4      A.  Correct.
5      Q.  I'm going to ask you to look over to the
6  left of your computer.  Can I ask you to do that?
7      A.  Okay.
8      Q.  Was anyone including your attorney,
9  Mr. Adams, communicating with you via text during any
10 portion of this deposition?
11     A.  No.
12     Q.  Did you look at your cell phone for any
13 text messages during the course of your deposition?
14     A.  No.
15     Q.  Did you have any communication with
16 Nicholas Crowley during the course of this deposition?
17     A.  On the breaks, yes, he asked how the kids
18 were doing.
19     Q.  Did you talk with him by telephone?
20     A.  Via text.  He's at work.
21     Q.  Okay.  All right.  You mentioned earlier
22 that during the deposition you were hearing your
23 gmails sounding.  Do you remember telling us that
24 earlier?

Page 232

1      A.  Uh-huh, yes.
2      Q.  Okay.  And how would you receive notice of
3  gmails?
4      A.  It came across on the top of the screen on
5  my computer.
6      Q.  Okay.  But your computer – Like, if you're
7  looking at your gmails, you would be looking directly
8  at the computer screen just like you're looking now,
9  correct?
10     A.  I didn't open up my e-mails.
11     Q.  Okay.  Like, how would you describe it, a
12 notice or an alert of a gmail message?  Would it be,
13 like, a pop-up and then fade away?
14     A.  Yes, and then I don't know what happened
15 with the Zoom thing, that I messed up the screen.  I
16 couldn't see it anymore, I could just hear them.
17     Q.  Did you receive – Go ahead.  I'm sorry.
18     A.  I'm saying I couldn't see anything that
19 came across as notification from the gmail because of
20 how the screen is for the Zoom thing.  Like, I only
21 have four boxes – five, let me take that back.  I
22 don't even have a big picture and all I have is Zoom
23 and my Bluetooth thing for this ear pod – or whatever
24 these things are.

Page 233

1      Q.  Okay.  Is your Bluetooth only connected to
2  your laptop or is it also simultaneously connected
3  with your cell phone?
4      A.  No.  I shut it off on my cell phone so I
5  can use it on my laptop.
6      Q.  And have you received any gmails from
7  anyone or any e-mails through your gmail account from
8  anyone during the course of this deposition?
9      A.  They're ads.  I was receiving ads for,
10 like, socks, I think.
11     Q.  Okay.  But nothing from Nicholas Crowley?
12     A.  No, ma'am.
13     Q.  Okay.  Have you received any gmails, I
14 don't want to know what they say, from your attorney
15 during the course of this deposition?
16     A.  Not during the deposition, no.
17     Q.  But presumably on breaks, correct?
18     A.  Yes.
19     Q.  You had communications with your attorney
20 on breaks, I'm just going to leave that at that.  Did
21 Nicholas Crowley influence you in any way to file this
22 lawsuit?
23     A.  No.
24     Q.  When you're both working, Officer Socha,

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021                                                          Pages 234..237

Page 234

1  you and Nicholas Crowley, does Crowley help you in
2  caring for the children? Does he help care for the
3  children or does that all fall on your mother and you
4  and your sister?
5      A. He does.
6      MR. ADAMS: Object to form. He does when he's
7  not at work.
8  BY MS. PROCTOR:
9      Q. When he's not working, does your husband
10 help you care for your children?
11     A. Of course.
12     Q. It takes two and then some. Okay. I know
13 that. Now, I asked you before, like -- You're aware,
14 Officer Socha, that you can file a lawsuit under a
15 fictitious name, correct, like Jane Doe, you're aware
16 of that concept?
17     A. I am not, no.
18     Q. You're not aware of that. Okay. Were you
19 aware that you could file this lawsuit under Jane Doe
20 instead of using your actual name? Were you aware of
21 that?
22     MR. ADAMS: I'll object to lack of foundation.
23 She doesn't know that's a given.
24 BY MS. PROCTOR:

Page 235

1      Q. So you could have filed this lawsuit under
2  the name of Jane Doe --
3      MR. ADAMS: I'm going to object lack of
4  foundation.
5  BY MS. PROCTOR:
6      Q. (Continuing.) -- if you wanted to?
7      A. I didn't know that that was -- I didn't
8  know that you could file under Jane Does or John Does
9  or however that would be.
10     Q. Well, just accept for purposes of this
11 deposition that you could have. Now, that you know
12 that, would you have preferred to file this lawsuit
13 under Jane Doe and not use your real name?
14     MR. ADAMS: Object to calls for speculation and
15 lacks foundation.
16 BY MS. PROCTOR:
17     Q. You can go ahead and answer.
18     A. I don't know how to answer that. I don't
19 know either way.
20     Q. Or would you agree that it would have went
21 better for you and not use your real name in this
22 lawsuit given that lawsuits are public information and
23 this lawsuit again is exposing some very private
24 information about you and your sex life and so on and

Page 236

1  so forth?
2      A. I don't mean to sound ignorant here. I'm
3  using ignorant in not knowing, but I don't know how a
4  lawsuit would uncover what this has uncovered if I
5  used a Jane Doe had I known how to do that.
6      Q. Well, it would still be you, you're just
7  using a fictitious name to keep your actual name out
8  of the record and out of the public eye and
9  newspapers. That's one of the reasons you do a Jane
10 Doe. But again, you did not know about that one way
11 or the other, correct?
12     MR. ADAMS: I'm going to object to form.
13 BY THE WITNESS:
14     A. Right. I didn't know that you could file
15 in a fictitious name.
16     Q. Did you take any medications today?
17     A. No.
18     Q. Do you have any memory problem?
19     A. I don't.
20     Q. Have you consumed any alcohol today?
21     A. No.
22     Q. Is there anything that may impact your
23 ability to remember any of the events which are the
24 subject of this lawsuit?

Page 237

1      A. No.
2      Q. Have you ever been convicted of a felony or
3  a crime of dishonesty?
4      A. No.
5      Q. Have you ever been disciplined in any
6  workplace or in school for being untruthful?
7      A. No.
8      Q. Have you ever filed a lawsuit as a
9  plaintiff other than this lawsuit?
10     A. No.
11     Q. Do you know what the total amount of your
12 medical or treatment bills that you're seeking
13 recovery for in this case would be?
14     A. No.
15     Q. Have all your bills been paid, to your
16 knowledge?
17     A. Through insurance and through what I've had
18 to pay, yes.
19     Q. Okay. And what insurance do you have?
20     A. Blue Cross-Blue Shield of Illinois.
21     Q. Okay. What plan do you have?
22     A. It's a PPO.
23     Q. Okay. And are there any copays or
24 deductibles that need to be satisfied before -- you

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021                                    Pages 238..241

Page 238

1  know, before any counseling services would be fully
2  paid for, if you know?
3      A.  I believe so, but I also believe that there
4  was payments that I had to make for Deb Del Re's
5  services.
6      Q.  Is that because she was out of network, if
7  you know, or it just wasn't fully covered, if you
8  know, Officer Socha, you may not?
9      A.  I don't know.  I'm pretty sure that they
10  were in network, but I think it wasn't -- whatever
11  wasn't covered, I had to pay those all at once.
12      Q.  Did you have to miss any time from work as
13  a result of the events alleged in this lawsuit?
14      A.  I have missed work, correct.  Yes.
15      Q.  Okay.  Have you been paid for those days
16  off?
17      A.  Yes.  I had to utilize my sick time.
18      Q.  Okay.  And, you know, how much sick time
19  did you have to utilize and when?
20      A.  I would have to go back on time cards and
21  look.  I'd have to go back and look.  I remember -- Go
22  ahead.  I'm sorry.
23      Q.  Can you give me a ballpark?  And I'm sorry.
24  I interrupted you.  You were starting to say I

Page 239

1  remember.  Please finish.
2      A.  That's okay.  Specifically just because I
3  was still on the street working, we work 12-hour
4  shifts, I think I called in two or three days so then
5  I had to use at least -- right there is 24 hours.  I
6  guess I have to go back in.
7      Q.  Sure.  Can you -- Other than missing two or
8  three days, is that the most amount of time that
9  you've missed from work, you know, which you attribute
10  to the events that we've been discussing or have there
11  been more days?
12      A.  No.  There have been more days.  Like I
13  said, I'd have to go back and look at the pay stubs or
14  totals.  It's just that was the most recent that I
15  remember.
16      Q.  And when was that in relation to today?
17      A.  Well, I'm still working on -- I'm still on
18  the street, so that was probably July -- July 2020,
19  June of 2020.  I'd have to go and look at that.
20      Q.  Is that before you went on light duty?
21      A.  Yes.
22      Q.  Did you go on light duty with both your
23  pregnancies, Officer Socha?
24      A.  Yes.

Page 240

1      Q.  I want to ask you just a couple more
2  questions about the letter that you received after --
3  This was the letter -- I don't want to have to pull it
4  up again on the screen.
5      A.  That's all right.
6      Q.  It was page 12 of 12 in your Mandatory
7  Initial Disclosures and it was the letter that begins
8  with Socha, dash, and then I think you testified
9  earlier that you didn't recall when you received this,
10  not specifically, maybe July, August of 2018, but it
11  was after you received the letter that came to you in
12  the U.S. Postal Service mail.  Okay.  I believe you
13  said you don't remember if it was in an envelope.  Is
14  it possible it was in an envelope or you just don't
15  remember?
16      A.  I don't remember.
17      Q.  Okay.  You told us, though, that there was
18  attorney information attached to this letter --
19      A.  Yes.
20      Q.  -- do you recall that?
21          Can you describe what you meant by attorney
22  information?
23      A.  It was -- I think there was, like, a -- it
24  looked like it was a printout from -- like a, -- like,

Page 241

1  a bio on an attorney, if I remember right.
2      Q.  Was there an attorney card attached?
3      A.  No.
4      Q.  It was just a printout bio on an attorney?
5      A.  Yes.
6      Q.  Did you recognize the name of the attorney?
7      A.  No.
8      Q.  What did you do with the bio printout?
9      A.  I don't know.  I think -- I don't know.  I
10  don't know if I gave it to Hall or ...
11      Q.  So this letter with the attorney bio, you
12  received it after you had retained or consulted with
13  Attorney Hall Adams, correct?
14      A.  I believe so.
15      Q.  So are you -- are you certain you gave a
16  copy of the attorney bio to Mr. Adams?
17      MR. ADAMS:  Objection, asked and answered.
18  BY MS. PROCTOR:
19      Q.  Yeah, do you know what, I'm sorry.  It's
20  just getting late in the day.  I don't know that I
21  heard you.  Can you just answer again?  It's not a
22  trick question.  Sorry.
23      A.  I don't remember if I gave him the copy
24  that was with the letter or not.

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 242..245

Page 242

1    Q.   Okay.  Do you still have a copy of it?
2    A.   No.
3    Q.   So you destroyed it?
4    A.   No, I didn't say I destroyed it.
5    Q.   Did you throw it out?
6    A.   I don't believe so.  I believe that I gave
7    both the letter and the bio to my attorney, but I
8    can't be sure about that one.
9    Q.   Okay.
10        MS. PROCTOR:  I don't recall – And, Hall, maybe
11   you can shed some light on this, I don't recall
12   receiving an attorney bio in the plaintiff's document
13   production, but, you know, I'm coming into the case in
14   the middle.  So is that something you've produced?
15       MR. ADAMS:  We produced what we produced.
16       MS. PROCTOR:  You produced what you produced, but
17   can you answer my question?  Did you produce a copy of
18   the attorney bio?  I don't recall seeing it.
19       MR. ADAMS:  Then take my deposition.
20       MS. PROCTOR:  And if you didn't produce it, then
21   I'm going to making a formal request for it today on
22   the record and again following up with plaintiff's
23   counsel.  Again, if we have it, I don't have to go
24   through that process, but I don't see that we do.

Page 243

1        MR. CLARK:  I don't think we received a copy.
2        MS. PROCTOR:  Okay.
3    BY MS. PROCTOR:
4    Q.   So, Officer Socha, if you didn't give a
5    copy to your attorney, would that mean that you may
6    still have a copy of it somewhere?
7    A.   I don't think I have – I don't have a copy
8    of it.  I don't think I have it anywhere.
9    Q.   Okay.  But you do believe you gave it to
10   Mr. Adams; is that correct?
11   A.   I believe so.  I couldn't be sure.
12   Q.   Did you ever show the attorney bio to
13   anyone other than Mr. Adams?
14   A.   I believe I showed Nick Crowley when I got
15   it.
16   Q.   Did Crowley recognize the name of the
17   attorney on the bio?
18   A.   No, I don't believe so.
19   Q.   Did you ever contact – I'm not going to
20   ask what was discussed, but did you ever contact the
21   attorney on the bio?
22   A.   No.
23       MS. PROCTOR:  Now, I just want to take one last
24   bathroom break and I'm going to come back on the

Page 244

1    record and I may have a couple more, but I'm hoping I
2    can come back and tell you I'm done.  So if you could
3    just give me a break for several minutes.  Thank you.
4        (A short recess was taken.)
5    BY MS. PROCTOR:
6    Q.   Officer Socha, did you feed or give any
7    information to the media concerning your lawsuit?
8    A.   No.
9    Q.   You know, I lost you.  I can hear you,
10   though.  Can you hear me okay?
11   A.   Yeah.
12   Q.   Then I don't know what you can see, but I
13   can't see you.
14   A.   I can see you.
15   Q.   Okay.  Do you know, Officer Socha, whether
16   Attorney Adams is representing Officer Crowley or any
17   other Joliet police officer in any other matter?
18   A.   I don't know.
19       MS. PROCTOR:  I'm done with my questions, but I
20   do want to just put something on the record.  It does
21   not appear, and this happens sometimes, that we have
22   full counseling records from Edgewood Clinical
23   Services, in particular the couples counseling and
24   also there was an additional – there was a doctor

Page 245

1    identified, Dr. Levy, in medical records today – or,
2    you know, in testimony today, so I'm – we're going to
3    be making a formal request for those records.  And
4    depending upon, you know, those records, we may have
5    to bring Officer Socha back.  So I just want to put
6    that on the record.  I want to reserve the right.  I
7    don't want to really conclude the City's questioning
8    of Officer Socha until I'm sure we've got full and
9    complete records.
10   BY MS. PROCTOR:
11   Q.   And while I have you here, Officer Socha,
12   can you give me the name of your ob-gyn physician, the
13   name and the name of the group and where they're
14   located?
15   A.   West Suburban Women's Health.
16   Q.   Okay.
17   A.   They're in –
18   Q.   Go ahead.  I'm sorry.
19   A.   They're in Willowbrook, Illinois.
20   Q.   And do you see a specific doctor there?
21   A.   I do, but throughout the pregnancy I had to
22   rotate – the pregnancies I had to rotate.
23   Q.   So you saw different doctors within the –
24   it's West Suburban Women's Health in Willowbrook?

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 246..249

Page 246

1   A.   Uh-huh, yes.
2   Q.   And were you a patient there before your
3   pregnancies?
4   A.   Yes.
5   Q.   Okay.  And how long have you been a patient
6   in this group?
7   A.   Oh, my teen-age years.
8   Q.   Okay.  So from your teens until?
9   A.   I think I was 18 – I'm sorry.  I think I
10  was 18 when I started going to that practice.
11  Q.   Okay.  And just to be clear, have you ever
12  been treated by any other physician for any other
13  reason from your teens to the present date other than
14  the folks we've already talked about?
15  A.   I can't – I don't remember.  I was at
16  Hinsdale Orthopedics.  I can't remember the name of
17  the doctor that I saw.
18  Q.   When was that, Officer Socha, roughly?
19  A.   2017.
20  Q.   Okay.  And what was the nature of the care?
21  It sounds like an orthopedic issue.
22  A.   Yeah.  It was for my back.
23  Q.   Okay.  And what's – What's the nature of
24  the back problem?

Page 247

1   A.   If I understand right, I have, like,
2   degenerative disc disease.  I could be – I can't
3   remember the numbers.  Like, the S, but my lower
4   back –
5   Q.   Okay.
6   A.   – the discs are messed up and then
7   they're – I can't remember the name of the other
8   thing.  I'd have to go and look at it.
9   Q.   That's fine.  Are you still under the care
10  of the Hinsdale Orthopedic group?
11  A.   No.
12  Q.   Did you see a specific physician there?
13  A.   It was a female, but I don't remember – I
14  went in thinking that I had to have surgery
15  originally, and then the surgeon was, like, No, go and
16  see this doctor and I – I saw her and I think I had a
17  couple, like, injections in my back and then I did
18  chiropractic and physical therapy.
19  Q.   Okay.  So the injections, was that done by
20  a different physician or a physician through Hinsdale
21  Orthopedics?
22  A.   Both.
23  Q.   Both.  Okay.  What about the physical
24  therapy?  Where was that done?

Page 248

1   A.   That was done at Brightmore – I don't
2   know – I don't want to use my computer, but it's
3   something Bright.  I'd have to Google it in physical
4   therapy.
5   Q.   And where was Brightmore located?
6   A.   They were in Plainfield.  They have an
7   office in Plainfield and they have an office in Joliet
8   and Frankfurt as well, I think.
9   Q.   Did you go to the Plainfield location?
10  A.   Yes.
11  Q.   Okay.  Other than the orthopedic issue that
12  you've mentioned and the related care, did you – have
13  you received any other medical treatment within the
14  last ten years for any reason?
15  A.   I had – I had a – I had my nose –
16  because of the sinus infections that I had, I had to
17  have surgeries on my nose –
18  Q.   When was that?
19  A.   – and my sinuses.
20       2016 – 2000– – Is it – It's the end of
21  2015 or 2016.
22  Q.   And was the surgery helpful?
23  A.   No.  I have to have another surgery.
24  Q.   Okay.  When?  What's the timeline on that,

Page 249

1   if you know?
2   A.   I have to go see another doctor.  They put
3   implants in my nose to – Because I can't breathe out
4   of my left nostril as good as I should be able to, so
5   they fixed my – they fixed the deviated septum twice
6   and then the second time I had implants and I had my
7   cheek sinuses cleaned out.  But like I said, like, I
8   still have a little bit, like a constant drip out of
9   my nose and I have to go back and see another doctor.
10  Q.   Where did you receive that care and the
11  surgery?
12  A.   I believe that surgery was at Edward's
13  Hospital.
14  Q.   And where is Edward's Hospital located?
15  A.   Naperville.
16  Q.   Okay.  And you believe that was in or
17  around 2016?
18  A.   I think so.
19  Q.   Okay.  Have you now told me all the medical
20  treatment that you have received for any reason within
21  the last ten years?
22  A.   Yes.  As far as ailments, yes.
23  Q.   When you say ailments, what do you mean?
24  Like, physical ailments?

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 250..253

Page 250

1   A.  Yeah.
2   Q.  Okay. And just to -- really just to be
3 sure I'm not missing anything, is the only place that
4 you've ever received individual therapy as well as the
5 couples counseling and possibly the marriage therapy
6 would have been through the Edgewood Clinical Services
7 and Pillars that you mentioned earlier in today's
8 deposition? Have you received mental health or
9 counseling services anywhere else?
10   A.  Other than that?
11   Q.  Yes.
12   A.  No.
13   MS. PROCTOR: Okay. I don't have anything
14 further. Thank you, Officer Socha.
15   THE WITNESS: You're welcome.
16   MR. ADAMS: Matt?
17   MR. CLARK: Officer Socha, just one quick
18 question.
19       REDIRECT EXAMINATION
20 BY MR. CLARK:
21   Q.  What is the name of your sister?
22   A.  Jacqueline.
23   Q.  And her last name?
24   A.  Socha.

Page 251

1   MR. CLARK: Thank you very much. I don't have
2 any further questions.
3     Hall, do you want to --
4   MR. ADAMS: We'll show signature as reserved.
5
6   MR. CLARK: Okay.
7   MS. PROCTOR: But, again, we're leaving the
8 deposition open so it's not concluded pending the
9 receipt of full medical so I just want that to just be
10 clear on the record.
11   MR. CLARK: I guess I would join in too.
12   MR. ADAMS: We'd object to that, of course.
13 You've had a lot of time to get whatever medical you
14 needed.
15   MS. PROCTOR: Well, I suppose we can have that
16 conversation another day, but I'm reserving the right
17 to bring Officer Socha back for that purpose as I
18 mentioned on the record. So thank you everyone for
19 their time.
20   MR. CLARK: Lisa, can I order a copy, e-tran.
21   THE COURT REPORTER: Okay. Ms. Proctor?
22   MS. PROCTOR: No order from the City.
23   MR. ADAMS: All I want is a copy if somebody
24 orders the original. I'm not paying for the original.

Page 252

1   MR. CLARK: Yeah, I'm ordering the original, if
2 that was unclear.
3   MR. ADAMS: So what I would like, Lisa, is to get
4 a condensed hard copy with the marked exhibits
5 attached and pdf of the very same thing, please.
6   THE COURT REPORTER: Okay. You got it.
7   We are off the record at 5:30 p.m.
8   (Witness excused.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 253

1     IN THE UNITED STATES DISTRICT COURT
      NORTHERN DISTRICT OF ILLINOIS
2       EASTERN DIVISION
3 CASSANDRA SOCHA,     )
            )
4   Plaintiff,     )
            )
5   -vs-     )  No. 18 CV 05681
            )
6 CITY OF JOLIET, a municipal  )
  corporation; EDWARD GRIZZLE,  )
7   and JOHN DOES 1-20,    )
            )
8   Defendants.  )
9
10     I, CASSANDRA SOCHA, state that I have read
11 the foregoing transcript of the testimony given by me
12 at my deposition on the 4th day of May, 2021, and that
13 said transcript constitutes a true and correct record
14 of the testimony given by me at the said deposition
15 except as I have so indicated on the errata sheets
16 provided herein.
17         CASSANDRA SOCHA
18 No corrections (Please initial)_____
  Number of errata sheets
19 submitted_____(pgs.)
20 SUBSCRIBED AND SWORN to
  before me this _____ day
21 of _____, 2021.
22 _____
23     NOTARY PUBLIC
24

EXHIBIT A

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 254..256

Page 254

```
 1   UNITED STATES OF AMERICA     )
     NORTHERN DISTRICT OF ILLINOIS )
 2   EASTERN DIVISION         )  SS.
 3   STATE OF ILLINOIS        )
     COUNTY OF COOK           )
 4
 5
 6        I, Lisa M. Walas, Certified Shorthand
 7   Reporter, appearing remotely via videoconference, do
 8   hereby certify that CASSANDRA SOCHA was first duly
 9   sworn by me to testify to the whole truth and that the
10   above deposition was reported stenographically by me
11   and reduced to typewriting under my personal
12   direction.
13        I further certify that the said deposition
14   was taken at the time and place specified and that the
15   taking of said deposition commenced on the 4th day of
16   May, A.D., 2021, at 10:00 a.m.
17        I further certify that I am not a relative
18   or employee or attorney or counsel of any of the
19   parties, nor a relative or employee of such attorney
20   or counsel nor financially interested directly or
21   indirectly in this action.
22
23
24
```

Page 255

```
 1        In witness whereof, I have hereunto set my
 2   hand this 1st day of June, A.D., 2021.
 3
 4
 5           LISA M. WALAS, CSR
             180 North LaSalle Street
 6           Suite 2800
             Chicago, Illinois  60601
 7           Phone:  (312) 236-6936
 8   CSR No. 084-003787
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 256

```
 1   Errata Sheet
 2
 3   NAME OF CASE: Socha vs City of Joliet
 4   DATE OF DEPOSITION: 05/04/2021
 5   NAME OF WITNESS: Cassandra Socha
 6
 7   Page _____ Line _____ Reason _____
 8   From _____ to _____ .
 9   Page _____ Line _____ Reason _____
10   From _____ to _____
11   Page _____ Line _____ Reason _____
12   From _____ to _____
13   Page _____ Line _____ Reason _____
14   From _____ to _____
15   Page _____ Line _____ Reason _____
16   From _____ to _____
17   Page _____ Line _____ Reason _____
18   From _____ to _____
19   Page _____ Line _____ Reason _____
20   From _____ to _____
21   Page _____ Line _____ Reason _____
22   From _____ to _____
23
24   _____
     SIGNATURE OF DEPONENT
```

EXHIBIT A

STATE OF ILLINOIS )
) SS.
COUNTY OF WILL )

### IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
### WILL COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS

vs.

IN REGARDS TO A CERTAIN
CRIMINAL INVESTIGATION

STATES ATTORNEYS OFFICE
SEARCH WARRANT NO.

# SEARCH WARRANT

TO ALL PEACE OFFICERS OF THE STATE OF ILLINOIS:

On this day, Friday, May 18th, 2018 Complainant-Affiant Detective Sergeant Edward
Grizzle of the Joliet Police Department, has signed and sworn to a complaint for search warrant
before me. Upon examination of the written complaint, I find that said complaint on its face
states facts sufficient to show probable cause for the issuance of a search warrant, and I therefore
command that the following property be searched:

Page 2 of 8



EXHIBIT
A



EXHIBIT

Defendant Ex 1, LW, 5/4/21

EXHIBIT A

A. The following described property:

1. Apple iPhone Rose Gold in color with cell phone number 708-717-3652

I further command that the following described instruments, articles and things which have been used in the commission of, or which constitute evidence of the offense of **Harassment via electronic communications, Intimidation** be seized, searched, and forensically analyzed:

> Any and all data regarding electronic communications, including dates and times of those communications, digital images or videos, e-mail, voice mail, buddy lists, chat logs, instant messaging or text accounts, forensic data as well as data pertaining to ownership and registration of the device, any and all access logs identifying who utilized said digital storage devices, and any "hidden," erased, compressed, password-protected, or encrypted files.

FORENSIC ANALYSIS: This search warrant shall include authority to analyze and search any media seized for relevant evidence as outlined in this search warrant.

ADDITIONAL AUTHORITY: This search warrant shall include authority to decrypt any encrypted or password-protected data located on these computers that were seized from the above listed residence. This search warrant shall also include the authority to enter any locked folders located in these computers seized in the above listed residence.

RETURN OF SEARCH WARRANT: This search warrant shall be considered formally returned within a reasonable time period by listing all physical items seized pursuant to the warrant. Full search warrant return including the results of all forensic analysis contemplates a reasonable time period in light of the fact that modern hard drives can potentially contain millions of pages of data in a format that is not easily searched.

USE OF UNSWORN PERSONNEL: Forensic analysis of any data obtained from the seized items pursuant to this search warrant may be conducted by employees of law enforcement agencies who are not sworn law enforcement personnel, but are instead civilian employees.

Page 3 of 8

EXHIBIT A

I further command that a return of any physical items so seized shall be made without unnecessary delay before me or before Judge ___ *Carlson* or before any Court of competent jurisdiction.

_____

Twelfth Circuit Judge

Date of Issuance: May 18th 2018

Time of Issuance: __ 11:19 AM

EXHIBIT A



**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CASSANDRA SOCHA, | ) |
| | ) Case No. 18 CV 05681 |
| Plaintiff, | ) |
| | ) Honorable Judge Jorge L. Alonso |
| v. | ) |
| | ) Honorable Magistrate Judge Mary M. |
| City of Joliet, a municipal corporation, | ) Rowland |
| Edward Grizzle, John Does 1 – 20, | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF'S MANDATORY INITIAL DISCOVERY RESPONSES**

NOW COMES Plaintiff, Cassandra Socha, by and through her attorneys, Law Offices of

Hall Adams, LLC and for her response to the Court's Mandatory Initial Discovery Responses as

required by Rule 26(a)(1), respectfully states as follows:

      1.     State the names and, if known, the addresses and telephone numbers of all

persons who you believe are likely to have discoverable information relevant to any party's

claims or defenses, and provide a fair description of the nature of the information each such

person is believed to possess.

**ANSWER:   Plaintiff – Cassandra Socha, Nicholas Crowley (*People v. Crowley* and**
**plaintiff's damages), Det. Sgt. Edward Grizzle (all liability facts) , Attorney Jeffrey**
**Tomczak (*People v. Crowley*), Michael DeVito  (FOP President – liability facts relating to**
**dissemination of photos/videos on plaintiff's phone), Special Prosecutor:  Lorinda Lamken,**
**and Maria Gatlin (plaintiff's transmissions to Gatlin re: *People v. Crowley*).**

      2.     State the names and, if known, the addresses and telephone numbers of all person

who you believe have given written or recorded statements relevant to any party's claims or

defenses.  Unless you assert a privilege or work product protection against disclosure under

applicable law, attach a copy of each such statement if it is in your possession, custody, or



EXHIBIT

Defendant Ex. 2, LW, 5/5/21

EXHIBIT A

control. If not in your possession, custody, or control, state the name and, if known, the address and telephone number of each person who you believe has custody of a copy.

**ANSWER: Det. Sgt. Edward Grizzle – 12th Judicial Circuit, Will County, Illinois Search Warrant issued on 18 May 2018, Exhibit A to plaintiff's Complaint; Copies of "anonymous" letters sent to plaintiff and are attached hereto.**

3. List the documents, electronically stored information ("ESI"), tangible things, land, or other property known by you to exist, whether or not in your possession, custody, or control, that you believe may be relevant to any party's claims or defenses. To the extent the volume of any such materials makes listing them individually impracticable, you may group similar documents or ESI into categories and describe the specific categories with particularity. Include in your response the names and, if known, the addresses and telephone numbers of the custodians of the documents, ESI, or tangible things in your possession, custody, or control, you may produce them with your response, or make then available for inspection on the date of the response, instead of listing them. Production of ESI will occur in accordance with paragraph C.2 below.

**ANSWER: Generally, contents of plaintiff's phone and any devices to which those contents were down/up-loaded and/or images copied; Copies of anonymous letters received by plaintiff and attached hereto.**

4. For each of your claims or defenses, state the facts relevant to it and the legal theories upon which it is based.

**ANSWER: As alleged in Plaintiff's Complaint.**

5. Provide a computation of each category of damages claimed by you, and a description of the documents or other evidentiary material on which it is based, including materials bearing on the nature and extent of the injuries suffered. You may produce the documents or other evidentiary materials with your response instead of describing them.

**ANSWER:** **Damages are non-economic violations of privacy and emotional distress.**

6.      Specifically identify and describe any insurance or other agreement under which

an insurance business or other person or entity may be liable to satisfy all or part of a possible

judgment in the action or to indemnify or reimburse a party for payments made by the party to

satisfy the judgment. You may produce a copy of the agreement with your response instead of

describing it.

**ANSWER:** **Paragraph #6 applies only to defendants.**

7.      A party receiving the list described in Paragraph 3, the description of materials

identified in Paragraph 5, or a description of agreements referred to in Paragraph 6 may request

more detailed or thorough responses to these mandatory discovery requests if it believes the

responses are deficient. When the court has authorized further discovery, a party may also serve

requests pursuant to Rule 34 to inspect, copy, test, or sample any or all of the listed or described

items, to the extent not already produced in response to these mandatory discovery requests, or to

enter onto designated land or other property identified or described.

**ANSWER:** **Copies of "anonymous" letters sent to plaintiff and attached hereto.**

Hall Adams
Law Offices of Hall Adams LLC
33 North Dearborn Street, Suite 2350
Chicago, Illinois 60602
Attorneys I.D. #6194886

3

EXHIBIT A

## ATTORNEY CERTIFICATION

As the plaintiff in this instant matter, I do hereby certify that to the best of my knowledge, information, and belief, formed after a reasonable inquiry, the request, response, or objection is:

(A) consistent with these rules and warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law;

(B) not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation; and

(C) not unreasonable or unduly burdensome or expensive, given the needs of the case, the discovery already had in the case, the amount in controversy, and the importance of the issues at stake in the litigation.

/s/    Hall Adams
Plaintiff's attorney

4

EXHIBIT A

## Affidavit

The undersigned certifies that the answers contained in **PLAINTIFF'S INITIAL DISCOVERY RESPONSES** are complete in accordance with this request as provided in Federal Rules of Civil Procedure the statements set forth in this instrument are true and correct, except as to the matters therein stated to be on information and belief, and as to such matters, the undersigned certifies as aforesaid that he verily believes the same to be true.

By: _____
Cassandra Socha

STATE OF ILLINOIS     )
                       )
COUNTY OF COOK     )

Subscribed and Sworn to before me
this 21 day of December 2018 .

_____
Notary Public

Official Seal
Rebecca Ortlund
Notary Public State of Illinois
My Commission Expires 11/16/2021

5



Cassandra Socha /Nicholas Crowley

    Investigation

Search warrant applied for by **Edward Grizzle**

Search warrant was taken to **several different will county judge**s due to several judges **refusing** to sign the search warrant, eventually judge Sarah Jones sign the searchd warrant without knowledge that other judges had refused to sign it.

Edward Grizzle excute  search warrant on Cassandra Socha personal cell phone

The cell phone is turned over to Chris Botzum for the cell phone to be downloaded (the system used will allow only text messages only to be downloaded however all contents in the cellular phone was downloaded)

Chris Botzum (previously assigned to the FBI Task Force  RCFL  specializing in recovering all data from electronic devices cell phones etc ) had some issues with  downloading the cell phone he contacted Jeffery German (equal rank) employee to Cassndra Socha (never should have happened)

After the download  all the contents were turned over to Edward Grizzle (NOTE each of the three watch and discussed the VIDEOS from the cell phone.

Edward Grizzle told Alan Roechner and Michael Batis  about the videos, all discussed and watched the videos, Edward Grizzle provided Alan Roehner  a copy of the video (to secure as evidence in his office with Brian Benton's approval) where it continued to be watched in Alan Roechner office and recorded onto his cell phone .

Internal affairs  Marc Reid was told about the video and  requested a copy, Edward Grizzle provided Marc Reid a copy (there was not nor has there ever been an internal investigation on this allegation where Marc Reid would need a copy, also internal investigations and criminal investigations are conducted seperate and should not be discussed together) this video was watched and discussed between Marc Reid. James Rouse, and Darrell Gavin.

Darrell Gavin discussed the video with us  Robert Brown, and Jeremy Harrison, the three discussed then watched the video.

Tab Jensen requested Darrell Gavin to obtain a copy of the video, Tab Jensen was provided a

EXHIBIT A

copy of the video, Tab Jensen and Brian Benton discussed and watched the video.

Cassandra Socha and Nicholas Crowley personal intimate affairs have been exposed throughout the departments administration to include internal affairs and their immediate supervisors humiliating them both, i'm personally ashamed to say i'm employed with such a police department knowing that wrong doing within the administration is constantly covered up with the **chief of police** and **head of internal affairs** leading the corruption.

** Watch for a Cellular Phone Changes**

EXHIBIT A



Hall Adams Law Offices
33 N Dearborn St.
Chicago, IL   60602

EXHIBIT A

7318



JOLIET
Police Department
150 West Washington
Joliet, IL 60432-4139

JOLIET POLICE
CASSANDRA SOCHA #262
150 W WASHINGTON ST
JOLIET, IL 60432

EXHIBIT A



EXHIBIT A

Cassandra,

I want to let you know after a search warrant was executed on your cell phone what is being talked about and has been SHARED by the **investigator, internal affairs,** with several members throughout the Police department including the staff. Cassandra only you know what is or was on your cell phone but you and Nick's sex life and all the pictures and videos of you both having sex has been viewed by **multiple** individuals throughout the department. Pictures of you giving Nick head, deep throating Nick's Penis, Spitting on his Penis while giving him head, fucking him, naked pictures of you and so much more all have been viewed by several members, supervisors, internal affairs throughout the department. Comments are said that you fuck like a porn star and the way you give Nick head and fuck, Nick or no man should ever leave you alone. The search warrant should have never revealed any of this information it should have only been for text messages and phone calls. This information is coming to you because you need to know what is going on with your private information and how it's being passed around and shared throughout the department, ***what you choose to do is up to you and Nick but you both need to no.*** VERY UNPROFESSIONAL INVESTIGATION

EXHIBIT A

Socha-

Not for sure if you are aware of Investigations Division actively showing photos off your cell phone they used a warrant to get, but they have been. There are several supervisors as well as the DC of Investigations, using this as a way to humiliate and degrade you, not to mention ruining your career. If you do not get the response you need by filing a formal complaint with your immediate supervisor, then you need to go above them or to human resources.

The person responsible for disclosing the photos is the same one who obtained the warrant for your phone, along with other supervisors involved in this case. It is no big secret throughout Investigations that this is being conducted while on duty, just wanted to make you aware of it. You have been made out to be the bad guy in all of this, which is not fair especially at the expense of losing your credibility within the dept.

EXHIBIT A