

Transcript of the Deposition of
# Detective Jeffrey German
**Case:** Cassandra Socha v. City of Joliet;et al.
**Taken On:** April 28, 2021

Royal Reporting Services, Inc.
Phone:312.361.8851
Email:info@royalreportingservices.com
Website: www.royalreportingservices.com

EXHIBIT E

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CASSANDRA SOCHA,                    )
                                    )
                 Plaintiff,         )
                                    )
         vs.                        )   No. 18 CV 05681
                                    )
CITY OF JOLIET, a municipal         )
corporation; EDWARD GRIZZLE;        )
JOHN DOES 1-20,                     )
                                    )
                 Defendants.        )


          The deposition of DETECTIVE JEFFREY GERMAN,

taken via videoconference, called by the Defendants for

examination, pursuant to notice and pursuant to the

Federal Rules of Civil Procedure for the United States

District Courts pertaining to the taking of depositions,

taken before Tina M. Hickey, Certified Shorthand

Reporter, on April 28th, 2021, at 9:27 a.m.

**EXHIBIT E**

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

```
                                                        Page 2
 1    APPEARANCES (via videoconference):
 2         LAW OFFICES OF HALL ADAMS, LLC
           MR. HALL ADAMS, III
 3         MS. TAJA REYNOLDS
           33 North Dearborn Street
 4         Suite 2350
           Chicago, Illinois 60602
 5         Phone:  312.445.4900
           E-mail:  hall@adamslegal.net
 6
                 On behalf of the Plaintiff;
 7
           TRESSLER LLP
 8         MS. DARCY L. PROCTOR
           MR. JAMES J. HESS
 9         550 East Boughton Road
           Suite 250
10         Bolingbrook, Illinois 60440
           Phone:  630.759.0800
11         E-mail:  dproctor@tresslerllp.com
                    jhess@tresslerllp.com
12
                 On behalf of Defendant City of Joliet;
13
           KNIGHT HOPPE KURNIK & KNIGHT, LTD.
14         MR. MATTHEW S. CLARK
           5600 North River Road
15         Suite 600
           Chicago, Illinois 60018
16         Phone:  847.261.0700
           E-mail:  mclark@khkklaw.com
17
                 On behalf of Defendant Edward Grizzle.
18
      ALSO PRESENT:  Cassandra Socha
19
                      *   *   *   *   *
20
21
22
23
24
```

**EXHIBIT E**

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 3

```
 1                      I  N  D  E  X

 2   WITNESS                                    PAGE

 3   DETECTIVE JEFFREY GERMAN

 4        Examination by Mr. Adams.............   4

 5

 6                   E  X  H  I  B  I  T  S

 7   GERMAN DEPOSITION EXHIBIT                   PAGE

 8        No. 1................................   71

 9        No. 2................................   74

10        No. 3................................   84

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

**EXHIBIT E**

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 4

1    (Witness sworn.)
2    WHEREUPON:
3        DETECTIVE JEFFREY GERMAN,
4    called as a witness herein, having been first duly sworn,
5    was examined and testified via videoconference as
6    follows:
7                EXAMINATION
8    BY MR. ADAMS:
9        Q.   It's Officer German, correct?
10       A.   Yes.
11       Q.   My name is Hall Adams.  I represent the
12   plaintiff in this lawsuit, Cassandra Socha.  I'm going to
13   ask you some questions this morning about her case.
14       Have you been deposed before?
15       A.   Yes.
16       Q.   So you have been deposed before?
17       A.   Yes, on different cases.
18       Q.   Approximately how many times?
19       A.   Maybe three or four, approximately.
20       Q.   I'm going to review just a couple ground rules
21   to make the whole process go more smoothly.  The most
22   important is that you make sure you hear and understand
23   every question you're asked before you attempt to give an
24   answer.  If you need to have questions repeated, read

Page 5

1    back, rephrased, say so; we'll accommodate you as many
2    times as you ask.  If you give an answer to a question,
3    we will all assume that you heard the question and
4    understood the question; is that fair?
5        A.   Yes.
6        Q.   Never guess.  If you don't know the answer to
7    a question, you should tell us you don't know the answer
8    to the question.  If you can't remember something you're
9    asked, you should tell us you can't remember what you're
10   asked.  Never guess.  Okay?
11       A.   I got you.
12       Q.   And, of course, the Zoom format can be a
13   little choppy at times.  If you have problems with the
14   technology on your end, say so, and we'll do whatever we
15   need to do to make this coherent.
16       A.   Will do.
17       MS. PROCTOR:  You know, before we begin -- Hello?
18   Can everybody hear me?  This is Darcy Proctor.  I
19   don't -- you guys started a little early.  I thought we
20   were starting at 9:30.
21       MR. ADAMS:  Well, we had somebody from both
22   defendants on.
23       MS. PROCTOR:  Okay.  Well, just to be clear, so the
24   court reporter and the witness knows who's present, good

Page 6

1    morning.  My name is Darcy Proctor.  I'm here today on
2    behalf of the City of Joliet.  And joining me is James
3    Hess from my office, just for the record.  Good morning,
4    everybody.
5        MR. CLARK:  Good morning.
6    BY MR. ADAMS:
7        Q.   Okay.  Officer German, have you reviewed any
8    documents in preparation for this deposition?
9        A.   Yes, the Joliet police reports, the harassment
10   report that was created.
11       Q.   Authored by whom?
12       A.   The initial author was Detective -- Sergeant
13   Grizzle, and then I had two follow-ups and in the report.
14       Q.   Did you review all the reports relative to the
15   department's investigation of Socha?
16       A.   Yes, the original, and I think there were
17   three or four follow-ups.
18       Q.   And did you review anything else in
19   preparation for the deposition?
20       A.   No.
21       Q.   Why did you review the investigative reports?
22       A.   Because they were my reports that I created to
23   document what occurred back in 2018.
24       Q.   In order to prepare for today's deposition,

Page 7

1    have you discussed this case with anyone?
2        A.   No.
3        Q.   Whether in preparation for this deposition or
4    any other purpose, except in conversations with the IG,
5    have you discussed the facts and circumstances of this
6    case with anyone?
7        A.   What do you mean by "IG"?
8        Q.   The Inspector General.
9        A.   Oh, no.  I didn't speak to that person.  I
10   don't know who that is.
11       Q.   Okay.
12       A.   Oh, I'm sorry.  You mean Mr. Regis?
13       Q.   Yes.
14       A.   Okay.  Yes.
15       Q.   Except for that interview, have you discussed
16   the facts and circumstances of this case with anyone,
17   regardless of whether it was to prepare for today's
18   deposition or any other purpose?
19       A.   Would have been --
20           (Whereupon, there was technical
21            difficulty.)
22   BY THE WITNESS:
23       A.   Can you hear me?
24       Q.   We can hear now.  If you said something in the

4 (Pages 4 to 7)

**EXHIBIT E**

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

## Page 8

1  middle, we didn't hear you.
2      **A.**  It would be Sergeant Grizzle, Officer, who's a
3  lieutenant now, Botzum at the time; Sergeant Gavin, when
4  some -- filed the request to be downloaded. And then
5  other various detectives throughout the last couple years
6  have spoken about it, you know, in passing.
7      **Q.**  Do you recall the contents of any of those
8  conversations?
9      **A.**  So Sergeant Grizzle would have been the
10  initial incident, the extraction of the phone records,
11  assisting him in knowing how to review --
12      **Q.**  Let me interrupt you because I think we're
13  talking about two different things. The conversations
14  that you had with those -- the fellow officers you just
15  identified, were those conversations relating to the
16  investigation of Socha?
17      **A.**  Yeah, Sergeant Grizzle, Sergeant Gavin,
18  Lieutenant Botzum, now, those were involved in the actual
19  criminal investigation.
20      **Q.**  Other than conversations that related to the
21  Socha investigation when it was ongoing, have you
22  discussed the circumstances of Socha's claims in this
23  case?
24      **A.**  Yes.

## Page 9

1      **Q.**  Okay. And with whom?
2      **A.**  Various detectives throughout the last couple
3  years.
4      **Q.**  Do you remember the contents of any of those
5  conversations?
6      **A.**  Other than what was reported in the newspaper
7  about the allegations and things like that.
8      **Q.**  With whom have you discussed what was reported
9  in the newspapers about the allegations?
10      **A.**  I don't recall specific conversations with
11  specific detectives. It would be pretty much every
12  detective that had been in investigation throughout the
13  last -- during that time period would have been present
14  at some point during conversation about what was reported
15  on the news.
16      **Q.**  Have you ever seen the complaint that was
17  filed on behalf of Officer Socha in this lawsuit?
18      **A.**  I saw portions of it in the -- I believe the
19  Patch and Herald-News I think had portions of it. I
20  don't think I ever saw the official documentation.
21      **Q.**  In any of your conversations with any of the
22  police officers with whom you discussed the claims
23  asserted by Socha in this case, have any ever expressed
24  to you their opinions that those claims were valid?

## Page 10

1      **A.**  No.
2      **Q.**  Have any expressed to you their opinions that
3  those claims were not valid or factually supported?
4      You're gone. There we go.
5      **A.**  Sorry about that. I must have a bad Zoom
6  connection. Can you repeat the question?
7      **Q.**  Sure. In any of those conversations you had
8  with your fellow officers about the claims asserted by
9  Socha in this case as you understand them from the
10  articles you've read, have any of those officers
11  expressed to you their opinions that Socha's claims are
12  not valid or not factually supported?
13      **A.**  Nothing direct firsthand knowledge other than
14  not believing if it happened.
15      **Q.**  You were interviewed by the Joliet Police
16  Department Inspector General --
17      **A.**  Yes.
18      **Q.**  -- regarding the circumstances of this
19  lawsuit?
20      **A.**  Sorry. Yes, I was.
21      **Q.**  How long did that interview last?
22      **A.**  Maybe -- I would say less than an hour. I
23  don't know exactly. I didn't keep track, so I don't know
24  how long it was.

## Page 11

1      **Q.**  Where did it take place?
2      **A.**  I believe it was his office, at City Hall.
3      **Q.**  Was anyone else present?
4      **A.**  The union -- one of the union representatives.
5  It might have been Officer DeVito, but I'm not a hundred
6  percent sure. And then the -- Tamara Cummings, who's the
7  FOP attorney.
8      **Q.**  Say that again.
9      **A.**  One of the union representatives for the
10  department, which I believe was Officer DeVito, and then
11  Tamara Cummings I believe is her name. She's the
12  attorney for the FOP.
13      **Q.**  Okay. Did you make any recording of that
14  interview with the IG?
15      **A.**  I did not.
16      **Q.**  Did anyone in the room, as far as you could
17  see, make a recording of your interview with the IG?
18      **A.**  Not that I'm aware of.
19      **Q.**  All right. Did you make notes of your own
20  during that interview?
21      **A.**  I did not.
22      **Q.**  Did you make any notes or memoranda of the
23  interview after it was completed?
24      **A.**  I did not.

5 (Pages 8 to 11)

**EXHIBIT E**

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 12

1   Q.   Do you have any written record of any kind of
2   your interview with the IG?
3   A.   I do not.
4   Q.   Have you ever seen the notes of that interview
5   created by the IG?
6   A.   No, I have not.
7   Q.   Have you ever been interviewed by any law
8   enforcement agency in connection with the claims asserted
9   by Officer Socha in this case?
10  A.   No.
11  Q.   Other than your reports relating to the
12  underlying Socha investigation, have you prepared any
13  written statements in connection with this lawsuit?
14  A.   No, I don't believe I have.
15  Q.   Okay. Have you met with any of the lawyers in
16  this case?
17  A.   No.
18  Q.   Have you spoken, by telephone, with any of the
19  lawyers in this case other than perhaps to deal with the
20  scheduling and logistics of today's deposition?
21  A.   Just scheduling and logistics.
22  Q.   And only that, correct?
23  A.   Yes.
24  Q.   After Officer Socha filed her complaint in

Page 13

1   this case, were there any meetings held by any group of
2   Joliet police officers to discuss the facts and
3   allegations raised in her complaint?
4   A.   Not that I'm aware of.
5   Q.   Do you have any imminent plans to leave the
6   Joliet Police Department?
7   A.   Here for at least nine years.
8   Q.   Say that again.
9   A.   Here for at least another nine years.
10  Q.   So if we have to find you, for example, to
11  bring you in as a trial witness, we can find you through
12  the department for at least the next nine years?
13  A.   Yes.
14  Q.   What's your highest level of formal education?
15  A.   Graduate of college, a bachelor's degree.
16  Q.   What college?
17  A.   Lewis University.
18  Q.   What year did you graduate?
19  A.   It would have been 2002, I believe.
20  Q.   In what discipline did you take your degree?
21  A.   It's a bachelor's of science in accounting.
22  Q.   Any military service?
23  A.   No.
24  Q.   After you graduated college, what did you do

Page 14

1   for a living?
2   A.   I was -- That year that I graduated, prior to
3   my graduation, I was hired by the Mokena Police
4   Department as a police officer in 2001.
5   Q.   Had you previously been through the police
6   academy?
7   A.   That was my first law enforcement job.
8   Q.   You just froze up and went dark.
9   A.   Sorry about that. So my first police job was
10  Mokena Police. I got hired in 2001. And that's when I
11  was sent to the police academy.
12  Q.   Okay. Where did you go through the academy?
13  A.   PTI, down at U of I, Champaign.
14  Q.   What year would that have been?
15  A.   June of 2001 is when I started.
16  Q.   How long were you with Mokena?
17  A.   Just under two years.
18  Q.   Where did you go from there?
19  A.   I got hired by Joliet Police in 2000- -- in
20  March of 2003.
21  Q.   What was your rank when you were hired?
22  A.   Patrol officer.
23  Q.   What is your rank now?
24  A.   It's not considered a rank, but I'm a

Page 15

1   detective in the investigations division.
2   Q.   Detective really connotes your role, not your
3   rank, correct?
4   A.   Correct.
5   Q.   Since 2018, May of 2018, to be precise, your
6   rank has been the same as Officer Socha's, correct?
7   A.   I'm not sure what hers is. I would be
8   considered a master patrol officer. I believe you have
9   to have at least 9 or 12 years on for that rank. I'm not
10  sure if she was a master patrol officer at that time or
11  not.
12  Q.   And that status of master patrol officer as
13  distinct from patrol officer would just be a function of
14  seniority?
15  A.   I believe so and pay.
16  Q.   Is that master patrol officer actually a
17  different rank, or is it just a designation of patrol
18  officer?
19  A.   It's probably more of a designation.
20  Q.   When did you first become a detective in the
21  investigations division?
22  A.   I believe it was February of 2013.
23  Q.   2016?
24  A.   '13.

6 (Pages 12 to 15)

**EXHIBIT E**

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 16

1    Q.   Okay.  Have you continued to serve as a
2  detective in the investigations division since that time?
3    A.   Yes.
4    Q.   Are you familiar with Joliet Police Department
5  General Order 7-2, the subject of which is complaints
6  against the agency or its employees?
7    A.   I've read it once, at least once.
8    Q.   Are you familiar with General Order 16-1 of
9  the Joliet Police Department, the subject of which is
10 evidence and property management?
11   A.   I read it at least once.
12   Q.   As a detective in the investigations
13 department, do you have a duty to be familiar with those
14 two general orders?
15   A.   Yes.
16   Q.   Who was the chief when you were promoted -- or
17 I shouldn't say "promoted" -- when you were made a
18 detective in the investigations division?
19   A.   It might have been Chief Hayes or
20 Chief Benton.  I don't remember when they retired and
21 switched.
22   Q.   Who was the chief in May of 2018?
23   A.   I believe that was Chief Benton.
24   Q.   Say again.

Page 17

1    A.   I believe it was Chief Benton.
2    Q.   What was -- I think it's Al Roechner's rank in
3  the department in May of 2018?
4    A.   I believe at the time he was a deputy chief in
5  investigations.
6    Q.   At that time, who was -- in May of 2018, who
7  was your direct reporting senior?
8    A.   So at least it would have been
9  Sergeant Grizzle in investigations, and it might have
10 been Sergeant Nicodemus, who was also, I believe, a
11 sergeant at that time in investigations.
12   Q.   In connection with the Socha investigation,
13 were you reporting to and being directed by
14 Sergeant Grizzle?
15   A.   Yes.  Also, Sergeant Gavin, I believe, was --
16   Q.   Say again.
17   A.   I believe Sergeant Gavin was also in
18 investigations at that time.
19   Q.   Of those two, was one or the other a lead
20 detective on the Socha investigation?
21   A.   It was my understanding Sergeant Grizzle was
22 the lead on that investigation.
23   Q.   What, if any, role was Sergeant Gavin's on the
24 Socha investigation?

Page 18

1    A.   My only understanding would be when he
2  requested videos to be saved and then deleted off our
3  Cellebrite server.  That's the only knowledge I have of
4  his involvement.
5    Q.   That was a direction you were given by
6  Sergeant Gavin?
7    A.   I know Sergeant Gavin was who I spoke with in
8  person about that request.  I can't remember if anyone
9  higher up was present or was around, but I know it was
10 definitely Sergeant Gavin.
11   Q.   When you call it a request, when a sergeant
12 makes a request of a detective, it's an order, right?
13   A.   Yeah, it would be a lawful order, yes.
14   Q.   Who was senior to Sergeants Grizzle and Gavin
15 in the investigations division in May of 2018?
16   A.   So above them would be the lieutenant.  It's
17 currently Lieutenant Egizio.  It may have been
18 Lieutenant Reid at the time, but I could have my dates
19 confused.  But then Deputy Chief Roechner would have been
20 the lead supervisor in investigations, and above him
21 would be the chief of police.
22   Q.   Do you have a specific recollection of what,
23 if any, roles the two lieutenants you just named played
24 in the Socha investigation?

Page 19

1    A.   I do not.
2    Q.   Has Sergeant Grizzle been involved in any
3  promotion or advancement of yours in the department?
4    A.   He's currently still a sergeant with the
5  Tri-County Auto Theft Task Force, which is a detached
6  unit but still a City of Joliet sergeant.
7    Q.   Any other?
8    A.   Not that I'm aware of.
9    Q.   Has Sergeant Gavin been responsible for any
10 promotion or advancement of yours on the Joliet
11 department?
12   A.   Responsible for mine?
13   Q.   Yes, sir.
14   A.   No.  I've been detective since then.  I
15 haven't changed.
16   Q.   When you were made a detective, what, if any,
17 role did Roechner play?
18   A.   Involved in myself?
19   Q.   Correct.
20   A.   No.  I was a detective, so I never changed any
21 roles.
22   Q.   In May of 2018 and June of 2018, did you have
23 a physical workstation, a place that was your place to
24 work as a detective within the Joliet Police Department?

7  (Pages 16 to 19)

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT E**

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 20

1   A.  Yes.
2   Q.  Where was that?
3   A.  It's in our main investigations division.
4  It's an open room, big desk assigned to me next to other
5  detectives' desks.
6   Q.  Were all the detectives in the investigations
7  division assigned workstations in that same room in the
8  May/June 2018 time frame?
9   A.  The ones that were not detached units, but
10  yes.
11   Q.  Were any personnel of the department who were
12  not sworn officers assigned to workstations in that room
13  during that time frame?
14   A.  One would be the secretary.
15   Q.  Who was that?
16   A.  It was either Sherri Gregory (phonetic) or
17  Gloria Coyl.  I'm not sure what time they switched
18  positions.  Gloria was a new secretary.  I don't believe
19  she was around back then, but I could be mistaken.
20   Q.  Did a person named Shawn, S-H-A-W-N,
21  Stachelski, S-T-A-C-H-E-L-S-K-I, have a workstation in
22  that investigations room?
23   A.  Yeah.  She was a detective at the time.
24   Q.  How about Robert Brown?

Page 21

1   A.  No.  He was a -- I think he was a lieutenant
2  at the time.  As far as my belief, he was patrol at the
3  time, to my knowledge.
4   Q.  Dave Jackson?
5   A.  He was a detective inside, yes.
6   Q.  Brad McKeon, M-C, capital, K-E-O-N?
7   A.  Yes.
8   Q.  Are you familiar with a Phillip Bergner?
9   A.  Yes.
10   Q.  What, if any, was his role in connection with
11  the department in that May/June 2018 time frame?
12   A.  He was an officer.  He was assigned at one
13  point to the FBI Regional Computer Forensic Laboratory.
14  I don't know the exact time period that was, this time
15  period in 2018.  But at one point he was assigned there
16  and would have a desk in investigations.
17   Q.  At that time was Roechner's desk in the
18  investigations area?
19   A.  The main division he had a separate office
20  that was secured for him.
21   Q.  Was it an office that opened into the
22  investigations area?
23   A.  Yes.
24   Q.  Was that true also for Lieutenant Reid?

Page 22

1   A.  Yes.  There was a separate office for that
2  lieutenant, yes.
3   Q.  In connection with your service as a
4  detective, what, if any, training have you received
5  relating to the gathering, retrieval, and storage of
6  evidence on computers of any kind?
7   A.  This would be entirely, or are you just
8  talking about this specific case?
9   Q.  The entirety.  I want to know about any such
10  training that you've had.
11   A.  So training, initial police academy training,
12  training through Tri-River, like a new detective type
13  training.  Lead homicide investigations touch on evidence
14  collection and handling.  My training as a detective with
15  a -- led by and trained by other detectives when I first
16  became a detective, things of that nature.
17   Q.  So I want to get a term squared away hopefully
18  to save us all some time.  If I use the term "computer,"
19  I mean any kind of computer, from a smart cell phone to a
20  laptop to a tablet to a desktop to a main frame computer,
21  any kind of computer unless I otherwise qualify the
22  specific type of computer I mean.  Okay?
23   A.  Okay.
24   Q.  When I use the word "computer," you'll

Page 23

1  appreciate that I mean that gamut of devices.  Okay?
2   A.  Understand.
3   Q.  May of 2018, the Joliet Police Department
4  investigations division had devices known a Cellebrite,
5  and Lantern respectively, correct?
6   A.  Yes.
7   Q.  Have either of those devices changed since
8  that time, or is the department still using the same
9  Cellebrite and the same Lantern equipment it was using
10  back in the spring and summer of 2018?
11   A.  We have new equipment.  Same license with
12  Cellebrite, but now we have two licenses for Cellebrite
13  and other forensic tools.
14   Q.  What is the Cellebrite?
15   A.  It's a company.  It's a forensic tool that's
16  used to extract and analyze phone records and computer
17  records and also create viewable reports.
18   Q.  Was the Cellebrite in use in the spring and
19  summer of 2018 equipped to gather and display photo or
20  video images that were taken off of computers obtained
21  during investigations?
22   A.  Yes.
23   Q.  What is the Lantern?
24   A.  It's another different company.  I believe the

8  (Pages 20 to 23)

**EXHIBIT E**

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 24

1  company is called Katana Forensics.  They created
2  software called Lantern which works similar to
3  Cellebrite.  It can extract phone data, analyze, and also
4  create viewable reports of phone data or from computers
5  and cell phones.
6      Q.   Does Lantern similarly allow for the retrieval
7  and display of photo and/or video images on computers
8  obtained during investigations?
9      A.   Yes.
10      Q.   How, if at all, do the two devices, the
11  Cellebrite and the Lantern, differ from one another in
12  terms of the their capabilities?
13      A.   So they're different companies.  They have
14  different technology.  Some -- one might be better at
15  retrieving a certain type of data from certain types of
16  phones or computers compared to the other.  But with
17  technology, it changes, all the time.  So one day, one
18  could work better than another one.  One can retrieve
19  more data, more deleted data, than the other one.  Back
20  then.  Now we don't use Lantern.
21      Q.   You no longer use Lantern at all?
22      A.   We have it.  I haven't used it probably for
23  two, three years.
24      Q.   In the May/June 2018 time frame, under what,

Page 25

1  if any, circumstances would you use Lantern instead of
2  Cellebrite?
3      A.   Depends on the case; also depends on what
4  you're looking -- searching for, investigating.  And if
5  you know that there's data -- or you believe there to be
6  data on a phone or a computer and Cellebrite may not be
7  able to recover that data, then I would possibly use
8  Lantern to see if they have a better capability to
9  possibly recover that type of data.
10      Q.   Did one or the other; that is, Cellebrite or
11  Lantern, have a better capability for searching and
12  retrieving data of any kind off of Apple iPhones?
13      A.   So I was told that in this case Lantern was
14  able to recover a message -- or messages that Cellebrite
15  wasn't able to parse in the supplementary report and was
16  in a hidden database.
17      Q.   During that time frame, did you have an
18  understanding as to whether Lantern was better suited for
19  retrieving video or photographic images from Apple
20  iPhones?
21           We've lost you.
22  BY THE WITNESS:
23      A.   Sorry.  I don't know about images or videos.
24  I just know about the one specific text message.

Page 26

1      Q.   Where did you receive your training in
2  Cellebrite?
3      A.   Through Cellebrite.
4      Q.   Did they come to the police department to
5  conduct the training, or did you go to one of their
6  facilities?
7      A.   I went to different police departments for
8  training conducted by Cellebrite.
9      Q.   When did you do that?
10      A.   I believe it was 2014, and I've taken multiple
11  Cellebrite and other forensic classes since 2014.
12      Q.   Bear with me here while I look for a
13  particular note.
14           Is the Cellebrite device that you've described
15  for us synonymous or the same as something known as the
16  Cellebrite Physical Analyzer, Versions 7.5.0.82?
17      A.   That's a software created by Cellebrite which
18  will parse extracted data from phones and makes it into a
19  viewable format, but it's the same company.
20      Q.   Is that particular software that I just
21  identified different from the -- what I'll call the
22  general Cellebrite software application that's used for
23  investigative purposes?
24      A.   Depends on the device itself, but we also have

Page 27

1  another software and hardware for Cellebrite, which is
2  called the UFED 4PC, which is a PC-based software used to
3  extract phone data from certain types of phones.  And
4  there's an adapter that plugs into a computer which is
5  the method of extracting the data from certain types of
6  phones.  And that works hand in hand with the physical
7  analyzer which takes that extracted data and makes it
8  into a viewable format that you could review and then
9  make a report on it.
10      Q.   So it's not -- it's not the case that one
11  piece of software can do something that the other can't;
12  it's that they're to be used in conjunction with one
13  another.
14      A.   For Cellebrite, yes.  So my phones can be
15  extracted directly through Cellebrite Physical Analyzer
16  without having to use Cellebrite 4PC.  And that's
17  through, I think, the advanced logical extraction, which
18  is done from an iPhone directly through Cellebrite
19  Physical Analyzer without the need of using Cellebrite
20  UFED 4PC.
21      MS. PROCTOR:  You know -- this is Darcy Proctor.
22  Just for the record, you know, I know we've been getting
23  into some technical questions.  And, you know, my
24  understanding is there is a confidentiality order in

9  (Pages 24 to 27)

EXHIBIT E

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 28

1   place. So I would just like for the record just put
2   forth that, you know, specific questions about the City
3   of Joliet Police Department's forensic-evidence-gathering
4   tools -- that the information that will be discussed here
5   today and what we've been touching on already will be
6   subject to the protective order in this case, and I think
7   we can all appreciate that. So, you know, which for the
8   witness's benefit, it's not to be disclosed outside this
9   lawsuit. You're obviously discussing internal things
10  that the City of Joliet Police Department does with
11  respect to gathering evidence and forensic analysis and
12  what tools are available to the department. You know,
13  again, it's the City's position in this case that all of
14  that would be subject to the confidentiality order and
15  protected from disclosure outside the four corners of
16  this lawsuit.
17        So, you know, from time to time -- I mean, I
18  think -- you know, can we have a general understanding of
19  that, or do we need to keep, you know, invoking it as we
20  move throughout it? I mean, I addressed it with respect
21  to this subject matter. So are we all in agreement on
22  that? Hall, Matt, what are your thoughts?
23        MR. ADAMS: The protective order says what it says.
24  We'll deal with -- we'll observe it.

Page 29

1         MS. PROCTOR: Right. But I think my reading of the
2   protective order is that it needs to be set forth on the
3   record during the deposition when you're getting into
4   matters that would be subject to the confidentiality
5   agreement and protective order in place. So if we have
6   that understanding, I may do it from time to time. I
7   mean, I don't want to keep interrupting, but -- so I've
8   said what I needed to for the record, so thanks.
9   BY MR. ADAMS:
10        Q.   Describe for us, Officer German, where in the
11  investigations unit you and your fellow detectives would
12  have gone to use the Cellebrite and/or Lantern computers?
13        A.   Are you talking about back in May of 2018?
14        Q.   Yes, yes.
15        A.   There's a desk in investigations where we had
16  a computer that had the licensing for Cellebrite. And
17  that's where the phones were extracted and then analyzed
18  by detectives. The Lantern was on an Apple Mac laptop,
19  separate from the Cellebrite computer.
20        Q.   Also in the investigations unit area?
21        A.   I believe that might have been in the major
22  case room, which was another room within investigations.
23        Q.   What did you call that room?
24        A.   At the time it was called a major case room.

Page 30

1   It was a conference room.
2         Q.   Was that major case room adjunct to the
3   investigations area?
4         A.   Yeah, it was -- Yes. It was within the
5   investigations division room. It was next to, at the
6   time, Deputy Chief Roechner's office.
7         Q.   Back at that time, was Officer McKinney in the
8   investigations unit?
9         A.   I believe so, yes, yes.
10        Q.   Did other personnel, that is, not members of
11  the investigations unit, have physical access to the
12  investigations area within the police department
13  building?
14        A.   It was limited access to normal -- the police
15  department, the investigation personnel, supervisors, as
16  far as my understanding.
17        Q.   Did General Order 16-1 relating to evidence
18  and property management apply to the Socha investigation?
19        A.   Yes.
20        Q.   Did General Order 7-2 relating to complaints
21  against the agency or its employees apply to the Socha
22  investigation?
23        A.   I believe, yes, any general order would apply.
24        Q.   Your earlier answer suggested that sometime

Page 31

1   since the Socha investigation the Cellebrite computer has
2   been moved to some location other than that in which it
3   was used back in May/June of 2018; is that correct?
4         A.   Yes. It's been moved about three times or --
5   three or four times.
6         Q.   Where was it moved first after that Socha
7   investigation?
8         A.   So at some point afterwards, we obtained a
9   second Cellebrite license to work on two different
10  computers, and we had stopped using the original physical
11  computer and used newer computers. And then eventually
12  it got moved into the -- at some point the manager case
13  room, where we had two different licenses. The system
14  then got moved to our old digital forensic lab maybe a
15  couple years ago, and then it currently resides in our
16  new digital forensic lab, which is our old major case
17  room that I mentioned back in 2018.
18        Q.   And were those moves each time made simply to
19  additional equipment and capability?
20        A.   Yes and evidence that we would have to hold
21  because of forensic -- mobile forensics.
22        Q.   In other words, evidence security?
23        A.   Yes.
24        Q.   How did you, as a detective, access the

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT E**

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 32

1 Cellebrite?
2    A. It would be logging in to the computer and
3 then using the software on the computer from Cellebrite.
4    Q. Did you have your own individual password?
5    A. No.
6    Q. Was there a single password for all users of
7 the Cellebrite software?
8    A. Yes.
9    Q. Where was that password displayed?
10    A. It wasn't displayed visibly anywhere. It was
11 just told to detectives who would have access to it.
12    Q. Was it told to officers other than detectives?
13 We lost you.
14    A. Not to my knowledge other than investigators
15 and supervisors in investigations.
16    Q. Did non-sworn officers who worked in the
17 investigations unit have access to the Cellebrite
18 password?
19    A. Other than possibly the IT department. Other
20 than that, not to my knowledge.
21    Q. Likewise, did the Lantern equipment and
22 software have access controlled by passwords?
23    A. Yes.
24    Q. A single password or individualized passwords?

Page 33

1    A. There would be a single password to log on to
2 the laptop.
3    Q. Was the Cellebrite equipment and software
4 equipped with the capability to log who signed on, when
5 they signed on, when they signed off?
6    A. The Windows operating system, I believe, would
7 have some type of login log of the general user logging
8 in. Cellebrite would not have a password itself within
9 the Windows computer.
10    Q. And if I understand correctly, in May and June
11 of 2018, the computer on which the Cellebrite software
12 was installed was a single computer in the investigations
13 area, correct?
14    A. Yes, for Cellebrite, yes.
15    Q. And it ran a Windows operating system and the
16 Cellebrite capability, the Cellebrite license, was
17 accessed by a password, true?
18    A. The Cellebrite license doesn't have -- does
19 not have a password login. Just the actual Windows
20 computer to access Cellebrite has a login.
21    Q. So before -- In accessing and using the
22 Cellebrite, in addition to entering the universal
23 password, you would enter some individualized identifying
24 information that indicated when you were using it and

Page 34

1 when you stopped using it?
2    A. No. Only when a report is generated with
3 Cellebrite would the officer -- the detective put in that
4 person's name and who's creating the report, which is a
5 portable report that you view the phone data on other
6 computers.
7    Q. If no reports were generated, would the system
8 identify and track the logging on and logging off of a
9 particular user?
10    A. Not at that time, no. Just the general
11 Windows user, not a not unique ...
12    Q. So if an individual used the password to log
13 in to the Cellebrite system, in order to view data that
14 was on a computer that was being analyzed as part of an
15 investigation but didn't create a report, the system
16 wouldn't identify that user, true?
17    A. To my knowledge, correct.
18    Q. In May and June of 2018, did the Joliet Police
19 Department have any rules, regulations, SOPs, or codes of
20 conducts -- codes of conduct regulating you how officers
21 should treat one another?
22    A. I believe there is one.
23    Q. Are officers expected to treat one another
24 professionally?

Page 35

1    A. I believe so, yes.
2    Q. Were they expected to treat one another with
3 dignity and respect?
4    A. I believe so, yes.
5    Q. Were officers expected not to treat female
6 officers in a sexist or misogynistic way?
7    A. Yes.
8    Q. Were officers expected not to discriminate
9 against female officers on the basis of their sex?
10    A. Yes.
11    Q. In order to search a computer by means of the
12 Cellebrite back in our time frame of May/June 2018, what
13 would have to be done with the computer being searched?
14    A. Depending on the make and model and the
15 operating system of the computer, a password may need to
16 be known to unlock the computer and then plug it into the
17 Cellebrite computer for the forensic extraction of the
18 phone data or the computer data.
19    Q. Plug in with a cord?
20    A. If there's an iPhone, it would be a lightning
21 cable, which is normally commonly used to charge iPhones.
22    Q. Does the Lantern work in essentially the same
23 way?
24    A. Yes.

11 (Pages 32 to 35)

**EXHIBIT E**

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 36

1    Q.  In May and June of '18, was there any
2 understanding regarding who was permitted to use the
3 Cellebrite and Lantern devices?
4    A.  It would be people trained to use it. It's
5 also used to review phone data that was downloaded from
6 Cellebrite. So any detective who had a case involving a
7 computer or cell phone could potentially use that same
8 computer to review the phone data before or after the
9 report is generated.
10    Q.  A detective in the investigations division who
11 was not working on a particular case would have no reason
12 to use the Cellebrite or Lantern equipment to search or
13 review the content of computers seized in connection with
14 those investigations, correct?
15    A.  Well, many times detectives work on cases
16 together and share knowledge and ask questions, so it's
17 not uncommon for a detective not assigned to a case to
18 assist in multiple cases.
19    Q.  You've answered the question a little
20 differently than the one I asked, and I appreciate that.
21 If a detective didn't have a role, wasn't working on the
22 investigation, that detective would have no reason to
23 access and review the contents of computers seized by
24 using either the Cellebrite or the Lantern equipment,

Page 37

1 correct?
2    A.  Correct, for that specific evidence for that
3 case they're not involved in, they wouldn't have a reason
4 to unless they were assisting in some way.
5    Q.  Okay.
6    A.  Obviously, they can use the same computer to
7 access other evidence for other cases using the same
8 computer.
9    Q.  And I appreciate that, but then they would
10 need only disconnect the computer seized in the
11 investigation they weren't working on and plug in the
12 computer seized or obtained in any investigation on which
13 they were working, correct?
14    A.  No. So, say, for example, the phone with the
15 computer, when it's plugged in, the data is extracted
16 into the Cellebrite system. That phone or computer then
17 can be disconnected, and that data is in the Cellebrite
18 system program on the computer to be reviewed and
19 eventually a report generated without that phone or
20 computer still being connected or the need to have the
21 phone or computer connected.
22    Q.  On Cellebrite -- and I'm thankful for your use
23 of the word "extracted," because I never know the
24 difference between uploaded and downloaded, so I'm going

Page 38

1 to go with your term, which is "extracted."
2    A.  Okay.
3    Q.  When Cellebrite extracts data from a computer
4 that's being searched as part of an investigation, how is
5 the extracted data identified on Cellebrite so as to
6 distinguish it from data extracted from unrelated
7 computers obtained in unrelated investigations?
8    A.  So when the data is initially extracted to the
9 Cellebrite Physical Analyzer software, it will be unique
10 to that name, the file name that the investigator creates
11 to identify that phone or that computer. And in that
12 data, there will be a summary of the device identifying
13 the device -- the name of the device, the serial number,
14 the UD ID, which is the unique device ID that Apple uses
15 to identify phones. It's like a serial number. Name,
16 phone number, all that will be unique to that device
17 that's in the Cellebrite Physical Analyzer software.
18    Now, you can extract data from multiple
19 devices in the same Cellebrite system software, and each
20 device will be different tabs separate in the Cellebrite
21 Physical Analyzer. Once a report is generated through
22 Cellebrite, that report unique to that device can now be
23 accessed by a reader, a Cellebrite reader, which can be
24 used on any computer anywhere to review whatever data

Page 39

1 that the examiner chose to create on the report.
2    Sorry if I'm being confusing.
3    Q.  All right. So let's use the Socha case as an
4 example. The specific computer seized from her was her
5 Apple iPhone. You remember that, true?
6    A.  Yes.
7    Q.  So when the data on her Apple iPhone was
8 extracted by and into the Cellebrite, it would have been
9 stored there under a tab that identified that data as
10 relating to the Socha investigation and/or that specific
11 iPhone, correct?
12    A.  Correct, until the Physical Analyzer program
13 is closed or turned off. And then that stored data is
14 not in the program software itself. It will be stored in
15 our -- the hard drive, the server of the computer, which
16 can also be later reexamined using the Cellebrite
17 Physical Analyzer and reopened.
18    Q.  And once it's stored in the hard drive of the
19 computer, does every detective in the investigations unit
20 have access to it without the necessity of logging on to
21 the Cellebrite equipment with the password?
22    A.  You would have to be able to log in to the
23 Cellebrite -- at the time, you'd have to log in to the
24 Cellebrite computer with the Windows password and know

Royal Reporting Services, Inc.
312.361.8851

EXHIBIT E

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 40

1   how to use Cellebrite Physical Analyzer and open up that
2   saved data, the phone data, back into the Cellebrite
3   Physical Analyzer unless there was a report generated.
4   And then the person could just download that, open up
5   that report in the Cellebrite reader, which is a portable
6   report that could be used in any computer.
7       Q.   And if a report had been generated, does that
8   then make the extracted data generally accessible to
9   every detectives' computer?
10      A.   No.  You have to get a -- you would have to
11  obtain the -- it's called the UFDR file.  It's the report
12  generated by Cellebrite.  You would need that file to
13  open up in the Cellebrite reader, commonly why we give
14  the prosecutors and defense attorneys and other
15  investigators to review phone data.
16      Q.   Internally, what was done to control access to
17  that file?
18      A.   It would be the investigations division
19  limited access and then the limited access to the
20  specific computer, the Windows computer, and then the
21  knowledge of using Cellebrite.
22      Q.   Was the data extracted from Socha's phone
23  saved in a limited access space in the system?
24      A.   It would be limited access to access of that

Page 41

1   computer itself.
2       Q.   Say that again, please.
3       A.   The limited access would be the access to that
4   computer itself with the Windows password and within the
5   investigations secured division.
6       Q.   So anyone in the investigations division would
7   have access to it?
8       A.   If they knew the password and they knew how to
9   obtain that data from Cellebrite.
10      Q.   And with the password, once they were in the
11  computer, how would they call up the data extracted from
12  Socha's iPhone?
13      A.   There could be two ways.  The simplest way, if
14  the report from Cellebrite was saved, the person would
15  just have to open up the Cellebrite reader which opens up
16  that report that was generated of the phone data.  The
17  other option, the more difficult option, would be to open
18  up the Cellebrite physical Analyzer, find the extracted
19  data, and then what they call parse -- or reparse, which
20  is making something in a viewable format, and reanalyze
21  that same extracted phone data.
22      Q.   In the Cellebrite -- If a report had been
23  generated and the person who logged on with the password
24  called up the report to get at the extracted data, what

Page 42

1   would be their search parameter?  The name Socha, a
2   report number, the identifying information for the
3   computer device from which the data had been extracted,
4   any of the above, none of the above?
5       A.   So it would depend on the examiner who
6   initially extracted the phone data, how that person
7   created the Windows folder in the Cellebrite hard drive
8   to store the data.  Usually it's a case number.
9   Sometimes it's the owner's name.  It could be the
10  detective's name who I believe is detective on the case.
11  Different ways to store it so that we know how to find
12  that data after the fact.
13      Q.   How was the Socha data stored?  That is, was
14  it under Grizzle's name, Socha's name, the Apple iPhone
15  identifying information, a case number, some of the
16  above, all the above?
17      A.   So Lieutenant Botzum, so Sergeant Botzum at
18  the time, had done the extraction of Officer Socha's
19  phone.  He would have chosen a name to save it to.  Back
20  in 2018, I knew.  As of now, all I could think of,
21  possibly, it may have been under the case file for the
22  alleged victim, Ms. -- I believe her name is Gatlin.  To
23  my knowledge I think that's where Socha's case was also
24  saved to, but I'm not a hundred percent sure.

Page 43

1       Q.   And if a report hadn't yet been generated and
2   somebody was looking in the Physical Analyzer for the
3   extracted data, what would be the identifying search
4   terms or criteria?
5       A.   The person would have to open up the
6   Cellebrite Physical Analyzer and open a new download,
7   reparse this phone data; and they would have to know what
8   folder to go to to find that extracted data.
9       Q.   And would it be the officer who did the
10  initial extraction who would label and identify the
11  folders?
12      A.   Yes, the data generated by that examiner -- or
13  that examiner.  And that examiner, when they do the
14  initial extraction, where that initial extracted data is
15  saved to.  And then also the Cellebrite report would have
16  to tell Cellebrite where to save those files to, and that
17  person would need to create a folder in the Cellebrite
18  server, title it in a way that they could know how to
19  find that data later on and then choose to save that data
20  to.
21      Q.   In May and June of 2018, were all of the
22  detectives in the investigations unit trained on how to
23  use Cellebrite?
24      A.   Only a limited were trained on how to extract

13  (Pages 40 to 43)

**EXHIBIT E**

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 44

1  phone data. And I would say the majority had at least
2  some training through myself or other examiners on how to
3  review the Cellebrite reports, the case reports that are
4  generated, to know how to access Cellebrite -- or use the
5  Cellebrite reader to review their phone data on their
6  cases.
7      Q.  Within the investigations unit, were you
8  considered to be something of an expert on the use of
9  Cellebrite and Lantern devices?
10     A.  Yes, with Lantern, I think I was -- myself and
11 Sergeant Botzum were the only ones, to my knowledge, that
12 had knowledge on how to use Lantern. With Cellebrite,
13 there was more -- a few other detectives that were
14 trained by myself and eventually through Cellebrite to
15 also do extractions.
16     Q.  Do you know who those few others were at the
17 time?
18     A.  It's changed, so Officer Bergner, when he was
19 assigned to the FBI's RCFO office, had been trained
20 through the FBI and possibly through Cellebrite.
21 Detective McKinney and Detective Martinez had been
22 through Cellebrite training through and through
23 Cellebrite. I'm not sure of the exact time frame of
24 when. I know Detectives -- well, Sergeant Landeros now,

Page 45

1  detective at the time; Sergeant Gavin; and a couple --
2  night detectives that used to work night shift, I had
3  shown -- I did a limited training on that, on how to
4  access Cellebrite if I wasn't around or if another
5  detective wasn't around to help him when, you know, we
6  weren't working.
7      Q.  Was McKinney involved in the Socha
8  investigation in any way that you're aware of?
9      A.  Not to my knowledge.
10     Q.  Was McKeon involved in the Socha investigation
11 in any way which you're aware?
12     A.  Not to my knowledge.
13     Q.  How, if at all, was extracted data retrieved
14 and viewed on Lantern differently than Cellebrite?
15     A.  So the Lantern computer only worked on an
16 Apple laptop, which is what we used for Lantern. So the
17 extracted files would be -- the original files would be
18 saved to the laptop hard drive. Normally, I would save a
19 copy to the Cellebrite server on that Cellebrite
20 computer. And generally for most cases, the reports and
21 the data would either be copied onto a DVD or a Blu-ray
22 disc and placed into evidence. Or more recently we use
23 evidence.com to store our digital evidence to Axon
24 evidence.com server. We don't use DVDs and Blu-rays as

Page 46

1  much anymore.
2      Q.  The department was not using evidence.com back
3  in the May and June of 2018 time frame, was it?
4      A.  I don't remember the exact time we got it. It
5  was around that time period. It may have been after, but
6  I don't recall exactly.
7      Q.  In the case of the Socha investigation, where
8  her Apple iPhone was seized and then its contents
9  extracted and examined, how would the BEAST chain of
10 custody protocol apply both to the device and to the
11 contents of the device?
12     A.  So the device would only be in the BEAST if
13 the investigator entered that phone into evidence to
14 hold. If the phone was being given back to the owner,
15 then it would not be entered into the BEAST unless, for
16 example, the detective decided to enter it into evidence,
17 extract the data, and then remove the item from evidence
18 and give it back to the owner. Normally, that's not the
19 case. Usually, it's just collected by the investigator,
20 phone extracted, and the phone given back to the owner of
21 the phone, so there would be no BEAST evidence labels.
22 As far as the phone data itself, the extracted data
23 and/or the report would be either placed onto a USB drive,
24 a DVD or a Blu-ray, depending on how big the data file

Page 47

1  is. Or, like I said, now zip the digital files, and we
2  import them into evidence.com for that digital holding of
3  the evidence. And then a BEAST label would be generated
4  for either the media, like the DVD or the Blu-ray disc,
5  or there would be a BEAST label for the cloud storage
6  through evidence.com.
7      Q.  What, if any, was Roechner's role in the Socha
8  investigation?
9      A.  Only, to my knowledge, the supervisor in
10 investigations over Sergeant Grizzle.
11     Q.  If the extracted contents of the Socha iPhone
12 were loaded onto a USB or to DVDs or any other physical
13 storage device for that data, those physical storage
14 devices should have been logged into and controlled
15 through the BEAST system?
16     A.  Once they're actually physically entered into
17 evidence and packaged and entered into evidence, that's
18 when there would be a BEAST label created, and then that
19 physical evidence would be held in the evidence division.
20     Q.  And to put a finer point on that, once the
21 data on the cell phone was extracted, whether through
22 Cellebrite or Lantern, and then loaded onto a storage
23 device like a USB or a DVD, those physical storage
24 devices should be placed into the BEAST system, correct?

14  (Pages 44 to 47)

**EXHIBIT E**

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 48

1    A.   Correct.  It would be logged -- the BEAST is a
2  computer log of the physical evidence, so that it would
3  be entered into the BEAST, and then the physical evidence
4  would be held in the evidence section.
5    Q.   Okay.  Just like any other physical evidence
6  at that point?
7    A.   Correct, like guns, knives, whatever.
8    MR. ADAMS: Tina, for our record BEAST is an
9  acronym.  It's all caps.
10  BY MR. ADAMS:
11    Q.   And the BEAST system, through its barcoding
12  feature, does track who accesses physical evidence for so
13  long as it's in the custody of the department, correct?
14    A.   Yes.  There's a chain of custody through the
15  BEAST.
16    Q.   Okay.  Is there any way to circumvent the
17  BEAST chain of custody system in order to take possession
18  of physical evidence without the BEAST system tracking
19  that?
20    A.   The only way I could think of would be someone
21  in the evidence section that has access to the evidence
22  could take the evidence and not log it into the BEAST.
23    Q.   And that would be a violation of the general
24  order, correct?

Page 49

1    A.   Yes.
2    Q.   That would be improper?
3    A.   It would be.
4    MS. PROCTOR: You know, could we just take a
5  five-minute bathroom break?  We've been going a little
6  over an hour.  Just take five.
7    MR. ADAMS: Sure.  I'm going to just mute and stop
8  my video.
9    (A short break was had.)
10  BY MR. ADAMS:
11    Q.   Once -- and I'll refer to it as -- although
12  it's probably not the right technical term -- transfer
13  data.  That is, data from -- that's extracted from a
14  seized computer into the Cellebrite and/or Lantern
15  systems, and then transferred from those to either a USB
16  or DVD or other storage device, is logged into and
17  maintained in the BEAST system.  The only officers who
18  should access that physical evidence would be those
19  officers performing some role on that particular
20  investigation, correct?
21    A.   Correct, either analyzing the evidence or,
22  say, making copies for court for prosecutors, defense,
23  things like that.
24    Q.   Something germane to the investigation,

Page 50

1  whatever that might be?
2    A.   Yes.
3    Q.   For an officer to go into the evidence storage
4  area, even if properly going through the BEAST steps, and
5  taking physical evidence, if they are not involved in the
6  investigation, that would be improper, wouldn't it?
7    A.   Possibly.  There could be some reasons why,
8  but that -- it could be improper, and it would be only by
9  evidence personnel who have only access to the evidence.
10    Q.   At any time in the May/June 2018 time frame,
11  how would you characterize your personal and/or
12  professional relationship with Officer Socha?
13    A.   Coworker.
14    Q.   Okay.  Any relationship of any kind outside
15  the workplace?
16    A.   No.
17    Q.   Same questions for Officer Crowley?
18    A.   Same with him.
19    Q.   Were you involved in any way in the
20  investigation and/or prosecution of Officer Crowley that
21  preceded this Socha investigation?
22    A.   Not involved with that investigation.
23    Q.   You're aware of it?
24    A.   I'm aware of it, yes.  I guess, technically,

Page 51

1  if that harassment -- alleged harassment of a witness is
2  considered part of that, then yes, but not the actual
3  allegation, the original offense allegation.
4    Q.   I appreciate that.
5    Have you had any contact with a woman named
6  Lorinda Lamken, a lawyer in the Illinois State Appellate
7  Prosecutor's Office?
8    A.   I don't believe I ever spoke or met with her.
9    Q.   Is the Socha investigation ongoing?
10    A.   That, I don't know.  I guess it would -- if
11  it's a misdemeanor, it would not be because that's a year
12  and a half.  If it's a felony, that would be three years,
13  so two -- three years after the date of the offense if it
14  was a felony, it possibly could be but -- for the
15  criminal aspect of it.
16    Q.   Have you ever discussed with Sergeant Grizzle
17  the role and/or effect of Officer Socha's trial testimony
18  in the Crowley prosecution?
19    A.   He spoke about it, yes.
20    Q.   When?
21    A.   On or just shortly after the testimony, I
22  remember speaking about it.
23    Q.   What did he tell you?
24    A.   Just what had occurred, what she had stated,

15  (Pages 48 to 51)

**EXHIBIT E**

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 52

1  and what the final ruling was.
2      Q.   That Crowley was acquitted?
3      A.   Yes.
4      Q.   What, if anything, did Grizzle say to you
5  about the impact of Socha's testimony at the Crowley
6  trial on that outcome?
7      A.   That her testimony would be -- was favorable
8  to Officer Crowley.
9      Q.   Do you recall anything specific that he said
10 to you about that?
11     A.   The only thing I remember would be that her
12 testimony contradicted her statements -- her original
13 statements to the police investigators about what had
14 occurred.  I can't think of anything else more specific
15 other than just a general what occurred and the outcome.
16     Q.   Okay.  Did he express to you his frustration
17 either with the outcome or the role that Socha's
18 testimony played in that outcome?
19     A.   I wouldn't be able to characterize his
20 emotions other than what he said.
21     Q.   You can characterize his tone or his
22 appearance while he said whatever it was that he said.
23     A.   Nothing in his tone or appearance led me to
24 believe that it affected him emotionally other than just

Page 53

1  a normal conversation.
2      Q.   Sergeant Grizzle had been the lead detective
3  on that Crowley investigation, had he not?
4      A.   I believe so, but I wasn't involved, so I
5  couldn't say a hundred percent for sure.
6      Q.   Have you ever heard Roechner discuss the
7  Crowley trial and Socha's effect on its outcome?
8      A.   I can't remember if he ever spoke to me in
9  person or the investigations with me around.  I don't
10 remember any specific things he may or may not have said.
11 It's possible.  I just don't recall.
12     Q.   Other than Grizzle, have you heard officers in
13 the investigations unit discuss the Crowley trial outcome
14 and/or Socha's role in that outcome?
15     A.   It was discussed throughout the office.  I
16 don't remember exactly who brought it up or what was said
17 by what individuals.  I just know it had been brought up.
18     Q.   Can you identify any other individuals who
19 discussed it?
20     A.   I would say almost every investigator during
21 that time period that would have been in the office was
22 either present or could have discussed it.  I wouldn't
23 say anyone individually, just because I don't want to say
24 somebody that did say something that may not have because

Page 54

1  I don't recall who said what other than it was discussed
2  by the majority of the personnel during that time period.
3      Q.   During those discussions, was it your
4  perception that there was a consensus that the officers
5  in the investigations unit were disappointed in Socha?
6      A.   I don't know their feelings other than what
7  they may or may not have known about the case.  I don't
8  think everybody knew all the details about the case, what
9  was said or what allegedly was said or wasn't said.  So I
10 don't think many investigation personnel were actually
11 involved in that investigation to know what specifically
12 occurred other than what we heard.
13     Q.   Did any express disappointment in the outcome
14 of the trial?
15     A.   Not that I can say disappointment other than
16 just talking about what occurred.  I don't know what they
17 felt other than -- what we heard was that the testimony
18 was different from what she had initially allegedly
19 reported to JPD personnel, which, at least, I would
20 assume most did not agree with, if that was the case,
21 where testimony was different.
22     Q.   When you had the conversation in which Grizzle
23 told you that Socha's testimony had been helpful to
24 Crowley, harmful to the prosecution, in that it had

Page 55

1  differed from statements she had given to investigators
2  prior to the trial, I want to focus on that conversation.
3  Okay?
4      A.   Okay.
5      Q.   Where did that occur?
6      A.   The only conversations I recall would have
7  been in the general investigations division, which is an
8  open area where all the detectives are at.
9      Q.   When did that consider?
10     A.   On and after -- shortly after the trial.
11     Q.   So more than one occasion?
12     A.   I'm sure there was more, a couple of
13 occasions.  I don't recall exactly how many or how long
14 it was.
15     Q.   Would those couple or so occasions have been
16 on the same day as the acquittal and then within the
17 following weeks sometime?
18     A.   I would say that's the best estimate of the
19 time, yes.
20     Q.   Did you have either of those conversations
21 with Grizzle during any facet of the Socha investigation?
22     A.   No, not -- other than just the allegations of
23 the subsequent alleged events.
24     Q.   Okay.  So the conversations in which Grizzle

16  (Pages 52 to 55)

**EXHIBIT E**

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 56

1   shared with you that Socha's testimony in the Crowley
2   trial had helped Crowley and hurt the prosecution in that
3   it had been different from her pretrial statements
4   occurred before the Socha investigation; is that
5   accurate?
6       A.   It would probably be during, because I believe
7   the investigation started the day or the day after the
8   testimony of the female. I don't recall exactly how long
9   Crowley's trial was and what -- when the witness's
10  testimony was in relation to the beginning of the Socha
11  investigation. I would say it was around that same time
12  period. I would say it's more accurate that it did occur
13  sometime during that week time period.
14      Q.   Can you be any more precise about the date of
15  either conversation with Grizzle?
16      A.   Other than the testimony, I guess, of the --
17  at the conclusion of the trial after the testimonies.
18  Don't recall when their testimonies were involved to the
19  conclusion of the trial, if it was the same day or a
20  whole week. I don't follow the trial that much, so I
21  couldn't say that, you know, especially now, three years
22  later.
23      Q.   During either conversation were there other
24  participants to the conversation?

Page 57

1       A.   About the trial or the --
2       Q.   The Crowley trial.
3       A.   Yeah, there would be -- most detectives at
4   some point were likely in the office when people were
5   talking about it in general.
6       Q.   I was a little precise. That's my problem.
7   In either of the conversations where you heard Grizzle
8   express his view that the Socha testimony in the Crowley
9   trial helped Crowley and hurt the prosecution and that
10  Socha's testimony in that trial was different than her
11  pretrial statements, were any other people participating
12  in either of those conversations?
13      A.   I don't --
14  MR. CLARK:  Objection, form.
15          But you can answer.
16  BY THE WITNESS:
17      A.   I don't recall any individual detectives that
18  may have overheard or took part.
19      Q.   Okay.
20      A.   But it is likely many were present at some
21  point.
22      Q.   In order to log on to Cellebrite or Lantern
23  for the purpose of viewing data extracted from a computer
24  as part of their investigation, did detectives need

Page 58

1   anyone's permission?
2       A.   No.
3       Q.   How much time did you spend viewing any data
4   that was extracted from Socha's Apple iPhone?
5       A.   Less than, I would say, a minute, just to
6   confirm that the data was extracted and reported and
7   turned over.
8       Q.   How would you characterize your role in the
9   extraction, reporting, and transfer and storage of the
10  data from Socha's iPhone during the Socha investigation?
11      A.   So the data was extracted by Sergeant Botzum,
12  Lieutenant Botzum now. I was requested by
13  Lieutenant Botzum to generate a report of the Lantern
14  extraction and provide a copy to Sergeant Grizzle. And
15  then Sergeant Grizzle requested a copy of the Cellebrite
16  extraction. And then about a month later, I was ordered
17  by Sergeant Gavin to copy any stored data on either
18  computer and then turn that over to Sergeant Gavin and
19  then delete any saved files on either computer.
20      Q.   Who promoted Botzum from sergeant to
21  lieutenant?
22      A.   I don't recall when. It may have been under
23  either Chief Roechner, who is now retired Roechner. Or
24  it could have been -- the previous chief was

Page 59

1   Chief Benton. I don't recall the exact time of his
2   promotion.
3       Q.   And it's Tab Jensen?
4       A.   He was the deputy chief, so Chief -- it was
5   either Chief Roechner or Chief Benton.
6       Q.   Benton. I'm sorry.
7       A.   Yeah, yeah.
8       Q.   At any point have you become aware that nude
9   and/or sexually explicit images, photographic and video
10  images, of Socha were extracted from her Apple iPhone?
11      A.   Other than the allegations that there were
12  videos on her device that were in the reports.
13      Q.   And to be clear -- and I apologize for doing
14  this. I don't know if it's your volume or mine, but I
15  don't hear the ends of some of your answers, so ...
16      A.   It could be my video camera or microphone. It
17  seems like it cuts out every now and then.
18      Q.   Or mine. If there's a technological
19  breakdown, there's a high likelihood it's on my end
20  always, so we'll just fight our way through it.
21          Did you say that there was a reference to
22  those images in a report that was generated, or were you
23  referring to the news reports?
24      A.   It's both. So the reports of the phone would

                                    17  (Pages 56 to 59)

**EXHIBIT E**

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 60

1  have had a complete set of her phone data, so any images
2  or videos that she had taken or were sent to the phone at
3  some point prior to the extraction would be on the
4  reports. I never viewed them myself, so I don't know
5  firsthand that there were nude images or videos. I just
6  heard that there was based on the allegations.
7      Q.   Okay. I'm going to use another short-form
8  word to get through -- if I use the word "images," I'm
9  talking about either photographic or videographic images
10  of Socha from that Apple iPhone of hers where she is
11  either nude or that are sexually explicit in nature.
12  Okay?
13     A.   Correct.
14     Q.   When did Cellebrite or Lantern first generate
15  reports that described or identified that such images had
16  been extracted from Socha's iPhone?
17     A.   So the day after Lieutenant Botzum started the
18  extractions, I had generated a report through Lantern.
19  When I came into work that following day, I believe
20  Sergeant Botzum started that night of the extraction. So
21  I would have generated a Lantern report on the full set
22  of phone data on Officer Socha's phone, which was copied
23  under a USB and turned over to Sergeant Grizzle and then
24  also a copy of the full data from Cellebrite. The report

Page 61

1  was generated by myself which was entered over also to
2  Sergeant Grizzle I believe that same day.
3      Q.   And the report also generated off of Lantern?
4      A.   If Lantern -- I think it was an HTML report.
5  That would have been generated and given to
6  Sergeant Grizzle to review and then continue the
7  investigation.
8      Q.   Why did you use Lantern as opposed to
9  Cellebrite to generate those particular reports?
10     A.   Lieutenant Botzum used Lantern and Cellebrite
11  to analyze the phone, and I was requested by
12  Sergeant Botzum at the time to complete the Lantern
13  extraction because the phone had been -- the phone data
14  had been extracted from Lantern, but Lantern was still
15  parsing, you know, trying to decode that extracted data
16  into a viewable format. So he requested me to finish
17  that and then give Sergeant Grizzle a copy so he could
18  review since he was the lead detective or investigator on
19  the case.
20     Q.   And describe to me the contents of those
21  reports that you generate. Are they narrative in nature,
22  or are they reported in iPhone code or Lantern code?
23  What is reported?
24     A.   So the final report, which Lantern was an HTML

Page 62

1  report that could be viewed on any computer, and it would
2  have -- it would be a Lantern program that one could
3  access. And everything that it extracted and was able to
4  decode would be viewable, so phone calls, texts.
5      Q.   From that point -- you went dark on us.
6           There we are. From that point, when you say
7  anyone could access --
8      A.   Anyone that has that report could view it on
9  any computer.
10     Q.   Any computer in the investigation section?
11     A.   No, any computer anywhere that has the final
12  report could view that data. That's what it's designed
13  for, so that somebody could review it outside of the
14  forensic tool.
15     Q.   To what other computers was that report sent?
16     A.   So the report was saved onto a USB drive with
17  the originals saved in Lantern. That was turned over to
18  Sergeant Grizzle for his review. And then he would be
19  responsible for reviewing that data, making whatever
20  appropriate copies are needed for evidence.
21     Q.   So anybody who got their hands on that USB
22  drive could access the images that were extracted from
23  Socha's iPhone, true?
24     A.   It would be everything on the phone, yes.

Page 63

1      Q.   You yourself have never seen the images that
2  were extracted from Socha's iPhone?
3      A.   I have not.
4      Q.   Have any of your colleagues, your fellow
5  officers in the investigations unit, told you that they
6  had seen those images?
7      A.   Not directly. I heard that Officer --
8  Detective McKeon and McKinney may have. To how or why, I
9  don't know.
10     Q.   Who told you that?
11     A.   Detective McKinney had told me at one point
12  that he may have seen it at some point accidentally. I
13  don't know the further detail about that. And I think
14  Detective McKeon may have seen it with Detective
15  McKinney, but I never spoke directly with
16  Detective McKeon about that.
17     Q.   Have you heard that anyone else in the
18  investigations unit viewed the images that were extracted
19  from Socha's iPhone?
20     A.   I believe Sergeant Grizzle may have during his
21  analysis. I don't know what particular images or videos
22  he could have seen, but he would have access, and I would
23  expect the investigating officer to review the contents
24  of the phone data and the report.

18  (Pages 60 to 63)

**EXHIBIT E**

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

## Page 64

1　　Q.　How about Sergeant Gavin?
2　　A.　I don't know if he did or not.
3　　Q.　Did Grizzle share with you that he had, in
4　fact, seen the images extracted from Socha's iPhone?
5　　A.　He never told me he saw them.  I wouldn't be
6　surprised if he did, just because he was the lead
7　detective.  But he never told me or I never heard that he
8　did.
9　　Q.　Have you ever heard that Roechner viewed the
10　images that were extracted from Socha's iPhone?
11　　A.　I have not.
12　　MS. PROCTOR:　Just for the record, I'm going to
13　just -- and forgive me because I wasn't here.  This again
14　is Darcy Proctor on behalf of the City of Joliet.
15　　　Detective German, you know, none of the
16　attorneys here today want you to guess or speculate about
17　what someone may or may not have done on any given time.
18　　MR. ADAMS:　Counsel, please don't interrupt my
19　deposition.
20　　MS. PROCTOR:　I don't know whether he was given
21　those instructions at the beginning of the deposition,
22　and he may have been.  So just want to confirm that he
23　was given those instructions, to not --
24　　MR. ADAMS:　He was, and I --

## Page 65

1　　MS. PROCTOR:　If he was, then --
2　　MR. ADAMS:　-- this deposition --
3　　MS. PROCTOR:　-- we're good.
4　　MR. ADAMS:　-- of the witness.
5　BY MR. ADAMS:
6　　Q.　Have you ever discussed the allegations of
7　Socha's complaint with Bergner?
8　　A.　I don't believe I have.
9　　Q.　Have you ever heard that Roechner directed
10　Bergner to either scrub and/or dispose of one or more
11　computer devices on which Roechner had stored the images
12　that had been extracted from Socha's iPhone?
13　　A.　No.
14　　Q.　Would there be any investigative purpose of
15　which you're aware that Roechner would have had the
16　images extracted from Socha's iPhone on any of his own
17　personal computer devices?
18　　A.　Are you talking about computers in
19　investigations that are signed in personally or his own
20　like home computers?
21　　Q.　His own personal devices.
22　　A.　Not that I know of, not that I could think of.
23　　Q.　Would there be any investigative purpose of
24　which you're aware that Roechner would have had the

## Page 66

1　images extracted from Socha's iPhone on his
2　department-issued computer devices?
3　　A.　If he was assisting Grizzle in the
4　investigation, I would say that it would be reasonable to
5　have it.
6　　Q.　If he did that, it would have been -- Strike
7　that.  If he did that, it should have been logged through
8　the BEAST system, correct?
9　　A.　Not necessarily.  It depends on what was
10　entered.  And working copies or copies of the visual
11　evidence would not be in the BEAST.
12　　Q.　How would anyone get working copies, as you
13　call them, of the images without going through the BEAST
14　system?
15　　A.　The report that -- for example, the Lantern
16　reports, which is one report that has all data from the
17　phone, including videos and images, would have been on
18　the USB drive I turned over to Sergeant Grizzle.  So if,
19　for example, Deputy Chief Roechner was assisting Sergeant
20　Grizzle in that investigation, it's possible he could
21　have had a copy of that to help analyze.
22　　Q.　Are you aware of any other Joliet Police
23　Department investigations division officer who had the
24　images extracted from Socha's iPhone on any computer

## Page 67

1　device issued to them by the Joliet Police Department?
2　　A.　No, other than Sergeant Grizzle who had the
3　copy and then the copies that were on the Lantern and the
4　Cellebrite system.
5　　Q.　Grizzle's copy was on a UBS [sic] that was --
6　　A.　USB.
7　　Q.　And that UBS should have been controlled
8　through the BEAST system, correct?
9　　A.　That depends on when he entered that data from
10　the USB into evidence.  It could be copied to a DVD or a
11　Blu-ray or if we had evidence.com uploaded to the system.
12　I don't know what he did with that piece of item.
13　　Q.　Are you aware of any Joliet officers who had
14　the images extracted from Socha's iPhone on their own
15　personal computer devices?
16　　A.　No.
17　　Q.　That would be improper, correct?
18　　A.　Likely, unless there's some extenuating
19　circumstance, but I would say improper.
20　　Q.　Have you ever heard a Joliet Police Department
21　officer comment on the images that were extracted from
22　Socha's iPhone?
23　　A.　No.
24　　Q.　Secondhand, what we'd call in the trade

19 (Pages 64 to 67)

EXHIBIT E

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 68

1  hearsay, have you heard of any officers who have
2  commented on the images extracted from Socha's iPhone?
3  　　A.　No.
4  　　Q.　Have you ever heard any Joliet officer utter
5  the words, quote, Now I know why Crowley is with her.
6  She sucks cock like a porn star, period, closed quote?
7  　　A.　No.
8  　　Q.　Secondhand, have you ever heard that any
9  Joliet officer had made that comment?
10 　　A.　Nope.
11 　　Q.　Have you ever heard any Joliet officer utter
12 any comment regarding Socha's physical appearance or
13 sexual behavior as shown on the images extracted from her
14 iPhone?
15 　　A.　No.
16 　　Q.　Have you, secondhand, heard that any Joliet
17 officer has made such comments?
18 　　A.　No.
19 　　Q.　Such comments about a fellow female officer
20 would be improper, correct?
21 　　A.　I believe.
22 　　Q.　Have you ever heard any other Joliet officers
23 express the opinion that the manner in which the images
24 extracted from Socha's iPhone and then handled,

Page 69

1  distributed, and made available to others was improper?
2  　　A.　I'm sorry.  Can you repeat the first part of
3  that question?
4  　　Q.　That wasn't much of a question.
5  　　　Have you ever heard any other Joliet officers
6  express criticisms of the way the images on Socha's
7  iPhone were handled by the department after those images
8  were extracted?
9  　　A.　Just Officer Socha through the complaint.
10 　　Q.　Any others?
11 　　A.　No.
12 　　Q.　Even secondhand?
13 　　A.　No.
14 　　Q.　All right.  I'm going to try my first ever
15 here screen share, so bear with me, but I think I'm keyed
16 up to do this properly.  We'll give it a try.
17 　　　All right.  Officer German, can you see on
18 your screen first a document labeled City 00053.
19 　　A.　I see an e-mail with an attached officer
20 supplement report pdf, entitled like e-mail with an
21 attachment.
22 　　Q.　Are you able to scroll down the attachment?
23 　　A.　I think you have to because you're sharing
24 your screen.

Page 70

1  　　Q.　So I'm going to do the scrolling.  So at the
2  top, what we're looking at is an officer supplement
3  report, and the number is --
4  　　A.　You might be sharing your wrong screen because
5  all I see is an e-mail with an attachment.
6  MR. CLARK:  That's all I see as well.
7  MS. PROCTOR:  It's an empty e-mail with --
8  MR. ADAMS:  It's open on my --
9  MS. PROCTOR:  It's a pdf attachment.  You have to
10 open it.
11 THE WITNESS:  If you go to your share screen
12 option --
13 MR. ADAMS:  I'm going to back out and start over
14 here.
15 THE WITNESS:  When you're going to share screen,
16 choose which screen you're going to share to, which
17 should be your open document and not your other screen.
18 BY MR. ADAMS:
19 　　Q.　Can you see it now?
20 　　A.　Yes.
21 　　Q.　All right.  So this is a document that you
22 prepared?
23 　　A.　Yes.
24 　　Q.　And the date shown here, that's the date you

Page 71

1  prepared the report?
2  　　A.　Correct, on May 17th.
3  　　Q.　And judging from the records that I've seen,
4  this does not supplement a prior report of your own but
5  rather one that was generated by Botzum at the start of
6  the process, correct?
7  　　A.　I believe it was generated by
8  Sergeant Grizzle, and then this would be a follow-up to
9  his original case he generated.
10 　　Q.　The phone that's described in this particular
11 exhibit --
12 MR. ADAMS:  Which, Tina, we'll call German 1 for
13 identification.
14 BY MR. ADAMS:
15 　　Q.　-- is the Gatlin phone, correct?
16 　　A.　Yes.
17 MS. PROCTOR:  For the record, Hall, can you just
18 scroll down and give me the City of Joliet Bates stamp
19 number for this document just for my reference?
20 MR. ADAMS:  Yes.  It's City 00053.
21 MS. PROCTOR:  Thank you.
22 BY MR. ADAMS:
23 　　Q.　Why did you use the Cellebrite to search the
24 Gatlin phone?

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT E**

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 72

1    A.  Sergeant Grizzle asked me to obtain copies of
2    images that were on Ms. Gatlin's phone of text messages
3    with Officer Socha.  That's the program I always use, is
4    Cellebrite, to extract that limited data.
5        Q.  And did you do that?  Were you able to extract
6    those images?
7        A.  Yes.
8        Q.  And to be precise, they were images of a
9    particular text message from Socha to Gatlin, correct?
10       A.  Yes.
11       Q.  And it was the text message which formed the
12   basis for Gatlin's original complaint that resulted in
13   the Socha investigation, true?
14       A.  Correct.
15       Q.  And after you did this extraction, you and
16   Sergeant Grizzle and anyone else involved in the Socha
17   investigation then had access to that text message,
18   correct?
19       A.  It would be a DVD that had the Cellebrite
20   report with the pictures of the text message.
21       Q.  Okay.
22       A.  Anyone who had access would have that access.
23       Q.  And just to put a finer point, you all had
24   access to the content of that text message, correct?

Page 73

1        A.  Not the message itself but a screenshot image
2    of a text message chain.
3        Q.  But you could read the words in the text
4    message?
5        A.  Yes.
6        Q.  And you could see that it was a text message
7    from Socha or Socha's iPhone to Gatlin?
8        A.  It was to Gatlin.  I don't recall if Socha's
9    name was saved in the context as Socha or if it just had
10   her phone number.  But it was -- I was told it was a
11   message between Officer Socha to this female witness.
12       Q.  At that point, once you had extracted that,
13   the Joliet Police Department had the contents of the text
14   message and knew from whom it had been sent and to whom
15   it had been sent, correct?
16       MS. PROCTOR:  I'm just going to object based on form
17   and foundation.
18           You can go ahead and answer if you can.
19   BY THE WITNESS:
20       A.  I would say not as I would have hoped for in a
21   forensic matter because it was a screenshot of messages
22   and not the actual messages where there's a specific
23   computer log of what phone number is being sent by what
24   and to who.  For example, I could make a contact in my

Page 74

1    phone with your name, send myself a text message from
2    another phone, and it would look like you had sent the
3    message, but I couldn't prove that was sent by you
4    because I don't have the extracted data from an SMS
5    database of the phone or a, say, a call log from AT&T
6    Verizon showing you had, in fact, sent me a text message
7    on my phone.
8        Q.  So I appreciate that.  So at least at this
9    point, the Joliet Police Department had the content of
10   the text message as a screenshot and Gatlin's statement
11   that it had been sent to her phone by Socha's phone?
12       A.  Yes.
13       Q.  I'm going to scroll down now to the next
14   document --
15       MR. ADAMS:  Which, Tina, we'll call German
16   Exhibit 2, City 00055.
17   BY MR. ADAMS:
18       Q.  This is a report that you prepared relating to
19   work that you did on the iPhone that was seized from
20   Socha, true?
21       A.  Yes.
22       Q.  So the work that you did here was work that
23   you were directed to do by Gavin, true?
24       A.  Yes.

Page 75

1        Q.  Did Gavin tell you why he wanted you to do the
2    work that's described here?
3        A.  Other than there was the allegation made by
4    Officer Socha and that they wanted the copies turned over
5    and deleted from the system.
6        Q.  Made against Officer Socha?
7        A.  I think it was the allegations of
8    Officer Socha about the --
9        Q.  I think you said allegations by Officer Socha.
10   I think you misspoke.
11       A.  So to my understanding this would be done
12   because Officer Socha made allegations of somebody
13   viewing her phone data.
14       Q.  Did Gavin explain to you why he wanted the
15   files from Socha's iPhone copied onto a USB device?
16       A.  No, other than since we were deleting files
17   off the system, to my understanding, to make sure there
18   was an accurate copy of those files before they were
19   deleted.
20       Q.  Off of which system were the files copied to
21   the USB device deleted?
22       A.  So both.  So Lantern and the copies of Lantern
23   on the Cellebrite system were both copied individually
24   and then deleted from both computers.

21  (Pages 72 to 75)

**EXHIBIT E**

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 76

1    Q.   At that point, however, based upon what I
2  understood earlier, because reports had been generated,
3  the images from -- that were extracted from Socha's
4  iPhone would still have been accessible via Cellebrite
5  and/or Lantern, correct?
6    A.   Prior to the deletion, they would be
7  accessible, yes.
8    Q.   Despite the deletion that's referred to in
9  this exhibit, they could still be accessed on Cellebrite,
10 right?
11   A.   Correct.  Before that date, before my deletion
12 or the copy of deletion, they would be on the system
13 accessible.
14   Q.   Even after the deletion, if a report is
15 generated, correct?
16   A.   Then that would be on the USB drive where the
17 data was copied to, so not on the actual Cellebrite
18 system.
19   Q.   Okay.  If after this deletion somebody sat
20 down at the Cellebrite device or the Lantern device,
21 entered a password, and knew how to call up the images,
22 they could be accessed in that way?
23   A.   No.  You would need the original extracted
24 data that was only on now the USB drive unless they were

Page 77

1  placed into evidence or copied on some other media, but
2  the actual stored data on and after June 8th would have
3  been deleted from the Lantern computer and the Cellebrite
4  computer, and so you would have to obtain that original
5  data somehow to reopen up the phone data.
6    Q.   Okay.  And this deletion you did on 8 June
7  2018, correct?
8    A.   Yes.
9    Q.   Did Gavin tell you that he had been directed
10 by anyone else to have the deletion conducted?
11   A.   I don't recall if he did or not, if it was his
12 decision or somebody else.
13   Q.   The second line of the second paragraph, you
14 say that, quote, Sergeant Botzum started the extraction
15 on Lantern and Cellebrite, but due to unknown issues, the
16 report for Lantern hadn't been completed, period, closed
17 quote.
18        Did you ever determine what those issues were?
19   A.   No.  I should have been more clear in my
20 report.  They were completed by me that next morning.
21 Unknown issues would have been Lantern taking a
22 longer-than-expected period of time to finalize Lantern
23 when used by Sergeant Botzum.  That's what I meant by
24 that sentence, that I had to complete the extraction that

Page 78

1  morning and then make the report and get it over to
2  Sergeant Grizzle.
3    Q.   That prior extraction and your generating that
4  report occurred back on 17 May of 2018, correct?
5    A.   Yeah, I believe the night of.
6    Q.   Okay.
7    A.   By Sergeant Botzum.
8    Q.   Long before Gavin told you to delete the
9  contents from Cellebrite and Lantern, true?
10   A.   Yes.
11   Q.   So much earlier in the deposition we talked
12 about which Cellebrite or Lantern was used for particular
13 purposes.  In here, you say, in part, the Apple Mac
14 computer that is solely used for Lantern extractions.
15 You're talking about the computer that was there in the
16 investigations unit that was connected to that used the
17 Lantern software?
18   A.   Correct.
19   Q.   Continuing, you describe that a copy had
20 previously been provided to Sergeant Grizzle of the
21 Lantern and Cellebrite extractions by you at the time of
22 extraction.  That would have been on 17 May of 2018,
23 correct?
24   A.   Could you still hear me?  There we go.

Page 79

1        So I think that would be the 18th, so the day
2  the extraction started, that night, by Sergeant Botzum.
3  That morning when I came into work, that's when the
4  reports were generated and then turned over to
5  Sergeant Grizzle.  So I think it would be the following
6  day when this -- of the initial extraction.
7    Q.   In what form did you provide a copy of the
8  contents of the data extracted from Socha's iPhone on the
9  18th of May?  Did you do it by USB or by a disc?
10   A.   That would be USB for Cellebrite and Lantern.
11   Q.   So the USB device that you created on the
12 8th of June of 2018 was the second such USB device
13 containing the extracted contents of the Socha iPhone?
14   A.   Correct.
15   Q.   Were either entered into and controlled
16 through the BEAST system?
17   A.   I'm not aware.
18   Q.   They should have been, true?
19   A.   For final evidence, yes.
20   Q.   Is the deletion referenced in the first
21 paragraph of this Exhibit 2 a deletion of the V, as in
22 Victor, drive that's referred to in this second
23 paragraph?
24   A.   Correct.  That would be the storage for that

22  (Pages 76 to 79)

**EXHIBIT E**

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 80

1    Cellebrite computer, the V drive.
2        Q.   So after that deletion, the extracted contents
3    of the Socha iPhone were no longer on the Cellebrite,
4    true?
5        A.   Correct, on the June 8th and after.
6        Q.   In the next paragraph, there's a reference to
7    a dump file.  What is the dump file?
8        A.   That's a generic term for the original
9    extracted data that you would need a forensic tool like
10   Cellebrite or Lantern to, what they call, parse or make
11   it viewable to me or you.  So the dump file is just a
12   file system copy of the phone, but that's not something
13   you could actually review and look at text messages,
14   phone calls.  You would need a forensic tool, like
15   Cellebrite or Lantern, to parse or decode into a viewable
16   format.
17       Q.   So all you're doing in this third paragraph is
18   describing in step-by-step detail how you did, what you
19   did as described in the first paragraph, true?
20       A.   Correct.
21       Q.   And in the sentence in the third paragraph it
22   reads, quote, I located the Lantern files which were
23   copied onto a different USB device, period, closed quote.
24   Was that different USB device yet a third one on which

Page 81

1    the extracted contents of Socha's iPhone had been loaded?
2        A.   Correct.  One was from the Lantern system, the
3    copy of the files.  The other one is from the Cellebrite
4    server.  Those are on a separate USB due to the size of
5    the files.
6        Q.   And then the third one was this third one that
7    you created at Gavin's direction as reflected in this
8    exhibit?
9        A.   Correct, the copies that were copied on the
10   USB drive, turned over to Gavin, which were the same
11   copies on the server and the Lantern.
12       Q.   Did the Lantern files which were copied onto a
13   different USB device, as recited in that third paragraph,
14   include the images that had been extracted from Socha's
15   iPhone?
16       A.   The entire contents, yes.
17       Q.   So all three USB devices contained those
18   images, correct?
19       A.   They should.  I didn't look at the report, but
20   they should have the entire set of the retrieved data.
21       Q.   Where it says in the last sentence of this
22   paragraph, quote, The original Cellebrite files had
23   already been previously deleted from the V drive after
24   the files were transferred onto external media and given

Page 82

1    to Sergeant Grizzle when the extractions were completed,
2    closed quote, can you tell us when that deletion
3    occurred?
4        A.   I believe the same day, on the 8th.
5        Q.   I'm sorry?
6        A.   On the 8th, June 8th.
7        Q.   The 8th of June?
8        A.   Correct.
9        Q.   So that whole third paragraph describes what
10   you did on the 8th of June of 2018?
11       A.   Correct.
12       Q.   Then it says here the USB devices were turned
13   over to Sergeant Gavin.  How many USB devices were turned
14   over to Sergeant Gavin?
15       A.   I believe it was the two, one from Lantern and
16   one from Cellebrite.
17       Q.   And Grizzle already had those which you had
18   created for him back in May, correct?
19       A.   Correct, yes.
20       Q.   All right.  I'm scrolling down now to
21   City 00120, a 9 November 2018 memo from Botzum to
22   Roechner.  I appreciate that you didn't prepare this, but
23   you're referenced in it.  I'm going to ask you a couple
24   questions about it.  Is it the case that every person in

Page 83

1    the investigations unit had a Joliet Police Department
2    issued computer of some kind?
3        A.   Yes.
4        Q.   And did some of you have more than one Joliet
5    Police Department issued computer?
6        A.   Some might if they're in the tech units or
7    other units.
8        Q.   Were you in a tech unit?
9        A.   No, investigations.
10       Q.   Okay.  And each computer that was issued to a
11   Joliet Police Department investigations section officer
12   was assigned an identifying number.  Yours was 07?
13       A.   Yes.
14       Q.   In any investigation like this one of Socha,
15   was there any log generated that would document each
16   computer on which data extracted from a computer seized
17   in an investigation was viewed or reviewed?
18       A.   Sorry.  Could you repeat that question?
19       Q.   So was there any protocol or procedure in the
20   investigations division whereby a log or record was
21   created that would document each time extracted data,
22   like the data extracted from Socha's iPhone, was viewed
23   on particular computers?
24       A.   There should be a log, yes.

23  (Pages 80 to 83)

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT E**

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 84

1    **Q.**   So if you review extracted data on your
2    Invest 07 computer, how would you log that in?
3        **A.**   Are you talking about like in a report?
4        **Q.**   What record would be made of the fact that you
5    did that?
6        **A.**   I wouldn't have any record other than a
7    follow-up. The computer itself may have some type of
8    records of files being accessed on a computer.
9        **Q.**   Do you know what that record would be called?
10       **A.**   Not specifically, no.
11       **Q.**   Makes two of us.
12           Are you able to tell from reading this whether
13   his reference here -- Botzum's reference to
14   "Detective German assisted in making copies of the files
15   and taking the files off the forensic machines" refers to
16   the work that you did on the 8th and 9th of May or the
17   work that you did -- the work that you did in May or the
18   work that you did in June or both?
19       **A.**   It would likely be June.
20       **Q.**   Okay. I'm going to scroll down now to a
21   document labeled City 00163.
22       MR. ADAMS:   Tina, we'll call this German number next
23   in order, whatever that is.
24

Page 85

1    BY MR. ADAMS:
2        **Q.**   Can you see that okay, Officer?
3        **A.**   Yes.
4        **Q.**   I'll represent to you -- I just want to go
5    through it, that these are notes of the IG -- of his
6    interview with you. Okay?
7        **A.**   Okay.
8        **Q.**   And I appreciate that you've probably never
9    seen it before, but I want to go through them.
10           You see the third line down that appears, to
11   me, to read, German, Bergner has password?
12       MR. CLARK:   Hall, I'm sorry to interrupt. Is this
13   German Exhibit No. 4, then?
14       MR. ADAMS:   Yes.
15       MR. CLARK:   And the last one I think we said was
16   German Exhibit 3, the City 00120?
17       MR. ADAMS:   I hope so, but, frankly, I'm counting on
18   Tina to keep track.
19       MR. CLARK:   Okay. Just wanted to clarify that for
20   the record. Thanks.
21   BY MR. ADAMS:
22       **Q.**   Do you recall what you told the IG about
23   German, Bergner having password?
24       **A.**   Just that he would have access while he was --

Page 86

1    **Q.**   The password?
2        **A.**   For the -- I believe I was referring to the
3    Cellebrite computer.
4        **Q.**   And is that -- did you tell the IG that you
5    and Bergner had the password?
6        **A.**   I think I would have told him that he did,
7    along with myself and other detectives.
8        **Q.**   So that was going to be my next questions.
9    Did you tell him that all the detectives had the password
10   for the Cellebrite?
11       **A.**   I don't remember if I said all or most that
12   use Cellebrite to review phone data.
13       **Q.**   Do you recall specifying that Bergner had it?
14       **A.**   I may have just because he was in our -- if my
15   timing is right, if he was in the RCFL, the FBI's
16   computer forensic laboratory, he would have had the
17   ability to also use our mobile system to dump phones --
18   or that could have been the server that was set up for
19   Cellebrite I believe he took part in. Maybe that's why
20   I'm referencing to Bergner, the V drive.
21       **Q.**   Further down you see the phrase, it says, "Not
22   on network"?
23       **A.**   The only thing I could think of that would be
24   as it's not like a drive that, like, patrol or

Page 87

1    nonauthorized people could access.
2        **Q.**   Meaning that the contents of Cellebrite and
3    Lantern aren't on the general Joliet Police Department
4    computer network?
5        **A.**   Correct.
6        **Q.**   The line that reads "vics phone," "vic" is
7    meant to be shorthand for victim?
8        **A.**   Okay.
9        **Q.**   I'm asking. You think -- is that -- If that's
10   the case, that would be a reference to the Gatlin phone?
11       **A.**   I would imagine.
12       **Q.**   So you see -- now we're about two-thirds of
13   the way down, the line that reads, quote, A few days
14   later, Grizzle asked for full copy from Cellebrite,
15   closed quote. You see that?
16       **A.**   Yes.
17       **Q.**   Did you actually make two copies of -- two
18   UBSs [sic] for Grizzle in May?
19       **A.**   So that -- the day in May would have been the
20   Lantern -- that day or the day after extraction. I
21   had never given him the full set of the report from
22   Cellebrite until that point.
23       **Q.**   So you had given him a partial USB first and
24   then a full USB the next day?

24  (Pages 84 to 87)

**EXHIBIT E**

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 88

1    A.    Two different systems.  One was Lantern.  The
2  other one was Cellebrite.  So Lantern was the day I came
3  in, and then Cellebrite was probably the next day.  I
4  don't remember exactly when.
5    Q.    I see.
6    A.    Two different systems were used to extract the
7  phone data.
8    Q.    So you actually gave Grizzle two different
9  USB's, one that contained data extracted to the
10  Cellebrite system; a second that included data extracted
11  from -- I should say extracted to the Lantern system,
12  correct?
13    A.    Correct.  But just, chronologically, the first
14  one would have been Lantern; the second would have been
15  Cellebrite.
16    Q.    Did both of those USB's contain all of the
17  data that was extracted from the Socha iPhone?
18    A.    Yes.
19    Q.    Including the images?
20    A.    Correct.
21    Q.    Now, about a quarter of the way up from the
22  bottom, there is a line that reads, quote, 6/8-Gavin told
23  him of rumors, closed quote.  Do you see that?
24    A.    Yes.

Page 89

1    Q.    What do you remember telling the IG, if
2  anything, about Gavin telling you about rumors?
3    A.    Other than that there was allegations made by,
4  I believe, Officer Socha that someone had viewed nude
5  images, and he had informed me to copy the data that was
6  saved in both systems and to then delete the data.
7    Q.    Was that the same conversation in which Gavin
8  told you to take the actions described in the earlier
9  exhibit, where you copied files onto a USB drive and
10  deleted the contents of the Cellebrite and the Lantern?
11    A.    Correct.
12    Q.    And is that the way that the conversation
13  went?  Gavin told you about these rumors and then told
14  you to take those actions?
15    A.    Correct, as in one conversation.
16    Q.    And in that conversation, that would have been
17  the sequence?  Gavin told you about the rumors and then
18  told you to take those actions?
19    A.    Correct.
20    Q.    In that conversation did Gavin tell you
21  whether personnel had viewed the images extracted from
22  Socha's iPhone either on the Cellebrite or the Lantern
23  who should not have accessed and viewed those images?
24    A.    No.  I was only told that there were rumors

Page 90

1  but nothing that was known.
2    Q.    Did Gavin tell you why he wanted you to delete
3  from Cellebrite and Lantern?
4    A.    Other than he said the rumors and that they
5  wanted copies deleted from the system and -- after being
6  copied onto external media or USB drives.
7    Q.    The last line of this Exhibit 4 says, quote,
8  Was told he put it in ALS safe, closed quote.  You see
9  that?
10    A.    Yes.
11    Q.    What's the ALS safe?
12    A.    I believe Deputy Chief Roechner's safe in the
13  investigations division.
14    Q.    Oh, so it's Al's safe?
15    A.    I believe that's what it's referencing.
16    Q.    That's what you told the IG?
17    A.    Yes.
18    Q.    And Gavin told you that he, Gavin, had put the
19  new USB that you generated for him on 8 June into Al's
20  safe, correct?
21    A.    I don't know if it was in reference to those
22  copies or the original copies or where those were held at
23  for evidence purposes.
24    Q.    Wouldn't they be properly held in the evidence

Page 91

1  room utilizing the BEAST system?
2    A.    I guess it depends on the case and the
3  investigator, but that's where I put my evidence.
4    Q.    Did Gavin offer you any explanation for why
5  the USB with the data extracted from the Socha iPhone was
6  in Al's safe as opposed to the evidence room?
7    A.    I didn't know if it was in evidence already or
8  not, if that was just a copy, so I don't know what the
9  decision-making was or why.
10    Q.    And Gavin didn't offer you any explanation?
11    A.    I don't recall if he did or not.  I don't
12  recall anything to do with that.
13    Q.    Are you aware, Officer German, of any other
14  instance in which Roechner kept video evidence on a
15  personal computer device, a tablet, for instance?
16    A.    I'm sorry.  I think I missed the first part.
17  Could you repeat the question, please?
18    Q.    Are you aware of any other instance in which
19  Roechner kept video evidence of an open investigation on
20  a personal computer device of his?
21    MS. PROCTOR:  I'm going to object based on the
22  record.  Your question assumes facts not in evidence.  So
23  I'm objecting based on form and foundation.
24

25  (Pages 88 to 91)

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT E**

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

---

Page 92

1    BY THE WITNESS:
2         A.   I don't know of any other cases he deals with
3    to know that, so I don't know.
4         Q.   Okay.  Did you ever see the warrant that was
5    issued for Socha's iPhone that led to its seizure?
6         A.   I don't know if I saw the signed copy.  I
7    believe I provided Sergeant Grizzle with the formatted of
8    a search warrant that's normally used by us.
9         Q.   When?
10        A.   Prior to the search warrant being drafted.
11        Q.   So it was a draft before it was entered by the
12   Court?
13        A.   Well, any search warrant is created on a Word
14   document and then completed and then sent to the
15   prosecutor for approval and then signed by a judge if
16   authorized.
17        Q.   Okay.  Fair.  I understand.  But did you ever
18   see the warrant that was actually issued, signed by the
19   judge?
20        A.   I don't recall if I did.  I may have.  I don't
21   recall.
22        Q.   We talked before about the text message that
23   led Gatlin to complain in the first place?
24        A.   Yeah, from Gatlin's phone, yes.

---

Page 93

1         Q.   Were you ever asked to express any opinions in
2    connection with the Socha investigation about whether the
3    contents of that message constituted actionable
4    harassment?
5         A.   No.
6         Q.   That was not a decision for you to make?
7         A.   That was not.
8         Q.   That was not your role in this investigation?
9         A.   Correct.
10        Q.   Did McKinney tell you that he had seen the
11   images that were extracted from Socha's iPhone?
12        A.   He had mentioned he had seen an image, but I
13   don't know exactly what he saw.
14        Q.   Did he comment in any way on the image about
15   which he told you he looked at?
16        A.   No.
17        Q.   Did McKeon tell you that he had seen any of
18   the images that were extracted from Socha's iPhone?
19        A.   No.
20        Q.   Did McKinney tell you how it is that he came
21   to view the images that were extracted from Socha's
22   iPhone?
23        A.   That he was on a Cellebrite computer on
24   something unrelated to that, and he had seen it from that

---

Page 94

1    unrelated case or reason to be on there.
2         Q.   Did he tell you what his reason for being on
3    the Cellebrite computer at that time was?
4         A.   If he did, I don't recall now exactly why.
5         Q.   Did he tell you how it is that he accessed
6    those images after he entered the password and logged
7    onto the Cellebrite computer?
8         A.   No.
9         Q.   Did he tell you why he accessed and viewed
10   those images?
11        A.   Other than he was on the computer for either
12   an investigation or some other reason to access that
13   computer, which is common.
14        Q.   Did he tell you that he was performing some
15   investigative function associated with the Socha
16   investigation?
17        A.   No.  It would be unrelated.
18        Q.   To your knowledge he was not performing any
19   such role in the Socha investigation, correct?
20        A.   Not to my knowledge.
21        Q.   That's correct?
22        A.   Correct.  I don't have any knowledge of that.
23        Q.   What was Botzum's rank at the time of the
24   Socha investigation?

---

Page 95

1         A.   I believe he was a sergeant.
2         Q.   Are you aware of any Joliet officer, other
3    than yourself, who performed any work on the Socha
4    investigation who was not of the rank of sergeant or
5    higher?
6         A.   Not that I'm aware of.  I don't know of
7    anybody else.
8         MS. PROCTOR:  You know, Hall and Matt, can I just
9    interject?  I mean, based on your dep notices and the
10   lineup that I know our office helped coordinate, the next
11   witness is here, ready to go.  So I --
12        MR. ADAMS:  I think I'm -- I think I'm done with the
13   exception of follow-up on the other lawyer's questions
14   here.
15        So, Officer German, I appreciate your time
16   here this morning.
17        THE WITNESS:  Thank you.
18        MR. CLARK:  Can we just have a quick five-minute
19   break just to review notes, and I don't think I'll have
20   too much, but --
21        MS. PROCTOR:  Yeah, and I want to just take a -- I
22   mean, I think a quick break would be good.  But to be
23   clear, you know, we're going to move -- once we're
24   completed with Detective German's deposition, we're going

---

26  (Pages 92 to 95)

**EXHIBIT E**

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 96

1    to move straight away into McKinney's deposition and not
2    push it back until 1:00?  I know there was some
3    suggestion of that earlier.
4        MR. ADAMS:  Yeah.  That is my intention too, Darcy.
5    I have no place else to go.
6        MR. HESS:  Just so you're aware, we have
7    communication with Officer McKinney.  He is available to
8    start at 1:00, if necessary.  He's just on standby at the
9    moment.  So if you want to start right away, I'll just
10   have him continue to stand by; otherwise, if we want to
11   do it at 1:00, we can do it at 1:00.
12       MR. ADAMS:  I'm ready to go if you're ready to go.
13       MR. HESS:  We'll have him stand by, and we'll move
14   forward when everybody is ready.
15       MS. PROCTOR:  I wouldn't mind taking a break to get
16   a quick bite.  Maybe we could compromise and start at
17   around 12:30-ish.  But let's finish German, and we'll
18   take it up in a moment.  Okay?  Let's take five for now,
19   please.  Thanks.
20           (A short break was had.)
21       MS. PROCTOR:  So, Hall, you were concluded with your
22   questions.
23       MR. ADAMS:  I'm concluded with my questions.
24       MS. PROCTOR:  All right.  And as far as the City of

Page 97

1    Joliet is concerned, we have no questions for this
2    witness, and we want to thank Detective German for
3    presenting here today and participating in this process.
4    So thank you so much.
5        THE WITNESS:  Thank you.
6        MR. CLARK:  On behalf of Defendant Grizzle, I have
7    no questions as well.  Thank you.  Thank you very much.
8        MS. PROCTOR:  As far as signature, we don't
9    represent Detective German, but we -- I mean, he -- Does
10   someone want to explain what signature means?
11       MR. ADAMS:  Detective German, you mentioned you've
12   done this before.  You have the right, under our rules,
13   to read and review the transcript of this deposition in
14   order to note any instances in which you believe the
15   transcript is inaccurate in any way, not to change the
16   content of it, but on a separate document to make a
17   notation of where you believe there may be transcription
18   errors.  That's a right you have, or you can waive that
19   right.  We do need you to tell us on the record whether
20   you intend to exercise or to waive that right.  The
21   choice is, as Darcy said, entirely yours.
22       THE WITNESS:  I could waive that right.
23           (Deposition concluded at 12:17 p.m.)
24

27  (Pages 96 to 97)

**EXHIBIT E**

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 98

```
 1   UNITED STATES OF AMERICA        )
     NORTHERN DISTRICT OF ILLINOIS  )
 2   EASTERN DIVISION                )    SS.
     STATE OF ILLINOIS               )
 3   COUNTY OF COOK                  )

 4

 5               I, Tina M. Hickey, Certified Shorthand

 6   Reporter, do hereby certify that DETECTIVE JEFFREY GERMAN

 7   was first duly sworn via videoconference by me to testify

 8   the whole truth and that the above deposition was

 9   reported stenographically by me and reduced to

10   typewriting under my personal direction.

11               I further certify that the said deposition was

12   taken via videoconference at the time and place specified

13   and that the taking of said deposition commenced on

14   April 28th, 2021, at 9:27 o'clock a.m.

15               The signature of the witness, DETECTIVE JEFFREY

16   GERMAN, was waived by agreement of counsel.

17               I further certify that I am not a relative or

18   employee or attorney or counsel of any of the parties,

19   nor a relative or employee of such attorney or counsel or

20   financially interested directly or indirectly in this

21   action.

22

23

24
```

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT E**

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 99

1          Witness my official signature as a Certified

2    Shorthand Reporter in the State of Illinois, on

3    May 18th, 2021.

4

5

6

7

8

9

10    _____
      TINA M. HICKEY, CSR
11    161 North Clark Street
      Suite 3050
12    Chicago, Illinois 60601
      Phone:  312.361.8851
13
      CSR No. 084-003858
14

15

16

17

18

19

20

21

22

23

24

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT E**

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 100

| A | | | | AT&T 74:5 |
|---|---|---|---|---|

**A**
**a.m** 1:17 98:14
**ability** 86:17
**able** 25:7,14,15
  39:22 52:19
  62:3 69:22
  72:5 84:12
**academy** 14:6
  14:11,12 22:11
**access** 30:11,14
  31:24 32:11,17
  32:22 33:20
  36:23 37:7
  39:20 40:16,19
  40:19,23,24,24
  41:3,3,7 44:4
  45:4 48:21
  49:18 50:9
  62:3,7,22
  63:22 72:17,22
  72:22,24 85:24
  87:1 94:12
**accessed** 33:17
  38:23 76:9,22
  84:8 89:23
  94:5,9
**accesses** 48:12
**accessible** 40:8
  76:4,7,13
**accessing** 33:21
**accidentally**
  63:12
**accommodate**
  5:1
**accounting**
  13:21
**accurate** 56:5,12
  75:18
**acquittal** 55:16
**acquitted** 52:2
**acronym** 48:9
**action** 98:21
**actionable** 93:3
**actions** 89:8,14

89:18
**actual** 8:18
  33:19 51:2
  73:22 76:17
  77:2
**Adams** 2:2,2 3:4
  4:8,11 5:21 6:6
  28:23 29:9
  48:8,10 49:7
  49:10 64:18,24
  65:2,4,5 70:8
  70:13,18 71:12
  71:14,20,22
  74:15,17 84:22
  85:1,14,17,21
  95:12 96:4,12
  96:23 97:11
**adapter** 27:4
**addition** 33:22
**additional** 31:19
**addressed** 28:20
**adjunct** 30:2
**advanced** 27:17
**advancement**
  19:3,10
**agency** 12:8
  16:6 30:21
**ago** 31:15
**agree** 54:20
**agreement**
  28:21 29:5
  98:16
**ahead** 73:18
**AI** 17:2
**AI's** 90:14,19
  91:6
**allegation** 51:3,3
  75:3
**allegations** 9:7,9
  13:3 55:22
  59:11 60:6
  65:6 75:7,9,12
  89:3
**alleged** 42:22

51:1 55:23
**allegedly** 54:9
  54:18
**allow** 24:6
**ALS** 90:8,11
**AMERICA** 98:1
**analysis** 28:11
  63:21
**analyze** 23:16
  24:3 61:11
  66:21
**analyzed** 29:17
  34:14
**analyzer** 26:16
  27:7,15,19
  38:9,17,21
  39:12,17 40:1
  40:3 41:18
  43:2,6
**analyzing** 49:21
**and/or** 24:7
  29:12 39:10
  46:23 49:14
  50:11,20 51:17
  53:14 59:9
  65:10 76:5
**answer** 4:24 5:2
  5:6,7 30:24
  57:15 73:18
**answered** 36:19
**answers** 59:15
**anybody** 62:21
  95:7
**anymore** 46:1
**anyone's** 58:1
**apologize** 59:13
**appearance**
  52:22,23 68:12
**APPEARAN...**
  2:1
**appears** 85:10
**Appellate** 51:6
**Apple** 25:12,19
  29:18 38:14

39:5,7 42:14
  45:16 46:8
  58:4 59:10
  60:10 78:13
**application**
  26:22
**apply** 30:18,21
  30:23 46:10
**appreciate** 23:1
  28:7 36:20
  37:9 51:4 74:8
  82:22 85:8
  95:15
**appropriate**
  62:20
**approval** 92:15
**approximately**
  4:18,19
**April** 1:17 98:14
**area** 21:18,22
  29:20 30:3,12
  33:13 50:4
  55:8
**articles** 10:10
**asked** 4:23 5:9
  5:10 36:20
  72:1 87:14
  93:1
**asking** 87:9
**aspect** 51:15
**asserted** 9:23
  10:8 12:8
**assigned** 20:4,7
  20:12 21:12,15
  36:17 44:19
  83:12
**assist** 36:18
**assisted** 84:14
**assisting** 8:11
  37:4 66:3,19
**associated** 94:15
**assume** 5:3
  54:20
**assumes** 91:22

**AT&T** 74:5
**attached** 69:19
**attachment**
  69:21,22 70:5
  70:9
**attempt** 4:23
**attorney** 11:7,12
  98:18,19
**attorneys** 40:14
  64:16
**author** 6:12
**Authored** 6:11
**authorized**
  92:16
**Auto** 19:5
**available** 28:12
  69:1 96:7
**aware** 11:18
  13:4 19:8 45:8
  45:11 50:23,24
  59:8 65:15,24
  66:22 67:13
  79:17 91:13,18
  95:2,6 96:6
**Axon** 45:23

**B**
**B** 3:6
**bachelor's** 13:15
  13:21
**back** 5:1 6:23
  20:19 23:10
  24:19 29:13
  30:7 31:3,17
  35:12 40:2
  42:19 46:2,14
  46:18,20 70:13
  78:4 82:18
  96:2
**bad** 10:5
**barcoding** 48:11
**based** 60:6
  73:16 76:1
  91:21,23 95:9

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT E**

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 101

| | | | | |
|---|---|---|---|---|
| **basis** 35:9 72:12 | **Benton** 16:20,23 | 66:13 67:24 | 24:11 25:2,6 | 27:3,5 |
| **Bates** 71:18 | 17:1 59:1,5,6 | 71:12 74:5,15 | 25:10,14 26:2 | **Certified** 1:16 |
| **bathroom** 49:5 | **Bergner** 21:8 | 76:21 80:10 | 26:3,8,11,14 | 98:5 99:1 |
| **bear** 26:12 | 44:18 65:7,10 | 84:22 | 26:16,17,22 | **certify** 98:6,11 |
| 69:15 | 85:11,23 86:5 | **called** 1:12 4:4 | 27:1,14,15,16 | 98:17 |
| **BEAST** 46:9,12 | 86:13,20 | 24:1,2 27:2 | 27:18,19 29:12 | **chain** 46:9 48:14 |
| 46:15,21 47:3 | **best** 55:18 | 29:24 40:11 | 29:16,19 31:1 | 48:17 73:2 |
| 47:5,15,18,24 | **better** 24:14,18 | 41:24 84:9 | 31:9 32:1,3,7 | **Champaign** |
| 48:1,3,8,11,15 | 25:8,11,18 | **calls** 62:4 80:14 | 32:17 33:3,8 | 14:13 |
| 48:17,18,22 | **big** 20:4 46:24 | **camera** 59:16 | 33:11,14,16,16 | **change** 97:15 |
| 49:17 50:4 | **bite** 96:16 | **capabilities** | 33:18,20,22 | **changed** 19:15 |
| 66:8,11,13 | **Blu-ray** 45:21 | 24:12 | 34:3,13 35:12 | 19:20 23:7 |
| 67:8 79:16 | 46:24 47:4 | **capability** 25:8 | 35:17 36:3,6 | 44:18 |
| 91:1 | 67:11 | 25:11 31:19 | 36:12,24 37:16 | **changes** 24:17 |
| **beginning** 56:10 | **Blu-rays** 45:24 | 33:4,16 | 37:17,22 38:3 | **characterize** |
| 64:21 | **Bolingbrook** | **capital** 21:6 | 38:5,9,17,19 | 50:11 52:19,21 |
| **behalf** 2:6,12,17 | 2:10 | **caps** 48:9 | 38:20,22,23 | 58:8 |
| 6:2 9:17 64:14 | **bottom** 88:22 | **case** 4:13 7:1,6 | 39:8,16,21,23 | **charge** 35:21 |
| 97:6 | **Botzum** 8:3,18 | 7:16 8:23 9:23 | 39:24 40:1,2,5 | **Chicago** 2:4,15 |
| **behavior** 68:13 | 42:17,17 44:11 | 10:9 12:9,16 | 40:12,13,21 | 99:12 |
| **belief** 21:2 | 58:11,12,13,20 | 12:19 13:1 | 41:9,14,15,18 | **chief** 16:16,19 |
| **believe** 9:18 | 60:17,20 61:10 | 22:8 25:3,13 | 41:22 42:7 | 16:20,22,23 |
| 11:2,10,11 | 61:12 71:5 | 27:10 28:6,13 | 43:6,15,16,17 | 17:1,4 18:19 |
| 12:14 13:19 | 77:14,23 78:7 | 29:22,24 30:2 | 43:23 44:3,4,5 | 18:21 30:6 |
| 15:8,15,22 | 79:2 82:21 | 31:12,16 36:6 | 44:9,12,14,20 | 58:23,24 59:1 |
| 16:23 17:1,4 | **Botzum's** 84:13 | 36:11,17 37:3 | 44:22,23 45:4 | 59:4,4,5,5 |
| 17:10,15,17 | 94:23 | 39:3 42:8,10 | 45:14,19,19 | 66:19 90:12 |
| 20:18 23:24 | **Boughton** 2:9 | 42:15,21,23 | 47:22 49:14 | **choice** 97:21 |
| 25:5 26:10 | **Brad** 21:6 | 44:3 46:7,19 | 57:22 58:15 | **choose** 43:19 |
| 29:21 30:9,23 | **break** 49:5,9 | 54:7,8,20 | 60:14,24 61:9 | 70:16 |
| 33:6 34:22 | 95:19,22 96:15 | 61:19 71:9 | 61:10 67:4 | **choppy** 5:13 |
| 35:1,4 42:10 | 96:20 | 82:24 87:10 | 71:23 72:4,19 | **chose** 39:1 |
| 42:22 51:8 | **breakdown** | 91:2 94:1 | 75:23 76:4,9 | **chosen** 42:19 |
| 52:24 53:4 | 59:19 | **cases** 4:17 36:15 | 76:17,20 77:3 | **chronologically** |
| 56:6 60:19 | **bring** 13:11 | 36:18 37:7 | 77:15 78:9,12 | 88:13 |
| 61:2 63:20 | **brought** 53:16 | 44:6 45:20 | 78:21 79:10 | **circumstance** |
| 65:8 68:21 | 53:17 | 92:2 | 80:1,3,10,15 | 67:19 |
| 71:7 78:5 82:4 | **Brown** 20:24 | **Cassandra** 1:3 | 81:3,22 82:16 | **circumstances** |
| 82:15 86:2,19 | **building** 30:13 | 2:18 4:12 | 86:3,10,12,19 | 7:5,16 8:22 |
| 89:4 90:12,15 | ——————— | **cell** 22:19 24:5 | 87:2,14,22 | 10:18 25:1 |
| 92:7 95:1 | **C** | 36:7 47:21 | 88:2,3,10,15 | **circumvent** |
| 97:14,17 | **cable** 35:21 | **Cellebrite** 18:3 | 89:10,22 90:3 | 48:16 |
| **believing** 10:14 | **call** 18:11 26:21 | 23:4,9,12,12 | 93:23 94:3,7 | **City** 1:6 2:12 6:2 |
| **benefit** 28:8 | 29:23 41:11,19 | 23:14,18 24:3 | **certain** 24:15,15 | 11:2 19:6 28:2 |

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT E**

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 102

28:10 64:14
69:18 71:18,20
74:16 82:21
84:21 85:16
96:24
**City's** 28:13
**Civil** 1:14
**claims** 8:22 9:22
9:24 10:3,8,11
12:8
**clarify** 85:19
**Clark** 2:14 6:5
57:14 70:6
85:12,15,19
95:18 97:6
99:11
**classes** 26:11
**clear** 5:23 59:13
77:19 95:23
**closed** 39:15
68:6 77:16
80:23 82:2
87:15 88:23
90:8
**cloud** 47:5
**cock** 68:6
**code** 61:22,22
**codes** 34:19,20
**coherent** 5:15
**colleagues** 63:4
**collected** 46:19
**collection** 22:14
**college** 13:15,16
13:24
**come** 26:4
**commenced**
98:13
**comment** 67:21
68:9,12 93:14
**commented** 68:2
**comments** 68:17
68:19
**common** 94:13
**commonly** 35:21

40:13
**communication**
96:7
**companies**
24:13
**company** 23:15
23:24 24:1
26:19
**compared** 24:16
**complain** 92:23
**complaint** 9:16
12:24 13:3
65:7 69:9
72:12
**complaints** 16:5
30:20
**complete** 60:1
61:12 77:24
**completed** 11:23
77:16,20 82:1
92:14 95:24
**compromise**
96:16
**computer** 21:13
22:18,19,20,21
22:22,24 23:16
25:6 27:4
29:16,19 31:1
31:11 32:2,3
33:9,11,12,20
34:14 35:11,13
35:15,16,17,18
36:7,8 37:6,8
37:10,12,15,16
37:18,20,21
38:3,11,24
39:4,15,19,24
40:6,9,20,20
41:1,4,11 42:3
45:15,20 48:2
49:14 57:23
58:18,19 62:1
62:9,10,11
65:11,17 66:2

66:24 67:15
73:23 77:3,4
78:14,15 80:1
83:2,5,10,16
83:16 84:2,7,8
86:3,16 87:4
91:15,20 93:23
94:3,7,11,13
**computers** 22:6
23:20 24:4,7
24:16 29:12
31:10,11 34:6
36:13,23 38:7
62:15 65:18,20
75:24 83:23
**concerned** 97:1
**concluded** 96:21
96:23 97:23
**conclusion**
56:17,19
**conduct** 26:5
34:20
**conducted** 26:8
77:10
**conducts** 34:20
**conference** 30:1
**confidentiality**
27:24 28:14
29:4
**confirm** 58:6
64:22
**confused** 18:19
**confusing** 39:2
**conjunction**
27:12
**connected** 37:20
37:21 78:16
**connection** 10:6
12:8,13 17:12
21:10 22:3
36:13 93:2
**connotes** 15:2
**consensus** 54:4
**consider** 55:9

considered
14:24 15:8
44:8 51:2
**constituted** 93:3
**contact** 51:5
73:24
**contain** 88:16
**contained** 81:17
88:9
**containing**
79:13
**content** 36:13
72:24 74:9
97:16
**contents** 8:7 9:4
36:23 46:8,11
47:11 61:20
63:23 73:13
78:9 79:8,13
80:2 81:1,16
87:2 89:10
93:3
**context** 73:9
**continue** 61:6
96:10
**continued** 16:1
**Continuing**
78:19
**contradicted**
52:12
**control** 40:16
**controlled** 32:22
47:14 67:7
79:15
**conversation**
9:14 53:1
54:22 55:2
56:15,23,24
89:7,12,15,16
89:20
**conversations**
7:4 8:8,13,15
8:20 9:5,10,21
10:7 55:6,20

55:24 57:7,12
**COOK** 98:3
**coordinate**
95:10
**copied** 45:21
60:22 67:10
75:15,20,23
76:17 77:1
80:23 81:9,12
89:9 90:6
**copies** 49:22
62:20 66:10,10
66:12 67:3
72:1 75:4,22
81:9,11 84:14
87:17 90:5,22
90:22
**copy** 45:19
58:14,15,17
60:24 61:17
66:21 67:3,5
75:18 76:12
78:19 79:7
80:12 81:3
87:14 89:5
91:8 92:6
**cord** 35:19
**corners** 28:15
**corporation** 1:7
**correct** 4:9
12:22 15:3,4,6
19:19 23:5
31:3 33:13
34:17 36:14
37:1,2,13
39:11,12 47:24
48:1,7,13,24
49:20,21 60:13
66:8 67:8,13
68:20 71:2,6
71:15 72:9,14
72:18,24 73:15
76:5,11,15
77:7 78:4,18

**EXHIBIT E**

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

78:23 79:14,24
80:5,20 81:2,9
81:18 82:8,11
82:18,19 87:5
88:12,13,20
89:11,15,19
90:20 93:9
94:19,21,22
**correctly** 33:10
**counsel** 64:18
98:16,18,19
**counting** 85:17
**COUNTY** 98:3
**couple** 4:20 8:5
9:2 31:15 45:1
55:12,15 82:23
**course** 5:12
**court** 1:1 5:24
49:22 92:12
**Courts** 1:15
**Coworker** 50:13
**Coyl** 20:17
**create** 23:17
24:4 34:15
39:1 43:17
**created** 6:10,22
12:5 24:1
26:17 42:7
47:18 79:11
81:7 82:18
83:21 92:13
**creates** 38:10
**creating** 34:4
**criminal** 8:19
51:15
**criteria** 43:4
**criticisms** 69:6
**Crowley** 50:17
50:20 51:18
52:2,5,8 53:3,7
53:13 54:24
56:1,2 57:2,8,9
68:5
**Crowley's** 56:9

**CSR** 99:10,13
**Cummings** 11:6
11:11
**currently** 18:17
19:4 31:15
**custody** 46:10
48:13,14,17
**cuts** 59:17
**CV** 1:5

**D**

**D** 3:1
**Darcy** 2:8 5:18
6:1 27:21
64:14 96:4
97:21
**dark** 14:8 62:5
**data** 24:3,4,15
24:19,19 25:5
25:6,7,9,12
26:18 27:3,5,7
34:5,13 35:18
35:18 36:5,8
37:15,17 38:3
38:5,6,8,12,18
38:24 39:7,9
39:13 40:2,2,8
40:15,22 41:9
41:11,16,19,21
41:24 42:3,6,8
42:12,13 43:3
43:7,8,12,14
43:19,19 44:1
44:5 45:13,21
46:17,22,22,24
47:13,21 49:13
49:13 57:23
58:3,6,10,11
58:17 60:1,22
60:24 61:13,15
62:12,19 63:24
66:16 67:9
72:4 74:4
75:13 76:17,24

77:2,5,5 79:8
80:9 81:20
83:16,21,22
84:1 86:12
88:7,9,10,17
89:5,6 91:5
**database** 25:16
74:5
**date** 51:13 56:14
70:24,24 76:11
**dates** 18:18
**Dave** 21:4
**day** 24:17 55:16
56:7,7,19
60:17,19 61:2
79:1,6 82:4
87:19,20,20,24
88:2,3
**days** 87:13
**deal** 12:19 28:24
**deals** 92:2
**Dearborn** 2:3
**decided** 46:16
**decision** 77:12
93:6
**decision-maki...**
91:9
**decode** 61:15
62:4 80:15
**Defendant** 2:12
2:17 97:6
**defendants** 1:8
1:12 5:22
**defense** 40:14
49:22
**definitely** 18:10
**degree** 13:15,20
**delete** 58:19
78:8 89:6 90:2
**deleted** 18:2
24:19 75:5,19
75:21,24 77:3
81:23 89:10
90:5

**deleting** 75:16
**deletion** 76:6,8
76:11,12,14,19
77:6,10 79:20
79:21 80:2
82:2
**dep** 95:9
**department**
10:16 11:10
13:6,12 14:4
16:4,9,13 17:3
19:3,11,24
20:11 21:11
23:3,8 26:4
28:10,12 30:12
30:15 32:19
34:19 46:2
48:13 66:23
67:1,20 69:7
73:13 74:9
83:1,5,11 87:3
**department's**
6:15 28:3
**department-is...**
66:2
**departments**
26:7
**depend** 42:5
**depending**
35:14 46:24
**depends** 25:3,3
26:24 66:9
67:9 91:2
**deposed** 4:14,16
**deposition** 1:11
3:7 6:8,19,24
7:3,18 12:20
29:3 64:19,21
65:2 78:11
95:24 96:1
97:13,23 98:8
98:11,13
**depositions** 1:15
**deputy** 17:4

18:19 30:6
59:4 66:19
90:12
**describe** 29:10
61:20 78:19
**described** 26:14
60:15 71:10
75:2 80:19
89:8
**describes** 82:9
**describing** 80:18
**designation**
15:17,19
**designed** 62:12
**desk** 20:4 21:16
21:17 29:15
**desks** 20:5
**desktop** 22:20
**Despite** 76:8
**detached** 19:5
20:9
**detail** 63:13
80:18
**details** 54:8
**detective** 1:11
3:3 4:3 6:12
9:12 15:1,2,20
16:2,12,18
17:20 18:12
19:14,16,20,24
20:23 21:5
22:4,12,14,16
31:24 34:3
36:6,10,17,21
36:22 39:19
42:10 44:21,21
45:1,5 46:16
53:2 61:18
63:8,11,14,14
63:16 64:7,15
84:14 95:24
97:2,9,11 98:6
98:15
**detective's** 42:10

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT E**

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

**detectives** 8:5 9:2,11 20:6 22:15 29:11,18 32:11,12 36:15 43:22 44:13,24 45:2 55:8 57:3 57:17,24 86:7 86:9
**detectives'** 20:5 40:9
**determine** 77:18
**device** 26:14,24 38:12,13,13,14 38:16,20,22 42:3 46:10,11 46:12 47:13,23 49:16 59:12 67:1 75:15,21 76:20,20 79:11 79:12 80:23,24 81:13 91:15,20
**devices** 23:1,4,7 24:10 36:3 38:19 44:9 47:14,24 65:11 65:17,21 66:2 67:15 81:17 82:12,13
**DeVito** 11:5,10
**differ** 24:11
**differed** 55:1
**difference** 37:24
**different** 4:17 8:13 15:17 23:24 24:13,14 26:7,21 31:9 31:13 38:20 42:11 54:18,21 56:3 57:10 80:23,24 81:13 88:1,6,8
**differently** 36:20 45:14
**difficult** 41:17

**difficulty** 7:21
**digital** 31:14,16 45:23 47:1,2
**dignity** 35:3
**direct** 10:13 17:7
**directed** 17:13 65:9 74:23 77:9
**direction** 18:5 81:7 98:10
**directly** 27:15 27:18 63:7,15 98:20
**disappointed** 54:5
**disappointment** 54:13,15
**disc** 45:22 47:4 79:9
**discipline** 13:20
**disclosed** 28:8
**disclosure** 28:15
**disconnect** 37:10
**disconnected** 37:17
**discriminate** 35:8
**discuss** 13:2 53:6,13
**discussed** 7:1,5 7:15 8:22 9:8 9:22 28:4 51:16 53:15,19 53:22 54:1 65:6
**discussing** 28:9
**discussions** 54:3
**display** 23:19 24:7
**displayed** 32:9 32:10
**dispose** 65:10

**distinct** 15:13
**distinguish** 38:6
**distributed** 69:1
**District** 1:1,1,15 98:1
**division** 1:2 15:1 15:21 16:2,18 18:15 20:3,7 21:19 23:4 30:5 36:10 40:18 41:5,6 47:19 55:7 66:23 83:20 90:13 98:2
**document** 6:23 69:18 70:17,21 71:19 74:14 83:15,21 84:21 92:14 97:16
**documentation** 9:20
**documents** 6:8
**doing** 59:13 80:17
**download** 40:4 43:6
**downloaded** 8:4 36:5 37:24
**dproctor@tre...** 2:11
**draft** 92:11
**drafted** 92:10
**drive** 35:18 42:7 45:18 46:23 62:16,22 66:18 76:16,24 79:22 80:1 81:10,23 86:20 86:24 89:9
**drives** 90:6
**due** 77:15 81:4
**duly** 4:4 98:7
**dump** 80:7,7,11 86:17

**duty** 16:13
**DVD** 45:21 46:24 47:4,23 49:16 67:10 72:19
**DVDs** 45:24 47:12

**— E —**

**E** 3:1,6
**e-mail** 2:5,11,16 69:19,20 70:5 70:7
**earlier** 30:24 76:2 78:11 89:8 96:3
**early** 5:19
**East** 2:9
**EASTERN** 1:2 98:2
**education** 13:14
**Edward** 1:7 2:17
**effect** 51:17 53:7
**Egizio** 18:17
**either** 20:16 23:7 36:24 45:21 46:23 47:4 49:15,21 52:17 53:22 55:20 56:15,23 57:7,12 58:17 58:19,23 59:5 60:9,11 65:10 79:15 89:22 94:11
**emotionally** 52:24
**emotions** 52:20
**employee** 98:18 98:19
**employees** 16:6 30:21
**empty** 70:7

**ends** 59:15
**enforcement** 12:8 14:7
**enter** 33:23 46:16
**entered** 46:13 46:15 47:16,17 48:3 61:1 66:10 67:9 76:21 79:15 92:11 94:6
**entering** 33:22
**entire** 81:16,20
**entirely** 22:7 97:21
**entirety** 22:9
**entitled** 69:20
**equipment** 23:9 23:11 31:19 32:21 33:3 36:12,24 39:21
**equipped** 23:19 33:4
**errors** 97:18
**especially** 56:21
**essentially** 35:22
**estimate** 55:18
**events** 55:23
**eventually** 31:11 37:19 44:14
**everybody** 5:18 6:4 54:8 96:14
**evidence** 16:10 22:6,13 28:11 30:17 31:20,22 37:2,7 45:22 45:23 46:13,16 46:17,21 47:3 47:17,17,19,19 48:2,3,4,5,12 48:18,21,21,22 49:18,21 50:3 50:5,9,9 62:20 66:11 67:10

**EXHIBIT E**

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

77:1 79:19
90:23,24 91:3
91:6,7,14,19
91:22
evidence.com
45:23,24 46:2
47:2,6 67:11
exact 21:14
44:23 46:4
59:1
exactly 10:23
46:6 53:16
55:13 56:8
88:4 93:13
94:4
examination
1:13 3:4 4:7
examined 4:5
46:9
examiner 39:1
42:5 43:12,13
43:13
examiners 44:2
example 13:10
37:14 39:4
46:16 66:15,19
73:24
exception 95:13
exercise 97:20
exhibit 3:7
71:11 74:16
76:9 79:21
81:8 85:13,16
89:9 90:7
expect 63:23
expected 34:23
35:2,5,8
expert 44:8
explain 75:14
97:10
explanation
91:4,10
explicit 59:9
60:11

express 52:16
54:13 57:8
68:23 69:6
93:1
expressed 9:23
10:2,11
extenuating
67:18
external 81:24
90:6
extract 23:16
24:3 27:3
38:18 43:24
46:17 72:4,5
88:6
extracted 26:18
27:7,15 29:17
37:15,23 38:1
38:5,6,8 39:8
40:8,22 41:11
41:18,21,24
42:3,6 43:3,8
43:14 45:13,17
46:9,20,22
47:11,21 49:13
57:23 58:4,6
58:11 59:10
60:16 61:14,15
62:3,22 63:2
63:18 64:4,10
65:12,16 66:1
66:24 67:14,21
68:2,13,24
69:8 73:12
74:4 76:3,23
79:8,13 80:2,9
81:1,14 83:16
83:21,22 84:1
88:9,10,11,17
89:21 91:5
93:11,18,21
extracting 27:5
extraction 8:10
27:17 35:17

42:18 43:10,14
58:9,14,16
60:3,20 61:13
72:15 77:14,24
78:3,22 79:2,6
87:20
extractions
44:15 60:18
78:14,21 82:1
extracts 38:3

F

facet 55:21
facilities 26:6
fact 42:12 64:4
74:6 84:4
facts 7:5,16 13:2
91:22
factually 10:3
10:12
fair 5:4 92:17
familiar 16:4,8
16:13 21:8
far 11:16 21:2
30:16 46:22
96:24 97:8
favorable 52:7
FBI 21:13 44:20
FBI's 44:19
86:15
feature 48:12
February 15:22
Federal 1:14
feelings 54:6
fellow 8:14 10:8
29:11 63:4
68:19
felony 51:12,14
felt 54:17
female 35:5,9
56:8 68:19
73:11
fight 59:20
file 38:10 40:11

40:12,17 42:21
46:24 80:7,7
80:11,12
filed 8:4 9:17
12:24
files 43:16 45:17
45:17 47:1
58:19 75:15,16
75:18,20 80:22
81:3,5,12,22
81:24 84:8,14
84:15 89:9
final 52:1 61:24
62:11 79:19
finalize 77:22
financially
98:20
find 13:10,11
41:18 42:11
43:8,19
finer 47:20
72:23
finish 61:16
96:17
first 4:4 14:7,9
15:20 22:15
31:6 60:14
69:2,14,18
79:20 80:19
87:23 88:13
91:16 92:23
98:7
firsthand 10:13
60:5
five 49:6 96:18
five-minute 49:5
95:18
focus 55:2
folder 42:7 43:8
43:17
folders 43:11
follow 56:20
follow-up 71:8
84:7 95:13

follow-ups 6:13
6:17
following 55:17
60:19 79:5
follows 4:6
FOP 11:7,12
Force 19:5
forensic 21:13
23:13,15 26:11
28:11 31:14,16
31:21 35:17
62:14 73:21
80:9,14 84:15
86:16
forensic-evide...
28:3
forensics 24:1
31:21
forgive 64:13
form 57:24 71:14
73:16 79:7
91:23
formal 13:14
format 5:12
26:19 27:8
41:20 61:16
80:16
formatted 92:7
formed 72:11
forth 28:2 29:2
forward 96:14
foundation
73:17 91:23
four 4:19 6:17
28:15 31:5
frame 20:8,13
21:11 22:20
24:24 25:17
35:12 44:23
46:3 50:10
frankly 85:17
froze 14:8
frustration
52:16

**EXHIBIT E**

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 106

**full** 60:21,24
87:14,21,24
**function** 15:13
94:15
**further** 63:13
86:21 98:11,17

**G**

**gamut** 23:1
**gather** 23:19
**gathering** 22:5
28:11
**Gatlin** 42:22
71:15,24 72:9
73:7,8 87:10
92:23
**Gatlin's** 72:2,12
74:10 92:24
**Gavin** 8:3,17
17:15,17 18:6
18:7,10,14
19:9 45:1
58:17,18 64:1
74:23 75:1,14
77:9 78:8
81:10 82:13,14
89:2,7,13,17
89:20 90:2,18
90:18 91:4,10
**Gavin's** 17:23
81:7
**general** 7:8
10:16 16:5,8
16:14 26:22
28:18 30:17,20
30:23 33:7
34:10 48:23
52:15 55:7
57:5 87:3
**generally** 40:8
45:20
**generate** 58:13
60:14 61:9,21
**generated** 34:2

34:7 36:9
37:19 38:21
40:3,7,12
41:16,23 43:1
43:12 44:4
47:3 59:22
60:18,21 61:1
61:3,5 71:5,7,9
76:2,15 79:4
83:15 90:19
**generating** 78:3
**generic** 80:8
**German** 1:11
3:3,7 4:3,9 6:7
29:10 64:15
69:17 71:12
74:15 84:14,22
85:11,13,16,23
91:13 95:15
96:17 97:2,9
97:11 98:6,16
**German's** 95:24
**germane** 49:24
**getting** 27:22
29:3
**give** 4:23 5:2
40:13 46:18
61:17 69:16
71:18
**given** 18:5 46:14
46:20 55:1
61:5 64:17,20
64:23 81:24
87:21,23
**Gloria** 20:17,18
**go** 4:21 10:4
14:12,18 26:5
38:1 43:8 50:3
70:11 73:18
78:24 85:4,9
95:11 96:5,12
96:12
**going** 4:12,20
37:24 49:5,7

50:4 60:7
64:12 66:13
69:14 70:1,13
70:15,16 73:16
74:13 82:23
84:20 86:8
91:21 95:23,24
**good** 5:24 6:3,5
65:3 95:22
**graduate** 13:15
13:18
**graduated** 13:24
14:2
**graduation** 14:3
**Gregory** 20:16
**Grizzle** 1:7 2:17
6:13 8:2,9,17
17:9,14,21
18:14 19:2
47:10 51:16
52:4 53:2,12
54:22 55:21,24
56:15 57:7
58:14,15 60:23
61:2,6,17
62:18 63:20
64:3 66:3,18
66:20 67:2
71:8 72:1,16
78:2,20 79:5
82:1,17 87:14
87:18 88:8
92:7 97:6
**Grizzle's** 42:14
67:5
**ground** 4:20
**group** 13:1
**guess** 5:6,10
50:24 51:10
56:16 64:16
91:2
**guns** 48:7
**guys** 5:19

**H**

**H** 3:6
**half** 51:12
**Hall** 2:2,2 4:11
11:2 28:22
71:17 85:12
95:8 96:21
**hall@adamsle...**
2:5
**hand** 27:6,6
**handled** 68:24
69:7
**handling** 22:14
**hands** 62:21
**happened** 10:14
**harassment** 6:9
51:1,1 93:4
**hard** 39:15,18
42:7 45:18
**hardware** 27:1
**harmful** 54:24
**Hayes** 16:19
**hear** 4:22 5:18
7:23 8:1 59:15
78:24
**heard** 5:3 53:6
53:12 54:12,17
57:7 60:6 63:7
63:17 64:7,9
65:9 67:20
68:1,4,8,11,16
68:22 69:5
**hearsay** 68:1
**held** 13:1 47:19
48:4 90:22,24
**Hello** 5:17
**help** 45:5 66:21
**helped** 56:2 57:9
95:10
**helpful** 54:23
**Herald-News**
9:19
**Hess** 2:8 6:3
96:6,13

**Hickey** 1:16
98:5 99:10
**hidden** 25:16
**high** 59:19
**higher** 18:9 95:5
**highest** 13:14
**hired** 14:3,10,19
14:21
**hold** 31:20 46:14
**holding** 47:2
**home** 65:20
**homicide** 22:13
**hope** 85:17
**hoped** 73:20
**hopefully** 22:17
**HOPPE** 2:13
**hour** 10:22 49:6
**HTML** 61:4,24
**hundred** 11:5
42:24 53:5
**hurt** 56:2 57:9

**I**

**ID** 38:14,14
**identification**
71:13
**identified** 8:15
26:21 38:5
39:9 60:15
**identify** 34:8,16
38:11,15 43:10
53:18
**identifying**
33:23 38:12
42:2,15 43:3
83:12
**IG** 7:4,7 11:14
11:17 12:2,5
85:5,22 86:4
89:1 90:16
**III** 2:2
**Illinois** 1:1 2:4
2:10,15 51:6
98:1,2 99:2,12

EXHIBIT E

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

image 73:1
93:12,14
images 23:20
24:7 25:19,23
59:9,10,22
60:1,5,8,9,15
62:22 63:1,6
63:18,21 64:4
64:10 65:11,16
66:1,13,17,24
67:14,21 68:2
68:13,23 69:6
69:7 72:2,6,8
76:3,21 81:14
81:18 88:19
89:5,21,23
93:11,18,21
94:6,10
imagine 87:11
imminent 13:5
impact 52:5
import 47:2
important 4:22
improper 49:2
50:6,8 67:17
67:19 68:20
69:1
inaccurate
97:15
incident 8:10
include 81:14
included 88:10
including 66:17
88:19
indicated 33:24
indirectly 98:20
individual 32:4
34:12 57:17
individualized
32:24 33:23
individually
53:23 75:23
individuals
53:17,18

information
28:4 33:24
42:2,15
informed 89:5
initial 6:12 8:10
22:11 43:10,14
43:14 79:6
initially 38:8
42:6 54:18
inside 21:5
Inspector 7:8
10:16
installed 33:12
instance 91:14
91:15,18
instances 97:14
instructions
64:21,23
intend 97:20
intention 96:4
interested 98:20
interject 95:9
internal 28:9
Internally 40:16
interrupt 8:12
64:18 85:12
interrupting
29:7
interview 7:15
10:21 11:14,17
11:20,23 12:2
12:4 85:6
interviewed
10:15 12:7
Invest 84:2
investigating
25:4 63:23
investigation
6:15 8:16,19
8:21 9:12
12:12 17:12,20
17:22,24 18:24
30:15,18,22
31:1,7 34:15

36:22 37:11,12
38:4 39:10
45:8,10 46:7
47:8 49:20,24
50:6,20,21,22
51:9 53:3
54:10,11 55:21
56:4,7,11
57:24 58:10
61:7 62:10
66:4,20 72:13
72:17 83:14,17
91:19 93:2,8
94:12,16,19,24
95:4
investigations
15:1,21 16:2
16:12,18 17:5
17:9,11,18
18:15,20 20:3
20:6,22 21:16
21:18,22 22:13
23:4,21 24:8
29:11,15,20,22
30:3,5,8,11,12
32:15,17 33:12
36:10,14 38:7
39:19 40:18
41:5,6 43:22
44:7 47:10
53:9,13 54:5
55:7 63:5,18
65:19 66:23
78:16 83:1,9
83:11,20 90:13
investigative
6:21 26:23
65:14,23 94:15
investigator
38:10 46:13,19
53:20 61:18
91:3
investigators
32:14 40:15

52:13 55:1
invoking 28:19
involved 8:18
19:2,18 37:3
45:7,10 50:5
50:19,22 53:4
54:11 56:18
72:16
involvement
18:4
involving 36:6
iPhone 27:18
35:20 39:5,7
39:11 41:12
42:14 46:8
47:11 58:4,10
59:10 60:10,16
61:22 62:23
63:2,19 64:4
64:10 65:12,16
66:1,24 67:14
67:22 68:2,14
68:24 69:7
73:7 74:19
75:15 76:4
79:8,13 80:3
81:1,15 83:22
88:17 89:22
91:5 92:5
93:11,18,22
iPhones 25:12
25:20 35:21
issued 67:1 83:2
83:5,10 92:5
92:18
issues 77:15,18
77:21
item 46:17 67:12

J
J 2:8
Jackson 21:4
James 2:8 6:2
JEFFREY 1:11

3:3 4:3 98:6,15
Jensen 59:3
jhess@tressle...
2:11
job 14:7,9
JOHN 1:7
joining 6:2
Joliet 1:6 2:12
6:2,9 10:15
13:2,6 14:19
16:4,9 19:6,10
19:24 23:3
28:3,10 34:18
64:14 66:22
67:1,13,20
68:4,9,11,16
68:22 69:5
71:18 73:13
74:9 83:1,4,11
87:3 95:2 97:1
JPD 54:19
judge 92:15,19
judging 71:3
June 14:15
19:22 33:10
34:18 36:1
43:21 46:3
77:2,6 79:12
80:5 82:6,7,10
84:18,19 90:19

K
K-E-O-N 21:6
Katana 24:1
keep 10:23
28:19 29:7
85:18
kept 91:14,19
keyed 69:15
kind 12:1 22:6
22:19,21 25:12
50:14 83:2
knew 41:8,8
42:20 54:7,8

Royal Reporting Services, Inc.
312.361.8851

EXHIBIT E

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 108

73:14 76:21
**KNIGHT** 2:13
  2:13
**knives** 48:7
**know** 5:6,7,17
  7:10 8:6 10:23
  10:23 18:7,9
  21:14 22:9
  25:5,23,24
  27:21,22,22,23
  28:2,7,12,17
  28:18,19 37:23
  39:24 42:11
  43:7,18 44:4
  44:16,24 45:5
  49:4 51:10
  53:17 54:6,11
  54:16 56:21
  59:14 60:4
  61:15 63:9,13
  63:21 64:2,15
  64:20 65:22
  67:12 68:5
  84:9 90:21
  91:7,8 92:2,3,3
  92:6 93:13
  95:6,8,10,23
  96:2
**knowing** 8:11
**knowledge**
  10:13 18:3
  21:3 32:14,20
  34:17 36:16
  40:21 42:23
  44:11,12 45:9
  45:12 47:9
  94:18,20,22
**known** 23:4
  26:15 35:16
  90:1
**knows** 5:24
**KURNIK** 2:13

─────────────
        **L**
─────────────

**L** 2:8
**lab** 31:14,16
**label** 43:10 47:3
  47:5,18
**labeled** 69:18
  84:21
**labels** 46:21
**laboratory**
  21:13 86:16
**Lamken** 51:6
**Landeros** 44:24
**Lantern** 23:5,9
  23:23 24:2,6
  24:11,20,21
  25:1,8,11,13
  25:18 29:12,18
  32:21 35:22
  36:3,12,24
  44:9,10,12
  45:14,15,16
  47:22 49:14
  57:22 58:13
  60:14,18,21
  61:3,4,8,10,12
  61:14,14,22,24
  62:2,17 66:15
  67:3 75:22,22
  76:5,20 77:3
  77:15,16,21,22
  78:9,12,14,17
  78:21 79:10
  80:10,15,22
  81:2,11,12
  82:15 87:3,20
  88:1,2,11,14
  89:10,22 90:3
**laptop** 22:20
  29:18 33:2
  45:16,18
**law** 2:2 12:7
  14:7
**lawful** 18:13
**lawsuit** 4:12
  9:17 10:19

12:13 28:9,16
**lawyer** 51:6
**lawyer's** 95:13
**lawyers** 12:15
  12:19
**lead** 17:19,22
  18:20 22:13
  53:2 61:18
  64:6
**leave** 13:5
**led** 22:15 52:23
  92:5,23
**let's** 39:3 96:17
  96:18
**level** 13:14
**Lewis** 13:17
**license** 23:11
  31:9 33:16,18
**licenses** 23:12
  31:13
**licensing** 29:16
**lieutenant** 8:3
  8:18 18:16,17
  18:18 21:1,24
  22:2 42:17
  58:12,13,21
  60:17 61:10
**lieutenants**
  18:23
**lightning** 35:20
**likelihood** 59:19
**Likewise** 32:21
**limited** 30:14
  40:19,19,23,24
  41:3 43:24
  45:3 72:4
**line** 77:13 85:10
  87:6,13 88:22
  90:7
**lineup** 95:10
**little** 5:13,19
  36:19 49:5
  57:6
**living** 14:1

**LLC** 2:2
**LLP** 2:7
**loaded** 47:12,22
  81:1
**located** 80:22
**location** 31:2
**log** 33:1,4,7
  34:12 39:22,23
  48:2,22 57:22
  73:23 74:5
  83:15,20,24
  84:2
**logged** 41:23
  47:14 48:1
  49:16 66:7
  94:6
**logging** 32:2
  33:7 34:8,8
  39:20
**logical** 27:17
**login** 33:7,19,20
**logistics** 12:20
  12:21
**long** 10:21,24
  14:16 48:13
  55:13 56:8
  78:8
**longer** 24:21
  80:3
**longer-than-e...**
  77:22
**look** 26:12 74:2
  80:13 81:19
**looked** 93:15
**looking** 25:4
  43:2 70:2
**Lorinda** 51:6
**lost** 25:21 32:13

─────────────
        **M**
─────────────

**M** 1:16 98:5
  99:10
**M-C** 21:6
**Mac** 29:18 78:13

**machines** 84:15
**main** 20:3 21:19
  22:20
**maintained**
  49:17
**major** 29:21,24
  30:2 31:16
**majority** 44:1
  54:2
**making** 41:20
  49:22 62:19
  84:14
**management**
  16:10 30:18
**manager** 31:12
**manner** 68:23
**March** 14:20
**Martinez** 44:21
**master** 15:8,10
  15:12,16
**Matt** 28:22 95:8
**matter** 28:21
  73:21
**matters** 29:4
**MATTHEW**
  2:14
**May/June** 20:8
  21:11 24:24
  31:3 35:12
  50:10
**McKeon** 21:6
  45:10 63:8,14
  63:16 93:17
**McKinney** 30:7
  44:21 45:7
  63:8,11,15
  93:10,20 96:7
**McKinney's**
  96:1
**mclark@khk...**
  2:16
**mean** 7:7,12
  22:19,22 23:1
  28:17,20 29:7

**EXHIBIT E**

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 109

95:9,22 97:9
**Meaning** 87:2
**means** 35:11
97:10
**meant** 77:23
87:7
**media** 47:4 77:1
81:24 90:6
**meetings** 13:1
**members** 30:10
**memo** 82:21
**memoranda**
11:22
**mentioned**
31:17 93:12
97:11
**message** 25:14
25:24 72:9,11
72:17,20,24
73:1,2,4,6,11
73:14 74:1,3,6
74:10 92:22
93:3
**messages** 25:14
72:2 73:21,22
80:13
**met** 12:15 51:8
**method** 27:5
**microphone**
59:16
**middle** 8:1
**military** 13:22
**mind** 96:15
**mine** 19:12
59:14,18
**minute** 58:5
**misdemeanor**
51:11
**misogynistic**
35:6
**missed** 91:16
**misspoke** 75:10
**mistaken** 20:19
**mobile** 31:21

86:17
**model** 35:14
**Mokena** 14:3,10
14:16
**moment** 96:9,18
**month** 58:16
**morning** 4:13
6:1,3,5 77:20
78:1 79:3
95:16
**move** 28:20
95:23 96:1,13
**moved** 31:2,4,6
31:12,14
**moves** 31:18
**multiple** 26:10
36:18 38:18
**municipal** 1:6
**mute** 49:7

**N**
**N** 3:1
**name** 4:11 6:1
11:11 34:4
38:10,10,13,15
42:1,9,10,14
42:14,19,22
73:9 74:1
**named** 18:23
20:20 51:5
**narrative** 61:21
**nature** 22:16
60:11 61:21
**necessarily** 66:9
**necessary** 96:8
**necessity** 39:20
**need** 4:24 5:15
27:19 28:19
35:15 37:10,20
40:12 43:17
57:24 76:23
80:9,14 97:19
**needed** 29:8
62:20

**needs** 29:2
**network** 86:22
87:4
**never** 5:6,10
19:20 37:23
60:4 63:1,15
64:5,7,7 85:8
87:21
**new** 20:18 22:12
23:11 31:16
43:6 90:19
**newer** 31:11
**news** 9:15 59:23
**newspaper** 9:6
**newspapers** 9:9
**Nicodemus**
17:10
**night** 45:2,2
60:20 78:5
79:2
**nine** 13:7,9,12
**non-sworn**
32:16
**nonauthorized**
87:1
**Nope** 68:10
**normal** 30:14
53:1
**normally** 35:21
45:18 46:18
92:8
**North** 2:3,14
99:11
**NORTHERN**
1:1 98:1
**notation** 97:17
**note** 26:13 97:14
**notes** 11:19,22
12:4 85:5
95:19
**notice** 1:13
**notices** 95:9
**November** 82:21
**nude** 59:8 60:5

60:11 89:4
**number** 38:13
38:15,16 42:2
42:8,15 70:3
71:19 73:10,23
83:12 84:22

**O**
**o'clock** 98:14
**object** 73:16
91:21
**objecting** 91:23
**Objection** 57:14
**observe** 28:24
**obtain** 40:11
41:9 72:1 77:4
**obtained** 23:20
24:8 31:8
37:12 38:7
**obviously** 28:9
37:6
**occasion** 55:11
**occasions** 55:13
55:15
**occur** 55:5 56:12
**occurred** 6:23
51:24 52:14,15
54:12,16 56:4
78:4 82:3
**offense** 51:3,13
**offer** 91:4,10
**office** 6:3 11:2
21:19,21 22:1
30:6 44:19
51:7 53:15,21
57:4 95:10
**officer** 4:9 6:7
8:2 9:17 11:5
11:10 12:9,24
14:4,22 15:6,8
15:10,12,13,16
15:18 21:12
29:10 30:7
34:3 42:18

43:9 44:18
50:3,12,17,20
51:17 52:8
60:22 63:7,23
66:23 67:21
68:4,9,11,17
68:19 69:9,17
69:19 70:2
72:3 73:11
75:4,6,8,9,12
83:11 85:2
89:4 91:13
95:2,15 96:7
**officers** 8:14
9:22 10:8,10
13:2 20:12
32:12,16 34:20
34:23 35:5,6,8
35:9 49:17,19
53:12 54:4
63:5 67:13
68:1,22 69:5
**OFFICES** 2:2
**official** 9:20
99:1
**Oh** 7:9,12 90:14
**okay** 5:10,23 6:7
7:11,14 9:1
11:13 12:15
14:12 16:1
22:22,23 23:1
37:5 38:2 48:5
48:16 50:14
52:16 55:3,4
55:24 57:19
60:7,12 72:21
76:19 77:6
78:6 83:10
84:20 85:2,6,7
85:19 87:8
92:4,17 96:18
**old** 31:14,16
**once** 16:7,7,11
38:21 39:18

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT E**

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 110

41:10 47:16,20
49:11 73:12
95:23
ones 20:9 44:11
ongoing 8:21
51:9
open 20:4 40:1,4
40:13 41:15,17
43:5,6 55:8
70:8,10,17
91:19
opened 21:21
opens 41:15
operating 33:6
33:15 35:15
opinion 68:23
opinions 9:24
10:2,11 93:1
opposed 61:8
91:6
option 41:17,17
70:12
order 6:24 16:5
16:8 18:12,13
27:24 28:6,14
28:23 29:2,5
30:17,20,23
34:13 35:11
48:17,24 57:22
84:23 97:14
ordered 58:16
orders 16:14
original 6:16
31:10 45:17
51:3 52:12
71:9 72:12
76:23 77:4
80:8 81:22
90:22
originals 62:17
outcome 52:6,15
52:17,18 53:7
53:13,14 54:13
outside 28:8,15

50:14 62:13
overheard 57:18
owner 46:14,18
46:20
owner's 42:9

P
p.m 97:23
packaged 47:17
PAGE 3:2,7
paragraph
77:13 79:21,23
80:6,17,19,21
81:13,22 82:9
parameter 42:1
parse 25:15
26:18 41:19
80:10,15
parsing 61:15
part 34:14 38:4
51:2 57:18,24
69:2 78:13
86:19 91:16
partial 87:23
participants
56:24
participating
57:11 97:3
particular 26:13
26:20 34:9
36:11 49:19
61:9 63:21
71:10 72:9
78:12 83:23
parties 98:18
passing 8:6
password 32:4,6
32:9,18,24
33:1,8,17,19
33:23 34:12
35:15 39:21,24
41:4,8,10,23
76:21 85:11,23
86:1,5,9 94:6

passwords
32:22,24
Patch 9:19
patrol 14:22
15:8,10,12,13
15:16,17 21:2
86:24
pay 15:15
PC-based 27:2
pdf 69:20 70:9
people 36:4 57:4
57:11 87:1
percent 11:6
42:24 53:5
perception 54:4
performed 95:3
performing
49:19 94:14,18
period 9:13
21:14,15 46:5
53:21 54:2
56:12,13 68:6
77:16,22 80:23
permission 58:1
permitted 36:2
person 7:9 18:8
20:20 40:4
41:14,23 42:6
43:5,17 53:9
82:24
person's 34:4
personal 50:11
65:17,21 67:15
91:15,20 98:10
personally 65:19
personnel 20:11
30:10,15 50:9
54:2,10,19
89:21
pertaining 1:15
Phillip 21:8
phone 2:5,10,16
8:10 22:19
23:16 24:3,4

25:6 27:3 34:5
35:18 36:5,7,8
37:14,16,19,21
38:11,16 40:2
40:15,22 41:16
41:21 42:6,19
43:7 44:1,5
46:13,14,20,20
46:21,22 47:21
59:24 60:1,2
60:22,22 61:11
61:13,13 62:4
62:24 63:24
66:17 71:10,15
71:24 72:2
73:10,23 74:1
74:2,5,7,11,11
75:13 77:5
80:12,14 86:12
87:6,10 88:7
92:24 99:12
phones 24:5,16
26:18 27:3,6
27:14 29:17
38:15 86:17
phonetic 20:16
photo 23:19
24:7
photographic
25:19 59:9
60:9
phrase 86:21
physical 19:23
26:16 27:6,15
27:19 30:11
31:10 38:9,17
38:21 39:12,17
40:1,3 41:18
43:2,6 47:12
47:13,19,23
48:2,3,5,12,18
49:18 50:5
68:12
physically 47:16

pictures 72:20
piece 27:11
67:12
place 11:1 19:23
19:23 28:1
29:5 92:23
96:5 98:12
placed 45:22
46:23 47:24
77:1
plaintiff 1:4 2:6
4:12
plans 13:5
play 19:17
played 18:23
52:18
please 41:2
64:18 91:17
96:19
plug 35:16,19
37:11
plugged 37:15
plugs 27:4
point 9:14 21:13
21:15 31:8,12
47:20 48:6
57:4,21 59:8
60:3 62:5,6
63:11,12 72:23
73:12 74:9
76:1 87:22
police 6:9 9:22
10:15 13:2,6
14:3,4,5,9,10
14:11,19 16:4
16:9 18:21
19:24 22:11
23:3 26:4,7
28:3,10 30:12
30:14 34:18
52:13 66:22
67:1,20 73:13
74:9 83:1,5,11
87:3

**EXHIBIT E**

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 111

porn 68:6
portable 34:5
  40:5
portions 9:18,19
position 28:13
positions 20:18
possession 48:17
possible 53:11
  66:20
possibly 25:7,9
  32:19 42:21
  44:20 50:7
  51:14
potentially 36:7
preceded 50:21
precise 15:5
  56:14 57:6
  72:8
preparation 6:8
  6:19 7:3
prepare 6:24
  7:17 82:22
prepared 12:12
  70:22 71:1
  74:18
present 2:18
  5:24 9:13 11:3
  18:9 53:22
  57:20
presenting 97:3
pretrial 56:3
  57:11
pretty 9:11
previous 58:24
previously 14:5
  78:20 81:23
prior 14:2 55:2
  60:3 71:4 76:6
  78:3 92:10
probably 15:19
  24:22 49:12
  56:6 85:8 88:3
problem 57:6
problems 5:13

procedure 1:14
  83:19
process 4:21
  71:6 97:3
Proctor 2:8 5:17
  5:18,23 6:1
  27:21,21 29:1
  49:4 64:12,14
  64:20 65:1,3
  70:7,9 71:17
  71:21 73:16
  91:21 95:8,21
  96:15,21,24
  97:8
professional
  50:12
professionally
  34:24
program 37:18
  39:12,14 62:2
  72:3
promoted 16:16
  16:17 58:20
promotion 19:3
  19:10 59:2
properly 50:4
  69:16 90:24
property 16:10
  30:18
prosecution
  50:20 51:18
  54:24 56:2
  57:9
prosecutor
  92:15
Prosecutor's
  51:7
prosecutors
  40:14 49:22
protected 28:15
protective 28:6
  28:23 29:2,5
protocol 46:10
  83:19

prove 74:3
provide 58:14
  79:7
provided 78:20
  92:7
PTI 14:13
purpose 7:4,18
  57:23 65:14,23
purposes 26:23
  78:13 90:23
pursuant 1:13
  1:13
push 96:2
put 28:1 34:3
  47:20 72:23
  90:8,18 91:3

**Q**

qualify 22:21
quarter 88:21
question 4:23
  5:2,3,4,7,8
  10:6 36:19
  69:3,4 83:18
  91:17,22
questions 4:13
  4:24 27:23
  28:2 36:16
  50:17 82:24
  86:8 95:13
  96:22,23 97:1
  97:7
quick 95:18,22
  96:16
quote 68:5,6
  77:14,17 80:22
  80:23 81:22
  82:2 87:13,15
  88:22,23 90:7
  90:8

**R**

raised 13:3
ran 33:15

rank 14:21,23
  14:24 15:3,6,9
  15:17 17:2
  94:23 95:4
RCFL 86:15
RCFO 44:19
read 4:24 10:10
  16:7,11 73:3
  85:11 97:13
reader 38:23,23
  40:5,13 41:15
  44:5
reading 29:1
  84:12
reads 80:22 87:6
  87:13 88:22
ready 95:11
  96:12,12,14
really 15:2
reanalyze 41:20
reason 36:11,22
  37:3 94:1,2,12
reasonable 66:4
reasons 50:7
recall 8:7 9:10
  46:6 52:9
  53:11 54:1
  55:6,13 56:8
  56:18 57:17
  58:22 59:1
  73:8 77:11
  85:22 86:13
  91:11,12 92:20
  92:21 94:4
receive 26:1
received 22:4
recited 81:13
recollection
  18:22
record 6:3 12:1
  27:22 28:1
  29:3,8 48:8
  64:12 71:17
  83:20 84:4,6,9

85:20 91:22
  97:19
recording 11:13
  11:17
records 8:10
  23:16,17 71:3
  84:8
recover 25:7,9
  25:14
reduced 98:9
reexamined
  39:16
refer 49:11
reference 59:21
  71:19 80:6
  84:13,13 87:10
  90:21
referenced
  79:20 82:23
referencing
  86:20 90:15
referred 76:8
  79:22
referring 59:23
  86:2
refers 84:15
reflected 81:7
regarding 10:18
  36:2 68:12
regardless 7:17
Regional 21:13
Regis 7:12
regulating 34:20
regulations
  34:19
Reid 18:18
  21:24
related 8:20
relating 8:15
  12:11 22:5
  30:17,20 39:10
  74:18
relation 56:10
relationship

**EXHIBIT E**

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 112

50:12,14
**relative** 6:14
98:17,19
**remember** 5:8,9
9:4 16:20 18:8
39:5 46:4
51:22 52:11
53:8,10,16
86:11 88:4
89:1
**remove** 46:17
**reopen** 77:5
**reopened** 39:17
**reparse** 41:19
43:7
**repeat** 10:6 69:2
83:18 91:17
**repeated** 4:24
**rephrased** 5:1
**report** 6:10,13
25:15 27:9
34:2,4,5,15
36:9 37:19
38:21,22 39:1
40:3,5,6,7,11
41:14,16,22,24
42:2 43:1,15
46:23 58:13
59:22 60:18,21
60:24 61:3,4
61:24 62:1,8
62:12,15,16
63:24 66:15,16
69:20 70:3
71:1,4 72:20
74:18 76:14
77:16,20 78:1
78:4 81:19
84:3 87:21
**reported** 9:6,8
9:14 54:19
58:6 61:22,23
98:9
**reporter** 1:17

5:24 98:6 99:2
**reporting** 17:7
17:13 58:9
**reports** 6:9,14
6:21,22 12:11
23:17 24:4
34:7 44:3,3
45:20 59:12,23
59:24 60:4,15
61:9,21 66:16
76:2 79:4
**represent** 4:11
85:4 97:9
**representatives**
11:4,9
**request** 8:4 18:8
18:11,12
**requested** 18:2
58:12,15 61:11
61:16
**resides** 31:15
**respect** 28:11,20
35:3
**respectively**
23:5
**responsible** 19:9
19:12 62:19
**resulted** 72:12
**retired** 16:20
58:23
**retrieval** 22:5
24:6
**retrieve** 24:18
**retrieved** 45:13
81:20
**retrieving** 24:15
25:12,19
**review** 4:20 6:14
6:18,21 8:11
27:8 36:5,8,13
36:23 38:24
40:15 44:3,5
61:6,18 62:13
62:18 63:23

80:13 84:1
86:12 95:19
97:13
**reviewed** 6:7
37:18 83:17
**reviewing** 62:19
**REYNOLDS**
2:3
**right** 11:19
18:12 29:1
39:3 49:12
69:14,17 70:21
76:10 82:20
86:15 96:9,24
97:12,18,19,20
97:22
**River** 2:14
**Road** 2:9,14
**Robert** 20:24
**Roechner** 18:19
19:17 53:6
58:23,23 59:5
64:9 65:9,11
65:15,24 66:19
82:22 91:14,19
**Roechner's** 17:2
21:17 30:6
47:7 90:12
**role** 15:2 17:23
19:17 21:10
36:21 47:7
49:19 51:17
52:17 53:14
58:8 93:8
94:19
**roles** 18:23
19:21
**room** 11:16 20:4
20:7,12,22
29:22,22,23,24
30:1,2,5 31:13
31:17 91:1,6
**rules** 1:14 4:20
34:19 97:12

**ruling** 52:1
**rumors** 88:23
89:2,13,17,24
90:4
_____
**S**
**S** 2:14 3:6
**S-H-A-W-N**
20:20
**S-T-A-C-H-E-...**
20:21
**safe** 90:8,11,12
90:14,20 91:6
**sat** 76:19
**save** 22:18 42:19
43:16,19 45:18
**saved** 18:2 40:2
40:23 41:14
42:24 43:15
45:18 58:19
62:16,17 73:9
89:6
**saw** 9:18,20 64:5
92:6 93:13
**says** 28:23,23
81:21 82:12
86:21 90:7
**scheduling**
12:20,21
**science** 13:21
**screen** 69:15,18
69:24 70:4,11
70:15,16,17
**screenshot** 73:1
73:21 74:10
**scroll** 69:22
71:18 74:13
84:20
**scrolling** 70:1
82:20
**scrub** 65:10
**search** 35:11
36:12 42:1
43:3 71:23

92:8,10,13
**searched** 35:13
38:4
**searching** 25:4
25:11
**second** 31:9
77:13,13 79:12
79:22 88:10,14
**secondhand**
67:24 68:8,16
69:12
**secretary** 20:14
20:18
**section** 48:4,21
62:10 83:11
**secured** 21:20
41:5
**security** 31:22
**see** 11:17 25:8
69:17,19 70:5
70:6,19 73:6
85:2,10 86:21
87:12,15 88:5
88:23 90:8
92:4,18
**seen** 9:16 12:4
63:1,6,12,14
63:22 64:4
71:3 85:9
93:10,12,17,24
**seized** 36:13,23
37:10,12 39:4
46:8 49:14
74:19 83:16
**seizure** 92:5
**send** 74:1
**senior** 17:7
18:14
**seniority** 15:14
**sent** 14:11 60:2
62:15 73:14,15
73:23 74:2,3,6
74:11 92:14
**sentence** 77:24

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT E**

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 113

separate 21:19
22:1 29:19
38:20 81:4
97:16
sequence 89:17
sergeant 6:12
8:2,3,9,17,17
17:9,10,11,14
17:15,17,21,23
18:6,7,10,11
19:2,4,6,9
42:17 44:11,24
45:1 47:10
51:16 53:2
58:11,14,15,17
58:18,20 60:20
60:23 61:2,6
61:12,17 62:18
63:20 64:1
66:18,19 67:2
71:8 72:1,16
77:14,23 78:2
78:7,20 79:2,5
82:1,13,14
92:7 95:1,4
Sergeants 18:14
serial 38:13,15
serve 16:1
server 18:3
39:15 43:18
45:19,24 81:4
81:11 86:18
service 13:22
22:3
set 29:2 60:1,21
81:20 86:18
87:21
sex 35:9
sexist 35:6
sexual 68:13
sexually 59:9
60:11
share 36:16 64:3
69:15 70:11,15

70:16
shared 56:1
sharing 69:23
70:4
Shawn 20:20
Sherri 20:16
shift 45:2
short 49:9 96:20
short-form 60:7
shorthand 1:16
87:7 98:5 99:2
shortly 51:21
55:10
showing 74:6
shown 45:3
68:13 70:24
sic 67:5 87:18
signature 97:8
97:10 98:15
99:1
signed 33:4,5,5
65:19 92:6,15
92:18
similar 24:2
similarly 24:6
simplest 41:13
simply 31:18
single 32:6,24
33:1,12
sir 19:13
size 81:4
smart 22:19
smoothly 4:21
SMS 74:4
Socha 1:3 2:18
4:12 6:15 8:16
8:21 9:17,23
10:9 12:9,12
12:24 17:12,20
17:24 18:24
30:18,21 31:1
31:6 39:3,10
42:1,13 45:7
45:10 46:7

47:7,11 50:12
50:21 51:9
54:5 55:21
56:4,10 57:8
58:10 59:10
60:10 69:9
72:3,9,13,16
73:7,9,11
74:20 75:4,6,8
75:9,12 79:13
80:3 83:14
88:17 89:4
91:5 93:2
94:15,19,24
95:3
Socha's 8:22
10:11 15:6
40:22 41:12
42:14,18,23
51:17 52:5,17
53:7,14 54:23
56:1 57:10
58:4,10 60:16
60:22 62:23
63:2,19 64:4
64:10 65:7,12
65:16 66:1,24
67:14,22 68:2
68:12,24 69:6
73:7,8 74:11
75:15 76:3
79:8 81:1,14
83:22 89:22
92:5 93:11,18
93:21
software 24:2
26:17,20,22
27:1,2,11 32:3
32:7,22 33:3
33:11 38:9,17
38:19 39:14
78:17
solely 78:14
somebody 5:21

43:2 53:24
62:13 75:12
76:19 77:12
SOPs 34:19
sorry 7:12 10:5
10:20 14:9
25:23 39:2
59:6 69:2 82:5
83:18 85:12
91:16
space 40:23
speak 7:9
speaking 51:22
specific 9:10,11
18:22 22:8,22
25:24 28:2
37:2 39:4,10
40:20 52:9,14
53:10 73:22
specifically
54:11 84:10
specified 98:12
specifying 86:13
speculate 64:16
spend 58:3
spoke 18:7 51:8
51:19 53:8
63:15
spoken 8:6
12:18
spring 23:10,18
squared 22:17
SS 98:2
Stachelski 20:21
stamp 71:18
stand 96:10,13
standby 96:8
star 68:6
start 70:13 71:5
96:8,9,16
started 5:19
14:15 56:7
60:17,20 77:14
79:2

starting 5:20
State 51:6 98:2
99:2
stated 51:24
statement 74:10
statements
12:13 52:12,13
55:1 56:3
57:11
States 1:1,14
98:1
status 15:12
stenographica...
98:9
step-by-step
80:18
steps 50:4
stop 49:7
stopped 31:10
34:1
storage 22:5
47:5,13,13,22
47:23 49:16
50:3 58:9
79:24
store 42:8,11
45:23
stored 39:9,13
39:14,18 42:13
58:17 65:11
77:2
straight 96:1
Street 2:3 99:11
Strike 66:6
subject 16:5,9
28:6,14,21
29:4
subsequent
55:23
sucks 68:6
suggested 30:24
suggestion 96:3
Suite 2:4,9,15
99:11

EXHIBIT E

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 114

suited 25:18
summary 38:12
summer 23:10
  23:19
supervisor
  18:20 47:9
supervisors
  30:15 32:15
supplement
  69:20 70:2
  71:4
supplementary
  25:15
supported 10:3
  10:12
sure 4:22 10:7
  11:6 15:7,10
  20:17 42:24
  44:23 49:7
  53:5 55:12
  75:17
surprised 64:6
switched 16:21
  20:17
sworn 4:1,4
  20:12 98:7
synonymous
  26:15
system 31:13
  33:6,15 34:7
  34:13,15 35:15
  37:16,18 38:19
  40:23 47:15,24
  48:11,17,18
  49:17 66:8,14
  67:4,8,11 75:5
  75:17,20,23
  76:12,18 79:16
  80:12 81:2
  86:17 88:10,11
  90:5 91:1
systems 49:15
  88:1,6 89:6

**T**

T 3:6
tab 39:9 59:3
tablet 22:20
  91:15
tabs 38:20
TAJA 2:3
take 11:1 13:20
  48:17,22 49:4
  49:6 89:8,14
  89:18 95:21
  96:18,18
taken 1:12,16
  23:20 26:10
  60:2 98:12
takes 27:7
talked 78:11
  92:22
talking 8:13
  22:8 29:13
  54:16 57:5
  60:9 65:18
  78:15 84:3
Tamara 11:6,11
Task 19:5
tech 83:6,8
technical 7:20
  27:23 49:12
technically
  50:24
technological
  59:18
technology 5:14
  24:14,17
telephone 12:18
tell 5:7,9 43:16
  51:23 75:1
  77:9 82:2
  84:12 86:4,9
  89:20 90:2
  93:10,17,20
  94:2,5,9,14
  97:19
telling 89:1,2

term 22:17,18
  38:1 49:12
  80:8
terms 24:12 43:4
testified 4:5
testify 98:7
testimonies
  56:17,18
testimony 51:17
  51:21 52:5,7
  52:12,18 54:17
  54:21,23 56:1
  56:8,10,16
  57:8,10
text 25:24 72:2,9
  72:11,17,20,24
  73:2,3,6,13
  74:1,6,10
  80:13 92:22
texts 62:4
thank 71:21
  95:17 97:2,4,5
  97:7,7
thankful 37:22
thanks 29:8
  85:20 96:19
Theft 19:5
thing 52:11
  86:23
things 8:13 9:7
  22:16 28:9
  49:23 53:10
think 6:16 8:12
  9:19,20 17:2
  21:1 27:17
  28:6,18 29:1
  42:20,23 44:10
  48:20 52:14
  54:8,10 61:4
  63:13 65:22
  69:15,23 75:7
  75:9,10 79:1,5
  85:15 86:6,23
  87:9 91:16

95:12,12,19,22
third 80:17,21
  80:24 81:6,6
  81:13 82:9
  85:10
thought 5:19
thoughts 28:22
three 4:19 6:17
  24:23 31:4,5
  51:12,13 56:21
  81:17
time 8:3 9:13
  15:10 16:2
  17:4,6,11,18
  18:18 20:8,13
  20:17,23 21:2
  21:3,11,14,14
  21:17 22:18
  23:8 24:17,24
  25:17 28:17,17
  29:6,6,24 30:6
  30:7 31:18
  34:10 35:12
  39:23 42:18
  44:17,23 45:1
  46:3,4,5 50:10
  50:10 53:21
  54:2 55:19
  56:11,13 58:3
  59:1 61:12
  64:17 77:22
  78:21 83:21
  94:3,23 95:15
  98:12
times 4:18 5:2
  5:13 31:4,5
  36:15
timing 86:15
Tina 1:16 48:8
  71:12 74:15
  84:22 85:18
  98:5 99:10
title 43:18
today 6:1 28:5

64:16 97:3
today's 6:24
  7:17 12:20
told 25:13 32:11
  32:12 54:23
  63:5,10,11
  64:5,7 73:10
  78:8 85:22
  86:6 88:22
  89:8,13,13,17
  89:18,24 90:8
  90:16,18 93:15
tone 52:21,23
tool 23:15 62:14
  80:9,14
tools 23:13 28:4
  28:12
top 70:2
touch 22:13
touching 28:5
track 10:23 34:8
  48:12 85:18
tracking 48:18
trade 67:24
trained 22:15
  36:4 43:22,24
  44:14,19
training 22:4,10
  22:11,11,12,13
  22:14 26:1,5,8
  44:2,22 45:3
transcript 97:13
  97:15
transcription
  97:17
transfer 49:12
  58:9
transferred
  49:15 81:24
treat 34:21,23
  35:2,5
TRESSLER 2:7
Tri-County 19:5
Tri-River 22:12

**EXHIBIT E**

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 115

| | | | | |
|---|---|---|---|---|
| **trial** 13:11 51:17 | **uncommon** | 80:24 81:4,10 | 1:12 2:1 4:5 | **wasn't** 25:15 |
| 52:6 53:7,13 | 36:17 | 81:13,17 82:12 | 98:7,12 | 32:10 36:21 |
| 54:14 55:2,10 | **underlying** | 82:13 87:23,24 | **videographic** | 45:4,5 53:4 |
| 56:2,9,17,19 | 12:12 | 89:9 90:6,19 | 60:9 | 54:9 64:13 |
| 56:20 57:1,2,9 | **understand** 4:22 | 91:5 | **videos** 18:2 | 69:4 |
| 57:10 | 10:9 23:2 | **USB's** 88:9,16 | 25:23 59:12 | **way** 35:6,23 |
| **true** 21:24 33:17 | 33:10 92:17 | **use** 22:18,24 | 60:2,5 63:21 | 37:4 41:13 |
| 34:16 39:5 | **understanding** | 23:18 24:20,21 | 66:17 | 43:18 45:8,11 |
| 62:23 72:13 | 17:21 18:1 | 25:1,7 27:16 | **view** 34:5,13 | 48:16,20 50:19 |
| 74:20,23 78:9 | 25:18 27:24 | 29:12 36:2,4,7 | 57:8 62:8,12 | 59:20 69:6 |
| 79:18 80:4,19 | 28:18 29:6 | 36:12 37:6,22 | 93:21 | 76:22 87:13 |
| **truth** 98:8 | 30:16 36:2 | 39:3 40:1 | **viewable** 23:17 | 88:21 89:12 |
| **try** 69:14,16 | 75:11,17 | 43:23 44:4,8 | 24:4 26:19 | 93:14 97:15 |
| **trying** 61:15 | **understood** 5:4 | 44:12 45:22,24 | 27:8 41:20 | **ways** 41:13 |
| **turn** 58:18 | 76:2 | 60:7,8 61:8 | 61:16 62:4 | 42:11 |
| **turned** 39:13 | **union** 11:4,4,9 | 71:23 72:3 | 80:11,15 | **we'll** 5:1,14 |
| 58:7 60:23 | **unique** 34:11 | 86:12,17 | **viewed** 45:14 | 28:24,24 59:20 |
| 62:17 66:18 | 38:9,14,16,22 | **user** 33:7 34:9 | 60:4 62:1 | 69:16 71:12 |
| 75:4 79:4 | **unit** 19:6 29:11 | 34:11,16 | 63:18 64:9 | 74:15 84:22 |
| 81:10 82:12,13 | 29:20 30:8,11 | **users** 32:6 | 83:17,22 89:4 | 96:13,13,17 |
| **two** 6:13 8:13 | 32:17 39:19 | **uses** 38:14 | 89:21,23 94:9 | **we're** 8:12 65:3 |
| 14:17 16:14 | 43:22 44:7 | **Usually** 42:8 | **viewing** 57:23 | 70:2 87:12 |
| 17:19 18:23 | 53:13 54:5 | 46:19 | 58:3 75:13 | 95:23,23,24 |
| 23:12 24:10,23 | 63:5,18 78:16 | **utilizing** 91:1 | **violation** 48:23 | **we've** 25:21 |
| 31:9,13 41:13 | 83:1,8 | **utter** 68:4,11 | **visibly** 32:10 | 27:22 28:5 |
| 51:13 82:15 | **United** 1:1,14 | | **visual** 66:10 | 49:5 |
| 84:11 87:17,17 | 98:1 | ———————— | **volume** 59:14 | **week** 56:13,20 |
| 88:1,6,8 | **units** 20:9 83:6,7 | **V** | **vs** 1:5 | **weeks** 55:17 |
| **two-thirds** 87:12 | **universal** 33:22 | **V** 79:21 80:1 | | **went** 14:8 26:7 |
| **type** 22:12,22 | **University** 13:17 | 81:23 86:20 | ———————— | 62:5 89:13 |
| 24:15 25:9 | **unknown** 77:15 | **valid** 9:24 10:3 | **W** | **weren't** 37:11 |
| 33:7 84:7 | 77:21 | 10:12 | **waive** 97:18,20 | 45:6 |
| **types** 24:15 27:3 | **unlock** 35:16 | **various** 8:5 9:2 | 97:22 | **Windows** 33:6,9 |
| 27:5 | **unrelated** 38:6,7 | **Verizon** 74:6 | **waived** 98:16 | 33:15,19 34:11 |
| **typewriting** | 93:24 94:1,17 | **Versions** 26:16 | **want** 22:9,17 | 39:24 40:20 |
| 98:10 | **uploaded** 37:24 | **vic** 87:6 | 29:7 53:23 | 41:4 42:7 |
| | 67:11 | **vics** 87:6 | 55:2 64:16,22 | **witness** 3:2 4:1,4 |
| ———————— | **USB** 46:23 | **victim** 42:22 | 85:4,9 95:21 | 5:24 7:22 |
| **U** | 47:12,23 49:15 | 87:7 | 96:9,10 97:2 | 13:11 25:22 |
| **U** 14:13 | 60:23 62:16,21 | **Victor** 79:22 | 97:10 | 51:1 57:16 |
| **UBS** 67:5,7 | 66:18 67:6,10 | **video** 23:20 24:7 | **wanted** 75:1,4 | 65:4 70:11,15 |
| **UBSs** 87:18 | 75:15,21 76:16 | 25:19 49:8 | 75:14 85:19 | 73:11,19 92:1 |
| **UD** 38:14 | 76:24 79:9,10 | 59:9,16 91:14 | 90:2,5 | 95:11,17 97:2 |
| **UFDR** 40:11 | 79:11,12 80:23 | 91:19 | **warrant** 92:4,8 | 97:5,22 98:15 |
| **UFED** 27:2,20 | | **videoconference** | 92:10,13,18 | |

**EXHIBIT E**

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

99:1
**witness's** 28:8
  56:9
**woman** 51:5
**word** 22:24
  37:23 60:8,8
  92:13
**words** 31:22
  68:5 73:3
**work** 19:24
  24:18 31:9
  35:22 36:15
  45:2 60:19
  74:19,22,22
  75:2 79:3
  84:16,17,17,18
  95:3
**worked** 32:16
  45:15
**working** 36:11
  36:21 37:11,13
  45:6 66:10,12
**workplace** 50:15
**works** 24:2 27:6
**workstation**
  19:23 20:21
**workstations**
  20:7,12
**wouldn't** 34:16
  37:3 50:6
  52:19 53:22
  64:5 84:6
  90:24 96:15
**written** 12:1,13
**wrong** 70:4

---

**X**

**X** 3:1,6

---

**Y**

**yeah** 8:17 18:13
  20:23 30:4
  57:3 59:7,7
  78:5 92:24

95:21 96:4
**year** 13:18 14:2
  14:14 51:11
**years** 8:5 9:3
  13:7,9,12
  14:17 15:9
  24:23 31:15
  51:12,13 56:21

---

**Z**

**zip** 47:1
**Zoom** 5:12 10:5

---

**0**

**00053** 69:18
  71:20
**00055** 74:16
**00120** 82:21
  85:16
**00163** 84:21
**05681** 1:5
**07** 83:12 84:2
**084-003858**
  99:13

---

**1**

**1** 3:8 71:12
**1-20** 1:7
**1:00** 96:2,8,11
  96:11
**12** 15:9
**12:17** 97:23
**12:30-ish** 96:17
**13** 15:24
**16-1** 16:8 30:17
**161** 99:11
**17** 78:4,22
**17th** 71:2
**18** 1:5 36:1
**18th** 79:1,9 99:3

---

**2**

**2** 3:9 74:16
  79:21
**2000-** 14:19

**2001** 14:4,10,15
**2002** 13:19
**2003** 14:20
**2013** 15:22
**2014** 26:10,11
**2016** 15:23
**2018** 6:23 15:5,5
  16:22 17:3,6
  18:15 19:22,22
  20:8 21:11,15
  23:3,10,19
  24:24 29:13
  31:3,17 33:11
  34:18 35:12
  42:20 43:21
  46:3 50:10
  77:7 78:4,22
  79:12 82:10,21
**2021** 1:17 98:14
  99:3
**2350** 2:4
**250** 2:9
**28th** 1:17 98:14

---

**3**

**3** 3:10 85:16
**3050** 99:11
**312.361.8851**
  99:12
**312.445.4900**
  2:5
**33** 2:3

---

**4**

**4** 3:4 85:13 90:7
**4PC** 27:2,16,20

---

**5**

**550** 2:9
**5600** 2:14

---

**6**

**6/8-Gavin** 88:22
**600** 2:15
**60018** 2:15

**60440** 2:10
**60601** 99:12
**60602** 2:4
**630.759.0800**
  2:10

---

**7**

**7-2** 16:5 30:20
**7.5.0.82** 26:16
**71** 3:8
**74** 3:9

---

**8**

**8** 77:6 90:19
**84** 3:10
**847.261.0700**
  2:16
**8th** 77:2 79:12
  80:5 82:4,6,6,7
  82:10 84:16

---

**9**

**9** 15:9 82:21
**9:27** 1:17 98:14
**9:30** 5:20
**9th** 84:16

---

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT E**