

Transcript of the Deposition of
# Sergeant Christopher Botzum
**Case:** Cassandra Socha v. City of Joliet; et al.
**Taken On:** April 30, 2021

Royal Reporting Services, Inc.
Phone:312.361.8851
Email:info@royalreportingservices.com
Website: www.royalreportingservices.com

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CASSANDRA SOCHA,                        )
                                        )
                Plaintiff,              )
                                        )
        vs.                             )   No. 18 CV 05681
                                        )
CITY OF JOLIET, a municipal             )
corporation, EDWARD GRIZZLE,            )
JOHN DOES 1-20,                         )
                                        )
                Defendants.             )

        The deposition of SERGEANT CHRISTOPHER

BOTZUM, called by the Plaintiff for examination, taken

pursuant to notice and pursuant to the Federal Rules of

Civil Procedure for the United States District Courts

pertaining to the taking of depositions, taken before

Monica Kim, Certified Shorthand Reporter via

videoconference, commencing at 12:56 p.m. on April 30th,

2021.

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 2

```
 1   APPEARANCES: (VIA VIDEOCONFERENCE)

 2        LAW OFFICES OF HALL ADAMS, LLC
          MR. HALL ADAMS, III
 3        33 North Dearborn Street
          Suite 2350
 4        Chicago, Illinois 60602
          Phone:  312.445.4900
 5        E-mail: hall@adamslegal.net

 6            On behalf of the Plaintiff;

 7        TRESSLER LLP
          MS. DARCY L. PROCTOR
 8        MR. JAMES J. HESS, JR.
          550 East Boughton Road
 9        Suite 250
          Bolingbrook, Illinois 60440
10        Phone:  630.759.0800
          E-mail: dproctor@tresslerllp.com
11                jhess@tresslerllp.com

12            On behalf of the Defendant the City of
              Joliet;
13
          KNIGHT HOPPE KURNIK & KNIGHT, LTD.
14        MR. MICHAEL J. ATKUS
          5600 North River Road
15        Suite 600
          Rosemont, Illinois 60018
16        Phone:  847.261.0700
          E-mail: matkus@khkklaw.com
17
              On behalf of the Defendant Edward Grizzle.
18

19   ALSO PRESENT:  Ms. Cassandra Socha

20                    *    *    *    *    *    *

21

22

23

24
```

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 3

1                    I N D E X

2    WITNESS                                    PAGE

3    SERGEANT CHRISTOPHER BOTZUM

4         Examination by Mr. Adams ................  4

5

6
                     E X H I B I T S
7
     BOTZUM DEPOSITION EXHIBIT                   PAGE
8
          No. 1 ...................................  80
9
          No. 2 ...................................  87
10
          No. 3 ...................................  89
11
          No. 4 ...................................  94
12
          No. 5 ...................................  98
13
          No. 6 ................................... 102
14
          No. 7 ................................... 105
15
          No. 8 ................................... 107
16
          No. 9 ................................... 111
17
          No. 10 .................................. 113
18
          No. 11 .................................. 116
19

20

21

22

23

24

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

## Page 4

1    (Witness sworn.)
2    WHEREUPON:
3        SERGEANT CHRISTOPHER BOTZUM,
4    called as a witness herein, having been first duly
5    sworn, was examined and testified via videoconference as
6    follows:
7                EXAMINATION
8    BY MR. ADAMS:
9        Q.  Sir, my name is Hall Adams.  I represent the
10   plaintiff, Cassandra Socha.
11           Have you given deposition testimony before?
12       A.  I've been prepped for depositions before.  I
13   don't recall ever giving one.
14       Q.  Okay.  Let's start with the easy questions.
15           What is your name?
16       A.  Christopher Botzum, B-O-T-Z, as in zebra, U-M,
17   as in Mary.
18       Q.  Are you employed by the Joliet Police
19   Department?
20       A.  I am a lieutenant in the internal affairs unit
21   currently.
22       Q.  A couple things I want to tell you about the
23   process, Lieutenant Botzum, is to make sure that you
24   hear and understand every question completely before you

## Page 5

1    attempt to answer a question.  That's a particularly
2    important ground rule in the Zoom era.
3            If you have any doubts about a question, if
4    you need for it to be repeated, read back, rephrased,
5    explained, say so.  We'll accommodate you as many times
6    as you ask.  If you give an answer to a question, we
7    will all presume that you've heard it completely and
8    understood it completely; is that fair?
9        A.  Yes.
10       Q.  Never guess.  If you don't know the answer to
11   a question, tell us you don't know the answer to the
12   question.  If you can't remember the answer to the
13   question, tell us you can't remember the answer to the
14   question.  But never guess.  Okay?
15       A.  Okay.
16       Q.  All right.  What's your highest level of
17   formal educational?
18       A.  I have about two years of college.
19       Q.  Where?
20       A.  At -- It was currently -- The last place I was
21   at was Lewis University.
22       Q.  How long have you been a police officer?
23       A.  18 years.
24       Q.  All with Joliet?

## Page 6

1        A.  Yes.
2        Q.  When were you promoted to lieutenant?
3        A.  I was promoted last year, March of last year.
4        Q.  By whom?
5        A.  By whom?
6        Q.  Yes, sir.
7        A.  By the Joliet Police Department, police and
8    fire board.
9        Q.  Do you know what role, if any, the then, I
10   believe, Chief Al Roechner played in your promotion?
11       A.  The only thing I would think it would be is
12   recommending to the police and fire board for a
13   promotion.
14       Q.  Had he previously recommended you for prior
15   promotions?
16       A.  No.
17       Q.  You're currently in internal affairs?
18       A.  Correct.
19       Q.  How long have you been in internal affairs?
20       A.  About a year.
21       Q.  Before you were a lieutenant in the internal
22   affairs division, what was your rank and what were your
23   duties?
24       A.  I was a sergeant and I was the public

## Page 7

1    information officer prior to this position.
2        Q.  How long were you the public information
3    officer?
4        A.  I was there for about a little over a year.
5        Q.  What did you do before that?
6        A.  Before that, I was a tactical sergeant.
7        Q.  How long were you a tactical sergeant?
8        A.  I believe from September of 2016.
9        Q.  In a particular unit or division of the police
10   department?
11       A.  What was that?
12       Q.  A tactical sergeant in any particular unit or
13   division of the police department?
14       A.  That's within our -- our tactical unit.
15       Q.  Generally describe for us what a sergeant in a
16   tactical unit does.
17       A.  Basically, we -- basically, we assist with
18   drug investigations, gang investigations.  We look
19   for -- We deal with the gang members, the gun violence,
20   assist our drug units when it comes to surveillance.
21   And we did search warrants, work informants.
22       Q.  As a tactical officer sergeant --
23           Were you a tactical officer before you became
24   a tactical sergeant?

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 8

1  A. I'm sorry. What was that?
2  Q. Were you an officer in the tactical unit
3  before you became a sergeant?
4  A. I was a tactical officer back in '06, I
5  believe, and then to about '09.
6  Q. All right. What did you do before you became
7  a tactical sergeant?
8  A. I was assigned to investigations. I was up at
9  the Chicago -- the FBI's regional forensics laboratory
10 up in Chicago.
11 Q. What did you do there?
12 A. I did computer forensics. I did cell phone
13 forensics. Then I did video forensics.
14 Q. For what period of time did you do that?
15 A. I did that from about January of 2009, and
16 then I got promoted in November of 2014. And then from
17 2014, I was in a -- They consider it an associate status
18 where I wasn't up there full-time anymore but I still
19 worked on cases as needed and was doing that for
20 about -- maybe up till about a year ago, maybe a little
21 bit more than that.
22 Q. And that facility is the Chicago Regional
23 Computer Forensics Laboratory?
24 A. I'm -- For some reason I'm having trouble

Page 9

1  hearing you. I'm not sure why.
2  Q. That facility is known as the Chicago Regional
3  Computer Forensics Laboratory?
4  A. I believe so.
5  Q. What, if any, is its affiliation with the FBI?
6  A. It is overseen by the FBI. So the training
7  and the budgets comes from the FBI.
8  Q. Were you trained in computer forensics at the
9  Chicago Regional Computer Forensics Laboratory?
10 A. The training was -- was done there and around
11 from -- different facilities around the country, but it
12 was organized by the FBI and trained by FBI either
13 personnel or people that they had do their training.
14 But it was organized by them.
15 Q. So from time to time it's referred to in the
16 Joliet Police Department as the FBI's Regional Computer
17 Forensic Laboratory?
18 A. Correct, I believe so.
19 Q. The shorthand for which is RCFL?
20 A. Yes.
21 Q. If I refer to the "RCFL" throughout this
22 deposition, you'll know that's what I'm talking about
23 and I'll know that's what you're talking about. Okay?
24 A. Okay.

Page 10

1  Q. Was your first tour at the RCFL the first time
2  you got computer forensic training as a law enforcement
3  officer?
4  A. Was that my first training?
5  Q. Yes, sir.
6  A. Yes.
7  Q. Specifically what training did you get at
8  RCFL?
9  A. I've had a lot of training. I'd have to go
10 through my CV which I don't have in front of me. But
11 I've had -- I've been sworn in as an expert in several
12 cases. And I don't want to just throw a number out
13 there, but I've had hour -- hundreds of hours of
14 training.
15 Q. Do you actually have a formal CV that includes
16 a description of your training and experience as a
17 forensic investigator?
18 A. I do.
19 Q. Is it accessible online?
20 A. Online like at a website?
21 Q. Right. If I Googled your name, for example,
22 would I get your CV or do we have to get it through you
23 or your department?
24 A. Probably through me or the department. I

Page 11

1  don't think I've ever been posted online.
2  Q. Have you been trained on a forensic tool known
3  as Cellebrite?
4  A. Yes.
5  Q. When were you first trained on Cellebrite?
6  A. I'd have to look at my CV. But if I -- It
7  probably may be within -- Probably like maybe a year
8  after starting at the RCFL.
9  Q. Your CV would reflect that?
10 A. Yes. Because I put down the dates and times
11 and the classes of what I took.
12 Q. And the CV would reflect all the subsequent
13 training you've received on Cellebrite?
14 A. It would have -- I'm trying to recall what it
15 was, what would be on there. But it would have -- it
16 would have cell phone training on there that was
17 probably put on from the FBI if I remember correctly,
18 but it should have the training.
19 Q. The CV would reflect all of your training and
20 experience with Cellebrite?
21 A. Should, yeah.
22 Q. Have you been trained on a forensic tool known
23 as Lantern?
24 A. I have used it. I -- I used it, I believe,

5 (Pages 8 to 11)

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 12

1    at -- I don't recall if I remember using it at the FBI.
2            I was assigned to two different labs at one
3    point.  And the other lab I was assigned to was at the
4    Will County's lab.  Will County had their own lab.  I
5    think they might even still have it.  And I might have
6    used it there in the past.
7            I'm trying to -- And I'm trying to recall if I
8    used it at the RCFL.  I don't want to sit there and say
9    that I did and I didn't.
10           But I do recall Will County having it.  And
11   it's not -- If I remember correctly, it's been a while
12   since I've seen it.  But it wasn't overly complicated.
13   Once you knew the one, you can understand the other, if
14   I remember correctly.
15           Q.  Do you mean by that once you've been trained
16   on Cellebrite you can understand Lantern?
17           A.  Well, it's the fundamentals of the forensics.
18   So once you understand the fundamentals of the forensics
19   of what -- what you're looking at for a phone, they kind
20   of -- I mean, obviously, you've got different
21   interface -- different user interface, but you can
22   generally understand what you're trying to -- what
23   you're trying to do.
24           MR. ADAMS:  Off the record.

Page 13

1            (Discussion off the record.)
2    BY MR. ADAMS:
3            Q.  Is all of your training and experience with
4    Lantern memorialized on your CV?
5            A.  I do not believe so.
6            Q.  Over what period of time would you estimate
7    you've been working with Lantern from time to time?
8            A.  The Lantern program, not as much as
9    Cellebrite.  So my experience with Lantern is -- would
10   be -- I wouldn't -- I don't know how much to say I -- my
11   exposure to, but it wouldn't -- Cellebrite was mostly
12   what I used.
13           Q.  If you were going to explain to a juror with
14   no training or experience in the field, how would you
15   describe what Cellebrite is and what it can do for a law
16   enforcement investigator?
17           A.  So with a -- with a cell phone or, like,
18   Cellebrite, when you have your cell phone it's like a
19   personal computer.  So the Cellebrite forensic software
20   allows you to access the data within the phone.  And it
21   takes the data and extracts it and it puts it into a --
22   in a format that's easily readable -- they can easily
23   read.
24           So when someone is sitting there looking at

Page 14

1    your phone and say they're trying to find a text message
2    that they might have done a year and a half ago or
3    something, they were having trouble finding it but they
4    knew it was on there, what this does is it allows you to
5    parse out that information and it allows you to search
6    for it quicker than normally going through a phone.
7            And it also allows you to search for deleted
8    information.  So say if you, you know, had a photo or a
9    message or something that you deleted, you have the
10   potential to bring that back up by using some of the
11   software like un-- -- undeleting.
12           Q.  Retrieving, in other words?
13           A.  Retrieving, sure.
14           Q.  What, if anything, can Lantern do that
15   Cellebrite cannot do?
16           A.  So through my experience dealing with
17   forensics, it's not -- this is not particular to
18   Lantern.  This is just a -- of a general thing that I
19   experienced and I noticed is when it comes to computer
20   forensics, there's a bunch of different forensic
21   companies that are out there that can pull and extract
22   data from hard drives or whatever might -- And this goes
23   with -- the same for phones.  So -- But the companies
24   are different and they pull information differently and

Page 15

1    then they explain information differently.
2            So from my experience, depending on what
3    you're looking for in an examination, you might use one,
4    two, possibly three different forensic softwares to look
5    for data because sometimes one might not pick it up, the
6    other one would, or it presents it in a format that is
7    easier to read compared to the other ones.  So a lot of
8    it depends on if you're going to use one, two, possibly
9    a third.  You might use several ones on the same visual
10   items.
11           Q.  If I can say, Lieutenant, on the last question
12   and answer -- So your volume on my end at least dropped
13   quite a bit.  I don't know why that occurred.  But it
14   did.  And you're not quite as easy to hear as you were.
15   But we'll just fight on and see what we can do.
16           Was your training on Cellebrite, wherever you
17   happen to be stationed at the time, provided by the
18   Cellebrite company?
19           A.  I believe, if I remember correctly, it was
20   done through the FBI.  I don't think it was done through
21   the company.
22           Q.  Have you ever been trained by Officer German?
23           A.  No.
24           Q.  Have you ever trained Officer German?

6  (Pages 12 to 15)

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

---

Page 16

1    A. I have assisted him in cases and shown him
2 different things that I've learned.
3    Q. As a tactical officer and sergeant, would you
4 from time to time be detailed to the investigations
5 division in order to provide forensic support for their
6 investigative work?
7    A. Yes.
8    Q. That happened on a regular basis?
9    A. It would happen. Every now and then I would
10 be pulled for certain investigation cases depending on
11 what they were. Sometimes it's like homicides or bigger
12 cases because of my associate status with the RCFL.
13    So if they had a phone or a computer or a
14 hard- -- or a DVR or something that they needed to be
15 worked on, I could take it up to Chicago and I can work
16 on it myself because I still had my certification
17 through the FBI.
18    So I still had to do a yearly examination or
19 testing that they would do. They would -- You know, I
20 can't remember what it's called -- proficiency test.
21 They do a proficiency test every year. And I would have
22 to do that. So I kept my certification up to do those
23 type of works. And I would also get called into
24 internal affairs also and do internal affairs cases.

---

Page 17

1    Q. As of May of 2018, were you considered within
2 the Joliet Police Department, for lack of a better term,
3 the duty expert on computer forensics?
4    A. I -- The duty expert? I was the person that
5 was certified to do it.
6    Q. As of May of 2018, are you aware of anyone
7 else in the department who had more training and
8 experience doing computer forensic work than you did?
9    A. Doing computer forensics?
10    Q. Well, that's a fair question. I'll narrow it.
11    Doing forensic work with the Cellebrite and/or
12 Lantern relating to the extraction and analysis of data
13 from smartphones.
14    A. Detective German was doing cell phone
15 extractions, and I thought he was doing some DVR or some
16 video-type stuff. I -- I know he had training in it,
17 but I don't know the time frame of when he had it.
18    Q. In the May of 2018 time frame, do you know of
19 anyone on the department who had more training and
20 experience in that specific area of forensics than you
21 on the Joliet Department?
22    A. I do not because -- I don't recall being
23 trained specifically by Cellebrite. I believe it was
24 done through the FBI. It is possible that German -- And

---

Page 18

1 this is obviously -- You'd have to speak to him on this.
2 But he could have been -- I thought he got trained
3 specifically by Cellebrite. So if -- There's a
4 possibility that he was trained by the company itself
5 where I don't -- I was not, if that answers your --
6    Q. Have you reviewed any documents in preparation
7 for today's deposition?
8    A. I have.
9    Q. What documents have you reviewed?
10    A. I reviewed my reports, my -- the report that I
11 did with the extraction -- my initial extraction.
12    Q. Anything else?
13    A. I reviewed some memos that I did.
14    Q. Anything else?
15    A. An e-mail maybe. I have it in front of me.
16 So I have some reports, some e-mails, and I think that's
17 about it.
18    Q. What I'd like you to do, Lieutenant, is just
19 index those for our record. Give us the date and to
20 and from and the subject line of each of those documents
21 that you reviewed. And just go through them one after
22 another. And I won't interrupt you.
23    A. Do you want me to do that now?
24    Q. Yes, sir.

---

Page 19

1    A. The first one is -- Do you want me to show it
2 up to the -- How do you want me to do this?
3    Q. Well, just -- I think we've probably seen them
4 all. If you name one I haven't seen, we may have --
5    A. Okay.
6    Q. -- you share it if you know how to do that.
7    A. This one is an officer supplement report.
8 This was done on May 18th of 2018 at approximately
9 6:30 p.m. It's a three-paragraph narrative by -- that I
10 wrote to -- that I wrote.
11    Does that seem -- what you have?
12    Q. Okay.
13    A. Then let's see. I have -- I have an e-mail
14 where -- It's to Chris Regis. Actually, it was
15 forwarded to me from Roechner. But basically it states
16 that I was sent to the RCFL to go get reports and bring
17 it back to Regis.
18    Q. Okay. What's the date of that e-mail?
19    A. That one is August 14th of 2020.
20    Q. Okay.
21    A. I've got a bunch of different documents here,
22 but these -- I'm not referring to all these. Are you --
23 What are we -- What are you --
24    Q. Any documents that you reviewed in preparation

---

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 20

1  for today's deposition.
2      A.  Okay.  I've got -- There's one that's dated
3  November 7th of 2018.  It's an interoffice memorandum
4  from -- to the chief from me.  It says, "RCFL Update."
5      Q.  Okay.
6      A.  Okay.  I've got one that says, "RCFL Update
7  (Part 2)," which is dated November 9th, 2018.
8      Q.  Okay.
9      A.  And I think that's about all I looked at
10  for -- in preparation for this.
11      Q.  Okay.  How did you get your hands on those in
12  order to review them to prepare for today's deposition?
13      A.  So I had copies of these from -- When I was
14  doing as a PIO, I was doing the FOIAs also.  So there
15  was a FOIA that came in in regards to this.  So I had
16  already had the documents from my historical of FOIAs.
17      Q.  Who submitted FOIA?
18      A.  That's a great question.
19      Q.  Thanks.
20      A.  I could find out.  My -- my thought if --
21  if -- my memory might be wrong, but my thought is it was
22  the Herald-News, but I can -- Like I said, I can find
23  out for certain.
24      MR. ATKUS:  The what?

Page 21

1      THE WITNESS:  The Herald-News.
2      MR. ATKUS:  Okay.  Thank you.
3      THE WITNESS:  You're welcome.
4  BY MR. ADAMS:
5      Q.  Have you spoken with anyone for the purpose of
6  preparing for today's deposition other than the
7  logistics of it, the time, the place, the Zoom
8  information?
9      A.  No.
10      Q.  Have you read ever of the complaint filed in
11  this case by my client, Cassandra Socha?
12      A.  I believe the -- I believe I read it, and I
13  think I only read it once.  And if I remember -- And
14  I -- This is my -- It's been a while.  But at some
15  time -- And I don't remember the date.  But whenever
16  the -- When -- Excuse me.  Whenever the lawsuit was
17  filed, I was part of a meeting.  And I don't know what
18  date this was.  And I'm sure it's -- it's on the -- when
19  the lawsuit was filed.
20      But there was a meeting with me -- I got
21  called into a meeting with Brian Benton; Chris Regis;
22  Hales, the former city manager.  And there were several
23  other people in this meeting.  And I called over there,
24  I believe, from Chief Benton at the time.  And if -- And

Page 22

1  I -- and I could be wrong on this, but this is -- I'm
2  just trying to refresh my memory because sometimes
3  I'm -- and I'm getting old.
4      MS. PROCTOR:  You know what?  I don't want to
5  interrupt the witness.  But to the extent there were
6  attorneys present for this meeting, you know, the
7  conversations may be subject to the attorney-client
8  privilege.  I don't know that, but I just wanted to note
9  that before you went any further.
10      And I didn't mean to get you in the -- before
11  you were finished.  But based on the nature of my -- not
12  an objection, but it's -- it's just I'm raising a
13  concern, you know, whether -- you know, to the extent
14  you could continue with your answer whether it would
15  invoke the attorney-client privilege or call upon
16  attorney-client protected information.
17  BY MR. ADAMS:
18      Q.  You can continue.
19      A.  Okay.  Answer the question?
20      Q.  Yes.
21      A.  Okay.  So -- Yeah.  And I'm trying to recall
22  if I was shown the complaint then.  I don't recall
23  what's in the complaint directly.  But I -- I feel as
24  though the complaint was shown then, but I could be

Page 23

1  wrong on that.
2      MS. PROCTOR:  Okay.  You know what?  Can I just
3  interject?  Because I do think we need an answer to the
4  question whether this witness knows one way or the other
5  whether there were any attorneys present for this
6  meeting.
7      MR. ADAMS:  And so one of the great things about --
8      MS. PROCTOR:  So I think we need an answer to that
9  question before we go further --
10      MR. ADAMS:  So --
11      MS. PROCTOR:  So why don't you ask it?  Or maybe
12  the witness could answer my question.
13      MR. ADAMS:  Two -- two great things about this --
14      MS. PROCTOR:  Okay.
15      MR. ADAMS:  -- I get a chance to ask that myself
16  and you get an at bat too.  I'm not the only one.  So
17  you don't need to interrupt all the time to do that.
18      MS. PROCTOR:  No.  But, Hall, based on -- I think
19  we need to get an answer to this question --
20      MR. ADAMS:  You get a chance to ask --
21      MS. PROCTOR:  -- whether there were attorneys
22  present for this meeting.  If the answer is yes, then I
23  can make my objection.  If it's not, then we can move
24  on.

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 24

1    MR. ADAMS:  And you get a chance to ask all the
2    questions you need to ask today.
3        MS. PROCTOR:  No.  But the point is -- And don't be
4    coy with me.
5            The point is if there were attorneys present
6    for this meeting, the meeting could be subject to the
7    attorney-client privilege.  And if you allow the witness
8    to answer that question, he could be disclosing
9    information that would be protected by privilege.  So I
10   am trying to protect and maintain that privilege to the
11   extent it exists.
12           And a practical solution would be to ask the
13   witness now before we go further with any discussions
14   about this meeting whether or not there were any
15   attorneys present associated with the City of Joliet, be
16   that private defense counsel or any members of the
17   City's corporation counsel's office.
18       MR. ADAMS:  You don't represent this witness, do
19   you?
20       MS. PROCTOR:  I do not represent this witness.
21   However, I do represent the City of Joliet.  And to the
22   extent -- You know, this witness may very well be in the
23   control group.  So don't --
24           Let's not play games, Hall.  Why don't you

Page 25

1    just ask this witness or -- whether there were any
2    attorneys present --
3    BY MR. ADAMS:
4        Q.  Mr. Botzum --
5        MS. PROCTOR:  -- because I know you -- Let me
6    finish.
7            I know you, as an officer of the court, would
8    not want to violate the attorney-client privilege.
9    BY MR. ADAMS:
10       Q.  Mr. Botzum --
11       MS. PROCTOR:  But by allowing this witness to
12   continue without just getting to the bottom of this,
13   Hall -- And that's all I ask.
14       MR. ADAMS:  Are you through?
15       MS. PROCTOR:  For the moment.  Will you please ask
16   my question or --
17   BY MR. ADAMS:
18       Q.  Mr. Bot- -- Or, Lieutenant Botzum, were you
19   represented by counsel at that meeting?
20       A.  Chris Regis, I believe, was our corporate
21   counsel at that time, so I'm not sure how this fits into
22   that.  And that's, I believe, why he was brought in.  So
23   it --
24       Q.  You personally weren't represented in your

Page 26

1    individual capacity, true?
2        A.  Me being represented?
3        Q.  Yes, sir.
4        A.  No.
5        MS. PROCTOR:  That's not the standard, Hall, and
6    you know it.  You're playing games.
7            But go ahead.  Let's move on.
8    BY MR. ADAMS:
9        Q.  You mentioned that there were other people
10   present in that meeting.  Can you name any of the other
11   people?
12       A.  At this time, no, I can't.  I don't recall the
13   other people.
14       Q.  Can you estimate the number of other people?
15       A.  I would guess.  Maybe --
16       Q.  I don't want you to guess.  Give me an
17   estimate, a reasonable estimate.
18       A.  An estimate is kind of guessing.  I would say
19   possibly about two other people.
20       MS. PROCTOR:  Okay.  To be clear, because I don't
21   think it's clear from his prior answer -- And I would
22   just like the witness -- You know, we just need an
23   answer to this question.
24           Was Christopher Regis, in his capacity as a

Page 27

1    corporation counsel for the City of Joliet, present for
2    the meeting that you've been speaking of, sir?
3            That is the question that I would like
4    answered now.
5        MR. ADAMS:  He doesn't have to answer it now.
6    You'll get your chance.
7        MS. PROCTOR:  You're playing games, Hall, and I
8    don't appreciate it.
9    BY MR. ADAMS:
10       Q.  Mr. -- I said it again.  Lieutenant --
11       MS. PROCTOR:  It's just it's unclear.  I -- I
12   thought he said he was.  If he was, then we may have an
13   issue.  If he wasn't, then I don't think we do.
14   BY MR. ADAMS:
15       Q.  Lieutenant Botzum, did you make any written
16   records of your own of that meeting?
17       A.  Did I make my own records?
18       Q.  Yes, sir.
19       A.  I did not.
20       Q.  Was there a court reporter present during that
21   meeting?
22       A.  I don't believe so.
23       Q.  Did anyone that you could see make notes or
24   take minutes of that meeting?

9  (Pages 24 to 27)

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 28

1    A. I wasn't -- That wasn't my focus so I can't
2  say yes or no.
3    Q. Can you tell us when -- either by specific
4  date or month, year or in relationship to when Socha's
5  complaint was filed -- that that meeting occurred?
6    A. It was -- My understanding, it was the date
7  that was given to the City or the City became aware of
8  it or something to that -- to that effect.
9    Q. At the time, you were still a sergeant; is
10  that correct?
11    A. It was in 2018. So yes, that's correct.
12    Q. And you were a sergeant in the tactical unit,
13  correct?
14    A. I could have been in patrol at that time. I'd
15  have -- I'm not sure on that date. Oh, no. You know,
16  no. I would be -- I'm sorry. I would be in tactical.
17  That's correct.
18    Q. There was someone named Hales at that meeting?
19    A. Correct.
20    Q. Who is Hales?
21    A. He's our former city manager.
22    Q. Was he the then city manager at the time of
23  that meeting?
24    A. Yes.

Page 29

1    Q. Where did the meeting take place?
2    A. It was in city hall. And I'm -- I'm trying to
3  recall. I don't know if it was in the city manager's
4  office. It might have been in there. I don't recall
5  the exact room, though. It was somewhere in city hall.
6    Q. You went to that meeting because Chief Benton
7  told you go to that meeting?
8    A. If I remember correctly, yes.
9    Q. When Chief Benton told you to go to that
10  meeting, did he tell you why he wanted you at that
11  meeting?
12    A. Not -- not beforehand, not that I recall
13  anyways.
14    Q. Walking into the meeting, did he tell you
15  that?
16    A. I think -- I believe I found out when I went
17  into the meeting and I sat down. And I think I was
18  trying to figure out basically why I was there.
19    Q. Other than that meeting that we've been
20  discussing, have you attended others involving either
21  Joliet Police Department officers and/or City of Joliet
22  officials at which Officer Socha's allegations in this
23  case were discussed?
24    A. Not that I recall.

Page 30

1    Q. How long did that meeting at city hall last?
2    A. By the time I got there -- By the time it was
3  done maybe -- maybe half hour. There was a meeting that
4  I believe was already in progress prior to me getting
5  there.
6    Q. At that time, you weren't a policy maker for
7  the Joliet Police Department, were you?
8    A. I've never been a policy maker.
9    Q. All right. At that time, you did not have any
10  control over the direction of the City of Joliet's
11  conduct of this lawsuit, did you?
12    A. No.
13    Q. At any time that you were present in that
14  meeting, did Regis articulate what his role was in the
15  meeting?
16    A. I don't recall whether he said his role or
17  not. I mean, I remember -- I remember what the context
18  of when I got in there -- what the discussion was about.
19    Q. What was that?
20    A. Am I allowed to answer this or ...
21    Q. Yeah.
22    A. So, basically, it was -- When I got in there,
23  they were trying to discuss shutting down
24  investigations. So what they wanted to do -- and I

Page 31

1  believe it was Regis that was stating it -- is they
2  wanted to gather all the computers and shut down and
3  basically take all the computers away from the
4  investigations and basically have them analyzed.
5    Q. Okay. You then were involved in that process
6  at some later point, true?
7    A. There was a discussion back and forth, I
8  believe, with Chief Benton and -- I'm really trying to
9  remember who else. I know there was other people there.
10    But there was discussions on they can't shut
11  down because they have active homicide investigations
12  and different things going on with these computers. So
13  there was some back-and-forth going on there.
14    At that point, I -- I came up with an idea
15  that could be -- that could be used to alleviate the
16  issue that they were having.
17    Q. What was that idea?
18    A. So working at the RCFL, one of the things that
19  we did on a regular basis especially with the FBI is we
20  always did searches. And a lot of the searches you
21  would go to a place and you would copy all the digital
22  media that was there preserving it, the evidence, but
23  then not taking it from the place.
24    So I recommended and I advised this to the

10  (Pages 28 to 31)

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 32

1  group that this could be an option if they're worried
2  about trying to keep the functionality of investigations
3  going because we have, obviously, ongoing, you know,
4  criminal things going on and stuff; but preserving
5  everything that occurred -- everything that's on the
6  hard drives and to be analyzed at a later date.
7      Q.  And when you say everything that was on the
8  hard drive, you mean the Cellebrite hard drive and the
9  Lantern hard drive, correct?
10     A.  Any -- any hard drive that would have been in
11 there -- any computer.
12     Q.  Okay.
13     MR. ATKUS:  I just -- You said "in there."  Can we
14 get a clarification in where?
15     THE WITNESS:  In the investigations unit.
16     MR. ATKUS:  Okay.
17 BY MR. ADAMS:
18     Q.  That meeting aside and without regard to
19 whether you did so in preparation for today's
20 deposition, have you discussed the allegations in
21 Socha's complaint with any of your fellow officers?
22     A.  In regards to -- Besides the logistics of it?
23     Q.  Yes, sir.  Besides the logistics.
24     A.  Just my part in just the logistics of what I

Page 33

1  did.
2      Q.  How would you characterize your relationship
3  with Officer Nicholas Crowley?
4      A.  I'm not -- I don't know him that well.  I
5  never really worked with him.  So, I mean, I don't -- I
6  don't have an opinion one way or another.
7      Q.  So you're -- I'm not asking about opinions
8  necessarily.  But you're members of the same police
9  force but, otherwise, you're not particularly involved
10 with Officer Crowley; is that accurate?
11     A.  No.  I never -- I never had the experience of
12 working with him.  I think I've been on maybe some calls
13 with him, but I've never -- Maybe spoken to him a
14 handful of times but --
15     Q.  How would you characterize your relationship
16 with Officer Socha?
17     A.  Fine.  No problems.
18     Q.  Have you had frequent or regular occasion to
19 work with her?
20     A.  She was assigned to us.  When I was in the
21 tactical unit, she was assigned to us, like a
22 cross-training-type platform.  And I think she was up
23 there -- I could be wrong on this, but I thought it was
24 like two to four weeks or something like that and -- No.

Page 34

1  I had a good working relationship with her, no issues.
2      Q.  During whatever exposure you've had to Officer
3  Socha in the performance of her duties as a Joliet
4  police officer, did she impress you as an officer who
5  was committed to her service and who took her job
6  seriously?
7      A.  Yeah.  I mean, when we had her in the
8  cross-training, I thought she did an excellent job in
9  there.  I thought she was our charging -- You know, I
10 mean, it -- It was a situation where -- It was kind of a
11 nice thing that we did at the time because we were doing
12 some cross-training.
13     But if it came up, like, down the road where,
14 like -- having openings in our tactical unit, which
15 doesn't happen as often, she would have been a high
16 contender, in my opinion, at that time to -- to go into
17 the unit.
18     Q.  Did you yourself play any role in the
19 investigation and/or prosecution of Officer Crowley that
20 preceded the Department's investigation of Officer
21 Socha?
22     A.  None.
23     Q.  Have you ever had any conversations with
24 Detective Sergeant Grizzle about his role in the

Page 35

1  investigation and/or prosecution of Crowley?
2      A.  None.
3      Q.  Have you ever had any conversations with
4  Grizzle in which he expressed his views about the role
5  of Socha's testimony in the prosecution of the case
6  against Crowley?
7      A.  No.
8      Q.  You sat for an interview with Regis at one
9  point in connection with this lawsuit?
10     A.  What?  I'm sorry.  What was that?
11     Q.  You sat for an interview with Regis at one
12 point in connection with the issues raised in this
13 lawsuit?
14     A.  Correct.  He -- he requested -- requested
15 or -- I think it was more -- it was ordered or what.
16 But I did sit with him and Sergeant Matt Breen in
17 Regis's office at the time in regards to my part in
18 this.
19     Q.  What, if anything, did you understand Breen's
20 role to be in that meeting?
21     A.  Breen's role -- I -- I went there just to have
22 another person there with me in regards -- There was --
23 There was some issues in the way that it was being
24 presented to us.  Because under -- because under the

11  (Pages 32 to 35)

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 36

1    IPTA, you know, we have certain rights when it comes to
2    giving testimony and --
3         So there was issues with being forced to give
4    statements and then there was talk about those
5    statements being used criminally against you later. And
6    they're like, well, hang on a second; if you're being
7    forced to give statements, you know, they can't be used
8    against you criminally. So there was issues with that.
9    And so just to kind of, like -- as a -- as protection
10   on -- being a union member I had my union rep come and
11   represent me.
12        Q. So that -- that Breen was the union rep?
13        A. Correct.
14        Q. Got it.
15        A. Sorry. I should have said that.
16        Q. Was the meeting audio recorded?
17        A. Yes. I believe Sergeant -- Sergeant Breen
18   audio recorded it.
19        Q. Have you ever heard that audio recording?
20        A. I have not.
21        Q. Have you ever seen a transcript of that audio
22   recording?
23        A. I have not.
24        Q. Other than these documents we've talked about

Page 37

1    earlier that you've reviewed in preparation for the
2    deposition, have you yourself given any written
3    statements regarding any of the issues raised in Socha's
4    complaint?
5         A. No.
6         Q. Has the union ever called any meetings
7    relating to any of the facts and issues raised by
8    Socha's complaint?
9         A. Involving me or, like, speaking with me on it?
10        Q. With the union -- the gathering of union
11   members generally?
12        A. That, I don't know. I -- I wouldn't be privy
13   to that.
14        Q. Do you have any plans to leave the Joliet
15   Department in the next few years?
16        A. No plans.
17        Q. Okay.
18        A. No.
19        Q. So as far as you know right now, if we had to
20   reach you at a trial that was a year, two years, three
21   years out, we could reach you through the Joliet Police
22   Department?
23        A. Yes.
24        Q. Did you ever serve in the military?

Page 38

1         A. No.
2         Q. In the May, June, and since timeframe, did the
3    Joliet Police Department have rules, regulations, SOPs,
4    or codes of conduct that provided that officers should
5    treat one another professionally?
6         A. I'm sorry. Was that a question?
7         Q. Yes, sir.
8         A. I'm sorry. What was it again?
9         Q. Beginning -- Since May of 2018 at least, did
10   the Joliet Police Department have rules or regulations
11   or codes of conduct that provided that officers were
12   expected to treat one another professionally and as
13   fellow law enforcement professionals?
14        A. Yes.
15        Q. And to treat one another with dignity and with
16   respect?
17        A. I believe it states something very similar to
18   that.
19        Q. And not to treat female officers in a sexist
20   or misogynistic way?
21        A. I believe so, yes.
22        Q. And not to discriminate against female
23   officers on the basis of their sex?
24        A. Yes.

Page 39

1         Q. When Socha was investigated beginning of -- in
2    May of 2018, Joliet Police Department General Order 16-1
3    relating to evidence and property management complied to
4    that investigation?
5         MS. PROCTOR: I'm just going to object based on
6    form and foundation.
7         MR. ADAMS: Sure. That's well taken. I'll ask a
8    couple of foundational questions.
9    BY MR. ADAMS:
10        Q. You're familiar aren't you, Lieutenant Botzum,
11   with General Order 16-1?
12        A. What is 16-1?
13        Q. The subject of which is evidence and property
14   management?
15        A. I'm sure I've reviewed it at some point.
16        Q. That general order applied to the handling of
17   evidence obtained in the Department's investigation of
18   Socha, didn't it?
19        MS. PROCTOR: Same objection, form and foundation.
20        You can go ahead and answer, witness, to the
21   extent you can. I just need to make the objections for
22   the record.
23   BY THE WITNESS:
24        A. Yeah, I believe so.

12 (Pages 36 to 39)

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 40

1    Q.  Are you familiar with the Joliet Police
2  Department General Order 7-2, the subject of which is
3  complaints against the agency or its employees?
4    A.  Yes.
5    Q.  That is central to the work that you now do in
6  internal investigations and internal affairs, correct?
7    A.  That I'm in investigations -- or internal
8  affairs?
9    Q.  Yes, sir.
10   A.  Yes.
11   Q.  That general order, 7-2, applies to the
12 Department's investigation of Socha?
13   MS. PROCTOR:  Objection, form and foundation.
14 BY THE WITNESS:
15   A.  You're asking me if that's -- I was not in
16 invest- -- or internal affairs at that point nor was I
17 part of any complaint or anything.  So that -- I don't
18 have any standing on what was happening or what they
19 were deciding to do at that point.
20   Q.  And that wasn't exactly my question, but I
21 appreciate what you said.
22       My question was whether that general order,
23 7-2, applied to the Department's investigation of
24 Officer Socha, an employee of the agency.

Page 41

1    MS. PROCTOR:  Same objection, form.
2  BY THE WITNESS:
3    A.  Yeah, I -- I mean, you could sit there and
4  take any complaints -- You know, I mean, I'm not -- I
5  guess I'm not understanding your question.  What -- what
6  are you -- Are you trying to have my personal
7  perspective on this complaint back then?
8    Q.  On whether that general order relating to
9  complaints against the agency or its employees applied
10 to the Department's investigation of Officer Socha.
11   A.  I don't know.  I can speak generally on
12 complaints.  I can speak specific on complaints that I'm
13 aware of.  I'm not familiar with her complaint
14 specifically, so I can't answer that.
15   Q.  Just to be clear -- And maybe I -- This is the
16 confusing point.  I'm not talking about Socha's
17 complaint in this lawsuit.  I'm talking about the
18 Department's investigation of Socha back in May of 2018.
19   A.  My --
20   Q.  So I'll reframe the question, if it makes a
21 difference.
22       Did that general order, 7-2, apply to the
23 Department's investigation of Socha?
24   MS. PROCTOR:  Same objection, form and foundation.

Page 42

1    MR. ATKUS:  Objection, asked and answered.
2  BY MR. ADAMS:
3    Q.  You can answer it.
4    A.  I can answer?
5    Q.  Yes.
6    A.  Okay.  So I was not part of the internal
7  investigation.  My part was small as -- as they were
8  asking me to do one part of this.  So whether this is
9  the --
10   Q.  You've gone dark and quiet.
11   MR. ATKUS:  We lost Chris.
12   THE WITNESS:  Hang on.
13   MR. ADAMS:  Lieutenant Botzum, we can't see you or
14 hear you.
15   THE WITNESS:  I'm coming back.
16   MR. ADAMS:  We still can't see you or hear you.
17   THE WITNESS:  Hang on.  Can you hear me?
18   MR. ATKUS:  Yeah, I can hear you.
19   MR. ADAMS:  Yeah.
20   THE WITNESS:  For some reason -- I'm not sure what
21 happened.  Give me --
22   MS. PROCTOR:  Take your time.
23   THE WITNESS:  Let me come back in.  All right.
24 Well, it says it should be up, but it's not.  Huh.  But

Page 43

1  you guys can hear me right now?
2    MR. ADAMS:  Barely.
3    THE WITNESS:  Barely?  I can try to answer while I
4  try to figure out -- Or do you guys -- Is it possible
5  for me to exit and come back in really quick or is
6  that ...
7    MR. ADAMS:  Yeah, that's fine.
8    MS. PROCTOR:  Take your time.
9        (A short break was had.)
10   MR. ADAMS:  Can you read back the last question
11 that preceded our technological snafu?
12       (Record read as requested.)
13 BY THE WITNESS:
14   A.  I don't know.
15   Q.  Okay.  Are you familiar with a lawyer with the
16 state appellate prosecutor's office named Lorinda
17 Lamken, L-A-M-K-E-N?
18   A.  I am familiar with her in two ways.
19   Q.  How is that?
20   A.  I believe either -- I don't know where I heard
21 her name before.  I don't know if it was through the
22 press or something like that.  But I had to call her in
23 regards to the FOIA that we had.
24   Q.  The FOIA that you got for information relating

13  (Pages 40 to 43)

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 44

1  to the Socha matter?
2      A.  I believe so.
3      Q.  Do you remember --
4          And did you, in fact, call her and speak to
5  her?
6      A.  I did.
7      Q.  Do you remember when that occurred?
8      A.  I do actually because I actually have it here.
9  October 12th of 2020.
10     Q.  Did you make any record, notes, or memoranda
11 of that conversation?
12     A.  Ironically, I had it here on my -- on my
13 computer.  But, basically, I believe it was in regards
14 to the FOIA request.
15     Q.  What do you recall she saying to you and you
16 saying to her?
17     A.  The only thing, if I recall, is I think it
18 just had to do with what we were authorized to release
19 in regards to the investigation from her standpoint.
20     Q.  You mentioned you knew her a couple ways.
21 That's one of them.  Was there another?
22     A.  Yeah.  And I believe I heard her name or
23 something from, like, the press or something.  I never
24 spoke with her before or had any interaction with her.

Page 45

1      Q.  So that conversation was the one and only time
2  you have spoken with Lamken?
3      A.  Yes.
4      Q.  In that conversation, did Lamken tell you
5  what, if any, role Socha's testimony had played in the
6  outcome of the Crowley trial?
7      A.  He did not.
8      Q.  Did the Crowley case come up at all in that
9  conversation?
10     A.  Not that I recall.
11     Q.  Did Lamken say anything in that conversation
12 about Socha other than as it related to the FOIA?
13     A.  The only thing I recall is -- I believe she
14 said she was not the special -- special -- a prosecutor
15 again, and I thought she said it was someone else who
16 was doing it.  And I don't recall.  I'm sure I have it
17 down in the FOIA because I document it that way.  But I
18 don't recall what specifically was her determination on
19 what went out.  I'd have to sit there and go back on the
20 FOIA and determine what was actually said.
21     Q.  In May and June of 2018, the Department's --
22 the Department had a single Cellebrite terminal?
23     A.  I don't -- I was not in investigations at that
24 point.  I don't recall what they had.

Page 46

1          Are you talking about in 20- -- In what year?
2      Q.  2018.
3      A.  Oh, 2018.  I apologize.  I thought you were
4  talking about 2020.
5          In 2018, from what I recall, they had a
6  Cellebrite computer and then they had a laptop that was
7  a MacBook that ran the Lantern program.
8      Q.  All right.  And they were both located in the
9  investigations division area of the police department
10 offices?
11     A.  Yes.
12     Q.  And the Cellebrite was accessible by a common
13 password?
14     A.  I don't recall, but it's possible.
15     Q.  How about the Lantern?
16     A.  I don't recall.
17     Q.  When -- So all my questions now relate to that
18 same time frame.  When an officer went onto the
19 Cellebrite, how, if at all, would the officer doing that
20 identify himself or herself?
21     A.  What do you mean?
22     Q.  So was it necessary for the officer accessing
23 the data on the Cellebrite to enter any personal
24 identifying information whether that's a name, a badge

Page 47

1  number, a passcode, or any other identification that was
2  personal to that particular officer?
3      A.  Are you talking about viewing or are you
4  talking about doing an extraction?
5      Q.  Viewing.
6      A.  Viewing, if I remember how the Cellebrite
7  works -- It's been a bit.  I believe there is nothing
8  that dictates who was viewing what, if that's -- if I'm
9  understanding your question correctly.
10     Q.  Right.  So if someone -- anyone went on the
11 Cellebrite to view data that had been -- that had
12 already been extracted from a phone, there wasn't
13 anything about the Cellebrite that would capture the
14 identity of that viewer?
15     A.  I don't know.  I don't know the -- the audit
16 capabilities of Cellebrite.
17     Q.  You say the audit, A-U-D-I-T?
18     A.  Audit, A-U-D-I-T.  Correct.
19     Q.  To view data that was extracted from Socha's
20 iPhone while it was on that Cellebrite, walk us through
21 the steps that the viewer would have to go through in
22 order to view the data.
23     A.  So once the phone is -- is extracted and
24 everything is completed, is that what you're asking?

14  (Pages 44 to 47)

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 48

1    Q.   Yeah.  So the extraction is done.  The data
2    that has been extracted from the iPhone is in the
3    Cellebrite.  Walk us through the steps that the viewer
4    now has to go through in order to view the data that was
5    extracted.
6        A.   So just, mind you, I haven't done this in a
7    while, so I'm trying to do this off memory.  But if I
8    remember correctly, once you have an extraction that's
9    completed within Cellebrite, it creates a -- a -- like,
10   a viewer, a reporter which if -- if I'm remembering this
11   correctly again.  It's been a bit.  It will parse out
12   the information.  You have to use a Cellebrite viewer or
13   proprietary software, and it will bring up the
14   extraction again.  And from that point on, you could sit
15   there and go through the data that would be on that
16   extraction.
17       Q.   Okay.  I appreciate -- That's helpful.  But as
18   unfamiliar with it all as I am, I want to do it a little
19   bit more by the numbers.  So I'll try to walk us through
20   that.
21           At any given time the hard drive for the
22   Cellebrite would hold data that had been extracted from
23   computer devices relating to many investigations that
24   were ongoing, true?

Page 49

1        A.   From what it appeared -- Because, like I said,
2    I wasn't doing extractions from there all the time --
3    Actually, really mostly almost never.  There were other
4    extractions that were on that computer.  From my
5    understanding, that is where all of the cell phone
6    extractions were being kept.  And I think it was either
7    tied to a server or something that can store the large
8    amount of data because the Cellebrite is -- I'm sorry.
9    These -- The extractions are extremely large in size.
10   So you have to have a good storing house in place to put
11   those extractions.
12           So I believe the data was -- And I'm not sure.
13   Again, not being in there often and not using it and
14   it's been some time -- And probably Detective German
15   would be much more better to answer this question.  But
16   my understanding is there was some sort of storage
17   network drive or storage device or something that was
18   storing all the cell phone extractions due to how large
19   the extractions can be.
20       Q.   All right.  So back to my by-the-numbers
21   step-by-step question, let's take it one at a time.
22           What was the Cellebrite device left powered
23   on?  It was always turned on, electrical power running
24   to the device, or would somebody who wanted to view

Page 50

1    extracted data have to turn it on?
2        A.   I don't know if it's ever been -- If it's
3    turned off, turned on, I don't know because I'm not -- I
4    wasn't in investigations at the time.  I -- You know
5    what?  I don't recall.
6        Q.   Okay.
7        A.   I don't recall if I had to turn it on when I
8    used it, if it was already on.  That, I don't recall.
9        Q.   Okay.  So somebody turns it on.  At some time,
10   it's on.
11           Now, you want to view data that has been
12   extracted in the -- from Socha's iPhone as part of the
13   investigation into Socha's conduct.  You've entered the
14   password, whatever that password was, and that gets you
15   access to the extracted data, correct?
16       A.   What do you mean by "password"?
17       Q.   Well, there was a -- Was there a password that
18   had to be entered in order for an investigator to view
19   data?
20       A.   I don't --
21       MR. ATKUS:  Objection, asked and answered.
22           Go ahead.
23   BY MR. ADAMS:
24       Q.   Go ahead.

Page 51

1        THE WITNESS:  I may answer?
2        MR. ATKUS:  Yes.
3    BY THE WITNESS:
4        A.   Okay.  If you're talking about -- Are you
5    talking about a password to get into the computer or are
6    you talking about a password to get into a phone or are
7    you talking about a password just to view the
8    extraction?
9        Q.   A password just to view the extraction.
10       A.   I don't recall if -- if Cellebrite had its own
11   login.  Each -- each individual extraction would not
12   have its own password, if that's what you're asking.
13       Q.   No.  And I appreciate that -- appreciate the
14   clarification.
15           So just to get into the extractions that are
16   already in Cellebrite -- all of them, not just one
17   particular -- a password was needed, true?
18       A.   I don't -- I don't recall.
19       Q.   So the machine is on.  Whether there was a
20   password required or not, you don't know.  And now we
21   want to find the data that was extracted from the Socha
22   iPhone.  What would be the next step?
23       A.   So, like I said, I'm trying to go from my
24   memory.  There would be a -- And this could have

15  (Pages 48 to 51)

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 52

1    changed -- Excuse me.  This could have changed by now,
2    but --
3            And, again, if I remember correctly, there was
4    a -- So you had the extraction software that would
5    actually extract the data, and then you would have a --
6    I guess, a report reviewer.  I think it was -- I'm
7    trying to remember the name.  I think it's called
8    physical analyzer, is --
9            It will parse out the data.  And you would use
10   that program to sit there and do your searches.  So --
11   And, again, if I'm remembering correctly, every time you
12   opened it up, you would have to reparse out the
13   extraction.  And it could take some time to put things
14   into categories within the Cellebrite.
15      Q.   Okay.  What -- what would the officer who was
16   attempting to view the data that had been already
17   extracted from Socha's iPhone have to do to make sure
18   that he got access to that data instead of the data from
19   the Jones or the Smith or the Johnson investigations?
20      MS. PROCTOR:  I'm just going to object based on
21   form and foundation for the record.
22   BY THE WITNESS:
23      A.   So I -- I can -- I can -- I can articulate
24   on -- on the Socha extraction specifically because

Page 53

1    that's the one that I was a part of.
2       Q.   Okay.
3       A.   And I can explain how that was done, but it's
4    going to take a little bit of a -- starting from the
5    beginning if you want to hear it.
6       Q.   So I'm not as interested in the extraction
7    part as in what was necessary to view what had already
8    been extracted from her iPhone.
9       A.   So --
10      MS. PROCTOR:  Is there -- is there a question
11   pending?
12      MR. ADAMS:  Yes.
13      MS. PROCTOR:  What is it?  Can you read it back for
14   my benefit?  I think we don't have a question.
15           (Record read as requested.)
16      MS. PROCTOR:  Same objection, form and foundation.
17   BY MR. ADAMS:
18      Q.   You can answer, Lieutenant.
19      A.   So when -- The best way I can answer this is
20   when I did the extraction, I specifically -- And I don't
21   recall exactly where it was put on -- on the computer.
22   But I remember telling Sergeant Grizzle -- I said --
23           Now, my spot -- my -- my position was not in
24   investigations.  I'm not doing the investigation.  I was

Page 54

1    asked to assist with the extraction from -- of the cell
2    phone because of the warrant.
3            But once the extraction was done, I advised
4    Sergeant Grizzle -- I said -- And I told him because it
5    was very -- I don't know how else to put this but very
6    vanilla.  Like, I didn't have her name on there.  At
7    least from what I recall, there was nothing on there
8    that stated that was her phone -- her extraction.  And
9    -- and I'd have to recall where it was put.  But I
10   thought maybe I might have put it under German's name or
11   something to that effect under his -- He did a lot of
12   cell phone extractions and -- And I could be incorrect
13   on that, but my gut tells me it was put in there.
14           And I remember telling Sergeant Grizzle -- I
15   said, "Here's your extraction.  Here's where it's at."
16   And I purposely -- Because there was -- He made
17   indiction when he got the phone from Officer Socha that
18   she was very upset.  She said there was things that were
19   personal on there and she didn't want people going
20   through her phone.  So, obviously, I'm not going to go
21   do that.
22           And when I was advising Sergeant Grizzle, I
23   told him, "This was put in a certain position."  I said,
24   "If you need to get back in there for wherever your

Page 55

1    investigation is going, this is where it's located."  I
2    don't remember the exact location.
3            And I'm not sure if this is answering your
4    question, but this was kind of what -- You know, if a
5    person was going to go in there and look for Officer
6    Socha's phone, they -- they shouldn't be able to find it
7    using her name or anything else like that.  And it was
8    put in a particular position or in a particular spot
9    where I advised Sergeant Grizzle that this is where this
10   is at.  If you need this later, this is where you can go
11   to do whatever else you need to do as part of this
12   investigation.
13           So that was -- I'm not sure if that answers
14   your question, but it's kind of -- From what you're
15   asking, that's kind of my answer to that, if that helps
16   you.
17      Q.   Okay.  I appreciate that.  I think we're both
18   trying to get to the same nut of the thing here.
19           When you did the extraction, do you recall how
20   you labeled the data in the Cellebrite system?
21      A.   The only thing -- I don't remember exactly how
22   it was labeled, but I do recall being -- Whatever it was
23   labeled, it was purposely not labeled with her name.
24   And I advised Sergeant Grizzle of that due to the fact

16  (Pages 52 to 55)

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 56

1  of her concerns when the phone was taken from her down
2  in the watch commander's office.
3  Q.  When you extracted the data from Socha's phone
4  onto the Cellebrite, did you do anything to secure it in
5  such a way that only authorized personnel could go in
6  and access that data?
7  A.  I don't believe I had a way to specifically
8  secure it so no one else can get in there.  My
9  understanding -- And, again, not being in the unit and
10  not working on those cases in a unit, my understanding
11  is that -- that Cellebrite was secure on its own, from
12  my understanding, and that it wasn't being used by
13  everyone within investigations.
14      And when I -- when I left or when I was
15  speaking to Sergeant Grizzle, obviously, I explained to
16  him where it was at, where it was located.  And from
17  that point, my understanding or my -- my position on
18  that is this is now his case.  Whatever happens to it
19  is -- goes from there.
20  Q.  Did you tell anyone other than Grizzle how to
21  locate the Socha iPhone data on the Cellebrite?
22  A.  The only person I can think -- if I would have
23  said anything to -- and I'm not even sure if I did --
24  would have been Detective German.  But I don't recall

Page 57

1  ever even saying that to him.  But I don't want to say I
2  didn't because I -- It's possible because I was -- I
3  asked him to do something else for me later on.
4  Q.  Even if you don't remember specifically how
5  you labeled the Socha iPhone data in the Cellebrite, did
6  you label it in some way?
7  A.  I don't recall how it was labeled.  I don't
8  remember if it was auto generated from the Cellebrite,
9  which is very possible.  And I -- Without using it and
10  being familiar with it again, I'd have to sit there and
11  look at the system again, how it does it.  But I do --
12  Like I said, the only thing I could say is I remember
13  specifically not labeling it as Socha's.
14      And I remember advising Sergeant Grizzle of
15  the location and putting it into a position or in a spot
16  where, in my opinion, you know, no one should be -- no
17  one should be looking.  And I -- and I don't recall
18  exactly where that was at.  And maybe Detective German
19  can probably enlighten you more on where it was located,
20  but I don't recall.
21  Q.  Did you put it in a location in the Cellebrite
22  where one would have to know where to look for it?
23  MS. PROCTOR:  Objection, based on form and
24  foundation.

Page 58

1  MR. ATKUS:  Yeah, objection, calls for speculation,
2  I think, too.
3  BY THE WITNESS:
4  A.  Answer?
5  Q.  You can answer.
6  MR. ATKUS:  You can answer.
7  BY THE WITNESS:
8  A.  So -- so my thought on this was -- And, you
9  know, she had a concern when -- when her phone was taken
10  and she had a concern that she had -- the way Sergeant
11  Grizzle was explaining it to me that she had personal
12  things that were on her phone and, you know, just for
13  her own privacy and everything else like that.  And it's
14  a very sensitive, you know, thing for someone to have
15  your phone.
16      I put it somewhere where, in my belief, a
17  normal person or a normal detective would not go, if
18  that answers your question.
19  Q.  And where was that?
20  A.  I don't -- And that's the thing is I don't
21  recall exactly where it was.  I thought maybe -- And I'm
22  trying to remember again.  It's been a while.  It might
23  have been broken up into either people's names or
24  something like that.  Maybe German had his own name with

Page 59

1  his own extractions and different things like that.  I
2  remember putting it somewhere.  I remember showing
3  Sergeant Grizzle it was put here to let him know that,
4  you know, no one -- no one should be able to find this.
5  And if you need it for whatever, your information going
6  forward would need it for, it would be located here.
7  Q.  Okay.
8  A.  And he might be able to, you know, answer that
9  better and Detective German might be able to answer that
10  better because I can't.  I just, unfortunately, don't
11  remember exactly the location.  But I remember purposely
12  doing it and -- Not to bring someone else involved in
13  this, but -- And this person was not part of my
14  extraction.  But I did have a partner that night that
15  was not -- didn't see anything, you know, just kind of
16  standing off in the distance but was there when I did
17  the extraction, if that makes any sense.
18  Q.  Who was that?
19  A.  That was Officer Dave Szymanski.  He was an
20  officer.  He was a tactical officer at the time.  But he
21  wasn't part of it.  He didn't see me do any of the
22  extractions and, you know, or any of that.  He was
23  more --
24      Just for full disclosure, you know, in that

17  (Pages 56 to 59)

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 60

1    room when we were doing the extraction, it was
2    Sergeant Grizzle; it was me; and it was Officer Dave
3    Szymanski. And like I said, Dave Szymanski -- I don't
4    blame him -- wanted nothing to do with this, was off in
5    a corner somewhere not even in view of the screen and --
6    But just for openness, that's who else was in the room.
7        Q. Okay.
8        A. I'm not trying to bring someone else in this,
9    but that's who was there.
10       Q. When you did the extraction, did you have any
11   more information about what of a personally sensitive
12   nature to Socha was on that phone?
13       A. If I recall, it was like either -- she had
14   personal stuff on there that she didn't want people
15   seeing. I didn't -- Obviously -- And this is coming
16   from Sergeant Grizzle.
17        I didn't want to know. I didn't want, you
18   know, what -- For what he was asking for me to do, I
19   didn't need to go in and look at pictures or anything.
20   So I was able -- For what he was asking me to do and
21   knowing the software and knowing what I was looking for,
22   I didn't need to sit there and start going through
23   pictures or anything like that.
24       Q. Did Grizzle tell you that the sensitive

Page 61

1    information were pictures?
2        A. I don't -- I don't recall if he said it was
3    pictures. He said it was sensitive things she didn't
4    want people to see. It could have been pictures --
5        Q. Any more detail than that?
6        MS. PROCTOR: Would you let him finish? You cut
7    him off.
8    BY MR. ADAMS:
9        Q. Any more detail than that?
10       A. I don't recall. Like I said, he could have
11   said pictures. He could have said videos. He could
12   have said just personal things. I don't recall the
13   exact thing.
14       What I do recall is -- was she was upset. She
15   didn't want -- She initially, I guess, didn't want to
16   give up her phone. She eventually did. And she made
17   the statement, I believe, according to Sergeant Grizzle
18   which was in front of Lieutenant Brown, the watch
19   commander's office that she was concerned about the
20   information being shared on her phone and she didn't
21   want either being viewed or something to that effect.
22       Q. Okay. At some later point in time, did you
23   come to learn that the extraction included both
24   photographic and videographic images of Officer Socha

Page 62

1    nude and engaged in sexual acts?
2        A. The only thing I ever heard on that is when
3    the warrant -- or not the warrant -- the lawsuit came
4    out and there was allegations at that point.
5        Q. Have you heard that from any source other than
6    the allegations in her complaint?
7        A. No.
8        Q. Since that complaint was filed, have you heard
9    any other officers talk about the fact that there were
10   nude and sexually explicit images of Officer Socha
11   extracted from her iPhone?
12       A. The only thing I heard is the rumors that
13   people in investigations had viewed it. And what they
14   viewed, I'm not sure what it was, images or videos or
15   something to that effect. And this -- this was after
16   the lawsuit was filed.
17       Q. Who have you heard viewed those images?
18       A. The only thing I heard was just people from
19   investigations. Specifically, I don't recall. I ...
20       Q. What have you heard the images viewed by
21   personnel in investigations depicted?
22       A. I don't know.
23       MS. PROCTOR: Objection, asked and answered.
24       You just answered again.

Page 63

1       Did you get his -- Did you get the witness's
2    answer, Ms. Court Reporter? You nodding?
3    THE REPORTER: Yes, I did.
4    THE WITNESS: Sorry. I answered too quick.
5    BY MR. ADAMS:
6        Q. Have you heard any Joliet officers comment on
7    Socha's appearance in those images?
8        A. No.
9        Q. Have you heard any Joliet officers comment on
10   the depictions of Socha engaged in sexual acts in those
11   images?
12       A. No.
13       Q. Secondhand, have you heard of such comments?
14       A. No.
15       Q. Did you play any role in extracting Socha's
16   iPhone to the other device? Bear with me. Not the
17   Cellebrite, but the other one.
18       A. The Lantern?
19       Q. Yes, sir.
20       A. Yes.
21       Q. And what exactly was your role in that?
22       A. So it happened the same day. And I think I
23   may have talked about this earlier.
24       So when you have -- So when I did the

18  (Pages 60 to 63)

EXHIBIT F

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 64

1    extraction off the Cellebrite and Sergeant Grizzle was
2    looking for a certain text messaging -- a certain phrase
3    in the text messaging to a certain person -- And within
4    the Cellebrite software you can sit there and just go
5    through text messaging and you can -- and you can narrow
6    it down to two people talking.
7         So that's exactly what I did. I had two phone
8    numbers, extracted it, found the text messaging. And
9    according to my report, it said that there was two
10   deleted text messages that were on there but they were
11   not the two that Sergeant Grizzle was referring to.
12        Through my experience working on cell phone
13   forensics and stuff like that I'm aware within iPhones
14   there's -- everything is done on a database. So -- And
15   once you extract, within Cellebrite what it does is it
16   extracts all the databases within that phone. And
17   within the databases has all the data. And I know
18   through experience is that, like, Cellebrite does not
19   always gather or -- excuse me -- get all the
20   information -- Losing my voice.
21        So what I ended up doing is I ended up going
22   into the SQL -- using a SQL database. I'm not sure if
23   you're familiar with SQL, but it reads -- it could read
24   the database. And it's -- This is the core of what an

Page 65

1    iPhone uses. And within there there's a thing called
2    SMS, which is basically a store- -- is a storing house
3    of all the text messaging within a cell phone. And it
4    can keep cell phones that are -- or messages that are
5    deleted and not deleted and so forth like that until
6    some point that a system will actually wipe it out
7    completely and we can't get it at all. But --
8         So I use the Cellebrite SQLite, which I've
9    used before in other cases. And I was able to bring up
10   that database. And within a certain parameter I typed
11   in the text messaging that he was looking for, and I did
12   find remnants of that text message within there. And I
13   believe I did a screen shot, created a disk, and gave it
14   to Sergeant Grizzle.
15        But with my experience also and knowing I
16   couldn't tell if this message was sent, received, you
17   know, where it came from, date and time, and all that
18   stuff -- So what we've always done on numerous
19   occasions -- and I learned this when I was up in Chicago
20   on the task force -- is you use a different program, you
21   know, and you kind of verify your results.
22        So what I ended up doing at that point is I
23   took the phone and I put it on Lantern. And at that
24   point, I believe I did another extraction off the

Page 66

1    Lantern, which is off of iMac or on a MacBook,
2    obviously. So what happened then is it extracted the
3    data from the phone on that one.
4         And then for whatever reason where the
5    Cellebrite was able to parse out the information and put
6    it into a nice report in a fairly quick manner this
7    Lantern program maybe because of the hardware that it
8    was running on was taking much longer and to the point
9    where, you know, it -- I was there for -- And I couldn't
10   tell you the amount of time. I was there for quite an
11   amount of time waiting for this thing. It didn't look
12   like it was going to get done for a long time.
13        So at that point, knowing that Detective
14   German has been on -- was on this case prior -- he
15   assisted Sergeant Grizzle with the complainant on this
16   initially or victim or however you want to call her in
17   regards to this complaint -- and plus his knowledge in
18   using this software and everything else, so I called him
19   up and advised him, "Hey, this thing is parsing out,"
20   seeing if he was going to be working the next day. He
21   stated he was. I asked him if he can sit there and keep
22   an eye on it and let me know when it finished.
23        Q.  In connection with an extraction of data from
24   an iPhone, does Cellebrite allow you to search for

Page 67

1    specific data like a text message without also
2    displaying other types of data such as e-mails and
3    photographs and videos?
4         A.  Are you asking if you can just search directly
5    for text messaging without having to look at anything
6    else?
7         Q.  Yes, sir.
8         A.  Yes.
9         Q.  Is that true also of Lantern?
10        A.  I don't recall on the Lantern. And I did not
11   see the final product of the Lantern when it was
12   finished.
13        Q.  On Cellebrite to search for photos must one
14   specifically look for photos?
15        A.  Yes.
16        Q.  In order to search for video images, must one
17   specifically search for video images?
18        A.  You can, yeah.
19        Q.  But I'm not just -- You can.
20             But in order to get video images on
21   Cellebrite, you have to specifically look for video
22   images, don't you?
23        A.  If I remember correctly how the software
24   works, there are categories for photos. There's

19  (Pages 64 to 67)

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 68

1   categories for videos. And if you're looking in like --
2   And, again, my memory is -- I've got to remember this --
3   certain text messaging or certain apps like -- I don't
4   know -- like TikTok or -- I don't even think -- TikTok's
5   not the right one, but, like, you know, some of the
6   social media apps could imbed pictures in a text
7   messaging stream. So if you had a text message between
8   two people, it could put the images in there too or it
9   can parse out and have its own category of photos.
10       Q.   If all you want to look at are text messages,
11   you can -- you can search or query just for text
12   messages?
13       A.   Yeah. You can just look at the text messages.
14   And I don't recall if pictures -- if you can just
15   eliminate -- Are you talking like where -- with pictures
16   being shown up also or are you talking about just --
17       Q.   It's just text messages, whatever their
18   content. And I get that pictures can be in text
19   messages. But I -- If what you're looking for are text
20   messages, you can search for just text messages, true?
21       A.   Yeah. And that's exactly what I did. So I
22   looked for her cell phone and I looked for the other
23   person's cell phone. And I was able to -- There's a
24   way -- It's not called grouping, but you -- you parse

Page 69

1   those out. And that's only two messages that you look
2   in. You can see in the back-and-forth between the two.
3   So that's the -- exactly what I did between those two
4   phone numbers that I had.
5       Q.   And your answer just now pretty much addresses
6   my next question. But I want to make it clear --
7       A.   Sure.
8       Q.   -- that in searching for text messages on
9   Cellebrite, you were also able to further narrow the
10   search to text messages from one cell phone device to
11   another cell phone device, correct?
12       A.   Correct.
13       Q.   And you were able to search for specific text
14   messages between a sending device and a receiving device
15   without looking for all the other data that was
16   extracted from a cell phone, correct?
17       A.   Correct.
18       Q.   Was that also true of Lantern?
19       A.   I don't recall. Like I said, I -- I was more
20   familiar with Cellebrite. But what I was -- What my
21   understanding of Lantern and, like I said, the reason
22   why we did it is because it pulls information
23   differently. It can pull up possible dates and times
24   that Cellebrite did not.

Page 70

1       So we've had previous cases that Cellebrite
2   would miss something and, like, Lantern or -- And I'm
3   trying to remember if there was other forensic software
4   used for cell phones at the time. And I've got to
5   remember what they were. But either way they would pull
6   up information differently off -- off the same phone,
7   but those different companies for whatever reason
8   extracted things differently.
9       Q.   In using Cellebrite to search for and find the
10   text messages you were asked to search for and find, you
11   did not also have to look through pictures and videos
12   and e-mails, true?
13       A.   No.
14       Q.   That's correct?
15       A.   Correct.
16       Q.   In connection with the work that you were
17   asked to do in the Socha investigation, were you ever
18   shown a copy of the search warrant pursuant to which
19   Socha's iPhone was seized and the search of the data on
20   that phone authorized?
21       A.   I believe I reviewed it. I believe Sergeant
22   Grizzle gave me a copy of it or had me review it prior
23   to him going down and retrieving the phone from her.
24       Q.   In this time frame, the May 2018 time frame,

Page 71

1   was it common for a sergeant in the tactical unit to be
2   involved in an internal investigation of another Joliet
3   officer?
4       A.   Yes.
5       Q.   And was that role of sergeants in the tactical
6   unit in internal investigations at Joliet officers
7   limited to the forensic IT support like that which you
8   provided in this particular investigation?
9       A.   Yeah. So I've been -- There was -- There's
10   been several internal investigations that I got involved
11   in or asked to assist on while I was in -- as a tactical
12   sergeant. And it had to do, I believe, with the fact
13   that I was still an associate member with the FBI's
14   forensic laboratory.
15       And the reason why I was still an associate
16   member is because we didn't put another member up
17   there -- a full-time member until later last year. So
18   we didn't want to lose that position there and the
19   resources that we get from it. So they were using me
20   kind of almost like a holding place for it.
21       And when big things came up and the fact that
22   I was a sergeant, they were using my abilities and I'd
23   even say connections up in Chicago to do certain cases
24   that they needed done that were high priority or

20  (Pages 68 to 71)

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 72

1  sensitive in nature or things like that.
2      Q. Mark Reid is a fellow officer of yours?
3      A. He is. I believe he's retired now, retired
4  lieutenant.
5      Q. And he was a lieutenant in the internal
6  affairs unit?
7      A. He was at -- at one point. It could have been
8  during that time frame.
9      Q. Was Lieutenant Reid given a copy of the
10  contents of Socha's iPhone?
11     A. I have no idea.
12     Q. At some later point, you acted as -- and you
13  can correct my verbiage if I don't have it exactly
14  right -- an intermediary between the department and RCFL
15  in conjunction with the forensic inquiry into the
16  allegations made by Socha in this case, correct?
17     A. Are you asking if I was like a liaison
18  between --
19     Q. Yeah. Liaison.
20     A. -- RCFL and --
21        Yeah, for the most part.
22     Q. Who detailed you to that specific -- as you
23  call -- liaison duty? Was that Roechner?
24     A. It was Roechner. I don't recall if it was --

Page 73

1  It was Ben before that. But I know I did at one point
2  respond to Roechner.
3      Q. You're familiar with a department -- I guess
4  he's a former department employee named Bergner?
5      A. Am I familiar with him?
6      Q. Yes, sir.
7      A. Yes.
8      Q. Was he a sworn officer?
9      A. Yes, he was.
10     Q. In May of 2018, what did he do for the
11  department?
12     A. In May of 2019?
13     Q. '18.
14     A. '18? He might have been assigned to records
15  maybe doing IT stuff, I think. I don't recall. I'm
16  sorry.
17     Q. His particular background was IT?
18     A. Yeah. So he -- he was a sworn officer, but he
19  was working and doing a lot of the IT stuff around the
20  department. And I don't know exactly where he was
21  assigned to, but he was kind of like our IT person at
22  that time for the department.
23     Q. Did you ever have any discussion with Bergner
24  about any IT issues associated with the investigation of

Page 74

1  the contents of Socha's iPhone?
2      A. No. I don't recall at all.
3        Are you talking about like -- Are talking
4  about just IT-network-type stuff or are you talking
5  about an actual -- in regards to the -- I -- Because I
6  don't recall ever having any conversation with him. I
7  just want to make sure I'm answering this correctly.
8      Q. Fair. Are you aware of whether he played any
9  role at all in handling IT relating to the Socha
10  investigation in any way, shape, or form?
11     A. I -- I don't have any memory or any knowledge
12  of him doing that unless there was something in regards
13  to a computer issue or something. I don't recall. And
14  not that I can recall unless for some reason ...
15     Q. In the normal -- I'm sorry. Are we done? I
16  didn't want to cut you off.
17     A. No. I just -- I just want to make sure I'm
18  answering the question right. I don't -- I just -- You
19  know, because I only did IT stuff and I don't recall
20  ever -- I know I didn't talk to him about the -- you
21  know, Socha's phone or anything like that. I just want
22  to make sure I didn't call him on something in regards
23  to -- I don't think I ever -- My only thing is if I ever
24  asked him about the Lantern -- or not the Lantern -- the

Page 75

1  iMac machine running slow, but I don't think I ever did
2  that.
3        And that would be -- And I'm trying to think
4  of any reason why I would ever have to talk to him in
5  regards to anything that we're discussing today, and the
6  only thing if I ever had to discuss anything with him
7  might have been that, but I don't even think I did that,
8  if that, again, answers your question.
9      Q. In the course of doing forensics investigating
10  work for the Joliet Police Department, does the BEAST --
11     MR. ADAMS: And, Monica, that's all caps as an
12  acronym.
13  BY MR. ADAMS:
14     Q. (Continuing) -- evidence chain of custody
15  system apply to devices that are obtained and data on
16  those devices?
17     MS. PROCTOR: Objection, based on form and
18  foundation for the record.
19  BY THE WITNESS:
20     A. So you're talking about the -- our -- our
21  evidence control --
22     Q. Yes, sir.
23     A. -- called the BEAST?
24     Q. Yes, sir.

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 76

1   A.  And you're asking -- Are you asking
2   specifically in this case or are you asking in general?
3   Q.  Generally.
4   A.  That we put extractions into evidence?
5   Q.  Yes, sir.
6   A.  Certain things -- I believe back at that time
7   certain extractions were not put in evidence due to the
8   large size because we would have phones that were beyond
9   our capabilities of putting onto any type of digital
10  media.  So I think that's why they were stored on that
11  server or whatever they had in investigations, however
12  that system was set up.  But if you had an extraction or
13  a report that was generated, then that could be put into
14  the BEAST.
15  Q.  How about extractions that were copied to
16  storage devices like disks or thumb drives?
17  MS. PROCTOR:  Same objection, form and foundation.
18  BY THE WITNESS:
19  A.  If you're asking if they can be put into the
20  evidence control?
21  Q.  If they're supposed to be put into evidence
22  control.
23  A.  Yeah.  It depends on -- I guess it depends on
24  what you're -- what you're referring to and what case.

Page 77

1   Yes.  Obviously, certain cases you're absolutely going
2   to put into evidence.  If you're sitting there talking
3   about a working product or something like that, you
4   might not put it into evidence until you're done with
5   it.  So --
6   And in regards to this case specifically, I
7   didn't deal with any of that.  So I don't have any
8   knowledge on what would have been or did get put into
9   the BEAST or not.  Everything that I did got handed over
10  to Sergeant Grizzle.
11  Q.  All right.  I'm going to attempt to show you
12  some documents.  I'm going to do it by this screen
13  share.  And I'm no better at it today than I was the day
14  before, but it's -- We'll keep practicing here, and I'll
15  break the code eventually.
16  Can you see on your screen, Lieutenant?
17  A.  Yep.
18  Q.  A document I put up there "Officer Supplement
19  Report."  You got that?
20  A.  Yep.  Yes.
21  Q.  That's a document that you prepared on 17 May
22  2018 at the time shown?
23  A.  I believe it was done on the 18th.  I think
24  the 17th was the date of -- when the original report was

Page 78

1   created.
2   MR. ATKUS:  I'm sorry.  Could I just -- I'm not
3   seeing the document.  What I'm seeing, Hall, is like a
4   list of PDF files with an arrow like you were about to
5   click on it, but I can't see the actual report itself.
6   MS. PROCTOR:  Yeah, you need to open up the PDF.
7   MR. ADAMS:  I don't know how the witness can see
8   that and the rest of you can't.
9   MS. PROCTOR:  Does the witness see it or is he
10  going off the written copy he has in front of him?
11  THE WITNESS:  I just see the list of PDFs.
12  BY MR. ADAMS:
13  Q.  Oh, I thought I'd opened it.  Okay.  Well,
14  here.  Can you see it now?
15  A.  No.  It might be opening it up on a different
16  window for you.
17  MR. ATKUS:  Right click and open.
18  MR. ADAMS:  All right.  I'm going to try to do
19  something a little different.
20  MR. ATKUS:  There we go.
21  MR. ADAMS:  How's that?
22  MR. ATKUS:  You were almost there.  You've got to
23  pick one of those, Hall.  You've got to pick the
24  software you want to open that file in.  So right click

Page 79

1   there.  Now it's going to give you a -- Now do open.  Go
2   down to open and click that.
3   MR. ADAMS:  How's that?
4   MR. ATKUS:  You're not double-clicking it right.
5   It might be where you're -- Here, you're just sharing a
6   window like an Explorer window and not your full screen,
7   was what you're sharing with us.  It could be -- That's
8   not going to be it.
9   THE WITNESS:  No.
10  MR. ADAMS:  Right click.
11  MR. ATKUS:  You might have just e-mailed it to
12  somebody.
13  MR. ADAMS:  Well, right click and open, that's what
14  I've just done.  And nobody can see it.
15  MR. ATKUS:  No.  Are you seeing it on your screen?
16  MR. ADAMS:  Yeah, I am.
17  MR. ATKUS:  Is it on a separate window on a
18  separate side?
19  MR. ADAMS:  I'm going to do this a different way.
20  How about that?
21  THE WITNESS:  No.
22  MR. ADAMS:  This is frustrating.
23  MR. ATKUS:  Seems like that should have worked,
24  from what I could see.

22  (Pages 76 to 79)

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 80

1    MR. ADAMS: Let me get a professional in here.
2    MS. PROCTOR: This is Darcy Proctor. Could we take
3    a five-minute break while you're getting this sorted out
4    just to take five?
5    MR. ADAMS: Sure.
6        (A short break was had.)
7    BY MR. ADAMS:
8    Q. Lieutenant Botzum, can you hear okay?
9    A. Yep, I can hear you.
10   Q. So this particular document, which we'll call
11   Exhibit 1 to today's deposition, was a document you
12   prepared on the 18th of May of 2018 at 6:30 p.m.,
13   correct?
14       A. I believe that was the -- Yes, it's at the
15   right -- right around that time.
16   Q. Does this top part of the document refresh
17   your recollection as to any of the identifying data by
18   which Cellebrite might have been searched for the data
19   that was extracted from Socha's iPhone?
20       A. Are you -- are you referring to this serial
21   number? I'm not sure I'm understanding the question.
22   Q. Is there anything in this document that
23   refreshes your recollection as to the identifying
24   information under which you stored the data extracted

Page 81

1    from Socha's cell phone on the Cellebrite system?
2        A. No, I don't recall what it was exactly named,
3    how it was named, if that's what you're asking for.
4    Q. Yeah.
5        A. No, this does not help me.
6    Q. Whatever that was, you gave it a specific name
7    for purposes of retrieving that data from the Cellebrite
8    system, right?
9        A. If I did what now?
10   Q. You gave it a specific name, right?
11       A. I -- No. I -- I don't recall if it's auto
12   generated through the Cellebrite.
13   Q. Okay.
14       A. And, again, like I said, it's been some time
15   since I've done forensic examinations so I don't recall
16   if it was auto generated from Cellebrite or if it was
17   something that would have been typed in.
18       But what I -- what I recall is regardless of
19   the way that Cellebrite would have done it and if it was
20   typed in or auto generated, I know I didn't put her
21   anywhere in the extraction or any code or any -- sort
22   like that.
23   Q. However it was done by you or auto- --
24   automatically by the software, it was assigned a name,

Page 82

1    true?
2        A. There was -- there was something that would
3    have been identifiable. And when I pointed it out to
4    Sergeant Grizzle and I pointed it out to where it was at
5    so he would know where to go back and locate the
6    extraction if he needed to.
7    Q. And you don't know what that name was, but you
8    do know that it wasn't Socha's name?
9        A. Correct.
10   Q. Okay. Do you know where that name might be
11   found today?
12       A. What -- what name are you referring to?
13   Meaning the extraction name?
14   Q. Yes, sir.
15       A. Probably the extraction itself, wherever
16   that -- in evidence or wherever it may be at.
17   Q. And when you use the -- extraction as a noun
18   like that, you're referring to the universe of data that
19   was pulled off of Socha's iPhone, true?
20       A. Correct. The one -- And -- and in -- So
21   you're understanding this too so we -- so we're all on
22   the same page -- And I probably said this 100 times.
23   But like I said, it's been a while since I've done
24   these.

Page 83

1        When you do an extraction within the
2    Cellebrite, I believe it creates one big file like an
3    encrypted file. And you have to use their, like,
4    reporting software, which I probably -- I think it's a
5    physical analyzer -- and I believe is what it was
6    called -- to parse out that information every time you
7    run the -- every time you use it. So it's not like you
8    can just sit there --
9        And, again, I could be incorrect on this. And
10   I'm trying to go off memory. But everything is
11   encrypted. You can't just search through like your
12   Windows Explorer and just find pictures. I think you
13   have to use the actual analyzer to do the pictures, I
14   believe, and I -- But I could be wrong on that. And,
15   like I said, it's been a while since I've sat there and
16   used it.
17   Q. Looking at the first paragraph of the
18   narrative of Exhibit 1 that's on the screen --
19       A. Yes.
20   Q. -- you did the extraction and you're able to
21   create a report that showed the text message that had
22   been sent from the Socha phone to the Gatlin phone,
23   true?
24       A. Yeah. I created a report between that phone

23 (Pages 80 to 83)

EXHIBIT F

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 84

1   number and the other phone number, and I believe that
2   name might have been a name that was auto populated
3   within the extraction.
4        Q.  Why did you burn that particular report to a
5   disk, period, question mark?
6        A.  This was all the communication that was on the
7   phone between those two numbers, and that's just to show
8   with the Cellebrite locator.  Sergeant Grizzle stated
9   that there was -- what he was looking for in particular
10  was a certain text messaging that was sent from Officer
11  Socha's phone and -- So this showed that and it showed
12  that there was two deleted text messages, I believe,
13  according to my report.
14       Q.  And when you burned that disk, that was all
15  that you burned to the disk, true?
16       A.  I don't recall everything I burned to the
17  disk.  It could have been a compilation of a couple
18  different things.
19       Q.  What in addition to the two text messages that
20  had been deleted could have been burned to that disk?
21       A.  If you look at the second paragraph where I go
22  into and extract the sms-- sms.db file and I use the
23  SQLite browser, I went into that database and found this
24  wording that Sergeant Grizzle was looking for.  And then

Page 85

1   I did a -- I thought I did a screen shot, if I remember
2   correctly.  It should state within -- Yeah.  I took a
3   screen shot of the messages and saved it to an image.
4   So what I burned might have had both of those on there.
5   And I -- and I don't recall what was on the disk, but it
6   might have had both of those on there.
7        Q.  Is it safe to say that on those disks that you
8   burned for Grizzle there were no photographs?
9        A.  Correct.  Besides the screen shot --
10       Q.  No videos?
11       A.  Besides the screen shot that I did of the text
12  messaging out of the SQLite database?
13       Q.  Perfect.  Besides that screen shot.
14       A.  No.  There was no -- there was no -- If you're
15  asking, like, if there was, like, photos, like, that
16  would have came from the cell phone extraction?
17       Q.  Correct.
18       A.  No, none.
19       Q.  Similarly, there were no videos on those disks
20  that you burned for Grizzle, true?
21       A.  True.  No -- There was no videos, correct.
22       Q.  So the third paragraph that begins, "I also
23  used Lantern," and it goes on, why did you use Lantern
24  after you had already extracted the text messages and

Page 86

1   burned reports to disks relating to those text messages?
2        A.  So as -- as I was saying before, you know, we
3   use -- sometimes you use second forensic softwares to
4   confirm what we're looking at.  And since we found
5   remnants in the Cellebrite in examination of the text
6   messaging that he was looking for, knowing how forensic
7   softwares work, we used a second one.
8        So Lantern being Apple-based, a different
9   software that had been useful in other cases, it could
10  potentially extract that -- that information that
11  Sergeant Grizzle was looking for with dates and times
12  and who sent it and who received it.  Because from
13  having the database there itself, we didn't have that
14  information readily available.  And I'm not even sure if
15  we would have even been able to determine through the
16  way the Cellebrite extracted the data.
17       So to try to get it as -- as correct
18  information as possible, you use your second forensic
19  tool to confirm the data, which is why Lantern was used.
20       MR. ADAMS:  Okay.  Monica, would you go to the next
21  document, please, which is on the list something called
22  a "Police Department Interoffice Memorandum"?  And this
23  one is dated 18 May 2018.
24       THE REPORTER:  Is it the part one, Hall?

Page 87

1        MR. ADAMS:  I didn't hear that.
2        THE REPORTER:  Is it part 1?  I have three
3   different PDF interoffice memorandums.
4        MR. ADAMS:  Yeah, it should be part 1.
5        No.  I'm looking for one that's dated 18 May.
6        THE REPORTER:  Nope.  Hold on.  Okay.  Hold on.
7   This one?
8        MR. ADAMS:  There we go.  We'll call this
9   Exhibit 2.
10       BY MR. ADAMS:
11       Q.  Lieutenant, have you ever seen this document
12  before?
13       A.  I might have seen it when I did the FOIA.  I
14  don't recall off the top of my head.
15       MR. ADAMS:  So, Monica, would you scroll to the
16  very bottom of this document?
17       THE REPORTER:  So all the way -- all the way to the
18  bottom?
19       MR. ADAMS:  To the last paragraph.  Not quite that
20  far.
21       THE REPORTER:  The last.
22       MR. ADAMS:  Okay.  That's fine.
23       BY MR. ADAMS:
24       Q.  So what I'd like you to do is read that last

24  (Pages 84 to 87)

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 88

1   paragraph and let us know when you've read it.
2       A.  Do you want me to read it?
3       Q.  To yourself.
4       MS. PROCTOR:  Like silently?
5   BY THE WITNESS:
6       A.  Oh, okay.  Okay.
7       Q.  Have you had a chance to read that paragraph?
8       A.  Yes.
9       Q.  I don't want to deprive you of the opportunity
10  to read the rest of the document if you need to.  If
11  that's the case, tell us.  But my only question for you
12  about this paragraph of Exhibit 2 is, is that consistent
13  with your recollection, that is, that by the 18th of May
14  of 2018 you had completed the extraction and you had
15  given Grizzle the text messages that were on the Socha
16  phone?
17      A.  So somewhat.  So when it says that, you know,
18  I found deleted messages that were sent to Maria's phone
19  from Cassandra, I couldn't determine at that point who
20  sent what.
21          Just for clarification, you know, I found
22  remnants using that SQLite database.  But without
23  running and knowing what Lantern could show, I wasn't
24  sure who sent what, what date and time, and all that

Page 89

1   stuff.
2           But, generally speaking, from reading that and
3   understanding that part, yeah, I just -- as we stated
4   before, is what I gave to Sergeant Grizzle.
5       Q.  After you did that extraction for Grizzle, you
6   were not asked to do anything else in connection with
7   the investigation into Socha until after the -- this
8   complaint and this lawsuit was filed, true?
9       A.  Correct.  Yeah, I wasn't -- I wasn't part of
10  any of this until I was brought in by Chief Benton back
11  when the search -- or the complaint came through for the
12  lawsuit.
13      MR. ADAMS:  Monica, if we go to Exhibit -- We'll
14  call it Exhibit 3, which is the 7 November 2018
15  memorandum.
16      THE REPORTER:  Is this the right one, Hall?  I have
17  a November --
18      MR. ADAMS:  Yes, it is.  And we'll call it
19  Exhibit 3.
20  BY MR. ADAMS:
21      Q.  Lieutenant, you've seen this before?
22      A.  I have.
23      Q.  You authored it?
24      A.  I did.

Page 90

1       Q.  If we look at the second paragraph of -- at
2   the top -- two -- two -- after -- there -- that begins,
3   "Two of the examiners" -- Do you see that paragraph?
4       A.  Correct.
5       Q.  First of all, to what computers are you
6   referring in that first sentence?
7       A.  The reasoning -- To be honest with you, I'm
8   not sure which one I'm referring to exactly on this one.
9   The reasoning before this memo was -- I believe, like,
10  Chief Roechner was asking for an updated or wanted -- or
11  someone wanted a status on where things were at or
12  something to that regards, so -- which is why I -- I
13  penned this memo.  And I don't recall which computers
14  or -- And, obviously, I wasn't that specific in this
15  memo.
16      Q.  How many computers were delivered up to RCFL
17  to examine?
18      A.  I don't recall, but there are documentations
19  of what we brought in.
20      Q.  What, if any, was the significance that you
21  were trying to convey to Chief Roechner when you say
22  that one of the examiners found the Lantern's file name
23  in a log on a computer that was labeled, quote,
24  Cellebrite, close quote, computer?

Page 91

1       A.  I think at that -- If I'm reading this right,
2   is there was a Lantern's file name and a log file, which
3   I think it's just kind of how it states, that there was
4   a Lantern file located on a computer called Cellebrite.
5       Q.  So, again, the first line of the next
6   paragraph that begins, "The last examiner," refers again
7   to the computers as did the preceding paragraph.  Are
8   you able to identify those computers by some identifying
9   feature or whose computers they were?
10      A.  This -- this memo wasn't meant to be specific
11  like that.  It was more of a general, as stated in the
12  title.  It was more of an update of where things were at
13  at -- in -- as I was asked to do.  So no, I -- It's not
14  specifically stating which computers or even which
15  examiners were doing it.
16      Q.  While this work was being done, was the FBI
17  investigating the Joliet Police Department or was this
18  work being done at RCFL because the Joliet Police
19  Department had asked RCFL to do an analysis?
20      A.  My understanding is that the RCFL was doing
21  this at the request of the Joliet Police Department.
22      Q.  Could we scroll to the bottom paragraph on the
23  first page, please?  Do you see the reference in that
24  bottom paragraph to a, quote, case agent, close quote?

25  (Pages 88 to 91)

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 92

1    A.  I do not.  Where are we looking at?
2    Q.  Well, we're in this bottom paragraph here that
3  begins, "The final reports," and about -- and three
4  lines down the term "case agent" appears.
5    A.  "Inform the case agent verbally if anything
6  was found"?
7    Q.  Right.
8    A.  I thought you said something was in quotes.  I
9  apologize.
10    Q.  Who was the case agent?
11    A.  I think what I was referring to in this is a
12  general statement as to some of the policies within the
13  RCFL.  So I don't -- In this particular sentence, it
14  wasn't particularly anyone specifically, if that makes
15  sense.
16    Q.  Okay.  It does.  Okay.  I get it.
17        So the next sentence begins, "The final
18  reports."  Do you see that?
19    A.  Yes.
20    Q.  Have you ever seen the final reports generated
21  by RCFL from the analysis it did of the -- of computers
22  that -- at the request of the Joliet Department?
23    A.  I -- Yeah.  So if we're talking about the
24  completed report that the examiner would write and sign

Page 93

1  a paperwork and do all that --
2    Q.  Yes.
3    A.  -- I was asked again from Chief Roechner and
4  Chris Regis to get all the documents, all the reports
5  that were up at the RCFL in regards to this case.  So --
6  And when it comes -- If you're asking -- If that's what
7  you're asking for, then yes.
8    Q.  Do you remember how many so-called final
9  reports there were?
10    A.  I -- I do not, but I know they were turned
11  over to Chief Roechner.  And I also handed them over to
12  Chris Regis.
13    Q.  Did the final reports contain a narrative that
14  described what the examiners and/or case agents at RCFL
15  had found relative to who, if anyone, on the Joliet
16  Police Department had accessed photographic or
17  videographic images from the data extracted from Socha's
18  iPhone?
19    A.  What I -- Well, from my understanding of what
20  was -- the way it was written up is they were looking
21  for images or Lantern files that would have been located
22  on the hard drive that were copied from the search that
23  the FBI did at whatever the date was.
24    Q.  Do you know which hard drives those were?

Page 94

1    A.  No.  But they were -- they were documented.
2  So when the RCFL goes and does a search on a site, they
3  label everything.  So they'll label the computer.
4  They'll label the hard drive.  And there's a tracking
5  order in -- in regards to that.  And then you can kind
6  of figure out whose computer was what at that time.
7    MR. ADAMS:  All right.  Can we go, Monica, to the
8  next exhibit in order?  I think we're on 4, which would
9  be identified as the police department memorandum,
10  part 2, dated 9 November 2018.
11  BY MR. ADAMS:
12    Q.  All right.  This is a document you've seen
13  before?
14    A.  Yes.
15    Q.  You authored it?
16    A.  I did.
17    Q.  Were the two computers identified in this memo
18  the only two computers that were turned over to RCFL to
19  examine?
20    A.  No.  My understanding, every computer that was
21  in investigations was copied.  And then Chief Roechner
22  took them all -- Or I think I took him up to the RCFL
23  because I had access to get into the building.  And he
24  submitted it as a, you know, case agent or however you

Page 95

1  want to call it but per -- as a point of contact for the
2  case.
3    Q.  Okay.
4    A.  So my understanding -- I never touched the
5  evidence nor what was copied.  So whatever was done at
6  that search was taken up to the RCFL to be examined.
7    Q.  Was -- I should say were any personal computer
8  devices of officers in the investigations unit included
9  among those that were delivered up to RCFL to examine?
10    A.  I have no idea what was actually examined.  So
11  my -- my understanding would be unless you had a search
12  warrant, it should just be government property.  If you
13  had a criminal case where, you know, then you need a
14  search warrant or consent or something, then you could
15  do personal stuff.  So -- And they -- If they had that,
16  I wasn't aware of it.
17        My understanding is everything was property of
18  the City of Joliet.  That was submitted -- That was
19  copied and that was submitted and taken up to the RCFL.
20  And if it's something different, obviously, I wasn't
21  part of the search and I wasn't part of what was
22  determined to be searched or not.  So I don't have
23  firsthand knowledge on.
24    Q.  Do you know who did make the determination

26  (Pages 92 to 95)

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

| Page 96 |
| --- |

1  about which computers were delivered up to RCFL to
2  examine?
3      A.  I do not know.  The only thing I do know is I
4  drove Chief Roechner up to the RCFL because, again, if
5  you've ever been up there, it's -- you get -- there's
6  special parking.  There's special access to the
7  building.  And it's much easier when you have someone
8  that can get in there.
9      Q.  And to be precise, what was delivered weren't
10 actual physical computers but the contents of all of the
11 computers that had been extracted for purposes of this
12 analysis, correct?
13     A.  So yeah.  So when -- when you -- When the RCFL
14 goes to a place to do a search like that, what they do
15 is they copy a hard drive bit for bit.  So you're going
16 to get everything.  You're going to get everything
17 deleted -- Everything that would have been on that
18 computer as if you had it -- you know, the original in
19 your hands, you would have that within the copy.
20         And the way they verify this -- I'm not
21 try- -- I'm not trying to get too technical here, but
22 it's like a -- it's like a thumbprint or DNA.  It's
23 probably -- DNA is even better, even better than DNA
24 when you really look at it.

| Page 97 |
| --- |

1         But it's like -- They take an image of the
2  hard drive and they come up with a DNA-type profile of
3  it.  Then they'll copy everything to an additional hard
4  drive using hardware tools and things like that.  And
5  then they verify it, that everything was copied
6  correctly.  And if it comes out with the same
7  identifying number, which is a -- It's a hash value,
8  which is a very long number.  They use it as numbers and
9  letters and things like that.  Then you know you have
10 the same exact data that was on the original to the
11 copy.
12         And it's so precise that even if you change
13 one -- the littlest thing on the hard drive, the
14 littlest thing, the whole number will change completely.
15 And that's how they verify that you have a
16 forensically -- I don't know if clean copy is the right
17 way, but that you copied everything correctly.  And it's
18 called MD- -- MD5 hash is -- is the acronym or the
19 process that they use when they do this.
20     Q.  Were computers delivered to CRFL -- RCFL,
21 rather, just one time for their examination as part of
22 this investigation?
23     A.  I'd have to look at the intake log.  I want to
24 say that it was taken up there once.  But I want to say

| Page 98 |
| --- |

1  maybe there was twice.  But my recollection would be one
2  time but possibly two, but I'd have to look at the
3  intake logs.
4      MR. ADAMS:  Can we go, Monica, to the next exhibit
5  which is an RCFL report dated 31 August 2018?
6  BY MR. ADAMS:
7      Q.  You've seen this before?  This is Exhibit 5.
8      A.  I'm sure I have.  There was -- there was some
9  issues as I can tell you right off the bat that they
10 have my name down as the person to send this to.
11     Q.  And it should have been Roechner?
12     A.  Yes.  It should not have been me.
13     Q.  Because Roechner was the one who commissions
14 this examination.
15     A.  Correct.  He's the one -- When you look at the
16 intake log, it's his signature on everything.  It's not
17 mine.  And I don't know if the examiners just because
18 their familiarity with me and -- and -- and putting my
19 name on there -- I'm not sure -- but that my name should
20 not have been on these reports.  And I know -- They're
21 not on all of them, if I remember correctly.  But they
22 are on some of them.  And the reports start -- And some
23 of the reports we're talking about a search warrant.
24 And there was never a search warrant that was done.  It

| Page 99 |
| --- |

1  was done on consent.  So there was some inaccuracies in
2  some of these reports that I noticed.
3      Q.  This particular exhibit, 5, does not shed any
4  light on the contents of the data on any computer that
5  was submitted for examination, does it?
6      A.  It's not asking for what?
7      Q.  It doesn't shed any light on the content of --
8  the content of any of the devices that were submitted
9  for examination, does it?
10     MS. PROCTOR:  Just to be clear --
11     MR. ATKUS:  Yeah, we can't see the whole document.
12     MS. PROCTOR:  Yeah.  You know --
13     MR. ATKUS:  It looks like we're only seeing about
14 half a page.  Yeah, a little -- Zoom out a little bit
15 more, please.
16 BY THE WITNESS:
17     A.  So this one looks like it was for a cell
18 phone.  So this one would have -- probably would have
19 been an actual cell phone and not a copy of it.
20     Q.  And it doesn't identify whose cell phone it
21 was, correct?
22     A.  It does not.
23     Q.  And --
24     MS. PROCTOR:  You know, just for the record for our

27  (Pages 96 to 99)

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

| Page 100 |
| --- |

1    reference, can the court reporter scroll down and give
2    us a Bates reference in the lower right-hand corner of
3    the first page of this document that's been identified
4    as Exhibit 5? You know, it looks like our photos are
5    kind of cutting off.
6        MR. ADAMS: Yeah, that's fine. It's City 79 and
7    80 --
8        MR. ATKUS: It's City 79 and 80.
9        MS. PROCTOR: Okay. Thank you.
10   BY MR. ADAMS:
11       Q.   Does this document, Lieutenant, tell us
12   anything about what was found on the particular cell
13   phone device that was submitted for examination?
14       A.   I'd have to look at more of the report. I
15   can't --
16       THE REPORTER: If you just tell me where you
17   want --
18       MR. ADAMS: Let the court reporter know when you'd
19   like her to scroll so that you can read it.
20       THE WITNESS: You can scroll down.
21   BY THE WITNESS:
22       A.   But like -- like I said before, I'm -- I'm not
23   the one -- I'm not the case agent on this. I'm not the
24   one that's going to be going through any of this. This

| Page 101 |
| --- |

1    should have been done by someone else besides me, if I'm
2    understanding what you're asking.
3        Q.   Does your particular training and experience
4    allow you to construe this particular document?
5        MS. PROCTOR: I'm just going to object based on
6    form and foundation.
7    BY THE WITNESS:
8        A.   I'm not sure what -- Are you -- So I'm looking
9    at this report, and I'm not sure exactly what you're
10   asking me. Are you asking me if -- what was found on
11   the phone?
12       Q.   Yes.
13       A.   It looks like that they dumped the phone, if
14   I'm understanding what's in this report. And if you
15   scroll down more, I'd have to look a little bit more.
16   And I don't -- It does not say where -- Or scroll back
17   up if you don't mind. I apologize.
18       THE REPORTER: More?
19   BY THE WITNESS:
20       A.   So as I'm looking --
21       THE WITNESS: Okay. Scroll -- Continue to scroll
22   up a little bit more on the first page just so I can --
23   about right there.
24

| Page 102 |
| --- |

1    BY THE WITNESS:
2        A.   So what it looks like with this report with
3    what this examiner did is there was a phone -- they did
4    an extraction of the phone, complete, and then they
5    burned a disk. From what is put in this report, if
6    there was a search done by the examiner, it was not put
7    on here.
8        Q.   Can we go to the next exhibit which we'll
9    call 6 which is dated 13 September 2018?
10       MR. ADAMS: And I'll represent for counsel's
11   benefit --
12   BY MR. ADAMS:
13       Q.   But we'll still give you the time, Lieutenant,
14   that you need to scroll through --
15       MR. ADAMS: -- that it's City production 226
16   through 230.
17       MS. PROCTOR: Thank you.
18   BY MR. ADAMS:
19       Q.   And do tell us -- You know, guide the reporter
20   through the scrolling. My question is going to be the
21   same, Lieutenant, as you're reading this.
22       And that is, does this exhibit tell us what
23   was found as opposed to merely what was done?
24       THE WITNESS: Did we decide to scroll or are we --

| Page 103 |
| --- |

1        MR. ADAMS: Yeah, tell her to scroll as you --
2        THE WITNESS: Okay. Yeah. Please scroll down.
3    Keep going. A little bit more. About right
4    there. That's perfect.
5    BY THE WITNESS:
6        A.   It looks like kind of the same as before where
7    they did an examination -- examination on the phone and
8    then burned a disk and presented that as the final
9    report.
10       Q.   Do you see the last line where it reads
11   graphics -- I shouldn't say the last line -- the last
12   line on page 3 where it reads, "Graphic and video files
13   within the image file were included in a forensic
14   report"?
15       A.   Where? On which page? 3?
16       MS. PROCTOR: Is that shown?
17   BY MR. ADAMS:
18       Q.   Well, so go --
19       A.   I'm not seeing it.
20       Q.   So here, we'll -- Go back to where we were.
21       THE REPORTER: I think the sentence you're talking
22   about is on this page, Hall, in the middle of the page,
23   "Graphic and video files."
24       MR. ADAMS: I see. I see.

28  (Pages 100 to 103)

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 104

BY THE WITNESS:
A. "Graphic and video files within the image file were included in a forensic report."
Q. Have you seen such a forensic report?
A. I have not seen any of the reports.
Q. Okay. So that's --
A. Are you talking about the one that was extracted --
Q. So that's --
MS. PROCTOR: Wait. Let him finish. You cut him off. Let him finish.
Were you done with your answer?
THE WITNESS: Me?
MS. PROCTOR: Yes.
BY THE WITNESS:
A. Do you want me -- do you want me to wait or do you want me to finish my answer?
Q. No. I thought you were complete. Do you have anything more you want to say about that?
A. So -- Yeah. So I had never seen any of the examination results from the RCFL. Obviously, I've seen the reports. But, obviously, with the two things with the FOIA -- Or, actually, not that this had to do with FOIAs. But this had more to deal with Chief Roechner at

Page 105

the time and Chris Regis getting copies of these reports. That's where I've seen these at.
But the actual examination, I have no part of. That's not -- This had nothing -- This whole -- What do you want to call it? I don't want to say search -- but investigation, however you want to call it, I'm not part of that. I wasn't part of it and I'm ...
Q. And you were never privy to the results that were reported, true?
A. Besides what's in -- written in these reports, no.
Q. Would you go to Exhibit 6, which is another RCFL report of examination dated 17 September 2018, and take the time that you need to direct Monica to scroll through? My question is going to be the same. Does this particular exhibit tell us what was found in this examination as opposed to just what was done?
THE REPORTER: Hall, is this the right one? Because then this is Exhibit 7.
MR. ADAMS: Yes. Yes.
THE WITNESS: If you could scroll down to the summary.
BY THE WITNESS:
A. According to the report, it says they used

Page 106

available forensic tools. Submitted items were processed and examined for along -- for any and all retrievable information along with photos and videos. And then it was made to a forensics report.
Q. Okay. So, again, this tells us what was done but not what was found?
A. Well, here, one thing -- So when it comes to RCFL reports and -- and maybe this might highlight some things on it. So you have the report which is -- This is like the official report, but you also have your -- your notes where our -- a little more detailed in what the actual examiner did. This is more just, like I say, a finalized report. But they do have their notes that they do on every examination. And, like I said, without sitting there looking at what was on the disk and what they found, you know, I -- I can't really answer with what they did.
Q. Okay.
A. I mean, obviously, they make a statement up here about Roechner requesting searches for videos and -- and photos of a sexual nature. Without -- Like I said, unless you look at that disk and see what's on there and see what they did or maybe look at their notes or something like that I really can't comment on what

Page 107

the examiner did because I don't have access and I didn't view the final results.
I mean, I'm kind of going off of their report. It's very general. It's very basic. But I can't really articulate whether they found anything or not.
Q. Okay. Let's go to the next exhibit, the RCFL report of examination dated November 12th, 2018. Have you seen that before?
A. I'm sure I have.
MR. ADAMS: Are we on 3.
8 now, Monica.
THE REPORTER: Yes.
BY MR. ADAMS:
Q. We'll call this Exhibit 8 and again ask you to scroll as much as necessary.
MR. ADAMS: And, Counsel, it's 231 to 234.
BY MR. ADAMS:
Q. Lieutenant, my question is going to be the same. Does this inform us as to findings and conclusions or merely as to process?
A. Your question is -- is -- I'm sorry. In regards to --
Q. This Exhibit 8 tells us what was done but not what was found, correct?

29 (Pages 104 to 107)

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 108

1    A.  It states -- You're talking about where --
2  John Dziedzic, lab director?  It says, "No items
3  matching the criteria were located, there would be no
4  review, and the case could be archived and closed."
5        Is that what you're referring to?
6    Q.  Well, it says, "If no items," blah-blah-blah.
7  So what I'm trying to understand is whether this
8  particular document tells us what the examiners found as
9  opposed to what they did.
10    A.  Well, it looks like where it says, "the
11  following observations were documented," it said,
12  "Observed no .lantern file extensions.  Observed no file
13  named 18-00742.  Observed no achieves which referenced
14  18-00742 or lantern."
15        Is that what you're referring to?  That part?
16    Q.  Is that the only part that informs about
17  findings as opposed to --
18    A.  Within this document it seems to be stating
19  that they found no files in reference to Lantern
20  extensions or that report number.
21    Q.  What do those terms mean to you, if anything?
22    A.  Which terms?
23    Q.  "No .lantern file extensions."  What's a
24  Lantern file extension?

Page 109

1    MS. PROCTOR:  I'm just going to object based on
2  form and foundation for the record.
3  BY THE WITNESS:
4    A.  So a Lantern file -- The Lantern file is like
5  a Lantern extraction.
6    Q.  And does the phrase, quote, File named
7  18-000742, close quote, have a particular meaning to
8  you?
9    A.  Yeah.  So when you -- so when you do a
10  forensic exam -- And this one, from looking at the
11  beginning of the report, is on a computer.  So the one
12  thing you can do within a computer examination is a
13  thing called indexing.  So if there was any remnants at
14  all in reference to this number, it would pull it up.
15  Whether it was deleted or anything else or typed in on
16  anything on any type of record whether it was a Word
17  document or something like that, remnants -- remnants of
18  it could be on a computer whether it was deleted and so
19  forth.
20        So, again, without looking at the examiner's
21  notes and things like this, this kind of tells me if I
22  was reading this from being an examiner that they did an
23  index search in reference to that -- that number.
24    Q.  Do you know what piece or category of data

Page 110

1  from the device examiner was identified by 18-000742?
2    A.  What -- what would have been found?
3    Q.  Right.  So they looked for or at a file named
4  18-000742.  Do you know what was contained in that file?
5    A.  I think out of the Lantern extraction file
6  would be my guess, but, again, I haven't been part of
7  this for a while.  And I'm trying to recall.  But if
8  they were looking for a Lantern file extension and then
9  they're looking for a file name 18-00742, that would
10  tell me that they're looking for -- And is that -- Is
11  this the case number for this -- Is -- Or is part of the
12  case number.
13    Q.  Well, it -- So on the header line there's a
14  reference number 18-0007242 [sic].
15    MR. ADAMS:  And, Monica, you can scroll back up to
16  the top of this exhibit.  It shows that.
17  BY MR. ADAMS:
18    Q.  Does that further inform you about what
19  that -- what, if any, data that reference number
20  designates?
21    A.  So that number, if I look back at my -- my
22  notes that I did my follow-up, this appears to be
23  connected to Sergeant Grizzle's initial investigation.
24  Right?  Correct.

Page 111

1        So that number where it says reference number,
2  that is the same number as Sergeant Grizzle's
3  investigation, which appears that this was put under the
4  same case number.
5    Q.  All right.  Would you go to the next exhibit
6  we can call 9, which is an RCFL report of examination
7  dated 4 December 2018?  Have you seen this report
8  before?
9    A.  I'm -- I'm sure I have.
10    MR. ADAMS:  And, Counsel, this is 68 through 89.
11  BY MR. ADAMS:
12    Q.  If you go to the second page where it's -- in
13  the paragraph that contains the sentence, quote, On
14  26 October 2018, Sergeant Chris Botzum reviewed -- Do
15  you see that sentence?
16    A.  I never reviewed any examination results in
17  regards to this case.  Why it was put in there?  That
18  would be a great question to ask the director.  But my
19  only thought is -- And I'd have to read this further.
20  But no, I didn't -- I didn't search or was part of any
21  of these examination results.
22        Like I said, my part in this was very simple.
23  I was a liaison between the department and the RCFL.
24  And I purposely advised multiple times that that's my

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

| Page 112 | Page 114 |
|---|---|

**Page 112**

1  part in this, so I don't -- I'm not doing this. This is
2  not -- I'm not the case agent, is kind of where I'm
3  going at this.
4       Q.  Is it fair to say that you did not give any
5  direction to RCFL that, quote, No further processing
6  would be needed and that the case should be archived and
7  closed, period, close quote?
8       A.  Any direction -- any direction I would have
9  gave them would have came from someone else such as
10  Roechner.  I wouldn't have made any decision on my own.
11  If I relayed something to -- I believe it was Dziedzic
12  on this -- that came from someone else.
13      Q.  Do you recall relaying that instruction on or
14  about --
15      A.  I don't -- Sorry.
16      Q.  -- on or about 26 October 2018?
17      A.  I don't recall doing that, but it's very
18  possible that whatever course of conversation might have
19  been happening, that I could have relayed those words to
20  Dziedzic from Roechner.
21      Q.  But you don't have a specific recollection?
22      A.  No, I don't.
23      MR. ADAMS:  Would you go to the next page?  And I
24  think this is -- Scroll down a little further, please.

**Page 113**

1  Not quite that far.  There we go.
2  BY MR. ADAMS:
3       Q.  I think this is just repetition of that
4  earlier revision we were just looking at where it says,
5  "On 26 November 2018 Sergeant Botzum advised that
6  derivative evidence was not required."
7            That wasn't a judgment call that you made,
8  true?
9       A.  On which part here?  I'm sorry.
10      Q.  The sentence that reads, quote, On October 26,
11  2018, Sergeant Botzum advised that derivative evidence
12  was not required, period, close quote.  Do you see that?
13      A.  Yeah.  No, I see it.  If -- if I had made that
14  comment -- And I might have said something like that.
15  But like I stated before, that's coming from someone
16  else like Chief Roechner or someone directing.  So I
17  might have said that to them, but that did not -- that
18  didn't come from -- if that makes sense in regards to
19  this because -- Yeah.
20      Q.  Okay.  Would you look at --
21      MR. ADAMS:  I guess we're on 10, Monica, which is
22  an RCFL report dated 12 December 2018.
23  BY MR. ADAMS:
24      Q.  Have you seen that before at some time?

**Page 114**

1       A.  I'm sure I have.
2       Q.  If you'll look at near the bottom of page 2 --
3  and this is 235 to 244 -- at the bottom of page 2 near
4  the bottom of the summary section, you're referred to
5  there as having given RCFL a specific direction.
6            Same question, do you recall doing that?
7       A.  This would -- No, I see that.  So this would
8  probably be the same situation where, again, some sort
9  of direction from probably Chief Roechner.  And it's
10  talking to -- I don't know who this examiner was -- or
11  talking to -- John Dziedzic was the director up there --
12  and advising whatever Roechner advised me to tell him.
13           Like I said, not trying -- My whole part in
14  this was to be that liaison between the RCFL and the
15  department in regards to this.  So, like I said, when
16  you look at these reports, it had my name on there in
17  different places which are inaccurate, but no, I did
18  not -- It wasn't my decision or anything like that to
19  sit there and tell the examiners anything in regards to
20  how they were searching, anything that I would have said
21  to them, which would have came from someone higher than
22  me.
23      Q.  Just by accident of stapling at pages 241 to
24  244 is a later date of report of exam -- And we'll keep

**Page 115**

1  it as part of this exhibit.  There we go.
2            Have you seen this one before?
3       A.  Again, I probably have.
4       Q.  Okay.  If you scroll down to the top of the
5  next page, 242, the first full paragraph there, do you
6  see where you are referenced making certain requests and
7  directions to RCFL?
8       A.  I do.
9       Q.  The same thing -- And that wasn't originating
10  from you.  If, in fact, you gave that direction, it
11  wasn't originating with you.  You may have conveyed
12  Roechner's direction --
13      A.  Correct.
14      Q.  -- but it wasn't you?
15      A.  Correct.  Because I know -- If -- if I'm
16  remembering, there was some concern about the Lantern
17  file.  And it's probably where I've seen a lot of it
18  within these reports.  And, like I said, my direction
19  would have came from Chief Roechner on to what, you
20  know, the examiners to focus on.  Or if something that
21  needed something or some change or whatever, that was my
22  part, which is probably why my name appears on several
23  of these is my guess.
24           I don't recall stating this.  But with -- with

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 116

1   the way that these reports are written, I mean,
2   that's -- that's the only thing I could think of is ...
3       Q.  All right.  Let's go to the next exhibit.
4       MR. ADAMS:  Which is 11?  Monica, is that right?
5   And this is City 320 to 324.
6       THE REPORTER:  Can you tell me what it's called on
7   your list of documents, Hall?  Is it the notes?
8       MR. ADAMS:  Notes.
9       THE REPORTER:  Notes?  Okay.  Let's try that one.
10  This one?
11  BY MR. ADAMS:
12      Q.  Now, Lieutenant, you have not seen this
13  document before, have you?
14      A.  I have not.
15      Q.  I'll represent to you -- and you don't have to
16  take my word for it -- these are handwritten notes that
17  Regis made of his interview of you.  Okay?
18      A.  Whose interview?
19      Q.  Regis's interview of you.
20      A.  Okay.
21      Q.  We talked about that interview earlier when
22  the union rep was with you?
23      A.  Correct.
24      Q.  Okay.  And I -- Again, I appreciate these

Page 117

1   aren't your notes.  These are somebody else's notes.
2   But I want to see if any of these notes refresh your
3   recollection as to what you may have said to Regis
4   during this meeting.
5       A.  Okay.
6       Q.  A ways down the -- This first page where
7   there's a note that says, quote, Everyone has log-in or
8   own computer, close quote, do you recall making a
9   statement to that effect to Regis in that meeting?
10      A.  Where -- where is this?  I'm not seeing it.
11      Q.  About halfway down in the first page, the
12  first word is "Everyone."
13      A.  Okay.
14      MS. PROCTOR:  And to be clear, Hall, your question
15  suggested that this was a quote, and it's not.  So I
16  think you need to clear that up.
17      MR. ADAMS:  So I was getting -- It was a quote to
18  the extent that I was reading from the note, right?
19  I've made pretty clear that this is somebody else's
20  notes.  And I -- I don't mean to suggest that these are
21  meant to be word for word what came out of this
22  witness's mouth from this meeting with Regis.  I've
23  asked him if he's -- and I'm going to continue to ask
24  him -- whether these refreshed his recollection about

Page 118

1   things that he said to Regis.
2       MS. PROCTOR:  I get it, but I just thought your
3   question was confusing and, you know, unknowingly
4   misleading.
5   BY MR. ADAMS:
6       Q.  Does that line, Lieutenant, refresh your
7   recollection as to what, if anything, you said to Regis
8   about everyone having log-ins of their own computer?
9       A.  It does not, because it can mean -- Everyone
10  has a log-in for own computer.  I'm not sure what he's
11  referring to.
12      Q.  Okay.  I don't -- And I cut you off only to
13  tell you that's totally fair.  That's why I told you and
14  I wanted to acknowledge these aren't your notes.
15  They're someone else's notes.  I'm just trying to see if
16  they prompt a memory of what you said to them.
17      A.  Yeah.  You know what?  And no, it -- it
18  doesn't.  I mean, I don't recall if there was no
19  password on there, if you had to sign on with your own
20  network ID.  I -- I don't recall how it was set up.  I
21  mean, that's the question you're asking, correct?
22      Q.  Correct.
23      A.  Yeah.  I don't recall.
24      Q.  So a little further down is a note that reads,

Page 119

1   quote, Physical dump is encoded in Cellebrite software,
2   close quote.  That's what he wrote.
3       Does that refresh your recollection about
4   anything that you said to Regis?
5       A.  Which -- There's a couple parts where it says
6   physical dump -- physical dump gets app data.  Is that
7   what you're referring to?
8       Q.  I read it as, "Physical dump is encoded in
9   Cellebrite software."
10      MR. ATKUS:  I think we can still be on the first
11  page.
12      THE WITNESS:  Yeah, I'm not seeing that one.  Oh,
13  okay.
14  BY THE WITNESS:
15      A.  Physical dump is encoded in Cellebrite
16  software, right?
17      Q.  Right.
18      A.  Yeah, I think I -- I think I -- I talked about
19  this earlier where when you do the extraction, it puts
20  it into one large file.  Then every time you open it it
21  has to parse it out again.  So I think, if looking at
22  this, just from this statement, it sounds like what I
23  said earlier.
24      And when you extract a cell phone using the

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

| Page 120 |
| --- |

1   Cellebrite, it creates one -- one large file that's
2   encoded or encrypted. And then you have to use a
3   different program to view the data.
4       Q.  In using that different program, you have to
5   go in and query or search for the specific data you're
6   looking for, true?
7       A.  Correct. Like we were speaking of earlier
8   about -- I think it's called physical analyzer. Again,
9   I could be incorrect on this, but that's my memory. And
10  within there it kind of parses out the information and
11  it breaks it up into -- You've got videos, photos, text
12  messages, locations. And I'm sure there's several other
13  ones I can't think of off the top of my head.
14      Q.  At RCFL in the different reports we looked at
15  there were names of several different examiners involved
16  in the work that Roechner commissioned. Was there one
17  person there who was in charge of the RCFL's work on
18  this project?
19      A.  Like a -- like a project manager?
20      Q.  Right.
21      A.  Is that kind of what you --
22      Q.  You can call it whatever you want.
23      A.  No. The way -- the way -- And this is my
24  experience with being up there is we get cases where we

| Page 121 |
| --- |

1   get a large amount of data and basically the -- Well, I
2   guess if you look at the -- the project manager or the
3   person that's kind of in charge of it is ultimately the
4   case agent. So the case agent is the one that's
5   supposed to guide the examiner in exactly what they're
6   looking for. So I guess if you -- if you look at it
7   that way, that's the person that really guides the
8   examiner on, you know, over all the case. Because it
9   can get split up into multiple different examiners
10  because some cases are extremely large. Within the RCFL
11  itself, no, you don't have a project manager that would
12  be over -- in charge of one examination.
13      Q.  Okay. What was the case agent -- I'm sorry.
14  You're not done. I'm sorry.
15      A.  Yeah. The case agent should be the one that
16  dictates with the examiners on what they're looking at
17  and what to do.
18      Q.  Who was the case agent on this case at RCFL?
19      A.  It should have been Roechner. I mean, that's
20  my understanding. His name is on -- He's the one that
21  submitted the evidence. And from, like I was stating
22  before, being the liaison between the City and the RCFL,
23  that's the person I spoke with.
24      Q.  In the course of your work on the Socha

| Page 122 |
| --- |

1   investigation beginning with the initial extraction and
2   continuing through the internal investigation where you
3   were the liaison with RCFL, did you ever learn whether
4   the data that had been extracted by you from Socha's
5   phone was loaded onto other Joliet Police Department
6   computers?
7       A.  The only thing -- and this came from the
8   reports -- is that he had the Lantern file on a couple
9   different computers and -- was my understanding.
10  Anything beyond that, I'm not aware of.
11      Q.  And as one of your memos indicated, those
12  computers were computers assigned to Grizzle and German?
13      A.  Yeah, I believe that's what my memo stated.
14      Q.  In the course of your work on this case, did
15  you learn from any source the data that you had
16  extracted from Socha's iPhone was subsequently loaded
17  onto any officer's personal computer device of any kind?
18      A.  No.
19      Q.  Other than the disks that you burned for
20  Grizzle, about what you've already told us in your work
21  on this case, did you learn whether the data you
22  extracted from Socha's iPhone was burned to any other
23  storage devices, any disks, USB thumb drives, any other
24  storage devices?

| Page 123 |
| --- |

1       A.  The only thing I was made aware of was that --
2   I don't know if it was before the lawsuit came out or if
3   it was after, but -- And I didn't play a part in this,
4   but they moved or they took the extraction off of
5   Cellebrite or the Lantern or both or something like that
6   and then put it somewhere either in evidence or
7   somewhere else.
8       Q.  That's where it should have been put, was in
9   evidence, correct?
10      MS. PROCTOR:  Objection, based on form and
11  foundation for the record.
12  BY THE WITNESS:
13      A.  Again, it's -- It was -- It's not my case.
14  I -- Whoever -- whoever is in charge of that, that's up
15  to them.
16      Q.  Did anyone ever share with you that that
17  evidence was -- taken from the extractions was stored in
18  personal offices of Joliet police officers?
19      A.  Are you asking me if I knew or -- or if I saw
20  it?
21      Q.  Have you heard that?
22      A.  The only thing recently was -- So we have a
23  new chief right now. And so Chief Malec was going
24  through -- The chief --

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 124

1    Q. We lost you, Lieutenant. Lieutenant, we lost
2  you.
3    MS. PROCTOR: This could be a sign to wrap it up.
4  BY MR. ADAMS:
5    Q. You're showing as muted, Lieutenant.
6    MS. PROCTOR: Yeah, I don't even see him on my
7  screen but --
8    MR. ADAMS: Neither do I.
9  BY THE WITNESS:
10   A. Am I back?
11   Q. Yes. We can hear you. Now we can see you.
12   A. Sorry. I unplugged my camera and muted. That
13 seemed to help.
14   Q. Okay. So --
15   A. All right. Let me go back to what I was -- I
16 hope I'm not remembering this wrong.
17      So my understanding is this was recently put
18 into evidence, I believe, when our new chief, Dawn
19 Malec, came in. And I don't remember if it was in her
20 safe or if it was in Carl Spanlock's (phonetic) safe.
21 But I believe that there was a thumb drive or something
22 that ended up being put into evidence, and I take that --
23      And I take that back. I'm remembering more
24 now. With her witnessing we had to make copies of what

Page 125

1  was in there, which was turned over, I believe, to you.
2  Does that sound right?
3    Q. Well, it's your answer. I ...
4    A. All I know is we were doing at the -- At the
5  direction of Dawn Malec, they found, I believe -- I
6  thought it was for you -- or for your office at least to
7  make copies and give them to you and then put the
8  originals that they had into evidence.
9    Q. Have you ever been tasked with training other
10 detectives in the Joliet Department on the use of this
11 Cellebrite?
12   A. So when I first got in the RCFL, I did a
13 training class on Cellebrite, but it was not the version
14 that was used in this. It was a -- it was a hardware
15 version that didn't use a computer. And I did a class,
16 I guess you could say, with the guys in investigations.
17 I don't even think it was all the guys. But I don't
18 think that quite would carry over to the new Cellebrite.
19 But that was the -- if you want to say -- official
20 training that I did. And that was -- I don't even know
21 what year that was.
22      But beyond that, I don't think I did any
23 official training. If anything, with Detective German,
24 I know he got trained in it. I probably helped him with

Page 126

1  any questions or anything that he might have had in it,
2  but no official training from the new Cellebrite that
3  was used in regards to this -- this case here.
4    Q. Do you know how detectives got trained on the
5  Cellebrite that was being used in May of 2018?
6    A. I don't. But I believe -- And, again, you'd
7  have to speak to the officers on this or the detectives,
8  but I felt they got trained through a Cellebrite class
9  itself, so through the company.
10      But, again, you're going to have to probably
11 speak to them on that. That's just kind of going off of
12 recollection.
13   MS. PROCTOR: Yeah, I'm just going to do a late
14 objection based on form and foundation for the record.
15 BY MR. ADAMS:
16   Q. Has Detective McKinney ever reached out to you
17 for training on the Cellebrite?
18   A. Not that I recall.
19   Q. Have you personally ever observed McKinney
20 doing investigative work on the Cellebrite?
21   A. Not that I recall. But, I mean, it is
22 possible. I could have been in a room when he was doing
23 something in it, but nothing that I would have memorized
24 or would have noticed to a point where I would remember.

Page 127

1    Q. Do you know whether there was any practice in
2  the investigations division with officers practicing on
3  the Cellebrite without a particular official
4  investigative purpose?
5    MS. PROCTOR: Objection, based on form and
6  foundation and speculation for the record.
7  BY THE WITNESS:
8    A. So with me being in -- in the tactical unit,
9  I'm not aware of what they were doing in investigations.
10   Q. Okay.
11   THE WITNESS: Could I ask a question on this really
12 quick?
13   MR. ADAMS: Yes.
14   THE WITNESS: Do I get a copy of the transcripts on
15 this?
16   MR. ADAMS: Great question. And we answer that
17 pretty extensively for you here very shortly at the end.
18 It's sort of the grand finale of this.
19      I don't have any further questions.
20   MS. PROCTOR: No questions from the City of Joliet.
21   MR. ATKUS: I don't have any questions either.
22 Sorry.
23   MR. ADAMS: Okay. So in the one instance,
24 Lieutenant, where we will answer your question, and that

34 (Pages 124 to 127)

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 128

1   is you do have a right to read and review the transcript
2   of this deposition when it's written, which it will be,
3   and it's not for the purpose of changing any questions
4   or answers, which you can't do --
5       THE WITNESS: Right.
6       MR. ADAMS: -- but for the purpose of noting in a
7   separate document any instances in which you believe the
8   transcription is in error in any way.
9           And that is a right that you have, and you can
10  exercise that right or waive that right. And we do need
11  you to tell us on the record whether you elect to
12  exercise or to waive that right.
13      THE WITNESS: To have a copy of it, yes.
14      MR. ADAMS: So we'll show signature is reserved.
15      MS. PROCTOR: Reserved.
16      MR. ADAMS: I'm going to write it, Monica, the
17  usual ways.
18      MS. PROCTOR: Monica, the City of Joliet will take
19  a copy of this one.
20      THE REPORTER: Okay.
21          What kind of copy? Ms. Proctor, E-Tran or
22  PDF?
23      MS. PROCTOR: I'll let you know.
24      THE REPORTER: Mr. Atkus, do you need a copy?

Page 129

1       MR. ATKUS: Yeah, we'll do an E.
2       MS. PROCTOR: I'm going to -- The City of Joliet is
3   going to withdraw its request for the transcript.
4       THE REPORTER: Okay. So who -- Am I sending the
5   transcript for signature to which attorney for the
6   witness --
7       MS. PROCTOR: Oh, you know what? Why don't you let
8   me get this one, Mike? I'll get this transcript, okay,
9   on behalf of the City of Joliet, and we'll figure out
10  what we're going to do with getting it to our witness.
11      MR. ATKUS: Okay. All right.
12          So I'll withdraw my order then.
13      THE REPORTER: Okay.
14              (The deposition was concluded
15              at 4:19 p.m.)
16
17
18
19
20
21
22
23
24

35 (Pages 128 to 129)

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

```
                                                    Page 130

 1              IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3    CASSANDRA SOCHA,                  )
                                        )
 4                   Plaintiff,         )
                                        )
 5         vs.                          )   No. 18 CV 05681
                                        )
 6    CITY OF JOLIET, a municipal       )
      corporation, EDWARD GRIZZLE,      )
 7    JOHN DOES 1-20,                   )
                                        )
 8                   Defendants.        )

 9

10              I, SERGEANT CHRISTOPHER BOTZUM, state that I

11    have read the foregoing transcript of the testimony

12    given by me at my videoconference deposition on

13    April 30th, 2021, and that said transcript constitutes a

14    true and correct record of the testimony given by me at

15    the said deposition except as I have so indicated on the

16    errata sheets provided herein.

17

18

19                              _____
                                SERGEANT CHRISTOPHER BOTZUM
20

      SUBSCRIBED AND SWORN to
21    before me this _____ day
      of _____, 2021.
22

23    _____
           NOTARY PUBLIC
24
```

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 131

1    UNITED STATES OF AMERICA          )
     NORTHERN DISTRICT OF ILLINOIS     )
2    EASTERN DIVISION                  ) SS.
     STATE OF ILLINOIS                 )
3    COUNTY OF COOK                    )

4

5              I, Monica Kim, Certified Shorthand Reporter,

6    do hereby certify that SERGEANT CHRISTOPHER BOTZUM was

7    first duly sworn by me to testify to the whole truth and

8    that the above videoconference deposition was reported

9    stenographically by me and reduced to typewriting under

10   my personal direction.

11             I further certify that the said deposition was

12   taken at the time and date specified and that the

13   taking of said deposition commenced on April 30th, 2021,

14   at 12:56 p.m.

15             I further certify that I am not a relative or

16   employee or attorney or counsel of any of the parties,

17   nor a relative or employee of such attorney or counsel,

18   nor financially interested directly or indirectly in

19   this action.

20

21

22

23

24

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 132

1          The signature of the witness, SERGEANT

2     CHRISTOPHER BOTZUM, was reserved by agreement of

3     counsel.

4          Witness my signature as a Certified Shorthand

5     Reporter in the State of Illinois, on May 19th, 2021.

6

7

8

9

10

11

12     _____
       MONICA KIM, CSR
13     161 North Clark Street
       Suite 3050
14     Chicago, Illinois 60601
       Phone:  312.361.8851

15

16
       CSR No.   084-004606
17

18

19

20

21

22

23

24

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 133

| A | | | | |
|---|---|---|---|---|
| **A-U-D-I-T** 47:17,18 | 32:17 39:7,9 42:2,13,16,19 43:2,7,10 | **agency** 40:3,24 41:9 | 30:20 39:20 41:14 42:3,4 | **April** 1:16 130:13 131:13 |
| **abilities** 71:22 | 50:23 53:12,17 | **agent** 91:24 92:4 | 43:3 49:15 | **archived** 108:4 |
| **able** 55:6 59:4,8 59:9 60:20 | 61:8 63:5 75:11,13 78:7 | 92:5,10 94:24 100:23 112:2 | 51:1 53:18,19 55:15 58:4,5,6 | 112:6 **area** 17:20 46:9 |
| 65:9 66:5 68:23 69:9,13 | 78:12,18,21 79:3,10,13,16 | 121:4,4,13,15 121:18 | 59:8,9 63:2 69:5 104:12,17 | **arrow** 78:4 **articulate** 30:14 |
| 83:20 86:15 91:8 | 79:19,22 80:1 80:5,7 86:20 | **agents** 93:14 **ago** 8:20 14:2 | 106:16 125:3 127:16,24 | 52:23 107:5 **aside** 32:18 |
| **absolutely** 77:1 | 87:1,4,8,10,15 | **agreement** | **answered** 27:4 | **asked** 42:1 |
| **access** 13:20 50:15 52:18 | 87:19,22,23 89:13,18,20 | 132:2 **ahead** 26:7 | 42:1 50:21 62:23,24 63:4 | 50:21 54:1 57:3 62:23 |
| 56:6 94:23 96:6 107:1 | 94:7,11 98:4,6 100:6,10,18 | 39:20 50:22,24 **AI** 6:10 | **answering** 55:3 74:7,18 | 66:21 70:10,17 71:11 74:24 |
| **accessed** 93:16 **accessible** 10:19 | 102:10,12,15 102:18 103:1 | **allegations** 29:22 32:20 | **answers** 18:5 55:13 58:18 | 89:6 91:13,19 93:3 117:23 |
| 46:12 **accessing** 46:22 | 103:17,24 105:20 107:10 | 62:4,6 72:16 **alleviate** 31:15 | 75:8 128:4 **anymore** 8:18 | **asking** 33:7 40:15 42:8 |
| **accident** 114:23 **accommodate** | 107:13,16,17 110:15,17 | **allow** 24:7 66:24 101:4 | **anyways** 29:13 **apologize** 46:3 | 47:24 51:12 55:15 60:18,20 |
| 5:5 **accurate** 33:10 | 111:10,11 112:23 113:2 | **allowed** 30:20 **allowing** 25:11 | 92:9 101:17 **app** 119:6 | 67:4 72:17 76:1,1,2,19 |
| **achieves** 108:13 **acknowledge** | 113:21,23 116:4,8,11 | **allows** 13:20 14:4,5,7 | **appearance** 63:7 **APPEARAN...** | 81:3 85:15 90:10 93:6,7 |
| 118:14 **acronym** 75:12 | 117:17 118:5 124:4,8 126:15 | **AMERICA** 131:1 | 2:1 **appeared** 49:1 | 99:6 101:2,10 101:10 118:21 |
| 97:18 **acted** 72:12 | 127:13,16,23 128:6,14,16 | **amount** 49:8 66:10,11 121:1 | **appears** 92:4 110:22 111:3 | 123:19 **assigned** 8:8 |
| **action** 131:19 **active** 31:11 | **addition** 84:19 **additional** 97:3 | **analysis** 17:12 91:19 92:21 | 115:22 **appellate** 43:16 | 12:2,3 33:20 33:21 73:14,21 |
| **acts** 62:1 63:10 **actual** 74:5 78:5 | **addresses** 69:5 **advised** 31:24 | 96:12 **analyzed** 31:4 | **Apple-based** 86:8 | 81:24 122:12 **assist** 7:17,20 |
| 83:13 96:10 99:19 105:3 | 54:3 55:9,24 66:19 111:24 | 32:6 **analyzer** 52:8 | **applied** 39:16 40:23 41:9 | 54:1 71:11 **assisted** 16:1 |
| 106:12 **Adams** 2:2,2 3:4 | 113:5,11 114:12 | 83:5,13 120:8 **and/or** 17:11 | **applies** 40:11 **apply** 41:22 | 66:15 **associate** 8:17 |
| 4:8,9 12:24 13:2 21:4 | **advising** 54:22 57:14 114:12 | 29:21 34:19 35:1 93:14 | 75:15 **appreciate** 27:8 | 16:12 71:13,15 **associated** 24:15 |
| 22:17 23:7,10 23:13,15,20 | **affairs** 4:20 6:17 6:19,22 16:24 | **answer** 5:1,6,10 5:11,12,13 | 40:21 48:17 51:13,13 55:17 | 73:24 **Atkus** 2:14 |
| 24:1,18 25:3,9 25:14,17 26:8 | 16:24 40:6,8 40:16 72:6 | 15:12 22:14,19 23:3,8,12,19 | 116:24 **approximately** | 20:24 21:2 32:13,16 42:1 |
| 27:5,9,14 | **affiliation** 9:5 | 23:22 24:8 26:21,23 27:5 | 19:8 **apps** 68:3,6 | 42:11,18 50:21 51:2 58:1,6 |

Royal Reporting Services, Inc.
312.361.8851

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 134

78:2,17,20,22
79:4,11,15,17
79:23 99:11,13
100:8 119:10
127:21 128:24
129:1,11
**attempt** 5:1
77:11
**attempting**
52:16
**attended** 29:20
**attorney** 129:5
131:16,17
**attorney-client**
22:7,15,16
24:7 25:8
**attorneys** 22:6
23:5,21 24:5
24:15 25:2
**audio** 36:16,18
36:19,21
**audit** 47:15,17
47:18
**August** 19:19
98:5
**authored** 89:23
94:15
**authorized**
44:18 56:5
70:20
**auto** 57:8 81:11
81:16,20 84:2
**auto-** 81:23
**automatically**
81:24
**available** 86:14
106:1
**aware** 17:6 28:7
41:13 64:13
74:8 95:16
122:10 123:1
127:9

———————
**B**
———————

**B** 3:6
**B-O-T-Z** 4:16
**back** 5:4 8:4
14:10 19:17
31:7 41:7,18
42:15,23 43:5
43:10 45:19
49:20 53:13
54:24 76:6
82:5 89:10
101:16 103:20
110:15,21
124:10,15,23
**back-and-forth**
31:13 69:2
**background**
73:17
**badge** 46:24
**Barely** 43:2,3
**based** 22:11
23:18 39:5
52:20 57:23
75:17 101:5
109:1 123:10
126:14 127:5
**basic** 107:4
**basically** 7:17
7:17 19:15
29:18 30:22
31:3,4 44:13
65:2 121:1
**basis** 16:8 31:19
38:23
**bat** 23:16 98:9
**Bates** 100:2
**Bear** 63:16
**BEAST** 75:10
75:23 76:14
77:9
**beginning** 38:9
39:1 53:5
109:11 122:1
**begins** 85:22
90:2 91:6 92:3

92:17
**behalf** 2:6,12,17
129:9
**belief** 58:16
**believe** 6:10 7:8
8:5 9:4,18
11:24 13:5
15:19 17:23
21:12,12,24
25:20,22 27:22
29:16 30:4
31:1,8 36:17
38:17,21 39:24
43:20 44:2,13
44:22 45:13
47:7 49:12
56:7 61:17
65:13,24 70:21
70:21 71:12
72:3 76:6
77:23 80:14
83:2,5,14 84:1
84:12 90:9
112:11 122:13
124:18,21,22
125:1,5 126:6
128:7
**Ben** 73:1
**benefit** 53:14
102:11
**Benton** 21:21,24
29:6,9 31:8
89:10
**Bergner** 73:4,23
**best** 53:19
**better** 17:2
49:15 59:9,10
77:13 96:23,23
**beyond** 76:8
122:10 125:22
**big** 71:21 83:2
**bigger** 16:11
**bit** 8:21 15:13
47:7 48:11,19

53:4 96:15,15
99:14 101:15
101:22 103:3
**blah-blah-blah**
108:6
**blame** 60:4
**board** 6:8,12
**Bolingbrook** 2:9
**Bot-** 25:18
**bottom** 25:12
87:16,18 91:22
91:24 92:2
114:2,3,4
**Botzum** 1:11 3:3
3:7 4:3,16,23
25:4,10,18
27:15 39:10
42:13 80:8
111:14 113:5
113:11 130:10
130:19 131:6
132:2
**Boughton** 2:8
**break** 43:9
77:15 80:3,6
**breaks** 120:11
**Breen** 35:16
36:12,17
**Breen's** 35:19
35:21
**Brian** 21:21
**bring** 14:10
19:16 48:13
59:12 60:8
65:9
**broken** 58:23
**brought** 25:22
89:10 90:19
**Brown** 61:18
**browser** 84:23
**budgets** 9:7
**building** 94:23
96:7
**bunch** 14:20

19:21
**burn** 84:4
**burned** 84:14,15
84:16,20 85:4
85:8,20 86:1
102:5 103:8
122:19,22
**by-the-numbers**
49:20

———————
**C**
———————

**call** 22:15 43:22
44:4 66:16
72:23 74:22
80:10 87:8
89:14,18 95:1
102:9 105:5,6
107:14 111:6
113:7 120:22
**called** 1:11 4:4
16:20,23 21:21
21:23 37:6
52:7 65:1
66:18 68:24
75:23 83:6
86:21 91:4
97:18 109:13
116:6 120:8
**calls** 33:12 58:1
**camera** 124:12
**capabilities**
47:16 76:9
**capacity** 26:1,24
**caps** 75:11
**capture** 47:13
**Carl** 124:20
**carry** 125:18
**case** 21:11 29:23
35:5 45:8
56:18 66:14
72:16 76:2,24
77:6 88:11
91:24 92:4,5
92:10 93:5,14

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 135

94:24 95:2,13
100:23 108:4
110:11,12
111:4,17 112:2
112:6 121:4,4
121:8,13,15,18
121:18 122:14
122:21 123:13
126:3
**cases** 8:19 10:12
16:1,10,12,24
56:10 65:9
70:1 71:23
77:1 86:9
120:24 121:10
**Cassandra** 1:3
2:19 4:10
21:11 88:19
130:3
**categories** 52:14
67:24 68:1
**category** 68:9
109:24
**cell** 8:12 11:16
13:17,18 17:14
49:5,18 54:1
54:12 64:12
65:3,4 68:22
68:23 69:10,11
69:16 70:4
81:1 85:16
99:17,19,20
100:12 119:24
**Cellebrite** 11:3
11:5,13,20
12:16 13:9,11
13:15,18,19
14:15 15:16,18
17:11,23 18:3
32:8 45:22
46:6,12,19,23
47:6,11,13,16
47:20 48:3,9
48:12,22 49:8

49:22 51:10,16
52:14 55:20
56:4,11,21
57:5,8,21
63:17 64:1,4
64:15,18 65:8
66:5,24 67:13
67:21 69:9,20
69:24 70:1,9
80:18 81:1,7
81:12,16,19
83:2 84:8 86:5
86:16 90:24
91:4 119:1,9
119:15 120:1
123:5 125:11
125:13,18
126:2,5,8,17
126:20 127:3
**central** 40:5
**certain** 16:10
20:23 36:1
54:23 64:2,2,3
65:10 68:3,3
71:23 76:6,7
77:1 84:10
115:6
**certification**
16:16,22
**certified** 1:15
17:5 131:5
132:4
**certify** 131:6,11
131:15
**chain** 75:14
**chance** 23:15,20
24:1 27:6 88:7
**change** 97:12,14
115:21
**changed** 52:1,1
**changing** 128:3
**characterize**
33:2,15
**charge** 120:17

121:3,12
123:14
**charging** 34:9
**Chicago** 2:4 8:9
8:10,22 9:2,9
16:15 65:19
71:23 132:13
**chief** 6:10 20:4
21:24 29:6,9
31:8 89:10
90:10,21 93:3
93:11 94:21
96:4 104:24
113:16 114:9
115:19 123:23
123:23,24
124:18
**Chris** 19:14
21:21 25:20
42:11 93:4,12
105:1 111:14
**Christopher**
1:10 3:3 4:3,16
26:24 130:10
130:19 131:6
132:2
**city** 1:6 2:12
21:22 24:15,21
27:1 28:7,7,21
28:22 29:2,3,5
29:21 30:1,10
95:18 100:6,8
102:15 116:5
121:22 127:20
128:18 129:2,9
130:6
**City's** 24:17
**Civil** 1:13
**clarification**
32:14 51:14
88:21
**Clark** 132:12
**class** 125:13,15
126:8

**classes** 11:11
**clean** 97:16
**clear** 26:20,21
41:15 69:6
99:10 117:14
117:16,19
**click** 78:5,17,24
79:2,10,13
**client** 21:11
**close** 90:24
91:24 109:7
112:7 113:12
117:8 119:2
**closed** 108:4
112:7
**code** 77:15
81:21
**codes** 38:4,11
**college** 5:18
**come** 36:10
42:23 43:5
45:8 61:23
97:2 113:18
**comes** 7:20 9:7
14:19 36:1
93:6 97:6
106:7
**coming** 42:15
60:15 113:15
**commander's**
56:2 61:19
**commenced**
131:13
**commencing**
1:16
**comment** 63:6,9
106:24 113:14
**comments** 63:13
**commissioned**
120:16
**commissions**
98:13
**committed** 34:5
**common** 46:12

71:1
**communication**
84:6
**companies**
14:21,23 70:7
**company** 15:18
15:21 18:4
126:9
**compared** 15:7
**compilation**
84:17
**complainant**
66:15
**complaint** 21:10
22:22,23,24
28:5 32:21
37:4,8 40:17
41:7,13,17
62:6,8 66:17
89:8,11
**complaints** 40:3
41:4,9,12,12
**complete** 102:4
104:18
**completed** 47:24
48:9 88:14
92:24
**completely** 4:24
5:7,8 65:7
97:14
**complicated**
12:12
**complied** 39:3
**computer** 8:12
8:23 9:3,8,9,16
10:2 13:19
14:19 16:13
17:3,8,9 32:11
44:13 46:6
48:23 49:4
51:5 53:21
74:13 90:23,24
91:4 94:3,6,20
95:7 96:18

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 136

99:4 109:11,12
109:18 117:8
118:8,10
122:17 125:15
**computers** 31:2
31:3,12 90:5
90:13,16 91:7
91:8,9,14
92:21 94:17,18
96:1,10,11
97:20 122:6,9
122:12,12
**concern** 22:13
58:9,10 115:16
**concerned** 61:19
**concerns** 56:1
**concluded**
129:14
**conclusions**
107:20
**conduct** 30:11
38:4,11 50:13
**confirm** 86:4,19
**confusing** 41:16
118:3
**conjunction**
72:15
**connected**
110:23
**connection** 35:9
35:12 66:23
70:16 89:6
**connections**
71:23
**consent** 95:14
99:1
**consider** 8:17
**considered** 17:1
**consistent** 88:12
**constitutes**
130:13
**construe** 101:4
**contact** 95:1
**contain** 93:13

**contained** 110:4
**contains** 111:13
**contender** 34:16
**content** 68:18
99:7,8
**contents** 72:10
74:1 96:10
99:4
**context** 30:17
**continue** 22:14
22:18 25:12
101:21 117:23
**continuing**
75:14 122:2
**control** 24:23
30:10 75:21
76:20,22
**conversation**
44:11 45:1,4,9
45:11 74:6
112:18
**conversations**
22:7 34:23
35:3
**convey** 90:21
**conveyed** 115:11
**COOK** 131:3
**copied** 76:15
93:22 94:21
95:5,19 97:5
97:17
**copies** 20:13
105:1 124:24
125:7
**copy** 31:21
70:18,22 72:9
78:10 96:15,19
97:3,11,16
99:19 127:14
128:13,19,21
128:24
**core** 64:24
**corner** 60:5
100:2

**corporate** 25:20
**corporation** 1:7
24:17 27:1
130:6
**correct** 6:18
9:18 28:10,11
28:13,17,19
32:9 35:14
36:13 40:6
47:18 50:15
69:11,12,16,17
70:14,15 72:13
72:16 80:13
82:9,20 85:9
85:17,21 86:17
89:9 90:4
96:12 98:15
99:21 107:24
110:24 115:13
115:15 116:23
118:21,22
120:7 123:9
130:14
**correctly** 11:17
12:11,14 15:19
29:8 47:9 48:8
48:11 52:3,11
67:23 74:7
85:2 97:6,17
98:21
**counsel** 24:16
25:19,21 27:1
107:16 111:10
131:16,17
132:3
**counsel's** 24:17
102:10
**country** 9:11
**County** 12:4,10
131:3
**County's** 12:4
**couple** 4:22 39:8
44:20 84:17
119:5 122:8

**course** 75:9
112:18 121:24
122:14
**court** 1:1 25:7
27:20 63:2
100:1,18 130:1
**Courts** 1:13
**coy** 24:4
**create** 83:21
**created** 65:13
78:1 83:24
**creates** 48:9
83:2 120:1
**CRFL** 97:20
**criminal** 32:4
95:13
**criminally** 36:5
36:8
**criteria** 108:3
**cross-training**
34:8,12
**cross-training...**
33:22
**Crowley** 33:3,10
34:19 35:1,6
45:6,8
**CSR** 132:12,16
**currently** 4:21
5:20 6:17
**custody** 75:14
**cut** 61:6 74:16
104:10 118:12
**cutting** 100:5
**CV** 1:5 10:10,15
10:22 11:6,9
11:12,19 13:4
130:5

_____
**D**
**D** 3:1
**Darcy** 2:7 80:2
**dark** 42:10
**data** 13:20,21
14:22 15:5

17:12 46:23
47:11,19,22
48:1,4,15,22
49:8,12 50:1
50:11,15,19
51:21 52:5,9
52:16,18,18
55:20 56:3,6
56:21 57:5
64:17 66:3,23
67:1,2 69:15
70:19 75:15
80:17,18,24
81:7 82:18
86:16,19 93:17
97:10 99:4
109:24 110:19
119:6 120:3,5
121:1 122:4,15
122:21
**database** 64:14
64:22,24 65:10
84:23 85:12
86:13 88:22
**databases** 64:16
64:17
**date** 18:19 19:18
21:15,18 28:4
28:6,15 32:6
65:17 77:24
88:24 93:23
114:24 131:12
**dated** 20:2,7
86:23 87:5
94:10 98:5
102:9 105:13
107:7 111:7
113:22
**dates** 11:10
69:23 86:11
**Dave** 59:19 60:2
60:3
**Dawn** 124:18
125:5

Royal Reporting Services, Inc.
312.361.8851

EXHIBIT F

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 137

day 63:22 66:20
77:13 130:21
deal 7:19 77:7
104:24
dealing 14:16
Dearborn 2:3
December 111:7
113:22
decide 102:24
deciding 40:19
decision 112:10
114:18
Defendant 2:12
2:17
Defendants 1:8
130:8
defense 24:16
deleted 14:7,9
64:10 65:5,5
84:12,20 88:18
96:17 109:15
109:18
delivered 90:16
95:9 96:1,9
97:20
department
4:19 6:7 7:10
7:13 9:16
10:23,24 17:2
17:7,19,21
29:21 30:7
37:15,22 38:3
38:10 39:2
40:2 45:22
46:9 72:14
73:3,4,11,20
73:22 75:10
86:22 91:17,19
91:21 92:22
93:16 94:9
111:23 114:15
122:5 125:10
Department's
34:20 39:17

40:12,23 41:10
41:18,23 45:21
depending 15:2
16:10
depends 15:8
76:23,23
depicted 62:21
depictions 63:10
deposition 1:10
3:7 4:11 9:22
18:7 20:1,12
21:6 32:20
37:2 80:11
128:2 129:14
130:12,15
131:8,11,13
depositions 1:14
4:12
deprive 88:9
derivative 113:6
113:11
describe 7:15
13:15
described 93:14
description
10:16
designates
110:20
detail 61:5,9
detailed 16:4
72:22 106:11
detective 17:14
34:24 49:14
56:24 57:18
58:17 59:9
66:13 125:23
126:16
detectives
125:10 126:4,7
determination
45:18 95:24
determine 45:20
86:15 88:19
determined

95:22
device 49:17,22
49:24 63:16
69:10,11,14,14
100:13 110:1
122:17
devices 48:23
75:15,16 76:16
95:8 99:8
122:23,24
dictates 47:8
121:16
difference 41:21
different 9:11
12:2,20,21
14:20,24 15:4
16:2 19:21
31:12 59:1
65:20 70:7
78:15,19 79:19
84:18 86:8
87:3 95:20
114:17 120:3,4
120:14,15
121:9 122:9
differently
14:24 15:1
69:23 70:6,8
digital 31:21
76:9
dignity 38:15
direct 105:14
directing 113:16
direction 30:10
112:5,8,8
114:5,9 115:10
115:12,18
125:5 131:10
directions 115:7
directly 22:23
67:4 131:18
director 108:2
111:18 114:11
disclosing 24:8

disclosure 59:24
discriminate
38:22
discuss 30:23
75:6
discussed 29:23
32:20
discussing 29:20
75:5
discussion 13:1
30:18 31:7
73:23
discussions
24:13 31:10
disk 65:13 84:5
84:14,15,17,20
85:5 102:5
103:8 106:15
106:22
disks 76:16 85:7
85:19 86:1
122:19,23
displaying 67:2
distance 59:16
District 1:1,1,13
130:1,1 131:1
division 1:2 6:22
7:9,13 16:5
46:9 127:2
130:2 131:2
DNA 96:22,23
96:23
DNA-type 97:2
document 45:17
77:18,21 78:3
80:10,11,16,22
86:21 87:11,16
88:10 94:12
99:11 100:3,11
101:4 108:8,18
109:17 116:13
128:7
documentations
90:18

documented
94:1 108:11
documents 18:6
18:9,20 19:21
19:24 20:16
36:24 77:12
93:4 116:7
doing 8:19 17:8
17:9,11,14,15
20:14,14 34:11
45:16 46:19
47:4 49:2
53:24 59:12
60:1 64:21
65:22 73:15,19
74:12 75:9
91:15,20 112:1
112:17 114:6
125:4 126:20
126:22 127:9
double-clicking
79:4
doubts 5:3
dproctor@tre...
2:10
drive 32:8,8,9
32:10 48:21
49:17 93:22
94:4 96:15
97:2,4,13
124:21
drives 14:22
32:6 76:16
93:24 122:23
dropped 15:12
drove 96:4
drug 7:18,20
due 49:18 55:24
76:7
duly 4:4 131:7
dump 119:1,6,6
119:8,15
dumped 101:13
duties 6:23 34:3

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 138

**duty** 17:3,4
72:23
**DVR** 16:14
17:15
**Dziedzic** 108:2
112:11,20
114:11

**E**
**E** 3:1,6 129:1
**e-mail** 2:5,10,16
18:15 19:13,18
**e-mailed** 79:11
**e-mails** 18:16
67:2 70:12
**E-Tran** 128:21
**earlier** 37:1
63:23 113:4
116:21 119:19
119:23 120:7
**easier** 15:7 96:7
**easily** 13:22,22
**East** 2:8
**EASTERN** 1:2
130:2 131:2
**easy** 4:14 15:14
**educational** 5:17
**Edward** 1:7
2:17 130:6
**effect** 28:8 54:11
61:21 62:15
117:9
**either** 9:12 28:3
29:20 43:20
49:6 58:23
60:13 61:21
70:5 123:6
127:21
**elect** 128:11
**electrical** 49:23
**eliminate** 68:15
**else's** 117:1,19
118:15
**employed** 4:18

**employee** 40:24
73:4 131:16,17
**employees** 40:3
41:9
**encoded** 119:1,8
119:15 120:2
**encrypted** 83:3
83:11 120:2
**ended** 64:21,21
65:22 124:22
**enforcement**
10:2 13:16
38:13
**engaged** 62:1
63:10
**enlighten** 57:19
**enter** 46:23
**entered** 50:13
50:18
**era** 5:2
**errata** 130:16
**error** 128:8
**especially** 31:19
**estimate** 13:6
26:14,17,17,18
**eventually** 61:16
77:15
**evidence** 31:22
39:3,13,17
75:14,21 76:4
76:7,20,21
77:2,4 82:16
95:5 113:6,11
121:21 123:6,9
123:17 124:18
124:22 125:8
**exact** 29:5 55:2
61:13 97:10
**exactly** 40:20
53:21 55:21
57:18 58:21
59:11 63:21
64:7 68:21
69:3 72:13

73:20 81:2
90:8 101:9
121:5
**exam** 109:10
114:24
**examination**
1:11 3:4 4:7
15:3 16:18
86:5 97:21
98:14 99:5,9
100:13 103:7,7
104:21 105:3
105:13,17
106:14 107:7
109:12 111:6
111:16,21
121:12
**examinations**
81:15
**examine** 90:17
94:19 95:9
96:2
**examined** 4:5
95:6,10 106:2
**examiner** 91:6
92:24 102:3,6
106:12 107:1
109:22 110:1
114:10 121:5,8
**examiner's**
109:20
**examiners** 90:3
90:22 91:15
93:14 98:17
108:8 114:19
115:20 120:15
121:9,16
**example** 10:21
**excellent** 34:8
**excuse** 21:16
52:1 64:19
**exercise** 128:10
128:12
**exhibit** 3:7

80:11 83:18
87:9 88:12
89:13,14,19
94:8 98:4,7
99:3 100:4
102:8,22
105:12,16,19
107:6,14,23
110:16 111:5
115:1 116:3
**exists** 24:11
**exit** 43:5
**expected** 38:12
**experience**
10:16 11:20
13:3,9,14
14:16 15:2
17:8,20 33:11
64:12,18 65:15
101:3 120:24
**experienced**
14:19
**expert** 10:11
17:3,4
**explain** 13:13
15:1 53:3
**explained** 5:5
56:15
**explaining**
58:11
**explicit** 62:10
**Explorer** 79:6
83:12
**exposure** 13:11
34:2
**expressed** 35:4
**extension**
108:24 110:8
**extensions**
108:12,20,23
**extensively**
127:17
**extent** 22:5,13
24:11,22 39:21

117:18
**extract** 14:21
52:5 64:15
84:22 86:10
119:24
**extracted** 47:12
47:19,23 48:2
48:5,22 50:1
50:12,15 51:21
52:17 53:8
56:3 62:11
64:8 66:2
69:16 70:8
80:19,24 85:24
86:16 93:17
96:11 104:8
122:4,16,22
**extracting** 63:15
**extraction** 17:12
18:11,11 47:4
48:1,8,14,16
51:8,9,11 52:4
52:13,24 53:6
53:20 54:1,3,8
54:15 55:19
59:14,17 60:1
60:10 61:23
64:1 65:24
66:23 76:12
81:21 82:6,13
82:15,17 83:1
83:20 84:3
85:16 88:14
89:5 102:4
109:5 110:5
119:19 122:1
123:4
**extractions**
17:15 49:2,4,6
49:9,11,18,19
51:15 54:12
59:1,22 76:4,7
76:15 123:17
**extracts** 13:21

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 139

64:16
extremely 49:9
121:10
eye 66:22

F

facilities 9:11
facility 8:22 9:2
fact 44:4 55:24
62:9 71:12,21
115:10
facts 37:7
fair 5:8 17:10
74:8 112:4
118:13
fairly 66:6
familiar 39:10
40:1 41:13
43:15,18 57:10
64:23 69:20
73:3,5
familiarity
98:18
far 37:19 87:20
113:1
FBI 9:5,6,7,12
9:12 11:17
12:1 15:20
16:17 17:24
31:19 91:16
93:23
FBI's 8:9 9:16
71:13
feature 91:9
Federal 1:12
feel 22:23
fellow 32:21
38:13 72:2
felt 126:8
female 38:19,22
field 13:14
fight 15:15
figure 29:18
43:4 94:6

129:9
file 78:24 83:2,3
84:22 90:22
91:2,2,4
103:13 104:2
108:12,12,23
108:24 109:4,4
109:6 110:3,4
110:5,8,9
115:17 119:20
120:1 122:8
filed 21:10,17,19
28:5 62:8,16
89:8
files 78:4 93:21
103:12,23
104:2 108:19
final 67:11 92:3
92:17,20 93:8
93:13 103:8
107:2
finale 127:18
finalized 106:13
financially
131:18
find 14:1 20:20
20:22 51:21
55:6 59:4
65:12 70:9,10
83:12
finding 14:3
findings 107:19
108:17
fine 33:17 43:7
87:22 100:6
finish 25:6 61:6
104:10,11,17
finished 22:11
66:22 67:12
fire 6:8,12
first 4:4 10:1,1,4
11:5 19:1
83:17 90:5,6
91:5,23 100:3

101:22 115:5
117:6,11,12
119:10 125:12
131:7
firsthand 95:23
fits 25:21
five 80:4
five-minute 80:3
focus 28:1
115:20
FOIA 20:15,17
43:23,24 44:14
45:12,17,20
87:13 104:23
FOIAs 20:14,16
104:24
follow-up
110:22
following
108:11
follows 4:6
force 33:9 65:20
forced 36:3,7
foregoing
130:11
forensic 9:17
10:2,17 11:2
11:22 13:19
14:20 15:4
16:5 17:8,11
70:3 71:7,14
72:15 81:15
86:3,6,18
103:13 104:3,4
106:1 109:10
forensically
97:16
forensics 8:9,12
8:13,13,23 9:3
9:8,9 12:17,18
14:17,20 17:3
17:9,20 64:13
75:9 106:4
form 39:6,19

40:13 41:1,24
52:21 53:16
57:23 74:10
75:17 76:17
101:6 109:2
123:10 126:14
127:5
formal 5:17
10:15
format 13:22
15:6
former 21:22
28:21 73:4
forth 31:7 65:5
109:19
forward 59:6
forwarded
19:15
found 29:16
64:8 82:11
84:23 86:4
88:18,21 90:22
92:6 93:15
100:12 101:10
102:23 105:16
106:6,16 107:5
107:24 108:8
108:19 110:2
125:5
foundation 39:6
39:19 40:13
41:24 52:21
53:16 57:24
75:18 76:17
101:6 109:2
123:11 126:14
127:6
foundational
39:8
four 33:24
frame 17:17,18
46:18 70:24,24
72:8
frequent 33:18

front 10:10
18:15 61:18
78:10
frustrating
79:22
full 59:24 79:6
115:5
full-time 8:18
71:17
functionality
32:2
fundamentals
12:17,18
further 22:9
23:9 24:13
69:9 110:18
111:19 112:5
112:24 118:24
127:19 131:11
131:15

G

games 24:24
26:6 27:7
gang 7:18,19
gather 31:2
64:19
gathering 37:10
Gatlin 83:22
general 14:18
39:2,11,16
40:2,11,22
41:8,22 76:2
91:11 92:12
107:4
generally 7:15
12:22 37:11
41:11 76:3
89:2
generated 57:8
76:13 81:12,16
81:20 92:20
German 15:22
15:24 17:14,24

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 140

49:14 56:24
57:18 58:24
59:9 66:14
122:12 125:23
**German's** 54:10
**getting** 22:3
25:12 30:4
80:3 105:1
117:17 129:10
**give** 5:6 18:19
26:16 36:3,7
42:21 61:16
79:1 100:1
102:13 112:4
125:7
**given** 4:11 28:7
37:2 48:21
72:9 88:15
114:5 130:12
130:14
**giving** 4:13 36:2
**go** 10:9 18:21
19:16 23:9
24:13 26:7
29:7,9 31:21
34:16 39:20
45:19 47:21
48:4,15 50:22
50:24 51:23
54:20 55:5,10
56:5 58:17
60:19 64:4
78:20 79:1
82:5 83:10
84:21 86:20
87:8 89:13
94:7 98:4
102:8 103:18
103:20 105:12
107:6 111:5,12
112:23 113:1
115:1 116:3
120:5 124:15
**goes** 14:22 56:19

85:23 94:2
96:14
**going** 13:13 14:6
15:8 31:12,13
32:3,4 39:5
52:20 53:4
54:19,20 55:1
55:5 59:5
60:22 64:21
66:12,20 70:23
77:1,11,12
78:10,18 79:1
79:8,19 96:15
96:16 100:24
100:24 101:5
102:20 103:3
105:15 107:3
107:18 109:1
112:3 117:23
123:23 126:10
126:11,13
128:16 129:2,3
129:10
**good** 34:1 49:10
**Googled** 10:21
**government**
95:12
**grand** 127:18
**Graphic** 103:12
103:23 104:2
**graphics** 103:11
**great** 20:18 23:7
23:13 111:18
127:16
**Grizzle** 1:7 2:17
34:24 35:4
53:22 54:4,14
54:22 55:9,24
56:15,20 57:14
58:11 59:3
60:2,16,24
61:17 64:1,11
65:14 66:15
70:22 77:10

82:4 84:8,24
85:8,20 86:11
88:15 89:4,5
122:12,20
130:6
**Grizzle's** 110:23
111:2
**ground** 5:2
**group** 24:23
32:1
**grouping** 68:24
**guess** 5:10,14
26:15,16 41:5
52:6 61:15
73:3 76:23
110:6 113:21
115:23 121:2,6
125:16
**guessing** 26:18
**guide** 102:19
121:5
**guides** 121:7
**gun** 7:19
**gut** 54:13
**guys** 43:1,4
125:16,17

---

**H**

**H** 3:6
**Hales** 21:22
28:18,20
**half** 14:2 30:3
99:14
**halfway** 117:11
**hall** 2:2,2 4:9
23:18 24:24
25:13 26:5
27:7 29:2,5
30:1 78:3,23
86:24 89:16
103:22 105:18
116:7 117:14
**hall@adamsle...**
2:5

**handed** 77:9
93:11
**handful** 33:14
**handling** 39:16
74:9
**hands** 20:11
96:19
**handwritten**
116:16
**hang** 36:6 42:12
42:17
**happen** 15:17
16:9 34:15
**happened** 16:8
42:21 63:22
66:2
**happening**
40:18 112:19
**happens** 56:18
**hard** 14:22 32:6
32:8,8,9,10
48:21 93:22,24
94:4 96:15
97:2,3,13
**hard-** 16:14
**hardware** 66:7
97:4 125:14
**hash** 97:7,18
**head** 87:14
120:13
**header** 110:13
**hear** 4:24 15:14
42:14,16,17,18
43:1 53:5 80:8
80:9 87:1
124:11
**heard** 5:7 36:19
43:20 44:22
62:2,5,8,12,17
62:18,20 63:6
63:9,13 123:21
**hearing** 9:1
**help** 81:5 124:13
**helped** 125:24

**helpful** 48:17
**helps** 55:15
**Herald-News**
20:22 21:1
**HESS** 2:8
**Hey** 66:19
**high** 34:15 71:24
**higher** 114:21
**highest** 5:16
**highlight** 106:8
**historical** 20:16
**hold** 48:22 87:6
87:6
**holding** 71:20
**homicide** 31:11
**homicides** 16:11
**honest** 90:7
**hope** 124:16
**HOPPE** 2:13
**hour** 10:13 30:3
**hours** 10:13
**house** 49:10
65:2
**How's** 78:21
79:3
**Huh** 42:24
**hundreds** 10:13

---

**I**

**ID** 118:20
**idea** 31:14,17
72:11 95:10
**identifiable** 82:3
**identification**
47:1
**identified** 94:9
94:17 100:3
110:1
**identify** 46:20
91:8 99:20
**identifying**
46:24 80:17,23
91:8 97:7
**identity** 47:14

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 141

**III** 2:2
**Illinois** 1:1 2:4,9
  2:15 130:1
  131:1,2 132:5
  132:13
**iMac** 66:1 75:1
  103:13 104:2
**image** 85:3 97:1
  103:13 104:2
**images** 61:24
  62:10,14,17,20
  63:7,11 67:16
  67:17,20,22
  68:8 93:17,21
**imbed** 68:6
**important** 5:2
**impress** 34:4
**inaccuracies**
  99:1
**inaccurate**
  114:17
**included** 61:23
  95:8 103:13
  104:3
**includes** 10:15
**incorrect** 54:12
  83:9 120:9
**index** 18:19
  109:23
**indexing** 109:13
**indicated** 122:11
  130:15
**indiction** 54:17
**indirectly**
  131:18
**individual** 26:1
  51:11
**inform** 92:5
  107:19 110:18
**informants** 7:21
**information** 7:1
  7:2 14:5,8,24
  15:1 21:8
  22:16 24:9
  43:24 46:24

48:12 59:5
60:11 61:1,20
64:20 66:5
69:22 70:6
80:24 83:6
86:14,18 106:3
120:10
**informs** 108:16
**initial** 18:11
  110:23 122:1
**initially** 61:15
  66:16
**inquiry** 72:15
**instance** 127:23
**instances** 128:7
**instruction**
  112:13
**intake** 97:23
  98:3,16
**interaction**
  44:24
**interested** 53:6
  131:18
**interface** 12:21
  12:21
**interject** 23:3
**intermediary**
  72:14
**internal** 4:20
  6:17,19,21
  16:24,24 40:6
  40:6,7,16 42:6
  71:2,6,10 72:5
  122:2
**interoffice** 20:3
  86:22 87:3
**interrupt** 18:22
  22:5 23:17
**interview** 35:8
  35:11 116:17
  116:18,19,21
**invest-** 40:16
**investigated**
  39:1

**investigating**
  75:9 91:17
**investigation**
  16:10 34:19,20
  35:1 39:4,17
  40:12,23 41:10
  41:18,23 42:7
  44:19 50:13
  53:24 55:1,12
  70:17 71:2,8
  73:24 74:10
  89:7 97:22
  105:6 110:23
  111:3 122:1,2
**investigations**
  7:18,18 8:8
  16:4 30:24
  31:4,11 32:2
  32:15 40:6,7
  45:23 46:9
  48:23 50:4
  52:19 53:24
  56:13 62:13,19
  62:21 71:6,10
  76:11 94:21
  95:8 125:16
  127:2,9
**investigative**
  16:6 126:20
  127:4
**investigator**
  10:17 13:16
  50:18
**invoke** 22:15
**involved** 31:5
  33:9 59:12
  71:2,10 120:15
**involving** 29:20
  37:9
**iPhone** 47:20
  48:2 50:12
  51:22 52:17
  53:8 56:21
  57:5 62:11

63:16 65:1
66:24 70:19
72:10 74:1
80:19 82:19
93:18 122:16
122:22
**iPhones** 64:13
**IPTA** 36:1
**Ironically** 44:12
**issue** 27:13
  31:16 74:13
**issues** 34:1
  35:12,23 36:3
  36:8 37:3,7
  73:24 98:9
**IT-network-ty...**
  74:4
**items** 15:10
  106:1 108:2,6

**J**

**J** 2:8,14
**JAMES** 2:8
**January** 8:15
**jhess@tressle...**
  2:11
**job** 34:5,8
**John** 1:7 108:2
  114:11 130:7
**Johnson** 52:19
**Joliet** 1:6 2:12
  4:18 5:24 6:7
  9:16 17:2,21
  24:15,21 27:1
  29:21,21 30:7
  34:3 37:14,21
  38:3,10 39:2
  40:1 63:6,9
  71:2,6 75:10
  91:17,18,21
  92:22 93:15
  95:18 122:5
  123:18 125:10
  127:20 128:18

129:2,9 130:6
**Joliet's** 30:10
**Jones** 52:19
**JR** 2:8
**judgment** 113:7
**June** 38:2 45:21
**juror** 13:13

**K**

**keep** 32:2 65:4
  66:21 77:14
  103:3 114:24
**kept** 16:22 49:6
**Kim** 1:15 131:5
  132:12
**kind** 12:19
  26:18 34:10
  36:9 55:4,14
  55:15 59:15
  65:21 71:20
  73:21 91:3
  94:5 100:5
  103:6 107:3
  109:21 112:2
  120:10,21
  121:3 122:17
  126:11 128:21
**knew** 12:13 14:4
  44:20 123:19
**KNIGHT** 2:13
  2:13
**know** 5:10,11
  6:9 9:22,23
  13:10 14:8
  15:13 16:19
  17:16,17,18
  19:6 21:17
  22:4,6,8,13,13
  23:2 24:22
  25:5,7 26:6,22
  28:15 29:3
  31:9 32:3 33:4
  34:9 36:1,7
  37:12,19 41:4

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 142

| | | | |
|---|---|---|---|
| 41:11 43:14,20 | **L-A-M-K-E-N** | 30:11 35:9,13 | 78:19 99:14,14 | 114:16 121:2,6 |
| 43:21 47:15,15 | 43:17 | 41:17 62:3,16 | 101:15,22 | **looked** 20:9 |
| 50:2,3,4 51:20 | **lab** 12:3,4,4 | 89:8,12 123:2 | 103:3 106:11 | 68:22,22 110:3 |
| 54:5 55:4 | 108:2 | **lawyer** 43:15 | 112:24 118:24 | 120:14 |
| 57:16,22 58:9 | **label** 57:6 94:3,3 | **learn** 61:23 | **littlest** 97:13,14 | **looking** 12:19 |
| 58:12,14 59:3 | 94:4 | 122:3,15,21 | **LLC** 2:2 | 13:24 15:3 |
| 59:4,8,15,22 | **labeled** 55:20,22 | **learned** 16:2 | **LLP** 2:7 | 57:17 60:21 |
| 59:24 60:17,18 | 55:23,23 57:5 | 65:19 | **loaded** 122:5,16 | 64:2 65:11 |
| 62:22 64:17 | 57:7 90:23 | **leave** 37:14 | **locate** 56:21 | 68:1,19 69:15 |
| 65:17,21 66:9 | **labeling** 57:13 | **left** 49:22 56:14 | 82:5 | 83:17 84:9,24 |
| 66:22 68:4,5 | **laboratory** 8:9 | **let's** 4:14 19:13 | **located** 46:8 | 86:4,6,11 87:5 |
| 73:1,20 74:19 | 8:23 9:3,9,17 | 24:24 26:7 | 55:1 56:16 | 92:1 93:20 |
| 74:20,21 78:7 | 71:14 | 49:21 107:6 | 57:19 59:6 | 101:8,20 |
| 81:20 82:5,7,8 | **labs** 12:2 | 116:3,9 | 91:4 93:21 | 106:15 109:10 |
| 82:10 86:2 | **lack** 17:2 | **letters** 97:9 | 108:3 | 109:20 110:8,9 |
| 88:1,17,21 | **Lamken** 43:17 | **level** 5:16 | **location** 55:2 | 110:10 113:4 |
| 93:10,24 94:24 | 45:2,4,11 | **Lewis** 5:21 | 57:15,21 59:11 | 119:21 120:6 |
| 95:13,24 96:3 | **lantern** 11:23 | **liaison** 72:17,19 | **locations** 120:12 | 121:6,16 |
| 96:3,18 97:9 | 12:16 13:4,7,8 | 72:23 111:23 | **locator** 84:8 | **looks** 99:13,17 |
| 97:16 98:17,20 | 13:9 14:14,18 | 114:14 121:22 | **log** 90:23 91:2 | 100:4 101:13 |
| 99:12,24 100:4 | 17:12 32:9 | 122:3 | 97:23 98:16 | 102:2 103:6 |
| 100:18 102:19 | 46:7,15 63:18 | **lieutenant** 4:20 | **log-in** 117:7 | 108:10 |
| 106:16 109:24 | 65:23 66:1,7 | 4:23 6:2,21 | 118:10 | **Lorinda** 43:16 |
| 110:4 114:10 | 67:9,10,11 | 15:11 18:18 | **log-ins** 118:8 | **lose** 71:18 |
| 115:15,20 | 69:18,21 70:2 | 25:18 27:10,15 | **login** 51:11 | **Losing** 64:20 |
| 118:3,17 121:8 | 74:24,24 85:23 | 39:10 42:13 | **logistics** 21:7 | **lost** 42:11 124:1 |
| 123:2 125:4,20 | 85:23 86:8,19 | 53:18 61:18 | 32:22,23,24 | 124:1 |
| 125:24 126:4 | 88:23 91:4 | 72:4,5,9 77:16 | **logs** 98:3 | **lot** 10:9 15:7 |
| 127:1 128:23 | 93:21 108:12 | 80:8 87:11 | **long** 5:22 6:19 | 31:20 54:11 |
| 129:7 | 108:14,19,23 | 89:21 100:11 | 7:2,7 30:1 | 73:19 115:17 |
| **knowing** 60:21 | 108:24 109:4,4 | 102:13,21 | 66:12 97:8 | **lower** 100:2 |
| 60:21 65:15 | 109:5 110:5,8 | 107:18 116:12 | **longer** 66:8 | |
| 66:13 86:6 | 115:16 122:8 | 118:6 124:1,1 | **look** 7:18 11:6 | |
| 88:23 | 123:5 | 124:5 127:24 | 15:4 55:5 | **M** |
| **knowledge** | **Lantern's** 90:22 | **light** 99:4,7 | 57:11,22 60:19 | **MacBook** 46:7 |
| 66:17 74:11 | 91:2 | **limited** 71:7 | 66:11 67:5,14 | 66:1 |
| 77:8 95:23 | **laptop** 46:6 | **line** 18:20 91:5 | 67:21 68:10,13 | **machine** 51:19 |
| **known** 9:2 11:2 | **large** 49:7,9,18 | 103:10,11,12 | 69:1 70:11 | 75:1 |
| 11:22 | 76:8 119:20 | 110:13 118:6 | 84:21 90:1 | **maintain** 24:10 |
| **knows** 23:4 | 120:1 121:1,10 | **lines** 92:4 | 96:24 97:23 | **maker** 30:6,8 |
| **KURNIK** 2:13 | **late** 126:13 | **list** 78:4,11 | 98:2,15 100:14 | **making** 115:6 |
| | **law** 2:2 10:2 | 86:21 116:7 | 101:15 106:22 | 117:8 |
| **L** | 13:15 38:13 | **little** 7:4 8:20 | 106:23 110:21 | **Malec** 123:23 |
| **L** 2:7 | **lawsuit** 21:16,19 | 48:18 53:4 | 113:20 114:2 | 124:19 125:5 |
| | | | | **management** |

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 143

39:3,14
**manager** 21:22
28:21,22
120:19 121:2
121:11
**manager's** 29:3
**manner** 66:6
**March** 6:3
**Maria's** 88:18
**mark** 72:2 84:5
**Mary** 4:17
**matching** 108:3
**matkus@khk...**
2:16
**Matt** 35:16
**matter** 44:1
**McKinney**
126:16,19
**MD-** 97:18
**MD5** 97:18
**mean** 12:15,20
22:10 30:17
32:8 33:5 34:7
34:10 41:3,4
46:21 50:16
106:19 107:3
108:21 116:1
117:20 118:9
118:18,21
121:19 126:21
**meaning** 82:13
109:7
**meant** 91:10
117:21
**media** 31:22
68:6 76:10
**meeting** 21:17
21:20,21,23
22:6 23:6,22
24:6,6,14
25:19 26:10
27:2,16,21,24
28:5,18,23
29:1,6,7,10,11

29:14,17,19
30:1,3,14,15
32:18 35:20
36:16 117:4,9
117:22
**meetings** 37:6
**member** 36:10
71:13,16,16,17
**members** 7:19
24:16 33:8
37:11
**memo** 90:9,13
90:15 91:10
94:17 122:13
**memoranda**
44:10
**memorandum**
20:3 86:22
89:15 94:9
**memorandums**
87:3
**memorialized**
13:4
**memorized**
126:23
**memory** 20:21
22:2 48:7
51:24 68:2
74:11 83:10
118:16 120:9
**memos** 18:13
122:11
**mentioned** 26:9
44:20
**merely** 102:23
107:20
**message** 14:1,9
65:12,16 67:1
68:7 83:21
86:10
**messages** 64:10
65:4 68:10,12
68:13,17,19,20
68:20 69:1,8

69:10,14 70:10
84:12,19 85:3
85:24 86:1
88:15,18
120:12
**messaging** 64:2
64:3,5,8 65:3
65:11 67:5
68:3,7 84:10
85:12 86:6
**MICHAEL** 2:14
**middle** 103:22
**Mike** 129:8
**military** 37:24
**mind** 48:6
101:17
**mine** 98:17
**minutes** 27:24
**misleading**
118:4
**misogynistic**
38:20
**moment** 25:15
**Monica** 1:15
75:11 86:20
87:15 89:13
94:7 98:4
105:14 107:11
110:15 113:21
116:4 128:16
128:18 131:5
132:12
**month** 28:4
**mouth** 117:22
**move** 23:23 26:7
**moved** 123:4
**multiple** 111:24
121:9
**municipal** 1:6
130:6
**muted** 124:5,12
_____
**N**
_____
**N** 3:1

**name** 4:9,15
10:21 19:4
26:10 43:21
44:22 46:24
52:7 54:6,10
55:7,23 58:24
81:6,10,24
82:7,8,10,12
82:13 84:2,2
90:22 91:2
98:10,19,19
110:9 114:16
115:22 121:20
**named** 28:18
43:16 73:4
81:2,3 108:13
109:6 110:3
**names** 58:23
120:15
**narrative** 19:9
83:18 93:13
**narrow** 17:10
64:5 69:9
**nature** 22:11
60:12 72:1
106:21
**near** 114:2,3
**necessarily** 33:8
**necessary** 46:22
53:7 107:15
**need** 5:4 23:3,8
23:17,19 24:2
26:22 39:21
54:24 55:10,11
59:5,6 60:19
60:22 78:6
88:10 95:13
102:14 105:14
117:16 128:10
128:24
**needed** 8:19
16:14 51:17
71:24 82:6
112:6 115:21

**Neither** 124:8
**network** 49:17
118:20
**never** 5:10,14
30:8 33:5,11
33:11,13 44:23
49:3 95:4
98:24 104:20
105:8 111:16
**new** 123:23
124:18 125:18
126:2
**nice** 34:11 66:6
**Nicholas** 33:3
**night** 59:14
**nodding** 63:2
**Nope** 87:6
**normal** 58:17,17
74:15
**normally** 14:6
**North** 2:3,14
132:12
**NORTHERN**
1:1 130:1
131:1
**NOTARY**
130:23
**note** 22:8 117:7
117:18 118:24
**notes** 27:23
44:10 106:11
106:13,23
109:21 110:22
116:7,8,9,16
117:1,1,2,20
118:14,15
**notice** 1:12
**noticed** 14:19
99:2 126:24
**noting** 128:6
**noun** 82:17
**November** 8:16
20:3,7 89:14
89:17 94:10

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 144

nude 62:1,10
number 10:12
26:14 47:1
80:21 84:1,1
97:7,8,14
108:20 109:14
109:23 110:11
110:12,14,19
110:21 111:1,1
111:2,4
numbers 48:19
64:8 69:4 84:7
97:8
numerous 65:18
nut 55:18

**O**

object 39:5
52:20 101:5
109:1
objection 22:12
23:23 39:19
40:13 41:1,24
42:1 50:21
53:16 57:23
58:1 62:23
75:17 76:17
123:10 126:14
127:5
objections 39:21
observations
108:11
observed 108:12
108:12,13
126:19
obtained 39:17
75:15
obviously 12:20
18:1 32:3
54:20 56:15
60:15 66:2
77:1 90:14
95:20 104:21
104:22 106:19

occasion 33:18
occasions 65:19
occurred 15:13
28:5 32:5 44:7
October 44:9
111:14 112:16
113:10
office 24:17 29:4
35:17 43:16
56:2 61:19
125:6
officer 5:22 7:1
7:3,22,23 8:2,4
10:3 15:22,24
16:3 19:7 25:7
29:22 33:3,10
33:16 34:2,4,4
34:19,20 40:24
41:10 46:18,19
46:22 47:2
52:15 54:17
55:5 59:19,20
59:20 60:2
61:24 62:10
71:3 72:2 73:8
73:18 77:18
84:10
officer's 122:17
officers 29:21
32:21 38:4,11
38:19,23 62:9
63:6,9 71:6
95:8 123:18
126:7 127:2
offices 2:2 46:10
123:18
official 106:10
125:19,23
126:2 127:3
officials 29:22
Oh 28:15 46:3
78:13 88:6
119:12 129:7
okay 4:14 5:14

5:15 9:23,24
19:5,12,18,20
20:2,5,6,8,11
21:2 22:19,21
23:2,14 26:20
31:5 32:12,16
37:17 42:6
43:15 48:17
50:6,9 51:4
52:15 53:2
55:17 59:7
60:7 61:22
78:13 80:8
81:13 82:10
86:20 87:6,22
88:6,6 92:16
92:16 95:3
100:9 101:21
103:2 104:6
106:5,18 107:6
113:20 115:4
116:9,17,20,24
117:5,13
118:12 119:13
121:13 124:14
127:10,23
128:20 129:4,8
129:11,13
old 22:3
once 12:13,15,18
21:13 47:23
48:8 54:3
64:15 97:24
ones 15:7,9
120:13
ongoing 32:3
48:24
online 10:19,20
11:1
open 78:6,17,24
79:1,2,13
119:20
opened 52:12
78:13

opening 78:15
openings 34:14
openness 60:6
opinion 33:6
34:16 57:16
opinions 33:7
opportunity
88:9
opposed 102:23
105:17 108:9
108:17
option 32:1
order 16:5 20:12
39:2,11,16
40:2,11,22
41:8,22 47:22
48:4 50:18
67:16,20 94:5
94:8 129:12
ordered 35:15
organized 9:12
9:14
original 77:24
96:18 97:10
originals 125:8
originating
115:9,11
outcome 45:6
overly 12:12
overseen 9:6

**P**

p.m 1:16 19:9
80:12 129:15
131:14
page 3:2,7 82:22
91:23 99:14
100:3 101:22
103:12,15,22
103:22 111:12
112:23 114:2,3
115:5 117:6,11
119:11
pages 114:23

paperwork 93:1
paragraph
83:17 84:21
85:22 87:19
88:1,7,12 90:1
90:3 91:6,7,22
91:24 92:2
111:13 115:5
parameter
65:10
parking 96:6
parse 14:5 48:11
52:9 66:5 68:9
68:24 83:6
119:21
parses 120:10
parsing 66:19
part 20:7 21:17
32:24 35:17
40:17 42:6,7,8
50:12 53:1,7
55:11 59:13,21
72:21 80:16
86:24 87:2,4
89:3,9 94:10
95:21,21 97:21
105:3,6,7
108:15,16
110:6,11
111:20,22
112:1 113:9
114:13 115:1
115:22 123:3
particular 7:9
7:12 14:17
47:2 51:17
55:8,8 71:8
73:17 80:10
84:4,9 92:13
99:3 100:12
101:3,4 105:16
108:8 109:7
127:3
particularly 5:1

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 145

| | | | | |
|---|---|---|---|---|
| 33:9 92:14 | 122:17 123:18 | 85:15 100:4 | 62:4 65:6,22 | **preceding** 91:7 |
| **parties** 131:16 | 131:10 | 106:3,21 | 65:24 66:8,13 | **precise** 96:9 |
| **partner** 59:14 | **personally** 25:24 | 120:11 | 72:7,12 73:1 | 97:12 |
| **parts** 119:5 | 60:11 126:19 | **phrase** 64:2 | 88:19 95:1 | **preparation** |
| **passcode** 47:1 | **personnel** 9:13 | 109:6 | 126:24 | 18:6 19:24 |
| **password** 46:13 | 56:5 62:21 | **physical** 52:8 | **pointed** 82:3,4 | 20:10 32:19 |
| 50:14,14,16,17 | **perspective** 41:7 | 83:5 96:10 | **police** 4:18 5:22 | 37:1 |
| 51:5,6,7,9,12 | **pertaining** 1:24 | 119:1,6,6,8,15 | 6:7,7,12 7:9,13 | **prepare** 20:12 |
| 51:17,20 | **phone** 2:4,10,16 | 120:8 | 9:16 17:2 | **prepared** 77:21 |
| 118:19 | 8:12 11:16 | **pick** 15:5 78:23 | 29:21 30:7 | 80:12 |
| **patrol** 28:14 | 12:19 13:17,18 | 78:23 | 33:8 34:4 | **preparing** 21:6 |
| **PDF** 78:4,6 87:3 | 13:20 14:1,6 | **pictures** 60:19 | 37:21 38:3,10 | **prepped** 4:12 |
| 128:22 | 16:13 17:14 | 60:23 61:1,3,4 | 39:2 40:1 46:9 | **present** 2:19 |
| **PDFs** 78:11 | 47:12,23 49:5 | 61:11 68:6,14 | 75:10 86:22 | 22:6 23:5,22 |
| **pending** 53:11 | 49:18 51:6 | 68:15,18 70:11 | 91:17,18,21 | 24:5,15 25:2 |
| **penned** 90:13 | 54:2,8,12,17 | 83:12,13 | 93:16 94:9 | 26:10 27:1,20 |
| **people** 9:13 | 54:20 55:6 | **piece** 109:24 | 122:5 123:18 | 30:13 |
| 21:23 26:9,11 | 56:1,3 58:9,12 | **PIO** 20:14 | **policies** 92:12 | **presented** 35:24 |
| 26:13,14,19 | 58:15 60:12 | **place** 5:20 21:7 | **policy** 30:6,8 | 103:8 |
| 31:9 54:19 | 61:16,20 64:7 | 29:1 31:21,23 | **populated** 84:2 | **presents** 15:6 |
| 60:14 61:4 | 64:12,16 65:3 | 49:10 71:20 | **position** 7:1 | **preserving** |
| 62:13,18 64:6 | 65:23 66:3 | 96:14 | 53:23 54:23 | 31:22 32:4 |
| 68:8 | 68:22,23 69:4 | **places** 114:17 | 55:8 56:17 | **press** 43:22 |
| **people's** 58:23 | 69:10,11,16 | **plaintiff** 1:4,11 | 57:15 71:18 | 44:23 |
| **perfect** 85:13 | 70:6,20,23 | 2:6 4:10 130:4 | **possibility** 18:4 | **presume** 5:7 |
| 103:4 | 74:21 81:1 | **plans** 37:14,16 | **possible** 17:24 | **pretty** 69:5 |
| **performance** | 83:22,22,24 | **platform** 33:22 | 43:4 46:14 | 117:19 127:17 |
| 34:3 | 84:1,7,11 | **play** 24:24 34:18 | 57:2,9 69:23 | **previous** 70:1 |
| **period** 8:14 13:6 | 85:16 88:16,18 | 63:15 123:3 | 86:18 112:18 | **previously** 6:14 |
| 84:5 112:7 | 99:18,19,20 | **played** 6:10 45:5 | 126:22 | **prior** 6:14 7:1 |
| 113:12 | 100:13 101:11 | 74:8 | **possibly** 15:4,8 | 26:21 30:4 |
| **person** 17:4 | 101:13 102:3,4 | **playing** 26:6 | 26:19 98:2 | 66:14 70:22 |
| 35:22 55:5 | 103:7 119:24 | 27:7 | **posted** 11:1 | **priority** 71:24 |
| 56:22 58:17 | 122:5 132:14 | **please** 25:15 | **potential** 14:10 | **privacy** 58:13 |
| 59:13 64:3 | **phones** 14:23 | 86:21 91:23 | **potentially** | **private** 24:16 |
| 73:21 98:10 | 65:4 70:4 76:8 | 99:15 103:2 | 86:10 | **privilege** 22:8 |
| 120:17 121:3,7 | **phonetic** 124:20 | 112:24 | **power** 49:23 | 22:15 24:7,9 |
| 121:23 | **photo** 14:8 | **plus** 66:17 | **powered** 49:22 | 24:10 25:8 |
| **person's** 68:23 | **photographic** | **point** 12:3 24:3 | **practical** 24:12 | **privy** 37:12 |
| **personal** 13:19 | 61:24 93:16 | 24:5 31:6,14 | **practice** 127:1 | 105:8 |
| 41:6 46:23 | **photographs** | 35:9,12 39:15 | **practicing** 77:14 | **probably** 10:24 |
| 47:2 54:19 | 67:3 85:8 | 40:16,19 41:16 | 127:2 | 11:7,7,17 19:3 |
| 58:11 60:14 | **photos** 67:13,14 | 45:24 48:14 | **preceded** 34:20 | 49:14 57:19 |
| 61:12 95:7,15 | 67:24 68:9 | 56:17 61:22 | 43:11 | 82:15,22 83:4 |

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 146

| | | | | |
|---|---|---|---|---|
| 96:23 99:18 114:8,9 115:3 115:17,22 125:24 126:10 | professionals 38:13 | pulls 69:22 | 47:9 49:15,21 53:10,14 55:4 55:14 58:18 | 90:16 91:18,19 91:20 92:13,21 93:5,14 94:2 |

**96:23 99:18
114:8,9 115:3
115:17,22
125:24 126:10
problems** 33:17
**Procedure** 1:13
**process** 4:23
31:5 97:19
107:20
**processed** 106:2
**processing**
112:5
**Proctor** 2:7 22:4
23:2,8,11,14
23:18,21 24:3
24:20 25:5,11
25:15 26:5,20
27:7,11 39:5
39:19 40:13
41:1,24 42:22
43:8 52:20
53:10,13,16
57:23 61:6
62:23 75:17
76:17 78:6,9
80:2,2 88:4
99:10,12,24
100:9 101:5
102:17 103:16
104:10,14
109:1 117:14
118:2 123:10
124:3,6 126:13
127:5,20
128:15,18,21
128:23 129:2,7
**product** 67:11
77:3
**production**
102:15
**professional**
80:1
**professionally**
38:5,12

**professionals**
38:13
**proficiency**
16:20,21
**profile** 97:2
**program** 13:8
46:7 52:10
65:20 66:7
120:3,4
**progress** 30:4
**project** 120:18
120:19 121:2
121:11
**promoted** 6:2,3
8:16
**promotion** 6:10
6:13
**promotions** 6:15
**prompt** 118:16
**property** 39:3
39:13 95:12,17
**proprietary**
48:13
**prosecution**
34:19 35:1,5
**prosecutor**
45:14
**prosecutor's**
43:16
**protect** 24:10
**protected** 22:16
24:9
**protection** 36:9
**provide** 16:5
**provided** 15:17
38:4,11 71:8
130:16
**public** 6:24 7:2
130:23
**pull** 14:21,24
69:23 70:5
109:14
**pulled** 16:10
82:19

**pulls** 69:22
**purpose** 21:5
127:4 128:3,6
**purposely** 54:16
55:23 59:11
111:24
**purposes** 81:7
96:11
**pursuant** 1:12
1:12 70:18
**put** 11:10,17
49:10 52:13
53:21 54:5,9
54:10,13,23
55:8 57:21
58:16 59:3
65:23 66:5
68:8 71:16
76:4,7,13,19
76:21 77:2,4,8
77:18 81:20
102:5,6 111:3
111:17 123:6,8
124:17,22
125:7
**puts** 13:21
119:19
**putting** 57:15
59:2 76:9
98:18

**———————**
**Q**
**query** 68:11
120:5
**question** 4:24
5:1,3,6,11,12
5:13,14 15:11
17:10 20:18
22:19 23:4,9
23:12,19 24:8
25:16 26:23
27:3 38:6
40:20,22 41:5
41:20 43:10

**47:9 49:15,21
53:10,14 55:4
55:14 58:18
69:6 74:18
75:8 80:21
84:5 88:11
102:20 105:15
107:18,21
111:18 114:6
117:14 118:3
118:21 127:11
127:16,24
questions** 4:14
24:2 39:8
46:17 126:1
127:19,20,21
128:3
**quick** 43:5 63:4
66:6 127:12
**quicker** 14:6
**quiet** 42:10
**quite** 15:13,14
66:10 87:19
113:1 125:18
**quote** 90:23,24
91:24,24 109:6
109:7 111:13
112:5,7 113:10
113:12 117:7,8
117:15,17
119:1,2
**quotes** 92:8

**———————**
**R**
**raised** 35:12
37:3,7
**raising** 22:12
**ran** 46:7
**rank** 6:22
**RCFL** 9:19,21
10:1,8 11:8
12:8 16:12
19:16 20:4,6
31:18 72:14,20

**90:16 91:18,19
91:20 92:13,21
93:5,14 94:2
94:18,22 95:6
95:9,19 96:1,4
96:13 97:20
98:5 104:21
105:13 106:8
107:6 111:6,23
112:5 113:22
114:5,14 115:7
120:14 121:10
121:18,22
122:3 125:12
RCFL's** 120:17
**reach** 37:20,21
**reached** 126:16
**read** 5:4 13:23
15:7 21:10,12
21:13 43:10,12
53:13,15 64:23
87:24 88:1,2,7
88:10 100:19
111:19 119:8
128:1 130:11
**readable** 13:22
**readily** 86:14
**reading** 89:2
91:1 102:21
109:22 117:18
**reads** 64:23
103:10,12
113:10 118:24
**really** 31:8 33:5
43:5 49:3
96:24 106:16
106:24 107:4
121:7 127:11
**reason** 8:24
42:20 66:4
69:21 70:7
71:15 74:14
75:4
**reasonable**

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 147

26:17
reasoning 90:7,9
recall 4:13 11:14
12:1,7,10
17:22 22:21,22
26:12 29:3,4
29:12,24 30:16
44:15,17 45:10
45:13,16,18,24
46:5,14,16
50:5,7,8 51:10
51:18 53:21
54:7,9 55:19
55:22 56:24
57:7,17,20
58:21 60:13
61:2,10,12,14
62:19 67:10
68:14 69:19
72:24 73:15
74:2,6,13,14
74:19 81:2,11
81:15,18 84:16
85:5 87:14
90:13,18 110:7
112:13,17
114:6 115:24
117:8 118:18
118:20,23
126:18,21
received 11:13
65:16 86:12
receiving 69:14
recollection
80:17,23 88:13
98:1 112:21
117:3,24 118:7
119:3 126:12
recommended
6:14 31:24
recommending
6:12
record 12:24
13:1 18:19

39:22 43:12
44:10 52:21
53:15 75:18
99:24 109:2,16
123:11 126:14
127:6 128:11
130:14
recorded 36:16
36:18
recording 36:19
36:22
records 27:16
27:17 73:14
reduced 131:9
refer 9:21
reference 91:23
100:1,2 108:19
109:14,23
110:14,19
111:1
referenced
108:13 115:6
referred 9:15
114:4
referring 19:22
64:11 76:24
80:20 82:12,18
90:6,8 92:11
108:5,15
118:11 119:7
refers 91:6
reflect 11:9,12
11:19
reframe 41:20
refresh 22:2
80:16 117:2
118:6 119:3
refreshed
117:24
refreshes 80:23
regard 32:18
regarding 37:3
regardless 81:18
regards 20:15

32:22 35:17,22
43:23 44:13,19
66:17 74:5,12
74:22 75:5
77:6 90:12
93:5 94:5
107:22 111:17
113:18 114:15
114:19 126:3
regional 8:9,22
9:2,9,16
Regis 19:14,17
21:21 25:20
26:24 30:14
31:1 35:8,11
93:4,12 105:1
116:17 117:3,9
117:22 118:1,7
119:4
Regis's 35:17
116:19
regular 16:8
31:19 33:18
regulations 38:3
38:10
Reid 72:2,9
relate 46:17
related 45:12
relating 17:12
37:7 39:3 41:8
43:24 48:23
74:9 86:1
relationship
28:4 33:2,15
34:1
relative 93:15
131:15,17
relayed 112:11
112:19
relaying 112:13
release 44:18
remember 5:12
5:13 11:17
12:1,11,14

15:19 16:20
21:13,15 29:8
30:17,17 31:9
44:3,7 47:6
48:8 52:3,7
53:22 54:14
55:2,21 57:4,8
57:12,14 58:22
59:2,2,11,11
67:23 68:2
70:3,5 85:1
93:8 98:21
124:19 126:24
remembering
48:10 52:11
115:16 124:16
124:23
remnants 65:12
86:5 88:22
109:13,17,17
rep 36:10,12
116:22
reparse 52:12
repeated 5:4
repetition 113:3
rephrased 5:4
report 18:10
19:7 52:6 64:9
66:6 76:13
77:19,24 78:5
83:21,24 84:4
84:13 92:24
98:5 100:14
101:9,14 102:2
102:5 103:9,14
104:3,4 105:13
105:24 106:4,9
106:10,13
107:3,7 108:20
109:11 111:6,7
113:22 114:24
reported 105:9
131:8
reporter 1:15

27:20 48:10
63:2,3 86:24
87:2,6,17,21
89:16 100:1,16
100:18 101:18
102:19 103:21
105:18 107:12
116:6,9 128:20
128:24 129:4
129:13 131:5
132:5

reporting 83:4
reports 18:10,16
19:16 86:1
92:3,18,20
93:4,9,13
98:20,22,23
99:2 104:5,22
105:2,10 106:8
114:16 115:18
116:1 120:14
122:8
represent 4:9
24:18,20,21
36:11 102:10
116:15
represented
25:19,24 26:2
request 44:14
91:21 92:22
129:3
requested 35:14
35:14 43:12
53:15
requesting
106:20
requests 115:6
required 51:20
113:6,12
reserved 128:14
128:15 132:2
resources 71:19
respect 38:16
respond 73:2

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 148

**rest** 78:8 88:10
**results** 65:21
  104:21 105:8
  107:2 111:16
  111:21
**retired** 72:3,3
**retrievable**
  106:3
**retrieving** 14:12
  14:13 70:23
  81:7
**review** 20:12
  70:22 108:4
  128:1
**reviewed** 18:6,9
  18:10,13,21
  19:24 37:1
  39:15 70:21
  111:14,16
**reviewer** 52:6
**revision** 113:4
**right** 5:16 8:6
  10:21 30:9
  37:19 42:23
  43:1 46:8
  47:10 49:20
  68:5 72:14
  74:18 77:11
  78:17,18,24
  79:4,10,13
  80:15,15 81:8
  81:10 89:16
  91:1 92:7 94:7
  94:12 97:16
  98:9 101:23
  103:3 105:18
  110:3,24 111:5
  116:3,4 117:18
  119:16,17
  120:20 123:23
  124:15 125:2
  128:1,5,9,10
  128:10,12
  129:11

**right-hand**
  100:2
**rights** 36:1
**River** 2:14
**road** 2:8,14
  34:13
**Roechner** 6:10
  19:15 72:23,24
  73:2 90:10,21
  93:3,11 94:21
  96:4 98:11,13
  104:24 106:20
  112:10,20
  113:16 114:9
  114:12 115:19
  121:16 121:19
**Roechner's**
  115:12
**role** 6:9 30:14,16
  34:18,24 35:4
  35:20,21 45:5
  63:15,21 71:5
  74:9
**room** 29:5 60:1
  60:6 126:22
**Rosemont** 2:15
**rule** 5:2
**rules** 1:12 38:3
  38:10
**rumors** 62:12
**run** 83:7
**running** 49:23
  66:8 75:1
  88:23

───────
**S**
───────

**S** 3:6
**safe** 85:7 124:20
  124:20
**sat** 29:17 35:8
  35:11 83:15
**saved** 85:3
**saw** 123:19
**saying** 44:15,16

57:1 86:2
**says** 20:4,6
  42:24 88:17
  105:24 108:2,6
  108:10 111:1
  113:4 117:7
  119:5
**screen** 60:5
  65:13 77:12,16
  79:6,15 83:18
  85:1,3,9,11,13
  124:7
**scroll** 87:15
  91:22 100:1,19
  100:20 101:15
  101:16,21,21
  102:14,24
  103:1,2 105:14
  105:21 107:15
  110:15 112:24
  115:4
**scrolling** 102:20
**search** 7:21 14:5
  14:7 66:24
  67:4,13,16,17
  68:11,20 69:10
  69:13 70:9,10
  70:18,19 83:11
  89:11 93:22
  94:2 95:6,11
  95:14,21 96:14
  98:23,24 102:6
  105:5 109:23
  111:20 120:5
**searched** 80:18
  95:22
**searches** 31:20
  31:20 52:10
  106:20
**searching** 69:8
  114:20
**second** 36:6
  84:21 86:3,7
  86:18 90:1

111:12
**Secondhand**
  63:13
**section** 114:4
**secure** 56:4,8,11
**see** 15:15 19:13
  27:23 42:13,16
  59:15,21 61:4
  67:11 69:2
  77:16 78:5,7,9
  78:11,14 79:14
  79:24 90:3
  91:23 92:18
  99:11 103:10
  103:24,24
  106:22,23
  111:15 113:12
  113:13 114:7
  115:6 117:2
  118:15 124:6
  124:11
**seeing** 60:15
  66:20 78:3,3
  79:15 99:13
  103:19 117:10
  119:12
**seen** 12:12 19:3
  19:4 36:21
  87:11,13 89:21
  92:20 94:12
  98:7 104:4,5
  104:20,21
  105:2 107:8
  111:7 113:24
  115:2,17
  116:12
**seized** 70:19
**send** 98:10
**sending** 69:14
  129:4
**sense** 59:17
  92:15 113:18
**sensitive** 58:14
  60:11,24 61:3

72:1
**sent** 19:16 65:16
  83:22 84:10
  86:12 88:18,20
  88:24
**sentence** 90:6
  92:13,17
  103:21 111:13
  111:15 113:10
**separate** 79:17
  79:18 128:7
**September** 7:8
  102:9 105:13
**sergeant** 1:10
  3:3 4:3 6:24
  7:6,7,12,15,22
  7:24 8:3,7 16:3
  28:9,12 34:24
  35:16 36:17,17
  53:22 54:4,14
  54:22 55:9,24
  56:15 57:14
  58:10 59:3
  60:2,16 61:17
  64:1,11 65:14
  66:15 70:21
  71:1,12,22
  77:10 82:4
  84:8,24 86:11
  89:4 110:23
  111:2,14 113:5
  113:11 130:10
  130:19 131:6
  132:1
**sergeants** 71:5
**serial** 80:20
**seriously** 34:6
**serve** 37:24
**server** 49:7
  76:11
**service** 34:5
**set** 76:12 118:20
**sex** 38:23
**sexist** 38:19

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 149

| | | | | |
|---|---|---|---|---|
| sexual 62:1 | single 45:22 | 121:24 130:3 | sounds 119:22 | SS 131:2 |
| 63:10 106:21 | sir 4:9 6:6 10:5 | Socha's 28:4 | source 62:5 | standard 26:5 |
| sexually 62:10 | 18:24 26:3 | 29:22 32:21 | 122:15 | standing 40:18 |
| shape 74:10 | 27:2,18 32:23 | 35:5 37:3,8 | Spanlock's | 59:16 |
| share 19:6 77:13 | 38:7 40:9 | 41:16 45:5 | 124:20 | standpoint |
| 123:16 | 63:19 67:7 | 47:19 50:12,13 | speak 18:1 | 44:19 |
| shared 61:20 | 73:6 75:22,24 | 52:17 55:6 | 41:11,12 44:4 | stapling 114:23 |
| sharing 79:5,7 | 76:5 82:14 | 56:3 57:13 | 126:7,11 | start 4:14 60:22 |
| shed 99:3,7 | sit 12:8 35:16 | 63:7,15 70:19 | speaking 27:2 | 98:22 |
| sheets 130:16 | 41:3 45:19 | 72:10 74:1,21 | 37:9 56:15 | starting 11:8 |
| short 43:9 80:6 | 48:14 52:10 | 80:19 81:1 | 89:2 120:7 | 53:4 |
| shorthand 1:15 | 57:10 60:22 | 82:8,19 84:11 | special 45:14,14 | state 43:16 85:2 |
| 9:19 131:5 | 64:4 66:21 | 93:17 122:4,16 | 96:6,6 | 130:10 131:2 |
| 132:4 | 83:8 114:19 | 122:22 | specific 17:20 | 132:5 |
| shortly 127:17 | site 94:2 | social 68:6 | 28:3 41:12 | stated 54:8 |
| shot 65:13 85:1 | sitting 13:24 | software 13:19 | 67:1 69:13 | 66:21 84:8 |
| 85:3,9,11,13 | 77:2 106:15 | 14:11 48:13 | 72:22 81:6,10 | 89:3 91:11 |
| show 19:1 77:11 | situation 34:10 | 52:4 60:21 | 90:14 91:10 | 113:15 122:13 |
| 84:7 88:23 | 114:8 | 64:4 66:18 | 112:21 114:5 | statement 61:17 |
| 128:14 | size 49:9 76:8 | 67:23 70:3 | 120:5 | 92:12 106:19 |
| showed 83:21 | slow 75:1 | 78:24 81:24 | specifically 10:7 | 117:9 119:22 |
| 84:11,11 | small 42:7 | 83:4 86:9 | 17:23 18:3 | statements 36:4 |
| showing 59:2 | smartphones | 119:1,9,16 | 41:14 45:18 | 36:5,7 37:3 |
| 124:5 | 17:13 | softwares 15:4 | 52:24 53:20 | states 1:1,13 |
| shown 16:1 | Smith 52:19 | 86:3,7 | 56:7 57:4,13 | 19:15 38:17 |
| 22:22,24 68:16 | sms- 84:22 | solution 24:12 | 62:19 67:14,17 | 91:3 108:1 |
| 70:18 77:22 | SMS 65:2 | somebody 49:24 | 67:21 76:2 | 130:1 131:1 |
| 103:16 | sms.db 84:22 | 50:9 79:12 | 77:6 91:14 | stating 31:1 |
| shows 110:16 | snafu 43:11 | 117:1,19 | 92:14 | 91:14 108:18 |
| shut 31:2,10 | so-called 93:8 | somewhat 88:17 | specified 131:12 | 115:24 121:21 |
| shutting 30:23 | Socha 1:3 2:19 | SOPs 38:3 | speculation 58:1 | stationed 15:17 |
| sic 110:14 | 4:10 21:11 | sorry 8:1 28:16 | 127:6 | status 8:17 |
| side 79:18 | 33:16 34:3,21 | 35:10 36:15 | split 121:9 | 16:12 90:11 |
| sign 92:24 | 39:1,18 40:12 | 38:6,8 49:8 | spoke 44:24 | stenographica... |
| 118:19 124:3 | 40:24 41:10,18 | 63:4 73:16 | 121:23 | 131:9 |
| signature 98:16 | 41:23 44:1 | 74:15 78:2 | spoken 21:5 | step 51:22 |
| 128:14 129:5 | 45:12 51:21 | 107:21 112:15 | 33:13 45:2 | step-by-step |
| 132:1,4 | 52:24 54:17 | 113:9 121:13 | spot 53:23 55:8 | 49:21 |
| significance | 56:21 57:5 | 121:14 124:12 | 57:15 | steps 47:21 48:3 |
| 90:20 | 60:12 61:24 | 127:22 | SQL 64:22,22 | storage 49:16,17 |
| silently 88:4 | 62:10 63:10 | sort 49:16 81:21 | 64:23 | 76:16 122:23 |
| similar 38:17 | 70:17 72:16 | 114:8 127:18 | SQLite 65:8 | 122:24 |
| Similarly 85:19 | 74:9 83:22 | sorted 80:3 | 84:23 85:12 | store 49:7 |
| simple 111:22 | 88:15 89:7 | sound 125:2 | 88:22 | store- 65:2 |

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 150

**stored** 76:10
80:24 123:17
**storing** 49:10,18
65:2
**stream** 68:7
**Street** 2:3
132:12
**stuff** 17:16 32:4
60:14 64:13
65:18 73:15,19
74:4,19 89:1
95:15
**subject** 18:20
22:7 24:6
39:13 40:2
**submitted** 20:17
94:24 95:18,19
99:5,8 100:13
106:1 121:21
**SUBSCRIBED**
130:20
**subsequent**
11:12
**subsequently**
122:16
**suggest** 117:20
**suggested**
117:15
**Suite** 2:3,9,15
132:13
**summary**
105:22 114:4
**supplement** 19:7
77:18
**support** 16:5
71:7
**supposed** 76:21
121:5
**sure** 4:23 9:1
14:13 21:18
25:21 28:15
39:7,15 42:20
45:16 49:12
52:17 55:3,13

56:23 62:14
64:22 69:7
74:7,17,22
80:5,21 86:14
88:24 90:8
98:8,19 101:8
101:9 107:9
111:9 114:1
118:10 120:12
**surveillance**
7:20
**sworn** 4:1,5
10:11 73:8,18
130:20 131:7
**system** 55:20
57:11 65:6
75:15 76:12
81:1,8
**Szymanski**
59:19 60:3,3

---

**T**

**T** 3:6
**tactical** 7:6,7,12
7:14,16,22,23
7:24 8:2,4,7
16:3 28:12,16
33:21 34:14
59:20 71:1,5
71:11 127:8
**take** 16:15 27:24
29:1 31:3 41:4
42:22 43:8
49:21 52:13
53:4 80:2,4
97:1 105:14
116:16 124:23
128:18
**taken** 1:11,14
39:7 56:1 58:9
95:6,19 97:24
123:17 131:12
**takes** 13:21
**talk** 36:4 62:9

74:20 75:4
**talked** 36:24
63:23 116:21
119:18
**talking** 9:22,23
41:16,17 46:1
46:4 47:3,4
51:4,5,6,7 64:6
68:15,16 74:3
74:3,4 75:20
77:2 92:23
98:23 103:21
104:7 108:1
114:10,11
**task** 65:20
**tasked** 125:9
**technical** 96:21
**technological**
43:11
**tell** 4:22 5:11,13
28:3 29:10,14
45:4 56:20
60:24 65:16
66:10 88:11
98:9 100:11,16
102:19,22
103:1 105:16
110:10 114:12
114:19 116:6
118:13 128:11
**telling** 53:22
54:14
**tells** 54:13 106:5
107:23 108:8
109:21
**term** 17:2 92:4
**terminal** 45:22
**terms** 108:21,22
**test** 16:20,21
**testified** 4:5
**testify** 131:7
**testimony** 4:11
35:5 36:2 45:5
130:11,14

**testing** 16:19
**text** 14:1 64:2,3
64:5,8,10 65:3
65:11,12 67:1
67:5 68:3,6,7
68:10,11,13,17
68:18,19,20
69:8,10,13
70:10 83:21
84:10,12,19
85:11,24 86:1
86:5 88:15
120:11
**Thank** 21:2
100:9 102:17
**Thanks** 20:19
**thing** 6:11 14:18
34:11 44:17
45:13 55:18,21
57:12 58:14,20
61:13 62:2,2
62:18 65:1
66:11,19 74:23
75:6 96:3
97:13,14 106:7
109:12,13
115:9 116:2
122:7 123:1,22
**things** 4:22 16:2
23:7,13 31:12
31:18 32:4
52:13 54:18
58:12 59:1
61:3,12 70:8
71:21 72:1
76:6 84:18
90:11 91:12
97:4,9 104:22
106:9 109:21
118:1
**think** 6:11 11:1
12:5 15:20
18:16 19:3
20:9 21:13

23:3,8,18
26:21 27:13
29:16,17 33:12
33:22 35:15
44:17 49:6
52:6,7 53:14
55:17 56:22
58:2 63:22
68:4 73:15
74:23 75:1,3,7
76:10 77:23
83:4,12 91:1,3
92:11 94:8,22
103:21 110:5
112:24 113:3
116:2 117:16
119:10,18,18
119:21 120:8
120:13 125:17
125:18,22
**third** 15:9 85:22
**thought** 17:15
18:2 20:20,21
27:12 33:23
34:8,9 45:15
46:3 54:10
58:8,21 78:13
85:1 92:8
104:18 111:19
118:2 125:6
**three** 15:4 37:20
87:2 92:3
**three-paragra...**
19:9
**throw** 10:12
**thumb** 76:16
122:23 124:21
**thumbprint**
96:22
**tied** 49:7
**TikTok** 68:4
**TikTok's** 68:4
**till** 8:20
**time** 8:14 9:15

**EXHIBIT F**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 151

9:15 10:1 13:6
13:7,7 15:17
16:4,4 17:17
17:18 21:7,15
21:24 23:17
25:21 26:12
28:9,14,22
30:2,2,6,9,13
34:11,16 35:17
42:22 43:8
45:1 46:18
48:21 49:2,14
49:21 50:4,9
52:11,13 59:20
61:22 65:17
66:10,11,12
70:4,24,24
72:8 73:22
76:6 77:22
80:15 81:14
83:6,7 88:24
94:6 97:21
98:2 102:13
105:1,14
113:24 119:20
131:12
**timeframe** 38:2
**times** 5:5 11:10
33:14 69:23
82:22 86:11
111:24
**title** 91:12
**today** 24:2 75:5
77:13 82:11
**today's** 18:7
20:1,12 21:6
32:19 80:11
**told** 29:7,9 54:4
54:23 118:13
122:20
**tool** 11:2,22
86:19
**tools** 97:4 106:1
**top** 80:16 87:14

90:2 110:16
115:4 120:13
**totally** 118:13
**touched** 95:4
**tour** 10:1
**tracking** 94:4
**trained** 9:8,12
11:2,5,22
12:15 15:22,24
17:23 18:2,4
125:24 126:4,8
**training** 9:6,10
9:13 10:2,4,7,9
10:14,16 11:13
11:16,18,19
13:3,14 15:16
17:7,16,19
101:3 125:9,13
125:20,23
126:2,17
**transcript** 36:21
128:1 129:3,5
129:8 130:11
130:13
**transcription**
128:8
**transcripts**
127:14
**treat** 38:5,12,15
38:19
**TRESSLER** 2:7
**trial** 37:20 45:6
**trouble** 8:24
14:3
**true** 26:1 31:6
48:24 51:17
67:9 68:20
69:18 70:12
82:1,19 83:23
84:15 85:20,21
89:8 105:9
113:8 120:6
130:14
**truth** 131:7

**try** 43:3,4 48:19
78:18 86:17
116:9
**try-** 96:21
**trying** 11:14
12:7,7,22,23
14:1 22:2,21
24:10 29:2,18
30:23 31:8
32:2 41:6 48:7
51:23 52:7
55:18 58:22
60:8 70:3 75:3
83:10 90:21
96:21 108:7
110:7 114:13
118:15
**turn** 50:1,7
**turned** 49:23
50:3,3 93:10
94:18 125:1
**turns** 50:9
**twice** 98:1
**two** 5:18 12:2
15:4,8 23:13
23:13 26:19
33:24 37:20
43:18 64:6,7,9
64:11 68:8
69:1,2,3 84:7
84:12,19 90:2
90:2,3 94:17
94:18 98:2
104:22
**type** 16:23 76:9
109:16
**typed** 65:10
81:17,20
109:15
**types** 67:2
**typewriting**
131:9

_____

U

**U-M** 4:16
**ultimately** 121:3
**un-** 14:11
**unclear** 27:11
**undeleting**
14:11
**understand** 4:24
12:13,16,18,22
35:19 108:7
**understanding**
28:6 41:5 47:9
49:5,16 56:9
56:10,12,17
69:21 80:21
82:21 89:3
91:20 93:19
94:20 95:4,11
95:17 101:2,14
121:20 122:9
124:17
**understood** 5:8
**unfamiliar**
48:18
**unfortunately**
59:10
**union** 36:10,10
36:12 37:6,10
37:10 116:22
**unit** 4:20 7:9,12
7:14,16 8:2
28:12 32:15
33:21 34:14,17
56:9,10 71:1,6
72:6 95:8
127:8
**United** 1:1,13
130:1 131:1
**units** 7:20
**universe** 82:18
**University** 5:21
**unknowingly**
118:3
**unplugged**
124:12

**update** 20:4,6
91:12
**updated** 90:10
**upset** 54:18
61:14
**USB** 122:23
**use** 15:3,8,9
48:12 52:9
65:8,20 82:17
83:3,7,13
84:22 85:23
86:3,3,18 97:8
97:19 120:2
125:10,15
**useful** 86:9
**user** 12:21
**uses** 65:1
**usual** 128:17

_____

V

**value** 97:7
**vanilla** 54:6
**verbally** 92:5
**verbiage** 72:13
**verify** 65:21
96:20 97:5,15
**version** 125:13
125:15
**victim** 66:16
**video** 8:13 67:16
67:17,20,21
103:12,23
104:2
**video-type** 17:16
**videoconference**
1:16 2:1 4:5
130:12 131:8
**videographic**
61:24 93:17
**videos** 61:11
62:14 67:3
68:1 70:11
85:10,19,21
106:3,20

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 152

120:11
view 47:11,19,22
  48:4 49:24
  50:11,18 51:7
  51:9 52:16
  53:7 60:5
  107:2 120:3
viewed 61:21
  62:13,14,17,20
viewer 47:14,21
  48:3,10,12
viewing 47:3,5,6
  47:8
views 35:4
violate 25:8
violence 7:19
visual 15:9
voice 64:20
volume 15:12
vs 1:5 130:5

W

wait 104:10,16
waiting 66:11
waive 128:10,12
walk 47:20 48:3
  48:19
Walking 29:14
want 4:22 10:12
  12:8 18:23
  19:1,2 22:4
  25:8 26:16
  48:18 50:11
  51:21 53:5
  54:19 57:1
  60:14,17,17
  61:4,15,15,21
  66:16 68:10
  69:6 71:18
  74:7,16,17,21
  78:24 88:2,9
  95:1 97:23,24
  100:17 104:16
  104:16,17,19

105:5,5,6
117:2 120:22
125:19
wanted 22:8
  29:10 30:24
  31:2 49:24
  60:4 90:10,11
  118:14
warrant 54:2
  62:3,3 70:18
  95:12,14 98:23
  98:24
warrants 7:21
wasn't 8:18
  12:12 27:13
  28:1,1 40:20
  47:12 49:2
  50:4 56:12
  59:21 82:8
  88:23 89:9,9
  90:14 91:10
  92:14 95:16,20
  95:21 105:7
  113:7 114:18
  115:9,11,14
watch 56:2
  61:18
way 23:4 33:6
  35:23 38:20
  45:17 53:19
  56:5,7 57:6
  58:10 68:24
  70:5 74:10
  79:19 81:19
  86:16 87:17,17
  93:20 96:20
  97:17 116:1
  120:23,23
  121:7 128:8
ways 43:18
  44:20 117:6
  128:17
we'll 5:5 15:15
  77:14 80:10

87:8 89:13,18
102:8,13
103:20 107:14
114:24 128:14
129:1,9
we're 55:17 75:5
  82:21 86:4
  92:2,23 94:8
  98:23 99:13
  113:21 129:10
we've 19:3 29:19
  36:24 65:18
  70:1
website 10:20
weeks 33:24
welcome 21:3
went 22:9 29:6
  29:16 35:21
  45:19 46:18
  47:10 84:23
weren't 25:24
  30:6 96:9
window 78:16
  79:6,6,17
Windows 83:12
wipe 65:6
withdraw 129:3
  129:12
witness 3:2 4:1,4
  21:1,3 22:5
  23:4,12 24:7
  24:13,18,20,22
  25:1,11 26:22
  32:15 39:20,23
  40:14 41:2
  42:12,15,17,20
  42:23 43:3,13
  51:1,3 52:22
  58:3,7 63:4
  75:19 76:18
  78:7,9,11 79:9
  79:21 88:5
  99:16 100:20
  100:21 101:7

101:19,21
102:1,24 103:2
103:5 104:1,13
104:15 105:21
105:23 109:3
119:12,14
123:12 124:9
127:7,11,14
128:5,13 129:6
129:10 132:1,4
witness's 63:1
  117:22
witnessing
  124:24
word 109:16
  116:16 117:12
  117:21,21
wording 84:24
words 14:12
  112:19
work 7:21 16:6
  16:15 17:8,11
  33:19 40:5
  70:16 75:10
  86:7 91:16,18
  120:16,17
  121:24 122:14
  122:20 126:20
worked 8:19
  16:15 33:5
  79:23
working 13:7
  31:18 33:12
  34:1 56:10
  64:12 66:20
  73:19 77:3
works 16:23
  47:7 67:24
worried 32:1
wouldn't 13:10
  13:11 37:12
  112:10
wrap 124:3
write 92:24

128:16
written 27:15
  37:2 78:10
  93:20 105:10
  116:1 128:2
wrong 20:21
  22:1 23:1
  33:23 83:14
  124:16
wrote 19:10,10
  119:2

X

X 3:1,6

Y

yeah 11:21
  22:21 30:21
  34:7 39:24
  41:3 42:18,19
  43:7 44:22
  48:1 58:1
  67:18 68:13,21
  71:9 72:19,21
  73:18 76:23
  78:6 79:16
  81:4 83:24
  85:2 87:4 89:3
  89:9 92:23
  96:13 99:11,12
  99:14 100:6
  103:1,2 104:20
  109:9 113:13
  113:19 118:17
  118:23 119:12
  119:18 121:15
  122:13 124:6
  126:13 129:1
year 6:3,3,20 7:4
  8:20 11:7 14:2
  16:21 28:4
  37:20 46:1
  71:17 125:21
yearly 16:18

EXHIBIT F

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 153

**years** 5:18,23
37:15,20,21
**Yep** 77:17,20
80:9

**Z**

**zebra** 4:16
**Zoom** 5:2 21:7
99:14

**0**

**05681** 1:5 130:5
**06** 8:4
**084-004606**
132:16
**09** 8:5

**1**

**1** 3:8 80:11
83:18 86:24
87:2,4
**1-20** 1:7 130:7
**10** 3:17 113:21
**100** 82:22
**102** 3:13
**105** 3:14
**107** 3:15
**11** 3:18 116:4
**111** 3:16
**113** 3:17
**116** 3:18
**12** 113:22
**12:56** 1:16
131:14
**12th** 44:9 107:7
**13** 102:9
**14th** 19:19
**16-1** 39:2,11,12
**161** 132:12
**17** 77:21 105:13
**17th** 77:24
**18** 1:5 5:23
73:13,14 86:23
87:5 130:5
**18-0007242**

110:14
**18-000742** 109:7
110:1,4
**18-00742** 108:13
108:14 110:9
**18th** 19:8 77:23
80:12 88:13
**19th** 132:5

**2**

**2** 3:9 20:7 87:9
88:12 94:10
114:2,3
**20-** 46:1
**2009** 8:15
**2014** 8:16,17
**2016** 7:8
**2018** 17:1,6,18
19:8 20:3,7
28:11 38:9
39:2 41:18
45:21 46:2,3,5
70:24 73:10
77:22 80:12
86:23 88:14
89:14 94:10
98:5 102:9
105:13 107:7
111:7,14
112:16 113:5
113:11,22
126:5
**2019** 73:12
**2020** 19:19 44:9
46:4
**2021** 1:17
130:13,21
131:13 132:5
**226** 102:15
**230** 102:16
**231** 107:16
**234** 107:16
**235** 114:3
**2350** 2:3

**241** 114:23
**242** 115:5
**244** 114:3,24
**250** 2:9
**26** 111:14
112:16 113:5
113:10

**3**

**3** 3:10 89:14,19
103:12,15
107:10
**3050** 132:13
**30th** 1:16 130:13
131:13
**31** 98:5
**312.361.8851**
132:14
**312.445.4900**
2:4
**320** 116:5
**324** 116:5
**33** 2:3

**4**

**4** 3:4,11 94:8
111:7
**4:19** 129:15

**5**

**5** 3:12 98:7 99:3
100:4
**550** 2:8
**5600** 2:14

**6**

**6** 3:13 102:9
105:12
**6:30** 19:9 80:12
**600** 2:15
**60018** 2:15
**60440** 2:9
**60601** 132:13
**60602** 2:4
**630.759.0800**

2:10
**68** 111:10

**7**

**7** 3:14 89:14
105:19
**7-2** 40:2,11,23
41:22
**79** 100:6,8
**7th** 20:3

**8**

**8** 3:15 107:11,14
107:23
**80** 3:8 100:7,8
**847.261.0700**
2:16
**87** 3:9
**89** 3:10 111:10

**9**

**9** 3:16 94:10
111:6
**94** 3:11
**98** 3:12
**9th** 20:7

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT F**