



Transcript of the Deposition of
# Alan Roechner
**Case:** Cassandra Socha v. City of Joliet; et al.
**Taken On:** June 21, 2021

Royal Reporting Services, Inc.
Phone:312.361.8851
Email:info@royalreportingservices.com
Website: www.royalreportingservices.com

**EXHIBIT G**

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CASSANDRA SOCHA,                    )

        Plaintiff,           )

        -vs-                 ) No. 18 CV 05681

CITY OF JOLIET, a municipal         )

Corporation, EDWARD GRIZZLE,        )

JOHN DOES 1-20,                     )

        Defendants.          )


      The deposition of ALAN ROECHNER, taken

remotely before Michelle A. Duzan, Certified

Shorthand Reporter and Registered Professional

Reporter, taken pursuant to the provisions of the

Illinois Code of Civil Procedure and the Rules of the

Supreme Court thereof pertaining to the taking of

depositions, commencing at 9:30 a.m. on June 21,

2021.

**EXHIBIT G**

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 2

```
 1      APPEARANCES: (via videoconference)
 2      LAW OFFICES OF HALL ADAMS, LLC
        MR. HALL ADAMS III
 3      33 North Dearborn Street
        Suite 2350
 4      Chicago, Illinois  60602
        Phone:  312.445.4900
 5      E-mail: hall@adamslegal.net
 6
             On behalf of the Plaintiff,
 7
 8      TRESSLER LLP
        MS. DARCY L. PROCTOR
 9      MR. JAMES J. HESS, Jr.
        550 East Boughton Road
10      Suite 250
        Bolingbrook, Illinois 60440
11      Phone:  630.759.0880
        E-mails:  dproctor@tresslerllp.com
12                jhess@tresslerllp.com
13          On behalf of the Defendant, City of Joliet;
14
        KNIGHT HOPPE KURNIK & KNIGHT, LTD.
15      MR. MATTHEW S. CLARK
        5600 North River Road
16      Suite 600
        Rosemont, Illinois  60018
17      Phone:  847.261.0700
        E-mail: mclark@khklaw.com
18
             On behalf of the Defendant, Edward Grizzle.
19
     ALSO PRESENT:
20
        Ms. Sabrina Spano, Esq., City of Joliet
21
        Ms. Cassandra Socha, Plaintiff
22
23
24
```

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT G**

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 3

1                    I N D E X

2

     WITNESS                         EXAMINATION

3

     ALAN ROECHNER

4

5    Direct Examination by Mr. Adams          4
     Cross-Examination by Ms. Proctor         94
6    Redirect Examination by Mr. Adams        99

7

8

9                E X H I B I T S
     EXHIBIT                        INTRODUCED
10
     No. 2                              69
11   No. 3                              78
     No. 5                              84
12
              (Other exhibits marked but not introduced.)
13

14

15

16

17

18

19

20

21

22

23

24

**EXHIBIT G**

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 4

1      (Whereupon, Deposition
2      Exhibits Nos. 1-8 were marked.)
3      (Witness duly sworn.)
4          ALAN ROECHNER,
5   called as a witness herein, having been first duly
6   sworn, was examined and testified as follows:
7          DIRECT EXAMINATION
8   BY MR. ADAMS:
9      Q.  Good morning, sir.  My name is Hall Adams.
10  I represent Officer Cassandra Socha in this lawsuit.
11  We ask that you do a couple of things this morning.
12  The first and most important is that you make sure
13  you hear and understand every question before you
14  give an answer.  If you need to have questions
15  repeated, rephrased, read back, explained, we'll
16  accommodate you as many times as you ask.  If you
17  give an answer to a question, we will all presume
18  that you heard and understood the question; is that
19  fair?
20     A.  Yes.
21     Q.  Please never guess.  If you don't know the
22  answer to a question, say you don't know.  If you
23  can't remember something you're asked, tell us that
24  you can't remember.  If you can only provide an

Page 5

1   estimate -- and that may be particularly true with
2   dates -- feel free to provide an estimate if you tell
3   us that's what it is, but never guess.  Okay?
4      A.  Yep.
5      Q.  Have you reviewed any documents in order to
6   prepare for your deposition today?
7      A.  No.
8      Q.  Have you spoken with anyone in order to
9   prepare for your deposition today?
10     A.  No.
11     Q.  How many times in your life have you been
12  deposed?
13     A.  Approximately three.
14     Q.  When most recently?
15     A.  I don't know the exact date.  But less than
16  six months ago was the last one.
17     Q.  Have you ever read any version of the
18  complaint filed by Officer Socha in this lawsuit?
19     A.  The lawsuit, you're talking about, itself?
20     Q.  Yes, sir.
21     A.  Yes.
22     Q.  When did you first do that?
23     A.  Back when -- when it was issued, so a couple
24  of years ago.

Page 6

1      Q.  How did it reach you?
2      A.  How did it reach me?
3      Q.  Yes, sir.
4      A.  Because it was against the sergeant that
5   worked for me.  So through the chief.
6      Q.  At the time it was filed, you were a deputy
7   chief --
8      A.  Correct.
9      Q.  -- of investigations?
10     A.  Correct.
11     Q.  And the individual named in the complaint
12  was Detective Sergeant Grizzle?
13     A.  Correct.
14     Q.  Have you reviewed the complaint since the
15  first time you did so?
16     A.  I may have, but not any time, you know,
17  recent or anything like that.
18     Q.  When you first reviewed the complaint, did
19  you make any written record of having done so,
20  whether notes, a memo, a letter to anyone?
21     A.  Not that I recall.
22     Q.  Did you discuss the contents of the
23  complaint with anyone around the time that you first
24  read it?

Page 7

1      A.  Exactly who, I don't know.  But probably
2   with the chief at the time.
3      Q.  Do you have a specific recollection of
4   having discussed the contents of the complaint with
5   the chief?
6      A.  Probably when he showed it to me.
7      Q.  Okay.  Do you remember in that conversation
8   where it took place?
9      A.  Somewhere at the PD.  Maybe his office.
10     Q.  In that conversation, do you remember what
11  he said to you and what you said to him about the
12  contents of Officer Socha's complaint?
13     A.  No, I do not recall.
14     Q.  Did you make any written record, notes, or
15  memoranda or letters or e-mails or of any other type,
16  regarding that conversation with the chief about the
17  contents of Officer Socha's complaint?
18     A.  I -- I may have.  I don't recall.
19     Q.  Have you ever discussed the allegations in
20  Officer Socha's complaint with Detective Sergeant
21  Grizzle?
22     A.  I'm sure we've had discussion.  Exactly, you
23  know, what, I don't know, but I'm sure.
24     Q.  How many?

4  (Pages 4 to 7)

**EXHIBIT G**

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 8

1    A.  I -- it would have been back then.  So I --
2  I -- I don't know.  Maybe one or two.  I don't know.
3    Q.  Did you make any written record of those
4  discussions?
5    A.  I -- I don't -- I don't recall if I did.
6    Q.  Back at or around the time that you first
7  reviewed Officer Socha's complaint, did you discuss
8  its contents with any other Joliet Police Department
9  officers?
10   A.  Not specific, no.
11   Q.  Has -- oh, that's a different -- strike --
12  I'll withdraw that.
13       Until the time that you were appointed
14  interim chief and then chief, did Officer Socha ever
15  serve in your chain of command?
16   A.  I mean, everyone serves in my chain of
17  command in the department at that level.
18   Q.  Well, so that -- that's why I qualified the
19  question.  Before you became interim chief or chief,
20  did Officer Socha ever serve in your chain of
21  command?
22   A.  I guess the best answer is not directly.  I
23  mean, if we were on a scene and something needed to
24  be done, then, yes, they would be in my chain of

Page 9

1  command, but specifically, no.
2    Q.  Did you ever prepare any written performance
3  evaluations or ratings or reviews of her performance
4  as a police officer?
5    A.  I mean, as -- I don't know any specific, but
6  as -- as commander of operations, I would sign off on
7  all -- all performance evaluations.
8    Q.  After they were prepared by some other
9  supervising police officer?
10   A.  Yeah.  Correct.
11   Q.  Let me rephrase my question then.
12   A.  Sure.
13   Q.  Were you ever the original author of any
14  performance evaluation of Officer Socha?
15   A.  Not that I can recall, no.
16   Q.  Did you ever take issue with any other
17  officer's performance evaluation of Officer Socha?
18   A.  Not that I recall, no.
19   Q.  Based upon your review from time to time of
20  written performance evaluations or ratings of Officer
21  Socha, which you had to sign off, do you have any
22  opinions about her qualities as a police officer with
23  the Joliet Police Department?
24   A.  Like I said, I don't recall her evaluations

Page 10

1  to make that answer.  I don't know.
2    Q.  Fair to say then if we were to go to trial
3  tomorrow, you wouldn't have any such opinions?
4    A.  Not based off the evaluations, no.
5    Q.  You never -- you never directly supervised
6  her and you don't have any independent recollection
7  of evaluations offered by others of her performance,
8  correct?
9    A.  Yeah.  Not that I recall, no.
10   Q.  Did you attend the criminal trial of Officer
11  Nicholas Crowley?
12   A.  No.
13   Q.  Did you attend any part of it?
14   A.  I don't recall.  I mean, I know I was out in
15  the hallway.  I don't know if -- you know, so...
16   Q.  Were you out in the hallway for the whole
17  trial?
18   A.  No.
19   Q.  Were you in the courthouse where Officer
20  Crowley was tried when Officer Socha testified at
21  that trial?
22   A.  I don't recall that.
23   Q.  Were you in the courtroom watching and
24  listening to Officer Socha testify at Crowley's

Page 11

1  trial?
2    A.  I don't recall.
3    Q.  Did you detail any other Joliet officer to
4  attend that trial for purposes of reporting to you on
5  what was taking place?
6    A.  Detail, no.
7    Q.  I'll pick another word and say, did you
8  order anyone to do that?
9    A.  Order, no.
10   Q.  How about assign?
11   A.  No.  Not that I recall, no.
12   Q.  Was there any Joliet officer who attended
13  the Crowley trial who did, in fact, report back to
14  you on trial events?
15   A.  I mean, without, I mean, remembering
16  specifically, I'm sure whoever handled the case did
17  from investigations.
18   Q.  Do you remember who that was?
19   A.  Well, I mean, it would -- it would have been
20  Sergeant Grizzle.
21   Q.  Did Sergeant Grizzle provide you with daily
22  reports of what was taking place in the Crowley trial
23  as it was ongoing?
24   A.  He -- I mean, I don't recall specifically.

5 (Pages 8 to 11)

**EXHIBIT G**

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 12

1  I know he did give me some information. Whether it
2  was daily or not, I don't know.
3      Q.  Why?
4      A.  Why -- why what?
5      Q.  Why did he provide you with information
6  about Crowley's trial as it was ongoing?
7      A.  Well, because all the detectives give us
8  summaries of their trials when they're -- when you're
9  in charge of the unit, plus it also involved officers
10 from our department.
11     Q.  Well, even if it wasn't something that you
12 had ordered or assigned Grizzle to do, it was
13 something that he was expected by you to do?
14     A.  Correct.
15     Q.  Did Grizzle provide you with any report of
16 Officer Socha's testimony at the Crowley criminal
17 trial?
18     A.  Not that I can recall.
19     Q.  Were you present in court when the verdict
20 was rendered in Crowley's criminal trial?
21     A.  I don't believe I was.
22     Q.  Did Grizzle report to you on the verdict of
23 the Crowley trial?
24     A.  I'm -- I'm sure he did.  I don't recall,

Page 13

1  though.
2      Q.  Well, my next question was going to be, what
3  do you recall him reporting to you?
4      A.  That -- whatever -- I mean, it was the not
5  guilty verdict, I guess.
6      Q.  In any way did Grizzle ever communicate to
7  you his personal opinions about that verdict?
8      A.  Not that I recall.
9      Q.  Did Grizzle ever report to you his personal
10 opinions about the role that Socha's testimony played
11 in the outcome of that trial?
12     A.  Not that I recall.
13     Q.  Did you ever discuss the trial with Lorinda
14 Lamken from the state appellate prosecutors' office?
15     A.  Not that I recall.
16     Q.  What is your status with the Joliet Police
17 Department?
18     A.  I'm retired.
19     Q.  When did you retire?
20     A.  January 21st of 2021.
21     Q.  From what position did you retire?
22     A.  Chief of police.
23     Q.  Was the retirement a voluntary decision?
24     A.  I guess yes and no.

Page 14

1      Q.  Okay.  Well, explain to me, if you would,
2  each of those three answers to that one question.  In
3  what sense was it voluntary and in what sense was it
4  not voluntary?
5      A.  Well, I mean, I -- I signed the paperwork,
6  so I chose to.  So I guess that's voluntary.
7      Q.  In what sense was it about voluntary?
8      A.  Well, the city manager stated that the mayor
9  didn't want me there anymore because he couldn't
10 control me.  So when the new city manager came, then
11 he was going to fire me.  So there'd be the
12 unvoluntary part of it.
13     Q.  Who was the city manager who communicated
14 that ultimatum to you?
15     A.  That would be Jim Hock.
16     Q.  Who was the new city manager to whom Jim
17 Hock was referring?
18     A.  Jim Capparelli.
19     Q.  And who was the mayor to whom the city
20 manager Hawk was referring?
21     A.  Mayor O'Dekirk.
22     Q.  How long did you serve as chief?
23     A.  For two years -- a little over two years.
24     Q.  Before that period, did you serve as interim

Page 15

1  chief?
2      A.  Yes.
3      Q.  For how long before you became chief were
4  you the interim chief?
5      A.  From August to December.
6      Q.  Of what year?
7      A.  Of '18.  So -- wait.  Yeah, '18.
8      Q.  And you replaced Chief Benton when you
9  became interim chief?
10     A.  Correct.
11     Q.  Prior to that, you were the deputy chief of
12 investigations?
13     A.  Correct.
14     Q.  How long were you the deputy chief of
15 investigations?
16     A.  Close to three or four years it was.
17 Exactly, I don't have the dates.
18     Q.  You were the deputy chief of investigations
19 when --
20     A.  When --
21     Q.  -- Crowley was tried?
22     A.  Correct.
23     Q.  You were the deputy chief of investigations
24 when the department investigated Officer Socha?

6 (Pages 12 to 15)

**EXHIBIT G**

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 16

1    A.  Correct.
2    Q.  What role did you hold before you became
3  deputy chief of investigations?
4    A.  Commander of operations.
5    Q.  How long did you hold that position?
6    A.  A little over five years.
7    Q.  And what position did you hold before that?
8    A.  Lieutenant of the tactical narcotics unit.
9    Q.  How long did you hold that position?
10   A.  Maybe a couple years.  I don't know exact.
11   Q.  What did you do -- what position did you
12  hold before that?
13   A.  Lieutenant in operations, patrol.
14   Q.  How long did you hold that position?
15   A.  Maybe four years.  I don't know exact.
16   Q.  And what position did you hold before that?
17   A.  Sergeant of the tactical unit.
18   Q.  What position did you hold before that?
19   A.  Sergeant of operations.
20   Q.  Before that?
21   A.  Tactical officer.
22   Q.  Before that?
23   A.  NOPT officer, neighborhood policing.
24   Q.  Before that?

Page 17

1    A.  Patrol officer.
2    Q.  How long were you a patrol officer?
3    A.  Before I got in NOPT.  Probably four, five
4  years.
5    Q.  Was patrol officer your first position with
6  the department?
7    A.  Correct.
8    Q.  When did you start with the department?
9    A.  1991.
10   Q.  Was that your first job in policing?
11   A.  Yes.
12   Q.  What's your highest level of formal
13  education?
14   A.  A bachelor's degree in business
15  administration.
16   Q.  From what institution?
17   A.  Illinois Benedictive University.
18   Q.  And what year did you achieve that?
19   A.  I want to say 2017.
20   Q.  Did you personally author any of the --
21   A.  I'm sorry.  I'm sorry.  That would have been
22  before that.  I apologize.  It would have been maybe
23  2013.  I don't know exactly.  I could get that for
24  you, though.

Page 18

1    Q.  Did you personally author any of the
2  department's general orders?
3    A.  Not -- not -- well, not personally author,
4  no.
5    Q.  Did you personally revise or update any of
6  the department's general orders?
7    A.  Yes, I was involved in the revision of some
8  general orders.
9    Q.  Which?
10   A.  I -- I don't know exact.  They're revised a
11  lot, so...
12   Q.  In what position or positions were you
13  involved in revising or updating general orders?
14   A.  I mean, it could go all the way to when I
15  was a patrolman.  I helped revised them.  So just all
16  different positions.
17   Q.  While you were with the department, was
18  there a specific process by which general orders were
19  drafted, updated, or revised?
20   A.  Yeah.  I mean, it's -- it's all different.
21  There's new laws that they have to put in there, so
22  that happens with new laws.  Just updated stuff that
23  just has to be, you know, put to the new time frame,
24  stuff like that.  So nothing specific.  Just when

Page 19

1  they need to be updated, then -- then we'd have our
2  CALEA officer review other departments' general
3  orders for the best practices and update them.
4    Q.  Beginning say in January of 2018, was there
5  any particular officer or established group of
6  officers tasked with drafting, updating, or revising
7  general orders?
8    A.  Nobody specific, no.  But the research would
9  be done by our CALEA officer.
10   Q.  By what kind of officer?
11   A.  CALEA, our accreditation officer.
12   Q.  In the year 2018, who was that officer?
13   A.  It would be Officer Coleman.
14   Q.  Are you familiar with a General Order 16-1,
15  the subject of which is evidence and property
16  management, that was in effect at the Joliet Police
17  Department beginning at least by 1 May of 2018 and
18  continuing through that calendar year?
19   A.  Not offhand after -- no, I haven't looked at
20  it in a long time, so, no, I don't know.
21   Q.  What was the BEAST --
22   MR. ADAMS:  And that, Michelle, is all caps.
23  It's an acronym.
24  BY MR. ADAMS:

7 (Pages 16 to 19)

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT G**

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 20

1    Q.   -- bar coding and evidence handling system?
2    A.   Is that a question or description?
3    Q.   That's a question.
4    A.   Well, you just described what it is.  It's
5    an evidence bar coding.
6    Q.   What's the purpose of the BEAST bar coding
7    and evidence handling system?
8    A.   To keep track of evidence.
9    Q.   Are you aware generally, even if you're not
10   aware of any of the specific terms, that in May of
11   2018, General Order 16-1 relating to evidence and
12   property management was in effect at the Joliet
13   Police Department?
14   A.   I'm sure there was a policy on it, correct.
15   Q.   When did you first learn that the department
16   was investigating Officer Socha?
17   A.   I don't have the date.  I don't know.
18   Q.   How did you first learn that?
19   A.   From Sergeant Grizzle.
20   Q.   How did Sergeant Grizzle first communicate
21   that fact to you?
22   A.   I'm guessing in person.
23   Q.   Was anyone else present when he communicated
24   that fact to you for the first time?

Page 21

1    A.   I don't remember.
2    Q.   What did he tell you?
3    A.   Just that a special prosecutor wanted me to
4    get a search warrant for her phone due to text
5    message threats.
6    Q.   Prior to that, had you any information about
7    the text messages or the special prosecutor's
8    interest in investigating Officer Socha?
9    A.   No, not that I recall.
10   Q.   Did Grizzle come to you to approve the
11   issuance of a warrant?
12   A.   No.
13   Q.   What did he come to you for?
14   A.   To keep me informed that she wanted him to
15   get a warrant.
16   Q.   Within the department, was Grizzle required
17   to obtain approval from anyone in order to seek such
18   a warrant?
19   A.   From the judge.
20   Q.   Okay.  I mean, I -- that's a bad question by
21   me.  Before he approached the judge with an
22   application for a warrant, was he required to get any
23   clearance from anyone in the department?
24   A.   No, not clearance.  I mean, just inform me,

Page 22

1    just like anybody else with an ongoing case, what's
2    going on.
3    Q.   Was he required to follow the direction of
4    the so-called special prosecutor or Lorinda Lamken in
5    this case?
6    A.   Yes.
7    Q.   When Grizzle came to you and told you that
8    Lamken wanted him to obtain a search warrant, of what
9    was he to obtain a search warrant?
10   A.   For her cell phone.
11   Q.   For anything else?
12   A.   Not that I recall.
13   Q.   Did he give you any factual background
14   regarding the events leading to the special
15   prosecutor's direction to obtain a warrant for
16   Officer Socha's cell phone?
17   A.   I'm sure he did.  Specifically, I -- and
18   what, I don't.
19   Q.   How long did that conversation last in which
20   Grizzle first informed you that the special
21   prosecutor had directed him to attempt to obtain a
22   search warrant for Officer Socha's phone?
23   A.   Just as long as it would take him to tell
24   me.  So I don't know.  A minute or two.

Page 23

1    Q.   Did you make any written record of that
2    conversation?
3    A.   Not that I recall.
4    Q.   Did you direct Grizzle to make any written
5    record of that conversation?
6    A.   It's part of his case file, so, yeah, he
7    would make a record of it.
8    Q.   Is that something that you specifically
9    recall directing him to do, or is that something that
10   you would have expected him to --
11   A.   Are you talking about -- I'm sorry.  Are you
12   talking about a record of her telling me to get the
13   warrant?  Is that what you mean?  I'm sorry.
14   Q.   Of that conversation that he had when he
15   came to --
16   A.   Oh, with me?
17   Q.   -- to you.  Yes, sir.
18   A.   No.  It doesn't have to -- I mean, he
19   doesn't have to make a written record of that.
20   Q.   Do you recall when in relationship to the
21   execution of the warrant that was ultimately
22   obtained, Grizzle first came to you and told you that
23   the special prosecutor had directed him to seek a
24   warrant for Officer Socha's phone?

8  (Pages 20 to 23)

**EXHIBIT G**

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 24

1    A. A day or two maybe.
2    Q. After that, what is the next event about
3  which you recall learning in the sequence of the
4  events of the department's investigation of Officer
5  Socha?
6    A. Probably that he served a warrant and got
7  the phone, about -- probably the next.
8    Q. At the time these events were occurring, as
9  a detective sergeant in the investigations division,
10  Grizzle reported directly to you?
11    A. There's a lieutenant.
12    Q. Who was that lieutenant?
13    A. Lieutenant Mike Batis.
14    Q. Is there a reason of which you're aware that
15  Grizzle first approached you with the information
16  that the special prosecutor had directed him to
17  obtain -- attempt to obtain a warrant for Socha's
18  phone rather than going through Batis?
19    A. I don't know that he didn't go through
20  Batis, so I can't answer that.
21    Q. Did Batis ever report that fact to you?
22    A. Yeah, we discussed it.
23    Q. When?
24    A. I -- at the time that it was told to me.

Page 25

1    Q. At the time Grizzle told you about it?
2    A. I -- yeah, I believe so. It might have been
3  before that. I don't know exactly, but yeah.
4    Q. What -- what did Batis tell you?
5    A. The same -- same information.
6    Q. Did Batis tell you how he knew that the
7  special prosecutor had directed Grizzle to attempt to
8  obtain a warrant for Socha's phone?
9    A. I don't recall if he told me. I don't think
10  I asked.
11    Q. Did you make any written record of your
12  conversation with Batis about that?
13    A. No.
14    Q. Did Batis ever make any written record of
15  that conversation that you would have seen?
16    A. No, I haven't seen anything.
17    Q. When you learned that the search warrant had
18  been obtained and executed and that Detective
19  Sergeant Grizzle had taken Socha's cell phone into
20  custody, who told you that?
21    A. I -- I believe Grizzle would have told me
22  that.
23    Q. What, if anything, did he tell you about the
24  circumstances of the execution of the warrant and the

Page 26

1  seizure of the phone?
2    A. I don't recall exactly what he said. Just
3  that he has it.
4    Q. Did you make any record of that
5  conversation?
6    A. Not that I recall.
7    Q. Did -- have you ever seen any record of that
8  conversation in which Grizzle told you he had seized
9  Socha's phone that was prepared by Grizzle?
10    A. I don't remember.
11    Q. Have you ever seen any written record of
12  that conversation prepared by anyone else who
13  participated in the conversation?
14    A. Not that I remember.
15    Q. Have you ever seen any written record of
16  anyone other than Grizzle memorializing the facts and
17  circumstances of the execution of the warrant and the
18  seizure of the phone?
19    A. Not that I remember.
20    Q. Have you ever discussed those events with
21  then Lieutenant, now Deputy Chief Brown?
22    A. No.
23    Q. Did Grizzle tell you that there was anything
24  noteworthy about the circumstances of the execution

Page 27

1  of the warrant and the seizure of Socha's phone?
2    A. Not that I recall.
3    Q. Did he tell you anything about the manner in
4  which she responded to the issuance of -- I should
5  say, the service of the warrant and the direction
6  that she surrender her phone?
7    A. I don't -- not that I can recall or
8  specifics, no.
9    Q. When Grizzle told you that he had executed
10  the warrant and seized the phone, what, if anything,
11  did he tell you intended to do with it?
12    A. What the search warrant says, search it, I
13  believe.
14    Q. What, if anything, did he tell you about how
15  he intended to do that?
16    A. I don't believe he did. I don't know if he
17  did.
18    Q. Did you give him any particular direction
19  about how to search the phone or for what on the
20  phone to search it?
21    A. No, I would not know how.
22    Q. At that time were you trained on and facile
23  with the use of the Cellebrite computer?
24    A. No.

9  (Pages 24 to 27)

**EXHIBIT G**

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 28

1  **Q.** At that time were you trained on or facile
2  with the use of the Lantern computer?
3      **A.** No.
4      **Q.** At that time who, if anyone, did you
5  consider to be the department's duty experts relating
6  to using the Cellebrite and/or the Lantern computers
7  to search phones?
8      **A.** I'd say Detective German had the training --
9      **Q.** Anyone else?
10     **A.** -- through our major crimes task force.
11     **Q.** Anyone else?
12     **A.** For the Lantern? Gosh. No, I think he'd be
13  the one considered.
14     **Q.** At that time in May of 2018, what, if any,
15  was the state of Detective McKinney's training and
16  capabilities with the Cellebrite computer?
17     **A.** I don't know. Without his training records,
18  I really don't know.
19     **Q.** Of what did a Joliet police officer's
20  training record consist in the May of 2018 time
21  frame?
22     **A.** Rephrase that again. I'm sorry.
23     **Q.** Of what did an officer's training record
24  consist in the May of 2018 time frame? Put

Page 29

1  differently, what kinds of information was kept in an
2  officer's training record?
3      **A.** Yeah. It'd be trainings they've attended,
4  either in state, out of state, stuff like that,
5  throughout their career.
6      **Q.** Is the training record a discrete piece of
7  information in an officer's personnel file?
8      **A.** Discrete?
9      **Q.** A specific different either document or part
10  of a document in the larger personnel record.
11     **A.** It's probably in their personnel record, but
12  there's also a search engine that has it.
13     **Q.** So you believe that an officer's training
14  record could be queried specifically without need for
15  calling up all of the officer's personnel record?
16     **A.** Yeah. You could query their training.
17  There's a -- it's in employee records. Now, is it
18  accurate and up-to-date? I mean, I can't answer that
19  question. If someone forgets to put something in,
20  you know what I mean? I can't say it's exact, but
21  that most of their training records -- they should
22  all be in there, but most of them are.
23     **Q.** In officers' records, how are disciplinary
24  records compiled?

Page 30

1      **A.** Disciplinary would be -- there's -- like
2  sustained discipline would be in their file and then
3  just discipline -- of all discipline? Like any
4  discipline incident would be in the internal affairs
5  computer.
6      **Q.** Would you expect any formal discipline that
7  was meted out to an officer to be in both the
8  personnel record and the internal affairs computer
9  system?
10     **A.** Yeah, it would be, and I don't know -- I
11  know there's an expungement period for some of those
12  records. You'd have to ask someone in IA for that.
13     **Q.** Prior to May of 2018, did you ever have
14  reason to initiate disciplinary proceedings against a
15  Detective McKinney relating to his accessing or
16  disseminating information?
17     **A.** I may have if it's there. I don't know the
18  exact dates or anything like that.
19     **Q.** Do you have a specific recollection of
20  having done so?
21     **A.** I know there's an investigation, yes, of him
22  doing so.
23     **Q.** Do you remember when that investigation
24  occurred?

Page 31

1      **A.** I -- I do not know when the date was on
2  that, no.
3      **Q.** What do you remember about the subject and
4  particulars of that investigation?
5      **A.** Gosh. It was -- I don't know -- remember
6  specifics, but information about another officer,
7  that he was kind of using -- making fun of, I guess,
8  the officer, stuff like that, just inappropriate.
9      **Q.** Was the information that McKinney used
10  inappropriately or the inappropriate information
11  sexual in nature?
12     **A.** I don't recall exactly what it was. I do
13  not know.
14     **Q.** That is to say, what -- what officer
15  initiated the disciplinary proceedings against
16  McKinney?
17     **A.** Say that again. I'm sorry.
18     **Q.** Who, meaning which officer or officers,
19  initiated the disciplinary proceedings?
20     **A.** Oh, man. Oh, man, I don't recall who the
21  officer was that did. I just -- I just -- it might
22  come to me. I'm sorry. I just don't recall right
23  now.
24     **Q.** Who was the officer or officers who

10  (Pages 28 to 31)

**EXHIBIT G**

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 32

1  ultimately imposed discipline on McKinney?
2    A.  The final discipline would be from me.
3    Q.  Do you recall that in this instance with
4  McKinney, there was some final discipline imposed?
5    A.  I believe there was, yes.
6    Q.  Was that discipline suspension?
7    A.  Boy, I -- possibly. I don't...
8    Q.  While you were deputy chief of
9  investigations, did you ultimately impose discipline
10  on any other detective based upon the improper
11  accessing or dissemination of information?
12    A.  I mean, I would not impose any discipline.
13  It's up to the chief to impose the discipline.
14    Q.  So you believe that when you, as you said, I
15  think, earlier ultimately imposed discipline on
16  McKinney, you were the chief at the time?
17    A.  Yes.
18    Q.  While you were the deputy chief of
19  investigations, you would certainly know about
20  discipline that was imposed on the detectives you
21  supervised, true?
22    A.  Sometimes. Not always.
23    Q.  During that time, was any detective other
24  than McKinney disciplined for improperly accessing or

Page 33

1  disseminating information?
2    A.  I do not recall.
3    Q.  After Grizzle told you that he had executed
4  the search warrant for Socha's phone and seized the
5  phone, did he later tell you what, if anything, he
6  did with the contents of the phone?
7    A.  Searched -- searched the contents, I guess.
8    Q.  Did he tell you that he did that by
9  downloading the contents of the cell phone onto the
10  Cellebrite computer?
11    A.  Oh, yeah. It would have had to have been
12  downloaded. I just don't recall who -- if he did it
13  or had someone else do it for him.
14    Q.  Based upon what Grizzle told you, did you
15  understand that the entire contents of Socha's phone
16  were downloaded onto the Cellebrite computer?
17    A.  If that's the process, then, yes. Like I
18  said, I -- I'm not familiar with the work using the
19  Cellebrite or the Lantern. I was never trained in
20  it. So if that's how it has to be done, then -- then
21  I guess it's correct.
22    Q.  Did Grizzle tell you -- separate and apart
23  from how you understand Cellebrite to work, did
24  Grizzle tell you whether he had downloaded all or

Page 34

1  less than all of the contents of Socha's phone onto
2  the Cellebrite?
3    A.  He just said he downloaded the phone. I
4  don't know -- I don't know if he ever said Cellebrite
5  or what. Just that it was downloaded.
6    Q.  Was that in a separate conversation from the
7  conversation in which he told you that he had seized
8  the phone?
9    A.  It would have had to have been, correct.
10    Q.  Where did the conversation in which Grizzle
11  told you that he had downloaded the contents of
12  Socha's phone onto the Cellebrite occur?
13    A.  Probably in the PD.
14    Q.  Can you be more specific about where in the
15  PD?
16    A.  Well, I don't remember when it was. We were
17  probably in investigations, I'm guessing, my office
18  usually.
19    Q.  Was anyone else present?
20    A.  Not that I recall, no.
21    Q.  Did you make any written record of that
22  conversation?
23    A.  Not that I remember.
24    Q.  Have you ever seen any written record of

Page 35

1  that conversation generated by Detective Sergeant
2  Grizzle?
3    A.  If it's in the -- I mean, I'm sure I read
4  the police report back then. So if it's in the
5  report, then yeah.
6    Q.  Incidentally, what are you doing now that
7  you're retired from the Joliet Police Department?
8    A.  Whatever my wife tells me to do. I mean...
9    Q.  Are you -- are you gainfully employed in
10  your retired status?
11    A.  Right now, no.
12    Q.  Have you spoken with Detective Sergeant
13  Grizzle since your retirement?
14    A.  Yeah. Yeah. Uh-huh.
15    Q.  When?
16    A.  Sure. A couple times since I've been gone.
17  And then I wished him happy Father's Day this week,
18  like I did with a bunch of people.
19    Q.  Did you reach out to him specifically for
20  that purpose?
21    A.  Yeah.
22    Q.  Is Detective Sergeant Grizzle a person with
23  whom you socialize from time to time?
24    A.  Talk to. Not socialize.

11  (Pages 32 to 35)

**EXHIBIT G**

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 36

1     Q. Would you consider him to be a close
2 personal friend?
3     A. No.
4     Q. How many people did you call and wish happy
5 Father's Day to?
6     A. Probably 30.
7     Q. What was the next event in the Socha
8 investigation about which you learned or in which you
9 yourself participated?
10     A. Was -- what time frame?
11     Q. Sure. The next event. So Grizzle has told
12 you now that he has downloaded the contents of
13 Socha's phone onto the Cellebrite computer. What is
14 the next event in sequence in the Socha investigation
15 that you can recall being told about or in which you
16 yourself participated?
17     A. I know -- I know he showed me that he found
18 the text message that they were looking for, that
19 part. I guess that would be next.
20     Q. When did that occur? I guess when did he
21 show you that he had found the text message they were
22 looking for in relationship to the conversation in
23 which he told you that he had downloaded the contents
24 of Socha's phone onto the Cellebrite?

Page 37

1     A. I don't -- I don't know exactly.
2     Q. When Grizzle told you that -- so he actually
3 showed you text messages that were downloaded from
4 Socha's phone, correct?
5     A. Correct.
6     Q. How many text messages did she -- did he
7 show you?
8     A. Just a -- just a few, nothing...
9     Q. Where were you when he showed you those text
10 messages?
11     A. I believe at his desk.
12     Q. On what computer device were you viewing
13 those text messages?
14     A. It'd be his computer.
15     Q. How, if you know, had the contents of
16 Socha's cell phone gotten from the Cellebrite
17 computer to Grizzle's computer?
18     A. Flash drive.
19     Q. Did you yourself at that time see the flash
20 drive?
21     A. Yes.
22     Q. And --
23     A. I guess -- I don't know if it was at that
24 time, but I saw it, yes.

Page 38

1     Q. When you refer to Grizzle's computer as,
2 quote, his computer, close quote, do you mean one
3 that he personally owned or a computer assigned to
4 him by the Joliet Police Department?
5     A. A computer assigned to him by the Joliet
6 Police Department.
7     Q. Did he have a personal computer device of
8 any kind with him while he was conducting the Socha
9 investigation? And by personal, I mean one that he
10 owned, not that was assigned to him by the Joliet
11 department. And by computer device, I mean of any
12 kind, phone, a desktop, a laptop, a tablet, any sort
13 of computer device.
14     A. Not that I know of.
15     Q. Did you ever view those text messages
16 directly on the Cellebrite computer terminal?
17     A. No.
18     Q. Was anyone present -- anyone other than you
19 and Grizzle present when you viewed the text messages
20 on Grizzle's computer?
21     A. I don't believe so, no.
22     Q. And was that at his desk in the
23 investigations unit?
24     A. Correct.

Page 39

1     Q. Was that a desktop, a laptop, a tablet?
2 What kind of computer device was that in which you
3 viewed --
4     A. It's a desktop.
5     Q. Say it again.
6     A. A desktop, I believe -- yeah, a desktop is
7 what he had.
8     Q. How many text messages from Socha's phone
9 did you review?
10     A. I -- I said a couple maybe. I don't -- just
11 the one in question really.
12     Q. Beyond those text messages, at that time did
13 you review any other data that had been downloaded
14 from Socha's phone?
15     A. No.
16     Q. When Grizzle showed you those couple of text
17 messages, was it your understanding that he had
18 downloaded the contents of Socha's cell phone onto
19 the Cellebrite and then downloaded the contents of
20 Socha's phone from the Cellebrite to that flash drive
21 that he then put into his Joliet department-issued
22 desktop for viewing?
23     A. I believe it was -- it was -- the only copy
24 was on that flash drive.

12 (Pages 36 to 39)

**EXHIBIT G**

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 40

1  Q.  And that -- that copy had -- what I'm trying
2  to get straight is --
3  A.  Yeah, go ahead.
4  Q.  -- the sequence was Socha's phone was
5  seized.  Its contents were downloaded onto the
6  Cellebrite, and then Grizzle downloaded the contents
7  of Socha's phone from the Cellebrite to this thumb
8  drive.  And when he showed you these text messages
9  that had come from her phone, it was off of the thumb
10 drive that he loaded from the Cellebrite?
11 A.  That's what I believe, yes.
12 Q.  At that time -- strike that.
13     When was your viewing those text messages in
14 relationship to the seizure of the phone?
15 A.  I don't recall exactly when it was.
16 Q.  Do you have any understanding of the time
17 that elapsed between the seizure of the phone and the
18 download of its contents onto the Cellebrite?
19 A.  No.  I wasn't there for that.  I don't know.
20 Q.  How much time elapsed between the download
21 of Socha's phone onto the Cellebrite and Grizzle's
22 subsequent downloading of those same contents onto
23 this flash drive from which he showed you text
24 messages on his desktop?

Page 41

1  A.  I don't know.
2  Q.  Are the intervals between those events
3  matters of hours or days or weeks?
4  A.  It depends on how long to download all that.
5  I don't know.  You'd have to ask the guys that do
6  that.
7  Q.  How long did it take for Grizzle to show you
8  the text messages that he had downloaded onto this
9  flash drive from Socha's phone?
10 A.  Seconds.  I don't know.  He just showed me
11 the screen.  It was there, so...
12 Q.  What did Grizzle tell you about the
13 whereabouts of that flash drive between the time that
14 he had downloaded the contents of Socha's phone onto
15 it and showing you the text messages from Socha's
16 phone that were on that flash drive?
17 A.  I'm trying to remember, but I think -- I
18 think -- you'd have to ask Grizzle, but he -- he gave
19 me the flash drive, and it was in my office in the
20 locked cabinet.  Now, I may be mistaken.  It may --
21 it may have been downloaded on his computer right
22 away and then he gave me the flash drive right away
23 because it was locked in my office.  It was the only
24 copy of anything, so -- the reason I'm saying flash

Page 42

1  drive, because that's the only thing I know it to be
2  on because I have it, you know, or had it in my
3  office, locked in there so no one can view it, so...
4     You see what I mean?  I'm trying to
5  pinpoint.  He may have given it to me right after it
6  was downloaded, and he may have put it on his
7  computer before he did, and it might be -- I know it
8  was on his computer once the -- the RCFL, other
9  things.  So it might have already been on there.  You
10 know what I mean?  You'd have to ask him on the total
11 time frame of that.
12 Q.  Okay.  Well, I'm -- I'm asking you, and I --
13 I -- as I indicated at the outset, if the answer is,
14 I don't know, that's a fair answer.  So I'm trying
15 to --
16 A.  Yeah.
17 Q.  -- get what you remember and don't remember,
18 what you know and what you don't know.
19 A.  Correct.
20 Q.  So what I'm trying to understand is --
21 A.  Sure.
22 Q.  -- Grizzle downloaded the contents of
23 Socha's phone from the Cellebrite to this flash
24 drive.

Page 43

1  A.  Right.
2  Q.  And he showed you text messages that were
3  part of that download with that thumb drive in his
4  own desktop.
5  A.  I might -- that's what I'm saying.  I'm
6  saying I may be mistaken on that.  He may have just
7  shown me off his computer now.  It's been a long
8  time, so I'm trying to -- you know, I just want to be
9  correct on this.  That's all.
10 Q.  Do you know one way or another whether when
11 you viewed the text messages on Grizzle's desktop,
12 they were loaded onto that desktop already or whether
13 Grizzle was showing you from this thumb drive that he
14 had created?
15 A.  I guess the best to say, I don't know.
16 Q.  At some point, you understood that Grizzle
17 downloaded the contents of Socha's phone onto his own
18 desktop, correct?
19 A.  Correct.
20 Q.  Whether he -- strike that.
21     And you don't know whether that occurred
22 before or after he first showed you the text messages
23 that were part of that download, correct?
24 A.  That's fair, yeah.

13  (Pages 40 to 43)

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT G**

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 44

1      Q.   At some point, you took control of the thumb
2  drive that had been in Grizzle's possession, correct?
3      A.   Correct.
4      Q.   Who gave that thumb drive to you?
5      A.   Grizzle.
6      Q.   Why did he give it to you?
7      A.   To lock in my office.
8      Q.   Did he do that at your direction?
9      A.   Probably.  I mean, I don't recall exactly
10  how the conversation went, but yeah.
11      Q.   Was that an oral direction, or did you give
12  him a written order to do that?
13      A.   No.  It was oral, in person.
14      Q.   During the time that the download from
15  Socha's phone was on Grizzle's desktop, how did
16  Grizzle secure his desktop?
17      A.   I mean, they're all password protected,
18  encrypted, all that.  You have to ask our IT people
19  on that.
20      Q.   Where specifically in your office did you
21  store the flash drive that Grizzle gave you?
22      A.   In a locked cabinet.
23      Q.   Where in the -- in the office was that
24  locked cabinet?

Page 45

1      A.   Let's see.  So -- southwest corner, I
2  believe.
3      Q.   Was the locked cabinet labeled in any way?
4      A.   No.
5      Q.   Was it a key lock, a padlock --
6      A.   Key lock.
7      Q.   -- punch code?
8          Who had keys to that lock?
9      A.   I did.
10      Q.   Did the Joliet chief of police have a key to
11  that lock?
12      A.   No.
13      Q.   Did Lieutenant Batis have a key to that
14  lock?
15      A.   No.
16      Q.   Did anyone else at the Joliet Police
17  Department have a key to that lock?
18      A.   Not that I'm aware of, no.
19      Q.   Did anyone else on the planet that you're
20  aware of have a key to that --
21      A.   Not that I'm aware of.
22      Q.   Other than that flash drive, at the time you
23  put the flash drive in that cabinet, in that locked
24  cabinet, what else did you keep there?

Page 46

1      A.   There was other -- other evidence and case
2  files from other officer incidents in that cabinet,
3  from previous deputy chiefs in that office.
4      Q.   Had you yourself put any other evidence in
5  that locked cabinet, that is, other than this flash
6  drive on which Socha's -- the contents of Socha's
7  phone had been loaded?
8      A.   The -- all the hard drives are in there from
9  computer downloads and phone downloads.
10      Q.   Stored how?
11      A.   What do you mean, stored how?
12      Q.   The hard drives, you mean the actual
13  computer devices as opposed to a storage device like
14  a disc or a flash drive?
15      A.   Hard drives -- yeah.  Hard drives that were
16  copied by the RCFL.
17      Q.   And to be clear, I'm talking about at the
18  moment in time that you first put the flash drive
19  with the contents of Socha's phone --
20      A.   Just the flash drive at that point.
21      Q.   What flash drive?
22      A.   What you just said.
23      Q.   Okay.  So when you put that flash drive in
24  the cabinet, that was the only thing in there?

Page 47

1      A.   No.  I said there was evidence in there from
2  other officer incidents from previous deputy chiefs
3  in that cabinet.
4      Q.   Okay.  Any time we're not communicating like
5  this, under the rules --
6      A.   No, it's okay.
7      Q.   -- it's my fault, not your fault.
8      A.   No, no.  It's okay.
9      Q.   At the time you put this flash drive into
10  that cabinet --
11      A.   Yes.
12      Q.   -- was there any other -- anything else in
13  that cabinet that you had put there?
14      A.   There may have been other things.  I don't
15  know.  But there was other evidence, I know, in there
16  from other officer cases.  So, yes, there's other
17  stuff in there.
18      Q.   And other than by describing it in that
19  general way, other stuff, you can't identify it with
20  any particularity, that is, the -- this evidence
21  relating to the investigation of that officer or so
22  forth, because you didn't put it there?
23      A.   Right.  Right.  I got what you're saying.
24      Q.   Is that correct?

14  (Pages 44 to 47)

**EXHIBIT G**

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 48

1    A. The other evidence, yeah, I didn't review
2 the other stuff that's in there, no.
3    Q. You were the deputy chief of investigations
4 when Crowley was investigated?
5    A. Yes. Correct.
6    Q. Before you put the flash drive with the
7 contents of Socha's phone in it into that cabinet for
8 the first time, had you ever done anything to
9 inventory or clear out that cabinet of old, stale,
10 unneeded materials?
11    A. Not that I recall, no.
12    Q. Who was the deputy chief of investigations
13 who you succeeded?
14    A. Brian Benton.
15    Q. How long had he been in that post before he
16 became chief?
17    A. I don't know exact. Maybe four years. Four
18 or five years. Maybe even less.
19    Q. In May of 2018, was there any written
20 authority promulgated by the Joliet Police Department
21 that authorized the deputy chief of investigations to
22 keep any evidence in a cabinet in his own office of
23 which he and no one else held a key?
24    A. I don't know if there's anything written.

Page 49

1    Q. Before you took that flash drive and put it
2 in that cabinet, was it logged into the BEAST
3 evidence management system?
4    A. I -- I don't know if it was or not.
5    Q. After you took that flash drive from
6 Grizzle, did you ever log it into the BEAST evidence
7 management system?
8    A. No.
9    Q. Did you ever direct anyone else at the
10 police department to do that?
11    A. No.
12    Q. Why didn't you log that flash drive into the
13 BEAST evidence management system or direct some
14 subordinate to do it?
15    A. Because it was sensitive information about
16 an officer, so it's kept in my office, like, you
17 know, previous cases with officers.
18    Q. Was there any written authority within the
19 Joliet Police Department that authorized the deputy
20 chief of investigations to store evidence about
21 investigations of other officers in that cabinet?
22    A. Written, you said? I don't know. I just --
23 I don't know.
24    Q. Did you take control of that flash drive at

Page 50

1 the same time that you viewed the text messages that
2 you viewed that had been downloaded from Socha's
3 phone on Grizzle's desktop?
4    A. Well, like I explained, I -- I said I was
5 mistaken with that, and I said I believe I got it
6 from him right after it was downloaded and after he
7 put it on his computer. So it'd be just on his
8 computer.
9    Q. And I appreciate that you made that
10 correction. And what I'm trying to get at is, did
11 all that happen at one time in one meeting where you
12 didn't --
13    A. I don't think it -- I don't think it was all
14 at the same time, no. No.
15    Q. So by the time you viewed these text
16 messages on Grizzle's desktop, on some prior
17 occasion, you had already taken custody and control
18 of the flash drive, correct?
19    A. Yes, that's correct.
20    Q. Okay.
21    A. There you go. Yes.
22    Q. How long before you viewed the image -- the
23 text messages on his desktop, had you taken control
24 of the flash drive?

Page 51

1    A. Like I said, I don't recall exactly when,
2 and there may be -- like you said, there may be --
3 Grizzle would probably know when he gave it to me.
4 There might be a memo to it. I don't know. I don't
5 have access.
6    Q. Can you give an estimate as to whether it
7 was hours, days, weeks?
8    A. I wouldn't say probably more -- more -- more
9 than hours. I would say probably maybe days or so
10 just to go through stuff.
11    Q. At the point in time that you took control
12 of that first flash drive that Grizzle told you
13 contained the download from Socha's phone, what, if
14 anything, did Grizzle tell you about whether there
15 were other copies of the download on other storage
16 devices, flash drives or discs?
17    A. Well, that's the only one he said that there
18 was.
19    Q. Did he tell you why he had saved the
20 contents of the -- Socha's phone to his desktop and
21 to this flash drive?
22    A. Yeah. He saved it to his desktop because
23 he's -- the case agent has to review it for the case,
24 and he saved it to the flash drive, in case something

15  (Pages 48 to 51)

**EXHIBIT G**

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 52

1    happened to his computer, then he'd still have it.
2        Q.  Is that something you told him to do?
3        A.  No.
4        Q.  Is that something that is prescribed by any
5    written authority in the Joliet Police Department?
6        A.  I don't know if it's that or if it's in
7    their Cellebrite training or that.  I don't know.
8        Q.  Did Grizzle tell you why he was showing you
9    the text messages that had been downloaded from
10   Socha's phone?
11       A.  Because it was part of the search warrant we
12   was looking for.
13       Q.  But he told you that he already executed and
14   downloaded the contents of the phone and found the
15   text messages, correct?
16       A.  When he showed it to me is when he told me
17   he found it.
18       Q.  Were you personally directing that
19   investigation?
20       A.  No.  Over- -- overseeing, I guess, as the --
21   as the deputy chief, but not directing nothing, no.
22       Q.  Did you ask to see the text messages, or did
23   Grizzle in some way get your attention to show them
24   to you?

Page 53

1        A.  No, I don't recall, but I'm sure when he
2    found them, he -- he told me he found them.
3        Q.  And did you then ask to see them, or did he
4    wave you over and somehow get your attention and have
5    you look at the text messages?
6        A.  I don't -- I don't know.  He may have -- I
7    mean, he probably came to my office and said he found
8    them and then went and looked at them.
9        Q.  Was there any law enforcement purposes
10   related to the Socha investigation that you needed to
11   see those text messages?
12       A.  Yeah.  I'm in charge of investigations, so,
13   yeah, definitely.
14       Q.  So I appreciate that's your role there.
15       A.  Yeah.
16       Q.  So as far as the ongoing direction of the
17   investigation is concerned, was there any particular
18   purpose for you reviewing those text messages?
19       A.  Just to prove the search warrant was valid.
20       Q.  You were not the one who would be making any
21   charging decisions, were you?
22       A.  No.
23       Q.  Did Grizzle show you the contents of any of
24   his warrant application materials before they were

Page 54

1    presented to any Will County judge?
2        A.  No.
3        Q.  Wasn't the time to determine whether the
4    warrant was valid before it was executed?
5        A.  Well, yeah.  That's why the judge signed it.
6        Q.  Was there any other particular purpose for
7    which you viewed the text messages that were
8    downloaded from Socha's phone?
9        A.  Yeah, because I'm his boss and I oversee all
10   the investigations, just like I view evidence in
11   other crimes.
12       Q.  And you've already told us that, and I
13   appreciate it.  And that's why I asked -- phrased the
14   question about a particular purpose.  Was there some
15   specific role in that investigation that you would
16   dictate next steps or in some way -- some follow-up
17   that you would initiate based upon your review of
18   those text messages?
19       A.  No.  Probably more so to the fact that I
20   have a boss that I have to report to, and I'm sure I
21   told the chief that he found the text messages on the
22   phone, so...
23       Q.  Is there any other particular reason that
24   you needed to see those text messages?

Page 55

1        A.  Just that my people are -- were in charge of
2    the investigation.
3        Q.  I get that.  And that's all in our records.
4    So I'm just trying to determine whether there's any
5    other particular reason for you to have looked at
6    those text messages.
7        A.  No.  I mean, just -- I'm his boss, and
8    that's what -- I mean, I do it on every case, so --
9    you know, I go to all their crime scenes.  Any time
10   there's a shooting, a homicide, I'm on the scene.  I
11   mean, it's part of being a boss.
12       Q.  So it'd be fair to say that the only reason
13   for you to look at those text messages was in
14   relationship to your supervisory role?
15       A.  Correct.
16           MS. PROCTOR:  You know, I'm going to lodge a
17   late objection.  That misstates the witness's prior
18   testimony.
19   BY MR. ADAMS:
20       Q.  What do you recall your next involvement in
21   the Socha investigation, if any, being?
22       A.  It would probably be when the lawsuit was
23   filed.
24       Q.  Was Grizzle's computer or its contents

16  (Pages 52 to 55)

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT G**

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 56

1  logged into the BEAST system?
2      A.   His computer, no.
3      Q.   Sometime after you viewed the text messages
4  on Grizzle's computer, did you communicate with
5  Deputy Chief Jensen in reference to Officer Socha
6  telling him that she had heard that officers in your
7  department had been sharing photos and videos that
8  had been downloaded from her phone with one another?
9          MS. PROCTOR:  I'm just -- I'm going to lodge
10 an objection based on lack of foundation and form.
11         MR. CLARK:  I'll join in that objection.
12         MR. ADAMS:  You can answer.
13         MR. CLARK:  Hall, also --
14         MS. PROCTOR:  Let's explain to -- yeah, I
15 think it would be helpful to explain to the witness
16 how objections work.  Mr. Roechner --
17         MR. CLARK:  Sir --
18 BY MR. ADAMS:
19     Q.   These lawyers can object all they want, and
20 you can still go ahead and answer the questions.  So
21 you can answer that question.
22         MS. PROCTOR:  Assuming you can, obviously.
23         THE WITNESS:  Right.  And what was the
24 question again?

Page 57

1  BY MR. ADAMS:
2      Q.   Was there a point after Grizzle showed you
3  the text messages on his computer, the text messages
4  that had been downloaded from Socha's cell phone,
5  where you were contacted by Deputy Chief Jensen in
6  reference to Officer Socha telling him that she,
7  Officer Socha, had heard that investigations
8  personnel had been sharing personal pictures or
9  videos that were on Socha's phone?
10     A.   No to that, but he did contact me to say
11 that it was still on the Cellebrite computer, the
12 contents of the phone.
13         MR. CLARK:  Hey -- hey, Hall, it sounds like
14 you're about to start another topic area.  Would it
15 be possible to take like just a couple minute
16 restroom break?
17         MR. ADAMS:  That's fair.  So we can all go
18 mute and silence, dark on the screen.  Keep your line
19 open.
20         MS. PROCTOR:  Let's take five.
21         MR. ADAMS:  Keep your line open, and we'll
22 all reconvene here and come back on in five minutes.
23 Okay?
24         THE WITNESS:  Okay.

Page 58

1          MR. CLARK:  Thank you.
2              (Whereupon, a break was taken,
3              after which the following
4              proceedings were had:)
5  BY MR. ADAMS:
6      Q.   All right.  You all set, Mr. Roechner?
7      A.   Yeah.
8          MR. ADAMS:  Could you read back the last
9  question, Michelle, just so we can queue up to the
10 right place?
11             (Whereupon, the record
12             was read as requested.)
13         MR. ADAMS:  Did you answer that question?
14         THE COURT REPORTER:  He did.
15         THE WITNESS:  Yeah.  So -- okay.  So like I
16 said, at first he called -- when he called, he said
17 it was on the Cellebrite, and, you know, when I said
18 it couldn't be on the Cellebrite because I have the
19 only copy in my office, and I said, why is he asking?
20 And then that's when he said that she had made
21 accusations that some of the detectives had been
22 sharing her pictures and videos.
23 BY MR. ADAMS:
24     Q.   Okay.  Do you recall when Deputy Chief

Page 59

1  Jensen called you and said those things to you?
2      A.   I do not.
3      Q.   Do you recall when he did that in reference
4  to when you took control of the one flash drive that
5  was given to you by Detective Sergeant Grizzle that
6  you then put in the cabinet in your office?
7      A.   It would have been well after that.  I don't
8  know when.
9      Q.   Did you say well after?
10     A.   Yeah, yeah.  Like, you know, definitely
11 after.
12     Q.   Was it also after you had viewed the text
13 messages from Socha's phone on Detective Sergeant
14 Grizzle's desktop computer?
15     A.   It may have been.
16     Q.   And did Deputy Chief Jensen tell you that he
17 had learned from Socha that she had heard that
18 investigations personnel had been sharing personal
19 pictures and videos from her cell phone?
20     A.   Yeah.  When he called it, it was on his
21 Cellebrite, like I said, yes.
22     Q.   And just to be clear, Deputy Chief Jensen
23 told you that he had heard that from Socha?
24     A.   I believe so.

17  (Pages 56 to 59)

**EXHIBIT G**

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 60

1    Q.   Did he tell you that he had heard it from
2  anyone else?
3    A.   I -- I -- not that I know of.
4    Q.   And what did you say when he told you that?
5    A.   Well, he said it was on the Cellebrite.  I
6  said it's not possible because I have the only copy
7  in my office, so...
8    Q.   And what did he say to you?
9    A.   He said that it was.  It was on there, I
10  mean.
11    Q.   Did you take any steps yourself to determine
12  whether the contents of Socha's cell phone were or
13  were not still accessible on the Cellebrite computer?
14    A.   No.  I was out of town.  The -- Deputy Chief
15  Jensen was taking care of that.
16    Q.   What did Deputy Chief Jensen tell you he
17  intended to do to take care of that?
18    A.   Get it taken off of there.
19    Q.   Did he tell you who he intended to have take
20  the contents of Socha's phone off of the Cellebrite?
21    A.   I don't know if he said who he intended, but
22  I think it would end up being Sergeant Gavin at the
23  time that did it for him.
24    Q.   Did Jensen tell you why Gavin as opposed to,

Page 61

1  for example, German or Botzum?
2    A.   I don't -- I don't know if he couldn't get
3  ahold of them or not.  I don't -- I don't recall.
4  I'm sure there's a reason.
5    Q.   Did Jensen tell you with any more
6  specificity how it was that he intended to get the
7  contents of Socha's phone off of the Cellebrite?
8    A.   No.  Just that he was going to have it done.
9    Q.   Between the time that -- strike that.
10      Up until that time, was it your
11  understanding that the contents of Socha's phone were
12  removed from the Cellebrite when they were downloaded
13  by Grizzle onto that flash drive that Grizzle then
14  gave to you that you then put into the cabinet in
15  your office?
16    A.   Yeah.  My belief was it was only on the
17  flash drive and on Grizzle's computer.
18    Q.   Had Grizzle said anything to you to give you
19  that belief?
20    A.   Well, yeah.  When I -- I got the flash
21  drive, he said it was the only copy.  So, yeah, I
22  mean, in my mind, that was the only copy besides on
23  his computer, so...
24    Q.   Did Grizzle say anything to you of an

Page 62

1  affirmative nature, that in downloading the contents
2  of Socha's phone from the Cellebrite to that flash
3  drive that he then gave to you, he had removed the
4  contents of Socha's phone from the Cellebrite, or did
5  you just infer that from what he told you?
6    A.   I don't believe we -- he told me he did, so
7  I believe I must have inferred that.
8    Q.   Up until the time that Jensen contacted you,
9  did you have any understanding one way or the other
10  about whether when contents of evidence that had been
11  downloaded to the Cellebrite were then downloaded
12  onto another storage device like a flash drive or a
13  disc, that that subsequent downloading operated to
14  remove them from the Cellebrite?
15    A.   I mean, that's -- that's what I had thought.
16  I mean, like I said, I'm not versed in it, though,
17  so...
18    Q.   When the downloaded contents of any computer
19  device were on the Cellebrite, how was access to that
20  downloaded information controlled?
21    A.   I don't know.
22    Q.   And that's because you yourself are
23  insufficiently familiar with how Cellebrite operated
24  to say, true?

Page 63

1    A.   I've never been trained, correct.
2    Q.   Okay.  When Jensen called you and told you
3  that Socha had come to her with her concerns about
4  the sharing of photos and videos from her phone, had
5  Jensen already -- did Jensen tell you whether he had
6  already taken the corrective action, or did he tell
7  you what he planned to do prospectively?
8    A.   I don't recall which -- whether it was
9  before or after.  I don't remember.
10    Q.   Whether before or after, did Jensen say
11  whether that corrective action included making
12  another copy of the contents of Socha's cell phone
13  from the data that was still in the Cellebrite?
14    A.   Yes, I believe it did, yes.
15    Q.   So assuming that whatever Gavin did to
16  remove the contents of Socha's phone from the
17  Cellebrite actually effectively did that, and that
18  what he did involved creating another copy of the
19  contents of Socha's cell phone onto a storage device,
20  whether a flash drive or a disc, at that point there
21  would have been three copies of the contents of
22  her phone in the investigations unit.  One was the
23  one in the cabinet in your office, the second one was
24  that on Grizzle's computer, and the third would have

18  (Pages 60 to 63)

**EXHIBIT G**

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 64

1    been the one created by Gavin when he did what Jensen
2    asked him to do, correct?
3        A.   That's fair, yeah.
4        Q.   Do you have an understanding about the type
5    of storage device that Gavin used to store all of the
6    contents of Socha's phone that were still on the
7    Cellebrite, whether that was a flash drive or a disc
8    or any other?
9        A.   Flash drive.
10       Q.   Was that flash drive that was created by
11   Gavin -- well, let me strike that and go further.
12            How did you learn that, that it was a flash
13   drive?
14       A.   Because it was given to me to lock in the --
15   in the cabinet with the other one.
16       Q.   By whom?
17       A.   You know what, I don't recall if it was --
18   it was Gavin or Jensen, one of them.
19       Q.   They would have given it to you after you
20   got back from your vacation?
21       A.   After I got back to work, yeah, so...
22       Q.   How long was that after Jensen had first
23   called you to tell you that this was taking place?
24       A.   It would -- I don't know because I don't

Page 65

1    remember the exact date that happened, but it would
2    have been probably the next day, or a couple of days,
3    if that, if it was a weekend.  I don't recall.
4        Q.   During that time, until you came back to the
5    office, where was that flash drive that Gavin had
6    created stored?
7        A.   You would have to ask Deputy Chief Jensen
8    that.
9        Q.   Was that second flash drive ever logged into
10   and tracked with the BEAST system?
11       A.   No.
12       Q.   Why not?
13       A.   It was locked in my office.
14       Q.   Where was Grizzle when Jensen called you to
15   tell you about the concerns with which he had been
16   contacted by Socha?
17       A.   I don't know where he was.
18       MR. CLARK:  Objection, foundation.
19       You can answer.
20       THE WITNESS:  I don't know where he was.
21   BY MR. ADAMS:
22       Q.   Do you know whether he was on duty?
23       A.   I don't -- I know he wasn't at work.  So I
24   don't know where he was.

Page 66

1        Q.   Do you know whether he too was out on
2    vacation?
3        A.   I don't know where he was.
4        Q.   Did Grizzle ever subsequently express to you
5    concerns about the fact that the contents of Socha's
6    phone had been deleted from the Cellebrite?
7        A.   Not that I recall.
8        Q.   Did anyone report to you that Grizzle had
9    expressed such concerns to Gavin or to Deputy Chief
10   Jensen?
11       A.   Not that I recall.
12       Q.   When you learned from Jensen that Socha had
13   communicated her concerns about the handling of the
14   photos and videos that were downloaded from her cell
15   phone, did you order or initiate an internal
16   investigation?
17       A.   No.
18       Q.   Why not?
19       A.   It wasn't reported to me.
20       Q.   And Deputy Chief Jensen's call didn't
21   constitute a report?
22       A.   No.  I mean, a report?  What do you mean a
23   report?  He informed me what was on there, that he
24   was having it taken off.

Page 67

1        Q.   Well, specifically what he told you was that
2    Socha had expressed to him concerns that personal
3    pictures and videos from her cell phone were being
4    shared by personnel in the investigations unit,
5    correct?
6        A.   Correct.
7        Q.   Why did that report from Deputy Chief Jensen
8    not cause you to order or initiate an internal
9    investigation?
10       A.   It would have been Deputy Chief Jensen's
11   call.  It was reported to him.  I don't know what the
12   conversation was.
13       Q.   Have you yourself viewed personal photos or
14   videos from the contents of Socha's phone that were
15   downloaded pursuant to the -- strike that -- that
16   were downloaded to the Cellebrite and then to these
17   flash drives and to Grizzle's desktop?
18       A.   No.
19       Q.   Has any Joliet police officer told you that
20   they have seen such images, either photo or video?
21       A.   No.
22       Q.   Have you ever heard any Joliet officer
23   discussing such images?
24       A.   No.

19  (Pages 64 to 67)

**EXHIBIT G**

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 68

1  Q.  Have you ever heard any Joliet officer
2  describe what those personal photos or videos
3  depicted?
4  A.  No.
5  Q.  In your office, you had a desktop computer?
6  A.  I have a computer, yes.
7  Q.  Just one?
8  A.  Yes, one computer.
9  Q.  Was it a personal computer or one that was
10 property of the Joliet Police Department?
11 A.  It was a City of Joliet Police Department
12 computer.
13 Q.  In your office when you were present in your
14 office, did you have a cell phone?
15 A.  Yes.
16 Q.  Just one?
17 A.  Yes.
18 Q.  Was it a personal cell phone, or was it a
19 property of Joliet Police Department cell phone?
20 A.  The City of Joliet phone.
21 Q.  Did you have any personal cell phone of your
22 own for personal use?
23 A.  No.
24 Q.  Did you have in your office any other

Page 69

1  computer devices, laptops, tablets, any other
2  computer devices?
3  A.  Just the city computer.
4  Q.  Did you ever have occasion to view any of
5  the contents of the data that was downloaded from
6  Socha's phone onto the Cellebrite and then onto at
7  least these two flash drives on your own office
8  desktop?
9  A.  No.
10 Q.  Were the contents of her cell phone ever
11 downloaded from either of those flash drives onto
12 your desktop?
13 A.  No.
14 Q.  Separate and apart from the desktop in your
15 office and your Joliet Police Department issued cell
16 phone, did you own any computer devices?
17 A.  No.
18 MR. ADAMS:  Michelle, do you have Exhibit 2?
19 THE COURT REPORTER:  I have the exhibits,
20 yeah.
21         (Whereupon, a discussion
22          was had off the record.)
23 BY MR. ADAMS:
24 Q.  So let's look here at Exhibit 2.  Do you see

Page 70

1  the exhibit sticker down there?
2  A.  Sure.  Yep, I see.
3  Q.  And working from bottom to top, that's your
4  signature?
5  A.  Yes.
6  Q.  And that date, 3 August, 2018, is the date
7  that you signed this document?
8  A.  Correct.
9  Q.  Number 7 --
10 A.  Yes.
11 Q.  -- was your star number or employee number
12 or officer number when you signed?
13 A.  Star number, yep.
14 Q.  This is a memo from you to then Chief
15 Benton, correct?
16 A.  Correct.
17 Q.  And it describes generally the events which
18 took place in the -- over the time frame 18 to 24 May
19 of 2018, correct?
20 A.  That's what it says, yes.
21 Q.  Why did you wait until August of 2018 to
22 compose this memo?
23 A.  I don't -- I don't recall why.
24 Q.  Did Chief Benton ask you to send him a

Page 71

1  written recap of these events as you recall them?
2  A.  I don't -- I don't know if he did, but I
3  sent it to him.
4  Q.  All of this was true and to the best of your
5  recollection when you authored and signed and sent it
6  to your chief?
7  A.  As far as I know, yes.  I mean...
8  Q.  Do you see the sentence that begins, quote,
9  I have viewed?
10 A.  Right.  And I explained it to you.
11 Q.  Okay.  I'm going to get to that.
12        So when you use the phrase in that sentence,
13 quote, some of the cell phone contents, close
14 quote --
15 A.  Uh-huh.
16 Q.  -- what were those contents?
17 A.  The text message he was looking for, like I
18 said.
19 Q.  Any others?
20 A.  No.
21 Q.  When Deputy Chief Jensen explained to you
22 that the phone download was still on the Cellebrite
23 computer, and that detectives have access, that was
24 news to you, correct?

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT G**

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 72

1      A.   Correct.
2      Q.   You didn't understand that that was how the
3   Cellebrite computer worked, correct?
4      A.   I didn't understand why it was still on
5   there, correct.
6      Q.   Where the sentence begins, On 5-24-18, I was
7   contacted by Deputy Chief Jensen in reference to
8   Officer Socha telling him, do you see that?
9      A.   Okay.
10     Q.   And we've talked about that, correct?
11     A.   You asked, yes.
12     Q.   Deputy Chief Jensen never told you that
13   Gavin approached him to report that he, Gavin, had
14   heard that there were rumors of photos or videos from
15   Socha's phone being viewed by personnel in the
16   investigations division, did he?
17     A.   No.
18     Q.   If he had, you would have reported that in
19   this memo to your chief, wouldn't you?
20     A.   I believe I would have.  It was at that
21   phone call, yes.
22     Q.   Do you recall when in relation to the dates
23   cited in Exhibit 2 your vacation from the office
24   began and ended?

Page 73

1      A.   No, I do not.
2      Q.   Was it your understanding that the download
3   of the contents of Socha's phone onto the Cellebrite
4   computer occurred on or about 18 May, 2018?
5      A.   I don't know if that's when he did.  It
6   doesn't say that's when he did.
7      Q.   Do you have a recollection?
8      A.   No, I don't.
9      Q.   For how many days were the contents of
10   Socha's cell phone on the Cellebrite computer to
11   which detectives in the investigations unit had
12   access before being removed by Gavin at Jensen's
13   direction?
14     A.   I don't know.
15     Q.   Can you estimate based upon the timeline
16   that's laid out here?
17     A.   Well, I don't know when he exactly
18   downloaded it to the computer, so it'd be hard to do
19   that.
20     Q.   Okay.  Do you know when in relation to that
21   24 May, 2018 call from Jensen that's referenced here
22   that Gavin copied everything from Socha's phone off
23   the Cellebrite and deleted it from the Cellebrite?
24     A.   I don't know.

Page 74

1      Q.   So as of 3 August, 2018, you report to your
2   Chief Benton that, quote, all working copies are
3   locked up in a cabinet in my office.  How many at
4   that time were all the copies?
5      A.   Say it again.  How many what now?
6      Q.   So that sentence begins, quote, all working
7   copies.  Do you see that sentence?
8      A.   Yeah.
9      Q.   As of 3 August, 2018, how many working
10   copies were there locked up in a cabinet in your
11   office?
12     A.   Just those two.
13     Q.   Is there a reason you use the word all as
14   opposed to both?
15     A.   Because both are all.  I mean, I don't...
16     Q.   As of 3 August, 2018, had any other officer
17   made a copy of the download from Socha's phone other
18   than those two that were locked up in the cabinet in
19   your office?
20     A.   No.  And that's why I say all, because that
21   is all there was.
22     Q.   You use the modifier working copies.
23     A.   Yes.
24     Q.   Why modify it?  Were there other copies that

Page 75

1   weren't working copies?
2      A.   No.
3      Q.   In the last line of the memo to your chief,
4   you use the phrase, quote, sensitive information,
5   close quote.  To what information were you referring
6   as to sensitive?
7      A.   Well, after this happened, I advised all my
8   supervisors that any -- any information about any of
9   our officers they're investigating should not be left
10   on the computer.  That's what I mean, sensitive.
11     Q.   At any point between the 24th of May of 2018
12   and the 3rd of August of 2018, did you ever log those
13   two flash drives into the BEAST evidence management
14   system?
15     A.   No.
16     Q.   Did anyone tell you that Detective McKinney
17   had viewed photographic images of Officer Socha that
18   were downloaded from her cell phone on the
19   Cellebrite?
20     A.   No.
21     Q.   Is that a fact you had ever heard before
22   today?
23     A.   Rumor, but haven't heard fact, no.
24     Q.   When did you first hear the rumor?

21  (Pages 72 to 75)

**EXHIBIT G**

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 76

1  A. I don't -- I don't recall when. I think
2  maybe when Regis was doing his investigation.
3  Q. From whom did you first hear the rumor?
4  A. It may have been from Regis.
5  Q. Do you recall with respect to the text
6  messages that were downloaded from Socha's phone that
7  you viewed on Grizzle's desktop, from and to whom
8  those text messages were?
9  A. No, I don't recall.
10  Q. Do you recall the contents of those text
11  messages?
12  A. I do not recall.
13  Q. At some point an investigation of the --
14  some of the computer equipment in the investigations
15  unit was conducted by the Regional Crime Forensics
16  Lab relative to Socha's concerns about the handling
17  of the data from her phone; is that correct?
18  A. That we called the RCFL in, yes, that's
19  correct.
20  Q. Who initiated that, that forensic work?
21  A. Chief Benton, I believe.
22  Q. And were you consulted before Chief Benton
23  initiated that forensic work?
24  A. No.

Page 77

1  Q. When the regional lab personnel arrived at
2  the Joliet Police Department to take possession of
3  certain computer devices, did you know that they were
4  coming?
5  A. Yes.
6  Q. Who had told you that?
7  A. Chief Benton.
8  Q. How far in advance of the arrival of the
9  forensics lab personnel did you learn that from Chief
10  Benton?
11  A. Probably a couple of days before.
12  Q. After you learned before the regional lab
13  folks showed up at the police department, did you
14  tell anyone else in the investigations unit that they
15  would be coming?
16  A. No.
17  Q. When Chief Benton told you that he had
18  initiated this forensics lab work, what did he tell
19  you was the reason he had done so?
20  A. To prove there was nothing on any of the
21  computers, disprove the allegations.
22  Q. Did he tell you there was any other reason
23  for doing so?
24  A. Not that I recall.

Page 78

1  Q. Do you have Exhibit 3 up on your screen?
2  A. Sure.
3  Q. That's a memo that you signed when you were
4  the interim chief? And if it helps, I'll try to
5  center it so you can get dates and so forth a little
6  more clearly. If you need -- if you need me to move
7  it around, say so.
8  A. Okay.
9  Q. Is that your signature at the bottom?
10  A. Correct.
11  Q. As of 31 August, 2018, what exactly was your
12  status? And I ask that because you sign as interim
13  chief, but in the text of the memo, you refer to
14  yourself as deputy chief. And it was, according to
15  you, then Chief Benton who had initiated this
16  process, and he's referred to in here as the chief.
17  So I'm trying to get some understanding of who held
18  what ranks and positions when this occurred.
19  A. Well, on -- on that morning, Chief -- Chief
20  Benton was still there as the chief, and I believe it
21  was his last day. And I was called over to the city
22  manager's office at about -- a little after 9:00 and
23  was told that I was interim chief. So it's correct
24  all the way around actually.

Page 79

1  Q. So this all occurs right in the middle of
2  the line change, right?
3  A. Yeah, exactly.
4  Q. Okay. Were the personnel in the
5  investigations division asked to turn over only their
6  city-issued computer devices to the RCFL team?
7  A. City-issued computer and cell phones, yes.
8  Q. Only city-issued devices, correct?
9  A. Correct.
10  Q. Who determined that the investigations
11  division personnel would be directed to turn over
12  only city-issued devices, you or Chief Benton?
13  A. It was Chief -- it wasn't me. Chief Benton
14  and I think the city manager and the city attorneys,
15  I believe.
16  Q. Did any of those people ever communicate to
17  you why it was that investigations division personnel
18  were being directed to turn over their city-issued
19  devices and not their own personal devices?
20  A. Because the City owns those. You would
21  need -- there's laws against searching personal stuff
22  without a warrant.
23  Q. Was any effort made to obtain a warrant to
24  get the personal devices of any of the investigations

22  (Pages 76 to 79)

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT G**

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 80

1 division personnel so that they could be forensically
2 examined by the RCFL?
3 　A. No. There was no probable cause for that.
4 　Q. That wasn't a determination you made, was
5 it?
6 　A. It'd be the determination they made. There
7 still wasn't.
8 　Q. I'm not asking for your opinion. I'm
9 asking, who made the determination not to seek a
10 warrant?
11 　A. It wouldn't have been me, but don't know.
12 　Q. Who got Sergeant Botzum involved in this
13 process that's described here in Exhibit 3?
14 　A. I believe he was involved from the beginning
15 with Chief Benton.
16 　Q. Were you aware of Botzum's involvement
17 before the RCFL team arrived at the police department
18 on 24 August?
19 　A. Yes.
20 　Q. How did you learn that?
21 　A. From Chief Benton.
22 　Q. Why did you yourself actually go to RCFL
23 with all these devices?
24 　A. Because I was put in charge of it, handling

Page 81

1 it, from the chief and the city manager and Tressler
2 Law.
3 　Q. Why did you copy John O'Driscoll on this
4 memo?
5 　A. He's the law firm handling it.
6 　Q. When did the RCFL forensic examination of
7 the devices that were turned over to it for forensics
8 examination end?
9 　A. Which -- which part are we talking about?
10 　Q. The whole scope of work.
11 　A. I -- I don't recall when it ended.
12 　Q. Had it concluded by the time you retired?
13 　A. Oh, yeah.
14 　Q. Who decided that it would be concluded?
15 　A. The RCFL.
16 　Q. Did you give a direction to terminate any
17 portion of the RCFL's forensic work?
18 　A. No.
19 　Q. Did you ever obtain any of RCFL's final
20 forensic reports?
21 　A. Yes.
22 　Q. When?
23 　A. At various times.
24 　Q. When you were deputy chief of

Page 82

1 investigations --
2 　　MR. ADAMS: I'll take us out of screen
3 share.
4 　　There we go.
5 BY MR. ADAMS:
6 　Q. While you were deputy chief of
7 investigations, were any police officers other than
8 Crowley or Socha investigated by the Joliet Police
9 Department?
10 　A. I -- I don't recall. I don't know.
11 　Q. In connection with the investigation of
12 Crowley that led to the criminal trial, what physical
13 evidence was collected by the Joliet Police
14 Department?
15 　A. I don't know.
16 　Q. Can you remember any physical evidence that
17 was collected by the Joliet Police Department?
18 　A. I'm sure there was photos taken of the
19 scene.
20 　Q. Anything else?
21 　A. I don't know.
22 　Q. Do you have a recollection of whether any
23 computer devices, meaning, again, cell phones,
24 desktops, laptops, tablets, were obtained and

Page 83

1 searched in the Crowley investigation?
2 　A. I don't know.
3 　Q. Was any evidence at all relating to the
4 Crowley investigation stored in the cabinet in your
5 office where you put the two flash drives containing
6 the download of the contents of Socha's phone?
7 　A. No.
8 　Q. Why not?
9 　A. Because we were not called out for that
10 investigation. Patrol handled it.
11 　Q. Grizzle led that investigation, didn't he?
12 　A. No. He -- he got it after it was complete.
13 　Q. After the sequence of events that started
14 with Jensen telling you that Socha had come to him
15 with her concerns about investigation division
16 personnel viewing personal photos and videos from her
17 cell phone, did you issue any written order regarding
18 deleting information from the Cellebrite computer
19 after the Cellebrite computer was used to download or
20 to extract information from other computer devices
21 seized during investigations?
22 　A. Any written?
23 　Q. Yes, sir.
24 　A. Is that what you said?

23 (Pages 80 to 83)

**EXHIBIT G**

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 84

1   No.
2       Q. Did the department issue any such written
3   directives?
4       A. I don't -- I don't recall.
5       Q. Did you recommend to the department that it
6   issue such written directives?
7       A. No, not that I recall.
8       Q. I'm going to try to screen share again here.
9       Do you have the exhibit in front of you?
10      A. No.
11      Q. I have to replicate what I did last time,
12  which was just dumb luck.
13      So you see this is a memo from you to
14  somebody named Craig Golucki dated 1 November, 2018,
15  correct?
16      A. Correct.
17      Q. And although Golucki is identified as being
18  with the Chicago Police Department, he was as of that
19  date working with the same forensic lab?
20      A. RCFL, correct.
21      Q. There were no attachments to this exhibit
22  the way it was produced to us. So what pictures or
23  in your parlance down in the second half, your reply,
24  what photos did you transmit to him?

Page 85

1       A. The police photos -- hire photos of Officer
2   Socha and Crowley.
3       Q. Photos showing what, just head shots or
4   their identifying photographs?
5       A. Head shots, yes.
6       Q. And so the purpose of this was so that as
7   RCFL did its work, they would be able to identify
8   Socha and Crowley if they saw images of either on the
9   computer devices they were examining?
10      A. Or phones, correct.
11      MR. ADAMS: Okay. You can take us out of
12  that.
13  BY MR. ADAMS:
14      Q. I'm going to try to come back in here. Let
15  me do something right quick.
16      Of course not -- there we go.
17      All right. And you've already told us that
18  there was no written authority for you to store these
19  flash drives in your cabinet in your office. Can you
20  tell us otherwise on what, if any, authority you kept
21  evidence of police criminal investigations, that is,
22  investigations of officers, in a cabinet in your
23  office, which you held the only key?
24      A. Why, you want to ask?

Page 86

1       Q. Not why. What authority?
2       A. Because I -- as the deputy chief of
3   investigations, I am the custodian of all evidence.
4   I have access to all of it. And until the
5   investigation is complete, we don't want it down
6   there where evidence techs can view it.
7       Q. Who's the we? That's just a decision that
8   you made.
9       A. Me and the chief, who's the we.
10      Q. Did Chief Benton tell you to do that before
11  you did it, or did you tell him after the fact?
12      A. I don't recall.
13      Q. And there's no memo or other writing from
14  Chief Benton to you authorizing you to do that in
15  advance or, for lack of a better term, blessing or
16  acquiescing in your doing it after the fact, is
17  there?
18      A. Well, like I stated before, there's evidence
19  in there from other cases involving officers from
20  other deputy chiefs, and it doesn't become evidence
21  unless they're being charged with something. There
22  still has not been a charge in this, so it's still
23  there.
24      Q. That's -- I appreciate that, but that's not

Page 87

1   the question I asked. I asked, after the fact, Chief
2   Benton never issued any writing in which he approved
3   of this handling of the flash drives, did he?
4       A. In writing, no. Not that I know of. I
5   don't know.
6       Q. I asked you earlier if you had issued any
7   direction that the RCFL terminate its forensic
8   examination. You answered that question. I want to
9   ask a somewhat different question.
10      Did you ever issue a direction to or make a
11  request of RCFL that it terminate or suspend any part
12  of its forensic examination due to time constraint?
13      A. Not that I recall, no.
14      Q. Did you ever direct anyone else in the
15  department, including particularly Botzum, to issue
16  such a direction or make such a request of RCFL?
17      A. I had him check and see where they were at
18  in the investigation, if that's what you mean, but
19  just do it thorough and get it done.
20      Q. Did you ever direct Botzum to communicate to
21  RCFL that it should terminate or suspend any part of
22  its work for any reason, including due to a time
23  constraint?
24      A. Not that I recall, no.

24  (Pages 84 to 87)

**EXHIBIT G**

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 88

1   Q.  Did you ever during your career with the
2   department have video evidence of a homicide
3   investigation where the homicide occurred at an
4   Izzy's, I Z Z Y, apostrophe, S, Bar on your own
5   personal iPad device?
6   A.  No.
7   Q.  Did you ever have any evidence of that
8   homicide investigation on any personally-owned
9   computer devices of yours?
10  A.  No.
11  Q.  Did you ever have such evidence on any
12  portable computer device that was issued to you by
13  the Joliet department?
14  A.  I don't believe so.
15  Q.  Did any Joliet officer ever report to you
16  having heard Gavin comment on Socha's performance of
17  any sex act depicted in the videos that were
18  downloaded from her cell phone?
19  A.  No.
20  MR. ADAMS:  I believe those are all the
21  questions I have at this time.  I appreciate your
22  patience with me.
23  THE WITNESS:  Thank you.
24  MS. PROCTOR:  I have a few, but let's -- if

Page 89

1   we could, could we just take another five-minute
2   break?
3   THE WITNESS:  Sure.
4   MS. PROCTOR:  Thank you.
5   (Whereupon, a break was taken,
6   after which the following
7   proceedings were had:)
8   MR. ADAMS:  You know, I don't know who's
9   next.  I'm going to -- so as to not disrupt this,
10  I've got a few more questions.
11  MS. PROCTOR:  Okay.  Go ahead.
12  MR. ADAMS:  Michelle, are we good to go?
13  THE COURT REPORTER:  Yeah.
14  MR. ADAMS:  Mr. Roechner?
15  THE WITNESS:  Yeah.
16  BY MR. ADAMS:
17  Q.  I'm going to give you some names of officers
18  who I believe were investigated by the Joliet
19  department, whether you were -- while you were the
20  deputy chief of investigations, interim chief, or
21  chief, and I'd like you to just confirm that for us.
22  Javier Esqueda?
23  A.  Yes.
24  Q.  Dennis McWherter?

Page 90

1   A.  Yes.
2   Q.  Dave Jackson?
3   A.  Yes.
4   Q.  David Blackmore?
5   A.  Yes.
6   Q.  Ryan Nagra, N A G R A?
7   A.  Yes.
8   Q.  And now I want to try to understand what
9   your position was when each was investigated by the
10  department.  Esqueda, were you chief or deputy chief?
11  A.  Chief.
12  Q.  McWherter, chief or deputy chief?
13  A.  Chief -- either interim or chief, but,
14  yeah, chief.
15  Q.  Jackson?
16  A.  Chief.
17  Q.  Blackmore?
18  A.  That was -- that was probably before my time
19  as chief and -- and to my time as chief, I guess,
20  so...
21  Q.  Nagra?
22  A.  Before -- before chief and then as chief.
23  Q.  And were each of those officers investigated
24  by the investigations division?

Page 91

1   A.  It depends on the case -- which case, I
2   guess, is the way to look at that.
3   Q.  Well, let's do one at a time.  How about
4   Esqueda?
5   A.  Yes.
6   Q.  McWherter?
7   A.  Yes.
8   Q.  Jackson?
9   A.  For the domestic, yes.
10  Q.  Blackmore?
11  A.  No.  I think that was just an internal.  I
12  don't -- I don't recall exactly on that one.
13  Q.  Nagra?
14  A.  Yes.
15  Q.  With respect to -- I guess excluding only
16  Blackmore, with respect to the investigations of
17  Esqueda, McWherter, Blackmore, and Nagra, was
18  evidence gathered by the investigations division in
19  connection with any of those investigations stored in
20  this cabinet in the office of the deputy chief of
21  investigations without being logged into the BEAST
22  evidence handling and management system?
23  A.  Not in that cabinet because that was no
24  longer the deputy chief's office, so...

25  (Pages 88 to 91)

**EXHIBIT G**

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 92

1    Q.  All right then.  In each of those
2  investigations, was evidence relating to those
3  investigations maintained in the deputy chief's
4  office, wherever it was, without being logged into
5  and managed using the BEAST system?
6    A.  Well, it's not really a fair question
7  because those other investigations were completed the
8  day they happened.  So there was no reason to -- to
9  hold it because there were charges right away.  So
10  without going over each individually, it's hard to
11  answer that question.
12    Q.  Okay.  Well, let's -- let's do that, I
13  guess, then.
14    A.  I don't have it in front of me, though, to
15  do that --
16    Q.  Okay.
17    A.  -- each case.
18    Q.  Let's just -- if the answer is I can't
19  remember, that's the answer.
20    A.  Got you.
21    Q.  The Esqueda case, was any of the evidence
22  relating to his case stored in the deputy chief
23  of investigations office without being logged into and
24  managed by the BEAST system?

Page 93

1    A.  Yes, I believe it was.
2    Q.  What evidence?
3    A.  The police reports, the handwritten reports,
4  stuff like that, and -- and video.
5    Q.  Who was the lead investigator on that case?
6    A.  The lead on that, I believe, is Lieutenant
7  Egizio.
8    Q.  How about McWherter?
9    A.  McWherter, no.  He was -- he was arrested
10  that day.
11    Q.  How about Jackson?
12    A.  He was arrested that night.
13    Q.  Why does the date of arrest determine how
14  the evidence is handled?
15    A.  Because it's already out in the public.
16  It's out there already.
17    Q.  I see.
18    A.  It's to protect the officer.  If you don't
19  find anything, then you don't want it out there.
20    Q.  How about Blackmore?
21    A.  There was no criminal that I know of.
22    Q.  And how about Nagra?
23    A.  Nagra was before my time, as even deputy
24  chief.  Actually, I'm sorry.  Actually, it was -- the

Page 94

1  commander of operations was involved in that one,
2  that investigation.  Not me, so -- sorry about that.
3    MR. ADAMS:  Those are all the questions I
4  have.
5    THE WITNESS:  Thank you.
6    CROSS-EXAMINATION
7  BY MS. PROCTOR:
8    Q.  I just -- I just have a few for you --
9    A.  Sure.
10    Q.  -- Mr. Roechner.
11    A.  Yeah.
12    Q.  You were asked earlier about a conversation
13  that you had with Tab Jensen in which you learned
14  that the Cellebrite -- well, that the contents of
15  Officer Socha's cell phone were on the Cellebrite
16  system.  Do you remember that line of questioning
17  from earlier?
18    A.  Yes.
19    Q.  Okay.  To be clear, did you have only one
20  conversation with Tab Jensen in which the removal of
21  the contents of Officer Socha's cell phone from the
22  Cellebrite system were discussed?
23    A.  I don't know exactly, but I'm sure it was
24  more than one because I had to get it -- get the

Page 95

1  contents from either him or Darrell.  So, yeah, I had
2  to have more than one conversation.
3    Q.  Okay.  Well, maybe my question should be --
4    A.  I'm sorry.
5    Q.  -- more focused then.
6    A.  Sure.  Go ahead.
7    Q.  The day you learned that the information in
8  question was still on the Cellebrite system from Tab
9  Jensen, was the -- to the best of your knowledge,
10  were the contents removed the same day of that
11  conversation with D.C. Jensen?
12    A.  Yes.
13    Q.  Okay.  There was no delay in the --
14    A.  No.
15    Q.  -- removal of that information once you
16  learned that the information was, in fact, at least
17  according to Jensen, still on the Cellebrite system,
18  correct?
19    A.  Correct.
20    Q.  Okay.  Now, earlier you were asked questions
21  that -- well, to your knowledge, do you know who
22  actually handled the removal of the contents of
23  Officer Socha's cell phone, who handled the removal
24  from the Cellebrite system once Tab Jensen notified

26  (Pages 92 to 95)

**EXHIBIT G**

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 96

1  you of the fact that the information was still on the
2  system?  Who handled it?
3       A.  I don't know for a -- for a fact without
4  looking, you know, at old notes and stuff.  I believe
5  it was Sergeant Gavin, I believe.
6       Q.  Okay.  Well, we -- you know, we've deposed
7  Detective German in this case.
8       A.  Sure.  Sure.
9       Q.  And according to Detective German, at the
10  direction of Gavin, he is the one who, in fact,
11  handled the technical aspects of the removal --
12       A.  Got you.  Sure.
13       Q.  -- and -- and subsequent deletion of the
14  contents of officer's cell phone from the Cellebrite
15  system.  Does that -- does that --
16       A.  No, that --
17       MR. ADAMS:  I'll object to the --
18  BY MS. PROCTOR:
19       Q.  -- trigger your memory?
20       MR. ADAMS:  -- form.  I'll --
21       THE WITNESS:  Well, I mean, it makes sense
22  to the fact that -- huh?  I'm sorry.
23  BY MS. PROCTOR:
24       Q.  It makes sense?

Page 97

1       A.  It makes sense to the fact that Tab told
2  Darrell to do it.  I don't know how -- who he used,
3  yeah, exactly.  So it makes sense, sure.
4       Q.  Okay.  Because do you know whether Gavin was
5  trained in how to use the Cellebrite system?
6       A.  I do not know.
7       Q.  Okay.  And according to Detective German, he
8  removed the information and deleted it from the
9  Cellebrite on June 8th of 2018.  Okay?
10       A.  Okay.
11       Q.  So I'm going to ask you just to accept that
12  date as correct.  Okay?  We have no reason to --
13       A.  Okay.
14       Q.  -- dispute that --
15       A.  Sure.  No, no problem.
16       Q.  -- date.
17       A.  Right.
18       Q.  So my question to you is, you -- you wrote a
19  memo some months later, a couple of months later on
20  August 3rd of 2018, Chief Roechner, where you
21  indicate that the contents were removed on the --
22  following your conversation with chief -- Deputy
23  Chief Jensen and that that conversation took place on
24  May 24th of 2018.  Do you remember being asked about

Page 98

1  that date?
2       A.  Yeah, I do remember being asked about it.
3       Q.  All right.  So would you agree that
4  May 24th, 2018, is an incorrect date, that the more
5  likely date you had the conversation with Jensen
6  about the removal that was done that same day would
7  be --
8       A.  Sure.
9       Q.  -- June 8th, 2018, correct?
10       A.  Yeah.  It could --
11       MR. ADAMS:  Object to form.
12       THE WITNESS:  It could be a typo.  No
13  problem.
14  BY MS. PROCTOR:
15       Q.  Okay.  And, you know, and in fairness to
16  you, you prepared this memo to Chief Benton on -- you
17  know, some months, almost two -- almost two
18  months after --
19       A.  Well, I should --
20       Q.  -- the event took place?
21       A.  Well, actually, that's when I signed it.  I
22  don't know if it -- it might have been given to him
23  before that, and he asked me to sign it -- sign my
24  signature on it.  So that might be the day I signed

Page 99

1  it.
2       Q.  Okay.
3       A.  You know, I do recall that, so...
4       MS. PROCTOR:  I don't believe I have any
5  further questions.
6       THE WITNESS:  Thank you.
7       MS. PROCTOR:  Thank you, sir.
8       MR. CLARK:  I don't have any questions.
9  Thank you for your time.  I appreciate it.
10       THE WITNESS:  Thank you.
11       MR. ADAMS:  I have a follow-up.
12       Michelle, could you put Exhibit 2 back up on
13  the screen?
14           REDIRECT EXAMINATION
15  BY MR. ADAMS:
16       Q.  Mr. Roechner, can you see the exhibit?
17       A.  Yes, I can.
18       Q.  When you prepared this memo, did you do it
19  from any notes or other documents?  Were you
20  referring to anything else?
21       A.  I don't recall that if I was.
22       Q.  Had you made any notes or other written
23  records of the events described in Exhibit 2 before
24  you prepared Exhibit 2?

27  (Pages 96 to 99)

**EXHIBIT G**

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 100

1    A.   No.  Huh-uh.  Not that I know of, huh-uh.
2    Q.   And you believe -- so you prepared Exhibit 2
3  at the time you prepared it from memory; is that
4  correct?
5    A.   Correct.
6    Q.   And --
7    A.   Sorry.  As far as I can recall.  You know,
8  it's been awhile.
9    Q.   And when you reported these events to your
10  chief, it was -- the statements you make in here were
11  true and accurate to the very best of your ability at
12  the time, correct?
13    A.   To the best of my knowledge, yes.
14    Q.   Now, you've indicated to us just now that
15  you may have signed the document sometime after you
16  prepared it.  Do you recall that testimony just now?
17    A.   Correct.
18    Q.   Okay.  When did you prepare the document?
19    A.   Well, you'd have to -- I mean, it'd be an
20  e-mail record.  You'd have to look.  I don't know.
21    Q.   Can you give any reasonable estimate that's
22  not a wild guess as to how long before the date
23  in which you signed it you actually prepared it?
24    A.   No, I can't.  If -- if I put the wrong date

Page 101

1  on there, it's hard to do that, so I can't.
2    Q.   Do you have a specific recollection of Chief
3  Benton directing you to sign Exhibit 2 on the 3rd of
4  August of 2018, some date after you had actually
5  prepared and submitted it to him?
6    A.   Right.  Like I said, I believe it was
7  e-mailed to him, which doesn't have a signature, so
8  he wanted me to make sure I signed it, so correct.
9    MR. ADAMS:  Would you scroll up, Michelle,
10  so that we can see the top of this?
11  BY MR. ADAMS:
12    Q.   So on this exhibit, Mr. Roechner, there's no
13  e-mail header.  There's no to, from, or date or
14  subject line.  Do you see that?
15    A.   On that paper, yes, I see it.
16    Q.   Yet, you believe that this was as originally
17  transmitted, formatted as an e-mail?
18    A.   I said I don't know, but it may have been.
19    Q.   Was there any other medium through which you
20  transmitted written memos like this to your chief
21  that were typed?
22    A.   Sure.  On the computer, I'm sure.  I'm sure
23  there was.
24    Q.   Where you would just type up a document and

Page 102

1  print it and deliver it to him?
2    A.   Possibly, yes.  It's been done.
3    Q.   When you typed this Exhibit 2 and
4  transmitted it to your chief, the events described
5  here were still reasonably fresh in your mind?
6    A.   I believe so, yes.
7    Q.   When you did that, had you any doubt about
8  the dates, you would have said so in the memo,
9  correct?
10    A.   Yeah, I guess I would have.
11    Q.   If you were doing your best to approximate
12  dates, as opposed to reporting to your chief the
13  specific dates on which the events described
14  occurred, you would have in this memo told him
15  approximately this date or on or about that date,
16  instead of on this date and on that date, correct?
17    A.   I -- I don't know why the date is what it
18  is.  I can't recall from -- at this point, so it's
19  hard to answer that question.
20    Q.   I guess you've answered a little different
21  question than I asked.  If when you typed and
22  transmitted this memo to Chief Benton, you weren't
23  certain that the first date was 18 May, 2018, but you
24  believed it was around that time, you would have

Page 103

1  communicated your uncertainty by saying on
2  approximately 18 May, 2018, or on or about 18 May,
3  2018.  You would not have told your chief
4  definitively that that was the date on which those
5  events occurred, correct?
6    A.   I don't understand the question.  You want
7  the 5-18 date?  What about it?
8    Q.   So --
9    A.   That was the day he got the search warrant.
10  That's when it's signed, so that's...
11    Q.   And where the next date is concerned, the 24
12  May --
13    A.   Yeah.
14    Q.   -- 2018 date, if you were uncertain of that
15  date when you sent this memo to your chief, you could
16  have said on approximately 5-24-18 or you could have
17  said on or about 5-24-18, true?
18    A.   I could have.  I could have put 6-8 on there
19  too.  I don't know why -- I got the wrong date.  I
20  don't -- I can't answer that question.
21    Q.   As you sit here today, you don't know that
22  it's the wrong date, do you?
23    A.   Well, no, I -- I don't definitively because
24  I don't know -- I mean, I wasn't the one that did the

28  (Pages 100 to 103)

**EXHIBIT G**

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 104

1  taking off and all that stuff, so I -- I don't know.
2  But the phone records would probably show it.
3      Q.  And you just know that when you prepared
4  this memo, you were being as accurate as possible
5  based upon these events that were then much fresher
6  in your memory, correct?
7      A.  That's what I believe, yes.
8          MR. ADAMS:  Those are all the questions I
9  have.
10         Michelle, you can take it down.
11         THE WITNESS:  Thank you.
12         MS. PROCTOR:  And nothing else from the
13  City.
14         THE WITNESS:  Thank you.
15         MR. CLARK:  No questions.  Thank you very
16  much.
17         MR. ADAMS:  So you have a right under our
18  rules to review the transcript of this deposition
19  when it's written in order to note any instance in
20  which you believe the transcription is in error on a
21  separate form.  Or you can waive that right.
22         The choice is entirely yours.  We ask only
23  that you tell us on the record whether you elect to
24  exercise or to waive that right.

Page 105

1          THE WITNESS:  To review it?
2          MR. ADAMS:  Show signature as reserved.  And
3  we'll write.  And the City's lawyers will figure out
4  how to get it to you to review.  Okay?
5          THE WITNESS:  Thank you.
6          THE COURT REPORTER:  Are you ordering it?
7          MR. ADAMS:  Yes.
8          MS. PROCTOR:  Our office will order a copy,
9  Tressler's office.
10         MR. CLARK:  I'm okay.  Thank you.
11             WITNESS EXCUSED AT 12:29 p.m.
12
13
14
15
16
17
18
19
20
21
22
23
24

29 (Pages 104 to 105)

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT G**

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 106

```
 1              UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION

 3   CASSANDRA SOCHA,                    )

 4             Plaintiff,               )

 5             -vs-                      ) No. 18 CV 05681

 6   CITY OF JOLIET, a municipal         )

 7   Corporation, EDWARD GRIZZLE,        )

 8   JOHN DOES 1-20,                     )

 9             Defendants.               )

10        I hereby certify that I have read the
     foregoing transcript of my deposition given at the
11   time and place aforesaid, consisting of Pages 1 to
     108, inclusive, and I do again subscribe and make
12   oath that the same is a true, correct and complete
     transcript of my deposition so given as aforesaid,
13   and includes changes, if any, so made by me.

14                       ALAN ROECHNER
     SUBSCRIBED AND SWORN TO
15   Before me this        day
     of             , A.D. 2021.
16        Notary Public

17

18

19

20

21

22

23

24
```

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT G**

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 107

1    STATE OF ILLINOIS  )
                        )  SS:
2    COUNTY OF MACON    )

3

4          I, Michelle A. Duzan, CSR No. 084-004270, a

5    Notary Public within and for the County of Macon,

6    State of Illinois, and a Certified Shorthand Reporter

7    of said state, do hereby certify:

8          That previous to the commencement of the

9    examination of the witness, the witness was duly

10   sworn to testify the whole truth concerning the

11   matters herein;

12         That the foregoing deposition transcript was

13   reported stenographically by me, was thereafter

14   reduced to typewriting under my personal direction

15   and constitutes a true record of the testimony given

16   and the proceedings had;

17         That the said deposition was taken before me

18   at the time and date specified;

19         That I am not a relative or employee or

20   attorney or counsel, nor a relative or employee of

21   such attorney or counsel for any of the parties

22   hereto, nor interested directly or indirectly in the

23   outcome of this action.

24         IN WITNESS WHEREOF, I do hereunto set my

**EXHIBIT G**

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 108

1   hand and affix my seal of office at Forsyth,

2   Illinois, this 8th day of July, 2021.

3

4

5

6

7

8

9                     *Michelle Duzan*

10                Notary Public, Macon County, Illinois.

11                My commission expires 10/23/21.

12

13

14

15

16

17

18

19

20

21

22

23

24

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT G**

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 109

| A | | | |
|---|---|---|---|
| **A.D** 106:15 | **advance** 77:8 | 53:14 54:13 | 53:4 |
| **a.m** 1:17 | 86:15 | 86:24 88:21 | **attorney** 107:20 |
| **ability** 100:11 | **advised** 75:7 | 99:9 | 107:21 |
| **able** 85:7 | **affairs** 30:4,8 | **approached** | **attorneys** 79:14 |
| **accept** 97:11 | **affirmative** 62:1 | 21:21 24:15 | **August** 15:5 |
| **access** 51:5 | **affix** 108:1 | 72:13 | 70:6,21 74:1,9 |
| 62:19 71:23 | **aforesaid** 106:11 | **approval** 21:17 | 74:16 75:12 |
| 73:12 86:4 | 106:12 | **approve** 21:10 | 78:11 80:18 |
| **accessible** 60:13 | **agent** 51:23 | **approved** 87:2 | 97:20 101:4 |
| **accessing** 30:15 | **ago** 5:16,24 | **approximate** | **author** 9:13 |
| 32:11,24 | **agree** 98:3 | 102:11 | 17:20 18:1,3 |
| **accommodate** | **ahead** 40:3 | **approximately** | **authored** 71:5 |
| 4:16 | 56:20 89:11 | 5:13 102:15 | **authority** 48:20 |
| **accreditation** | 95:6 | 103:2,16 | 49:18 52:5 |
| 19:11 | **ahold** 61:3 | **area** 57:14 | 85:18,20 86:1 |
| **accurate** 29:18 | **ALAN** 1:11 3:3 | **arrest** 93:13 | **authorized** |
| 100:11 104:4 | 4:4 106:14 | **arrested** 93:9,12 | 48:21 49:19 |
| **accusations** | **allegations** 7:19 | **arrival** 77:8 | **authorizing** |
| 58:21 | 77:21 | **arrived** 77:1 | 86:14 |
| **achieve** 17:18 | **and/or** 28:6 | 80:17 | **aware** 20:9,10 |
| **acquiescing** | **answer** 4:14,17 | **asked** 4:23 | 24:14 45:18,20 |
| 86:16 | 4:22 8:22 10:1 | 25:10 54:13 | 45:21 80:16 |
| **acronym** 19:23 | 24:20 29:18 | 64:2 72:11 | **awhile** 100:8 |
| **act** 88:17 | 42:13,14 56:12 | 79:5 87:1,1,6 | |
| **action** 63:6,11 | 56:20,21 58:13 | 94:12 95:20 | **B** |
| 107:23 | 65:19 92:11,18 | 97:24 98:2,23 | **B** 3:9 |
| **actual** 46:12 | 92:19 102:19 | 102:21 | **bachelor's** 17:14 |
| **Adams** 2:2,2 3:5 | 103:20 | **asking** 42:12 | **back** 4:15 5:23 |
| 3:6 4:8,9 19:22 | **answered** 87:8 | 58:19 80:8,9 | 8:1,6 11:13 |
| 19:24 55:19 | 102:20 | **aspects** 96:11 | 35:4 57:22 |
| 56:12,18 57:1 | **answers** 14:2 | **assign** 11:10 | 58:8 64:20,21 |
| 57:17,21 58:5 | **anybody** 22:1 | **assigned** 12:12 | 65:4 85:14 |
| 58:8,13,23 | **anymore** 14:9 | 38:3,5,10 | 99:12 |
| 65:21 69:18,23 | **apart** 33:22 | **assuming** 56:22 | **background** |
| 82:2,5 85:11 | 69:14 | 63:15 | 22:13 |
| 85:13 88:20 | **apologize** 17:22 | **attachments** | **bad** 21:20 |
| 89:8,12,14,16 | **apostrophe** 88:4 | 84:21 | **bar** 20:1,5,6 |
| 94:3 96:17,20 | **APPEARAN...** | **attempt** 22:21 | 88:4 |
| 98:11 99:11,15 | 2:1 | 24:17 25:7 | **based** 9:19 10:4 |
| 101:9,11 104:8 | **appellate** 13:14 | **attend** 10:10,13 | 32:10 33:14 |
| 104:17 105:2,7 | **application** | 11:4 | 54:17 56:10 |
| **administration** | 21:22 53:24 | **attended** 11:12 | 73:15 104:5 |
| 17:15 | **appointed** 8:13 | 29:3 | **Batis** 24:13,18 |
| | **appreciate** 50:9 | **attention** 52:23 | 24:20,21 25:4 |

| | | |
|---|---|---|
| 25:6,12,14 | | |
| 45:13 | | |
| **BEAST** 19:21 | | |
| 20:6 49:2,6,13 | | |
| 56:1 65:10 | | |
| 75:13 91:21 | | |
| 92:5,24 | | |
| **began** 72:24 | | |
| **beginning** 19:4 | | |
| 19:17 80:14 | | |
| **begins** 71:8 72:6 | | |
| 74:6 | | |
| **behalf** 2:6,13,18 | | |
| **belief** 61:16,19 | | |
| **believe** 12:21 | | |
| 25:2,21 27:13 | | |
| 27:16 29:13 | | |
| 32:5,14 37:11 | | |
| 38:21 39:6,23 | | |
| 40:11 45:2 | | |
| 50:5 59:24 | | |
| 62:6,7 63:14 | | |
| 72:20 76:21 | | |
| 78:20 79:15 | | |
| 80:14 88:14,20 | | |
| 89:18 93:1,6 | | |
| 96:4,5 99:4 | | |
| 100:2 101:6,16 | | |
| 102:6 104:7,20 | | |
| **believed** 102:24 | | |
| **Benedictive** | | |
| 17:17 | | |
| **Benton** 15:8 | | |
| 48:14 70:15,24 | | |
| 74:2 76:21,22 | | |
| 77:7,10,17 | | |
| 78:15,20 79:12 | | |
| 79:13 80:15,21 | | |
| 86:10,14 87:2 | | |
| 98:16 101:3 | | |
| 102:22 | | |
| **best** 8:22 19:3 | | |
| 43:15 71:4 | | |
| 95:9 100:11,13 | | |

**EXHIBIT G**

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

102:11
better 86:15
Beyond 39:12
Blackmore 90:4
  90:17 91:10,16
  91:17 93:20
blessing 86:15
Bolingbrook
  2:10
boss 54:9,20
  55:7,11
bottom 70:3
  78:9
Botzum 61:1
  80:12 87:15,20
Botzum's 80:16
Boughton 2:9
Boy 32:7
break 57:16
  58:2 89:2,5
Brian 48:14
Brown 26:21
bunch 35:18
business 17:14

            C
cabinet 41:20
  44:22,24 45:3
  45:23,24 46:2
  46:5,24 47:3
  47:10,13 48:7
  48:9,22 49:2
  49:21 59:6
  61:14 63:23
  64:15 74:3,10
  74:18 83:4
  85:19,22 91:20
  91:23
CALEA 19:2,9
  19:11
calendar 19:18
call 36:4 66:20
  67:11 72:21
  73:21

called 4:5 58:16
  58:16 59:1,20
  63:2 64:23
  65:14 76:18
  78:21 83:9
calling 29:15
capabilities
  28:16
Capparelli
  14:18
caps 19:22
care 60:15,17
career 29:5 88:1
case 11:16 22:1
  22:5 23:6 46:1
  51:23,23,24
  55:8 91:1,1
  92:17,21,22
  93:5 96:7
cases 47:16
  49:17 86:19
Cassandra 1:3
  2:21 4:10
  106:3
cause 67:8 80:3
cell 22:10,16
  25:19 33:9
  37:16 39:18
  57:4 59:19
  60:12 63:12,19
  66:14 67:3
  68:14,18,19,21
  69:10,15 71:13
  73:10 75:18
  79:7 82:23
  83:17 88:18
  94:15,21 95:23
  96:14
Cellebrite 27:23
  28:6,16 33:10
  33:16,19,23
  34:2,4,12
  36:13,24 37:16
  38:16 39:19,20

40:6,7,10,18
  40:21 42:23
  52:7 57:11
  58:17,18 59:21
  60:5,13,20
  61:7,12 62:2,4
  62:11,14,19,23
  63:13,17 64:7
  66:6 67:16
  69:6 71:22
  72:3 73:3,10
  73:23,23 75:19
  83:18,19 94:14
  94:15,22 95:8
  95:17,24 96:14
  97:5,9
center 78:5
certain 77:3
  102:23
certainly 32:19
Certified 1:12
  107:6
certify 106:10
  107:7
chain 8:15,16,20
  8:24
change 79:2
changes 106:13
charge 12:9
  53:12 55:1
  80:24 86:22
charged 86:21
charges 92:9
charging 53:21
check 87:17
Chicago 2:4
  84:18
chief 6:5,7 7:2,5
  7:16 8:14,14
  8:19,19 13:22
  14:22 15:1,3,4
  15:8,9,11,14
  15:18,23 16:3
  26:21 32:8,13

32:16,18 45:10
  48:3,12,16,21
  49:20 52:21
  54:21 56:5
  57:5 58:24
  59:16,22 60:14
  60:16 65:7
  66:9,20 67:7
  67:10 70:14,24
  71:6,21 72:7
  72:12,19 74:2
  75:3 76:21,22
  77:7,9,17 78:4
  78:13,14,15,16
  78:19,19,20,23
  79:12,13,13
  80:15,21 81:1
  81:24 82:6
  86:2,9,10,14
  87:1 89:20,20
  89:21 90:10,10
  90:11,12,12,13
  90:13,14,16,19
  90:19,22,22
  91:20 92:22
  93:24 97:20,22
  97:23 98:16
  100:10 101:2
  101:20 102:4
  102:12,22
  103:3,15
chief's 91:24
  92:3
chiefs 46:3 47:2
  86:20
choice 104:22
chose 14:6
circumstances
  25:24 26:17,24
cited 72:23
city 1:6 2:13,20
  14:8,10,13,16
  14:19 68:11,20
  69:3 78:21

79:14,14,20
  81:1 104:13
  106:6
City's 105:3
city-issued 79:6
  79:7,8,12,18
Civil 1:15
CLARK 2:15
  56:11,13,17
  57:13 58:1
  65:18 99:8
  104:15 105:10
clear 46:17 48:9
  59:22 94:19
clearance 21:23
  21:24
clearly 78:6
close 15:16 36:1
  38:2 71:13
  75:5
code 1:15 45:7
coding 20:1,5,6
Coleman 19:13
collected 82:13
  82:17
come 21:10,13
  31:22 40:9
  57:22 63:3
  83:14 85:14
coming 77:4,15
command 8:15
  8:17,21 9:1
commander 9:6
  16:4 94:1
commencement
  107:8
commencing
  1:17
comment 88:16
commission
  108:8
communicate
  13:6 20:20
  56:4 79:16

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT G**

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 111

87:20
communicated 14:13 20:23 66:13 103:1
communicating 47:4
compiled 29:24
complaint 5:18 6:11,14,18,23 7:4,12,17,20 8:7
complete 83:12 86:5 106:12
completed 92:7
compose 70:22
computer 27:23 28:2,16 30:5,8 33:10,16 36:13 37:12,14,17,17 38:1,2,3,5,7,11 38:13,16,20 39:2 41:21 42:7,8 43:7 46:9,13 50:7,8 52:1 55:24 56:2,4 57:3,11 59:14 60:13 61:17,23 62:18 63:24 68:5,6,8 68:9,12 69:1,2 69:3,16 71:23 72:3 73:4,10 73:18 75:10 76:14 77:3 79:6,7 82:23 83:18,19,20 85:9 88:9,12 101:22
computers 28:6 77:21
concerned 53:17 103:11
concerning 107:10

concerns 63:3 65:15 66:5,9 66:13 67:2 76:16 83:15
concluded 81:12 81:14
conducted 76:15
conducting 38:8
confirm 89:21
connection 82:11 91:19
consider 28:5 36:1
considered 28:13
consist 28:20,24
consisting 106:11
constitute 66:21
constitutes 107:15
constraint 87:12 87:23
consulted 76:22
contact 57:10
contacted 57:5 62:8 65:16 72:7
contained 51:13
containing 83:5
contents 6:22 7:4,12,17 8:8 33:6,7,9,15 34:1,11 36:12 36:23 37:15 39:18,19 40:5 40:6,18,22 41:14 42:22 43:17 46:6,19 48:7 51:20 52:14 53:23 55:24 57:12 60:12,20 61:7 61:11 62:1,4

62:10,18 63:12 63:16,19,21 64:6 66:5 67:14 69:5,10 71:13,16 73:3 73:9 76:10 83:6 94:14,21 95:1,10,22 96:14 97:21
continuing 19:18
control 14:10 44:1 49:24 50:17,23 51:11 59:4
controlled 62:20
conversation 7:7 7:10,16 22:19 23:2,5,14 25:12,15 26:5 26:8,12,13 34:6,7,10,22 35:1 36:22 44:10 67:12 94:12,20 95:2 95:11 97:22,23 98:5
copied 46:16 73:22
copies 51:15 63:21 74:2,4,7 74:10,22,24 75:1
copy 39:23 40:1 41:24 58:19 60:6 61:21,22 63:12,18 74:17 81:3 105:8
corner 45:1
Corporation 1:7 106:7
correct 6:8,10 6:13 9:10 10:8 12:14 15:10,13

15:22 16:1 17:7 20:14 33:21 34:9 37:4,5 38:24 42:19 43:9,18 43:19,23 44:2 44:3 47:24 48:5 50:18,19 52:15 55:15 63:1 64:2 67:5 67:6 70:8,15 70:16,19 71:24 72:1,3,5,10 76:17,19 78:10 78:23 79:8,9 84:15,16,20 85:10 95:18,19 97:12 98:9 100:4,5,12,17 101:8 102:9,16 103:5 104:6 106:12
correction 50:10
corrective 63:6 63:11
counsel 107:20 107:21
County 54:1 107:2,5 108:7
couple 4:11 5:23 16:10 35:16 39:10,16 57:15 65:2 77:11 97:19
course 85:16
court 1:1,16 12:19 58:14 69:19 89:13 105:6 106:1
courthouse 10:19
courtroom 10:23
Craig 84:14

created 43:14 64:1,10 65:6
creating 63:18
crime 55:9 76:15
crimes 28:10 54:11
criminal 10:10 12:16,20 82:12 85:21 93:21
Cross-Examin... 3:5 94:6
Crowley 10:11 10:20 11:13,22 12:16,23 15:21 48:4 82:8,12 83:1,4 85:2,8
Crowley's 10:24 12:6,20
CSR 107:4 108:10,11
custodian 86:3
custody 25:20 50:17
CV 1:5 106:5

D

D 3:1
D.C 95:11
daily 11:21 12:2
DARCY 2:8
dark 57:18
Darrell 95:1 97:2
data 39:13 63:13 69:5 76:17
date 5:15 20:17 31:1 65:1 70:6 70:6 84:19 93:13 97:12,16 98:1,4,5 100:22,24 101:4,13 102:15,15,16 102:16,17,23

**EXHIBIT G**

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 112

103:4,7,11,14
103:15,19,22
107:18
**dated** 84:14
**dates** 5:2 15:17
30:18 72:22
78:5 102:8,12
102:13
**Dave** 90:2
**David** 90:4
**day** 24:1 35:17
36:5 65:2
78:21 92:8
93:10 95:7,10
98:6,24 103:9
106:15 108:2
**days** 41:3 51:7,9
65:2 73:9
77:11
**Dearborn** 2:3
**December** 15:5
**decided** 81:14
**decision** 13:23
86:7
**decisions** 53:21
**Defendant** 2:13
2:18
**Defendants** 1:9
106:9
**definitely** 53:13
59:10
**definitively**
103:4,23
**degree** 17:14
**delay** 95:13
**deleted** 66:6
73:23 97:8
**deleting** 83:18
**deletion** 96:13
**deliver** 102:1
**Dennis** 89:24
**department** 8:8
8:17 9:23
12:10 13:17

15:24 17:6,8
18:17 19:17
20:13,15 21:16
21:23 35:7
38:4,6,11
45:17 48:20
49:10,19 52:5
56:7 68:10,11
68:19 69:15
77:2,13 80:17
82:9,14,17
84:2,5,18
87:15 88:2,13
89:19 90:10
**department's**
18:2,6 24:4
28:5
**department-is...**
39:21
**departments'**
19:2
**depends** 41:4
91:1
**depicted** 68:3
88:17
**deposed** 5:12
96:6
**deposition** 1:11
4:1 5:6,9
104:18 106:10
106:12 107:12
107:17
**depositions** 1:17
**deputy** 6:6
15:11,14,18,23
16:3 26:21
32:8,18 46:3
47:2 48:3,12
48:21 49:19
52:21 56:5
57:5 58:24
59:16,22 60:14
60:16 65:7
66:9,20 67:7

67:10 71:21
72:7,12 78:14
81:24 82:6
86:2,20 89:20
90:10,12 91:20
91:24 92:3,22
93:23 97:22
**describe** 68:2
**described** 20:4
80:13 99:23
102:4,13
**describes** 70:17
**describing** 47:18
**description** 20:2
**desk** 37:11
38:22
**desktop** 38:12
39:1,4,6,6,22
40:24 43:4,11
43:12,18 44:15
44:16 50:3,16
50:23 51:20,22
59:14 67:17
68:5 69:8,12
69:14 76:7
**desktops** 82:24
**detail** 11:3,6
**detective** 6:12
7:20 24:9
25:18 28:8,15
30:15 32:10,23
35:1,12,22
59:5,13 75:16
96:7,9 97:7
**detectives** 12:7
32:20 58:21
71:23 73:11
**determination**
80:4,6,9
**determine** 54:3
55:4 60:11
93:13
**determined**
79:10

**device** 37:12
38:7,11,13
39:2 46:13
62:12,19 63:19
64:5 88:5,12
**devices** 46:13
51:16 69:1,2
69:16 77:3
79:6,8,12,19
79:19,24 80:23
81:7 82:23
83:20 85:9
88:9
**dictate** 54:16
**different** 8:11
18:16,20 29:9
87:9 102:20
**differently** 29:1
**direct** 3:5 4:7
23:4 49:9,13
87:14,20
**directed** 22:21
23:23 24:16
25:7 79:11,18
**directing** 23:9
52:18,21 101:3
**direction** 22:3
22:15 27:5,18
44:8,11 53:16
73:13 81:16
87:7,10,16
96:10 107:14
**directives** 84:3,6
**directly** 8:22
10:5 24:10
38:16 107:22
**disc** 46:14 62:13
63:20 64:7
**disciplinary**
29:23 30:1,14
31:15,19
**discipline** 30:2,3
30:3,4,6 32:1,2
32:4,6,9,12,13

32:15,20
**disciplined**
32:24
**discrete** 29:6,8
**discs** 51:16
**discuss** 6:22 8:7
13:13
**discussed** 7:4,19
24:22 26:20
94:22
**discussing** 67:23
**discussion** 7:22
69:21
**discussions** 8:4
**disprove** 77:21
**dispute** 97:14
**disrupt** 89:9
**disseminating**
30:16 33:1
**dissemination**
32:11
**DISTRICT** 1:1
1:1 106:1,1
**division** 1:2 24:9
72:16 79:5,11
79:17 80:1
83:15 90:24
91:18 106:2
**document** 29:9
29:10 70:7
100:15,18
101:24
**documents** 5:5
99:19
**doing** 30:22 35:6
76:2 77:23
86:16 102:11
**domestic** 91:9
**doubt** 102:7
**download** 40:18
40:20 41:4
43:3,23 44:14
51:13,15 71:22
73:2 74:17

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT G**

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 113

83:6,19
downloaded
33:12,16,24
34:3,5,11
36:12,23 37:3
39:13,18,19
40:5,6 41:8,14
41:21 42:6,22
43:17 50:2,6
52:9,14 54:8
56:8 57:4
61:12 62:11,11
62:18,20 66:14
67:15,16 69:5
69:11 73:18
75:18 76:6
88:18
downloading
33:9 40:22
62:1,13
downloads 46:9
46:9
dproctor@tre...
2:11
drafted 18:19
drafting 19:6
drive 37:18,20
39:20,24 40:8
40:10,23 41:9
41:13,16,19,22
42:1,24 43:3
43:13 44:2,4
44:21 45:22,23
46:6,14,18,20
46:21,23 47:9
48:6 49:1,5,12
49:24 50:18,24
51:12,21,24
59:4 61:13,17
61:21 62:3,12
63:20 64:7,9
64:10,13 65:5
65:9
drives 46:8,12

46:15,15 51:16
67:17 69:7,11
75:13 83:5
85:19 87:3
due 21:4 87:12
87:22
duly 4:3,5 107:9
dumb 84:12
duty 28:5 65:22
Duzan 1:12
107:4 108:10

———————
E
E 3:1,9
e-mail 2:5,17
100:20 101:13
101:17
e-mailed 101:7
e-mails 2:11
7:15
earlier 32:15
87:6 94:12,17
95:20
East 2:9
EASTERN 1:2
106:2
education 17:13
Edward 1:7
2:18 106:7
effect 19:16
20:12
effectively 63:17
effort 79:23
Egizio 93:7
either 29:4,9
67:20 69:11
85:8 90:13
95:1
elapsed 40:17,20
elect 104:23
employed 35:9
employee 29:17
70:11 107:19
107:20

encrypted 44:18
ended 72:24
81:11
enforcement
53:9
engine 29:12
entire 33:15
entirely 104:22
equipment
76:14
error 104:20
Esq 2:20
Esqueda 89:22
90:10 91:4,17
92:21
established 19:5
estimate 5:1,2
51:6 73:15
100:21
evaluation 9:14
9:17
evaluations 9:3
9:7,20,24 10:4
10:7
event 24:2 36:7
36:11,14 98:20
events 11:14
22:14 24:4,8
26:20 41:2
70:17 71:1
83:13 99:23
100:9 102:4,13
103:5 104:5
evidence 19:15
20:1,5,7,8,11
46:1,4 47:1,15
47:20 48:1,22
49:3,6,13,20
54:10 62:10
75:13 82:13,16
83:3 85:21
86:3,6,18,20
88:2,7,11
91:18,22 92:2

92:21 93:2,14
exact 5:15 16:10
16:15 18:10
29:20 30:18
48:17 65:1
exactly 7:1,22
15:17 17:23
25:3 26:2
31:12 37:1
40:15 44:9
51:1 73:17
78:11 79:3
91:12 94:23
97:3
examination 3:2
3:5,6 4:7 81:6
81:8 87:8,12
99:14 107:9
examined 4:6
80:2
examining 85:9
example 61:1
excluding 91:15
EXCUSED
105:11
executed 25:18
27:9 33:3
52:13 54:4
execution 23:21
25:24 26:17,24
exercise 104:24
exhibit 3:9
69:18,24 70:1
72:23 78:1
80:13 84:9,21
99:12,16,23,24
100:2 101:3,12
102:3
exhibits 3:12 4:2
69:19
expect 30:6
expected 12:13
23:10
experts 28:5

expires 108:8
explain 14:1
56:14,15
explained 4:15
50:4 71:10,21
express 66:4
expressed 66:9
67:2
expungement
30:11
extract 83:20

———————
F
facile 27:22 28:1
fact 11:13 20:21
20:24 24:21
54:19 66:5
75:21,23 86:11
86:16 87:1
95:16 96:1,3
96:10,22 97:1
facts 26:16
factual 22:13
fair 4:19 10:2
42:14 43:24
55:12 57:17
64:3 92:6
fairness 98:15
familiar 19:14
33:18 62:23
far 53:16 71:7
77:8 100:7
Father's 35:17
36:5
fault 47:7,7
feel 5:2
figure 105:3
file 23:6 29:7
30:2
filed 5:18 6:6
55:23
files 46:2
final 32:2,4
81:19

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT G**

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 114

| | | | | |
|---|---|---|---|---|
| **find** 93:19 | 106:10 107:12 | 66:9 72:13,13 | 6:12 7:21 | **guys** 41:5 |
| **fire** 14:11 | **forensic** 76:20 | 73:12,22 88:16 | 11:20,21 12:12 | |
| **firm** 81:5 | 76:23 81:6,17 | 96:5,10 97:4 | 12:15,22 13:6 | **H** |
| **first** 4:5,12 5:22 | 81:20 84:19 | **general** 18:2,6,8 | 13:9 20:19,20 | **H** 3:9 |
| 6:15,18,23 8:6 | 87:7,12 | 18:13,18 19:2 | 21:10,16 22:7 | **half** 84:23 |
| 17:5,10 20:15 | **forensically** 80:1 | 19:7,14 20:11 | 22:20 23:4,22 | **Hall** 2:2,2 4:9 |
| 20:18,20,24 | **forensics** 76:15 | 47:19 | 24:10,15 25:1 | 56:13 57:13 |
| 22:20 23:22 | 77:9,18 81:7 | **generally** 20:9 | 25:7,19,21 | **hall@adamsle...** |
| 24:15 43:22 | **forgets** 29:19 | 70:17 | 26:8,9,16,23 | 2:5 |
| 46:18 48:8 | **form** 56:10 | **generated** 35:1 | 27:9 33:3,14 | **hallway** 10:15 |
| 51:12 58:16 | 96:20 98:11 | **German** 28:8 | 33:22,24 34:10 | 10:16 |
| 64:22 75:24 | 104:21 | 61:1 96:7,9 | 35:2,13,22 | **hand** 108:1 |
| 76:3 102:23 | **formal** 17:12 | 97:7 | 36:11 37:2 | **handled** 11:16 |
| **five** 16:6 17:3 | 30:6 | **give** 4:14,17 | 38:19 39:16 | 83:10 93:14 |
| 48:18 57:20,22 | **formatted** | 12:1,7 22:13 | 40:6 41:7,12 | 95:22,23 96:2 |
| **five-minute** 89:1 | 101:17 | 27:18 44:6,11 | 41:18 42:22 | 96:11 |
| **flash** 37:18,19 | **Forsyth** 108:1 | 51:6 61:18 | 43:13,16 44:5 | **handling** 20:1,7 |
| 39:20,24 40:23 | **forth** 47:22 78:5 | 81:16 89:17 | 44:16,21 49:6 | 66:13 76:16 |
| 41:9,13,16,19 | **found** 36:17,21 | 100:21 | 51:3,12,14 | 80:24 81:5 |
| 41:22,24 42:23 | 52:14,17 53:2 | **given** 42:5 59:5 | 52:8,23 53:23 | 87:3 91:22 |
| 44:21 45:22,23 | 53:2,7 54:21 | 64:14,19 98:22 | 57:2 59:5 | **handwritten** |
| 46:5,14,18,20 | **foundation** | 106:10,12 | 61:13,13,18,24 | 93:3 |
| 46:21,23 47:9 | 56:10 65:18 | 107:15 | 65:14 66:4,8 | **happen** 50:11 |
| 48:6 49:1,5,12 | **four** 15:16 16:15 | **go** 10:2 18:14 | 83:11 106:7 | **happened** 52:1 |
| 49:24 50:18,24 | 17:3 48:17,17 | 24:19 40:3 | **Grizzle's** 37:17 | 65:1 75:7 92:8 |
| 51:12,16,21,24 | **frame** 18:23 | 50:21 51:10 | 38:1,20 40:21 | **happens** 18:22 |
| 59:4 61:13,17 | 28:21,24 36:10 | 55:9 56:20 | 43:11 44:2,15 | **happy** 35:17 |
| 61:20 62:2,12 | 42:11 70:18 | 57:17 64:11 | 50:3,16 55:24 | 36:4 |
| 63:20 64:7,9 | **free** 5:2 | 80:22 82:4 | 56:4 59:14 | **hard** 46:8,12,15 |
| 64:10,12 65:5 | **fresh** 102:5 | 85:16 89:11,12 | 61:17 63:24 | 46:15 73:18 |
| 65:9 67:17 | **fresher** 104:5 | 95:6 | 67:17 76:7 | 92:10 101:1 |
| 69:7,11 75:13 | **friend** 36:2 | **going** 13:2 14:11 | **group** 19:5 | 102:19 |
| 83:5 85:19 | **front** 84:9 92:14 | 22:2 24:18 | **guess** 4:21 5:3 | **Hawk** 14:20 |
| 87:3 | **fun** 31:7 | 55:16 56:9 | 8:22 13:5,24 | **head** 85:3,5 |
| **focused** 95:5 | **further** 64:11 | 61:8 71:11 | 14:6 31:7 33:7 | **header** 101:13 |
| **folks** 77:13 | 99:5 | 84:8 85:14 | 33:21 36:19,20 | **hear** 4:13 75:24 |
| **follow** 22:3 | | 89:9,17 92:10 | 37:23 43:15 | 76:3 |
| **follow-up** 54:16 | **G** | 97:11 | 52:20 90:19 | **heard** 4:18 56:6 |
| 99:11 | **G** 90:6 | **Golucki** 84:14 | 91:2,15 92:13 | 57:7 59:17,23 |
| **following** 58:3 | **gainfully** 35:9 | 84:17 | 100:22 102:10 | 60:1 67:22 |
| 89:6 97:22 | **gathered** 91:18 | **good** 4:9 89:12 | 102:20 | 68:1 72:14 |
| **follows** 4:6 | **Gavin** 60:22,24 | **Gosh** 28:12 31:5 | **guessing** 20:22 | 75:21,23 88:16 |
| **force** 28:10 | 63:15 64:1,5 | **gotten** 37:16 | 34:17 | **held** 48:23 78:17 |
| **foregoing** | 64:11,18 65:5 | **Grizzle** 1:7 2:18 | **guilty** 13:5 | 85:23 |

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT G**

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 115

helped 18:15
helpful 56:15
helps 78:4
hereto 107:22
hereunto 107:24
HESS 2:9
hey 57:13,13
highest 17:12
hire 85:1
Hock 14:15,17
hold 16:2,5,7,9
    16:12,14,16,18
    92:9
homicide 55:10
    88:2,3,8
HOPPE 2:14
hours 41:3 51:7
    51:9
huh 96:22
huh-uh 100:1,1

**I**
IA 30:12
identified 84:17
identify 47:19
    85:7
identifying 85:4
III 2:2
Illinois 1:1,15
    2:4,10,16
    17:17 106:1
    107:1,6 108:2
    108:7
image 50:22
images 67:20,23
    75:17 85:8
important 4:12
impose 32:9,12
    32:13
imposed 32:1,4
    32:15,20
improper 32:10
improperly
    32:24

inappropriate
    31:8,10
inappropriately
    31:10
incident 30:4
Incidentally
    35:6
incidents 46:2
    47:2
included 63:11
includes 106:13
including 87:15
    87:22
inclusive 106:11
incorrect 98:4
independent
    10:6
indicate 97:21
indicated 42:13
    100:14
indirectly
    107:22
individual 6:11
individually
    92:10
infer 62:5
inferred 62:7
inform 21:24
information
    12:1,5 21:6
    24:15 25:5
    29:1,7 30:16
    31:6,9,10
    32:11 33:1
    49:15 62:20
    75:4,5,8 83:18
    83:20 95:7,15
    95:16 96:1
    97:8
informed 21:14
    22:20 66:23
initiate 30:14
    54:17 66:15
    67:8

initiated 31:15
    31:19 76:20,23
    77:18 78:15
instance 32:3
    104:19
institution 17:16
insufficiently
    62:23
intended 27:11
    27:15 60:17,19
    60:21 61:6
interest 21:8
interested
    107:22
interim 8:14,19
    14:24 15:4,9
    78:4,12,23
    89:20 90:13
internal 30:4,8
    66:15 67:8
    91:11
intervals 41:2
introduced 3:9
    3:12
inventory 48:9
investigated
    15:24 48:4
    82:8 89:18
    90:9,23
investigating
    20:16 21:8
    75:9
investigation
    24:4 30:21,23
    31:4 36:8,14
    38:9 47:21
    52:19 53:10,17
    54:15 55:2,21
    66:16 67:9
    76:2,13 82:11
    83:1,4,10,11
    83:15 86:5
    87:18 88:3,8
    94:2

investigations
    6:9 11:17
    15:12,15,18,23
    16:3 24:9 32:9
    32:19 34:17
    38:23 48:3,12
    48:21 49:20,21
    53:12 54:10
    57:7 59:18
    63:22 67:4
    72:16 73:11
    76:14 77:14
    79:5,10,17,24
    82:1,7 83:21
    85:21,22 86:3
    89:20 90:24
    91:16,18,19,21
    92:2,3,7,23
investigator
    93:5
involved 12:9
    18:7,13 63:18
    80:12,14 94:1
involvement
    55:20 80:16
involving 86:19
iPad 88:5
issuance 21:11
    27:4
issue 9:16 83:17
    84:2,6 87:10
    87:15
issued 5:23
    69:15 87:2,6
    88:12
it'd 29:3 37:14
    50:7 55:12
    73:18 80:6
    100:19
Izzy's 88:4

**J**
J 2:9
Jackson 90:2,15

91:8 93:11
JAMES 2:9
January 13:20
    19:4
Javier 89:22
Jensen 56:5 57:5
    59:1,16,22
    60:15,16,24
    61:5 62:8 63:2
    63:5,5,10 64:1
    64:18,22 65:7
    65:14 66:10,12
    67:7 71:21
    72:7,12 73:21
    83:14 94:13,20
    95:9,11,17,24
    97:23 98:5
Jensen's 66:20
    67:10 73:12
jhess@tressle...
    2:12
Jim 14:15,16,18
job 17:10
John 1:8 81:3
    106:8
join 56:11
Joliet 1:6 2:13
    2:20 8:8 9:23
    11:3,12 13:16
    19:16 20:12
    28:19 35:7
    38:4,5,10
    39:21 45:10,16
    48:20 49:19
    52:5 67:19,22
    68:1,10,11,19
    68:20 69:15
    77:2 82:8,13
    82:17 88:13,15
    89:18 106:6
Jr 2:9
judge 21:19,21
    54:1,5
July 108:2

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT G**

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 116

**June** 1:17 97:9
98:9

**K**

**keep** 20:8 21:14
45:24 48:22
57:18,21
**kept** 29:1 49:16
85:20
**key** 45:5,6,10,13
45:17,20 48:23
85:23
**keys** 45:8
**kind** 19:10 31:7
38:8,12 39:2
**kinds** 29:1
**knew** 25:6
**KNIGHT** 2:14
2:14
**know** 4:21,22
5:15 6:16 7:1
7:23,23 8:2,2
9:5 10:1,14,15
10:15 12:1,2
16:10,15 17:23
18:10,23 19:20
20:17 22:24
24:19 25:3
27:16,21 28:17
28:18 29:20
30:10,11,17,21
31:1,5,13
32:19 34:4,4
36:17,17 37:1
37:15,23 38:14
40:19 41:1,5
41:10 42:1,2,7
42:10,14,18,18
43:8,10,15,21
47:15,15 48:17
48:24 49:4,17
49:22,23 51:3
51:4 52:6,7
53:6 55:9,16

58:17 59:8,10
60:3,21 61:2
62:21 64:17,24
65:17,20,22,23
65:24 66:1,3
67:11 71:2,7
73:5,14,17,20
73:24 77:3
80:11 82:10,15
82:21 83:2
87:4,5 89:8,8
93:21 94:23
95:21 96:3,4,6
97:2,4,6 98:15
98:17,22 99:3
100:1,7,20
101:18 102:17
103:19,21,24
104:1,3
**knowledge** 95:9
95:21 100:13
**KURNIK** 2:14

**L**

**L** 2:8
**lab** 76:16 77:1,9
77:12,18 84:19
**labeled** 45:3
**lack** 56:10 86:15
**laid** 73:16
**Lamken** 13:14
22:4,8
**Lantern** 28:2,6
28:12 33:19
**laptop** 38:12
39:1
**laptops** 69:1
82:24
**larger** 29:10
**late** 55:17
**law** 2:2 53:9
81:2,5
**laws** 18:21,22
79:21

**lawsuit** 4:10
5:18,19 55:22
**lawyers** 56:19
105:3
**lead** 93:5,6
**leading** 22:14
**learn** 20:15,18
64:17 77:9
80:20
**learned** 25:17
36:8 59:17
66:12 77:12
94:13 95:7,16
**learning** 24:3
**led** 82:12 83:11
**left** 75:9
**let's** 45:1 56:14
57:20 69:24
88:24 91:3
92:12,12,18
**letter** 6:20
**letters** 7:15
**level** 8:17 17:12
**lieutenant** 16:8
16:13 24:11,12
24:13 26:21
45:13 93:6
**life** 5:11
**line** 57:18,21
75:3 79:2
94:16 101:14
**listening** 10:24
**little** 14:23 16:6
78:5,22 102:20
**LLC** 2:2
**LLP** 2:8
**loaded** 40:10
43:12 46:7
**lock** 44:7 45:5,6
45:8,11,14,17
64:14
**locked** 41:20,23
42:3 44:22,24
45:3,23 46:5

65:13 74:3,10
74:18
**lodge** 55:16 56:9
**log** 49:6,12
75:12
**logged** 49:2 56:1
65:9 91:21
92:4,23
**long** 14:22 15:3
15:14 16:5,9
16:14 17:2
19:20 22:19,23
41:4,7 43:7
48:15 50:22
64:22 100:22
**longer** 91:24
**look** 53:5 55:13
69:24 91:2
100:20
**looked** 19:19
53:8 55:5
**looking** 36:18,22
52:12 71:17
96:4
**Lorinda** 13:13
22:4
**lot** 18:11
**luck** 84:12

**M**

**Macon** 107:2,5
108:7
**maintained** 92:3
**major** 28:10
**making** 31:7
53:20 63:11
**man** 31:20,20
**managed** 92:5
92:24
**management**
19:16 20:12
49:3,7,13
75:13 91:22
**manager** 14:8

14:10,13,16,20
79:14 81:1
**manager's** 78:22
**manner** 27:3
**marked** 3:12 4:2
**materials** 48:10
53:24
**matters** 41:3
107:11
**MATTHEW**
2:15
**mayor** 14:8,19
14:21
**McKinney**
30:15 31:9,16
32:1,4,16,24
75:16
**McKinney's**
28:15
**mclark@khk...**
2:17
**McWherter**
89:24 90:12
91:6,17 93:8,9
**mean** 8:16,23
9:5 10:14
11:15,15,19,24
13:4 14:5
18:14,20 21:20
21:24 23:13,18
29:18,20 32:12
35:3,8 38:2,9
38:11 42:4,10
44:9,17 46:11
46:12 53:7
55:7,8,11
60:10 61:22
62:15,16 66:22
66:22 71:7
74:15 75:10
87:18 96:21
100:19 103:24
**meaning** 31:18
82:23

**EXHIBIT G**

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 117

**medium** 101:19
**meeting** 50:11
**memo** 6:20 51:4
70:14,22 72:19
75:3 78:3,13
81:4 84:13
86:13 97:19
98:16 99:18
102:8,14,22
103:15 104:4
**memoranda**
7:15
**memorializing**
26:16
**memory** 96:19
100:3 104:6
**memos** 101:20
**message** 21:5
36:18,21 71:17
**messages** 21:7
37:3,6,10,13
38:15,19 39:8
39:12,17 40:8
40:13,24 41:8
41:15 43:2,11
43:22 50:1,16
50:23 52:9,15
52:22 53:5,11
53:18 54:7,18
54:21,24 55:6
55:13 56:3
57:3,3 59:13
76:6,8,11
**meted** 30:7
**Michelle** 1:12
19:22 58:9
69:18 89:12
99:12 101:9
104:10 107:4
108:10
**middle** 79:1
**Mike** 24:13
**mind** 61:22
102:5

**minute** 22:24
57:15
**minutes** 57:22
**misstates** 55:17
**mistaken** 41:20
43:6 50:5
**modifier** 74:22
**modify** 74:24
**moment** 46:18
**months** 5:16
97:19,19 98:17
98:18
**morning** 4:9,11
78:19
**move** 78:6
**municipal** 1:6
106:6
**mute** 57:18

**N**

**N** 3:1 90:6
**Nagra** 90:6,21
91:13,17 93:22
93:23
**name** 4:9
**named** 6:11
84:14
**names** 89:17
**narcotics** 16:8
**nature** 31:11
62:1
**need** 4:14 19:1
29:14 78:6,6
79:21
**needed** 8:23
53:10 54:24
**neighborhood**
16:23
**never** 4:21 5:3
10:5,5 33:19
63:1 72:12
87:2
**new** 14:10,16
18:21,22,23

**news** 71:24
**Nicholas** 10:11
**night** 93:12
**NOPT** 16:23
17:3
**North** 2:3,15
**NORTHERN**
1:1 106:1
**Nos** 4:2
**Notary** 106:16
107:5 108:7
**note** 104:19
**notes** 6:20 7:14
96:4 99:19,22
70:11,12,13
**noteworthy**
26:24
**notified** 95:24
**November** 84:14
**number** 70:9,11
70:11,12,13

**O**

**O'Dekirk** 14:21
**O'Driscoll** 81:3
**oath** 106:12
**object** 56:19
96:17 98:11
**objection** 55:17
56:10,11 65:18
**objections** 56:16
**obtain** 21:17
22:8,9,15,21
24:17,17 25:8
79:23 81:19
**obtained** 23:22
25:18 82:24
**obviously** 56:22
**occasion** 50:17
69:4
**occur** 34:12
36:20
**occurred** 30:24
43:21 73:4
78:18 88:3

102:14 103:5
**occurring** 24:8
**occurs** 79:1
**offered** 10:7
**offhand** 19:19
**office** 7:9 13:14
34:17 41:19,23
42:3 44:7,20
44:23 46:3
48:22 49:16
53:7 58:19
59:6 60:7
61:15 63:23
65:5,13 68:5
68:13,14,24
69:7,15 72:23
74:3,11,19
78:22 83:5
85:19,23 91:20
91:24 92:4,23
105:8,9 108:1
**officer** 4:10 5:18
7:12,17,20 8:7
8:14,20 9:4,9
9:14,17,20,22
10:10,19,20,24
11:3,12 12:16
15:24 16:21,23
17:1,2,5 19:2,5
19:9,10,11,12
19:13 20:16
21:8 22:16,22
23:24 24:4
30:7 31:6,8,14
31:18,21,24
46:2 47:2,16
47:21 49:16
56:5 57:6,7
67:19,22 68:1
70:12 72:8
74:16 75:17
85:1 88:15
93:18 94:15,21
95:23

**officer's** 9:17
28:19,23 29:2
29:7,13,15
96:14
**officers** 8:9 12:9
19:6 31:18,24
49:17,21 56:6
75:9 82:7
85:22 86:19
89:17 90:23
**officers'** 29:23
**OFFICES** 2:2
**oh** 8:11 23:16
31:20,20 33:11
81:13
**okay** 5:3 7:7
14:1 21:20
42:12 46:23
47:4,6,8 50:20
57:23,24 58:15
58:24 63:2
71:11 72:9
73:20 78:8
79:4 85:11
89:11 92:12,16
94:19 95:3,13
95:20 96:6
97:4,7,9,10,12
97:13 98:15
99:2 100:18
105:4,10
**old** 48:9 96:4
**once** 42:8 95:15
95:24
**ongoing** 11:23
12:6 22:1
53:16
**open** 57:19,21
**operated** 62:13
62:23
**operations** 9:6
16:4,13,19
94:1
**opinion** 80:8

**EXHIBIT G**

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 118

opinions 9:22 10:3 13:7,10
opposed 46:13 60:24 74:14 102:12
oral 44:11,13
order 5:5,8 11:8 11:9 19:14 20:11 21:17 44:12 66:15 67:8 83:17 104:19 105:8
ordered 12:12
ordering 105:6
orders 18:2,6,8 18:13,18 19:3 19:7
original 9:13
originally 101:16
outcome 13:11 107:23
outset 42:13
Over- 52:20
oversee 54:9
overseeing 52:20
owned 38:3,10
owns 79:20

**P**
p.m 105:11
padlock 45:5
Pages 106:11
paper 101:15
paperwork 14:5
parlance 84:23
part 10:13 14:12 23:6 29:9 36:19 43:3,23 52:11 55:11 81:9 87:11,21
participated 26:13 36:9,16

particular 19:5 27:18 53:17 54:6,14,23 55:5
particularity 47:20
particularly 5:1 87:15
particulars 31:4
parties 107:21
password 44:17
patience 88:22
patrol 16:13 17:1,2,5 83:10
patrolman 18:15
PD 7:9 34:13,15
people 35:18 36:4 44:18 55:1 79:16
performance 9:2,3,7,14,17 9:20 10:7 88:16
period 14:24 30:11
person 20:22 35:22 44:13
personal 13:7,9 36:2 38:7,9 57:8 59:18 67:2,13 68:2,9 68:18,21,22 79:19,21,24 83:16 88:5 107:14
personally 17:20 18:1,3,5 38:3 52:18
personally-ow... 88:8
personnel 29:7 29:10,11,15 30:8 57:8

59:18 67:4 72:15 77:1,9 79:4,11,17 80:1 83:16
pertaining 1:16
phone 2:4,11,17 21:4 22:10,16 22:22 23:24 24:7,18 25:8 25:19 26:1,9 26:18 27:1,6 27:10,19,20 33:4,5,6,9,15 34:1,3,8,12 36:13,24 37:4 37:16 38:12 39:8,14,18,20 40:4,7,9,14,17 40:21 41:9,14 41:16 42:23 43:17 44:15 46:7,9,19 48:7 50:3 51:13,20 52:10,14 54:8 54:22 56:8 57:4,9,12 59:13,19 60:12 60:20 61:7,11 62:2,4 63:4,12 63:16,19,22 64:6 66:6,15 67:3,14 68:14 68:18,19,20,21 69:6,10,16 71:13,22 72:15 72:21 73:3,10 73:22 74:17 75:18 76:6,17 83:6,17 88:18 94:15,21 95:23 96:14 104:2
phones 28:7 79:7 82:23 85:10

photo 67:20
photographic 75:17
photographs 85:4
photos 56:7 63:4 66:14 67:13 68:2 72:14 82:18 83:16 84:24 85:1,1,3
phrase 71:12 75:4
phrased 54:13
physical 82:12 82:16
pick 11:7
pictures 57:8 58:22 59:19 67:3 84:22
piece 29:6
pinpoint 42:5
place 7:8 11:5 11:22 58:10 64:23 70:18 97:23 98:20 106:11
Plaintiff 1:4 2:6 2:21 106:4
planet 45:19
planned 63:7
played 13:10
Please 4:21
plus 12:9
point 43:16 44:1 46:20 51:11 57:2 63:20 75:11 76:13 102:18
police 8:8 9:4,9 9:22,23 13:16 13:22 19:16 20:13 28:19 35:4,7 38:4,6 45:10,16 48:20

49:10,19 52:5 67:19 68:10,11 68:19 69:15 77:2,13 80:17 82:7,8,13,17 84:18 85:1,21 93:3
policing 16:23 17:10
policy 20:14
portable 88:12
portion 81:17
position 13:21 16:5,7,9,11,14 16:16,18 17:5 18:12 90:9
positions 18:12 18:16 78:18
possession 44:2 77:2
possible 57:15 60:6 104:4
possibly 32:7 102:2
post 48:15
practices 19:3
prepare 5:6,9 9:2 100:18
prepared 9:8 26:9,12 98:16 99:18,24 100:2 100:3,16,23 101:5 104:3
prescribed 52:4
present 2:19 12:19 20:23 34:19 38:18,19 68:13
presented 54:1
presume 4:17
previous 46:3 47:2 49:17 107:8
print 102:1

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT G**

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 119

prior 15:11 21:6
 30:13 50:16
 55:17
probable 80:3
probably 7:1,6
 17:3 24:6,7
 29:11 34:13,17
 36:6 44:9 51:3
 51:8,9 53:7
 54:19 55:22
 65:2 77:11
 90:18 104:2
problem 97:15
 98:13
Procedure 1:15
proceedings
 30:14 31:15,19
 58:4 89:7
 107:16
process 18:18
 33:17 78:16
 80:13
Proctor 2:8 3:5
 55:16 56:9,14
 56:22 57:20
 88:24 89:4,11
 94:7 96:18,23
 98:14 99:4,7
 104:12 105:8
produced 84:22
Professional
 1:13
promulgated
 48:20
property 19:15
 20:12 68:10,19
prosecutor 21:3
 22:4,21 23:23
 24:16 25:7
prosecutor's
 21:7 22:15
prosecutors'
 13:14
prospectively

63:7
protect 93:18
protected 44:17
prove 53:19
 77:20
provide 4:24 5:2
 11:21 12:5,15
provisions 1:14
public 93:15
 106:16 107:5
 108:7
punch 45:7
purpose 20:6
 35:20 53:18
 54:6,14 85:6
purposes 11:4
 53:9
pursuant 1:14
 67:15
put 18:21,23
 28:24 29:19
 39:21 42:6
 45:23 46:4,18
 46:23 47:9,13
 47:22 48:6
 49:1 50:7 59:6
 61:14 80:24
 83:5 99:12
 100:24 103:18

**Q**

qualified 8:18
qualities 9:22
queried 29:14
query 29:16
question 4:13,17
 4:18,22 8:19
 9:11 13:2 14:2
 20:2,3 21:20
 29:19 39:11
 54:14 56:21,24
 58:9,13 87:1,8
 87:9 92:6,11
 95:3,8 97:18

102:19,21
 103:6,20
questioning
 94:16
questions 4:14
 56:20 88:21
 89:10 94:3
 95:20 99:5,8
 104:8,15
queue 58:9
quick 85:15
quote 38:2,2
 71:8,13,14
 74:2,6 75:4,5

**R**

R 90:6
ranks 78:18
ratings 9:3,20
RCFL 42:8
 46:16 76:18
 79:6 80:2,17
 80:22 81:6,15
 84:20 85:7
 87:7,11,16,21
RCFL's 81:17
 81:19
reach 6:1,2
 35:19
read 4:15 5:17
 6:24 35:3 58:8
 58:12 106:10
really 28:18
 39:11 92:6
reason 24:14
 30:14 41:24
 54:23 55:5,12
 61:4 74:13
 77:19,22 87:22
 92:8 97:12
reasonable
 100:21
reasonably
 102:5

recall 6:21 7:13
 7:18 8:5 9:15
 9:18,24 10:9
 10:14,22 11:2
 11:11,24 12:18
 12:24 13:3,8
 13:12,15 21:9
 22:12 23:3,9
 23:20 24:3
 25:9 26:2,6
 27:2,7 31:12
 31:20,22 32:3
 33:2,12 34:20
 36:15 40:15
 44:9 48:11
 51:1 53:1
 55:20 58:24
 59:3 61:3 63:8
 64:17 65:3
 66:7,11 70:23
 71:1 72:22
 76:1,5,9,10,12
 77:24 81:11
 82:10 84:4,7
 86:12 87:13,24
 91:12 99:3,21
 100:7,16
 102:18
recap 71:1
recollection 7:3
 10:6 30:19
 71:5 73:7
 82:22 101:2
recommend
 84:5
reconvene 57:22
record 6:19 7:14
 8:3 23:1,5,7,12
 23:19 25:11,14
 26:4,7,11,15
 28:20,23 29:2
 29:6,10,11,14
 29:15 30:8
 34:21,24 58:11

69:22 100:20
 104:23 107:15
records 28:17
 29:17,21,23,24
 30:12 55:3
 99:23 104:2
Redirect 3:6
 99:14
reduced 107:14
refer 38:1 78:13
reference 56:5
 57:6 59:3 72:7
referenced
 73:21
referred 78:16
referring 14:17
 14:20 75:5
 99:20
regarding 7:16
 22:14 83:17
regional 76:15
 77:1,12
Regis 76:2,4
Registered 1:13
related 53:10
relating 20:11
 28:5 30:15
 47:21 83:3
 92:2,22
relation 72:22
 73:20
relationship
 23:20 36:22
 40:14 55:14
relative 76:16
 107:19,20
remember 4:23
 4:24 7:7,10
 11:18 21:1
 26:10,14,19
 30:23 31:3,5
 34:16,23 41:17
 42:17,17 63:9
 65:1 82:16

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT G**

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 120

92:19 94:16
97:24 98:2
**remembering**
11:15
**remotely** 1:12
**removal** 94:20
95:15,22,23
96:11 98:6
**remove** 62:14
63:16
**removed** 61:12
62:3 73:12
95:10 97:8,21
**rendered** 12:20
**repeated** 4:15
**rephrase** 9:11
28:22
**rephrased** 4:15
**replaced** 15:8
**replicate** 84:11
**reply** 84:23
**report** 11:13
12:15,22 13:9
24:21 35:4,5
54:20 66:8,21
66:22,23 67:7
72:13 74:1
88:15
**reported** 24:10
66:19 67:11
72:18 100:9
107:13
**Reporter** 1:13
1:14 58:14
69:19 89:13
105:6 107:6
**reporting** 11:4
13:3 102:12
**reports** 11:22
81:20 93:3,3
**represent** 4:10
**request** 87:11,16
**requested** 58:12
**required** 21:16

21:22 22:3
**research** 19:8
**reserved** 105:2
**respect** 76:5
91:15,16
**responded** 27:4
**restroom** 57:16
**retire** 13:19,21
**retired** 13:18
35:7,10 81:12
**retirement**
13:23 35:13
**review** 9:19 19:2
39:9,13 48:1
51:23 54:17
104:18 105:1,4
**reviewed** 5:5
6:14,18 8:7
**reviewing** 53:18
**reviews** 9:3
**revise** 18:5
**revised** 18:10,15
18:19
**revising** 18:13
19:6
**revision** 18:7
**right** 31:22
35:11 41:21,22
42:5 43:1
47:23,23 50:6
56:23 58:6,10
71:10 79:1,2
85:15,17 92:1
92:9 97:17
98:3 101:6
104:17,21,24
**River** 2:15
**Road** 2:9,15
**Roechner** 1:11
3:3 4:4 56:16
58:6 89:14
94:10 97:20
99:16 101:12
106:14

**role** 13:10 16:2
53:14 54:15
55:14
**Rosemont** 2:16
**RPR** 108:10
**rules** 1:15 47:5
104:18
**rumor** 75:23,24
76:3
**rumors** 72:14
**Ryan** 90:6

_____
                S
_____
**S** 2:15 3:9 88:4
**Sabrina** 2:20
**saved** 51:19,22
51:24
**saw** 37:24 85:8
**saying** 41:24
43:5,6 47:23
103:1
**says** 27:12 70:20
**scene** 8:23 55:10
82:19
**scenes** 55:9
**scope** 81:10
**screen** 41:11
57:18 78:1
82:2 84:8
99:13
**scroll** 101:9
**seal** 108:1
**search** 21:4 22:8
22:9,22 25:17
27:12,12,19,20
28:7 29:12
33:4 52:11
53:19 103:9
**searched** 33:7,7
83:1
**searching** 79:21
**second** 63:23
65:9 84:23
**Seconds** 41:10

**secure** 44:16
**see** 37:19 42:4
45:1 52:22
53:3,11 54:24
69:24 70:2
71:8 72:8 74:7
84:13 87:17
93:17 99:16
101:10,14,15
**seek** 21:17 23:23
80:9
**seen** 25:15,16
26:7,11,15
34:24 67:20
**seized** 26:8
27:10 33:4
34:7 40:5
83:21
**seizure** 26:1,18
27:1 40:14,17
**send** 70:24
**sense** 14:3,3,7
96:21,24 97:1
97:3
**sensitive** 49:15
75:4,6,10
**sent** 71:3,5
103:15
**sentence** 71:8,12
72:6 74:6,7
**separate** 33:22
34:6 69:14
104:21
**sequence** 24:3
36:14 40:4
83:13
**sergeant** 6:4,12
7:20 11:20,21
16:17,19 20:19
20:20 24:9
25:19 35:1,12
35:22 59:5,13
60:22 80:12
96:5

**serve** 8:15,20
14:22,24
**served** 24:6
**serves** 8:16
**service** 27:5
**set** 58:6 107:24
**sex** 88:17
**sexual** 31:11
**share** 82:3 84:8
**shared** 67:4
**sharing** 56:7
57:8 58:22
59:18 63:4
**shooting** 55:10
**Shorthand** 1:13
107:6
**shots** 85:3,5
**show** 36:21 37:7
41:7 52:23
53:23 104:2
105:2
**showed** 7:6
36:17 37:3,9
39:16 40:8,23
41:10 43:2,22
52:16 57:2
77:13
**showing** 41:15
43:13 52:8
85:3
**shown** 43:7
**sign** 9:6,21
78:12 98:23,23
101:3
**signature** 70:4
78:9 98:24
101:7 105:2
**signed** 14:5 54:5
70:7,12 71:5
78:3 98:21,24
100:15,23
101:8 103:10
**silence** 57:18
**sir** 4:9 5:20 6:3

**EXHIBIT G**

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 121

| | | | | |
|---|---|---|---|---|
| 23:17 56:17 | 88:16 94:15,21 | **stated** 14:8 | 40:22 62:13 | **T** 3:9 |
| 83:23 99:7 | 95:23 | 86:18 | 96:13 | **Tab** 94:13,20 |
| **sit** 103:21 | **socialize** 35:23 | **statements** | **subsequently** | 95:8,24 97:1 |
| **six** 5:16 | 35:24 | 100:10 | 66:4 | **tablet** 38:12 |
| **so-called** 22:4 | **somebody** 84:14 | **STATES** 1:1 | **succeeded** 48:13 | 39:1 |
| **Socha** 1:3 2:21 | **somewhat** 87:9 | 106:1 | **Suite** 2:3,10,16 | **tablets** 69:1 |
| 4:10 5:18 8:14 | **sorry** 17:21,21 | **status** 13:16 | **summaries** 12:8 | 82:24 |
| 8:20 9:14,17 | 23:11,13 28:22 | 35:10 78:12 | **supervised** 10:5 | **tactical** 16:8,17 |
| 9:21 10:20,24 | 31:17,22 93:24 | **stenographica...** | 32:21 | 16:21 |
| 15:24 20:16 | 94:2 95:4 | 107:13 | **supervising** 9:9 | **take** 9:16 22:23 |
| 21:8 24:5 36:7 | 96:22 100:7 | **steps** 54:16 | **supervisors** 75:8 | 41:7 49:24 |
| 36:14 38:8 | **sort** 38:12 | 60:11 | **supervisory** | 57:15,20 60:11 |
| 53:10 55:21 | **sounds** 57:13 | **sticker** 70:1 | 55:14 | 60:17,19 77:2 |
| 56:5 57:6,7 | **southwest** 45:1 | **storage** 46:13 | **Supreme** 1:16 | 82:2 85:11 |
| 59:17,23 63:3 | **Spano** 2:20 | 51:15 62:12 | **sure** 4:12 7:22 | 89:1 104:10 |
| 65:16 66:12 | **special** 21:3,7 | 63:19 64:5 | 7:23 9:12 | **taken** 1:11,14 |
| 67:2 72:8 | 22:4,14,20 | **store** 44:21 | 11:16 12:24 | 25:19 50:17,23 |
| 75:17 82:8 | 23:23 24:16 | 49:20 64:5 | 20:14 22:17 | 58:2 60:18 |
| 83:14 85:2,8 | 25:7 | 85:18 | 35:3,16 36:11 | 63:6 66:24 |
| 106:3 | **specific** 7:3 8:10 | **stored** 46:10,11 | 42:21 53:1 | 82:18 89:5 |
| **Socha's** 7:12,17 | 9:5 18:18,24 | 65:6 83:4 | 54:20 61:4 | 107:17 |
| 7:20 8:7 12:16 | 19:8 20:10 | 91:19 92:22 | 70:2 78:2 | **Talk** 35:24 |
| 13:10 22:16,22 | 29:9 30:19 | **straight** 40:2 | 82:18 89:3 | **talked** 72:10 |
| 23:24 24:17 | 34:14 54:15 | **Street** 2:3 | 94:9,23 95:6 | **talking** 5:19 |
| 25:8,19 26:9 | 101:2 102:13 | **strike** 8:11 | 96:8,8,12 97:3 | 23:11,12 46:17 |
| 27:1 33:4,15 | **specifically** 9:1 | 40:12 43:20 | 97:15 98:8 | 81:9 |
| 34:1,12 36:13 | 11:16,24 22:17 | 61:9 64:11 | 101:8,22,22,22 | **task** 28:10 |
| 36:24 37:4,16 | 23:8 29:14 | 67:15 | **surrender** 27:6 | **tasked** 19:6 |
| 39:8,14,18,20 | 35:19 44:20 | **stuff** 18:22,24 | **suspend** 87:11 | **team** 79:6 80:17 |
| 40:4,7,21 41:9 | 67:1 | 29:4 31:8 | 87:21 | **technical** 96:11 |
| 41:14,15 42:23 | **specificity** 61:6 | 47:17,19 48:2 | **suspension** 32:6 | **techs** 86:6 |
| 43:17 44:15 | **specifics** 27:8 | 51:10 79:21 | **sustained** 30:2 | **tell** 4:23 5:2 21:2 |
| 46:6,6,19 48:7 | 31:6 | 93:4 96:4 | **sworn** 4:3,6 | 22:23 25:4,6 |
| 50:2 51:13,20 | **specified** 107:18 | 104:1 | 106:14 107:10 | 25:23 26:23 |
| 52:10 54:8 | **spoken** 5:8 | **subject** 19:15 | **system** 20:1,7 | 27:3,11,14 |
| 57:4,9 59:13 | 35:12 | 31:3 101:14 | 30:9 49:3,7,13 | 33:5,8,22,24 |
| 60:12,20 61:7 | **SS** 107:1 | **submitted** 101:5 | 56:1 65:10 | 41:12 51:14,19 |
| 61:11 62:2,4 | **stale** 48:9 | **subordinate** | 75:14 91:22 | 52:8 59:16 |
| 63:12,16,19 | **star** 70:11,13 | 49:14 | 92:5,24 94:16 | 60:1,16,19,24 |
| 64:6 66:5 | **start** 17:8 57:14 | **subscribe** | 94:22 95:8,17 | 61:5 63:5,6 |
| 67:14 69:6 | **started** 83:13 | 106:11 | 95:24 96:2,15 | 64:23 65:15 |
| 72:15 73:3,10 | **state** 13:14 | **SUBSCRIBED** | 97:5 | 75:16 77:14,18 |
| 73:22 74:17 | 28:15 29:4,4 | 106:14 | | 77:22 85:20 |
| 76:6,16 83:6 | 107:1,6,7 | **subsequent** | **T** | 86:10,11 |

**EXHIBIT G**

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

104:23
**telling** 23:12
  56:6 57:6 72:8
  83:14
**tells** 35:8
**term** 86:15
**terminal** 38:16
**terminate** 81:16
  87:7,11,21
**terms** 20:10
**testified** 4:6
  10:20
**testify** 10:24
  107:10
**testimony** 12:16
  13:10 55:18
  100:16 107:15
**text** 21:4,7 36:18
  36:21 37:3,6,9
  37:13 38:15,19
  39:8,12,16
  40:8,13,23
  41:8,15 43:2
  43:11,22 50:1
  50:15,23 52:9
  52:15,22 53:5
  53:11,18 54:7
  54:18,21,24
  55:6,13 56:3
  57:3,3 59:12
  71:17 76:5,8
  76:10 78:13
**Thank** 58:1
  88:23 89:4
  94:5 99:6,7,9
  99:10 104:11
  104:14,15
  105:5,10
**thereof** 1:16
**thing** 42:1 46:24
**things** 4:11 42:9
  47:14 59:1
**think** 25:9 28:12
  32:15 41:17,18

50:13,13 56:15
60:22 76:1
79:14 91:11
**third** 63:24
**thorough** 87:19
**thought** 62:15
**threats** 21:5
**three** 5:13 14:2
  15:16 63:21
**thumb** 40:7,9
  43:3,13 44:1,4
**time** 6:6,15,16
  6:23 7:2 8:6,13
  9:19,19 18:23
  19:20 20:24
  24:8,24 25:1
  27:22 28:1,4
  28:14,20,24
  32:16,23 35:23
  35:23 36:10
  37:19,24 39:12
  40:12,16,20
  41:13 42:11
  43:8 44:14
  45:22 46:18
  47:4,9 48:8
  50:1,11,14,15
  51:11 54:3
  55:9 60:23
  61:9,10 62:8
  65:4 70:18
  74:4 81:12
  84:11 87:12,22
  88:21 90:18,19
  91:3 93:23
  99:9 100:3,12
  102:24 106:11
  107:18
**timeline** 73:15
**times** 4:16 5:11
  35:16 81:23
**today** 5:6,9
  75:22 103:21
**told** 22:7 23:22

24:24 25:1,9
25:20,21 26:8
27:9 33:3,14
34:7,11 36:11
36:15,23 37:2
51:12 52:2,13
52:16 53:2
54:12,21 59:23
60:4 62:5,6
63:2 67:1,19
72:12 77:6,17
78:23 85:17
97:1 102:14
103:3
**tomorrow** 10:3
**top** 70:3 101:10
**topic** 57:14
**total** 42:10
**town** 60:14
**track** 20:8
**tracked** 65:10
**trained** 27:22
  28:1 33:19
  63:1 97:5
**training** 28:8,15
  28:17,20,23
  29:2,6,13,16
  29:21 52:7
**trainings** 29:3
**transcript**
  104:18 106:10
  106:12 107:12
**transcription**
  104:20
**transmit** 84:24
**transmitted**
  101:17,20
  102:4,22
**Tressler** 2:8
  81:1
**Tressler's** 105:9
**trial** 10:2,10,17
  10:21 11:1,4
  11:13,14,22

12:6,17,20,23
13:11,13 82:12
**trials** 12:8
**tried** 10:20
  15:21
**trigger** 96:19
**true** 5:1 32:21
  62:24 71:4
  100:11 103:17
  106:12 107:15
**truth** 107:10
**try** 78:4 84:8
  85:14 90:8
**trying** 40:1
  41:17 42:4,14
  42:20 43:8
  50:10 55:4
  78:17
**turn** 79:5,11,18
**turned** 81:7
**two** 8:2 14:23,23
  22:24 24:1
  69:7 74:12,18
  75:13 83:5
  98:17,17
**type** 7:15 64:4
  101:24
**typed** 101:21
  102:3,21
**typewriting**
  107:14
**typo** 98:12

———————
**U**
**Uh-huh** 35:14
  71:15
**ultimately** 23:21
  32:1,9,15
**ultimatum**
  14:14
**uncertain**
  103:14
**uncertainty**
  103:1

**understand** 4:13
  33:15,23 42:20
  72:2,4 90:8
  103:6
**understanding**
  39:17 40:16
  61:11 62:9
  64:4 73:2
  78:17
**understood** 4:18
  43:16
**unit** 12:9 16:8
  16:17 38:23
  63:22 67:4
  73:11 76:15
  77:14
**UNITED** 1:1
  106:1
**University** 17:17
**unneeded** 48:10
**unvoluntary**
  14:12
**up-to-date** 29:18
**update** 18:5
  19:3
**updated** 18:19
  18:22 19:1
**updating** 18:13
  19:6
**use** 27:23 28:2
  68:22 71:12
  74:13,22 75:4
  97:5
**usually** 34:18

———————
**V**
**vacation** 64:20
  66:2 72:23
**valid** 53:19 54:4
**various** 81:23
**verdict** 12:19,22
  13:5,7
**versed** 62:16
**version** 5:17

**EXHIBIT G**

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 123

**video** 67:20 88:2
93:4
**videoconference**
2:1
**videos** 56:7 57:9
58:22 59:19
63:4 66:14
67:3,14 68:2
72:14 83:16
88:17
**view** 38:15 42:3
54:10 69:4
86:6
**viewed** 38:19
39:3 43:11
50:1,2,15,22
54:7 56:3
59:12 67:13
71:9 72:15
75:17 76:7
**viewing** 37:12
39:22 40:13
83:16
**voluntary** 13:23
14:3,4,6,7
**vs-** 1:5 106:5

**W**

**wait** 15:7 70:21
**waive** 104:21,24
**want** 14:9 17:19
43:8 56:19
85:24 86:5
87:8 90:8
93:19 103:6
**wanted** 21:3,14
22:8 101:8
**warrant** 21:4,11
21:15,18,22
22:8,9,15,22
23:13,21,24
24:6,17 25:8
25:17,24 26:17
27:1,5,10,12

33:4 52:11
53:19,24 54:4
79:22,23 80:10
103:9
**wasn't** 12:11
40:19 54:3
65:23 66:19
79:13 80:4,7
103:24
**watching** 10:23
**wave** 53:4
**way** 13:6 18:14
43:10 45:3
47:19 52:23
54:16 62:9
78:24 84:22
91:2
**we'll** 4:15 57:21
105:3
**we're** 47:4
**we've** 7:22 72:10
96:6
**week** 35:17
**weekend** 65:3
**weeks** 41:3 51:7
**went** 44:10 53:8
**weren't** 75:1
102:22
**whereabouts**
41:13
**WHEREOF**
107:24
**wife** 35:8
**wild** 100:22
**wish** 36:4
**wished** 35:17
**withdraw** 8:12
**witness** 3:2 4:3,5
56:15,23 57:24
58:15 65:20
88:23 89:3,15
94:5 96:21
98:12 99:6,10
104:11,14

105:1,5,11
107:9,9,24
**witness's** 55:17
**word** 11:7 74:13
**work** 33:18,23
56:16 64:21
65:23 76:20,23
77:18 81:10,17
85:7 87:22
**worked** 6:5 72:3
**working** 70:3
74:2,6,9,22
75:1 84:19
**wouldn't** 10:3
51:8 72:19
80:11
**write** 105:3
**writing** 86:13
87:2,4
**written** 6:19
7:14 8:3 9:2,20
23:1,4,19
25:11,14 26:11
26:15 34:21,24
44:12 48:19,24
49:18,22 52:5
71:1 83:17,22
84:2,6 85:18
99:22 101:20
104:19
**wrong** 100:24
103:19,22
**wrote** 97:18

**X**

**X** 3:1,9

**Y**

**Y** 88:4
**yeah** 9:10 10:9
15:7 18:20
23:6 24:22
25:2,3 29:3,16
30:10 33:11

35:5,14,14,21
39:6 40:3
42:16 43:24
44:10 46:15
48:1 51:22
53:12,13,15
54:5,9 56:14
58:7,15 59:10
59:10,20 61:16
61:20,21 64:3
64:21 69:20
74:8 79:3
81:13 89:13,15
90:14 94:11
95:1 97:3 98:2
98:10 102:10
103:13
**year** 15:6 17:18
19:12,18
**years** 5:24 14:23
14:23 15:16
16:6,10,15
17:4 48:17,18
**yep** 5:4 70:2,13

**Z**

**Z** 88:4,4

**0**

**05681** 1:5 106:5
**084-004270**
107:4 108:11

**1**

**1** 19:17 84:14
106:11
**1-20** 1:8 106:8
**1-8** 4:2
**10/23/25** 108:8
**108** 106:11
**12:29** 105:11
**16-1** 19:14 20:11
**18** 1:5 15:7,7
70:18 73:4
102:23 103:2,2

106:5
**1991** 17:9

**2**

**2** 3:10 69:18,24
72:23 99:12,23
99:24 100:2
101:3 102:3
**2013** 17:23
**2017** 17:19
**2018** 19:4,12,17
20:11 28:14,20
28:24 30:13
48:19 70:6,19
70:21 73:4,21
74:1,9,16
75:11,12 78:11
84:14 97:9,20
97:24 98:4,9
101:4 102:23
103:2,3,14
**2021** 1:18 13:20
106:15 108:2
**21** 1:17
**21st** 13:20
**2350** 2:3
**24** 70:18 73:21
80:18 103:11
**24th** 75:11 97:24
98:4
**250** 2:10

**3**

**3** 3:11 70:6 74:1
74:9,16 78:1
80:13
**30** 36:6
**31** 78:11
**312.445.4900**
2:4
**33** 2:3
**3rd** 75:12 97:20
101:3

**4**

**EXHIBIT G**

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 124

**4** 3:5

**5**

**5** 3:11
**5-18** 103:7
**5-24-18** 72:6
  103:16,17
**550** 2:9
**5600** 2:15

**6**

**6-8** 103:18
**600** 2:16
**60018** 2:16
**60440** 2:10
**60602** 2:4
**630.759.0880**
  2:11
**69** 3:10

**7**

**7** 70:9
**78** 3:11

**8**

**84** 3:11
**847.261.0700**
  2:17
**8th** 97:9 98:9
  108:2

**9**

**9:00** 78:22
**9:30** 1:17
**94** 3:5
**99** 3:6

**EXHIBIT G**