

Transcript of the Deposition of
**Lieutenant Jeremy Harrison**
**Case:** Cassandra Socha v. City of Joliet; et al.
**Taken On:** June 8, 2021

Royal Reporting Services, Inc.
Phone:312.361.8851
Email:info@royalreportingservices.com
Website: www.royalreportingservices.com

**EXHIBIT H**

Cassandra Socha v. City of Joliet; et al.
Deposition of Lieutenant Jeremy Harrison - Taken 6/8/2021

Page 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CASSANDRA SOCHA,                    )
                                    )
          Plaintiff,                )
                                    )
          -vs-                      )    No. 18 CV 05681
                                    )
CITY OF JOLIET, a municipal         )
corporation; EDWARD GRIZZLE, and    )
JOHN DOES 1-20,                     )
                                    )
          Defendants.               )


          The deposition of LIEUTENANT JEREMY

HARRISON, taken pursuant to the Federal Rules of

Civil Procedure of the United States District Courts

pertaining to the taking of depositions, taken via

videoconference before KRISTA R. DOLGNER, Registered

Professional Reporter and Certified Shorthand

Reporter of the State of Illinois, on Tuesday,

June 8, 2021, at 9:30 a.m.

**EXHIBIT H**

Cassandra Socha v. City of Joliet; et al.
Deposition of Lieutenant Jeremy Harrison - Taken 6/8/2021

Page 2

```
 1   APPEARANCES (via videoconference):

 2       LAW OFFICES OF HALL ADAMS, LLC
         MR. HALL ADAMS, III
 3       33 North Dearborn Street
         Suite 2350
 4       Chicago, Illinois 60602
         Phone:  312.445.4900
 5       E-mail: hall@adamslegal.net

 6           on behalf of Plaintiff;

 7       TRESSLER LLP
         MS. DARCY L. PROCTOR
 8       MR. JAMES J. HESS, Jr.
         550 East Boughton Road
 9       Suite 250
         Chicago, Illinois 60440
10       Phone:  630.759.0800
         E-mail: dproctor@tresslerllp.com
11       E-mail: jhess@tresslerllp.com

12           on behalf of Defendant City of
             Joliet;
13
         KNIGHT HOPPE KURNIK & KNIGHT, LTD.
14       MR. MICHAEL J. ATKUS
         5600 North River Road
15       Suite 600
         Rosemont, Illinois 60018-5114
16       Phone:  847.261.0700
         E-mail: matkus@khkklaw.com
17
             on behalf of Defendant Edward
18           Grizzle.

19   ALSO PRESENT:

20       MS. CASSANDRA SOCHA.

21

22

23

24
```

**EXHIBIT H**

Cassandra Socha v. City of Joliet; et al.
Deposition of Lieutenant Jeremy Harrison - Taken 6/8/2021

Page 3

1                    I N D E X

2   WITNESS                                    PAGE

3   LIEUTENANT JEREMY HARRISON

4        Examination By Mr. Adams ....................4

5

6                 (No exhibits marked.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**EXHIBIT H**

Cassandra Socha v. City of Joliet; et al.
Deposition of Lieutenant Jeremy Harrison - Taken 6/8/2021

Page 4

1    MS. PROCTOR: Before we begin, I would like to
2  make some introductions. Good morning. My name is
3  Darcy Proctor, and I represent the City of Joliet.
4  Thank you for your cooperation and your attention at
5  today's deposition.
6    THE WITNESS: Good morning.
7    MR. ATKUS: Good morning, sir. My name is
8  Michael Atkus. I am one of the attorneys who
9  represents Ed Grizzle in this case.
10    MR. ADAMS: Okay, Krista, go ahead.
11        (Witness sworn.)
12  WHEREUPON:
13        LIEUTENANT JEREMY HARRISON,
14  called as a witness herein, having been first duly
15  sworn, was examined and testified as via video
16  conference as follows:
17        EXAMINATION
18  BY MR. ADAMS:
19    Q. Good morning, sir. My name is Hall Adams.
20  I represent the plaintiff, Cassandra Socha, in this
21  case. I'm going to ask you some questions this
22  morning. So too may the other lawyers. I would ask
23  that you do a couple things. First and most
24  importantly, make sure that you hear and understand

Page 5

1  every question you're asked before you attempt to
2  give an answer. If you give an answer to a
3  question, we'll all presume that you heard it and
4  understood it. Is that fair?
5    A. That's fair. Can you guys hear me okay?
6  Because the air is out in my station, and they have
7  like a mobile unit in my office here.
8    Q. I am having some trouble hearing you, I
9  will say.
10    A. Are you? Let me turn this off.
11    Q. That's much better, whatever you did.
12        The only thing that I would ask is that
13  you not guess. If you don't know something, tell us
14  you don't know. If you can't remember something,
15  tell us you can't remember. But never guess. Okay?
16    A. Got it.
17    Q. You're currently a Joliet police officer?
18    A. Yes, sir.
19    Q. What is your rank?
20    A. Lieutenant.
21    Q. What is your current duty assignment?
22    A. I'm the lieutenant of narcotics, and then
23  it was the tactical unit.
24    Q. How long have you been a lieutenant?

Page 6

1    A. Six years. Sorry.
2    Q. How long have you been assigned to
3  narcotics?
4    A. As a lieutenant, roughly a year and a
5  half.
6    Q. Is that division separate and distinct
7  from investigations?
8    A. We fall under the umbrella of
9  investigations. So my deputy chief would be the
10  investigations deputy chief.
11    Q. Who is that now?
12    A. Carlos Matlock.
13    Q. When did you become a police officer?
14    A. April 12, 1999.
15    Q. When did you start with the Joliet Police
16  Department?
17    A. You know what? Actually, now that you say
18  that, I became a police officer in January of '99.
19  I became a Joliet police officer April 12, '99. I
20  went to the academy for another department.
21    Q. What's your highest level of formal
22  education?
23    A. I received my bachelor's.
24    Q. From what institution?

Page 7

1    A. University of Illinois-Chicago.
2    Q. In what year?
3    A. 1998.
4    Q. In what discipline?
5    A. I got a bachelor's in criminal justice and
6  a minor in psychology.
7    Q. Okay. You held your current position in
8  the May through, say, Labor Day of 2018 time frame?
9    A. Not out of this office. I was in patrol
10  then.
11    Q. What was your first stint in
12  investigations?
13    A. This is going to be -- the way the
14  department is made up -- and they switched it
15  around -- once I came in as a lieutenant, because we
16  used to fall under patrol. They flip-flopped this
17  office under whose umbrella we fall under, if we
18  fall under operations or if we fall under
19  investigations. So I believe this is the first
20  time -- I may be -- I may be incorrect. There may
21  have been a stint before when I was a regular
22  narcotics agent when I was a sergeant in this office
23  I did it, but I don't recall that we were ever under
24  investigations before that.

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT H**

Cassandra Socha v. City of Joliet; et al.
Deposition of Lieutenant Jeremy Harrison - Taken 6/8/2021

Page 8

1    Q.  Have you reviewed any documents in order
2  to prepare for today's deposition?
3    A.  No.
4    Q.  Have you ever reviewed the complaint filed
5  by Officer Socha in this lawsuit?
6    A.  No.
7    Q.  Have you ever read any of its allegations,
8  including those which were repeated or paraphrased
9  in the local press?
10    A.  I'm sure I have read some that were in the
11  press, yes.
12    THE REPORTER:  Did we have someone join?
13  Should I add somebody?
14    MR. HESS:  This is Jim Hess from Tressler.  I
15  am here just to observe.  While we seem to have
16  taken a little break, is there a phone number,
17  dial-in?  I'm having trouble hearing.  I think the
18  phone audio might be better.
19    MR. ADAMS:  I will read it off for you, Jim.
20      (Off-the-record discussion.)
21    MR. ADAMS:  We are back on the air.
22  BY MR. ADAMS:
23    Q.  Have you spoken with any of the lawyers in
24  this case about it at any time?

Page 9

1    A.  Never.
2    Q.  All right.  Have you discussed the fact
3  that you would be giving a deposition today with any
4  of your fellow Joliet Police Department officers?
5    A.  I'm sure I have.
6    Q.  With whom?
7    A.  I'm sure I have with Tim Powers.  He's a
8  sergeant in my unit.
9    Q.  Anyone else?
10    A.  Offhand I don't recall.
11    Q.  When did you discuss with Powers that you
12  would be giving a deposition?
13    A.  We both received an e-mail for the
14  deposition dates.  We were all under the same
15  e-mail.  And then there was an article in the
16  "Patch" that I actually made mention to him.  I said
17  I must have messed up on my calendar what my date
18  was, but the "Patch" reminded me what my date was
19  for my deposition.
20    Q.  Did you discuss anything else with Powers
21  about your deposition?
22    A.  Not that I can recall.
23    Q.  Have you discussed with any of your fellow
24  officers --

Page 10

1      (Voice interruption.)
2  BY MR. ADAMS:
3    Q.  I'm going to try to go ahead now.
4      Have you spoken with any of your fellow
5  officers about depositions which they have given?
6    A.  No.
7    Q.  Have you spoken with any of your fellow
8  officers about this lawsuit?
9    A.  I'm sure I have over the course of time.
10  It wouldn't have been anything really of any
11  importance other than that I've got a deposition.
12    Q.  Are you generally aware that the Joliet
13  Police Department investigated Officer Nicholas
14  Crowley in the 2017 time frame?
15    A.  Yes.
16    Q.  Were you personally involved in any
17  official capacity in that investigation?
18    A.  In the investigation, no.
19    Q.  Were you personally involved in the
20  criminal trial of Officer Crowley?
21    A.  No, sir.
22    Q.  Did you attend any of that trial?
23    A.  I did not.
24    Q.  And you're aware that later, beginning in

Page 11

1  the May of 2018 time frame, the Joliet department
2  investigated my client, Officer Socha?
3    A.  In what time frame?
4    Q.  Beginning in the May 2018 time frame.
5    A.  That sounds about right, yes.
6    Q.  How did you become aware of that fact?
7    A.  If I've got the time frame, which I
8  believe I do, I would have been Cassandra's
9  lieutenant or the lieutenant of her shift, and I --
10  basically myself and Robert Brown, who is now a
11  deputy chief of operations, we were the lieutenants
12  of our 12-hour shift.  So when both of us worked, he
13  was the lieutenant of the east side of town, and I
14  was the lieutenant of anything west of the river, so
15  it would be our Central District and our West
16  District.
17      He called me and said that -- she was
18  under my command, but I was at the other police
19  department to handle roll calls.  When both of us
20  worked, we split between the stations.  He had
21  advised me that they were doing a search warrant on
22  her phone and just advising me because I was her
23  lieutenant.
24    Q.  And when you say "he," you mean then

5 (Pages 8 to 11)

EXHIBIT H

Cassandra Socha v. City of Joliet; et al.
Deposition of Lieutenant Jeremy Harrison - Taken 6/8/2021

| Page 12 |
|---|
| 1  Lieutenant Brown? |
| 2     A.  Yes, sir.  Sorry. |
| 3     Q.  Do you recall when he so advised you? |
| 4     A.  Can you repeat that?  I had trouble |
| 5  hearing you. |
| 6     Q.  Do you recall when he so advised you? |
| 7     A.  You know, we would have been in the middle |
| 8  of roll call or just finished roll call.  So like |
| 9  probably six, seven at night, letting me know that |
| 10  Sergeant Grizzle had grabbed her phone for a search |
| 11  warrant. |
| 12     Q.  So it would have been right on -- just |
| 13  before or just after her phone was seized? |
| 14     A.  It would have been after, yes, sir. |
| 15     Q.  Were you physically present when her phone |
| 16  was seized? |
| 17     A.  No, I was not. |
| 18     Q.  Prior to that event, had you ever |
| 19  discussed with Sergeant Grizzle the investigation, |
| 20  trial, or acquittal of Officer Crowley? |
| 21     A.  No, sir. |
| 22     Q.  Had you ever discussed any of those things |
| 23  with Sergeant Gavin? |
| 24     A.  No. |

| Page 13 |
|---|
| 1     Q.  Had you ever discussed any of those things |
| 2  with then Lieutenant Matlock? |
| 3     A.  Can you repeat that again?  Something is |
| 4  going on. |
| 5     Q.  Prior to the seizure of Socha's phone, had |
| 6  you discussed the investigation, trial, or acquittal |
| 7  of Office Crowley with then Lieutenants Brown or |
| 8  Matlock? |
| 9     A.  No.  And Carlos Matlock was never a |
| 10  lieutenant. |
| 11     Q.  Okay.  I stand corrected.  I'm doing my |
| 12  best to keep up with the roster. |
| 13     A.  Oh, no problem.  I just don't want to say |
| 14  the wrong thing. |
| 15     Q.  Okay.  Within the department, the current |
| 16  officers, are there particular officers of any rank |
| 17  with whom you are personally closest, whether it be |
| 18  virtue of friendship, mentorship, or any other way? |
| 19     A.  As a general answer, I would say I'm |
| 20  friends with people of every rank.  I don't really |
| 21  have a specific rank that I'm more friends with. |
| 22     Q.  How would you characterize your |
| 23  relationship with current Deputy Chief Brown? |
| 24     A.  We have always had a good working |

| Page 14 |
|---|
| 1  relationship. |
| 2     Q.  Any personal or social relationship? |
| 3     A.  I don't -- maybe when we were younger, but |
| 4  not really.  You know, just work. |
| 5     Q.  How would you characterize your |
| 6  relationship with Deputy Chief Matlock? |
| 7     A.  The same as Deputy Chief Brown, more of a |
| 8  work relationship. |
| 9     Q.  How would you characterize your |
| 10  relationship with Sergeant Grizzle? |
| 11     A.  The same thing. |
| 12     Q.  How would you characterize your |
| 13  relationship with -- I believe it's Sergeant, and I |
| 14  believe he is no longer on the department -- Gavin? |
| 15     A.  You know, I may have a little bit more of |
| 16  a friendship with him than the others, but it's rare |
| 17  that we hang out publicly, you know, usually a golf |
| 18  outing or something like that. |
| 19     Q.  And I'm going to not have a rank here. |
| 20  Batis, B-A-T -- maybe two Ts -- I-S, Batis? |
| 21     A.  Oh, Mike Batis? |
| 22     Q.  Batis.  How you would you characterize |
| 23  your relationship with Batis? |
| 24     A.  The same thing.  As we've gotten older and |

| Page 15 |
|---|
| 1  have kids, it's gotten less.  I maybe golf with him |
| 2  once a year.  That's about it. |
| 3     Q.  How would you characterize your |
| 4  relationship with former chief and before that |
| 5  Deputy Chief Roechner? |
| 6     A.  Likewise, the same, maybe golf once or |
| 7  twice a year. |
| 8     Q.  And Lieutenant Reid? |
| 9     A.  I might be a little bit closer.  My |
| 10  father-in-law is a retired police officer, and he |
| 11  and my father-in-law were good friends.  So we would |
| 12  all get together, things like that. |
| 13     Q.  How would you characterize your |
| 14  relationship with Officer Dave Jackson? |
| 15     A.  There is none. |
| 16     Q.  Because you don't know him or you don't |
| 17  want to have a relationship? |
| 18     A.  Oh, I know him very well.  I have nothing |
| 19  to say to him. |
| 20     Q.  Why is that? |
| 21     A.  Because he starts trouble and he lies. |
| 22     Q.  Are you aware of examples where that has |
| 23  occurred where you're concerned? |
| 24     A.  Sure. |

6 (Pages 12 to 15)

**EXHIBIT H**

Cassandra Socha v. City of Joliet; et al.
Deposition of Lieutenant Jeremy Harrison - Taken 6/8/2021

Page 16

1    Q.  Tell us about that.
2    A.  I've heard he has said that I have
3  witnessed this video, and that is factually false
4  and a lie.
5    Q.  Any others?  Any other such examples?
6    A.  That I can factually say he's lying, no,
7  that I can think of off the top of my head.
8    Q.  Do you have any explanation as to what
9  Jackson's motivation for lying about your conduct
10 would be?
11   MR. ATKUS:  Objection.  Calls for him to
12 speculate on another's motives.
13   MS. PROCTOR:  I'll join in that objection on
14 behalf of the City of Joliet.  It also lacks
15 foundation.
16 BY MR. ADAMS:
17   Q.  You can answer, Officer.
18   A.  I'm sorry.  You said to answer?
19   A.  Yes, sir.
20   A.  Okay.  That's it.  I can't -- I can only
21 guess to why he's doing that.  It's for a personal
22 gain of his own.
23   Q.  Have you discussed the department's
24 investigation of Officer Socha with

Page 17

1  Sergeant Grizzle?
2    A.  No.
3    Q.  Are you trained on the use of the
4  Cellebrite computer equipment to extract evidence
5  from other computer devices?
6    A.  No, sir.
7    Q.  Are you trained on that equipment with
8  respect to viewing data that has already been
9  extracted from other computer devices?
10   A.  No.
11   Q.  How would you characterize your
12 relationship with Officer McKinney?
13   A.  I was his direct supervisor in narcotics.
14 He was a sergeant.  We were probably tighter then
15 when he was in the unit.  But then you go to other
16 units in the department, you know.  I don't
17 really -- we don't hang out or anything like that.
18 But we have a decent working relationship.
19   Q.  Are you currently in Officer Socha's chain
20 of command?
21   A.  No.
22   Q.  When did that stop?  When you moved over
23 to narcotics?
24   A.  Yes, sir.

Page 18

1    Q.  How long was she in your chain of command?
2    A.  I don't know.  It might have been
3  two years.  I'm not sure.  She came over from
4  another shift.  She was on a different shift, and
5  she came over to my shift.  I can't exactly recall.
6    Q.  Did you ever author performance
7  evaluations or ratings of Officer Socha?
8    A.  No, not that I recall.
9    Q.  Based on the time that you worked in her
10 chain of command, what, if any, opinion did you hold
11 of her as a police officer?
12   A.  Oh, I have a very high opinion of her as a
13 police officer.
14   Q.  Was she trustworthy?
15   A.  Yes.
16   Q.  Was she officious?  Did she take her job
17 seriously?
18   A.  Very much so.
19   Q.  Was she skillful, given her level of
20 experience?
21   A.  In my opinion, yes.
22   Q.  Was she reliable?
23   A.  In my opinion, yes.
24   Q.  And did you ever have occasion to

Page 19

1  recommend her for promotion or other recognition?
2    A.  I don't recall.
3    Q.  Based upon your experience in Socha's
4  chain of command, is she a police officer you would
5  recommend for promotion?
6    A.  Yeah.  I haven't worked directly with her
7  in a while, but during my working relationship with
8  her, I would have, yes.
9    Q.  How did you learn that Dave Jackson said
10 that you had viewed videos that you had not, in
11 fact, viewed?
12   A.  There was a rumor going around the
13 department that he had received information through
14 an attorney that I was trying to latch onto a
15 lawsuit.  There was talk about it.
16   Q.  How did that rumor reach you?
17   A.  I don't remember specifically.  I mean, I
18 didn't have a specific person come up and approach
19 me and pull me aside, if that's what you're asking.
20   Q.  Is this something you overheard in the
21 station?
22   A.  Yes.
23   Q.  And you can't attribute the voice to any
24 individual you can identify to it?

7  (Pages 16 to 19)

**EXHIBIT H**

Cassandra Socha v. City of Joliet; et al.
Deposition of Lieutenant Jeremy Harrison - Taken 6/8/2021

Page 20

1      A.  No, I can't.
2      Q.  And when did you hear that?
3      A.  I'd say a couple months before I found out
4  I was going to be deposed.
5      Q.  And where were you when you heard it?
6      A.  I was in the police department.
7      Q.  Where in the police department?
8      A.  I don't remember.  If I did, I would
9  probably know who was talking about it.
10     Q.  Are you aware generally that Socha's
11  claims in this lawsuit relate to the handling of
12  photographic and video images that were extracted
13  from her phone by the Joliet Police Department after
14  Sergeant Grizzle seized the phone?
15     A.  Yes.
16     Q.  How did you come by that general
17  awareness?
18     A.  From Cassandra Socha.
19     Q.  When did you come by that general
20  awareness?
21     A.  I don't have the date in front of me, but
22  she had come in.  I was in the watch commander's
23  office, and she asked to speak with me.  She said
24  she needed to go home, that she found out -- someone

Page 21

1  left a letter in her mailbox.  She found out that
2  someone had in the letter said people had looked at
3  images and videos off of her phone.
4      Q.  At the time the chief of police was
5  Chief Benton?
6      A.  Yes, sir.
7      Q.  If I told you that that conversation that
8  you described between you and Socha just now
9  occurred on the 2nd of August of 2018, does that
10  sound accurate to you?
11     A.  I would be guessing.  I mean, it sounds
12  probably close.
13     Q.  At that time what was your chain of
14  command up to Chief Benton?
15     A.  So I was the lieutenant nights.  Then my
16  deputy chief of patrol would have been Edgar
17  Gregory.  And then there were other deputy chiefs,
18  but he's our buffer between myself and the chief --
19  would have been.  Excuse me.
20     MR. ADAMS:  Off the record, Krista.
21         (Off-the-record discussion.)
22     MR. ADAMS:  Let's go back on the record.
23  BY MR. ADAMS:
24     Q.  Do you recall that after that conversation

Page 22

1  you authored a memo to Chief Benton, the subject of
2  which was Officer Socha, where you told Chief Benton
3  about the conversation with Socha?
4      A.  I'm sorry.  I didn't hear the beginning of
5  what you said.  Can you repeat that, please?
6      Q.  Sure.  Do you recall that after that
7  conversation with Socha in which she told you what
8  she had learned about the handling of the evidence
9  that was extracted from her phone, you authored and
10  sent a memo to Chief Benton about that conversation?
11     A.  I did.  I made a phone call to him first.
12     Q.  Why did you do that?
13     A.  Well, because that would be something that
14  I would -- we have a watch commander's log.  You
15  would let people know what had happened during your
16  shift, anything, you know, of a nature that command
17  staff should know.  This is something that I felt
18  command staff should know, but I felt only certain
19  people should know because of the allegations; and
20  if somebody was actually doing this, I didn't trust
21  that if I told somebody else that it wouldn't get
22  spread.
23         So I figured I would go straight to the
24  chief and let him know this is what had happened.

Page 23

1  "I sent Cassandra home.  I'm going to document it
2  and let you know.  But I didn't want to have anybody
3  else in the way of letting you know.  It's coming
4  from my mouth straight to you."
5      Q.  And you did that the same day that you had
6  the conversation with Socha?
7      A.  Oh, probably five minutes after.
8      Q.  So the date on that memo would certainly
9  refresh your recollection as to when you had the
10  conversation with Socha?
11     A.  I'm sorry.  I cut you off.  Yes, sir.
12     Q.  And the reason you went directly to the
13  chief as opposed to first to the deputy chief of
14  patrol was for the reason you just described to us.
15  You wanted to keep the communication circle narrowly
16  limited until the senior people in the department
17  decided what should be done about this information?
18     A.  Yeah.  I knew, you know, with an
19  accusation like that that there's going to be an
20  internal investigation and probably the potential
21  for a lawsuit, and I wanted it documented.  I needed
22  it documented that she had told me.  But I didn't
23  want -- if there was some truth to what she said, I
24  did want that getting out because I didn't know who

8  (Pages 20 to 23)

**EXHIBIT H**

Cassandra Socha v. City of Joliet; et al.
Deposition of Lieutenant Jeremy Harrison - Taken 6/8/2021

Page 24

1   had seen it. So the only other person I could think
2   to go to would be the chief specifically in case
3   other people in between us were people that
4   potentially had seen it. Do you see what I'm
5   saying?
6        Q.   What is your best recollection of exactly
7   what Socha said to you in that meeting?
8        A.   She just asked if she could talk to me.
9   We went off to a room just to the side of the watch
10  commander's office. She had said, "Hey, I need to
11  go home."
12       I said, "Okay. What's wrong?" I could
13  tell she was visibly upset. She said she received a
14  letter. I think I said that -- I can't recall now.
15  I asked her what was wrong. She said she received a
16  letter in her mailbox saying that people had
17  looked -- or viewed pictures, explicit pictures --
18  that might not be the exact word she said,
19  "explicit," but pictures from her phone and videos
20  from her phone. And I said, "Absolutely. Go
21  ahead."
22       She had said she didn't want anybody else
23  to know about it. I said I'm not going to tell
24  anybody. After I spoke to the chief, I then called

Page 25

1   her back and said, I do have to make you aware,
2   though -- I probably -- I'm telling you I'm not
3   telling anybody else, but I obviously had to tell
4   our ultimate boss.
5        Q.   And when you called the chief to tell him
6   what Socha had reported to you, did you tell him
7   specifically that Socha had reported concerns about
8   the photographic or video images that were explicit
9   in nature that had been viewed and circulated?
10       A.   Can you repeat that?
11       Q.   Sure. That's a crummy question. I will
12  withdraw it instead.
13       A.   I'll agree with you.
14       Q.   Yeah. And I know it's shocking to
15  everybody that that would happen.
16       Tell us exactly then in your phone call to
17  the deputy chief what you told him Socha had
18  reported to you.
19       A.   Sure. It was to the chief directly. I
20  let him know. I said, Hey, I need to let you know
21  that I've sent Cassandra Socha home on emergency
22  leave. She came into the office and advised me that
23  there was a letter put in her mailbox, an anonymous
24  letter put in her mailbox, that said that people had

Page 26

1   viewed pictures and videos from her phone from the
2   search warrant on her phone.
3        Q.   Did you describe to the chief in that call
4   what you understood the nature of those pictures and
5   videos to be?
6        A.   To be 100 percent sure, I don't know if I
7   said exactly. I just felt that we assumed that it
8   wasn't just a normal picture viewed. Do you see
9   what I'm saying?
10       Q.   Did you communicate that assumption to the
11  chief in any words that you can recall?
12       A.   I can't recall.
13       Q.   When you wrote the memo, that followed the
14  phone call to the chief, correct?
15       A.   It did.
16       Q.   And that was an effort by you to -- as we
17  would say in the legal profession -- to paper the
18  file so there was some record of your having
19  reported this to the chief, correct?
20       A.   Correct.
21       Q.   What do you recall conveying in that memo
22  about Socha's report to you?
23       A.   I would have to see the memo. It was
24  something similar to that conversation.

Page 27

1        Q.   Did you -- in the memo did you report to
2   the chief that Socha had expressed concern
3   specifically about video and/or photo images
4   extracted from her phone being circulated around the
5   department?
6        A.   I'm sure I said something similar to that.
7        Q.   Did that conversation take place face to
8   face between you and Socha?
9        A.   Oh, I thought we were talking about a
10  letter.
11       Q.   No, no, no. When Socha reported to you
12  her concerns, was that a face-to-face conversation?
13       A.   It was.
14       Q.   Did it take place at the Joliet Police
15  Department?
16       A.   Yes, sir.
17       Q.   About what time of day?
18       A.   It was right around roll call time or just
19  before or just after.
20       Q.   And was anyone else present within
21  earshot?
22       A.   When her and I had that conversation, no.
23       Q.   Do you recall what, if any, other
24  circumstances led her to -- well, strike that. Let

9  (Pages 24 to 27)

**EXHIBIT H**

Cassandra Socha v. City of Joliet; et al.
Deposition of Lieutenant Jeremy Harrison - Taken 6/8/2021

---

Page 28

1  me ask the predicate question first.
2          Did you approach her or did she approach
3  you that day?
4      A.  She approached me.
5      Q.  Do you recall what, if any, other
6  circumstances led her to approach you that morning?
7      A.  On that day?
8      Q.  Yes, sir.
9      A.  No.
10     Q.  All right.  And as you recall, Socha
11  approached you and expressed these concerns about
12  the handling of the video and photo images on her
13  phone and asked to be relieved for the day?
14     A.  Yes, essentially.
15     Q.  And you granted that request, true?
16     A.  I did.
17     Q.  All right.  Do you recall whether there
18  was any other reason or cause that Socha ascribed
19  for requesting a day's leave?
20     A.  Well, she was upset.  So she, you know,
21  because of what she -- the letter she got in her
22  mailbox.  So that would be the general root of the
23  cause.  It wasn't just necessarily her just saying,
24  I want to go home.  It was that she received the

---

Page 29

1  letter.
2      Q.  Did she make any reports of any other
3  facts or events to you in that conversation?
4      A.  No, sir.
5      Q.  When she made that report to you that led
6  you then to call and then to send a memo to
7  Chief Benton, you believed -- you told us -- that if
8  true, the conduct that she was describing could lead
9  to a lawsuit or to an internal investigation,
10  correct?
11     A.  Yes, sir.
12     Q.  Why did you believe that?
13     A.  It's a pretty strong accusation.  If
14  there's some truth to that, I would expect both of
15  those to happen.
16     Q.  And you would expect an internal
17  investigation to occur why?
18     A.  Well, that wouldn't be proper handling of
19  evidence in a police department if it were true.
20     Q.  Based on your training and experience in
21  the Joliet Police Department, you are familiar with
22  the general order known as 16-1 relating to evidence
23  and property management?
24     A.  Yes.

---

Page 30

1      Q.  If what Socha told you were true, among
2  other things, the handling of the evidence from her
3  phone that she described to you would be in
4  violation of that general order, correct?
5          MS. PROCTOR:  I'm going to object based on
6  foundation and assumes facts not in evidence.
7  BY MR. ADAMS:
8      Q.  You can answer.
9      A.  If true, correct.
10     Q.  Based upon your familiarity with that
11  general order, it would be improper for officers not
12  involved in an official capacity in the
13  investigation of Socha to have access to evidence
14  that was extracted from her phone, correct?
15         MS. PROCTOR:  Same objection.  Lack of
16  foundation.
17  BY MR. ADAMS:
18     Q.  You can answer.
19     A.  Correct.
20     Q.  Similarly, it would be improper for such
21  officers to view evidence that was extracted from
22  her phone, correct?
23         MS. PROCTOR:  Same objection.
24

---

Page 31

1  BY THE WITNESS:
2      A.  Ones not directly involved in that
3  investigation, yes, sir.
4      Q.  And when you say -- I think we mean the
5  same thing -- "directly involved," involved in any
6  official capacity, correct?
7      A.  Correct.
8      Q.  What is the BEAST?
9          It's an acronym, Krista, spelled like it
10  sounds, the BEAST system.
11     A.  Yeah, I don't know what it stands for.
12  It's to put our evidence in.
13     Q.  And the general order that I just referred
14  to provides that evidence should be maintained and
15  the handling of evidence tracked by means of the
16  BEAST system, correct?
17     A.  That sounds right.
18     Q.  Have you ever seen the anonymous letter or
19  letters that were placed in Socha's mailbox that she
20  described to you?
21     A.  No, sir.
22     Q.  Has anyone told you that they have seen
23  those letters?
24     A.  Can you repeat that, please?

---

10  (Pages 28 to 31)

**EXHIBIT H**

Cassandra Socha v. City of Joliet; et al.
Deposition of Lieutenant Jeremy Harrison - Taken 6/8/2021

Page 32

1   Q.  Has anyone told you that they have seen
2 those letters, other than Officer Socha, of course?
3   A.  No.
4   Q.  Has anyone told you that they authored
5 those letters?
6   A.  No.
7   Q.  Have you discussed those letters with
8 anyone other than Chief Benton?
9   A.  No.
10   Q.  Did you tell Chief Benton what Socha had
11 told you about those anonymous letters when you
12 called Chief Benton after you spoke with Socha?
13   A.  Yeah, I think this is the same question
14 you had asked before.  Yes, I did.  But you're
15 saying "letters." I don't know anything about
16 plural.  I thought from my conversation with her
17 that it was one.
18   Q.  All right.  Fine.  But you did tell
19 Chief Benton about Socha's reporting having received
20 that letter, correct?
21   A.  Yes.  She received information in her
22 mailbox, something to that effect.
23   Q.  And that was included in your follow-up
24 memo to the chief?

Page 33

1   A.  I don't know.  I haven't seen the memo
2 since I typed it.  So I don't know how it said it.
3   Q.  Okay.  After you called and then sent the
4 memo to the chief, did the chief tell you to do
5 anything in follow up?
6   A.  No.  I just said, "Hey, I'm going to
7 document this phone call as well on an interoffice
8 memorandum and throw it in your mailbox."
9   Q.  Since sending that interoffice memo to the
10 chief, has anyone reached out to you -- and by
11 "anyone," I mean anyone affiliated with the
12 department -- to gather any additional information
13 from you about that report that Socha had conveyed
14 to you?
15   A.  I don't believe so, no.
16   Q.  You have not been interviewed by the
17 police department's Inspector General, a fellow
18 named Regis, in connection with the Socha matter;
19 have you?
20   A.  No.
21   Q.  Have you talked with any other officers
22 who have been interviewed by Regis about their
23 sessions with Regis?
24   A.  No.

Page 34

1   Q.  Have you spoken with any Joliet officer
2 who has told you that they have viewed either
3 photographic or videographic images that were
4 extracted from Socha's phone in which she is
5 depicted either nude or engaged in sexual conduct?
6   A.  No.  If so, I would have reported that.
7   Q.  Have you overheard through this rumor mill
8 that you described any officer describing that he or
9 she had viewed those images?
10   A.  No.  I would have reported it if I had.
11   Q.  Have you overheard through this rumor mill
12 that you described earlier any officer identifying
13 some other officer who had viewed those images?
14   A.  No.  I would have reported it.
15   Q.  Have you discussed with any other Joliet
16 Police Department officer the duplication or
17 replication of the images that were extracted from
18 Socha's phone after it was seized by Sergeant
19 Grizzle?
20   A.  No.  I would have reported it.
21   Q.  And you would have reported all these
22 events, had you received knowledge of them, because
23 they would have indicated to you impropriety or
24 potential impropriety in the handling of that

Page 35

1 evidence, correct?
2   A.  Correct.
3   Q.  In reference to the video and/or
4 photographic images extracted from Socha's phone
5 after it was seized by Grizzle, have you ever heard
6 any Joliet officer comment on what those images
7 depicted, whether they themselves admitted to having
8 viewed these images?
9   A.  No.  I would have reported that.
10   Q.  Specifically, have you ever heard any
11 Joliet officer utter the phrase "Now I know why
12 Crowley is with her; she sucks dick like a porn
13 star"?  Have you ever heard that?
14   A.  Never.
15   Q.  Have you ever heard anything like that in
16 terms of its explicit or graphic nature and
17 attributed it to the images of Socha that were
18 extracted from that phone?
19   A.  No, never.  I would have reported any of
20 that.
21   Q.  Because anything like that would suggest
22 impropriety on the part of any such officers
23 involved, correct?
24   A.  Correct.

11 (Pages 32 to 35)

**EXHIBIT H**

Cassandra Socha v. City of Joliet; et al.
Deposition of Lieutenant Jeremy Harrison - Taken 6/8/2021

Page 36

1    Q.  Have you in your experience relied on
2  other officers in the department who were trained
3  and familiar with the Cellebrite to assist you in
4  your investigations?
5    A.  No.
6    Q.  Are there officers on the force known to
7  you to be what I will characterize as "duty experts"
8  in the use of the Cellebrite to extract and view
9  evidence that come in on other computer devices?
10   A.  What type of experts did you say?
11   Q.  "Duty experts."  Somebody who -- "go-to"
12 people.
13   A.  Yeah, there's probably a handful of guys
14 that do that.
15   Q.  Who do you consider those people to be?
16   A.  Ones that have received the training.
17 I've not -- I don't know that I will know them all.
18 But I know Chris Botzum is a lieutenant.  He was one
19 of the original ones.  Jeff German is one.  John
20 McKinney is one.  And then there's one guy out of my
21 office that would handle many of the narcotics cases
22 or burglary cases, and that's Dave Szymanski.  But I
23 don't think he even has, you know, the full training
24 for some of that.

Page 37

1       There's different programs with different
2  acronyms, and I barely know how to log into my
3  computer anymore it seems like.  So I don't know
4  them all.
5    Q.  Have you heard any Joliet officer say that
6  they received duplicates or replicas of the data
7  that was extracted from Socha's phone either on a
8  thumb drive or a disk?
9    A.  No.  I would have reported that.
10   Q.  Have you heard officers say that any other
11 officer got duplicates or replicas of the data that
12 was extracted from Socha's phone on either a thumb
13 drive or a disk?
14   A.  No, sir.  I would have reported that.
15   Q.  Did now Former Chief and Deputy Chief
16 Roechner ever tell you that he had the contents of
17 the data that was extracted from Socha's phone
18 loaded onto his own desktop computer at the police
19 station?
20   A.  No.  I would have reported that.
21   Q.  For the same reason we've talked about
22 earlier?  That would have suggested impropriety to
23 you?
24   A.  Correct.

Page 38

1    Q.  Are you acquainted with a former officer
2  named Bergner?
3    A.  Phil Bergner.  I know him.
4    Q.  How would you characterize your
5  relationship with Bergner?
6    A.  Not much.  It was a working relationship
7  if I needed something, but I didn't really need much
8  from him.
9    Q.  In that say 1 May to Labor Day 2018 time
10 frame, what did you understand his role at the
11 police department to be?
12   A.  I don't recall during that time frame what
13 it was because he had transferred from one area or
14 department to another roughly around that time.  So
15 I'm not sure if he was -- At one point he was an IT,
16 and then at another point he got sent off to assist
17 in a computer crimes unit in the FBI.  I can't
18 recall during what time frame.  Either way, he was
19 some form of IT, technically.
20   Q.  During that time frame and irrespective of
21 the change of command, did Deputy Chief Roechner
22 have a what -- I will use the phrase "inner circle
23 of colleagues" who were associated closely with one
24 another?

Page 39

1    A.  Not that I'm aware of necessarily.  I
2  mean, people have friends, but I don't know about
3  any inner circle of colleagues.
4    Q.  Whom did you understand his friends in the
5  department to be?
6    A.  No, I'm just saying in general.  I mean,
7  people have friends.  I don't want to make it seem
8  like he doesn't talk to people.  But I don't know of
9  an inner circle is what I'm getting at, I guess.
10   Q.  Were you ever in his chain of command?
11 Obviously, for the time that he was a chief you
12 were.  But until he was the chief, were you in his
13 chain of command?
14   A.  Yes.
15   Q.  When?
16   A.  At one point he was my tactical sergeant,
17 and then at one point he was the lieutenant -- very
18 briefly he was the lieutenant of my office in my
19 position here when I was a narcotics officer.
20   Q.  When you reported the conversation you had
21 with Socha to Chief Benton, what, if anything, did
22 Chief Benton tell you to do with or about the
23 information that you had gotten from Socha?
24   A.  I don't think he really told me anything.

12  (Pages 36 to 39)

**EXHIBIT H**

Cassandra Socha v. City of Joliet; et al.
Deposition of Lieutenant Jeremy Harrison - Taken 6/8/2021

Page 40

1    I just said, "Hey, listen. I'm making a
2    notification to you." I basically told him what I
3    was doing, and I said, "Hey, listen. I'm making a
4    notification to you, and I'm going to document this
5    phone call and to let you know I'm sending her home.
6    But I'm not going to put this on the watch
7    commanders' log."
8        You'll do a log at the end of your shift
9    sometimes. There may be some internal things that
10   happen in a department or an officer from another
11   department is involved in something that you
12   wouldn't put out on your brief sheet for the watch
13   commanders for the next shift. I didn't feel it
14   even needed to be put on for a brief sheet because
15   when we send that log out, command staff sees it,
16   watch commanders see it, and then sometimes, you
17   know, someone else can see it.
18       But I didn't want anybody to be aware of
19   it. If there's some accusations -- and I didn't
20   know if there was some truth to it -- I didn't want
21   anybody else to know.
22   Q.  Did Benton say to you "Don't tell anyone
23   else about this" or words to similar effect?
24   A.  I don't recall. He wouldn't need to,

Page 41

1    though.
2    Q.  If there were, in fact, photographic or
3    video images of Socha that had been extracted from
4    her iPhone, that kind of evidence would rate
5    particularly careful handling and discretion; would
6    you agree with that?
7    A.  Can you repeat that?
8        MR. ADAMS: Sure. Krista, could you read that
9    back, please?
10       (Record read.)
11       MS. PROCTOR: I'm going to object based on
12   foundation.
13       MR. ATKUS: I will join in that objection.
14   BY MR. ADAMS:
15   Q.  You can answer.
16   A.  I would think from anybody's cell phone, a
17   normal citizen, you know, pictures or any evidence
18   from it from a case should have particularly good
19   handling of it.
20   Q.  Have you ever discussed with Sergeant
21   Grizzle Officer Socha's role in the investigation or
22   criminal trial of Officer Crowley?
23   A.  It would have been brief, and it would
24   have been the day that he did the search warrant on

Page 42

1    the phone.
2    Q.  Do you have a particular recollection of
3    such a conversation?
4    A.  It's not verbatim, but it was just to the
5    effect of, hey, listen. We are doing a search
6    warrant on her phone. I believe it's -- not the
7    appellate prosecutor -- whoever was the special
8    counsel that was appointed by Glasgow to handle the
9    case, from what he said had, you know, wanted me to
10   conduct a search warrant for some communications
11   that she made with a witness, I believe, in Nick
12   Crowley's trial. That was really the extent of it.
13   Q.  Did Grizzle ever convey to you any
14   personal opinions he had about the outcome of the
15   Crowley trial?
16   A.  No.
17   Q.  Did he ever convey to you any opinions
18   that he held regarding Socha's role in the outcome
19   of that trial?
20   A.  No.
21   Q.  You never communicated with the appellate
22   prosecutor, a woman named Lamken, who prosecuted
23   Crowley; did you?
24   A.  No.

Page 43

1    Q.  Do you know of anyone on the department
2    other than Grizzle who did?
3    A.  Who communicated with the appellate
4    prosecutor?
5    Q.  In connection with the Crowley matter.
6    A.  I don't.
7    Q.  Do you know of anyone on the department
8    who communicated with her in connection with the
9    investigation of Socha other than Grizzle?
10   A.  Can you repeat that?
11   Q.  Do you know of anyone on the department
12   who communicated with the same appellate prosecutor
13   named Lamken about the investigation of Socha other
14   than Grizzle?
15   A.  I do not. I don't know of anyone.
16   Q.  Have you ever had any conversations with
17   Deputy Chief Matlock about the evidence that was
18   extracted from Socha's iPhone?
19   A.  No.
20   Q.  Have you ever discussed that with Deputy
21   Chief Brown?
22   A.  No.
23       MR. ADAMS: Those are all the questions I have
24   at this time, Lieutenant. Thanks for your time this

13  (Pages 40 to 43)

**EXHIBIT H**

Cassandra Socha v. City of Joliet; et al.
Deposition of Lieutenant Jeremy Harrison - Taken 6/8/2021

Page 44

1    morning.
2         THE WITNESS:  Thank you.
3         MS. PROCTOR:  I have no questions on behalf of
4    the City of Joliet.  Thank you, sir, for your time
5    and attention today.  It's appreciated by all.
6         THE WITNESS:  Thank you.
7         MR. ADAMS:  Mike, you're muted.
8         MR. ATKUS:  No questions from me.  Thanks.
9         THE WITNESS:  Thank you.
10        MR. ADAMS:  Lieutenant, you have the right
11   under our rules to review the transcript of this
12   deposition if it's ordered and to note any instances
13   where you believe the transcription is not accurate.
14   You can't change questions or answers in the
15   transcript, but you can note instances where you
16   perceive inaccuracy.  Or you can waive that right.
17   You do have to tell us on the record here which you
18   prefer to do, to exercise or to waive that right.
19        THE WITNESS:  You know, I would rather review
20   it, please.
21        MR. ADAMS:  Okay.  Show signature is reserved.
22   And any need to get that to you will occur through
23   counsel for the City.
24        Krista, we are going to order that in our

Page 45

1    usual fashion.
2         MS. PROCTOR:  And we will take a copy on behalf
3    of the City of Joliet and make arrangements to get a
4    copy to the witness when it's printed up, which
5    could take several weeks.
6              (Proceedings concluded at
7              10:39 a.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

14  (Pages 44 to 45)

**EXHIBIT H**

Cassandra Socha v. City of Joliet; et al.
Deposition of Lieutenant Jeremy Harrison - Taken 6/8/2021

Page 46

```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION

 3
    CASSANDRA SOCHA,                )
 4                                  )
                   Plaintiff,       )
 5                                  )
                -vs-                )   No. 18 CV 05681
 6                                  )
    CITY OF JOLIET, a municipal     )
 7  corporation; EDWARD GRIZZLE, and )
    JOHN DOES 1-20,                 )
 8                                  )
                   Defendants.      )
 9

10            I hereby certify that I have read the

11  foregoing transcript of my deposition given at the

12  time and place aforesaid, consisting of pages 1 to

13  47, inclusive, and I do again subscribe and make

14  oath that the same is a true, correct, and complete

15  transcript of my deposition so given as aforesaid

16  and includes changes, if any, so made by me.

17

18  _____
                JEREMY HARRISON
19
    SUBSCRIBED AND SWORN TO
20  before me this _____ day
    of _____, A.D. 2021.
21

22  _____
           Notary Public
23

24
```

**EXHIBIT H**

Cassandra Socha v. City of Joliet; et al.
Deposition of Lieutenant Jeremy Harrison - Taken 6/8/2021

Page 47

1   STATE OF ILLINOIS  )
                  ) SS:
2   COUNTY OF C O O K  )

3          I, KRISTA R. DOLGNER, a Certified
   Shorthand Reporter within and for the State of
4   Illinois, do hereby certify:

5          That previous to the commencement of the
   examination of the witness, the witness was duly
6   sworn to testify the whole truth concerning the
   matters herein;

7

          That the foregoing videoconference
8   deposition was reported stenographically by me, was
   thereafter reduced to a computerized transcript by
9   me, and constitutes a true record of the testimony
   given and the proceedings had;

10

          That the said deposition was taken before
11   me at the date and time specified;

12          That the reading and signing by the
   witness of the deposition transcript was agreed upon
13   as stated herein;

14          That I am not a relative or employee or
   attorney or counsel, nor a relative or employee of
15   such attorney or counsel for any of the parties
   hereto, nor interested directly or indirectly in the
16   outcome of this action.

17          IN WITNESS WHEREOF, I do hereunto set my
   hand at Chicago, Illinois.

18

19

20   Krista R. Dolgner, CSR, RPR
   161 North Clark Street
21   Suite 3050
   Chicago, Illinois 60601
22   312.361.8851

23   CSR License No. 084-002878

24

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT H**

Cassandra Socha v. City of Joliet; et al.
Deposition of Lieutenant Jeremy Harrison - Taken 6/8/2021

Page 48

| A | | | | |
|---|---|---|---|---|
| **A.D** 46:20 | **and/or** 27:3 35:3 | **Atkus** 2:14 4:7,8 | 45:2 | **case** 4:9,21 8:24 |
| **a.m** 1:18 45:7 | **anonymous** | 16:11 41:13 | **believe** 7:19 | 24:2 41:18 |
| **Absolutely** | 25:23 31:18 | 44:8 | 11:8 14:13,14 | 42:9 |
| 24:20 | 32:11 | **attempt** 5:1 | 29:12 33:15 | **cases** 36:21,22 |
| **academy** 6:20 | **another's** 16:12 | **attend** 10:22 | 42:6,11 44:13 | **Cassandra** 1:3 |
| **access** 30:13 | **answer** 5:2,2 | **attention** 4:4 | **believed** 29:7 | 2:20 4:20 |
| **accurate** 21:10 | 13:19 16:17,18 | 44:5 | **Benton** 21:5,14 | 20:18 23:1 |
| 44:13 | 30:8,18 41:15 | **attorney** 19:14 | 22:1,2,10 29:7 | 25:21 46:3 |
| **accusation** | **answers** 44:14 | 47:14,15 | 32:8,10,12,19 | **Cassandra's** |
| 23:19 29:13 | **anybody** 23:2 | **attorneys** 4:8 | 39:21,22 40:22 | 11:8 |
| **accusations** | 24:22,24 25:3 | **attribute** 19:23 | **Bergner** 38:2,3 | **cause** 28:18,23 |
| 40:19 | 40:18,21 | **attributed** 35:17 | 38:5 | **cell** 41:16 |
| **acquainted** 38:1 | **anybody's** 41:16 | **audio** 8:18 | **best** 13:12 24:6 | **Cellebrite** 17:4 |
| **acquittal** 12:20 | **anymore** 37:3 | **August** 21:9 | **better** 5:11 8:18 | 36:3,8 |
| 13:6 | **APPEARAN...** | **author** 18:6 | **bit** 14:15 15:9 | **Central** 11:15 |
| **acronym** 31:9 | 2:1 | **authored** 22:1,9 | **boss** 25:4 | **certain** 22:18 |
| **acronyms** 37:2 | **appellate** 42:7 | 32:4 | **Botzum** 36:18 | **certainly** 23:8 |
| **action** 47:16 | 42:21 43:3,12 | **aware** 10:12,24 | **Boughton** 2:8 | **Certified** 1:16 |
| **Adams** 2:2,2 3:4 | **appointed** 42:8 | 11:6 15:22 | **break** 8:16 | 47:3 |
| 4:10,18,19 | **appreciated** | 20:10 25:1 | **brief** 40:12,14 | **certify** 46:10 |
| 8:19,21,22 | 44:5 | 39:1 40:18 | 41:23 | 47:4 |
| 10:2 16:16 | **approach** 19:18 | **awareness** 20:17 | **briefly** 39:18 | **chain** 17:19 18:1 |
| 21:20,22,23 | 28:2,2,6 | 20:20 | **Brown** 11:10 | 18:10 19:4 |
| 30:7,17 41:8 | **approached** | | 12:1 13:7,23 | 21:13 39:10,13 |
| 41:14 43:23 | 28:4,11 | **B** | 14:7 43:21 | **change** 38:21 |
| 44:7,10,21 | **April** 6:14,19 | **B-A-T** 14:20 | **buffer** 21:18 | 44:14 |
| **add** 8:13 | **area** 38:13 | **bachelor's** 6:23 | **burglary** 36:22 | **changes** 46:16 |
| **additional** 33:12 | **arrangements** | 7:5 | | **characterize** |
| **admitted** 35:7 | 45:3 | **back** 8:21 21:22 | **C** | 13:22 14:5,9 |
| **advised** 11:21 | **article** 9:15 | 25:1 41:9 | **C** 47:2 | 14:12,22 15:3 |
| 12:3,6 25:22 | **ascribed** 28:18 | **barely** 37:2 | **calendar** 9:17 | 15:13 17:11 |
| **advising** 11:22 | **aside** 19:19 | **based** 18:9 19:3 | **call** 12:8,8 22:11 | 36:7 38:4 |
| **affiliated** 33:11 | **asked** 5:1 20:23 | 29:20 30:5,10 | 25:16 26:3,14 | **Chicago** 2:4,9 |
| **aforesaid** 46:12 | 24:8,15 28:13 | 41:11 | 27:18 29:6 | 47:17,21 |
| 46:15 | 32:14 | **basically** 11:10 | 33:7 40:5 | **chief** 6:9,10 |
| **agent** 7:22 | **asking** 19:19 | 40:2 | **called** 4:14 | 11:11 13:23 |
| **agree** 25:13 41:6 | **assigned** 6:2 | **Batis** 14:20,20 | 11:17 24:24 | 14:6,7 15:4,5 |
| **agreed** 47:12 | **assignment** 5:21 | 14:21,22,23 | 25:5 32:12 | 21:4,5,14,16 |
| **ahead** 4:10 10:3 | **assist** 36:3 38:16 | **BEAST** 31:8,10 | 33:3 | 21:18 22:1,2, |
| 24:21 | **associated** 38:23 | 31:16 | **calls** 11:19 16:11 | 22:10,24 23:13 |
| **air** 5:6 8:21 | **assumed** 26:7 | **beginning** 10:24 | **capacity** 10:17 | 23:13 24:2,24 |
| **allegations** 8:7 | **assumes** 30:6 | 11:4 22:4 | 30:12 31:6 | 25:5,17,19 |
| 22:19 | **assumption** | **behalf** 2:6,12,17 | **careful** 41:5 | 26:3,11,14,19 |
| | 26:10 | 16:14 44:3 | **Carlos** 6:12 13:9 | 27:2 29:7 32:8 |

**EXHIBIT H**

Cassandra Socha v. City of Joliet; et al.
Deposition of Lieutenant Jeremy Harrison - Taken 6/8/2021

Page 49

32:10,12,19,24
33:4,4,10
37:15,15 38:21
39:11,12,21,22
43:17,21
**chiefs** 21:17
**Chris** 36:18
**circle** 23:15
38:22 39:3,9
**circulated** 25:9
27:4
**circumstances**
27:24 28:6
**citizen** 41:17
**City** 1:6 2:12 4:3
16:14 44:4,23
45:3 46:6
**Civil** 1:13
**claims** 20:11
**Clark** 47:20
**client** 11:2
**close** 21:12
**closely** 38:23
**closer** 15:9
**closest** 13:17
**colleagues** 38:23
39:3
**come** 19:18
20:16,19,22
36:9
**coming** 23:3
**command** 11:18
17:20 18:1,10
19:4 21:14
22:16,18 38:21
39:10,13 40:15
**commander's**
20:22 22:14
24:10
**commanders**
40:13,16
**commanders'**
40:7
**commencement**

47:5
**comment** 35:6
**communicate**
26:10
**communicated**
42:21 43:3,8
43:12
**communication**
23:15
**communicatio...**
42:10
**complaint** 8:4
**complete** 46:14
**computer** 17:4,5
17:9 36:9 37:3
37:18 38:17
**computerized**
47:8
**concern** 27:2
**concerned** 15:23
**concerning** 47:6
**concerns** 25:7
27:12 28:11
**concluded** 45:6
**conduct** 16:9
29:8 34:5
42:10
**conference** 4:16
**connection**
33:18 43:5,8
**consider** 36:15
**consisting** 46:12
**constitutes** 47:9
**contents** 37:16
**conversation**
21:7,24 22:3,7
22:10 23:6,10
26:24 27:7,12
27:22 29:3
32:16 39:20
42:3
**conversations**
43:16
**convey** 42:13,17

**conveyed** 33:13
**conveying** 26:21
**cooperation** 4:4
**copy** 45:2,4
**corporation** 1:7
46:7
**correct** 26:14,19
26:20 29:10
30:4,9,14,19
30:22 31:6,7
31:16 32:20
35:1,2,23,24
37:24 46:14
**corrected** 13:11
**counsel** 42:8
44:23 47:14,15
**COUNTY** 47:2
**couple** 4:23 20:3
**course** 10:9 32:2
**COURT** 1:1
46:1
**Courts** 1:13
**crimes** 38:17
**criminal** 7:5
10:20 41:22
**Crowley** 10:14
10:20 12:20
13:7 35:12
41:22 42:15,23
43:5
**Crowley's** 42:12
**crummy** 25:11
**CSR** 47:20,23
**current** 5:21 7:7
13:15,23
**currently** 5:17
17:19
**cut** 23:11
**CV** 1:5 46:5

_____

**D**

**D** 3:1
**Darcy** 2:7 4:3
**data** 17:8 37:6

37:11,17
**date** 9:17,18
20:21 23:8
47:11
**dates** 9:14
**Dave** 15:14 19:9
36:22
**day** 7:8 23:5
27:17 28:3,7
28:13 38:9
41:24 46:20
**day's** 28:19
**Dearborn** 2:3
**decent** 17:18
**decided** 23:17
**Defendant** 2:12
2:17
**Defendants** 1:8
46:8
**department**
6:16,20 7:14
9:4 10:13 11:1
11:19 13:15
14:14 17:16
19:13 20:6,7
20:13 23:16
27:5,15 29:19
29:21 33:12
34:16 36:2
38:11,14 39:5
40:10,11 43:1
43:7,11
**department's**
16:23 33:17
**depicted** 34:5
35:7
**deposed** 20:4
**deposition** 1:11
4:5 8:2 9:3,12
9:14,19,21
10:11 44:12
46:11,15 47:8
47:10,12
**depositions** 1:14

10:5
**deputy** 6:9,10
11:11 13:23
14:6,7 15:5
21:16,17 23:13
25:17 37:15
38:21 43:17,20
**describe** 26:3
**described** 21:8
23:14 30:3
31:20 34:8,12
**describing** 29:8
34:8
**desktop** 37:18
**devices** 17:5,9
36:9
**dial-in** 8:17
**dick** 35:12
**different** 18:4
37:1,1
**direct** 17:13
**directly** 19:6
23:12 25:19
31:2,5 47:15
**discipline** 7:4
**discretion** 41:5
**discuss** 9:11,20
**discussed** 9:2,23
12:19,22 13:1
13:6 16:23
32:7 34:15
41:20 43:20
**discussion** 8:20
21:21
**disk** 37:8,13
**distinct** 6:6
**District** 1:1,1,13
11:15,16 46:1
46:1
**division** 1:2 6:6
46:2
**document** 23:1
33:7 40:4
**documented**

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT H**

Cassandra Socha v. City of Joliet; et al.
Deposition of Lieutenant Jeremy Harrison - Taken 6/8/2021

Page 50

23:21,22
documents 8:1
doing 11:21
  13:11 16:21
  22:20 40:3
  42:5
Dolgner 1:15
  47:3,20
dproctor@tre...
  2:10
drive 37:8,13
duly 4:14 47:5
duplicates 37:6
  37:11
duplication
  34:16
duty 5:21 36:7
  36:11

___ E ___

E 3:1
e-mail 2:5,10,11
  2:16 9:13,15
earlier 34:12
  37:22
earshot 27:21
east 2:8 11:13
EASTERN 1:2
  46:2
Ed 4:9
Edgar 21:16
education 6:22
Edward 1:7
  2:17 46:7
effect 32:22
  40:23 42:5
effort 26:16
either 34:2,5
  37:7,12 38:18
emergency
  25:21
employee 47:14
  47:14
engaged 34:5

equipment 17:4
  17:7
essentially 28:14
evaluations 18:7
event 12:18
events 29:3
  34:22
everybody 25:15
evidence 17:4
  22:8 29:19,22
  30:2,6,13,21
  31:12,14,15
  35:1 36:9 41:4
  41:17 43:17
exact 24:18
exactly 18:5
  24:6 25:16
  26:7
examination 3:4
  4:17 47:5
examined 4:15
examples 15:22
  16:5
Excuse 21:19
exercise 44:18
exhibits 3:6
expect 29:14,16
experience
  18:20 19:3
  29:20 36:1
experts 36:7,10
  36:11
explanation
  16:8
explicit 24:17,19
  25:8 35:16
expressed 27:2
  28:11
extent 42:12
extract 17:4
  36:8
extracted 17:9
  20:12 22:9
  27:4 30:14,21

34:4,17 35:4
  35:18 37:7,12
  37:17 41:3
  43:18

___ F ___

face 27:7,8
face-to-face
  27:12
fact 9:2 11:6
  19:11 41:2
facts 29:3 30:6
factually 16:3,6
fair 5:4,5
fall 6:8 7:16,17
  7:18,18
false 16:3
familiar 29:21
  36:3
familiarity
  30:10
fashion 45:1
father-in-law
  15:10,11
FBI 38:17
Federal 1:12
feel 40:13
fellow 9:4,23
  10:4,7 33:17
felt 22:17,18
  26:7
figured 22:23
file 26:18
filed 8:4
Fine 32:18
finished 12:8
first 4:14,23
  7:11,19 22:11
  23:13 28:1
five 23:7
flip-flopped
  7:16
follow 33:5
follow-up 32:23

followed 26:13
follows 4:16
force 36:6
foregoing 46:11
  47:7
form 38:19
formal 6:21
former 15:4
  37:15 38:1
found 20:3,24
  21:1
foundation
  16:15 30:6,16
  41:12
frame 7:8 10:14
  11:1,3,4,7
  38:10,12,18,20
friends 13:20,21
  15:11 39:2,4,7
friendship 13:18
  14:16
front 20:21
full 36:23

___ G ___

gain 16:22
gather 33:12
Gavin 12:23
  14:14
general 13:19
  20:16,19 28:22
  29:22 30:4,11
  31:13 33:17
  39:6
generally 10:12
  20:10
German 36:19
getting 23:24
  39:9
give 5:2,2
given 10:5 18:19
  46:11,15 47:9
giving 9:3,12
Glasgow 42:8

go 4:10 10:3
  17:15 20:24
  21:22 22:23
  24:2,11,20
  28:24
go-to 36:11
going 4:21 7:13
  10:3 13:4
  14:19 19:12
  20:4 23:1,19
  24:23 30:5
  33:6 40:4,6
  41:11 44:24
golf 14:17 15:1,6
good 4:2,6,7,19
  13:24 15:11
  41:18
gotten 14:24
  15:1 39:23
grabbed 12:10
granted 28:15
graphic 35:16
Gregory 21:17
Grizzle 1:7 2:18
  4:9 12:10,19
  14:10 17:1
  20:14 34:19
  35:5 41:21
  42:13 43:2,9
  43:14 46:7
guess 5:13,15
  16:21 39:9
guessing 21:11
guy 36:20
guys 5:5 36:13

___ H ___

half 6:5
Hall 2:2,2 4:19
hall@adamsle...
  2:5
hand 47:17
handful 36:13
handle 11:19

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT H**

Cassandra Socha v. City of Joliet; et al.
Deposition of Lieutenant Jeremy Harrison - Taken 6/8/2021

Page 51

36:21 42:8
**handling** 20:11
22:8 28:12
29:18 30:2
31:15 34:24
41:5,19
**hang** 14:17
17:17
**happen** 25:15
29:15 40:10
**happened** 22:15
22:24
**HARRISON**
1:12 3:3 4:13
46:18
**head** 16:7
**hear** 4:24 5:5
20:2 22:4
**heard** 5:3 16:2
20:5 35:5,10
35:13,15 37:5
37:10
**hearing** 5:8 8:17
12:5
**held** 7:7 42:18
**hereto** 47:15
**hereunto** 47:17
**Hess** 2:8 8:14,14
**hey** 24:10 25:20
33:6 40:1,3
42:5
**high** 18:12
**highest** 6:21
**hold** 18:10
**home** 20:24 23:1
24:11 25:21
28:24 40:5
**HOPPE** 2:13

**I**

**I-S** 14:20
**identify** 19:24
**identifying**
34:12

**III** 2:2
**Illinois** 1:1,17
2:4,9,15 46:1
47:1,4,17,21
**Illinois-Chicago**
7:1
**images** 20:12
21:3 25:8 27:3
28:12 34:3,9
34:13,17 35:4
35:6,8,17 41:3
**importance**
10:11
**importantly**
4:24
**improper** 30:11
30:20
**impropriety**
34:23,24 35:22
37:22
**inaccuracy**
44:16
**included** 32:23
**includes** 46:16
**including** 8:8
**inclusive** 46:13
**incorrect** 7:20
**indicated** 34:23
**indirectly** 47:15
**individual** 19:24
**information**
19:13 23:17
32:21 33:12
39:23
**inner** 38:22 39:3
39:9
**Inspector** 33:17
**instances** 44:12
44:15
**institution** 6:24
**interested** 47:15
**internal** 23:20
29:9,16 40:9
**interoffice** 33:7

33:9
**interruption**
10:1
**interviewed**
33:16,22
**introductions**
4:2
**investigated**
10:13 11:2
**investigation**
10:17,18 12:19
13:6 16:24
23:20 29:9,17
30:13 31:3
41:21 43:9,13
**investigations**
6:7,9,10 7:12
7:19,24 36:4
**involved** 10:16
10:19 30:12
31:2,5,5 35:23
40:11
**iPhone** 41:4
43:18
**irrespective**
38:20

**J**

**J** 2:8,14
**Jackson** 15:14
19:9
**Jackson's** 16:9
**JAMES** 2:8
**January** 6:18
**Jeff** 36:19
**JEREMY** 1:11
3:3 4:13 46:18
**jhess@tressle...**
2:11
**Jim** 8:14,19
**job** 18:16
**John** 1:7 36:19
46:7
**join** 8:12 16:13

41:13
**Joliet** 1:6 2:12
4:3 5:17 6:15
6:19 9:4 10:12
11:1 16:14
20:13 27:14
29:21 34:1,15
35:6,11 37:5
44:4 45:3 46:6
**Jr** 2:8
**June** 1:18
**justice** 7:5

**K**

**K** 47:2
**keep** 13:12
23:15
**kids** 15:1
**kind** 41:4
**knew** 23:18
**KNIGHT** 2:13
2:13
**know** 5:13,14
6:17 12:7,9
14:4,15,17
15:16,18 17:16
18:2 20:9
22:15,16,17,18
22:19,24 23:2
23:3,18,24
24:23 25:14,20
25:20 26:6
28:20 31:11
32:15 33:1,2
35:11 36:17,17
36:18,23 37:2
37:3 38:3 39:2
39:8 40:5,17
40:20,21 41:17
42:9 43:1,7,11
43:15 44:19
**knowledge**
34:22
**known** 29:22

36:6
**Krista** 1:15 4:10
21:20 31:9
41:8 44:24
47:3,20
**KURNIK** 2:13

**L**

**L** 2:7
**Labor** 7:8 38:9
**Lack** 30:15
**lacks** 16:14
**Lamken** 42:22
43:13
**latch** 19:14
**LAW** 2:2
**lawsuit** 8:5 10:8
19:15 20:11
23:21 29:9
**lawyers** 4:22
8:23
**lead** 29:8
**learn** 19:9
**learned** 22:8
**leave** 25:22
28:19
**led** 27:24 28:6
29:5
**left** 21:1
**legal** 26:17
**Let's** 21:22
**letter** 21:1,2
24:14,16 25:23
25:24 27:10
28:21 29:1
31:18 32:20
**letters** 31:19,23
32:2,5,7,11,15
**letting** 12:9 23:3
**level** 6:21 18:19
**License** 47:23
**lie** 16:4
**lies** 15:21
**lieutenant** 1:11

**EXHIBIT H**

Cassandra Socha v. City of Joliet; et al.
Deposition of Lieutenant Jeremy Harrison - Taken 6/8/2021

Page 52

3:3 4:13 5:20
5:22,24 6:4
7:15 11:9,9,13
11:14,23 12:1
13:2,10 15:8
21:15 36:18
39:17,18 43:24
44:10
**lieutenants**
11:11 13:7
**Likewise** 15:6
**limited** 23:16
**listen** 40:1,3
42:5
**little** 8:16 14:15
15:9
**LLC** 2:2
**LLP** 2:7
**loaded** 37:18
**local** 8:9
**log** 22:14 37:2
40:7,8,15
**long** 5:24 6:2
18:1
**longer** 14:14
**looked** 21:2
24:17
**lying** 16:6,9

**M**
**mailbox** 21:1
24:16 25:23,24
28:22 31:19
32:22 33:8
**maintained**
31:14
**making** 40:1,3
**management**
29:23
**marked** 3:6
**matkus@khk...**
2:16
**Matlock** 6:12
13:2,8,9 14:6

43:17
**matter** 33:18
43:5
**matters** 47:6
**McKinney**
17:12 36:20
**mean** 11:24
19:17 21:11
31:4 33:11
39:2,6
**means** 31:15
**meeting** 24:7
**memo** 22:1,10
23:8 26:13,21
26:23 27:1
29:6 32:24
33:1,4,9
**memorandum**
33:8
**mention** 9:16
**mentorship**
13:18
**messed** 9:17
**Michael** 2:14
4:8
**middle** 12:7
**Mike** 14:21 44:7
**mill** 34:7,11
**minor** 7:6
**minutes** 23:7
**mobile** 5:7
**months** 20:3
**morning** 4:2,6,7
4:19,22 28:6
44:1
**motivation** 16:9
**motives** 16:12
**mouth** 23:4
**moved** 17:22
**municipal** 1:6
46:6
**muted** 44:7

**N**

**N** 3:1
**name** 4:2,7,19
**named** 33:18
38:2 42:22
43:13
**narcotics** 5:22
6:3 7:22 17:13
17:23 36:21
39:19
**narrowly** 23:15
**nature** 22:16
25:9 26:4
35:16
**necessarily**
28:23 39:1
**need** 24:10
25:20 38:7
40:24 44:22
**needed** 20:24
23:21 38:7
40:14
**never** 5:15 9:1
13:9 35:14,19
42:21
**Nicholas** 10:13
**Nick** 42:11
**night** 12:9
**nights** 21:15
**normal** 26:8
41:17
**North** 2:3,14
47:20
**NORTHERN**
1:1 46:1
**Notary** 46:22
**note** 44:12,15
**notification** 40:2
40:4
**nude** 34:5
**number** 8:16

**O**
**O** 47:2,2
**oath** 46:14

**object** 30:5
41:11
**objection** 16:11
16:13 30:15,23
41:13
**observe** 8:15
**obviously** 25:3
39:11
**occasion** 18:24
**occur** 29:17
44:22
**occurred** 15:23
21:9
**Off-the-record**
8:20 21:21
**Offhand** 9:10
**office** 5:7 7:9,17
7:22 13:7
20:23 24:10
25:22 36:21
39:18
**officer** 5:17 6:13
6:18,19 8:5
10:13,20 11:2
12:20 15:10,14
16:17,24 17:12
17:19 18:7,11
18:13 19:4
22:2 32:2 34:1
34:8,12,13,16
35:6,11 37:5
37:11 38:1
39:19 40:10
41:21,22
**officers** 9:4,24
10:5,8 13:16
13:16 30:11,21
33:21 35:22
36:2,6 37:10
**OFFICES** 2:2
**official** 10:17
30:12 31:6
**officious** 18:16
**Oh** 13:13 14:21

15:18 18:12
23:7 27:9
**okay** 4:10 5:5,15
5:7 13:11,15
16:20 24:12
33:3 44:21
**older** 14:24
**once** 7:15 15:2,6
**ones** 31:2 36:16
36:19
**operations** 7:18
11:11
**opinion** 18:10
18:12,21,23
**opinions** 42:14
42:17
**opposed** 23:13
**order** 8:1 29:22
30:4,11 31:13
44:24
**ordered** 44:12
**original** 36:19
**outcome** 42:14
42:18 47:16
**outing** 14:18
**overheard** 19:20
34:7,11

**P**
**PAGE** 3:2
**pages** 46:12
**paper** 26:17
**paraphrased** 8:8
**part** 35:22
**particular** 13:16
42:2
**particularly**
41:5,18
**parties** 47:15
**Patch** 9:16,18
**patrol** 7:9,16
21:16 23:14
**people** 13:20
21:2 22:15,19

**EXHIBIT H**

Cassandra Socha v. City of Joliet; et al.
Deposition of Lieutenant Jeremy Harrison - Taken 6/8/2021

Page 53

23:16 24:3,3
24:16 25:24
36:12,15 39:2
39:7,8
**perceive** 44:16
**percent** 26:6
**performance**
18:6
**person** 19:18
24:1
**personal** 14:2
16:21 42:14
**personally** 10:16
10:19 13:17
**pertaining** 1:14
**Phil** 38:3
**phone** 2:4,10,16
8:16,18 11:22
12:10,13,15
13:5 20:13,14
21:3 22:9,11
24:19,20 25:16
26:1,2,14 27:4
28:13 30:3,14
30:22 33:7
34:4,18 35:4
35:18 37:7,12
37:17 40:5
41:16 42:1,6
**photo** 27:3
28:12
**photographic**
20:12 25:8
34:3 35:4 41:2
**phrase** 35:11
38:22
**physically** 12:15
**picture** 26:8
**pictures** 24:17
24:17,19 26:1
26:4 41:17
**place** 27:7,14
46:12
**placed** 31:19

**plaintiff** 1:4 2:6
4:20 46:4
**please** 22:5
31:24 41:9
44:20
**plural** 32:16
**point** 38:15,16
39:16,17
**police** 5:17 6:13
6:15,18,19 9:4
10:13 11:18
15:10 18:11,13
19:4 20:6,7,13
21:4 27:14
29:19,21 33:17
34:16 37:18
38:11
**porn** 35:12
**position** 7:7
39:19
**potential** 23:20
34:24
**potentially** 24:4
**Powers** 9:7,11
9:20
**predicate** 28:1
**prefer** 44:18
**prepare** 8:2
**present** 2:19
12:15 27:20
**press** 8:9,11
**presume** 5:3
**pretty** 29:13
**previous** 47:5
**printed** 45:4
**Prior** 12:18 13:5
**probably** 12:9
17:14 20:9
21:12 23:7,20
25:2 36:13
**problem** 13:13
**Procedure** 1:13
**proceedings**
45:6 47:9

**Proctor** 2:7 4:1
4:3 16:13 30:5
30:15,23 41:11
44:3 45:2
**profession** 26:17
**Professional**
1:16
**programs** 37:1
**promotion** 19:1
19:5
**proper** 29:18
**property** 29:23
**prosecuted**
42:22
**prosecutor** 42:7
42:22 43:4,12
**provides** 31:14
**psychology** 7:6
**Public** 46:22
**publicly** 14:17
**pull** 19:19
**pursuant** 1:12
**put** 25:23,24
31:12 40:6,12
40:14

———
**Q**
**question** 5:1,3
25:11 28:1
32:13
**questions** 4:21
43:23 44:3,8
44:14

———
**R**
**R** 1:15 47:3,20
**rank** 5:19 13:16
13:20,21 14:19
**rare** 14:16
**rate** 41:4
**ratings** 18:7
**reach** 19:16
**reached** 33:10
**read** 8:7,10,19

41:8,10 46:10
**reading** 47:12
**really** 10:10
13:20 14:4
17:17 38:7
39:24 42:12
**reason** 23:12,14
28:18 37:21
**recall** 7:23 9:10
9:22 12:3,6
18:5,8 19:2
21:24 22:6
24:14 26:11,12
26:21 27:23
28:5,10,17
38:12,18 40:24
**received** 6:23
9:13 19:13
24:13,15 28:24
32:19,21 34:22
36:16 37:6
**recognition** 19:1
**recollection** 23:9
24:6 42:2
**recommend**
19:1,5
**record** 21:20,22
26:18 41:10
44:17 47:9
**reduced** 47:8
**reference** 35:3
**referred** 31:13
**refresh** 23:9
**regarding** 42:18
**Regis** 33:18,22
33:23
**Registered** 1:15
**regular** 7:21
**Reid** 15:8
**relate** 20:11
**relating** 29:22
**relationship**
13:23 14:1,2,6
14:8,10,13,23

15:4,14,17
17:12,18 19:7
38:5,6
**relative** 47:14
47:14
**reliable** 18:22
**relied** 36:1
**relieved** 28:13
**remember** 5:14
5:15 19:17
20:8
**reminded** 9:18
**repeat** 12:4 13:3
22:5 25:10
31:24 41:7
43:10
**repeated** 8:8
**replicas** 37:6,11
**replication**
34:17
**report** 26:22
27:1 29:5
33:13
**reported** 25:6,7
25:18 26:19
27:11 34:6,10
34:14,20,21
35:9,19 37:9
37:14,20 39:20
47:8
**Reporter** 1:16
1:17 8:12 47:3
**reporting** 32:19
**reports** 29:2
**represent** 4:3,20
**represents** 4:9
**request** 28:15
**requesting**
28:19
**reserved** 44:21
**respect** 17:8
**retired** 15:10
**review** 44:11,19
**reviewed** 8:1,4

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT H**

Cassandra Socha v. City of Joliet; et al.
Deposition of Lieutenant Jeremy Harrison - Taken 6/8/2021

**right** 9:2 11:5 12:12 27:18 28:10,17 31:17 32:18 44:10,16 44:18
**river** 2:14 11:14
**Road** 2:8,14
**Robert** 11:10
**Roechner** 15:5 37:16 38:21
**role** 38:10 41:21 42:18
**roll** 11:19 12:8,8 27:18
**room** 24:9
**root** 28:22
**Rosemont** 2:15
**roster** 13:12
**roughly** 6:4 38:14
**RPR** 47:20
**rules** 1:12 44:11
**rumor** 19:12,16 34:7,11

**S**

**saying** 24:5,16 26:9 28:23 32:15 39:6
**search** 11:21 12:10 26:2 41:24 42:5,10
**see** 24:4 26:8,23 40:16,17
**seen** 24:1,4 31:18,22 32:1 33:1
**sees** 40:15
**seized** 12:13,16 20:14 34:18 35:5
**seizure** 13:5
**send** 29:6 40:15
**sending** 33:9

40:5
**senior** 23:16
**sent** 22:10 23:1 25:21 33:3 38:16
**separate** 6:6
**sergeant** 7:22 9:8 12:10,19 12:23 14:10,13 17:1,14 20:14 34:18 39:16 41:20
**seriously** 18:17
**sessions** 33:23
**set** 47:17
**seven** 12:9
**sexual** 34:5
**sheet** 40:12,14
**shift** 11:9,12 18:4,4,5 22:16 40:8,13
**shocking** 25:14
**Shorthand** 1:16 47:3
**Show** 44:21
**side** 11:13 24:9
**signature** 44:21
**signing** 47:12
**similar** 26:24 27:6 40:23
**Similarly** 30:20
**sir** 4:7,19 5:18 10:21 12:2,14 12:21 16:19 17:6,24 21:6 23:11 27:16 28:8 29:4,11 31:3,21 37:14 44:4
**six** 6:1 12:9
**skillful** 18:19
**Socha** 1:3 2:20 4:20 8:5 11:2 16:24 18:7

20:18 21:8 22:2,3,7 23:6 23:10 24:7 25:6,7,17,21 27:2,8,11 28:10,18 30:1 30:13 32:2,10 32:12 33:13,18 35:17 39:21,23 41:3 43:9,13 46:3
**Socha's** 13:5 17:19 19:3 20:10 26:22 31:19 32:19 34:4,18 35:4 37:7,12,17 41:21 42:18 43:18
**social** 14:2
**somebody** 8:13 22:20,21 36:11
**sorry** 6:1 12:2 16:18 22:4 23:11
**sound** 21:10
**sounds** 11:5 21:11 31:10,17
**speak** 20:23
**special** 42:7
**specific** 13:21 19:18
**specifically** 19:17 24:2 25:7 27:3 35:10
**specified** 47:11
**speculate** 16:12
**spelled** 31:9
**split** 11:20
**spoke** 24:24 32:12
**spoken** 8:23 10:4,7 34:1

**spread** 22:22
**SS** 47:1
**staff** 22:17,18 40:15
**stand** 13:11
**stands** 31:11
**star** 35:13
**start** 6:15
**starts** 15:21
**State** 1:17 47:1,3
**stated** 47:13
**States** 1:1,13 46:1
**station** 5:6 19:21 37:19
**stations** 11:20
**stenographica...** 47:8
**stint** 7:11,21
**stop** 17:22
**straight** 22:23 23:4
**Street** 2:3 47:20
**strike** 27:24
**strong** 29:13
**subject** 22:1
**subscribe** 46:13
**SUBSCRIBED** 46:19
**sucks** 35:12
**suggest** 35:21
**suggested** 37:22
**Suite** 2:3,9,15 47:21
**supervisor** 17:13
**sure** 4:24 8:10 9:5,7 10:9 15:24 18:3 22:6 25:11,19 26:6 27:6 38:15 41:8
**switched** 7:14
**sworn** 4:11,15

46:19 47:6
**system** 31:10,16
**Szymanski** 36:22

**T**

**tactical** 5:23 39:16
**take** 18:16 27:7 27:14 45:2,5
**taken** 1:12,14 8:16 47:10
**talk** 19:15 24:8 39:8
**talked** 33:21 37:21
**talking** 20:9 27:9
**technically** 38:19
**tell** 5:13,15 16:1 24:13,23 25:3 25:5,6,16 32:10,18 33:4 37:16 39:22 40:22 44:17
**telling** 25:2,3
**terms** 35:16
**testified** 4:15
**testify** 47:6
**testimony** 47:9
**Thank** 4:4 44:2 44:4,6,9
**Thanks** 43:24 44:8
**thing** 5:12 13:14 14:11,24 31:5
**things** 4:23 12:22 13:1 15:12 30:2 40:9
**think** 8:17 16:7 24:1,14 31:4 32:13 36:23

**EXHIBIT H**

Cassandra Socha v. City of Joliet; et al.
Deposition of Lieutenant Jeremy Harrison - Taken 6/8/2021

Page 55

39:24 41:16
**thought** 27:9
  32:16
**throw** 33:8
**thumb** 37:8,12
**tighter** 17:14
**Tim** 9:7
**time** 7:8,20 8:24
  10:9,14 11:1,3
  11:4,7 18:9
  21:4,13 27:17
  27:18 38:9,12
  38:14,18,20
  39:11 43:24,24
  44:4 46:12
  47:11
**today** 9:3 44:5
**today's** 4:5 8:2
**told** 21:7 22:2,7
  22:21 23:22
  25:17 29:7
  30:1 31:22
  32:1,4,11 34:2
  39:24 40:2
**top** 16:7
**town** 11:13
**tracked** 31:15
**trained** 17:3,7
  36:2
**training** 29:20
  36:16,23
**transcript** 44:11
  44:15 46:11,15
  47:8,12
**transcription**
  44:13
**transferred**
  38:13
**Tressler** 2:7
  8:14
**trial** 10:20,22
  12:20 13:6
  41:22 42:12,15
  42:19

**trouble** 5:8 8:17
  12:4 15:21
**true** 28:15 29:8
  29:19 30:1,9
  46:14 47:9
**trust** 22:20
**trustworthy**
  18:14
**truth** 23:23
  29:14 40:20
  47:6
**try** 10:3
**trying** 19:14
**Ts** 14:20
**Tuesday** 1:17
**turn** 5:10
**twice** 15:7
**two** 14:20 18:3
**type** 36:10
**typed** 33:2

**U**

**ultimate** 25:4
**umbrella** 6:8
  7:17
**understand** 4:24
  38:10 39:4
**understood** 5:4
  26:4
**unit** 5:7,23 9:8
  17:15 38:17
**United** 1:1,13
  46:1
**units** 17:16
**University** 7:1
**upset** 24:13
  28:20
**use** 17:3 36:8
  38:22
**usual** 45:1
**usually** 14:17
**utter** 35:11

**V**

**verbatim** 42:4
**video** 4:15 16:3
  20:12 25:8
  27:3 28:12
  35:3 41:3
**videoconference**
  1:15 2:1 47:7
**videographic**
  34:3
**videos** 19:10
  21:3 24:19
  26:1,5
**view** 30:21 36:8
**viewed** 19:10,11
  24:17 25:9
  26:1,8 34:2,9
  34:13 35:8
**viewing** 17:8
**violation** 30:4
**virtue** 13:18
**visibly** 24:13
**voice** 10:1 19:23
**vs-** 1:5 46:5

**W**

**waive** 44:16,18
**want** 13:13
  15:17 23:2,23
  23:24 24:22
  28:24 39:7
  40:18,20
**wanted** 23:15,21
  42:9
**warrant** 11:21
  12:11 26:2
  41:24 42:6,10
**wasn't** 26:8
  28:23
**watch** 20:22
  22:14 24:9
  40:6,12,16
**way** 7:13 13:18
  23:3 38:18
**we'll** 5:3

**we've** 14:24
  37:21
**weeks** 45:5
**went** 6:20 23:12
  24:9
**west** 11:14,15
**WHEREOF**
  47:17
**withdraw** 25:12
**witness** 3:2 4:6
  4:11,14 31:1
  42:11 44:2,6,9
  44:19 45:4
  47:5,5,12,17
**witnessed** 16:3
**woman** 42:22
**word** 24:18
**words** 26:11
  40:23
**work** 14:4,8
**worked** 11:12
  11:20 18:9
  19:6
**working** 13:24
  17:18 19:7
  38:6
**wouldn't** 10:10
  22:21 29:18
  40:12,24
**wrong** 13:14
  24:12,15
**wrote** 26:13

**X**

**X** 3:1

**Y**

**Yeah** 19:6 23:18
  25:14 31:11
  32:13 36:13
**year** 6:4 7:2 15:2
  15:7
**years** 6:1 18:3
**younger** 14:3

**Z**

**0**

**05681** 1:5 46:5
**084-002878**
  47:23

**1**

**1** 38:9 46:12
**1-20** 1:7 46:7
**10:39** 45:7
**100** 26:6
**12** 6:14,19
**12-hour** 11:12
**16-1** 29:22
**161** 47:20
**18** 1:5 46:5
**1998** 7:3
**1999** 6:14

**2**

**2017** 10:14
**2018** 7:8 11:1,4
  21:9 38:9
**2021** 1:18 46:20
**2350** 2:3
**250** 2:9
**2nd** 21:9

**3**

**3050** 47:21
**312.361.8851**
  47:22
**312.445.4900**
  2:4
**33** 2:3

**4**

**4** 3:4
**47** 46:13

**5**

**550** 2:8
**5600** 2:14

EXHIBIT H

Cassandra Socha v. City of Joliet; et al.
Deposition of Lieutenant Jeremy Harrison - Taken 6/8/2021

Page 56

| **6** | | | | |
|---|---|---|---|---|
| **600** 2:15 | | | | |
| **60018-5114** 2:15 | | | | |
| **60440** 2:9 | | | | |
| **60601** 47:21 | | | | |
| **60602** 2:4 | | | | |
| **630.759.0800** 2:10 | | | | |
| **7** | | | | |
| **8** | | | | |
| **8** 1:18 | | | | |
| **847.261.0700** 2:16 | | | | |
| **9** | | | | |
| **9:30** 1:18 | | | | |
| **99** 6:18,19 | | | | |

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT H**