



Transcript of the Deposition of
# Officer Mike Devito

**Case:** Cassandra Socha v. City of Joliet; et al.
**Taken On:** June 3, 2021

Royal Reporting Services, Inc.
Phone:312.361.8851
Email:info@royalreportingservices.com
Website: www.royalreportingservices.com

EXHIBIT J

Cassandra Socha v. City of Joliet; et al.
Deposition of Officer Mike Devito - Taken 6/3/2021

Page 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CASSANDRA SOCHA,                    )
                                    )
                Plaintiff,          )
                                    )
        vs.                         )  No. 18 CV 05681
                                    )
CITY OF JOLIET, a municipal         )
corporation; EDWARD GRIZZLE;        )
JOHN DOES 1-20,                     )
                                    )
                Defendants.         )


        The subpoenaed deposition of OFFICER MIKE

DEVITO, taken via videoconference, called by the

Defendants for examination, pursuant to notice and

pursuant to the Federal Rules of Civil Procedure for the

United States District Courts pertaining to the taking of

depositions, taken before Tina M. Hickey, Certified

Shorthand Reporter, on June 3rd, 2021, at 9:30 a.m.

**EXHIBIT J**

Cassandra Socha v. City of Joliet; et al.
Deposition of Officer Mike Devito - Taken 6/3/2021

Page 2

```
 1   APPEARANCES (via videoconference):

 2       LAW OFFICES OF HALL ADAMS, LLC
         MR. HALL ADAMS, III
 3       33 North Dearborn Street
         Suite 2350
 4       Chicago, Illinois 60602
         Phone:  312.445.4900
 5       E-mail: hall@adamslegal.net

 6           On behalf of the Plaintiff;

 7       TRESSLER LLP
         MS. DARCY L. PROCTOR
 8       MR. JAMES J. HESS, Jr.
         550 East Boughton Road
 9       Suite 250
         Bolingbrook, Illinois 60440
10       Phone:  630.759.0800
         E-mail: dproctor@tresslerllp.com
11               jhess@tresslerllp.com

12           On behalf of Defendant City of Joliet;

13       KNIGHT HOPPE KURNIK & KNIGHT, LTD.
         MR. MATTHEW S. CLARK
14       5600 North River Road
         Suite 600
15       Chicago, Illinois 60018
         Phone:  847.261.0700
16       E-mail: mclark@khkklaw.com

17           On behalf of Defendant Edward Grizzle.

18   ALSO PRESENT:  Cassandra Socha

19                     *   *   *   *   *

20

21

22

23

24
```

**EXHIBIT J**

Cassandra Socha v. City of Joliet; et al.
Deposition of Officer Mike Devito - Taken 6/3/2021

Page 3

1                          I   N   D   E   X

2   WITNESS                                                PAGE

3   OFFICER MIKE DEVITO

4        Examination by Mr. Adams..................... 4

5        Examination by Ms. Proctor.................. 33

6        Examination by Mr. Clark.................... 48

7        Further Examination by Ms. Proctor........... 67

8        Further Examination by Mr. Adams............. 68

9

10                       E   X   H   I   B   I   T   S

11                      (NO EXHIBITS MARKED.)

12

13

14

15

16

17

18

19

20

21

22

23

24

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT J**

Cassandra Socha v. City of Joliet; et al.
Deposition of Officer Mike Devito - Taken 6/3/2021

Page 4

1     (Witness sworn.)
2     MS. PROCTOR:  Good morning, Mr. DeVito.  My name is
3  Attorney Darcy Proctor, and I am attending today's
4  deposition on behalf of the City of Joliet.  Thank you
5  for coming.
6     THE WITNESS:  Thank you.
7     MR. CLARK:  Good morning.  My name is Matthew Clark.
8  I'm representing Ed Grizzle in this matter.
9     THE WITNESS:  Nice to meet you.
10    MR. CLARK:  Nice to meet you as well.
11 WHEREUPON:
12         OFFICER MIKE DEVITO,
13 called as a witness herein, having been first duly sworn,
14 was examined and testified via videoconference as
15 follows:
16         EXAMINATION
17 BY MR. ADAMS:
18    Q.    Officer DeVito, my name is Hall Adams.  I
19 represent Cassandra Socha.  Before we start, I'm going to
20 give you a few basic ground rules so that it will make
21 the deposition go more smoothly.  Have you ever done this
22 before?
23    A.    I have not.
24    Q.    It's important that you make sure that you

Page 5

1  hear and understand every question completely before you
2  attempt to answer a question.  If you need to have
3  questions repeated read back, rephrased, or explained,
4  say so, and we'll accommodate you as many times as you
5  ask.  If you give an answer to a question, we will all
6  assume that you heard and understood the question.  Is
7  that fair?
8     A.    Yes.
9     Q.    Never guess.  If you don't know something, say
10 you don't know.  If you can't remember something, say you
11 can't remember, but never guess.  Okay?
12    A.    Yes.
13    Q.    Have you reviewed any documents in preparation
14 for your deposition today?
15    A.    I have not.
16    Q.    Have you spoken with anyone regarding your
17 deposition today?
18    A.    Yes.  I don't remember the name.  I believe it
19 was a law firm representing the City.
20    Q.    Was the subject of that conversation related
21 to anything other than the scheduling of the deposition?
22    A.    It was not.
23    Q.    Okay.  You and I spoke once by telephone
24 briefly, I want to say, a few weeks, a month or so ago.

Page 6

1  Do you recall that?
2     A.    Yes, I do.
3     Q.    And in that conversation, you indicated that
4  you would be more comfortable addressing topics
5  associated with Socha's case if we first caused you to be
6  served with a subpoena to give a deposition, which is
7  what we are doing here today.  Correct?
8     A.    Yes.
9     Q.    You are currently a Joliet police officer?
10    A.    I am.
11    Q.    What is your rank?
12    A.    Patrol officer.
13    Q.    What is your duty assignment at the current
14 time?
15    A.    I work in the traffic unit.
16    Q.    Would you give us a quick recap of your
17 training and experience as a police officer including
18 your time with the Joliet Police Department.
19    A.    Yes.  I have 27 years on the Joliet Police
20 Department.  I went to the Illinois State Police Academy.
21 And I have received extensive hours of training
22 throughout that 27-year career.
23    Q.    In which different divisions of the Joliet
24 Police Department have you worked?

Page 7

1     A.    I have worked in patrol; I have worked in the
2  neighborhood policing unit, and I have also worked in the
3  traffic unit which I am currently in.
4     Q.    What is the union to which Joliet police
5  officers are members?
6     A.    It is the Fraternal Order of Police.
7     Q.    Do you currently hold any positions with the
8  Fraternal Order of Police?
9     A.    I do.  I'm the union president.
10    Q.    How long have you been the union president?
11    A.    16 years.
12    Q.    In a very general sense, would you explain
13 what the duties of the union president are?
14    A.    I handle all the day-to-day operations of the
15 union.  I handle grievances.  I handle discipline.  I'm
16 the lead in all contract negotiations and any of the
17 grievance and discipline process.
18    Q.    In the course of your service as a police
19 officer on the Joliet force, have you been personally
20 involved in any official capacity in investigating
21 Officer Nicholas Crowley?
22    A.    No.
23    Q.    Have you been personally involved in any
24 official capacity in investigating my client, Officer

4  (Pages 4 to 7)

**EXHIBIT J**

Cassandra Socha v. City of Joliet; et al.
Deposition of Officer Mike Devito - Taken 6/3/2021

Page 8

1  Cassandra Socha?
2      A.  No.
3      Q.  I want to direct your attention to the
4  summertime of 2018.  Okay?
5      A.  Okay.
6      Q.  And we'll zero in on specific dates.  We'll
7  get as close as you we can shortly, but I just want now
8  to work with the summer of 2018.
9          Do you recall, during that time frame, being
10  approached by some other Joliet Police Department
11  officers or employees who expressed to you concerns about
12  the way evidence that was obtained from Socha's iPhone
13  was being handled by her fellow officers?
14      A.  Yes.  A lot of the information that I had been
15  hearing throughout the department were basic rumors, but
16  I was approached by -- I can think of one off the top of
17  my head, maybe more, but I'm not a hundred percent sure.
18      Q.  Who is the one that you can remember off the
19  top of your head?
20      A.  It would -- at the time -- well, it still is,
21  Detective Dave Jackson.
22      Q.  Do you recall when Detective Jackson first
23  approached you with information, concerns about the way
24  evidence that was obtained from Socha's phone was being

Page 9

1  handled?
2      A.  I do not recall.
3      Q.  Do you recall the month in the summer of 2018
4  that that occurred?
5      A.  I don't remember.
6      Q.  Do you recall whether that was a face-to-face
7  communication or an over-the-telephone communication?
8      A.  I believe -- I don't remember.
9      Q.  Was there one or more than one communication
10  from Detective Jackson to you regarding the topic of the
11  handling of evidence obtained from Socha's phone?
12      A.  Yes.
13      Q.  That was an either/or question.  Was there
14  more than one?
15      A.  I'm sorry.  Yes.  There was more than one
16  conversation.
17      Q.  How many times did you and Detective Jackson
18  discuss that?
19      A.  I would say -- I can't recall specific, but
20  numerous.
21      Q.  All during that same summer of 2018 time
22  frame?
23      A.  Yes, along with other officers.  I just can't
24  recall specific names.  But there were for people coming

Page 10

1  to me as the rumors began to spread.
2      Q.  The occasions when Jackson came to you, what
3  specifically do you recall Jackson telling you at the
4  time he was concerned about them?
5      A.  I believe the conversations were in line with
6  a lot of the rumors that were running through the
7  department.
8      Q.  All right.  So what I want to try to do,
9  Officer DeVito, is call for general rumors, whatever
10  specific information was communicated to you by
11  particular people to the extent that you're able to do
12  that.
13      A.  I understand.  Detective Jackson approached me
14  in regards to what he believed to be the mishandling and
15  the improper dissemination of videos and -- I believe
16  just videos of Cassandra's cell phone.
17      Q.  And by that you mean video images that had
18  been extracted from her cell phone?
19      A.  Correct, during the process of a search
20  warrant.
21      Q.  Okay.  Do you recall any of the specific
22  concerns that Jackson raised with you about that, about
23  the videos depicted, about how they were being
24  mishandled, about who was mishandling them, any of those

Page 11

1  particulars?
2      A.  Nothing in regards to specific images from the
3  phone other than that they were of a sexual nature.  He
4  did not state any specific footage, but he did speak of
5  the improper storage of this evidence along with
6  potentially members viewing it that should not have had
7  access to it.
8      Q.  Did he identify for you any of those other
9  officers who viewed the video who should not have?
10      A.  The only people that I believe -- He did state
11  to me that there was a piece of evidence that was stored
12  in -- at the time, Deputy Chief Al Roechner's office,
13  which he believed to be the improper storage of this, and
14  also that at the time, Lieutenant Reid, who was in charge
15  of internal affairs, also received a copy of this
16  footage.
17      Q.  Did Detective Brown tell you --
18      A.  Sorry.  It's Detective Jackson.
19      Q.  I'm sorry.  Detective Jackson.  Did
20  Detective Jackson tell you how he understood Roechner had
21  gotten ahold of the video?
22      A.  Nothing specific.  And I assumed that it was
23  based on the rumors that I was hearing through multiple
24  parties.  But he never gave me any specific information

5 (Pages 8 to 11)

**EXHIBIT J**

Cassandra Socha v. City of Joliet; et al.
Deposition of Officer Mike Devito - Taken 6/3/2021

Page 12

1  on how he knew that to have happened.
2      Q.  Did Detective Jackson tell you how he
3  understood Lieutenant Reid had gotten his hands on the
4  videos from Socha's phone?
5      A.  He did not.
6      MR. CLARK:  Can I just object to form?
7      Hall, have we clarified which videos we're
8  talking about or just videos in general?
9      MR. ADAMS:  Well, I think the witness has described
10  videos of a sexual nature that were extracted from
11  Socha's phone.
12      MR. CLARK:  Okay.  I missed that.  Sorry.
13  BY MR. ADAMS:
14      Q.  Did Jackson tell you whether he himself had
15  viewed the videos?
16      A.  He was very adamant in stating that he had
17  never seen them.
18      Q.  Did Jackson tell you who, if anyone, that he
19  was aware of had actually viewed the videos?
20      A.  Other than those two names that I gave you, I
21  can't specifically recall the names of other members, but
22  he did mention other members, other -- I'm sorry -- other
23  officers.
24      Q.  Did Jackson share with you any information he

Page 13

1  had about conversations that other officers had had
2  regarding those videos?
3      A.  He did not.
4      Q.  Within what time span did Jackson raise these
5  concerns that you described was -- you said numerous
6  conversations?  Was that over the course of a whole
7  summer of 2018, over the course of a single week?  Over
8  what period of time?
9      A.  It started in the summer of '18 and has
10  continued on up until recently in regards to what he felt
11  was misconduct.
12      Q.  Okay.  Did he specify further in more recent
13  conversations of what he characterizes your
14  characterization just now as misconduct?
15      A.  That's what he expressed to me, that he
16  believed that there was misconduct by the previous
17  administration.
18      Q.  And by that, you took him to mean the Roechner
19  administration?
20      A.  Correct.
21      Q.  Did you make any written record -- notes,
22  memoranda, some sort of record to any file -- any written
23  record, whatsoever, of these conversations that you had
24  with Jackson?

Page 14

1      A.  I did not.
2      Q.  Did you report Jackson's report of these
3  concerns to anyone?
4      A.  I did not.
5      Q.  At some point during the summer of 2018, did
6  you communicate to Officer Socha that you had been
7  approached by an anonymous source with information about
8  the way the images extracted from her phone were being
9  handled?
10      A.  I did.
11      Q.  Do you recall when you did that?
12      A.  You know, I don't recall the date.
13      Q.  Do you recall how you did that?  Did you reach
14  out to her by telephone or in person?
15      A.  No.  I'm not a hundred percent sure on how I
16  made contact with her, but I did make contact with her to
17  meet with me.
18      Q.  Before I get to that meeting, I want to go
19  back to Jackson for a moment.  The first time that
20  Jackson raised his concerns about the handling of the
21  evidence that was extracted from Socha's phone with you,
22  did he explicitly request anonymity?
23      A.  No.
24      Q.  Did you maintain his communication -- or his

Page 15

1  role as the source of the information he communicated
2  anonymous because that's your practice as the union
3  president, to maintain those types of communications in
4  confidence?
5      A.  Had he come to me as an involved member, then
6  definitely, that -- I would have not made any statements.
7  He came to me trying to expose what he felt was
8  misconduct, and I don't believe that he came to me as
9  much as a member of my union as someone who he felt could
10  intervene and help with this problem.
11      Q.  Was there ever a subsequent occasion where
12  Jackson asked you to maintain his anonymity as the source
13  of this information to you?
14      A.  No.
15      Q.  Well, okay.  Let's go forward then.
16      Where did you meet with Socha?
17      A.  In our FOP office, which is 30 North Bluff
18  Street, Joliet.
19      Q.  Who was present in the room when you met?
20      A.  I believe we were -- there might have been
21  people in the building, but I believe I met privately
22  with her in my office.
23      Q.  Was there an Officer Banas, B-A-N-A-S, first
24  name, Tom, present?

6  (Pages 12 to 15)

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT J**

Cassandra Socha v. City of Joliet; et al.
Deposition of Officer Mike Devito - Taken 6/3/2021

Page 16

1    A.   Yes, he was.  I forgot.
2    Q.   What is Banas's role in the union?  Why was he
3  there in your office?
4    A.   At the time of this meeting, he was the
5  treasurer of the FOP labor council.
6    Q.   And did he just happen to be there when Socha
7  came in, or did you have him come in to participate in
8  some capacity?
9    A.   No.  I recall now.  I did have him present
10  with me because of the conversation that I was going to
11  have with Officer Socha about the sexual nature of the
12  phone, so I wanted someone in the room with me.
13    Q.   How long did that meeting with Socha last?
14    A.   I don't recall.
15    Q.   Did you make any type of written record of
16  that meeting whatsoever, whether it's a memo, a letter,
17  notes, a diary, any written record?
18    A.   I did not.
19    Q.   Did Banas, if you know?
20    A.   Not that I know of.
21    Q.   Do you recall how long the meeting lasted?
22    A.   No.  Maybe a half hour, but I'm not sure.
23    Q.   What did you tell Socha in that meeting?
24    A.   I told her of a lot of the rumors that I had

Page 17

1  heard throughout the department and specifically the
2  conversation that I had with Detective Jackson.
3    Q.   In that meeting you did not identify
4  Detective Jackson as the source of your information, did
5  you?
6    A.   I did not.
7    Q.   Why is that?
8    A.   Because all of the information that I was
9  getting at that time was nothing more than rumor, but I
10  wanted her to be aware of the conversations that were
11  going around the police department involving her name and
12  also another officer who I believed was on those videos.
13    Q.   That would be Crowley?
14    A.   Correct.
15    Q.   And there was no point after that that you
16  ever revealed to Socha that a source of this information
17  to you had been Detective Jackson?
18    A.   I don't believe so.
19    Q.   Do you recall any of the particulars about
20  what you told Socha in that meeting?
21    A.   I was very -- I remember talking to her about
22  some of the rumors that were very specific to videos of
23  her and Officer Crowley that she stated to me were
24  factual and that those videos did exist on her phone.

Page 18

1  And she stated, I believe, something of the effect of,
2  "Obviously, those rumors are true because there would be
3  no way I would know of those specific videos."
4    Q.   What specifically do you recall about the
5  content of those videos that you relayed to Socha?
6    A.   There were videos of her giving
7  Officer Crowley a, quote, blow job, is one of the
8  comments I made to her, and of her exposing herself from
9  the waist up while doing so.
10    Q.   Were there any other specifics regarding
11  sexual acts or conduct that you described to Socha as
12  being on the videos that were the subject of your
13  discussions with Jackson?
14    A.   Just to clarify, those discussions weren't
15  just of Officer -- or I'm sorry -- Detective Jackson.
16  They were of numerous people who came to me with
17  information in regards to specific things that were going
18  around the department of those videos being seen.  I
19  don't recall Dave Jackson actually was the one who
20  gave me those specific images.  It was a variety of
21  people.
22    Q.   Regardless of the source, then, can you
23  specify for us any further whether you described for
24  Socha the specific contents of these videos as reported

Page 19

1  to you?
2    A.   I believe I mentioned other images that she
3  confirmed to me existed, but I cannot recall the
4  specifics.  At one point I basically told her that I
5  didn't care to share any more information of specifics;
6  it was verified that there was some fact to it.  So we
7  just moved on from the graphic details.
8    Q.   Okay.  Move on to what point?  What did you
9  say to her?  What did she say to you?
10    A.   Well, at that point I informed her, because of
11  the potential misconduct, this would not be something
12  that would fall into the labor -- my representing her on
13  these issues, that I felt it would be in her best
14  interest to seek legal counsel, as this was not a labor
15  issue if there was true misconduct and that I wouldn't
16  have any standing to represent her.
17    Q.   Okay.  So this wasn't a union issue?
18    A.   In my understanding, at that time I felt that
19  this was clearly not a violation of the contract or any
20  matters that would involve labor, that this potentially
21  was a criminal issue; therefore, we had no standing.  And
22  I confirmed that with our FOP attorney who represents our
23  local.
24    Q.   In the meeting with Socha, did you share with

7 (Pages 16 to 19)

**EXHIBIT J**

Cassandra Socha v. City of Joliet; et al.
Deposition of Officer Mike Devito - Taken 6/3/2021

---

Page 20

1  Socha any particular rumors that had been reported to you
2  relating to the videos?
3      A.  I'm not sure I understand.
4      Q.  Sure.  For example, did you relay to Socha
5  anything that you had heard about specific conversations
6  that people in the department had had about the videos?
7      A.  I believe so.  I believe I gave her all the
8  information that was given to me by whoever was giving it
9  to me.
10     Q.  In connection with the specific subject of
11 oral sex, had you, prior to your meeting with Socha,
12 heard about a comment attributed to another officer that
13 goes, quote, Now I know why Socha's with Crowley.  She
14 sucks dick like a porn star, closed quote, or words to a
15 similar effect?
16     A.  I remember that specific quote, but I can't
17 remember by who it was given to me.
18     Q.  Okay.  Regardless of the source from whom you
19 heard that statement repeated, to whom was it attributed?
20     A.  I don't --
21     Q.  Do you have an understanding as to who had
22 made that comment that was reported to you?
23     A.  I don't recall.
24     Q.  All right.  Now, you mentioned that over time

---

Page 21

1  numerous officers and/or other employees of the Joliet
2  department reached out to you with their concerns about
3  the video images that were extracted from Socha's phone,
4  correct?
5      A.  Yes.
6      Q.  In addition to Jackson, how many others do you
7  believe there were, best estimate?
8      A.  I would definitely say double digits.  I'm not
9  a hundred -- I don't know for sure, though.
10     Q.  Were these people who reached out to you
11 specifically to raise these concerns, or were these --
12 was this topic something that came up incidental to other
13 conversations?
14     A.  I believe it was people coming to me with
15 concern.
16     Q.  Can you identify any of the other people who
17 came to you with these concerns?
18     A.  I don't recall.
19     Q.  Did you make any written record of any of
20 these other conversations, whether notes, memos, letters,
21 et cetera, anything in writing to memorialize these other
22 people coming forward?
23     A.  I never made any documentations of this
24 incident.

---

Page 22

1      Q.  Were the people who reached out to you, in
2  addition to Jackson, members of the investigations
3  division?
4      A.  No.
5      Q.  Were any of them members of the investigations
6  division?
7      A.  No.  Other -- I'm sorry.  Yes.  Officer Dave
8  Jackson.
9      Q.  Other than Jackson.
10     A.  No.
11     Q.  Let me suggest a few names, and tell me if
12 they refresh your recollection about who else -- that is,
13 who in addition to Jackson reached out to you with these
14 concerns:  Carlos Matlock, who I believe is now a deputy
15 chief?
16     A.  Yes.  I'm sorry.  I forgot.  Yes, he did.  I'm
17 sorry.  I forgot that he was a detective then.
18     Q.  Did you remember when Matlock reached out to
19 you with these concerns?
20     A.  I believe it was shortly after I spoke with
21 Cassandra.
22     Q.  Did he reach out to you unsolicited, or did
23 you contact him?
24     A.  No.  For the record, I never reached out to

---

Page 23

1  anyone on my own.  Everything came to me through other
2  parties.
3      Q.  And when -- So this would have been after the
4  first time that Jackson reached out to you with his
5  concerns, true?
6      A.  Correct.
7      Q.  And after meeting with Socha, true?
8      A.  Correct.
9      Q.  Can you estimate how long after your meeting
10 with Socha Matlock reached out to you?
11     A.  I can estimate it was probably within the
12 month of meeting with her.
13     Q.  Was the outreach from Matlock by phone,
14 face-to-face?
15     A.  I don't recall.
16     Q.  What did Matlock tell you about the data,
17 specifically the videos that had been extracted from
18 Socha's phone?
19     A.  The basic conversation I had with him was very
20 similar to Detective Jackson.  He stated that there was a
21 lot of talk up in the investigations unit in regards to
22 this alleged misconduct.  And I believe the conversation
23 we had was something in regards to "There's a lot of
24 nervous people on the second floor."

---

8  (Pages 20 to 23)

EXHIBIT J

Cassandra Socha v. City of Joliet; et al.
Deposition of Officer Mike Devito - Taken 6/3/2021

Page 24

1  Q.  Second floor being where the investigations
2  division is?
3  A.  Being where the investigations division is,
4  internal affairs, and also the entire previous command
5  staff.
6  Q.  Did Matlock tell you whether he had ever seen
7  the videos that were on -- that were extracted from
8  Socha's phone?
9  A.  I remember him specifically saying absolutely
10 not and that he had nothing to worry about.
11 Q.  Did Matlock tell you -- identify for you who
12 he was aware had seen videos extracted from Socha's
13 phone?
14 A.  It was very similar to Detective Jackson's,
15 where he stated that it was, at the time,
16 Lieutenant Reid, Detective -- I'm sorry -- Deputy Chief
17 Al Roechner.  And he spoke in general terms of people in
18 investigations but never specific names, that I recall.
19 Q.  Did he -- that is, Matlock -- describe any
20 conversations that he had heard or overheard in the
21 investigations division about the videos on Socha's
22 phone?
23 A.  Can you clarify it?  I'm --
24 Q.  Sure.  Did Matlock report to you the contents

Page 25

1  of any conversations he had heard other officers having
2  about the video images on Socha's phone?
3  A.  Not that I recall.  I believe it was very
4  general.
5  Q.  Okay.  Did either Detective Jackson or now
6  Deputy Chief Matlock raise with you, then Lieutenant, now
7  Deputy Chief, Brown's involvement in the viewing,
8  handling, or discussions about the videos extracted from
9  Socha's phone?
10 A.  Yes.  I recall a conversation that I had with
11 both, at the time, Detective Matlock and
12 Detective Jackson, in regards to a conversation that was
13 had in the watch commander's office that, at that time,
14 it was Lieutenant Brown was in the room.  And I do not
15 recall the specific people that were there, but it was
16 something of the effect of people seeing this video.
17 Q.  Did Matlock or Jackson tell you how or from
18 whom they had learned that Brown had been in the watch
19 commander's office involved in some communication
20 associated with the videos extracted from Socha's phone?
21 A.  I'm not sure, but he's the watch commander on
22 that specific shift, so I would assume he was in the
23 office in his official capacity.
24 Q.  Did Matlock or Jackson ever communicate to you

Page 26

1  their understanding of the source of the, quote, She
2  sucks dick like a porn star, closed quote, remark was a
3  Detective Gavin?
4  A.  I don't recall.
5  Q.  Did Lieutenant Harrison ever approach you with
6  concerns about the way that the data extracted from
7  Socha's phone was being handled?
8  A.  No.
9  Q.  Did Lieutenant Reid ever approach you with
10 such concerns?
11 A.  No.
12 Q.  Did any female officers approach you with such
13 concerns?
14 A.  I don't believe so.
15 Q.  I appreciate it's a big department, and I
16 couldn't name every officer in 2018 if I tried, but you
17 said that it was double digits, and I got two names.  And
18 so I'm just trying to jog your memory as to other
19 officers who came forward and approached you with their
20 concerns.  We've got Jackson and Matlock.  Can you think
21 of others?
22 A.  There were -- there was a lot of talk during
23 that time frame within the department.  I mean, our
24 police department is probably like many others, somewhat

Page 27

1  of a soap opera at times.  So as my position as the union
2  president, people tend to come to me with a lot of
3  information on a regular basis that some is legitimate
4  information and others nothing more than rumor mill.  So
5  it's hard for me to go back that far and just remember
6  specific people because it's a constant flow of
7  information, truly.  I really -- those names are specific
8  because I had multiple meetings with them in regards to
9  this as the potential misconduct, but as far as many
10 other people, it was probably a lot in passing, nothing
11 very specific that would make it stick in my mind like
12 the other two.
13 Q.  Did you have more than one meeting with
14 Matlock in which you discussed his concerns about the
15 handling of the information extracted from Socha's phone?
16 A.  I did.
17 Q.  Were those face-to-face meetings?
18 A.  Mostly.  I'm sure there were phone calls also
19 but mostly face-to-face.
20 Q.  In the FOP offices?
21 A.  Usually.  There's times that I've met with
22 people in the traffic unit.  There's a private area for
23 interviewing people, so I've also met with people -- both
24 Detective Jackson and Deputy Chief Carlos Matlock there

9  (Pages 24 to 27)

**EXHIBIT J**

Cassandra Socha v. City of Joliet; et al.
Deposition of Officer Mike Devito - Taken 6/3/2021

Page 28

1 also. But I do most of my business in the union office.
2     Q. Did Matlock ever express to you why he felt it
3 was important for him to come forward to you with his
4 concerns?
5     A. Yes. I believe that the reason that many
6 members were upset and concerned about this was because
7 of the previous administration.
8     Q. Again, meaning the Roechner administration?
9     A. Correct.
10     Q. In the department at that time, were there
11 particular officers who were associated with Roechner and
12 the so-called Roechner administration?
13     A. Yes.
14     Q. Who were they?
15     A. Well, you had the entire command staff being
16 Deputy Chief Reid, Deputy Chief Perona, Deputy
17 Chief Gavin, Deputy Chief Batis, along with their --
18 there's a group of people that have all worked together,
19 and everyone knows that they have this long line of
20 friendship and they hang out beyond the police
21 department, and they look out for one another. And he
22 brought that with this administration and specifically
23 made it clear to the department, you know, what his
24 agenda was.

Page 29

1     Q. And other than general misgivings about the
2 so-called Roechner administration, did Matlock indicate
3 whether there were any specific reasons he believed it
4 was important to come forward to you with his concerns
5 about the data that was extracted from Socha's phone?
6     A. Yes. He believed it to be the right thing to
7 do.
8     Q. Okay. Likewise, did Jackson express to you
9 why it was that he felt it necessary to come forward and
10 report this to you?
11     A. Yeah. Dave had made comments to me when we
12 talked about this indent how he felt. He was disgusted
13 by how this administration would treat a subordinate
14 member, employee.
15     Q. Whether Jackson or Matlock or any of the other
16 people whose names you can't now remember who came
17 forward with information or concerns about the handling
18 of the evidence extracted from Socha's phone, did anyone
19 ever identify for you particular officers who had viewed
20 the images extracted from her phone?
21     A. Yes.
22     Q. Which officers were identified?
23     A. I can't give that information out because it
24 was during the investigation process when I was in the

Page 30

1 interrogations representing members.
2     Q. And you're talking about the inspector
3 general?
4     A. Correct.
5     And you're saying people who just saw the
6 video, correct?
7     Q. Correct.
8     A. Yes.
9     Q. Did Matlock indicate whether he had voiced his
10 concerns about the handling of the data extracted from
11 Socha's phone up his chain of command?
12     A. Yes.
13     Q. What did he say about that?
14     A. It was in regards to the process of how this
15 information would be taken from the phone. And I have
16 no -- I have no knowledge of this process, so forgive me
17 if I'm not a hundred percent right on the technical side.
18 But he did state something in regards to how the
19 information was taken from the phone, how they have done
20 it from numerous criminal matters, where phones have been
21 extracted of information, and that the process can be
22 very specific to items that are needed via search warrant
23 or subpoena or however they're taking information out,
24 and that how the process was clearly not done the correct

Page 31

1 way and that the information was not put into the proper
2 channels of evidence based on whatever information he had
3 at that time. He was very adamant that the actual
4 process of pulling information was done inappropriately.
5     Q. Did he say why he didn't take all that to the
6 chain of command?
7     A. I don't believe anyone had faith in the chain
8 of command.
9     Q. In connection with concerns about the data,
10 handling of the data extracted from Socha's phone, did
11 you ever speak with a former officer named Bergner,
12 Phillip Bergner?
13     A. In regards to this incident? No.
14     Q. Yes, sir.
15     Okay. Did you ever speak about that matter
16 with an officer named and -- and I may butcher the
17 pronounce -- Stachelski?
18     A. No.
19     Q. Did any non-sworn officer or employees of the
20 department ever come forward to you to voice concerns
21 about the handling of data extracted from Socha's phone?
22     A. Not that I can recall.
23     Q. No office staff, people who would have been
24 proverbial flies on the wall, if you will?

10 (Pages 28 to 31)

EXHIBIT J

Cassandra Socha v. City of Joliet; et al.
Deposition of Officer Mike Devito - Taken 6/3/2021

Page 32

1    **A.**    Not that I can recall.
2    **Q.**    Okay. Because you viewed this as not a union
3    matter, you did not make any further report about any of
4    this except for letting Socha know about what you had
5    heard from Jackson, true?
6    **A.**    True.
7    MR. ADAMS: I don't think I have any further
8    questions at this point, Officer DeVito, and I appreciate
9    your sitting for the deposition.
10   Let me request everyone's indulgence. If we
11   get close to 10:30, I have what should be a very quick
12   Zoom court event which I'd like to log off and handle and
13   come back on, but we might be done by 10:30. I don't
14   know. I just -- I have that issue. It shouldn't take me
15   very long.
16   MS. PROCTOR: I'd like to take a five-minute break.
17   And with that in mind, we will not be done by 10:30, so
18   let's take a five-minute break and come back and see how
19   it goes. All right? Or do you just want to reconvene
20   after your -- how long you think your court date is going
21   to be? It's hard to say, Hall. I understand.
22   MR. ADAMS: You know, I think we're the 10:30 case
23   on this judge's call. It's an intake and a motion. It
24   should be very administrative, not substantive, so I

Page 33

1    wouldn't expect it to take hardly any time.
2    May I request, Officer DeVito, your
3    indulgence for this, if we took a break now and came back
4    on at 10:45, would that work for everyone?
5    MS. PROCTOR: It would work for defense. What about
6    Mr. DeVito? Are you flexible? Please tell us.
7    THE WITNESS: I'm wide open. Anything works for me.
8    MS. PROCTOR: We'll reconvene at 10:45-ish,
9    understanding, Hall, if you run over, we know you'll sign
10   on as soon as you can.
11   (A short break was had.)
12   EXAMINATION
13   BY MS. PROCTOR:
14   **Q.**    Officer DeVito, you have been employed by the
15   Joliet Police Department for 27 years; is that right?
16   **A.**    Correct.
17   **Q.**    And your current position is a patrol officer,
18   correct?
19   **A.**    It is.
20   **Q.**    Have you held any other positions or ranks
21   within the Joliet Police Department within the last
22   27 years?
23   **A.**    Yes. I was in --
24   **Q.**    Tell us about that.

Page 34

1    **A.**    Sure. I was in patrol, and I was also in the
2    neighborhood policing unit and traffic, which I'm
3    currently in.
4    **Q.**    Okay. Have you -- In those 27 years, at some
5    point you became union president, correct?
6    **A.**    I did.
7    **Q.**    How does one become union president in the
8    City of Joliet?
9    **A.**    Elected by my peers.
10   **Q.**    When did you become union president?
11   **A.**    I believe I've been the union president for 16
12   years, but I also served one term as an executive board
13   member in my first election year, so 18 years ago,
14   roughly. I'm estimating.
15   **Q.**    So you've been the union president for roughly
16   18 years?
17   **A.**    No, 16 years. I served -- my first term I
18   served as an executive board member. Eric Stanley was
19   the standing president at that time.
20   **Q.**    What is the role of the union president in the
21   Joliet Police Department?
22   **A.**    I handle all day-to-day operations. I handle
23   grievances. I handle discipline. And I'm the leading
24   role in contract negotiations, discipline, and also

Page 35

1    grievances.
2    **Q.**    In your role as union president, do you have
3    occasion to have interaction with the police department
4    administration?
5    **A.**    I do.
6    **Q.**    You mentioned earlier that you attended some
7    of the interviews of the inspector general concerning the
8    allegations in Officer Socha's lawsuit. Do you recall
9    that?
10   **A.**    Yes, I did.
11   **Q.**    Okay. Do you recall which interviews you
12   attended? For which officers, really, is my specific
13   question.
14   **A.**    You know, I'm not a hundred percent sure of
15   each and every officer I did, but I was on record in
16   every one of the interviews that I was in. So I would be
17   guessing at what exactly I was -- I know I was there for
18   the majority, but I'm not sure if I was there for all of
19   them in regards to my members and my labor council.
20   Obviously, I don't represent anybody of the rank sergeant
21   or higher.
22   **Q.**    I see.
23   Getting back to your meeting with
24   Officer Socha in the summer of 2018, my question to you

11  (Pages 32 to 35)

**EXHIBIT J**

Cassandra Socha v. City of Joliet; et al.
Deposition of Officer Mike Devito - Taken 6/3/2021

Page 36

1  is, can you be any more specific with respect to the
2  date?  Even a month would be helpful.
3      A.  I can't recall.
4      Q.  What was the time frame between your meeting
5  with Officer Socha and your meeting with
6  Detective Jackson where he disclosed the rumors that were
7  discussed earlier?
8      A.  I believe that it was within weeks of -- maybe
9  days of within my conversations with Detective Jackson
10  along with other employees who had come to me.
11      Q.  And forgive me if you already testified to it;
12  I may have missed it.  So my question is, when was your
13  first meeting with David Jackson where the rumors
14  that were testified by -- testified to by you earlier?
15      A.  So to kind of generalize on the time frame,
16  there was the incident that occurred.  It wasn't long
17  after that that some of the rumors started to unfold.
18  And it was within that time frame of the initial rumors
19  that he came to me.  But the specific date and time, I
20  just can't -- I don't know.
21      Q.  So it could be days, weeks, or perhaps months
22  from the incident that you referred to?
23      A.  I believe it would probably have been weeks to
24  months after the search warrant was done.  I don't

Page 37

1  believe it was days that any of these rumors started to
2  trickle around.
3      Q.  So when you testified to just a few moments
4  ago, about the incident that occurred and then things
5  happening after the incident, you're referring to what?
6      A.  So to try to generalize the time frame, this
7  incident occurred during them conducting a search
8  warrant.  It was -- there was a gap of time where there
9  was no rumors or anything going around; then these rumors
10  began to come out.  And it was shortly after the rumor
11  mill was out that Detective Jackson approached me.  So to
12  say the time gap between the actual search warrant to the
13  actual rumors, it was an extended period of time.  I can
14  say in generalizing, but to give specific time frames, I
15  just can't do that.
16      Q.  So you do not know the answer to that
17  question, correct?
18      A.  Correct.
19      Q.  All right.  Your meeting with Officer Socha
20  where you shared with her your conversation with David
21  Jackson, was there only one such meeting with
22  Officer Socha?
23      A.  Yes.  That I can recall, yes.
24      Q.  And that meeting took place in the FOP office?

Page 38

1      A.  Correct.
2      Q.  And you believe that Officer Tom Banas --
3      A.  Correct.
4      Q.  -- was present for that meeting at your
5  request?
6      A.  Yes.
7      Q.  And could you spell Banas's last name for us?
8      A.  I can.  It's B-A-N-A-S, Boy, Adam, Nora, Adam,
9  Sam.
10      Q.  All right.  And what is Officer Banas's role,
11  if any -- Well, focusing on the time of this meeting
12  between you Banas and Socha, what was Officer Banas's
13  position or role within the Joliet Police Department at
14  that time?
15      A.  I don't know what his assignment was to the
16  police department, but as far as the labor council, he
17  was my treasurer.
18      Q.  I see.
19      Officer DeVito, it was our understanding
20  through representations made by Officer Socha's attorney,
21  that you would be disclosing the identity of an informant
22  who came forward with information concerning the contents
23  of Officer Socha's video -- or excuse me -- Officer
24  Socha's cell phone.  And my question to you is, is David

Page 39

1  Jackson the informant as described by Socha's counsel?
2      A.  So I was given information in regards to
3  specific video, and I can't tell you for certain who
4  delivered that information to me.
5      Q.  Okay.  So it could have been David Jackson; it
6  could have been someone else.  You're not sure, as you
7  sit here today, who delivered that information to you
8  regarding a video of a sexual nature, correct?
9      A.  Correct.
10      Q.  You have no understanding -- Well, let me back
11  up.
12      Have you ever worked in the investigations
13  unit or department for the City of Joliet Police?
14      A.  I have not.
15      Q.  You would agree that you have absolutely no
16  understanding, technical or otherwise, with respect to
17  how any of their forensic evidence tools or equipment
18  work, correct?
19      A.  Correct.
20      Q.  You told us earlier that in addition to
21  David Jackson that there were others who came forward
22  with information concerning the mishandling, to use your
23  words, or improper dissemination of information from
24  Officer Socha's cell phone.  Do you recall that --

12  (Pages 36 to 39)

EXHIBIT J

Cassandra Socha v. City of Joliet; et al.
Deposition of Officer Mike Devito - Taken 6/3/2021

Page 40

1    A.  Yes.
2    Q.  -- earlier today?
3        And to be clear, other than David Jackson and
4    perhaps Carlos Matlock, you do not have and cannot give
5    us today the names of any of those people that came
6    forward with these concerns, correct?
7    A.  Correct.
8    Q.  Now, with respect to the concerns that were
9    raised by David Jackson, those were not raised to you in
10   your capacity as a union official, correct?
11   A.  Correct.
12   Q.  My question to you, Officer DeVito, is, what,
13   if anything, did you do concerning these concerns raised
14   to you by David Jackson that were not brought to you in
15   your capacity as a union official?
16   A.  Scheduled a meeting with Officer Socha.
17   Q.  And what was the purpose of that meeting?
18   A.  To attempt to inform her of the rumors that
19   were going around the police department.
20   Q.  You would agree, as you testified -- Well, let
21   me rephrase that.
22        I believe you told us earlier that these
23   rumors could be criminal conduct, correct?
24   A.  Correct.  In my previous testimony, I stated

Page 41

1    that I informed Officer Socha that it was my belief that
2    this was not a labor issue.
3    Q.  And why not?
4    A.  Due to the fact that it was involving a
5    criminal investigation that was being conducted by the
6    Joliet Police Department and that I did not believe that
7    it fell into the process that the labor counsel would
8    handle, and I did refer her to counsel on that issue.
9    Q.  And you mentioned labor counsel.  Who is that
10   or was that at the time?
11   A.  Our FOP attorney, Tamara Cummings.
12   Q.  Okay.  Is Ms. Cummings still labor counsel for
13   the FOP?
14   A.  She is and she still represents our local.
15   Q.  Okay.  To turn to a different subject, I
16   believe you testified to earlier that this alleged
17   sharing of information and material of a sexual nature
18   from Officer Socha's cell phone could potentially amount
19   to criminal conduct.  Did I get that testimony correct?
20   A.  Correct.
21   Q.  Okay.  And is that information that you shared
22   with Officer Socha?
23   A.  I don't believe so.  That was in my own mind
24   at the time when I was telling her this was not a labor

Page 42

1    issue; therefore, I cannot represent her on this matter.
2    Q.  I'm sorry.  I actually missed the last -- the
3    first part of your answer, and let me just try to clear
4    it up.
5        Did you believe at any time that the rumors of
6    the alleged sharing and dissemination of information from
7    Officer Socha's cell phone -- that that conduct could
8    amount to criminal conduct?
9    A.  Yes.  If the rumors were true, then I believed
10   it could be criminal conduct, yes.
11   Q.  Did you notify any law enforcement agency
12   concerning your concern that there was criminal conduct
13   being committed by members of the Joliet Police
14   Department?
15   A.  No, I did not.
16   Q.  Did you notify the FBI of your concerns?
17   A.  No, I did not.
18   Q.  Did you notify the State Police of your
19   concerns of potential criminal conduct?
20   A.  No, I did not.
21   Q.  Why not, Officer DeVito?
22   A.  Because I did not feel that rumors were
23   something that should be reported to any outside agency.
24   Q.  And, in fact, the only information you have

Page 43

1    concerning this alleged sharing or dissemination of
2    matters from Officer Socha's cell phone is based
3    exclusively on rumors, correct?
4    A.  I believe so.
5    Q.  To be clear, did you document your meeting
6    with David Jackson in any, way, shape or form?
7    A.  No.
8    Q.  You didn't send any e-mails, take any notes?
9    A.  No.
10   Q.  With respect to your meeting with
11   Officer Socha, did you document the contents of that
12   meeting or any of the material or matters discussed with
13   Officer Socha during that meeting in the summer of 2018?
14   A.  No.
15   Q.  Did you ever send Officer Socha any letter to
16   her home address concerning these alleged rumors?
17   A.  No.
18   Q.  Are you aware of any member of the Joliet
19   Police Department that may have sent a letter or letters
20   to Officer Socha's home address concerning these alleged
21   rumors?
22   A.  No.
23   Q.  Are you aware of anyone sending a letter --
24   Well, strike that.

13  (Pages 40 to 43)

**EXHIBIT J**

Cassandra Socha v. City of Joliet; et al.
Deposition of Officer Mike Devito - Taken 6/3/2021

Page 44

1    Did you place any letters in Officer Socha's
2 mailbox at the Joliet Police Department at any time
3 concerning these alleged rumors?
4    A.   No.
5    Q.   Are you aware of anyone else placing a letter
6 or materials in Officer Socha's mailbox concerning these
7 alleged rumors?
8    A.   No.
9    Q.   I'm just reviewing my notes. I may only have
10 a couple more, so bear with me.
11    A.   No problem.
12    Q.   In your meeting with Officer Socha, did you
13 tell her that it was in her best interest to talk to an
14 attorney concerning these alleged rumors?
15    A.   I did.
16    Q.   Did you refer her to any specific attorney or
17 give her a name of a potential attorney?
18    A.   I believe I may have mentioned someone, but I
19 don't recall 100 percent.
20    Q.   Do you recall the name of the attorney that
21 you may have mentioned --
22    A.   Yes.
23    Q.   -- Socha go talk to?
24    A.   Yes. I'm sorry. Go ahead.

Page 45

1    Q.   It's a little hard. Actually, I think we've
2 been doing pretty good. So let me just ask you, what was
3 the name -- what name did you give Officer Socha?
4    A.   Anytime any one of our officers is in need of
5 an attorney outside of the labor council, I always refer
6 to the same attorney, and that attorney would be Jeff
7 Tomczak.
8    Q.   And has that been your practice as union
9 president for the last -- how many years is it?
10 16 years?
11    A.   16. Yes, it has.
12    Q.   Did you at any time refer Officer Socha to the
13 civil attorney, Mr. Hall Adams, who's representing her in
14 her lawsuit?
15    A.   No.
16    Q.   Have you ever worked with Hall Adams on any
17 matter?
18    A.   No.
19    Q.   Has Mr. Adams ever represented you in any
20 lawsuit or legal matter?
21    A.   No.
22    Q.   Have you ever reviewed the specific
23 allegations contained in Officer Socha's civil complaint
24 against the City of Joliet and others?

Page 46

1    A.   No.
2    Q.   Have you ever read about the allegations of
3 her civil complaint in any newspaper or on social media?
4    A.   Yes.
5    Q.   Tell us about that.
6    A.   I believe there's been articles in the Joliet
7 Patch, also the Herald News; and I believe it was even
8 something on WJOL, but I'm not a hundred percent sure of
9 the radio. But I do listen to that every morning.
10    Q.   And were those articles published in the
11 newspapers you mentioned and perhaps aired on the radio
12 station that you mentioned before or after Officer Socha
13 filed her civil lawsuit for which we are here today?
14    A.   That, I don't recall. I honestly don't know
15 when she filed it.
16    Q.   Have you ever spoken to Robert Brown, now
17 Deputy Chief Brown, concerning any of the allegations in
18 Officers [sic] lawsuit or these alleged rumors we have
19 been discussing today?
20    A.   Not that I can recall.
21    Q.   Officer DeVito, do you have any personal
22 knowledge of any member of the Joliet Police Department
23 having viewed any sexual material from Officer Socha's
24 cell phone?

Page 47

1    A.   Yes, I do.
2    Q.   Are you referring to information you may have
3 learned during your capacity as union representative
4 during the inspector general's investigation that
5 followed Socha's lawsuit?
6    A.   Yes.
7    Q.   Is that what -- that's what you're referring
8 to?
9    A.   Yes.
10    Q.   You told us earlier that there were rumors
11 about Lieutenant Brown at the time being present during
12 discussions about the contents of Officer Socha's cell
13 phone. Do you recall that testimony, sir?
14    A.   Yes, I do.
15    Q.   And, again, this information was provided to
16 you by David Jackson, correct?
17    A.   I believe it could have been Detective Dave
18 Jackson or now Deputy Chief Carlos Matlock. I don't
19 remember which or maybe both. I don't recall. But
20 someone did, yes. One of those two or both.
21    Q.   Would you agree that you have no way of
22 verifying whether that information is true?
23    A.   Yes, I agree with you.
24    Q.   I believe you testified earlier that if this

14  (Pages 44 to 47)

**EXHIBIT J**

Cassandra Socha v. City of Joliet; et al.
Deposition of Officer Mike Devito - Taken 6/3/2021

Page 48

1　rumor occurred with respect to Lieutenant Brown as
2　reported to you by David Jackson or perhaps Carlos
3　Matlock -- that if that rumor occurred, that you assumed
4　that Brown, if he was present, that he was present in his
5　official capacity.  Do you recall that?
6　　　A.　I do.
7　　　Q.　All right.  Would you agree you have no way --
8　no information to verify, A, whether Brown was in fact
9　present for any such conversations, correct?
10　　　A.　Correct.
11　　　Q.　And the same would be true in that you have no
12　way to verify whether Brown, if he was present, whether
13　he was present in his official capacity or not, correct?
14　　　A.　Correct.
15　　　Q.　So when you used the word "assume," would you
16　agree that that's sheer speculation and has no basis in
17　fact, correct?
18　　　A.　Yes.
19　　　MS. PROCTOR:  That's all the questions I have.
20　Thank you, Officer DeVito.
21　　　THE WITNESS:  Thank you.
22　　　　　　EXAMINATION
23　BY MR. CLARK:
24　　　Q.　Officer DeVito, as I introduced myself before,

Page 49

1　my name is Matthew Clark, and I represent Ed Grizzle in
2　this matter.  I think I just have a few follow-up
3　questions to sort of ask you.
4　　　You've indicated that you have worked 27 years
5　on the force; is that right?
6　　　A.　Yes.
7　　　Q.　Have you ever worked with Grizzle?
8　　　A.　Yes, I believe so, in patrol.
9　　　Q.　And do you recall when that was in patrol?
10　　　A.　Early in both of our careers.
11　　　Q.　More than 20 years ago?
12　　　A.　Yeah, probably.
13　　　Q.　Has Ed Grizzle ever been your supervisor?
14　　　A.　I don't believe so.
15　　　Q.　Do you have any opinions with respect to
16　Grizzle as a police officer or his performance as a
17　police officer?
18　　　A.　No.
19　　　Q.　You testified earlier that Jackson and Matlock
20　and numerous officers had come to you with complaints
21　concerning the manner in which the materials were given
22　to Roechner and Reid; is that right?
23　　　A.　Yes.
24　　　Q.　During those conversations -- this is -- I'll

Page 50

1　ask this generally.  We'll get to specifics if we need
2　to.  But during those conversations, were there any
3　complaints made about Ed Grizzle?
4　　　A.　Yes.
5　　　Q.　Okay.  Let's start with Detective Jackson.
6　Did Detective Jackson ever make complaints about
7　Ed Grizzle?
8　　　A.　Yes.
9　　　Q.　Okay.  What were the nature of those
10　complaints?  What did he say?
11　　　A.　It was my understanding that it was in regards
12　to how other persons had obtained this information that
13　he was ultimately responsible for.
14　　　Q.　And what was the complaint or concern about
15　Ed Grizzle's role in that providing of information?
16　　　A.　I believe the information that was provided to
17　me was that somehow this information was given to the
18　command staff, and it was ultimately his responsibility
19　to secure that information.
20　　　Q.　Okay.  If a member of a command staff orders
21　that information be provided, does that officer have an
22　obligation to follow that command?
23　　　A.　As long as a it's a lawful order.
24　　　Q.　Other than providing the command staff with

Page 51

1　the materials related to the investigation, were there
2　any other complaints raised concerning Ed Grizzle by
3　Detective Jackson?
4　　　A.　Not that I can recall.
5　　　Q.　Same questions with respect to Carlos Matlock.
6　Did he raise any concerns regarding Ed Grizzle or have
7　any complaints of misconduct related to his actions?
8　　　A.　Yes.
9　　　Q.　And were those the same complaints that we
10　just reviewed with respect to the complaints raised by
11　Detective Jackson, in the manner of which information or
12　materials were provided to the command staff?
13　　　A.　That and additional complaints.
14　　　Q.　What additional complaints did Matlock have
15　concerning Grizzle?
16　　　A.　It was in regards to the process that the
17　information is withdrawn from the phone.
18　　　Q.　Okay.  And what did Matlock -- I think you may
19　have gone through these issues before in your testimony,
20　but specifically what were those concerns addressed with
21　respect to Ed Grizzle in the process in which information
22　was drawn from the phone?
23　　　A.　Once again, he talked about the system that I
24　clearly have no background or never used before.  But

15 (Pages 48 to 51)

**EXHIBIT J**

Cassandra Socha v. City of Joliet; et al.
Deposition of Officer Mike Devito - Taken 6/3/2021

---

Page 52

1  there was some system that is used to withdraw
2  information from cell phones in -- that investigation
3  uses throughout many different investigations, criminal.
4  And the system, Detective Matlock at the time said that
5  he had knowledge of and said that when removing
6  information, it is possible to remove specific
7  information from a cell phone in regards to what a
8  specific search warrant reads rather than, I guess, what
9  you would call dumping the whole phone.
10    Q.  Do you know if it is the detective's or
11  someone else within the investigation unit that actually
12  retrieves information from cell phones?
13    A.  I don't know.
14    Q.  Okay.  Would it surprise you if there's other
15  technology people involved in that process?
16    A.  Not at all.
17    Q.  Did Matlock raise any other specific concerns
18  with you regarding Ed Grizzle and the retrieval of
19  information process from Socha's cell phone?
20    A.  Not that I can recall.
21    Q.  I think you mentioned that numerous other
22  people came to you that had complaints in which -- the
23  manner in which materials were given to Roechner and Reid
24  and that misconduct.  Do you recall -- I know you don't

---

Page 53

1  recall the specific names of these individuals.  Do you
2  recall any additional complaints raised by any of these
3  other individuals with respect to Ed Grizzle?
4    A.  I do not recall.
5    Q.  Would it be fair to say, as we sit here today,
6  we have exhausted all potential complaints made to you by
7  Matlock, Jackson, or other officers regarding Ed Grizzle?
8    A.  I believe so.
9    Q.  During your testimony you've used the phrase
10  "misconduct."  And was the misconduct you're referring to
11  the manner in which the information was given to Roechner
12  and Reid, or was there some other misconduct that you're
13  referencing?
14    A.  I believe I referred to the rumors of the
15  information being disseminated throughout the
16  administration, yes.
17    Q.  Any other misconduct you may have been
18  referencing during the course of your deposition?
19    A.  No.
20    Q.  What is the nature of your relationship --
21  Strike that.
22      What was the nature of your relationship in
23  2018 with Roechner?
24    A.  Neutral.

---

Page 54

1    Q.  Okay.  What was the -- when you say "neutral,"
2  what do you mean by that?
3    A.  He was a Deputy chief in investigations.  I
4  was the union president.  We had very limited
5  interactions with my official capacity.
6    Q.  Okay.  What was your nature of relationship at
7  the time with Lieutenant Reid?
8    A.  I would say good.  I dealt with him a lot in
9  his capacity as the lieutenant in charge of internal
10  affairs.  All discipline, obviously, went through him.
11  So there was a lot of contact between myself and him.
12    Q.  I think towards the end of your questions
13  asked by Mr. Adams, Attorney Adams, you indicated that
14  numerous people had come to you, along with Matlock and
15  Jackson, because no one had faith in the administration.
16  I think that's what you said.  Is that right?
17    A.  Yes.
18    Q.  What did you mean by no one had faith in the
19  administration?
20    A.  So I think that we're talking about is the
21  positions they held prior to all of them being promoted.
22  Upon all of their promotion, there was clear distrust and
23  friction between the FOP, blue shirts, and the
24  administration and the membership, for the most part, and

---

Page 55

1  the administration.
2    Q.  When did those promotions occur?
3    A.  I know it was obviously after this incident,
4  but I can't -- I don't remember exactly when Chief Benton
5  retired.  It was right after Chief Benton retired, and
6  there was obviously a change in the command structure.
7    Q.  Okay.  I think you had made reference to this
8  as the Roechner administration; is that right?
9    A.  Correct.
10    Q.  And you included in the Roechner
11  administration Reid, Perona, Gavin, and Batis?
12    A.  It's Perona, P-E-R- --
13    Q.  Thank you.
14    A.  Sorry.
15    Q.  Was there anyone else considered to be a part
16  of the Roechner administration?
17    A.  Yes.
18    Q.  Who would that be?
19    A.  There were officers that he had worked with --
20  or not officers.  Strike that.
21      There were supervisors that he had worked with
22  in previous areas of the department that everyone knew
23  was in his inner circle.
24    Q.  Who were those individuals?

16  (Pages 52 to 55)

**EXHIBIT J**

Cassandra Socha v. City of Joliet; et al.
Deposition of Officer Mike Devito - Taken 6/3/2021

Page 56

1      A.   Lieutenant Jeremy Harrison; Lindsey Heavener,
2   Sergeant Lindsey Heavener.  I think it was either
3   Lieutenant or Sergeant Joe Egizio, Sergeant Doug May,
4   Sergeant Pat Cardwell, Sergeant Matt Breen.  I may be
5   forgetting some names.  I mean, there's this inner circle
6   of guys that kind of came up together, all worked side by
7   side.  And, you know, everyone and their partner knew who
8   were their friends, and he made it very obviously who
9   weren't his friends.
10      Q.   I didn't hear you mention Ed Grizzle.  Is
11   Ed Grizzle not a part of that inner circle?
12      A.   I don't -- I didn't believe -- I don't believe
13   so, no.
14      Q.   At the time that people were coming --
15   numerous officers were coming forward about the rumors,
16   is it your recollection that Roechner was chief at that
17   time?
18      A.   I'm not sure.  I don't recall.
19      Q.   Did people have concerns about the
20   Chief Benton administration?
21      A.   Not -- no, no.  I mean, there's always
22   friction but not to the level of Al Roechner's regime,
23   no.
24      Q.   Other than the issues with the promotion of

Page 57

1   officers to the inner circle, were there any other issues
2   between, I guess, the FOP and the blue shirts and the
3   administration?
4      A.   Numerous.
5      Q.   What were some of those issues?
6      A.   In my opinion as the union president, this
7   administration had a clear agenda.  It was to settle
8   scores; it was to attack and alienate my membership.
9   They were very hash and one-sided on discipline.  Their
10   conduct during the discipline process in my opinion was
11   completely unprofessional and violated many standards
12   including numerous attempts they made in open roll calls
13   to not only attack the labor council but to embarrass and
14   humiliate members who were under investigation or had
15   just been disciplined by this administration.  The list
16   just goes on and on and on.  As a matter of fact, we even
17   wrote a letter and had it read to the council --
18   basically going to the city council and complaining of
19   all of the action that this administration was doing to
20   my membership.
21      Q.   Do you recall when that letter or the
22   complaint to the city council occurred?
23      A.   I don't know exactly when it was presented by
24   our legal counsel, and it was at an open meeting.  It may

Page 58

1   have been Zoom or something because -- I'm not sure if it
2   happened during the epidemic or not, but our legal
3   counsel did read a letter of, more or less, disgust of
4   what we were dealing with with that administration.
5      Q.   Was there any type of lawsuit or labor
6   relations complaint filed related to that dispute?
7      A.   Just numerous grievances.  Basically, nothing
8   was being settled anymore from the labor council at the
9   level of the chief.  Everything was being moved forward
10   to either the city hall, police and fire board, or the
11   arbitration process.  We no longer had faith or
12   considered any stance that the administration took as
13   final.
14      Q.   You indicated there was legal counsel.  Is
15   that -- was it Tamara Cummings representing that?
16      A.   It was.
17      Q.   Has Laura Scarry ever represented the union?
18      A.   No, not in my tenure.
19      Q.   Do you know who Laura Scarry is?
20      A.   I do not.
21      Q.   Has Jeff Tomczak ever represented the union?
22      A.   No.
23      Q.   I think you indicated in the last 16 years you
24   would always refer civil matters to Jeff Tomczak; is that

Page 59

1   right?
2      A.   No.
3      A.   Oh.
4      A.   I'm sorry.  I stated that I refer all union --
5   nonunion matters to Jeff Tomczak, not civil, all union
6   matters.
7      Q.   You refer all nonunion matters to Jeff
8   Tomczak?
9      A.   Correct.  Sorry.  Yeah.
10      Q.   And some of those are civil cases or potential
11   civil cases?
12      A.   Yes.  Potential, yeah, potential.
13      Q.   Criminal defense cases?
14      A.   Correct.
15      Q.   And what about -- Did you refer Nick Crowley
16   to Jeff Tomczak for his criminal defense?
17      A.   I did.
18      Q.   Have you ever talked with Jeff Tomczak about
19   the criminal defense of Nick Crowley?
20      A.   Yes.  Yes, I did, in context to the internal
21   complaint, myself and Tamara Cummings.
22      Q.   What did you tell Jeff, and what did he tell
23   you?
24      A.   I can't discuss that.

17  (Pages 56 to 59)

**EXHIBIT J**

Cassandra Socha v. City of Joliet; et al.
Deposition of Officer Mike Devito - Taken 6/3/2021

Page 60

1    Q.   Did you ever have a conversation outside of
2    the presence of the union counsel with Jeff Tomczak about
3    Nick Crowley?
4    A.   Yes.
5    Q.   What were those conversations?
6    A.   I can't discuss those.
7    Q.   Why is that?
8    A.   I was acting in my official capacity as union
9    president representing Nick Crowley.
10   Q.   Do you recall when those conversations
11   occurred?
12   A.   The actual time frame, no, but it would be
13   during the process of the internal complaint.
14   Q.   Do you know how the internal complaint was
15   resolved?
16   A.   I don't recall the final disposition, no.
17   Q.   You indicated that you had conversations with
18   Ms. Socha about the contents -- or the rumors of the
19   contents of her cell phone, correct?
20   A.   Yes.
21   Q.   Did you ever have similar conversations with
22   Nick Crowley about the contents of what was on
23   Ms. Socha's phone?
24   A.   I may have in general, but I don't recall.

Page 61

1    Specific -- I don't recall specific conversations.  I'm
2    sorry.
3    Q.   Why not?
4    A.   I've had contact with him where we've had
5    conversations in passing, so I could only assume that at
6    some point we may have discussed general issues about it.
7    But I don't recall anything that sticks in my head, any
8    specific conversation I may have had with him.  Sorry.
9    Q.   You brought Ms. Socha in specifically to tell
10   her about the rumors because you wanted her to know?
11   A.   Correct.
12   Q.   And, incidentally, when you told Ms. Socha,
13   how did she respond to those conversations?  Was she
14   aware of those rumors?
15   A.   Yes, I believe so.  She seemed to be upset,
16   though, when I discussed it.
17   Q.   Did Ms. Socha indicate specifically that she
18   had already been aware of those rumors?
19   A.   Yes.  I believe she said she had heard some of
20   the same rumors that I had heard.
21   Q.   Do you recall Ms. Socha saying anything else
22   during that conversation?
23   A.   Not specifically, no.  I know we talked about
24   the matter but not specific comments.

Page 62

1    Q.   Okay.  So you brought Ms. Socha in to have a
2    conversation about what videos may have been -- or rumors
3    about videos on her cell phone, but you didn't do the
4    same for Nick Crowley?
5    A.   No, I did not.
6    Q.   Do you recall why not?
7    A.   Because I believe she was going to speak with
8    Nick about the matter, and I felt that it was -- because
9    it was from her cell phone, that she was the person that
10   I should have this conversation with.
11   Q.   Okay.  I'm going to go take a look at my notes
12   here.  I'm almost done here.
13        Did you ever discuss with Detective Jackson
14   his civil lawsuit?
15   A.   I don't believe so.  Oh, wait.  I'm sorry.
16   Strike that.
17        I thought you said "Grizzle."  You said
18   "Detective Jackson"?
19   Q.   Yes.
20   A.   I'm sorry.  Yes, I have.
21   Q.   Okay.  Was that outside of the confines of
22   your representation as union representative?
23   A.   Yeah.
24   Q.   Okay.  I guess, what has Detective Jackson

Page 63

1    told you about his civil lawsuit?
2    A.   The only thing that he's ever really brought
3    to my attention were like status updates.  That's kind
4    of -- it's kind of been just general conversations that I
5    can recall.
6    Q.   When you say "status updates," just -- I mean,
7    is there any particular reason he gives you a status
8    update?
9    A.   No.  I think, more or less, just because he --
10   he has some pending discipline that is still tied to some
11   of this, so just kind of keeping me in the loop in
12   regards to the process is all.
13   Q.   Okay.  Have you ever applied for a promotion
14   in the Joliet Police Department?
15   A.   Yes.  I took the test once.
16   Q.   When did you take the test?
17   A.   I can estimate probably over 12 years ago,
18   maybe more.
19   Q.   Okay.
20   A.   Yeah.
21   Q.   And you were never promoted?
22   A.   No.  I bombed it.
23   Q.   Okay.  Have there been any positions outside
24   of the sergeant's exam that you applied for and never

18  (Pages 60 to 63)

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT J**

Cassandra Socha v. City of Joliet; et al.
Deposition of Officer Mike Devito - Taken 6/3/2021

Page 64

1   received?
2       A.  No, I don't believe so.  I spent a long time
3   in patrol.
4       Q.  You were happy, though?
5       A.  I liked it.
6       Q.  Okay.
7       A.  Still do, just too old.
8       Q.  Why do you refer all your case -- nonunion
9   cases to Jeff Tomczak?
10      A.  For a personal reason.  Early on in my career,
11  I was in trouble within the police department, and he
12  represented me, and I believe that he did a spectacular
13  job representing me.  And every case that I've referred
14  to him, I believe the outcome has been positive for my
15  members that I've referred.  So, you know, in my opinion
16  he's good at what he does, so I continued to use him
17  until he proves that's not the case.
18      Q.  The personal matter --
19      A.  Yes.
20      Q.  -- when was that?
21      A.  Back in 1996 or '97, I believe.
22      Q.  Do you recall what the nature of that issue
23  was or --
24      A.  Yeah.  I was in trouble for discharging my

Page 65

1   firearm off duty back in -- like I said, I think it was
2   1996.
3       Q.  Was this a criminal matter, or was this a
4   discipline within the department?
5       A.  Both.
6       Q.  Were criminal charges filed?
7       A.  Yes.
8       Q.  And where were the criminal charges filed?
9       A.  Cook County.
10      Q.  Did the matter go to trial?
11      A.  It did.
12      Q.  I'm guessing a not-guilty verdict?
13      A.  No, a plea.
14      Q.  A plea.
15          Do you believe there's any conflict of
16  interest in referring your -- you become a union
17  president and referring cases to Jeff Tomczak to file
18  civil lawsuits against Joliet?
19      A.  To my knowledge Jeff isn't a civil attorney,
20  but no.
21      MS. PROCTOR:  Actually, Hall, I just had one last
22  question I forgot to ask Officer DeVito if -- I'm
23  sorry -- if Matt Clark was concluded.
24          I'm sorry.  I took your pause as a conclusion,

Page 66

1   and that might not be accurate.
2       MR. CLARK:  I'm just going through my notes, but I'm
3   almost done, and things just kind of pop in my head.
4       MS. PROCTOR:  Take your time.  Didn't mean to
5   interrupt.
6   BY MR. CLARK:
7       Q.  Have you ever talked to Ed Grizzle about the
8   complaints or issues raised by Cassandra Socha?
9       A.  Not to my knowledge.
10      Q.  And outside of what you already testified at
11  today's deposition, have you talked to anyone else about
12  the issues raised by Ms. Socha?
13      A.  No, not to my -- I don't know if I brought
14  up - obviously, Tamara Cummings, but that's it.
15      Q.  Okay.  Do you have an understanding as to
16  whether or not Lieutenant Reid ever saw videos of a
17  sexual nature of Ms. Socha?
18      A.  I'm sorry.  You say did I have an
19  understanding?
20      Q.  Yeah.  Do you know if Lieutenant Reid ever saw
21  the video of Ms. Socha in sexual activity?
22      A.  No, I don't.
23      Q.  Do you know if Deputy Chief Roechner ever saw
24  the sexual video of Ms. Socha?

Page 67

1       A.  I do not.
2       Q.  If a criminal matter comes to your attention
3   as union president, do you have any obligation to report
4   that criminal activity to anyone within the Joliet Police
5   Department?
6       A.  Yes.
7       Q.  Is that under the union contract, or is it
8   under general orders?
9       A.  General orders.
10      Q.  With respect to any of the testimony given
11  here today or any allegations raised, did you ever report
12  any of these matters to the Joliet Police Department?
13      A.  I did not.
14      MR. CLARK:  Okay.  I think I'm done.  Thank you very
15  much for your time.
16      THE WITNESS:  Not a problem.
17      MS. PROCTOR:  Just hopefully a few last questions.
18          FURTHER EXAMINATION
19  BY MS. PROCTOR:
20      Q.  Officer DeVito, how many conversations did you
21  have with Officer Socha's attorney, Hall Adams?
22      A.  None.
23      Q.  None?  You never had a conversation with him
24  at any time concerning any matter?

19  (Pages 64 to 67)

EXHIBIT J

Cassandra Socha v. City of Joliet; et al.
Deposition of Officer Mike Devito - Taken 6/3/2021

Page 68

1    A.   Not to my knowledge.  I don't know who he is.
2    I've never met the person that I know of.
3    Q.   Okay.  Have you ever talked to any attorney --
4    any attorney representing Officer Socha on any matter to
5    your knowledge?
6    A.   Not to my knowledge.
7    Q.   Do you recall any specific -- Or strike that.
8        Did you have any specific conversations with
9    Officer Nick Crowley regarding the alleged concerns or
10   rumors that you testified to here today?
11   A.   Not that I can recall, nothing specific.
12   Q.   Do you have any knowledge regarding any
13   anonymous letters being sent to Officer Socha regarding
14   the concerns or rumors you testified to here today?
15   A.   No.
16   MS. PROCTOR:  That's all I have.  Thank you, Officer
17   DeVito.  We appreciate your time and attention.
18   MR. ADAMS:  Officer, I have just a couple quick
19   follow-up questions.
20   THE WITNESS:  Sure.
21       FURTHER EXAMINATION
22   BY MR. ADAMS:
23   Q.   Did Jackson tell you that Detective McKinney
24   had viewed nude images of Socha that were extracted from

Page 69

1    her phone?
2    A.   I do not recall that conversation.
3    Q.   Did Matlock tell you that?
4    A.   I also do not recall that conversation.
5    Q.   Did Detective Jackson -- Strike that --
6    Officer Jackson -- or Detective Jackson tell you that
7    Detective McKeon had viewed nude images of Socha that had
8    been extracted from her phone?
9    A.   I don't recall that conversation.
10   Q.   Did Matlock tell you?
11   A.   I don't recall.
12   Q.   Did you ever hear anyone whom you associate
13   with the Roechner administration or the Roehner inner
14   circle express any disappointment or frustration with the
15   outcome of the criminal trial against Crowley?
16   A.   Yes.
17   Q.   Who did you hear express such comments?
18   A.   Sergeant Cardwell, Sergeant Breen, and other
19   individuals, but I never heard them specifically comment
20   on it.  It was all third party.  But those two I heard
21   specifically.
22   Q.   Did you ever hear Roechner himself express any
23   disappointment or frustration with the outcome of the
24   criminal trial?

Page 70

1    A.   I personally did not.
2    Q.   Did you ever hear Detective Grizzle express
3    any concerns or disappointment with the outcome of the
4    Crowley trial?
5    A.   I personally did not.
6    Q.   Did you ever hear Detective Grizzle express
7    any disappointment or frustration with Socha's role in
8    the Crowley trial?
9    A.   Not personally, no.
10   Q.   Did you ever hear Roechner express any such
11   disappointment or frustration?
12   A.   Not personally, no.
13   Q.   You named two individuals in here express
14   frustration or disappointment with the outcome of the
15   criminal trial but by attributing to each by name, can
16   you tell us what they said?
17   A.   Yes.  Sergeant Cardwell is the president of
18   the white shirt -- we call it them white shirt -- the
19   supervisors' union.  And Sergeant Breen, I believe, is
20   the vice president.  And at that time, we had
21   conversations in regard to just general matters within
22   the police department.  And there were other issues that
23   were going on within the police department disciplinary
24   process, and they had some concerns that they had voiced

Page 71

1    both at the police and fire board meetings, and they had
2    definitely taken a stance supporting the administration,
3    and there were some -- they were angry with the outcome,
4    kind of unhappy, thinking that, in their minds, politics
5    played a role.
6    Q.   Did they, either of them, express to you any
7    particular frustration or disappointment about the role
8    that Socha had played in the Crowley trial or its
9    outcome?
10   A.   Not specifically her, just in general terms
11   the outcome they were disappointed.
12   MR. ADAMS:  Okay.  Those are all the questions I
13   have.
14       Anyone else?
15   MS. PROCTOR:  No.
16   MR. CLARK:  Nothing from me.
17   MR. ADAMS:  Officer, you have the right, when we
18   order the transcript of this deposition, to review it in
19   order to note any instances in which you believe the
20   transcription is in error.  You can't change questions or
21   answers, but you can separately note instances where you
22   believe either are transcribed erroneously, or you can
23   waive that right.  We do need you to tell us on the
24   record today whether you intend to exercise or to waive

20  (Pages 68 to 71)

EXHIBIT J

Cassandra Socha v. City of Joliet; et al.
Deposition of Officer Mike Devito - Taken 6/3/2021

Page 72

1    that right.
2        THE WITNESS:  Yes.  I'd like to review and make
3    notations.
4        MR. ADAMS:  All right.  So we'll show signature is
5    reserved.  As we have in the past with other deponents,
6    the reporter can get that transcript to the City's
7    attorneys in the case.
8        I am going to write this, Tina.
9        Officer, thanks for your all your time this
10   morning, and thanks for giving me that little break.  it
11   helped me be in two places at once.
12       MS. PROCTOR:  The City will take a copy.
13       And as it's been indicated, Officer DeVito,
14   we'll be sure you get a copy of it.  We'll make
15   arrangements to make sure that happens.  And, again,
16   thank you for your time today.  It's much appreciate by
17   all.
18           (Deposition concluded at 11:40 a.m.)
19
20
21
22
23
24

21 (Page 72)

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT J**

Cassandra Socha v. City of Joliet; et al.
Deposition of Officer Mike Devito - Taken 6/3/2021

Page 73

1                    IN THE UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF ILLINOIS
2                           EASTERN DIVISION

3
    CASSANDRA SOCHA,                    )
4                                       )
                          Plaintiff,    )
5                                       )
              vs.                       )   No. 18 CV 05681
6                                       )
    CITY OF JOLIET, a municipal         )
7   corporation; EDWARD GRIZZLE;        )
    JOHN DOES 1-20,                     )
8                                       )
                          Defendants.   )
9

10

11             I, OFFICER MIKE DEVITO, state that I have read

12    the foregoing transcript of the testimony given by me via

13    videoconference at my deposition on June 3rd, 2021, and

14    that said transcript constitutes a true and correct

15    record of the testimony given by me at said deposition

16    except as I have so indicated on the errata sheets

17    provided herein.

18

19                        _____
                              OFFICER MIKE DEVITO

20    No corrections (Please initial)_____
      Number of errata sheets submitted_____(pgs.)
21

      SUBSCRIBED AND SWORN to
22    before me this _____ day
      of _____, 2021.
23

      _____
24          NOTARY PUBLIC

EXHIBIT J

Cassandra Socha v. City of Joliet; et al.
Deposition of Officer Mike Devito - Taken 6/3/2021

Page 74

```
 1   UNITED STATES OF AMERICA        )
     NORTHERN DISTRICT OF ILLINOIS   )
 2   EASTERN DIVISION                )    SS.
     STATE OF ILLINOIS               )
 3   COUNTY OF COOK                  )

 4

 5                I, Tina M. Hickey, Certified Shorthand

 6   Reporter, do hereby certify that OFFICER MIKE DEVITO was

 7   first duly sworn by me via videoconference to testify the

 8   whole truth and that the above deposition was reported

 9   stenographically by me and reduced to typewriting under

10   my personal direction.

11                I further certify that the said deposition was

12   taken via videoconference at the time and date specified

13   and that the taking of said deposition commenced on

14   June 3rd, 2021, at 9:30 o'clock a.m.

15                The signature of the witness, OFFICER MIKE

16   DEVITO, was reserved by agreement of counsel.

17                I further certify that I am not a relative or

18   employee or attorney or counsel of any of the parties,

19   nor a relative or employee of such attorney or counsel or

20   financially interested directly or indirectly in this

21   action.

22

23

24
```

**EXHIBIT J**

Cassandra Socha v. City of Joliet; et al.
Deposition of Officer Mike Devito - Taken 6/3/2021

Page 75

1          Witness my official signature as a Certified

2    Shorthand Reporter in the State of Illinois, on

3    June 22nd, 2021.

4

5

6

7

8

9

10                              _Tina M. Hickey_____

                                TINA M. HICKEY, CSR
11                              161 North Clark Street
                                Suite 3050
12                              Chicago, Illinois 60601
                                Phone:  312.361.8851
13
      CSR No. 084-003858
14

15

16

17

18

19

20

21

22

23

24

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT J**

Cassandra Socha v. City of Joliet; et al.
Deposition of Officer Mike Devito - Taken 6/3/2021

Page 76

| A | | | | |
|---|---|---|---|---|
| **a.m** 1:17 72:18 74:14 | 55:11,16 56:20 57:3,7,15,19 58:4,12 69:13 71:2 | **answers** 71:21 **anybody** 35:20 **anymore** 58:8 **Anytime** 45:4 | 68:17 **attorney** 4:3 19:22 38:20 41:11 44:14,16 | **began** 10:1 37:10 **behalf** 2:6,12,17 4:4 |
| **able** 10:11 **absolutely** 24:9 39:15 | **administrative** 32:24 **affairs** 11:15 | **APPEARAN...** 2:1 **applied** 63:13,24 | 44:17,20 45:5 45:6,6,13 54:13 65:19 | **belief** 41:1 **believe** 5:18 9:8 10:5,15 11:10 |
| **Academy** 6:20 **access** 11:7 **accommodate** 5:4 | 24:4 54:10 **agency** 42:11,23 **agenda** 28:24 57:7 | **appreciate** 26:15 32:8 68:17 72:16 **approach** 26:5,9 | 67:21 68:3,4 74:18,19 **attorneys** 72:7 **attributed** 20:12 | 15:8,20,21 17:18 18:1 19:2 20:7,7 21:7,14 22:14 |
| **accurate** 66:1 **acting** 60:8 **action** 57:19 74:21 | **ago** 5:24 34:13 37:4 49:11 63:17 | 26:12 **approached** 8:10,16,23 10:13 14:7 | 20:19 **attributing** 70:15 **aware** 12:19 | 22:20 23:22 25:3 26:14 28:5 31:7 34:11 36:8,23 |
| **actions** 51:7 **activity** 66:21 67:4 | **agree** 39:15 40:20 47:21,23 48:7,16 | 26:19 37:11 **arbitration** 58:11 | 17:10 24:12 43:18,23 44:5 61:14,18 | 37:1 38:2 40:22 41:6,16 41:23 42:5 |
| **acts** 18:11 **actual** 31:3 37:12,13 60:12 | **agreement** 74:16 **ahead** 44:24 | **area** 27:22 **areas** 55:22 **arrangements** | B | 43:4 44:18 46:6,7 47:17 47:24 49:8,14 |
| **Adam** 38:8,8 **adamant** 12:16 31:3 | **ahold** 11:21 **aired** 46:11 **Al** 11:12 24:17 | 72:15 **articles** 46:6,10 **asked** 15:12 | **B** 3:10 **B-A-N-A-S** 15:23 38:8 | 50:16 53:8,14 56:12,12 61:15 61:19 62:7,15 |
| **Adams** 2:2,2 3:4 3:8 4:17,18 12:9,13 32:7 | 56:22 **alienate** 57:8 **allegations** 35:8 | 54:13 **assignment** 6:13 38:15 | **back** 5:3 14:19 27:5 32:13,18 33:3 35:23 | 64:2,12,14,21 65:15 70:19 71:19,22 |
| 32:22 45:13,16 45:19 54:13,13 67:21 68:18,22 | 45:23 46:2,17 67:11 **alleged** 23:22 | **associate** 69:12 **associated** 6:5 25:20 28:11 | 39:10 64:21 65:1 **background** 51:24 | **believed** 10:14 11:13 13:16 17:12 29:3,6 |
| 71:12,17 72:4 **addition** 21:6 22:2,13 39:20 | 41:16 42:6 43:1,16,20 44:3,7,14 | **assume** 5:6 25:22 48:15 61:5 | **Banas** 15:23 16:19 38:2,12 **Banas's** 16:2 | 42:9 **Benton** 55:4,5 56:20 |
| **additional** 51:13 51:14 53:2 | 46:18 68:9 **AMERICA** 74:1 **amount** 41:18 | **assumed** 11:22 48:3 **attack** 57:8,13 | 38:7,10,12 **based** 11:23 31:2 43:2 | **Bergner** 31:11 31:12 **best** 19:13 21:7 44:13 |
| **address** 43:16 43:20 **addressed** 51:20 | 42:8 **and/or** 21:1 **angry** 71:3 | **attempt** 5:2 40:18 **attempts** 57:12 | **basic** 4:20 8:15 23:19 **basically** 19:4 | **beyond** 28:20 **big** 26:15 **blow** 18:7 |
| **addressing** 6:4 **administration** 13:17,19 28:7 | **anonymity** 14:22 15:12 **anonymous** 14:7 | **attended** 35:6 35:12 **attending** 4:3 | 57:18 58:7 **basis** 27:3 48:16 **Batis** 28:17 | **blue** 54:23 57:2 **Bluff** 15:17 **board** 34:12,18 |
| 28:8,12,22 29:2,13 35:4 53:16 54:15,19 | 15:2 68:13 **answer** 5:2,5 37:16 42:3 | **attention** 8:3 63:3 67:2 | 55:11 **bear** 44:10 | 58:10 71:1 |
| 54:24 55:1,8 | | | | |

**EXHIBIT J**

Cassandra Socha v. City of Joliet; et al.
Deposition of Officer Mike Devito - Taken 6/3/2021

Page 77

| | | | | |
|---|---|---|---|---|
| **Bolingbrook** 2:9 | 72:7 | 56:16,20 58:9 | 56:15 | **concerned** 10:4 |
| **bombed** 63:22 | **cases** 59:10,11 | 66:23 | **command** 24:4 | 28:6 |
| **Boughton** 2:8 | 59:13 64:9 | **circle** 55:23 56:5 | 28:15 30:11 | **concerning** 35:7 |
| **Boy** 38:8 | 65:17 | 56:11 57:1 | 31:6,8 50:18 | 36:13 38:22 |
| **break** 32:16,18 | **Cassandra** 1:3 | 69:14 | 50:20,22,24 | 39:22 40:13 |
| 33:3,11 72:10 | 2:18 4:19 8:1 | **city** 1:6 2:12 4:4 | 51:12 55:6 | 42:12 43:1,16 |
| **Breen** 56:4 | 22:21 66:8 | 5:19 34:8 | **commander** | 43:20 44:3,6 |
| 69:18 70:19 | 73:3 | 39:13 45:24 | 25:21 | 44:14 46:17 |
| **briefly** 5:24 | **Cassandra's** | 57:18,22 58:10 | **commander's** | 49:21 51:2,15 |
| **brought** 28:22 | 10:16 | 72:12 73:6 | 25:13,19 | 67:24 |
| 40:14 61:9 | **caused** 6:5 | **City's** 72:6 | **commenced** | **concerns** 8:11 |
| 62:1 63:2 | **cell** 10:16,18 | **civil** 1:14 45:13 | 74:13 | 8:23 10:22 |
| 66:13 | 38:24 39:24 | 45:23 46:3,13 | **comment** 20:12 | 13:5 14:3,20 |
| **Brown** 11:17 | 41:18 42:7 | 58:24 59:5,10 | 20:22 69:19 | 21:2,11,17 |
| 25:14,18 46:16 | 43:2 46:24 | 59:11 62:14 | **comments** 18:8 | 22:14,19 23:5 |
| 46:17 47:11 | 47:12 52:2,7 | 63:1 65:18,19 | 29:11 61:24 | 26:6,10,13,20 |
| 48:1,4,8,12 | 52:12,19 60:19 | **clarified** 12:7 | 69:17 | 27:14 28:4 |
| **Brown's** 25:7 | 62:3,9 | **clarify** 18:14 | **committed** | 29:4,17 30:10 |
| **building** 15:21 | **certain** 39:3 | 24:23 | 42:13 | 31:9,20 40:6,8 |
| **business** 28:1 | **Certified** 1:16 | **Clark** 2:13 3:6 | **communicate** | 40:13 42:16,19 |
| **butcher** 31:16 | 74:5 75:1 | 4:7,7,10 12:6 | 14:6 25:24 | 51:6,20 52:17 |
| _____ | **certify** 74:6,11 | 12:12 48:23 | **communicated** | 56:19 68:9,14 |
| **C** | 74:17 | 49:1 65:23 | 10:10 15:1 | 70:3,24 |
| **call** 10:9 32:23 | **cetera** 21:21 | 66:2,6 67:14 | **communication** | **concluded** 65:23 |
| 52:9 70:18 | **chain** 30:11 31:6 | 71:16 75:11 | 9:7,7,9 14:24 | 72:18 |
| **called** 1:12 4:13 | 31:7 | **clear** 28:23 40:3 | 25:19 | **conclusion** |
| **calls** 27:18 57:12 | **change** 55:6 | 42:3 43:5 | **communicatio...** | 65:24 |
| **capacity** 7:20,24 | 71:20 | 54:22 57:7 | 15:3 | **conduct** 18:11 |
| 16:8 25:23 | **channels** 31:2 | **clearly** 19:19 | **complaining** | 40:23 41:19 |
| 40:10,15 47:3 | **characterizati...** | 30:24 51:24 | 57:18 | 42:7,8,10,12 |
| 48:5,13 54:5,9 | 13:14 | **client** 7:24 | **complaint** 45:23 | 42:19 57:10 |
| 60:8 | **characterizes** | **close** 8:7 32:11 | 46:3 50:14 | **conducted** 41:5 |
| **Cardwell** 56:4 | 13:13 | **closed** 20:14 | 57:22 58:6 | **conducting** 37:7 |
| 69:18 70:17 | **charge** 11:14 | 26:2 | 59:21 60:13,14 | **confidence** 15:4 |
| **care** 19:5 | 54:9 | **come** 15:5 16:7 | **complaints** | **confines** 62:21 |
| **career** 6:22 | **charges** 65:6,8 | 27:2 28:3 29:4 | 49:20 50:3,6 | **confirmed** 19:3 |
| 64:10 | **Chicago** 2:4,15 | 29:9 31:20 | 50:10 51:2,7,9 | 19:22 |
| **careers** 49:10 | 75:12 | 32:13,18 36:10 | 51:10,13,14 | **conflict** 65:15 |
| **Carlos** 22:14 | **chief** 11:12 | 37:10 49:20 | 52:22 53:2,6 | **connection** |
| 27:24 40:4 | 22:15 24:16 | 54:14 | 66:8 | 20:10 31:9 |
| 47:18 48:2 | 25:6,7 27:24 | **comes** 67:2 | **completely** 5:1 | **considered** |
| 51:5 | 28:16,16,17,17 | **comfortable** 6:4 | 57:11 | 55:15 58:12 |
| **case** 6:5 32:22 | 46:17 47:18 | **coming** 4:5 9:24 | **concern** 21:15 | **constant** 27:6 |
| 64:8,13,17 | 54:3 55:4,5 | 21:14,22 56:14 | 42:12 50:14 | **constitutes** |

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT J**

Cassandra Socha v. City of Joliet; et al.
Deposition of Officer Mike Devito - Taken 6/3/2021

Page 78

73:14
contact 14:16,16
    22:23 54:11
    61:4
contained 45:23
content 18:5
contents 18:24
    24:24 38:22
    43:11 47:12
    60:18,19,22
context 59:20
continued 13:10
    64:16
contract 7:16
    19:19 34:24
    67:7
conversation
    5:20 6:3 9:16
    16:10 17:2
    23:19,22 25:10
    25:12 37:20
    60:1 61:8,22
    62:2,10 67:23
    69:2,4,9
conversations
    10:5 13:1,6,13
    13:23 17:10
    20:5 21:13,20
    24:20 25:1
    36:9 48:9
    49:24 50:2
    60:5,10,17,21
    61:1,5,13 63:4
    67:20 68:8
    70:21
Cook 65:9 74:3
copy 11:15
    72:12,14
corporation 1:7
    73:7
correct 6:7
    10:19 13:20
    17:14 21:4
    23:6,8 28:9

30:4,6,7,24
33:16,18 34:5
37:17,18 38:1
38:3 39:8,9,18
39:19 40:6,7
40:10,11,23,24
41:19,20 43:3
47:16 48:9,10
48:13,14,17
55:9 59:9,14
60:19 61:11
73:14
corrections
    73:20
council 16:5
    35:19 38:16
    45:5 57:13,17
    57:18,22 58:8
counsel 19:14
    39:1 41:7,8,9
    41:12 57:24
    58:3,14 60:2
    74:16,18,19
County 65:9
    74:3
couple 44:10
    68:18
course 7:18 13:6
    13:7 53:18
court 1:1 32:12
    32:20 73:1
Courts 1:15
criminal 19:21
    30:20 40:23
    41:5,19 42:8
    42:10,12,19
    52:3 59:13,16
    59:19 65:3,6,8
    67:2,4 69:15
    69:24 70:15
Crowley 7:21
    17:13,23 18:7
    20:13 59:15,19
    60:3,9,22 62:4

68:9 69:15
70:4,8 71:8
CSR 75:10,13
Cummings
    41:11,12 58:15
    59:21 66:14
current 6:13
    33:17
currently 6:9
    7:3,7 34:3
CV 1:5 73:5

——— D ———
D 3:1
Darcy 2:7 4:3
data 23:16 26:6
    29:5 30:10
    31:9,10,21
date 14:12 32:20
    36:2,19 74:12
dates 8:6
Dave 8:21 18:19
    22:7 29:11
    47:17
David 36:13
    37:20 38:24
    39:5,21 40:3,9
    40:14 43:6
    47:16 48:2
day 73:22
day-to-day 7:14
    34:22
days 36:9,21
    37:1
dealing 58:4
dealt 54:8
Dearborn 2:3
Defendant 2:12
    2:17
Defendants 1:8
    1:13 73:8
defense 33:5
    59:13,16,19
definitely 15:6

21:8 71:2
delivered 39:4,7
department
    6:18,20,24
    8:10,15 10:7
    17:1,11 18:18
    20:6 21:2
    26:15,23,24
    28:10,21,23
    31:20 33:15,21
    34:21 35:3
    38:13,16 39:13
    40:19 41:6
    42:14 43:19
    44:2 46:22
    55:22 63:14
    64:11 65:4
    67:5,12 70:22
    70:23
depicted 10:23
deponents 72:5
deposition 1:11
    4:4,21 5:14,17
    5:21 6:6 32:9
    53:18 66:11
    71:18 72:18
    73:13,15 74:8
    74:11,13
depositions 1:16
deputy 11:12
    22:14 24:16
    25:6,7 27:24
    28:16,16,16,17
    46:17 47:18
    54:3 66:23
describe 24:19
described 12:9
    13:5 18:11,23
    39:1
details 19:7
detective 8:21
    8:22 9:10,17
    10:13 11:17,18
    11:19,20 12:2

17:2,4,17
18:15 22:17
23:20 24:14,16
25:5,11,12
26:3 27:24
36:6,9 37:11
47:17 50:5,6
51:3,11 52:4
62:13,18,24
68:23 69:5,6,7
70:2,6
detective's 52:10
DeVito 1:12 3:3
    4:2,12,18 10:9
    32:8 33:2,6,14
    38:19 40:12
    42:21 46:21
    48:20,24 65:22
    67:20 68:17
    72:13 73:11,19
    74:6,16
diary 16:17
dick 20:14 26:2
different 6:23
    41:15 52:3
digits 21:8 26:17
direct 8:3
direction 74:10
directly 74:20
disappointed
    71:11
disappointment
    69:14,23 70:3
    70:7,11,14
    71:7
discharging
    64:24
disciplinary
    70:23
discipline 7:15
    7:17 34:23,24
    54:10 57:9,10
    63:10 65:4
disciplined

**EXHIBIT J**

Cassandra Socha v. City of Joliet; et al.
Deposition of Officer Mike Devito - Taken 6/3/2021

Page 79

disclosed 36:6
disclosing 38:21
discuss 9:18
  59:24 60:6
  62:13
discussed 27:14
  36:7 43:12
  61:6,16
discussing 46:19
discussions
  18:13,14 25:8
  47:12
disgust 58:3
disgusted 29:12
disposition
  60:16
dispute 58:6
disseminated
  53:15
dissemination
  10:15 39:23
  42:6 43:1
District 1:1,1,15
  73:1,1 74:1
distrust 54:22
division 1:2 22:3
  22:6 24:2,3,21
  73:2 74:2
divisions 6:23
document 43:5
  43:11
documentations
  21:23
documents 5:13
doing 6:7 18:9
  45:2 57:19
double 21:8
  26:17
Doug 56:3
dproctor@tre...
  2:10
drawn 51:22
Due 41:4
duly 4:13 74:7

dumping 52:9
duties 7:13
duty 6:13 65:1

          E
E 3:1,10
E-mail 2:5,10,16
e-mails 43:8
earlier 35:6 36:7
  36:14 39:20
  40:2,22 41:16
  47:10,24 49:19
Early 49:10
  64:10
East 2:8
EASTERN 1:2
  73:2 74:2
Ed 4:8 49:1,13
  50:3,7,15 51:2
  51:6,21 52:18
  53:3,7 56:10
  56:11 66:7
Edward 1:7
  2:17 73:7
effect 18:1 20:15
  25:16
Egizio 56:3
either 25:5 56:2
  58:10 71:6,22
either/or 9:13
Elected 34:9
election 34:13
embarrass
  57:13
employed 33:14
employee 29:14
  74:18,19
employees 8:11
  21:1 31:19
  36:10
enforcement
  42:11
entire 24:4
  28:15

epidemic 58:2
equipment
  39:17
Eric 34:18
errata 73:16,20
erroneously
  71:22
error 71:20
estimate 21:7
  23:9,11 63:17
estimating 34:14
et 21:21
event 32:12
everyone's
  32:10
evidence 8:12,24
  9:11 11:5,11
  14:21 29:18
  31:2 39:17
exactly 35:17
  55:4 57:23
exam 63:24
examination
  1:13 3:4,5,6,7
  3:8 4:16 33:12
  48:22 67:18
  68:21
examined 4:14
example 20:4
exclusively 43:3
excuse 38:23
executive 34:12
  34:18
exercise 71:24
exhausted 53:6
EXHIBITS 3:11
exist 17:24
existed 19:3
expect 33:1
experience 6:17
explain 7:12
explained 5:3
explicitly 14:22
expose 15:7

exposing 18:8
express 28:2
  29:8 69:14,17
  69:22 70:2,6
  70:10,13 71:6
expressed 8:11
  13:15
extended 37:13
extensive 6:21
extent 10:11
extracted 10:18
  12:10 14:8,21
  21:3 23:17
  24:7,12 25:8
  25:20 26:6
  27:15 29:5,18
  29:20 30:10,21
  31:10,21 68:24
  69:8

          F
face-to-face 9:6
  23:14 27:17,19
fact 19:6 41:4
  42:24 48:8,17
  57:16
factual 17:24
fair 5:7 53:5
faith 31:7 54:15
  54:18 58:11
fall 19:12
far 27:5,9 38:16
FBI 42:16
Federal 1:14
feel 42:22
fell 41:7
fellow 8:13
felt 13:10 15:7,9
  19:13,18 28:2
  29:9,12 62:8
female 26:12
file 13:22 65:17
filed 46:13,15
  58:6 65:6,8

final 58:13
  60:16
financially
  74:20
fire 58:10 71:1
firearm 65:1
firm 5:19
first 4:13 6:5
  8:22 14:19
  15:23 23:4
  34:13,17 36:13
  42:3 74:7
five-minute
  32:16,18
flexible 33:6
flies 31:24
floor 23:24 24:1
flow 27:6
focusing 38:11
follow 50:22
follow-up 49:2
  68:19
followed 47:5
follows 4:15
footage 11:4,16
FOP 15:17 16:5
  19:22 27:20
  37:24 41:11,13
  54:23 57:2
force 7:19 49:5
foregoing 73:12
forensic 39:17
forgetting 56:5
forgive 30:16
  36:11
forgot 16:1
  22:16,17 65:22
form 12:6 43:6
former 31:11
forward 15:15
  21:22 26:19
  28:3 29:4,9,17
  31:20 38:22
  39:21 40:6

**EXHIBIT J**

Cassandra Socha v. City of Joliet; et al.
Deposition of Officer Mike Devito - Taken 6/3/2021

Page 80

56:15 58:9
**frame** 8:9 9:22
  26:23 36:4,15
  36:18 37:6
  60:12
**frames** 37:14
**Fraternal** 7:6,8
**friction** 54:23
  56:22
**friends** 56:8,9
**friendship** 28:20
**frustration**
  69:14,23 70:7
  70:11,14 71:7
**further** 3:7,8
  13:12 18:23
  32:3,7 67:18
  68:21 74:11,17

**G**

**gap** 37:8,12
**Gavin** 26:3
  28:17 55:11
**general** 7:12
  10:9 12:8
  24:17 25:4
  29:1 30:3 35:7
  60:24 61:6
  63:4 67:8,9
  70:21 71:10
**general's** 47:4
**generalize** 36:15
  37:6
**generalizing**
  37:14
**generally** 50:1
**getting** 17:9
  35:23
**give** 4:20 5:5 6:6
  6:16 29:23
  37:14 40:4
  44:17 45:3
**given** 20:8,17
  39:2 49:21

50:17 52:23
  53:11 67:10
  73:12,15
**gives** 63:7
**giving** 18:6 20:8
  72:10
**go** 4:21 14:18
  15:15 27:5
  44:23,24 62:11
  65:10
**goes** 20:13 32:19
  57:16
**going** 4:19 16:10
  17:11 18:17
  32:20 37:9
  40:19 57:18
  62:7,11 66:2
  70:23 72:8
**good** 4:2,7 45:2
  54:8 64:16
**gotten** 11:21
  12:3
**graphic** 19:7
**grievance** 7:17
**grievances** 7:15
  34:23 35:1
  58:7
**Grizzle** 1:7 2:17
  4:8 49:1,7,13
  49:16 50:3,7
  51:2,6,15,21
  52:18 53:3,7
  56:10,11 62:17
  66:7 70:2,6
  73:7
**Grizzle's** 50:15
**ground** 4:20
**group** 28:18
**guess** 5:9,11
  52:8 57:2
  62:24
**guessing** 35:17
  65:12
**guys** 56:6

**H**

**H** 3:10
**half** 16:22
**hall** 2:2,2 4:18
  12:7 32:21
  33:9 45:13,16
  58:10 65:21
  67:21
**hall@adamsle...**
  2:5
**handle** 7:14,15
  7:15 32:12
  34:22,22,23
  41:8
**handled** 8:13
  9:1 14:9 26:7
**handling** 9:11
  14:20 25:8
  27:15 29:17
  30:10 31:10,21
**hands** 12:3
**hang** 28:20
**happen** 16:6
**happened** 12:1
  58:2
**happening** 37:5
**happens** 72:15
**happy** 64:4
**hard** 27:5 32:21
  45:1
**Harrison** 26:5
  56:1
**hash** 57:9
**head** 8:17,19
  61:7 66:3
**hear** 5:1 56:10
  69:12,17,22
  70:2,6,10
**heard** 5:6 17:1
  20:5,12,19
  24:20 25:1
  32:5 61:19,20
  69:19,20
**hearing** 8:15

11:23
**Heavener** 56:1,2
**held** 33:20 54:21
**help** 15:10
**helped** 72:11
**helpful** 36:2
**Herald** 46:7
**HESS** 2:8
**Hickey** 1:16
  74:5 75:10
**higher** 35:21
**hold** 7:7
**home** 43:16,20
**honestly** 46:14
**hopefully** 67:17
**HOPPE** 2:13
**hour** 16:22
**hours** 6:21
**humiliate** 57:14
**hundred** 8:17
  14:15 21:9
  30:17 35:14
  46:8

**I**

**identified** 29:22
**identify** 11:8
  17:3 21:16
  24:11 29:19
**identity** 38:21
**III** 2:2
**Illinois** 1:1 2:4,9
  2:15 6:20 73:1
  74:1,2 75:2,12
**images** 10:17
  11:2 14:8
  18:20 19:2
  21:3 25:2
  29:20 68:24
  69:7
**important** 4:24
  28:3 29:4
**improper** 10:15
  11:5,13 39:23

**inappropriately**
  31:4
**incident** 21:24
  31:13 36:16,22
  37:4,5,7 55:3
**incidental** 21:12
**incidentally**
  61:12
**included** 55:10
**including** 6:17
  57:12
**indent** 29:12
**indicate** 29:2
  30:9 61:17
**indicated** 6:3
  49:4 54:13
  58:14,23 60:17
  72:13 73:16
**indirectly** 74:20
**individuals** 53:1
  53:3 55:24
  69:19 70:13
**indulgence**
  32:10 33:3
**inform** 40:18
**informant** 38:21
  39:1
**information**
  8:14,23 10:10
  11:24 12:24
  14:7 15:1,13
  17:4,8,16
  18:17 19:5
  20:8 27:3,4,7
  27:15 29:17,23
  30:15,19,21,23
  31:1,2,4 38:22
  39:2,4,7,22,23
  41:17,21 42:6
  42:24 47:2,15
  47:22 48:8
  50:12,15,16,17
  50:19,21 51:11
  51:17,21 52:2

**EXHIBIT J**

Cassandra Socha v. City of Joliet; et al.
Deposition of Officer Mike Devito - Taken 6/3/2021

Page 81

52:6,7,12,19
53:11,15
**informed** 19:10
41:1
**initial** 36:18
73:20
**inner** 55:23 56:5
56:11 57:1
69:13
**inspector** 30:2
35:7 47:4
**instances** 71:19
71:21
**intake** 32:23
**intend** 71:24
**interaction** 35:3
**interactions**
54:5
**interest** 19:14
44:13 65:16
**interested** 74:20
**internal** 11:15
24:4 54:9
59:20 60:13,14
**interrogations**
30:1
**interrupt** 66:5
**intervene** 15:10
**interviewing**
27:23
**interviews** 35:7
35:11,16
**introduced**
48:24
**investigating**
7:20,24
**investigation**
29:24 41:5
47:4 51:1 52:2
52:11 57:14
**investigations**
22:2,5 23:21
24:1,3,18,21
39:12 52:3

54:3
**involve** 19:20
**involved** 7:20,23
15:5 25:19
52:15
**involvement**
25:7
**involving** 17:11
41:4
**iPhone** 8:12
**issue** 19:15,17
19:21 32:14
41:2,8 42:1
64:22
**issues** 19:13
51:19 56:24
57:1,5 61:6
66:8,12 70:22
**items** 30:22

——————
**J**
**J** 2:8
**Jackson** 8:21,22
9:10,17 10:2,3
10:13,22 11:18
11:19,20 12:2
12:14,18,24
13:4,24 14:19
14:20 15:12
17:2,4,17
18:13,15,19
21:6 22:2,8,9
22:13 23:4,20
25:5,12,17,24
26:20 27:24
29:8,15 32:5
36:6,9,13
37:11,21 39:1
39:5,21 40:3,9
40:14 43:6
47:16,18 48:2
49:19 50:5,6
51:3,11 53:7
54:15 62:13,18

62:24 68:23
69:5,6,6
**Jackson's** 14:2
24:14
**JAMES** 2:8
**Jeff** 45:6 58:21
58:24 59:5,7
59:16,18,22
60:2 64:9
65:17,19
**Jeremy** 56:1
**jhess@tressle...**
2:11
**job** 18:7 64:13
**Joe** 56:3
**jog** 26:18
**JOHN** 1:7 73:7
**Joliet** 1:6 2:12
4:4 6:9,18,19
6:23 7:4,19
8:10 15:18
21:1 33:15,21
34:8,21 38:13
39:13 41:6
42:13 43:18
44:2 45:24
46:6,22 63:14
65:18 67:4,12
73:6
**Jr** 2:8
**judge's** 32:23
**June** 1:17 73:13
74:14 75:3

——————
**K**
**keeping** 63:11
**kind** 36:15 56:6
63:3,4,11 66:3
71:4
**knew** 12:1 55:22
56:7
**KNIGHT** 2:13
2:13
**know** 5:9,10

14:12 16:19,20
18:3 20:13
21:9 28:23
32:4,14,22
33:9 35:14,17
36:20 37:16
38:15 46:14
52:10,13,24
55:3 56:7
57:23 58:19
60:14 61:10,23
64:15 66:13,20
66:23 68:1,2
**knowledge**
30:16 46:22
52:5 65:19
66:9 68:1,5,6
68:12
**knows** 28:19
**KURNIK** 2:13

——————
**L**
**L** 2:7
**labor** 16:5 19:12
19:14,20 35:19
38:16 41:2,7,9
41:12,24 45:5
57:13 58:5,8
**lasted** 16:21
**Laura** 58:17,19
**law** 2:2 5:19
42:11
**lawful** 50:23
**lawsuit** 35:8
45:14,20 46:13
46:18 47:5
58:5 62:14
63:1
**lawsuits** 65:18
**lead** 7:16
**leading** 34:23
**learned** 25:18
47:3
**legal** 19:14

45:20 57:24
58:2,14
**legitimate** 27:3
**let's** 15:15 32:18
50:5
**letter** 16:16
43:15,19,23
44:5 57:17,21
58:3
**letters** 21:20
43:19 44:1
68:13
**letting** 32:4
**level** 56:22 58:9
**lieutenant** 11:14
12:3 24:16
25:6,14 26:5,9
47:11 48:1
54:7,9 56:1,3
66:16,20
**liked** 64:5
**Likewise** 29:8
**limited** 54:4
**Lindsey** 56:1,2
**line** 10:5 28:19
**list** 57:15
**listen** 46:9
**little** 45:1 72:10
**LLC** 2:2
**LLP** 2:7
**local** 19:23
41:14
**log** 32:12
**long** 7:10 16:13
16:21 23:9
28:19 32:15,20
36:16 50:23
64:2
**longer** 58:11
**look** 28:21 62:11
**loop** 63:11
**lot** 8:14 10:6
16:24 23:21,23
26:22 27:2,10

**EXHIBIT J**

Cassandra Socha v. City of Joliet; et al.
Deposition of Officer Mike Devito - Taken 6/3/2021

54:8,11

**M**

**M** 1:16 74:5
75:10
**mailbox** 44:2,6
**maintain** 14:24
15:3,12
**majority** 35:18
**manner** 49:21
51:11 52:23
53:11
**MARKED** 3:11
**material** 41:17
43:12 46:23
**materials** 44:6
49:21 51:1,12
52:23
**Matlock** 22:14
22:18 23:10,13
23:16 24:6,11
24:19,24 25:6
25:11,17,24
26:20 27:14,24
28:2 29:2,15
30:9 40:4
47:18 48:3
49:19 51:5,14
51:18 52:4,17
53:7 54:14
69:3,10
**Matt** 56:4 65:23
**matter** 4:8 31:15
32:3 42:1
45:17,20 49:2
57:16 61:24
62:8 64:18
65:3,10 67:2
67:24 68:4
**matters** 19:20
30:20 43:2,12
58:24 59:5,6,7
67:12 70:21
**Matthew** 2:13

4:7 49:1
**McKeon** 69:7
**McKinney**
68:23
**mclark@khk...**
2:16
**mean** 10:17
13:18 26:23
54:2,18 56:5
56:21 63:6
66:4
**meaning** 28:8
**media** 46:3
**meet** 4:9,10
14:17 15:16
**meeting** 14:18
16:4,13,16,21
16:23 17:3,20
19:24 20:11
23:7,9,12
27:13 35:23
36:4,5,13
37:19,21,24
38:4,11 40:16
40:17 43:5,10
43:12,13 44:12
57:24
**meetings** 27:8
27:17 71:1
**member** 15:5,9
29:14 34:13,18
43:18 46:22
50:20
**members** 7:5
11:6 12:21,22
22:2,5 28:6
30:1 35:19
42:13 57:14
64:15
**membership**
54:24 57:8,20
**memo** 16:16
**memoranda**
13:22

**memorialize**
21:21
**memory** 26:18
**memos** 21:20
**mention** 12:22
56:10
**mentioned** 19:2
20:24 35:6
41:9 44:18,21
46:11,12 52:21
**met** 15:19,21
27:21,23 68:2
**MIKE** 1:11 3:3
4:12 73:11,19
74:6,15
**mill** 27:4 37:11
**mind** 27:11
32:17 41:23
**minds** 71:4
**misconduct**
13:11,14,16
15:8 19:11,15
23:22 27:9
51:7 52:24
53:10,10,12,17
**misgivings** 29:1
**mishandled**
10:24
**mishandling**
10:14,24 39:22
**missed** 12:12
36:12 42:2
**moment** 14:19
**moments** 37:3
**month** 5:24 9:3
23:12 36:2
**months** 36:21,24
**morning** 4:2,7
46:9 72:10
**motion** 32:23
**Move** 19:8
**moved** 19:7 58:9
**multiple** 11:23
27:8

**municipal** 1:6
73:6

**N**

**N** 3:1
**name** 4:2,7,18
5:18 15:24
17:11 26:16
38:7 44:17,20
45:3,3 49:1
70:15
**named** 31:11,16
70:13
**names** 9:24
12:20,21 22:11
24:18 26:17
27:7 29:16
40:5 53:1 56:5
**nature** 11:3
12:10 16:11
39:8 41:17
50:9 53:20,22
54:6 64:22
66:17
**necessary** 29:9
**need** 5:2 45:4
50:1 71:23
**needed** 30:22
**negotiations**
7:16 34:24
**neighborhood**
7:2 34:2
**nervous** 23:24
**neutral** 53:24
54:1
**never** 5:9,11
11:24 12:17
21:23 22:24
24:18 51:24
63:21,24 67:23
68:2 69:19
**News** 46:7
**newspaper** 46:3
**newspapers**

46:11
**Nice** 4:9,10
**Nicholas** 7:21
**Nick** 59:15,19
60:3,9,22 62:4
62:8 68:9
**non-sworn**
31:19
**nonunion** 59:5,7
64:8
**Nora** 38:8
**North** 2:3,14
15:17 75:11
**NORTHERN**
1:1 73:1 74:1
**not-guilty** 65:12
**NOTARY** 73:24
**notations** 72:3
**note** 71:19,21
**notes** 13:21
16:17 21:20
43:8 44:9
62:11 66:2
**notice** 1:13
**notify** 42:11,16
42:18
**nude** 68:24 69:7
**Number** 73:20
**numerous** 9:20
13:5 18:16
21:1 30:20
49:20 52:21
54:14 56:15
57:4,12 58:7

**O**

**o'clock** 74:14
**object** 12:6
**obligation** 50:22
67:3
**obtained** 8:12
8:24 9:11
50:12
**obviously** 18:2

**EXHIBIT J**

Case: 1:18-cv-05681 Document #: 253-10 Filed: 11/21/22 Page 33 of 38 PageID #:1502

Cassandra Socha v. City of Joliet; et al.
Deposition of Officer Mike Devito - Taken 6/3/2021

Page 83

35:20 54:10
55:3,6 56:8
66:14
occasion 15:11
35:3
occasions 10:2
occur 55:2
occurred 9:4
36:16 37:4,7
48:1,3 57:22
60:11
office 11:12
15:17,22 16:3
25:13,19,23
28:1 31:23
37:24
officer 1:11 3:3
4:12,18 6:9,12
6:17 7:19,21
7:24 10:9 14:6
15:23 16:11
17:12,23 18:7
18:15 20:12
22:7 26:16
31:11,16,19
32:8 33:2,14
33:17 35:8,15
35:24 36:5
37:19,22 38:2
38:10,12,19,20
38:23,23 39:24
40:12,16 41:1
41:18,22 42:7
42:21 43:2,11
43:13,15,20
44:1,6,12 45:3
45:12,23 46:12
46:21,23 47:12
48:20,24 49:16
49:17 50:21
65:22 67:20,21
68:4,9,13,16
68:18 69:6
71:17 72:9,13

73:11,19 74:6
74:15
officers 7:5 8:11
8:13 9:23 11:9
12:23 13:1
21:1 25:1
26:12,19 28:11
29:19,22 35:12
45:4 46:18
49:20 53:7
55:19,20 56:15
57:1
offices 2:2 27:20
official 7:20,24
25:23 40:10,15
48:5,13 54:5
60:8 75:1
Oh 59:3 62:15
okay 5:11,23 8:4
8:5 10:21
12:12 13:12
15:15 19:8,17
20:18 25:5
29:8 31:15
32:2 34:4
35:11 39:5
41:12,15,21
50:5,9,20
51:18 52:14
54:1,6 55:7
62:1,11,21,24
63:13,19,23
64:6 66:15
67:14 68:3
71:12
old 64:7
once 5:23 51:23
63:15 72:11
one-sided 57:9
open 33:7 57:12
57:24
opera 27:1
operations 7:14
34:22

opinion 57:6,10
64:15
opinions 49:15
oral 20:11
order 7:6,8
50:23 71:18,19
orders 50:20
67:8,9
outcome 64:14
69:15,23 70:3
70:14 71:3,9
71:11
outreach 23:13
outside 42:23
45:5 60:1
62:21 63:23
66:10
over-the-telep...
9:7
overheard 24:20

P
P-E-R- 55:12
PAGE 3:2
part 42:3 54:24
55:15 56:11
participate 16:7
particular 10:11
20:1 28:11
29:19 63:7
71:7
particulars 11:1
17:19
parties 11:24
23:2 74:18
partner 56:7
party 69:20
passing 27:10
61:5
Pat 56:4
Patch 46:7
patrol 6:12 7:1
33:17 34:1
49:8,9 64:3

pause 65:24
peers 34:9
pending 63:10
people 9:24
10:11 11:10
15:21 18:16,21
20:6 21:10,14
21:16,22 22:1
23:24 24:17
25:15,16 27:2
27:6,10,22,23
27:23 28:18
29:16 30:5
31:23 40:5
52:15,22 54:14
56:14,19
percent 8:17
14:15 30:17
35:14 44:19
46:8
performance
49:16
period 13:8
37:13
Perona 28:16
55:11,12
person 14:14
62:9 68:2
personal 46:21
64:10,18 74:10
personally 7:19
7:23 70:1,5,9
70:12
persons 50:12
pertaining 1:15
pgs 73:20
Phillip 31:12
phone 2:4,10,15
8:24 9:11
10:16,18 11:3
12:4,11 14:8
14:21 16:12
17:24 21:3
23:13,18 24:8

24:13,22 25:2
25:9,20 26:7
27:15,18 29:5
29:18,20 30:11
30:15,19 31:10
31:21 38:24
39:24 41:18
42:7 43:2
46:24 47:13
51:17,22 52:7
52:9,19 60:19
60:23 62:3,9
69:1,8 75:12
phones 30:20
52:2,12
phrase 53:9
piece 11:11
place 37:24 44:1
places 72:11
placing 44:5
Plaintiff 1:4 2:6
73:4
played 71:5,8
plea 65:13,14
Please 33:6
73:20
point 14:5 17:15
19:4,8,10 32:8
34:5 61:6
police 6:9,17,18
6:19,20,24 7:4
7:6,8,18 8:10
17:11 26:24
28:20 33:15,21
34:21 35:3
38:13,16 39:13
40:19 41:6
42:13,18 43:19
44:2 46:22
49:16,17 58:10
63:14 64:11
67:4,12 70:22
70:23 71:1
policing 7:2 34:2

**EXHIBIT J**

Case: 1:18-cv-05681 Document #: 253-10 Filed: 11/21/22 Page 34 of 38 PageID #:1503

Cassandra Socha v. City of Joliet; et al.
Deposition of Officer Mike Devito - Taken 6/3/2021

Page 84

politics 71:4
pop 66:3
porn 20:14 26:2
position 27:1
  33:17 38:13
positions 7:7
  33:20 54:21
  63:23
positive 64:14
possible 52:6
potential 19:11
  27:9 42:19
  44:17 53:6
  59:10,12,12
potentially 11:6
  19:20 41:18
practice 15:2
  45:8
preparation
  5:13
presence 60:2
present 2:18
  15:19,24 16:9
  38:4 47:11
  48:4,4,9,12,13
presented 57:23
president 7:9,10
  7:13 15:3 27:2
  34:5,7,10,11
  34:15,19,20
  35:2 45:9 54:4
  57:6 60:9
  65:17 67:3
  70:17,20
pretty 45:2
previous 13:16
  24:4 28:7
  40:24 55:22
prior 20:11
  54:21
private 27:22
privately 15:21
probably 23:11
  26:24 27:10

36:23 49:12
  63:17
problem 15:10
  44:11 67:16
Procedure 1:14
process 7:17
  10:19 29:24
  30:14,16,21,24
  31:4 41:7
  51:16,21 52:15
  52:19 57:10
  58:11 60:13
  63:12 70:24
Proctor 2:7 3:5
  3:7 4:2,3 32:16
  33:5,8,13
  48:19 65:21
  66:4 67:17,19
  68:16 71:15
  72:12
promoted 54:21
  63:21
promotion
  54:22 56:24
  63:13
promotions 55:2
pronounce
  31:17
proper 31:1
proverbial
  31:24
proves 64:17
provided 47:15
  50:16,21 51:12
  73:17
providing 50:15
  50:24
PUBLIC 73:24
published 46:10
pulling 31:4
purpose 40:17
pursuant 1:13
  1:14
put 31:1

**Q**
question 5:1,2,5
  5:6 9:13 35:13
  35:24 36:12
  37:17 38:24
  40:12 65:22
questions 5:3
  32:8 48:19
  49:3 51:5
  54:12 67:17
  68:19 71:12,20
quick 6:16 32:11
  68:18
quote 18:7 20:13
  20:14,16 26:1
  26:2

**R**
radio 46:9,11
raise 13:4 21:11
  25:6 51:6
  52:17
raised 10:22
  14:20 40:9,9
  40:13 51:2,10
  53:2 66:8,12
  67:11
rank 6:11 35:20
ranks 33:20
reach 14:13
  22:22
reached 21:2,10
  22:1,13,18,24
  23:4,10
read 5:3 46:2
  57:17 58:3
  73:11
reads 52:8
really 27:7
  35:12 63:2
reason 28:5 63:7
  64:10
reasons 29:3
recall 6:1 8:9,22

9:2,3,6,19,24
  10:3,21 12:21
  14:11,12,13
  16:9,14,21
  17:19 18:4,19
  19:3 20:23
  21:18 23:15
  24:18 25:3,10
  25:15 26:4
  31:22 32:1
  35:8,11 36:3
  37:23 39:24
  44:19,20 46:14
  46:20 47:13,19
  48:5 49:9 51:4
  52:20,24 53:1
  53:2,4 56:18
  57:21 60:10,16
  60:24 61:1,7
  61:21 62:6
  63:5 64:22
  68:7,11 69:2,4
  69:9,11
recap 6:16
received 6:21
  11:15 64:1
recollection
  22:12 56:16
reconvene 32:19
  33:8
record 13:21,22
  13:23 16:15,17
  21:19 22:24
  35:15 71:24
  73:15
reduced 74:9
refer 41:8 44:16
  45:5,12 58:24
  59:4,7,15 64:8
reference 55:7
referencing
  53:13,18
referred 36:22
  53:14 64:13,15

referring 37:5
  47:2,7 53:10
  65:16,17
refresh 22:12
regard 70:21
regarding 5:16
  9:10 13:2
  18:10 39:8
  51:6 52:18
  53:7 68:9,12
  68:13
Regardless
  18:22 20:18
regards 10:14
  11:2 13:10
  18:17 23:21,23
  25:12 27:8
  30:14,18 31:13
  35:19 39:2
  50:11 51:16
  52:7 63:12
regime 56:22
regular 27:3
Reid 11:14 12:3
  24:16 26:9
  28:16 49:22
  52:23 53:12
  54:7 55:11
  66:16,20
related 5:20
  51:1,7 58:6
relating 20:2
relations 58:6
relationship
  53:20,22 54:6
relative 74:17
  74:19
relay 20:4
relayed 18:5
remark 26:2
remember 5:10
  5:11,18 8:18
  9:5,8 17:21
  20:16,17 22:18

**EXHIBIT J**

Cassandra Socha v. City of Joliet; et al.
Deposition of Officer Mike Devito - Taken 6/3/2021

24:9 27:5
29:16 47:19
55:4
remove 52:6
removing 52:5
repeated 5:3
20:19
rephrase 40:21
rephrased 5:3
report 14:2,2
24:24 29:10
32:3 67:3,11
reported 18:24
20:1,22 42:23
48:2 74:8
reporter 1:17
72:6 74:6 75:2
represent 4:19
19:16 35:20
42:1 49:1
representation
62:22
representations
38:20
representative
47:3 62:22
represented
45:19 58:17,21
64:12
representing 4:8
5:19 19:12
30:1 45:13
58:15 60:9
64:13 68:4
represents 19:22
41:14
request 14:22
32:10 33:2
38:5
reserved 72:5
74:16
resolved 60:15
respect 36:1
39:16 40:8

43:10 48:1
49:15 51:5,10
51:21 53:3
67:10
respond 61:13
responsibility
50:18
responsible
50:13
retired 55:5,5
retrieval 52:18
retrieves 52:12
revealed 17:16
review 71:18
72:2
reviewed 5:13
45:22 51:10
reviewing 44:9
right 10:8 20:24
29:6 30:17
32:19 33:15
37:19 38:10
48:7 49:5,22
54:16 55:5,8
59:1 71:17,23
72:1,4
River 2:14
Road 2:8,14
Robert 46:16
Roechner 11:20
13:18 24:17
28:8,11,12
29:2 49:22
52:23 53:11,23
55:8,10,16
56:16 66:23
69:13,13,22
70:10
Roechner's
11:12 56:22
role 15:1 16:2
34:20,24 35:2
38:10,13 50:15
70:7 71:5,7

roll 57:12
room 15:19
16:12 25:14
roughly 34:14
34:15
rules 1:14 4:20
rumor 17:9 27:4
37:10 48:1,3
rumors 8:15
10:1,6,9 11:23
16:24 17:22
18:2 20:1 36:6
36:13,17,18
37:1,9,9,13
40:18,23 42:5
42:9,22 43:3
43:16,21 44:3
44:7,14 46:18
47:10 53:14
56:15 60:18
61:10,14,18,20
62:2 68:10,14
run 33:9
running 10:6

_____
S
S 2:13 3:10
Sam 38:9
saw 30:5 66:16
66:20,23
saying 24:9 30:5
61:21
Scarry 58:17,19
Scheduled 40:16
scheduling 5:21
scores 57:8
search 10:19
30:22 36:24
37:7,12 52:8
second 23:24
24:1
secure 50:19
see 32:18 35:22
38:18

seeing 25:16
seek 19:14
seen 12:17 18:18
24:6,12
send 43:8,15
sending 43:23
sense 7:12
sent 43:19 68:13
separately 71:21
sergeant 35:20
56:2,3,3,4,4
69:18,18 70:17
70:19
sergeant's 63:24
served 6:6 34:12
34:17,18
service 7:18
settle 57:7
settled 58:8
sex 20:11
sexual 11:3
12:10 16:11
18:11 39:8
41:17 46:23
66:17,21,24
shape 43:6
share 12:24 19:5
19:24
shared 37:20
41:21
sharing 41:17
42:6 43:1
sheer 48:16
sheets 73:16,20
shift 25:22
shirt 70:18,18
shirts 54:23 57:2
short 33:11
Shorthand 1:17
74:5 75:2
shortly 8:7
22:20 37:10
show 72:4
sic 46:18

side 30:17 56:6,7
sign 33:9
signature 72:4
74:15 75:1
similar 20:15
23:20 24:14
60:21
single 13:7
sir 31:14 47:13
sit 39:7 53:5
sitting 32:9
smoothly 4:21
so-called 28:12
29:2
soap 27:1
Socha 1:3 2:18
4:19 8:1 14:6
15:16 16:6,11
16:13,23 17:16
17:20 18:5,11
18:24 19:24
20:1,4,11 23:7
23:10 32:4
35:24 36:5
37:19,22 38:12
40:16 41:1,22
43:11,13,15
44:12,23 45:3
45:12 46:12
60:18 61:9,12
61:17,21 62:1
66:8,12,17,21
66:24 68:4,13
68:24 69:7
71:8 73:3
Socha's 6:5 8:12
8:24 9:11 12:4
12:11 14:21
20:13 21:3
23:18 24:8,12
24:21 25:2,9
25:20 26:7
27:15 29:5,18
30:11 31:10,21

**EXHIBIT J**

Cassandra Socha v. City of Joliet; et al.
Deposition of Officer Mike Devito - Taken 6/3/2021

Page 86

35:8 38:20,23
38:24 39:1,24
41:18 42:7
43:2,20 44:1,6
45:23 46:23
47:5,12 52:19
60:23 67:21
70:7
social 46:3
somewhat 26:24
soon 33:10
sorry 9:15 11:18
11:19 12:12,22
18:15 22:7,16
22:17 24:16
42:2 44:24
55:14 59:4,9
61:2,8 62:15
62:20 65:23,24
66:18
sort 13:22 49:3
source 14:7 15:1
15:12 17:4,16
18:22 20:18
26:1
span 13:4
speak 11:4
31:11,15 62:7
specific 8:6 9:19
9:24 10:10,21
11:2,4,22,24
17:22 18:3,17
18:20,24 20:5
20:10,16 24:18
25:15,22 27:6
27:7,11 29:3
30:22 35:12
36:1,19 37:14
39:3 44:16
45:22 52:6,8
52:17 53:1
61:1,1,8,24
68:7,8,11
specifically 10:3

12:21 17:1
18:4 21:11
23:17 24:9
28:22 51:20
61:9,17,23
69:19,21 71:10
specifics 18:10
19:4,5 50:1
specified 74:12
specify 13:12
18:23
spectacular
64:12
speculation
48:16
spell 38:7
spent 64:2
spoke 5:23
22:20 24:17
spoken 5:16
46:16
spread 10:1
SS 74:2
Stachelski 31:17
staff 24:5 28:15
31:23 50:18,20
50:24 51:12
stance 58:12
71:2
standards 57:11
standing 19:16
19:21 34:19
Stanley 34:18
star 20:14 26:2
start 4:19 50:5
started 13:9
36:17 37:1
state 6:20 11:4
11:10 30:18
42:18 73:11
74:2 75:2
stated 17:23
18:1 23:20
24:15 40:24

59:4
statement 20:19
statements 15:6
States 1:1,15
73:1 74:1
stating 12:16
station 46:12
status 63:3,6,7
stenographica...
74:9
stick 27:11
sticks 61:7
storage 11:5,13
stored 11:11
Street 2:3 15:18
75:11
strike 43:24
53:21 55:20
62:16 68:7
69:5
structure 55:6
subject 5:20
18:12 20:10
41:15
submitted 73:20
subordinate
29:13
subpoena 6:6
30:23
subpoenaed
1:11
SUBSCRIBED
73:21
subsequent
15:11
substantive
32:24
sucks 20:14 26:2
suggest 22:11
Suite 2:3,9,14
75:11
summer 8:8 9:3
9:21 13:7,9
14:5 35:24

43:13
summertime 8:4
supervisor
49:13
supervisors
55:21
supervisors'
70:19
supporting 71:2
sure 4:24 8:17
14:15 16:22
20:3,4 21:9
24:24 25:21
27:18 34:1
35:14,18 39:6
46:8 56:18
58:1 68:20
72:14,15
surprise 52:14
sworn 4:1,13
73:21 74:7
system 51:23
52:1,4

T
T 3:10
take 31:5 32:14
32:16,18 33:1
43:8 62:11
63:16 66:4
72:12
taken 1:12,16
30:15,19 71:2
74:12
talk 23:21 26:22
44:13,23
talked 29:12
51:23 59:18
61:23 66:7,11
68:3
talking 12:8
17:21 30:2
54:20
Tamara 41:11

58:15 59:21
66:14
technical 30:17
39:16
technology
52:15
telephone 5:23
14:14
tell 11:17,20
12:2,14,18
16:23 22:11
23:16 24:6,11
25:17 33:6,24
39:3 44:13
46:5 59:22,22
61:9 68:23
69:3,6,10
70:16 71:23
telling 10:3
41:24
tend 27:2
tenure 58:18
term 34:12,17
terms 24:17
71:10
test 63:15,16
testified 4:14
36:11,14,14
37:3 40:20
41:16 47:24
49:19 66:10
68:10,14
testify 74:7
testimony 40:24
41:19 47:13
51:19 53:9
67:10 73:12,15
thank 4:4,6
48:20,21 55:13
67:14 68:16
72:16
thanks 72:9,10
thing 29:6 63:2
things 18:17

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT J**

Cassandra Socha v. City of Joliet; et al.
Deposition of Officer Mike Devito - Taken 6/3/2021

Page 87

37:4 66:3
**think** 8:16 12:9
  26:20 32:7,20
  32:22 45:1
  49:2 51:18
  52:21 54:12,16
  54:20 55:7
  56:2 58:23
  63:9 65:1
  67:14
**thinking** 71:4
**third** 69:20
**thought** 62:17
**tied** 63:10
**time** 6:14,18 8:9
  8:20 9:21 10:4
  11:12,14 13:4
  13:8 14:19
  16:4 17:9
  19:18 20:24
  23:4 24:15
  25:11,13 26:23
  28:10 31:3
  33:1 34:19
  36:4,15,18,19
  37:6,8,12,13
  37:14 38:11,14
  41:10,24 42:5
  44:2 45:12
  47:11 52:4
  54:7 56:14,17
  60:12 64:2
  66:4 67:15,24
  68:17 70:20
  72:9,16 74:12
**times** 5:4 9:17
  27:1,21
**Tina** 1:16 72:8
  74:5 75:10
**today** 5:14,17
  6:7 39:7 40:2,5
  46:13,19 53:5
  67:11 68:10,14
  71:24 72:16

**today's** 4:3
  66:11
**told** 16:24 17:20
  19:4 39:20
  40:22 47:10
  61:12 63:1
**Tom** 15:24 38:2
**Tomczak** 45:7
  58:21,24 59:5
  59:8,16,18
  60:2 64:9
  65:17
**tools** 39:17
**top** 8:16,19
**topic** 9:10 21:12
**topics** 6:4
**traffic** 6:15 7:3
  27:22 34:2
**training** 6:17,21
**transcribed**
  71:22
**transcript** 71:18
  72:6 73:12,14
**transcription**
  71:20
**treasurer** 16:5
  38:17
**treat** 29:13
**TRESSLER** 2:7
**trial** 65:10 69:15
  69:24 70:4,8
  70:15 71:8
**trickle** 37:2
**tried** 26:16
**trouble** 64:11,24
**true** 18:2 19:15
  23:5,7 32:5,6
  42:9 47:22
  48:11 73:14
**truly** 27:7
**truth** 74:8
**try** 10:8 37:6
  42:3
**trying** 15:7

26:18
**turn** 41:15
**two** 12:20 26:17
  27:12 47:20
  69:20 70:13
  72:11
**type** 16:15 58:5
**types** 15:3
**typewriting** 74:9

**U**

**ultimately** 50:13
  50:18
**understand** 5:1
  10:13 20:3
  32:21
**understanding**
  19:18 20:21
  26:1 33:9
  38:19 39:10,16
  50:11 66:15,19
**understood** 5:6
  11:20 12:3
**unfold** 36:17
**unhappy** 71:4
**union** 7:4,9,10
  7:13,15 15:2,9
  16:2 19:17
  27:1 28:1 32:2
  34:5,7,10,11
  34:15,20 35:2
  40:10,15 45:8
  47:3 54:4 57:6
  58:17,21 59:4
  59:5 60:2,8
  62:22 65:16
  67:3,7 70:19
**unit** 6:15 7:2,3
  23:21 27:22
  34:2 39:13
  52:11
**United** 1:1,15
  73:1 74:1
**unprofessional**

57:11
**unsolicited**
  22:22
**update** 63:8
**updates** 63:3,6
**upset** 28:6 61:15
**use** 39:22 64:16
**uses** 52:3
**Usually** 27:21

**V**

**variety** 18:20
**verdict** 65:12
**verified** 19:6
**verify** 48:8,12
**verifying** 47:22
**vice** 70:20
**video** 10:17 11:9
  11:21 21:3
  25:2,16 30:6
  38:23 39:3,8
  66:21,24
**videoconference**
  1:12 2:1 4:14
  73:13 74:7,12
**videos** 10:15,16
  10:23 12:4,7,8
  12:10,15,19
  13:2 17:12,22
  17:24 18:3,5,6
  18:12,18,24
  20:2,6 23:17
  24:7,12,21
  25:8,20 62:2,3
  66:16
**viewed** 11:9
  12:15,19 29:19
  32:2 46:23
  68:24 69:7
**viewing** 11:6
  25:7
**violated** 57:11
**violation** 19:19
**voice** 31:20

**voiced** 30:9
  70:24
**vs** 1:5 73:5

**W**

**waist** 18:9
**wait** 62:15
**waive** 71:23,24
**wall** 31:24
**want** 5:24 8:3,7
  10:8 14:18
  32:19
**wanted** 16:12
  17:10 61:10
**warrant** 10:20
  30:22 36:24
  37:8,12 52:8
**wasn't** 19:17
  36:16
**watch** 25:13,18
  25:21
**way** 8:12,23
  14:8 18:3 26:6
  31:1 43:6
  47:21 48:7,12
**we'll** 5:4 8:6,6
  33:8 50:1 72:4
  72:14,14
**we're** 12:7 32:22
  54:20
**we've** 26:20 45:1
  61:4
**week** 13:7
**weeks** 5:24 36:8
  36:21,23
**went** 6:20 54:10
**weren't** 18:14
  56:9
**whatsoever**
  13:23 16:16
**white** 70:18,18
**wide** 33:7
**withdraw** 52:1
**withdrawn**

**EXHIBIT J**

Cassandra Socha v. City of Joliet; et al.
Deposition of Officer Mike Devito - Taken 6/3/2021

Page 88

| | | |
|---|---|---|
| 51:17 | **zero** 8:6 | 75:12 |
| **witness** 3:2 4:1,6 | **Zoom** 32:12 | **312.445.4900** |
| 4:9,13 12:9 | 58:1 | 2:4 |
| 33:7 48:21 | | **33** 2:3 3:5 |
| 67:16 68:20 | **0** | **3rd** 1:17 73:13 |
| 72:2 74:15 | **05681** 1:5 73:5 | 74:14 |
| 75:1 | **084-003858** | |
| **WJOL** 46:8 | 75:13 | **4** |
| **word** 48:15 | | **4** 3:4 |
| **words** 20:14 | **1** | **48** 3:6 |
| 39:23 | **1-20** 1:7 73:7 | |
| **work** 6:15 8:8 | **10:30** 32:11,13 | **5** |
| 33:4,5 39:18 | 32:17,22 | **550** 2:8 |
| **worked** 6:24 7:1 | **10:45** 33:4 | **5600** 2:14 |
| 7:1,2 28:18 | **10:45-ish** 33:8 | |
| 39:12 45:16 | **100** 44:19 | **6** |
| 49:4,7 55:19 | **11:40** 72:18 | **600** 2:14 |
| 55:21 56:6 | **12** 63:17 | **60018** 2:15 |
| **works** 33:7 | **16** 7:11 34:11,17 | **60440** 2:9 |
| **worry** 24:10 | 45:10,11 58:23 | **60601** 75:12 |
| **wouldn't** 19:15 | **161** 75:11 | **60602** 2:4 |
| 33:1 | **18** 1:5 13:9 | **630.759.0800** |
| **write** 72:8 | 34:13,16 73:5 | 2:10 |
| **writing** 21:21 | **1996** 64:21 65:2 | **67** 3:7 |
| **written** 13:21,22 | | **68** 3:8 |
| 16:15,17 21:19 | **2** | |
| **wrote** 57:17 | **20** 49:11 | **7** |
| | **2018** 8:4,8 9:3 | |
| **X** | 9:21 13:7 14:5 | **8** |
| **X** 3:1,10 | 26:16 35:24 | **847.261.0700** |
| | 43:13 53:23 | 2:15 |
| **Y** | **2021** 1:17 73:13 | |
| **yeah** 29:11 | 73:22 74:14 | **9** |
| 49:12 59:9,12 | 75:3 | **9:30** 1:17 74:14 |
| 62:23 63:20 | **22nd** 75:3 | **97** 64:21 |
| 64:24 66:20 | **2350** 2:3 | |
| **year** 34:13 | **250** 2:9 | |
| **years** 6:19 7:11 | **27** 6:19 33:15,22 | |
| 33:15,22 34:4 | 34:4 49:4 | |
| 34:12,13,16,17 | **27-year** 6:22 | |
| 45:9,10 49:4 | | |
| 49:11 58:23 | **3** | |
| 63:17 | **30** 15:17 | |
| | **3050** 75:11 | |
| **Z** | **312.361.8851** | |

Royal Reporting Services, Inc.
312.361.8851

**EXHIBIT J**