

Douglas E. Kein EnCE,CFCE,CCME,CBE
ArcherHall
8003 Franklin Farms Dr., Ste. 123
Henrico, VA 23229
doug@ProDigital4n6.com
Ph: 804-588-9877

September 15, 2022

*CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CASSANDRA SOCHA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18 cv 05681 |
| v. | ) | |
| | ) | |
| CITY OF JOLIET, an Illinois municipal | ) | |
| corporation, EDWARD GRIZZLE | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**ATTORNEYS:**

John M. O'Driscoll                     Matthew Clark
Darcy L. Proctor                       Matthew Atkus
James H. Hess                          Counsel for Edward Grizzle
TRESSLER LLP                           KNIGHT HOPPE KURNIK & KNIGHT, LTD.
Counsel for City of Joliet             5600 N. River Road, Suite 600
550 East Boughton Road, Suite 250      Rosemont, Illinois 60018
Bolingbrook, IL 60440

I.    **LIST OF MATERIALS REVIEWED**

        In addition to my specialized knowledge, experience, education, and training in the areas
of law enforcement practice and procedures, evidence collection, storage, management, and

*CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

1

**EXHIBIT K**

security, noted in this report and my curriculum vitae attached as Exhibit A (CV of Doug Kein), I considered the following facts, data and materials in forming the opinions set forth in this report:

- First Amended Complaint
- Plaintiff's Sworn Answers to Interrogatories
- Complaint for Search Warrant and Search Warrant
- Documents Identified as Bates Stamped CITY00001 - CITY00425
- A complete copy of Socha phone data
- Edward Grizzle's curriculum vitae
- Edward Grizzle's training records
- Joliet Police Department (JPD) General Order #7-2 titled Complaints Against the Agency or its Employees
- JPD General Order #16-1 titled Evidence and Property Management
- JPD General Order #10-6 titled Criminal Investigation Organization and Administration (CITY00420-CITY00422)
- Lorinda Lampkin Affidavit
- IAPE Professional Standards -Version 2.6
- CALEA Law Enforcement Manual – Version 6.5
- JPD Law Enforcement Accreditation Assessment – October 14, 2021
- Deposition Transcript of Jeffery German, taken April 28, 2021
- Deposition Transcript of Donald McKinney, taken April 28, 2021
- Deposition Transcript of Christopher Botzum, taken April 30, 2021
- Deposition Transcript of Cassandra Socha, taken May 4, 2021
- Deposition Transcript of Brad McKeon, taken May 13, 2021
- Deposition Transcript of Mike DeVito, taken June 3, 2021
- Deposition Transcript of Tab Jensen, taken June 10, 2021
- Deposition Transcript of Nick Crowley, taken June 17, 2021
- Deposition Transcript of Alan Roechner, taken June 21, 2021
- Deposition Transcript of Marc Reid, taken June 22, 2021
- Deposition Transcript of Darrell Gavin, taken June 24, 2021
- Deposition Transcript of Jeff Tomczak, taken July 21, 2021
- Deposition Transcript of Edward Grizzle, taken July 28, 2021
- Deposition of Detective Dave Jackson, taken June 2, 2021
- Deposition of Sergeant Darrell Gavin, taken June 24, 2021
- Deposition of Officer Michael Batis, taken July 9, 2021
- Deposition of Deputy Chief Tab Jensen, taken June 10, 2021
- Report of Andrew J. Scott/AJS Consulting dated April 22, 2022
- Deposition of Andrew J. Scott, taken June 27, 2022
- Mr. Scott's Resource Materials.
- Telephone Interview of Sgt. Edward Grizzle on September 14, 2022
- Telephone Interview of former Chief of Police Brian Benton on September 14, 2022
- Telephone Interview of Frank Coleman on September 15, 2022

*CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

**EXHIBIT K**

## II.   SUMMARY OF FACTS

### Introduction

Plaintiff Cassandra Socha was and still is a City of Joliet police officer. In 2018, Officer Socha came under investigation following a text message she sent to a witness that had testified against Socha's boyfriend, Nicholas Crowley (also a Joliet police officer) in a criminal matter captioned, *People v. Crowley*. (Grizzle Dep.) As a result of the allegations, Joliet Detective Edward Grizzle obtained a search warrant from a judge in order to examine Socha's phone. Socha brought suit against the City and Detective (now Sergeant) Grizzle alleging that sexually explicit videos and photographs of her and Crowley on her phone did not remain private. Plaintiff's claims against the Defendants allege fourth amendment violations against Grizzle, and state law privacy tort claims of "intrusion upon seclusion" and "publication of private facts" against the City and Grizzle. Plaintiff's legal claims boil down to her argument that Defendants' violated her privacy rights by allegedly: (1) searching her iPhone without probable cause, (2) providing inaccurate and/or incomplete information in the Grizzle Affidavit to obtain a warrant to search plaintiff's phone, (3) conducting a search beyond the scope of the warrant, (4) allowing private information to be viewed by unauthorized officers within the police department, and (5) sharing of Plaintiff's private images within the investigations unit of the JPD.

### Domestic Dispute and Crowley Trial

On July 16, 2017, Socha was involved in a domestic dispute with her boyfriend (now husband) and fellow JPD officer Nicholas Crowley. Crowley was ultimately charged and stood criminal trial for allegations surrounding a domestic disturbance and Crowley's reckless discharge of a firearm. (CITY00003, 00028-30) Socha's neighbor, Maria Gatlin, provided a statement to the Joliet police supportive of these criminal charges (CITY00021).

Crowley's criminal trial proceeded in May of 2018, and Gatlin testified against Crowley on May 16, 2018. (CITY00024). Both Socha and Crowley were off-duty and highly intoxicated at the time of the domestic dispute. As such, Socha's recollection of events and criminal trial testimony was hazy on what actually transpired on the night in question. Grizzle was present for parts of the trial, as he was the investigator assigned to oversee the Crowley case, although he was not directly involved in the investigation of the case, nor did he testify at trial. (CITY00019) Crowley was ultimately found not guilty at trial. (Grizzle Dep.).

Just hours following her testimony at Crowley's trial, Socha's neighbor and fellow witness in the Crowley criminal trial, Maria Gatlin, contacted the prosecuting State's Attorney and Appellate Prosecutor Lorinda Lamken assigned to the criminal case to report that she had just received a threatening/harassing text message from Officer Socha, which she had accidentally deleted while trying to take a screenshot. On May 17, 2018, Gatlin arrived at the Joliet police department and met with Detective Grizzle, showing him a screenshot of the text message. In order to obtain forensic evidence of the text message, including verifying that Socha sent it, Gatlin volunteered to allow her phone to be forensically examined by the JPD. Detective Jeffrey German

*CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

**EXHIBIT K**

performed a forensic download of Gatlin's phone using the Cellebrite forensic tool to obtain the original text message received by Gatlin from Socha. (CITY00012-13) (Grizzle Dep.).

**Search Warrant**

On May 18, 2018, Grizzle opened his investigation into Socha's texts to Gatlin. On the same date, he signed a sworn complaint, and with the assistance of Appellate Prosecutor Lamken, obtained a search warrant for Socha's phone, including all of its data, signed by Will County Criminal Judge Sara Jones. (Grizzle Dep., Search Warrant and Application and Lamken Affidavit).

**Socha Cell Phone Seizure and Data Extraction**

On May 18, 2018, Detective Grizzle served the search warrant and obtained Socha's cell phone at the Joliet Police Department, with Lt. Brown present. (CITY00051-2). Detective Grizzle was not trained on how to use the forensic tools of Cellebrite and Lantern. At the time, only German and Botzum were certified and formally trained on these forensic tools. That same afternoon, Sgt. Botzum performed the cell phone data extraction using the Cellebrite and Lantern tools. (*Id*.). The Cellebrite extraction finished first, while the Lantern extraction took several hours longer. German took over the extractions while the Lantern program was finishing. The text messages in question were located and Sgt. German provided Detective Grizzle with a "working copy" of the cell phone data on a flash drive.

Once the "phone dump" was completed, Botzum saved the Cellebrite data to the Cellebrite computer. Botzum testified that upon saving the data, he showed Grizzle the name and location of the Socha data on the Cellebrite machine, and intentionally obscured the file name and location as an extra measure of security. (Botzum Dep.).

**Cellebrite and Lantern Forensic Tools**

In May of 2018, the Joliet Police Department had two forensic computers that were purpose-built computer systems dedicated to conducting cellular phone extractions and the analysis of the digital evidence. The two forensic tools that it used to obtain forensic data from cell phones were Cellebrite and Lantern. Each program is contained on a separate forensic computer.

The windows computer contained the Cellebrite 4PC program which is utilized to conduct cellular device extractions along with an additional program called Cellebrite Physical Analyzer. Physical Analyzer is a computer program that is used to process the cellular device extractions and create reports on notable items located within the digital evidence. Physical Analyzer also supports the extractions of iPhones and at the time of this event was the standard process for extracting iPhone digital data. The Cellebrite program was located on a single desktop computer located in the "bullpen" of the investigations division.

An Apple MacBook laptop computer contained a program called Lantern produced by Katana Forensics. The Lantern program conducts Apple cellular device extractions and processes

*CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

**EXHIBIT K**

the digital data automatically after extraction.  Lantern provides a listing of all files extracted and their respective hash value for verification. The Apple MacBook laptop was also kept and secured within the investigations division. (German dep. 29:10-30-6).

Both the Cellebrite and Lantern machines were kept within a secure area of the investigations unit which was not accessible to anyone other than investigators and supervisors (German dep. 32:2-33:20). The investigations room was limited to investigations personnel and supervisors and required keycode access (German dep. 30:10-16). Both machines were password protected.  The forensic machines were not connected to any common network drives, and the data stored on each respective machine could only be accessed by physically accessing the machines. (German Dep.) Instead of a shared drive, the respective computers were attached to a Network Attached Storage device (NAS) that allows for storage of extracted digital data.  The Network Attached Storage device contains the digital evidence that is collected during extraction and processing.  This storing of digital evidence on a dedicated password protected independent computer system is commonplace within the forensics community and is consistent with International Association for Property & Evidence ("IAPE") professional standards. (IAPE Professional Standard 16.3).

In conducting an extraction, the phone would first need to be plugged into the computer running the Cellebrite or Lantern programs. The program would detect the phone, and the phone data would then be downloaded to be analyzed. At the time of the Socha investigation, the Cellebrite and Lantern programs required that all phone data be downloaded in order for the phone to be searched.  There was no ability for only "part" of the data to be downloaded (i.e. only downloading text messages). Once downloaded, the forensic programs allowed for a reader report to be run that would parse out the data (separate into text messages, images, videos, applications, etc.) to allow for the user to effectively navigate and review the data.

### Storage of Cell Phone Data

When data is extracted, it is given a unique name for the file, which is saved and stored on the hard drive of the computer. Once data is extracted, only those who had the computer password AND know how to use Cellebrite would be capable to open saved data and run a report. (German Dep.). Once a report is generated, it is not accessible to every detective's computer. (German Dep.). Access to data is limited to access of the specific computer (including access to investigations room) and then knowledge of using Cellebrite or Lantern. It was accessible to individuals in investigations that knew the password and knew how to use Cellebrite. (German Dep.). At the time of the Socha investigation, only Grizzle and Botzum had any formal training with these forensic tools. Others were in the process of receiving formal or informal training, including Bergner, McKinney and Martinez. (Grizzle Dep. 43:21-44:6). It was not unusual for officers that were training to hone their Cellebrite and Lantern skills by accessing the forensic programs and navigate different data sets to get used to how the data is downloaded, stored and parsed. Depositions of JPD witnesses established that only Botzum, German and McKinney (who

*CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

**EXHIBIT K**

would later receive formal training) had knowledge of how to use the Cellebrite system and reader reports. (Botzum, German and McKinney Deps.).

Once phone data was extracted using the Cellebrite or Lantern machines, the cell phone would either be returned to its owner or retained for further investigation. Phones that were retained by the police department would be stored subject JPD's applicable general orders. The City had in place a general order that outlined in general the collection and storage of physical evidence – General Order 16-1. In the Socha case, the original physical evidence (Socha's iPhone) was returned to her when the extraction was completed.

Data from extractions, the "digital evidence", was stored on the computers housing the forensic programs and would not be entered into the BEAST system. (German Dep.).

### JPD General Order 10-6 – Criminal Investigation Organization and Administration

JPD General Order 10-6 covered departmental policies related to criminal investigation organization and administration (the division that handled the Socha investigation). This General Order was in place at the time of the Socha investigation and still remains in place. Section 4 of GO 10-6 dealt with accessibility to the investigation files. This section allowed for the investigator assigned to the case to have access to the investigative files, which includes "working copies" of phone extractions. Specifically, Section 4.2 of GO 10-6 reads "Investigative case files shall only be accessible to law enforcement personnel at the discretion of the assigned investigator or an investigation supervisor."

Investigators on the cases would need to readily access the data for their investigation, so they would be given a USB with the data that could be accessed away from the Lantern or Cellebrite machines. (German Dep). These USBs were known as "working copies". Working copies, by their nature, needed to be quickly accessible and used by the investigators, and were not stored in the BEAST system.

Section 4.3 of GO 10-6 allowed for the storage of evidence in special circumstances. Specifically, GO 10-6, Section 4.3 reads: "It is recognized that some criminal investigations contain sensitive information, which may compromise the eventual outcome of the inquiry. The Investigation Division Deputy Chief may authorize that original reports involving such cases are maintained within the Investigation Division safe. The Investigations Division Deputy Chief is responsible for the auditing and return to the Records Section any cases maintained in this fashion".

Pursuant to GO 10-6, Detective Grizzle did not enter the USB "working copy" into BEAST after transferring the Socha data from the "working copy" USB to his desktop (in order to have it readily accessible to utilize for his investigation). Instead, Grizzle turned over the USB to Deputy Chief of Investigation, Alan Roechner, who then placed the USB in the investigations safe in his office pursuant to GO 10-6. (Grizzle Dep., CITY00032, Roechner Dep.) It was customary for Deputy Chiefs to store evidence related to criminal investigations involving JPD officers in the Investigations safe. During Roechner's tenure as Deputy Chief, he was aware of multiple other occasions where evidence related to officer investigations was stored in the Investigations safe rather than being stored in BEAST. Roechner stated the purpose of this method of storage was to

*CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

**EXHIBIT K**

reduce access to the data related to the department employee by other officers or evidence technicians. (Roechner Dep.). This practice and procedure was allowable pursuant to Section 4.3 of GO 10-6. (Benton Interview). According to former JPD Chief of Police Brian Benton, who served as Chief during the events at issue in this lawsuit, GO 10-6 authorized the Deputy Chief of Investigations (Alan Roechner) to secure working copies of Officer Socha's cell phone data in the investigations safe because it involved a sensitive matter. Benton stated that GO 10-6 is based on and consistent with CALEA standards and is not uncommon based on his knowledge of law enforcement practices of other police agencies in the State of Illinois. (Benton Interview). As a member of CALEA, the JPD's police procedures and practices are periodically audited for compliance with CALEA accreditation standards and to Benton's knowledge, JPD has consistently received high marks for excellence in all areas. (Benton Interview).

Frank Coleman serves as JPD's CALEA Accreditation Officer/Manager and had held this position since 2012. Coleman verified that GO 10-6 was last revised on November 9, 2014, that GO 10-6 was in effect in 2018 during the events in question, and remains in effect to the present date. According to Officer Coleman, CALEA periodically audited the JPD's compliance in various areas of police practices and procedures including case file management (CALEA Standard 42.1.3) and evidence/property control (CALEA Standard 84.1.1). In 2021, CALEA conducted an audit of JPD's General Orders and generated a report regarding the compliance of the department's orders with CALEA standards, for which a report was generated. The report is attached hereto as Exhibit D (JPD Law Enforcement Accreditation Assessment – October 14, 2021). Based on the 2021 audit which included a review of GO 10.6, JPD was found to be in full compliance with applicable CALEA standards. (Coleman Interview; Exhibit D).

**Rumors**

In early June of 2018, while Grizzle was on vacation in Florida, the JPD became aware of rumors that data from Socha's phone of sexual images was purportedly viewed or disseminated to officers in the investigations unit. (Tab Jensen Dep.) During witness depositions, Socha's counsel asked witnesses if they had ever heard first or secondhand of any rumors or discussions related to nude or sexually explicit photos/videos of Socha. Specifically, Socha's counsel inquired if witnesses had heard rumors regarding the dissemination or viewing by JPD officers of a video of Socha performing oral sex. The viewing and dissemination of this oral sex video is a focus of Socha's lawsuit. The evidence and testimony indicate all rumors occurred second hand, and no JPD officers could be identified (directly or by rumor) as to who had in actuality viewed any private images extracted from Socha's cell phone other than Detectives McKinney and McKeon, who viewed a single photograph of Socha's breast in the course of McKinney's authorized use of the Cellebrite reader reports for training purposes. There is no evidence that McKinney, McKeon or any other member of the JPD viewed the oral sex video in question much less disseminated it amongst the detective division as Plaintiff claims. In fact, the City of Joliet's Inspector General conducted an investigation into these alleged rumors and other than McKinney and McKeon as previously noted, did not find any evidence to support Plaintiff's allegations that her private images were viewed, shared or disseminated by any member of the JPD.

*CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

**EXHIBIT K**

**Data Removal**

On or about June 8, 2018, Deputy Chief Jensen informed Deputy Chief of Investigations Al Roechner of rumors that investigations personnel may have seen or shared pictures or videos from Socha's phone. Jensen informed Roechner that he had already begun the process of having the data removed from the computers.  (Jensen Dep.). Roechner was out of the office during this time.

On the same date, Detective German received an order from Sgt. Gavin to remove the Socha phone data from the respective Cellebrite and Lantern computers, put them on a USB, and give them to Sgt. Gavin. (German dep, CITY0055). At this point, Socha's phone data no longer remained on the Cellebrite or Lantern computers. (Id.) When informed about the data removal, Grizzle was concerned that the original phone data being removed from the Cellebrite and Lantern systems would possibly taint or damage the original evidence. (Grizzle Dep).

On August 3, 2018, nearly two months after the removal of the original phone data from the Cellebrite/Lantern machines, Socha asked her supervisor for permission to leave work early because she had heard rumors related to the contents of her phone data. An internal memo of this report was generated. (Harrison Dep.) Socha did not provide any details about the alleged rumors. This was the only time Socha had made any report to the JPD relating to concerns about her phone data. Socha, nor any other party, made a report of the nature of the data, who had seen or disseminated the data, or how the data had been viewed or disseminated.

**Socha Lawsuit, RCFL Investigation and Findings**

On August 21, 2018, Socha filed a civil lawsuit captioned *Cassandra Socha v. City of Joliet, et. al,* alleging that sexual photographs and videos from her phone data were shared and/or disseminated within the Joliet police department.  Two days later, on August 23, 2018, the JPD requested the Chicago Regional Crime laboratory ("RCFL") to investigate the presence of Socha data on JPD electronic devices.  On August 24, RCFL personnel came to JPD and "imaged" the hard drives and electronic devices in the investigations unit.  On August 30, 2018, Roechner and Botzum brought additional JPD cell phones to the RCFL to be examined.  (Botzum Dep, Roechner Dep,).

The Regional Computer Forensics Lab (RCFL) reports provided to the City of Joliet indicate that the RCFL conducted forensics examinations on hardware belonging to the City of Joliet that included cellular phones and computer hard drives.  The RCFL imaged the listed devices and conducted a keyword search on the cellular/computer systems for the terms ".lantern" and "000742", a reference to the Lantern forensic tool and the Socha case file number that was used to store Socha's phone data A keyword search is when all the words within the device are compiled into a list for searching. In this case, the keywords were used to determine if the Socha phone data extraction materials were present on any of the devices examined.

Evidence of Socha's phone data was located only on two devices – "Invest 07" and "Invest 39". The fact materials reviewed indicate the respective devices were Sgt. Grizzle's  and Det.

*CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

**EXHIBIT K**

Germans computers, locations where they were intended to and had a lawful purpose to be. Based on their roles in the Socha investigation, it would be expected that both Sgt. Grizzle's and Det. German's computers would contain files related Socha's phone data. There were no phones that showed any evidence of ever containing Socha's phone data. (Botzum Dep., CITY0079-89).

### Review of Socha's Phone Data

In preparation of my expert report, I generated a Cellebrite Extraction Report to document or bookmark notable items found in the phone data. The Cellebrite Extraction Report can be found in the attached Exhibit B (Doug Kein's Cellebrite Extraction Report). I also conducted a forensic review of Socha's phone data that is the subject of this case. The details of this forensic examination can be found in the attached Exhibit C (Doug Kein's Forensic Examination Report of Socha's Cell Phone). After confirming the phone data was in the same state it was when extracted and had not been altered via the hashing process (which is outlined in Opinion 3 below), the following statements of fact can be made:

- The cell phone data (sms data) disclosed in discovery has not been altered, damaged or destroyed since it was originally extracted from Socha's cell phone in May of 2018.
- Socha's phone contained twenty-six (26) images of Socha in various stages of undress.
- Socha's phone contained four (4) videos of Socha in various stages of undress or involved in sexual activity.
- Socha sent nineteen (19) images or videos of herself in various stages of undress or engaged in sexual activity via outgoing text message on thirty-one (31) occasions.
- Socha received nine (9) images or videos of herself in various stages of undress or engaged in sexual activity via incoming text message on ten (10) occasions.
- The images or videos originated on four (4) different phone devices: an iPhone 5. iPhone SE, iPhone 6, and iPhone 7 plus.
- All images or videos described herein was created prior to May 17, 2018 (date of JPD's seizure of Socha's phone).
- Every transmission (outgoing or incoming) of the images or videos described herein occurred prior to May 17, 2018 (date of JPD's seizure of Socha's phone).

## III.   STATEMENT OF OPINIONS

My opinions and the basis of my opinions are formed from the totality of my specialized knowledge, skill, education, research, literature, training, and information I have reviewed; are the product of reliable law enforcement principles and methods; and I have applied these law enforcement principles and methods reliably to the facts and circumstances of this case. I refer and incorporate herein my professional qualifications summarized in brief in my attached curriculum vitae. Specifically, I have extensive knowledge, training and experience in law enforcement practices and procedures regarding the proper handling of forensic digital evidence and cell phone data in particular, including but not limited to chain of custody, evidence storage

*CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

**EXHIBIT K**

and collection, evidence management and related access and security standards. My expert opinions in this matter are held to a reasonable degree of law enforcement professional certainty, including law enforcement practices and procedures pertaining to investigations, my understanding of JPD's applicable departmental policies (General Orders), and how the CALEA and IAPE standards correspond to and comply with same.

> **OPINION 1:**
> **THE SEARCH WARRANT IN QUESTION WAS NOT OVERLY BROAD, AND THE EXTRACTION OF ALL PHONE DATA FROM PLAINTIFF'S PHONE WAS NECESSARY TO PERFORM A FULL LAW ENFORCEMENT INVESTIGATION.**

The warrant for Plaintiff's cell phone was not limited to obtaining or viewing text messages, a point which Plaintiff raises in her complaint and a point that is touched on in the Plaintiff's expert report. I disagree with Scott's opinion on this point. Based on my review of the case facts and knowledge and understanding of the workings of the Cellebrite/Lantern forensic tools, the warrant for Plaintiff's cell phone was not overly broad. Indeed, the language in the warrant, as presented to the criminal judge for her review and approval, was absolutely necessary and permitted the entire contents of the cell phone to be extracted for the criminal investigation of Officer Socha for witness intimidation/harassment. Ostensibly, the Plaintiff and her expert argue that the City should have limited its extraction/search of Plaintiff's phone data to just text messages. This premise is incorrect for a number of reasons.

First, the police department is required to follow the scope of the warrant that was approved by the judge. In this case, the warrant approved by the Will County Judge Sara Jones authorized the search, seizure, and forensic analysis of:

> "Any and all data regarding electronic communications, including dates and times of those communications, digital images or videos, e-mail, voice mail, buddy lists, chat logs, instant messaging or text accounts, forensic data as well as data pertaining to ownership and registration of the device, any and all access logs identifying who utilized said digital storage devices, and any "hidden," erased, compressed, password-protected, or encrypted files."

(See Search Warrant).

In applying this language to digital forensics, this means that the search warrant covered the entirety of Plaintiff's cell phone and its data. Pursuant to the plain language of the search warrant, and in accordance with the police investigation procedures, the City complied with the parameters of the search warrant and did not exceed the scope of the search warrant when it extracted all of Plaintiff's phone data.

Second, the Lantern and Cellebrite programs require that the entire contents of cell phones be extracted. Neither program has the capability of "partial" extractions (i.e. limiting extractions to just text messages). Given the nature of how Lantern and Cellebrite work, it is not possible to narrow the scope of the search warrant to anything less than all of the cell phone data. Even if an

*CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

**EXHIBIT K**

investigator wanted to limit the scope of their investigation to one area of the phone data, a phone extraction using Lantern and/or Cellebrite would require the entire contents of the phone be extracted.

Third, the extraction of all of the data is necessary for the investigator to do a full and thorough investigation. Even though Sgt. Grizzle was advised the information he was looking for was in a text message format, that doesn't mean that evidence supporting the potential crime of witness intimidation did not exist in other areas of the phone. For instance, it is possible copies of the text were saved in an image format, or there were further discussions of the incident that took place in email correspondence, Facebook chat, or on other communication applications (such as Snapchat, WhatsApp, or Discord). In conducting a thorough and complete investigation, an investigator could become aware of information that would necessitate they look into other areas of the cell phone data that they did not originally believe they needed to investigate.

In addition to completing a full investigation to find any evidence in support of the alleged actions, the investigator (and prosecution) has a duty to locate and consider possible exculpatory evidence. In fact, limiting the scope of the search to just text messages could result in the investigator missing out on information that would support Plaintiff's innocence. Appellate Prosecutor Lamkin even considered the need to investigate the phone for possible exculpatory evidence as well. (Lamkin Affidavit ¶ 11).

In order for Sergeant Grizzle to conduct a comprehensive investigation, including the possibility of finding exculpatory evidence, he needed access to the entire contents/phone data which includes messaging that could be found in other areas of the phone contents (e.g., messaging applications, screen shots of it, emailed, and photos, etc.). As noted above, access to the entire phone contents would include any exculpatory evidence that shows Maria Gatlin was lying or did not give the police the full story. For these reasons, the scope and language of the search warrant which authorized the search and seizure of the entire contents of Plaintiff's phone data was necessary for a full forensic analysis and in line with law enforcement investigation policies and practices to allow the investigator to conduct a full and thorough investigation.

Additionally, following review of the materials, including the search warrant and affidavit of Lorinda Lamken, it can be concluded that the warrant contained accurate facts and information. Additionally, at all times the search warrant served and executed by Detective Grizzle and the Joliet Police Department was correct, proper, and reasonable to include all of the materials sought. Further, all contents of the cell phone, including text messages, applications, media and the like had a reasonable law enforcement basis to have been searched for possible evidence of witness harassment and possible exculpatory evidence.

**OPINION 2:**
**DEFENDANTS DID NOT BREACH CHAIN OF CUSTODY PROTOCOL FOR THE PHYSICAL EVIDENCE IN QUESTION.**

The term chain of custody refers to chronological documentation of the seizure, custody, control, transfer, and disposition of evidence, either physical or electronic (IAPE Professional Standards -Version 2.6, P. 5). For this case, the chain of custody for the physical evidence in

*CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

**EXHIBIT K**

question, Plaintiff's cell phone, was properly followed. The investigators involved in Socha's phone extraction each documented their roles as it relates to the seizure extraction and return of Plaintiff's phone. Based on my review of all materials provided, there were only three JPD officers involved in the handling of the physical evidence: Sgt. Grizzle, Detective German and Detective Botzum. Grizzle was the lead investigator, and German and Botzum assisted with the cell phone extraction via Cellebrite and Lantern. Thus, all three had a law enforcement purpose to handle Socha's cell phone.

Specifically, Sgt. Grizzle documented in written reports the date, time and additional details of the lawful seizure of the phone. Detectives German and Botzum, who assisted with the extraction, also documented the handling and extraction of Plaintiff's phone. German and Botzum also detailed in their reports how, upon leaving the office in the middle of the extraction, Botzum transferred the cell phone to German to finish the extraction. German's reports also indicate his receipt of the phone and how he finished the extraction. Their respective reports also detail that immediately after Botzum and German completed the extraction pursuant to the search warrant, they returned the physical evidence to Plaintiff. Upon the return of the phone to Plaintiff, the department no longer had control or custody of physical evidence. As a result, there was no physical evidence to place in the BEAST system pursuant to General Order 16-1. The only remaining evidence in the department's possession was digital evidence of Plaintiff's cell phone data.

The actions of Grizzle, Botzum and German were in accordance with established law enforcement practices and procedures, and with the department's policies and procedures regarding the handling, documenting and return of the physical evidence so as to ensure proper chain of custody of the physical evidence. Additionally, Socha's cell phone was returned to her immediately after the extractions occurred. This is consistent with International Association for Property and Evidence (IAPE) Standard 13.4 - Property for Safekeeping – Disposition, which requires property be returned to as quickly as practical (IAPE Professional Standards Version 2.6, P. 68).

**OPINION 3:**
**DEFENDANTS DID NOT BREACH CHAIN OF CUSTODY PROTOCOL FOR THE DIGITAL EVIDENCE IN QUESTION.**

Once the data was extracted from Plaintiff's phone on to the JPD's Cellebrite and Lantern forensic evidence machines, the department was in control of the digital evidence (e.g., Plaintiff's original phone data). Defendants' documentation that the original extraction remained on the Cellebrite and Lantern systems is undisputed. Based on my review of the materials and training on digital evidence collection, Defendants did not breach chain of custody protocol in their handling of the digital evidence in question. In fact, Defendants' handling of the collection, storage and management of the digital evidence involved in this case is in accordance with current law enforcement standards. Specifically, IAPE has published standards and best practices for the infrastructure and storage of digital evidence; "Agencies utilizing digital evidence should maintain the technological capacity to appropriately manage and store digital evidence and adopt measures

*CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

**EXHIBIT K**

to accommodate future demands in digital evidence technology." (IAPE Professional Standards Version 2.6, P. 86). Plaintiff's phone data fits within the IAPE definition of digital evidence: "Digital Evidence refers to digital information that has probative value in either tending to prove or disprove a material fact in a criminal or civil case. Digital information is any type of electronic file containing text, data, signal, image, video, or voice recording stored on magnetic, optical or flash media." ( *Id* at 83). The Joliet Police Department's digital evidence infrastructure further complies with IAPE Standard 16.4, in that the department: 1) stored Plaintiff's digital evidence on a secured, dedicated computer; 2) within a secure room with limited access (investigations room that required key code access; 3) within a secure police department. (*Id* at 86)

Although Joliet does not have a General Order regarding digital evidence, Joliet's practice and procedure of storing digital evidence infrastructure was consistent with IAPE standards and widely accepted law enforcement practices and procedures. The Cellebrite and Lantern computers which housed the digital evidence were dedicated and secured machines. The machines were not used for any other purpose than to perform and store extractions. The machines were password protected. Only those who had the login information could access the Cellebrite and Lantern machines that housed the digital evidence. The machines were also not connected to a shared network, meaning that they were not accessible from any outside computer or device.

Contrary to Plaintiff and her expert's contention, Plaintiff's cell phone extraction (digital image of the cell phone) did not need to be stored within the BEAST/evidence property room in order to maintain chain of custody or comply with law enforcement evidence storage standards. Based on my review of the case materials, Defendants' infrastructure for the handling of digital evidence complies with IAPE standards which require that police departments utilize a dedicated, password protected computer for forensic extractions and storage. The JPD had dedicated machines, that were password protected, inside secured investigations division which provided limited access from the rest of the department or members of the public.

Overall, JPD followed IAPE standards and widely accepted and applied practices and procedures in the storage of the original cell phone extraction. The evidence/phone data was extracted and stored on a single computer in the detective division that was not connected to any shared network and not accessible from any outside device. The physical access to the computer was limited to detectives who had key code access to the investigations division (secure area of the JPD police station) and the computers housed the Cellebrite and Lantern systems were password protected. Contrary to Scott's opinion, the password to access the computer was not "commonly known" within the detective division but rather only several users aware of the password (German, Botzum, and McKinney). In addition to the protected password, in order to access the data, the user would need formal training and/or hands on experience in how to navigate the Cellebrite program. Here, the only members of the JPD detective division with this ability were Botzum, German and McKinney. In total, there were four steps of protection to secure and safeguard access to the main computer.

Additionally, the location of the Cellebrite machine at the time of the Socha investigation was consistent with law enforcement practices and procedures. Having the Cellebrite computer out in the investigations unit allowed investigators to see who is using it, and monitor those who

*CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

**EXHIBIT K**

were accessing the secured dedicated computer. Unauthorized users would be readily apparent to the investigations unit.

In applying the chain of custody standards related to ensuring evidence is maintained and can be properly introduced in criminal cases, the City properly followed the IAPE standards and law enforcement practices and procedures that ensured the phone data was not altered, damaged or destroyed. In fact, based on my review of the materials provided, I can definitively say that the evidence (the phone data extracted from Cassandra Socha's cell phone) has not been altered, damaged or destroyed. A forensic examination of the data was performed by "hashing" the phone data. Hashing files is a common practice within digital forensics that allows for files to be validated. Hashing a file is the process of utilizing a hashing algorithm to produce a unique fixed-length string or hash value. Upon re-hashing a file for verification we will receive the same hash value indicating that the file was not altered or changed from the original file.

Using the hashing process on the phone data, I have confirmed that the phone data has not been altered since the original extraction. (See Exhibit C). Based on this review, I can say with certainty that Plaintiff's phone data has not been altered and remains in the same state as it existed from the original extraction. The parties in a criminal proceeding would be able to rely on the data and properly lay foundation to have it introduced in a criminal trial.

It is important to note that, according to IAPE Standard 16.3, chain of custody applies to original evidence. It does not discuss the creation and storage of working copies, which is discussed further below. (IAPE Professional Standards Version 2.6, P. 86).

**McKinney's Viewing of Nude Photo**

Plaintiff's expert has opined that McKinney's viewing of an image of Socha's bare breast while utilizing the Cellebrite computer is an example of a breach of the "chain of custody protocols involving criminal evidence" (Scott Report 1.39, p. 22). Once again, Plaintiff's expert misapplies "chain of custody" standards in what this expert can only conclude is an effort to allege McKinney was not authorized to access or had no law enforcement purpose for being on the Cellebrite computer.

To the contrary, the evidence and testimony confirms Detective McKinney had a law enforcement purpose for being on the machine and exploring the phone data when he viewed the photo of a bare breast in question. Specifically, his law enforcement purpose was for training on the Cellebrite forensic tool. German was aware that McKinney was beginning the process of engaging in formal Cellebrite training to become Cellebrite certified. (German Dep.). McKinney had been given the Cellebrite password by Detective German. (McKinney Dep). German testified that at the time the photo of the bare breast in question was viewed by McKinney, McKinney would have been on the computer for an investigation or other reasons, which could include training, and that this was not unusual. (German Dep). The evidence and testimony indicates that Socha's phone data was stored in a file that was not identifiable to her. (Botzum dep).

The evidence and testimony suggest that, while accessing the Cellebrite computer and training for a law enforcement purpose, Detective McKinney came upon the photo of the bare

*CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

**EXHIBIT K**

breast by chance. Both McKinney and McKeon testified that the photo did not contain the person's face to identify them. (McKinney Dep, McKeon Dep). McKinney testified he closed the file immediately upon seeing that the next photo was of Socha would support the fact that he was not aware that he was viewing Socha's data when he came across the next photo showing Socha's face. (McKinney Dep). Additionally, McKeon testified that when he asked McKinney who the photo was of, McKinney response "It might be Socha", indicating he was not sure until he moved on to the next photo of her face.

As a certified Cellebrite instructor, it is my standard and practice to encourage individuals like McKinney to engage in informal and independent self-education on the Cellebrite program as often as possible in order to gain experience with the program. I encourage my students and trainees to log on to Cellebrite machine and practice interacting with the Cellebrite software and reader whenever they have the opportunity in order to familiarize themselves with the program. This includes opening up older extractions, running a report via the physical analyzer, and exploring the contents of the phone data by utilizing Cellebrite's various functions. Practicing in this manner is one of the best ways to become proficient at honing your forensic skills. It is important to note, McKinney was using the physical analyzer function, which is a read only application. It does not make changes to the original evidence, while the user is utilizing the application.

**OPINION 4:**
**WORKING COPIES MADE OF THE ORIGINAL EVIDENCE WERE DONE SO FOR A LEGAL LAW ENFORCEMENT PURPOSE AND WERE CREATED AND STORED CONSISTENT WITH JPD POLICIES AND PROCEDURES AS WELL AS CALEA AND IAPE STANDARDS.**

Consistent with law enforcement practices and procedures, Joliet General Order 10-6 (and corresponding CALEA standard 42.1.3), a working copy was made for the lead detective (Edward Grizzle) assigned to the criminal investigation of Cassandra Socha for witness intimidation. Det. German provided a flash drive to Sgt. Grizzle, who copied the data to his workstation computer. It is not uncommon for a working copy of the digital evidence to be provided to the lead detective, and not unusual for the investigator to keep a copy on their workstation computer. Sgt. Grizzle utilized a working copy to facilitate his investigation and review of the data. This action is consistent with accepted investigative police practices for the lead detective to maintain a working copy of digital evidence relevant to an open criminal case investigation. Specifically, CALEA standard 42.1.3 (which corresponds to GO 10-6) includes commentary stating "case files should contain a copy of preliminary investigative reports…needed for investigative purposes. These files should be consolidated into the central records system when the case is suspended or closed."

The commentary clearly indicates that copies are permitted for investigative purposes. The commentary also indicates that copies should be put into central evidence, or BEAST in this case, only when the case is suspended or closed. It is undisputed that during the timeframe of the allegations complained of in Plaintiff's complaint, the investigation remained ongoing, and at no

*CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

15

**EXHIBIT K**

time was suspended or closed. As a result, Grizzle and the JPD complied withs it General Order, CALEA and IAPE standards when working copies were created and not kept in central evidence.

Consistent with best practices, the GO 10-6 and IAPE standards, Grizzle took efforts to secure the thumb drive by handing it to Deputy Chief Roechner, who then placed the thumb drive in the investigations safe in his office. Grizzle, in his deposition testimony, recognized the possible sensitive nature of an investigation into one of the department's officers, so much so that he provided the flash drive working copy to DC Roechner so it could be secured pursuant to GO 10-6. Furthering the efforts to secure the working copy on his computer, Grizzle ensured his workstation computer was password protected and that any time he left his station, he ensured he locked the computer.

The reports generated by Grizzle, German and Roechner, as well as the deposition testimony, support that the officers involved both followed and documented what was done with the initial working copy, which is in accordance with what is required by CALEA and IAPE. GO 10-6 follows CALEA standards with respect to evidence and property control. As previously mentioned, GO 10-6 is based on CALEA Standard 42.1.3 which allows working copies of evidence to be stored on the lead detective's computer until the case investigation is completed. Additionally, the City's securing of the USB thumb drive of Grizzle's working copy in the investigation division safe is consistent with CALEA Standard 84.1.1 regarding evidence/property control which gives law enforcement agencies the ability to "establish extra security measures for handling exceptional, valuable, or sensitive items of property." (CALEA Standard 84.1.1). Without question, the City of Joliet and Grizzle were acting pursuant to and in accordance with CALEA standards when Al Roechner stored the working copy thumb drive from Grizzle under lock and key in the investigations unit safe.

JPD exercised its discretion under General Order 10-6, CALEA and IAPE standards to secure working copies of the evidence in a locked safe in the detective division. To place the working copies in central evidence, where anyone in the department had access to the sensitive data, defies common sense and best police practices. Given the case history at the time of the events in question, the City would be remiss if it put the working copy in a place where possibly Socha, Crowley or others working with them, could get access to it. For this reason, when there is an officer involved criminal investigation, the DC of investigation secured the working copy in a locked safe that only he had access to in accordance with JPD General Order 10-6

**CALEA Audit of JPD General Orders**

According to Joliet Police Department's CALEA officer/administrator, Frank Coleman, General Order 10-6 (CITY00420-CITY00422) was last updated in 2014 and was in effect during the entirety of the Socha investigation in 2018 and has remained in effect since. (Coleman Interview). As indicated in the header for GO 10-6, it is based upon CALEA Accreditation Standards 42.1.1-42.1.5. (CITY00420-CITY00422).

In 2021, CALEA performed an audit of JPD's General orders, including Joliet's GO 10-6. When performing an audit, CALEA will review a department's general orders and make a determination if any of them do not meet the CALEA standards. CALEA's 2021 audit of the Joliet

*CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

**EXHIBIT K**

Police Department and the CALEA assessment record of its review indicate "Compliance Verified" with 42.1.3, meaning that CALEA looked at JPD GO 10-6 and found that it complied with CALEA standards.

Consistent with Sgt. Grizzle's training and experience, JPD polices and CALEA standards, along with widely taught and accepted law enforcement practices and procedures, Grizzle maintained a working copy of the investigation of Socha on his computer at his workstation. The investigations area was restricted to only detective sergeants requiring a 4-digit pin code specific to individuals. Sgt. Grizzle's workstation computer was password protected and was always locked if he was not present. Only Sgt. Grizzle and command staff would have had access to the contents of the computer and Socha investigation. In order for anyone other than Sgt. Grizzle to access his workstation computer, Sgt. Grizzle would have had to share his password. Sgt. Grizzle's has indicated he did not share his password with anyone.

Based on his training, experience, the general orders, and law enforcement practices and procedures, a working investigation report and materials were kept on Grizzle's computer at his workstation. This would allow Grizzle to have access to the investigation materials when working on the same which he would need potentially at any time. The investigation materials were stored in a secure manner on his computer at his workstation and for a law enforcement purpose. Any and all copies of the investigation materials were given to the command staff pursuant to the general orders of the police department including the chain of command.

At all times, Sgt. Grizzle actions were reasonable with respect to the manner in which the investigation materials were stored and handled.

**Internal Affairs Investigation**

To the extent Plaintiff's expert's argument of a "breach" occurring extends to the possession of a copy of the digital evidence by the Internal Affairs division (via Lt. Reid), Plaintiff's expert's opinion is again flawed. First, there is no record or testimony that supports that Lt. Reid obtained a copy of anything other than a screenshot of the text message itself. Even in the event he received a full copy of Socha's phone data, as the IA investigator, he would have a lawful purpose to do so. Just as there were policies and procedures that supported Grizzle and those involved with the direct investigation having copies of digital evidence, General Order 7-2 supports an Internal Affairs investigator gathering copies of evidence. Specifically, Section 6.3(B) allows for the investigating supervisor, in this case Lt. Reid, to gather evidence such as reports, photos, and videos. (General Order 7-2 Section 6.3(B)(1)).

**OPINION 5:**
**A REVIEW OF PLAINTIFF'S PHONE DATA (SHOWS THAT PLAINTIFF DISSEMINATED SEXUALLY EXPLICIT VIDEOS OR IMAGES HERSELF ON MULTIPLE OCCASIONS BEFORE HER PHONE WAS SEIZED BY JPD. THERE IS NO EVIDENCE THAT ANY VIDEOS OR IMAGES WERE DISSEMINATED BY ANY MEMBER OF THE JOLIET POLICE DEPARTMENT OTHER THAN**

*CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

17

**EXHIBIT K**

**ONE IMAGE BEING SEEN BY TWO OFFICERS WHILE ENGAGED IN CELLEBRITE TRAINING.**

Plaintiff's complaint alleges that private images and/or videos from her cell phone were disseminated by members of the Joliet Police Department. In reviewing the provided materials, the only instance of a "private" image or video of Socha being viewed JPD officers was when Detective McKinney (along with Detective McKeon) saw a photo a bare breast while training on the Cellebrite machine. Immediately after, McKinney saw a different photo of Socha's face and drew the conclusion that the breast was that of Socha. McKinney then immediately closed the program. There is no other evidence to suggest that any other individuals ever saw or disseminated any private images or videos.

A review of Socha's phone data indicates that she did not keep her data, including nude images and videos, secure. The forensic examination showed that Socha took photos and videos of herself in various stages of undress or engaged in sexual activity, as well as allowed others to take photos of herself in similar states. Additionally, Socha sent nineteen (19) different images or videos of herself in various stages of undress or engaged in sexual activity via outgoing text message on thirty-one (31) occasions and received nine (9) images or videos of herself in various stages of undress or engaged in sexual activity via incoming text message on ten (10) occasions. There were at least four (4) cell phones that contained images or videos of Socha in various stages of undress or engaged in sexual activity. All of these images or videos were created prior to May 17, 2018 (the date of JPD's seizure of Socha's phone). All transmissions, both incoming and outgoing, occurred prior to May 17, 2018. In reviewing the complaint and fact materials, the video of which Plaintiff's counsel indicates is the basis of the rumors around the department (relating to Socha performing oral sex) would only relate to one of the four video files. The video file that contains the sexual activity described by Socha's counsel is identified as MOV_8903.mov. Forensic data shows that Socha sent this video via outbound text message on two occasions.

These findings are significant because they reveal that Socha both took nude and sexual photos/videos of herself that she sent out to other devices, and that she received various sexual images and videos of herself that were taken on a device that did not belong to her (the reasonable conclusion being that they were taken by another person on their phone, then sent to Socha via text messages). The larger number of images and videos that were transmitted, and the larger number of devices those images and videos were located on results in a greater possibility of exposure of those images and videos. When Socha either sent these images/videos out to other devices or allowed these images/videos to be taken of her on other devices, she no longer had exclusive control over the images and videos. This means that the person/people who possessed them has the ability to show or disseminate the images/videos without Socha's knowledge or consent. In other words, by transmitting photos and videos of herself and allowing images and videos of herself to be taken on other devices, Socha had lost exclusive control of the photos and images well before the Joliet Police Department took possession of her phone data.

*CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

18

**EXHIBIT K**

IV.      <u>**EXPERT QUALIFICATIONS**</u>

See my Curriculum Vitae attached hereto as Exhibit A.

V.      <u>**LIST OF CASE TESTIMONY IN PREVIOUS 4 YEARS**</u>

*State of Illinois v. John Wison Jr*, Case# 11 CR 2031901, Circuit Court of Cook County, September 10, 2014.  Indian Head Park, IL Homicide.  Cellular phone testimony provided during a homicide trial.

VI.      <u>**STATEMENT OF COMPENSATION TO BE PAID FOR STUDY AND TESTIMONY**</u>

My hourly rate for professional services is $275/hour. To date, I have billed the City of Joliet $6,187.50 for my services in this matter.

VII.      <u>**CERTIFICATION**</u>

I hereby certify that this report is a complete and accurate statement of all my opinions, and the basis and reasons for them, to which I will testify under oath.

Respectfully submitted,

Douglas E. Kein, EnCE,CFCE,CCME,CBE
ArcherHall
8003 Franklin Farms Dr., Ste. 123
Henrico, VA 23229
doug@ProDigital4n6.com
Ph: 804-588-9877

*CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

**EXHIBIT K**