# EXHIBIT 2

Page 1

```
 1              IN  THE  UNITED  STATES  DISTRICT  COURT
                NORTHERN  DISTRICT  OF  ILLINOIS
 2                   EASTERN  DIVISION

 3   CASSANDRA SOCHA,              )
                                   )
 4                Plaintiff,       )
                                   )
 5        -vs-                     )      No.  18 CV 05681
                                   )
 6   CITY OF JOLIET, a municipal   )
     corporation; EDWARD GRIZZLE,  )
 7   and JOHN DOES 1-20,           )
                                   )
 8                Defendants.      )

 9

10              The deposition of CASSANDRA SOCHA called by

11   the Defendant Edward Grizzle for examination, taken

12   pursuant to notice and pursuant to the Federal Rules

13   of Civil Procedure for the United States District

14   Courts pertaining to the taking of depositions, taken

15   before Lisa M. Walas, Certified Shorthand Reporter,

16   appearing remotely via LegalView, at 5614 South

17   74th Avenue, Summit, Illinois, commencing at

18   10:00 a.m on the 4th day of May, A.D., 2021.

19

20

21

22

23

24
```



Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 2..5

Page 2

```
1   APPEARANCES:
2       LAW OFFICES OF HALL ADAMS LLC
        MR. HALL ADAMS (via videoconference)
3       33 North Dearborn Street
        Suite 2350
4       Chicago, Illinois  60602
        Phone:  (312)445-4902
5       E-mail: hall@adamslegal.net
6           On behalf of the Plaintiff;
7       TRESSLER LLP
        MS. DARCY L. PROCTOR (via videoconference)
8       MR. JOHN M. O'DRISCOLL (via videoconference)
        233 South Wacker Drive
9       61st Floor
        Chicago, Illinois  60606
10      Phone:  (312)627-4000
        E-mail: dproctor@tresslerllp.com
11              jodriscoll@tresslerllp.com
12          On behalf of the Defendant City of Joliet;
13      KNIGHT, HOPPE, KURNIK & KNIGHT, LTD.
        MR. MATTHEW CLARK (via videoconference)
14      5600 North River Road
        Suite 600
15      Rosemont, Illinois  60018
        Phone:  (312) 261-0700
16      E-mail:  mclark@khkklaw.com
17          On behalf of the Defendant Edward Grizzle.
18  ALSO PRESENT:  Ms. Taja Reynolds (via videoconference)
                   Mr. Mike Atkus (via videoconference)
19
20                      *  *  *  *  *
21
22
23
24
```

Page 3

```
1               I N D E X
2
    WITNESS                              PAGE
3
    CASSANDRA SOCHA
4
        Direct Examination by Mr. Clark .......   4
5
        Cross-Examination by Ms. Proctor ...... 167
6
        Redirect Examination by Mr. Clark ..... 250
7
8           E X H I B I T S
9
    DEFENDANT EXHIBIT                       PAGE
10
        Exhibit No. 1 (Search warrant) ........  75
11
        Exhibit No. 2 (Plaintiff's Mandatory
12          of Initial Discovery Responses) .... 115
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
1           The deposition of CASSANDRA SOCHA is being
2   conducted remotely via LegalView.  Today's date is
3   May 28, 2021, and the time is 10:00 a.m.
4           The witness is located at 5614 South
5   74th Avenue, Summit, Illinois.  My name is Lisa M.
6   Walas.
7           At the conclusion of today's deposition, I
8   will ask that counsel place their orders on the
9   record.
10          Thank you.
11              (Witness sworn.)
12  WHEREUPON:
13              CASSANDRA SOCHA,
14  called as a witness herein, having been first duly
15  sworn, was examined and testified as follows:
16              DIRECT EXAMINATION
17  BY MR. CLARK:
18      Q.  Ms. Socha, my name is Matt Clark.  I am an
19  attorney representing Ed Grizzle in the case.  Good
20  morning.  Could you please state your name for the
21  record, spelling your last name?
22      A.  Sure.  Cassandra Socha, S O C H A.
23      MR. CLARK:  Let the record reflect that this
24  deposition is being taken pursuant to notice and
```

Page 5

```
1   agreement of the parties, pursuant to all applicable
2   federal rules of Civil Procedure and the Northern
3   District of Illinois Rules.
4       Q.  Ms. Socha, have you ever given a deposition
5   before?
6       A.  Yes.
7       Q.  How many depositions have you given?
8       A.  Two.
9       Q.  And what was the nature of the first
10  deposition you gave?
11      A.  I was in a lawsuit for a car accident.
12      Q.  Were you plaintiff or defendant in that
13  case or a witness?
14      A.  Defendant.
15      Q.  And when did that lawsuit take place?
16      A.  Maybe 2005, 2006.
17      Q.  Was this in Cook County?
18      A.  Yes.
19      Q.  Who was your attorney for that lawsuit?
20      A.  I didn't have an attorney.  It was State
21  Farm.
22      Q.  Was there an actual lawsuit filed or was it
23  just an accident in which you gave a recorded
24  statement?
```



Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 6..9

Page 6

1    A.    No, I'm pretty sure she filed -- I don't
2  really remember.  I'm pretty sure she filed a lawsuit.
3  She had a settlement.
4    Q.    And who was she?
5    A.    The driver of the other car.
6    Q.    And what was the driver of the other car's
7  name?
8    A.    I have no idea.  I don't remember.
9    Q.    And then what was the second deposition you
10  gave?
11   A.    Through the City of Joliet.
12   Q.    And when did you give that deposition?
13   A.    2016, 2017, maybe.
14   Q.    And were you a plaintiff or a defendant in
15  that case?
16   A.    Defendant.
17   Q.    And what were the nature of the
18  allegations?
19   A.    That, I don't remember either.
20   Q.    Do you recall what kind of case it was in
21  summary of your testimony?
22   A.    It was -- I know it was an arrest.  It was
23  a drug arrest and there was a foot chase involved in
24  it.  It was just basically about the summary of what

Page 7

1  happened prior to his arrest.
2    Q.    Okay.  Do you know what the result of that
3  lawsuit was?
4    A.    He was -- The City settled.
5    Q.    And do you recall the name of the
6  plaintiff?
7    A.    I think Torres was the last name, maybe.
8    Q.    Okay.  You're generally familiar with the
9  deposition process, but just let me go over a couple
10  rules.  First of all, I'm going to be asking a series
11  of questions today and I need to have you give me
12  verbal responses either yes or no and you can't shake
13  your head or say uh-huh because the court reporter
14  needs to be able to take all the information down.
15  Okay?
16   A.    Yes.
17   Q.    The court reporter can only take down one
18  of us at any given time.  I admit that sometimes I
19  have a tendency to ask long-winded questions.  If I do
20  so, just allow me to finish those questions before you
21  start to give your answer.  That way the court
22  reporter can take down whatever is said here today.
23  Okay?
24   A.    Yes.

Page 8

1    Q.    If you don't understand any question I ask,
2  please don't hesitate to ask me to rephrase and I'm
3  more than happy to do so.  Okay?
4    A.    Okay.
5    Q.    Finally, we are via Zoom today, so every
6  once in a while there's technological breakdowns; and
7  if you have any problems hearing us or kind of have
8  problems, just bring it to our attention, we'll do the
9  best we can to resolve those.  All right?
10   A.    Sure.
11   Q.    We're probably going to be here for a
12  little while today; so if you do need to take a break,
13  just don't hesitate to let us know.  I would only ask
14  that you answer the question that's posed to you
15  before we take a break.  All right?
16   A.    Okay.
17   Q.    In preparation for today's deposition, did
18  you review any documents?
19   A.    Yes.
20   Q.    What documents did you review?
21   A.    I reviewed the complaint that my attorney
22  prepared for me, interrogatories, the deposition list.
23   Q.    Any other documents?
24   A.    No, not that -- No.

Page 9

1    Q.    With respect to the complaint that you
2  reviewed, had you seen that complaint before?
3    A.    After it was prepared, yes.
4    Q.    Do you recall the last time you saw that
5  complaint?
6    A.    Saturday.
7    Q.    Outside of meeting with your attorney or
8  discussing anything with your attorney, I don't want
9  to know about that, but have you discussed this
10  deposition with anyone else?
11   A.    No.
12   Q.    In terms of the lawsuit itself, have you
13  had conversations with anyone regarding the lawsuit?
14   A.    No.
15   Q.    All right.  What is your date of birth?
16   A.    1/13/1985.
17   Q.    Where do you currently reside?
18   A.    City of Joliet.
19   Q.    And what's the address?
20   A.    3727 Mustang Road and the zip is 60435.
21   Q.    How long have you lived at that address?
22   A.    Six years.
23   Q.    So since 2015; is that right?
24   A.    January 2015.



Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 10..13

Page 10

1    Q.    And who do you live at that address with?
2    A.    I live there with my husband Nick Crowley
3  and our two sons.
4    Q.    How old are your sons?
5    A.    My oldest is almost two and then the
6  youngest is three months.
7    Q.    Congratulations.
8    A.    Thank you.
9    Q.    When did you marry Nick Crowley?
10   A.    April 19, 2019.
11   Q.    How long had you been dating or been in a
12  relationship with Nick Crowley prior to getting
13  married?
14   A.    Since the end of 2014, approximately.
15   Q.    What's your highest level of education?
16   A.    I have an associate's degree.
17   Q.    When did you obtain that associate's
18  degree?
19   A.    2007.  It's in my office.
20   Q.    Just for the record, are you looking at the
21  diploma on your wall?
22   A.    It's on my mom's wall in her office.
23   Q.    And what was your associate's degree in?
24   A.    Liberal studies.

Page 11

1    Q.    And where did you receive your liberal
2  studies degree?
3    A.    Morton College in Cicero.
4    Q.    When did you first become employed with the
5  police department?
6    A.    Which police department?
7    Q.    Any police department.
8    A.    I was hired in 2007, I believe, as a
9  part-time dispatcher -- I'm sorry -- I was training as
10  a dispatcher in the Village of McCook and then I went
11  on to the police academy through that village.
12   Q.    Where did you attend the police academy?
13   A.    Cook County Sheriff's.
14   Q.    And how long were you with the Village of
15  McCook?
16   A.    Just under seven years.
17   Q.    And after you were employed with the
18  Village of McCook -- Or strike that.
19        When you worked for Village of McCook, were
20  you only a dispatcher or did you also serve as a
21  patrol officer?
22   A.    No.  I trained as a dispatcher and then I
23  was hired as a police officer so I didn't dispatch any
24  longer.

Page 12

1    Q.    And what year did that occur?
2    A.    2008, January 2008.
3    Q.    What duties and responsibilities did you
4  perform for the Village of McCook?
5    A.    As far as what position?
6    Q.    Well, let's start with your first position.
7  When you were hired with the Village of McCook in
8  2008, what position were you hired into?
9    A.    I was hired in 2007 and I was hired -- I
10  helped in the clerk's office.  That was just
11  paperwork, talking to some people that came to the
12  window or passing it off to the actual clerk of the
13  Village.  And then the other days that I didn't work
14  in the clerk's office, I was in the radio room
15  training as a dispatcher.  And then I became a police
16  officer.
17   Q.    Okay.  And when you became a police
18  officer, what position were you hired into?
19   A.    A patrol officer.
20   Q.    And what duties and responsibilities did
21  you have as a patrol officer for the Village of
22  McCook?
23   A.    Patrolling the Village, traffic stops -- I
24  mean, it wasn't really a busy town -- answering the

Page 13

1  calls that we had for the businesses, mostly alarm
2  calls, a lot of accidents.
3    Q.    And did you serve as a patrol officer until
4  2014?
5    A.    Yes.
6    Q.    Did you attempt to have any additional
7  promotions or seek any other opportunities with the
8  Village of McCook at that time?
9    A.    I did.  I took the sergeant's exam.
10   Q.    Do you recall what year you took the
11  sergeant's exam?
12   A.    Probably 2013.
13   Q.    And do you recall how you did or where you
14  were on the list?
15   A.    They didn't rank you by numbers.  I just
16  made the list.  I didn't get promoted; but being on
17  the list, I was enabled to be officer in charge on a
18  shift.
19   Q.    And I believe you said that was 2013?
20   A.    I -- I believe so.
21   Q.    Were you ever subject to any discipline
22  while working for the Village of McCook?
23   A.    No.
24   Q.    Did you ever -- or were you ever subject



Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 14..17

Page 14

1  with a citizen's complaint while working for the
2  Village of McCook?
3      A.    No.
4      Q.    Who was your supervisor when you left the
5  Village of McCook in 2014?
6      A.    Mario DePasquale.
7      Q.    Can you spell Mario's last name for me?
8      A.    Sure. D E P A S Q U A L E.
9      Q.    And is he still with the Village of McCook?
10     A.    I believe so, but he's under federal
11 indictment.
12     Q.    Do you know for what?
13     A.    He was caught up in this whole scheme
14 that's going on with the red light cameras and stuff
15 like that.  There's a complaint, I don't remember
16 exactly what the complaint said, but I believe that
17 they were taking money, like shaking down businesses.
18     Q.    Have you been called as a witness for
19 anything related to that indictment?
20     A.    No.  I think that was way after I was
21 there.
22     Q.    You left the Village of McCook in 2014?
23     A.    Yes.
24     Q.    And why did you leave the Village of McCook

Page 15

1  in 2014?
2      A.    I applied for the City of Joliet and was
3  hired.
4      Q.    Was there any reason that you were looking
5  for a new position away from the Village of McCook?
6      A.    I just wanted a better opportunity, a
7  bigger department.
8      Q.    And what kind of better opportunities did
9  you see with the City of Joliet Police Department?
10     A.    That I would be able to grow as a patrol
11 officer, possibly rise up in the ranks.  There was --
12 There's different units in the City of Joliet rather
13 than the Village of McCook.
14     Q.    What units does the City of Joliet Police
15 Department have?
16     A.    They have an evidence unit, tactical,
17 investigations, a neighborhood orienting policing
18 team.  They have a drug unit -- I think I got it
19 all -- traffic.
20     Q.    What was the process in order to obtain
21 employment with the Joliet Police Department?
22     A.    There was a written test that we had to
23 take.  After -- If you passed the written test, you
24 were called back for an oral interview, I believe.

Page 16

1  And then if you did well on the oral interview, you
2  had to go for a physical exam and psychological.
3      Q.    In terms of the written test, what was the
4  nature of the written test?
5      A.    Maybe -- Gosh, it was a while ago.  Writing
6  maybe, English.  I can't really recall exactly.
7      Q.    In 2014, when you're interviewing for the
8  Joliet Police Department, did you know Nick Crowley at
9  that time?
10     A.    No.  And I believe that I interviewed prior
11 to 2014.
12     Q.    Is it fair to say you met Nick Crowley when
13 you first became employed at the Joliet Police
14 Department?
15     A.    Yes.
16     Q.    You indicated that you had an oral
17 interview to obtain your employment with the Joliet
18 Police Department.  Do you recall who you interviewed
19 with?
20     A.    No.
21     Q.    Do you recall how many people you
22 interviewed with?
23     A.    Maybe four to five.
24     Q.    Do you recall if Ed Grizzle was one of

Page 17

1  those four to five people that you interviewed with?
2      A.    No.
3      Q.    And just to clarify, he was not or you
4  don't recall?
5      A.    I don't recall.
6      Q.    When did you first become employed with the
7  Joliet Police Department in 2014?
8      A.    April 14th.
9      Q.    At what position were you hired into?
10     A.    Patrol officer.
11     Q.    When you were first hired with the Joliet
12 Police Department, did you receive any additional
13 training?
14     A.    To be become a patrol officer, there or ...
15     Q.    Let me rephrase.  When you were hired on
16 April 14th of 2014 as a police officer for the Joliet
17 Police Department, was it a probationary status?
18     A.    Yes.
19     Q.    And how long did the probationary status
20 last for?
21     A.    I believe it's a year.
22     Q.    And when you were first hired on as a
23 probationary status officer, did you have a field
24 training officer?



Page 18

1    A.    I had a couple -- a few, actually, yeah.
2    Q.    Okay.  Do you recall who your field
3  training officers were with the Joliet Police
4  Department after you were hired on April 14th of 2014?
5    A.    Yes.
6    Q.    Who were those people?
7    A.    The first one I had was Sherri Blackburn,
8  the second I had was Brian Matchiak, the third I
9  believe was Anthony Adams, and the fourth was Michael
10  Paulie.  I may have those two flip-flopped, but those
11  are the last two that I had.
12    Q.    Could you spell Brian's last name for me?
13    A.    M A T C H I A K.
14    Q.    And when you were first hired with the
15  Joliet Police Department, who was your direct
16  supervisor?
17    A.    As far as my chief?
18    Q.    Well, who did you report to on a daily
19  basis?
20    A.    Well, it varied.  It would depend on the
21  shift that I was working.  Like, when I started and I
22  was working with Sherri Blackburn, she was in NOPP, so
23  I believe that supervisor would have been Robert
24  Desiderio, but I can't recall have it changed.

Page 19

1    Q.    Did you ever report directly to Ed Grizzle?
2    A.    No, not that I remember.
3    Q.    How long did you have an FTO?  Was it the
4  entire probationary time or was there a smaller period
5  of time in which you had an FTO?
6    A.    No, it's a smaller period of time.
7    Q.    Do you recall how long that was?
8    A.    I think the group that I got hired with, we
9  got released in August of 2014.
10    Q.    Do you recall -- Strike that.
11         You were hired with a group of officers in
12  April of 2014?
13    A.    Yes.
14    Q.    Do you recall which officers you were hired
15  with?
16    A.    Yes.
17    Q.    What are their names?
18    A.    I was hired with Stan Lowery (phonetic),
19  Luis Ayala, Tim Shaughnessy, Paul Schumann, and David
20  Gillespie.
21    Q.    After you were released from the FTO
22  program in August of 2014, what duties and
23  responsibilities did you assume?
24    A.    Patrol officer.

Page 20

1    Q.    And what were your duties and
2  responsibility as a patrol officer?
3    A.    That was patrolling whatever area I was
4  assigned to, answering my calls, proactively
5  patrolling.
6    Q.    How many areas is Joliet divided up in?
7    A.    There's -- The east side has -- the east
8  side has six areas plus a cover car, the central
9  district has six as well as a cover car, and then the
10  west side of Joliet, six as well plus a cover car.
11    Q.    Were you patrolling one particular area or
12  would you patrol all areas?
13    A.    When I was first off of FTO in August, I
14  was a relief car.  So that means I just was plugged in
15  wherever they needed an officer.  And then I believe
16  the beginning of 2015, I was assigned Sector 22 in the
17  central district.
18    Q.    Do you recall who your supervisor was in
19  August of 2014?
20    A.    No.
21    Q.    Did you receive -- While you were a
22  probationary officer for the Joliet Police Department
23  in 2014, 2015, did you receive any additional
24  training?

Page 21

1    A.    There was a two-week period after we got
2  hired that we had to go through.  It was a classroom
3  setting just, kind of, to learn Joliet in and outs.  I
4  know we did a physical training, like a defensive
5  tactics training.  Obviously, we had to certify with
6  our duty weapons.  I mean, I could be missing, but
7  that's what I can recall.
8    Q.    Fair enough.  Is there an officer at the
9  Joliet Police Department that keeps track of all your
10  training?
11    A.    I believe so, yes.
12    Q.    Do you know who that is?
13    A.    I believe now it would be Sergeant Veronda.
14    Q.    Would it be fair to say that as far as you
15  know, all your training records are with that
16  sergeant?
17    A.    Yes.
18    Q.    Did you receive any -- Strike that.
19         How did you become aware that you're no
20  longer a probationary officer through the City of
21  Joliet Police Department?
22    A.    It's your hire date.  I mean, I'm still
23  employed.  So the anniversary of your hire date is,
24  like, you know, you made it.



Socha vs City of Joliet
Cassandra Socha - 05/04/2021                                    Pages 22..25

Page 22

1    Q.    Did you receive a notification from
2  someone?
3    A.    I didn't.
4    Q.    No one sent congratulations, you're now --
5  you passed probationary and now you're a full-time
6  officer?
7    A.    No.  I think just the group I was in, we
8  finally got a raise, so ...
9    Q.    Okay.  Since 2015, have you served as a
10 patrol officer the entire time?
11   A.    I have.
12   Q.    And who is your current supervisor?
13   A.    That would be Lieutenant Jose.
14   Q.    And can you spell Joe's last name?
15   A.    His first name is Andrew.
16   Q.    Okay.  Thank you.
17   A.    And his last name is Jose, J O S E.
18   Q.    Okay.  And when you were hired in 2015 as a
19 patrol officer, who was your supervisor at that time?
20   A.    In 2015?
21   Q.    Yes.
22   A.    Maybe Kevin LaBolle (phonetic).
23   Q.    Were you assigned in 2015 to a particular
24 shift or would that rotate?

Page 23

1    A.    No.  I was assigned to a particular shift.
2    Q.    What shift were you assigned to in 2015?
3    A.    I believe that was Night A and then I
4  worked 1900 to 0700 hours.
5    Q.    And how long did you remain on that shift,
6  approximately?
7    A.    Maybe till the end of 2018.
8    Q.    A lot of the events in describing your
9  complaint occurred in May or June of 2018; is that
10 fair?
11   A.    Yes.
12   Q.    At that time in May or June of 2018, what
13 shift were you on?
14   A.    I was on Night B.
15   Q.    And what is Night B?
16   A.    It's just the other shifts.  There's
17 four shifts.  It's Days A, Days B, Nights A, Nights B.
18   Q.    In shift Night B, when would you serve as a
19 patrol officer?
20   A.    The time?
21   Q.    Correct.
22   A.    I served from 1800 hours to 0600.
23   Q.    And in May or June of 2018, when you were
24 on the Night B shift, who was your supervisor?

Page 24

1    A.    That would have been either
2  Lieutenant Jeremy Harrison or Lieutenant Robert Brown.
3    Q.    Is Lieutenant Brown still with the Joliet
4  Police Department?
5    A.    He is.
6    Q.    When did you first meet Nick Crowley?
7    A.    Sometime in 2014.
8    Q.    Was he on the same shift as you?
9    A.    No.  The majority of 2014 I was in training
10 so I wasn't on one particular shift until I was
11 released in August.
12   Q.    I'm sorry.  Before I forget, have you had
13 any additional training in securing a warrant since
14 you started work for the Joliet Police Department?
15   A.    I did a -- When I did a cross-training in
16 tact, I think I was shown how to write up a warrant.
17 If you ask me now how to do it, I don't know.
18   Q.    Okay.  As your duties and responsibilities
19 of police officer, is securing warrants something you
20 typically don't do?
21   A.    Myself?
22   Q.    Yes.
23   A.    I -- No.  I haven't -- I don't secure -- I
24 haven't secured a search warrant, if that's what

Page 25

1  you're asking me, as a patrol officer.
2    Q.    Have you ever worked in the investigations
3  unit?
4    A.    I have not.
5    Q.    Have you testified at criminal trials?
6    A.    Yes.  I had to think of that.  Yeah.
7    Q.    Okay.  About how many?
8    A.    Not many.
9    Q.    Would you say more than five?
10   A.    No.
11   Q.    Do you recall the last time you testified
12 at a criminal trial?
13   A.    I do.
14   Q.    When was that?
15   A.    2018.
16   Q.    Is that the Nick Crowley trial?
17   A.    Yes.
18   Q.    Okay.  As part of your duties and
19 responsibilities as an officer of the Joliet Police
20 Department, have you had an opportunity to testify at
21 a criminal trial?
22   A.    I can't -- I don't think so.
23   Q.    Do you have any experience in working in --
24 within internal investigations while you've been



Page 26

1 employed for the City of Joliet?

2      A.    No.

3      Q.    Have you been trained on the Cellebrite

4 computer system?

5      A.    No.

6      Q.    Would you know how to operate the

7 Cellebrite computer system?

8      A.    No.

9      Q.    Are you familiar with the Lantern computer

10 system?

11      A.    I am not.

12      Q.    Have you heard of it before?

13      A.    Not until 2018.

14      Q.    Is it fair to say as your duties and

15 responsibilities as a patrol officer, you didn't have

16 occasion to operate the Cellebrite and Lantern system;

17 is that fair?

18      A.    Yes.

19      Q.    Have you ever had any experience of

20 downloading a phone as part of either the Cellebrite

21 or Lantern systems or part of any duty and

22 responsibility you may have had as a Joliet police

23 officer?

24      A.    No.

Page 27

1      Q.    When you first began your relationship with

2 Nick Crowley, what was his position?

3      A.    Patrol officer.

4      Q.    Is Nick Crowley still a patrol officer with

5 the Joliet Police Department?

6      A.    Yes.

7      Q.    Would it be fair to describe that you guys

8 were co-workers at the time?

9      A.    At what time?

10      Q.    When you first began dating.

11      A.    Yes.

12      Q.    And as of today, do you and Nick Crowley

13 both have the same position or rank?

14      A.    We do.

15      Q.    Was there a point in time that you and Nick

16 Crowley as part of your relation started to live

17 together?

18      A.    Yes.

19      Q.    Do you recall when that was, approximately?

20      A.    2015, 2016.

21      Q.    And where did you and Nick Crowley live

22 together, at what residence?

23      A.    The address on Mustang.

24      Q.    And that's the same address you currently

Page 28

1 reside in, correct?

2      A.    Yes.

3      Q.    Nick Crowley moved into your house?

4      A.    Yes.

5      Q.    I should clarify. The residence on

6 Mustang, is that a house or an apartment?

7      A.    It's a townhouse.

8      Q.    And is that a townhouse you own or pay a

9 mortgage to?

10      A.    Yes.

11      Q.    At to the point in 2016, did you begin to

12 seek counseling or therapy related to relationship

13 issues with Nick Crowley?

14      A.    I wouldn't say it was a relationship issue,

15 but yes, I did.

16      Q.    How would you describe it?

17      MR. ADAMS: Let me object to form. You have

18 yet -- It's pretty vague.

19      MR. CLARK: Okay.

20 BY THE WITNESS:

21      A.    There was just -- I just didn't -- There --

22 Well, he had -- He was divorced and I didn't know how

23 to navigate that being a single woman.

24      Q.    Who was Nick Crowley's ex-spouse?

Page 29

1      A.    Her name is Brittany.

2      Q.    Does she work at the Joliet Police

3 Department?

4      A.    No.

5      Q.    Did Nick Crowley have any children from

6 that marriage?

7      A.    Yes.

8      Q.    How many children did he have?

9      A.    Two.

10      Q.    How old are they right now?

11      A.    12 and 9.

12      Q.    Do they currently live with you as well?

13      A.    They do not.

14      Q.    In terms of starting counseling, was that

15 something you did on your own or is that something you

16 did with Nick or how did that come about?

17      A.    We did it together.

18      Q.    It was a couples therapy or did Nick see

19 one counselor and you saw another?

20      A.    No. We both saw one.

21      Q.    And who was that counselor?

22      A.    Her name was Nicole Thompson.

23      Q.    And where was Nicole Thompson located?

24      A.    That office was in Plainfield, Illinois.



Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 30..33

Page 30

1     Q.    Is that the first time you had seen a
2  counselor or therapist?
3     A.    No.
4     Q.    When was the first time you saw a counselor
5  or a therapist?
6     A.    When I was 17.
7     Q.    How old are you now?
8     A.    36.
9     Q.    Why did you see a counselor when you were
10  17?
11     A.    I was just having a little bit of trouble
12  with the fact that my father had passed away.
13     Q.    Do you recall the name of that therapist or
14  counselor?
15     A.    Dawn Valdez.
16     Q.    Do you remember where Dawn Valdez was
17  located or her offices?
18     A.    I don't believe she's in practice any
19  longer.
20     Q.    How long did you go to counseling or
21  therapy at that time when you were 17?
22     A.    I think I saw Dawn on and off until I was
23  maybe in my 20s.
24     Q.    Did you ever receive any type of

Page 31

1  psychological diagnosis at that time when you were 17?
2     A.    Not that I remember.
3     Q.    Were you taking any medications at that
4  time when you saw Dawn as a counselor when you were
5  17?
6     A.    No.
7     Q.    How often would you see Dawn when you were
8  at -- when you were 17 or in your 20s?
9     A.    That was a long time ago.  Like, I don't --
10  Maybe once every other week.
11     Q.    I think you indicated that you don't think
12  Dawn is in practice anymore, but do you recall where
13  her office was located?
14     A.    She -- I know she moved a couple of times.
15  I think she was in -- I think she was in Burr Ridge --
16  No.  She was in Hinsdale, Oak Brook Terrace, maybe.
17  The last time I had communication with her, she was in
18  Joliet.
19     Q.    Do you recall if Dawn was part of a group
20  or organization?  Hospital?
21     A.    Uh-uh.
22     Q.    Was she in practice by herself, do you
23  recall?
24     A.    I don't remember.

Page 32

1     Q.    Prior to 2016, before seeing Nicole
2  Thompson, other than Dawn, had you had any other
3  counseling or therapy?
4     A.    No.
5     Q.    How did you come to find out about Nicole
6  Thompson or how did you select her as a counselor?
7     A.    She was a Google search -- I'm sorry.  I
8  take that back.  The practice was a Google search and
9  then the practice just placed us with Nicole for the
10  first opening.
11     Q.    How often would you see Nicole in 2016?
12     A.    I believe she was every other week too.
13     Q.    Every other week, was that also with Nick?
14     A.    Not all the time.
15     Q.    How often would Nick attend the counseling
16  sessions?
17     A.    I don't recall that.
18     Q.    Other than how to navigate issues with
19  Nick's divorce, what other issues did you cover
20  securing the sessions?
21     A.    Just -- Just the issues that I still had
22  regarding my father and my brother.
23     Q.    What was the issue you had with your
24  brother?

Page 33

1     A.    My brother died in a car accident that I
2  was on-scene for.
3     Q.    And when did that occur?
4     A.    2012.
5     Q.    Did you see any counselor for your
6  brother's death after he died in 2012?
7     A.    I believe I saw Dawn, but I didn't -- but
8  there wasn't -- I saw Dawn once, I believe, and then I
9  went to a counselor that work had sent me to, the
10  Village had sent me to.
11     Q.    And at that time, that would have been
12  Manooka -- I'm sorry -- McCook?
13     A.    Yeah, uh-huh.  Yes.
14     Q.    Was that part of, like, an employee
15  program, an EAP program?
16     A.    They didn't ask me to go to it, I asked to
17  go to it.
18     Q.    And do you know how often you went to the
19  program that you asked to go to in 2012?
20     A.    Just once.  It wasn't a program.
21     Q.    In 2016 when you started to go to -- Strike
22  that.
23          When -- In 2016 when you went to see
24  Nicole, did you have any psychological diagnoses given



Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 34..37

Page 34

1  at that time?
2      A.    I don't remember.
3      Q.    In 2016 when you started to see Nicole for
4  counseling, were you prescribed any medication?
5      A.    No.
6      Q.    In 2016 when you started to see -- or when
7  you saw Nicole for counseling, do you recall if Nick
8  Crowley had any diagnosis given at that time?
9      A.    Not that I know.
10     Q.    Were there ever any issues of domestic
11  abuse discussed?
12     A.    No.
13     Q.    Prior to July 16th of 2017, did you
14  socialize with any other officers on the Joliet Police
15  Department?
16     A.    Can you ask that one more time, please?
17     Q.    Sure.  Prior to July 16th of 2017 or about
18  that time frame, did you have any friends that you
19  socialized with that worked for Joliet Police
20  Department?
21     A.    I'm sure.
22     Q.    Do you recall who those individuals would
23  have been?
24     A.    Are you asking about a specific date or are

Page 35

1  you asking about just in general?
2      Q.    We'll start with in general.  Who were your
3  friends on the department?
4      A.    Not many.  I go to work to work.
5      Q.    Fair enough.
6      A.    There wasn't a -- I don't -- I still don't
7  make it a point to socialize outside of work that
8  often with work people.
9      Q.    Do you have any friends on the Joliet
10  Police Department?
11     A.    As of right now?
12     Q.    Yeah.
13     A.    Yes.
14     Q.    Who are those people?
15     A.    I'm friends with Officer Wright,
16  Officer Michelle Banas, Officer Brandy Dalton.
17     Q.    Were you friends with those individuals in
18  2017 as well?
19     A.    No.
20     Q.    And when did you become friends with those
21  officers?
22     A.    Officer Banas and I became friends when I
23  cross-trained in tact and Officer Wright and Officer
24  Dalton when I went to their -- the shift that they

Page 36

1  were on.
2      Q.    And what -- Approximately, what years or
3  dates would those have been?
4      A.    I think I did the -- I think I did the tact
5  cross-training in 2017, and then 2018 is when I went
6  to the other shift.
7      Q.    Okay.  So -- I'm sorry -- in 2018 you
8  became friends with which officers?
9      A.    Officer Dalton and Officer Wright.
10     Q.    Prior to July of 2017, did you have
11  occasion to work with Ed Grizzle at all?
12     A.    Prior to what date?
13     Q.    July of 2017.
14     A.    Yes.
15     Q.    How often would you work with Ed Grizzle
16  prior to July of 2017?
17     A.    Not often.  No, not often now that I think
18  about it now.
19     Q.    Approximately, how many times did you work
20  with Ed Grizzle prior to July of 2017?
21     A.    I'd estimate maybe -- I don't know.  I
22  don't know.  I don't know.  There's -- There's a
23  department of almost 300.  Maybe four, five times.
24     Q.    Prior to July of 2017, based on those four

Page 37

1  or five times that you worked with Ed Grizzle, did you
2  have any opinion as far as what kind of police officer
3  he was?
4      A.    No.
5      Q.    Prior to July of 2017, did you feel like --
6  did you have an opinion that Ed Grizzle did his job in
7  a confident manner?
8      A.    I didn't have an opinion either way.
9      Q.    Do you recall those four or five times that
10  you worked with Ed Grizzle -- do you recall any of the
11  specifics of those occasions?
12     A.    No.
13     Q.    Prior to July of 2017, outside of the
14  confines of those four or five times you worked with
15  Ed Grizzle, did you ever talk to Ed?
16     A.    Yes.
17     Q.    Were you friendly with Ed or how would you
18  describe the nature of your relationship with Ed
19  Grizzle before July of 2017?
20     A.    He was a sergeant so it was a supervisory
21  role.
22     Q.    Prior to July of 2017, did Ed Grizzle have
23  an opportunity to supervise you in any capacity?
24     A.    I would say over a training manner, yes.



Page 38

1    Q.    And is it your under- -- Strike that.
2          Did Ed Grizzle perform training duties for
3    the Joliet Police Department?
4    A.    He did.
5    Q.    What training duties did Ed Grizzle perform
6    that you attended?
7    A.    The defensive tactic, I don't know if
8    that's what he calls it or if it's called that, but
9    that portion of the training.
10   Q.    Prior to July of 2017, did you have any
11   opinions of how Ed Grizzle performed as a defensive
12   tactic supervisor?
13   A.    No.
14   Q.    Prior to July of 2017, did you socialize
15   with Maria Gatlin?
16   A.    Yes.
17   Q.    How long had you socialized or been friends
18   with Maria Gatlin prior to July of 2017?
19   A.    Maybe about 15 years.
20   Q.    And how did you know Maria Gatlin?
21   A.    She was a police officer in the town that I
22   grew up in.
23   Q.    Which town was that?
24   A.    Summit.

Page 39

1    Q.    How would you describe the nature of your
2    relationship prior to July of 2017 with Maria Gatlin?
3    Close friends?  Talked on a weekly basis?
4    A.    We were close friends, but we didn't speak
5    weekly, no.
6    Q.    What happened on July 16, 2017, that caused
7    officers to come to your townhome?
8    A.    Nick and myself got into an argument.
9    Q.    Did you call the police?
10   A.    I did not, no.
11   Q.    Do you know who did?
12   A.    My mother called.
13   Q.    What's your mother's name?
14   A.    Patricia.
15   Q.    And what's Patricia's last name?
16   A.    Socha, S O C H A.
17   Q.    And do you know why Patricia Socha called
18   the police on July 16, 2017?
19   A.    I can't really answer for my mom.
20   Q.    Did you ever talk to your mom about why she
21   called the police on July 16, 2017?
22   A.    I'm sure at some point we had that
23   discussion, yeah.
24   Q.    Did you inform her about the domestic

Page 40

1    disturbance on that night?
2    A.    The argument that Nick and I had?  Yes.
3    Q.    Do you recall what you told your mother
4    about the argument you and Nick had?
5    A.    I do not.
6    Q.    What happened -- When you say you had an
7    argument with Nick that night, what happened?
8    A.    We got into an argument.
9    Q.    Do you recall what it was about?
10   A.    I mean, it -- it was about a variety of
11   things, I'm assuming, but I can't recall specifics.
12   Q.    During the course of that argument, was
13   your TV broken?
14   A.    The TV was broken, yes.
15   Q.    During the course of the argument, was the
16   refrigerator broken?
17   A.    Yes.
18   Q.    Do you recall the argument?  Was there
19   glass on the floor?
20   A.    I don't remember if there was glass on the
21   floor.
22   Q.    During the argument, did you hear a gun
23   fire?
24   A.    I heard something.  I don't know if it was

Page 41

1    gunfire.
2    Q.    What did you hear?
3    A.    I don't remember.  It was a while ago and
4    there was -- I was pretty intoxicated to go back that
5    far.
6    Q.    When you say you were "pretty intoxicated,"
7    do you mean while you were having an argument with
8    Nick, you were intoxicated at that time?
9    A.    Yes.
10   Q.    Was Nick Crowley intoxicated on July 16,
11   2017?
12   A.    I can't speak for somebody else's ...
13   Q.    The evening of July 16, 2017, prior to your
14   argument with Nick, had you been out to dinner or out
15   to a bar?
16   A.    We were out at a bar.
17   Q.    And that's where -- At the bar is where you
18   became intoxicated; is that fair to say?
19   A.    Sure.
20   Q.    Was Nick Crowley also drinking at the bar?
21   A.    I believe so.
22   Q.    Was anyone -- Strike that.
23         Do you recall which bar this was at?
24   A.    I don't.



Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 42..45

Page 42

1    Q.    Do you recall if you were with anyone else
2  at that bar besides you and Nick?
3    A.    Yes.
4    Q.    Who were you there with?
5    A.    There were other co-workers at the bar.
6    Q.    Who were the other co-workers?
7    A.    I believe Officer Blackmore was there,
8  Officer Busse, Officer Emph --
9    Q.    What was the last one you said after Busse?
10   A.    Emph.
11   Q.    Can you spell that for me?
12   A.    Sure.  E M P H.
13   Q.    I'm sorry.  I didn't mean to cut you off.
14   A.    That's okay.  I don't recall any --
15 anybody -- I don't remember who else was there.  I'm
16 sorry.
17   Q.    That's fine.  Are those officers friends of
18 Nick's?
19   A.    In what capacity?  I mean, I don't -- I
20 mean ...
21   Q.    Well, before, you listed three officers to
22 me that you were friends with and you didn't include
23 any of those officers.  So I guess I'm wondering, are
24 those officers friends of Nick's then?

Page 43

1    A.    I believe we all worked on the same shift
2  together, so it's not uncommon for people on the same
3  shift to go out as, like, a shift thing; and I believe
4  that's what that was that night.  I mean, I don't --
5  you know.
6    Q.    Who are -- If you know, who are Nick
7  Crowley's friends on the Joliet Police Department?
8    A.    I don't -- I don't know.  He'd have to
9  answer that for himself.
10   Q.    Do you know if Nick Crowley socializes with
11 anyone from the Joliet Police Department ever?
12   A.    As far as going out?
13   Q.    Sure.
14   A.    No.
15   Q.    And just to clarify, you don't know or he
16 doesn't, Nick Crowley does not go out with other
17 officers?
18   A.    He doesn't -- I mean, he doesn't go out.  I
19 mean, we don't have the lifestyle to go out.
20   Q.    You weren't sure if you heard a shot.  You
21 heard a noise, correct?
22   A.    Uh-huh, yes.  Sorry.
23   Q.    And that back -- Before that evening on
24 July 16, 2017, do you recall if you had any bullets in

Page 44

1  your ceiling?
2    A.    The date was what again?  I'm sorry.
3    Q.    July 16th of 2017, do you recall if you had
4  any bullets in your ceiling in your townhome?
5    A.    I don't believe I did.
6    Q.    After the evening of July 16, 2017, did you
7  become aware that you did have a bullet in your
8  ceiling?
9    A.    Yes.
10   Q.    That -- Strike that.
11         As a result of that evening, you're aware
12 that Nick Crowley was charged with reckless discharge
13 of a firearm; is that fair?
14   A.    Yes, he was charged.
15   Q.    And as a result of that evening's events,
16 you're aware that Nick Crowley was charged with
17 domestic battery with you as a victim; is that right?
18   A.    Yes.
19   Q.    During that argument, did you result with a
20 cut on your nose as a result of that argument?
21   A.    No.
22   Q.    As a result of that argument, did you have
23 a swelling and a cut under your right eye?
24   A.    No.

Page 45

1    Q.    As a result of that argument, do you recall
2  having swelling under your left eye?
3    A.    It wasn't a result of an argument, I was
4  bit by the dog.
5    Q.    On that evening, were your injuries
6  photographed?
7    A.    The evening of what -- What evening?
8    Q.    I'm sorry.  On the evening of July 16,
9  2017, did you have those injuries photographed, do you
10 recall?
11   A.    Not on that evening, no.
12   Q.    Do you recall when you had photographs of
13 your injuries taken?
14   A.    The next day in the morning.
15   Q.    Do you recall who took them?
16   A.    No, I do not.
17   Q.    Do you recall telling any officer that your
18 injuries occurred during your altercation with Nick?
19   A.    No, I don't.
20   Q.    Do you recall talking with Officer Kazak
21 (phonetic) on the evening or this may be morning hours
22 of July 16, 2017?
23   A.    I know he was there, but I don't believe we
24 spoke.



Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 46..49

Page 46

1    Q.    Do you recall Ed Grizzle being on the scene
2  that evening of July 16, 2017?
3    A.    Not on July 16th, no.
4    Q.    When did Ed -- Strike that.
5         At some point in time, Ed Grizzle became
6  assigned to this case involving the altercation
7  between you and Nick?
8    A.    Yes.
9    Q.    Do you recall when that was?
10   A.    I believe it was the next day.
11   Q.    And how did you become aware that Ed
12  Grizzle had been assigned to the case involving Nick
13  Crowley?
14   A.    When I went to the police station.
15   Q.    When did you go to the police station?
16   A.    The next afternoon.
17   Q.    Why did you go to the police station the
18  next afternoon?
19   A.    I had to meet with internal affairs and
20  then I was to go see Grizzle when I was done with
21  internal affairs.
22   Q.    With respect to internal affairs, do you
23  recall who you met with?
24   A.    Marc Reid and Tad Jensen.

Page 47

1    Q.    Are you aware if an internal affairs
2  investigation occurred as a result of that incident?
3    A.    Can you ask that one more time? I'm sorry.
4    Q.    Do you know if an internal affairs
5  investigation occurred as a result of your
6  conversation with Lieutenant Reid and the sergeant?
7    A.    An internal affairs investigation was
8  already underway prior to my conversation.
9    Q.    Nick Crowley was the subject of that
10  internal investigation?
11   A.    Yes.
12   Q.    Do you know what the results of that
13  internal investigation were?
14   A.    I don't, no.
15   Q.    Do you know if Nick Crowley has ever been
16  disciplined by the Joliet Police Department?
17   A.    He has.
18   Q.    Do you know when he was disciplined by the
19  Joliet Police Department?
20   A.    2018.
21   Q.    Do you know if Nick Crowley was disciplined
22  in 2018 as a result of an internal investigation in
23  which stemmed from your argument with Nick Crowley?
24   A.    I believe so.

Page 48

1    Q.    Do you know if he was suspended or what the
2  results of that internal investigation were?
3    A.    I believe he was suspended.
4    Q.    Do you recall how long Nick Crowley was
5  suspended for?
6    A.    No.
7    Q.    Do you recall if it was more or less than
8  30 days?
9    A.    I don't recall.
10   Q.    When -- After an internal -- After you met
11  with Lieutenant Reid in the internal affairs division,
12  I think you indicated you met with Ed Grizzle; is that
13  right?
14   A.    Yes.
15   Q.    And what did you and Ed Grizzle talk about
16  on July 17, 2017?
17   A.    I believe -- I don't -- I don't recall
18  really speaking to him much. I think he did most of
19  the talking.
20   Q.    Do you recall what Ed Grizzle said to you
21  during that meeting?
22   A.    No. I -- No. I believe he was speaking
23  about his dog and trying to relate something with his
24  dog, but that's all that I can remember. I don't

Page 49

1  remember specifically.
2    Q.    Do you recall Ed Grizzle giving you any
3  opinions related to Nick Crowley during that meeting?
4    A.    No.
5    Q.    Do you recall if Ed Grizzle indicated that
6  he believed the charges to be true?
7    A.    I don't recall.
8    Q.    Was it your opinion that Ed Grizzle thought
9  the allegations -- or the criminal charges to be true?
10       MR. ADAMS:  I'm going to object to lack of
11  foundation.
12  BY THE WITNESS:
13   A.    No.
14   Q.    I'm sorry.  You don't recall?
15   A.    You asked me if I had an opinion and I
16  don't have an opinion.
17   Q.    All right.  Fair enough.  During the course
18  of the investigation, did you have opportunities to
19  meet with Ed Grizzle again regarding the allegations
20  of the criminal charges filed against Nick Crowley?
21   A.    In the same setting that was -- that we're
22  speaking about prior?
23   Q.    Yes.
24   A.    No.



Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 50..53

Page 50

1    Q.    Well, let me -- Okay.  Let me ask it this
2  way:  With respect to the argument between you and
3  Nick that occurred on July 16, 2017, you met with Ed
4  Grizzle the next day, correct?
5    A.    Yes.
6    Q.    Okay.  And I believe the trial related to
7  Nick Crowley started in early May of 2018; is that
8  right?
9    A.    I believe so.
10    Q.    Between July 17th of 2017 and I believe you
11  testified on May 14th of 2018, how many times did you
12  speak with Ed Grizzle regarding the criminal charges
13  filed against Nick Crowley?
14    A.    I think we didn't speak about the charges
15  that were filed.
16    Q.    Okay.  Let me clarify.  Not to be
17  specifically related to the charges that were filed
18  necessarily, but did you have any conversations with
19  Ed Grizzle regarding Nick Crowley and the incident
20  that occurred on July 16, 2017?
21    A.    No.
22    Q.    So would it be fair to say that the one and
23  only time you met with Ed Grizzle to relate to what
24  occurred on the evening of July 16, 2017, was the next

Page 51

1  day?
2    A.    That's not what you asked originally, but
3  there was other -- there was another time -- well,
4  there was a couple different times, specifically that
5  I remember.
6    Q.    How many times were there with Ed Grizzle?
7    A.    When he served me with a subpoena for a
8  Grand Jury and then when he served the search warrant
9  for my cell phone.
10    Q.    Okay.  So that makes sense that there was
11  three times that you talked with Ed Grizzle relating
12  to Nick Crowley -- the day after the incident on
13  July 17th, the time that he served the subpoena for
14  the Grand Jury, and the time that he served the search
15  warrant for your phone -- is that fair to say?
16    A.    That I can remember specifically, yes.
17    Q.    Do you recall having any conversations
18  between July 17, 2017, and May 14, 2018, with Ed
19  Grizzle in which he expressed an opinion as to the
20  guilt or innocence of Nick Crowley?
21    A.    Well, he did -- he was at the house.  I
22  take that back.  He did come to the house afterwards.
23  I don't remember what day it was.  He came back with
24  an evidence tech to my residence.

Page 52

1    Q.    At that time did he express an opinion as
2  to the guilt or innocence of Nick Crowley?
3    A.    I don't recall.
4    Q.    The evidence tech that came to your house
5  after the incident, was that to remove the bullet from
6  your ceiling in your townhouse?
7    A.    I believe so.
8    Q.    When Ed Grizzle came to your house with the
9  evidence technician to remove the bullet from the
10  ceiling in your townhouse, do you recall having any
11  conversations with Ed Grizzle at that time?
12    A.    I believe he told me the final charges.
13    Q.    With respect to the charges against Nick
14  Crowley, did you have an opinion as to whether or not
15  charged should have been filed?
16    A.    I did.
17    Q.    What was your opinion?
18    A.    They shouldn't have been filed.
19    Q.    Why did -- Strike that.
20    Did you always have the opinion that
21  charged should not have been filed against Nick
22  Crowley?
23    A.    Always as of when?
24    Q.    Let's see.  When Ed Grizzle told you what

Page 53

1  the final charges were filed against Nick Crowley, it
2  was your opinion that those charges should not have
3  been filed; is that fair to say?
4    A.    Yes.
5    Q.    Did that opinion ever change?
6    A.    No.
7    Q.    After Nick Crowley was arrested -- Strike
8  that.
9    On July 16, 2017, you and Nick Crowley
10  lived together; is that fair to say?
11    A.    Yes.
12    Q.    Did anyone else live with you on July 16,
13  2017?
14    A.    No.
15    Q.    After Nick Crowley was arrested and charges
16  were filed against him, where did Nick Crowley live
17  after that?
18    A.    He lived with his mother.
19    Q.    What's Nick Crowley's mother's name?
20    A.    Cynthia Crowley.
21    Q.    And where does Cynthia Crowley live?
22    A.    Grant Park, Illinois.
23    Q.    And I should clarify.  Is that where
24  Cynthia Crowley lived on or about July 16th of 2017?



Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 54..57

Page 54

1    A.    Yes.
2    Q.    Does Cynthia Crowley still live there
3  today?
4    A.    She does.
5    Q.    Who else lives with Cynthia Crowley?
6    A.    Her husband.
7    Q.    Is that Nick's dad?
8    A.    It is.
9    Q.    And what's his name?
10   A.    Robert.
11   Q.    And when did Nick Crowley live with Cynthia
12 and Robert Crowley in 2017?
13   A.    When did he live?
14   Q.    Strike that.  Yeah, bad question, my fault.
15       Between July 16th of 2017 and Nick
16 Crowley's trial which began on or around, let's say,
17 May 13, 2018, did Nick Crowley live with his parents?
18   A.    He did.
19   Q.    Between July 16th of 2017 and May 13th of
20 2018, did Nick Crowley ever reside with you?
21   A.    No.
22   Q.    Was there a no contact order in place
23 between you and Nick Crowley at that time or order of
24 protection?

Page 55

1    A.    No.
2    Q.    Why did Nick Crowley live with his parents
3  during the time frame of July 16, 2017, until May 13th
4  of 2018?
5    MR. ADAMS:  Object to lack --
6  BY THE WITNESS:
7    A.    I take that back.
8    Q.    Okay.  What do you take back?
9    A.    No.  We -- No, he couldn't -- we couldn't
10 reside together, but there was -- we could speak.  I'm
11 sorry.  I needed to clarify that.
12   Q.    Fair enough.  When you say you "couldn't
13 reside together," why could you not reside together?
14   A.    That's what the judge had ordered when a
15 motion was brought up.
16   Q.    And then you indicated that you could speak
17 to Nick Crowley; is that right?
18   A.    Can ask you that one more time?  I'm sorry.
19   Q.    Sure.  Between July 16th of 2017 and
20 May 13th of 2018, the judge ordered that you could not
21 reside together, but you were allowed to speak to Nick
22 Crowley; is that right?
23   A.    Yes.
24   Q.    How often would you and Nick Crowley speak

Page 56

1  during the time frame of July 16, 2017, through
2  May 13th of 2018?
3    A.    Daily.
4    Q.    Would you see each other in person?
5    A.    Yes.
6    Q.    How often would you and Nick Crowley see
7  each other in person between July 16, 2017, and
8  May 13, 2018?
9    A.    Maybe a couple times a week.
10   Q.    During that time frame between July 16th of
11 2017 and May 13th of 2018, did you and Nick Crowley
12 ever discuss Ed Grizzle?
13   A.    Not that I recall.
14   Q.    Between July 16th of 2017 and May 13, 2018,
15 did you ever express opinions regarding the nature of
16 the investigation or criminal charges filed against
17 Nick Crowley?
18   A.    I may have, but I don't recall.
19   Q.    It's fair to say, though, you thought the
20 charges shouldn't be brought, right?
21   A.    Say that one more time, sir.
22   Q.    It's fair to say that you thought the
23 charges shouldn't have been brought?
24   MR. ADAMS:  Objection, asked and answered.

Page 57

1  BY THE WITNESS:
2    A.    Yes.
3    Q.    I'm sorry.  I didn't hear you.
4    A.    I said yes.  I'm sorry.
5    Q.    Okay.  After Nick Crowley was arrested on
6  July 16, 2017, did you ever have conversations with
7  Maria Gatlin?
8    A.    Yes.
9    Q.    How often did you and Maria Gatlin have
10 conversations after Nick was arrested on July 16,
11 2017?
12   A.    Not often.
13   Q.    Between July 16, 2017, and May 13, 2018,
14 would you say that you had more or less than
15 five conversations with Maria Gatlin?
16   A.    I don't think I could put a number on that,
17 sir.  Maybe five, maybe more than five.
18   Q.    Between July 16, 2017, and May 13, 2018,
19 would you and Maria Gatlin ever text each other?
20   A.    We could have text, yes.
21   Q.    Do you recall doing so?
22   A.    Yes.
23   Q.    Between July 16th of 2017 and May 13th of
24 2018, would you and Maria Gatlin ever exchange



Page 58

1  photographs?
2      A.    In between that time period?
3      Q.    Yes.
4      A.    We could have, but I don't remember.
5      MR. CLARK:  Okay.  I think that --
6  BY THE WITNESS:
7      A.    Can I --
8      MR. CLARK:  (Continuing.) -- I am going to change
9  topics, so maybe this will be a good time for a
10  five-minute break.
11  BY MR. CLARK:
12      Q.    I'm sorry.  Ms. Socha, you were going to
13  say something?
14      A.    Yes.  I was just going to ask for a break
15  because I have to nurse my son, if you don't mind.
16      Q.    Sure.  How long do you need for that?
17      A.    Maybe about ten minutes.  Is that okay?
18      Q.    Yep.
19      A.    Okay.
20      MR. CLARK:  We will shoot for being back on the
21  record at about 11:26.
22                  (A short recess was taken.)
23  BY MR. CLARK:
24      Q.    Okay.  Ms. Socha, prior to the criminal

Page 59

1  trial of Nick Crowley, did you ever share the opinion
2  with anyone that Nick Crowley should not have been
3  charged?
4      A.    Not that I remember.
5      Q.    On the evening of July 16, 2017, or the
6  next day, did you discuss the events and incidents
7  with Maria Gatlin?
8      A.    Can you give me the date that you asked for
9  about again?
10      Q.    Sure.  Let me strike that.
11            Did you ever discuss with Maria Gatlin the
12  incident that occurred on July 16, 2017?
13      A.    Yes.
14      Q.    When did you have that conversation or
15  discussion with Maria Gatlin?
16      A.    The morning.
17      Q.    That would be July 17th?
18      A.    Yes.
19      Q.    And what did you tell Maria Gatlin that had
20  occurred on the evening of July 16, 2017?
21      A.    I don't recall specifics, but I know that I
22  told her that Nick and I had gotten into an argument.
23      Q.    Prior to -- Strike that.
24            After that morning, July 17, 2017, did you

Page 60

1  have any other discussions with Maria Gatlin about the
2  incidents that occurred on July 16, 2017, with the
3  argument involving Nick Crowley?
4      A.    You're asking after that morning?  I'm
5  sorry.
6      Q.    Yes.
7      A.    Possibly, but I don't remember when.
8      Q.    Prior to the trial of Nick Crowley, did you
9  know if Maria Gatlin was going to be a witness?
10      A.    No.
11      Q.    When did you find out that Maria Gatlin was
12  going to be a witness at the trial of Nick Crowley?
13      A.    When I saw her at the Grand Jury.
14      Q.    When was the Grand Jury, do you recall?
15      A.    I don't recall.
16      Q.    How long after the incident on July 16,
17  2017, was the Grand Jury?  A month?  Two months,
18  approximately?
19      A.    I don't -- I don't remember.
20      Q.    When you saw Maria Gatlin at the Grand
21  Jury, did you have any conversation with her about the
22  incident that occurred on July 16, 2017?
23      A.    I don't believe so.
24      Q.    Prior to the trial of Nick Crowley, did you

Page 61

1  have any conversation with Nick Crowley's attorney,
2  the criminal defense attorney?
3      A.    I don't recall.
4      Q.    Do you recall who Nick Crowley's criminal
5  defense attorney was?
6      A.    Tomczak.
7      Q.    Do you recall conversations with Tomczak
8  after the criminal trial, after Nick Crowley was
9  acquitted, that your testimony had been helpful?
10      A.    I don't recall that specifically, no.
11      Q.    Do you recall Nick Crowley's criminal
12  defense attorney Tomczak ever speaking to you about
13  the merits or if your testimony was favorable for the
14  defense or the acquittal of his client?
15      A.    I don't recall that conversation, no.
16      Q.    Prior to the criminal trial -- Strike that.
17            Nick Crowley's criminal trial was started
18  on or around May 13, 2018; is that fair?
19      A.    Okay.  Sure.
20      Q.    Do you recall that you testified at that
21  criminal trial, yes?
22      A.    Yes.
23      Q.    And according to the complaint, you
24  testified on May 14, 2018; is that fair to say?



Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 62..65

Page 62

1  A.  According to the complaint?  I'm sorry.
2  Q.  Yeah.
3  A.  Okay.  Yes.
4  Q.  Do you know if you were the first witness
5  to testify at the criminal trial?
6  A.  I believe I was.
7  Q.  Do you know who else testified at the
8  criminal trial?
9  A.  I believe there were officers that
10 testified.  I know Maria Gatlin testified.  I can't
11 remember who else.
12 Q.  Did you know the substance of what Maria
13 Gatlin was going to testify at the trial of Nick
14 Crowley?
15 A.  No.
16 Q.  Did you at some point in time learn whether
17 or not Maria Gatlin's testimony was helpful or harmful
18 to Nick Crowley's case?
19 A.  No.
20 Q.  Did you ever know which day Maria Gatlin
21 testified during the criminal trial?  For example, did
22 you know she testified the day after you?
23 A.  No.  Do you mean do I know it now?  Is that
24 what you're asking?

Page 63

1  Q.  At the time.
2  A.  No.
3  Q.  During the criminal trial of Nick Crowley,
4  do you recall having any conversations with Ed
5  Grizzle?
6  A.  No.
7  Q.  During the course of the trial, do you
8  recall sending Maria Gatlin a text?
9  A.  Once the trial was concluded, I did, yes.
10 Q.  Do you recall -- So you don't recall
11 sending a text to Maria Gatlin during the course of
12 the trial itself?
13 A.  The trial as far as I'm concerned was
14 concluded, testimonies were complete.
15 MR. ADAMS:  Matt, if you want my guidance on
16 this, I'm happy to share it, but I don't want to --
17 MR. CLARK:  No, go ahead.
18 MR. ADAMS:  You know, the judge took the matter
19 under advisement for a period of several days before
20 ruling and I think that's what Cassie refers to here.
21 The evidence had closed, but the judge hadn't
22 announced his verdict.
23 MR. CLARK:  Okay.  Very good.  Thank you.
24 BY MR. CLARK:

Page 64

1  Q.  And it's your understanding that the judge
2  announced his verdict on May 22, 2018, right?
3  A.  I don't remember the specific date; but if
4  you're saying that's that it, yes.
5  Q.  If your complaint says in this federal
6  lawsuit that the verdict was announced on May 22,
7  2018, you wouldn't dispute that; is that fair?
8  A.  The complaint that my attorney prepared?
9  Yes.
10 Q.  Do you recall sending Maria Gatlin a text
11 on May 16, 2018?
12 A.  Yes.
13 Q.  Do you recall what the text read or said?
14 A.  I don't.
15 Q.  I believe the text read as follows, it's a
16 long paragraph, so just allow me:  I think it's safe
17 to say at this point I have seen your true colors and
18 who are as a human being.  I use that term loosely.  I
19 also use the term mother loosely when I talk about
20 you.  At one point maybe I did speak of you that way,
21 but my God now I know why your own kids don't now
22 besides Josh, but that's probably only we see you but
23 literally bailed that criminal out of jail and used
24 your police influence to help him out up to and

Page 65

1  committing a burglary to help him.  I am sure that he
2  can testify to that.  Wow.  If you are charged, that
3  would be a felony.  I forgot about the insurance
4  fraud.  What happened to the (inaudible) Intrepid
5  again?  Stolen, right?  Or did Dave Kline get rid of
6  it for you?  How much did insurance pay out again?
7  Poor (inaudible).  My goodness, that poor kid.  He
8  would have had a better life in a fucking foster home
9  than being with you dysfunctional animals.  All he was
10 a paycheck and mixed kid you and Bruce could never
11 have.  It clearly has shown throughout that poor kid
12 was a burden to you both, but quick to use him when
13 you didn't get your way during scheduling at the
14 station.  You're a fucking scammer and a joke.  Didn't
15 you ever think all your female problems was a sign
16 telling you were unfit to be a mother?  No doubt I
17 believe all the shit you said your older son would say
18 about you.  Your own husband and his family hated your
19 child, but you chose to stand by him.  Kind of gross
20 if you ask me.  I mean, I've never given birth to a
21 child, but I know I wouldn't choose a dude over my
22 spawn.  Looking back concurrently, you're nothing but
23 miserable, miserable in every aspect of your life down
24 to your neighbors who fucking hate you.  Gee, it was



Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 66..69

Page 66

1　never you, always them.　Again, I wondered why no one
2　from Summit gave a fuck about you when you got fired,
3　but I don't know -- I did know.　Now, having read that
4　text, is that the text you authored?
5　　　A.　Yes.
6　　　Q.　And do you recall why you sent that to
7　Maria Gatlin?
8　　　A.　That text message wasn't supposed to be
9　sent.　It actually wasn't even finished and it was a
10　way for me to just get out the disappointment and the
11　hurt that I felt for Maria from breaking a confidence
12　in our friendship that we had.
13　　　Q.　What confidence did Maria break?
14　　　A.　It was just I called her as a friend and I
15　called her because I was upset about an argument that
16　Nick and I had had and she broke that confidence.　I
17　wasn't calling her to do anything but just be my
18　friend.
19　　　Q.　Do you think she was concerned about your
20　well-being as your friend?
21　　　A.　No.
22　　　Q.　Why not?
23　　　MR. ADAMS:　I'm going to object to lack of
24　foundation.　You're asking this witness someone else's

Page 67

1　state of mind.
2　　　MR. CLARK:　Fair enough.
3　BY MR. CLARK:
4　　　Q.　Did Maria ever indicate to you why she
5　testified in the manner that she did?
6　　　A.　I haven't spoken to Maria so I don't know.
7　　　Q.　When is the last time you spoke to Maria?
8　　　A.　Probably the day of the Grand Jury when she
9　said -- when there was niceties exchanged.
10　　　Q.　Was this text that I just read the last
11　communication that you had with Maria?
12　　　A.　Yes.
13　　　Q.　Did Maria respond to this text?
14　　　A.　No.
15　　　Q.　What part of the text did you not complete?
16　　　A.　The text wasn't complete.　It wasn't -- I
17　mean, it cut off at the end where your -- I don't
18　recall what I was going to say after that, but I know
19　that I wasn't finished with the text when I -- when it
20　was sent.
21　　　Q.　You sent this text, right?
22　　　A.　Inadvertently, yes.　It wasn't meant to be
23　sent.
24　　　Q.　You typed it in your phone?

Page 68

1　　　A.　I did.
2　　　Q.　You typed in the contact of Maria or
3　Maria's phone number?
4　　　A.　I did.
5　　　Q.　You typed it on the phone with the phone
6　number (708) 717-3652?
7　　　A.　I did.
8　　　Q.　And you knew she was a witness at least via
9　the Grand Jury, right?
10　　　A.　Yes.
11　　　Q.　In that text, you accuse her of a felony?
12　　　A.　It's what she had done, yes.
13　　　Q.　In that text, you accuse her of insurance
14　fraud?
15　　　A.　It's what happened, yes.
16　　　Q.　When you say you "inadvertently" sent it,
17　what do you mean by that?
18　　　A.　Well, I hit the send button when I was
19　still typing.
20　　　Q.　Do you know if Maria was upset by that text
21　message?
22　　　MR. ADAMS:　Object to lack of foundation.
23　BY THE WITNESS:
24　　　A.　I don't.

Page 69

1　　　Q.　Do you know who Maria shared that text
2　with?
3　　　MR. ADAMS:　Object, lack of foundation.
4　BY THE WITNESS:
5　　　A.　I do not.
6　　　Q.　Do you know if Maria shared that text with
7　a prosecutor, Lorinda Lamken?
8　　　A.　Well, I do now as far as -- since the
9　complaint has been drawn up by my attorney, yes.
10　　　Q.　When was the first time you learned that
11　Maria had spoke to Prosecutor Lorinda Lamken?
12　　　A.　When the discovery was released.
13　　　Q.　And when you say "when the discovery was
14　released," you mean the discovery in this present
15　lawsuit that you filed?
16　　　A.　Yes.
17　　　Q.　Do you know about any conversations that
18　Lorinda Lamken would have had with Ed Grizzle?
19　　　A.　Just from discovery.
20　　　Q.　And, again, just to clarify, you mean
21　discovery from the litigation that you filed here in
22　federal court?
23　　　A.　That my attorney had filed on by behalf,
24　yes.



Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 70..73

Page 70

1    Q.    Are you aware of any conversations Ed
2  Grizzle had with any judge in securing a warrant with
3  your home?
4    A.    Again, just from discovery.
5    Q.    And, again, just to clarify, discovery from
6  this litigation, correct?
7    A.    Yes.
8    Q.    Are you aware of any conversations that Ed
9  Grizzle had with Appellate Prosecutor Lorinda Lamken
10  with the securing of a warrant?
11    A.    Just from this discovery in this
12  litigation.
13    Q.    Are you aware of any conversations or
14  information that Ed Grizzle provided to any judge in
15  securing the warrant?
16    A.    Can ask you that again?
17    Q.    Sure.  Are you aware of any conversations
18  or testimony or information that Ed Grizzle provided
19  to any judge with respect to the issuance of the
20  search warrant of your phone?
21    A.    Again, I would just have to go back to the
22  discovery in this litigation.
23    Q.    It would be fair to say that prior to
24  filing your federal lawsuit, you had no idea what

Page 71

1  occurred or what was said in terms to any judge in
2  order to obtain a search warrant for your personal
3  phone?
4    A.    I never saw the affidavit for the search
5  warrant, I saw just the search warrant the day that
6  Grizzle served it.  So I wouldn't know what it said.
7    Q.    I know you didn't know what the affidavit
8  said, but no one told you what was provided or what
9  information was provided to any judge; is that fair?
10    A.    No.
11    Q.    Okay.  Did someone tell you what
12  information was provided to the judge to secure the
13  search warrant prior to the filing of this lawsuit?
14    A.    No, I don't know how I would know that
15  anyway.
16    Q.    Well, for example, have you had any
17  conversations with Lorinda Lamken about what Ed
18  Grizzle said in securing the search warrant of your
19  personal phone?
20    A.    Have I had conversations with her?
21    Q.    Yes.
22    A.    No.
23    Q.    Have you had conversations with Maria
24  Gatlin about what Ed Grizzle and she may have talked

Page 72

1  about just prior to obtaining the search warrant for
2  your personal phone?
3    A.    No.
4    Q.    Have you had any conversations with Ken
5  Gray about what Ed Grizzle may or may not have told a
6  judge in securing a search warrant for your personal
7  phone?
8    A.    No.
9    Q.    Have you spoken to Judge Carlson -- I'm
10  sorry.  Strike that.
11        Yeah, have you had any conversations with
12  Judge Carlson about any conversations that Ed Grizzle
13  and he may have had in securing a search warrant for
14  your personal cell phone?
15    A.    No.
16    Q.    Have you had any conversations with
17  Judge Sarah Jones as to what Ed Grizzle said to her
18  prior to her signing a search warrant for your
19  personal phone?
20    A.    No.
21    Q.    Outside of the confines of the discovery in
22  this lawsuit, do you have any knowledge to date what
23  Ed Grizzle said to anyone in order to secure the
24  search warrant for your personal cell phone?

Page 73

1    A.    No.
2    Q.    After Nick Crowley was acquitted on
3  May 22nd, did Nick Crowley then resume living at your
4  residence?
5    A.    Yes.
6    Q.    Did you and Nick Crowley have any
7  conversations about -- at that time about Ed Grizzle
8  and his involvement in the criminal trial of Nick
9  Crowley?
10    A.    Maybe, but I don't recall.
11    Q.    Did Nick Crowley share with you at that
12  time any opinions about Ed Grizzle and his involvement
13  in his criminal trial?
14    A.    Not that I recall.
15    Q.    Did you have any opinions at that time
16  after Nick Crowley's acquittal on May 22, 2018, as to
17  Ed Grizzle's involvement with Nick Crowley's criminal
18  trial?
19    A.    I could have, but I don't remember what
20  they would have been.
21    Q.    As we sit here today, do you have an
22  opinion as to Ed Grizzle's involvement with Nick
23  Crowley's criminal trial?
24    A.    Maybe.



Page 74

1    Q.    What opinion may those be?
2    A.    That he was going a little above and
3  beyond.
4    Q.    How so?
5    A.    As far as obtaining a search warrant for my
6  cell phone.
7    Q.    Anything else?
8    A.    No.
9    Q.    During the criminal trial of Nick Crowley
10  prior to his acquittal, did you have any conversations
11  with Ed Grizzle about Nick Crowley's criminal trial?
12   A.    No.
13   Q.    Prior to the search warrant -- Strike that.
14        Prior to Ed Grizzle providing you with a
15  search warrant, were you aware of private images on
16  your cell phone?  And by private images, I think we've
17  been using that term to mean any private images which
18  include naked -- or any photos of yourself, Nick
19  Crowley, and any videos that the two of you may have
20  engaged in any sex acts.
21   A.    Yes.
22   Q.    Prior to Sergeant Grizzle providing you
23  with a copy of the search warrant, had you shared --
24  or strike that -- was anyone else aware of the private

Page 75

1  images on your phone?
2    MR. ADAMS:  Let me object to the form.  Are you
3  including or not including Crowley?
4    MR. CLARK:  Including Crowley.  I can reask it.
5  BY MR. CLARK:
6    Q.    Outside of yourself and Nick Crowley, prior
7  to Sergeant Grizzle providing you with the search
8  warrant, was anyone else besides yourself and Nick
9  Crowley aware of the private images on your phone?
10   A.    No.
11   Q.    It would be fair to say then that prior to
12  Detective Grizzle -- I'm sorry -- Sergeant Ed Grizzle
13  preparing the search warrant, Sergeant Grizzle was
14  unaware of any private images on your cell?
15   A.    Right.
16   MR. CLARK:  Lisa, can you mark as Defendant
17  Exhibit 1 the search warrant and screen share that?
18        (Screen share of Exhibit No 1.)
19  BY MR. CLARK:
20   Q.    Officer Socha, if I can have you look at
21  that search warrant, there should be three pages.
22   A.    Uh-huh.
23   MR. CLARK:  And, Lisa, can she scroll down or do
24  you need to do that?

Page 76

1    THE COURT REPORTER:  I think I do.
2        (Discussion off the record.)
3  BY MR. CLARK:
4    Q.    I'm going to ask you, is this the -- what
5  Sergeant Grizzle gave to you?  I'll just lead with the
6  answer that Exhibit 1 is Exhibit A to your complaint,
7  anticipate what this is, but I'll let you take a look
8  and answer the question.
9    A.    Okay.
10        (Witness peruses document.)
11   MR. CLARK:  Lisa, if I can have you go up to
12  maybe the second page.
13  BY MR. CLARK:
14   Q.    Okay.  Ms. Socha, the phone number that you
15  can read in Exhibit 1 in paragraph, I guess it's A1,
16  (708) 717-3652, that was your phone?
17   A.    Yes.
18   Q.    Do you still have that phone?
19   A.    The phone number?
20   Q.    Well, let's start with the phone.  Do you
21  still have that same phone?
22   A.    I do have the phone, yeah.
23   Q.    And do you still use that phone as part of
24  your normal daily routine or are you just saying for

Page 77

1  the lawsuit?
2    A.    I do not.
3    Q.    And do you still have the same cell phone
4  number?
5    A.    I do.
6    Q.    Have you transferred the contents of what
7  was on the iPhone rose gold to your current phone?
8    A.    I believe -- I don't know if it all -- if
9  it's all transferred over.  This is, I think, my
10  second or third phone since this iPhone.  Apple has a
11  great way of making it so you have to get a new phone,
12  like, every year.  So I know this is, like, my second
13  or third phone since that rose gold phone.
14   Q.    The private images that are at issue in
15  this case, are they on your current phone as well?
16   A.    I believe some are, yes.
17   Q.    With respect to Exhibit No. 1, do you
18  recall this being the search warrant that
19  Sergeant Grizzle provided you on May 18, 2018?
20   A.    I believe it is, yes.
21   Q.    Is there something about this search
22  warrant that you believe to be false?
23   A.    I'm sure we can go in the whole harassment
24  and intimidation part.



Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 78..81

Page 78

1    Q.    Anything else?

2    A.    I mean, just looking, nothing with the body

3  of it here, but they're -- I mean, they're looking for

4  a text message that they already were in possession

5  of, so ... And why are they going through all of the

6  contents of my phone for a text message that was

7  already obtained?

8    Q.    And when you say that there's nothing in

9  the body of this document that says that, it's just

10  your own speculation why did they need to do this; is

11  that fair?

12    MR. ADAMS:  I'll object to the form, specifically

13  to the use of the word speculation.

14  BY MR. CLARK:

15    Q.    Is it your opinion that they did not need

16  your phone because they already had the text message;

17  is that correct?

18    A.    Correct.

19    Q.    You were present during Officer German's

20  deposition, yes?

21    A.    I was.

22    Q.    Did you hear his testimony as to why both

23  phones were needed?

24    A.    I mean, I was on mute and I was still

Page 79

1  dealing with the kids in the house, so I wasn't

2  really -- Can you refresh my memory as to why, or no?

3    Q.    Yeah.  Do you think -- Do you recall

4  Officer German testifying that the need for both

5  phones is because text messages can be made up from

6  sender to sender, right?

7    A.    Oh, I understand that.  Okay.  I can gather

8  that, yes.

9    Q.    So do you think it's reasonable then that

10  both phones are secured to make sure that the text

11  message went from one phone to another?

12    A.    No.

13    Q.    Why not?

14    A.    Well, if I'm going off of the discovery,

15  there was already -- Maria had already given the text

16  message and they had already had Maria's cell phone

17  and so they grabbed it from her cell phone that came

18  from my telephone number.  So I understand when you're

19  saying that messages could be made up, but that's not

20  what I believe happened in this case.

21    Q.    Okay.  When you said you take offense with

22  harassment via electronic communications and

23  intimidation, what you mean is that you don't believe

24  that you did constitutes harassment via electronic

Page 80

1  communications or intimidation; is that fair to say?

2    A.    Right, there was no intent.

3    Q.    Any other reason you believe that phrase to

4  be substantially false or incomplete?

5    A.    Can you repeat that one more time, please?

6    Q.    Sure.  Any other reason you believe that

7  phrase, harassment via electronic communications or

8  intimidation, can be substantially false or

9  incomplete?

10    MR. ADAMS:  I'll object to the lack of

11  foundation.  In this context, you're asking for a

12  legal conclusion.

13  BY MR. CLARK:

14    Q.    You can answer.

15    A.    In my -- In this case, in my opinion, no,

16  there was no intent on harassment or intimidation.

17    Q.    Do you recall when Sergeant Grizzle served

18  this search warrant to you?

19    A.    I do.

20    Q.    It was on May 18, 2018?

21    A.    If that's the date signed, yes, uh-huh.

22    Q.    Where were you located at the time?

23    A.    I was in the police station.

24    Q.    Were you on duty?

Page 81

1    A.    I was.

2    Q.    Do you recall what time that occurred?

3    A.    It was probably right after roll call.  I

4  was called back into the station.

5    Q.    And when you said you were "called back

6  into the station," was that -- how were you called

7  back into the station?

8    A.    A co-worker came and knocked on my squad

9  car window and stated that the lieutenant needed to

10  see me.

11    Q.    Do you recall which co-worker?

12    A.    It was Officer Dalton.

13    Q.    And by "lieutenant," do you mean

14  Lieutenant Brown?

15    A.    I do.

16    Q.    Was Lieutenant Brown your supervisor at the

17  time?

18    A.    Like I said, it was either Lieutenant Brown

19  or Lieutenant Harrison.

20    Q.    Where was your squad car parked at the time

21  or located at the time?

22    A.    On the street in front of the employee

23  entrance.

24    Q.    So you just had to walk back into the



Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 82..85

Page 82

1   station; is that fair?
2       A.    I had to walk back in, right.
3       Q.    And where did you go?
4       A.    I went into the watch commander's office
5   where I was led into a conference room.
6       Q.    Who else was present?
7       A.    When I -- Lieutenant Brown walked me in and
8   then Grizzle was in the conference room sitting at
9   a -- on a chair.
10      Q.    Was anyone else present?
11      A.    No.
12      Q.    And what did Sergeant Grizzle say to you?
13      A.    He didn't say anything.  He slid over the
14  pieces of paper that had the warrant on them.
15      Q.    Did you read the warrant at that time?
16      A.    Briefly.
17      Q.    And what did you say to Sergeant Grizzle?
18      A.    I don't recall specifics, but I believe he
19  stated he needed my cell phone after that.
20      Q.    Did you provide Sergeant Grizzle with the
21  cell phone?
22      A.    Not immediately, but I did, yes.
23      Q.    Between the time you provided
24  Sergeant Grizzle with your cell phone and not

Page 83

1   immediately, did the two of you have conversations
2   with it?
3       A.    I asked him what he -- what it was the
4   search warrant was in relation to and he told me that
5   if he wanted to -- if I wanted to speak to him, I had
6   to go to investigations.
7       Q.    Did Sergeant Grizzle say anything else?
8       A.    He told me that he needed my cell phone and
9   then I asked for what and he said I had to go to
10  investigations if I wanted to know for what.
11      Q.    Did Lieutenant Brown say anything during
12  this visit?
13      A.    He asked to see the search warrant, I
14  believe, and then he looked at it and he said it's a
15  valid search warrant and that I had to give my phone
16  up.
17      Q.    Did you say anything to Lieutenant Brown
18  about that?
19      A.    I told him that I didn't trust Grizzle,
20  that I know that what they were going to do with my
21  cell phone when they took it upstairs, that Grizzle
22  had -- I believe this was the day that I came back to
23  work and that he had ample time to come and serve me
24  with a search warrant at my home instead of again

Page 84

1   parading me in front of my peers and embarrassing me
2   yet again with this.  And that's how that went.
3       Q.    When you say "yet again," what do you mean?
4   Had Grizzle embarrassed you in front of your peers
5   previously?
6       A.    Yes, when he served me with the warrant --
7   I'm sorry -- not with the warrant, with the subpoena
8   with Grand Jury.  I again was called out of roll call,
9   paraded in front of my superiors, my bosses, and into
10  the room right outside of the watch commander's office
11  and served with a subpoena to go testify.  And again,
12  he had ample opportunity when he served other
13  people -- others at their home the search warrant and
14  he couldn't -- or I'm sorry -- not the search warrant,
15  but the subpoena, but he chose to do it both of these
16  when I was at work in my work capacity.
17      Q.    Do you know if it is Joliet Police
18  Department custom and practice to serve warrants at
19  Joliet police officers at work?
20      A.    I mean, I don't know.
21      Q.    Do you know of other Joliet police officers
22  that have been served with subpoenas to testify at
23  Grand Jury that received that warrant -- that subpoena
24  at their homes?

Page 85

1       A.    Other Joliet Police Department members?
2       Q.    Yes.
3       A.    I don't know.
4       Q.    Do you know of other Joliet Police
5   Department officers that have received a search
6   warrant for their own personal items at their home?
7       A.    I don't know.
8       Q.    Other than the serving of the subpoena for
9   the Grand Jury when you said Grizzle yet again
10  embarrassed you in front your peers, were there any
11  other incidents that Grizzle had embarrassed you in
12  front of peers?
13      A.    It was the time with the search warrant and
14  then the subpoena for Grand Jury.
15      Q.    Fair to say those are the only two times?
16      A.    Yes.
17      Q.    You indicated that you didn't trust Grizzle
18  when you spoke earlier.  Why did you not trust
19  Grizzle?
20      A.    Because I knew what was on my cell phone, I
21  knew what happens up in investigations when they dump
22  phones.
23      Q.    You said before, though, Grizzle didn't
24  know that you had any private images on your phone



Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 86..89

Page 86

1  when he served the search warrant, true?
2      A.    True.
3      Q.    Were there other -- Strike that.
4            Were there any other reasons you didn't
5  trust Grizzle when you made that comment on May 18,
6  2018?
7      A.    No.
8      Q.    You just indicated you knew what they do up
9  in investigations when they dump phones.  Is that what
10 you just said?
11     A.    That's what I said, yes.
12     Q.    What did you mean by that?
13     A.    That they're not -- All the times that we
14 stick specifically to what we're looking for, not we,
15 but investigations is looking for, I've witnessed it
16 myself.
17     Q.    What did you witness?
18     A.    There was a time when I was in tact, the
19 cross-training, and the room that had the machine to
20 download the phone, they were -- there's a --
21 investigators in the room, I don't recall who, looking
22 at stuff and talking about pictures that were on
23 someone's phone.
24     Q.    Do you recall when this occurred?

Page 87

1      A.    No.
2      Q.    And when you say "the machine," are you
3  referring to the Cellebrite bracket machine or the
4  Lantern machine?
5      A.    I don't know which one.
6      Q.    And was this in the investigations area of
7  the Joliet Police Department that this occurred?
8      A.    In the -- Yeah, in the investigations
9  department or division, yes.
10     Q.    You don't recall who else was present?
11     A.    No, sir.
12     Q.    Do you recall what year this occurred?
13     A.    I think it was -- Like I said, when I was
14 in cross-training in tact for two weeks, so 2017.
15     Q.    You indicated that they were talking about
16 pictures on the phone, I think that's what you said;
17 is that right?
18     A.    They were talking about pictures that were
19 on the -- whatever phone that they had -- that they
20 had searched.
21     Q.    So did they make reference to -- Strike
22 that.
23            Did you see the pictures?
24     A.    I did not.

Page 88

1      Q.    What were their comments about the pictures
2  that they were talking about?
3      A.    I don't recall.
4      Q.    Were they talking about private images?
5      A.    I don't recall the content of it.
6      Q.    Was there any other occasion that you were
7  witness to investigations talking about a cell
8  phone -- talking about the cell phone and pictures?
9      A.    No.
10     Q.    Were there any other reasons you didn't
11 trust Grizzle or the investigations unit to handle
12 your phone?
13     A.    Specifically because of that reason and I
14 had no idea what the process entailed, but I knew that
15 they were going to get all of my stuff on my phone,
16 and lo and behold.
17     Q.    During -- Strike that.
18            When you provided Sergeant Grizzle with
19 your phone in the conference room with
20 Lieutenant Brown, did you indicate at that time that
21 you had private images on your phone?
22     A.    I believe I said something along the line
23 that there was stuff on there that I didn't want them
24 to see or anybody to see, and I would assume most

Page 89

1  people.
2      Q.    Did you specifically indicate during that
3  conversation with Sergeant Grizzle and
4  Lieutenant Brown that you had naked photos --
5  photographs or pictures on your phone?
6      A.    I did not.
7      Q.    When you had the conversation with
8  Sergeant Grizzle and Lieutenant Brown on that occasion
9  on May 18, 2018, did you indicate that you had videos
10 of yourself and/or others in sex acts?
11     A.    I did not.
12     Q.    Is it fair to say that it's your testimony
13 that Sergeant Grizzle and Lieutenant Brown had no idea
14 that there were any private images on your phone
15 whatsoever?
16     MR. ADAMS:  Object, lack of foundation as to what
17 they knew.
18 BY THE WITNESS:
19     A.    I can't answer for what they knew, but I
20 did have a conversation with Lieutenant Brown after
21 Grizzle took my phone.
22     Q.    After Grizzle took your phone, what was
23 your conversation with Lieutenant Brown?
24     A.    Lieutenant Brown stated something in



Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 90..93

Page 90

1 regards to he'd be careful as to what was on his cell
2 phone and I just said that there was pictures of when
3 I -- progress pictures from when I was working out,
4 and I never said anything about my photos being nude
5 or anything like that, but I just said that, you know,
6 it was -- just that was a private time in my life that
7 I was trying to accomplish something and I don't think
8 anybody should have been privy to that.
9     Q.    When were those pictures from?
10     A.    Anywhere from 2015 on.
11     Q.    The phone that you gave to Sergeant Grizzle
12 on May 18, 2018, it's fair to say it had pictures that
13 dated back to 2015; is that fair?
14     A.    Yeah.
15     Q.    The conversation you had with
16 Lieutenant Brown after, was anyone else present for
17 when you said that you had pictures of your progress
18 from working out?
19     A.    No.
20     Q.    Had Sergeant Grizzle already left the
21 conference room?
22     A.    Yes.
23     Q.    What did Lieutenant Brown say to you after
24 you said you didn't want people looking at your

Page 91

1 progress photos?
2     A.    I don't recall what he said after that.
3     Q.    When you -- Strike that.
4     So Sergeant Grizzle left the conference
5 room before you did?
6     A.    Yes.  I seen him in the conference room and
7 then I was in there by myself for a little bit and
8 then Lieutenant Brown came in and asked if I wanted to
9 wait until my phone was completed or if I wanted to go
10 home and they would call me or -- it was either go
11 home or go back on the street, I don't remember which
12 one it was, until the phone was done and I opted to
13 stay in the conference room until the phone was
14 completed.
15     Q.    How long was that?
16     A.    It was a couple of hours because they --
17 Lieutenant Brown would give me a status check and said
18 that there was something going on with the machine and
19 I just -- I just had to wait, so I waited until they
20 deemed that it was done.
21     Q.    Lieutenant Brown gave you your cell phone
22 back?
23     A.    I believe it was Lieutenant Brown.  I don't
24 recall exactly who.

Page 92

1     Q.    At any point in time did you get mad and
2 storm out of the conference room?
3     A.    I did.
4     Q.    When did that occur?
5     A.    Before Grizzle took my cell phone.
6     Q.    Why did you storm out of the conference
7 room before Sergeant Grizzle took your cell phone?
8     A.    Because I was upset again that I was
9 brought in and embarrassed.  I was again in front of
10 my peers and superiors that I had to walk past and
11 then be served a search warrant at work.  When I don't
12 have a normal 9:00 to 5:00, I have to be a certain way
13 when I'm at work and then to be presented with this.
14     Q.    Who else besides Lieutenant Brown knew that
15 you were being provided a search warrant?
16     A.    I don't know.
17     Q.    When -- Strike that.
18     How -- After you stormed -- After you got
19 mad and stormed out of the conference room, did
20 someone chase after you or call you to come back in or
21 what happened and what was said?
22     A.    Lieutenant Brown did.
23     Q.    And what did Lieutenant Brown say to get
24 you back into the conference room?

Page 93

1     A.    He told me that I had to come back in or I
2 was going to be arrested.
3     Q.    Was anyone else present for that comment by
4 Lieutenant Brown?
5     A.    Grizzle was there.
6     Q.    Anyone else?
7     A.    I believe just those two.
8     Q.    After you left the conference room after
9 receiving your phone back, did anyone talk to you
10 about the search warrant on that day?
11     A.    I don't understand the question.  Can you
12 ask it again.  I'm sorry.
13     Q.    Sure.  It was a bad question.  After you
14 received your phone back after waiting for a couple of
15 hours, you left the conference room, right?
16     A.    After I got my phone back?
17     Q.    Yes.
18     A.    I believe I went home for that night.
19     Q.    Okay.  Did you talk with anyone at the
20 Joliet Police Department about what had occurred in
21 the conference room?
22     A.    I spoke to my union rep.
23     Q.    Who was your union rep?
24     A.    Mike DeVito.



Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 94..97

Page 94

1     Q.    And when did you speak to Mike DeVito?
2     A.    That evening.
3     Q.    Was it in person or by phone?
4     A.    In person.
5     Q.    When you left the conference room with your
6  phone, about what time was it?
7     A.    I believe maybe 9:30, 10:00 o'clock.
8     Q.    Between 9:30, 10:00 o'clock on May 18, 2018
9  and until the time you spoke with Mike DeVito in
10  person, did you speak to anyone else about what had
11  occurred with the search warrant or your cell phone?
12     A.    I didn't have any way to talk to anybody.
13     Q.    It's fair to say that when you left the
14  conference room, you went straight home and you didn't
15  talk to anyone else at the Joliet Police Department?
16     A.    I went -- Right, yes.
17     Q.    How can -- Strike that.
18           The conversation with Mike DeVito, you said
19  that was in person, where did that occur?
20     A.    In the same room that I was in when the
21  search warrant was given to me.
22     Q.    So it's fair to say that you returned back
23  to the Joliet Police Department to have this
24  conversation with Mike?

Page 95

1     A.    I never left. I don't think you
2  understand.
3     Q.    No, I guess I don't. Can you clarify for
4  me?
5     A.    I stayed in the conference room the entire
6  time until my phone was completed and given back to
7  me. I never left. And the only time I did leave was
8  to go back home at about 9:30, 10:00 o'clock.
9     Q.    I see. How did -- And then your
10  conversation with Mike DeVito then occurred before you
11  went home or after you were at home?
12     A.    No. It was before I went home.
13     Q.    And how did you contact Mike DeVito?
14     A.    Lieutenant Brown asked if I wanted to speak
15  to a union rep and I said yes.
16     Q.    And what did you tell Mike DeVito?
17     A.    I just said that I was served with a search
18  warrant and he said, Okay, we know, and then he's,
19  like -- I believe he told me to reach out to Tomczak
20  in the morning, but I can't be sure.
21     Q.    And why did he tell you to reach out to
22  Tomczak in the morning, if you know?
23     MR. O'DRISCOLL: I'm going to object to
24  foundation. You're asking her again what someone else

Page 96

1  said.
2  BY THE WITNESS:
3     A.    I don't know.
4     Q.    When Mike DeVito indicated that we know
5  that you were served with a search warrant, did he
6  indicate who we were -- we was, we were?
7     A.    No. I'm assuming because Lieutenant Brown
8  called him and was witness to what happened.
9     Q.    Did he recommend that you file a union
10  grievance?
11     A.    The conversation was just what I told you,
12  that's all that it was.
13     Q.    Have you ever filed a union grievance over
14  what occurred?
15     A.    No.
16     Q.    Why not?
17     A.    I don't know what grievance there would be
18  to file.
19     Q.    Did you contact Attorney Tomczak?
20     A.    I did.
21     Q.    And when did you contact Attorney Tomczak?
22     A.    The question is what? I'm sorry.
23     Q.    I'm sorry. When did you contact
24  Attorney Tomczak?

Page 97

1     A.    I think he and I spoke the next morning.
2     Q.    And what did you tell Attorney Tomczak?
3     MR. O'DRISCOLL: I'm going to object and I'm
4  going to instruct the witness not to answer that
5  question inasmuch as she sought out Tomczak for legal
6  advice, it's a privileged conversation.
7  BY MR. CLARK:
8     Q.    Let me ask it. Were you contacting
9  Attorney Tomczak for legal advice?
10     A.    I was.
11     Q.    Was Mike -- Did Mike DeVito indicate that
12  you should contact Attorney Tomczak for legal advice?
13     A.    No. The conversation was just what I told
14  you it was.
15     Q.    Okay. After you spoke with -- Strike that.
16           Did you retain Attorney Tomczak as a
17  defense counsel?
18     A.    I did not. He --
19     MR. O'DRISCOLL: Cassie, you don't have to tell
20  anything --
21  BY MR. CLARK:
22     Q.    Yeah, you don't have to tell me what he
23  said.
24     A.    Okay. I'm sorry. Can you ask that again



Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 98..101

Page 98

1   one more time?  I'm sorry.
2        MR. CLARK:  Lisa, can you reread the question,
3   please?
4        MR. ADAMS:  And the answer.
5                 (From the record above, the court
6                 reporter read the following:
7                 "Q.  Did you retain
8                 Attorney Tomczak as a defense
9                 counsel?
10                "A.  I did not.  He --".)
11  BY MR. CLARK:
12       Q.    After speaking with Attorney Tomczak, what
13  did you do next in connection with the search warrant,
14  if anything?
15       A.    We didn't do anything.
16       Q.    Did you have any conversations with anyone
17  about the search warrant and your cell phone besides
18  whatever you said to Attorney Tomczak?
19       A.    I'm sure I had.  I don't remember what it
20  was.
21       Q.    Do you recall who?
22       A.    I'm sure Nick and I had conversation about
23  it.
24       Q.    Besides Nick, anyone else that you can

Page 99

1   recall?
2        A.    No.
3        Q.    With respect to your conversation with
4   Nick, what did you say to him about the contents of
5   your cell phone?
6        A.    Like, what was on my cell phone?
7        Q.    Yes.
8        A.    Is that what you're asking?
9        Q.    Yes.
10       A.    As far as, like -- I don't understand the
11  question.
12       Q.    Let me ask it this way:  Did you discuss
13  with Nick Crowley that you had private images on your
14  phone on I guess it would be May 19, 2018?
15       A.    Nick knew that the images were on my phone.
16       Q.    Okay.  But did you have a conversation
17  about that at that time?
18       A.    I'm sure we had.
19       Q.    And did you express concern?
20       A.    Of course.
21       Q.    And did you express to Nick Crowley the
22  base of your concern?
23       A.    The base of my concern was that these
24  images were on my phone and that somebody else was in

Page 100

1   possession of it?
2        Q.    Yes.
3        A.    Yes.
4        Q.    Did you say anything else to -- For
5   example, you mentioned another time in investigations
6   that you just testified to a little bit earlier.  Did
7   you have any conversations about that incident with
8   Nick Crowley on May 19, 2018?
9        A.    I may have, but I don't remember the whole
10  conversation that he and I had.
11       Q.    Do you recall having any conversations with
12  Nick Crowley on May 19, 2018, about not trusting Ed
13  Grizzle?
14       A.    I don't remember.
15       Q.    The contents of your phone, do you recall
16  how many private images you would have had on that
17  phone?
18       A.    No.
19       Q.    Do you recall how many -- I guess let me
20  break that down.  Do you recall how many photographs
21  of either you or Nick being naked or nude that were on
22  the phone?
23       A.    No.
24       Q.    Do you recall how many videos of you and/or

Page 101

1   Nick engaged in sex acts were on the phone?
2        A.    No.
3        Q.    Do you think it's more than a hundred?
4        A.    I don't really know.
5        Q.    Do you think it's more than 50?
6        A.    I really couldn't give you a number on it.
7        Q.    Was there a particular photograph of a
8   private image that you were concerned about?
9        A.    All of my private images particularly
10  concerned me and somebody else seeing them.
11       Q.    Was there any specific one in particular?
12       A.    All of my private images concerned me.
13       Q.    Were there any specific videos that you
14  were concerned with?
15       A.    All of my private images and videos on my
16  cell phone concerned me.
17       Q.    Do you recall if on your phone on May 18th
18  of 2018 were the photographs delineated by date?
19       A.    I believe so.
20       Q.    Do you recall how many photographs you had
21  on your phone at the time on May 18th of 2018?
22       A.    I do not.
23       Q.    Do you think it was more than a thousand?
24       A.    Again, I couldn't put a number on it.



Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 102..105

Page 102

1    Q.    Do you take a lot of photographs?  It could
2    be of anything:  recipes, scenery, birds, friends,
3    family.
4    A.    I don't think I take any more than anybody
5    else would take.
6    Q.    Fair to say you take a lot of photos?
7    A.    I wouldn't characterize it that way either.
8    Q.    Did -- During your conversation with Nick
9    Crowley on May 19th of 2018, did Nick Crowley express
10   any concern about his private images being with the
11   Joliet Police Department?
12   A.    I don't remember.
13   Q.    In terms of these private images, were they
14   all taken on your phone or were some of the images
15   taken on Nick's phone and sent to you?
16   A.    I don't remember that either.  They're on
17   my phone.
18   Q.    Did you ever send Nick Crowley private
19   images or naked photos perhaps or videos?
20   A.    I may have.
21   Q.    Did Nick Crowley ever send you naked
22   pictures or videos from his phone to yours?
23   A.    He may have.
24   Q.    Do you know if Nick Crowley ever told

Page 103

1    anyone that he had naked images of you on his phone?
2    A.    I don't believe so.
3    Q.    Why don't you believe so?
4    A.    Because I don't believe that he told
5    anybody.
6    Q.    Did you ever ask him?
7    A.    Of course, I asked him.
8    Q.    What did he say?
9    A.    He said no.
10   Q.    Did anyone -- Strike that.
11   Did anyone ever take any private images
12   photographs or videos of you and Nick besides either
13   you or Nick?
14   A.    No.
15   Q.    Do you recall when you first took your
16   first private image of either yourself or Nick?
17   A.    No.
18   Q.    Do you think that would have been before
19   2016?
20   A.    Yes.
21   Q.    Do you know why you were taking private
22   images?
23   A.    Images of myself or him or of what?
24   Q.    Yeah.  Why would you take private images of

Page 104

1    yourself?
2    A.    I mean, I was young, we were in a
3    relationship, we were in a fun relationship.  It's
4    what we, you know -- There's nothing wrong with it
5    between two consenting adults that don't share it and
6    don't expect it to be ever looked at by anybody else
7    but ourselves.
8    Q.    That's something that you did in the
9    confines of your relationship; is that fair to say?
10   A.    It is.
11   Q.    Have you done that in any other
12   relationship?
13   A.    I have not.
14   Q.    Do you know if Nick Crowley has done that
15   in any other relationship?
16   A.    I can't speak for him.
17   Q.    Has Nick ever Crowley ever said that he
18   has?
19   A.    He has not.
20   Q.    When you took private images of yourself
21   and shared them with Nick Crowley, did you expect them
22   not to be shared with anyone else?
23   A.    Right.
24   Q.    Did you ever tell Nick Crowley that?

Page 105

1    A.    Of course.
2    Q.    What did Nick Crowley say?
3    A.    I believe there was an understanding that
4    we don't share each other's images with other people.
5    Q.    Did Nick Crowley say that?
6    A.    No.  I just said there was an
7    understanding, but ...
8    Q.    You were present for McKinney's deposition,
9    correct?
10   A.    Yes.
11   Q.    And you heard McKinney indicate that he had
12   seen a picture of breasts, correct?
13   A.    Yes.
14   Q.    And then he said he saw a picture -- the
15   next picture of that was a picture of your face?
16   A.    I heard that, yes.
17   Q.    Outside that testimony, do you have any
18   firsthand knowledge that anyone has seen your private
19   images?
20   A.    No.
21   Q.    I'm going to turn to a slightly different
22   topic, but similar.  Is this a good time for a break?
23   THE WITNESS:  Can I go check?
24   MR. ADAMS:  I defer to the witness and the court



Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 106..109

Page 106

1　reporter both.  I don't know, Cassie, if you're on any
2　particular schedule where you think you'll need a
3　break to nurse again any time soon.  That might
4　dictate.
5　　　　　MR. CLARK:  Yeah.
6　　　　　THE WITNESS:  Yeah, I was just going to see if I
7　can go check really quick.  I mean, he was crying a
8　little bit ago, but I haven't heard him.  So can I go
9　check really quick?
10　　　　MR. CLARK:  We can just take a five-minute break.
11　　　　MS. PROCTOR:  Let's take five.
12　　　　THE WITNESS:  Okay.
13　　　　　　　　　(A short recess was taken.)
14　BY MR. CLARK:
15　　　Q.　Before we continue, I should have asked you
16　this at the beginning:  Ms. Socha, you said you're in
17　your mother's office, I think?
18　　　A.　Yes.
19　　　Q.　Is anyone else present in the room?
20　　　A.　No.  It's just me.
21　　　Q.　Can anyone else hear the contents of this
22　deposition?
23　　　A.　No.
24　　　Q.　Do you have any notes or any documents in

Page 107

1　front of you that pertains to this lawsuit?
2　　　A.　No.  I mean, like, this stuff is on my
3　computer, but you can't see it, I just see your face
4　and the four screens, the four people or five.
5　　　Q.　You haven't prepared any written notes that
6　you were referring to during --
7　　　A.　Oh, no.
8　　　Q.　It's fair to say you haven't kept a journal
9　of these events?
10　　　A.　For the deposition?
11　　　Q.　For any of the allegations.
12　　　A.　No.
13　　　Q.　Or do you have any notes related to the
14　deposition?
15　　　A.　No.
16　　　　MR. ADAMS:  For form purposes, Matt, your
17　previous question and answer was a double negative, Is
18　it fair to say and she answered no and I'm sure that
19　isn't what was intend by either.
20　　　　MR. CLARK:  Okay.
21　BY MR. CLARK:
22　　　Q.　Ms. Socha, you have not prepared any
23　documents for this deposition?
24　　　A.　No, I have not.

Page 108

1　　　Q.　During the course of the events as laid out
2　in your complaint, you have not made a journal or a
3　diary of the events?
4　　　A.　No.
5　　　Q.　And I notice you have an AirPod on -- or
6　AirPods.  Is that how you hear the computer?
7　　　A.　That's how I hear, yeah.
8　　　Q.　Fair to say that you're not having any
9　instruction from any other witness or any other
10　person; is that fair?
11　　　A.　No, I'm not.
12　　　　MR. ADAMS:  Hey, Matt, I can't even screen share.
13　You give me too much credit.
14　　　　MR. CLARK:  You know, I don't know.  I'll give
15　you lots of credit.  You screen shared and I had to
16　take the easy way out so, you know, I think you're up
17　on it.
18　BY THE WITNESS:
19　　　A.　Do you need a visual of the room?
20　　　Q.　No, that's fine.  Thank you, though.
21　　　A.　Okay.
22　　　Q.　But I will since we're talking about --
23　Well, let me ask you this:  How did you first
24　become -- Strike that.

Page 109

1　　　　Are you aware as to whether or not other
2　officers in the department of Joliet Police Department
3　have seen private images of you from your cell phone?
4　　　A.　Can you ask that again, please?
5　　　Q.　Yes.  Are you aware as to whether or not
6　other officers in the Joliet Police Department have
7　seen private images from your cell phone?
8　　　A.　It's a confusing question because of how I
9　was told that people have.
10　　　Q.　Let me ask it that way.  When were you
11　first told that other individuals in the Joliet Police
12　Department have seen private images of your cell
13　phone?
14　　　A.　I received a letter in my mailbox.
15　　　Q.　And when you say in your "mailbox," are you
16　referring to your private residence?
17　　　A.　I'm sorry.  My work mailbox.
18　　　Q.　And where is your work mailbox located?
19　　　A.　In the police department.
20　　　Q.　Where in the police department?
21　　　A.　In what we call the commons.  It's in,
22　like, the general -- it's where all the mailboxes are
23　by the watch commander's office by the roll call room.
24　　　Q.　Is the common area where your mailbox is



Page 110

1  located, can anyone see who gets -- can anyone put
2  anything in any other person's mailbox?
3      A.    Are you saying, like, if I can put
4  something in someone's mailbox?
5      Q.    Correct.
6      A.    Yes.
7      Q.    So it's fair to say that the note could
8  have been placed in a mailbox by anyone as opposed to
9  having a Joliet Police Department officer that does
10  it?
11      A.    It was mailed through the United States
12  Postal Service to my attention.
13      Q.    Thank you.  In the Joliet Police
14  Department, do you have a desk or an office?
15      A.    I do not.
16      Q.    In the Joliet Police Department, do you
17  have a locker?
18      A.    I do.
19      Q.    Is it fair to say that's where you would
20  keep your private items that you may have before and
21  after your shift?
22      A.    No, I don't.  No.
23      Q.    What do you keep in your locker?
24      A.    I don't utilize my locker.  I have a

Page 111

1  take-home squad car so I have all of my police stuff
2  at home and just get dressed at home and then go in
3  that way to work.
4      Q.    In May or June of 2018, did you also have a
5  squad car -- a take-home car?
6      A.    I did.
7      Q.    Does Nick Crowley have a take-home car?
8      A.    Yes.
9      Q.    In relation to the common area where the
10  mailboxes are located, where in the department is the
11  investigations room?
12      A.    Upstairs.
13      Q.    Do you ever have occasion to go upstairs to
14  the investigations room?
15      A.    I have, yes.
16      Q.    How often on a weekly basis would you say
17  you go to the investigations room upstairs?
18      A.    I wouldn't say weekly.
19      Q.    Would you say once a month?
20      A.    No.  It would be on a -- if I would get
21  called up there for what they call a blind
22  administrator, I've gotten called sometimes up there
23  for.
24      Q.    What's a blind administrator?

Page 112

1      A.    If there is a case where an individual
2  needs to see a lineup, somebody who is unfamiliar with
3  the case at hand has to administer the lineup.
4      Q.    And so the lineup is conducted upstairs?
5      A.    Right.
6      Q.    How often would you say that occurs?
7      A.    I don't know how often it occurs.  I think
8  I've done it maybe three or four times.
9      Q.    On or around May or June of 2018, do you
10  recall going upstairs for a blind administrator?
11      A.    No.
12      Q.    Are -- What's upstairs in the Joliet Police
13  Department?
14      A.    The records division, investigation,
15  there's a conference room, dispatch is up there and
16  administration.
17      Q.    Are those areas all separated by a wall or
18  doors or are they altogether?
19      A.    Yes.
20      Q.    They're all separated?
21      A.    They're separated.
22      Q.    And so in order to go into investigations
23  unit, you actually have to enter through a door, like,
24  I don't know if it's titled investigations, but you

Page 113

1  know you're going into the investigations room?
2      A.    Yes.
3      Q.    Inside the area of the investigations unit,
4  what's in it, what's inside that door?
5      A.    Desks and computers and interview rooms.
6      Q.    The blind administrative, does that take
7  place in that unit area?
8      A.    Yes.  It would take place in an interview
9  room.
10      Q.    When you go into the investigations unit in
11  May or June of 2018, would you have known where the
12  Cellebrite machine is located?
13      A.    No.
14      Q.    In May or June of 2018, would you have
15  known where the Lantern machine is located?
16      A.    No.
17      Q.    Are there any administrative assistants
18  that have either a desk or space in the investigations
19  unit?
20      A.    I believe so, yes.
21      Q.    Do you know any of the administrative
22  individuals that have space in or a desk in the
23  investigations unit?
24      A.    I'm sorry.  I heard nothing you asked.



Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 114..117

Page 114

1    Q.    Okay.  Sorry.  Would you know any
2   administration individuals that would have space in
3   the investigations area?
4    A.    I'm sorry.  You're choppy again.  I don't
5   know if it's my phone or -- Can I have that one more
6   time?  I'm sorry.
7    Q.    Yeah, absolutely.  Do you know anyone, an
8   administrative individual, that has space in the
9   investigations room?
10   A.    Yeah, there's secretaries in there.
11   Q.    And who are those secretaries?
12   A.    I know one is a Gloria Coral and I think
13  the other one -- I think her first name is Kim, maybe.
14  I could be wrong.  She's a blond-headed woman.
15   Q.    Okay.  What about Sherri Gregory?  Do you
16  know who that is?
17   A.    No.
18   Q.    Have you ever talked to any of the
19  administrative individuals -- Gloria, Kim, or
20  anyone -- about the allegations of your lawsuit?
21   A.    No.
22   MR. CLARK:  Lisa, can I mark as Exhibit No. 2,
23  and can you screen share Plaintiff's Mandatory Initial
24  Discovery Responses?

Page 115

1              (Screen share Exhibit No. 2.
2   BY MR. CLARK:
3    Q.    Okay.  Ms. Socha, we're looking at page 1
4   of Exhibit No. 2.  Before I go to the document, let me
5   just ask you:  How many conversations have you had
6   with Michael DeVito about the allegations of your
7   case?
8    A.    I had no conversations regarding this case.
9    Q.    Let me clarify.  Have you ever had a
10  conversation with Michael DeVito about private images
11  and people seeing private images within the Joliet
12  Police Department?
13   A.    I have.
14   Q.    How many conversations?
15   A.    Once.
16   Q.    When did that conversation occur?
17   A.    Sometime in 2018.  I'm not sure of the
18  exact date.
19   Q.    Fair enough.  Do you recall if you had a
20  conversation with Michael DeVito in 2018 prior to
21  filing a lawsuit?
22   A.    Yes.
23   Q.    Do you recall having a conversation with
24  Michael DeVito in 2018 shortly after you learned that

Page 116

1   other officers may have seen your private images?
2    A.    After I learned?  I'm sorry.  Can you ask
3   that one more time, please?
4    Q.    Yeah, sure.  Do you recall having a
5   conversation with -- Let me ask it this way:  Do you
6   recall having conversations with Mike DeVito in May of
7   2018 of other officers seeing private images?
8    A.    I don't believe it was in those months, no.
9    Q.    Where did this conversation take place?
10   A.    At the union office.
11   Q.    Where is the union office located?
12   A.    In Joliet on Bluff Street, I believe.
13   Q.    How did you know to come to the union
14  office on Bluff Street to have a conversation with
15  Michael DeVito?
16   A.    I was contacted.  I don't remember how.
17  Either he called me or another union member contacted
18  me.
19   Q.    Would that be Tom Banas?
20   A.    Yes.
21   Q.    Would it be fair to say that either Tom or
22  Michael called you to come to the union office?
23   A.    Yes.
24   Q.    During that conversation, did either

Page 117

1   Michael or Tom indicate why?
2    A.    No.
3    Q.    Would it be unusual for you to go to the
4   union office to talk with Mike or Tom?
5    A.    I don't -- I mean, I don't -- Like, as far
6   as me being in trouble?  I don't --
7    Q.    How often --
8    A.    There was no issue.  I didn't have any --
9   Go ahead.
10   Q.    I'm sorry.  How often have you had
11  conversations with Mike or Tom at the union office
12  prior to this one?
13   A.    Maybe a couple of times before that.
14   Q.    The couple of times before this
15  conversation with Michael or Tom, the couple of times
16  you reference, what did they involve, generally?
17   A.    I don't -- I don't really recall.
18   Q.    When you went to the union office on Bluff
19  Street, you had a conversation with Michael and Tom?
20   A.    Officer Banas really didn't say anything,
21  he was kind of just there.  It was more
22  Officer DeVito.
23   Q.    Okay.  And was anyone else present?
24   A.    No.

LEXITAS

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 118..121

Page 118

1   Q.   Where did this conversation occur?
2   A.   In the union office.
3   Q.   Were there any recordings of this
4   conversation?
5   A.   No, not that I know.
6   Q.   Do you know if there were any notes of this
7   conversation?
8   A.   Not that I know of.
9   Q.   And what did Michael DeVito tell you during
10  that conversation?
11  A.   He stated that he was told that the images
12  and the video on my cell phone that had been extracted
13  would be viewed and disseminated amongst members of
14  the police department.
15  Q.   Was that the first time that you had heard
16  that?
17  A.   From an actual person?  Yes.
18  Q.   And I think you made reference you received
19  a note in your mailbox at work, that was the first
20  time that you had any indication that anyone had seen
21  the private images of you from your cell phone?
22  A.   Right.
23  Q.   Between the time you received that note in
24  the mail and your conversation with Michael about it,

Page 119

1   about how long of a time had passed?
2   A.   I don't remember.
3   Q.   Do you think it was more than a month?
4   A.   I don't think so.
5   Q.   Did Michael tell you who had told him that
6   images or videos on your cell phone had been extracted
7   and disseminated?
8   A.   He did not.
9   Q.   Did you ask him?
10  A.   No.
11  Q.   Why the no?
12  A.   Because it just seemed that he was told in
13  confidence.
14  Q.   How long did this conversation last?
15  A.   I don't remember.
16  Q.   Did Michael DeVito tell you any specifics
17  as to the contents of the images or video that had
18  been extracted and disseminated?
19  A.   He did.
20  Q.   What did he tell you?
21  A.   He described a video that was on my cell
22  phone.
23  Q.   And what was the video on your cell phone
24  that he described?

Page 120

1   A.   It depicted myself giving oral sex to Nick.
2   Q.   Did Michael DeVito indicate that he had
3   seen that video?
4   A.   He did not.  He said he didn't see it.
5   Q.   And I think you indicated that Tom Banas
6   said nothing during this conversation?
7   A.   I don't -- Yeah, I don't believe he said
8   anything.
9   Q.   Is there -- Strike that.
10       Was there on your cell phone in May or June
11  of 2018 video on your phone depicting you giving oral
12  sex to Nick?
13  A.   There was.
14  Q.   Did Michael indicate any other specific
15  videos or photographs that had been seen by his source
16  and confidence?
17  A.   Not that I recall, no.
18  Q.   Did Michael DeVito indicate to you about
19  any comments that were made with respect to the video
20  depicting you giving oral sex to Nick?
21  A.   Not that I recall.  I remember I got a
22  little upset so I don't remember.
23  Q.   Was that the first time that someone had
24  told you they had -- someone had seen this private

Page 121

1   image or video?
2   A.   Other than the letter?
3   Q.   Yes.
4   A.   No.
5   Q.   Did Michael DeVito -- I'm sorry.  No?  Who
6   else had indicated to you that they had seen the video
7   depicting you giving oral sex to Nick?
8   A.   I wasn't specifically saying that, but it
9   was Lieutenant Harrison after I had gotten into an
10  accident.
11  Q.   Do you recall when the accident was?
12  A.   It was in the summer of 2018.
13  Q.   And what did Lieutenant Harrison say to
14  you?
15  A.   He asked if I was upset regarding stuff
16  that was found on my phone.
17  Q.   At that time, had you received that
18  anonymous note from your mailbox?
19  A.   No.
20  Q.   Was Lieutenant Harrison -- was that the
21  first time from any source that you learned that
22  officers at the Joliet Police Department may have seen
23  private images of you from your cell phone?
24  A.   I believe so.



Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 122..125

Page 122

1  Q.   Let me ask it this way --
2  A.   I mean, it all -- Go ahead.
3  Q.   I was going to say, the first indication
4  that someone might have viewed contents of your cell
5  phone was from Lieutenant Harrison, the second was the
6  anonymous note, and the third was your conversation
7  with Michael DeVito; does that sound right?
8  A.   Lieutenant Harrison didn't say anything
9  specifically about images. He just asked if I was
10  upset about my cell phone contents or something along
11  those lines after I had gotten into an accident on my
12  way to work.
13  Q.   Where did that conversation take place?
14  A.   And then I --
15  Q.   Go ahead. I'm sorry.
16  A.   That's all right. In the watch commander's
17  office.
18  Q.   And you were about to say "and then"?
19  A.   And then shortly after that, I believe I
20  got the letter in my mailbox that was mailed and then
21  I was contacted by either DeVito or Batis at the time.
22  Q.   So Lieutenant Harrison didn't indicate to
23  you that there were private images, just contents of
24  cell phone; is that fair?

Page 123

1  A.   I can't remember specifically what he had
2  said, but it was about my -- he asked if I was upset
3  about my cell phone in some way that -- in some way
4  like that. I can't really quote it specifically.
5  Q.   Okay. But he didn't make reference to
6  private images, true?
7  A.   I can't say either -- I can't say either
8  way. I don't remember, but he made mention of my --
9  of my cell phone.
10  Q.   Okay. If Lieutenant Harrison would have
11  indicated to you that people were in possession of
12  private images, you would have asked him about it,
13  right?
14  A.   Maybe. I don't know.
15  Q.   If Lieutenant Harrison had indicated to you
16  that other officers would have seen your private
17  images, you would have taken action and reported it?
18  A.   Reported it to whom?
19  Q.   A supervisor, someone within the Joliet
20  Police Department.
21  MR. ADAMS: I'm going to object to form. The way
22  it's phrased it calls for speculation. Why don't you
23  just ask her if she did that?
24  BY MR. CLARK:

Page 124

1  Q.   Did you -- After your conversation with
2  Lieutenant Harrison about the contents of your cell
3  phone, did you report it to anyone?
4  A.   I did not.
5  Q.   And I think you indicated the anonymous
6  note or letter was received in your mailbox shortly
7  after your conversation with Lieutenant Harrison?
8  A.   If I remember correctly, yes.
9  MR. CLARK: Lisa, can I have you go to -- I think
10  it's page 6 of this document.
11  THE COURT REPORTER: (Complying.)
12  BY MR. CLARK:
13  Q.   Ms. Socha, I'm going to have you take a
14  look at page 6, 7, 8, 9, 10, 11, 12 of that document
15  and ask you questions. I'll tell you what my question
16  is going to be. Which note did you receive in the
17  mail? So I guess I can ask you this right now.
18  Pages 6 and 7 appear to be part of the same note.
19  When you said you received a note in the mail, did you
20  receive pages 6 and 7?
21       (Witness peruses document.)
22  BY THE WITNESS:
23  A.   I don't believe this was the letter I
24  received.

Page 125

1  Q.   Okay.
2  A.   I don't --
3  THE WITNESS: Can you scroll back up, please?
4       (Witness peruses document.)
5  BY THE WITNESS:
6  A.   I don't believe this was the letter that I
7  received. I believe this is a letter that was sent to
8  Hall.
9  Q.   And if you look at page 8, it does appear
10  to be, like, a copy of an envelope from the Hall Adams
11  Law Offices.
12  MR. CLARK: Lisa, if I can have you scroll down
13  and you can stop right there.
14  THE COURT REPORTER: (Complying.)
15  BY MR. CLARK:
16  Q.   So to the best of your recollection,
17  pages 6 and 7 belong to the contents or with the
18  contents of page 8 in a letter sent to Hall Adams; is
19  that fair?
20  A.   Sure. I mean, that -- Yeah.
21  Q.   I can't -- I can't read it, but maybe
22  you'll know. It looks like the date stamp of that
23  letter is September 4, 2020, but --
24  A.   2018.

