# EXHIBIT 2

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 126..129

Page 126

1    Q.    2018?

2    A.    2018.

3    Q.    Okay.

4    MR. CLARK:  So let me have you go to pages 9, 10,

5    11, and 12.

6    THE COURT REPORTER:  (Complying.)

7    BY MR. CLARK:

8    Q.    The question is, it's either, I guess, on

9    pages 11 and 12, which letter did you receive in the

10   U.S. mail at the Joliet Police Department?

11   A.    This letter on page 11.

12   Q.    Okay.

13   MR. CLARK:  Can I -- Lisa, can I have you go back

14   to page 9, that has the Joliet Police Department on

15   it?

16   THE COURT REPORTER:  (Complying.)

17   BY MR. CLARK:

18   Q.    Okay.  Ms. Socha, is this -- you made

19   reference to an anonymous letter and it was sent via

20   U.S. mail.  To the best of your recollection, is this

21   the envelope that contained that letter?

22   A.    Yes.

23   Q.    Do you recognize the handwriting of Joliet

24   police Cassandra Socha, Number 162?

Page 127

1    A.    No.

2    Q.    Do you know who sent this letter to you?

3    A.    I do not.

4    Q.    Did you ask Michael DeVito if he sent you a

5    letter?

6    A.    I never disclosed I got a letter.

7    Q.    Did you ever tell Nick Crowley you got a

8    letter?

9    A.    I did.

10   Q.    Did you tell Nick Crowley at the time you

11   received the letter?

12   A.    I did.

13   Q.    And I can't see -- My copy doesn't have

14   what date you received the letter, but do you know

15   what date you received the letter?

16   A.    I don't remember what date, no.

17   Q.    Do you have --

18   A.    I think it said it on the envelope.  I'm

19   sorry.  Go ahead.

20   Q.    That's what I was going to ask.  Do you

21   have the original envelope?

22   A.    I do not.

23   Q.    Do you know where the original envelope is?

24   A.    Hall has it.

Page 128

1    MR. CLARK:  Hall, do you know the dates or, I

2    mean, can we have an inspection of that envelope

3    because I can't tell any date?

4    MR. O'DRISCOLL:  You certainly can have

5    inspection of it.  I don't think -- There's no way

6    that I can think of to display it here that would make

7    it clear.  I'll read for you the -- as much of the

8    date stamp as is legible, and it's 2 July 2000- -- and

9    at that point, as you see, there are three stamps on

10   the letter?

11   MR. CLARK:  Yes.

12   MR. O'DRISCOLL:  The inner most stamp cuts off

13   the last two digits of the year on the date stamp; but

14   based upon context, of course, one presumes it's 2018.

15   MR. CLARK:  Okay.

16   MR. O'DRISCOLL:  But what you see here is 2000

17   and a smudge.

18   MR. CLARK:  Great.

19   MR. O'DRISCOLL:  And, of course, you are welcome

20   any time you want to come in and look at it.

21   MR. CLARK:  All right.  Thank you.

22   Okay.  Lisa, can we go down to page 10?

23   THE COURT REPORTER:  (Complying.)

24   BY MR. CLARK:

Page 129

1    Q.    Ms. Socha, do you know what page 10 is?

2    A.    That wrapped the letter enclosed in the

3    envelope.

4    Q.    Does the stamp -- It looks to me like it's

5    a stamp.  Was that a stamp or was that handwritten?

6    A.    No.  It -- if I remember right, they were

7    glitter stickers.

8    MR. O'DRISCOLL:  Matt, if you'd like, I can take

9    a stab at this, or not, if you want.  Inside the

10   postmarked envelope, there was another envelope in

11   which the letter itself was contained.  The letter --

12   The envelope inside the envelope is the one that had

13   this Cassandra just the way you see it spelled with

14   glued-on glitter and it's purple and pinkish red.

15   And, again, you're welcome to come in and look at it.

16   It's just what I've described it.

17   BY MR. CLARK:

18   Q.    Ms. Socha, you've heard what your counsel

19   described as the envelope.  Is that true and accurate

20   to the best of your recollection?

21   A.    Yes.

22   Q.    Do you know anyone that uses glitter that

23   might send you this letter?

24   A.    No.



Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 130..133

Page 130

1     Q.    Okay.  And then let me have you --
2     MR. CLARK:  Lisa, if you go down to page 12.
3     BY MR. CLARK:
4     Q.    Ms. Socha, page 12, was that also in the
5     envelope or is this a separate note from a different
6     occasion?
7     A.    I believe this is a second letter that I
8     received, I believe.
9     Q.    And when did you receive a second letter?
10    A.    I know it was -- I don't know.  July,
11    August sometime.
12    Q.    Did you receive the second letter after
13    your conversation with Michael DeVito?
14    A.    I don't know that either.  I'm sorry.  I
15    don't recall that.
16    Q.    When you say you received a second letter,
17    did it come to you in the U.S. mail again?
18    A.    I don't believe so.
19    Q.    How did you receive the second letter?
20    A.    This was in my work mailbox.
21    Q.    So page -- I'm sorry.  Page 12 of Exhibit 2
22    was a note that was in your work mailbox?
23    A.    Yes.
24    Q.    Was it in an envelope?

Page 131

1     A.    I don't recall.  I know it had -- It was
2     a -- Yeah, I don't think so.  No, there was no
3     envelope.  I don't remember, to be honest.  I don't.
4     Q.    Was it just one page that you received?
5     A.    I think there was an attorney information
6     attached to it.
7     Q.    Was the attorney info attached to it your
8     current counsel's information?
9     A.    No.
10    Q.    Do you recall what attorney information was
11    attached to page 12 of Exhibit 2?
12    A.    I don't.
13    MR. ADAMS:  Learner and learner.
14    THE WITNESS:  Yeah, right.
15        Is it possible for me to ask for a break?
16    MR. CLARK:  Sure.
17    MR. ADAMS:  What do you need, Cassie?
18    THE WITNESS:  Like, ten minutes?  I'm sorry.
19    MR. ADAMS:  Okay.
20    MR. CLARK:  Yes.
21    MS. PROCTOR:  Why don't we take 15 or are we just
22    going to keep moving through this and not break for
23    lunch?  What does the group think?
24    MR. CLARK:  That's fine with me.

Page 132

1     MR. ADAMS:  Whatever the witness and the reporter
2     need.  I'm a team player that way.
3     THE WITNESS:  I just have to feed -- I mean, I
4     can feed him here.
5     MR. ADAMS:  No, we don't want you to do that.
6     MR. CLARK:  No, that's right.
7     MS. PROCTOR:  No, no, that's fine.  I was
8     thinking we probably might break, you know, in the
9     middle of this if that's even where we're at, you
10    know, for just a quick bite; but if we could just take
11    15 minutes.  Sandra, would that work for you?  It
12    certainly will work on my end.
13    THE WITNESS:  That's fine.
14    MS. PROCTOR:  I'm someone who needs to eat fairly
15    regularly.
16    THE WITNESS:  That's fine.
17        (A short recess was taken.)
18    BY MR. CLARK:
19    Q.    Ms. Socha, between the time receiving of
20    the search warrant by Sergeant Grizzle and you
21    receiving the first anonymous note which is page 11,
22    who else have you told you had been served with a
23    search warrant for your personal cell phone?
24    A.    I think I had a -- I think I told my mom

Page 133

1     because she was trying to reach me the day that it was
2     served and she couldn't get a hold of me.
3     Q.    Have you ever had any conversation with any
4     officer at the Joliet Police Department that you had
5     been served with a search warrant for your cell phone?
6     A.    No, not that I recall.
7     Q.    Okay.  Before, you indicated that page 11
8     that's up on the screen right now was your first
9     indication that someone had seen private images other
10    than Lieutenant Harrison had made reference to a cell
11    phone, correct?
12    A.    Yes.
13    Q.    And then I think we believe that you
14    received this letter on or about July 2nd of 2018.
15    Does that sound about right?
16    A.    Yes.
17    Q.    Okay.  And where did you read the note?
18    A.    I believe I opened it right by my mailbox,
19    I think, or I went outside and read it.  I don't
20    remember exactly.
21    Q.    How did you react?
22    A.    I was upset.  I kind of, like -- My breath
23    was kind of taken away.  It was quite embarrassing to
24    read what was written.



Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 134..137

Page 134

1    Q.   Was anyone else present when you were
2  reading the letter?
3    A.   No.
4    Q.   Did you say anything?
5    A.   No.
6    Q.   Have you shared this letter with any other
7  officer in the police department?
8    A.   Just Nick.
9    Q.   Do you recall when you showed Nick this
10 letter?
11   A.   The evening I was at home or the morning.
12 I don't -- We worked overnight so I don't know if it
13 was in the morning when we both got off.
14   Q.   Did you call him before your shared the
15 contents of this note with him?
16   A.   Yes.
17   Q.   And did the two of you talk by way of
18 phone?
19   A.   Yes.
20   Q.   Where did you speak with him?
21   A.   Outside of the police department.
22   Q.   Do you know where Nick was at the time?
23   A.   I believe he was at the substation that we
24 have.

Page 135

1    Q.   What's the substation?
2    A.   There's two police stations.  There's the
3  main station where I was at and then he was at the
4  substation which is considered the west station off of
5  Caton Farm Road.
6    Q.   Okay.  It's addressed to Cassandra.  Do
7  people in the department call you Cassandra or Socha?
8    A.   Both.
9    Q.   Both.  So the fact that they used the name
10 Cassandra doesn't lead you to identify any particular
11 officer; is that fair?
12   A.   No, it doesn't.
13   Q.   Have you ever found out who sent this note
14 to you?
15   A.   I have not.
16   Q.   Have you asked anyone?
17   A.   I have not.
18   Q.   Did you ever ask Nick if he sent the note
19 to you?
20   A.   I did not.
21   Q.   This was the first indication that you
22 received that any of the private images of your cell
23 phone were being shared with anyone at the department;
24 is that true?

Page 136

1    A.   Yes.
2    Q.   Did you ask any investigators at the
3  department if they had seen the contents of your cell
4  phone at that time?
5    A.   No.
6    Q.   Have you ever asked any investigators if
7  they had seen the contents of your cell phone --
8    A.   No.
9    Q.   -- your private images?
10        With respect to internal affairs, have you
11 asked anyone in internal affairs if they had seen the
12 contents and the private images of your cell phone?
13   A.   No.
14   Q.   Have you asked any of the staff members if
15 they've seen the contents of the private images of
16 your cell phone?
17   A.   No.
18   Q.   It indicates in the -- Strike that.
19        Are there pictures on your -- Strike that.
20        In May or June of 2018, were there pictures
21 of -- on your cell phone of private images of you
22 giving Nick head?
23   A.   Yes.
24   Q.   Were there private images, pictures, or

Page 137

1  videos that says deep throating Nick's penis?
2    A.   I believe so, yes.
3    Q.   Were there images or videos on your cell
4  phone in May or June of 2018 of you spitting on his
5  penis while giving him head?
6    A.   Yes.
7    Q.   Were there pictures in May or June of 2018
8  on your private cell phone of you fucking him?
9    A.   Yes.
10   Q.   So when you read this letter or note, you
11 believed the contents of these pictures or videos to
12 be true; is that fair?
13   A.   Yes.
14   Q.   Did you speak to any supervisors if they
15 had viewed these contents of private images of your
16 cell phone in May or June of 2018?
17   A.   I did not.
18   Q.   What did you do with this note?
19   A.   I'm sorry?
20   Q.   What did you do with this note?
21   A.   I folded it back how it was, took it with
22 me in my squad car because I had to work that night,
23 and then I brought it home and I showed Nick as he's
24 clearly involved in this, he's depicted in these



Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 138..141

Page 138

1  images, and then I believe again I -- I think I spoke
2  to Tomczak again.
3      Q.    So after talking with Nick, your first
4  contact was to Mike Tomczak -- Jeff Tomczak?  Sorry.
5      A.    Yes.
6      Q.    Okay.
7      MR. ADAMS:  Jeff probably throws better too.
8  BY MR. CLARK:
9      Q.    Were you seeking legal advice when you
10 contacted the attorney contact?
11     A.    I was seeking some sort of advice.  I mean,
12 my -- the contents of some of the things that were on
13 my phone have been clearly depicted in this and I
14 didn't know what to -- where to go from there because
15 obviously I couldn't go to any members of the police
16 department as they're clearly involved.
17     Q.    So what did you do?  Who did you go to?
18     A.    I just said I went to Tomczak.
19     Q.    After Tomczak.
20     A.    Like, that day?  I mean, your question is
21 kind of broad.
22     Q.    Okay.  With respect to going to Tomczak --
23 Let me get the date clear.  When did you go speak with
24 Attorney Tomczak?

Page 139

1      A.    The morning I -- The morning after I
2  received this letter.
3      Q.    After speaking with Attorney Tomczak the
4  morning after receiving this letter, did you make a
5  report to anyone within the Joliet Police Department?
6      A.    No, because like I said, they were clearly
7  involved in the viewing of this.
8      Q.    Did Attorney Tomczak contact anyone at the
9  Joliet Police Department, to the best of your
10 knowledge?
11     A.    No.
12     Q.    Did you -- Who did you report the contents
13 of this letter to after speaking with
14 Attorney Tomczak?
15     A.    Reported to the police department?
16     Q.    Anyone.
17     A.    I didn't report it --
18     Q.    Who did you --
19     A.    I didn't report it to anybody, I contacted
20 my attorney Hall Adams.
21     Q.    Okay.  So you admit you never reported this
22 to the Joliet Police Department?
23     MR. ADAMS:  Asked and answered.
24 BY THE WITNESS:

Page 140

1      A.    No.
2      Q.    Are you aware of any investigation that was
3  conducted as a result of you receiving this letter?
4      A.    Nobody knew I got the note.
5      Q.    And I don't want to know the conversations
6  with Hall Adams, but did you ever share this note with
7  the FBI?
8      A.    No.
9      Q.    Did you ever make a report to Deputy
10 Chief Roechner?
11     A.    No.
12     Q.    Did you ever have a conversation with
13 Sergeant Grizzle, Ed Grizzle about the contents of
14 this letter?
15     A.    No.
16     Q.    Why not?
17     A.    There's -- I mean, there's no reason to do
18 that.  People were involved in spreading my images
19 around and the content of my cell phone that was meant
20 to be private and he is in a supervisory role, and it
21 states in this letter that supervisors, internal
22 affairs and members have seen and trolled through my
23 phone the contents of it.
24     Q.    Did you believe this to be Ed's fault?

Page 141

1      A.    I believe there's culpability on Grizzle's
2  part, absolutely.
3      Q.    Why?
4      A.    Had the search warrant not been executed
5  and the phone dumped the way that it was, this stuff
6  never would have been able to be leaked or viewed.
7      Q.    Do you think Ed Grizzle has seen these
8  photos or videos?
9      A.    I believe he has seen.
10     Q.    Why?
11     A.    I don't think that after going through and
12 dumping a cell phone that you -- you know, knowing
13 that I have a concern about it, I think the curiosity
14 probably got the best of some people.
15     Q.    Do you know who?
16     A.    I'm sorry?
17     Q.    Do you know who was curious about it or got
18 the best of them?
19     A.    I don't know.
20     Q.    Now, going back to the document page 11 of
21 Exhibit 2, it says that comment are said that you fuck
22 like a porn star and the way you give head and fuck
23 Nick no man should ever leave you alone.  Have you
24 ever heard anyone make that comment to you?



Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 142..145

Page 142

1    A.   No.
2    Q.   Have you ever heard it just through
3  passing?
4    A.   No.
5    Q.   The next sentence reads:  The search
6  warrant should have never revealed any of this
7  information.  It should have only been for text
8  messages and phone calls.  Do you see that sentence?
9    A.   I do.
10   Q.   Had you expressed that concern with anyone
11 prior to receiving this note?
12   A.   No.
13   Q.   Do you have an idea who might have sent
14 this note to you?
15   A.   I don't.
16   Q.   I think -- Strike that.
17      Did you ever talk with Nick to determine
18 who might have sent this note to you?
19   A.   I'm sure we've had discussions, but never
20 came up with anybody.
21   Q.   Do you know who Nick thinks might have sent
22 you this note?
23   A.   No.
24   MR. CLARK:  If we can go to page 12 of Exhibit 2.

Page 143

1     THE COURT REPORTER:  (Complying.)
2  BY MR. CLARK:
3    Q.   Ms. Socha, I just want to clarify, you're
4  not sure when you received page 12, this note?
5    A.   I'm not sure of the exact date, if that's
6  what you're asking, but I know that this was after the
7  letter that I received via U.S.P.S.
8    Q.   Did you ask Michael DeVito about any of
9  these notes?
10   A.   No.
11   Q.   Did you tell Michael DeVito that you
12 received any of these notes?
13   A.   No.
14   Q.   Who have you told about these notes?
15   A.   Just Tomczak and my attorney and Nick.
16   Q.   Looking at page 12, the second sentence, it
17 says:  There are several supervisors as well as the DC
18 investigations.  At that time you received the note,
19 who was the DC investigations?
20   A.   Roechner.
21   Q.   Have you ever heard that Roechner has
22 viewed your private images?
23   A.   In the other -- In another letter that was
24 sent that I read that it said that.

Page 144

1    Q.   The letter you said that was sent to Hall
2  Adams?
3    A.   Yes.
4    Q.   Any other source that has indicated that
5  the DC of investigations, Roechner, had seen private
6  images of you from your cell phone?
7    A.   Nobody has told me that, no.
8    Q.   Have you ever heard the rumor that Roechner
9  had scrubbed his personal computer?
10   A.   Yes.
11   Q.   Where did you hear those rumors?
12   A.   At the police station.
13   Q.   Who told you that?
14   A.   I couldn't tell you.
15   Q.   Do you recall --
16   A.   I don't recall.
17   Q.   -- when you were told that?
18   A.   No.
19   Q.   Was it before or after you filed your
20 lawsuit?
21   A.   Afterwards.
22   Q.   Ms. Socha, on occasion I see you kind of
23 dart your eyes up to the left.  Are you looking at
24 something?

Page 145

1    A.   I don't have anything on my thing.  What's
2  coming across is my gmail e-mail and it's beeping in
3  my ear.
4    Q.   Okay.  Thank you.
5       On page 12, the first sentence of the
6  second paragraph reads:  The person responsible for
7  disclosing the photos is the same one who obtained
8  warrant for your phone along with other supervisors
9  involved in this case.  And you never had a
10 conversation with Ed Grizzle about this; is that
11 right?
12   MR. ADAMS:  Objection --
13 BY THE WITNESS:
14   A.   I did not.
15   MR. ADAMS:  (Continuing.) -- asked and answered.
16 BY MR. CLARK:
17   Q.   The next sentence:  It is no big secret
18 throughout investigations that this is being conducted
19 while on duty.  Before this -- I'm sorry.  Before the
20 first note, you had never heard that before, had you?
21   A.   Can you repeat that?  I didn't hear you at
22 all.  I'm sorry.
23   Q.   Sure.  The first part of the second
24 sentence -- I'm sorry.  Yeah, the first part of the



Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 146..149

Page 146

1  second sentence reads:  It is no big secret throughout
2  investigations that this is being conducted while on
3  duty.  Outside of the first note that we sent through,
4  you had never heard that rumor or secret before; is
5  that fair?
6      A.    Yes.
7      Q.    The next sentence, the first part reads:
8  You have been made out to be the bad guy in all of
9  this.  What do you think that means?
10     A.    I think exactly what it reads.
11     MR. ADAMS:  Objection as to speculation.  You're
12  asking her to assume some anonymous author.
13     MR. CLARK:  Fair enough.
14  BY MR. CLARK:
15     Q.    How did you take it when someone made the
16  assertion that you had been made out to be the bad guy
17  in all of this?
18     A.    That it makes me look -- That it makes me
19  look bad.  I mean, there's no other way to interpret
20  it.
21     Q.    What makes you look bad?
22     A.    Whatever has been -- being done behind my
23  back.
24     MR. ADAMS:  Objection.  You're asking her to

Page 147

1  construe what somebody else meant.
2      MR. CLARK:  No, I'm asking her how she took it.
3      MR. ADAMS:  You're asking her, Matt, respectfully
4  what this author meant by that.  That's what the
5  question is.
6      MR. CLARK:  Okay.  She answered so we can move
7  on.
8  BY MR. CLARK:
9      Q.    Were you aware that an Inspector General
10  investigation took place?
11     A.    I was not.
12     Q.    Did you ever become aware of the fact that
13  an Inspector General investigation took place?
14     A.    When the discovery was released.
15     Q.    As part of this litigation?
16     A.    Yes.
17     MR. CLARK:  If I can go to pages 6 and 7 of this
18  exhibit, Lisa.
19     THE COURT REPORTER:  (Complying.)
20  BY MR. CLARK:
21     Q.    Okay.  Do you know if Chris Botzum -- Or is
22  it Botzum?
23     A.    It's Botzum.
24     Q.    (Continuing) -- Chris Botzum, if he's ever

Page 148

1  seen any private images of you?
2      A.    I don't know.
3      Q.    Do you know if Jeffrey German has ever seen
4  any private images of you?
5      A.    I don't know.
6      Q.    Do you know if Michael Banas has ever seen
7  any private images of you?
8      A.    I don't know.
9      Q.    Do you know if Brian Benton has ever seen
10  any private images of you?
11     A.    I don't know.
12     Q.    Do you know if Marc Reid has ever seen any
13  private images of you?
14     A.    I don't know.
15     Q.    Do you know if James Rouse has ever seen
16  any private images of you?
17     A.    I don't know.
18     Q.    Do you know if Darrell Gavin has ever seen
19  any private images of you?
20     A.    I don't know.
21     Q.    Do you know if Robert Brown has ever seen
22  any private images of you?
23     A.    I don't know.
24     Q.    Do you know if Jerry Harrison has ever seen

Page 149

1  any private images of you?
2      A.    I don't know.
3      Q.    Do you know if Tab Jensen has ever seen any
4  private images of you?
5      A.    I don't know.
6      Q.    Do you know if Nick Crowley knows if any of
7  those individuals have ever seen any private images of
8  you?
9      A.    I don't know.
10     Q.    Has Nick Crowley ever told you that he is
11  aware of officers seeing private images of either you
12  or him?
13     A.    He has not told me that, no.
14     Q.    Have you ever had a conversation with
15  Detective Dave Jackson about seeing your private
16  images?
17     A.    I haven't, no.
18     Q.    Are you aware that Nick Crowley has had
19  conversations with Detective Jackson about seeing
20  private images?
21     A.    I believe he has talked to Dave Jackson.
22     Q.    Has Nick Crowley told you what Dave Jackson
23  told him?
24     A.    No.



Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 150..153

Page 150

1    Q.    Nothing at all or no specifics?
2    A.    No specifics.  I mean, I know that they
3    have -- they've had conversations.
4    Q.    Do you believe that any officer -- Strike
5    that.
6          Since May or June of 2018, have you
7    attempted to obtain any different positions within the
8    department?
9    A.    No.  Nothing has came up.  I mean,
10   there's -- there hasn't been really openings, I don't
11   believe, as far as my recollection.
12   Q.    Are you aware of the time frame of Darrell
13   Gavin being promoted to deputy chief of
14   investigations?
15   A.    Do I know when?
16   Q.    No.  Did you know that occurred?
17   A.    Yes.
18   Q.    Do you have any basis on how or as to why
19   that occurred?
20   A.    Why he was promoted?
21   Q.    Right, yes.
22   A.    No.
23   Q.    Are you aware that Sergeant Grizzle was
24   reassigned to the Tri-County Auto Theft Task Force?

Page 151

1    A.    I am.
2    Q.    Do you know why that occurred?
3    A.    I don't know why.
4    Q.    Do you know if Philip Bergner was
5    reassigned to the FBI Cyber Crimes Unit?
6    A.    Yeah, I believe he was temporarily or for a
7    short term.
8    Q.    Do you know why that occurred?
9    A.    No.
10   Q.    Did you know that Jeremy Harrison was
11   reassigned to lieutenant of Joliet Narcotics Unit?
12   A.    Yes.
13   Q.    Do you know why that occurred?
14   A.    I do not.
15   Q.    Did you know that Mike Batis was promoted
16   to deputy chief?
17   A.    Yes.
18   Q.    Do you know why that occurred?
19   A.    I don't know why.
20   Q.    Do you know that Tim Powers was reassigned
21   to the Tactical Unit?
22   A.    I do.
23   Q.    Do you know why that occurred?
24   A.    I do not.

Page 152

1    Q.    At some point in time did you become aware
2    of an FBI raid?
3    A.    Yes.
4    Q.    When did that FBI raid occur?
5    A.    I believe after the lawsuit that was filed
6    on my behalf was entered.
7    Q.    Do you know how the FBI became aware of
8    your lawsuit?
9    A.    I don't know.
10   Q.    Have you ever spoken to anyone at the FBI?
11   A.    No.
12   Q.    Do you know any of the results as a result
13   of the FBI raid?
14   A.    The only thing that I know is based off the
15   discovery that I got from this litigation.
16   Q.    What did you learn?
17   A.    It's Chinese to me, but that there was --
18   there was an investigation that was spearheaded after
19   the lawsuit was filed on my behalf.
20   Q.    Who is Deb Del Re?
21   A.    She was a nurse practitioner that I saw in
22   conjunction with Nicole.
23   Q.    And as nurse practitioner, what did she do?
24   A.    Nurse practitioner in psychiatry?

Page 153

1    Q.    Yeah.
2    A.    Yeah, that's what she did.
3    Q.    Okay.  Let me ask a better question then.
4    For counseling sessions, you had seen Nicole; is that
5    right?
6    A.    Yes.
7    Q.    Why would you see Deb Del Re?
8    A.    I went to see Deb after I asked for a
9    recommendation.  I was having trouble sleeping and a
10   little anxious and so Nicole referred Deb Del Re --
11   her to me.
12   Q.    And was Deb Del Re able to help you with
13   sleeping issues?
14   A.    Yes.
15   Q.    And how did she do so?
16   A.    I was prescribed a low dose of Lexapro and
17   also an antihistamine, I guess there's -- an
18   antihistamine rather than taking a narcotic to help
19   individuals sleep that she prescribed which I took.
20   Q.    As a result of -- Strike that.
21         With respect to the viewing of your private
22   images, have you spoken to that with Counselor Nicole?
23   A.    Yes.
24   Q.    How many times?



Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 154..157

Page 154

1    A.    I would assume -- I think every time that
2    we had met from the time that I had discovered this
3    until we no longer saw each other.
4        Q.    Why did you stop seeing Nicole?
5        A.    Because I got pregnant and it was just
6    difficult to manage the time to go see her because she
7    had limited availability.  And then after I had my
8    son, my first son, I did go back and see her for a
9    little -- I'm sorry.  I take that back.  I did see her
10   while I was pregnant.  I'm sorry.  I stopped seeing
11   her shortly after I had my son.  I'm sorry.  I did go
12   back and see her for a while and then she left the
13   practice.
14       Q.    And had you seen any other counselor since?
15       A.    I have not.
16       Q.    What kind of problems or issues did you
17   report to Nicole after you learned that the contents
18   of your cell phone and private images may have been
19   seen by others?
20       A.    I just let her know how upset I was, how I
21   was pretty sure that the career path that I had chosen
22   was no longer available for me.  The way that people I
23   felt viewed me was no longer the way that I had once
24   thought it was.  I had a lack of drive to go to work.

Page 155

1    This is something -- You know, I chose to leave a
2    place that I was comfortable in to go to a completely
3    different place, being the Joliet Police Department,
4    to better myself and, you know, I had people who were
5    my supervisors, people who were supposed to be mentors
6    to me degrade me, embarrass me.  I've been exploited.
7    I don't know who has seen my body and who hasn't seen
8    my body when I go to work.  You know, when I would go
9    on calls, I feel like I would have to hide my name
10   because my name was all over the press down there.
11       Q.    Why was your name in the press?
12       A.    Because after this lawsuit was filed on my
13   behalf, I'm sure that somebody in this police
14   department leaked it to one or several of the agencies
15   down there and they ran stories about it.
16       Q.    You indicated that your career path that
17   you wanted to choose was no longer there, correct?
18       A.    That's how I felt, how I feel.
19       Q.    What was the career path you're making
20   reference to?
21       A.    Just to be able to go into -- if I wanted
22   to go into a different unit had the opportunity arose
23   or, you know, become in a supervisory role had I felt
24   confident enough to take that step and I'll tell you

Page 156

1    that there has been a sergeant's exam that has come
2    and gone and I've let it pass.  I passed the
3    sergeant's exam when I was in another police
4    department.  I took on a supervisory role there and
5    it's just I didn't -- You know, to have to be over
6    people, you have to have confidence.  And the
7    confidence that I feel as though I once exuded has
8    been taken from me.
9        Q.    When was the sergeant's exam that you
10   passed on?
11       A.    I'm sorry.  There may have been two.  I
12   couldn't tell you the exact dates or the years, but I
13   know it's -- it's been since 2018.
14       Q.    Are sergeant's exams in the Joliet Police
15   Department offered every other year?
16       A.    I don't know how they're offered, to be
17   honest with you.
18       Q.    Did you tell anyone that you had passed on
19   sitting for the sergeant's exam on one or two
20   occasions because of the viewing of the private
21   images?
22       A.    No, but I know that Nicole -- not
23   specifically, but I know Nicole and I have had
24   discussions regarding jobs in the police department

Page 157

1    that I just was -- didn't take or didn't try for.
2        Q.    Were there any other opportunities to go to
3    different units that you've passed on?
4        A.    I don't know.  I mean, I would have to go
5    back and look at the exact dates that if there was
6    anything offered, but there are certain, like, years
7    that people have to commit and you have to wait until
8    these people exhaust these years and then -- You know,
9    like, just for example, like, investigations, you have
10   to give a two-year commitment, but it's, like,
11   life-long.  So you can be an investigator for the
12   duration of your career once you get into
13   investigations.  But seeing as how this all has
14   happened in investigations, there would be no -- I
15   mean, I couldn't even stomach going in there to apply
16   for that.
17       Q.    Is it fair to say that you haven't applied
18   for any position since May or June of 2018 that you
19   haven't received?
20       A.    Can you repeat that one more time?
21       Q.    Sure.  Since May or June of 2018, have you
22   applied for any different positions within the
23   Department of Joliet?
24       A.    No.



Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 158..161

Page 158

1    Q.    You indicated that you're upset because of
2  how you have -- or are viewed, but as we sit here
3  today you don't know which officers have seen or
4  viewed any of the videos of private images; is that
5  true?
6    A.    Right.
7    Q.    And how did that change or how did your
8  internal mechanism change from the time before it came
9  to the attention that private images may have been
10 viewed until after?
11   A.    I didn't under- -- Are you asking me how
12 I -- I don't understand how you're asking me.  Are you
13 asking how I process this?
14   Q.    Well, you indicated that after you learned
15 about private images being viewed that you had a lack
16 of drive to go to work, right?
17   A.    Right.
18   Q.    How does that manifest itself in terms of
19 what's actually changed?
20   A.    I no -- I can recall specifically there was
21 an article, I think, that was printed, I don't
22 remember exactly which one, but it -- this keeps
23 coming up with the press down here when somebody leaks
24 something, when somebody says something to somebody

Page 159

1  and my name is thrown into it or the article is about
2  myself.  And I know that I have called in sick more
3  than I ever did before.  I'm not one to call in sick
4  just to hang out.  I know I've stayed home for an
5  entire weekend.  I know that sometimes when articles
6  leak, I have left work when I was on the desk working
7  light duty because I was pregnant and an article came
8  out.  And, you know, I get text messages of my face in
9  the newspaper, my family sends me a picture.  I don't
10 think you'd feel any better.
11   Q.    I'm sorry.  When you say you've received
12 text messages when your face is in the paper, what do
13 you mean by that?
14   A.    People will send me screen shots and -- of
15 my face in the newspaper or a newspaper article or an
16 on-line article.
17   Q.    Is that in connection with your performance
18 of your job or this lawsuit?
19   A.    It's in connection with this lawsuit, but
20 it goes hand-in-hand when I'm in uniform and I'm on
21 the front page of the Herald newspaper.
22   Q.    Who has sent you a text screen shot?
23   A.    It's been other officers.
24   Q.    Which officers?

Page 160

1    A.    I couldn't -- I couldn't tell you.  Right
2  now, I don't have them on my phone.
3    Q.    Did you delete them?
4    A.    Yeah.
5    Q.    When the officers send you the screen shot
6  of your photograph on newspapers, are any comments
7  made?
8    A.    I don't really comment back.  I just say
9  okay.  That's about it.
10   Q.    Do the officers that have sent you the text
11 messages -- do they make any comments about the
12 photograph?
13   A.    Not that I can recall.
14   Q.    Have you been diagnosed with any disorder
15 as a result of the viewing of the private images?
16   A.    I'd have to look at both Deb Del Re's and
17 Nicole's notes to tell you.
18   Q.    Do you recall ever being diagnosed with
19 depression?
20   A.    I believe so.
21   Q.    Do you take any medication as a result of
22 being diagnosed with depression or having depression?
23   A.    Do I or did I?
24   Q.    Did you.

Page 161

1    A.    I did.
2    Q.    What were you prescribed?
3    A.    Lexapro.
4    Q.    And when did you start to take that
5  medication?
6    A.    I couldn't be sure.  2018.
7    Q.    When did you stop?
8    A.    I stopped when I found out I was pregnant.
9    Q.    Just the first time?
10   A.    Yes.  Sorry.
11   Q.    Have you taken any medication for
12 depression since then?
13   A.    No, because I've been breast feeding for
14 two years.  I'm still breast feeding.
15   Q.    Do you have any thoughts or feelings of
16 depression since you stopped taking that medication?
17   A.    I have bouts of it, yes.
18   Q.    How do those bouts of depression manifest
19 themself?
20   A.    I mean, I cry.  I can't really sleep
21 because it's not doable.  I -- Migraines.  I know that
22 I did have a migraine for a while.  You know, I'm
23 quick to anger sometimes.  I mean, I guess, you know,
24 it's classic depression definition.



Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 162..165

Page 162

1      Q.   How often do you cry?
2      A.   When this gets -- It's when this litigation
3  or when this -- when the whole -- everything gets
4  brought up again regarding this lawsuit and the stuff
5  that happened around it,
6      Q.   How often can't you sleep as a result of
7  your private images being viewed?
8      A.   Well, a while.  I mean, I don't -- I mean,
9  I couldn't tell you.  It's often, but it's -- I don't
10 know.
11     Q.   Once a month?
12     A.   So I mean, it's kind of hard to pinpoint it
13 when I have a newborn.  So I don't really -- I don't
14 really -- I don't know.  Before this, it was a while.
15 You know, it's just when things get, like, put in
16 front of my face again.  Like, that letter that you
17 made me read and then you repeated it back, that's --
18 there's that, so ...
19     Q.   How often do you have migraines?
20     A.   I'm sorry?
21     Q.   How often do you have migraines?
22     A.   I haven't had one for a while.  I think
23 in -- I don't even know what month this is.  Last -- I
24 don't know.

Page 163

1      Q.   Do you think it's been more than
2  two months?
3      A.   Since I had a migraine?
4      Q.   Yeah.
5      A.   I don't -- I couldn't -- I mean, honestly,
6  these last three months have been a blur since the
7  baby.
8      Q.   Fair enough.  You indicated that you're
9  quick to anger.  Can you give me an example of how
10 you've been quick to anger?
11     A.   I don't know.  Like, snapping kind of; kind
12 of snappy.
13     Q.   Does that occur on a regular basis?
14     A.   No.  I mean, I -- No.  I think it's just
15 most of this gets centered around this stuff that gets
16 brought up.  I mean, with all due respect, I -- I --
17 You know, like I said, I've been pregnant and then I
18 had my baby so it's kind of hard to differentiate the
19 last couple of months from what you're asking me.
20     Q.   Fair enough.  Before you had your most
21 recent child, did you differentiate the two?
22     A.   Well, yeah.
23     Q.   And how could you differentiate being quick
24 to anger before you had your child?

Page 164

1      A.   Well, it would be -- it would be, like,
2  little things.  I don't know.  You know, I couldn't
3  get my shoe on or something.  I mean, it's just little
4  stuff that would just -- that wouldn't set you off if
5  you weren't upset about something and then this set
6  you off.
7      Q.   You're not currently seeing a counselor; is
8  that right?
9      A.   I'm not.
10     Q.   Have you been diagnosed with PTSD?
11     A.   I believe I was -- I'm sorry.  I did see
12 somebody after -- I did see somebody in the same
13 practice.  It's just the schedules again didn't line
14 up once they were met, so I couldn't continue to see
15 her.  I think I saw her once or twice, maybe once.
16     Q.   When did you see her?
17     A.   I'm sorry?
18     Q.   When did you see her?
19     A.   October.
20     Q.   Of which year?
21     A.   2020.
22     Q.   And I think you indicated that was someone
23 in the same practice as Nicole?
24     A.   Yeah.

Page 165

1      Q.   Are there any -- Strike that.
2           After learning that private images may have
3  been viewed, were you put on any other medications?
4      A.   No.  I -- Like I said, just the Lexapro and
5  antihistamine.
6      Q.   Do you believe your reputation has been
7  damaged?
8      A.   I do.
9      Q.   How so?
10     A.   I've been in this profession long enough to
11 know that unless you're pretty squeaky clean, any kind
12 of mishap or anything like this follows you for the
13 entirety of your career.
14     Q.   Has anyone told you that?
15     A.   No.  This is my feeling, again, for being
16 in this profession long enough to know better.
17     Q.   Other than what you just told me in the
18 last 20, 30 minutes, and I appreciate your patience,
19 has there been any other way that you -- that you can
20 tell me that you suffered emotional distress as a
21 result of your private images being viewed?
22     A.   I mean, I'll tell you that it is hard for
23 me even though -- it's hard for me to be intimate with
24 Nick even though I know it's, like, oh, yeah, you have



Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 166..169

Page 166

1  two kids.  Well, that's not -- it's just hard.  I
2  feel, like, maybe -- I don't feel as comfortable in my
3  own skin anymore.  I don't feel comfortable in my
4  uniform.  I don't feel comfortable -- I didn't feel
5  comfortable being pregnant and being in the police
6  station.  I mean, I didn't even show that I was
7  pregnant with my first child to anybody.  I tried to
8  hide it.  I tried to hide the second one.  And I
9  shouldn't have tried to hide my kids.
10       Q.    Okay.  Anything else that you can tell me?
11       A.    No.
12       MR. CLARK:  I think I'm done with my line of
13  questioning.  You know, I'm going to turn it over to
14  the City attorney.  Maybe now is a good time for a
15  break as well, but I don't know if you think so.
16       MS. PROCTOR:  Yeah, I'm going to have some
17  questions.  So maybe can we take 10 -- a 10-minute
18  break and resume?  Will that work for everyone?  Okay.
19  We'll see everyone in about 10 minutes.
20                 (A short recess was taken.)
21
22
23
24

Page 167

1                 CROSS-EXAMINATION
2  BY MS. PROCTOR:
3       Q.    Officer Socha, my name is Darcy Proctor and
4  I represent the City of Joliet in this matter.  So
5  just like Officer Grizzle's counsel had an opportunity
6  to ask you questions, it's now my turn, it's part of
7  the process.  Let me just ask you a couple things.
8  The -- Would you agree that your lawsuit against the
9  City of Joliet for which we're here for today was
10  filed on August 21st of 2018?
11       A.    Yes, ma'am.
12       Q.    Okay.  And attorney Hall Adams filed this
13  lawsuit on your behalf, correct?
14       A.    Yes, ma'am.
15       Q.    Okay.  When did you first -- And I don't
16  want to know what you talked about to be clear, but
17  when did you first consult with Mr. Hall Adams?
18       A.    Are you looking for a date?
19       Q.    Yes.
20       A.    He would probably have a better record of
21  that, but I believe July or August in 2018.
22       Q.    Okay.  So when we were going through some
23  of the exhibits earlier, you know, we talked
24  specifically about a letter that at least was

Page 168

1  postmarked -- I think it was July 2nd of 2018.  Do you
2  recall talking about that letter, Officer Socha?
3       A.    Yes, ma'am.
4       Q.    Okay.  So did you meet with Hall Adams,
5  either meet or consult with by phone -- again, I don't
6  want to know what you discussed -- at some point after
7  July 2, 2018, and before your lawsuit was filed on
8  August 21st of 2018?
9       A.    Yes, ma'am.
10       Q.    Okay.  And to be clear, there were
11  three people that you told about having received this
12  letter on or around July 2, 2018, and those
13  three people included Officer Crowley -- Nicholas
14  Crowley, Attorney Tomczak, and Attorney Hall Adams,
15  correct?
16       A.    Yes.
17       Q.    Okay.  You didn't share that information
18  with anybody else --
19       A.    No.
20       Q.    -- the fact that you received the letter or
21  what the contents of the letter were that you received
22  on or around July 2nd of 2018, correct?
23       A.    No.
24       Q.    Okay.  Did you review and approve the

Page 169

1  factual allegations contained in your complaint filed
2  on August 21, 2018, before it was actually filed with
3  the federal court?
4       A.    Yes.
5       Q.    And at the time your lawsuit was filed on
6  August 21, 2018, did you verify the truth of the
7  allegations contained in that document you filed which
8  is known as your civil complaint?  Did you verify
9  those altercations?
10       MR. ADAMS:  I'm going to object and instruct her
11  not to answer.  That would call for her to disclose
12  attorney-client privilege.  It's not a verified
13  pleading, and the only portions of which she might
14  have verified that is me.
15       MS. PROCTOR:  I don't disagree with -- I don't
16  agree with that, Hall, but let me try it another way.
17  Okay.
18  BY MS. PROCTOR:
19       Q.    Officer Socha, did you review the factual
20  allegations contained in your civil complaint before
21  it was filed on August 21st of 2018?
22       MR. ADAMS:  Objection, asked and answered.
23  BY MS. PROCTOR:
24       Q.    I believe you said yes, correct?  I'm just



Page 170

1  trying to set some context.  Yes?
2       A.    Yes.  I reviewed what my attorney had
3  prepared, yes.
4       Q.    Okay.  And were the allegations contained
5  in your complaint -- the factual allegations contained
6  in your complaint -- And to be clear, we have close to
7  23 pages of allegations, not all are factual, but many
8  of them are factual allegations.  And my question to
9  you is, are the factual allegations contained in your
10  original complaint and any amended complaint that was
11  filed on your behalf true?
12      A.    Yes.
13      Q.    Specifically paragraph 29 of your amended
14  complaint, which for the record was filed on July 31,
15  2019, states that senior leaders and/or supervisors of
16  the City's Department of Police have been aware of and
17  acquiesced and participated in the viewing,
18  dissemination, and re-recording of the private images
19  on plaintiff's iPhone.  Is that allegation true or
20  false, to the best of your knowledge?
21      A.    True.
22      Q.    On what do you base that allegation?  What
23  is the factual basis to support the allegation that I
24  just read to you in paragraph 29 of your first amended

Page 171

1  complaint, if you know?
2       A.    I'm going to go off of the letters that
3  were received, ma'am.
4       Q.    Okay.  Other than the letters that were
5  received which I'm not going to go through those again
6  because Mr. Grizzle's counsel already covered that,
7  but other than the letters that have been received and
8  produced to the parties in this litigation, you don't
9  have any other information concerning the
10  allegation -- to support in your view the allegation
11  that I just read in paragraph 29 of the first amended
12  complaint, true?
13      A.    True.
14      Q.    Okay.  I want to -- You also identified
15  almost -- other than yourself, 24 potential witnesses
16  that you indicate have some knowledge or information
17  concerning these matters, and I don't know any other
18  way other than to go through the list and just sort of
19  ask you about each of these witnesses.  So let's start
20  with Detective Dave Jackson.  Can you tell us,
21  Officer Socha, what, if any, knowledge or information
22  do you have that Detective Dave Jackson either viewed
23  your private images including photographs and videos
24  or was aware that such images were being viewed by

Page 172

1  members of the Joliet Police Department?
2       A.    I don't have knowledge that he's viewed any
3  of my private images.
4       Q.    Do you have any knowledge that he was aware
5  that any past or present member of the Joliet Police
6  Department viewed your private images that we've been
7  discussing today?
8       A.    Can you ask that one more time?  I'm sorry.
9       Q.    Sure.  What, if any, knowledge or
10  information do you have that Detective Dave Jackson
11  was aware that your private images were being viewed
12  by members of the Joliet Police Department?
13      A.    I don't have any direct knowledge from Dave
14  Jackson of that.
15      Q.    Well, when you say "direct knowledge,"
16  that's -- what do you mean by that?
17      A.    I mean exactly what I said.  I don't have
18  any direct -- David Jackson and I haven't spoken about
19  that, if that's what you're asking.
20      Q.    Well, yeah, I -- Look, you filed this
21  lawsuit against the City of Joliet, correct?
22      A.    Yes, ma'am.
23      Q.    All right.  And you've also, you know,
24  identified close to 24 different witnesses who may or

Page 173

1  may not have knowledge concerning the events that
2  we've been discussing today.  Okay.  So I'm just
3  trying to set a context.  And my question to you is,
4  what knowledge, if any -- what knowledge or
5  information, if any, do you have that
6  Detective Jackson either viewed or was aware that your
7  private images were viewed?
8       A.    I don't have any.
9       Q.    I'd like to talk next about Darrell Gavin,
10  who according to your supplemental disclosures in this
11  lawsuit which were made on or around September 4th of
12  2020, you state that Darrell Gavin, Deputy Chief of
13  Investigations, is -- has knowledge regarding the
14  handling, viewing, circulation, reproduction, and
15  downloading of images from your iPhone.  So my
16  question to you is, what -- can you identify for me
17  what knowledge, if any, or information you have, if
18  any, to support that representation in your discovery?
19      A.    I don't have any.
20      Q.    So to be clear, you have no knowledge or
21  information that Deputy Chief Gavin either viewed or
22  was aware that your private images were viewed at any
23  point in time by any member of the Joliet Police
24  Department, correct?



Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 174..177

Page 174

1    A.    Well, I do if we go off of the letters that
2  have been sent.
3    Q.    Okay.  Well, other than what's in these
4  purported letters.  Okay.  Other than what's in the
5  purported letters, let's just put those aside, do you
6  have any other knowledge or information that Darrell
7  Gavin viewed or was aware that your private images
8  were viewed by any member of the Joliet Police
9  Department including Darrell Gavin?
10   A.    No.
11   Q.    What, if any, knowledge or information do
12 you have that Philip Bergner either viewed or was
13 aware that your private images were being viewed by
14 any member of the Joliet Police Department at any
15 point in time?
16   A.    I don't.
17   Q.    I'm sorry.  Your answer just kind of cut
18 out on me.  I'm sorry.  I didn't hear it.
19   A.    Oh, I'm sorry.  I don't.
20   Q.    Okay.  What, if any, knowledge or
21 information do you have that Marc Reid viewed or was
22 aware that your private images were viewed by any
23 member of the Joliet Police Department at any point in
24 time?

Page 175

1    MR. ADAMS:  I'm going to pose an objection to
2  form and just ask for clarification.  Do all these
3  questions regarding the list of witnesses all mean to
4  exclude the letters as you did with a couple of the
5  earlier witnesses?
6    MS. PROCTOR:  Yes.
7    MR. ADAMS:  Okay.
8  BY MS. PROCTOR:
9    Q.    Do you understand that, Officer Socha?
10 Okay.  Let's just put the letters aside, or you can
11 just tell me.  I'm going to ask you about a witness,
12 and if the only basis for including them in your
13 discovery disclosures in the case is what's in these
14 purported letters, then just tell me that, just tell
15 me that.  All right?
16   A.    Okay.
17   Q.    So let's talk about -- I think we were
18 on -- I think we were on Marc Reid, correct?
19   A.    Yes.
20   Q.    Okay.  So what, if any, knowledge or
21 information do you have that Marc Reid either viewed
22 your private images or was aware that these images
23 were being viewed by any member of the Joliet Police
24 Department?

Page 176

1    A.    From the letters.
2    Q.    Okay.  So no information other than the
3  information contained in these purported letters,
4  correct?
5    A.    Yes.
6    Q.    All right.  What, if any, knowledge or
7  information do you have that Jeremy Harrison has any
8  knowledge regarding the viewing, circulation,
9  reproduction, and downloading of images on your
10 iPhone?
11   A.    I don't except for the letters and -- yeah.
12   Q.    Is there anything else or just the contents
13 of --
14   A.    I mean -- Go ahead.
15   Q.    -- the letters?
16   A.    I don't know what happened to the ...
17   Q.    Can you hear me okay, Officer Socha, or
18 did -- we lost each other?
19   A.    No.  I can hear you, but I can't see you.
20   Q.    Do you want to just take a minute?
21   A.    Okay.  I don't -- You're not on my screen.
22 Okay.  I can hear you.  I'm sorry.  Go ahead.
23   Q.    Should we go forward?
24   A.    Yes, ma'am.

Page 177

1    MR. ADAMS:  You were finishing an answer, Cassie.
2  BY MS. PROCTOR:
3    Q.    Yes, and I --
4    MR. ADAMS:  Cut her off.
5  BY MS. PROCTOR:
6    Q.    Yeah, and I didn't mean to.  Shall we have
7  it read back or --
8    A.    Yes, ma'am.
9    Q.    -- do you want to just start over?  You
10 tell me.
11   A.    Either one is fine.
12   Q.    Okay.  What, if any, knowledge or
13 information do you have that Jeremy Harrison either
14 viewed or had -- or was aware that your personal or
15 private images were being viewed by any member of the
16 Joliet Police Department?
17   A.    Other than the letter, I don't have any.
18   Q.    What, if any, knowledge or information do
19 you have that Mike Batis, B A T, like in Tom, I S,
20 like in Sam, either himself viewed or was aware that
21 other members of the Joliet Police Department were
22 viewing your private images?
23   A.    Other than the letter, I don't.
24   Q.    What, if any, knowledge or information do



Page 178

1  you have that Tim Powers either himself viewed or was
2  aware that other members of the Joliet Police
3  Department were viewing your private images?
4      A.   Other than the letter, I don't -- Letters.
5      Q.   Thank you.
6      A.   You're welcome.
7      Q.   What, if any, knowledge or information do
8  you have that Carlos Matlock either himself viewed or
9  was aware that any member of the Joliet Police
10 Department had viewed your private images at any point
11 in time?
12     A.   I don't.
13     Q.   I believe Officer Grizzle's counsel asked
14 you earlier about Donald McKinney.  And, again, you
15 were present for Detective McKinney's deposition,
16 correct?
17     A.   Yes, ma'am.
18     Q.   You attended it via Zoom?
19     A.   Yes.
20     Q.   Okay.  So just -- So I don't leave
21 Detective McKinney out, I'm just going to ask you the
22 same question with respect to McKinney.  So my
23 question is, what, if any, knowledge or information do
24 you have that Detective McKinney either viewed or was

Page 179

1  aware that your private images were being viewed by
2  other members of the Joliet Police Department?
3      A.   He wasn't listed in any of the letters as
4  far as I know; however, I can't recall who.  But I
5  know that there were rumors that stated that he had
6  seen my private images that I -- yeah, that he had
7  seen them.  But that's what I heard and I don't recall
8  from who, but that was the knowledge that I had of
9  that.
10     Q.   Okay.  The rumors that you just mentioned
11 that McKinney had seen your private images, can you
12 identify with any specificity what the -- you know,
13 who is the source of those rumors?
14     A.   No.  If -- No.  If I could, I would
15 because ...
16     Q.   Because what?
17     A.   Because it was a while ago when I -- when
18 this had came out.
19     Q.   When did you first hear of these rumors
20 concerning McKinney that you just testified to?
21     A.   I want to say maybe 2019.  I couldn't put
22 an exact date on it, but I know that it obviously was
23 after the lawsuit was filed on my behalf.
24     Q.   Okay.  So the rumors that you've mentioned

Page 180

1  were -- you became aware of those at some point after
2  your lawsuit was filed.  And, again, it was originally
3  filed on August 21st of 2018.  But again you don't --
4  you can't remember who shared this information with
5  you or with any more specificity when you heard these
6  alleged rumors?
7      A.   No, ma'am.
8      Q.   What, if any, knowledge or information do
9  you have that Brad McKeon had any knowledge or
10 information -- excuse me.  Let me rephrase it.  What,
11 if any, knowledge or information do you have that
12 Detective Brad McKeon either viewed himself or was
13 aware that other members of the Joliet Police
14 Department were viewing your private images at any
15 point in time?
16     A.   I didn't have any until the discovery in
17 this litigation.
18     Q.   Okay.  And, you know, specifically what
19 discovery are you referring to that shed light on this
20 matter?
21     A.   It was the handwritten notes that were
22 released.
23     Q.   Okay.  Are you referring to the handwritten
24 notes by the Inspector General, if you know?

Page 181

1      A.   I believe so.
2      Q.   Okay.  Other than the handwritten notes
3  that were shared with you by your counsel as notes
4  being produced by the parties in this litigation,
5  other than those notes, do you have any other
6  knowledge or information to indicate what role, if
7  any, Brad McKeon played in the events which are the
8  subject of your lawsuit?
9      A.   No.
10     Q.   What, if any, knowledge or information do
11 you have that Alan Roechner viewed your private
12 images?
13     A.   Other than the letters, I don't have any.
14     Q.   What knowledge, if any, do you have that
15 Alan Roechner was aware that your private images were
16 being viewed by other members of the Joliet Police
17 Department?
18     A.   Other than the letters, I don't.
19     Q.   What, if any, knowledge or information do
20 you have that Marc Reid either viewed himself or was
21 aware that others within the Joliet Police Department
22 were viewing your private images at any point in time?
23     A.   Other than the letters, I don't.
24     Q.   What, if any, knowledge or information do



Page 182

1  you have that Tab Jensen either viewed himself or was
2  aware that your private images were being viewed by
3  members of the Joliet Police Department at any point
4  in time?
5      A.    Same answer as far as the letters go.
6      Q.    Okay.  None other than --
7      A.    The letters.
8      Q.    -- the purported letters?
9            Okay.  What, if any, knowledge or
10  information do you have that Brian Benton either
11  viewed himself or was aware that members of the Joliet
12  Police Department had viewed your private images at
13  any point in time?
14     A.    Just from the letters.
15     Q.    What, if any, knowledge or information do
16  you have that Sergeant Shawn Stachelski -- and that's
17  spelled, first name is S H A W N, last name is
18  S T A C H E L S K I -- what knowledge or information
19  do you have that Sergeant Stachelski either viewed
20  himself or was aware that other members of the Joliet
21  Police Department had viewed your private images?
22     A.    I'm sorry.  I don't mean to be rude, but
23  it's a female.
24     Q.    Thank you for clarifying that.  Okay.

Page 183

1  Let's start over.  Can you tell us, Officer Socha,
2  what, if any, knowledge or information Sergeant Shawn
3  Stachelski may have concerning the viewing of private
4  images?
5      A.    I don't have any.
6      Q.    Okay.  What, if any, knowledge or
7  information do you have with respect to Chris Regis'
8  role as Office of Inspector General may have
9  concerning the factual allegations alleged in your
10  lawsuit?
11     A.    Just from the letters and, again, from the
12  discovery that was shown to me through this
13  litigation.
14     Q.    Can you be any more specific about what
15  discovery you became aware of through your counsel
16  that would shed any light on Chris Regis' involvement
17  in the events in question?
18     A.    The letters -- I'm sorry -- not the
19  letters.  I'm so sorry.  The handwritten notes that
20  were given and then I believe there may be -- was an
21  audio recording of an interview between himself and
22  Grizzle.
23     Q.    Okay.  Other than those pieces, do you have
24  any knowledge or information regarding what, if any,

Page 184

1  other factual piece Chris Regis can speak to in this
2  lawsuit?
3      A.    No, ma'am.
4      Q.    What, if any, knowledge or information do
5  you have that Detective Jeff German either himself
6  viewed or was aware that any member of the Joliet
7  Police Department may have viewed your private images
8  at any point in time?
9      A.    I just knew that he was involved in the
10  downloading of the contents of my cell phone the day
11  that it happened.
12     Q.    Other than his involvement in that process,
13  what, if any, other role did Detective Jeff German
14  play in the events that are the subject of your
15  lawsuit?
16     A.    I don't know.
17     Q.    What, if any, knowledge or information do
18  you have that Mitchell Banas, B A N A S, either viewed
19  himself or is aware that your private images may have
20  been viewed by members of the Joliet Police
21  Department?
22     A.    Okay.  Again, I'm not trying to be rude,
23  but there is no Mitchell Banas.
24     Q.    Oh, well that's --

Page 185

1      A.    So I don't know if that was a typo, but it
2  was supposed to be a Tom Banas.
3      Q.    Okay.  Do you know what, and it may have
4  been, I'm just looking at paragraph 23 of plaintiff's,
5  which is you, Supplemental Rule 26(a)(1) disclosures.
6  So the last name Banas, B A N A S, is that Tom Banas?
7      A.    Yes, ma'am.
8      Q.    Okay.  And is Tom Banas -- is he currently,
9  if you know, a patrol officer in the City of Joliet?
10     A.    Yes.
11     Q.    Okay.  And I believe you talked about him
12  earlier, he was present for this meeting between you
13  and Officer Mike DeVito, correct?
14     A.    Yes.
15     Q.    Okay.  Was Banas present for the entire
16  meeting with Mike DeVito that you spoke of earlier?
17     A.    Yes.
18     Q.    Well, can you be any more specific about
19  what knowledge or information, if any, Tom Banas may
20  have concerning the allegations you allege in this
21  lawsuit?
22     A.    I would just go off of what he had
23  overheard when DeVito and I were speaking.
24     Q.    Well, what do you think he overheard?



Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 186..189

Page 186

1    A.    He overheard what Mike told him.
2    Q.    And remind me, what did Mike tell you in
3  this meeting?
4    A.    He told me that the private images on my
5  phone were being viewed and disseminated in
6  investigations and then he described the video that
7  was on my phone -- a video that was on my phone.
8    Q.    Okay.  To be clear, though, Mike DeVito
9  never revealed this alleged source of the information,
10  correct?
11    A.    No, ma'am.  No, ma'am.
12    Q.    And this meeting with DeVito, I believe, at
13  least your counsel has represented, that this was in
14  or around early July of 2018; is that accurate, if you
15  know?
16    A.    It was sometime in the summer of 2018, July
17  or August, the summer of 2018.  I'm sorry.  I don't
18  remember the exact date.
19    Q.    Okay.  Although you don't remember the
20  exact date, let's approach it this way:  Was it before
21  or after you filed this lawsuit on August 21st of
22  2018?
23    A.    It was before.
24    Q.    Okay.  And although you don't remember the

Page 187

1  exact date, was it before or after you consulted with
2  Attorney Hall Adams?
3    A.    It was after.
4    Q.    How did you come to consult with Hall
5  Adams?
6    MR. ADAMS:  I'm going to object.
7  BY MS. PROCTOR:
8    Q.    Did someone recommend you?
9    MR. ADAMS:  I'm going to object.
10       Don't answer that Cassie.  That's
11  privileged information.
12    MS. PROCTOR:  Okay.
13  BY MS. PROCTOR:
14    Q.    I mean, did you Google Mr. Adams?
15    A.    No.
16    Q.    Okay.  Is this the first matter that
17  Mr. Adams has handled for you?
18    A.    Yes.
19    Q.    Just a couple more names, Officer Socha.
20  What, if any, knowledge or information do you have
21  that Lieutenant Joseph Egizio, and that's spelled
22  E G I Z I O, has with respect to the allegations in
23  your lawsuit?
24    A.    I don't.

Page 188

1    Q.    And what, if any, knowledge or information
2  do you have that Christopher Botzum, if I'm
3  pronouncing it correctly, either viewed your private
4  images or is aware that your private images may have
5  been viewed by other members of the Joliet Police
6  Department?
7    A.    I don't have knowledge except for his
8  involvement in the downloading of the contents of my
9  cell phone the night the search warrant was executed.
10    Q.    Okay.  Now, you have since married Nicholas
11  Crowley, correct?
12    A.    Yes.
13    Q.    When did you get married?
14    A.    April 19, 2019.
15    Q.    Did you have a formal wedding?
16    A.    No.
17    Q.    Did you get married at city hall?
18    A.    We got married at a courthouse.
19    Q.    At the Will County Courthouse?
20    A.    No.
21    Q.    Which courthouse did you get married at?
22    A.    Du Page County.
23    Q.    Okay.  Why Du Page County?
24    A.    Because I didn't want people to look up a

Page 189

1  record and then again publicize everything in the
2  newspaper in Will County.
3    Q.    Okay.  And know, Officer Socha, that things
4  we speak of, like private matters like this, are
5  confidential pursuant to a confidential order --
6    A.    Okay.
7    Q.    -- so I just wanted to share that
8  information with you.
9       Did you have a small family gathering to
10  celebrate your wedding to Mr. Crowley?
11    A.    My mom was present.  His family lives kind
12  of far away from it, so she wanted to be there because
13  she was --
14    Q.    She's your mother?
15    A.    No.  She was going through chemotherapy at
16  the time.
17    Q.    Okay.
18    A.    I'm sorry.
19    Q.    So that was a special day for her too.
20       Do you need to take minute?  We can if you
21  want to just take five.
22    A.    No.  Keep going.
23    Q.    All right.  I understand.
24       Okay.  Other than your mom, yourself, and



Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 190..193

Page 190

1 Mr. Crowley, was there anybody else, you know, present
2 for your marriage?
3     A.    No.  She was our witness or whatever you
4 call it.
5     Q.    Okay.  I understand.  Now, you have dated
6 Mr. Crowley since -- I was a little unclear on when
7 you first started dating, and I know that was way back
8 at the beginning of your deposition.  Was it 2015?  I
9 know you started out with Joliet in 2014.
10     A.    Yeah.  I don't think we -- You know, I
11 think we're too old for an exact date.  The end of
12 2014 because -- Yeah, end of 2014.
13     Q.    Okay.  How old are you today,
14 Officer Socha?
15     A.    Well, 36.
16     Q.    You're 36 years old.  Okay.  And you've got
17 two children now, correct?
18     A.    Uh-huh, yes.
19     Q.    Okay.  And your oldest child is two?
20     A.    He's going to be two.
21     Q.    Okay.  And when was he born?
22     A.    June 7, 2019.
23     Q.    Okay.
24     MR. ADAMS:  V-Day.

Page 191

1     THE WITNESS:  Yes.
2 BY MS. PROCTOR:
3     Q.    Yes.  And what is his first name?
4     A.    Jacob.
5     Q.    Okay.  And then you have a
6 three-month-year-old infant?
7     A.    Yes.
8     Q.    Okay.  I remember how hard those days were
9 as a working mom.
10         And what is it, a boy or a girl?
11     A.    Boy.
12     Q.    Boy, little boy.  And what is your baby's
13 name?
14     A.    His first name is Jackson.
15     Q.    Jackson.  Okay.  And he's healthy,
16 everybody good?
17     A.    Yes.
18     Q.    Okay.  Who helps you care for your children
19 when you're working?
20     A.    Right now I'm not, I'm on maternity leave.
21     Q.    Okay.
22     A.    But my mother did.
23     Q.    So your mother --
24     A.    Yes.

Page 192

1     Q.    Your mother helps?  Okay.  Tell me --
2     A.    And my sister.
3     Q.    And your sister.  You plan on returning to
4 the City of Joliet, correct?
5     A.    Yes.
6     Q.    Do you have a mentor in the department,
7 maybe not even a formal one, but just someone that you
8 can go to for advice, career advice?
9     A.    I mean, not really.
10     Q.    Okay.  Anyone that comes close to serving
11 in that role for you or no, you just haven't foraged
12 that kind of a relationship with anybody?
13     A.    Not really, no.
14     Q.    Okay.  I know we talked about it toward the
15 end of Mr. Clark's questioning, but I just want to
16 follow up on a couple of things.  Other than what
17 you've already testified to, Officer Socha, can you be
18 any more specific on what, if any, career
19 opportunities that you have been denied that you
20 attribute to the events which are the subject of this
21 lawsuit?
22     A.    None.
23     Q.    Other than what you've already testified
24 to, correct?

Page 193

1     A.    Correct.
2     Q.    Okay.  How would you describe your marital
3 relationship to Crowley now?
4     MR. ADAMS:  I'm going to object to that and tell
5 the witness to use your discretion in answering if she
6 sees fit or not.  It's totally irrelevant.  And to the
7 extent it implicates privileged communications between
8 spouses, they're just that, they're privileged.  And I
9 leave it to the witness.
10     MS. PROCTOR:  You are way wrong, Hall.  Look,
11 unless you want to withdraw your damages claim, this
12 is fair game.  So are you instructing your witness not
13 to -- Are you instructing your witness not to answer
14 my question?
15     MR. ADAMS:  I told her to use her discretion.
16 It's not a matter of sensitivity to me, maybe to her.
17     MS. PROCTOR:  Okay.
18     MR. ADAMS:  I don't believe it is remotely
19 connected to our damage claim.  You don't see it in
20 the pleadings or the discovery responses.
21 BY MS. PROCTOR:
22     Q.    You're making a claim for emotional
23 distress damages in this lawsuit, correct,
24 Officer Socha?



Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 194..197

Page 194

1    A.    Yes, ma'am.
2    MR. ADAMS:  I'm sorry.  I thought you're asking
3    me.
4    MS. PROCTOR:  No, it's directed to the witness.
5    BY THE WITNESS:
6    A.    Yes, ma'am.
7    Q.    Okay.  So I'm going to ask you if you can
8    describe what your current marital relationship is
9    with your husband.
10   MR. ADAMS:  Same objections and same guidance to
11   the witness.
12   BY THE WITNESS:
13   A.    It's a marriage as ...
14   Q.    Can you be any more specific than that?
15   A.    I mean, we have a marriage just like would
16   seem anybody else has a marriage.
17   Q.    Well, how would you describe -- I mean, how
18   would you describe it?
19   MR. ADAMS:  Objection, asked and answered.
20   MS. PROCTOR:  No, I don't believe the witness has
21   answered it.
22   MR. ADAMS:  Maybe not as descriptively as you
23   might have liked, but she's answered the question as
24   best as she's able to.

Page 195

1    MS. PROCTOR:  Okay.  And do you know what, can we
2    just, like, moving forward not have speaking
3    observations, unless you're going to assert some type
4    of attorney-client privilege, and I'm giving you fair
5    amount of leeway?  But speaking objections are not,
6    you know -- just try not to do those.
7    BY MS. PROCTOR:
8    Q.    So I mean, are you currently having any
9    marital issues with your husband?
10   MR. ADAMS:  Same objection.
11   BY THE WITNESS:
12   A.    I mean, we're in a marriage, ma'am.  I
13   don't know what you think a marital issue as being.  I
14   can't ...
15   Q.    Well, how would you describe your marriage:
16   Good, bad --
17   MR. ADAMS:  Objection, asked and answered.
18   BY MS. PROCTOR:
19   Q.    (Continuing.) -- somewhere in between??
20   I'm really looking for some descriptors.
21   MR. ADAMS:  Objection.  It's asked and answered.
22   BY MS. PROCTOR:
23   Q.    So you can go ahead and answer again.
24   A.    Okay.  I mean, it's a marriage like anybody

Page 196

1    else has a marriage.
2    Q.    Are you happy?
3    A.    In respect to what?
4    Q.    In your marriage.
5    A.    Yes.
6    Q.    Now, you've gone to marital counseling,
7    correct?
8    A.    I wasn't married when we went to
9    counseling, no.
10   Q.    Okay.  And that's a good point, and I
11   appreciate that.  I know you did go to, I believe, you
12   testified to some -- I believe we referred to it as
13   couples counseling with -- is it Nicole --
14   A.    Yeah.
15   Q.    -- -- is who is the therapist?
16   Okay.  What are Nicole's credentials, if
17   you know?
18   A.    I don't know.
19   Q.    Okay.  You don't know whether she's -- Is
20   she a psychiatrist or a counselor or social worker or
21   a professional counselor?  I mean, do you know
22   anything about her credentials?
23   A.    I know she has her doctorate, but I don't
24   know -- I mean, I don't know how to read those

Page 197

1    initials.
2    Q.    Well, what are the initials?
3    A.    I don't know them either.
4    Q.    Okay.  And she is associated with Edgewood
5    Clinical Services?
6    A.    She was.  I don't believe she's with them
7    any longer.
8    Q.    When did she leave them?
9    A.    That, I don't -- I don't know either.  I
10   tried to make an appointment with her and I was routed
11   to go to somebody else.
12   Q.    So just to be clear, when was the last time
13   you saw Nicole for the couples counseling that you
14   testified to earlier?  I'm a bit unclear on that.
15   A.    I don't remember the last time that we went
16   together.
17   Q.    Can you identify it maybe by year?
18   A.    Maybe 2018.  I don't -- I couldn't ...
19   Q.    Okay.  Because, you know, we have some --
20   we have some of your mental health counseling records
21   and I don't believe I -- I don't believe the couples
22   counseling records were included in that and that's
23   what I'm trying to get at just a time frame on.  The
24   couples counseling that you had, was it always with



Page 198

1  Nicole at Edgewood Clinical Services?
2      A.    Yes.
3      Q.    Okay.  Have you and Nick Crowley seen any
4  other therapist at any time for counseling concerning
5  your relationship either before or, you know, during
6  your marriage?
7      A.    You mean -- Yes.  What --
8      Q.    Okay.
9      A.    I believe -- I don't -- I'd have to look at
10 the records, I don't really remember.
11     Q.    Okay.  Well, who did you and Nick see for
12 counseling services concerning your relationship other
13 than Nicole?
14     A.    There -- It was -- Her name was Danielle, I
15 think.
16     Q.    All right.  And was Danielle also
17 associated, if you know, with Edgewood Clinical
18 Services?
19     A.    Yes.
20     Q.    Other than Danielle and Nicole -- Do you
21 know Danielle's last name, by the way?
22     A.    I don't.  I don't.  I think we went
23 together for this matter and then I went by myself
24 with her, but she wasn't -- she wasn't a good fit for

Page 199

1  myself.
2      Q.    For you.  Okay.  And how many times did you
3  and Nicholas Crowley see Nicole for relationship
4  counseling, roughly?
5      A.    I don't know.  I'd have to look at the
6  notes or the records for that.
7      Q.    Was it helpful?
8      A.    Yes.
9      Q.    Okay.  And was your individual therapy with
10 Nicole helpful to you?
11     A.    Yes.
12     Q.    Okay.  Would you like to return to therapy?
13     A.    I would.
14     Q.    Have you made an effort to track down
15 Nicole to maybe resume therapy with her assuming she's
16 still practicing?
17     A.    I wouldn't know how to do that.  The
18 practice was kind of short in how they answered when I
19 tried to reach out for her again.
20     Q.    I'll talk to Hall, he might be able to help
21 you out, track her down.  They don't fall off the face
22 of the earth, they can be found.
23     A.    Right.
24     Q.    Is that not a priority right now for you

Page 200

1  given that you're a new mom and you're dealing with
2  other things in your life?
3      A.    It is a priority for me.  It's just hard to
4  find the time to do it.  You know, I'm basically by
5  myself.  This is, like, the longest I've been way from
6  both of my kids, so ...
7      Q.    And when is your -- Like, do you have a set
8  date that you're returning from maternity leave?
9      A.    July 20th or the 21st.
10     Q.    Okay.  Other than your mother and your
11 sister, do you have anybody else helping you with the
12 children currently?
13     A.    No.
14     Q.    And what shift is your husband currently
15 working?
16     A.    He works 7:00 a.m. to 7:00 p.m.
17     Q.    Okay.  Can you say with absolute certainty,
18 Officer Socha, whether or not Nicholas Crowley ever
19 shared any of the contents, the sexually explicit
20 contents, that presumably were on his cell phone in
21 part at any point in time with any person?
22     MR. ADAMS:  Object to form and to lack of
23 foundation.
24 BY MS. PROCTOR:

Page 201

1      Q.    Do you understand the question?
2      A.    Are you asking me if he's shared the
3  content on his phone with anybody?
4      Q.    Correct.
5      A.    Regarding myself?
6      Q.    We've been talking all day about the
7  sexually explicit photographs and videos.  Can we
8  agree on that?
9      A.    Okay.  I just want to make sure.
10     Q.    Yeah, right.  And you told us earlier that
11 you believe that some of that information you shared
12 with Mr. Crowley and vice versa on your respective
13 cell phones; did I get that correct?
14     A.    Uh-huh, yes.
15     Q.    All right.  So now my question to you is,
16 can you say with absolute certainty one way or the
17 other that Nicholas Crowley never shared that
18 information with a third party?
19     A.    I can.
20     Q.    You can.  You're 100 percent certain?
21     A.    I'm certain.
22     Q.    And that's based on him telling you what?
23     A.    That he hasn't shared it.
24     Q.    And you believe him, correct?



Page 202

1    A.    Yes, ma'am.
2    Q.    Do you have any way of proving that?
3    A.    I don't.
4    Q.    Bear with me, I'm going through my notes.
5  Okay?
6    A.    That's okay.
7    Q.    I'm just trying to move things along a
8  little bit.
9          You mentioned when you were an officer in
10 McCook that you requested counseling services to help
11 you deal with the death of your brother, correct?
12   A.    I did.
13   Q.    And I think you said you went one time.
14 Did I hear that right?
15   A.    I did.
16   Q.    Do you have any -- Can you -- Do you have
17 any identifying information about where you went for
18 those counseling services?
19   A.    It was through an organization called
20 Pillars, P I L L A R S.
21   Q.    Yeah, I'm familiar with it.  And is that
22 in, like, the Berwyn area more or less, or was it?
23   A.    No.  I went to the one in LaGrange.
24   Q.    Okay.  All right.  And you believe you went

Page 203

1  on one occasion?
2    A.    I'm pretty sure, yes.
3    Q.    Okay.  The -- Do you have a primary care
4  physician?
5    A.    No.
6    Q.    Have you ever had a primary care physician
7  or a family doctor for you?
8    A.    I have.
9    Q.    Okay.  What's his or her name?
10   A.    It was Dr. David Levy, L E V Y.
11   Q.    And where did Dr. Levy practice?
12   A.    The practice was called Archer Family
13 Medical in Chicago.
14   Q.    Okay.  And are you still under the care of
15 Dr. Levy?
16   A.    No.  I mean, I moved away from the area,
17 so ...
18   Q.    Okay.  When were you last treated by
19 Dr. Levy?
20   A.    Maybe 2014, 2015, maybe.
21   Q.    Okay.  Have you seen any -- You know,
22 putting your therapists aside, have you been under the
23 care of any medical doctor?
24   MR. ADAMS:  To be clear, you want all the

Page 204

1  pregnancy ob-gyn, all that stuff too, Darcy?
2    MS. PROCTOR:  Well, let's talk about general
3  practitioners.
4  BY MS. PROCTOR:
5    Q.    I mean, do you -- Other than Dr. Levy, do
6  you -- you know, in the last ten years, have you been
7  under the care of any medical doctor aside from your
8  ob-gyn physicians?
9    A.    A primary physician, is that what you're
10 asking?
11   Q.    Yes, right.
12   A.    No.  If I became ill or I needed to see a
13 doctor, I would go to a clinic, like a -- I don't know
14 what those -- What are those clinics called?
15   Q.    Like, an immediate care or walk-in clinic?
16   A.    Yes.  Yes.
17   Q.    Is there a -- Do you go have a go-to
18 immediate care or walk-in clinic that you will go to
19 for when you're sick?
20   A.    It would obviously be whichever one would
21 have the appointment available.
22   Q.    Do you try to stay in and around the Joliet
23 area or do you go elsewhere?
24   A.    No.  I try to stay in the Joliet area.

Page 205

1    Q.    Okay.  In the last five years, have you
2  gone to a walk-in clinic?
3    A.    Yeah, I have.  I'm sorry.  I'm trying to
4  think of years here.  Yeah.
5    Q.    And when was that?
6    A.    Maybe 2000-- -- I know that I was having
7  sinus infections so I was going to the physician's
8  immediate care.
9    Q.    Which one?
10   A.    They were reoccurring so I went to one on
11 Houbolt.  There's one on Larkin, I think.  I went to
12 the one on Black and Larkin and then --
13   Q.    And that's in the City of Joliet?
14   A.    Those both are, yeah.  And there was one on
15 Plainfield.
16   Q.    Okay.  In the last ten years, have you
17 received any kind of medical health treatment or
18 prescriptions of medicine for any mental health issue
19 from any other treating physician?
20   A.    Other than Deb Del Re?
21   Q.    So -- Oh, Deb Del Re is the -- is that the
22 nurse practitioner that can prescribe --
23   A.    Yes.
24   Q.    -- medication?



Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 206..209

Page 206

1    Okay.  Other than Deb Del Re, yes.
2    A.    No.
3    Q.    Now, did I hear you right, were you on
4  Lexapro before the events that are the subject of this
5  lawsuit?
6    A.    I don't recall when I started the Lexapro.
7  I know that I was on the antihistamine.  I can't
8  remember the -- It started with an H that she
9  prescribed because it was -- instead of prescribing
10 somebody with anxiety, a Xanax or something of that
11 caliber, she wanted to do a histamine.
12   Q.    Are you referring to -- is it hydroxyzine
13 which is like a --
14   A.    Could be.
15   Q.    -- can be used to treat anxiety, something
16 like that?
17   A.    I believe so.
18   Q.    Okay.  So just to be clear, before May of
19 2018, you were taking medications to deal with
20 anxiety, correct?
21   A.    I don't know the time frame.  I'd have
22 to -- or it could have started in May.  I don't
23 remember when I started on the medication.
24   Q.    I mean, you don't know one way or the other

Page 207

1  when you started --
2    MR. ADAMS:  I object.
3  BY MS. PROCTOR:
4    Q.    (Continuing.) -- on any medication to deal
5  with anxiety?  Okay.  Let's just maybe be a little bit
6  broader.  Do you know when you first -- when were you
7  first prescribed any medication that deal with
8  anxiety?
9    A.    That's what I'm saying.  I don't remember
10 when it was first prescribed.
11   Q.    Well, other than the hydroxyzine and then
12 you mentioned Lexapro, you know, what is Lexapro used
13 to treat, if you know?
14   MR. ADAMS:  Object, foundation.
15 BY MS. PROCTOR:
16   Q.    If you know.
17   A.    Depression.
18   Q.    And you can't be any more clear on when you
19 started on the Lexapro, correct?
20   A.    If I -- I mean, if I say maybe -- I don't
21 know the exact date.  I know that's hard -- it's hard
22 to pinpoint.  We're going back a while, so ... 2018.
23   Q.    Do you know how long you received services
24 from Edgewood Clinical Services, like when it started

Page 208

1  and when it ended?  Just to give me a ballpark.
2    A.    I know Nicole ended in 2019, but the -- the
3  other female, I think, was 2020.  2016, 2015, maybe.
4    Q.    And do you have any memory of being on any
5  medication for anxiety or any other mental health
6  issue in the year 2015?
7    A.    No.
8    Q.    Same question for 2016?
9    A.    No.  No, because I didn't --
10   Q.    Go ahead.
11   A.    I didn't see anybody to be able to
12 prescribe me medicine.  Nicole wasn't able to
13 prescribe medication.  That's why I was  referred to
14 the nurse practitioner.
15   Q.    Okay.  And other than believing it was
16 sometime in 2018, you don't really have any
17 information to shed any light on when you first were
18 prescribed any medication to deal with anxiety or any
19 other mental health issue, correct?
20   A.    I mean, I can go back and look at my EOBs,
21 but I -- 2018 sounds about right.
22   Q.    Any more -- Can you be any more specific
23 about when in 2018 you started on -- I think it was
24 the Lexapro, to your memory?

Page 209

1    A.    No.  I don't want to say a date and then be
2  incorrect.
3    Q.    Okay.  Well, why don't we look at it like
4  this:  Was it before or after the events in May and
5  June of 2018 that are the subject of the lawsuit?
6    A.    Probably around that time frame.
7    Q.    Around -- So before or not?
8    A.    I don't know.  I don't want to give you an
9  answer either way and be incorrect.
10   Q.    Okay.  Well, why were you prescribed the
11 Lexapro, if you know?
12   A.    I think she did that in the combination.  I
13 can't -- I mean.
14   Q.    She you're referring to is Debbie --
15   A.    Deb Del Re.
16   Q.    The nurse practitioner?
17   A.    Yes.
18   Q.    Okay.
19   A.    And the antihistamine, I think, was for
20 sleeping.
21   Q.    Did it help?
22   A.    Sometimes.
23   Q.    Are you still on the Lexapro?
24   A.    No.



Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 210..213

Page 210

1    Q.    When did you stop taking it?
2    A.    I stopped taking it when I was pregnant --
3  when I found out I was pregnant.
4    Q.    And when was that?
5    A.    October of 2018.
6    Q.    Okay.  You mentioned earlier that I believe
7  it was the day after you received the letter
8  postmarked July 2nd of 2018 that I think you said the
9  next morning you went to see Attorney Tomczak.  Again,
10  I'm not going to ask you what you discussed, but I
11  just want to set -- put some context out here.  Did I
12  get that correctly?
13    A.    Yes.
14    Q.    Okay.  And let me ask you this:  Did
15  Attorney Tomczak take any legal action on your behalf?
16    A.    As far as notifying anybody?
17    Q.    Just any legal action on your behalf.
18    MR. ADAMS:  I'll object to form.  I think she's
19  asked for clarification.
20  BY MS. PROCTOR:
21    Q.    Okay.  Well, I'm trying -- I don't want
22  to -- I'm trying to be careful and not have any issues
23  with asking you about attorney-client privilege
24  communication.  Let me just back up a little bit.  I

Page 211

1  think you told us earlier that the day after the
2  search warrant was issued and your cell phone was
3  searched, you contacted Attorney Tomczak the next
4  morning, correct?  Okay.  That's -- Correct?
5    A.    I don't -- I know I saw him the next
6  morning.  I believe I -- Maybe I spoke to him that
7  night and we had the meeting to go meet each other in
8  the morning.
9    Q.    Okay.  So with respect to the search
10  warrant is my question, did Attorney Tomczak take any
11  legal action on your behalf in relation to the search
12  warrant?
13    A.    No.
14    Q.    Did he challenge the scope of the search
15  warrant in any way?
16    A.    To my -- I don't know.  I guess I don't
17  understand what you're asking me.  If he did it -- I
18  mean, I don't -- I guess I don't understand what
19  you're asking me.  Did he take it to scope to anybody
20  besides myself?
21    Q.    What I'm asking is whether Attorney Tomczak
22  took any legal action on your behalf concerning the
23  search warrant?
24    MR. ADAMS:  And I'll object just to form relating

Page 212

1  to the phrase legal action as to which the witness has
2  expressed some confusion.
3  BY THE WITNESS:
4    A.    No.
5    Q.    Do you know whether Attorney Tomczak
6  contacted Appellate Prosecutor Lamken --
7    A.    I don't know.
8    Q.    -- on your behalf?
9    Q.    Do you know whether Attorney Tomczak
10  contacted any member of the Joliet Police Department
11  on your behalf concerning the search warrant?
12    A.    I don't know.
13    Q.    You told us earlier about your mailbox
14  in the Joliet Police Department and I just want to ask
15  you a couple of follow-up questions on that.  Can you
16  describe for me what your mailbox looked like?  And
17  this is, again, in July because I don't know if it's
18  changed.  Let's just focus May, June, July, August of
19  2018, during that time frame.  What did -- Can you
20  describe what your mailbox looked like?
21    A.    It's just a piece of silver metal with a
22  lock on it and a slit that has -- that you can put
23  stuff through.
24    Q.    Okay.  So you have to access it with a

Page 213

1  lock, correct?
2    A.    What?
3    Q.    You have to access it with a key?
4    A.    In order for whomever is assigned it, yes.
5  I believe there's a universal key too.  I don't know
6  who's in possession of that.
7    Q.    Okay.
8    A.    I'm sorry.  I take that back.  The
9  sergeant, he was, like, an equipment sergeant, I know
10  that he has the keys.  Like, he would be the one who
11  would give the keys out.  So he may have had a key.
12  But in order to access it, like, you have your own key
13  and then there is a hole in order to put mail into.
14  Did I answer that right?
15    Q.    Well, I think so.  So if someone wanted to
16  put a letter in your mailbox, they would just put it
17  through the slot, correct?
18    A.    Yes.
19    Q.    All right.  And you had a key to access
20  your mailbox, correct?
21    A.    Yes.
22    Q.    And you received that key, I'm assuming,
23  when you were hired --
24    A.    Yes.



Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 214..217

Page 214

1    Q.   -- from the equipment person?

2        Okay.  And whether the equipment person

3 does or does not have a master key, you don't really

4 have any personal knowledge of that, correct?

5    A.   No.

6    Q.   Okay.  And what was the name of the

7 equipment officer or person when you were hired, if

8 you recall?

9    A.   Sergeant Moeller, M O E L L E R.

10   Q.   Okay.  And was Sergeant Moeller working at

11 the Joliet Police Department, if you know, in May,

12 June, July, August of 2018, if you know?

13   A.   He was.  I know he just retired when I

14 was -- Yeah.

15   Q.   Okay.  Did you have a good relationship

16 with Sergeant Moeller?

17   A.   I don't really have a relationship with

18 him.

19   Q.   Okay.

20   A.   Yeah.

21   Q.   Okay.  He was -- You really didn't -- It

22 sounds like you didn't have any relationship with him?

23   A.   No.

24   Q.   Okay.  You told us earlier that you make it

Page 215

1 a point to not, like -- Before the incidents that

2 we've been talking about, but when you were hired at

3 the Joliet Police Department, you made it a point to

4 not socialize with people you work with; is that fair

5 to say?

6    A.   Yeah.  Like, I didn't go out of my way to

7 go to someone's house or go to events that, you know,

8 like, the police department.  Like, it just wasn't

9 anything that I really -- I don't know.  I just never

10 really did it.

11   Q.   Okay.  But, you know -- But because you

12 were dating a fellow officer, correct, Nicholas

13 Crowley, you certainly did do certain social things

14 with other members maybe that worked on your shift,

15 okay, after work, right?

16   MR. ADAMS:  Object to --

17 BY THE WITNESS:

18   A.   I didn't really hang out -- I mean, if

19 you're -- I didn't really hang out after work.  On

20 different days, maybe, like, if a Christmas party came

21 up for a shift, I would go to that.

22   Q.   Well, you know, we talked a little earlier

23 about the night at the bar which, you know, led to the

24 prosecution concerning Crowley.  Do you recall that

Page 216

1 night, right?

2    A.   Yes.

3    Q.   I don't want to rehash that again, but now

4 you said there were other officers present that night

5 and the bar.  I think you gave us the name of it,

6 maybe you did, maybe you didn't.  I mean, do you

7 remember the name of the bar you were at that night?

8    A.   I don't.

9    Q.   You don't.  Was it in Joliet?

10   A.   No.

11   Q.   Do you know where it was?

12   A.   I believe it was in New Lenox.

13   Q.   Okay.

14   A.   Or Frankfurt.

15   Q.   What brought you to the bar in New Lenox or

16 Frankfurt?  Did someone live near there?

17   A.   Not that I know of.

18   Q.   Okay.  Had you been there before?

19   A.   No.

20   Q.   Was that your first and only time there?

21   A.   Yes.

22   Q.   And can you recall the name of any of the

23 officers who were present at the bar on the night

24 we're talking of other than you and Crowley?

Page 217

1    A.   Just the ones that I gave to the other

2 attorney.

3    Q.   I don't know if you gave names.  I may have

4 missed them.  So if you could just indulge me again,

5 who was present that night?  What other officers were

6 present.

7    A.   I remember Officer Blackmore was there and

8 Officer Emph.  Do you need me to spell it again?

9 E M P H.

10   Q.   No, no.  It's coming back to me and that's

11 fine.  Okay.  So you've shared with us as best you can

12 the names of the officers who were present that night.

13       Okay.  Were those officers that you and

14 Nicholas Crowley hung out with on a regular basis?

15   A.   I believe that was the first -- at least

16 that was the first time that I've hung out with them

17 outside of work.

18   Q.   Okay.  Are you close with anybody at the

19 Joliet Police Department, any fellow officer other

20 than Nicholas Crowley?

21   A.   Yeah.  I gave a couple names.

22   Q.   Okay.  And I think you told us earlier that

23 you've received text messages from other officers when

24 there might be articles concerning your lawsuit in the

Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Page 218

1  newspaper.  Do you remember that line of questioning?
2      A.    Yes.
3      Q.    Okay.  The officers that shared that
4  information with you, are those your closer friends on
5  the department that were sharing that information with
6  you?
7      A.    No.
8      Q.    Who, if you know, shared that information
9  with you, the names of the officers, if you know?
10     A.    I don't.  I don't recall those names.
11     Q.    Okay.  Do you know why they were sharing
12  the information with you?
13     A.    No.
14     Q.    How did they get your private cell phone
15  number, if you know?
16     A.    Well, the people on shift or on shifts or,
17  you know, I've worked different shifts, we've
18  exchanged telephone numbers for work purposes when
19  we're at work if something has to be done or when
20  we're at work and it can't be done over the radio.
21     Q.    Okay.  I understand.  And I know you
22  described to us the way it makes you feel when you
23  see -- you know, when you -- when this information is
24  shared with you.  Have you ever complained to anyone

Page 219

1  within the Department of Joliet about receiving those
2  texts from co-workers?
3      A.    No.
4      Q.    Did you ever tell co-workers to stop?
5      A.    No.  I don't believe they were in
6  harassing -- in a harassing nature.  I don't think
7  that that's what that --
8      Q.    Okay.  You don't think that that was the
9  intent, and I'm glad you clarified that because then I
10  misunderstood you.
11     A.    Oh, I'm sorry.
12     Q.    No, that's my fault.  To the extent you
13  were receiving messages that maybe had your picture
14  because the lawsuit was reported -- the lawsuit may
15  have been reported upon in the paper, those were not
16  done in a harassing way to you; do I understand that
17  correctly?
18     A.    Right.
19     Q.    Okay.  Thank you.  Thank you very much for
20  clarifying that.
21           Officer Socha, do you regret putting these
22  sexually explicit images on your cell phone?
23     A.    No.
24     Q.    Now, your lawsuit was filed in your name.

Page 220

1  Are you aware of that?  I mean, you're listed in a
2  public document as a plaintiff and you're listed as
3  Cassandra Socha.  You're aware of that, correct?
4      A.    Yes.
5      Q.    Okay.  And you're aware that when lawsuits
6  are filed, they become matters of public record,
7  correct?
8      A.    Yes.
9      Q.    And you're aware that journalists have
10  public access to court filed documents, correct?
11     A.    I am.
12     Q.    Okay.  And you are aware that there's been
13  multiple newspaper articles reporting on the lawsuit
14  that you filed and Attorney Hall Adams filed on your
15  behalf, correct?
16     A.    Yes, ma'am.
17     Q.    Okay.  And you're also aware that your
18  attorney made comments to reporters concerning the
19  allegations in your lawsuit, correct?
20     A.    Yes.
21     Q.    And do these news reports cause you
22  continued embarrassment and anxiety?
23     A.    They do.
24     Q.    And is it your view that any anxiety that

Page 221

1  you're continuing to have, that the sole cause are the
2  events at issue in this lawsuit?
3      A.    Can you clarify that a little bit?  I'm
4  sorry.
5      Q.    Yeah.  I mean, you -- I know you told us
6  earlier that you're feeling really overwhelmed right
7  now.  I mean, you're a new mom and, you know, there's
8  a lot going on with your life.  Would you agree with
9  that?
10     A.    Right now, yes.
11     Q.    Okay.  And I think you kind of gave us your
12  own definition of, you know, that you are showing, I
13  guess, classic depression signs by definition.  You
14  testified to something like that?
15     A.    Yes.
16     Q.    Okay.  I mean -- But you're not getting
17  any -- I mean, is that a self-diagnosis that you've
18  made for yourself?
19     A.    I haven't self-diagnosed myself with
20  anything.  I just know how I feel.  And I mean, I've
21  been -- I've been to therapy where they've, you
22  know -- they've said that I have depression and then
23  the PTSD that I testified too as well.
24     Q.    You know, I just wanted to talk a little



Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 222..225

Page 222

1  bit about the PTSD.  I mean, do you understand what
2  PTSD is, just generally speaking?
3      A.    I do.  And even when I went to go see the
4  counselor after my brother was killed, that's exactly
5  what he stated.  So it's not -- I know I'm not
6  unfamiliar with it.
7      Q.    Okay.  So you were diagnosed -- You were
8  previously diagnosed with PTSD in relation to your
9  being killed, and I think that related to -- and I
10 don't want to get too deep into it -- that you
11 witnessed the car accident and you came upon the
12 scene; is that fair to say?
13     A.    I didn't witness it happening.  But yeah, I
14 was called to the scene unrelated.  We didn't know
15 that -- didn't know that it was my brother.
16     Q.    Okay.  So the traumatic event in that case
17 was what, if you could describe it in your own words?
18     A.    I mean, do you want me to tell you the
19 trauma that I endured from seeing my brother in an
20 accident?
21     Q.    No.  And that's what I'm just trying to
22 understand is that was the trauma.  Now, what I'm
23 unclear on is, have you been diagnosed with PTSD
24 following the events which are the subject of this

Page 223

1  lawsuit and any feelings that you may be having?
2      A.    I believe I have.
3      Q.    Okay.  And what I'm trying to understand is
4  if you know what the traumatic event was.
5      A.    To pinpoint this?
6      Q.    Yes.
7      A.    If I -- I mean -- And you're asking me to
8  tell myself, not what a doctor has said?
9      Q.    Well, what has a doctor said, if you know?
10     A.    I don't know what a doctor has said.  I'm
11 just telling you I don't know that there's necessarily
12 one specific thing or one specific event in this
13 entire thing that has happened, but it's the
14 culmination of it all.
15     Q.    Okay.  And we've already talked about that,
16 Officer Socha, and I don't intend to get into that
17 again.  Okay?
18     A.    I appreciate it.
19     Q.    Unless there's something that you would --
20 something else you would like to say concerning your
21 feelings, okay, that we haven't already discussed.
22     A.    No, not right now.
23     Q.    Not that you can think of as you sit here
24 today.  Has anybody -- You know, I know you told us

Page 224

1  earlier, you know, that you feel that your -- you
2  know, that your reputation has been damaged by these
3  events.  And I want to ask you whether anyone, either
4  past or current member of the Joliet Police
5  Department, has said anything to you directly that
6  makes you feel that they think anything less of you?
7      A.    Not that I can recall, no.
8      Q.    Have you experienced any interaction with
9  any member, past or current of the Joliet Police
10 Department, where they did not treat you
11 professionally or with respect?
12     MR. ADAMS:  Object to form.  Presumably other
13 than the events alleged?
14     MS. PROCTOR:  Right.
15 BY THE WITNESS:
16     A.    Not that I can recall, no.
17     Q.    Why did you feel you had to hide the fact
18 that you were pregnant at work as it relates to
19 this -- you know, to the allegations or any of the
20 damages you're claiming in the lawsuit, just to make
21 it a little bit more specific, if you know?  If you
22 know.
23     A.    Okay.  I'm going to try and not to again
24 get he emotional speaking, but both times I was

Page 225

1  pregnant I had to report to Darrell Gavin and request
2  to work light duty and going off of the letters that
3  were produced and the things that were written about
4  what Darrell Gavin had said or heard or what have
5  you --
6      Q.    Allegedly, but yes, allegedly.
7      MR. ADAMS:  Let her answer without your --
8      MS. PROCTOR:  Okay.  You're right.
9  BY MS. PROCTOR:
10     Q.    I didn't mean to interrupt you.
11     A.    That's okay.  So I would hope that you can
12 appreciate as the sensitive context that's inside of
13 this lawsuit that he had said heard or disseminated
14 that to go and ask him for permission to work another
15 position while I'm pregnant with my first child and
16 then again with my second child.  In no way am I
17 embarrassed by my children.  Don't misconstrue that.
18 It's the fact that we all know how babies are made and
19 we all know the context of this lawsuit that's been
20 filed on my behalf.  And to go and ask somebody that
21 and to feel I have to hide that is awful and you
22 shouldn't have to do that and I felt that I had to do
23 that because of whom I had to report to and who I had
24 to ask that favor of.



Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 226..229

Page 226

1    Q.    Well, was it -- did you request light
2  duty -- you know, did you have a medical note for the
3  need for light duty due to your pregnancy?
4    A.    Are you saying, like, did I have a
5  complication with my pregnancy?
6    Q.    I don't really want to -- No, I'm not
7  really asking you that.  The request for light duty,
8  was that done under doctor's orders or, you know, at
9  the direction of your physician?
10    A.    Right, I asked my physician to draft a
11  letter to ask for -- if I could work light duty
12  instead of me going on the street and having to put
13  all the gear on, physically fight people, answer these
14  calls, work overnight.  So yes, my physician wrote the
15  letter on my behalf both times.
16    Q.    And was that request honored by the
17  department?
18    A.    Yes.
19    MS. PROCTOR:  Now, I'd like to just take five for
20  a bathroom break and review my notes, but I think I'm
21  just about done.  Okay.  Does that work for everybody?
22    MR. ADAMS:  That's fine.
23    THE WITNESS:  Yes.
24    MR. CLARK:  Sounds good.

Page 227

1  BY MS. PROCTOR:
2    Q.    All right.  Officer Socha, did someone
3  within the Joliet Police Department refer you to
4  Attorney Hall Adams?  Officer Socha, can you hear me
5  okay?
6    A.    Hello?
7    Q.    Yes, I don't think you heard my last
8  question.
9              (Audio distortion.)
10  BY MS. PROCTOR:
11    Q.    Yeah, I'm having a hard time.  I can hear
12  you, but you sound far away.  Do you want to maybe
13  just say your name?  We've been doing pretty good.
14    A.    I'm sorry.  I did not hear your question at
15  all.  I heard nothing.
16    Q.    Okay.  My question is, did someone from the
17  Joliet Police Department refer you to Attorney Hall
18  Adams?
19    A.    No.
20    Q.    Did Attorney Tomczak refer you to Hall
21  Adams?
22    MR. ADAMS:  Objection.  That's attorney-client
23  privileged communication.
24    MS. PROCTOR:  I don't think it is.  I'm not

Page 228

1  asking what was discussed.  I'm asking about a
2  referral.
3    MR. ADAMS:  I'm directing the witness not to
4  answer the question.  A referral is legal advice.
5  BY MS. PROCTOR:
6    Q.    Are you -- Do you understand the question,
7  Officer Socha?
8    A.    Yes, ma'am.
9    Q.    Okay.  And are you following your
10  attorney's advice?
11    A.    I am.
12    Q.    Okay.  And you're refusing to answer the
13  question, correct?
14    A.    I'm taking my attorney's advice.
15    Q.    Okay.  Other than Hall Adams, are you aware
16  of any other attorneys representing you in this
17  lawsuit?
18    A.    No.
19    Q.    Does Mr. Adams have co-counsel?
20    A.    I don't believe so.
21    Q.    Okay.  Is there a referring attorney
22  involved who will get money if you win your lawsuit,
23  if you know?
24    MR. ADAMS:  Objection.  That's privileged.

Page 229

1        Don't answer it.
2  BY MS. PROCTOR:
3    Q.    Do you have a contingent fee arrangement
4  with Mr. Adams?
5    MR. ADAMS:  Same objection.
6        Don't answer it.
7        That's privileged.  That's an
8  attorney-client communication.
9  BY MS. PROCTOR:
10    Q.    Do you understand the question,
11  Officer Socha?
12    A.    Yes, ma'am.
13    Q.    And are you taking your attorney's advice?
14    A.    Yes, ma'am.
15    Q.    Officer Socha, are you -- you told us
16  earlier that you're at your -- you are at your
17  mother's home, is it in Summit --
18    A.    Yes.
19    Q.    -- taking today's deposition?
20        What room are you in?  Are you in an
21  enclosed room?
22    A.    I am.
23    Q.    How would you describe the room?
24    A.    It's a small room.  It's her office.  It's



Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 230..233

Page 230

1  been turned into her office.
2      Q.    Okay.  And are you participating in this
3  deposition via Zoom on a laptop computer?
4      A.    I am.
5      Q.    Is it your personal laptop computer?
6      A.    It is.
7      Q.    Are there any other computers in the room
8  in which you're taking today's deposition?
9      A.    Her work computer.
10     Q.    And is her work computer -- As you're
11 looking at our screen, is it to your left?
12     A.    It's to my left.  Do you want to see it?
13     Q.    Sure.
14     A.    Okay.
15     Q.    Okay.  It's a desktop computer?
16     A.    It is.
17     Q.    Okay.  Other than the desktop computer, are
18 there any other computer devices in the room with you
19 such as an iPad or any other device?
20     A.    No.  Her printer.
21     Q.    Okay.  And have you referred to any other
22 device during the course of this deposition?
23     A.    No.
24     Q.    Okay.  Because right now, like, as you're

Page 231

1  sitting at your laptop, I'm going to ask you to look
2  directly into the camera.  Do you see where the camera
3  is, is that on top of the laptop?
4      A.    Correct.
5      Q.    I'm going to ask you to look over to the
6  left of your computer.  Can I ask you to do that?
7      A.    Okay.
8      Q.    Was anyone including your attorney,
9  Mr. Adams, communicating with you via text during any
10 portion of this deposition?
11     A.    No.
12     Q.    Did you look at your cell phone for any
13 text messages during the course of your deposition?
14     A.    No.
15     Q.    Did you have any communication with
16 Nicholas Crowley during the course of this deposition?
17     A.    On the breaks, yes, he asked how the kids
18 were doing.
19     Q.    Did you talk with him by telephone?
20     A.    Via text.  He's at work.
21     Q.    Okay.  All right.  You mentioned earlier
22 that during the deposition you were hearing your
23 gmails sounding.  Do you remember telling us that
24 earlier?

Page 232

1      A.    Uh-huh, yes.
2      Q.    Okay.  And how would you receive notice of
3  gmails?
4      A.    It came across on the top of the screen on
5  my computer.
6      Q.    Okay.  But your computer -- Like, if you're
7  looking at your gmails, you would be looking directly
8  at the computer screen just like you're looking now,
9  correct?
10     A.    I didn't open up my e-mails.
11     Q.    Okay.  Like, how would you describe it, a
12 notice or an alert of a gmail message?  Would it be,
13 like, a pop-up and then fade away?
14     A.    Yes, and then I don't know what happened
15 with the Zoom thing, that I messed up the screen.  I
16 couldn't see it anymore, I could just hear them.
17     Q.    Did you receive -- Go ahead.  I'm sorry.
18     A.    I'm saying I couldn't see anything that
19 came across as notification from the gmail because of
20 how the screen is for the Zoom thing.  Like, I only
21 have four boxes -- five, let me take that back.  I
22 don't even have a big picture and all I have is Zoom
23 and my Bluetooth thing for this ear pod -- or whatever
24 these things are.

Page 233

1      Q.    Okay.  Is your Bluetooth only connected to
2  your laptop or is it also simultaneously connected
3  with your cell phone?
4      A.    No, I shut it off on my cell phone so I
5  can use it on my laptop.
6      Q.    And have you received any gmails from
7  anyone or any e-mails through your gmail account from
8  anyone during the course of this deposition?
9      A.    They're ads.  I was receiving ads for,
10 like, socks, I think.
11     Q.    Okay.  But nothing from Nicholas Crowley?
12     A.    No, ma'am.
13     Q.    Okay.  Have you received any gmails, I
14 don't want to know what they say, from your attorney
15 during the course of this deposition?
16     A.    Not during the deposition, no.
17     Q.    But presumably on breaks, correct?
18     A.    Yes.
19     Q.    You had communications with your attorney
20 on breaks, I'm just going to leave that at that.  Did
21 Nicholas Crowley influence you in any way to file this
22 lawsuit?
23     A.    No.
24     Q.    When you're both working, Officer Socha,



Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 234..237

Page 234

1  you and Nicholas Crowley, does Crowley help you in
2  caring for the children?  Does he help care for the
3  children or does that all fall on your mother and you
4  and your sister?
5      A.   He does.
6      MR. ADAMS:  Object to form.  He does when he's
7  not at work.
8  BY MS. PROCTOR:
9      Q.   When he's not working, does your husband
10 help you care for your children?
11     A.   Of course.
12     Q.   It takes two and then some.  Okay.  I know
13 that.  Now, I asked you before, like -- You're aware,
14 Officer Socha, that you can file a lawsuit under a
15 fictitious name, correct, like Jane Doe, you're aware
16 of that concept?
17     A.   I am not, no.
18     Q.   You're not aware of that.  Okay.  Were you
19 aware that you could file this lawsuit under Jane Doe
20 instead of using your actual name?  Were you aware of
21 that?
22     MR. ADAMS:  I'll object to lack of foundation.
23 She doesn't know that's a given.
24 BY MS. PROCTOR:

Page 235

1      Q.   So you could have filed this lawsuit under
2  the name of Jane Doe --
3      MR. ADAMS:  I'm going to object lack of
4  foundation.
5  BY MS. PROCTOR:
6      Q.   (Continuing.) -- if you wanted to?
7      A.   I didn't know that that was -- I didn't
8  know that you could file under Jane Does or John Does
9  or however that would be.
10     Q.   Well, just accept for purposes of this
11 deposition that you could have.  Now, that you know
12 that, would you have preferred to file this lawsuit
13 under Jane Doe and not use your real name?
14     MR. ADAMS:  Object to calls for speculation and
15 lacks foundation.
16 BY MS. PROCTOR:
17     Q.   You can go ahead and answer.
18     A.   I don't know how to answer that.  I don't
19 know either way.
20     Q.   Or would you agree that it would have went
21 better for you and not use your real name in this
22 lawsuit given that lawsuits are public information and
23 this lawsuit again is exposing some very private
24 information about you and your sex life and so on and

Page 236

1  so forth?
2      A.   I don't mean to sound ignorant here.  I'm
3  using ignorant in not knowing, but I don't know how a
4  lawsuit would uncover what this has uncovered if I
5  used a Jane Doe had I known how to do that.
6      Q.   Well, it would still be you, you're just
7  using a fictitious name to keep your actual name out
8  of the public record and out of the public eye and
9  newspapers.  That's one of the reasons you do a Jane
10 Doe.  But again, you did not know about that one way
11 or the other, correct?
12     MR. ADAMS:  I'm going to object to form.
13 BY THE WITNESS:
14     A.   Right.  I didn't know that you could file
15 in a fictitious name.
16     Q.   Did you take any medications today?
17     A.   No.
18     Q.   Do you have any memory problem?
19     A.   I don't.
20     Q.   Have you consumed any alcohol today?
21     A.   No.
22     Q.   Is there anything that may impact your
23 ability to remember any of the events which are the
24 subject of this lawsuit?

Page 237

1      A.   No.
2      Q.   Have you ever been convicted of a felony or
3  a crime of dishonesty?
4      A.   No.
5      Q.   Have you ever been disciplined in any
6  workplace or in school for being untruthful?
7      A.   No.
8      Q.   Have you ever filed a lawsuit as a
9  plaintiff other than this lawsuit?
10     A.   No.
11     Q.   Do you know what the total amount of your
12 medical or treatment bills that you're seeking
13 recovery for in this case would be?
14     A.   No.
15     Q.   Have all your bills been paid, to your
16 knowledge?
17     A.   Through insurance and through what I've had
18 to pay, yes.
19     Q.   Okay.  And what insurance do you have?
20     A.   Blue Cross-Blue Shield of Illinois.
21     Q.   Okay.  What plan do you have?
22     A.   It's a PPO.
23     Q.   Okay.  And are there any copays or
24 deductibles that need to be satisfied before -- you



Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 238..241

Page 238

1  know, before any counseling services would be fully
2  paid for, if you know?
3      A.    I believe so, but I also believe that there
4  was payments that I had to make for Deb Del Re's
5  services.
6      Q.    Is that because she was out of network, if
7  you know, or it just wasn't fully covered, if you
8  know, Officer Socha, you may not?
9      A.    I don't know.  I'm pretty sure that they
10  were in network, but I think it wasn't -- whatever
11  wasn't covered, I had to pay those all at once.
12      Q.    Did you have to miss any time from work as
13  a result of the events alleged in this lawsuit?
14      A.    I have missed work, correct.  Yes.
15      Q.    Okay.  Have you been paid for those days
16  off?
17      A.    Yes.  I had to utilize my sick time.
18      Q.    Okay.  And, you know, how much sick time
19  did you have to utilize and when?
20      A.    I would have to go back on time cards and
21  look.  I'd have to go back and look.  I remember -- Go
22  ahead.  I'm sorry.
23      Q.    Can you give me a ballpark?  And I'm sorry.
24  I interrupted you.  You were starting to say I

Page 239

1  remember.  Please finish.
2      A.    That's okay.  Specifically just because I
3  was still on the street working, we work 12-hour
4  shifts, I think I called in two or three days so then
5  I had to use at least -- right there is 24 hours.  I
6  guess I have to go back in.
7      Q.    Sure.  Can you -- Other than missing two or
8  three days, is that the most amount of time that
9  you've missed from work, you know, which you attribute
10  to the events that we've been discussing or have there
11  been more days?
12      A.    No.  There have been more days.  Like I
13  said, I'd have to go back and look at the pay stubs or
14  totals.  It's just that was the most recent that I
15  remember.
16      Q.    And when was that in relation to today?
17      A.    Well, I'm still working on -- I'm still on
18  the street, so that was probably July -- July 2020,
19  June of 2020.  I'd have to go and look at that.
20      Q.    Is that before you went on light duty?
21      A.    Yes.
22      Q.    Did you go on light duty with both your
23  pregnancies, Officer Socha?
24      A.    Yes.

Page 240

1      Q.    I want to ask you just a couple more
2  questions about the letter that you received after --
3  This was the letter -- I don't want to have to pull it
4  up again on the screen.
5      A.    That's all right.
6      Q.    It was page 12 of 12 in your Mandatory
7  Initial Disclosures and it was the letter that begins
8  with Socha, dash, and then I think you testified
9  earlier that you didn't recall when you received this,
10  not specifically, maybe July, August of 2018, but it
11  was after you received the letter that came to you in
12  the U.S. Postal Service mail.  Okay.  I believe you
13  said you don't remember if it was in an envelope.  Is
14  it possible it was in an envelope or you just don't
15  remember?
16      A.    I don't remember.
17      Q.    Okay.  You told us, though, that there was
18  attorney information attached to this letter --
19      A.    Yes.
20      Q.    -- do you recall that?
21          Can you describe what you meant by attorney
22  information?
23      A.    It was -- I think there was, like, a -- it
24  looked like it was a printout from -- like, a -- like,

Page 241

1  a bio on an attorney, if I remember right.
2      Q.    Was there an attorney card attached?
3      A.    No.
4      Q.    It was just a printout bio on an attorney?
5      A.    Yes.
6      Q.    Did you recognize the name of the attorney?
7      A.    No.
8      Q.    What did you do with the bio printout?
9      A.    I don't know.  I think -- I don't know.  I
10  don't know if I gave it to Hall or ...
11      Q.    So this letter with the attorney bio, you
12  received it after you had retained or consulted with
13  Attorney Hall Adams, correct?
14      A.    I believe so.
15      Q.    So are you -- are you certain you gave a
16  copy of the attorney bio to Mr. Adams?
17      MR. ADAMS:  Objection, asked and answered.
18  BY MS. PROCTOR:
19      Q.    Yeah, do you know what, I'm sorry.  It's
20  just getting late in the day.  I don't know that I
21  heard you.  Can you just answer again?  It's not a
22  trick question.  Sorry.
23      A.    I don't remember if I gave him the copy
24  that was with the letter or not.



Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 242..245

Page 242

1    Q.    Okay.  Do you still have a copy of it?
2    A.    No.
3    Q.    So you destroyed it?
4    A.    No, I didn't say I destroyed it.
5    Q.    Did you throw it out?
6    A.    I don't believe so.  I believe that I gave
7    both the letter and the bio to my attorney, but I
8    can't be sure about that one.
9    Q.    Okay.
10       MS. PROCTOR:  I don't recall -- And, Hall, maybe
11   you can shed some light on this, I don't recall
12   receiving an attorney bio in the plaintiff's document
13   production, but, you know, I'm coming into the case in
14   the middle.  So is that something you've produced?
15       MR. ADAMS:  We produced what we produced.
16       MS. PROCTOR:  You produced what you produced, but
17   can you answer my question?  Did you produce a copy of
18   the attorney bio?  I don't recall seeing it.
19       MR. ADAMS:  Then take my deposition.
20       MS. PROCTOR:  And if you didn't produce it, then
21   I'm going to making a formal request for it today on
22   the record and again following up with plaintiff's
23   counsel.  Again, if we have it, I don't have to go
24   through that process, but I don't see that we do.

Page 243

1        MR. CLARK:  I don't think we received a copy.
2        MS. PROCTOR:  Okay.
3    BY MS. PROCTOR:
4    Q.    So, Officer Socha, if you didn't give a
5    copy to your attorney, would that mean that you may
6    still have a copy of it somewhere?
7    A.    I don't think I have -- I don't have a copy
8    of it.  I don't think I have it anywhere.
9    Q.    Okay.  But you do believe you gave it to
10   Mr. Adams; is that correct?
11   A.    I believe so.  I couldn't be sure.
12   Q.    Did you ever show the attorney bio to
13   anyone other than Mr. Adams?
14   A.    I believe I showed Nick Crowley when I got
15   it.
16   Q.    Did Crowley recognize the name of the
17   attorney on the bio?
18   A.    No, I don't believe so.
19   Q.    Did you ever contact -- I'm not going to
20   ask what was discussed, but did you ever contact the
21   attorney on the bio?
22   A.    No.
23       MS. PROCTOR:  Now, I just want to take one last
24   bathroom break and I'm going to come back on the

Page 244

1    record and I may have a couple more, but I'm hoping I
2    can come back and tell you I'm done.  So if you could
3    just give me a break for several minutes.  Thank you.
4            (A short recess was taken.)
5    BY MS. PROCTOR:
6    Q.    Officer Socha, did you feed or give any
7    information to the media concerning your lawsuit?
8    A.    No.
9    Q.    You know, I lost you.  I can hear you,
10   though.  Can you hear me okay?
11   A.    Yeah.
12   Q.    Then I don't know what you can see, but I
13   can't see you.
14   A.    I can see you.
15   Q.    Okay.  Do you know, Officer Socha, whether
16   Attorney Adams is representing Officer Crowley or any
17   other Joliet police officer in any other matter?
18   A.    I don't know.
19       MS. PROCTOR:  I'm done with my questions, but I
20   do want to just put something on the record.  It does
21   not appear, and this happens sometimes, that we have
22   full counseling records from Edgewood Clinical
23   Services, in particular the couples counseling and
24   also there was an additional -- there was a doctor

Page 245

1    identified, Dr. Levy, in medical records today -- or,
2    you know, in testimony today, so I'm -- we're going to
3    be making a formal request for those records.  And
4    depending upon, you know, those records, we may have
5    to bring Officer Socha back.  So I just want to put
6    that on the record.  I want to reserve the right.  I
7    don't want to really conclude the City's questioning
8    of Officer Socha until I'm sure we've got full and
9    complete records.
10   BY MS. PROCTOR:
11   Q.    And while I have you here, Officer Socha,
12   can you give me the name of your ob-gyn physician, the
13   name and the name of the group and where they're
14   located?
15   A.    West Suburban Women's Health.
16   Q.    Okay.
17   A.    They're in --
18   Q.    Go ahead.  I'm sorry.
19   A.    They're in Willowbrook, Illinois.
20   Q.    And do you see a specific doctor there?
21   A.    I do, but throughout the pregnancy I had to
22   rotate -- the pregnancies I had to rotate.
23   Q.    So you saw different doctors within the --
24   it's West Suburban Women's Health in Willowbrook?



Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 246..249

Page 246

1    A.    Uh-huh, yes.
2    Q.    And were you a patient there before your
3  pregnancies?
4    A.    Yes.
5    Q.    Okay.  And how long have you been a patient
6  in this group?
7    A.    Oh, my teen-age years.
8    Q.    Okay.  So from your teens until?
9    A.    I think I was 18 -- I'm sorry.  I think I
10  was 18 when I started going to that practice.
11    Q.    Okay.  And just to be clear, have you ever
12  been treated by any other physician for any other
13  reason from your teens to the present date other than
14  the folks we've already talked about?
15    A.    I can't -- I don't remember.  I was at
16  Hinsdale Orthopedics.  I can't remember the name of
17  the doctor that I saw.
18    Q.    When was that, Officer Socha, roughly?
19    A.    2017.
20    Q.    Okay.  And what was the nature of the care?
21  It sounds like an orthopedic issue.
22    A.    Yeah.  It was for my back.
23    Q.    Okay.  And what's -- What's the nature of
24  the back problem?

Page 247

1    A.    If I understand right, I have, like,
2  degenerative disc disease.  I could be -- I can't
3  remember the numbers.  Like, the S, but my lower
4  back --
5    Q.    Okay.
6    A.    -- the discs are messed up and then
7  they're -- I can't remember the name of the other
8  thing.  I'd have to go and look at it.
9    Q.    That's fine.  Are you still under the care
10  of the Hinsdale Orthopedic group?
11    A.    No.
12    Q.    Did you see a specific physician there?
13    A.    It was a female, but I don't remember -- I
14  went in thinking that I had to have surgery
15  originally, and then the surgeon was like, No, go and
16  see this doctor and I -- I saw her and I think I had a
17  couple, like, injections in my back and then I did
18  chiropractic and physical therapy.
19    Q.    Okay.  So the injections, was that done by
20  a different physician or a physician through Hinsdale
21  Orthopedics?
22    A.    Both.
23    Q.    Both.  Okay.  What about the physical
24  therapy?  Where was that done?

Page 248

1    A.    That was done at Brightmore -- I don't
2  know -- I don't want to use my computer, but it's
3  something Bright.  I'd have to Google it in physical
4  therapy.
5    Q.    And where was Brightmore located?
6    A.    They were in Plainfield.  They have an
7  office in Plainfield and they have an office in Joliet
8  and Frankfurt as well, I think.
9    Q.    Did you go to the Plainfield location?
10    A.    Yes.
11    Q.    Okay.  Other than the orthopedic issue that
12  you've mentioned and the related care, did you -- have
13  you received any other medical treatment within the
14  last ten years for any reason?
15    A.    I had -- I had a -- I had my nose --
16  because of the sinus infections that I had, I had to
17  have surgeries on my nose --
18    Q.    When was that?
19    A.    -- and my sinuses.
20    2016 -- 2000-- Is it -- It's the end of
21  2015 or 2016.
22    Q.    And was the surgery helpful?
23    A.    No.  I have to have another surgery.
24    Q.    Okay.  When?  What's the timeline on that,

Page 249

1  if you know?
2    A.    I have to go see another doctor.  They put
3  implants in my nose to -- Because I can't breathe out
4  of my left nostril as good as I should be able to, so
5  they fixed my -- they fixed the deviated septum twice
6  and then the second time I had implants and I had my
7  cheek sinuses cleaned out.  But like I said, like, I
8  still have a little bit, like a constant drip out of
9  my nose and I have to go back and see another doctor.
10    Q.    Where did you receive that care and the
11  surgery?
12    A.    I believe that surgery was at Edward's
13  Hospital.
14    Q.    And where is Edward's Hospital located?
15    A.    Naperville.
16    Q.    Okay.  And you believe that was in or
17  around 2016?
18    A.    I think so.
19    Q.    Okay.  Have you now told me all the medical
20  treatment that you have received for any reason within
21  the last ten years?
22    A.    Yes.  As far as ailments, yes.
23    Q.    When you say ailments, what do you mean?
24  Like, physical ailments?



Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 250..253

Page 250

1    A.    Yeah.
2    Q.    Okay.  And just to -- really just to be
3  sure I'm not missing anything, is the only place that
4  you've ever received individual therapy as well as the
5  couples counseling and possibly the marriage therapy
6  would have been through the Edgewood Clinical Services
7  and Pillars that you mentioned earlier in today's
8  deposition?  Have you received mental health or
9  counseling services anywhere else?
10    A.    Other than that?
11    Q.    Yes.
12    A.    No.
13    MS. PROCTOR:  Okay.  I don't have anything
14  further.  Thank you, Officer Socha.
15    THE WITNESS:  You're welcome.
16    MR. ADAMS:  Matt?
17    MR. CLARK:  Officer Socha, just one quick
18  question.
19            REDIRECT EXAMINATION
20  BY MR. CLARK:
21    Q.    What is the name of your sister?
22    A.    Jacqueline.
23    Q.    And her last name?
24    A.    Socha.

Page 251

1    MR. CLARK:  Thank you very much.  I don't have
2  any further questions.
3          Hall, do you want to --
4    MR. ADAMS:  We'll show signature as reserved.
5
6    MR. CLARK:  Okay.
7    MS. PROCTOR:  But, again, we're leaving the
8  deposition open so it's not concluded pending the
9  receipt of full medical so I just want that to just be
10  clear on the record.
11    MR. CLARK:  I guess I would join in too.
12    MR. ADAMS:  We'd object to, of course.
13  You've had a lot of time to get whatever medical you
14  needed.
15    MS. PROCTOR:  Well, I suppose we can have that
16  conversation another day, but I'm reserving the right
17  to bring Officer Socha back for that purpose as I
18  mentioned on the record.  So thank you everyone for
19  their time.
20    MR. CLARK:  Lisa, can I order a copy, e-tran.
21    THE COURT REPORTER:  Okay.  Ms. Proctor?
22    MS. PROCTOR:  No order from the City.
23    MR. ADAMS:  All I want is a copy if somebody
24  orders the original.  I'm not paying for the original.

Page 252

1    MR. CLARK:  Yeah, I'm ordering the original, if
2  that was unclear.
3    MR. ADAMS:  So what I would like, Lisa, is to get
4  a condensed hard copy with the marked exhibits
5  attached and pdf of the very same thing, please.
6    THE COURT REPORTER:  Okay.  You got it.
7          We are off the record at 5:30 p.m.
8            (Witness excused.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 253

1      IN THE UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION
3  CASSANDRA SOCHA,          )
                            )
4            Plaintiff,     )
                            )
5    -vs-                   )   No. 18 CV 05681
                            )
6  CITY OF JOLIET, a municipal )
   corporation; EDWARD GRIZZLE, )
7  and JOHN DOES 1-20,       )
                            )
8            Defendants.    )
9        I, CASSANDRA SOCHA, state that I have read
10  the foregoing transcript of the testimony given by me
11  at my deposition on the 4th day of May, 2021, and that
12  said transcript constitutes a true and correct record
13  of the testimony given by me at the said deposition
14  except as I have so indicated on the errata sheets
15  provided herein.
16
17            _____
                    CASSANDRA SOCHA
18  No corrections (Please initial)_____
    Number of errata sheets
19  submitted_____(pgs.)
20  SUBSCRIBED AND SWORN to
    before me this _____ day
21  of _____, 2021.
22
    _____
23        NOTARY PUBLIC
24



Socha vs City of Joliet
Cassandra Socha - 05/04/2021

Pages 254..256

Page 254

```
 1   UNITED STATES OF AMERICA      )
     NORTHERN DISTRICT OF ILLINOIS )
 2   EASTERN DIVISION              )   SS.
 3   STATE OF ILLINOIS             )
     COUNTY OF COOK                )
 4
 5
 6           I, Lisa M. Walas, Certified Shorthand
 7   Reporter, appearing remotely via videoconference, do
 8   hereby certify that CASSANDRA SOCHA was first duly
 9   sworn by me to testify to the whole truth and that the
10   above deposition was reported stenographically by me
11   and reduced to typewriting under my personal
12   direction.
13           I further certify that the said deposition
14   was taken at the time and place specified and that the
15   taking of said deposition commenced on the 4th day of
16   May, A.D., 2021, at 10:00 a.m.
17           I further certify that I am not a relative
18   or employee or attorney or counsel of any of the
19   parties, nor a relative or employee of such attorney
20   or counsel nor financially interested directly or
21   indirectly in this action.
22
23
24
```

Page 256

```
 1   Errata Sheet
 2
 3   NAME OF CASE: Socha vs City of Joliet
 4   DATE OF DEPOSITION: 05/04/2021
 5   NAME OF WITNESS: Cassandra Socha
 6
 7   Page _____ Line _____ Reason _____
 8   From _____ to _____
 9   Page _____ Line _____ Reason _____
10   From _____ to _____
11   Page _____ Line _____ Reason _____
12   From _____ to _____
13   Page _____ Line _____ Reason _____
14   From _____ to _____
15   Page _____ Line _____ Reason _____
16   From _____ to _____
17   Page _____ Line _____ Reason _____
18   From _____ to _____
19   Page _____ Line _____ Reason _____
20   From _____ to _____
21   Page _____ Line _____ Reason _____
22   From _____ to _____
23
24   _____
     SIGNATURE OF DEPONENT
```

Page 255

```
 1           In witness whereof, I have hereunto set my
 2   hand this 1st day of June, A.D., 2021.
 3
 4                    Lisa M. Walas
 5                    LISA M. WALAS, CSR
                      180 North LaSalle Street
 6                    Suite 2800
                      Chicago, Illinois  60601
 7                    Phone:  (312) 236-6936
 8   CSR No. 084-003787
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

