# EXHIBIT 3

Page 1

1           UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF ILLINOIS
2               EASTERN DIVISION

3  CASSANDRA SOCHA,          )
                            )
4      Plaintiff,          )
                            )
5      vs.                  )
                           ) No. 18 CV 05683
6  CITY OF JOLIET, a municipal  )
   corporation, EDWARD GRIZZLE, )
7  JOHN DOES 1-20,           )
                            )
8      Defendants.          )

9

          The deposition of OFFICER NICHOLAS CROWLEY
10
   called by the Defendants for examination in Joliet,
11
   Illinois, commencing at 10:00 a.m. on the 17th day of
12
   June, A.D., 2021.  It is taken pursuant to notice and
13
   pursuant to the Federal Rules of Civil Procedure for the
14
   United States District Courts pertaining to the taking
15
   of depositions, taken before Sharon A. Jerndt, Certified
16
   Shorthand Reporter and Registered Professional Reporter,
17
   appearing remotely via videoconferencing.
18

19

20

21

22

23

24

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021                                          Pages 2..5

Page 2

1  APPEARANCES: (remotely via videoconference)
2    LAW OFFICES OF HALL ADAMS
       MR. HALL ADAMS
3        33 North Dearborn Street
         Suite 2350
4        Chicago, Illinois 60602
         Phone: (312) 445-4900
5        E-mail: hall@adamslegal.net
6          On behalf of the Plaintiff;
7    TRESSLER, LLP
       MS. DARCY L. PROCTOR
8        550 East Boughton Road
         Suite 250
9        Bolingbrook, Illinois 60440
         Phone: (630) 759-0800
10       E-mail: dproctor@tresslerllp.com
11         On behalf of the Defendants City of Joliet
           and John Does 1-20;
12
     KNIGHT, HOPPE, KURNIK & KNIGHT, LTD.
13     MR. MATTHEW CLARK
         5600 North River Road
14       Suite 600
         Rosemont, Illinois 60018
15       Phone: (847) 261-0714
         E-mail: mclark@khkklaw.com
16
           On behalf of the Defendant Edward Grizzle.
17
18
19   ALSO PRESENT:
20       Sabrina Spano - City of Joliet
         (via videoconference)
21
22
23
24

Page 3

1            I N D E X
2  WITNESS                              PAGE
3  OFFICER NICHOLAS CROWLEY
4    Direct Examination By Ms. Proctor      5
5    Cross-Examination By Mr. Clark       148
6    Redirect Examination By Ms. Proctor  180
7
             E X H I B I T S
8        (No exhibits were marked.)
9    C E R T I F I E D  Q U E S T I O N S
10   Q.  At about 3 in the morning on       174
11   July 15, 2017, police officers
         were called to your and Officer
         Socha's home; right?
12
     A.  So in regards to this incident
13       and this night I'm not going to
         answer any questions about that.
14
     Q.  Why is that?                       174
15
     A.  I don't believe it has any relevance
16       to the lawsuit and I'm just
         going to respectfully decline to
17       answer any questions.
18   Q.  Okay.  Let's do this in two parts  174
19       then.  The first part is I want to ask
         you about the events leading up to
20       that night.  Officer Socha testified
         that you were at a bar with
21       other officers.
22   A.  Again, I'm not going to answer any
         questions that have to do with
23       that night.
24   Q.  And why is that?  174

Page 4

1   A.  I believe that it doesn't have any
        relevance on this lawsuit and I'm
2       just going to respectfully decline
        to answer any questions.
3
    Q.  Okay.  And it's your understanding    174
4       that I can ask a series of questions
        and you can be compelled by court
5       order and sanction?
6   A.  Yes.
7   Q.  Okay.  And the basis for your refusal  175
        to answer any questions about that
8       evening is relevancy; is that right?
9   A.  Yes.
10  Q.  And you've been acquitted of these     175
        crimes; is that correct?
11
    A.  That's correct.
12
    Q.  So let me see if I can do this in an   175
13      orderly fashion.  With respect to
        anything that occurred on July 15,
14      16 or 17 of 2017, related to your --
        criminal charges filed against you
15      for reckless discharge of a firearm,
        domestic battery or destruction of
16      property, is your position that you
        refuse to answer those questions; is
17      that fair?
18  A.  That's fair.
19  Q.  And you refuse to answer these         176
        questions based upon you don't think
20      they're relevant to the case?
21  A.  That's correct.
22  Q.  And your officer -- I'm sorry --       176
        your attorney has not instructed
23      you not to answer these questions;
        is that right?
24
    A.  That's correct.  It's my own decision.

Page 5

1   MS. REPORTER:  The deposition of Officer Nick
2  Crowley is being conducted remotely via LegalView.
3  Today's date is June 17, 2021 and the time is 10:00 a.m.
4       The witness is located in Joliet, Illinois.
5  My name is Sharon Jerndt.
6       At the conclusion of today's deposition I will
7  ask that counsel place their orders on the record.
8       Thank you.
9       Can you raise your right hand, please.
10          (Witness sworn.)
11 WHEREUPON:
12         OFFICER NICHOLAS CROWLEY,
13 called as a witness herein, having been first duly
14 sworn, was examined and testified as follows:
15         DIRECT EXAMINATION
16 BY MS. PROCTOR:
17  Q.  Officer Crowley, would you please state and
18 spell your name for the record.
19  A.  Nicholas Crowley, N-I-C-H-O-L-A-S,
20 C-R-O-W-L-E-Y.
21  Q.  Have you ever been known by any other names?
22  A.  Just Nick.
23  Q.  Are you taking any meditation today that might
24 impair your memory to remember any of the events at

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 6..9

Page 6

1 issue in this lawsuit?
2  A.  No.
3  Q.  Did you review any documents before today's
4 deposition?
5  A.  No.
6  Q.  Did you speak with anyone in preparation for
7 today's deposition?
8  A.  Just my attorney.
9  Q.  And who is your attorney?
10  A.  Hall Adams.
11  Q.  And when did you retain Mr. Adams to represent
12 you in these proceedings?
13  A.  I believe it was a couple of weeks ago.
14  Q.  Was that after you were told you were
15 requested to give a deposition in this case?
16  A.  That's correct.
17  Q.  So you would have retained him sometime in May
18 of 2021?
19  A.  Yes.
20  Q.  Do you have a written retainer agreement with
21 Mr. Adams?
22  A.  No.
23  Q.  Is Mr. Adams representing you in any other
24 legal proceedings?

Page 7

1  A.  No.
2  Q.  You are aware that Mr. Adams is also
3 representing Cassandra Socha; correct?
4  A.  Yes.
5  Q.  What is your date of birth?
6  A.  08/12/80.
7     (Dogs barking.)
8  MS. PROCTOR:  Is that on your end, Mr. Crowley, by
9 chance?
10  THE WITNESS:  Yeah, it is.
11     (Short break was taken.)
12 BY MS. PROCTOR:
13  Q.  Officer Crowley, other than speaking with your
14 attorney, Mr. Adams, did you speak with anybody else in
15 preparation for today's deposition?
16  A.  No.
17  Q.  Did you speak with your now wife, Cassandra
18 Socha?
19  A.  I just told her that I was being deposed.
20  Q.  But you didn't discuss any of the issues in
21 her lawsuit; is that right?
22  A.  That's correct.
23  Q.  What is your date of birth, Mr. Crowley?
24  A.  08/12/80.

Page 8

1  Q.  And where do you currently live?
2  A.  In Joliet.
3  Q.  What is your address in Joliet?
4  A.  3727 Mustang Road.
5  Q.  How long have you lived at that address?
6  A.  Since about 2005.
7  Q.  And who do you currently live there with?
8  A.  I live here with Cassie, our two sons, and I
9 have two daughters from a previous marriage that are
10 here on our days off.
11  Q.  Okay.  And when you say "Cassie," are you
12 referring to Cassandra Socha?
13  A.  Yes.
14  Q.  And how old are your two sons?
15  A.  Jackson is four months and Jacob just turned
16 two years old.
17  Q.  Congratulations.
18  A.  Thanks.
19  Q.  And those are children with Cassandra Socha;
20 correct?
21  A.  Yes.
22  Q.  Now, your two other daughters, how old are
23 they?
24  A.  12 and 9.

Page 9

1  Q.  Okay.  And what is the name of their mother?
2  A.  Britney Long.
3  Q.  Can you spell the last name?
4  A.  L-O-N-G.
5  Q.  And where does Britney live?
6  A.  In Bourbonnais.
7  Q.  And who has custody of your daughters from
8 your marriage with Ms. Long?
9  A.  She has residential custody, but we have joint
10 visitation.
11  Q.  Okay.  And when did you -- did you divorce
12 Ms. Long?
13  A.  Yes.
14  Q.  When did that divorce take place?
15  A.  2013.
16  Q.  Where was the divorce case filed?
17  A.  Kankakee County.
18  Q.  Have you ever been divorced at all -- before
19 your marriage to Ms. Long?
20  A.  No.
21  Q.  Have you ever been married before?
22  A.  No.
23  Q.  How long were you married to Britney Long?
24  A.  I would say five years.

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021                                                          Pages 10..13

Page 10

1    Q.   What is your highest level of education?
2    A.   I have an associate's degree.
3    Q.   And before we get into your education, Officer
4  Crowley, I just want to ask you -- just give me a
5  moment. Hold on. I just want to check one thing.
6         Thank you for that pause. How would you
7  describe your current relationship with Britney Long?
8    A.   It's amicable, you know. We have children
9  together, so it's good.
10   Q.   Where did you receive your associate's degree?
11   A.   Kankakee County Community College.
12   Q.   What was the associate's degree in?
13   A.   Criminal justice.
14   Q.   When did you receive it?
15   A.   I believe it would have been 2004.
16   Q.   Do you hold any other degrees?
17   A.   No.
18   Q.   Where did you attend high school?
19   A.   Grant Park High School, Grant Park, Illinois.
20   Q.   Where is Grant Park, Illinois?
21   A.   It's way down yonder. It's just south of
22  Beecher, Illinois. It's on the northeastern side of
23  Kankakee County. It borders Indiana. It's a small
24  town.

Page 11

1    Q.   Is that where you were essentially born and
2  raised?
3    A.   No.
4    Q.   Where were you born?
5    A.   I was born and raised in South Holland,
6  Illinois and then we moved to Grant Park going into my
7  freshman year of high school.
8    Q.   Of high school. Okay. Do you hold any
9  certifications?
10   A.   Yes.
11   Q.   In what?
12   A.   Certifications in law enforcement.
13   Q.   Okay. Can you tell me what some of those are?
14   A.   I'm a certified field training officer, a
15  certified SWAT operator, a certified school resource
16  officer, a certified pressure point control tactics
17  instructor, and I believe that's it.
18   Q.   Were those certifications received through the
19  city of Joliet Police Department?
20   A.   Not all of them, but some of them.
21   Q.   What is your current position with the Joliet
22  Police?
23   A.   Patrolman.
24   Q.   And how long have you held that position?

Page 12

1    A.   Eight years.
2    Q.   When did you join the Joliet Police
3  Department?
4    A.   February of 2013.
5    Q.   When did you graduate high school?
6    A.   May of 1998.
7    Q.   Can you just give -- tell me, what was your
8  employment right out of high school?
9    A.   I graduated in May and then I left for the
10  United States Marine Corps in August and I was -- I
11  served in the marines for four years.
12   Q.   Okay. And where did you do your duty with the
13  Marines?
14   A.   I was primarily stationed in Camp Pendleton,
15  California.
16   Q.   And you said that you did that for four years,
17  so did that bring you to 2002?
18   A.   Yes.
19   Q.   Were you discharged from the Marines?
20   A.   Yes.
21   Q.   Was it an honorable discharge?
22   A.   Yes.
23   Q.   What did you do after your tour with the
24  Marines?

Page 13

1    A.   After the Marine Corps I started going to
2  school and I was a bartender while I was in school.
3    Q.   And was the school the schooling we talked
4  about or some other schooling?
5    A.   It was at Kankakee Community College.
6    Q.   Okay. And where were you a bartender?
7    A.   TGI Fridays in Bradley, Illinois.
8    Q.   And that's the next town over from
9  Bourbonnais?
10   A.   Yes.
11   Q.   And how long did you do that?
12   A.   Until I became a police officer in Grant Park
13  in 2005.
14   Q.   And was that a full-time position with the
15  Grant Park Police?
16   A.   Yes.
17   Q.   How long did you work with Grant Park?
18   A.   Six months, maybe.
19   Q.   Did you receive any police training, basic
20  police training, in order to join the Grant Park Police?
21   A.   Yes.
22   Q.   Where did you receive your training?
23   A.   The Police Training Institute in Springfield,
24  Illinois.

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 14..17

Page 14

1    Q.   And when did you do that training?
2    A.   I entered the police academy September 11,
3  2005.
4    Q.   And what was your next job in law enforcement
5  following your work with Grant Park?
6    A.   I then got hired by the Bourbonnais Police
7  Department.
8    Q.   How long did you work for the Village of
9  Bourbonnais?
10   A.   Approximately seven and a half years.
11   Q.   What was the highest rank you received while
12  working at the Village of Bourbonnais?
13   A.   Patrolman.
14   Q.   Okay. Getting back to Grant Park, did you
15  have any disciplinary issues when you were an employee
16  there?
17   A.   No.
18   Q.   And you said you worked for Bourbonnais for
19  seven and a half years. So when did you leave their
20  employment?
21   A.   When I got hired by the Joliet Police
22  Department in February of 2013.
23   Q.   And was that a voluntarily resignation from
24  the Village of Bourbonnais?

Page 15

1    A.   Yes.
2    Q.   Did you receive any discipline while employed
3  at Bourbonnais?
4    A.   Yes.
5    Q.   Tell us about that.
6    A.   I took a ten-day suspension for writing in a
7  cake.
8    Q.   I'm sorry, for?
9    A.   I can tell you the story behind it. I took a
10  ten-day suspension. I wrote a word in a cake that was
11  made by an employee.
12   Q.   What was the word?
13   A.   It said "I love Chris."
14   Q.   Without getting into the full story, why did
15  that result in discipline, whether you agreed with it or
16  not?
17   A.   It was meant as a joke for another officer.
18  They didn't take that as a joke. They took offense to
19  it so I got suspended for it.
20   Q.   And what was the grounds of the suspension?
21   A.   I don't remember. It could have been conduct
22  unbecoming. Usually it's -- I don't really recall what
23  the wording was.
24   Q.   Was the officer who took offense to it a male

Page 16

1  or a female?
2    A.   Female.
3    Q.   Was there any sexual harassment component to
4  the reason for the discipline?
5    A.   No.
6    Q.   Was that deemed conduct unbecoming an officer
7  or what was the rule violation, if you --
8    A.   I don't remember.
9    Q.   Okay. Other than that discipline, were you
10  disciplined in any other way while at Bourbonnais?
11   A.   No.
12   Q.   Who was your chief of police in the years you
13  worked at Bourbonnais?
14   A.   Chief Joe Beard.
15   Q.   Was he the chief the entire time?
16   A.   No.
17   Q.   Can you spell the chief's last name for us?
18   A.   B, as in boy, E-A-R-D.
19   Q.   And the first name again?
20   A.   Joe.
21   Q.   How long was Joe Beard the chief of police
22  when you worked with Bourbonnais?
23   A.   The majority of the time, about six and a half
24  years.

Page 17

1    Q.   Was he the chief when you received the
2  discipline you just spoke of?
3    A.   Yes.
4    Q.   Did you work under any other chiefs of police
5  while employed at Bourbonnais?
6    A.   Yes.
7    Q.   Can you tell me his or her name?
8    A.   Jim Phelps, P-H-E-L-P-S.
9    Q.   And Phelps is still the chief of police at
10  Bourbonnais; correct?
11   A.   Yes.
12   Q.   Okay. Let's turn to just your -- a little bit
13  about your -- before we get -- I want to talk a little
14  bit more about when you joined Joliet, but you said
15  you've lived at 3727 Mustang since about 2015. Did I
16  get that right?
17   A.   Yes.
18   Q.   Is that a single-family home?
19   A.   It's a townhome.
20   Q.   Who owns the home?
21   A.   Cassandra Socha.
22   Q.   And how long has Ms. Socha owned the home, to
23  your knowledge?
24   A.   She maybe was here about a year before I moved

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021                                                    Pages 18..21

Page 18

1  in. I'm not really sure though.
2      Q.   And when – okay. You moved in sometime in
3  2015; correct?
4      A.   I believe so, yes.
5      Q.   Can you be any more specific on when you moved
6  in?
7      A.   I think it was the summertime in 2015, but I
8  couldn't give you an exact date.
9      Q.   Where did you live before you moved in with
10  Cassandra Socha in 2015?
11     A.   I was living with my parents.
12     Q.   And did you – where did your parents live?
13     A.   52 Lake – and I can spell this for you –
14  M-E-T-O-N-G-A, Metonga. And that's in Grant Park,
15  Illinois.
16     Q.   And how long did you live with your parents in
17  Grant Park, Illinois?
18     A.   Since my divorce in 2013.
19     Q.   Okay. And what are your parents' names?
20     A.   Robert and Cynthia Crowley.
21     Q.   Do they still live in Grant Park, Illinois?
22     A.   Yes.
23     Q.   When you joined the Joliet Police Department
24  were you required to do any additional police training?

Page 19

1      A.   No.
2      MS. PROCTOR: Let me just put you on mute.
3           (Brief pause.)
4      MS. PROCTOR: All right. Back on the record.
5  Thank you for the pause, Officer.
6  BY MS. PROCTOR:
7      Q.   How many – were you hired in the same class
8  of hires as Cassandra Socha?
9      A.   So she was hired maybe like – maybe a year
10  after me, six months, but we were on the same hiring
11  list.
12     Q.   What does that mean?
13     A.   So, a police department will put out a list of
14  potential hires, I believe there are between one to two
15  hundred persons on that list, and then they will hire in
16  batches. So I was in the first batch to be hired; I
17  believe Cassie came in maybe the third or fourth batch
18  off that list.
19     Q.   Had you known Cassandra before working with
20  her at Joliet?
21     A.   No.
22     Q.   And who was your supervisor when you first
23  came on board?
24     A.   His – it was Chief Trafton.

Page 20

1      Q.   Can you spell that for us?
2      A.   T-R-A-F-T-O-N.
3      Q.   Did you also have a field training officer
4  when you first started with the department?
5      A.   I had several, yes.
6      Q.   Did they rotate?
7      A.   Yes.
8      Q.   Can you give us the names of your field
9  training officers?
10     A.   Sure. The first one was Dennis Carrol,
11  C-A-R-R-O-L. I don't remember the order after this, but
12  I can just throw out some names for you.
13     Q.   That's fine.
14     A.   John Williams, W-I-L-L-I-A-M-S. Marc
15  Weitting – I'm going to guess at the spell of the last
16  name – W-E-I-T-T-I-N-G. And, oh, Kevin Robertson,
17  R-O-B-E-R-T-S-O-N.
18     Q.   Who hired you?
19     A.   The city of Joliet.
20     Q.   Were there certain individuals on the panel
21  that interviewed you for the job?
22     A.   Yes, but they did not work for the city of
23  Joliet.
24     Q.   Who was the chief of police when you were

Page 21

1  hired?
2      A.   Chief Trafton.
3      Q.   And since you've been a Joliet police officer,
4  how many different chiefs of police have you worked
5  under?
6      A.   It would be four, as of today.
7      Q.   Can you give me those names?
8      A.   Sure. Besides Chief Trafton, it was Chief
9  Brian Benton, Chief Alan Roechner. I don't know how to
10  spell his name. And then today it's Chief Dawn Malec,
11  M-A-L-E-C.
12     Q.   And how many years did you work under the
13  leadership of Chief Benton?
14     A.   Gosh, I'd have to say maybe five of those
15  years.
16     Q.   And same question for Chief Roechner. How
17  many years did you work under his leadership?
18     A.   He was chief for about two, two and a half
19  years.
20     Q.   How would you describe your relationship with
21  Chief Benton?
22     A.   Didn't really have one. He was the chief; I
23  was a midnight patrol officer. Didn't really have any
24  interaction with him, other than that.

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021                                                    Pages 22..25

Page 22

1    Q.   Same question for Chief Roechner.  What was
2 your relationship, if any, with Chief Roechner?
3    A.   Same answer.
4    Q.   Now, as a patrol officer were you assigned to
5 the patrol division?
6    A.   Yes.
7    Q.   Can you tell us, just generally, what your
8 responsibilities include as a patrol officer?
9    A.   Respond to crimes in progress.  Proactively
10 patrol your sector looking for anything suspicious,
11 speaking with citizens, making citizen contacts,
12 investigating suspicious activities, answering 911
13 calls, traffic monitoring and enforcement.
14    Q.   Have you always worked the midnight shift?
15    A.   No.
16    Q.   What's your current shift?
17    A.   Day shift.
18    Q.   Day shift, which is?  What are the hours
19 currently for the day shift?
20    A.   7 a.m. to 7 p.m.
21    Q.   Have you ever worked the same shift as
22 Cassandra?
23    A.   Yes.
24    Q.   And how long did you do that?

Page 23

1    A.   We work together for a few years.  I think
2 maybe like three.
3    Q.   In the years that you've been employed, would
4 that be more at the beginning, middle or more current?
5    A.   In the beginning.
6    Q.   Okay.  Who are your current supervisors?
7    A.   I would -- so my watch commander, right now
8 there's two.  I have Lieutenant Steve Breen, B-R-E-E-N,
9 and Lieutenant Joe Rosado, R-O-S-A-D-O.
10    Q.   Focusing your attention, Officer Crowley, on
11 May and June of 2018, do you recall who your supervisors
12 were during that time frame?
13    A.   I don't -- I was a relief car so there's --
14 you can be put in a sector, in a district, or you can be
15 a relief car.  A relief car would bounce around
16 districts and sectors and shifts.  If somebody is on
17 vacation or somebody calls off you're plugging their
18 position.  So I had -- in each district -- in each area
19 of districts will have different sergeants, and then an
20 overall watch commander for that area.
21        So I know that -- I believe Lieutenant --
22 she's now the chief -- but Lieutenant Dawn Malec was one
23 of the watch commanders.  I really don't recall.
24    Q.   You don't recall.  Okay.  Let's just focus on

Page 24

1 2018.  How many police officers were employed by the
2 city of Joliet, if you know, roughly?
3    A.   I would say approximately 300 at that time.
4    Q.   Has that number -- I'm sorry, I didn't --
5    A.   Three zero zero at that time, approximately.
6    Q.   Has that number remained pretty steady during
7 the years that you've been employed there?
8    A.   Yes, until recently.
9    Q.   Okay.  What has happened recently?
10    A.   Recently, due to -- well, started with COVID
11 but then we've had a lot of -- we've been on a hiring
12 freeze and a lot of retirees have since retired and
13 those positions have not been filled.  So I think we're
14 between 40 to 50 officers short of what we're allotted
15 to have.
16    Q.   During your years coming up in the department,
17 who would you say your best friends were from work?
18    A.   I don't know.  I would have a couple -- I
19 wouldn't say best friend, but I've had some associates.
20 Matt Campos was my partner when we first started,
21 C-A-M-P-O-S.  Officer Bill Busse, B-U-S-S-E, was a
22 friend of mine.  Alana Costa.  I've had several.
23    Q.   Currently who are your closest friends in the
24 department?

Page 25

1    A.   I mean, I really don't associate with anyone
2 outside of work right now.  I just -- you know, I go
3 into work and just kind of get along with everybody
4 there.
5    Q.   Okay.  What about in 2018, at or near the time
6 of the event, which are the subject of this lawsuit,
7 which fellow officers were you closest with, during
8 those years?
9    A.   I mean, you know, I worked on a shift where I
10 worked on a shift with -- I think we had, like, 25, 26,
11 every night.  So I would -- you know, wherever I would
12 bounce around at, you know, I would get along with
13 everybody at work, but I don't know.  I can tell you
14 kind of who would work a shift with me, if that helps.
15    Q.   Sure.
16    A.   Well, like I said, my partner Matt Campos,
17 Officer Mike Cagle, Officer Bill Busse, Officer Alana
18 Costa, Officer Socha -- gosh -- Officer Mauer, Officer
19 Meyer.
20    Q.   Are those the names that come to mind?
21    A.   Those are the names that come to mind, yes.
22    Q.   Other than Cassandra, do you socialize with
23 any of those officers outside of work?
24    A.   Not currently, no.

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 26..29

Page 26

1  Q.  Focusing more on 2018, 2019 years?
2  A.  Yeah, I mean, we would have shift parties, you
3 know, Christmas parties, Halloween parties and the shift
4 would just be there. So it would be mainly the group
5 that you work with would be the group that you kind of
6 hang out with.
7  Q.  Now, you mentioned you were a relief car.
8 Would you work alone or did you have a partner?
9  A.  It would depend on the sector. Not every
10 sector is a two-man unit. So when I would be in a
11 two-man unit I would have a partner, but if I was
12 working in a one-man unit, I wouldn't.
13  Q.  Officer Crowley, you may have told me already,
14 but I neglected to write it down. What shift are you
15 currently working?
16  A.  Day shift, 7 A to 7 P.
17  Q.  Now, when did you start dating Cassandra
18 Socha?
19  A.  2014, roughly.
20  Q.  So would it be fair to say you dated about a
21 year and then you --
22  A.  Yeah, that sounds about right.
23  Q.  -- began to live together around 2015?
24  A.  Yeah.

Page 27

1  Q.  Can you be any more specific when in 2015 you
2 began living together?
3  A.  Like I said, I believe the summertime, but I
4 don't know the exact month.
5  Q.  Okay. Thank you. Now, do you currently have
6 any ownership interest in the house on Mustang?
7  A.  No.
8  Q.  Did you have to pass a physical and
9 psychological test in order to be hired at the Joliet
10 Police Department?
11  A.  Yes.
12  Q.  Do you know what the results of both of those
13 tests were?
14  A.  Assuming I passed.
15  Q.  Have you ever received any discipline while
16 employed at the Joliet Police Department?
17  A.  Yes.
18  Q.  Tell us about those.
19  A.  I received a written reprimand. This would
20 have been 2014, 2015-ish. I received a five-day
21 suspension, possibly in 2016. And then I received a
22 30-day suspension in 2018.
23  Q.  What was the written reprimand for, going back
24 to 2014-15 that you just mentioned?

Page 28

1  A.  That was for -- I don't remember how they
2 titled these, like what the official thing was, but I
3 responded to an email that -- inappropriately, a
4 department email.
5  Q.  What was the subject of the email?
6  A.  There was a department email that got sent out
7 that one of the fingerprint machines wasn't working and
8 I responded, "big surprise."
9  Q.  Was that the extent of the response?
10  A.  Yes.
11  Q.  Okay. What did you mean by that?
12  A.  It just -- because the fingerprint machine
13 never worked. I just responded, "big surprise."
14  Q.  And that was the reason for the written
15 reprimand?
16  A.  Yes.
17  Q.  Let's talk about the five-day suspension,
18 going back to 2016. What did that involve?
19  A.  That was involving missing a court date.
20  Q.  Was that on one of your cases?
21  A.  Yes.
22  Q.  And what happened there?
23  A.  I received a five-day suspension for it.
24  Q.  Did you dispute that you missed the court

Page 29

1 date?
2  A.  No.
3  Q.  What was the reason for missing it?
4  A.  I don't really recall why I missed it.
5  Q.  Okay. At some point did Cassandra become your
6 fiancee?
7  A.  Yes.
8  Q.  When did that occur?
9  A.  That was in the winter of 2017, maybe. I
10 don't really remember when that was.
11  Q.  And you are currently married to Cassandra;
12 correct?
13  A.  Yes.
14  Q.  And what was the day you were married?
15  A.  April 19, 2019.
16  Q.  And where did you get married? In what
17 county?
18  A.  Du Page County.
19  Q.  Did you have a formal ceremony?
20  A.  No.
21  Q.  Who married you in Du Page County?
22  A.  It was a judge. I don't remember the judge's
23 name.
24  Q.  Did you publicly disclose at work that you and

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021                                          Pages 30..33

Page 30

1 Cassandra were married on April 19 of 2019?

2     A.   Can you explain what you mean by "publicly"?

3     Q.   Well, did you tell anybody, other than family,

4 that you and Cassandra had married on April 19, 2019?

5     A.   We have to update our personnel files with the

6 HR department.  That also includes insurance and all

7 that kind of stuff, so we had to do that.

8     Q.   Other than internal paperwork, did you share

9 the fact that you and Cassandra had married in 2019 with

10 any of your fellow officers or friends?

11    A.   Yes, a few people.

12    Q.   Who did you share it with?

13    A.   I know I told my friend, Bill.

14    Q.   Is that Bill Busse?

15    A.   Yes.  I believe I told Phil Empf, E-M-P-F

16 (sic).  I can't really remember who else I told.

17    Q.   Why did you chose -- you told Bill Busse and

18 is it Bill Empf (sic) is the last name?

19    A.   Yeah, Empf, E-M-P-F (sic).

20    Q.   Are those two Bills, are they -- were they

21 your closest friends?

22    A.   Yes.

23    Q.   And is Bill Busse still an officer with

24 Joliet?

Page 31

1     A.   No.

2     Q.   Okay.  And when did he leave?

3     A.   I believe his last day -- his last pay period

4 was this last June.

5     Q.   Of 2020?

6     A.   2021.

7     Q.   Oh, 2021.  Thank you.  And what about Bill

8 Empf, did he ever work at Joliet?

9     A.   His first name is Phil, P-H-I-L, and yeah, he

10 still works here.

11    Q.   Okay.  I'm sorry.  I misheard you.  Okay.  And

12 what is Phil Empf's position?

13    A.   He's a patrol officer.

14    Q.   And was he hired at or near the same time as

15 you were?

16    A.   No, he was there before I got there.

17    Q.   Okay.  Now Officer Crowley, you're aware that

18 this lawsuit involves allegations that certain images

19 from Cassandra's cell phone were shared with members of

20 the Joliet Police Department.  Do you understand that?

21    A.   Yes.

22    Q.   Have you ever reviewed the actual, like,

23 written allegations in Cassandra's lawsuit?

24    A.   Yes.

Page 32

1     Q.   Okay.  And when did you review those?

2     A.   I believe when the lawsuit was made public.

3     Q.   And when, to your knowledge, was the lawsuit

4 made public?

5     A.   I don't -- was that 2000 -- no, that couldn't

6 have been.  2018?  2019?  I don't really remember.

7     Q.   Did you review any of the allegations that are

8 contained in the written documents that are connected

9 with the lawsuit, before the actual lawsuit was filed?

10    A.   Can you ask that another way?

11    Q.   Sure.  Well, let me put it this way:  In order

12 to initiate a lawsuit, you have to file a written

13 document that is called a civil complaint.  Do you just

14 generally understand that concept?

15    A.   Yes.

16    Q.   So my question to you is:  Did you ever review

17 the civil complaint, even a draft of it, before it was

18 actually filed by Cassandra's lawyer with the federal

19 court?

20    A.   No.

21    Q.   Okay.  Can you tell the -- what is your

22 understanding of the allegations in Cassandra's lawsuit?

23    A.   It's my understanding that there was a search

24 warrant that was served on Cassandra's cell phone.  That

Page 33

1 the entire cell phone contents were downloaded to a

2 computer in investigations and that there was officers

3 that accessed that computer, viewed private images and

4 videos that were on that cell phone.

5         I also understand that there were copies that

6 were made of the contents of her phone and were

7 distributed amongst other police officers in the police

8 department.

9     Q.   Do you, Officer Crowley, have any personal

10 knowledge regarding any of those alleged events?

11    A.   No.

12    Q.   Do you dispute that there were nude

13 photographs and sex videos on Cassandra's cell phone?

14    A.   No.

15    Q.   How do you know that?

16    A.   I was the one that took some of those

17 photographs and took the videos from the cell phone.

18    Q.   Let's put the photographs aside for a moment.

19 I just want to focus on the video.  To your knowledge

20 was this more than one sex video on Cassandra's cell

21 phone?

22    A.   Yes.

23    Q.   How many such videos were on her cell phone as

24 of May or June of 2018?

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Page 34

1    A.  I don't know.
2    Q.  Did you guys -- did you and Cassandra engage
3 in recording your sexual activities on more than one
4 occasion?
5    A.  Yes.
6    Q.  Is that something that you do frequently?
7    A.  No.
8    Q.  Do you have a rough estimate of the number of
9 sex videos that may have been on Cassandra's cell phone?
10    A.  I would say no more than three, no more than
11 four.
12    Q.  Because it is the subject of this lawsuit,
13 Officer Crowley, I hope you understand why I have to ask
14 you these questions. It's not something I relish, but
15 I'm doing my job. I hope you understand that.
16    A.  I understand. I appreciate that.
17    Q.  Your best estimate is that there were probably
18 three or four sex videos contained on Cassandra's cell
19 phone as of May of 2018; can we agree on that?
20    A.  Yes.
21    Q.  Let's just take -- well, of those three or
22 four sex videos, can you describe the content with any
23 particularity of those videos?
24    A.  Yes. We were engaged in oral sex. We were

Page 35

1 engaged in intercourse. I think that's it.
2    Q.  And how did you record those activities?
3    A.  With her cell phone.
4    Q.  Is your face visible on any of those videos?
5    A.  No, they are not. I don't believe so.
6    Q.  Is Cassandra's face visible on any of those
7 videos?
8    A.  Yes.
9    Q.  Do you know, of the three or four videos, how
10 many of those her face is visible on?
11    A.  I believe just one.
12    Q.  Which one, in particular?
13    A.  When she is performing oral sex on me.
14    Q.  Let's focus on the oral sex video, if I could.
15 Why did you video that?
16    A.  You know, we were young. It was a private
17 intimate moment that we were consensually sharing with
18 each other. That's my answer.
19    Q.  Was it your idea to video that, the oral sex
20 between you two?
21    A.  It was both of our idea.
22    Q.  Did Cassandra consent to you videoing that
23 activity?
24    A.  Yes.

Page 36

1    Q.  Did you record any sexual activity between you
2 and Cassandra on any other device, other than her cell
3 phone, as you just described?
4    A.  No.
5    Q.  Did you share the sex videos that you've just
6 described with anyone other than Cassandra?
7    A.  No.
8    Q.  To your knowledge did Cassandra share any of
9 those sex videos with you on any of your devices?
10    A.  No.
11    Q.  Let's talk about the nude photographs. How
12 many nude photographs, to your knowledge, were on
13 Cassandra's cell phone in May of 2018?
14    A.  I couldn't give you an number, but I mean,
15 more than ten.
16    Q.  Do you know what the content of those nude
17 photographs depicted?
18    A.  Nude images of her. Nude images of myself.
19    Q.  Can you be more specific?
20    A.  As to body parts?
21    Q.  Right. What -- you know, what was depicted in
22 those images?
23    A.  There was pictures of us having sex, there was
24 pictures of her naked, pictures of me naked.

Page 37

1    Q.  Who took those photographs?
2    A.  I took some and she took some.
3    Q.  Why did you take those photographs?
4    A.  Same answer as I gave before, private intimate
5 movement between the two of us.
6    Q.  Do you regret having taken those photographs?
7    A.  No.
8    Q.  Do you know whether Sandra (sic) regrets
9 having taking those photographs?
10    A.  I don't think Cassandra regrets taking those
11 photographs.
12    Q.  Do you regret recording the sex acts that you
13 just described on video?
14    A.  No.
15    Q.  Do you know whether Sandra (sic) has any
16 regrets?
17    A.  Cassandra doesn't have any regrets. I don't
18 think so, no.
19    Q.  Would you do it again?
20    A.  Yes.
21    Q.  Have you done it since the allegations in this
22 lawsuit have come to light?
23    A.  No.
24    Q.  Why not?

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 38..41

Page 38

1    A.   Probably not a good idea right about now. I
2  certainly don't think she would be okay with that. I
3  don't think I would either. I mean...
4    Q.   Why would it not be a good idea right about
5  now?
6    A.   Well, I just don't think that we both would
7  want to do that right now, given the set of
8  circumstances that are currently going on.
9    Q.   What set of circumstances are you referring
10  to? Can you be more specific?
11   A.   Well, this lawsuit that's out there. We also
12  have children in the house now, so that probably
13  wouldn't work out very well. Probably not in the stars
14  for us right now.
15   Q.   The photographs that we spoke of, did you ever
16  share those photographs with anyone other than
17  Cassandra?
18   A.   No.
19   Q.   But did you say some were taken on your cell
20  phone and some were taken on – using her cell phone;
21  correct?
22   A.   No.
23   Q.   Oh, please correct me, where I got that wrong.
24   A.   They were just on her phone. I meant I would

Page 39

1  take them, meaning I would take them from her phone and
2  then she would also take some from her phone.
3    Q.   And thank you for clarifying that.
4         Did Cassandra ever share those photographs
5  with you?
6    A.   You mean showing me or sending me?
7    Q.   Let's start with showing you.
8    A.   Yes.
9    Q.   And when was that done?
10   A.   I don't understand. Like when did we take the
11  pictures or –
12   Q.   No, when did she show those to you?
13   A.   When she would take them. I mean, I would be
14  there when she would take them, or when I came home.
15   Q.   Okay. To be – well, just to clarify, would
16  those photographs be shared with you at or near the time
17  they were taken?
18   A.   Yes.
19   Q.   And did she ever text you copies of those
20  photographs to your phone or any other device?
21   A.   No.
22   Q.   Do you know whether Cassandra ever shared any
23  of those photographs, or sex videos – I may have asked
24  you this earlier – with anyone else, other than you?

Page 40

1    A.   I don't think so, no.
2    Q.   Not to your knowledge?
3    A.   Correct.
4    Q.   Can you be sure of that?
5    A.   Yes.
6    Q.   What do you base that on?
7    A.   Trust.
8    Q.   Officer Crowley, did you ever share any of
9  those photographs or the sex videos with anyone, at any
10  time, other than Cassandra?
11   A.   No.
12   Q.   Did you ever speak of those photographs or sex
13  videos with anyone, other than Cassandra?
14   A.   No.
15   Q.   Have you ever taken those similar sexual
16  photographs and videos in any of your other
17  relationships?
18   A.   No.
19   Q.   What about Cassandra, has she ever done that,
20  to the best of your knowledge?
21   A.   I don't know.
22   Q.   Do you know whether Cassandra still has any of
23  the nude photographs and sexual videos that we've been
24  discussing on her cell phone?

Page 41

1    A.   No.
2    Q.   To be clear – and probably a bad question on
3  my part – do any of these photographs and sexual videos
4  still exist on Cassandra's cell phone or any other
5  device, to your knowledge?
6    A.   I believe they would exist on the phone that
7  they were on. She doesn't have that phone anymore.
8  That would be my answer for that.
9    Q.   When did she get a new phone, I'm presuming?
10   A.   I don't know when she got a new phone. I
11  don't remember.
12   Q.   Do you know – okay. So you don't know when
13  she no longer used that phone?
14   A.   Correct.
15   Q.   The physical phone, right? And it was an
16  iPhone; correct?
17   A.   Yes.
18   Q.   Do you know which version of the iPhone it was
19  back in 2018?
20   A.   I don't know.
21   Q.   Was that a personal phone?
22   A.   Yes.
23   Q.   Do you know who Cassandra's mobile phone
24  carrier was in 2018?

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021                                    Pages 42..45

Page 42

1    A.  No, I don't.
2    Q.  Do you know what her telephone number was in
3  2018, for that specific phone?
4    A.  I'm assuming it stayed the same.
5    Q.  And what is that number?
6    A.  (708) 717-3652.
7    Q.  Did Cassandra have a work-issued cell phone?
8    A.  No.
9    Q.  Did you have a work-issued cell phone back in
10 2018?
11   A.  No.
12   Q.  And did you have a personal cell phone in
13 2018?
14   A.  Yes.
15   Q.  What was your telephone number?
16   A.  The same as it is today.
17   Q.  What is your telephone number?
18   A.  (815) 791-4154.
19   Q.  Do you know whether any of the photographs and
20 sex videos that we've been discussing were uploaded into
21 the Cloud?  Do you understand what I mean by that?
22   A.  Sort of, but I have no idea.
23   Q.  So there is a possibility that these photos
24 and sex videos may still exist, but they are being

Page 43

1  stored in the Cloud?  Can we agree on that?
2    MR. ADAMS:  I'm going to object to lack of
3  foundation.  Based on his prior answer and particularly
4  because that can be done by the intermediary, so that's
5  not necessarily something this witness or the owner of
6  the cell phone would do and so it is an additional
7  objection.
8    MS. PROCTOR:  And I appreciate the objection.  I
9  appreciate that your objection is foundation, but I
10 would ask that you not engage in speaking objections
11 because, as you know, that's not appropriate.
12 BY MS. PROCTOR:
13   Q.  Just a word about objections, Officer Crowley,
14 and there may be some more as we go through this.
15 Unless your attorney, Mr. Adams, instructs you not to
16 answer, you have to answer the question to the best of
17 your ability.  Do you understand that?
18   A.  Yes, I do.
19   Q.  Okay.  And also, have you ever given a
20 deposition before?
21   A.  Yes.
22   Q.  Just to be clear, if at any time you are asked
23 a question by me or any of the other attorneys who will
24 be asking questions today, that you do not understand,

Page 44

1  you have to please let us know so that you are certain
2  you're answering a question that is understandable.  Is
3  that fair?
4    A.  Yes.
5    Q.  Okay.  Have I asked you any questions thus far
6  in this deposition that you did not understand?
7    A.  The last one is a little confusing, but other
8  than that I believe I got them all.
9    Q.  Thank you.  And perhaps I can clean that up.
10        Do you know, one way or the other, Officer
11 Crowley, whether any of the photographs and videos that
12 we've been discussing are stored in the Cloud or
13 anywhere else?
14   A.  I don't know.
15   Q.  Do you have hard copies of any of those
16 photographs or videos?
17   A.  No.
18   Q.  Have you retained electronic copies of any of
19 those photographs or videos for your own personal
20 record?
21   A.  No.
22   Q.  Other than doing these things that we have
23 been discussing with Cassandra privately, have you guys
24 ever engaged in any of the same type of activity with

Page 45

1  others?
2    A.  No.
3    Q.  Have you ever engaged in that same type of
4  activity with others, other than Cassandra?
5    MR. ADAMS:  Let me object to form.  Same type of
6  activities being taping, photographing or --
7    MS. PROCTOR:  Right.  The practice -- thank you,
8  Paul.
9  BY MS. PROCTOR;
10   Q.  The practice of photographing your sexual
11 activities, either taking photographs or video recording
12 those events.  Have you ever engaged in that practice or
13 activity with anyone other than Cassandra?
14   A.  No.
15   Q.  And the same question for Cassandra, if you
16 know?
17   A.  I don't know.
18   Q.  Did you ever post any of those photographs or
19 sexual videos on any social media or other posting
20 platform?
21   A.  No.
22   Q.  Do you know whether Cassandra has ever posted
23 the photographs or sexual videos on any other social
24 media or other such platform?

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 46..49

Page 46

1    A.   Not to my knowledge.
2    Q.   Clarify for me, what is your understanding of
3 what Cassandra did with the photographs and sexual
4 videos that are the subject of this lawsuit?
5    A.   She didn't do anything with them.
6    Q.   Well, they've been destroyed; correct?
7    A.   I don't have any knowledge that they've been
8 destroyed.
9    Q.   Well, they would be still on her phone;
10 correct?
11    A.   Her -- the phone that it was originally taken
12 on, I'm assuming they would be on there, but I don't
13 know if they're on there or not.
14    Q.   Do you know whether they're stored on her
15 current phone in any way, shape or form, to the best of
16 your knowledge?
17    A.   To the best of my knowledge, no.
18    Q.   How do you know that?
19    A.   I don't really know that.  I just would --
20 because there was from an old phone, so I don't know how
21 they would be on her current phone.
22    Q.   Well, have you ever -- like you've never -- do
23 you own an iPhone?
24    A.   Yes.

Page 47

1    Q.   And have you -- how many iPhones have you
2 owned?
3    A.   Probably four, five different ones.
4    Q.   And when was the last time you switched
5 iPhones?
6    A.   I just got this new one for my birthday -- or,
7 yeah, my birthday.
8    Q.   And when was your birthday?
9    A.   August of last year.
10    Q.   Okay.  And where did you get the phone?
11    A.   Cassie bought it for me for my birthday.
12    Q.   Okay.  So when you got your new phone, did you
13 transfer the photographs or videos, whatever you had on
14 your old phone, did you transfer that to the new phone?
15    A.   Yes.
16    Q.   Now, getting back to -- so you understand that
17 process; right?  You have done it yourself; correct?
18    A.   Yes.
19    Q.   All right.  Now, focusing on Cassandra's cell
20 phone and the photographs and sex videos, which are the
21 subject of this lawsuit -- are you with me?
22    A.   I'm with you.
23    Q.   My question to you is, to your knowledge was
24 any of that content transferred from Sandra's (sic) old

Page 48

1 phone to her new phone?
2    A.   Not to my knowledge.
3    Q.   And how do you know that?
4    A.   I don't know that.  To my knowledge, I don't
5 know.
6    Q.   And you may have told me this before, but I
7 neglected to write it down, Officer.
8         Who was your cell phone provider back in 2018?
9    A.   Oh, jeez, Verizon potentially.
10    Q.   Do you pay your own cell phone bill?
11    A.   Yes.
12    Q.   Is it like a direct withdrawal from your
13 credit card or --
14    A.   No, I just pay the bill once a month.
15    Q.   So you believe -- have you always had your
16 mobile service or cellular service through Verizon?
17    A.   So I have AT&T now.  So I know I switched,
18 but --
19    Q.   Do you know when you switched?
20    A.   I don't recall when I did that, no.
21    Q.   Okay.  Have you testified in any criminal
22 trials?
23    A.   Yes.
24    Q.   How many, over the years?

Page 49

1    A.   I mean, I've been a police officer for 16
2 years so I've had quite a few times I've had to testify
3 in court.
4    Q.   Have you ever worked in the investigations
5 unit at the Joliet Police Department?
6    A.   No.
7    Q.   Are you trained in the use of the Cellebrite
8 System?
9    A.   No.
10    Q.   Are you friends with any of the folks in the
11 investigations unit at the Joliet PD, currently?
12    A.   No.
13    Q.   What about back in 2018, were you friendly
14 with any of the officers assigned to the investigations
15 unit?
16    A.   No.
17    Q.   Would you know how to operate the Cellebrite
18 computer system?
19    A.   No.
20    Q.   Other than Cassandra and your attorney, as of
21 May of 2021, Hall Adams, have you ever discussed the
22 allegations in this lawsuit with anyone else?
23    A.   No.
24    Q.   How would you describe your relationship with

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021                                                                    Pages 50..53

Page 50

1 David Jackson?
2    A.   We are co-workers, members of the BPOA.  We
3 get along.
4    Q.   What is the BPOA?
5    A.   The Black Police Officers Association.
6    Q.   And what is the purpose of that association?
7 What's its mission?
8    A.   Its purpose is to kind of gather community
9 partnership.  It's to gather police officers, not just
10 minority police officers, but anybody can be a member
11 there.  It just kind of bridges the gap between the
12 community and the police department.
13    Q.   And how long have you been a member of that
14 association?
15    A.   A couple of years.
16    Q.   A couple.  Can you be more specific than that
17 maybe?
18    A.   Maybe two, two years.
19    Q.   Well, let's -- were you a member of that
20 association in 2018?
21    A.   No.
22    Q.   Same question for 2019?
23    A.   I think sometime in 2019, like, late 2019 I
24 think maybe.  I don't remember when.

Page 51

1    Q.   How did you get involved with the association?
2    A.   You just sign up for it.  It's a volunteer
3 thing.
4    Q.   Do you hold -- like, did anyone in particular
5 encourage you to join the group?
6    A.   No.  I think, like, once a year they would put
7 a thing in your mailbox if anybody is interested in
8 joining the BPOA, just sign this form, and so I did.
9    Q.   Do you hold any positions within the
10 organization?
11    A.   No.
12    Q.   Does David Jackson hold any position within
13 the organization?
14    A.   He's the president.
15    Q.   And how long has he been the president of that
16 group?
17    A.   I don't know.
18    Q.   Can you tell us the names of any other
19 officers who hold leadership positions in the
20 organization?
21    A.   I believe Carlos Matlock is the vice
22 president.  That's the only other leadership positions
23 that I'm aware of.
24    Q.   Do you know how long Matlock has held the

Page 52

1 position as vice president?
2    A.   I don't know.
3    Q.   How would you describe your relationship with
4 Matlock?
5    A.   Don't really have one.  He's a deputy chief of
6 investigations.
7    Q.   How would you describe your relationship with
8 Gavin?
9    A.   I don't have one.
10    Q.   Do you know who he is?
11    A.   Yes.
12    Q.   Who is he?
13    A.   He was a sergeant in investigations but --
14 well, actually then he became a deputy chief, but since
15 retired.
16    Q.   Have you ever had any conversations with Gavin
17 concerning the allegations in this lawsuit?
18    A.   No.
19    Q.   Have you ever had any conversations with Al
20 Roechner concerning the allegations in this lawsuit?
21    A.   No.
22    Q.   Have you ever had any conversations with
23 Officer Mike DeVito concerning the allegations in this
24 lawsuit?

Page 53

1    A.   No.
2    Q.   Have you ever had any conversations with
3 DeVito concerning Cassandra Socha and the issues that
4 are at play in this lawsuit?
5    A.   No.
6    Q.   Do you know who Mike DeVito is?
7    A.   Yes.
8    Q.   Have you ever had any involvement with him
9 concerning any union issue, on your own behalf or on
10 behalf of someone else?
11    A.   Yes.
12    Q.   Can you tell us about that?
13    A.   When you're disciplined in the police
14 department the union represents you, so it goes through
15 them.
16    Q.   So the discipline that you mentioned earlier,
17 that would have been essentially your only interaction
18 with DeVito while a Joliet police officer?
19    A.   Yes.
20    Q.   Other than yourself, Officer Crowley, do you
21 have any personal knowledge as to whether or not any
22 officers on the Joliet Police Department have seen these
23 nude photographs and sexual videos from Cassandra's cell
24 phone?

Page 54

1  A.  No.
2  Q.  Do you have any personal knowledge as to
3 whether or not any supervisors or members of the command
4 staff at Joliet Police Department have ever seen or
5 viewed any nude photographs and sex videos from
6 Cassandra's cell phone?
7  A.  Can we just back up?  When you mean "personal
8 knowledge" are you saying did I witness or did I see
9 this happen?
10  Q.  Yes.
11  A.  No, I didn't witness this and I did not see
12 this happen.
13  Q.  Did you hear about it from someone?
14  A.  Yes.
15  Q.  When did you first hear about this allegation?
16  A.  I believe it was March of 2020.  I was
17 approached by Dave Jackson.
18  Q.  Where were you when Jackson approached you?
19  A.  In the police station.
20  Q.  What did he say to you?
21  A.  He asked me if he could speak to me privately
22 for a minute and so we went into an office and that's
23 when we spoke.
24  Q.  Was it just you and David Jackson present for

Page 55

1 this conversation?
2  A.  Yes.
3  Q.  How long did it last?
4  A.  Oh, I would say no more than a half hour.
5  Q.  And what do you recall about the conversation?
6 What did he say to you?  Let's start there.
7  A.  He told me he had information regarding
8 Cassandra's lawsuit and I asked him what that was and he
9 told me.
10  Q.  And what did he tell you?
11  A.  He told me that on the night that Cassandra's
12 phone was searched that Darrell Gavin had come down into
13 the watch commander's office and told Rob Brown, Jeremy
14 Harrison and Tim Powers that he knows why -- quote was,
15 "I know why Crowley is with Socha, because she sucks
16 dick like a porn star."
17  Q.  Did he tell you anything else that you recall
18 as you sit here today?
19  A.  Yes.
20  Q.  What else did he tell you?
21  A.  He told me that Al Roechner had videos on his
22 personal laptop.  He told me that Phil Bergner -- that
23 Al Roechner had approached Phil Bergner, who was like
24 the IT officer at the time, and I can't -- it was either

Page 56

1 asked him to issue him a new cell phone or erase his
2 current cell phone, and that Phil Bergner was
3 uncomfortable with that and that he approached another
4 officer named -- a female officer named Shawn -- I'm
5 going to butcher her last name.  I think it's
6 Stachelski, or something like that.  I can't really know
7 her last name.  But he approached her and that he was
8 uncomfortable with that and he wanted advice as to what
9 to do.
10      He told me that there were several copies made
11 from the Celebrex (sic).  Well, that Tab Jensen had
12 ordered the removal of the contents of the phone from
13 the Celebrex (sic) system and that copies were made --
14 before erasing they made copies and that those copies
15 were given to Al Roechner and that Al Roechner asked for
16 all the copies and kept them in his personal office, and
17 that none of these ever made it into evidence.
18      At this time that's all I can recall, but if
19 something pops later, I'll let you know.
20  Q.  Did David Jackson tell you how he obtained
21 this information?  In other words, what the source of
22 this alleged information was?
23  A.  No.  Well, I had another meeting with him
24 later on.

Page 57

1  Q.  Okay.  And we can talk more about that.  So in
2 terms of your first meeting with him at the Joliet
3 police station, I believe that was sometime in March of
4 2020?
5  A.  Yes.
6  Q.  Do I have that right?
7  A.  Yes.
8  Q.  And it took about half an hour.  What, if
9 anything, did you say in response to the information
10 shared with you by David Jackson?
11  A.  So I first asked him why he's coming to me and
12 why he's telling me this.  I specifically asked him if
13 he's looking for money out of this or, you know, because
14 a lawsuit potentially has -- you know, there's a lawsuit
15 potentially.  And I just wanted to clear that right off
16 the table because I would have walked out the door,
17 that's fine, and I'm not trying to do all that.  I just
18 asked him, why are you telling me this?
19  Q.  And what did he say?
20  A.  He responded that he knows what's right is
21 right and what's wrong is wrong and that, you know, he
22 knows that this stuff is wrong and you, know, it
23 shouldn't be done to anyone.  And if this happened to
24 one of his loved ones he would hope that someone

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021                                    Pages 58..61

Page 58

1 would -- if they had knowledge of it, would tell him.
2 And that was the reason that he provided me. He
3 specifically told me he's not looking for any type of
4 compensation for this whatsoever.
5    Q.   Do you recall anything else about your
6 conversation with Jackson that we've been discussing?
7    A.   Yes, he told me specifically with Al
8 Roechner's laptop that Al Roechner told him,
9 specifically, that these videos were on his personal
10 laptop.
11   Q.   Did he tell you when Al Roechner allegedly
12 told him that?
13   A.   No.
14   Q.   Did he say whether anyone else was present
15 during this alleged conversation between himself and
16 Roechner?
17   A.   No.
18   Q.   I just want to clarify. I want to go back to
19 something that you said. Your testimony that Jackson
20 told you that Roechner went to -- I think it is Shawn
21 Stachelski?
22   A.   No. Phil Bergner went to Shawn Stachelski and
23 said that Al Roechner went to Phil Bergner and asked him
24 to either issue him a new cell phone or erase the

Page 59

1 contents of his current phone. I don't remember which
2 one.
3    Q.   So this was an alleged conversation between
4 Bergner and Stachelski; correct?
5    A.   Yes.
6    Q.   Do you know if there was anyone present for
7 that conversation?
8    A.   I don't know.
9    Q.   Was Jackson present for that conversation?
10   A.   I don't know.
11   Q.   Do you know how Jackson came about that
12 information?
13   A.   I don't know that either.
14   Q.   And the same question for everything else that
15 Jackson shared with you in this half-hour conversation
16 in March of 2020 at the station. Do you know how
17 Jackson came about any of this information?
18   A.   I can -- I don't know specifically, but I know
19 that Detective Jackson is a detective. That everyone
20 involved in this case was either a detective or, you
21 know, a detective sergeant, a commander of the
22 investigations unit at the time. So I took him to be
23 credible because he works in the office with everyone
24 that you mentioned, outside of Phil Bergner.

Page 60

1    Q.   So you made an assumption, but really had no
2 understanding of how Jackson came about this
3 information?
4    A.   That's correct.
5    THE WITNESS: Did you guys lose me for a minute?
6    MS. PROCTOR: I can hear you okay.
7        Actually, you know, what, we've been going for
8 a little over an hour. Can we just take a short
9 five-minute break?
10           (Short break was taken.)
11 BY MS. PROCTOR:
12   Q.   Officer Crowley, was there ever a time you did
13 not live together with Cassandra?
14   A.   Like when we were together in --
15   Q.   Well --
16   MR. ADAMS: Ever?
17 BY MS. PROCTOR:
18   Q.   Yeah, just to be clear, after you started your
19 relationship with Cassandra, my question to you is, was
20 there ever a time where the two of you did not live
21 together under the same roof?
22   A.   Yes, when we were first dating I lived with my
23 parents and she lived here.
24   Q.   Okay. But beyond that, once you started

Page 61

1 living together in 2015, I believe it was, from that
2 point to the present was there ever a time when the two
3 of you did not live together?
4    A.   No.
5    Q.   Were you ever separated or did you ever take
6 any time away from each other, from 2015 to the present?
7    A.   Oh, I'm sorry. Yes, there was a time that I
8 was not allowed to live here and that's -- I lived down
9 with my parents.
10   Q.   Did that have to do with the no contact order?
11   A.   Yes.
12   Q.   Okay. Have you ever taken any trips out of
13 state with any other Joliet police officers during your
14 time with the department?
15   A.   No.
16   Q.   Have you ever taken a trip to Las Vegas with
17 anyone from the Joliet PD, at any time?
18   A.   Cassandra and I went to Vegas for her cousin's
19 wedding, but that's all. I mean, she works there, so
20 other than her, no.
21   Q.   Have you ever done any type of social outings
22 with anyone from the Joliet Police Department?
23   A.   Can you define "social outings?"
24   Q.   Look, do you have a close circle of friends

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021                                    Pages 62..65

Page 62

1  from work, from the Joliet PD?
2    A.   Not really. I mean, I don't really associate
3  outside of work with many people.
4    Q.   Was that always the case?
5    A.   I mean, I would -- there would be times when
6  we would go out for a drink or two outside of work,
7  every now and then. Like I said, there would be shift
8  parties, Christmas parties, there would be certain
9  events, department events, that we would go to, kid
10  Christmas party, an FOP Christmas party, but that's
11  about the extent.
12    Q.   So you don't -- other than Busse and that Emph
13  person that you named earlier, are those your only two
14  buddies, if you will, from the Joliet Police Department
15  in 16 years of working there?
16    A.   I've only worked here for eight years. I am
17  on my ninth years now. Yeah.
18    Q.   Okay, I'm sorry. I thought you were there
19  longer. But what I'm trying to understand is, like, who
20  your friends were on the force, other than the people
21  that you've already mentioned?
22    A.   Yeah, I keep a small circle. I don't --
23    Q.   And who's in the small circle?
24    A.   The officers that I mentioned before. With

Page 63

1  this department there's a lot of opportunities here, so
2  a lot of the officers that I got hired with they moved
3  on to other things and I don't really see them that
4  often. I just -- you work with the officers that are on
5  your shift, that you see day in and day out. You
6  develop relationships with them, but there is -- you
7  know, there's just a few guys that I, you know, will
8  talk on the phone with every now and then, but I
9  don't -- you know, I have four children. I've got a
10  household. I don't really do anything outside of work
11  with any of those people.
12    Q.   The few guys who you do talk with --
13    A.   Yes.
14    Q.   -- who are they?
15    A.   I'm sorry?
16    Q.   The few guys that you mentioned that you do
17  talk with --
18    A.   Yes.
19    Q.   -- who are they?
20    A.   Like I said, Bill. I talk to Bill Busse, but
21  he doesn't work here anymore. Phil, he works on my
22  shift. I go to jujitsu with a couple of guys, Alana
23  Costa, Casey and Ryan Killian go there, but I don't
24  really go out with them. They're younger.

Page 64

1    Q.   What is it that you mentioned you do? Is it
2  some type of martial arts?
3    A.   Yeah, jujitsu.
4    Q.   And you mentioned Ryan and Casey?
5    A.   Killian, K-I-L-L-I-A-N.
6    Q.   Are they brothers?
7    A.   Yes.
8    Q.   Okay. What about in 2018, did you have a
9  close circle of friends in 2018?
10    A.   I wouldn't say a close circle of friends.
11  There were just officers that, you know, you work with
12  on the shift that, like I said, occasionally we would
13  meet out. And when I say "we," Cassie and I. Shift
14  party or two, but again, that was before her and I had
15  children. So when we would have our days off and I
16  didn't have my girls, it was just the two us, so we had
17  more free time back then.
18    Q.   Well, I understand, when you have children
19  your life changes completely. But when you could go out
20  socially, you know, before children and the commitments
21  of family, who would you hang out with? You said you
22  would meet out with some people. Are there any other
23  names that we haven't already covered?
24    A.   I don't think so.

Page 65

1    Q.   Who did you work with on your shift in 2018?
2    A.   I think I went over that list already. I
3  mean, I can tell you the officers that worked in some of
4  the districts that I did work in.
5    Q.   Okay. And I don't really want -- you know, I
6  don't really need you to go over names that you've
7  already given me, Officer, so is there anybody that you
8  haven't mentioned?
9    A.   Not that I can recall.
10    Q.   Okay. You know, getting back to the sex
11  photographs and videos, why did you use Cassandra's cell
12  phone and not your own?
13    A.   My guess would be her phone was right there, I
14  just grabbed it, but I don't -- there's no specific
15  reason for that.
16    Q.   And is it your testimony that you've never
17  used your own cell phone, or any other device, to record
18  your sex acts with Cassandra?
19    A.   No.
20    Q.   Why were you recording these events?
21    MR. ADAMS: Objection. Asked and answered.
22    MS. PROCTOR: I don't know that I specifically
23  asked that, and if I did, I'll ask it again and we can
24  move on.

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021                                    Pages 66..69

Page 66

1    MR. ADAMS: You did and my objection is that you
2 have asked and answered.
3    MS. PROCTOR: But he can go ahead and answer it.
4 BY THE WITNESS:
5    A.  It was just a private intimate moment that I
6 had shared with her.
7    Q.  But why document it?  I mean, I don't get it.
8 Why record it?
9    MR. ADAMS: Object to form.
10 BY THE WITNESS:
11    A.  As I said, it was just a private moment that
12 her and I shared together.
13    Q.  Back in 2018, did Sandra have – was her
14 iPhone password protected, if you know?
15    A.  I don't know.
16    Q.  So you don't know whether she had a password
17 or not?
18    A.  I would assume that she did, but I don't know.
19    Q.  Did you have access to the password to her
20 phone in 2018?
21    A.  No.
22    Q.  Have you ever had access to the password on
23 her phone?
24    A.  If I needed to get into her phone for

Page 67

1 something I would ask her the password and she would
2 give to me, but I don't know it off the top of my head.
3    Q.  But you had access to it if you wanted to go
4 on her phone; would that be fair?
5    A.  I would have to ask her for the password, yes.
6    Q.  Have you read or seen any of the deposition
7 testimony that has been taken so far in this litigation?
8    A.  No.
9    Q.  I want to get back to – I think we were at
10 the March 2020 meeting with David Jackson –
11    A.  Okay.
12    Q.  – right?  And I think you exhausted your
13 memory on your conversation with Jackson, so let's –
14 that's where we're going to start this next line of
15 questioning.
16    What, if anything, did you do after that
17 conversation with Jackson?
18    A.  I documented that conversation.  I took
19 written notes.  I then informed Cassie, Cassandra, of
20 the conversation that I just had.  And then I
21 composed – I recomposed those notes in an email to her
22 and I told her she needed to get these over to her
23 attorney.
24    Q.  Okay.  So when did you take the written notes

Page 68

1 of your conversation with Jackson in March of 2020?
2    A.  As he was speaking to me.
3    Q.  How – what did you use to take the notes?
4    A.  A notepad and a pen.
5    Q.  Do you still have those notes?
6    A.  I do not.
7    Q.  Have you ever turned those notes over to
8 Cassandra's attorney in this lawsuit?
9    A.  No, I just composed them in an email to have
10 her send those to her attorney.  I believe she just
11 forwarded that email to him.  I don't really know
12 specifically, but the handwritten notes, I believe I
13 just threw away that day.
14    Q.  And when you say you recomposed the notes, did
15 you create an email based on those notes?
16    A.  Yes.
17    Q.  What device did you use to create the email?
18    A.  I think it was my phone.
19    Q.  And so I am clear on this, you used your phone
20 to compose an email; correct?
21    A.  Yes.
22    Q.  And that email was sent to Cassandra who you
23 believe in turn forwarded that same email to attorney
24 Hall Adams, who is representing you here today; correct?

Page 69

1    A.  Correct.
2    Q.  Did anyone assist you in composing the email?
3    A.  No.
4    Q.  Did you talk with anybody about your meeting
5 with Jackson before you composed that email?
6    A.  No.
7    Q.  Did you talk to Cassandra about your
8 conversation with Jackson before you composed the email?
9    A.  Yes.
10    Q.  And when did you have the conversation with
11 Cassandra?
12    A.  Immediately after the sit-down with Dave
13 Jackson.
14    Q.  How did you have that discussion?  In other
15 words, was it by phone or in person?
16    A.  Through text message.
17    Q.  Did you save those texts?
18    A.  No.
19    Q.  Do you know whether Cassandra saved those
20 texts?
21    A.  I don't know.
22    Q.  Okay.  How much information or detail did you
23 include in those texts?
24    A.  I just said Dave Jackson spoke with me.  I am

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 70..73

Page 70

1 going to send you an email about how our conversation
2 went. You need to get that over to your attorney.
3    Q.   Why did you believe she needed to get the
4 information over to her attorney?
5    A.   I believe the information that I was provided
6 was compelling and that her attorney needed to be aware
7 of what I was just told.
8    Q.   Do you know whether Cassandra forwarded your
9 email to Hall Adams?
10    A.   I believe she did, yes.
11    Q.   Were you copied on that email?
12    A.   No.
13    Q.   Do you know when she forwarded the email to
14 Mr. Adams?
15    A.   No.
16    Q.   Did you ever speak with Mr. Adams concerning
17 the content of your email?
18    A.   No.
19    Q.   At any time?
20    A.   No.
21    Q.   Including up to today?
22    A.   No, I don't think so.
23    Q.   So to be clear, you never had a conversation
24 with Hall Adams concerning the content of your email

Page 71

1 documenting your March 2020 meeting with Jackson; is
2 that correct?
3    A.   To my knowledge.
4    MR. ADAMS:   I am going to object and assert the
5 prior communication privileged as to any communications
6 since the time that he engaged me to be his lawyer in
7 conjunction with this deposition, although I'm not sure
8 that it matters.
9 BY MS. PROCTOR:
10    Q.   Okay. Well, just to be clear, you didn't hire
11 Mr. Adams to represent you until May of 2020 of this
12 year; correct?
13    A.   That's correct.
14    Q.   So my question to you is directed at any time
15 from March 2020 up until the time that you retained
16 Mr. Adams in May of 2021, did you ever discuss the
17 content of your email documenting your conversation with
18 Jackson with Mr. Adams?
19    A.   No.
20    Q.   Did you ever discuss the content of that email
21 with anyone other than Cassandra?
22    A.   No.
23    Q.   Did you review the email in written form
24 before today's deposition?

Page 72

1    A.   No.
2    Q.   I'll share with you, Officer Crowley, that a
3 copy of that email was provided to us by Cassandra's
4 counsel, okay? And I'm looking at it and it's dated
5 March 2 of 2020.
6    A.   Okay.
7    Q.   In other words, it begins "On March 2, 2020, I
8 was approached by Detective Jackson." Okay?
9    A.   Okay.
10    Q.   So my question to you is, was your meeting
11 with David Jackson on March 2 of 2020?
12    A.   If that's what it says, yes. I have no reason
13 to dispute otherwise.
14    Q.   Okay. Now, I believe you testified earlier
15 that you had another meeting with Jackson?
16    A.   Yes.
17    Q.   When did that meeting occur?
18    A.   I believe it was a couple of months after
19 that. I know it was before June of 2020, only because I
20 was still working the desk at the time of the second
21 meeting and I went back on the street sometime in June.
22 So I'm going to guess and say it was perhaps May of
23 2020.
24    Q.   Was anybody else present for the May 2020

Page 73

1 meeting with Dave Jackson?
2    A.   Yes.
3    Q.   Who was present for that meeting?
4    A.   Carlos Matlock.
5    Q.   And where did that meeting occur?
6    A.   It occurred at a Wendy's restaurant in Joliet.
7    Q.   Other than you, Matlock and Jackson, was there
8 anybody else present for that meeting?
9    A.   No.
10    Q.   How long did the meeting last?
11    A.   Again, probably about a half hour, 45 minutes.
12    Q.   How was the meeting initiated?
13    A.   I believe Jackson asked me if I could meet him
14 for lunch. He said that Carlos was going to be with him
15 and that they had some information for me. So I said,
16 okay, where do you want to meet?
17    Q.   And what do you recall about the May 2020
18 meeting with Jackson?
19    A.   That one I really didn't learn any more
20 specific information from the first time we met. There
21 was no, you know, new information that I wasn't aware
22 of. The only thing that kind of stuck out in my mind in
23 that meeting was that in regards to Darrell Gavin coming
24 down into the watch commander's office and making his

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 74..77

Page 74

1 comment, Carlos Matlock told me specifically that Rob
2 Brown told him, told Carlos, about this comment that
3 Darrell Gavin had made.
4    Q.  Okay.  So that's the only – new information,
5 if you will, that you learned concerning the topics that
6 were previously discussed with Detective Jackson;
7 correct?
8    A.  Yes, there was that and Carlos had also told
9 me that he heard from Ed Grizzle's mouth, that Ed
10 Grizzle, when he was – Ed Grizzle apparently was – I'm
11 going to use his words – like gloating up in
12 investigations office.  That he went across the street
13 and got interviewed by Chris Regis, the inspector
14 general, and that yeah, quote, you know, I told them
15 everything.  I told them that I made copies of the cell
16 phone and I told them that I gave copies out of the cell
17 phone because I was ordered to do that.  So that's what
18 he had told me.
19    Q.  Okay.  Do you remember anything else about
20 that conversation that you hadn't heard before from
21 Jackson?
22    A.  No, just that Carlos told me, hey, I'll
23 testify to all this stuff.  So if you need me to I'll
24 tell the truth.  I have no problem doing that.  I said

Page 75

1 okay.
2    Q.  Has that exhausted your memory of your meeting
3 with Jackson and Matlock in May of 2020?
4    A.  At this time, yes.
5    Q.  So to be clear, let me see if I have this
6 straight.  Matlock told you that Brown told him that
7 Gavin allegedly made the comment regarding the sex video
8 showing Cassandra giving you oral sex; correct?
9    A.  Yes, that Rob Brown was present when Darrell
10 Gavin said it.  So Rob Brown told Matlock, this is what
11 Gavin said when he came down into the watch commander's
12 office.
13    Q.  And the second piece that you mentioned,
14 Matlock – was it Matlock who said – who reported this
15 alleged conversation with Ed Grizzle that you just
16 testified to?
17    A.  Yes.
18    Q.  And was it your understanding from Matlock
19 that this was a conversation between Grizzle and
20 Matlock?
21    A.  From my understanding it was just a group
22 conversation, because Matlock told me his desk was right
23 next to Ed Grizzle's at the time and that Ed Grizzle was
24 just openly talking about how he did go across the

Page 76

1 street, was interviewed by Chris Regis and that he told
2 him, yes, I did make copies of her cell phone and, yes,
3 I did distribute those copies of her cell phone.  And he
4 said I gave it to Marc Reid, I gave it to Al Roechner,
5 so, that's just what he had told me.
6    Q.  So this is Matlock allegedly overhearing
7 something Grizzle said; correct?
8    A.  Yes.
9    Q.  Did Matlock give you a time frame of this
10 alleged statement from Grizzle?
11    A.  No, but I heard that it was either the day of
12 or around when Ed Grizzle was interviewed by Chris
13 Regis.
14    Q.  Do you know what the date of that occurrence,
15 if it occurred, happened?
16    A.  I don't know.
17    Q.  Was it before or after Cassandra filed her
18 lawsuit?
19    A.  It would have been after.
20    Q.  And same goes for your initial meeting with
21 Jackson and then the second meeting in May of 2020.
22 That was after Cassandra filed the lawsuit; correct?
23    A.  Yes.
24    Q.  Were you aware, during either of those

Page 77

1 meetings, that David Jackson had filed his own lawsuit
2 against the city?
3    A.  Yes.
4    Q.  What, if anything, do you know about the
5 allegations in Jackson's lawsuit against the city?
6    A.  I just know what's been publicly been made
7 available through media.  I never read it personally.  I
8 just read it, whatever came through the media.
9    Q.  What is your understanding of the allegations
10 in his lawsuit involved, if you know?
11    A.  From my understanding he's suing them.  I
12 believe it's a discrimination lawsuit, but I don't
13 really know the nuts and bolts of it.
14    Q.  Have you ever discussed with Jackson his
15 lawsuit against the city?
16    A.  No.
17    Q.  Before your meeting with Jackson in March of
18 2020, did you receive any information from anybody about
19 the alleged sharing of the nude photographs and sex
20 video from Cassandra's cell phone amongst members of the
21 Joliet Police Department?
22    A.  The only thing that was, I guess you could say
23 shared, was when Cassandra received a letter in her
24 mailbox.

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021                                    Pages 78..81

Page 78

1    Q.  Have you seen the letter Cassandra received in
2 her mailbox?
3    A.  Yes.
4    Q.  Do you know about when she received it?
5    A.  I don't know. I don't know. I know that we
6 were both on midnight shift. It could have been
7 sometime in 2018, but I don't know.
8    Q.  Was it before or after she filed the lawsuit?
9    A.  Oh, before.
10   Q.  Do you know when that was in relation to when
11 her phone was searched, if you know?
12   A.  It was after her phone was searched.
13   Q.  Do you know how long after? Days? Weeks?
14 Months? If you know.
15   A.  I don't know.
16   Q.  Did you read the letter?
17   A.  Yes.
18   Q.  Do you recall what the letter said?
19   A.  Yes.
20   Q.  What is your memory of what the letter said?
21   A.  The letter – it was typed and it just said
22 that there has been – I'm summarizing here, but there's
23 members of – there's detectives and supervisors that
24 watched a sex video. And then it gave a specificity of

Page 79

1 the actions that were occurring and that these were
2 being passed around by members of the investigations
3 division and that we needed to do something about it.
4    Q.  And what was the specificity you mentioned?
5    A.  Pardon my language, but it specifically made
6 mentioning of "deep throating."
7    Q.  What does that mean?
8    A.  A form of oral sex.
9    Q.  That phrase was used in the letter?
10   A.  Yes.
11   Q.  Do you know when Cassandra told you about the
12 letter? Was it at or near the time she received it?
13   A.  Yeah, she told me the night that she received
14 it. We were working together that night, just in
15 different districts, and she called me and told me that
16 she got this letter in her mailbox.
17   Q.  About what time was that?
18   A.  That she called me?
19   Q.  Yes.
20   A.  Our shift started at either 6 or 7 p.m. that
21 night, so it was shortly thereafter.
22   Q.  And what did she say to you in the
23 conversation?
24   A.  She just told me she got this weird letter in

Page 80

1 her mailbox and she read it to me.
2    Q.  And what else was discussed in that
3 conversation with Cassandra about the letter or her
4 response?
5    A.  She just asked what do I do with this? What
6 is this about? Stuff like that.
7    Q.  Was that the first time, to your knowledge,
8 that Cassandra learned that information from her cell
9 phone was allegedly being shared?
10   A.  Yes.
11   Q.  Do you have any idea who wrote that letter?
12   A.  No.
13   Q.  Do you have any – would you venture a guess
14 of who wrote that letter?
15   A.  No.
16   Q.  Did anyone ever tell you who wrote that
17 letter?
18   A.  No.
19   Q.  And I just want to clarify, was this the only
20 letter that Cassandra ever received concerning the
21 contents of her cell phone?
22   MR. ADAMS: Objection. Foundation.
23 BY THE WITNESS:
24   A.  She received another letter in her mailbox but

Page 81

1 all it was was an attorney like – it looked like it
2 might have been from a website from an attorney's
3 office. And I can't remember if it said, you should
4 contact this person, they can help you with this, or if
5 it was just in there. Like, you know, like a
6 suggestion. Here is an attorney that can help you with
7 that.
8    Q.  Do you know when she received that document?
9    A.  I don't recall. I know it was after the first
10 one, but I don't recall when.
11   Q.  Can you be anymore specific of the timeline
12 between the first letter and then hearing about this
13 other document? Was it days, weeks or months, if you
14 know?
15   A.  It would have been weeks, but I don't recall
16 exactly when.
17   Q.  Did you actually read the document?
18   A.  The first one?
19   Q.  No, this second – well, this document that
20 you mentioned –
21   A.  I did, yes.
22   Q.  – with the attorney information on it?
23   A.  Yes.
24   Q.  Do you recall the name of the attorney on the

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 82..85

Page 82

1 document?
2    A.   I recall it was a female attorney, but I don't
3 recall the name.
4    Q.   Other than containing attorney information did
5 it -- do you remember anything else about what the
6 document said?
7    A.   No.
8    Q.   Did Cassandra keep that document?
9    A.   I believe so.
10   Q.   Do you know what, if anything, Cassandra did
11 with that document?
12   A.   I assume she gave it to her attorney, but I
13 don't know.
14   Q.   Getting back to your meeting in May with
15 Matlock and Jackson, have you now told me about all your
16 meetings, in-person meetings with Jackson and/or Matlock
17 concerning the allegations in this lawsuit?
18   A.   Yes.
19   Q.   Have you met with any other member of the
20 Joliet Police Department concerning any issues that
21 touch upon the allegations in this lawsuit?
22   A.   No.
23   Q.   Did you ever hear any rumors within the Joliet
24 Police Department concerning the nude photographs or

Page 83

1 sexual videos from Cassandra's cell phone?
2    A.   No, other than what I was told by Jackson,
3 Matlock and the letter, no.
4    Q.   So if there were rumors you did not hear any
5 of them; correct?
6    A.   Correct.
7    Q.   The first letter that you mentioned that
8 Cassandra found in her mailbox, was that typed or
9 handwritten, if you recall?
10   A.   Typed.
11   Q.   Did you recognize the writing style?
12   A.   I mean, it was on a computer.  Like Times New
13 Roman or something like that.  I don't know.  It just
14 looked like a basic -- like a Word document.  Somebody
15 opened up a Word document, typed it and then put it in
16 her mailbox.
17   MR. ADAMS:  I'll object to form.  If it's helpful,
18 Nick, I think she meant the prose, not the font.  The
19 use of the language, not the particular font.
20   THE WITNESS:  Okay.
21 BY MS. PROCTOR:
22   Q.   So with that in mind, was there anything about
23 the letter that was familiar to you?  By writing --
24 that's what I meant by writing style.

Page 84

1    MS. PROCTOR:  Thank you, Hall.
2 BY THE WITNESS:
3    A.   No, no.
4    Q.   Have you ever had conversations with anyone
5 who admitted to seeing private images, the photographs
6 and the sex videos that we've been discussing here
7 today, which are the subject of this lawsuit?
8    A.   No.
9    Q.   What knowledge or information, if any, do you
10 have that any member of the Joliet Police Department
11 either viewed the nude photographs or viewed the sex
12 videos from Cassandra's cell phone, other than what you
13 testified to here today?
14   A.   None.
15   Q.   Are you aware that Cassandra sued 20
16 defendants identified as John Doe defendants in this
17 lawsuit?
18   A.   Yes.
19   Q.   Do you know the identities of any of those Doe
20 defendants?
21   A.   No.
22   Q.   What knowledge or information, if any, do you
23 have that Darrell Gavin either viewed the nude
24 photographs or sex videos from Cassandra's cell phone?

Page 85

1    A.   Other than what I've discussed here today?
2    Q.   Yes.
3    A.   None.  Just what I've testified here to today.
4    Q.   So other than the hearsay from David Jackson,
5 you have no other information which indicates that
6 Darrell Gavin either -- that Darrell Gavin viewed the
7 nude photographs or sex videos from Cassandra's cell
8 phone; correct?
9    A.   Correct.
10   Q.   What knowledge or information, if any, do you
11 have that Marc Reid viewed the nude photographs or sex
12 videos from Cassandra's cell phone?
13   A.   I don't have any.
14   Q.   Do you have any knowledge or information that
15 Phillip Bergner viewed the nude photographs or sexual
16 videos from Cassandra's cell phone?
17   A.   No.
18   Q.   Do you have any knowledge or information that
19 Mike Batis viewed the nude photographs or sex videos
20 from Cassandra's cell phone?
21   A.   No.
22   Q.   Do you have any knowledge or information that
23 Tim Powers viewed the nude photographs and sex videos
24 from Cassandra's cell phone?

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 86..89

Page 86

1  A.  No.
2  Q.  Do you have any knowledge or information that
3 Carlos Matlock viewed the nude photographs or sex videos
4 from Cassandra's cell phone?
5  A.  No.
6  Q.  Do you have any knowledge or information that
7 Donald McKinney viewed any nude photographs or sex
8 videos from Cassandra's cell phone?
9  A.  No.
10  Q.  Do you have any knowledge that Brad McKeon
11 viewed any of the nude photographs or sex videos from
12 Cassandra's cell phone?
13  A.  No.
14  Q.  Do you have any knowledge or information that
15 Alan Roechner viewed any of the nude photographs or sex
16 videos from Cassandra's cell phone?
17  A.  No.
18  Q.  Do you have any knowledge or information that
19 Edward Grizzle viewed any of the nude photographs or sex
20 videos from Cassandra's cell phone?
21  A.  No.
22  Q.  Do you have any knowledge or information that
23 Tab Jensen viewed any of the nude photographs or sex
24 videos from Cassandra's phone?

Page 87

1  A.  No.
2  Q.  Do you have any knowledge or information that
3 Brian Benton viewed any of the nude photographs or sex
4 videos from Cassandra's cell phone?
5  A.  No.
6  Q.  Do you have any knowledge that Sergeant Shawn
7 Stachelski either viewed or heard that nude photographs
8 and sex videos from Cassandra's cell phone had been
9 viewed by members of the Joliet Police Department?
10  A.  No.
11  Q.  Have you had any conversations with any of the
12 Doe defendants in this lawsuit?
13  A.  I don't know who they are, so I don't.
14  Q.  Okay.  Well, it's the list I just went
15 through, including Matlock and Jackson.
16  A.  Other than the conversations that I testified
17 to here today, no.
18  Q.  Did you keep a copy of the email that you
19 forwarded to Sandra – or that you sent to Sandra to
20 forward to her attorney concerning your March 2, 2020
21 meeting with Dave Jackson?
22  A.  I would have to go – I don't – I don't know.
23 I could potentially find that.  I'd have to dig it up.
24 It is old, so I don't know if it's automatically

Page 88

1 deleted.  I delete my emails so it could have been
2 deleted.  I don't know.
3  Q.  So is this a personal email that you used or
4 a, you know – well, let's start there.
5  A.  Yes.
6  Q.  Okay.  And what is your email address?
7  A.  G-U-C-K-C-O-P at Yahoo dot com.
8  Q.  Okay.  And does Cassandra have a personal
9 email address?
10  A.  She does, but I don't know it off the top of
11 my head.
12  Q.  Okay.  Well, I want to go through your email.
13 Okay?  And it indicates here that in your meeting with
14 Dave Jackson on March 2, 2020, that, it states:
15 "Jackson told me that several members of JPD currently
16 have civil rights lawsuits against the city and against
17 JPD command staff, including racial and sexual
18 orientation discrimination, period.  All of these claims
19 have been made while Alan Roechner has been chief of
20 police," period.
21  Is that a correct reading of the first
22 paragraph of your email?
23  A.  Yes.
24  MR. ADAMS:  Object to form because he doesn't have

Page 89

1 it in front of him.
2 BY MS. PROCTOR:
3  Q.  Well, does that sound true and correct, to the
4 best of your knowledge?
5  A.  Yes.
6  Q.  I'm representing to you that I'm reading the
7 email that Cassandra's lawyer sent us in this lawsuit.
8 So did you write that?
9  A.  Yes.
10  Q.  Did anyone help you write the email or you
11 wrote it on your own?
12  A.  I wrote it on my own.
13  Q.  Was anyone with you when you drafted it?
14  A.  No.
15  Q.  Did you confer with anybody as you were
16 drafting the email?
17  A.  No.
18  Q.  Okay.  I'm sorry.  I didn't mean to cut you
19 off.
20  A.  No.
21  Q.  Were you finished?
22  A.  Yes.
23  Q.  Paragraph two of your email states:  "Jackson
24 told me if we all work together and share information

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 90..93

Page 90

1 between our attorneys and somehow combined all our
2 lawsuits into one class action civil rights lawsuit
3 against the city, comma, it could be more effective
4 rather than individual lawsuits," period.
5        Is that a statement that you made in the
6 email?
7    A.  Yes.
8    Q.  Where did you receive that information?
9    A.  David Jackson told me that.
10   Q.  And you prepared your notes at or near the
11 time of your meeting with Jackson; correct?
12   A.  Correct.
13   Q.  And did you prepare this email documenting
14 your meeting with Dave Jackson from the notes at or near
15 the time the notes were taken?
16       MR. ADAMS:  I'm going to object again to form.
17       MS. PROCTOR:  That might have been confusing.  I'll
18 withdraw it.
19       MR. ADAMS:  Just the objection is to form.  The way
20 to ask this question --
21       MS. PROCTOR:  You know what, you don't have to tell
22 me the way to do anything.  Your objection to form is
23 noted.  I'm going to continue with my questions to the
24 witness.  I'm withdrawing my question.  You have nothing

Page 91

1 to say.  There's no question, Hall.
2       MR. ADAMS:  He's entitled to see the document.
3       MS. PROCTOR:  He's not entitled to see anything.
4 He's not.
5       MR. ADAMS:  You're asking --
6       MS. PROCTOR:  I'm sorry.  I disagree.
7       MR. ADAMS:  If you're asking if the document reads
8 in a particular way, he's entitled to see the document.
9 I could -- of all people, why you wouldn't want to
10 screen share it, it's a pain in the neck.
11       MS. PROCTOR:  What's your objection?  Form.  Noted.
12 We need to move on.
13       MR. ADAMS:  Form.  He's entitled to see the
14 document about which you're asking him to confirm the
15 contents.
16       MS. PROCTOR:  I disagree.
17 BY MS. PROCTOR:
18   Q.  Officer Crowley, the notes that you prepared
19 during your meeting with David Jackson, were those done
20 contemporaneously or at the same time as your meeting
21 with David Jackson?
22   A.  Yes.
23   Q.  And I know you did them on a notepad and you
24 said you threw them out the same day.  And the email

Page 92

1 that you prepared and sent to Cassandra, who in turn
2 sent it to her lawyer, that email was prepared within --
3 you know, was it prepared the same day, based on your
4 notes that -- was it prepared the same day that the
5 notes were created?
6    A.  Yes.
7    Q.  Okay.  So in your email it indicates that
8 Jackson told you he has very detailed and intimate
9 knowledge of Cassandra's case and asked me, quote, what
10 do you need from me?  How can I help you?  End quote.
11       Is that a true or false statement, based on
12 your meeting with David Jackson?
13   A.  That's true.
14   Q.  And again, that's based on information that
15 Jackson gave you; correct?
16   A.  Yes.
17   Q.  Okay.  Your statement also indicates that you
18 asked Jackson what kind of information did he have and
19 then he told you several things.  Does that sound
20 familiar?
21       MR. ADAMS:  Object to form.  It is totally unfair
22 to examine this witness about the document.
23 BY MS. PROCTOR:
24   Q.  Did we already discuss that earlier in today's

Page 93

1 deposition, Officer Crowley, you asking him what kind of
2 information he had?
3    A.  Yes.
4    Q.  Okay.  So according to your email, Jackson
5 first told you the night that Cassandra's cell phone was
6 taken and downloaded Deputy Chief Darrell Gavin, rank of
7 detective sergeant at the time, came from the
8 investigations office into the watch commander's office
9 and stated, quote, Socha sucks dick like a porn star.
10 No wonder Crowley is with her.  Period.  End quote.
11       Did you provide that information to Sandra to
12 provide to her attorney in this case?
13   A.  Yes.
14   Q.  And that statement came from David Jackson;
15 correct?
16   A.  Yes.
17   Q.  Your email also indicates that Jackson stated
18 they found a video on Cassandra's phone and encouraged
19 those in the room to go watch it.  Period.
20       Is that information that Jackson gave you?
21   A.  Yes.
22   Q.  And you have no independent way to verify
23 whether that's true or false; correct?
24   A.  Correct.

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 94..97

Page 94

1   Q.   Your email further states that Jackson told
2 you that in the room when Gavin made those comments were
3 Lieutenant Rob Brown, Lieutenant Jeremy Harrison and
4 Sergeant Tim Powers.
5      Is that information you received from David
6 Jackson on March 3, 2020?
7   A.   Yes.
8   Q.   And again, you would have no way to
9 independently verify the truth or falsity of that
10 statement; correct?
11   A.   That's correct.
12   Q.   Your email also indicates that Jackson stated
13 there was someone in that room that will testify as to
14 the validity of those comments, but didn't tell you who.
15   A.   That's correct.
16   Q.   Is that a correct statement that Jackson made
17 to you?
18   A.   Yes.
19   Q.   Do you have any information, as you sit here
20 today, who the person in that room was according to
21 Jackson?
22   A.   I would later learn that it was Rob Brown.
23   Q.   And how did you later learn that information?
24   A.   During the second meeting with Carlos at the

Page 95

1 Wendy's.
2   Q.   Thank you.  Reading on, your email states that
3 Jackson said at that moment, Harrison left the room and
4 he believed he went and watched the video, meaning
5 Harrison.
6      Now, Jackson wasn't there for that meeting;
7 correct?
8   A.   Which meeting?
9   Q.   This alleged meeting of watch commanders;
10 correct?
11   A.   I don't know if he was there or not.  I don't
12 know.
13   Q.   So you have no way of verifying this
14 information, whether Harrison was there or whether
15 Harrison went and watched the video; correct?
16   A.   Correct.
17   Q.   Okay.  Your email further states that Jackson
18 told you that Grizzle made hard copies of the video and
19 gave them to Department Chief Marc Reid, Deputy Chief
20 Tab Jensen, retired, and Police Chief Alan Roechner,
21 upon their request.  Period.
22      Did I read that statement correctly?
23   A.   Yes, I believe so.
24   Q.   Is that information that Jackson shared with

Page 96

1 you in your March 2, 2020 meeting?
2   A.   Yes.
3   Q.   Your statement, or your email to Cassandra
4 also states that Jackson said in the days leading up to
5 the FBI raid of the investigations office, Roechner went
6 to Officer Philip Bergner and asked him to clean his
7 phone.  Period.
8      Again, is that information given to you by
9 David Jackson?
10   A.   Yes.
11   Q.   And again, you have no way to independently
12 verify the truth of that statement?
13   A.   Correct.
14   Q.   Your email further indicates that Bergner was
15 the IT officer for the department and would have the
16 knowledge of how to do such a thing.
17      Again, is that information that David Jackson
18 gave you?
19   A.   Yes.
20   Q.   Your email further states that Bergner wasn't
21 able to clean the phone, but he was able to give
22 Roechner a new phone and that was the phone the FBI
23 seized.
24      That factual piece, is that based on

Page 97

1 information that David Jackson provided you in your
2 March 2, 2020 meeting?
3   A.   Yes.
4   Q.   You have no way to independently verify the
5 truth or the falsity of that allegation; correct?
6   A.   That's correct.
7   Q.   Your email further states that Jackson said
8 Harrison once had asked Chris Botzum to clean his phone
9 during an internal investigation.  Period.
10      Again, is that information from David Jackson?
11   A.   Yes.
12   Q.   Your email states that Chris Botzum was, at
13 the time, assigned to the FBI cyber crimes tasks force
14 and had the knowledge of how to do such a thing.
15 Period.
16      Information given to you by Detective Jackson?
17   A.   Yes.
18   Q.   And then your email further states, point
19 being, comma, officers know whom to go to in the event
20 they need a cell phone clean at the Joliet Police
21 Department and have done so in the past.  Period.
22      Is that something you wrote in the email to
23 Cassandra concerning your March 2, 2020 meeting with
24 Jackson?

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021                                    Pages 98..101

Page 98

1   A.  Yes.
2   Q.  And is that information that Jackson gave you?
3   A.  Yes.
4   Q.  As you sit here today you have no way to
5   independently verify the truth or falsity of such a
6   statement; correct?
7   A.  Correct.
8   Q.  Officer Crowley, when you were preparing this
9   email, based on the notes, did you prepare it in one
10  sitting or did you prepare some and come back to it?
11  How did you actually write it?
12  A.  I just composed the email when I was done with
13  the meeting and sent it over, just in one sitting.
14  Q.  And again, you're certain that no one else,
15  including Hall Adams, Cassandra, or anyone else had any
16  input into the content of this email?
17  MR. ADAMS:  Asked and answered.
18  BY MS. PROCTOR:
19  Q.  You're certain of that?
20  A.  Certain.
21  Q.  Okay.  Paragraph 10 indicates that -- and
22  we're getting toward the end, I assure you, Paragraph
23  10 -- well, did you -- first of all, this is numbered.
24  Did you number the paragraphs in your email?

Page 99

1   A.  Yes.
2   Q.  Why did you do that?
3   A.  To separate the points, just to clear
4   penmanship, I guess, if you want to call it.
5   Q.  So Paragraph 10 of your email indicates, it
6   should be noted that at the time of all of this, the
7   officers that either had copies of the video, watched
8   the video or helped conceal evidence of the video all
9   were either promoted and/or reassigned to highly sought
10  after and prestigious police units of their choice
11  afterwards.  Period.
12      That entry in this email, is that your thought
13  or --
14  A.  Yes.
15  Q.  -- is that something that Jackson told you?
16  A.  No, that's mine.
17  Q.  And you wanted Cassandra's lawyer to be aware
18  of that?
19  A.  Yes.
20  Q.  Why?
21  A.  I think that's noteworthy.  From the
22  information that I was just given from Dave Jackson and
23  those officers that were named, I just took note that
24  there was a connection between their potential

Page 100

1   involvement in this incident and their later and
2   subsequent promotions, given specifically by Al
3   Roechner.
4   Q.  So for that reason you believed it was
5   important to note that for Cassandra's lawyer and her
6   lawsuit; correct?
7   A.  Yes.
8   Q.  Okay.  And then you go through a list of
9   people identifying their promotions.  Do you recall
10  doing that?
11  A.  Yes.
12  Q.  And that included Gavin, Grizzle, Bergner,
13  Reid, Harrison, Batis and Powers?
14  A.  Yes.
15  Q.  You went through what they were promoted to.
16  What did you base that information on?  Just -- like how
17  did you come to know that information?
18  A.  How did I come to know what they were promoted
19  into or?
20  Q.  Yeah.  Well, let's do it this way.  Darrell
21  Gabin, lieutenant of investigations promoted to deputy
22  chief of investigation.  How did you come to know that
23  information?
24  A.  It's general information.

Page 101

1   Q.  Common knowledge?
2   A.  Yeah.  I mean, they send out department emails
3   when people get promoted or assigned to different
4   assignments.
5   Q.  Okay.  You also indicate that Edward Grizzle
6   JPD, of course, meaning Joliet Police Department,
7   detective sergeant of investigations was reassigned to
8   the tri-county auto theft task force.
9       And how did you come about that information?
10  A.  Again, general information sent out in a
11  department email.
12  Q.  You also indicate that Philip Bergner, IT
13  officer, reassigned to the FBI cyber crimes unit.
14      How did you come about that information?
15  A.  Same answer as the last.
16  Q.  Marc Reid, internal affairs, lieutenant,
17  promoted to deputy chief.  Same answer?
18  A.  Yes.
19  Q.  Lieutenant -- well, Jeremy Harrison,
20  lieutenant on midnight patrol, reassigned to lieutenant
21  of the Joliet narcotics unit.
22  A.  Same answer.
23  Q.  Common knowledge?
24  A.  Yes.

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 102..105

Page 102

1    Q.   Mike Batis, lieutenant of investigations,
2 promoted to deputy chief.  Same answer?
3    A.   Same answer, yes.
4    Q.   Tim Powers, midnight patrol sergeant,
5 reassigned to the tactical unit?
6    A.   Same answer.
7    Q.   Is that considered a promotion, in your
8 opinion?
9    A.   Yes.
10    Q.   Okay.  There are -- we just went through the
11 first ten paragraphs of your email.  There is a total of
12 19 paragraphs.  How long did it take you to actually
13 type all of this up?
14    A.   I don't know.
15    Q.   What is your best estimate?
16    A.   I mean, the notes were already written so I
17 just kind of copied them into the email and sent the
18 email over.  I don't know about a time limit.  Less than
19 an hour.
20    Q.   Okay.  Paragraph 11 of your email describes --
21 it says, Jackson stated the standard procedure of
22 downloading contents of a cell phone are, and then there
23 are four solid bullets which describe the Cellebrite
24 system.

Page 103

1        Do you recall drafting that information?
2    A.   Yes.
3    Q.   So any information regarding how the
4 Cellebrite worked would have been provided to you by
5 David Jackson; correct?
6    A.   That's correct.
7    Q.   Okay.  You, yourself, knew nothing of the
8 Cellebrite system or how it operated; correct?
9    A.   That's correct.
10    Q.   Okay.  Paragraph 12 of your email indicates
11 that Jackson said, in Cassandra's case the contents of
12 her phone were not deleted from the system for some time
13 and he believes they were only deleted just prior to the
14 FBI raid.
15        Again, is that information given to you by
16 Jackson?
17    A.   Yes.
18    Q.   Do you know how he came about that
19 information?
20    A.   No, I don't.
21    Q.   You have no way of verifying the truth or
22 falsity of this information; correct?
23    A.   That's correct.
24    Q.   Your email in Paragraph 13 states, by not

Page 104

1 deleting the contents of the phone, the video was able
2 to be viewed by anyone who wanted to view it.  Period.
3        Do you remember writing that in your email?
4    A.   Yes.
5    Q.   Again, was that information provided to you by
6 David Jackson?
7    A.   Yes.
8    Q.   Do you know how he came about that
9 information?
10    A.   No, I do not.
11    Q.   Do you know whether that's true or false?
12    A.   I don't know.
13    Q.   Paragraph 14 of your email indicates, Jackson,
14 and it said Detective Don McKinney, recorded the video
15 to his phone and was showing other detectives.
16        Do you recall including that information in
17 your email to Cassandra?
18    A.   Yes.
19    Q.   To be clear, that was information provided to
20 you by David Jackson; correct?
21    A.   Correct.
22    Q.   And as you sit here today you do not know how
23 Detective Jackson came about that information; correct?
24    A.   Correct.

Page 105

1    Q.   Nor do you know whether the statement or that
2 information was true or false; correct?
3    A.   Correct.
4    Q.   Paragraph 15 of your email indicates, it
5 should be noted McKinney was recently suspended for an
6 incident involving an officer who, prior to being an
7 officer, starred in a pornography video in which
8 McKinney was showing the video to other officers.
9 Period.
10        Do you remember including that information in
11 your email to Cassandra to give to her lawyer?
12    A.   Yes.
13    Q.   This information, in particular, what is the
14 source of that information?
15    A.   I actually know that officer so I had
16 knowledge that that already had occurred.  And I
17 believe -- usually when officers get suspended there's a
18 department email that comes out that says, this officer
19 was suspended for violation of department rules and
20 regulations.  It doesn't get into the specific nature of
21 that suspension, but I already had knowledge of that
22 information.
23    Q.   Who is this other officer referenced in your
24 email?

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 106..109

Page 106

1 A. The one that was in this video?
2 Q. Yes.
3 A. His name is Officer Pete Ranstead.
4 R-A-N-S-T-E-A-D.
5 Q. And is Officer Ranstead currently with the
6 Joliet Police Department?
7 A. Yes.
8 Q. How did you learn about the facts, if you
9 will, which led to McKinney's suspension?
10 A. Officer Ranstead told me about them.
11 Q. Okay. Did you ever see this pornography
12 video?
13 A. No.
14 Q. Did he describe the pornography video?
15 A. Yes.
16 Q. Tell us about his description of the content
17 of the video.
18 A. From my understanding Pete was -- it was in
19 like a show, like a reality show on Playboy TV. This
20 was prior to him being a police officer. And somehow
21 somebody got ahold of this episode that he stared in and
22 Don McKinney got ahold of it and was passing it around.
23 Q. When did this occur, if you know?
24 A. Gosh, I don't recall when that occurred.

Page 107

1 Q. Well, to your knowledge was this alleged
2 occurrence involving McKinney and this video, was it
3 before or after the search warrant was issued for
4 Cassandra's cell phone?
5 A. Oh, it was after.
6 Q. Do you know -- do you have any more details
7 about that alleged incident?
8 A. Just that I know that there was no contact
9 orders issued in the police department between Officer
10 Ranstead and Officer McKinney. I know that Officer
11 Ranstead had made a complaint about Officer McKinney
12 because apparently Officer McKinney was showing this
13 around the police department.
14     Officer Ranstead told me that there was a -- I
15 think it was at a golf outing, so this might have been
16 at summertime. That Officer Ranstead was standing in
17 line with his wife to get something and Officer McKinney
18 was playing the video behind them. Apparently Officer
19 Ranstead's wife wasn't aware of this video so that kind
20 of sparked off Ranstead to file a complaint on Officer
21 McKinney.
22 Q. What was shown in this video? I might have
23 missed that. I know you described it as pornography.
24 A. That I don't know. I just know it was Officer

Page 108

1 Ranstead having sex with another woman, but this was
2 like on a cable -- like a -- like a -- I think it was
3 Playboy TV.
4 Q. Now, were you close with Officer Ranstead?
5 A. I am.
6 Q. And is that why he chose to share the
7 information with you? That's rather private
8 information, isn't it?
9 A. It is, but, like, everybody knew about it. I
10 had heard about it prior to Officer Ranstead telling me
11 about it and then he had just called me and reached out
12 to me and was just, you know, talking about it.
13 Q. But you're certain that -- I'm just trying to
14 get a time frame on, like, you believe it was after --
15 would it have been after Cassandra's lawsuit was filed?
16 A. Yes.
17 Q. The rumors and then this conversation with --
18 like, the rumors regarding McKinney's alleged, I guess,
19 sharing of this video and the conversations with
20 Ranstead were all after Cassandra filed her lawsuit;
21 correct?
22 A. Yes.
23 Q. All right. But you have no personal knowledge
24 regarding any of those events; correct?

Page 109

1 A. Which events?
2 Q. The McKinney/Ranstead issues.
3 A. Other than what Officer Ranstead told me.
4 Q. Did you ever talk to McKinney about it to get
5 his side of the story?
6 A. No.
7 Q. And you've had no way to independently verify
8 the truth or falsity of those facts; correct?
9 A. All I know is that Officer McKinney was
10 suspended for that incident.
11 Q. Do you know for how long?
12 A. I don't recall for how long, but it would have
13 been in the department email.
14 Q. Okay. Moving on, your email indicates that, I
15 have been told by several officers at different times
16 that McKinney is going to, quote, fall on the sword, end
17 quote, for this case and admit to being the one who
18 downloaded the video and passed the video around in
19 order to protect higher level officers in exchange for a
20 promotion, slash, assignment to unit of choice. Period.
21     Is that you making that statement where it
22 says, "I have been told"?
23 A. I think what I meant -- I think I was
24 reiterating what Dave Jackson had told me. I've never

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 110..113

---

Page 110

1 personally been told that so that's potentially a typo
2 or a clerical error on my part, but I was never
3 personally told that by anybody.
4    Q.  So you believe it should -- it would be more
5 accurate to say Jackson told you that several officers
6 had told him that McKinney is going to fall on his
7 sword, et cetera?
8    A.  Yes.
9    Q.  Okay. Again, that's not information that
10 anyone has ever told you, personally, directly; correct?
11    A.  Correct.
12    Q.  All right. Your email further states that,
13 Jackson stated the Joliet Inspector General, Chris
14 Regis, conducted an internal investigation into this
15 matter in which several detectives did admit to either
16 watching the video or had knowledge as to whom had
17 copies of the video. It should be noted that only,
18 quote, blue shirt, end quote, detectives were questioned
19 by Regis and no supervisor or command level officers
20 were.
21    Let's talk about that. The information that I
22 just read, is that information that was provided to you
23 by David Jackson or --
24    A.  Yes, by David Jackson.

---

Page 111

1    Q.  Okay. So you, yourself, had no personal
2 knowledge regarding any of that information; correct?
3    A.  That is correct.
4    Q.  And you have no way of verifying the truth or
5 falsity of that information; correct?
6    A.  Correct.
7    Q.  Paragraph 18 of your email indicates that,
8 Jackson stated he can provide information as to which
9 officers should be deposed because of their personal
10 firsthand knowledge of the incident and because of their
11 willingness to tell the truth if put under oath. It is
12 unknown if Jackson can, slash, will be deposed, due to
13 his current pending lawsuit.
14    Again, is that information provided to you by
15 David Jackson?
16    A.  Yes.
17    Q.  And Paragraph 19, and it's the final paragraph
18 of your email, indicates that, Jackson highly
19 recommended that Cassandra's attorney send preservation
20 letters to the department because he believes Roechner's
21 phone and some of the hard copies of the video are still
22 somewhere in the department, but acknowledge some time
23 has passed and those items could have been destroyed.
24 Period.

---

Page 112

1    A.  That's correct.
2    Q.  Okay. The information that I just read, the
3 sole source of that information is Dave Jackson;
4 correct?
5    A.  Yes.
6    Q.  And you, yourself, have no independent means
7 or way of verifying the truth or falsity of that
8 information; correct?
9    A.  Correct.
10    MS. PROCTOR: Okay. This could be a good time for
11 a five-minute break. I think I'm almost concluded with
12 my portion of the questions. We've been going awhile,
13 so I don't know how we want to handle it, and I'm sure
14 Matt Clark has some questions as well.
15    So do we want to take a short break or keep
16 going?
17    THE WITNESS: I'm good with whatever you guys want
18 to do.
19    MS. PROCTOR: I'm flexible, too.
20    MR. CLARK: I'm good with just going on.
21    MS. PROCTOR: So let's just take a quick just,
22 like, a five-minute break and resume.
23      (Short break was taken.)
24

---

Page 113

1 BY MS. PROCTOR:
2    Q.  All right. Officer Crowley, we are back on
3 the record and I just wanted to ask you a couple
4 different questions.
5    The email that you prepared that we've been
6 discussing earlier, do you know whether Cassandra read
7 it before she sent it to her attorney?
8    A.  I don't know for sure. I'm assuming she did,
9 but I don't know.
10    Q.  Okay. Other than your email, Officer Crowley,
11 do you know whether anyone ever told Cassandra to
12 preserve her cell phone and the contents, which are the
13 subject of this lawsuit?
14    A.  I don't know.
15    Q.  How long did you say that it actually took you
16 to type up this 19 paragraph single-spaced email?
17    MR. ADAMS: Objection. Asked and answered.
18 BY MS. PROCTOR:
19    Q.  And if you did, I'm sorry. I didn't get it.
20    A.  I don't remember. Less than an hour. I don't
21 really know.
22    Q.  Okay. And were there any other drafts, other
23 than the email you sent to Cassandra who in turn gave it
24 to her lawyer?

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 114..117

Page 114

1   A.   No.
2   Q.   So this was just one continuing email.  It
3   wasn't saved or, you know, there weren't other versions
4   of it?
5   A.   No.
6   Q.   And you don't know whether you retained the
7   original email?
8   A.   I would have to look.  I don't know.
9   Q.   Okay.  You know, we're going to ask – we can
10  put it in a letter if you like, but on the record I just
11  want to make a formal request that we get the actual
12  email, not the cut and paste of the email, but the email
13  from Mr. Adams.  So we'll be following up on that.  And
14  we'd ask that you not delete or permanently destroy any
15  of your emails, and in particular, this one.
16       Did you make any revisions to the email after
17  it had been sent to Cassandra?
18  A.   No.
19  Q.   Did you make any revisions to your email dated
20  March 2, 2020 – I mean, it's not actually the date the
21  email was sent, but it indicates – my understanding was
22  your email was prepared and sent the same day as your
23  first meeting with David Jackson, which was on March 2,
24  2020.

Page 115

1        Do I have that right?  Was this all done on
2   the same day, Officer Crowley?
3   A.   Yes.
4   Q.   Okay.  So your email dated March 2, 2020, to
5   Cassandra, were there any revisions to that at any point
6   in time after it was sent to her initially?
7   A.   No.
8   Q.   Did you show that email to anyone other than
9   Cassandra and then perhaps her lawyer?
10  A.   No.
11  Q.   To be clear, Mr. Adams or anybody else didn't
12  have any input into the content of your email dated
13  March 2, 2020; right?
14       MR. ADAMS:  Objection.  Asked and answered for the
15  fourth time.
16  BY MS. PROCTOR:
17  Q.   Yeah, I want to clarify it.  Do I have that
18  right?
19  A.   That's correct.
20  Q.   Why did you chose to join the Black Police
21  Officers Association or Organization, you know, in 2020
22  and not before?
23  A.   No reason in particular.  I just – like I
24  said, every year they put something out or every couple

Page 116

1   of years or something like that they put a flyer in
2   everybody's mailbox asking if they want to join, so I
3   decided to join.
4   Q.   Just because?
5   A.   I support what they do.  I support their work.
6   I support the officers that are a part of that
7   organization and I just wanted to be a part of that.
8   Q.   And Jackson is part of that organization?
9   A.   He's the president.
10  Q.   And was he president at the time of your
11  meetings in March and May of 2020 concerning the
12  allegations which are the subject of your wife's
13  lawsuit?
14  A.   Yes.
15  Q.   And he currently holds that position?
16  A.   Yes.
17  Q.   Is that an elected position?
18  A.   Yes.
19  Q.   In other words, like you're a member of that
20  organization and then you would have input – you'd vote
21  on who gets to be the president?  Is that how it works
22  or –
23  A.   Yes.
24  Q.   – tell me.

Page 117

1   A.   Yes.
2   Q.   Do you know how long – like, what the
3   election cycle is, if you will, for that position?
4   A.   I do not know.
5   Q.   Okay.  Did you ever have to vote in an
6   election in support of Jackson?
7   A.   No.
8   Q.   Do you know whether or not David Jackson has a
9   reputation for trustworthiness within the Joliet Police
10  Department, if you know?
11       MR. ADAMS:  Objection to foundation.
12  BY THE WITNESS:
13  A.   I don't know.
14  Q.   You don't know one way or the other?
15  A.   I don't know.
16  Q.   Do you know whether or not Jackson is
17  trustworthy?
18       MR. ADAMS:  You are asking for his opinion?
19       MS. PROCTOR:  Yeah, his opinion.
20  BY THE WITNESS:
21  A.   I trust him, yeah.  I don't have a reason not
22  to trust him.
23  Q.   Well, what do you base the trust on?
24  A.   I mean, his reputation in the police

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 118..121

Page 118

1 department, as far as I know, is -- you know, he's a
2 detective. He's solved several high-profile homicides
3 in the city. He's held several different positions in
4 undercover work. So I just based it off of that.
5    Q.   You based it off his work experience and work
6 results?
7    A.   Yes.
8    Q.   I mean, you have no way of knowing whether
9 David Jackson -- the information that he was feeding you
10 was true or not; correct?
11    MR. ADAMS: Objection. Asked and answered.
12 BY THE WITNESS:
13    A.   That's correct. I have no way of verifying
14 anything.
15    Q.   But you believed what he told you; correct?
16    A.   I don't have any way of verifying it. I was
17 just passing the information along, you know.
18    Q.   Did you believe that the information may be
19 helpful to Cassandra's lawsuit?
20    A.   Yes.
21    Q.   And I think you mentioned earlier that this
22 lawsuit, you know, could be potentially expensive,
23 something along those lines. Do you remember saying
24 that before?

Page 119

1    A.   Yes.
2    Q.   What did you mean by that?
3    A.   Well, when the lawsuit was initially filed I
4 believe there was like a price for every single -- I
5 mean, like a hundred thousand dollars or something like
6 that per count. And when you added them up it was like
7 close to $1.5 million. So that's what I meant by that.
8    Q.   So it is your understanding, and I realize you
9 are not a lawyer, but it's your understanding that the
10 value of this lawsuit could potentially be $1.5 million
11 if Cassandra is ultimately successful?
12    A.   Yes.
13    Q.   Did you encourage Cassandra to move forward
14 with this lawsuit?
15    A.   We discussed what she should do.
16    Q.   And what were your discussions?
17    A.   Well, we discussed reporting this to internal
18 affairs. We discussed consulting with attorneys. And
19 we ultimately -- well, we, you know, discussed all of
20 those options and she chose to consult with an attorney.
21    Q.   Did Cassandra report any of these issues that
22 came to her attention to the office of internal affairs
23 within the Joliet Police Department?
24    A.   No.

Page 120

1    Q.   Why not?
2    A.   Because the information that she was provided
3 in her letter indicated officers that were a part of the
4 internal affairs investigation and officers that had
5 high ranking authority in the Joliet Police Department.
6 And we both agreed that it would not be a good idea to
7 report that because if this is true, they are directly
8 involved in this and they're not going to properly
9 investigate that.
10    Q.   That was an assumption both you and Cassandra
11 made; correct? Right or wrong you made; right?
12    A.   Right.
13    Q.   Now, the officers in internal affairs who
14 were, as you say, were potentially involved in this were
15 who?
16    A.   Lieutenant Marc Reid.
17    Q.   Anyone else from internal affairs or is that
18 it?
19    A.   There's two in internal affairs, I believe.
20 At the time it was -- I think Sergeant Rouse was the
21 other officer in internal affairs. But since, you know,
22 Marc Reid was the lieutenant and ultimately in charge of
23 internal affairs, his name was given to us in that
24 letter and then, you know, subsequent meeting that I had

Page 121

1 with Dave Jackson, and Carlos Matlock, his name was also
2 brought up. So it just was decided that that wouldn't
3 be a good idea, if this is in fact true.
4    Q.   And the high ranking people in authority that
5 you mentioned a reason for not reporting this internally
6 were who?
7    A.   Al Roechner, Tab Jensen, Brian Benton, Marc
8 Reid.
9    Q.   Is that it?
10    A.   Yes.
11    Q.   Did you consider reporting it to -- you know,
12 outside of the department to, for example, the State
13 Police, the Department of Justice, FBI, some other
14 agency outside of the city of Joliet? Was that
15 considered?
16    A.   Yes.
17    Q.   And why didn't you do that?
18    A.   Well, we decided that it would be best to just
19 consult with an attorney as to what our options would
20 be. I mean, you know, it just seemed like, you know,
21 the right way to go, I guess.
22    Q.   When you say we consulted with an attorney to
23 see what our options would be, do you mean your and
24 Cassandra's legal options?

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 122..125

Page 122

1    A.  Yes.  Hers mostly, yes.
2    Q.  Is there some reason you are not a plaintiff
3 in this lawsuit?
4    A.  I don't know.  I didn't -- you know, at first,
5 you know, my name is mentioned in there and it's a video
6 that I'm in and, you know, so that's why we were both in
7 talks about that, but I don't know.
8    Q.  So you don't know why you're not a plaintiff?
9    A.  That's correct.
10    Q.  Is that right?  Would you like to be a
11 plaintiff in this lawsuit?
12    A.  No police officer wants to be involved in
13 anything other than what we already have to be involved
14 with.  So, you know, this is her lawsuit and I'm just
15 here to support her.
16    Q.  The attorney that you say we consulted with,
17 other than Hall Adams, did you consult with any other
18 attorneys?  I do not want to know what you discussed.  I
19 just want you to answer that narrow question which is,
20 did you and/or Cassandra consult with any other
21 attorneys?
22    A.  Yes.
23    Q.  Can you identify the names of those attorneys?
24 Again, I do not want to know any discussions.

Page 123

1    A.  Jeff Tomczak.
2    Q.  And who is Jeff Tomczak?
3    A.  He is an attorney that represented me in my
4 case.
5    Q.  Were you present for the discussions with
6 Cassandra and Attorney Tomczak?
7    A.  No.
8    Q.  And have you ever been present for any
9 discussions between Cassandra and her attorney in this
10 civil lawsuit, Hall Adams?
11    A.  Just the initial first time we met with
12 Mr. Adams.
13    Q.  Okay.  And when was that?
14    A.  I don't recall when that was.  It would have
15 been shortly after she received the letter in her
16 mailbox, probably within weeks of that.
17    Q.  And how did you get Paul Adams' name?
18    MR. ADAMS:  Objection.  Instruct him not to answer
19 where the source of the information came from.
20    MS. PROCTOR:  You are dead wrong.  You are dead
21 wrong.  This is not subject to the attorney/client
22 privilege.  So I ask you, counsel, do you want to
23 reconsider your instructing this witness not to answer?
24    MR. ADAMS:  No.

Page 124

1 BY MS. PROCTOR:
2    Q.  Do you understand the question, Officer
3 Crowley?
4    A.  No.  Can you say it again?
5    Q.  My question is how did you get -- well, how
6 did you get the name or who -- well, who gave you the
7 name of Hall Adams as a potential layer to discuss your
8 and Cassandra's legal options?
9    MR. ADAMS:  My specific objection is if it was a
10 referral from a lawyer to whom you had gone for legal
11 advice, it is protected as such, and you should not
12 answer the question.
13    MS. PROCTOR:  Okay.  But I'm just laying a
14 foundation.
15 BY MS. PROCTOR:
16    Q.  Do you understand the question?  I'm not
17 asking you to answer it.
18    A.  I do.
19    Q.  And are you refusing to answer the question on
20 advice of your counsel, Mr. Adams?
21    A.  Yes.
22    Q.  The actual civil complaint in this case,
23 Officer Crowley, was filed on August 21 of 2018, for
24 point of reference.  So my question to you is, when did

Page 125

1 you and Cassandra meet with Hall Adams?  You said you
2 were present for the initial meeting and that was it,
3 right?  So my question is, when did that meeting take
4 place?
5    A.  Then it must have been sometime either in late
6 July or early August.
7    Q.  So it was shortly before the civil lawsuit was
8 filed; correct?
9    A.  Yes.
10    Q.  Were you aware that when the lawsuit was filed
11 that your name would be included in the filing and made
12 part of the public record available to the whole free
13 world?  Were you aware of that?
14    A.  Yes.
15    Q.  And were you also aware that the descriptions
16 contained in the civil complaint prepared by legal
17 counsel, that explicit descriptions of videos of a
18 sexual nature being on Cassandra's phone, that that
19 fact -- that those private facts would be publicly
20 disclosed in a civil lawsuit that would be available and
21 accessible to the whole free world?  Were you aware of
22 that?
23    A.  Yes.
24    Q.  Was Cassandra aware of that?

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021                                                                 Pages 126..129

Page 126

1     MR. ADAMS: Objection. Lack of foundation.
2  BY MS. PROCTOR:
3     Q.  If you know.
4     A.  I don't know. I would assume she would be.
5     Q.  And despite your and Cassandra being aware of
6  that, you went ahead and did it anyway?
7     A.  Yes.
8     Q.  And you are aware that as a result of the
9  civil lawsuit being filed incorporating some very
10  private facts about your life and Cassandra's life, your
11  sex lives in particular, that as a result of that legal
12  document being filed in the public record that that
13  document was reported on by various newspaper outlets,
14  including -- well, various newspapers. Were you aware
15  of that?
16    A.  Yes.
17    Q.  Did you anticipate that that could happen if
18  the lawsuit was filed in such a way, using everybody's
19  real names and putting all the dirty little details out
20  there in the public domain?
21    MR. ADAMS: Objection to form. It's argumentative.
22  BY MS. PROCTOR:
23    Q.  Did you understand that that could happen?
24    A.  Yes.

Page 127

1     Q.  Did that give you or Cassandra any pause or
2  cause for concern before you went ahead and authorized
3  it?
4     MR. ADAMS: Object to form and foundation as to
5  Cassandra.
6  BY THE WITNESS:
7     A.  I can't answer for her, but I was aware of it,
8  yes.
9     Q.  Did that give you any pause?
10    A.  No.
11    Q.  Did you think by including private facts in
12  the public record would keep them private or make them
13  more public?
14    A.  I don't understand your question.
15    Q.  I mean, did you understand by having private
16  facts -- well, have you actually read the allegations in
17  the complaint?
18    A.  Yes.
19    Q.  And did you review them before the actual
20  civil complaint was filed and made part of the public
21  record by your lawyer in Cassandra's lawsuit?
22    A.  No.
23    Q.  You didn't have an opportunity to do that
24  beforehand?

Page 128

1     A.  I didn't. I don't know if Cassandra did or
2  not, but I didn't.
3     Q.  Okay. Would you agree that by filing the
4  lawsuit, which included some very explicit private facts
5  about your life, Cassandra's life, your sex life, that
6  by including that in the public record that that
7  actually helped facilitate the publication of that
8  information?
9     MR. ADAMS: Object to form and to foundation.
10  BY THE WITNESS:
11    A.  Is your question -- are you asking me if the
12  fact of the details of this case helped it become more
13  public, like, a better read for the media to report on?
14    Q.  Well, it would disclose to the media in the
15  first instance.
16    A.  I guess I don't understand your question. I
17  understand that by -- I did understand that you, know,
18  this was going to be made public and, yes, details were
19  going to come out. Yes, I was well aware of that and so
20  was Cassandra.
21    Q.  Officer Crowley, Paragraph 29 of Cassandra's
22  lawsuit states or alleges that upon information and
23  belief senior leaders and/or supervisors of the city's
24  department of police have been aware of and acquiesced

Page 129

1  and participated in the viewing, dissemination and
2  rerecording of the private images on plaintiff's iPhone,
3  but have not been disciplined any of the police
4  officers -- but have not disciplined any of the police
5  officers or staff involved. That's from Paragraph 29 of
6  the complaint.
7        And my question to you is, what knowledge or
8  information, if any, do you have that senior leaders
9  and/or supervisors of the city's department of police
10  were aware of or acquiesced in or participated in the
11  viewing, dissemination and rerecording of the nude
12  photographs and sex videos that we've been discussing
13  here today?
14    MR. ADAMS: Object to form.
15    MS. PROCTOR: You can go ahead and answer.
16  BY THE WITNESS:
17    A.  The same answer I gave with the other
18  questions about the information Dave Jackson gave me. I
19  don't have any knowledge of that.
20    Q.  And the additional allegations in Cassandra's
21  complaint, specifically at Paragraphs 33, 34 and 35,
22  where they talk about the search and seizure of
23  plaintiff Cassandra's iPhone, that that was done without
24  probable cause and that it violated her Fourth Amendment

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 130..133

Page 130

1 rights.
2      What is the source of that information, if you
3 know, Officer Crowley?
4     MR. ADAMS: Object to form and to foundation.
5     MS. PROCTOR: I can rephrase it.
6 BY MS. PROCTOR:
7     Q. What, if any, factual information do you have
8 that there was an unlawful search and seizure of
9 Cassandra's cell phone and subsequent publication,
10 republication, dissemination of the private images we've
11 been discussing, by any of the potential John Doe
12 defendants named in this lawsuit?
13     MR. ADAMS: Object to form, to foundation and it
14 calls for a legal conclusion.
15 BY THE WITNESS:
16     A. So are you asking me my opinion of that bullet
17 point in the complaint, the lawsuit?
18     Q. That's a good question and actually I'm not.
19 I'm asking what, if any, factual information do you have
20 to support that any of the John Doe defendants named in
21 this lawsuit viewed, publicized, shared, disseminated
22 any of the private images from Cassandra's cell phone
23 that we've been discussing here today?
24     A. I don't have any.

Page 131

1     Q. How would you describe your relationship with
2 your mother-in-law, Patricia Socha?
3     MR. ADAMS: Is this relevant?
4     MS. PROCTOR: This is a discovery deposition.
5 What's the basis of your objection? Relevance? It's
6 not --
7     MR. ADAMS: It would be relevance.
8     MS. PROCTOR: So noted.
9 BY MS. PROCTOR:
10     Q. You can answer the question, Officer Crowley.
11     A. I love my mother-in-law.
12     Q. In 2017, 2018, before you were married, how
13 would you describe your relationship with Cassandra's
14 mother, Patricia? I'm not asking whether you love her.
15 I'm asking you to describe your relationship with her,
16 focusing on those years, 2017, 2018.
17     MR. ADAMS: Objection. Relevance.
18 BY THE WITNESS:
19     A. It was great.
20     Q. No issues?
21     A. No.
22     Q. Officer Crowley, can you tell us what impact,
23 if any, the events which are the subject of this lawsuit
24 had on your relationship with Cassandra?

Page 132

1     A. Our -- with our relationship in specific?
2     Q. Yes.
3     A. You know, this incident has taken a toll on
4 her and -- which has essentially taken a toll on us.
5 You know, I -- our intimacy -- I have to, you know, I
6 have to talk her through a lot of things sometimes, when
7 it comes to this. I've seen a dramatic change in her
8 motivation, in her character, in her trustworthy of
9 where we work and who we work for. I have seen a lack
10 of motivation for her, you know, in this career. I've
11 seen just a change, in a negative way. It impacted her
12 greatly and has affected our relationship.
13     Q. Give me more specific about -- I'm going to
14 talk -- I want to talk a little bit more about your
15 observations about Cassandra. So just kind of put those
16 aside, part of this conversation. What -- can you be
17 more specific about how these events have impacted your
18 relationship?
19     MR. ADAMS: Object to form. Ask him a better
20 question.
21 BY MS. PROCTOR:
22     Q. Do you understand the question, Officer
23 Crowley?
24     A. Yes. It's just -- it's taken its toll. It's

Page 133

1 something that I -- you know, she's experiencing that I
2 don't experience. She's a female police officer in a
3 male dominated profession and she -- she's objectified
4 now and she has to take orders from these individuals.
5     When we became pregnant she had to report
6 directly to Darrell Gavin and inform him that she's
7 pregnant and that she requested light duty. And she
8 just would -- she just was a mess. She'd cry and she
9 didn't want to do that. She wished she didn't have to
10 do that. She regularly had to have contact with him
11 about, you know, her status as being pregnant. And I
12 cannot imagine what that must have been like for her.
13 And as her husband, and as just a police officer that
14 works there, you know, I had to -- I had to support her
15 on that, you know.
16     Q. So maybe I'm a little unclear. What does the
17 fact that she was pregnant and had to request light duty
18 or request some work accommodations from Gavin have to
19 do with the allegations or the subject matter of this
20 lawsuit? Help me understand that.
21     A. Well, if the allegations are true, Darrell
22 Gavin made a pretty inappropriate comment about her,
23 seeing her in some pretty private matters and now she
24 has to tell him that she's pregnant. I don't think I

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 134..137

Page 134

1 have to go into any more further description other than
2 that. That's -- I can't imagine having to do that.
3    Q.   To tell him that she's pregnant? What, proof
4 that she had sex? I mean, I don't get it. I mean, you
5 know, tell me -- and I suppose what's most important
6 here is what your understanding of why that was an issue
7 for Cassandra. That's the most important thing here and
8 what I'm trying to get to the bottom of here.
9    MR. ADAMS: Objection to form. It's argumentative.
10 BY MS. PROCTOR:
11    Q.   So can you articulate for us why, other than
12 what you've already testified to, that was an issue for
13 Cassandra and then we can move on?
14    A.   Yeah, I don't really have anything more to say
15 than that.
16    Q.   Okay. Well, you also said later that she is
17 objectified now. Can you explain what you mean by that?
18    A.   I said she feels objectified.
19    Q.   Okay.
20    A.   She feels objectified.
21    Q.   What does that mean though, to feel
22 objectified?
23    A.   Well, I mean, as far as a female is concerned,
24 this is her explaining these things, you know, she

Page 135

1 believes that this happened, and so do I, and now she
2 has to be at work with these male co-workers, superiors,
3 that order her around, that she has to take orders from,
4 that seen her in a private, intimate, sexual moment with
5 me. And in her -- you know, and this is just what she
6 has told me, you know, that just -- it takes away her
7 ability to do her job the right way. She feels
8 objectified. She feels that these individuals that seen
9 her pictures and videos, that's what they see of her
10 now. Not a female police officer trying to do her job
11 effectively but as, you know, how they seen her in the
12 videos and pictures.
13    Q.   And these people, individuals, that you've
14 mentioned, can you identify them by name?
15    A.   Al Roechner, Marc Reid, Ed Grizzle, Darrell
16 Gavin.
17    Q.   Are any of them still working at the Joliet
18 Police Department?
19    A.   Ed Grizzle is.
20    Q.   Other than Ed, are any of these individuals
21 that you just mentioned still employed at the Joliet
22 Police Department?
23    A.   Don McKinney is, Brad McKeon is, Mike Batis.
24    Q.   Let's just take -- well, let's -- like

Page 136

1 Grizzle, McKinney, McKeon, Batis, who you just
2 mentioned, these are people that on information from
3 Dave Jackson you and Cassandra believe that these
4 officers were involved in and had seen her -- seen the
5 nude photographs and sex videos on her phone. All
6 right? So what, if any, interactions has Cassandra had
7 with any of these individual since this all came to
8 light?
9    A.   The ones that still work here, specifically?
10    Q.   Well, no, at any time. From when the lawsuit
11 was filed or whenever Cassandra learned about all of
12 this. When -- like, how much interaction has she had
13 with any of the people that you rattled off? And you
14 already talked about Gavin. We'll put him aside.
15    A.   So Al Roechner was our chief of police up
16 until just recently.
17    Q.   So let's take him. On a daily basis what, if
18 any, interaction would she have with Chief Roechner?
19    A.   She would see him routinely when she was
20 working the desk on light duty when she was pregnant.
21 He would wave to her. He would ask her how her day is
22 going.
23         She had to attend training classes that Ed
24 Grizzle would teach and they were mandated training that

Page 137

1 she couldn't get out of. She had to sit in a room while
2 Ed Grizzle was teaching.
3         She would run into like Darrell Gavin, again,
4 when she was on light duty and being pregnant, and have
5 to reach out to him and give him updates on her
6 pregnancy, and things of that nature.
7    Q.   Okay. With respect to Gavin, did she ever
8 request the opportunity to report to someone other than
9 Gavin concerning her light duty requests and any
10 accommodation that she needed due to her pregnancy?
11    A.   It doesn't work that way. There's -- officers
12 are in charge of certain functions in the police
13 department and those are the officers that you have to
14 go to for certain things. And he was that individual in
15 charge of light -- officers on light duty, so she didn't
16 have anyone else to go to.
17    Q.   Of the people who you mentioned, has Cassandra
18 ever told you that any of these individuals did or said
19 anything to her to make her feel objectified or
20 uncomfortable in any way?
21    A.   No.
22    Q.   I know we've talked somewhat about the changes
23 that you've noticed in Cassandra. Other than what
24 you've already testified to, is there anything else that

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 138..141

Page 138

1 strikes you as different about Cassandra, which you
2 relate to the events in question?
3    A.  I would just probably repeat what I said
4 earlier.
5    Q.  Has Sandra received professional help for
6 working through these feelings?
7    A.  Yes.
8    Q.  And has she received continuous counseling
9 since these issues came to light to the present day; if
10 you know?
11    MR. ADAMS:  Object to form.
12 BY MS. PROCTOR:
13    Q.  You kind of cut out a little bit on me,
14 Officer Crowley.
15    A.  Yes, I know she was seeing two counselors for
16 some time and then I know she stopped seeing one of them
17 because that was a psychiatrist or psychologist that was
18 prescribing her medicine to deal with these issues, but
19 we became pregnant so she couldn't be on those anymore
20 so I believe she stopped seeing her.
21    Q.  Do you know the name of that counselor?  And
22 you may or may not.
23    A.  Yes, it's Deb Delrey, D-E-L-R-E-Y.
24    Q.  Okay.  And she's with Edgewood?

Page 139

1    A.  Yes, Edgewood Clinical Services.
2    Q.  Okay.  And do you know when the last time
3 she's received -- Cassandra has received services from
4 anyone at Edgewood?
5    A.  I do not know.
6    Q.  Has she received mental health or counseling
7 services, whatever we want to call it, from any other
8 provider, to your knowledge, during the entire time of
9 your relationship?
10    A.  Yes.
11    Q.  And who else did she receive counseling from?
12    A.  Nicole Johnson.
13    Q.  And who is Nicole Johnson?
14    A.  She's the counselor also with Edgewood.
15    Q.  Okay.  What's, if you know, the difference
16 between the counseling that Debbie Delrey provided and
17 Nicole Johnson provided to Cassandra, if you know?
18    A.  So Nicole Johnson wasn't able to prescribe
19 medicine, so she referred Cassandra to Deb Delrey, who
20 was able to prescribe medicine.
21    Q.  Is Deb Delrey a nurse practitioner?  Is that
22 it, if you know?
23    A.  I don't know what her titles are, but I just
24 know she's able to write prescriptions.

Page 140

1    Q.  What kind of medicine was Sandra prescribed
2 and when, if you know?
3    A.  I don't know.
4    Q.  Do you know if Sandra was taking any
5 medications, antidepressants, or mental-health-related
6 medications before May or June of 2018?
7    A.  I don't know.
8    Q.  You don't know that one way or the other?
9    A.  No, I don't know.
10    Q.  And has Cassandra resumed taking the
11 medication?
12    A.  I -- no, because she's breast feeding.
13    Q.  And Cassandra is currently on maternity leave?
14    A.  Yes.
15    Q.  When does that end?
16    A.  I believe in -- it's soon.  I don't know an
17 exact date.  I think it's sometime in July.
18    Q.  Has she been off -- is it the 12 weeks, give
19 or take?
20    A.  Yes.
21    Q.  Okay.  And this is -- and this is -- she also
22 was on leave during the birth of your first child;
23 correct?
24    A.  Yes.

Page 141

1    Q.  For about the same amount of time?
2    A.  Yes, about.
3    Q.  Have you read any of the newspaper articles
4 concerning the lawsuit?
5    A.  Yes.
6    Q.  When was the first time you read a newspaper
7 article concerning the lawsuit?
8    A.  It would have been when the lawsuit became
9 public.
10    Q.  Okay.  So that was -- it was filed on August
11 21, 2018, so at or near that time?
12    A.  Yes.
13    Q.  In total, to the present date, how many times
14 have you read about Cassandra's lawsuit, the events in
15 question, in a newspaper article?
16    A.  Whenever they -- whenever they're published.
17 I don't know how many.  I think there maybe -- maybe
18 been like four or five since the lawsuit, but I don't
19 know how many.
20    Q.  Did you and Cassandra keep copies of those
21 articles?
22    A.  No.  They're --
23    Q.  Okay.  You're reading them on line, I see.
24 And which publications are you reading them from?  The

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 142..145

Page 142

1 local paper or --
2    A.   I believe it's the Daily Herald.  It's the
3 Joliet Herald, whatever it's called, and then the Joliet
4 Patch.
5    Q.   So there have been articles in both the Daily
6 Herald and the Joliet Patch.  Does Cassandra also read
7 those articles or hear about those articles?
8    A.   She hears about them, but I don't know if she
9 reads them or not.  I know she kind of doesn't like
10 that, so I don't know if she reads them or not.
11    Q.   What impact, if any, do these newspaper
12 articles have on Cassandra?
13    A.   A lot.
14    Q.   Well, how does she hear about them if she
15 doesn't read them?
16    A.   Well, sometimes some of her friends will text
17 her, hey, you're in the Patch again or somebody will
18 just send her the article to her phone.  I'll inform her
19 usually like first off, like, hey, you're famous today.
20 So she can know, so she won't see it for herself or
21 whatever.
22    Q.   You give her a heads up?
23    A.   Yes.
24    Q.   Okay.  And how does she -- she's upset, but

Page 143

1 does she -- you know, how does she deal with it?
2    A.   I know, you know, specifically when she is
3 working the street she tells me she covers her name up.
4 She tries to cover her vest with her name on it so
5 people don't see who she is and recognize her and
6 associate her with, you know, the incident that is going
7 on.
8    Q.   Do you have any knowledge regarding
9 Cassandra's psychological history before you met her?
10    A.   No.
11    Q.   To your knowledge has Cassandra ever applied
12 for any kind of a promotion within the Joliet Police
13 Department?
14    A.   No.
15    Q.   Why not?
16    A.   I don't think -- so a sergeant's test is like
17 every three years, I believe.  You cannot apply when
18 you're on light duty.  So she's been on light duty with
19 the pregnancies for about two years now, not
20 continuously.  And then prior to that, you know, we were
21 new -- newer here and we were not ready for that yet.
22    Q.   You're not ready for the additional
23 responsibility that goes along with being a sergeant; is
24 that fair to say?

Page 144

1    A.   When we were younger, when we were newer here
2 it's just not appropriate to do that.  You've got to get
3 your feet wet first.
4    Q.   What about you, have you ever taken a
5 sergeant's exam?
6    A.   Not yet, no.
7    Q.   Is that something that you intend to do in the
8 future?
9    A.   The next one that comes out I am, yes.
10    Q.   When is the next one, if you know?
11    A.   I believe this current list that is out
12 expires in 2023.  So 2023 and then I'm going to apply
13 for it then.
14    Q.   Has Cassandra explored employment
15 opportunities outside of the Joliet Police Department?
16    A.   I don't believe she has explored them.
17    Q.   Is that something that you and her have ever
18 discussed as an option?
19    A.   Yes.
20    Q.   And is there some reason why she hasn't
21 explored other employment opportunities?
22    A.   I don't know.
23    Q.   Before you and Cassandra were married did you
24 and her attend couples counseling through Edgewood?

Page 145

1    A.   Yes.
2    Q.   And during what time period did you do that?
3    A.   It was when we first started -- I believe it's
4 when I moved in or shortly thereafter, possibly before,
5 but kind of when, you know, we realized that this was
6 going to be -- we were going to give it a go, as you
7 might say.
8    Q.   And just what was the nature of the issues
9 that you were dealing with in the couples counseling;
10 just generally speaking?
11    A.   There was no issues.  Cassandra had come to me
12 because I was -- you know, I'm divorced and I had two
13 children.  So Cassie came to me and just wanted to
14 proactively seek a counselor's advice and kind of guide,
15 more her, how to do this now.  You know, how do we bring
16 children into -- because this was the first time that I
17 was doing that, too, so we just wanted to proactively
18 seek guidance on how to do this the right way so we
19 could be prepared for that.
20    Q.   Was it helpful?
21    A.   Yes.
22    Q.   Since May or June of 2018 have you and
23 Cassandra attended any other counseling?
24    A.   Yes.

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 146..149

Page 146

1 Q. When was that?
2 A. I attended counseling around that time, 2018,
3 2019, and I believe we did together also around that
4 time also.
5 Q. Was it -- did you attend individual
6 counseling --
7 A. Both.
8 Q. -- around that time?
9 A. Yes, both. We both did and then we did
10 couples counseling also.
11 Q. Okay. I know, you know, I thought -- can you
12 be any more specific in terms of the time frame that
13 you've just been speaking of? Was it before or after
14 May of 2018?
15 A. After.
16 Q. Do you know how long after? Was it days,
17 weeks, months --
18 A. Oh, months.
19 Q. -- years?
20 A. Months.
21 Q. And what was the nature of the -- you know,
22 why was counseling sought, generally speaking?
23 A. Well, I mean, you know, there was -- my case
24 is what sparked that.

Page 147

1 Q. Your criminal matter?
2 A. Yes.
3 Q. Okay. But any other reason you and Sandra,
4 either individually or as a couple, a unit, went to
5 counseling after May of 2018?
6 A. No.
7 Q. Other than what we've already discussed here
8 today, Officer Crowley, have you observed any other
9 differences or changes or impact, in your view, you
10 believe the incidents in question have had on Cassandra?
11 A. Not anything more than I've already discussed.
12 MS. PROCTOR: Okay. I believe that concludes my
13 questions for the moment, Officer Crowley. Thank you
14 for your time and I'll put it out to the group. Do we
15 want to take a short break or keep going? I'll leave
16 that up to my codefendant.
17 MR. CLARK: Officer Crowley, do you need a break?
18 I probably have about, I don't know, maybe 30 minutes or
19 so and then I don't know if your attorney will have any
20 questions.
21 THE WITNESS: I'm good with that.
22 MR. CLARK: Do you want to keep going or do you
23 need a break?
24 THE WITNESS: I don't need a break.

Page 148

1 MR. CLARK: Well, I'll go ahead and we'll see where
2 we go. Okay?
3 CROSS-EXAMINATION
4 BY MR. CLARK:
5 Q. Officer Crowley, as I indicated, I'm an
6 attorney representing Ed Grizzle in this matter and I'll
7 certainly try not to repeat any of counsel's questions,
8 but I do have some follow-up of things she asked you and
9 just a few others.
10 I think you testified that you've been deposed
11 before?
12 A. Yes.
13 Q. How many times have you been deposed?
14 A. Like three or four.
15 Q. And the three or four times you've been
16 deposed, are those for criminal matters or civil
17 matters?
18 A. Civil.
19 Q. When was the last time you were deposed?
20 A. Just the other day.
21 Q. Okay. Within the past week you mean?
22 A. Yes.
23 Q. Okay. And why were you deposed in the past
24 week or so?

Page 149

1 A. I'm involved in a civil lawsuit through work.
2 Q. Are you currently a party to a lawsuit through
3 work?
4 A. Yes, two of them.
5 Q. Okay. Can you tell me about the first lawsuit
6 that you've been involved with at your work?
7 A. It's a lawsuit involving an incident that I
8 was involved in at work and the subject is suing me and
9 another officer involved.
10 Q. And what is the name of the subject?
11 A. His name is Christopher Simenson. I don't
12 know how to spell that.
13 Q. And it is your understanding that that lawsuit
14 is still ongoing?
15 A. Yes.
16 Q. And what about the second incident in which
17 you are a party to a lawsuit?
18 A. The plaintiff's last name, I think it's Nobert
19 Waters. It could be Albert Waters also or Water or
20 something like that. That's also an ongoing lawsuit
21 involving me and other officers also.
22 Q. Okay. And then you've indicated that there
23 are one or two other occasions that you were deposed
24 civilly. Can you tell me about those occasions?

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021
Pages 150..153

Page 150

1    A.  The other one was for a car accident that -- I
2 was the reporting officer on a car accident and I took a
3 deposition for that.
4    Q.  Okay. And was there one other?
5    A.  I don't think so.
6    Q.  Okay. Any of those occasions or lawsuits that
7 you're involved with did you receive any type of
8 discipline as a result of those allegations?
9    A.  No.
10    Q.  Is it your understanding that those two
11 lawsuits are in federal court?
12    A.  Yes.
13    Q.  You have testified about various supervisors
14 that you've had through the years. Was Ed Grizzle one
15 of your supervisors?
16    A.  Yes.
17    Q.  When was Ed Grizzle one of your supervisors?
18    A.  At a point he was a midnight sergeant and when
19 I would work in the district that he was assigned to he
20 would be my supervisor.
21    Q.  And do you know what time frame that may have
22 been, what year?
23    A.  It was fairly new when I started here so
24 sometime in 2014, 2015 timeframe.

Page 151

1    Q.  Did you have any opinions of Ed Grizzle as a
2 supervisor?
3    A.  No.
4    Q.  No opinion whatsoever? He was fine? He was
5 bad? He was good?
6    A.  I had no problem with him.
7    Q.  Okay. And did you ever have a problem with Ed
8 Grizzle being a member of the Joliet Police Department?
9    A.  No.
10    Q.  As we sit here today, do you have any problems
11 with Ed Grizzle?
12    A.  No.
13    Q.  It is your understanding that Ed Grizzle was
14 part of your criminal investigation; is that correct?
15    A.  Yes.
16    Q.  Do you know what role Ed Grizzle played in
17 that investigation?
18    A.  He was assigned as the investigator in my
19 case.
20    Q.  And you were charged in that case, criminally
21 charged?
22    A.  Yes.
23    Q.  What were you charged with?
24    A.  I was charged with criminal damage to

Page 152

1 property, reckless discharge of a firearm and domestic
2 battery.
3    Q.  Okay. And was it Ed Grizzle that transported
4 you to the sheriff's jail?
5    A.  Him and another detective, yes.
6    Q.  Do you have any hard feelings associated with
7 Ed Grizzle's participation in your federal prosecution?
8    A.  No.
9    Q.  Why not?
10    A.  Just business.
11    Q.  He was doing his job?
12    A.  Yep.
13    Q.  Do you have any complaints or criticisms about
14 the job that Ed Grizzle did with respect to your
15 criminal prosecution?
16    A.  No.
17    Q.  You testified that you had received a 30-day
18 suspension in 2018 --
19    A.  Yes.
20    Q.  -- is that right?
21    A.  Yes.
22    Q.  And what was the -- why were you suspended for
23 30 days?
24    A.  It was for that matter.

Page 153

1    Q.  And when you say "that matter" it was for
2 the -- strike that.
3       When you say "for that matter," what do you
4 mean?
5    A.  The matter that we were just discussing, the
6 incident that Detective Grizzle was assigned to.
7    Q.  Okay. And it's my understanding that you were
8 acquitted of all crimes; is that correct?
9    A.  That's correct.
10    Q.  So you weren't given a 30-day suspension for
11 being acquitted; right?
12    A.  No.
13    Q.  Okay. So why were you given a 30-day
14 suspension?
15    A.  Well, so there's -- in an internal
16 investigation there's administrative and then there's
17 the criminal part. So the administrative is where I
18 sustained the suspension for.
19    Q.  And are there allegations or charges that the
20 internal investigation is reviewing?
21    A.  It's closed.
22    Q.  Okay. But that was the result -- that's how
23 you got a 30-day suspension; correct?
24    A.  Yes.

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 154..157

Page 154

1   Q.   And do you recall the findings or the reasons
2 they gave you for a 30-day suspension?
3   A.   They were sustained, was the findings. The
4 titles -- I don't recall what they titled them, but they
5 were sustained.
6   Q.   Okay. And do they have to deal with the
7 discharge of your weapon?
8   A.   Yes.
9   Q.   Did it have to do with your actions taken
10 toward Ms. Socha?
11   A.   Yes.
12   Q.   Do you recall if it had to deal with damage of
13 property?
14   A.   Yes.
15   Q.   Did you ever -- strike that.
16       Who conducted that internal investigation?
17   A.   Lieutenant Marc Reid.
18   Q.   Were you interviewed as part of that internal
19 investigation?
20   A.   Yes.
21   Q.   And was your criminal defense attorney
22 present?
23   A.   No.
24   Q.   Did you have a union representative present?

Page 156

1   Q.   Yes.
2   A.   Yes.
3   Q.   And do you recall when you received that?
4   A.   I don't. It would have been after the
5 criminal trial.
6   Q.   This all took place in 2018; is that fair to
7 say?
8   A.   Yes.
9   Q.   I believe you said your criminal defense
10 attorney was Jeff Tomczak?
11   A.   Yes.
12   Q.   Is that right?
13   A.   Yes.
14   MR. CLARK: I think we just lost your attorney.
15       (Short break was taken.)
16 BY MR. CLARK:
17   Q.   Let me ask you a different question, Officer
18 Crowley. As a part of your 30-day suspension were you
19 required to take anger management classes or go to
20 counseling?
21   A.   No.
22   Q.   And I think you testified that your criminal
23 defense attorney was Jeff Tomczak; is that right?
24   A.   Yes.

Page 155

1   A.   Yes.
2   Q.   Who was that union representative?
3   A.   Mike DeVito.
4   Q.   And do you recall when that investigation
5 occurred?
6   A.   May of 2018, I believe, or somewhere around
7 that time.
8   Q.   Was it after you were acquitted?
9   A.   No.
10   Q.   Did you ever see a copy of the internal
11 investigation report?
12   A.   Well, no. So I wouldn't have been provided
13 with one, but one later became public knowledge and was
14 printed in the media.
15   Q.   In what media?
16   A.   I believe it was both the Joliet Patch and the
17 Joliet Herald.
18   Q.   Is that the kind of information that is kept
19 in your personnel file?
20   A.   I believe so.
21   Q.   Did you ever get like a 30-day suspension -- a
22 written document?
23   A.   Meaning like explaining what you're suspended
24 for?

Page 157

1   Q.   And I don't want to know anything about what
2 the two of you talked about, your private
3 attorney/client conversation, but are you aware of
4 whether or not Cassandra Socha ever had conversations
5 with Jeff Tomczak about your criminal prosecution?
6   A.   I don't know.
7   Q.   Did Officer Socha ever tell you that she had
8 conversations with Jeff Tomczak about your criminal
9 prosecution?
10   A.   I don't think so. I don't think so.
11   Q.   Do you know if Jeff Tomczak was ever Officer
12 Socha's attorney?
13   A.   No.
14   Q.   No, you don't know or, no, he wasn't?
15   A.   No, he was never her attorney.
16   Q.   Did you -- strike that.
17       Have you ever had conversations with Ed
18 Grizzle about your criminal investigation and
19 prosecution?
20   A.   No.
21   Q.   Have you ever had conversations with Ed
22 Grizzle about any private images, naked photos or videos
23 that are subject to this lawsuit?
24   A.   No.

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021                                    Pages 158..161

Page 158

1    Q.  Have you ever had conversations with Ed
2  Grizzle about the search warrant for Officer Socha's
3  cell phone?
4    A.  No.
5    Q.  Are you aware what role Ed Grizzle played in
6  obtaining a search warrant for Officer Socha's cell
7  phone?
8    A.  Yes.
9    Q.  What role did he obtain?
10   A.  He obtained the search warrant from the judge.
11   Q.  How do you know that?
12   A.  Well, from the criminal complaint and then I
13  know that he executed the search warrant that night on
14  her phone.
15   Q.  When did you become first aware of Ed Grizzle
16  executing the search warrant on Officer Socha's phone?
17   A.  The night that it was executed.
18   Q.  And how did you find out?
19   A.  Officer Socha told me.
20   Q.  And what did Officer Socha tell you?
21   A.  That Grizzle put her in the watch commander's
22  office, showed her a warrant for her phone and then took
23  her phone and dumped it.
24   Q.  Okay.  Did she indicate that any other

Page 159

1  officers were present?
2    A.  Lieutenant Rob Brown.
3    Q.  Did Officer Socha tell you about any
4  conversation that was had between Ed Grizzle and
5  herself?
6    A.  Yes.  She just told me that she stressed her
7  frustration with the search warrant.  She said, this is
8  unfair.  I believe she tried walking out and that he
9  threatened her with arrest for obstructing the
10  investigation.  And then he had her turn over her cell
11  phone.
12   Q.  Did Officer Socha indicate to you that the
13  basis was a text that she sent Maria Gatlin?
14   A.  Yes.
15   Q.  Who is Maria Gatlin?
16   A.  Maria Gatlin is -- so from my understanding it
17  is her ex-boyfriend's mother, or adopted mother, but I
18  understand that she had a relationship with her prior to
19  dating her son.
20   Q.  Were Officer Socha and Maria Gatlin friends?
21   A.  At one time, yes.
22   Q.  Were you and Maria Gatlin friends at one time?
23   A.  I've never met her.
24   Q.  Are you -- strike that.

Page 160

1    Did Officer Socha indicate to you that she had
2  sent Maria Gatlin a text?
3    A.  Yes.
4    Q.  And do you know what the text read or the
5  subject matter of that text?
6    A.  I later learned it, yes.
7    Q.  When you say you later learned it, do you
8  recall when "later" is?
9    A.  Whenever the lawsuit was filed, that's when I
10  learned about -- Cassandra had told me what it said, but
11  I never read it verbatim.
12   Q.  Was Maria Gatlin a witness in your criminal
13  trial?
14   A.  Yes.
15   Q.  Was Officer Socha a witness in your criminal
16  prosecution trial?
17   A.  Yes.
18   Q.  In terms of the subject matter, I think you
19  just told me that you didn't learn about the subject
20  matter until after this civil lawsuit was filed; is that
21  right?
22   A.  I learned of the subject matter when Cassandra
23  told me about it, but I didn't like -- I wasn't able to
24  ever read it.

Page 161

1    Q.  Okay.  When did Officer Socha tell you about
2  the subject matter of the text?
3    A.  When she sent it.
4    Q.  And do you know when she sent the text?
5    A.  I don't recall when that was.
6    Q.  That was during your criminal trial; right?
7    A.  Yes.
8    Q.  And did Officer Socha tell you why she sent
9  the text?
10   A.  No.  She just told me that she -- she told me
11  that she was composing a text message and that she had
12  inadvertently sent it to her and it wasn't completed.
13   Q.  Did Officer Socha indicate to you that she
14  indicated or texted that Maria Gatlin had committed a
15  felony?
16   A.  Can you repeat that again?
17   Q.  Sure.  Did Officer Socha tell you, at that
18  time, that the text included allegations that Maria
19  Gatlin had committed a felony?
20   A.  No.
21   Q.  When did you first learn that?
22   A.  I guess I didn't know that.
23   Q.  After -- when Officer Socha told you about the
24  search warrant that Ed Grizzle served upon her, outside

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 162..165

Page 162

1 of what you already told me about the (indiscernible)
2 did Ed Grizzle say anything in addition that was
3 reported to you?
4    A.   No, not that I can recall.
5    Q.   Did you express any opinions about the
6 signature of the search warrant issued to Cassandra
7 Socha?
8    A.   Yes.
9    Q.   What did you say and what was your opinion?
10    A.   I just -- I disagreed with how it went down.
11 I -- I -- to this day I don't think that they should
12 have done that when she was at work.
13    Q.   Are you aware whether or not it is Joliet
14 Police Department policy to serve warrants on officers
15 while at work?
16    A.   I don't believe there's a policy on that.
17    Q.   Do you believe there's a practice on that?
18    A.   I've never known an officer to have a warrant
19 served on them, so I don't know.
20    Q.   Have you had any subsequent conversations with
21 Officer Socha about that search warrant?
22    A.   Yes.
23    Q.   About how many?
24    A.   A lot.

Page 163

1    Q.   Okay.  Do you have any firsthand knowledge
2 about the contents of that search warrant?
3    A.   No.
4    Q.   Do you know what Ed Grizzle informed the judge
5 that issued the warrant?
6    A.   No.
7    Q.   Do you know who Lorinda Lamken is?
8    A.   Yes.
9    Q.   Who is she?
10    A.   She was the prosecutor that prosecuted my
11 case.
12    Q.   Do you know if Lorinda Lamken -- strike that.
13       Do you know about any conversations between Ed
14 Grizzle and Lorinda Lamken concerning the search warrant
15 on Officer Socha's cell phone?
16    A.   No.
17    Q.   I think you testified that the first time that
18 you had heard any rumors about the video of you having
19 sexual acts with Cassandra Socha, or naked photos, was
20 when Ms. Socha received an anonymous letter; is that
21 right?
22    A.   That's right.
23    Q.   The second time you heard any information
24 about any videos of the two of you performing sex acts

Page 164

1 or naked photos was from Dave Jackson in March of 2020?
2    A.   No.  The next time that I learned that
3 information when Cassandra told me that Mike DeVito
4 informed her of these rumors that he was hearing also.
5    Q.   Do you recall when that conversation between
6 Officer Socha and Mike DeVito was?
7    A.   I do not.  It was after the initial letter was
8 found in her box, but I don't recall when that was.
9    Q.   Do you recall if the conversation between
10 Officer Socha and Mike DeVito was before the lawsuit was
11 filed?
12    A.   It was before the lawsuit was filed.
13    Q.   Do you know where that conversation took
14 place?
15    A.   I don't.  I wasn't there.
16    Q.   Did Officer Socha indicate to you where the
17 conversation took place?
18    A.   She might have, but I don't remember.  It
19 could have been in the union office.  It's kind of where
20 all that stuff happens.
21    Q.   And what did Officer Socha tell you that Mike
22 DeVito told her?
23    A.   Basically the exact same thing that the letter
24 had said, that there was, you know, rumors that

Page 165

1 detectives and supervisors were watching these videos
2 and that there was a cover up and things of that nature.
3    Q.   Is that when you decided to start consulting
4 with attorneys for a possible lawsuit?
5    A.   I think we had already done that prior to Mike
6 DeVito speaking with her.
7    Q.   Do you recall if Officer Socha indicated that
8 Mike DeVito indicated who had seen naked videos or
9 photographs of the two of you or of her?
10    A.   Yes.
11    Q.   Who was that?
12    A.   She related to me that Al Roechner, Ted
13 Grizzle, Darrell Gavin, Marc Reid, Jeremy Harrison, I
14 think that's it.  Oh, John McKinney.  Yeah, that's it.
15    Q.   Would it surprise you then that Officer Socha
16 indicated that she was unaware of Ed Grizzle ever seeing
17 naked photos of her?
18    MR. ADAMS:  Object to form.
19    THE WITNESS:  Can you repeat that question?
20 BY MR. CLARK:
21    Q.   Sure.  Would it surprise you then if Officer
22 Socha testified that she was unaware that Ed Grizzle had
23 ever saw any naked photos or videos?
24    MR. ADAMS:  Same objection.

Page 166

1  BY THE WITNESS:
2     A.   That wouldn't surprise me.
3     Q.   That wouldn't surprise you?
4     A.   No.
5     Q.   Did you have discuss -- strike that.
6          What else did Officer Socha indicate that Mike
7  DeVito informed her during that conversation?
8     A.   That's basically it. Just that.
9     Q.   What did Officer Socha tell you or what was
10 her opinion about what was shared with her by Mike
11 DeVito?
12    A.   You know, we both discussed that there's --
13 you know, there's -- why is this happening? Like why
14 are these people -- why are we getting letters in the
15 box? Why is the union president coming to you and
16 telling you about this? That indicates to us that
17 something had to have happened. You know, that just
18 kind of gave further credit to us, you know, to the
19 claim.
20    Q.   Did you ever ask any other officer if they had
21 heard those rumors?
22    A.   No.
23    Q.   Why not?
24    A.   I don't believe it was my place to do that. I

Page 167

1  didn't want to become -- I was already involved so I
2  didn't want to reach out and ask anybody that. We were
3  both in agreement that we're just going to keep quiet
4  and whoever is going to come to us is going to come to
5  us, but we're not going to be actively seeking
6  information in the police department. That wouldn't be
7  appropriate.
8     Q.   Why not?
9     A.   I don't know. That's just what we agreed to.
10 It's, you know, part of the -- it's not what we're
11 supposed to do when we go to work. I don't know. If
12 somebody was going to come to me, they are going to come
13 to me, but I wasn't going to go actively seeking it.
14    Q.   Yeah, but you have a duty to report sexual
15 harassment; correct?
16    A.   Yes.
17    Q.   But you didn't report this to anyone?
18    A.   Well, we have a duty to report sexual
19 harassment, you know, if we know about it or see about
20 it, but in this particular case the people that we were
21 supposed to report that to were directly involved in
22 sexually harassing her so we were kind of stuck between
23 a rock and a hard spot.
24    Q.   Did you ever reach out to anyone at the

Page 168

1  village administrator?
2     A.   No.
3     Q.   Or city administrator, I should say.
4     A.   No.
5     Q.   Okay. So there was the anonymous letter, the
6  conversation with DeVito and your conversation with
7  Jackson. Any other occasions that you can recall in
8  which any type of rumors were described to you?
9     A.   The only other thing was that secondary letter
10 that she received in her box that had like a female
11 attorney on it, and that's it.
12    Q.   Okay. So other than those four incidents, you
13 don't recall any other occasion in which you heard about
14 a rumor about Officer Socha and yourself in naked videos
15 or videos performing sex acts and --
16    A.   You included the secondary meeting with Dave
17 Jackson and Carlos Matlock; correct?
18    Q.   I didn't, but thank you for pointing it out.
19    A.   Other than that, no.
20    Q.   You indicated at that second meeting, I
21 believe, that Carlos Matlock said that he had overheard
22 various remarks after being interviewed by the Inspector
23 General Regis. That he told them everything because --
24 he told them everything; right?

Page 169

1     A.   Yes.
2     Q.   And I -- but what exactly did Carlos Matlock
3  say that Ed Grizzle said?
4     A.   He said that Ed Grizzle was indicating that he
5  went across the street and told them that he made copies
6  of Cassie's cell phone and that he distributed those
7  copies to Marc Reid and Al Roechner.
8     Q.   And Marc Reid was lieutenant of internal
9  affairs?
10    A.   That's correct.
11    Q.   So if Lieutenant Reid ordered you to make a
12 copy and provide you with it, if there's a lawful order,
13 you have to do so; right?
14    A.   Yes.
15    Q.   Roechner was the chief of police at the time.
16 If Chief Roechner provided you with a lawful order you
17 would have to follow that order; true?
18    A.   Yes.
19    Q.   (Indiscernible) is there anything else that
20 Grizzle said at that time?
21    A.   I don't believe so. You know -- strike that.
22 Yes. He indicated that there was a conversation between
23 Ed Grizzle and Tab Jensen and that Ed Grizzle had
24 threatened to arrest or criminally arrest Tab Jensen for

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 170..173

Page 170

1 obstructing the investigation when Tab Jensen ordered
2 the removal of the contents of the cell phone from the
3 Cellebrite System.
4     Q.   Okay.  When did that conversation -- I'm
5 sorry.  Strike that.
6          That's what Officer Matlock told you?
7     A.   Yes.
8     Q.   And it's your understanding that Ed Grizzle
9 was criminally investigating Officer Socha?
10    A.   Yes.
11    Q.   The removal of evidence from the computer,
12 that's potentially obstruction of justice; no?
13    A.   I mean, we'd have to look at the whole
14 situation behind that.  I mean, I couldn't answer that
15 right now.  I don't -- this is all things that I've just
16 been told, you know.  Obstruction of evidence is a crime
17 though, yes.
18    Q.   If you had an investigation going on and
19 someone destroyed evidence of your investigation you
20 would be upset?
21    A.   Sure, yes.
22    Q.   With respect to either of the anonymous
23 letters, did you tell anyone about the anonymous
24 letters?

Page 171

1    A.   Yes.
2    Q.   Who did you tell?
3    A.   Jeff Tomczak.
4    Q.   What about any of your friends on the force?
5    A.   No.
6    Q.   You never shared this information with Bill?
7    A.   With whom?
8    Q.   Bill.
9    A.   No.
10    Q.   You never shared the information with Phil?
11    A.   No.
12    Q.   You indicated that Ed Grizzle had been
13 transferred to tri-city duties?
14    A.   The tri-county, yes.
15    Q.   Tri-county.  Thank you.  Is that a promotion?
16    A.   I don't know about a paid promotion, but it is
17 a -- you know, in the police world there's paid
18 promotions and then there's jobs that are held in high
19 regard that are deemed to get and only given
20 to, you know, officers -- you know, not everybody gets
21 them, is what I'm saying.
22    Q.   You're implying that position is a preferred
23 position?
24    A.   I'm sorry?

Page 172

1    Q.   In your opinion that position was a preferred
2 position?
3    A.   Yes.
4    Q.   Why?
5    A.   If you are passed out of the police
6 department, you are put in charge of a task force, a
7 multi-agency task force, so that's --
8    Q.   I think you testified that there was no way to
9 verify the Jackson information told to you; is that
10 correct?
11    A.   Correct.
12    Q.   And why couldn't you ask Lieutenant Brown
13 about it?
14    A.   That would have not been appropriate for me to
15 do that.
16    Q.   Why?
17    A.   I'm a patrol officer.  He's a lieutenant, you
18 know, these things -- I believe at that point the
19 lawsuit was already filed so, you know, it's an ongoing
20 civil lawsuit.  It's just not my place to do so.  I was
21 just passing the information along.
22    Q.   It is fair to say that you could have verified
23 it, but you chose not to because you didn't think it was
24 appropriate because the lawsuit was pending; is that

Page 173

1 fair?
2    A.   I could have spoken to those individuals,
3 that's true, yes, but I chose not to.
4    Q.   Didn't you want to know if they'd seen the
5 video of you?
6    A.   Umm...
7    Q.   I mean engaged in sex acts?
8    A.   Right.  You know, like I said, I was not going
9 to approach a lieutenant with a question like that.  I
10 don't think that that would have been appropriate.
11    Q.   Do you think it's appropriate to sue Ed
12 Grizzle?
13    A.   I'm not suing Ed Grizzle.
14    Q.   Officer Socha is?
15    A.   She is.
16    Q.   Do you think it's appropriate that Officer
17 Socha is suing Ed Grizzle?
18    A.   If these allegations are correct, yes.
19    Q.   Prior to the complaint there's a lot of
20 allegations surrounding what occurred on July 5, 2017.
21 Just to let you know, I need to ask you a few questions
22 about that evening.  Okay?
23    A.   Okay.
24    Q.   At about 3 in the morning on July 15, 2017,

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 174..177

Page 174

1 police officers were called to your and Officer Socha's
2 home; right?
3   A.  So in regards to this incident and this night
4 I'm not going to answer any questions about that.
5   Q.  Why is that?
6   A.  I don't believe it has any relevance to the
7 lawsuit and I'm just going to respectfully decline to
8 answer any questions.
9   Q.  Okay.  Let's do this in two parts then.  The
10 first part is I want to ask you about the events leading
11 up to that night.  Officer Socha testified that you were
12 at a bar with other officers.
13   MR. ADAMS:  Object to form.
14 BY THE WITNESS:
15   A.  Again, I'm not going to answer any questions
16 that have to do with that night.
17   Q.  And why is that?
18   A.  I believe that it doesn't have any relevance
19 on this lawsuit and I'm just going to respectfully
20 decline to answer any questions.
21   Q.  Okay.  And it's your understanding that I can
22 ask a series of questions and you can be compelled by
23 court order and sanction?
24   A.  Yes.

Page 175

1   Q.  Okay.  And the basis for your refusal to
2 answer any questions about that evening is relevancy; is
3 that right?
4   A.  Yes.
5   Q.  And you've been acquitted of these crimes; is
6 that correct?
7   A.  That's correct.
8   Q.  And you indicated that you saw the lawsuit
9 that was filed in this case?
10   A.  Can you repeat that, please?
11   Q.  You testified that you saw the allegations of
12 Officer Socha's complaint?
13   A.  Yes.
14   Q.  And you're aware that allegations surrounding
15 that criminal case are part of this lawsuit?
16   A.  Yes.
17   Q.  And the events that took place are part of
18 your criminal lawsuit -- are part of the criminal case
19 against you; true?
20   A.  Yes.
21   Q.  So let me see if I can do this in an orderly
22 fashion.  With respect to anything that occurred on July
23 15, 16 or 17 of 2017, related to your -- criminal
24 charges filed against you for reckless discharge of a

Page 176

1 firearm, domestic battery or destruction of property, is
2 your position that you refuse to answer those questions;
3 is that fair?
4   A.  That's fair.
5   Q.  And you refuse to answer these questions based
6 upon you don't think they're relevant to the case?
7   A.  That's correct.
8   Q.  And your officer -- I'm sorry -- your attorney
9 has not instructed you not to answer these questions; is
10 that right?
11   A.  That's correct.  It's my own decision.
12   Q.  Okay.
13   MR. CLARK:  Court reporter, if you could please
14 certify those questions.
15   THE REPORTER:  Sure.
16 BY MR. CLARK:
17   Q.  You indicated that you love your mother-in-law
18 and have a great relationship with her; correct?
19   A.  That's correct.
20   Q.  Were you aware that she's the one that called
21 the police on the night of July 15, 2017?
22   A.  Yes.
23   MR. ADAMS:  I'll object to the relevance of that
24 question.

Page 177

1 BY THE WITNESS:
2   A.  I'm aware of that.
3   Q.  And no hard feelings to her calling the
4 police?
5   A.  Absolutely not.
6   MR. ADAMS:  Same objection.
7 BY MR. CLARK:
8   Q.  Have police ever been called -- strike that.
9     Prior to July 16, 2017, has there ever been a
10 complaint of domestic violence or abuse directed toward
11 you by Officer Socha?
12   MR. ADAMS:  Same objection.  Relevancy.
13 BY THE WITNESS:
14   A.  No, there hasn't.
15   Q.  Had the police ever been -- strike that.
16     Had the police ever been called to Officer
17 Socha's home in connection with any dispute between the
18 two of you?
19   MR. ADAMS:  Same objection.
20 BY THE WITNESS:
21   A.  No.
22   Q.  Do you have any knowledge or facts to support
23 the allegation that Officer Socha's testimony was
24 generally helpful to your criminal defense?

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021                                                      Pages 178..181

Page 178

1    A.  Can you repeat that?
2    Q.  Sure.  Do you have any knowledge or facts or
3  information to support the allegation that Officer
4  Socha's testimony was generally helpful to your criminal
5  defense?
6    MR. ADAMS:  Objection to form and to foundation.
7  BY THE WITNESS:
8    A.  No.
9    Q.  Do you have any knowledge or facts or
10  information to support the allegation that your
11  acquittal was much to the chagrin of Ed Grizzle?
12    A.  No.
13    Q.  Do you know if officer -- strike that.
14       Do you have any knowledge or fact or
15  information to support that officers' testimony resulted
16  in your acquittal?
17    A.  No.
18    Q.  Do you have any knowledge or facts or
19  information to support the allegation that Ed Grizzle
20  wanted to settle a score with Officer Socha and obtained
21  the search warrant?
22    A.  No.
23    Q.  Do you have any facts, knowledge or
24  information to support the allegation that the search

Page 179

1  warrant obtained by Ed Grizzle was substantially false
2  or incomplete?
3    A.  No.
4    Q.  Do you have any facts knowledge or information
5  to support the allegation that Ed Grizzle want to
6  embarrass Officer Socha?
7    A.  No.
8    Q.  Do you have any facts, information or
9  knowledge that Ed Grizzle was privy to private images
10  and naked photos and videos that we've been discussing
11  as part of the lawsuit?
12    A.  No.
13    MR. CLARK:  Okay.  I think I'm almost done here,
14  but if I could just have like a five-minute break and --
15  a few minute break and we can hopefully finish up.
16    MS. PROCTOR:  You know what, I actually had just a
17  couple cleanup.  I can do them now or I can wait.
18    THE WITNESS:  I'm good.
19       (Short break was taken.)
20    MR. CLARK:  Okay, Officer Crowley, I don't have any
21  further questions at this time.  I'm just going to pass
22  along the questions.  Thank you for your time.
23    MS. PROCTOR:  I just have a few follow up, Officer
24  Crowley.

Page 180

1         REDIRECT EXAMINATION
2  BY MS. PROCTOR:
3    Q.  Did a nonlawyer put you in touch with attorney
4  Hall Adams?
5    A.  No.
6    Q.  Can you describe the nature of the atmosphere
7  at the Joliet Police Department?
8    A.  Currently?
9    Q.  Currently.
10    MR. ADAMS:  I'll object to the form.
11  BY THE WITNESS:
12    A.  The atmosphere?
13    Q.  Well, here, let me rephrase it.  Let's focus
14  on 2018, 2019, okay?  Would you describe the atmosphere
15  at the Joliet Police Department as professional,
16  overall?
17    MR. ADAMS:  Same objection to form.
18  BY THE WITNESS:
19    A.  From my experience of it, yes, at that time.
20    Q.  Have you ever reported any other Joliet police
21  officers for not being professional or not complying
22  with the departmental rules, during your time as an
23  officer there?
24    A.  No.

Page 181

1    Q.  Did you or Cassandra talk to the media about
2  the allegations in this lawsuit, either before or after
3  it was filed?
4    A.  No.
5    Q.  Did you authorize attorney Hall Adams to talk
6  to the media about this lawsuit on your behalf or on
7  Cassandra's behalf?
8    MR. ADAMS:  Object.  That would be privileged.
9  Don't answer.
10  BY THE WITNESS:
11    A.  I didn't, no.
12    Q.  Do you know the name of Cassandra's family
13  doctor?
14    A.  No.
15    Q.  Does she have a family doctor or a primary
16  care physician?  Do you understand what I mean by that?
17  Not a counselor or therapist, but just general doctor.
18    A.  I know the name of her gynecologist because
19  she birthed the children we have, but other than that,
20  no, I don't know.
21    Q.  Did she deliver her babies through the West
22  Suburban --
23    A.  Yes.
24    Q.  West Suburban practice?

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 182..185

Page 182

1    A.   Yes.

2    Q.   What is the name of her baby doctor?

3    A.   Yeah, Carla -- I can't think of her last name.

4  I can't think of it right now.  It is Carla -- Dr. Carla

5  is kind of what I -- I can't think of her last name.

6    Q.   Okay.  Has Cassandra ever applied for

7  disability during her employment with the Joliet Police

8  Department?

9    A.   No.

10   Q.   What about before her employment at Joliet?

11   A.   No.

12   Q.   Were you aware that attorney Hall Adams has

13  spoken to journalists or reporters concerning the

14  allegations in Cassandra's lawsuit?

15   A.   Yes.

16   Q.   And do you know who initiated those

17  conversations?  Was it Mr. Adams or the journalists, if

18  you know?

19   A.   I don't know.

20   MS. PROCTOR:  I have no further questions.  Thank

21  you, Officer Crowley.

22   THE WITNESS:  Thank you.

23   MR. ADAMS:  Matt?

24   MR. CLARK:  No additional questions.

Page 183

1        For the record, I'm not going to go through

2  the list of questions at this time regarding what you

3  have described as not relevant, Officer Crowley.  I'm

4  reserving the right to recall you if and when that

5  information becomes relevant and/or court order

6  necessary, but for the time being no additional

7  questions.

8    MR. ADAMS:  Show signature as reserved.

9    MR. CLARK:  Go ahead.

10   MR. ADAMS:  If this is ordered, Sharon, what I

11  would like to get, please, is a condensed hard copy and

12  a PDF of the very same thing.  I do not want a full-size

13  transcript in any form.

14   THE REPORTER:  Okay.

15   MR. CLARK:  And, Sharon, I will order that.  Can I

16  have an email, full and condensed.

17       (AND FURTHER DEPONENT SAITH NAUGHT)

18

19

20

21

22

23

24

Page 184

1        UNITED STATES DISTRICT COURT
         NORTHERN DISTRICT OF ILLINOIS
2          EASTERN DIVISION
3  CASSANDRA SOCHA,          )
                             )
4      Plaintiff,            )
                             )
5      vs.                   )
                             )  No. 18 CV 5681
6  CITY OF JOLIET, a municipal  )
   corporation, EDWARD GRIZZLE, )
7  JOHN DOES 1-20,            )
                             )
8      Defendants.           )
9

        I, OFFICER NICHOLAS CROWLEY, state that I have
10  read the foregoing transcript of the testimony given by
    me at my deposition on the 17th day of June, 2021, and
11  that said transcript constitutes a true and correct
    record of the testimony given by me at the said
12  deposition except as I have so indicated on the errata
    sheets provided herein.
13
14  _____
            OFFICER NICHOLAS CROWLEY
15
16
    No corrections (Please initial)_____
17  Number of errata sheets submitted_____(pgs.)
18
19  SUBSCRIBED AND SWORN to
    before me this _____ day
20  of _____, 2021.
21  _____
        NOTARY PUBLIC
22
23
24

Page 185

1  UNITED STATES OF AMERICA

   NORTHERN DISTRICT OF ILLINOIS

2  EASTERN DIVISION

   STATE OF ILLINOIS

3  COUNTY OF COOK

4      I, Sharon A. Jerndt, Certified Shorthand

5  Reporter, and Registered Professional Reporter, do

6  hereby certify that OFFICER NICHOLAS CROWLEY, was first

7  duly sworn by me to testify to the whole truth and that

8  the above videoconferenced deposition was reported

9  stenographically by me and reduced to typewriting under

10  my personal direction.

11      I further certify that the said

12  videoconferenced deposition was taken at the time and

13  place specified and that the taking of said

14  videoconferenced deposition commenced on the 17th day of

15  June, A.D., 2021, at 10:00 a.m.

16      I further certify that I am not a relative or

17  employee or attorney or counsel of any of the parties,

18  nor a relative or employee of such attorney or counsel,

19  nor financially interested directly or indirectly in

20  this action.

21

22

23

24

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 186..187

Page 186

1        Witness my official signature on this 15th day

2  of July, A.D., 2021.

3

4

5

6

7

8        _____

          SHARON A. JERNDT, CSR, RPR

9          180 North LaSalle Street

          Suite 2800

10          Chicago, Illinois 60601

          Phone:  (312) 236-6936

11

12

13

   CSR No. 084-004044

14

15

16

17

18

19

20

21

22

23

24

Page 187

1  Errata Sheet

2

3  NAME OF CASE: Socha vs City of Joliet

4  DATE OF DEPOSITION: 06/17/2021

5  NAME OF WITNESS: Officer Nick Crowley

6

7  Page _____ Line _____ Reason _____

8  From _____ to _____

9  Page _____ Line _____ Reason _____

10  From _____ to _____

11  Page _____ Line _____ Reason _____

12  From _____ to _____

13  Page _____ Line _____ Reason _____

14  From _____ to _____

15  Page _____ Line _____ Reason _____

16  From _____ to _____

17  Page _____ Line _____ Reason _____

18  From _____ to _____

19  Page _____ Line _____ Reason _____

20  From _____ to _____

21  Page _____ Line _____ Reason _____

22  From _____ to _____

23

24  _____

   SIGNATURE OF DEPONENT

**$**

**$1.5** 119:7,10

**0**

**08/12/80** 7:6,24

**1**

**10** 98:21,23 99:5

**10:00** 5:3

**11** 14:2 102:20

**12** 8:24 103:10
140:18

**13** 103:24

**14** 104:13

**15** 105:4 173:24
175:23 176:21

**16** 49:1 62:15
175:23 177:9

**17** 5:3 175:23

**18** 111:7

**19** 29:15 30:1,4
102:12 111:17
113:16

**1998** 12:6

**2**

**2** 72:5,7,11 87:20
88:14 96:1 97:2,23
114:20,23 115:4,
13

**20** 84:15

**2000** 32:5

**2002** 12:17

**2004** 10:15

**2005** 8:6 13:13
14:3

**2013** 9:15 12:4
14:22 18:18

**2014** 26:19 27:20
150:24

**2014-15** 27:24

**2015** 17:15 18:3,7,
10 26:23 27:1
61:1,6 150:24

**2015-ish** 27:20

**2016** 27:21 28:18

**2017** 29:9 131:12,
16 173:20,24
175:23 176:21
177:9

**2018** 23:11 24:1
25:5 26:1 27:22
32:6 33:24 34:19
36:13 41:19,24
42:3,10,13 48:8
49:13 50:20 64:8,9
65:1 66:13,20 78:7
124:23 131:12,16
140:6 141:11
145:22 146:2,14
147:5 152:18
155:6 156:6
180:14

**2019** 26:1 29:15
30:1,4,9 32:6
50:22,23 146:3
180:14

**2020** 31:5 54:16
57:4 59:16 67:10
68:1 71:1,11,15
72:5,7,11,19,23,24
73:17 75:3 76:21
77:18 87:20 88:14
94:6 96:1 97:2,23
114:20,24 115:4,
13,21 116:11
164:1

**2021** 5:3 6:18 31:6,
7 49:21 71:16

**2023** 144:12

**21** 124:23 141:11

**25** 25:10

**26** 25:10

**29** 128:21 129:5

**3**

**3** 94:6 173:24

**30** 147:18 152:23

**30-day** 27:22
152:17 153:10,13,
23 154:2 155:21
156:18

**300** 24:3

**33** 129:21

**34** 129:21

**35** 129:21

**3727** 8:4 17:15

**4**

**40** 24:14

**45** 73:11

**5**

**5** 173:20

**50** 24:14

**52** 18:13

**6**

**6** 79:20

**7**

**7** 22:20 26:16
79:20

**708 717-3652**
42:6

**8**

**815 791-4154**
42:18

**9**

**9** 8:24

**911** 22:12

**A**

**a.m.** 5:3 22:20

**ability** 43:17 135:7

**Absolutely** 177:5

**abuse** 177:10

**academy** 14:2

**access** 66:19,22
67:3

**accessed** 33:3

**accessible**
125:21

**accident** 150:1,2

**accommodation**
137:10

**accommodations**
133:18

**accurate** 110:5

**acknowledge**
111:22

**acquiesced**
128:24 129:10

**acquittal** 178:11,
16

**acquitted** 153:8,
11 155:8 175:5

**action** 90:2

**actions** 79:1
154:9

**actively** 167:5,13

**activities** 22:12
34:3 35:2 45:6,11

**activity** 35:23 36:1
44:24 45:4,13

**acts** 37:12 65:18
163:19,24 168:15
173:7

**actual** 31:22 32:9
114:11 124:22
127:19

**Adams** 6:10,11,
21,23 7:2,14 43:2,
15 45:5 49:21
60:16 65:21 66:1,9
68:24 70:9,14,16,
24 71:4,11,16,18
80:22 83:17 88:24
90:16,19 91:2,5,7,

13 92:21 98:15,17
113:17 114:13
115:11,14 117:11,
18 118:11 122:17
123:10,12,18,24
124:7,9,20 125:1
126:1,21 127:4
128:9 129:14
130:4,13 131:3,7,
17 132:19 134:9
138:11 165:18,24
174:13 176:23
177:6,12,19 178:6
180:4,10,17 181:5,
8 182:12,17,23
183:8,10

**Adams'** 123:17

**added** 119:6

**addition** 162:2

**additional** 18:24
43:6 129:20
143:22 182:24
183:6

**address** 8:3,5
88:6,9

**administrative**
153:16,17

**administrator**
168:1,3

**admit** 109:17
110:15

**admitted** 84:5

**adopted** 159:17

**advice** 56:8
124:11,20 145:14

**affairs** 101:16
119:18,22 120:4,
13,17,19,21,23
169:9

**affected** 132:12

**agency** 121:14

**agree** 34:19 43:1
128:3

**agreed** 15:15
120:6 167:9

**agreement** 6:20
167:3

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

2

**ahead** 66:3 126:6
127:2 129:15
148:1 183:9

**ahold** 106:21,22

**Alan** 21:9 86:15
88:19 95:20

**Alana** 24:22 25:17
63:22

**Albert** 149:19

**allegation** 54:15
97:5 177:23 178:3,
10,19,24 179:5

**allegations** 31:18,
23 32:7,22 37:21
49:22 52:17,20,23
77:5,9 82:17,21
116:12 126:17
129:20 133:19,21
150:8 153:19
161:18 173:18,20
175:11,14 181:2
182:14

**alleged** 33:10
56:22 58:15 59:3
75:15 76:10 77:19
95:9 107:1,7
108:18

**allegedly** 58:11
75:7 76:6 80:9

**alleges** 128:22

**allotted** 24:14

**allowed** 61:8

**Amendment**
129:24

**amicable** 10:8

**amount** 141:1

**and/or** 82:16 99:9
122:20 128:23
129:9 183:5

**anger** 156:19

**anonymous**
163:20 168:5
170:22,23

**answering** 22:12
44:2

**anticipate** 126:17

**antidepressants**
140:5

**anymore** 41:7
63:21 81:11
138:19

**apparently** 74:10
107:12,18

**applied** 143:11
182:6

**apply** 143:17
144:12

**approach** 173:9

**approached**
54:17,18 55:23
56:3,7 72:8

**approximately**
14:10 24:3,5

**April** 29:15 30:1,4

**area** 23:18,20

**argumentative**
126:21 134:9

**arrest** 159:9
169:24

**article** 141:7,15
142:18

**articles** 141:3,21
142:5,7,12

**articulate** 134:11

**arts** 64:2

**assert** 71:4

**assigned** 22:4
49:14 97:13 101:3
150:19 151:18
153:6

**assignment**
109:20

**assignments**
101:4

**assist** 69:2

**associate** 25:1
62:2 143:6

**associate's** 10:2,
10,12

**associates** 24:19

**association** 50:5,
6,14,20 51:1
115:21

**assume** 66:18
82:12 126:4

**assuming** 27:14
42:4 46:12 113:8

**assumption** 60:1
120:10

**assure** 98:22

**AT&T** 48:17

**atmosphere**
180:6,12,14

**attend** 10:18
136:23 144:24
146:5

**attended** 145:23
146:2

**attention** 23:10
119:22

**attorney** 6:8,9
7:14 43:15 49:20
67:23 68:8,10,23
70:2,4,6 81:1,6,22,
24 82:2,4,12 87:20
93:12 111:19
113:7 119:20
121:19,22 122:16
123:3,6,9 147:19
148:6 154:21
156:10,14,23
157:12,15 168:11
176:8 180:3 181:5
182:12

**attorney's** 81:2

**attorney/client**
123:21 157:3

**attorneys** 43:23
90:1 119:18
122:18,21,23
165:4

**August** 12:10 47:9
124:23 125:6
141:10

**authority** 120:5
121:4

**authorize** 181:5

**authorized** 127:2

**auto** 101:8

**automatically**
87:24

**aware** 7:2 31:17
51:23 70:6 73:21
76:24 84:15 99:17
107:19 125:10,13,
15,21,24 126:5,8,
14 127:7 128:19,
24 129:10 157:3
158:5,15 162:13
175:14 176:20
177:2 182:12

**awhile** 112:12

---

**B**

**B-R-E-E-N** 23:8

**B-U-S-S-E** 24:21

**babies** 181:21

**baby** 182:2

**back** 14:14 19:4
27:23 28:18 41:19
42:9 47:16 48:8
49:13 54:7 58:18
64:17 65:10 66:13
67:9 72:21 82:14
98:10 113:2

**bad** 41:2 151:5

**bar** 174:12

**barking** 7:7

**bartender** 13:2,6

**base** 40:6 100:16
117:23

**based** 43:3 68:15
92:3,11,14 96:24
98:9 118:4,5 176:5

**basic** 13:19 83:14

**basically** 164:23
166:8

**basis** 131:5
136:17 159:13
175:1

**batch** 19:16,17

**batches** 19:16

**Batis** 85:19 100:13
102:1 135:23
136:1

**battery** 152:2
176:1

**Beard** 16:14,21

**Beecher** 10:22

**began** 26:23 27:2

**beginning** 23:4,5

**begins** 72:7

**behalf** 53:9,10
181:6,7

**belief** 128:23

**believed** 95:4
100:4 118:15

**believes** 103:13
111:20 135:1

**Benton** 21:9,13,21
87:3 121:7

**Bergner** 55:22,23
56:2 58:22,23
59:4,24 85:15
96:6,14,20 100:12
101:12

**big** 28:8,13

**bill** 24:21 25:17
30:13,14,17,18,23
31:7 48:10,14
63:20 171:6,8

**Bills** 30:20

**birth** 7:5,23 140:22

**birthday** 47:6,7,8,
11

**birthed** 181:19

**bit** 17:12,14 132:14
138:13

**Black** 50:5 115:20

**blue** 110:18

**board** 19:23

**body** 36:20

**bolts** 77:13

**borders** 10:23

**born** 11:1,4,5

**bottom** 134:8

**Botzum** 97:8,12

**bought** 47:11

**bounce** 23:15 25:12

**Bourbonnais** 9:6 13:9 14:6,9,12,18, 24 15:3 16:10,13, 22 17:5,10

**box** 164:8 166:15 168:10

**boy** 16:18

**BPOA** 50:2,4 51:8

**Brad** 86:10 135:23

**Bradley** 13:7

**break** 7:11 60:9,10 112:11,15,22,23 147:15,17,23,24 156:15 179:14,15, 19

**breast** 140:12

**Breen** 23:8

**Brian** 21:9 87:3 121:7

**bridges** 50:11

**bring** 12:17 145:15

**Britney** 9:2,5,23 10:7

**brothers** 64:6

**brought** 121:2

**Brown** 55:13 74:2 75:6,9,10 94:3,22 159:2 172:12

**buddies** 62:14

**bullet** 130:16

**bullets** 102:23

**business** 152:10

**Busse** 24:21 25:17 30:14,17,23 62:12 63:20

**butcher** 56:5

**C**

**C-A-M-P-O-S** 24:21

**C-A-R-R-O-L** 20:11

**C-R-O-W-L-E-Y** 5:20

**cable** 108:2

**Cagle** 25:17

**cake** 15:7,10

**California** 12:15

**call** 99:4 139:7

**called** 5:13 32:13 79:15,18 108:11 142:3 174:1 176:20 177:8,16

**calling** 177:3

**calls** 22:13 23:17 130:14

**Camp** 12:14

**Campos** 24:20 25:16

**car** 23:13,15 26:7 150:1,2

**card** 48:13

**care** 181:16

**career** 132:10

**Carla** 182:3,4

**Carlos** 51:21 73:4, 14 74:1,2,8,22 86:3 94:24 121:1 168:17,21 169:2

**carrier** 41:24

**Carrol** 20:10

**case** 6:15 9:16 59:20 62:4 92:9 93:12 103:11 109:17 123:4 124:22 128:12 146:23 151:19,20 163:11 167:20 175:9,15,18 176:6

**cases** 28:20

**Casey** 63:23 64:4

**Cassandra** 7:3,17 8:12,19 17:21 18:10 19:8,19 22:22 25:22 26:17 29:5,11 30:1,4,9 34:2 35:22 36:2,6, 8 37:10,17 38:17 39:4,22 40:10,13, 19,22 42:7 44:23 45:4,13,15,22 46:3 49:20 53:3 60:13, 19 61:18 65:18 67:19 68:22 69:7, 11,19 70:8 71:21 75:8 76:17,22 77:23 78:1 79:11 80:3,8,20 82:8,10 83:8 84:15 88:8 92:1 96:3 97:23 98:15 104:17 105:11 108:20 113:6,11,23 114:17 115:5,9 119:11,13,21 120:10 122:20 123:6,9 125:1,24 126:5 127:1,5 128:1,20 131:24 132:15 134:7,13 136:3,6,11 137:17, 23 138:1 139:3,17, 19 140:10,13 141:20 142:6,12 143:11 144:14,23 145:11,23 147:10 157:4 160:10,22 162:6 163:19 164:3 181:1 182:6

**Cassandra's** 31:19,23 32:18,22, 24 33:13,20 34:9, 18 35:6 36:13 41:4,23 47:19 53:23 54:6 55:8,11 65:11 68:8 72:3 77:20 83:1 84:12, 24 85:7,12,16,20, 24 86:4,8,12,16, 20,24 87:4,8 89:7 92:9 93:5,18 99:17 100:5 103:11 107:4 108:15 111:19 118:19

121:24 124:8 125:18 126:10 127:21 128:5,21 129:20,23 130:9, 22 131:13 141:14 143:9 181:7,12 182:14

**Cassie** 8:8,11 19:17 47:11 64:13 67:19 145:13

**Cassie's** 169:6

**Celebrex** 56:11,13

**cell** 31:19 32:24 33:1,4,13,17,20,23 34:9,18 35:3 36:2, 13 38:19,20 40:24 41:4 42:7,9,12 43:6 47:19 48:8,10 53:23 54:6 56:1,2 58:24 65:11,17 74:15,16 76:2,3 77:20 80:8,21 83:1 84:12,24 85:7,12, 16,20,24 86:4,8, 12,16,20 87:4,8 93:5 97:20 102:22 107:4 113:12 130:9,22 158:3,6 159:10 163:15 169:6 170:2

**Cellebrite** 49:7,17 102:23 103:4,8 170:3

**cellular** 48:16

**ceremony** 29:19

**certifications** 11:9,12,18

**certified** 11:14,15, 16

**certify** 176:14

**cetera** 110:7

**chagrin** 178:11

**chance** 7:9

**change** 132:7,11

**character** 132:8

**charge** 120:22 137:12,15 172:6

**charged** 151:20, 21,23,24

**charges** 153:19 175:24

**check** 10:5

**chief** 16:12,14,15, 21 17:1,9 19:24 20:24 21:2,8,9,10, 13,16,18,21,22 22:1,2 23:22 52:5, 14 88:19 93:6 95:19,20 100:22 101:17 102:2 136:15,18 169:15, 16

**chief's** 16:17

**chiefs** 17:4 21:4

**child** 140:22

**children** 8:19 10:8 38:12 63:9 64:15, 18,20 145:13,16 181:19

**choice** 99:10 109:20

**chose** 30:17 108:6 115:20 119:20 172:23 173:3

**Chris** 15:13 74:13 76:1,12 97:8,12 110:13

**Christmas** 26:3 62:8,10

**Christopher** 149:11

**circle** 61:24 62:22, 23 64:9,10

**circumstances** 38:8,9

**citizen** 22:11

**citizens** 22:11

**city** 11:19 20:19,22 24:2 77:2,5,15 88:16 90:3 118:3 121:14 168:3

**city's** 128:23 129:9

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

4

civil 32:13,17
88:16 90:2 123:10
124:22 125:7,16,
20 126:9 127:20
148:16,18 149:1
160:20 172:20

civilly 149:24

claim 166:19

claims 88:18

clarify 39:15 46:2
58:18 80:19
115:17

clarifying 39:3

Clark 112:14,20
147:17,22 148:1,4
156:14,16 165:20
176:13,16 177:7
179:13,20 182:24
183:9,15

class 19:7 90:2

classes 136:23
156:19

clean 44:9 96:6,21
97:8,20

cleanup 179:17

clear 41:2 43:22
57:15 60:18 68:19
70:23 71:10 75:5
99:3 104:19
115:11

clerical 110:2

Clinical 139:1

close 61:24 64:9,
10 108:4 119:7

closed 153:21

closest 24:23 25:7
30:21

Cloud 42:21 43:1
44:12

co-workers 50:2
135:2

codefendant
147:16

College 10:11
13:5

combined 90:1

comma 90:3
97:19

command 54:3
88:17 110:19

commander 23:7,
20 59:21

commander's
55:13 73:24 75:11
93:8 158:21

commanders
23:23 95:9

comment 74:1,2
75:7 133:22

comments 94:2,
14

commitments
64:20

committed
161:14,19

Common 101:1,
23

communication
71:5

communications
71:5

community 10:11
13:5 50:8,12

compelled 174:22

compelling 70:6

compensation
58:4

complaint 32:13,
17 107:11,20
124:22 125:16
127:17,20 129:6,
21 130:17 158:12
173:19 175:12
177:10

complaints
152:13

completed
161:12

completely 64:19

complying
180:21

component 16:3

compose 68:20

composed 67:21
68:9 69:5,8 98:12

composing 69:2
161:11

computer 33:2,3
49:18 83:12
170:11

conceal 99:8

concept 32:14

concern 127:2

concerned
134:23

concluded
112:11

concludes 147:12

conclusion 5:6
130:14

condensed
183:11,16

conduct 15:21
16:6

conducted 5:2
110:14 154:16

confer 89:15

confirm 91:14

confusing 44:7
90:17

Congratulations
8:17

conjunction 71:7

connected 32:8

connection 99:24
177:17

consensually
35:17

consent 35:22

considered 102:7
121:15

consult 119:20
121:19 122:17,20

consulted 121:22

122:16

consulting
119:18 165:3

contact 61:10
81:4 107:8 133:10

contacts 22:11

contained 32:8
34:18 125:16

contemporaneou
sly 91:20

content 34:22
36:16 47:24 70:17,
24 71:17,20 98:16
106:16 115:12

contents 33:1,6
56:12 59:1 80:21
91:15 102:22
103:11 104:1
113:12 163:2
170:2

continue 90:23

continuing 114:2

continuous 138:8

continuously
143:20

control 11:16

conversation
55:1,5 58:6,15
59:3,7,9,15 67:13,
17,18,20 68:1
69:8,10 70:1,23
71:17 74:20 75:15,
19,22 79:23 80:3
108:17 132:16
157:3 159:4 164:5,
9,13,17 166:7
168:6 169:22
170:4

conversations
52:16,19,22 53:2
84:4 87:11,16
108:19 157:4,8,17,
21 158:1 162:20
163:13 182:17

copied 70:11
102:17

copies 33:5 39:19
44:15,18 56:10,13,

14,16 74:15,16
76:2,3 95:18 99:7
110:17 111:21
141:20 169:5,7

copy 72:3 87:18
155:10 169:12
183:11

Corps 12:10 13:1

correct 6:16 7:3,
22 8:20 17:10 18:3
29:12 38:21,23
40:3 41:14,16
46:6,10 47:17 59:4
60:4 68:20,24 69:1
71:2,12,13 74:7
75:8 76:7,22 83:5,
6 85:8,9 88:21
89:3 90:11,12
92:15 93:15,23,24
94:10,11,15,16
95:7,10,15,16
96:13 97:5,6 98:6,
7 100:6 103:5,6,8,
9,22,23 104:20,21,
23,24 105:2,3
108:21,24 109:8
110:10,11 111:2,3,
5,6 112:1,4,8,9
115:19 118:10,13,
15 120:11 122:9
125:8 140:23
151:14 153:8,9,23
167:15 168:17
169:10 172:10,11
173:18 175:6,7
176:7,11,18,19

correctly 95:22

Costa 24:22 25:18
63:23

counsel 5:7 72:4
123:22 124:20
125:17

counsel's 148:7

counseling 138:8
139:6,11,16
144:24 145:9,23
146:2,6,10,22
147:5 156:20

counselor 138:21
139:14 181:17

counselor's

145:14

**counselors**
138:15

**count** 119:6

**county** 9:17
10:11,23 29:17,18,
21

**couple** 6:13 24:18
50:15,16 63:22
72:18 113:3
115:24 147:4
179:17

**couples** 144:24
145:9 146:10

**court** 28:19,24
32:19 49:3 150:11
174:23 176:13
183:5

**cousin's** 61:18

**cover** 143:4 165:2

**covered** 64:23

**covers** 143:3

**COVID** 24:10

**create** 68:15,17

**created** 92:5

**credible** 59:23

**credit** 48:13
166:18

**crime** 170:16

**crimes** 22:9 97:13
101:13 153:8
175:5

**criminal** 10:13
48:21 147:1
148:16 151:14,24
152:15 153:17
154:21 156:5,9,22
157:5,8,18 158:12
160:12,15 161:6
175:15,18,23
177:24 178:4

**criminally** 151:20
169:24 170:9

**criticisms** 152:13

**CROSS-EXAMINATION**
148:3

**Crowley** 5:2,12,
17,19 7:8,13,23
10:4 18:20 23:10
26:13 31:17 33:9
34:13 40:8 43:13
44:11 53:20 55:15
60:12 72:2 91:18
93:1,10 98:8
113:2,10 115:2
124:3,23 128:21
130:3 131:10,22
132:23 138:14
147:8,13,17 148:5
156:18 179:20,24
182:21 183:3

**cry** 133:8

**current** 10:7 11:21
22:16 23:4,6
46:15,21 56:2 59:1
111:13 144:11

**custody** 9:7,9

**cut** 89:18 114:12
138:13

**cyber** 97:13
101:13

**cycle** 117:3

**Cynthia** 18:20

**D**

**D-E-L-R-E-Y**
138:23

**daily** 136:17
142:2,5

**damage** 151:24
154:12

**Darrell** 55:12
73:23 74:3 75:9
84:23 85:6 93:6
100:20 133:6,21
135:15 137:3
165:13

**date** 5:3 7:5,23
18:8 28:19 29:1
76:14 114:20
140:17 141:13

**dated** 26:20 72:4
114:19 115:4,12

**dating** 26:17
60:22 159:19

**daughters** 8:9,22
9:7

**Dave** 54:17 69:12,
24 73:1 87:21
88:14 90:14 99:22
109:24 112:3
121:1 129:18
136:3 164:1
168:16

**David** 50:1 51:12
54:24 56:20 57:10
67:10 72:11 77:1
85:4 90:9 91:19,21
92:12 93:14 94:5
96:9,17 97:1,10
103:5 104:6,20
110:23,24 111:15
114:23 117:8
118:9

**Dawn** 21:10 23:22

**day** 22:17,18,19
26:16 29:14 31:3
63:5 68:13 76:11
91:24 92:3,4
114:22 115:2
136:21 138:9
148:20 162:11

**days** 8:10 64:15
78:13 81:13 96:4
146:16 152:23

**dead** 123:20

**deal** 138:18 143:1
154:6,12

**dealing** 145:9

**Deb** 138:23
139:19,21

**Debbie** 139:16

**decided** 116:3
121:2,18 165:3

**decision** 176:11

**decline** 174:7,20

**deemed** 16:6

**deep** 79:6

**defendants**
84:16,20 87:12
130:12,20

**defense** 154:21
156:9,23 177:24
178:5

**define** 61:23

**degree** 10:2,10,12

**degrees** 10:16

**delete** 88:1 114:14

**deleted** 88:1,2
103:12,13

**deleting** 104:1

**deliver** 181:21

**Delrey** 138:23
139:16,19,21

**Dennis** 20:10

**department** 11:19
12:3 14:7,22 18:23
19:13 20:4 24:16,
24 27:10,16 28:4,6
30:6 31:20 33:8
49:5 50:12 53:14,
22 54:4 61:14,22
62:9,14 63:1 77:21
82:20,24 84:10
87:9 95:19 96:15
97:21 101:2,6,11
105:18,19 106:6
107:9,13 109:13
111:20,22 117:10
118:1 119:23
120:5 121:12,13
128:24 129:9
135:18,22 137:13
143:13 144:15
151:8 162:14
167:6 172:6 180:7,
15 182:8

**departmental**
180:22

**depend** 26:9

**depicted** 36:17,21

**DEPONENT**
183:17

**deposed** 7:19
111:9,12 148:10,
13,16,19,23

149:23

**deposition** 5:1,6
6:4,7,15 7:15
43:20 44:6 67:6
71:7,24 93:1 131:4
150:3

**deputy** 52:5,14
93:6 95:19 100:21
101:17 102:2

**describe** 10:7
21:20 34:22 49:24
52:3,7 102:23
106:14 131:1,13,
15 180:6,14

**describes** 102:20

**description**
106:16 134:1

**descriptions**
125:15,17

**desk** 72:20 75:22
136:20

**destroy** 114:14

**destroyed** 46:6,8
111:23 170:19

**destruction** 176:1

**detail** 69:22

**detailed** 92:8

**details** 107:6
126:19 128:12,18

**detective** 59:19,
20,21 72:8 74:6
93:7 97:16 101:7
104:14,23 118:2
152:5 153:6

**detectives** 78:23
104:15 110:15,18
165:1

**develop** 63:6

**device** 36:2 39:20
41:5 65:17 68:17

**devices** 36:9

**Devito** 52:23 53:3,
6,18 155:3 164:3,
6,10,22 165:6,8
166:7,11 168:6

**dick** 55:16 93:9

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

6

difference 139:15

differences 147:9

difficult 171:19

dig 87:23

direct 5:15 48:12

directed 71:14
177:10

directly 110:10
120:7 133:6
167:21

dirty 126:19

disability 182:7

disagree 91:6,16

disagreed 162:10

discharge 12:21
152:1 154:7
175:24

discharged 12:19

disciplinary
14:15

discipline 15:2,15
16:4,9 17:2 27:15
53:16 150:8

disciplined 16:10
53:13 129:3,4

disclose 29:24
128:14

disclosed 125:20

discovery 131:4

discrimination
77:12 88:18

discuss 7:20
71:16,20 92:24
124:7 166:5

discussed 49:21
74:6 77:14 80:2
85:1 119:15,17,18,
19 122:18 144:18
147:7,11 166:12

discussing 40:24
42:20 44:12,23
58:6 84:6 113:6
129:12 130:11,23
153:5 179:10

discussion 69:14

discussions
119:16 122:24
123:5,9

dispute 28:24
33:12 72:13
177:17

disseminated
130:21

dissemination
129:1,11 130:10

distribute 76:3

distributed 33:7
169:6

district 23:14,18
150:19

districts 23:16,19
65:4 79:15

division 22:5 79:3

divorce 9:11,14,
16 18:18

divorced 9:18
145:12

doctor 181:13,15,
17 182:2

document 32:13
66:7 81:8,13,17,19
82:1,6,8,11 83:14,
15 91:2,7,8,14
92:22 126:12,13
155:22

documented
67:18

documenting
71:1,17 90:13

documents 6:3
32:8

Doe 84:16,19
87:12 130:11,20

dogs 7:7

dollars 119:5

domain 126:20

domestic 152:1
176:1 177:10

dominated 133:3

Don 104:14 106:22
135:23

Donald 86:7

door 57:16

dot 88:7

downloaded 33:1
93:6 109:18

downloading
102:22

draft 32:17

drafted 89:13

drafting 89:16
103:1

drafts 113:22

dramatic 132:7

drink 62:6

Du 29:18,21

due 24:10 111:12
137:10

duly 5:13

dumped 158:23

duties 171:13

duty 12:12 133:7,
17 136:20 137:4,9,
15 143:18 167:14,
18

---

**E**

E-A-R-D 16:18

E-M-P-F 30:15,19

earlier 39:24
53:16 62:13 72:14
92:24 113:6
118:21 138:4

early 125:6

Ed 74:9,10 75:15,
23 76:12 135:15,
19,20 136:23
137:2 148:6
150:14,17 151:1,7,
11,13,16 152:3,7,
14 157:17,21
158:1,5,15 159:4
161:24 162:2

163:4,13 165:16,
22 169:3,4,23
170:8 171:12
173:11,13,17
178:11,19 179:1,5,
9

Edgewood
138:24 139:1,4,14
144:24

education 10:1,3

Edward 86:19
101:5

effective 90:3

effectively 135:11

elected 116:17

election 117:3,6

electronic 44:18

email 28:3,4,5,6
67:21 68:9,11,15,
17,20,22,23 69:2,
5,8 70:1,9,11,13,
17,24 71:17,20,23
72:3 87:18 88:3,6,
9,12,22 89:7,10,
16,23 90:6,13
91:24 92:2,7 93:4,
17 94:1,12 95:2,17
96:3,14,20 97:7,
12,18,22 98:9,12,
16,24 99:5,12
101:11 102:11,17,
18,20 103:10,24
104:3,13,17 105:4,
11,18,24 109:13,
14 110:12 111:7,
18 113:5,10,16,23
114:2,7,12,16,19,
21,22 115:4,8,12
183:16

emails 88:1 101:2
114:15

embarrass 179:6

Empf 30:15,18,19
31:8

Empf's 31:12

Emph 62:12

employed 15:2
17:5 23:3 24:1,7
27:16 135:21

employee 14:15
15:11

employment 12:8
14:20 144:14,21
182:7,10

encourage 51:5
119:13

encouraged
93:18

end 7:8 92:10
93:10 98:22
109:16 110:18
140:15

enforcement
11:12 14:4 22:13

engage 34:2
43:10

engaged 34:24
35:1 44:24 45:3,12
71:6 173:7

entered 14:2

entire 16:15 33:1
139:8

entitled 91:2,3,8,
13

entry 99:12

episode 106:21

erase 56:1 58:24

erasing 56:14

error 110:2

essentially 11:1
53:17 132:4

estimate 34:8,17
102:15

evening 173:22
175:2

event 25:6 97:19

events 5:24 33:10
45:12 62:9 65:20
108:24 109:1
131:23 132:17
138:2 141:14
174:10 175:17

everybody's
116:2 126:18

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

7

**evidence** 56:17 99:8 170:11,16,19

**ex-boyfriend's** 159:17

**exact** 18:8 27:4 140:17 164:23

**exam** 144:5

**EXAMINATION** 5:15 180:1

**examine** 92:22

**examined** 5:14

**exchange** 109:19

**executed** 158:13, 17

**executing** 158:16

**exhausted** 67:12 75:2

**exist** 41:4,6 42:24

**expensive** 118:22

**experience** 118:5 133:2 180:19

**experiencing** 133:1

**expires** 144:12

**explain** 30:2 134:17

**explaining** 134:24 155:23

**explicit** 125:17 128:4

**explored** 144:14, 16,21

**express** 162:5

**extent** 28:9 62:11

**F**

**face** 35:4,6,10

**facilitate** 128:7

**fact** 30:9 121:3 125:19 128:12 133:17 178:14

**facts** 106:8 109:8

125:19 126:10 127:11,16 128:4 177:22 178:2,9,18, 23 179:4,8

**factual** 96:24 130:7,19

**fair** 26:20 44:3 67:4 143:24 156:6 172:22 173:1 176:3,4

**fairly** 150:23

**fall** 109:16 110:6

**false** 92:11 93:23 104:11 105:2 179:1

**falsity** 94:9 97:5 98:5 103:22 109:8 111:5 112:7

**familiar** 83:23 92:20

**family** 30:3 64:21 181:12,15

**famous** 142:19

**fashion** 175:22

**FBI** 96:5,22 97:13 101:13 103:14 121:13

**February** 12:4 14:22

**federal** 32:18 150:11 152:7

**feeding** 118:9 140:12

**feel** 134:21 137:19

**feelings** 138:6 152:6 177:3

**feels** 134:18,20 135:7,8

**feet** 144:3

**fellow** 25:7 30:10

**felony** 161:15,19

**female** 16:1,2 56:4 82:2 133:2 134:23 135:10 168:10

**fiancee** 29:6

**field** 11:14 20:3,8

**file** 32:12 107:20 155:19

**filed** 9:16 32:9,18 76:17,22 77:1 78:8 108:15,20 119:3 124:23 125:8,10 126:9,12,18 127:20 136:11 141:10 160:9,20 164:11,12 172:19 175:9,24 181:3

**files** 30:5

**filing** 125:11 128:3

**filled** 24:13

**final** 111:17

**find** 87:23 158:18

**findings** 154:1,3

**fine** 20:13 57:17 151:4

**fingerprint** 28:7, 12

**finish** 179:15

**finished** 89:21

**firearm** 152:1 176:1

**firsthand** 111:10 163:1

**five-day** 27:20 28:17,23

**five-minute** 60:9 112:11,22 179:14

**flexible** 112:19

**flyer** 116:1

**focus** 23:24 33:19 35:14 180:13

**focusing** 23:10 26:1 47:19 131:16

**folks** 49:10

**follow** 169:17 179:23

**follow-up** 148:8

**font** 83:18,19

**FOP** 62:10

**force** 62:20 97:13 101:8 171:4 172:6, 7

**form** 45:5 46:15 51:8 66:9 71:23 79:8 83:17 88:24 90:16,19,22 91:11, 13 92:21 126:21 127:4 128:9 129:14 130:4,13 132:19 134:9 138:11 165:18 174:13 178:6 180:10,17 183:13

**formal** 29:19 114:11

**forward** 87:20 119:13

**forwarded** 68:11, 23 70:8,13 87:19

**found** 83:8 93:18 164:8

**foundation** 43:3,9 80:22 117:11 124:14 126:1 127:4 128:9 130:4, 13 178:6

**fourth** 19:17 115:15 129:24

**frame** 23:12 76:9 108:14 146:12 150:21

**free** 64:17 125:12, 21

**freeze** 24:12

**frequently** 34:6

**freshman** 11:7

**Fridays** 13:7

**friend** 24:19,22 30:13

**friendly** 49:13

**friends** 24:17,23 30:10,21 49:10 61:24 62:20 64:9, 10 142:16 159:20, 22 171:4

**front** 89:1

**frustration** 159:7

**full** 15:14 183:16

**full-size** 183:12

**full-time** 13:14

**functions** 137:12

**future** 144:8

**G**

**G-U-C-K-C-O-P** 88:7

**Gabin** 100:21

**gap** 50:11

**gather** 50:8,9

**Gatlin** 159:13,15, 16,20,22 160:2,12 161:14,19

**gave** 37:4 74:16 76:4 78:24 82:12 92:15 93:20 95:19 96:18 98:2 113:23 124:6 129:17,18 154:2 166:18

**Gavin** 52:8,16 55:12 73:23 74:3 75:7,10,11 84:23 85:6 93:6 94:2 100:12 133:6,18, 22 135:16 136:14 137:3,7,9 165:13

**general** 74:14 100:24 101:10 110:13 168:23 181:17

**generally** 22:7 32:14 145:10 146:22 177:24 178:4

**get along** 25:3,12 50:3

**girls** 64:16

**give** 6:15 10:4 12:7 18:8 20:8 21:7 36:14 67:2 76:9 96:21 105:11 127:1,9 132:13

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

8

137:5 140:18
142:22 145:6

**giving** 75:8

**gloating** 74:11

**golf** 107:15

**good** 10:9 38:1,4
112:10,17,20
120:6 121:3
130:18 147:21
151:5 179:18

**gosh** 21:14 25:18
106:24

**grabbed** 65:14

**graduate** 12:5

**graduated** 12:9

**Grant** 10:19,20
11:6 13:12,15,17,
20 14:5,14 18:14,
17,21

**great** 131:19
176:18

**greatly** 132:12

**Grizzle** 74:10
75:15,19,23 76:7,
10,12 86:19 95:18
100:12 101:5
135:15,19 136:1,
24 137:2 148:6
150:14,17 151:1,8,
11,13,16 152:3,14
153:6 157:18,22
158:2,5,15,21
159:4 161:24
162:2 163:4,14
165:13,16,22
169:3,4,20,23
170:8 171:12
173:12,13,17
178:11,19 179:1,5,
9

**Grizzle's** 74:9
75:23 152:7

**grounds** 15:20

**group** 26:4,5 51:5,
16 75:21 147:14

**guess** 20:15 65:13
72:22 77:22 80:13
99:4 108:18

121:21 128:16
161:22

**guidance** 145:18

**guide** 145:14

**guys** 34:2 44:23
60:5 63:7,12,16,22
112:17

**gynecologist**
181:18

———————

**H**

**half** 14:10,19
16:23 21:18 55:4
57:8 73:11

**half-hour** 59:15

**Hall** 6:10 49:21
68:24 70:9,24 84:1
91:1 98:15 122:17
123:10 124:7
125:1 180:4 181:5
182:12

**Halloween** 26:3

**hand** 5:9

**handle** 112:13

**handwritten**
68:12 83:9

**hang** 26:6 64:21

**happen** 54:9,12
126:17,23

**happened** 24:9
28:22 57:23 76:15
135:1 166:17

**happening**
166:13

**harassing** 167:22

**harassment** 16:3
167:15,19

**hard** 44:15 95:18
111:21 152:6
167:23 177:3
183:11

**Harrison** 55:14
94:3 95:3,5,14,15
97:8 100:13
101:19 165:13

**head** 67:2 88:11

**heads** 142:22

**health** 139:6

**hear** 54:13,15 60:6
82:23 83:4 142:7,
14

**heard** 74:9,20
76:11 87:7 108:10
163:18,23 166:21
168:13

**hearing** 81:12
164:4

**hears** 142:8

**hearsay** 85:4

**held** 11:24 51:24
118:3 171:18

**helped** 99:8 128:7,
12

**helpful** 83:17
118:19 145:20
177:24 178:4

**helps** 25:14

**Herald** 142:2,3,6
155:17

**hey** 74:22 142:17,
19

**high** 10:18,19
11:7,8 12:5,8
120:5 121:4
171:18

**high-profile**
118:2

**higher** 109:19

**highest** 10:1
14:11

**highly** 99:9 111:18

**hire** 19:15 71:10

**hired** 14:6,21 19:7,
9,16 20:18 21:1
27:9 31:14 63:2

**hires** 19:8,14

**hiring** 19:10 24:11

**history** 143:9

**hold** 10:5,16 11:8

51:4,9,12,19

**holds** 116:15

**Holland** 11:5

**home** 17:18,20,22
39:14 174:2
177:17

**homicides** 118:2

**honorable** 12:21

**hope** 34:13,15
57:24

**hour** 55:4 57:8
60:8 73:11 102:19
113:20

**hours** 22:18

**house** 27:6 38:12

**household** 63:10

**HR** 30:6

**hundred** 19:15
119:5

**husband** 133:13

———————

**I**

**idea** 35:19,21
38:1,4 42:22 80:11
120:6 121:3

**identified** 84:16

**identify** 122:23
135:14

**identifying** 100:9

**identities** 84:19

**Illinois** 5:4 10:19,
20,22 11:6 13:7,24
18:15,17,21

**images** 31:18 33:3
36:18,22 84:5
129:2 130:10,22
157:22 179:9

**imagine** 133:12
134:2

**Immediately**
69:12

**impact** 131:22
142:11 147:9

**impacted** 132:11,
17

**impair** 5:24

**implying** 171:22

**important** 100:5
134:5,7

**in-person** 82:16

**inadvertently**
161:12

**inappropriate**
133:22

**inappropriately**
28:3

**incident** 100:1
105:6 107:7
109:10 111:10
132:3 143:6 149:7,
16 153:6 174:3

**incidents** 147:10
168:12

**include** 22:8
69:23

**included** 100:12
125:11 128:4
161:18 168:16

**includes** 30:6

**including** 70:21
87:15 88:17 98:15
104:16 105:10
126:14 127:11
128:6

**incomplete** 179:2

**incorporating**
126:9

**independent**
93:22 112:6

**independently**
94:9 96:11 97:4
98:5 109:7

**Indiana** 10:23

**indicating** 169:4

**indiscernible**
162:1 169:19

**individual** 90:4
136:7 137:14
146:5

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

9

**individually**
147:4

**individuals** 20:20
133:4 135:8,13,20
137:18 173:2

**inform** 133:6
142:18

**information** 55:7
56:21,22 57:9
59:12,17 60:3
69:22 70:4,5
73:15,20,21 74:4
77:18 80:8 81:22
82:4 84:9,22 85:5,
10,14,18,22 86:2,
6,14,18,22 87:2
89:24 90:8 92:14,
18 93:2,11,20
94:5,19,23 95:14,
24 96:8,17 97:1,
10,16 98:2 99:22
100:16,17,23,24
101:9,10,14 103:1,
3,15,19,22 104:5,
9,16,19,23 105:2,
10,13,14,22 108:7,
8 110:9,21,22
111:2,5,8,14
112:2,3,8 118:9,
17,18 120:2
123:19 128:8,22
129:8,18 130:2,7,
19 136:2 155:18
163:23 164:3
167:6 171:6,10
172:9,21 178:3,10,
15,19,24 179:4,8
183:5

**informed** 67:19
163:4 164:4 166:7

**initial** 76:20
123:11 125:2
164:7

**initially** 115:6
119:3

**initiate** 32:12

**initiated** 73:12
182:16

**input** 98:16 115:12
116:20

**inspector** 74:13

110:13 168:22

**instance** 128:15

**Institute** 13:23

**Instruct** 123:18

**instructed** 176:9

**instructing**
123:23

**instructor** 11:17

**instructs** 43:15

**insurance** 30:6

**intend** 144:7

**interaction** 21:24
53:17 136:12,18

**interactions**
136:6

**intercourse** 35:1

**interest** 27:6

**interested** 51:7

**intermediary**
43:4

**internal** 30:8 97:9
101:16 110:14
119:17,22 120:4,
13,17,19,21,23
153:15,20 154:16,
18 155:10 169:8

**internally** 121:5

**interviewed**
20:21 74:13 76:1,
12 154:18 168:22

**intimacy** 132:5

**intimate** 35:17
37:4 66:5 92:8
135:4

**investigate** 120:9

**investigating**
22:12 170:9

**investigation**
97:9 100:22
110:14 120:4
151:14,17 153:16,
20 154:16,19
155:4,11 157:18
159:10 170:1,18,
19

**investigations**
33:2 49:4,11,14
52:6,13 59:22
74:12 79:2 93:8
96:5 100:21 101:7
102:1

**investigator**
151:18

**involve** 28:18

**involved** 51:1
59:20 77:10 120:8,
14 122:12,13
129:5 136:4 149:1,
6,8,9 150:7 167:1,
21

**involvement** 53:8
100:1

**involves** 31:18

**involving** 28:19
105:6 107:2 149:7,
21

**iphone** 41:16,18
46:23 66:14 129:2,
23

**iphones** 47:1,5

**issue** 6:1 53:9
56:1 58:24 134:6,
12

**issued** 107:3,9
162:6 163:5

**issues** 7:20 14:15
53:3 82:20 109:2
119:21 131:20
138:9,18 145:8,11

**items** 111:23

---

**J**

**Jackson** 8:15
50:1 51:12 54:17,
18,24 56:20 57:10
58:6,19 59:9,11,
15,17,19 60:2
67:10,13,17 68:1
69:5,8,13,24 71:1,
18 72:8,11,15
73:1,7,13,18 74:6,
21 75:3 76:21
77:1,14,17 82:15,
16 83:2 85:4

87:15,21 88:14,15
89:23 90:9,11,14
91:19,21 92:8,12,
15,18 93:4,14,17,
20 94:1,6,12,16,21
95:3,6,17,24 96:4,
9,17 97:1,7,10,16,
24 98:2 99:15,22
102:21 103:5,11,
16 104:6,13,20,23
109:24 110:5,13,
23,24 111:8,12,15,
18 112:3 114:23
116:8 117:6,8,16
118:9 121:1
129:18 136:3
164:1 168:7,17
172:9

**Jackson's** 77:5

**Jacob** 8:15

**jail** 152:4

**jeez** 48:9

**Jeff** 123:1,2
156:10,23 157:5,8,
11 171:3

**Jensen** 56:11
86:23 95:20 121:7
169:23,24 170:1

**Jeremy** 55:13
94:3 101:19
165:13

**Jerndt** 5:5

**Jim** 17:8

**job** 14:4 20:21
34:15 135:7,10
152:11,14

**jobs** 171:18

**Joe** 16:14,20,21
23:9

**John** 20:14 84:16
130:11,20 165:14

**Johnson** 139:12,
13,17,18

**join** 12:2 13:20
51:5 115:20 116:2,
3

**joined** 17:14 18:23

**joining** 51:8

**joint** 9:9

**joke** 15:17,18

**Joliet** 5:4 8:2,3
11:19,21 12:2
14:21 17:14 18:23
19:20 20:19,23
21:3 24:2 27:9,16
30:24 31:8,20
49:5,11 53:18,22
54:4 57:2 61:13,
17,22 62:1,14 73:6
77:21 82:20,23
84:10 87:9 97:20
101:6,21 106:6
110:13 117:9
119:23 120:5
121:14 135:17,21
142:3,6 143:12
144:15 151:8
155:16,17 162:13
180:7,15,20 182:7,
10

**journalists**
182:13,17

**JPD** 88:15,17
101:6

**judge** 29:22
158:10 163:4

**judge's** 29:22

**jujitsu** 63:22 64:3

**July** 125:6 140:17
173:20,24 175:22
176:21 177:9

**June** 5:3 23:11
31:4 33:24 72:19,
21 140:6 145:22

**justice** 10:13
121:13 170:12

---

**K**

**K-I-L-L-I-A-N** 64:5

**Kankakee** 9:17
10:11,23 13:5

**Kevin** 20:16

**kid** 62:9

**Killian** 63:23 64:5

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

10

**kind** 25:3,14 26:5 30:7 50:8,11 73:22 92:18 93:1 102:17 107:19 132:15 138:13 140:1 142:9 143:12 145:5,14 155:18 164:19 166:18 167:22 182:5

**knew** 103:7 108:9

**knowing** 118:8

**knowledge** 17:23 32:3 33:10,19 36:8,12 40:2,20 41:5 46:1,7,16,17 47:23 48:2,4 53:21 54:2,8 58:1 71:3 80:7 84:9,22 85:10,14,18,22 86:2,6,10,14,18,22 87:2,6 89:4 92:9 96:16 97:14 101:1, 23 105:16,21 107:1 108:23 110:16 111:2,10 129:7,19 139:8 143:8,11 155:13 163:1 177:22 178:2,9,14,18,23 179:4,9

**L**

**L-O-N-G** 9:4

**lack** 43:2 126:1 132:9

**Lake** 18:13

**Lamken** 163:7,12, 14

**language** 79:5 83:19

**laptop** 55:22 58:8, 10

**Las** 61:16

**late** 50:23 125:5

**law** 11:12 14:4

**lawful** 169:12,16

**lawsuit** 6:1 7:21 25:6 31:18,23

**led** 106:9

**left** 12:9 95:3

**legal** 6:24 121:24 124:8,10 125:16 126:11 130:14

**Legalview** 5:2

**letter** 77:23 78:1, 16,18,20,21 79:9, 12,16,24 80:3,11, 14,17,20,24 81:12 83:3,7,23 114:10 120:3,24 123:15 163:20 164:7,23 168:5,9

**letters** 111:20 166:14 170:23,24

**level** 10:1 109:19 110:19

**lieutenant** 23:8,9, 21,22 94:3 100:21 101:16,19,20 102:1 120:16,22 154:17 159:2 169:8,11 172:12, 17 173:9

**life** 64:19 126:10 128:5

**light** 37:22 133:7, 17 136:8,20 137:4, 9,15 138:9 143:18

**limit** 102:18

**lines** 118:23

**list** 19:11,13,15,18 65:2 87:14 100:8 144:11 183:2

**litigation** 67:7

**live** 8:1,7,8 9:5 18:9,12,16,21 26:23 60:13,20 61:3,8

**lived** 8:5 17:15 60:22,23 61:8

**lives** 126:11

**living** 18:11 27:2 61:1

**local** 142:1

**located** 5:4

**long** 8:5 9:2,8,12, 19,23 10:7 11:24 13:11,17 14:8 16:21 17:22 18:16 22:24 50:13 51:15, 24 55:3 73:10 78:13 102:12 109:11,12 113:15 117:2 146:16

**longer** 41:13 62:19

**looked** 81:1 83:14

**Lorinda** 163:7,12, 14

**lose** 60:5

**lost** 156:14

**lot** 24:11,12 63:1,2 132:6 142:13 162:24 173:19

**love** 15:13 131:11, 14 176:17

**loved** 57:24

**lunch** 73:14

**M**

**M-A-L-E-C** 21:11

**M-E-T-O-N-G-A** 18:14

**machine** 28:12

**machines** 28:7

**made** 15:11 32:2,4 33:6 56:10,13,14, 17 60:1 74:3,15 75:7 77:6 79:5 88:19 90:5 94:2,16 95:18 107:11 120:11 125:11 127:20 128:18 133:22 169:5

**mailbox** 51:7 77:24 78:2 79:16 80:1,24 83:8,16 116:2 123:16

**majority** 16:23

**make** 76:2 114:11, 16,19 127:12 137:19 169:11

**making** 22:11 73:24 109:21

**male** 15:24 133:3 135:2

**Malec** 21:10 23:22

**management** 156:19

**mandated** 136:24

**Marc** 20:14 76:4 85:11 95:19 101:16 120:16,22 121:7 135:15 154:17 165:13 169:7,8

**March** 54:16 57:3 59:16 67:10 68:1 71:1,15 72:5,7,11 77:17 87:20 88:14 94:6 96:1 97:2,23 114:20,23 115:4, 13 116:11 164:1

**Maria** 159:13,15, 16,20,22 160:2,12 161:14,18

**Marine** 12:10 13:1

**marines** 12:11,13, 19,24

**marriage** 8:9 9:8, 19

**married** 9:21,23 29:11,14,16,21 30:1,4,9 131:12 144:23

**martial** 64:2

**maternity** 140:13

**Matlock** 51:21,24 52:4 73:4,7 74:1 75:3,6,10,14,18, 20,22 76:6,9 82:15,16 83:3 86:3 87:15 121:1 168:17,21 169:2 170:6

**Matt** 24:20 25:16 112:14 182:23

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

11

**matter** 110:15
133:19 147:1
148:6 152:24
153:1,3,5 160:5,
18,20,22 161:2

**matters** 71:8
133:23 148:16,17

**Mauer** 25:18

**Mckeon** 86:10
135:23 136:1

**Mckinney** 86:7
104:14 105:5,8
106:22 107:2,10,
11,12,17,21 109:4,
9,16 110:6 135:23
136:1 165:14

**Mckinney's** 106:9
108:18

**Mckinney/
ranstead** 109:2

**meaning** 39:1
95:4 101:6 155:23

**means** 112:6

**meant** 15:17 38:24
83:18,24 109:23
119:7

**media** 45:19,24
77:7,8 128:13,14
155:14,15 181:1,6

**medication**
140:11

**medications**
140:5,6

**medicine** 138:18
139:19,20 140:1

**meditation** 5:23

**meet** 64:13,22
73:13,16 125:1

**meeting** 56:23
57:2 67:10 69:4
71:1 72:10,15,17,
21 73:1,3,5,8,10,
12,18,23 75:2
76:20,21 77:17
82:14 87:21 88:13
90:11,14 91:19,20
92:12 94:24 95:6,
8,9 96:1 97:2,23

98:13 114:23
120:24 125:2,3
168:16,20

**meetings** 77:1
82:16 116:11

**member** 50:10,13,
19 82:19 84:10
116:19 151:8

**members** 31:19
50:2 54:3 77:20
78:23 79:2 87:9
88:15

**memory** 5:24
67:13 75:2 78:20

**mental** 139:6

**mental-health-
related** 140:5

**mentioned** 26:7
27:24 53:16 59:24
62:21,24 63:16
64:1,4 65:8 75:13
79:4 81:20 83:7
118:21 121:5
122:5 135:14,21
136:2 137:17

**mentioning** 79:6

**mess** 133:8

**message** 69:16
161:11

**met** 73:20 82:19
123:11 143:9
159:23

**Metonga** 18:14

**Meyer** 25:19

**middle** 23:4

**midnight** 21:23
22:14 78:6 101:20
102:4 150:18

**Mike** 25:17 52:23
53:6 85:19 102:1
135:23 155:3
164:3,6,10,21
165:5,8 166:6,10

**million** 119:7,10

**mind** 25:20,21
73:22 83:22

**mine** 24:22 99:16

**minority** 50:10

**minute** 54:22 60:5
179:15

**minutes** 73:11
147:18

**misheard** 31:11

**missed** 28:24 29:4
107:23

**missing** 28:19
29:3

**mission** 50:7

**mobile** 41:23
48:16

**moment** 10:5
33:18 35:17 66:5,
11 95:3 135:4
147:13

**money** 57:13

**monitoring** 22:13

**month** 27:4 48:14

**months** 8:15
13:18 19:10 72:18
78:14 81:13
146:17,18,20

**morning** 173:24

**mother** 9:1 131:14
159:17

**mother-in-law**
131:2,11 176:17

**motivation** 132:8,
10

**mouth** 74:9

**move** 65:24 91:12
119:13 134:13

**moved** 11:6 17:24
18:2,5,9 63:2
145:4

**movement** 37:5

**Moving** 109:14

**multi-agency**
172:7

**Mustang** 8:4
17:15 27:6

**mute** 19:2

---

**N**

**N-I-C-H-O-L-A-S**
5:19

**naked** 36:24
157:22 163:19
164:1 165:8,17,23
168:14 179:10

**named** 56:4 62:13
99:23 130:12,20

**names** 5:21 18:19
20:8,12 21:7
25:20,21 51:18
64:23 65:6 122:23
126:19

**narcotics** 101:21

**narrow** 122:19

**nature** 105:20
125:18 137:6
145:8 146:21
165:2 180:6

**NAUGHT** 183:17

**necessarily** 43:5

**neck** 91:10

**needed** 66:24
67:22 70:3,6 79:3
137:10

**negative** 132:11

**neglected** 26:14
48:7

**newer** 143:21
144:1

**newspaper**
126:13 141:3,6,15
142:11

**newspapers**
126:14

**Nicholas** 5:12,19

**Nick** 5:1,22 83:18

**Nicole** 139:12,13,
17,18

**night** 25:11 55:11
79:13,14,21 93:5
158:13,17 174:3,

11,16 176:21

**ninth** 62:17

**Nobert** 149:18

**nonlawyer** 180:3

**northeastern**
10:22

**note** 99:23 100:5

**noted** 90:23 91:11
99:6 105:5 110:17
131:8

**notepad** 68:4
91:23

**notes** 67:19,21,24
68:3,5,7,12,14,15
90:10,14,15 91:18
92:4,5 98:9 102:16

**noteworthy** 99:21

**noticed** 137:23

**nude** 33:12 36:11,
12,16,18 40:23
53:23 54:5 77:19
82:24 84:11,23
85:7,11,15,19,23
86:3,7,11,15,19,23
87:3,7 129:11
136:5

**number** 24:4,6
34:8 36:14 42:2,5,
15,17 98:24

**numbered** 98:23

**nurse** 139:21

**nuts** 77:13

---

**O**

**oath** 111:11

**object** 43:2 45:5
66:9 71:4 83:17
88:24 90:16 92:21
127:4 128:9
129:14 130:4,13
132:19 138:11
165:18 174:13
176:23 180:10
181:8

**objectified** 133:3
134:17,18,20,22

135:8 137:19

**objection** 43:7,8,9
65:21 66:1 80:22
90:19,22 91:11
113:17 115:14
117:11 118:11
123:18 124:9
126:1,21 131:5,17
134:9 165:24
177:6,12,19 178:6
180:17

**objections** 43:10,
13

**observations**
132:15

**observed** 147:8

**obstructing**
159:9 170:1

**obstruction**
170:12,16

**obtain** 158:9

**obtained** 56:20
158:10 178:20
179:1

**obtaining** 158:6

**occasion** 34:4
168:13

**occasionally**
64:12

**occasions**
149:23,24 150:6
168:7

**occur** 29:8 72:17
73:5 106:23

**occurred** 73:6
76:15 105:16
106:24 155:5
173:20 175:22

**occurrence** 76:14
107:2

**occurring** 79:1

**offense** 15:18,24

**office** 54:22 55:13
56:16 59:23 73:24
74:12 75:12 81:3
93:8 96:5 119:22
158:22 164:19

**officer** 5:1,12,17
7:13 10:3 11:14,16
13:12 15:17,24
16:6 19:5 20:3
21:3,23 22:4,8
23:10 24:21 25:17,
18 26:13 30:23
31:13,17 33:9
34:13 40:8 43:13
44:10 48:7 49:1
52:23 53:18,20
55:24 56:4 60:12
65:7 72:2 91:18
93:1 96:6,15 98:8
101:13 105:6,7,15,
18,23 106:3,5,10,
20 107:9,10,11,12,
14,16,17,18,20,24
108:4,10 109:3,9
113:2,10 115:2
120:21 122:12
124:2,23 128:21
130:3 131:10,22
132:22 133:2,13
135:10 138:14
147:8,13,17 148:5
149:9 150:2
156:17 157:7,11
158:2,6,16,19,20
159:3,12,20 160:1,
15 161:1,8,13,17,
23 162:18,21
163:15 164:6,10,
16,21 165:7,15,21
166:6,9,20 168:14
170:6,9 172:17
173:14,16 174:1,
11 175:12 176:8
177:11,16,23
178:3,13,20 179:6,
20,23 180:23
182:21 183:3

**officers** 20:9 24:1,
14 25:7,23 30:10
33:2,7 49:14 50:5,
9,10 51:19 53:22
61:13 62:24 63:2,4
64:11 65:3 97:19
99:7,23 105:8,17
109:15,19 110:5,
19 111:9 115:21
116:6 120:3,4,13
129:4,5 136:4
137:11,13,15
149:21 159:1
162:14 171:20

174:1,12 180:21

**officers'** 178:15

**official** 28:2

**one-man** 26:12

**ongoing** 149:14,
20 172:19

**opened** 83:15

**openly** 75:24

**operate** 49:17

**operated** 103:8

**operator** 11:15

**opinion** 102:8
117:18,19 130:16
151:4 162:9
166:10 172:1

**opinions** 151:1
162:5

**opportunities**
63:1 144:15,21

**opportunity**
127:23 137:8

**option** 144:18

**options** 119:20
121:19,23,24
124:8

**oral** 34:24 35:13,
14,19 75:8 79:8

**order** 13:20 20:11
27:9 32:11 61:10
109:19 135:3
169:12,16,17
174:23 183:5,15

**ordered** 56:12
74:17 169:11
170:1 183:10

**orderly** 175:21

**orders** 5:7 107:9
133:4 135:3

**organization**
51:10,13,20
115:21 116:7,8,20

**orientation** 88:18

**original** 114:7

**originally** 46:11

**outing** 107:15

**outings** 61:21,23

**outlets** 126:13

**overheard** 168:21

**overhearing** 76:6

**owned** 17:22 47:2

**owner** 43:5

**ownership** 27:6

**owns** 17:20

― ― ― ― ―

**P**

**P-H-E-L-P-S** 17:8

**P-H-I-L** 31:9

**p.m.** 22:20 79:20

**paid** 171:16,17

**pain** 91:10

**panel** 20:20

**paper** 142:1

**paperwork** 30:8

**paragraph** 88:22
89:23 98:21,22
99:5 102:20
103:10,24 104:13
105:4 111:7,17
113:16 128:21
129:5

**paragraphs** 98:24
102:11,12 129:21

**Pardon** 79:5

**parents** 18:11,12,
16 60:23 61:9

**parents'** 18:19

**Park** 10:19,20 11:6
13:12,15,17,20
14:5,14 18:14,17,
21

**part** 41:3 110:2
116:6,7,8 120:3
125:12 127:20
132:16 151:14
153:17 154:18
156:18 167:10
174:10 175:15,17,

18 179:11

**participated**
129:1,10

**participation**
152:7

**particularity**
34:23

**parties** 26:2,3
62:8

**partner** 24:20
25:16 26:8,11

**partnership** 50:9

**parts** 36:20 174:9

**party** 62:10 64:14
149:2,17

**pass** 27:8 179:21

**passed** 27:14 79:2
109:18 111:23
172:5

**passing** 106:22
118:17 172:21

**password** 66:14,
16,19,22 67:1,5

**past** 97:21 148:21,
23

**paste** 114:12

**Patch** 142:4,6,17
155:16

**Patricia** 131:2,14

**patrol** 21:23 22:4,
5,8,10 31:13
101:20 102:4
172:17

**Patrolman** 11:23
14:13

**Paul** 45:8 123:17

**pause** 10:6 19:3,5
127:1,9

**pay** 31:3 48:10,14

**PD** 49:11 61:17
62:1

**PDF** 183:12

**pen** 68:4

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

13

**pending** 111:13
172:24

**Pendleton** 12:14

**penmanship** 99:4

**people** 30:11 62:3,
20 63:11 64:22
91:9 100:9 101:3
121:4 135:13
136:2,13 137:17
143:5 166:14
167:20

**performing** 35:13
163:24 168:15

**period** 31:3 88:18,
20 90:4 93:10,19
95:21 96:7 97:9,
15,21 99:11 104:2
105:9 109:20
111:24 145:2

**permanently**
114:14

**person** 62:13
69:15 81:4 94:20

**personal** 33:9
41:21 42:12 44:19
53:21 54:2,7 55:22
56:16 58:9 88:3,8
108:23 111:1,9

**personally** 77:7
110:1,3,10

**personnel** 30:5
155:19

**persons** 19:15

**Pete** 106:3,18

**Phelps** 17:8,9

**Phil** 30:15 31:9,12
55:22,23 56:2
58:22,23 59:24
63:21 171:10

**Philip** 96:6 101:12

**Phillip** 85:15

**phone** 31:19
32:24 33:1,4,6,13,
17,21,23 34:9,19
35:3 36:3,13
38:20,24 39:1,2,20
40:24 41:4,6,7,9,
10,13,15,21,23

42:3,7,9,12 43:6
46:9,11,15,20,21
47:10,12,14,20
48:1,8,10 53:24
54:6 55:12 56:1,2,
12 58:24 59:1 63:8
65:12,13,17 66:20,
23,24 67:4 68:18,
19 69:15 74:16,17
76:2,3 77:20
78:11,12 80:9,21
83:1 84:12,24
85:8,12,16,20,24
86:4,8,12,16,20,24
87:4,8 93:5,18
96:7,21,22 97:8,20
102:22 103:12
104:1,15 107:4
111:21 113:12
125:18 130:9,22
136:5 142:18
158:3,7,14,16,22,
23 159:11 163:15
169:6 170:2

**photographing**
45:6,10

**photographs**
33:13,17,18 36:11,
12,17 37:1,3,6,9,
11 38:15,16 39:4,
16,20,23 40:9,12,
16,23 41:3 42:19
44:11,16,19 45:11,
18,23 46:3 47:13,
20 53:23 54:5
65:11 77:19 82:24
84:5,11,24 85:7,
11,15,19,23 86:3,
7,11,15,19,23
87:3,7 129:12
136:5 165:9

**photos** 42:23
157:22 163:19
164:1 165:17,23
179:10

**phrase** 79:9

**physical** 27:8
41:15

**physician** 181:16

**pictures** 36:23,24
39:11 135:9,12

**piece** 75:13 96:24

**place** 5:7 9:14
125:4 156:6
164:14,17 166:24
172:20 175:17

**plaintiff** 122:2,8,
11 129:23

**plaintiff's** 129:2
149:18

**platform** 45:20,24

**play** 53:4

**Playboy** 106:19
108:3

**played** 151:16
158:5

**playing** 107:18

**plugging** 23:17

**point** 11:16 29:5
61:2 97:18 115:5
124:24 130:17
150:18 172:18

**pointing** 168:18

**points** 99:3

**police** 11:19,22
12:2 13:12,15,19,
20,23 14:2,6,21
16:12,21 17:4,9
18:23,24 19:13
20:24 21:3,4 24:1
27:10,16 31:20
33:7 49:1,5 50:5,9,
10,12 53:13,18,22
54:4,19 57:3
61:13,22 62:14
77:21 82:20,24
84:10 87:9 88:20
95:20 97:20 99:10
101:6 106:6,20
107:9,13 115:20
117:9,24 119:23
120:5 121:13
122:12 128:24
129:3,4,9 133:2,13
135:10,18,22
136:15 137:12
143:12 144:15
151:8 162:14
167:6 169:15
171:17 172:5
174:1 176:21
177:4,8,15,16

180:7,15,20 182:7

**policy** 162:14,16

**pops** 56:19

**porn** 55:16 93:9

**pornography**
105:7 106:11,14
107:23

**portion** 112:12

**position** 11:21,24
13:14 23:18 31:12
51:12 52:1 116:15,
17 117:3 171:22,
23 172:1,2 176:2

**positions** 24:13
51:9,19,22 118:3

**possibility** 42:23

**possibly** 27:21
145:4

**post** 45:18

**posted** 45:22

**posting** 45:19

**potential** 19:14
99:24 124:7
130:11

**potentially** 48:9
57:14,15 87:23
110:1 118:22
119:10 120:14
170:12

**Powers** 55:14
85:23 94:4 100:13
102:4

**practice** 45:7,10,
12 162:17 181:24

**practitioner**
139:21

**preferred** 171:22
172:1

**pregnancies**
143:19

**pregnancy** 137:6,
10

**pregnant** 133:5,7,
11,17,24 134:3
136:20 137:4
138:19

**preparation** 6:6
7:15

**prepare** 90:13
98:9,10

**prepared** 90:10
91:18 92:1,2,3,4
113:5 114:22
125:16 145:19

**preparing** 98:8

**prescribe** 139:18,
20

**prescribed** 140:1

**prescribing**
138:18

**prescriptions**
139:24

**present** 54:24
58:14 59:6,9 61:2,
6 72:24 73:3,8
75:9 123:5,8 125:2
138:9 141:13
154:22,24 159:1

**preservation**
111:19

**preserve** 113:12

**president** 51:14,
15,22 52:1 116:9,
10,21 166:15

**pressure** 11:16

**prestigious** 99:10

**presuming** 41:9

**pretty** 24:6
133:22,23

**previous** 8:9

**previously** 74:6

**price** 119:4

**primarily** 12:14

**primary** 181:15

**printed** 155:14

**prior** 43:3 71:5
103:13 105:6
106:20 108:10
143:20 159:18
165:5 173:19
177:9

**private** 33:3 35:16
37:4 66:5,11 84:5
108:7 125:19
126:10 127:11,12,
15 128:4 129:2
130:10,22 133:23
135:4 157:2,22
179:9

**privately** 44:23
54:21

**privilege** 123:22

**privileged** 71:5
181:8

**privy** 179:9

**proactively** 22:9
145:14,17

**probable** 129:24

**problem** 74:24
151:6,7

**problems** 151:10

**procedure** 102:21

**proceedings**
6:12,24

**process** 47:17

**PROCTOR** 5:16
7:8,12 19:2,4,6
43:8,12 45:7,9
60:6,11,17 65:22
66:3 71:9 83:21
84:1 89:2 90:17,21
91:3,6,11,16,17
92:23 98:18
112:10,19,21
113:1,18 115:16
117:19 123:20
124:1,13,15 126:2,
22 129:15 130:5,6
131:4,8,9 132:21
134:10 138:12
147:12 179:16,23
180:2 182:20

**profession** 133:3

**professional**
138:5 180:15,21

**progress** 22:9

**promoted** 99:9
100:15,18,21
101:3,17 102:2

**promotion** 102:7
109:20 143:12
171:15,16

**promotions**
100:2,9 171:18

**proof** 134:3

**properly** 120:8

**property** 152:1
154:13 176:1

**prose** 83:18

**prosecuted**
163:10

**prosecution**
152:7,15 157:5,9,
19 160:16

**prosecutor**
163:10

**protect** 109:19

**protected** 66:14
124:11

**provide** 93:11,12
111:8 169:12

**provided** 58:2
70:5 72:3 97:1
103:4 104:5,19
110:22 111:14
120:2 139:16,17
155:12 169:16

**provider** 48:8
139:8

**psychiatrist**
138:17

**psychological**
27:9 143:9

**psychologist**
138:17

**public** 32:2,4
125:12 126:12,20
127:12,13,20
128:6,13,18 141:9
155:13

**publication** 128:7
130:9

**publications**
141:24

**publicized** 130:21

**publicly** 29:24
30:2 77:6 125:19

**published** 141:16

**purpose** 50:6,8

**put** 19:2,13 23:14
32:11 33:18 51:6
83:15 111:11
114:10 115:24
116:1 132:15
136:14 147:14
158:21 172:6
180:3

**putting** 126:19

**Q**

**question** 21:16
22:1 32:16 41:2
43:16,23 44:2
45:15 47:23 50:22
59:14 60:19 71:14
72:10 90:20,24
91:1 122:19 124:2,
5,12,16,19,24
125:3 127:14
128:11,16 129:7
130:18 131:10
132:20,22 138:2
141:15 147:10
156:17 165:19
173:9 176:24

**questioned**
110:18

**questioning**
67:15

**questions** 34:14
43:24 44:5 90:23
112:12,14 113:4
129:18 147:13,20
148:7 173:21
174:4,8,15,20,22
175:2 176:2,5,9,14
179:21,22 182:20,
24 183:2,7

**quick** 112:21

**quiet** 167:3

**quote** 55:14 74:14
92:9,10 93:9,10
109:16,17 110:18

**R**

**R-A-N-S-T-E-A-D**
106:4

**R-O-B-E-R-T-S-**
**O-N** 20:17

**R-O-S-A-D-O**
23:9

**racial** 88:17

**raid** 96:5 103:14

**raise** 5:9

**raised** 11:2,5

**rank** 14:11 93:6

**ranking** 120:5
121:4

**Ranstead** 106:3,
5,10 107:10,11,14,
16,20 108:1,4,10,
20 109:3

**Ranstead's**
107:19

**rattled** 136:13

**reach** 137:5 167:2,
24

**reached** 108:11

**read** 67:6 77:7,8
78:16 80:1 81:17
95:22 110:22
112:2 113:6
127:16 128:13
141:3,6,14 142:6,
15 160:4,11,24

**reading** 88:21
89:6 95:2 141:23,
24

**reads** 91:7 142:9,
10

**ready** 143:21,22

**real** 126:19

**reality** 106:19

**realize** 119:8

**realized** 145:5

**reason** 16:4 28:14
29:3 58:2 65:15

72:12 100:4
115:23 117:21
121:5 122:2
144:20 147:3

**reasons** 154:1

**reassigned** 99:9
101:7,13,20 102:5

**recall** 15:22 23:11,
23,24 29:4 48:20
55:5,17 56:18 58:5
65:9 73:17 78:18
81:9,10,15,24
82:2,3 83:9 100:9
103:1 104:16
106:24 109:12
123:14 154:1,4,12
155:4 156:3 160:8
161:5 162:4 164:5,
8,9 165:7 168:7,13
183:4

**receive** 10:10,14
13:19,22 15:2
77:18 90:8 139:11
150:7

**received** 11:18
14:11 17:1 27:15,
19,20,21 28:23
77:23 78:1,4
79:12,13 80:20,24
81:8 94:5 123:15
138:5,8 139:3,6
152:17 156:3
163:20 168:10

**recently** 24:8,9,10
105:5 136:16

**reckless** 152:1
175:24

**recognize** 83:11
143:5

**recommended**
111:19

**recomposed**
67:21 68:14

**reconsider**
123:23

**record** 5:7,18 19:4
35:2 36:1 44:20
65:17 66:8 113:3
114:10 125:12
126:12 127:12,21

128:6 183:1

**recorded** 104:14

**recording** 34:3
37:12 45:11 65:20

**REDIRECT** 180:1

**reference** 124:24

**referenced**
105:23

**referral** 124:10

**referred** 139:19

**referring** 8:12
38:9

**refusal** 175:1

**refuse** 176:2,5

**refusing** 124:19

**regard** 171:19

**Regis** 74:13 76:1,
13 110:14,19
168:23

**regret** 37:6,12

**regrets** 37:8,10,
16,17

**regularly** 133:10

**regulations**
105:20

**Reid** 76:4 85:11
95:19 100:13
101:16 120:16,22
121:8 135:15
154:17 165:13
169:7,8,11

**reiterating** 109:24

**relate** 138:2

**related** 165:12
175:23

**relation** 78:10

**relationship** 10:7
21:20 22:2 49:24
52:3,7 60:19
131:1,13,15,24
132:1,12,18 139:9
159:18 176:18

**relationships**
40:17 63:6

**relevance** 131:5,
7,17 174:6,18
176:23

**relevancy** 175:2
177:12

**relevant** 131:3
176:6 183:3,5

**relief** 23:13,15
26:7

**relish** 34:14

**remained** 24:6

**remarks** 168:22

**remember** 5:24
15:21 16:8 20:11
28:1 29:10,22
30:16 32:6 41:11
50:24 59:1 74:19
81:3 82:5 104:3
105:10 113:20
118:23 164:18

**remotely** 5:2

**removal** 56:12
170:2,11

**repeat** 138:3
148:7 161:16
165:19 175:10
178:1

**rephrase** 130:5
180:13

**report** 119:21
120:7 128:13
133:5 137:8
155:11 167:14,17,
18,21

**reported** 75:14
126:13 162:3
180:20

**reporter** 5:1
176:13,15 183:14

**reporters** 182:13

**reporting** 119:17
121:5,11 150:2

**represent** 6:11
71:11

**representative**
154:24 155:2

**represented**
123:3

**representing**
6:23 7:3 68:24
89:6 148:6

**represents** 53:14

**reprimand** 27:19,
23 28:15

**republication**
130:10

**reputation** 117:9,
24

**request** 95:21
114:11 133:17,18
137:8

**requested** 6:15
133:7

**requests** 137:9

**required** 18:24
156:19

**rerecording**
129:2,11

**reserved** 183:8

**reserving** 183:4

**residential** 9:9

**resignation** 14:23

**resource** 11:15

**respect** 137:7
152:14 170:22
175:22

**respectfully**
174:7,19

**Respond** 22:9

**responded** 28:3,
8,13 57:20

**response** 28:9
57:9 80:4

**responsibilities**
22:8

**responsibility**
143:23

**restaurant** 73:6

**result** 15:15 126:8,
11 150:8 153:22

**resulted** 178:15

**results** 27:12
118:6

**resume** 112:22

**resumed** 140:10

**retain** 6:11

**retained** 6:17
44:18 71:15 114:6

**retainer** 6:20

**retired** 24:12
52:15 95:20

**retirees** 24:12

**review** 6:3 32:1,7,
16 71:23 127:19

**reviewed** 31:22

**reviewing** 153:20

**revisions** 114:16,
19 115:5

**rights** 88:16 90:2
130:1

**Road** 8:4

**Rob** 55:13 74:1
75:9,10 94:3,22
159:2

**Robert** 18:20

**Robertson** 20:16

**rock** 167:23

**Roechner** 21:9,16
22:1,2 52:20
55:21,23 56:15
58:8,11,16,20,23
76:4 86:15 88:19
95:20 96:5,22
100:3 121:7
135:15 136:15,18
165:12 169:7,15,
16

**Roechner's** 58:8
111:20

**role** 151:16 158:5,
9

**Roman** 83:13

**roof** 60:21

**room** 93:19 94:2,

13,20 95:3 137:1

**Rosado** 23:9

**rotate** 20:6

**rough** 34:8

**roughly** 24:2
26:19

**Rouse** 120:20

**routinely** 136:19

**rule** 16:7

**rules** 105:19
180:22

**rumor** 168:14

**rumors** 82:23 83:4
108:17,18 163:18
164:4,24 166:21
168:8

**run** 137:3

**Ryan** 63:23 64:4

---

**S**

**SAITH** 183:17

**sanction** 174:23

**Sandra** 37:8,15
66:13 87:19 93:11
138:5 140:1,4
147:3

**Sandra's** 47:24

**save** 69:17

**saved** 69:19 114:3

**school** 10:18,19
11:7,8,15 12:5,8
13:2,3

**schooling** 13:3,4

**score** 178:20

**screen** 91:10

**search** 32:23
107:3 129:22
130:8 158:2,6,10,
13,16 159:7
161:24 162:6,21
163:2,14 178:21,
24

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021                                                                    16

**searched** 55:12
78:11,12

**secondary** 168:9,
16

**sector** 22:10
23:14 26:9,10

**sectors** 23:16

**seek** 145:14,18

**seeking** 167:5,13

**seized** 96:23

**seizure** 129:22
130:8

**send** 68:10 70:1
101:2 111:19
142:18

**sending** 39:6

**senior** 128:23
129:8

**separate** 99:3

**separated** 61:5

**September** 14:2

**sergeant** 52:13
59:21 87:6 93:7
94:4 101:7 102:4
120:20 143:23
150:18

**sergeant's**
143:16 144:5

**sergeants** 23:19

**series** 174:22

**serve** 162:14

**served** 12:11
32:24 161:24
162:19

**service** 48:16

**services** 139:1,3,
7

**set** 38:7,9

**settle** 178:20

**sex** 33:13,20 34:9,
18,22,24 35:13,14,
19 36:5,9,23 37:12
39:23 40:9,12
42:20,24 47:20

54:5 65:10,18
75:7,8 77:19 78:24
79:8 84:6,11,24
85:7,11,19,23
86:3,7,11,15,19,23
87:3,8 108:1
126:11 128:5
129:12 134:4
136:5 163:24
168:15 173:7

**sexual** 16:3 34:3
36:1 40:15,23 41:3
45:10,19,23 46:3
53:23 83:1 85:15
88:17 125:18
135:4 163:19
167:14,18

**sexually** 167:22

**shape** 46:15

**share** 30:8,12
36:5,8 38:16 39:4
40:8 72:2 89:24
91:10 108:6

**shared** 31:19
39:16,22 57:10
59:15 66:6,12
77:23 80:9 95:24
130:21 166:10
171:6,10

**sharing** 35:17
77:19 108:19

**Sharon** 5:5
183:10,15

**Shawn** 56:4 58:20,
22 87:6

**She'd** 133:8

**sheriff's** 152:4

**shift** 22:14,16,17,
18,19,21 25:9,10,
14 26:2,3,14,16
62:7 63:5,22
64:12,13 65:1 78:6
79:20

**shifts** 23:16

**shirt** 110:18

**short** 7:11 24:14
60:8,10 112:15,23
147:15 156:15
179:19

**shortly** 79:21
123:15 125:7
145:4

**show** 39:12
106:19 115:8
183:8

**showed** 158:22

**showing** 39:6,7
75:8 104:15 105:8
107:12

**shown** 107:22

**sic** 30:16,18,19
37:8,15 47:24
56:11,13

**side** 10:22 109:5

**sign** 51:2,8

**signature** 162:6
183:8

**Simenson** 149:11

**similar** 40:15

**single** 119:4

**single-family**
17:18

**single-spaced**
113:16

**sit** 55:18 94:19
98:4 104:22 137:1
151:10

**sit-down** 69:12

**sitting** 98:10,13

**situation** 170:14

**slash** 109:20
111:12

**small** 10:23 62:22,
23

**Socha** 7:3,18
8:12,19 17:21,22
18:10 19:8 25:18
26:18 53:3 55:15
93:9 131:2 154:10
157:4,7 158:19,20
159:3,12,20 160:1,
15 161:1,8,13,17,
23 162:7,21
163:19,20 164:6,
10,16,21 165:7,15,

22 166:6,9 168:14
170:9 173:14,17
174:11 177:11
178:20 179:6

**Socha's** 157:12
158:2,6,16 163:15
174:1 175:12
177:17,23 178:4

**social** 45:19,23
61:21,23

**socialize** 25:22

**socially** 64:20

**sole** 112:3

**solid** 102:23

**solved** 118:2

**son** 159:19

**sons** 8:8,14

**Sort** 42:22

**sought** 99:9
146:22

**sound** 89:3 92:19

**sounds** 26:22

**source** 56:21
105:14 112:3
123:19 130:2

**south** 10:21 11:5

**sparked** 107:20
146:24

**speak** 6:6 7:14,17
40:12 54:21 70:16

**speaking** 7:13
22:11 43:10 68:2
145:10 146:13,22
165:6

**specific** 18:5 27:1
36:19 38:10 42:3
50:16 65:14 73:20
81:11 105:20
124:9 132:1,13,17
146:12

**specifically** 57:12
58:3,7,9 59:18
65:22 68:12 74:1
79:5 100:2 129:21
136:9 143:2

**specificity** 78:24
79:4

**spell** 5:18 9:3
16:17 18:13 20:1,
15 21:10 149:12

**spoke** 17:2 38:15
54:23 69:24

**spoken** 173:2
182:13

**spot** 167:23

**Springfield** 13:23

**Stachelski** 56:6
58:21,22 59:4 87:7

**staff** 54:4 88:17
129:5

**standard** 102:21

**standing** 107:16

**star** 55:16 93:9

**stared** 106:21

**starred** 105:7

**stars** 38:13

**start** 26:17 39:7
55:6 67:14 88:4
165:3

**started** 13:1 20:4
24:10,20 60:18,24
79:20 145:3
150:23

**state** 5:17 61:13
121:12

**stated** 93:9,17
94:12 102:21
110:13 111:8

**statement** 76:10
90:5 92:11,17
93:14 94:10,16
95:22 96:3,12 98:6
105:1 109:21

**states** 12:10 88:14
89:23 94:1 95:2,17
96:4,20 97:7,12,18
103:24 110:12
128:22

**station** 54:19 57:3
59:16

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

17

stationed 12:14

status 133:11

stayed 42:4

steady 24:6

Steve 23:8

stopped 138:16, 20

stored 43:1 44:12 46:14

story 15:9,14 109:5

straight 75:6

street 72:21 74:12 76:1 143:3 169:5

stressed 159:6

strike 153:2 154:15 157:16 159:24 163:12 166:5 169:21 170:5 177:8,15 178:13

strikes 138:1

stuck 73:22 167:22

stuff 30:7 57:22 74:23 80:6 164:20

style 83:11,24

subject 25:6 28:5 34:12 46:4 47:21 84:7 113:13 116:12 123:21 131:23 133:19 149:8,10 157:23 160:5,18,19,22 161:2

subsequent 100:2 120:24 130:9 162:20

substantially 179:1

Suburban 181:22, 24

successful 119:11

sucks 55:15 93:9

sue 173:11

sued 84:15

suggestion 81:6

suing 77:11 149:8 173:13,17

summarizing 78:22

summertime 18:7 27:3 107:16

superiors 135:2

supervisor 19:22 110:19 150:20 151:2

supervisors 23:6, 11 54:3 78:23 128:23 129:9 150:13,15,17 165:1

support 116:5,6 117:6 122:15 130:20 133:14 177:22 178:3,10, 15,19,24 179:5

suppose 134:5

supposed 167:11, 21

surprise 28:8,13 165:15,21 166:2,3

surrounding 173:20 175:14

suspended 15:19 105:5,17,19 109:10 152:22 155:23

suspension 15:6, 10,20 27:21,22 28:17,23 105:21 106:9 152:18 153:10,14,18,23 154:2 155:21 156:18

suspicious 22:10, 12

sustained 153:18 154:3,5

SWAT 11:15

switched 47:4 48:17,19

sword 109:16 110:7

sworn 5:10,14

system 49:8,18 56:13 102:24 103:8,12 170:3

---

**T**

T-R-A-F-T-O-N 20:2

Tab 56:11 86:23 95:20 121:7 169:23,24 170:1

table 57:16

tactical 102:5

tactics 11:16

takes 135:6

taking 5:23 37:9, 10 45:11 140:4,10

talk 17:13 28:17 36:11 57:1 63:8, 12,17,20 69:4,7 109:4 110:21 129:22 132:6,14 181:1,5

talked 13:3 136:14 137:22 157:2

talking 75:24 108:12

talks 122:7

taping 45:6

task 101:8 172:6,7

tasks 97:13

teach 136:24

teaching 137:2

Ted 165:12

telephone 42:2, 15,17

telling 57:12,18 108:10 166:16

tells 143:3

ten 36:15 102:11

ten-day 15:6,10

terms 57:2 146:12 160:18

test 27:9 143:16

testified 5:14 48:21 72:14 75:16 84:13 85:3 87:16 134:12 137:24 148:10 150:13 152:17 156:22 163:17 165:22 172:8 174:11 175:11

testify 49:2 74:23 94:13

testimony 58:19 65:16 67:7 177:23 178:4,15

tests 27:13

text 39:19 69:16 142:16 159:13 160:2,4,5 161:2,4, 9,11,18

texted 161:14

texts 69:17,20,23

TGI 13:7

theft 101:8

therapist 181:17

thing 10:5 28:2 51:3,7 73:22 77:22 96:16 97:14 134:7 164:23 168:9 183:12

things 44:22 63:3 92:19 132:6 134:24 137:6,14 148:8 165:2 170:15 172:18

thought 62:18 99:12 146:11

thousand 119:5

threatened 159:9 169:24

threw 68:13 91:24

throating 79:6

throw 20:12

Tim 55:14 85:23 94:4 102:4

time 5:3 16:15,23 23:12 24:3,5 25:5 31:14 39:16 40:10 43:22 47:4 55:24 56:18 59:22 60:12, 20 61:2,6,7,14,17 64:17 70:19 71:6, 14,15 72:20 73:20 75:4,23 76:9 79:12,17 80:7 90:11,15 91:20 93:7 97:13 99:6 102:18 103:12 108:14 111:22 112:10 115:6,15 116:10 120:20 123:11 136:10 138:16 139:2,8 141:1,6,11 145:2, 16 146:2,4,8,12 147:14 148:19 150:21 155:7 159:21,22 161:18 163:17,23 164:2 169:15,20 179:21, 22 180:19,22 183:2,6

timeframe 150:24

timeline 81:11

times 49:2 62:5 83:12 109:15 141:13 148:13,15

titled 28:2 154:4

titles 139:23 154:4

today 5:23 21:6,10 42:16 43:24 55:18 68:24 70:21 84:7, 13 85:1,3 87:17 94:20 98:4 104:22 129:13 130:23 142:19 147:8 151:10

today's 5:3,6 6:3, 7 7:15 71:24 92:24

told 6:14 7:19 26:13 30:13,15,16, 17 48:6 55:7,9,11, 13,21,22 56:10

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

18

58:3,7,8,12,20
67:22 70:7 74:1,2,
8,14,15,16,18,22
75:6,10,22 76:1,5
79:11,13,15,24
82:15 83:2 88:15
89:24 90:9 92:8,19
93:5 94:1 95:18
99:15 106:10
107:14 109:3,15,
22,24 110:1,3,5,6,
10 113:11 118:15
135:6 137:18
158:19 159:6
160:10,19,23
161:10,23 162:1
164:3,22 168:23,
24 169:5 170:6,16
172:9

**toll** 132:3,4,24

**Tomczak** 123:1,2,
6 156:10,23 157:5,
8,11 171:3

**top** 67:2 88:10

**topics** 74:5

**total** 102:11
141:13

**totally** 92:21

**touch** 82:21 180:3

**tour** 12:23

**town** 10:24 13:8

**townhome** 17:19

**traffic** 22:13

**Trafton** 19:24
21:2,8

**trained** 49:7

**training** 11:14
13:19,20,22,23
14:1 18:24 20:3,9
136:23,24

**transcript** 183:13

**transfer** 47:13,14

**transferred** 47:24
171:13

**transported**
152:3

**tri-city** 171:13

**tri-county** 101:8
171:14,15

**trial** 156:5 160:13,
16 161:6

**trials** 48:22

**trip** 61:16

**trips** 61:12

**true** 89:3 92:11,13
93:23 104:11
105:2 118:10
120:7 121:3
133:21 169:17
173:3 175:19

**trust** 40:7 117:21,
22,23

**trustworthiness**
117:9

**trustworthy**
117:17 132:8

**truth** 74:24 94:9
96:12 97:5 98:5
103:21 109:8
111:4,11 112:7

**turn** 17:12 68:23
92:1 113:23
159:10

**turned** 8:15 68:7

**TV** 106:19 108:3

**two-man** 26:10,11

**type** 44:24 45:3,5
58:3 61:21 64:2
102:13 113:16
150:7 168:8

**typed** 78:21 83:8,
10,15

**typo** 110:1

───────
U
───────

**ultimately** 119:11,
19 120:22

**Umm** 173:6

**unaware** 165:16,
22

**unbecoming**
15:22 16:6

**unclear** 133:16

**uncomfortable**
56:3,8 137:20

**undercover** 118:4

**understand** 31:20
32:14 33:5 34:13,
15,16 39:10 42:21
43:17,24 44:6
47:16 62:19 64:18
124:2,16 126:23
127:14,15 128:16,
17 132:22 133:20
159:18 181:16

**understandable**
44:2

**understanding**
32:22,23 46:2 60:2
75:18,21 77:9,11
106:18 114:21
119:8,9 134:6
149:13 150:10
151:13 153:7
159:16 170:8
174:21

**unfair** 92:21 159:8

**union** 53:9,14
154:24 155:2
164:19 166:15

**unit** 26:10,11,12
49:5,11,15 59:22
101:13,21 102:5
109:20 147:4

**United** 12:10

**units** 99:10

**unknown** 111:12

**unlawful** 130:8

**update** 30:5

**updates** 137:5

**uploaded** 42:20

**upset** 142:24
170:20

───────
V
───────

**vacation** 23:17

**validity** 94:14

**Vegas** 61:16,18

**venture** 80:13

**verbatim** 160:11

**verified** 172:22

**verify** 93:22 94:9
96:12 97:4 98:5
109:7 172:9

**verifying** 95:13
103:21 111:4
112:7 118:13,16

**Verizon** 48:9,16

**version** 41:18

**versions** 114:3

**vest** 143:4

**vice** 51:21 52:1

**video** 33:19,20
35:14,15,19 37:13
45:11 75:7 77:20
78:24 93:18 95:4,
15,18 99:7,8
104:1,14 105:7,8
106:1,12,14,17
107:2,18,19,22
108:19 109:18
110:16,17 111:21
122:5 163:18
173:5

**videoing** 35:22

**videos** 33:4,13,17,
23 34:9,18,22,23
35:4,7,9 36:5,9
39:23 40:9,13,16,
23 41:3 42:20,24
44:11,16,19 45:19,
23 46:4 47:13,20
53:23 54:5 55:21
58:9 65:11 83:1
84:6,12,24 85:7,
12,16,19,23 86:3,
8,11,16,20,24
87:4,8 125:17
129:12 135:9,12
136:5 157:22
163:24 165:1,8,23
168:14,15 179:10

**view** 104:2 147:9

**viewed** 33:3 54:5

84:11,23 85:6,11,
15,19,23 86:3,7,
11,15,19,23 87:3,
7,9 104:2 130:21

**viewing** 129:1,11

**village** 14:8,12,24
168:1

**violated** 129:24

**violation** 16:7
105:19

**violence** 177:10

**visible** 35:4,6,10

**visitation** 9:10

**voluntarily** 14:23

**volunteer** 51:2

**vote** 116:20 117:5

───────
W
───────

**W-E-I-T-T-I-N-G**
20:16

**W-I-L-L-I-A-M-S**
20:14

**wait** 179:17

**walked** 57:16

**walking** 159:8

**wanted** 56:8 57:15
67:3 99:17 104:2
113:3 116:7
145:13,17 178:20

**warrant** 32:24
107:3 158:2,6,10,
13,16,22 159:7
161:24 162:6,18,
21 163:2,5,14
178:21 179:1

**warrants** 162:14

**watch** 23:7,20,23
55:13 73:24 75:11
93:8,19 95:9
158:21

**watched** 78:24
95:4,15 99:7

**watching** 110:16
165:1

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

19

**Water** 149:19

**Waters** 149:19

**wave** 136:21

**weapon** 154:7

**website** 81:2

**wedding** 61:19

**week** 148:21,24

**weeks** 6:13 78:13
81:13,15 123:16
140:18 146:17

**weird** 79:24

**Weitting** 20:15

**Wendy's** 73:6
95:1

**West** 181:21,24

**wet** 144:3

**whatsoever** 58:4
151:4

**wife** 7:17 107:17,
19

**wife's** 116:12

**Williams** 20:14

**willingness**
111:11

**winter** 29:9

**wished** 133:9

**withdraw** 90:18

**withdrawal** 48:12

**withdrawing**
90:24

**woman** 108:1

**word** 15:10,12
43:13 83:14,15

**wording** 15:23

**words** 56:21 69:15
72:7 74:11 116:19

**work** 13:17 14:5,8
17:4 20:22 21:12,
17 23:1 24:17
25:2,3,13,14,23
26:5,8 29:24 31:8
38:13 62:1,3,6
63:4,10,21 64:11

65:1,4 89:24 116:5
118:4,5 132:9
133:18 135:2
136:9 137:11
149:1,3,6,8 150:19
162:12,15 167:11

**work-issued**
42:7,9

**worked** 14:18
16:13,22 21:4
22:14,21 25:9,10
28:13 49:4 62:16
65:3 103:4

**working** 14:12
19:19 26:12,15
28:7 62:15 72:20
79:14 135:17
136:20 138:6
143:3

**works** 31:10 59:23
61:19 63:21
116:21 133:14

**world** 125:13,21
171:17

**write** 26:14 48:7
89:8,10 98:11
139:24

**writing** 15:6
83:11,23,24 104:3

**written** 6:20
27:19,23 28:14
31:23 32:8,12
67:19,24 71:23
102:16 155:22

**wrong** 38:23
57:21,22 120:11
123:20,21

**wrote** 15:10 80:11,
14,16 89:11,12
97:22

― Y ―

**Yahoo** 88:7

**year** 11:7 17:24
19:9 26:21 47:9
51:6 71:12 115:24
150:22

**years** 8:16 9:24
12:1,11,16 14:10,

19 16:12,24 21:12,
15,17,19 23:1,3
24:7,16 25:8 26:1
48:24 49:2 50:15,
18 62:15,16,17
116:1 131:16
143:17,19 146:19
150:14

**yonder** 10:21

**young** 35:16

**younger** 63:24
144:1

# EXHIBIT 4

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

CASSANDRA SOCHA,                          )
                                          )
         Plaintiff,               )
                                          )
         v.                       )  No. 1:18-cv-05681
                                          )
CITY OF JOLIET, a municipal corporation,  )
EDWARD GRIZZLE, JOHN DOES 1-20,           )
                                          )
         Defendants.              )

**<u>AFFIDAVIT OF LORINDA LAMKEN</u>**

       I, Lorinda Lamken, being an adult over eighteen (18) years of age, under penalty of perjury as provided by 28 U.S.C. §1746, do hereby state that the facts and information contained within this affidavit are true and correct and are based upon my personal knowledge. If called to testify, I would testify to the following:

       1.     I am currently employed as a Special Prosecutor with the Illinois Office of the State's Attorney's Appellate Prosecutor and have been since May 1, 2009. As a Special Prosecutor, I am assigned to various criminal cases where a conflict exists by appointment of the Court.

       2.     As such, in 2017, I was assigned to a review involving a domestic dispute involving off-duty Joliet police officers Nicholas Crowley and Cassandra Socha. The grand jury indicted Nicholas Crowley for reckless discharge of a firearm which resulted in a bench trial in the criminal case captioned *People v. Crowley,* Case No. 17-0010915 from May 14 through May 16, 2018.

3.     On or about May 16, 2018, the State called Ms. Maria Gatlin as a witness in the criminal case of *People v. Crowley*.

4.     In the evening of May 16, 2018, I was contacted by Ms. Gatlin, who informed me that she had received a text message from Cassandra Socha, and that Gatlin was very upset by the message. Ms. Gatlin further informed me that the text message was sent from a telephone number familiar and well-known to her as being associated with Ms. Socha as they had been friends for many years.

5.     Ms. Gatlin shared with me the screen shot of the text message from Cassandra Socha on Ms. Gatlin's phone.  The text message accused Ms. Gatlin of committing crimes when employed as a police officer and ridiculed Ms. Gatlin as a mother. It also made reference to "TESTIFY" and "FELONY" in the body of the text message. In my professional opinion, the above-described text message met the requisite elements of the criminal offense of witness harassment set forth in 720 ILCS 5/32-4a (a).

6.     Upon receiving this information, on May 16, 2018, I contacted Marc Reid with the Joliet Police Department's Internal Affairs Division to make him aware of this matter, as I understood he was handling a pending internal affairs investigation involving Officers Nicholas Crowley and Cassandra Socha arising from the events at issue in the *People v. Crowley* criminal case.

7.     On May 16, 2018, at approximately 8:50 p.m., I contacted Detective Grizzle to inform him of the phone call that I had received earlier that evening from Ms. Gatlin.

8.     I informed Detective Grizzle that a search warrant was needed for Ms. Socha's phone along with a search warrant to Ms. Socha's phone carrier for all cell phone records  in order

to make any phone material admissible and that the text message received by Ms. Gatlin originated from Ms. Socha's cell phone and directed him to obtain the same.

9.      In my role as prosecutor, I reviewed and approved the complaint for search warrant and search warrant attached hereto as Exhibit "A".

10.     In my view as a prosecutor, it was necessary to search Ms. Socha's phone to verify that the text message sent to Ms. Gatlin originated from Ms. Socha's cell phone.

11.     It was also necessary, in my view as a prosecutor, to search Ms. Socha's phone to confirm any possibility that the text message came from someone besides Socha.

12.     I informed Detective Grizzle that witness harassment under 720 ILCS 5/32- 4a (a) is a Class 2 felony.

13.     On or about May 17, 2018, Detective Grizzle went to see Judge Carlson regarding the proposed warrant.

14.     At this time, I was contacted by Detective Grizzle via phone and was informed that Judge Carlson wanted to speak with me as Judge Carlson noted that he was not sure about signing the warrant.

15.     I referred Judge Carlson's to the criminal statute of 720 ILCS 5/32-4a (a). Harassment of representatives for the child, jurors, witnesses and others.

16.     Judge Carlson did not sign the search warrant, however, he did not deny the warrant and stated that we could see another judge regarding this issue if we so choose.

17.     On May 18, 2018, we proceeded with the application for the search warrant with Judge Sarah Jones. The search warrant and written complaint attached hereto as Exhibit "A" was presented to and signed by Judge Jones.

18.    On May 18, 2018, as set forth in Exhibit "A", Judge Jones found that said "complaint on its face set forth facts sufficient to show probable cause for the issuance of a search warrant for the purpose of seizing, searching and forensically analyzing the instruments, articles and things described in the complaint for search warrant."

19.    On May 22, 2018, I appeared in court before Judge Kennedy in *People v. Crowley* for the entry of the verdict.

Further Affiant Sayeth Naught.


_____
Special Prosecutor Lorinda Lamken


## VERIFICATON

Under 28 U.S.C. §1746, I declare, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.

Executed on this 28th day of July, 2021.

_____
Special Prosecutor Lorinda Lamken

# EXHIBIT 5







Transcript of the Deposition of
## Sergeant Edward Grizzle
**Case:** Cassandra Socha v. City of Joliet; et al.
**Taken On:** July 28, 2021

Royal Reporting Services, Inc.
Phone:312.361.8851
Email:info@royalreportingservices.com
Website: www.royalreportingservices.com

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Edward Grizzle - Taken 7/28/2021

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CASSANDRA SOCHA,                    )
                                    )
                Plaintiff,          )
                                    )
        vs.                         )   No. 18 CV 05681
                                    )
CITY OF JOLIET, a municipal         )
corporation, EDWARD GRIZZLE,        )
JOHN DOES 1-20,                     )
                                    )
                Defendants.         )


        The videoconference deposition of

SERGEANT EDWARD GRIZZLE, called by the Plaintiff for

examination, pursuant to notice and pursuant to the

Federal Rules of Civil Procedure for the United States

District Courts pertaining to the taking of depositions,

taken before Nicole Marie DeBartolo, Certified Shorthand

Reporter and Registered Professional Reporter, with the

witness located at 150 Washington Street, Joliet,

Illinois, commencing at 9:32 a.m. on July 28, 2021.

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Edward Grizzle - Taken 7/28/2021

                                                        Page 2

 1    APPEARANCES VIA ZOOM:

 2          LAW OFFICES OF HALL ADAMS LLC
            MR. HALL ADAMS III
 3          33 North Dearborn Street
            Suite 2350
 4          Chicago, Illinois 60602
            Phone:  312.445.4900
 5          E-mail:  hall@adamslegal.net

 6               On behalf of the Plaintiff;

 7          TRESSLER, LLP
            MS. DARCY L. PROCTOR
 8          233 South Wacker Drive
            61st Floor
 9          Chicago, Illinois 60606
            Phone:  312.627.4000
10          E-mail:  dproctor@tresslerllp.com

11               On behalf of the Defendant City of Joliet,
                 a municipal corporation.
12
            KNIGHT HOPPE KURNIK & KNIGHT, LTD.
13          MR. MICHAEL J. ATKUS
            MR. MATTHEW S. CLARK
14          5600 North River Road
            Suite 600
15          Rosemont, Illinois  60018
            Phone:  847.261.0700
16          E-mail:  matkus@khkklaw.com
            E-mail:  mclark@khkklaw.com
17
                 on behalf of the Defendants
18               Edward Grizzle and John Does 1-20.

19
      ALSO PRESENT VIA ZOOM:
20
            Ms. Cassandra Socha, Plaintiff
21          Ms. Tara Reynolds, Law Offices of Hall Adams LLC

22                    *    *    *    *    *    *    *

23

24

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Edward Grizzle - Taken 7/28/2021

Page 3

1                              INDEX

2

     EXAMINATION BY                                    PAGE
3
     SERGEANT EDWARD GRIZZLE
4
         Examination by Mr Adams.................    4
5        Examination by Ms. Proctor...............   90

6

                               EXHIBITS
7                                                    PAGE
     GRIZZLE EXHIBIT
8
         No. 1.......................................   7
9        No. 2.......................................  20
         No. 3.......................................  25
10       No. 4.......................................  45
         No. 5.......................................  50
11       No. 6.......................................  79

12

13

14

15

16

17

18

19

20

21

22

23

24

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Edward Grizzle - Taken 7/28/2021

Page 4

1          (Witness sworn.)
2   WHEREUPON:
3          SERGEANT EDWARD GRIZZLE,
4   called as a witness herein, having been first duly
5   sworn, was examined upon oral interrogatories and
6   testified as follows:
7          EXAMINATION
8   BY MR ADAMS:
9       Q    Still Sergeant Grizzle?
10      A    Yes, sir.
11      Q    Sergeant, my name is Hall Adams.  I represent
12  Cassandra Socha.  I'm going to ask you some questions
13  this morning.
14      A    Okay.
15      Q    Have you reviewed any documents in preparation
16  for the deposition today?
17      A    Yes, I have.
18      Q    What documents have you reviewed?
19      A    My report and my memos.
20      Q    Have you ever reviewed a written transcript of
21  the interview you gave with the Inspector General Chris
22  Regis?
23      A    No.
24      Q    When did you do that?

Page 5

1       A    When did I have the interview with Inspector
2   Regis?
3       Q    No, sir.  Maybe you didn't hear me.
4          Have you ever read the written transcript of
5   that interview that was made from a recording?
6       A    No, I have never seen a written transcript.
7       Q    All right.  You recorded that interview with
8   Regis, did you not?
9       A    Yes, sir.
10      Q    Why did you do that?
11      A    With any interview that I would be involved
12  in, it is being recorded.  Any procedure that you have
13  in the police department, internal procedure, if I was
14  doing a criminal case, obviously with the consent of the
15  people, I would have it recorded.
16      Q    There is no department regulation that
17  requires that, is there?
18      A    Not that I'm aware of.
19      Q    This is just something that you did for your
20  own purposes?
21      A    Along with advice of my FOP lawyer, correct.
22      Q    What I'm going to do, then, and everybody
23  except you now is accustomed to being patient with me
24  while I screen share documents --

Page 6

1       A    Okay.
2       Q    -- is I'm going to put up on the screen the
3   full transcript of that interview, which I'll represent
4   to you was -- was created by a court reporter from the
5   recording that you made that was produced to us.
6       A    Okay.
7       Q    I'm going to give you a little time -- the
8   thing that's cumbersome about the screen share is I'm
9   going to ask you to read the whole thing.
10      A    Okay.
11      Q    And it will take a little while, and it's
12  going to require that when you get to the ends of pages,
13  you tell me to scroll to the next page.  That's one of
14  the shortcomings of screen sharing, is that I have to be
15  the page turner in that way.
16      A    Okay.
17      Q    So bear with me while I call up the document.
18      A    That's fine, sir.
19      Q    Do you have the cover of the transcript up in
20  front of you now, Sergeant?
21      A    Sir, I just have a cover of an e-mail that has
22  Interview of Detective Edward Grizzle, the evidence,
23  property and -- evidence property management.  I don't
24  actually have anything else.

Page 7

1       Q    Okay.  I'm going to do it a different way.
2          How about now, Sergeant?
3       A    Yes, sir.
4       Q    Do you see it up there now?
5       MR. ADAMS:  On this one, Nicole, and I think I'm
6   going to throw in the towel and ask you to screen share
7   and call it as Grizzle Exhibit 1, the transcript of the
8   interview of Sergeant Grizzle, the first page of which
9   is a Royal Reporting cover page.
10         (Discussion had off the record.)
11      MR. ADAMS:  I got it.
12      MR. CLARK:  Hold on, Hall.
13      MR. ADAMS:  I'm getting better at it.
14         (Grizzle Exhibit 1 marked.)
15  BY MR. ADAMS:
16      Q    So what I want you to do, Sergeant, is -- I
17  went past the cover page --
18      MR. ADAMS:  And we'll call this, Nicole, Exhibit 1.
19  BY MR. ADAMS:
20      Q    I'm on Page 1 now, which is a title page.
21  Have you had an opportunity to read it?
22      A    I see it, yes.  I read the first page and
23  title page.
24      Q    Okay.  The substance, as you can see, really

                                        4  (Pages 4 to 7)

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Edward Grizzle - Taken 7/28/2021

Page 8

1   starts at this next screen, and it's a condensed
2   transcript, so there are four pages of transcript for
3   each screen.  So just read through 2, tell me when you
4   want me to scroll, and I'll scroll along whenever you
5   tell me.
6       A   Okay.
7           Can you scroll down a little?  I can't see all
8   of Page 3.  It ends at 15.
9           There you go.
10          If you scroll up, so I can read part of
11  Page 4.  Thank you.
12          Okay.  If you can scroll down so I can see
13  Page 5.  Thank you.
14          And I need to read that other part through
15  Page 7.
16          If you can scroll up, so I can read that part.
17  Thank you.
18          Okay.  If you can scroll so I can read Page 9.
19  Thank you.
20          Next page, please.  Thank you.
21          Okay.  All right.  So I can read that Page 11.
22  I just need to see that Page 12.
23      MS. PROCTOR:  While the witness is reviewing
24  this -- this is Darcy Proctor -- I don't believe a copy

Page 9

1   of this has been produced in discovery unless I missed
2   it.  Hall, have you produced this as part of any of your
3   supplemental document production in the case?
4       MR. ADAMS:  Yes.
5       MS. PROCTOR:  You have?  When did you do that?
6   Because if you did, I think I may have missed that.
7       MR. ADAMS:  I can't remember the specific date.
8   Before you were involved in the case.
9       MS. PROCTOR:  Okay.  I'll --
10  BY THE WITNESS:
11      A   Could I see Page 13 now, please?
12          Next page, please.
13      Q   I'm sorry.
14      A   You're fine.
15          If I could see Page 15 now.
16          I need to see Page 16.
17          Page 17.
18          Next page, please.
19          Page 19, please.
20          Page 20.
21          Page 21, please.
22      MS. PROCTOR:  While the witness is reading Page 21,
23  Hall, can you do me a favor?  Can you just e-mail me a
24  copy of this transcript when you get a chance?

Page 10

1       MR. ADAMS:  I will when he's done reading it.  I
2   can't do both.
3       MS. PROCTOR:  Thank you.  Yeah, if you could, I
4   would appreciate it.
5       MR. CLARK:  If you could send me a copy when you're
6   done, I would appreciate it.
7   BY THE WITNESS:
8       A   Next page, please.
9           Now I need to read Page 23.
10          Page 24.
11          Page 25.
12          Next page, please.
13          Page 27.
14          Page 28.
15          Page 29.
16          Okay.  I'm done, sir.
17      MR. ADAMS:  If you wait for a moment before I go
18  further, I'm going to oblige these lawyers and send them
19  a copy of this statement.
20      MS. PROCTOR:  Thanks, Hall.  Much appreciated.
21  BY MR. ADAMS:
22      Q   All right.  Sergeant, if at any time you need
23  me to bring that exhibit back up on the screen to answer
24  any of my questions, say so and I'll accommodate you.

Page 11

1       A   Okay.
2       Q   As cumbersome as it is, have you had an
3   opportunity to review all 29 pages of text from that
4   transcript which we're calling Exhibit 1?
5       A   Yes, I did.
6       Q   Okay.  Is Exhibit 1 a true, accurate, and
7   complete transcript of the questions that you were asked
8   and the answers that you gave when you were interviewed
9   by Chris Regis?
10      A   I can't 100 percent tell you that was
11  everything on the recording and that's what's accurate
12  on that transcript, sir.
13      Q   When is the last time you listened to the
14  recording?
15      A   Probably a week ago.
16      Q   Did you do that in preparation for this
17  deposition?
18      A   Yes.
19      Q   How many times have you listened to that
20  recording?
21      A   It be only twice ever.
22      Q   When was the first time?
23      A   As soon as it was recorded, I transferred it
24  onto my computer to store it there and just didn't

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Edward Grizzle - Taken 7/28/2021

Page 12

1    listen to the whole thing, just listened to see if it
2    transferred over.
3        Q    When you read Exhibit 1 just now, did you see
4    anything that you do not believe you said -- So I'm
5    going to rephrase the question.
6            When you read Exhibit 1 just now, did you see
7    any answer to any question that you believe you did not
8    give during that interview?
9        A    I didn't see anything -- any answer that I can
10   recall that wasn't accurate on that.
11       Q    When you reviewed Exhibit 1 just now, did any
12   facet of it strike you as being inaccurate or
13   inconsistent with what you heard on the recording when
14   you listened to it a week or so ago?
15       A    No, sir.
16       Q    Based upon your review of Exhibit 1 just now,
17   do you have any reason to believe that any of it is
18   inaccurate?
19       A    No.
20       MR. CLARK:  Objection, form.
21           You can answer.
22   BY THE WITNESS:
23       A    No.
24       Q    When you read the Exhibit 1 just now, did you

Page 13

1    believe that any questions or answers that you gave
2    during the interview that were on the recording were
3    omitted from the transcript?
4        A    No.
5        Q    Based upon your review of Exhibit 1 just now,
6    do you have any reason to believe that it is not
7    complete?
8        A    No.
9        MR. CLARK:  Objection, form.
10   BY MR. ADAMS:
11       Q    When you gave the interview to Regis, you were
12   represented by a -- your union's representative?
13       A    Correct.
14       Q    Were you represented by anyone else?
15       A    No.
16       Q    You were the Joliet Police Department's lead
17   investigating detective when Officer Crowley was
18   investigated, correct?
19       A    I just did follow-up work.  There was no --
20   there was no lead detective to that case.
21       Q    How would you characterize your role in that
22   investigation?
23       A    I just did follow-ups to the people that the
24   patrol officers and the patrol supervisors who arrested

Page 14

1    Officer Crowley and the people they interviewed that
2    day, I just -- upon the request of the state's
3    attorney's office, the people they already interviewed
4    and did a police report for me to follow up and try to
5    do an audio-video interview with them.  So it was just a follow-up
6    investigation; standard practice.
7        Q    Did you testify in the Crowley trial?
8        A    No, I did not.
9        Q    Did you personally attend any part of the
10   Crowley trial?
11       A    Yes.  My job was to escort the appellate
12   prosecutor to and from court.
13       Q    So you were there for the whole trial?
14       A    In the hallway, yes.
15       Q    Were you in the courtroom for any part of the
16   trial?
17       A    I don't recall.
18       Q    Were you in the courtroom during the Crowley
19   trial when Officer Socha testified?
20       A    I don't recall if I was there.
21       Q    It's possible?
22       A    I just don't recall.
23       Q    Is there anything that would refresh your
24   recollection about whether you were physically present

Page 15

1    in the courtroom when Socha testified during the Crowley
2    trial?
3        A    None that I can think of.
4        Q    Were other Joliet police officers present at
5    court when Socha testified?
6        A    I don't recall that.  There's other people
7    there.
8        Q    Meaning you don't recall one way or the other?
9        A    Yeah, I don't recall one way or the other.
10       Q    Is there anything that would refresh your
11   recollection about that?
12       A    Nothing that I can think of.
13       Q    Did other Joliet officers attend any portion
14   of the Crowley trial?
15       A    I don't recall that.  My focus was getting the
16   appellate prosecutor to court, not what other officers
17   were doing.
18       Q    On what date did the evidence close in the
19   Crowley trial?
20       A    I don't know exactly when that evidence
21   closed.  I just remember the outcome day when he was
22   found not guilty.
23       Q    Do you recall that there was some number of
24   days that passed between the closing of the evidence and

6  (Pages 12 to 15)

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Edward Grizzle - Taken 7/28/2021

Page 16

1   the judge's announcement of his verdict?
2       A   I don't know.  I was not in the courtroom to
3   tell you when the evidence closed or not, that portion.
4       Q   Have you ever read a transcript of Socha's
5   testimony in the criminal trial of Crowley?
6       A   No.
7       Q   Do you have any opinions about her testimony
8   in that trial?
9       A   No.
10      Q   Do you have any opinions about the effect of
11  her testimony on the outcome of that trial?
12      A   No.
13      Q   Were you in court when the judge announced his
14  verdict?
15      A   Yes.
16      Q   Do you recall some summary fashion, if not
17  verbatim, the judge's explanation for his ruling?
18      A   No, I don't recall exactly his reasoning.
19      Q   Did you -- Strike that.
20          Do you have an opinion regarding whether that
21  verdict was the correct verdict?
22      A   I have no opinion.  Without sitting on the
23  whole trial, I couldn't tell you.
24      Q   Have you ever expressed to anyone any opinions

Page 17

1   that you held about Socha's testimony in the Crowley
2   trial?
3       A   No.
4       Q   Have you ever expressed any opinions to anyone
5   that you held about the impact of Socha's testimony on
6   the outcome of the Crowley trial?
7       A   Not that I recall.
8       Q   Is there anything that would refresh your
9   recollection about that?
10      A   No.
11      Q   Whether by sitting in the courtroom and
12  listening to it or getting a secondhand account of it,
13  did you learn the sum and substance of Socha's testimony
14  in the criminal trial of Crowley?
15      A   Just other than what maybe the appellate
16  prosecutor might have told me.
17      Q   What did the appellate prosecutor tell you
18  about Socha's testimony in that trial?
19      A   I honestly don't recall exactly one way or
20  another.  It was a brief conversation right after the
21  verdict.
22      Q   Have you ever expressed to anyone that you
23  were disappointed or frustrated with Socha's testimony
24  or with Socha herself because of her testimony in that

Page 18

1   trial?
2       A   No.
3       Q   That has never happened?
4       A   No, never happened.
5       Q   Did you have occasion to discuss the outcome
6   of the Crowley trial with Chief Benton?
7       A   Yes.
8       Q   What was his reaction to the outcome of that
9   trial?
10      A   Chief Benton never really would give you a
11  type of reaction.  He was always very stoic.  I told him
12  what the outcome was, he said okay, and that was pretty
13  much about the extent.
14      Q   Did you discuss with Chief Benton Socha's
15  trial testimony from the Crowley trial?
16      A   Not that I recall.
17      Q   Did you discuss the outcome of the Crowley
18  trial with then Deputy Chief Roechner?
19      A   Yes.
20      Q   What was his reaction to the outcome of the
21  Crowley trial?
22      A   That, I do not recall.
23      Q   Is there anything that would refresh your
24  recollection?

Page 19

1       A   Nope.
2       Q   Did you discuss with then Deputy Chief
3   Roechner any aspect of Socha's trial testimony from the
4   Crowley case?
5       A   No.
6       Q   Do you recall discussing the outcome of the
7   Crowley trial with any other Joliet police officer?
8       A   The only one would have been -- would have
9   been my direct boss, who was very limited to tell him
10  stuff, would have been Lieutenant Batis.
11      Q   What was Lieutenant Batis's reaction to the
12  outcome of the trial?
13      A   I don't recall what his reaction was.
14      Q   Did any of those three, being Benton,
15  Roechner, or Batis, personally attend any part of the
16  Crowley trial?
17      A   I don't recall any of them being there.
18      Q   Is it possible you just don't recall?
19      A   I just don't recall.
20      Q   Is there anything that would refresh your
21  recollection?
22      A   No.
23      MR. ADAMS:  All right.  I'm going to try my hand at
24  the screen sharing once again.

7 (Pages 16 to 19)

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Edward Grizzle - Taken 7/28/2021

Page 20

1    THE WITNESS:  Okay.
2    MR. CLARK:  We're rooting for you, Hall.
3    BY MR. ADAMS:
4        Q    Do you see on your screen, Sergeant, a
5    document in a box with a heading -- subject heading is
6    "Evidence and Property Management General Order 16-1"?
7        A    Yes, I do.
8        MR. ADAMS:  Nicole, we'll call this Exhibit 2 to
9    this deposition.
10       (Grizzle Exhibit 2 marked.)
11   BY MR. ADAMS:
12       Q    I'm going to scroll to the bottom.  Do you see
13   the revision date there of 9 November, 2014?
14       A    Yes, sir.
15       Q    Do you recognize this Exhibit 2?
16       A    Yes, I do.
17       Q    What is it?
18       A    It is a -- the general order, the guidelines
19   of how we should collect evidence and management of
20   evidence.
21       Q    Was this general order in effect at the Joliet
22   Police Department in, say, May, June, July, and August
23   of 2018?
24       A    Yes, it was.

Page 21

1        Q    You and other officers in the department were
2    trained regarding the contents of this general order?
3        A    Yes.
4        Q    What is your understanding of the purpose of
5    Exhibit 2?
6        A    Well, the purpose of all general orders are
7    basic guidelines of policies and procedures of the
8    Joliet Police Department.  And that one, again, is a
9    guideline that refers to evidence and property
10   management.
11       Q    Did you take vacation time during the
12   period -- any time during the period second half of May,
13   first half of June of 2018?
14       A    Yes, I did.
15       Q    What were the inclusive dates of your vacation
16   time?
17       A    That, I do not recall exact dates at this
18   point.
19       Q    Is there a document or are there documents
20   that would refresh your recollection about that?
21       A    There should be, yes.
22       Q    What do you have to do -- Strike that.
23       Back at that time, what did you have to do to
24   get vacation time?

Page 22

1        A    To get vacation time, you submit it to my
2    supervisor, which was then Lieutenant Batis, and he
3    would approve it, and then it would go on the schedule
4    up in the Investigations Division.
5        Q    So one document on which the inclusive dates
6    of your vacation would be reflected would be the
7    schedule for the Investigations Division for that
8    period, true?
9        A    It should be, yes.
10       Q    Can you think of any other document where the
11   inclusive dates of the vacation time that you took in
12   the second half of May, first half of June would be
13   memorialized?
14       A    There was a computer system called VSS Pro,
15   and that would be handled by the lieutenant, and that
16   would put all the days off, and that's how he would
17   generate a schedule.
18       Q    Any others?
19       A    Not that I can recall, no.
20       Q    I assume the vacation time that you took in
21   late May, early June of 2018 was approved, authorized
22   vacation time?
23       A    Yes, it was.
24       Q    While you were on that -- was it a single

Page 23

1    block of vacation time versus a few days here, a few
2    days there?
3        A    There was some that was like two days that
4    weren't vacation time, a personal day, and then vacation
5    time, but I think -- I believe they're all consecutive
6    at that point.
7        Q    Where did you go?
8        A    Florida.
9        Q    Where in Florida?  I don't need an address.
10   Just give me a city.
11       A    Just the Gulf side, Ft. Meyers-Sarasota-Tampa
12   area.
13       Q    Family vacation-type vacation?
14       A    Yes, sir.
15       Q    When you were away during that vacation, were
16   there specific individuals assigned to cover your cases
17   in your absence?
18       A    As a detective sergeant, the only cases we get
19   are criminal cases involving officers.  Other than that,
20   we assign cases out, so I don't get assigned a caseload
21   unless if it's a criminal case against an officer.
22       Q    The investigation of Officer Socha began
23   before you left on your vacation, true?
24       A    Correct, yes.

8  (Pages 20 to 23)

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Edward Grizzle - Taken 7/28/2021

---

Page 24

1    Q   Specifically, with respect to the Socha
2 investigation, while you were on vacation in May and/or
3 June of 2018, was anyone in the department detailed to
4 do anything because of your absence?
5    A   No.
6    Q   While you were on vacation during that time
7 frame, did you take any action with respect to the Socha
8 investigation?
9    A   I did no investigative stuff during that
10 period.
11    Q   Did you communicate back to any of your fellow
12 officers and direct anyone to take any action relative
13 to the Socha investigation while you were on vacation?
14    A   No, I didn't direct or call anybody to do any
15 action on the case.
16    MR. ADAMS:  So I'm screen sharing Exhibit 1, the
17 transcript, again.
18 BY MR. ADAMS:
19    Q   Do you see that up in front of you?
20    A   Yes, I do.
21    Q   See at Line 8 through 11 of Page 26?
22    A   Okay.
23    Q   Do you see the question and answer that appear
24 there?

---

Page 25

1    A   From 8 where it says, "And on your personal
2 phone"?
3    Q   Yes, sir.
4    A   Okay.  I do see that.
5    Q   Why would it have been risking your entire
6 reputation or career to have images of Socha from her
7 phone on your personal phone?
8    A   Well, of course, because that's my personal
9 phone.  It has nothing to do -- and there's rules of
10 evidence, there's laws.  Why would anything work related
11 be on my personal phone?  If anything, it needs to be on
12 a city computer or a city phone.
13    Q   Okay.  We're going to call Exhibit 3 -- we
14 have this incident summary, case report --
15    A   Yes, sir.
16    Q   -- in front of you, Sergeant?
17    A   Yes, sir, I see it.
18    MR. ADAMS:  And I'll represent, especially for the
19 benefit of Nicole, our reporter, that this is a document
20 Bates numbered City 00212-213.  Because of the way that
21 the document is scanned in, there are other pages, but I
22 want Exhibit 3 to be just this particular document.
23        (Grizzle Exhibit 3 marked.)
24

---

Page 26

1 BY THE WITNESS:
2    A   Okay.
3    Q   Sergeant, was this your opening report on the
4 department's investigation of Officer Socha?
5    A   Yes, it is.
6    Q   And the report number to the right of the
7 heading on the document, J1-18-0007242-001 is a control
8 number assigned by the department to this investigation?
9    A   Yes, sir.
10    Q   All documents related to the Socha
11 investigation would include that control number
12 somewhere?
13    A   Yes.
14    Q   How would you characterize your role with
15 respect to the Socha investigation?
16    A   How do I characterize my role?  As the lead
17 detective, supervisor on the case.
18    Q   Okay.  And just so that I am clear -- and you
19 made this distinction earlier, and I want to make sure
20 I'm clear about it, you were not the lead detective on
21 the Crowley matter; is that what you've told us?
22    A   Correct.  There was no detective or anybody
23 assigned to that case.
24    Q   And I appreciate how I'm jumping back to that,

---

Page 27

1 who in the department lead, if you will, the Crowley
2 investigation?
3    A   Well, there was no real investigation as far
4 as we occur our investigations.  He was arrested by
5 patrol, so that was all patrol's investigation.
6        So how it works in Joliet, if there's some
7 follow-up work that needs to be done in any patrol
8 arrest, like putting people on audio, video, that's done
9 by investigations.
10    Q   And on the Crowley case where -- that
11 Investigations Division follow-up work, that was
12 assigned to you, correct?
13    A   Yes.
14    Q   And it might be my characterization of it, not
15 one that the Joliet department would use, but within the
16 Investigations Division, you were the lead follow-up
17 investigator on the Crowley case; is that a fair
18 characterization?
19    A   Yeah, I would say that's fair, correct.
20    Q   And the difference here is you were the lead
21 investigating detective on the Socha investigation from
22 the inception because it did not begin with an arrest,
23 it began with a contact to you by Appellate Prosecutor
24 Lamken, correct?

---

9  (Pages 24 to 27)

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Edward Grizzle - Taken 7/28/2021

---

Page 28

1    A  Yes, sir.

2    Q  Is the date shown here as, quote, "Reported

3  On," close quote, the date and time you created this

4  Exhibit 3?

5    A  Just let me look real quick.

6      Yeah, I think when you put the reported on

7  portion under the incident summary, that's the time that

8  the whole computer system, when I receive a report

9  number, stamps it. So that would be when I...

10    Q  And the -- the reference in that same block

11  to, quote, "Occurred On," colon, close quote, refers to

12  the date and proximate time at which in this instance

13  Gatlin had reported receiving the subject text message

14  from Socha, true?

15    A  Yeah, where it says, "Occurred On:

16  5/16/2018," the time could be more reflective of when

17  the crime occurred or when the appellate prosecutor got

18  notified, not when I was notified because I wasn't

19  notified until, I believe, almost 9:00 p.m.

20    Q  Okay. Socha never made a complaint -- a

21  criminal complaint against Crowley, did she?

22    A  No, she did not. She did not talk during

23  that, no.

24    Q  In the first paragraph of the narrative part

---

Page 29

1  of the Exhibit 3, you characterize Socha as the, quote,

2  "Victim," close quote, relative to the Crowley incident.

3    Do you see that?

4    A  Yes, sir.

5    Q  Did Socha herself ever characterize herself as

6  a victim of Crowley?

7    A  She did not talk to me. You would have to ask

8  the patrol officers and supervisor who may have been at

9  the arrest, but on the reports, she was labeled as a

10  victim.

11    Q  So you took that characterization, quote,

12  "Victim," close quote, relative to Socha off the reports

13  from the underlying Crowley patrol officers, true?

14    A  Correct.

15    Q  That's not your own characterization, correct?

16    A  Without talking to her, I couldn't give you a

17  characterization of, you know, how she felt or what

18  occurred.

19    Q  When you took this call from Lamken, had

20  Crowley yet been acquitted?

21    A  No, he had not.

22    Q  Had the evidence in his criminal trial closed?

23    A  That, I do not know.

24    Q  Both Gatlin and Socha had completed their

---

Page 30

1  trial testimony and been excused as witnesses in the

2  Crowley case by the time you got this call from Lamken,

3  true?

4    A  I only recall Maria Gatlin being done with her

5  testimony that day.

6    Q  You don't recall one way or another whether

7  Socha had yet testified, correct?

8    A  No, sir.

9    Q  In the body of this report you quote verbatim

10  from the subject text message that Socha transmitted to

11  Gatlin in full in the second paragraph of the report

12  beginning with, quote, "I think," and it goes on?

13    A  Yes, sir.

14    Q  Do you see that?

15    A  Yes.

16    Q  When you wrote this report, you didn't do

17  that -- quote that whole text message from memory, did

18  you?

19    A  No. The report is a continuing documentation,

20  so my report stays open, locked by me. So when I have

21  something to add to it, I go back into my locked report,

22  that I'm the only one that can get to, and I continue on

23  the investigation.

24    Q  When was that paragraph of Exhibit 3 that

---

Page 31

1  contains the verbatim content of the Socha-to-Gatlin

2  text message added to this report?

3    A  I can only recall that was after the search

4  warrant and the evidence was found on Officer Socha's

5  phone.

6    Q  Is there a way to go back in time in the

7  computer system and determine when that paragraph was

8  added to this report?

9    A  I couldn't tell you about that computer system

10  and how it works.

11    Q  When Lamken called you on the 16th of May, did

12  she tell you what the text message said?

13    A  I don't know if she told me verbatim what the

14  text message said, but she did tell me about the text

15  message.

16    Q  Did she read the text message to you over the

17  phone?

18    A  I don't recall. I actually just woke up from

19  a nap at that point.

20    Q  Is it possible that she did that?

21    A  I couldn't recall that. It's certainly

22  possible. You would have to ask her.

23    Q  Is there anything that would refresh your

24  recollection?

---

10 (Pages 28 to 31)

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Edward Grizzle - Taken 7/28/2021

Page 32

1      A   Not that I can recall.
2      Q   After your telephone conversation with Lamken
3   but before preparing this Exhibit 3, did you create any
4   notes or memo or other document memorializing the
5   conversation with Lamken?
6      A   No, not that night.
7      Q   When did you start this report at the date and
8   time shown above as reported on?
9      A   Yeah.  So if you scroll back up where it says
10  the time it was stamped, it was somewhere in that time
11  period that I started, you know, inputting.  You can see
12  there's all that stuff that you have to, you know, put
13  in there and then probably just a little bit brief of
14  the very beginning, how I was contacted by Ms. Lamken.
15     Q   And when you say up above, that's this
16  "Reported On" date and time?
17     A   Yeah, the whole thing, the whole document.
18  The way it goes, the incident summary gets put in by
19  dispatch, the computer system, but then I put my name
20  in, reporting officer, disposition opened, and there's a
21  lot of little drop-down boxes.
22     Q   So if you control -- if you follow where I'm
23  scrolling --
24     A   Yes.

Page 33

1      Q   -- in the next paragraph, you described your
2   meeting with Gatlin on the 17th of May, correct?
3      A   Correct.
4      Q   Where did that meeting take place?
5      A   Here at the Joliet Police Department and where
6   it says in the report there in Interview Room 5.
7      Q   Was anyone else present in Interview Room 5
8   when you had this meeting with Gatlin?
9      A   No.  It was just me and her until I called
10  Detective German to take the cell phone.
11     Q   At the top of Page 2 of Exhibit 3, when you
12  say, quote, "I did see the saved screenshots, close
13  quote," on what device did you see the saved
14  screenshots?
15     A   Hold on.  Just trying to see where you saw
16  that.  Okay.  I see it right after the "10:30 hours."
17  She had the saved screenshots on her phone.
18     Q   And those would be saved screenshots of the
19  text message from Socha to Gatlin, correct?
20     A   At that point, I couldn't tell you where those
21  screenshots, other than what Maria Gatlin was saying,
22  yes, those were sent to her from Officer Socha.
23     Q   Did the screenshots that you viewed -- you
24  viewed them during that meeting at approximately

Page 34

1   10:30 a.m. in Exhibit -- Interview Room 5 at the Joliet
2   Police Department?
3      A   Correct.
4      Q   Did those screenshots include the text of the
5   text message?
6      A   I don't recall exactly.  It was just
7   screenshots of -- it didn't have what -- I guess what
8   you're getting at, the whole conversation.  It just was
9   a screenshot of what Ms. Gatlin was alleging that
10  Officer Socha sent to her, just parts of that paragraph
11  up on Page 1.
12     Q   Did the screenshots include all of the text
13  that's quoted up on the -- on Page 1 of your report?
14     A   I don't recall that.
15     Q   Is it possible?
16     A   I don't recall that.  I can't tell you
17  possible or not.
18     Q   One way or another?
19     A   I just know that I remember seeing a text
20  message.  I can't tell you if it was full or part at
21  that point.
22     Q   Were those screenshots preserved in any way?
23     A   At that point, Detective German, who operates
24  what would be called the Cellebrite, the forensic

Page 35

1   download machine, that was -- he was able to do his
2   technological stuff and retain them on to the
3   Cellebrite.
4      Q   Okay.  I appreciate what you said, and I
5   appreciate that you tried to answer the question that I
6   asked, and I'll ask it a different way because I meant
7   something a little different.
8      A   Okay.
9      Q   Were the screenshots that you viewed in the
10  interview room that morning preserved in any way
11  separate and apart or distinct from the excavation of
12  the full text message traffic that German performed?
13     A   I think what you're asking me, sir, is was it
14  retained somewhere else like the Cellebrite machine?
15     Q   Anywhere.
16     A   Yeah, it was put on -- it was downloaded on to
17  the Cellebrite machine.
18     Q   When you met with and interviewed Gatlin on
19  the 17th, she told you that the content of the
20  screenshots of the text message were, in fact,
21  transmitted to her by Socha, true?
22     A   Yes, sir.
23     Q   When did -- Strike that.
24         Did you see the full texts from Gatlin's phone

Royal Reporting Services, Inc.
312.361.8851

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Edward Grizzle - Taken 7/28/2021

Page 36

1  after German did the extraction of Gatlin's phone?
2      A   No.  I do recall that it only got partial --
3  the partial portion of the screenshots, I do recall
4  that.  It was just a partial.  It wasn't -- you could
5  see something was -- was missing.
6      Q   Do you remember what?
7      A   No, I don't recall exactly -- remember what,
8  but what was extracted was not fully everything that was
9  screenshotted on -- on Ms. Gatlin's phone.  I can't
10  recall how much, but I remember there was some missing.
11      Q   So the extraction was actually less text than
12  the screenshots is what you're telling us?
13      A   Yes.
14      Q   Is there any part of the quoted passage of the
15  Socha-to-Gatlin text message shown on the first page of
16  Exhibit 3 that you recall not being on the screenshots
17  that you viewed during your meeting with Gatlin on the
18  morning of the 17th in Room 5?
19      A   I don't recall.
20      Q   Is there anything that would refresh your
21  recollection?
22      A   Not that I could think of.
23      Q   Before Judge Jones issued the search warrant
24  that's described on Page 2 of Exhibit 3, the

Page 37

1  application, a complaint for a search warrant was
2  presented to Judge Carlson, correct?
3      A   Yes, sir.
4      Q   And Judge Carlson for his own part refused to
5  issue the warrant, true?
6      A   No.
7      Q   How did Judge Carlson handle the application?
8      A   He didn't refuse.  He said I'm not going to
9  deny it, I'm not going to approve it, and if you like,
10  you can go see another judge.  That's the way he left
11  it.
12      Q   He wouldn't sign it?
13      A   He wanted -- he wouldn't even go through
14  everything, yeah, so he said go see another judge.
15      Q   Did he tell you why he wouldn't sign it?
16      A   I don't recall that, but I do know during
17  that, myself and -- I had the appellate prosecutor on
18  speakerphone when we were in the judge's chambers.
19      Q   Did you make any notes or written record of
20  what Judge Carlson said, if anything, about his reasons
21  for personally declining to issue the warrant?
22      A   I did send a memo to, I believe, either Chief
23  Benton -- I believe Chief Benton just explaining the
24  whole -- whole process to them, but I can't give you

Page 38

1  verbatim without seeing that document what was said.
2      Q   Why doesn't this case report, Exhibit 3, refer
3  to the fact that the application for the warrant was
4  first presented to Judge Carlson who personally declined
5  to issue the warrant?
6      A   This police report is not complete yet because
7  it is still an open, ongoing criminal investigation.  So
8  there is still -- all the way down the line there could
9  be more facts or something that came through, and before
10  I finish all reports, I go through everything that I've
11  done and occurred.  And right then and there, you know,
12  until we hear different from the appellate prosecutor,
13  this is still an ongoing criminal case.  So at this
14  point, this is not a 100 percent completed document.
15      Q   But at this point, Judge Carlson had declined
16  to issue the warrant, correct?
17      A   Yeah, he didn't want to be involved.  He said
18  go see another judge.
19      Q   So why then didn't you include that in the
20  sentence or sentences before those in which you
21  described that Judge Jones did issue the warrant?
22      A   I sent them a memo about it.  Like I said,
23  this is not completely a done document.  This is -- the
24  police report is still open.  So that doesn't mean that

Page 39

1  I couldn't add anything else or continue on my case.
2  This is still a locked case that I am the only one that
3  has access to, and it is still an ongoing criminal
4  investigation.  So it doesn't mean that when I go to --
5  say this would go any further, that I am not going to go
6  and look, review, look at things, and maybe add some
7  things that were said previously, the more things I
8  learned through investigation.
9      Q   Did you ever do that?
10      A   No.  This is still an ongoing criminal
11  investigation.  It is still open.  I am not done with
12  this yet until I hear from the appellate prosecutor's
13  office that they are not going to continue on this
14  investigation or this investigation is closed by
15  somebody higher than me in the Joliet Police Department.
16      Q   Okay.  Is Exhibit 3 your entire case report as
17  of this moment in time?
18      A   Is it my entire as of right now?  No.  I'm
19  sure if I would look through it, as any investigator
20  would, there might be things, oh, I need to add this
21  based on a memo I sent or based on new facts that I
22  learned.
23      Q   And I appreciate you've kind of already told
24  us that, but my question is a little different.

12  (Pages 36 to 39)

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Edward Grizzle - Taken 7/28/2021

---

Page 40

1    Is Exhibit 3 your full report as of this
2  moment in time appreciating that in the future you might
3  go back in and supplement, add, change, et cetera?  At
4  this moment, is this your complete report?
5       A    No.
6       MR. CLARK:  Hall, just to clarify, you're talking
7  about a written report, correct?
8       MR. ADAMS:  Correct.
9  BY THE WITNESS:
10      A    So the answer would be no, this is not a
11  completed report.
12      Q    I'm sorry.  I didn't say completed, past
13  tense.
14      Is this all there is to this report at this
15  moment in time?
16      A    Yes, there's been nothing added.
17      I understand what you're saying now.
18      Q    Do you have an open case file of your own on
19  the Socha investigation?
20      A    Only what is on my computer in my secured -- I
21  think they call it the cloud, the OneDrive.
22      Q    When was this paragraph of Exhibit 3
23  describing that Judge Jones issued the warrant added to
24  Exhibit 3?

---

Page 41

1       A    I do not recall that.
2       Q    Whenever that occurred, Judge Carlson had
3  already informed you and Lamken that he was unwilling to
4  issue the warrant, correct?
5       MR. CLARK:  Objection, form.
6       MR. ADAMS:  You can answer.
7  BY THE WITNESS:
8       A    Can you restate that again, sir, please?
9       Q    Whenever it was that you added this paragraph,
10  specifically the sentence about Judge Jones issuing the
11  warrant, Judge Carlson had already communicated to you
12  his unwillingness to issue the warrant himself, correct?
13      A    Yes.  And to go see another judge, yes.
14      Q    Have you made any additions or revisions to
15  Exhibit 3 since leaving for the vacation that you took
16  in late June -- or late May, early June of 2018?
17      A    No.
18      Q    You have material in your own case file for
19  this investigation that's kept on either your computer
20  or the cloud/OneDrive that is not contained in
21  Exhibit 3?
22      A    No, I have nothing.  The report itself is
23  actually contained in what's called Motorola P1, which
24  is locked.  My case file would have my memos and things

---

Page 42

1  like that but nothing else.
2       Q    How about notes of yours regarding this
3  investigation?
4       A    I don't have any notes.
5       Q    When did Detective German give you the flash
6  drive containing all of the extraction from Socha's
7  phone?
8       A    I don't recall the exact date, but I knew from
9  the night that we did the search warrant, which I
10  believe would be up in my report somewhere, I believe it
11  was the next day.  So if I could see -- I think maybe it
12  was the day the search warrant was executed.  I'm trying
13  to see where that was at.  So on May 18th.
14      So I believe I got everything from Detective
15  German on the next day, the 19th, because how it was
16  being done on the Cellebrite and Lantern computers.
17      Q    You then loaded the contents of that flash
18  drive on to your own computer?
19      A    Yes, sir.
20      Q    After Judge Carlson declined to issue your
21  warrant, whose decision was it to approach Judge Jones
22  to remove the application before her?
23      A    The first --
24      MR. CLARK:  Objection.

---

Page 43

1  You can answer.
2  BY THE WITNESS:
3       A    First thing I did was, obviously, report back
4  to DC -- or Deputy Chief Roechner, Chief Benton.  On the
5  phone with -- during that time with Judge Carlson was
6  Appellate Prosecutor Lamken.  She said she would call me
7  shortly.
8       I then spoke with Jim Glasgow's -- the person
9  directly below him, which would be Ken Gray, so the
10  Number 2 in the Will County State's Attorney's Office of
11  what occurred and his legal opinion about going and
12  seeing another judge, explained to my command staff, and
13  that's when Lorinda Lamken got ahold of me, said yes, it
14  is completely acceptable, he did not confirm or deny it,
15  you can go see another judge.
16      At that point, I went to the courthouse, and I
17  saw, just like I do Judge Carlson for previous stuff, I
18  saw Judge Jones, and I asked if I could speak with her
19  regarding a search warrant.
20      Q    Did you present the application for the
21  warrant to any judges between Carlson and Jones?
22      A    No, I did not.
23      Q    Were any other judges suggested to you by
24  Glasgow, his second in his office Gray, I think you said

---

13  (Pages 40 to 43)

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Edward Grizzle - Taken 7/28/2021

| Page 44 | Page 46 |
|---|---|

**Page 44**

1 his name was, or Lamken before you went to Jones?

2     A  No. Prior to going to see Judge Carlson, it

3 was recommended to go see the chief judge, Judge

4 Schoenstedt. Judge Schoenstedt, at that time, the chief

5 judge was leaving, was gone, and Judge Carlson was the

6 acting chief judge at that point. So only from there

7 they said -- Ken Gray said go see Judge Carlson.

8     Q  After Carlson declined to issue a warrant,

9 were there any other names suggested before you went to

10 Jones?

11     A  No, nobody else.

12     MS. PROCTOR: Objection, form.

13 BY MR. ADAMS:

14     Q  Did you suggest Jones to Lamken, Glasgow, or

15 Gray?

16     A  No.

17     Q  On the basis of what criteria did you decide,

18 then, to approach Jones to renew your application for

19 the warrant?

20     A  Being involved in investigations for a long

21 time, obviously Judge Carlson, Judge Jones -- there are

22 certain judges that you know that you have seen through

23 other cases, so you obviously go to a judge that you're

24 familiar with compared to unfamiliar, just like I was

**Page 45**

1 familiar with Judge Carlson.

2     MR. ADAMS: I'll pull up another document. So bear

3 with me.

4     THE WITNESS: Okay.

5     MR. CLARK: Hall, are you starting in on another

6 topic? Or would this be a good time for like a

7 five-minute bathroom break?

8     MR. ADAMS: Yeah, it would be because it takes me

9 about that long to pull up these documents. Why don't

10 we do that. Break for five and I'll be ready to go when

11 you come back.

12     MR. CLARK: Thank you.

13     (A break was had.)

14 BY MR. ADAMS:

15     Q  Sergeant Grizzle, do you have on your screen a

16 document with the heading "Search Warrant" on it?

17     A  Yes, I do, sir.

18     MR. ADAMS: And, Nicole, we'll call this whole

19 exhibit, which runs through CITY 90 to CITY 95.

20     And I'll go as quickly and slowly as you need,

21 Sergeant.

22     (Grizzle Exhibit 4 marked.)

23 BY MR. ADAMS:

24     Q  Do you recognize this as the search warrant in

**Page 46**

1 the complaint for the search warrant --

2     A  Yes, I do, sir.

3     Q  -- for Socha's phone?

4     Who prepared these documents?

5     A  The search warrant? I prepared the search

6 warrant.

7     Q  Who prepared the complaint for the search

8 warrant?

9     A  The complaint for -- I did everything.

10 Everything on there was done by me.

11     Q  Did anyone review the complaint or the warrant

12 before they were submitted to Judge Carlson?

13     A  Yes, sir. The appellate prosecutor, I sent

14 everything to her for approval.

15     Q  Did she make any revisions or edits, add,

16 subtract, or anything at all to your drafts?

17     A  Not that I recall.

18     Q  Before you drafted the warrant and the warrant

19 complaint, did Lamken give you any instructions or

20 guidance about what should be included in them?

21     A  I know we talked to confer about the drafting

22 of the search warrant and what should be in there, but I

23 couldn't give you exactly what was said. We're talking

24 a couple years ago.

**Page 47**

1     Q  Would you look at the document? You can tell

2 me to scroll here or there, if necessary, in the

3 exhibit. Do you remember any particular content that

4 Lamken told you to include?

5     A  As I said, I don't recall from looking at it

6 or you and I talking.

7     Q  Now, I'm on the page that bears the Bates

8 number CITY 95, that is 7 of 8 of the -- it's a part of

9 the complaint for the application, correct?

10     A  Yeah. I see it's in between Page 6 of 8,

11 CITY00094 and another page that says -- it goes on

12 "Socha has conversed numerous times."

13     Q  In the sentence that begins, quote, "Cassandra

14 Socha's text message accuses," do you see that sentence?

15     A  Can you say it again? Sorry, sir.

16     Q  In the sentence on that page of Exhibit 4,

17 it's 7 of 8 of the --

18     A  Okay.

19     Q  -- of the complaint, it begins, quote,

20 "Cassandra Socha's text message accuses," and then

21 continues?

22     A  Yes, sir, I see it.

23     Q  At the point at which you submitted this

24 complaint to Judge Carlson and then to Judge Jones, you

14 (Pages 44 to 47)

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Edward Grizzle - Taken 7/28/2021

Page 48

1    had seen the screenshots of the text message described
2    there during your meeting with Gatlin, correct?
3        A    Yes, sir.
4        Q    Did you provide Judge Jones with any more
5    detail about the content of that text message that is
6    contained in this sentence of this exhibit?
7        A    I don't recall the exact conversation I had
8    with Judge Jones regarding this.
9        Q    Conversation aside, did you provide Judge
10   Jones with any additional documentary or electronic
11   detail regarding the content of the text message?
12       A    I'm not sure if you're asking if I showed her
13   a copy of the -- the screenshots or text messages.
14       Q    Either.  I'll give it as a full question.
15           Did you show Judge Jones copies of the
16   screenshots or text messages?
17       A    I don't recall if I did.
18       Q    Is there anything that would refresh your
19   recollection?
20       A    Not that I can recall.
21       Q    Before this complaint was submitted to Judge
22   Jones, had you shared the screenshots at least with
23   Lamken?
24       A    I don't recall if I shared the screenshots

Page 49

1    from Lamken.  She had, I believe, information from Maria
2    Gatlin herself.
3        Q    Is there anything that would refresh your
4    recollection about whether you shared the screenshots
5    with Gatlin -- Strike that -- with Lamken before you
6    submitted the warrant and complaint for warrant to Judge
7    Jones?
8        A    Nothing I can think of.
9        Q    Before Judge Jones issued the warrant, did she
10   ask you for any additional information?
11       A    Judge Jones or Lorinda Lamken, sir?
12       Q    Judge Jones.
13       A    Not that I recall.
14       Q    When you sought -- submitted the complaint and
15   approached Judge Carlson and then Judge Jones to have
16   the warrant issued, were you looking for photographs of
17   Cassandra Socha?
18       A    No.
19       Q    Were you looking for video of Cassandra Socha?
20       A    No.
21       Q    You were looking for the text message that
22   Gatlin had complained that Socha had sent to Gatlin,
23   correct?
24       A    Correct.

Page 50

1        Q    And nothing else?
2        A    Nothing else.
3        Q    And did Detective Don McKinney have any
4    official role in your investigation of Socha?
5        A    No.
6        MR. ADAMS:  I'm going to screen share, so I ask for
7    your patience.
8            Do you have a memo from you to Chief Benton
9    and Detective Chief Roechner up on your screen?
10       THE WITNESS:  Yes, I do.
11       MR. ADAMS:  Fantastic.  Nicole, we'll call that
12   Exhibit 5.
13           (Grizzle Exhibit 5 marked.)
14   BY MR. ADAMS:
15       Q    That's a memo that you recorded and sent to
16   those two on 18 May 2018, correct?
17       A    Correct.
18       Q    The number referenced on the subject line, is
19   that the control number for the Socha investigation that
20   we first see on Exhibit 3, correct?
21       A    Correct.
22       Q    Did Benton and/or Roechner ask you to prepare
23   this memo?
24       A    Yes.  I was ordered, I believe, by Chief

Page 51

1    Benton that after the search warrant was done, that he
2    wanted a memo fully explaining how everything occurred
3    and to the point of the search warrant.
4        Q    And in this memo to the chief and the deputy
5    chief, you attempted to be accurate?
6        A    Yes.
7        Q    To be complete?
8        A    It was more so of a synopsis of everything,
9    not a complete accurate report.
10       Q    Is there any significant detail that you
11   believe was not included in this several-page memo?
12       A    At that point, not that I recall.
13       Q    Does Exhibit -- does the exhibit -- you cite
14   events in order of sequence in which they occurred?
15       A    It's a synopsis, so I can't tell you exactly
16   from back then if it was in the exact sequence, but it's
17   a synopsis of, to make a logical form so the chief could
18   understand.
19       Q    There isn't anyplace in this memo that I can
20   see where you describe that the extraction done by
21   German was -- did not extract the entirety of the
22   Socha-to-Gatlin text message on the basis of which this
23   investigation was initiated.  Have I missed that?
24       MR. CLARK:  Objection, form.

15  (Pages 48 to 51)

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Edward Grizzle - Taken 7/28/2021

---

Page 52

1    You can answer.
2
3    BY THE WITNESS:
4        A   I'm just trying to -- Detective German only
5    downloaded Maria Gatlin's phone.  He didn't have
6    anything to do --
7        Q   I understand.
8        Q   So can you reask me that question, please?
9        Q   So I think -- I'm going to rephrase the
10   question, I guess.
11       The last sentence of this paragraph that's in
12   the middle of our screen reads, quote, "The screenshot
13   of the deleted," although deleted is misspelled, "text
14   was found."
15       Do you see that?
16       A   Yes, I do.
17       Q   That's a reference to the extraction from
18   Gatlin's phone, correct?
19       A   Yes, it's a reference to it, correct.
20       Q   When German did the extraction of the Gatlin
21   phone, he found the entire Socha-to-Gatlin text message,
22   correct?
23       A   No, I believe, like I said earlier, it was
24   just -- it wasn't all of it.  So, again, this was just a

---

Page 53

1    synopsis to the chief, not a full, you know, report,
2    which the next morning I talked to the chief about the
3    memo.
4        Q   Is there a reason in this report you do not
5    include the fact that German's download did not include
6    the -- I should say that German's download of Gatlin's
7    phone did not include the entire Socha-to-Gatlin text
8    message?
9        A   Again, this was just a synopsis.  This isn't a
10   report.  The chief wanted a memo synopsis of things that
11   occurred.  So, again, just a synopsis of everything.  If
12   it wasn't a synopsis, it would be many, many pages long.
13   Again, this is a memo, not a police report to Chief
14   Benton.
15       Q   In your police report, which I think we've
16   called Exhibit 3, there's no reference to that fact
17   either, is there?
18       A   Not that I recall without pulling it back up.
19   Again, that's not a completed document.  That's not a
20   completed report yet.  It's still an ongoing criminal
21   investigation.
22       Q   At what time of day on the 17th of May was
23   German's extraction of Gatlin's phone completed?
24       A   I do not recall the time period.

---

Page 54

1        Q   Do you recall whether it was in the morning or
2    the afternoon?
3        A   It could have been between -- what time was
4    that?  10:30.  Afternoon time maybe.
5        Q   Before Gatlin left the police station,
6    correct?
7        A   I believe so, yes.
8        Q   Because she was given her phone back when she
9    left, true?
10       A   Correct.  But that doesn't mean that the
11   computer system was done doing what it does.
12       Q   You believe that the extraction of the Gatlin
13   phone was completed by 5:00 p.m.?
14       A   I would guess, on her phone.
15       Q   I don't want to you guess.  That's your best
16   estimate?
17       A   I would say at this point, then, I don't
18   recall what time it was done.
19       Q   When Lamken told you that it was necessary to
20   get a search warrant for Socha's phone and to issue to
21   AT&T, did she tell you what you were looking for?
22       A   She told me about the text message, we talked
23   about the law which was harassing of jurors or
24   witnesses, and that -- that specific text message.

---

Page 55

1        Q   Again, you were not looking for photographs,
2    true?
3        A   True.  I was only looking to try to --
4    evidence of the crime.
5        Q   You were not looking for videos?
6        A   I was not, no.
7        Q   And Lamken did not tell you to look for
8    photos, did she?
9        A   Absolutely not, no.
10       Q   And she did not tell you to look for videos,
11   did she?
12       A   No.
13       Q   For purposes of your investigation, there is
14   no need to look for photos, was there?
15       A   No.  I'm looking for a text message.
16       Q   There was no need to look for videos, was
17   there?
18       A   No.
19       Q   When Socha's phone -- I should say it this
20   way.
21       The Gatlin phone extraction was completed
22   before Socha's phone was seized pursuant to the warrant,
23   correct?
24       A   Correct.

16 (Pages 52 to 55)

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Edward Grizzle - Taken 7/28/2021

Page 56

1  Q  Do you recall any specific statements that
2  Socha made to you when you told her that you had a
3  warrant to seize her phone other than those that are
4  described in Exhibit 5?
5  A  If you look back in my report, there's some
6  words that she said about me, but I did not put them, I
7  believe, in this memo.
8  Q  You're talking about the report, Exhibit 3,
9  that we looked at earlier?
10  A  I believe so, yeah, whatever that report was,
11  but I'd have to refresh, but she did swear at me a few
12  times, did call me names at that point.
13  Q  Did she say anything to you about the contents
14  of the phone you were seizing?
15  A  The only thing I recall is her saying "This
16  motherfucker is going to look at personal information,"
17  or something along those lines.
18  Q  In addition to -- we're out of the screen
19  share now.
20  A  Yes, we are.
21  Q  In addition to the thumb drive that German
22  gave you after he did the extraction of Socha's phone,
23  you're aware that another thumb drive or flash drive, as
24  they're called, of that same extraction of Socha's phone

Page 57

1  was created and given to then Lieutenant Reid, correct?
2  A  Correct.
3  Q  At whose direction was that done?
4  A  Lieutenant Reid at the time was the lieutenant
5  of internal affairs.  He came to me and said that they
6  were going to be doing an internal investigation and
7  needed a copy of the information, which it is very
8  standard during that time period for the lieutenant or
9  sergeant from internal affairs would want something from
10  a detective or detective sergeant because obviously
11  criminal can't share -- can share with internal but
12  internal can't share with criminal.
13     So at that point, he is the voice of the
14  chief.  If he has an ongoing internal affairs
15  investigation, I would have to give what he requested,
16  but I did confirm that with Deputy Chief Roechner if
17  that was what they wanted done, and he stated yes.
18  Q  When was that flash drive of the Socha phone
19  extraction that was created and given to Reid created?
20  A  I do not recall the -- the date of that at
21  all.
22  Q  Was it before or after you took your late May,
23  early June vacation?
24  A  That, I can't recall.

Page 58

1  Q  Is there anything that would refresh your
2  recollection?
3  A  Not that I have or I would have had, no.
4  Q  Without providing a specific date on which
5  that flash drive was created for and given to Reid, can
6  you estimate when that occurred relative to the -- the
7  time that you got your flash drive of the Socha phone
8  extraction?
9  A  I don't recall, but it was -- I do recall it
10  was after the trial of, you know, Officer Crowley, but I
11  can't tell you, you know, if it was before vacation,
12  after.  I don't know when the internal affairs division
13  was looking into the matter.
14  Q  Do you know who created the flash drive of the
15  Socha phone extraction that was given to Reid?
16  A  I recall it most likely would have been
17  Detective German upon my asking him to.  There were only
18  two people at that time I would have gone to, Sergeant
19  Botzum or Detective German.
20  Q  You would not have gone to McKinney for that,
21  would you?
22  A  I would not have, no.
23  Q  Are you personally aware of any other copies
24  of the Socha phone extraction that were made other than

Page 59

1  the one on your computer, the one on the flash drive
2  that you got, and the one on the flash drive that Reid
3  got?
4  A  I am not personally aware.  I heard, but I
5  have not physically seen any other flash drives other
6  than the one I gave to Reid or Deputy Chief Roechner.
7  Q  What have you heard about other copies being
8  created?
9  A  Other than when I was in Florida, that Deputy
10  Chief Jensen had the information taken off the
11  Cellebrite computer on to a flash drive to, at the time,
12  Sergeant Gavin.
13  Q  Did you learn about that after you got back
14  from your Florida vacation?
15  A  No.  I received a phone call from Detective
16  German when I was in Florida.
17  Q  What exactly did Detective German tell you on
18  that phone call when you were in Florida?
19  A  He advised me that Sergeant Gavin wanted to
20  take the contents of the Socha download off the
21  Cellebrite per orders from Deputy Chief Jensen, and that
22  was the extent of the conversation I had with Detective
23  German.
24  Q  What was your reaction to German when he told

Royal Reporting Services, Inc.
312.361.8851

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Edward Grizzle - Taken 7/28/2021

Page 60

1    you that?
2        A   Why nobody called me.
3        Q   Did you say anything else to German?
4        A   To Detective German, not that I recall, but I
5    did call Detective Gavin.
6        Q   Over the phone?
7        A   Yes.
8        Q   While you were still on vacation?
9        A   Yes.
10       Q   All right.  And in that phone call, what did
11   you say to Gavin and what did Gavin say to you?
12       A   Actually, I do not recall if Detective or
13   Sergeant Gavin called me or I called him, but I did have
14   a conversation with him.
15       Q   A telephone conversation?
16       A   Yes, sir.
17       Q   While you were in Florida?
18       A   Yes.
19       Q   In that telephone conversation, what did Gavin
20   say to you and what did you say to Gavin or vice versa?
21       A   He said there were rumors -- he did not
22   elaborate -- rumors involving Officer Socha's phone, and
23   that Deputy Chief Jensen wanted the contents extracted
24   off the phone, and he was following orders, and I

Page 61

1    believe I left it at that.
2        Q   Was that exchange in any way a heated or
3    contentious exchange?
4        A   It wasn't heated with myself and Sergeant
5    Gavin, no; nothing towards him.
6        Q   How would you characterize the tone of that
7    conversation?
8        A   The tone was, "Hey, this is what I'm ordered
9    to do."  And I had a lot of questions on why I wasn't
10   contacted, not that he could answer that because we are
11   the same rank, and that was pretty much it that I can
12   recall with him.
13       Q   Did you express to Gavin any concern that
14   removing the contents of the Socha phone extraction from
15   the Cellebrite would in any way compromise your
16   investigation of Socha?
17       A   Yes.  I don't know if that was with him or
18   later on with Deputy Chief Roechner, but my concern was
19   first digital evidence is now deleted off the computer
20   and the flash drive doesn't work, we have no evidence of
21   this crime.
22       Q   Okay.  Do you recall how long into your
23   vacation it was that you learned that -- first from
24   German that this was going to occur?

Page 62

1        A   It was almost towards the end of my vacation.
2        Q   Was it your understanding when you left for
3    vacation that the Socha phone extraction was still on
4    the Cellebrite?
5        A   Correct.
6        Q   And then the Lantern?
7        A   Yes, still on the computer systems.
8        Q   And based upon what you learned from German
9    and Gavin in those phone calls, is it your understanding
10   that the Socha phone extraction remained there on the
11   Cellebrite and the Lantern until such time as German
12   carried out the direction from wherever it came to
13   remove it from the Cellebrite and Lantern and load it on
14   to yet another flash drive?
15       A   Correct.
16       Q   Up until that time, then, the Socha phone
17   extraction existed on the Cellebrite and the Lantern,
18   correct?
19       A   Correct.
20       Q   Also on your computer, correct?
21       A   Correct.
22       Q   Also on the flash drive that had been given to
23   you when German did the original extraction of Socha's
24   phone, correct?

Page 63

1        A   Correct.
2        Q   On the flash drive that was made for and given
3    to Reid, correct?
4        A   Correct.
5        Q   And then yet another flash drive was created
6    when German carried out this direction to remove the
7    Socha cell phone extraction from the Cellebrite and
8    Lantern and transfer it on to yet this next flash drive,
9    correct?
10       A   I physically did not see it, but that's what I
11   was told.
12       Q   And then Gavin told you that rumors regarding
13   the Socha cell phone extraction led to his asking German
14   to remove the extraction from the Cellebrite and Lantern
15   and transfer it onto a new flash drive.  Did Gavin tell
16   you what the content of those rumors was?
17       A   I don't recall that.  I just recall he said
18   the rumors, and I just had more questions on why and who
19   asked him to take it off the computer.
20       Q   Did Gavin tell you who had been trafficking in
21   the rumors?
22       A   No.
23       Q   No names were named?
24       A   No, I don't recall hearing any names.

18  (Pages 60 to 63)

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Edward Grizzle - Taken 7/28/2021

Page 64

1      Q   Before you went on your vacation, did you
2   learn that Detective McKinney had viewed photographic
3   images from the Socha cell phone extraction on the
4   Cellebrite?
5      A   No, I never heard that.
6      Q   You say "never."  You just now learned that
7   when I mentioned it?
8      A   No, never during that time period.
9      Q   At some point, did you learn that?
10     A   Months after the Inspector General Regis did
11  his investigation, I heard rumors.
12     Q   From who?
13     A   That, I don't recall except for maybe
14  Detective German, "I want to make you aware of this.
15  Have you heard the rumors?"  Other than that, it's like
16  Romper Room high school with rumors.
17     Q   Did German confirm it was so?
18     A   No.  He said, "This is just a rumor I heard.
19  I wanted to make you aware of it."
20     Q   Has McKinney been disciplined by the Joliet
21  Police Department for having done so?
22     MR. CLARK:  Objection, foundation.
23        You can answer.
24

Page 65

1   BY THE WITNESS:
2      A   I would not know.  I have never heard any
3   rumors.  I would not be part of that procedure.
4      Q   At some point, did you become aware that
5   McKinney, after he himself viewed photographic images
6   from the Socha cell extraction on the Cellebrite, called
7   them to the attention of and showed them to a fellow
8   officer?
9      A   I only heard rumors that he supposedly looked
10  at something through his interview with the inspector
11  general, and that was the extent that I heard.
12     Q   By the time you got back from your vacation,
13  had the Socha cell extraction been removed from the
14  Cellebrite and Lantern?
15     A   That's what I was told, yes.
16     Q   You never had reason to go back and check
17  because you already had the Socha cell extraction on
18  your own computer and on a flash drive, true?
19     A   Yeah, I would have.
20     Q   After the Socha cell extraction was completed
21  and you were given a flash drive containing that
22  extraction and loaded it onto your computer, did you do
23  whatever investigative work you needed to do with that
24  extraction on your own computer?

Page 66

1      A   Yes.  I gave the flash drive to Deputy Chief
2   Roechner, and then I used that, what I put on my
3   computer, so I could go through and look for -- if there
4   was evidence of the crime that was being alleged.
5      Q   Describe for us in sequence each step that you
6   had to take in order to look for the text message that
7   you were searching for on the Socha cell phone
8   extraction.
9      A   I couldn't give you a step by step.  I opened
10  up the file that was contained, I looked.  I did not
11  know exactly where I was going to find things.  I'm not
12  very technology savvy when it all comes to that, so I
13  believe I called Detective German over and said, "Hey,
14  where do I find this information?  I can't determine
15  from here where to find anything."
16     Q   And German was sort of the department's tech
17  expert, true?
18     A   Correct.  Yes.
19     Q   And did you have German do that on the same
20  day that he had completed the Socha cell extraction?
21     A   I don't recall if it was the same day or the
22  next day.
23     Q   It was before you left for vacation?
24     A   It was before.

Page 67

1      Q   And did German take you right to the text
2   message you were looking for?
3      A   I believe so, yes.  Well, not to the text
4   message but to the screen that you'd click where the
5   text messages are, and then you have to go through
6   almost 9,000 pages.  You can't just individually pick
7   what you're looking for.  You have to go and find the
8   phone number you're looking for.
9      Q   And when you were doing that, looking for that
10  text messages -- text message, you did not click on any
11  icons that showed a camera, did you?
12     A   No.
13     Q   You did not click on any icons that showed
14  a -- an icon of a film clip, did you?
15     A   No.
16     Q   As you -- as you looked for the text message
17  in the field that German had opened for you --
18     A   Yes.
19     Q   -- what exactly were you clicking on?
20     A   So basically he showed me where to go.  So at
21  the beginning, I opened, I looked, there's icons of
22  other stuff, that's not what I'm looking for.  I need to
23  find the text messages.  He did his magic, clicked on
24  it, and then a screen popped up with all the text

19  (Pages 64 to 67)

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Edward Grizzle - Taken 7/28/2021

Page 68

1    messages that she has on her phone.
2        Q   And in that field that German opened up for
3    you consisted of all and only text messages, correct?
4        A   Yeah.  Any, you know -- just text messages.
5        Q   Okay.  No photographs, true?
6        A   In there when you're scrolling through, you
7    know, people's text messages -- people have, I don't
8    know, I'm probably saying it wrong, but GIFs or gaffes
9    [sic] or, you know, things like that that people
10   attached their text messages.  You know, that's
11   obviously, you know, all, you know, that's there.
12       Q   There's only photos that were attached to text
13   messages, correct?
14       A   Correct.
15       Q   Because that's all you needed to look at or
16   for was a particular text message, correct?
17       A   What I was looking for in the beginning, so I
18   would just, you know, scroll like you're doing with your
19   screenshots, looking for Maria Gatlin's phone number,
20   which -- so I would just go through, keep going, once I
21   found Maria Gatlin's, that was it.  And it took a while.
22       Q   When you interviewed Gatlin, she told you that
23   there was just this one text that she, Gatlin, was
24   concerned about, correct?

Page 69

1        A   Correct.
2        Q   You were just looking for one text message,
3    correct?
4        A   Correct.
5        Q   And Gatlin told you when you interviewed her
6    the date and approximate time on which it was sent to
7    her?
8        A   Correct.
9            You can't search the system on date or time.
10   You can only on that -- for her phone number going
11   through the text messages.
12       Q   When you were searching the Socha cell
13   extraction, how many different times did the Gatlin
14   phone number appear within this universe of text
15   messages that German had called up for you?
16       A   So the way it would go, it was in blocks.  So
17   it would be everything from this one phone number,
18   everything from that one phone number.  So when I got to
19   this block, it had text messages of Maria Gatlin and
20   Cassandra previously, and then it had that message, you
21   know, right there which was -- appeared to be the last
22   message sent to Ms. Gatlin.
23       Q   In that process, approximately how many text
24   messages were in this subset of those from Socha to

Page 70

1    Gatlin?
2        A   I do not recall.  I just kept going.  I
3    couldn't even -- I couldn't tell you that without
4    looking at the -- the phone.
5        Q   Can you give an estimate?  Was it a dozen?  A
6    hundred?
7        A   I couldn't give you an estimate.  I went
8    through, saw my text message and what I was looking for.
9        Q   How long did it take you to locate the single
10   text message from Socha to Gatlin that was the subject
11   of this investigation?
12       A   I couldn't give you an exact time, but it did
13   take me some time.
14       Q   Give me your best estimate.
15       A   I would say it took an hour.  Because in
16   between there, I'm answering phone calls, you know,
17   doing other stuff.
18       Q   With your undivided attention, it probably
19   would have taken you something less than a full hour,
20   true?
21       A   Correct, yes.
22       Q   Before serving the warrant on Socha and
23   seizing her phone, did you ask her to show you the text
24   message she had sent to Gatlin?

Page 71

1        A   No.
2        Q   Before serving the search warrant and seizing
3    her phone, did you tell her that that was what you were
4    looking for on her phone?
5        A   Before serving the search warrant, you mean
6    days before?  Hours before?
7        Q   Fair.
8            Any time before you served the warrant on
9    Socha and seized her phone, did you tell her that you
10   were looking for a particular text message from her to
11   Maria Gatlin?
12       A   Not before grabbing somebody's cell.  And
13   people have deleted that information from us before we
14   actually have been able to seize up the search warrant.
15   So I would not tell anybody that if it's still a
16   criminal investigation so they could reset and delete
17   stuff from their phone.
18       Q   Okay.  After you -- after you seized the phone
19   and had physical possession of it, did you tell Socha
20   that you were looking for this particular text message
21   that she had transmitted to Gatlin?
22       A   Once the phone was put on airplane mode so she
23   cannot have any chance to delete it, I told her I was
24   looking for information that she sent to Ms. Gatlin.

20  (Pages 68 to 71)

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Edward Grizzle - Taken 7/28/2021

Page 72

1    But she was very upset, so there wasn't much conversing
2    I was going to be able to have with her.
3        Q   When did that occur?  In that same -- in the
4    room with Brown right after you seized the phone?
5        A   Correct.  Everything, you know, occurred in
6    that room with Lieutenant Brown and Officer Socha.
7        Q   Is there a reason, Sergeant, that fact that
8    you told Socha after you seized her phone what you were
9    looking for is not described in your report or in your
10   memo for the chief and to the deputy chief?
11       A   Like I said previously, the memo is just a
12   synopsis, and my report isn't completely done yet.  It's
13   an ongoing criminal investigation.  So there are still
14   things -- you know, like my report could be added of the
15   derogatory comments she made about me and things of such
16   that nature as well.
17       Q   It's over three years since these events
18   occurred, true?
19       A   Yeah, that be about right, sir.
20       Q   After you had physical possession of the
21   phone --
22       A   Yes, sir.
23       Q   -- did you ask Socha whether she would show
24   you the text message?

Page 73

1        A   The way she was acting towards me, she was
2    very upset and very hostile towards me.  There wouldn't
3    have -- not have been a good opportunity to ask her
4    that.  She had to be ordered to be calmed down by
5    Lieutenant Brown.
6        Q   So the answer to my question is no, you didn't
7    ask her to simply show you the text message, correct?
8        A   Correct.
9        Q   Did you ask Socha after you had the phone
10   whether she had sent that text message?
11       A   Again, she would not talk.  She would just
12   swear at me.  So I was not asking her any more
13   questions.  To calm the situation down, I took the phone
14   and let Lieutenant Brown deal with her in the office
15   where she probably rightfully so needed to calm down.
16       Q   Is that a "no" in answer to the question I
17   asked?
18       A   Correct.
19       Q   Did you show -- after you had possession of
20   Socha's phone, did you show her the screenshots of the
21   same text message that you obtained from Gatlin and
22   asked Socha whether, in fact, she had transmitted that
23   text message to Gatlin?
24       A   I think at this point you'd realize -- you

Page 74

1    would know I would have to sit down and read her her
2    rights because she is the scope of the investigation.
3    Mine was to get the search warrant.  It was not at the
4    point to sit down with her and sit here and read her
5    rights.  I'm not going to continue on further, question
6    her, and show her and talk about things without doing
7    that.  And we were not at that point in that
8    investigation.
9        Q   So the answer to my question is no?
10       A   Correct.  Yes, sir.
11       Q   I'm going to do another quick screen share
12   here.
13       A   All right.
14       Q   Directing your attention to Page 19 of
15   Exhibit 1, the transcript recording at Lines 8 through
16   13.
17       A   Which page, sir?
18       Q   At Page 19.
19       A   Okay.
20       Q   Lines 8 through 13.
21       A   Yes.
22       Q   Why would there have been a write-up and
23   internal complaint by you against anyone who had seen
24   pictures of digital images of Socha from the extraction

Page 75

1    from her cell phone?
2        A   Well, Inspector Regis's interview was based
3    upon rumors and things being transmitted and people not
4    doing something appropriately.  So that was a line of
5    scope of questioning.
6            Let's say I found out that somebody who does
7    not have authorization to the Cellebrite computer or
8    authorization to anything, you know, say my computer,
9    which would only be me, but anybody who did not have
10   authorization beyond that Cellebrite computer, of course
11   I would have to look into that as a supervisor.  Why are
12   you on the system unless you're a trained Cellebrite
13   person or being trained on it?
14       Q   Have you discussed this lawsuit with now
15   Deputy Chief Brown?
16       A   Did I discuss the lawsuit with Deputy Chief
17   Brown?
18       Q   Yes, sir.
19       A   Yes.
20       Q   When?
21       A   When the lawsuit first came out, you can only
22   imagine, because it was put out through the paper, of
23   how many people were calling and asking what's going on
24   with the lawsuit.  So, you know, at the time, I believe

21  (Pages 72 to 75)

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Edward Grizzle - Taken 7/28/2021

Page 76

1    it was Lieutenant Brown.  He was like, "Hey, I hear
2    there's a lawsuit."
3           I said, "Yeah.  I just learned about it in the
4    Joliet Patch like everybody else."
5        Q   Do you recall any of the additional contents
6    of your conversation with Brown about the lawsuit?
7        A   Well, just maybe throughout the time any
8    statuses, you know, what -- that I've heard and then any
9    of the rumors that continue that keep circulating around
10   the department.  Like I said, it's like a kindergarten
11   class.
12       Q   Have you discussed the lawsuit with now former
13   Chief Roechner?
14       A   During the time period when he was chief, yes,
15   I'd have to give him if there were any statuses of, you
16   know, the lawsuit.
17       Q   Have you discussed with Brown any aspect of
18   his deposition in this case?
19       A   Brown's deposition?  No.  I was aware that he
20   had the deposition.  I haven't had direct talks with him
21   about his deposition.
22       Q   Have you discussed with Roechner his
23   deposition?
24       A   No, I have not.

Page 77

1        Q   Have you discussed this case with now I think
2    it's Deputy Chief Matlock?
3        A   Other than when Deputy Chief Matlock called me
4    a couple months ago before the depositions, he asked me
5    if -- on behalf of Sabrina Spano of the Joliet
6    corporation counsel if I knew where the evidence was in
7    this case.  And I advised him you'll have to take that
8    up with -- she should know where it's at.  And I also
9    said that "I believe I'm hearing rumors you might be
10   deposed as well, so I don't think it's a conversation me
11   and you should be having," or you -- "This needs to go
12   through either Tressler's law firm or my law firm."  And
13   that was about it.  And on speakerphone, actually, I
14   heard it was Deputy Chief Brown in the background.
15       Q   When was that conversation?
16       A   It was about two months ago or so.  I would
17   say right around the time, maybe before or after the
18   Patch put out depositions.  I couldn't give you the time
19   for it.
20       Q   In that conversation, did Dave Jackson's name
21   come up?
22       A   Not during that point, no.
23       Q   Have you had any conversations with Brown or
24   Matlock in which Jackson's name came up?

Page 78

1        A   We've had conversations, myself and Lieutenant
2    Brown -- or Deputy Chief Brown, that Detective Jackson
3    has multiple lawsuits against the City.  The rumor is
4    that he is saying stuff regarding myself and Deputy
5    Chief Brown.
6        Q   How did you learn about those -- what you
7    would characterize as rumors?
8        A   Just you'd hear people when you're walking.
9    I -- my office is not at the police department.  I'm not
10   at this office.  So when you go in there, you hear
11   people talking.  You know, just people in the common
12   areas.  I mean, every time there's a new article posted
13   in the paper, the Patch, you can only imagine, you know,
14   people are talking about it all the time.
15       Q   Have you discussed this lawsuit with Gavin?
16       A   No.  I have only spoken to former Deputy Chief
17   Gavin -- it was one time when he was here.  He did
18   mention to me that he heard from the -- he heard the
19   rumors about Dave Jackson.  And I said, "Yeah, there's
20   rumors floating around."  And that was pretty much it.
21   I haven't talked to him about it at all.
22       Q   When you spoke with Matlock --
23       A   Yes.
24       Q   -- did Matlock tell you that he and Jackson

Page 79

1    actually met with Nick Crowley to share with Crowley
2    their concerns about the handling of the extraction of
3    Socha's cell phone?
4        A   I have never had that conversation, but I
5    heard rumors that the Black Police Officers Association,
6    which I believe they're the president and vice
7    president, had met with Officer Crowley.  But, again,
8    that was just rumors.  I never bothered to ask them.
9            MR. CLARK:  Hey, Hall, I don't want to interrupt
10   your line of questioning, but if there's a good time for
11   a break coming up, I don't know if now is it or --
12           MR. ADAMS:  Let's do it now.  I have no problem
13   with this.
14           MR. CLARK:  Okay.  Any best guess about time
15   estimate?
16           MR. ADAMS:  Maybe a half hour, if that.
17           MR. CLARK:  Okay.  All right.  Great.  Just take
18   five, ten minutes?
19           MR. ADAMS:  Sure.
20           (A break was had.)
21           (Grizzle Exhibit 6 marked.)
22   BY MR. ADAMS:
23       Q   Can you hear me, Sergeant Grizzle?
24       A   Yes.

22  (Pages 76 to 79)

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Edward Grizzle - Taken 7/28/2021

Page 80

1    Q   Can you see the document that is up on the
2   screen?
3    A   Yes.
4    Q   And I trust that when we stop screen sharing,
5   I'll be able to reemerge, not that it's any loss to the
6   process is you cannot see my face.
7        We're calling this Exhibit 6, this CITY00211.
8    A   Yes.
9    Q   Is this a document that you've seen before?
10   A   Yes.
11   Q   And it's a document that you authored and sent
12  to then Chief Roechner on the date shown?
13   A   Correct.
14   Q   It references attaching reports regarding the
15  Socha investigation, correct?
16   A   Yes.
17   Q   And the pages that follow, the way they were
18  produced to us, are CITY 212 and 213, the same as
19  Exhibit 3 that we saw before, correct?
20   A   Yes, sir.
21   Q   When you sent Exhibit 6, the 27 September,
22  2018, memo to Roechner, were there any attachments or
23  enclosures other than what we've already marked as
24  Exhibit 3?

Page 81

1    A   No, nothing was sent other than that memo,
2   none of that was sent to him.  It only was the memo that
3   was sent to him, and that was upon his request.
4    Q   So I'm just going to ask:  Why did you send
5   this in late September 2018?
6    A   Chief Roechner asked.  He said "Hey, is it" --
7   pretty much had the conversation, you know what, the
8   original memo I sent to Chief Benton, that Lantern
9   extraction, was not done.  I didn't put it on the
10  original memo.  He said, "Send me another memo stating
11  that that wasn't completed until the next day."  And
12  that's what I did.
13   Q   So this Exhibit 6 is in the nature of an
14  addendum to what we previously called I think Exhibit 4,
15  the 18 May 2018, memo to Benton and Roechner, correct?
16   A   Yes, sir.
17   Q   Are there any other addenda to the 18 May
18  2018, memo?
19   A   No, sir.
20   Q   Was the flash drive that German -- the flash
21  drive of the Socha phone from extraction from the
22  Cellebrite that German created at the request of Gavin
23  entered into evidence?
24   A   I have no knowledge of what occurred or

Page 82

1   happened with that.
2    Q   And was the flash drive of the Socha phone
3   extraction that was made for and given to Reid entered
4   into evidence?
5    A   I do not know how internal affairs handles
6   their -- what they do.
7    Q   Does the flash drive that was created and
8   given to you at the time of the initial extraction of
9   the Socha phone entered into evidence?
10   A   No.
11   Q   Did Roechner have at any time a copy of the
12  Socha cell phone extraction on his desktop computer at
13  the police department?
14   A   I would have no knowledge of that.
15   Q   Did Roechner have a copy of the cell phone
16  extraction from the -- from Socha's phone on any
17  personal or Joliet Police Department issued cell phone?
18   A   I would have no knowledge of that.
19   Q   Did he have a copy of the Socha cell phone
20  extraction on any computer device that he had any
21  control or -- over or access to?
22   A   I would have no knowledge of that.
23   Q   Were any of the various copies of the Socha
24  cell phone extraction that were made by the Joliet

Page 83

1   Police Department entered into evidence in accordance
2   with General Order 16-1?
3    A   Are you specifically talking about what was
4   given to me that I gave to Lieutenant Reid and Chief
5   Roechner?  Because that would be the only thing I would
6   have knowledge of.
7    Q   Any of those copies.
8    A   They were put into the Investigations Division
9   safe, which is referred to -- also has a general order,
10  talks about records of sensitive cases and all cases
11  involving -- all cases involving a sensitive nature and
12  officers are then kept in the Investigations' safe,
13  which only the deputy chief would have access to.
14   Q   Pursuant to what general order?
15   A   It was a general order.  I believe it might be
16  under 10-6, which is criminal investigation operations
17  and administration.
18   Q   That's a different general order than what we
19  looked at earlier, 16-1 -- 16-1 rather.  You're
20  referring to a different general order?
21   A   Correct.
22   Q   Was that general order to which you're
23  referring, which you believe is 10-6, in existence in
24  May, June, July, and August of 2018?

23  (Pages 80 to 83)

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Edward Grizzle - Taken 7/28/2021

Page 84

1    A    Yes.
2    Q    Was there any separate general order of which
3  you're aware in effect relating to the manner in which
4  internal affairs handled evidence?
5    A    I am not aware of or have knowledge or
6  anything with internal affairs operations or general
7  orders regarding what they do.
8    Q    Have you ever heard any Joliet officer make or
9  repeat the statement, quote, "Now I know why Crowley is
10  with her.  She sucks dick like a porn star," close
11  quote, in reference to Officer Socha?
12    A    No, I have never heard anybody say that to me.
13    Q    Have you ever heard any rumors to the effect
14  that that statement was made by some other Joliet Police
15  Department officer?
16    A    That particular rumor, no.
17    Q    Have you have ever heard any Joliet police
18  officer make any statements about the appearance of
19  Officer Socha in nude photos or videos including videos
20  depicting her engaged in sexual activity that were
21  extracted from her cell phone after it was seized by
22  you?
23    A    No.
24    Q    Have you ever heard rumors that such comments

Page 85

1  were made by Joliet officers?
2    A    I heard rumors, yes.
3    Q    From whom did you hear those rumors?
4    A    I said I couldn't tell you who.  You walk into
5  the station, people are talking about things, but
6  usually people get quiet when they see me in the room.
7    Q    In the May and June 2018 time frame, were
8  there any female detectives working in the
9  Investigations Division?
10    A    Not that I recall, no.
11    Q    Were there any -- during the same time
12  frame -- any women who were not sworn officers working
13  in the Investigations Division?
14    A    Yes.  We have two female secretaries.
15    Q    And what are the names of those two women?
16    A    Kimberly Anderson and Gloria Coyl.
17    Q    Where do they -- back at that time, I should
18  say, where did they sit in reference to where the rest
19  of the detectives sat and worked?
20    A    Gloria sits up in front to the main entrance
21  of the door away from the main detective body.  She
22  can't even see the -- the detectives from where she
23  sits.  Kimberly Anderson is in a room -- separate room
24  with, again, the intelligence room separate from all the

Page 86

1  other detectives.
2    Q    Was that true back then, too?
3    A    Yeah.  It's been true since the building
4  opened.
5    Q    Have you ever served with Officer Socha?
6    A    Served -- I did make her one of my instructors
7  in combatives and use of force, yes.
8    Q    When was that?
9    A    Maybe 2016.
10    Q    Have you ever had occasion to perform a
11  performance evaluation or report of Officer Socha?
12    A    No.
13    Q    You didn't have an opinion of Officer Socha's
14  capabilities and performance as a police officer?
15    A    As a police officer, no.  But as one of my
16  instructors, she was a very good young officer learning
17  a lot of things and was very helpful during an
18  in-service training class that we have.
19    Q    And the reason you don't have any opinions of
20  her as an officer is you have not had an opportunity to
21  observe her?
22    A    Correct.  I've never supervised her in patrol.
23    Q    How long have you been with the department?
24    A    21 years.

Page 87

1    Q    Is it the only police agency with which you
2  served?
3    A    I worked at the Cook County Jail, and then I
4  worked for the Illinois Department of Corrections.
5    Q    And before starting with the Joliet
6  department?
7    A    Yes, before, correct.
8    Q    How long have you been in Investigations?
9    A    I believe I was a -- at first, I was a
10  detective for about four years, got promoted to
11  sergeant, and then I went back up to Investigations
12  around the time of 2014, to currently I'm still assigned
13  to the Joliet Investigations Division.
14    Q    So a total of eight years give or take in
15  Investigations?
16    A    Correct.
17    Q    How long have you been -- let me -- I suppose
18  I should establish this.
19         For some period you have been a detective in
20  the Investigations department.  Are you normally
21  detailed to investigations involving other Joliet
22  officers?
23    A    Can you reask that again?  I'm not following
24  you.

24  (Pages 84 to 87)

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Edward Grizzle - Taken 7/28/2021

| Page 88 | Page 90 |
|---|---|

**Page 88**

1  Q   Sure.

2     In this particular -- you were involved, in

3  the way we described it earlier, the departments, the

4  investigation of -- of Crowley and the investigation of

5  Socha.  Are you the -- are you the guy in the

6  Investigations Division who handles investigations of

7  other Joliet officers when they take place?

8  A   Currently, now, no, but before that, all

9  detective sergeants, there's -- would all get assigned

10  cases involving officers.

11  Q   Is there a particular reason that you were

12  assigned to be the lead on the Socha investigation?  I

13  appreciate that Lamken called you because you had just

14  worked together on the Crowley matter and you knew who

15  Gatlin was and so forth.  Is there, that aside, any

16  other particular reason that you led the Socha

17  investigation?

18  MR. CLARK:  Objection, speculation.

19     But if you know.

20  BY THE WITNESS:

21  A   Yeah, I couldn't answer that.  I couldn't

22  answer why the supervisors picked me.

23  Q   Did someone in the division specifically

24  detail you to lead that Socha investigation, or did you

**Page 89**

1  just take the ball and run with it after Lamken called

2  you?

3  A   After I talked to the Appellate Prosecutor

4  Lamken, the next day I spoke with Chief Benton, and

5  Chief Benton was the one who directed, "Okay.  Well, if

6  that's what she wants you to do, obtain the search

7  warrant, that's what you need to do, and then Chief

8  Roechner did as well.  So it was two command staff

9  personnel, the chief and deputy chief.

10  Q   Did it come up in those discussions that

11  because you had been involved in the Crowley

12  investigation, that you ought not lead the Socha

13  investigation?

14  A   I never had any discussion with anybody from

15  that command staff regarding that.

16  Q   What's your highest level of formal education?

17  A   Some college.

18  MR. ADAMS:  Those are all the questions I have.

19  Thanks.

20  THE WITNESS:  Thank you, sir.

21  MS. PROCTOR:  I guess I'm next.  Hi.  Let me just

22  first ask the witness, are you okay?  I have a handful

23  of questions.  Are you okay to move forward or do you

24  need a break?  You tell us.

**Page 90**

1  THE WITNESS:  I'm good to go, ma'am.  I'm ready.

2  MS. PROCTOR:  Okay.  Thank you.

3     EXAMINATION

4  BY MS. PROCTOR:

5  Q   As a detective, Detective [sic] Grizzle, would

6  you agree that you follow the evidence trail in your

7  investigations?

8  A   Yes.

9  Q   Would you also agree that you go where the

10  evidence leads you?

11  A   Yes.

12  Q   In the case of -- Well, let me ask you this:

13  Is it your understanding that the Cellebrite extracted

14  the entire contents of Officer Socha's cell phone?

15  A   Yes.

16  Q   And would you agree that text messages,

17  photographs, and videos, that all of this data from

18  Cassandra Socha's cell phone was within the scope of the

19  search warrant issued by Judge Jones?

20  A   Yes.

21  Q   Is it -- just asking in general, is it

22  possible for a person with a cell phone to save an image

23  of a text message in a photographic file on a cell

24  phone?

**Page 91**

1  A   Yes.

2  Q   And would you agree that a screenshot of a

3  text message is an image?

4  A   Correct, yes.

5  Q   In fact, would you agree that Cassandra Socha

6  could have saved an image of the text message in

7  question in her photo file on her cell phone?

8  A   Correct.  Yes.

9  Q   Would you also agree that had you not found

10  the text message in question in the text message file

11  extraction from Officer Socha's cell phone, that the

12  next step in your investigation could involve the search

13  of photographs to locate the image of the text message

14  in question?

15  A   Correct.  Yes.

16  Q   Again, you go where the evidence leads you,

17  correct?

18  A   Correct.  Yes.

19  Q   All right.  And, again, had you not found the

20  text message in question in her cell phone, would it

21  be -- would a logical place to look next would be in her

22  photo file for the reasons you just told us?

23  A   Yes, absolutely.

24  Q   All right.  And last question.  Would you

25  (Pages 88 to 91)

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Edward Grizzle - Taken 7/28/2021

Page 92

1  agree that your investigation, depending on what you
2  found, could have led you to video evidence on
3  Cassandra's cell phone pertinent to your investigation
4  of Officer Socha for witness harassment?
5      **A**   Yes.
6      MR. ADAMS:  Lack of foundation, calls for
7  speculation.
8  BY MS. PROCTOR:
9      **Q**   I understand that that's not what happened
10  here, but that certainly is within the realm of
11  possibility in the course of your investigation and
12  search of the contents of Officer Socha's cell phone,
13  correct?
14     **A**   Correct. Yes.
15     MS. PROCTOR:  That's all I have.  Thank you.
16     THE WITNESS:  You're welcome.
17     MR. CLARK:  I don't have any questions, Hall.  Do
18  you have any follow-up?
19     MR. ADAMS:  I don't.  What do you want to do about
20  signature?
21     MR. CLARK:  We'll reserve signature.
22          (Witness excused, 12:43 p.m.)
23
24

26  (Page 92)

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Edward Grizzle - Taken 7/28/2021

                                                              Page 93

 1            IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3    CASSANDRA SOCHA,                  )
                                        )
 4                  Plaintiff,          )
                                        )
 5          vs.                         ) No. 18 CV 05681
                                        )
 6    CITY OF JOLIET, a municipal       )
      corporation, EDWARD GRIZZLE,      )
 7    JOHN DOES 1-20,                   )
                                        )
 8                  Defendants.         )

 9            I, SERGEANT EDWARD GRIZZLE, state that I have

10    read the foregoing transcript of the testimony given by

11    me at my deposition on July 28, 2021, and that said

12    transcript constitutes a true and correct record of the

13    testimony given by me at the said deposition except as I

14    have so indicated on the errata sheets provided herein.

15

16

                            _____
17                          SERGEANT EDWARD GRIZZLE

18

      SUBSCRIBED AND SWORN to
19    before me this _____ day
      of _____, 2021.
20

21    _____
            NOTARY PUBLIC
22

23

24

                    Royal Reporting Services, Inc.
                         312.361.8851

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Edward Grizzle - Taken 7/28/2021

Page 94

```
 1    UNITED STATES OF AMERICA        )
      NORTHERN DISTRICT OF ILLINOIS   )
 2    EASTERN DIVISION                )    SS:
      STATE OF ILLINOIS               )
 3    COUNTY OF COOK                  )

 4

 5            I, NICOLE MARIE DeBARTOLO, Illinois Certified

 6    Shorthand Reporter and Registered Professional Reporter,

 7    do hereby certify that SERGEANT EDWARD GRIZZLE was first

 8    duly sworn by me to testify to the whole truth and that

 9    the above deposition was taken via Zoom, reported

10    stenographically by me, and reduced to typewriting under

11    my personal direction.

12            I further certify that the said deposition was

13    taken at the time and place specified and that the

14    taking of said deposition commenced on July 28, 2021, at

15    9:32 a.m.

16            I further certify that I am not a relative or

17    employee or attorney or counsel of any of the parties,

18    nor a relative or employee of such attorney or counsel,

19    nor financially interested directly or indirectly in

20    this action.

21            The signature of the witness, SERGEANT EDWARD

22    GRIZZLE, was reserved by agreement of counsel.

23

24
```

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Edward Grizzle - Taken 7/28/2021

Page 95

1              Witness my signature as a Certified Shorthand

2     Reporter in the State of Illinois, on August 20th, 2021.

3

4

5

6

7

8

9                         NICOLE MARIE DeBARTOLO, CSR, RPR
                          161 North Clark Street
10                        Suite 3050
                          Chicago, Illinois  60601
11                        Phone:  312.361.8851

12

13
      CSR No.   084-004127
14

15

16

17

18

19

20

21

22

23

24

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Edward Grizzle - Taken 7/28/2021

Page 96

**A**

**a.m** 1:18 34:1 94:15
**able** 35:1 71:14 72:2 80:5
**absence** 23:17 24:4
**absolutely** 55:9 91:23
**acceptable** 43:14
**access** 39:3 82:21 83:13
**accommodate** 10:24
**account** 17:12
**accurate** 11:6,11 12:10 51:5,9
**accuses** 47:14,20
**accustomed** 5:23
**acquitted** 29:20
**acting** 44:6 73:1
**action** 24:7,12 24:15 94:20
**activity** 84:20
**Adams** 2:2,2,21 3:4 4:8,11 7:5 7:11,13,15,18 7:19 9:4,7 10:1 10:17,21 13:10 19:23 20:3,8 20:11 24:16,18 25:18 40:8 41:6 44:13 45:2,8,14,18 45:23 50:6,11 50:14 79:12,16 79:19,22 89:18 92:6,19
**add** 30:21 39:1,6 39:20 40:3 46:15
**added** 31:2,8

40:16,23 41:9 72:14
**addenda** 81:17
**addendum** 81:14
**addition** 56:18 56:21
**additional** 48:10 49:10 76:5
**additions** 41:14
**address** 23:9
**administration** 83:17
**advice** 5:21
**advised** 59:19 77:7
**affairs** 57:5,9,14 58:12 82:5 84:4,6
**afternoon** 54:2,4
**agency** 87:1
**ago** 11:15 12:14 46:24 77:4,16
**agree** 90:6,9,16 91:2,5,9 92:1
**agreement** 94:22
**ahold** 43:13
**airplane** 71:22
**alleged** 66:4
**alleging** 34:9
**AMERICA** 94:1
**and/or** 24:2 50:22
**Anderson** 85:16 85:23
**announced** 16:13
**announcement** 16:1
**answer** 10:23 12:7,9,21 24:23 35:5 40:10 41:6 43:1 52:1

61:10 64:23 73:6,16 74:9 88:21,22
**answering** 70:16
**answers** 11:8 13:1
**anybody** 24:14 26:22 71:15 75:9 84:12 89:14
**anyplace** 51:19
**apart** 35:11
**appear** 24:23 69:14
**appearance** 84:18
**APPEARAN...** 2:1
**appeared** 69:21
**appellate** 14:11 15:16 17:15,17 27:23 28:17 37:17 38:12 39:12 43:6 46:13 89:3
**application** 37:1 37:7 38:3 42:22 43:20 44:18 47:9
**appreciate** 10:4 10:6 26:24 35:4,5 39:23 88:13
**appreciated** 10:20
**appreciating** 40:2
**approach** 42:21 44:18
**approached** 49:15
**appropriately** 75:4
**approval** 46:14
**approve** 22:3

37:9
**approved** 22:21
**approximate** 69:6
**approximately** 33:24 69:23
**area** 23:12
**areas** 78:12
**arrest** 27:8,22 29:9
**arrested** 13:24 27:4
**article** 78:12
**aside** 48:9 88:15
**asked** 11:7 35:6 43:18 63:19 73:17,22 77:4 81:6
**asking** 35:13 48:12 58:17 63:13 73:12 75:23 90:21
**aspect** 19:3 76:17
**assign** 23:20
**assigned** 23:16 23:20 26:8,23 27:12 87:12 88:9,12
**Association** 79:5
**assume** 22:20
**AT&T** 54:21
**ATKUS** 2:13
**attached** 68:10 68:12
**attaching** 80:14
**attachments** 80:22
**attempted** 51:5
**attend** 14:9 15:13 19:15
**attention** 65:7 70:18 74:14
**attorney** 94:17 94:18

**attorney's** 14:3 43:10
**audio** 27:8
**audio-video** 14:5
**August** 20:22 83:24 95:2
**authored** 80:11
**authorization** 75:7,8,10
**authorized** 22:21
**aware** 5:18 56:23 58:23 59:4 64:14,19 65:4 76:19 84:3,5

**B**

**back** 10:23 21:23 24:11 26:24 30:21 31:6 32:9 40:3 43:3 45:11 51:16 53:18 54:8 56:5 59:13 65:12,16 85:17 86:2 87:11
**background** 77:14
**ball** 89:1
**based** 12:16 13:5 39:21,21 62:8 75:2
**basic** 21:7
**basically** 67:20
**basis** 44:17 51:22
**Bates** 25:20 47:7
**bathroom** 45:7
**Batis** 19:10,15 22:2
**Batis's** 19:11
**bear** 6:17 45:2

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Edward Grizzle - Taken 7/28/2021

Page 97

**bears** 47:7
**began** 23:22
  27:23
**beginning** 30:12
  32:14 67:21
  68:17
**begins** 47:13,19
**behalf** 2:6,11,17
  77:5
**believe** 8:24
  12:4,7,17 13:1
  13:6 23:5
  28:19 37:22,23
  42:10,10,14
  49:1 50:24
  51:11 52:23
  54:7,12 56:7
  56:10 61:1
  66:13 67:3
  75:24 77:9
  79:6 83:15,23
  87:9
**benefit** 25:19
**Benton** 18:6,10
  18:14 19:14
  37:23,23 43:4
  50:8,22 51:1
  53:14 81:8,15
  89:4,5
**best** 54:15 70:14
  79:14
**better** 7:13
**beyond** 75:10
**bit** 32:13
**Black** 79:5
**block** 23:1 28:10
  69:19
**blocks** 69:16
**body** 30:9 85:21
**boss** 19:9
**bothered** 79:8
**bottom** 20:12
**Botzum** 58:19
**box** 20:5
**boxes** 32:21

**break** 45:7,10
  45:13 79:11,20
  89:24
**brief** 17:20
  32:13
**bring** 10:23
**Brown** 72:4,6
  73:5,14 75:15
  75:17 76:1,6
  76:17 77:14,23
  78:2,2,5
**Brown's** 76:19
**building** 86:3

_____
**C**
**call** 6:17 7:7,18
  20:8 24:14
  25:13 29:19
  30:2 40:21
  43:6 45:18
  50:11 56:12
  59:15,18 60:5
  60:10
**called** 1:11 4:4
  22:14 31:11
  33:9 34:24
  41:23 53:16
  56:24 60:2,13
  60:13 65:6
  66:13 69:15
  77:3 81:14
  88:13 89:1
**calling** 11:4
  75:23 80:7
**calls** 42:9 70:16
  92:6
**calm** 73:13,15
**calmed** 73:4
**camera** 67:11
**capabilities**
  86:14
**career** 25:6
**Carlson** 37:2,4,7
  37:20 38:4,15
  41:2,11 42:20

43:5,17,21
44:2,5,7,8,21
45:1 46:12
47:24 49:15
**carried** 62:12
  63:6
**case** 5:14 9:3,8
  13:20 19:4
  23:21 24:15
  25:14 26:17,23
  27:10,17 30:2
  38:2,13 39:1,2
  39:16 40:18
  41:18,24 76:18
  77:1,7 90:12
**caseload** 23:20
**cases** 23:16,18
  23:19,20 44:23
  83:10,10,11
  88:10
**Cassandra** 1:3
  2:20 4:12
  47:13,20 49:17
  49:19 69:20
  90:18 91:5
  93:3
**Cassandra's**
  92:3
**cell** 33:10 63:7
  63:13 64:3
  65:6,13,17,20
  66:7,20 69:12
  71:12 75:1
  79:3 82:12,15
  82:17,19,24
  84:21 90:14,18
  90:22,23 91:7
  91:11,20 92:3
  92:12
**Cellebrite** 34:24
  35:3,14,17
  42:16 59:11,21
  61:15 62:4,11
  62:13,17 63:7
  63:14 64:4

65:6,14 75:7
  75:10,12 81:22
  90:13
**certain** 44:22
**certainly** 31:21
  92:10
**Certified** 1:15
  94:5 95:1
**certify** 94:7,12
  94:16
**cetera** 40:3
**chambers** 37:18
**chance** 9:24
  71:23
**change** 40:3
**characterizati...**
  27:14,18 29:11
  29:15,17
**characterize**
  13:21 26:14,16
  29:1,5 61:6
  78:7
**check** 65:16
**Chicago** 2:4,9
  95:10
**chief** 18:6,10,14
  18:18 19:2
  37:22,23 43:4
  43:4 44:3,4,6
  50:8,9,24 51:4
  51:5,17 53:1,2
  53:10,13 57:14
  57:16 59:6,10
  59:21 60:23
  61:18 66:1
  72:10,10 75:15
  75:16 76:13,14
  77:2,3,14 78:2
  78:5,16 80:12
  81:6,8 83:4,13
  89:4,5,7,9,9
**Chris** 4:21 11:9
**circulating** 76:9
**cite** 51:13
**city** 1:6 2:11

23:10 25:12,12
  25:20 45:19,19
  47:8 78:3
  80:18 93:6
**CITY00094**
  47:11
**CITY00211**
  80:7
**Civil** 1:13
**clarify** 40:6
**Clark** 2:13 7:12
  10:5 12:20
  13:9 20:2 40:6
  41:5 42:24
  45:5,12 51:24
  64:22 79:9,14
  79:17 88:18
  92:17,21 95:9
**class** 76:11
  86:18
**clear** 26:18,20
**click** 67:4,10,13
**clicked** 67:23
**clicking** 67:19
**clip** 67:14
**close** 15:18 28:3
  28:11 29:2,12
  33:12 84:10
**closed** 15:21
  16:3 29:22
  39:14
**closing** 15:24
**cloud** 40:21
**cloud/OneDrive**
  41:20
**collect** 20:19
**college** 89:17
**colon** 28:11
**combatives** 86:7
**come** 45:11
  77:21 89:10
**comes** 66:12
**coming** 79:11
**command** 43:12
  89:8,15

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Edward Grizzle - Taken 7/28/2021

Page 98

commenced 94:14
commencing 1:18
comments 72:15 84:24
common 78:11
communicate 24:11
communicated 41:11
compared 44:24
complained 49:22
complaint 28:20 28:21 37:1 46:1,7,9,11,19 47:9,19,24 48:21 49:6,14 74:23
complete 11:7 13:7 38:6 40:4 51:7,9
completed 29:24 38:14 40:11,12 53:19,20,23 54:13 55:21 65:20 66:20 81:11
completely 38:23 43:14 72:12
compromise 61:15
computer 11:24 22:14 25:12 28:8 31:7,9 32:19 40:20 41:19 42:18 54:11 59:1,11 61:19 62:7,20 63:19 65:18,22 65:24 66:3 75:7,8,10 82:12,20

computers 42:16
concern 61:13 61:18
concerned 68:24
concerns 79:2
condensed 8:1
confer 46:21
confirm 43:14 57:16 64:17
consecutive 23:5
consent 5:14
consisted 68:3
constitutes 93:12
contact 27:23
contacted 32:14 61:10
contained 41:20 41:23 48:6 66:10
containing 42:6 65:21
contains 31:1
content 31:1 35:19 47:3 48:5,11 63:16
contentious 61:3
contents 21:2 42:17 56:13 59:20 60:23 61:14 76:5 90:14 92:12
continue 30:22 39:1,13 74:5 76:9
continues 47:21
continuing 30:19
control 26:7,11 32:22 50:19 82:21
conversation 17:20 32:2,5 34:8 48:7,9

59:22 60:14,15 60:19 61:7
76:6 77:10,15 77:20 79:4 81:7
conversations 77:23 78:1
conversed 47:12
conversing 72:1
Cook 87:3 94:3
copies 48:15 58:23 59:7 82:23 83:7
copy 8:24 9:24 10:5,19 48:13 57:7 82:11,15 82:19
corporation 1:6 2:11 77:6 93:6
correct 5:21 13:13,18 16:21 23:24 26:22 27:12,19,24 29:14,15 30:7 33:2,3,19 34:3 37:2 38:16 40:7,8 41:4,12 47:9 48:2 49:23,24 50:16 50:17,20,21 52:18,19,22 54:6,10 55:23 55:24 57:1,2 62:5,15,18,19 62:20,21,24 63:1,3,4,9 66:18 68:3,13 68:14,16,24 69:1,3,4,8 70:21 72:5 73:7,8,18 74:10 80:13,15 80:19 81:15 83:21 86:22 87:7,16 91:4,8

91:17,18 92:13 92:14 93:12
Corrections 87:4
counsel 77:6 94:17,18,22
County 43:10 87:3 94:3
couple 46:24 77:4
course 25:8 75:10 92:11
court 1:1 6:4 14:12 15:5,16 16:13 93:1
courthouse 43:16
courtroom 14:15,18 15:1 16:2 17:11
Courts 1:14
cover 6:19,21 7:9,17 23:16
Coyl 85:16
create 32:3
created 6:4 28:3 57:1,19,19 58:5,14 59:8 63:5 81:22 82:7
crime 28:17
criminal 5:14 16:5 17:14 23:19,21 28:21 29:22 38:7,13 39:3,10 53:20 57:11,12 71:16 72:13 83:16
criteria 44:17
Crowley 13:17 14:1,7,10,18 15:1,14,19 16:5 17:1,6,14

18:6,15,17,21 19:4,7,16 26:21 27:1,10 27:17 28:21 29:2,6,13,20 30:2 58:10 79:1,1,7 84:9 88:4,14 89:11
CSR 95:9,13
cumbersome 6:8 11:2
currently 87:12 88:8
CV 1:5 93:5

D

Darcy 2:7 8:24
data 90:17
date 9:7 15:18 20:13 28:2,3 28:12 32:7,16 42:8 57:20 58:4 69:6,9 80:12
dates 21:15,17 22:5,11
Dave 77:20 78:19
day 14:2 15:21 23:4 30:5 42:11,12,15 53:22 66:20,21 66:22 81:11 89:4 93:19
days 15:24 22:16 23:1,2,3 71:6
DC 43:4
deal 73:14
Dearborn 2:3
DeBartolo 1:15 94:5 95:9
decide 44:17
decision 42:21
declined 38:4,15

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Edward Grizzle - Taken 7/28/2021

42:20 44:8
**declining** 37:21
**Defendant** 2:11
**Defendants** 1:8
2:17 93:8
**delete** 71:16,23
**deleted** 52:13,13
61:19 71:13
**deny** 37:9 43:14
**department**
5:13,16 20:22
21:1,8 24:3
26:8 27:1,15
33:5 34:2
39:15 64:21
76:10 78:9
82:13,17 83:1
84:15 86:23
87:4,6,20
**department's**
13:16 26:4
66:16
**departments**
88:3
**depending** 92:1
**depicting** 84:20
**deposed** 77:10
**deposition** 1:10
4:16 11:17
20:9 76:18,19
76:20,21,23
93:11,13 94:9
94:12,14
**depositions** 1:14
77:4,18
**deputy** 18:18
19:2 43:4 51:4
57:16 59:6,9
59:21 60:23
61:18 66:1
72:10 75:15,16
77:2,3,14 78:2
78:4,16 83:13
89:9
**derogatory**

72:15
**describe** 51:20
66:5
**described** 33:1
36:24 38:21
48:1 56:4 72:9
88:3
**describing**
40:23
**desktop** 82:12
**detail** 48:5,11
51:10 88:24
**detailed** 24:3
87:21
**detective** 6:22
13:17,20 23:18
26:17,20,22
27:21 33:10
34:23 42:5,14
50:3,9 52:4
57:10,10 58:17
58:19 59:15,17
59:22 60:4,5
60:12 64:2,14
66:13 78:2
85:21 87:10,19
88:9 90:5,5
**detectives** 85:8
85:19,22 86:1
**determine** 31:7
66:14
**device** 33:13
82:20
**dick** 84:10
**difference** 27:20
**different** 7:1
35:6,7 38:12
39:24 69:13
83:18,20
**digital** 61:19
74:24
**direct** 19:9
24:12,14 76:20
**directed** 89:5
**Directing** 74:14

**direction** 57:3
62:12 63:6
94:11
**directly** 43:9
94:19
**disappointed**
17:23
**disciplined**
64:20
**discovery** 9:1
**discuss** 18:5,14
18:17 19:2
75:16
**discussed** 75:14
76:12,17,22
77:1 78:15
**discussing** 19:6
**discussion** 7:10
89:14
**discussions**
89:10
**dispatch** 32:19
**disposition**
32:20
**distinct** 35:11
**distinction**
26:19
**District** 1:1,1,14
93:1,1 94:1
**division** 1:2 22:4
22:7 27:11,16
58:12 83:8
85:9,13 87:13
88:6,23 93:2
94:2
**document** 6:17
9:3 20:5 21:19
22:5,10 25:19
25:21,22 26:7
32:4,17 38:1
38:14,23 45:2
45:16 47:1
53:19 80:1,9
80:11
**documentary**

48:10
**documentation**
30:19
**documents** 4:15
4:18 5:24
21:19 26:10
45:9 46:4
**doing** 5:14 15:17
54:11 57:6
67:9 68:18
70:17 74:6
75:4
**Don** 50:3
**door** 85:21
**download** 35:1
53:5,6 59:20
**downloaded**
35:16 52:5
**dozen** 70:5
**dproctor@tre...**
2:10
**drafted** 46:18
**drafting** 46:21
**drafts** 46:16
**drive** 2:8 42:6
42:18 56:21,23
56:23 57:18
58:5,7,14 59:1
59:2,11 61:20
62:14,22 63:2
63:5,8,15
65:18,21 66:1
81:20,21 82:2
82:7
**drives** 59:5
**drop-down**
32:21
**duly** 4:4 94:8

**E**

**e-mail** 2:5,10,16
2:16 6:21 9:23
**earlier** 26:19
52:23 56:9
83:19 88:3

**early** 22:21
41:16 57:23
**EASTERN** 1:2
93:2 94:2
**edits** 46:15
**education** 89:16
**Edward** 1:6,11
2:18 3:3 4:3
6:22 93:6,9,17
94:7,21
**effect** 16:10
20:21 84:3,13
**eight** 87:14
**either** 37:22
41:19 48:14
53:17 77:12
**elaborate** 60:22
**electronic** 48:10
**employee** 94:17
94:18
**enclosures**
80:23
**ends** 6:12 8:8
**engaged** 84:20
**entered** 81:23
82:3,9 83:1
**entire** 25:5
39:16,18 52:21
53:7 90:14
**entirety** 51:21
**entrance** 85:20
**errata** 93:14
**escort** 14:11
**especially** 25:18
**establish** 87:18
**estimate** 54:16
58:6 70:5,7,14
79:15
**et** 40:3
**evaluation**
86:11
**events** 51:14
72:17
**everybody** 5:22
76:4

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Edward Grizzle - Taken 7/28/2021

Page 100

evidence 6:22,23
15:18,20,24
16:3 20:6,19
20:20 21:9
25:10 29:22
31:4 55:4
61:19,20 66:4
77:6 81:23
82:4,9 83:1
84:4 90:6,10
91:16 92:2
exact 21:17 42:8
48:7 51:16
70:12
exactly 15:20
16:18 17:19
34:6 36:7
46:23 51:15
59:17 66:11
67:19
examination
1:12 3:2,4,5
4:7 90:3
examined 4:5
excavation
35:11
exchange 61:2,3
excused 30:1
92:22
executed 42:12
exhibit 3:7 7:7
7:14,18 10:23
11:4,6 12:3,6
12:11,16,24
13:5 20:8,10
20:15 21:5
24:16 25:13,22
25:23 28:4
29:1 30:24
32:3 33:11
34:1 36:16,24
38:2 39:16
40:1,22,24
41:15,21 45:19
45:22 47:3,16

48:6 50:12,13
50:20 51:13,13
53:16 56:4,8
74:15 79:21
80:7,19,21,24
81:13,14
EXHIBITS 3:6
existed 62:17
existence 83:23
expert 66:17
explained 43:12
explaining
37:23 51:2
explanation
16:17
express 61:13
expressed 16:24
17:4,22
extent 18:13
59:22 65:11
extract 51:21
extracted 36:8
60:23 84:21
90:13
extraction 36:1
36:11 42:6
51:20 52:17,20
53:23 54:12
55:21 56:22,24
57:19 58:8,15
58:24 61:14
62:3,10,17,23
63:7,13,14
64:3 65:6,13
65:17,20,22,24
66:8,20 69:13
74:24 79:2
81:9,21 82:3,8
82:12,16,20,24
91:11

**F**

face 80:6
facet 12:12
fact 35:20 38:3

53:5,16 72:7
73:22 91:5
facts 38:9 39:21
fair 27:17,19
71:7
familiar 44:24
45:1
Family 23:13
Fantastic 50:11
far 27:3
fashion 16:16
favor 9:23
Federal 1:13
fellow 24:11
65:7
felt 29:17
female 85:8,14
field 67:17 68:2
file 40:18 41:18
41:24 66:10
90:23 91:7,10
91:22
film 67:14
financially
94:19
find 66:11,14,15
67:7,23
fine 6:18 9:14
finish 38:10
firm 77:12,12
first 4:4 7:8,22
11:22 21:13
22:12 28:24
36:15 38:4
42:23 43:3
50:20 61:19,23
75:21 87:9
89:22 94:7
five 45:10 79:18
five-minute 45:7
flash 42:5,17
56:23 57:18
58:5,7,14 59:1
59:2,5,11
61:20 62:14,22

63:2,5,8,15
65:18,21 66:1
81:20,20 82:2
82:7
floating 78:20
Floor 2:8
Florida 23:8,9
59:9,14,16,18
60:17
focus 15:15
follow 14:4
32:22 80:17
90:6
follow-up 13:19
14:5 27:7,11
27:16 92:18
follow-ups
13:23
following 60:24
87:23
follows 4:6
FOP 5:21
force 86:7
foregoing 93:10
forensic 34:24
form 12:20 13:9
41:5 44:12
51:17,24
formal 89:16
former 76:12
78:16
forth 88:15
forward 89:23
found 15:22
31:4 52:14,21
68:21 75:6
91:9,19 92:2
foundation
64:22 92:6
four 8:2 87:10
frame 24:7 85:7
85:12
front 6:20 24:19
25:16 85:20
frustrated 17:23

Ft 23:11
full 6:3 30:11
34:20 35:12,24
40:1 48:14
53:1 70:19
fully 36:8 51:2
further 10:18
39:5 74:5
94:12,16
future 40:2

**G**

gaffes 68:8
Gatlin 28:13
29:24 30:4,11
33:2,8,19,21
34:9 35:18
36:17 48:2
49:2,5,22,22
52:20 54:5,12
55:21 68:22,23
69:5,13,19,22
70:1,10,24
71:11,21,24
73:21,23 88:15
Gatlin's 35:24
36:1,9 52:5,18
53:6,23 68:19
68:21
Gavin 59:12,19
60:5,11,11,13
60:19,20 61:5
61:13 62:9
63:12,15,20
78:15,17 81:22
general 4:21
20:6,18,21
21:2,6 64:10
65:11 83:2,9
83:14,15,18,20
83:22 84:2,6
90:21
generate 22:17
German 33:10
34:23 35:12

Royal Reporting Services, Inc.
312.361.8851

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Edward Grizzle - Taken 7/28/2021

Page 101

36:1 42:5,15
51:21 52:4,20
56:21 58:17,19
59:16,17,23,24
60:3,4 61:24
62:8,11,23
63:6,13 64:14
64:17 66:13,16
66:19 67:1,17
68:2 69:15
81:20,22
**German's** 53:5
53:6,23
**getting** 7:13
15:15 17:12
34:8
**GIFs** 68:8
**give** 6:7 12:8
18:10 23:10
29:16 37:24
42:5 46:19,23
48:14 57:15
66:9 70:5,7,12
70:14 76:15
77:18 87:14
**given** 54:8 57:1
57:19 58:5,15
62:22 63:2
65:21 82:3,8
83:4 93:10,13
**Glasgow** 43:24
44:14
**Glasgow's** 43:8
**Gloria** 85:16,20
**go** 8:9 10:17
22:3 23:7
30:21 31:6
37:10,13,14
38:10,18 39:4
39:5,5 40:3
41:13 43:15
44:3,7,23
45:10,20 65:16
66:3 67:5,7,20
68:20 69:16

77:11 78:10
90:1,9 91:16
**goes** 30:12 32:18
47:11
**going** 4:12 5:22
6:2,7,9,12 7:1
7:6 10:18 12:5
19:23 20:12
25:13 37:8,9
39:5,13 43:11
44:2 50:6 52:9
56:16 57:6
61:24 66:11
68:20 69:10
70:2 72:2 74:5
74:11 75:23
81:4
**good** 45:6 73:3
79:10 86:16
90:1
**grabbing** 71:12
**Gray** 43:9,24
44:7,15
**Great** 79:17
**Grizzle** 1:6,11
2:18 3:3,7 4:3
4:9 6:22 7:7,8
7:14 20:10
25:23 45:15,22
50:13 79:21,23
90:5 93:6,9,17
94:7,22
**guess** 34:7 52:10
54:14,15 79:14
89:21
**guidance** 46:20
**guideline** 21:9
**guidelines** 20:18
21:7
**guilty** 15:22
**Gulf** 23:11
**guy** 88:5

—————
**H**
—————
**half** 21:12,13

22:12,12 79:16
**Hall** 2:2,2,21
4:11 7:12 9:2
9:23 10:20
20:2 40:6 45:5
79:9 92:17
**hall@adamsle...**
2:5
**hallway** 14:14
**hand** 19:23
**handful** 89:22
**handle** 37:7
**handled** 22:15
84:4
**handles** 82:5
88:6
**handling** 79:2
**happened** 18:3,4
82:1 92:9
**harassing** 54:23
**harassment**
92:4
**heading** 20:5,5
26:7 45:16
**hear** 5:3 38:12
39:12 76:1
78:8,10 79:23
85:3
**heard** 12:13
59:4,7 64:5,11
64:15,18 65:2
65:9,11 76:8
77:14 78:18,18
79:5 84:8,12
84:13,17,24
85:2
**hearing** 63:24
77:9
**heated** 61:2,4
**held** 17:1,5
**helpful** 86:17
**Hey** 61:8 66:13
76:1 79:9 81:6
**Hi** 89:21
**high** 64:16

**higher** 39:15
**highest** 89:16
**Hold** 7:12 33:15
**honestly** 17:19
**HOPPE** 2:12
**hostile** 73:2
**hour** 70:15,19
79:16
**hours** 33:16
71:6
**hundred** 70:6

—————
**I**
—————
**icon** 67:14
**icons** 67:11,13
67:21
**III** 2:2
**Illinois** 1:1,18
2:4,9,15 87:4
93:1 94:1,2,5
95:2,10
**image** 90:22
91:3,6,13
**images** 25:6
64:3 65:5
74:24
**imagine** 75:22
78:13
**impact** 17:5
**in-service** 86:18
**inaccurate**
12:12,18
**inception** 27:22
**incident** 25:14
28:7 29:2
32:18
**include** 26:11
34:4,12 38:19
47:4 53:5,5,7
**included** 46:20
51:11
**including** 84:19
**inclusive** 21:15
22:5,11
**inconsistent**

12:13
**INDEX** 3:1
**indicated** 93:14
**indirectly** 94:19
**individually**
67:6
**individuals**
23:16
**information**
49:1,10 56:16
57:7 59:10
66:14 71:13,24
**informed** 41:3
**initial** 82:8
**initiated** 51:23
**inputting** 32:11
**inspector** 4:21
5:1 64:10
65:10 75:2
**instance** 28:12
**instructions**
46:19
**instructors** 86:6
86:16
**intelligence**
85:24
**interested** 94:19
**internal** 5:13
57:5,6,9,11,12
57:14 58:12
74:23 82:5
84:4,6
**interrogatories**
4:5
**interrupt** 79:9
**interview** 4:21
5:1,5,7,11 6:3
6:22 7:8 12:8
13:2,11 33:6,7
34:1 35:10
65:10 75:2
**interviewed**
11:8 14:1,3
35:18 68:22
69:5

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Edward Grizzle - Taken 7/28/2021

Page 102

investigated
  13:18
investigating
  13:17 27:21
investigation
  13:22 14:6
  23:22 24:2,8
  24:13 26:4,8
  26:11,15 27:2
  27:3,5,21
  30:23 38:7
  39:4,8,11,14
  39:14 40:19
  41:19 42:3
  50:4,19 51:23
  53:21 55:13
  57:6,15 61:16
  64:11 70:11
  71:16 72:13
  74:2,8 80:15
  83:16 88:4,4
  88:12,17,24
  89:12,13 91:12
  92:1,3,11
investigations
  22:4,7 27:4,9
  27:11,16 44:20
  83:8 85:9,13
  87:8,11,13,15
  87:20,21 88:6
  88:6 90:7
Investigations'
  83:12
investigative
  24:9 65:23
investigator
  27:17 39:19
involve 91:12
involved 5:11
  9:8 38:17
  44:20 88:2
  89:11
involving 23:19
  60:22 83:11,11
  87:21 88:10

issue 37:5,21
  38:5,16,21
  41:4,12 42:20
  44:8 54:20
issued 36:23
  40:23 49:9,16
  82:17 90:19
issuing 41:10

_____

**J**

**J** 2:13
**J1-18-000724...**
  26:7
**Jackson** 78:2,19
  78:24
**Jackson's** 77:20
  77:24
**Jail** 87:3
**Jensen** 59:10,21
  60:23
**Jim** 43:8
**job** 14:11
**John** 1:7 2:18
  93:7
**Joliet** 1:6,17
  2:11 13:16
  15:4,13 19:7
  20:21 21:8
  27:6,15 33:5
  34:1 39:15
  64:20 76:4
  77:5 82:17,24
  84:8,14,17
  85:1 87:5,13
  87:21 88:7
  93:6
**Jones** 36:23
  38:21 40:23
  41:10 42:21
  43:18,21 44:1
  44:10,14,18,21
  47:24 48:4,8
  48:10,15,22
  49:7,9,11,12
  49:15 90:19

judge 16:13
  36:23 37:2,4,7
  37:10,14,20
  38:4,15,18,21
  40:23 41:2,10
  41:11,13 42:20
  42:21 43:5,12
  43:15,17,18
  44:2,3,3,4,4,5
  44:6,7,21,21
  44:23 45:1
  46:12 47:24,24
  48:4,8,9,15,21
  49:6,9,11,12
  49:15,15 90:19
judge's 16:1,17
  37:18
judges 43:21,23
  44:22
July 1:18 20:22
  83:24 93:11
  94:14
jumping 26:24
June 20:22
  21:13 22:12,21
  24:3 41:16,16
  57:23 83:24
  85:7
jurors 54:23

_____

**K**

keep 68:20 76:9
Ken 43:9 44:7
kept 41:19 70:2
  83:12
Kimberly 85:16
  85:23
kind 39:23
kindergarten
  76:10
knew 42:8 77:6
  88:14
KNIGHT 2:12
  2:12
know 15:20 16:2

29:17,23 31:13
  32:11,12 34:19
  37:16 38:11
  44:22 46:21
  53:1 58:10,11
  58:12,14 61:17
  65:2 66:11
  68:4,7,8,9,10
  68:11,11,18
  69:21 70:16
  72:5,14 74:1
  75:8,24 76:8
  76:16 77:8
  78:11,13 79:11
  81:7 82:5 84:9
  88:19
knowledge
  81:24 82:14,18
  82:22 83:6
  84:5
KURNIK 2:12

_____

**L**

**L** 2:7
labeled 29:9
Lack 92:6
Lamken 27:24
  29:19 30:2
  31:11 32:2,5
  32:14 41:3
  43:6,13 44:1
  44:14 46:19
  47:4 48:23
  49:1,5,11
  54:19 55:7
  88:13 89:1,4
Lantern 42:16
  62:6,11,13,17
  63:8,14 65:14
  81:8
late 22:21 41:16
  41:16 57:22
  81:5
law 2:2,21 54:23
  77:12,12

laws 25:10
lawsuit 75:14,16
  75:21,24 76:2
  76:6,12,16
  78:15
lawsuits 78:3
lawyer 5:21
lawyers 10:18
lead 13:16,20
  26:16,20 27:1
  27:16,20 88:12
  88:24 89:12
leads 90:10
  91:16
learn 17:13
  59:13 64:2,9
  78:6
learned 39:8,22
  61:23 62:8
  64:6 76:3
learning 86:16
leaving 41:15
  44:5
led 63:13 88:16
  92:2
left 23:23 37:10
  54:5,9 61:1
  62:2 66:23
legal 43:11
Let's 75:6 79:12
level 89:16
lieutenant 19:10
  19:11 22:2,15
  57:1,4,4,8 72:6
  73:5,14 76:1
  78:1 83:4
limited 19:9
line 24:21 38:8
  50:18 75:4
  79:10
lines 56:17
  74:15,20
listen 12:1
listened 11:13
  11:19 12:1,14

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Edward Grizzle - Taken 7/28/2021

Page 103

listening 17:12
little 6:7,11 8:7
　32:13,21 35:7
　39:24
LLC 2:2,21
LLP 2:7
load 62:13
loaded 42:17
　65:22
locate 70:9
　91:13
located 1:17
locked 30:20,21
　39:2 41:24
logical 51:17
　91:21
long 44:20 45:9
　53:12 61:22
　70:9 86:23
　87:8,17
look 28:5 39:6,6
　39:19 47:1
　55:7,10,14,16
　56:5,16 66:3,6
　68:15 75:11
　91:21
looked 56:9 65:9
　66:10 67:16,21
　83:19
looking 47:5
　49:16,19,21
　54:21 55:1,3,5
　55:15 58:13
　67:2,7,8,9,22
　68:17,19 69:2
　70:4,8 71:4,10
　71:20,24 72:9
Lorinda 43:13
　49:11
loss 80:5
lot 32:21 61:9
　86:17

M

ma'am 90:1

machine 35:1,14
　35:17
magic 67:23
main 85:20,21
management
　6:23 20:6,19
　21:10
manner 84:3
Maria 30:4
　33:21 49:1
　52:5 68:19,21
　69:19 71:11
Marie 1:15 94:5
　95:9
marked 7:14
　20:10 25:23
　45:22 50:13
　79:21 80:23
material 41:18
matkus@khk...
　2:16
Matlock 77:2,3
　77:24 78:22,24
matter 26:21
　58:13 88:14
MATTHEW
　2:13
McKinney 50:3
　58:20 64:2,20
　65:5
mclark@khk...
　2:16
mean 38:24 39:4
　54:10 71:5
　78:12
Meaning 15:8
meant 35:6
meeting 33:2,4,8
　33:24 36:17
　48:2
memo 32:4
　37:22 38:22
　39:21 50:8,15
　50:23 51:2,4
　51:11,19 53:3

53:10,13 56:7
　72:10,11 80:22
　81:1,2,8,10,10
　81:15,18
memorialized
　22:13
memorializing
　32:4
memory 30:17
memos 4:19
　41:24
mention 78:18
mentioned 64:7
message 28:13
　30:10,17 31:2
　31:12,14,15,16
　33:19 34:5,20
　35:12,20 36:15
　47:14,20 48:1
　48:5,11 49:21
　51:22 52:21
　53:8 54:22,24
　55:15 66:6
　67:2,4,10,16
　68:16 69:2,20
　69:22 70:8,10
　70:24 71:10,20
　72:24 73:7,10
　73:21,23 90:23
　91:3,6,10,10
　91:13,20
messages 48:13
　48:16 67:5,10
　67:23 68:1,3,4
　68:7,10,13
　69:11,15,19,24
　90:16
met 35:18 79:1,7
Meyers-Saras...
　23:11
MICHAEL 2:13
middle 52:12
Mine 74:3
minutes 79:18
missed 9:1,6

51:23
missing 36:5,10
misspelled
　52:13
mode 71:22
moment 10:17
　39:17 40:2,4
　40:15
months 64:10
　77:4,16
morning 4:13
　35:10 36:18
　53:2 54:1
motherfucker
　56:16
Motorola 41:23
move 89:23
multiple 78:3
municipal 1:6
　2:11 93:6

N

name 4:11 32:19
　44:1 77:20,24
named 63:23
names 44:9
　56:12 63:23,24
　85:15
nap 31:19
narrative 28:24
nature 72:16
　81:13 83:11
necessary 47:2
　54:19
need 8:14,22
　9:16 10:9,22
　23:9 39:20
　45:20 55:14,16
　67:22 89:7,24
needed 57:7
　65:23 68:15
　73:15
needs 25:11 27:7
　77:11
never 5:6 18:3,4

18:10 28:20
　64:5,6,8 65:2
　65:16 79:4,8
　84:12 86:22
　89:14
new 39:21 63:15
　78:12
Nick 79:1
Nicole 1:15 7:5
　7:18 20:8
　25:19 45:18
　50:11 94:5
　95:9
night 32:6 42:9
Nope 19:1
normally 87:20
North 2:3,14
　95:9
NORTHERN
　1:1 93:1 94:1
NOTARY 93:21
notes 32:4 37:19
　42:2,4
notice 1:12
notified 28:18
　28:18,19
November
　20:13
nude 84:19
number 15:23
　26:6,8,11 28:9
　43:10 47:8
　50:18,19 67:8
　68:19 69:10,14
　69:17,18
numbered 25:20
numerous 47:12

O

Objection 12:20
　13:9 41:5
　42:24 44:12
　51:24 64:22
　88:18
oblige 10:18

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Edward Grizzle - Taken 7/28/2021

Page 104

| | | | | |
|---|---|---|---|---|
| **observe** 86:21 | 11:6 18:12 | **orders** 21:6 | **partial** 36:2,3,4 | 38:4 58:23 |
| **obtain** 89:6 | 20:1 24:22 | 59:21 60:24 | **particular** 25:22 | 59:4 |
| **obtained** 73:21 | 25:4,13 26:2 | 84:7 | 47:3 68:16 | **personnel** 89:9 |
| **obviously** 5:14 | 26:18 28:20 | **original** 62:23 | 71:10,20 84:16 | **pertaining** 1:14 |
| 43:3 44:21,23 | 33:16 35:4,8 | 81:8,10 | 88:2,11,16 | **pertinent** 92:3 |
| 57:10 68:11 | 39:16 45:4 | **ought** 89:12 | **parties** 94:17 | **phone** 2:4,9,15 |
| **occasion** 18:5 | 47:18 61:22 | **outcome** 15:21 | **parts** 34:10 | 25:2,7,7,9,11 |
| 86:10 | 68:5 71:18 | 16:11 17:6 | **passage** 36:14 | 25:12 31:5,17 |
| **occur** 27:4 61:24 | 74:19 79:14,17 | 18:5,8,12,17 | **passed** 15:24 | 33:10,17 35:24 |
| 72:3 | 89:5,22,23 | 18:20 19:6,12 | **Patch** 76:4 | 36:1,9 42:7 |
| **occurred** 28:11 | 90:2 | | 77:18 78:13 | 43:5 46:3 52:5 |
| 28:15,17 29:18 | **omitted** 13:3 | _____ | **patience** 50:7 | 52:18,21 53:7 |
| 38:11 41:2 | **once** 19:24 | **P** | **patient** 5:23 | 53:23 54:8,13 |
| 43:11 51:2,14 | 68:20 71:22 | **p.m** 28:19 54:13 | **patrol** 13:24,24 | 54:14,20 55:19 |
| 53:11 58:6 | **OneDrive** 40:21 | 92:22 | 27:5,7 29:8,13 | 55:21,22 56:3 |
| 72:5,18 81:24 | **ongoing** 38:7,13 | **P1** 41:23 | 86:22 | 56:14,22,24 |
| **office** 14:3 39:13 | 39:3,10 53:20 | **page** 3:2,7 6:13 | **patrol's** 27:5 | 57:18 58:7,15 |
| 43:10,24 73:14 | 57:14 72:13 | 6:15 7:8,9,17 | **people** 5:15 | 58:24 59:15,18 |
| 78:9,10 | **open** 30:20 38:7 | 7:20,20,22,23 | 13:23 14:1,3 | 60:6,10,22,24 |
| **officer** 13:17 | 38:24 39:11 | 8:8,11,13,15 | 15:6 27:8 | 61:14 62:3,9 |
| 14:1,19 19:7 | 40:18 | 8:18,20,21,22 | 58:18 68:7,9 | 62:10,16,24 |
| 23:21,22 26:4 | **opened** 32:20 | 9:11,12,15,16 | 71:13 75:3,23 | 63:7,13 64:3 |
| 31:4 32:20 | 66:9 67:17,21 | 9:17,18,19,20 | 78:8,11,11,14 | 66:7 67:8 68:1 |
| 33:22 34:10 | 68:2 86:4 | 9:21,22 10:8,9 | 85:5,6 | 68:19 69:10,14 |
| 58:10 60:22 | **opening** 26:3 | 10:10,11,12,13 | **people's** 68:7 | 69:17,18 70:4 |
| 65:8 72:6 79:7 | **operates** 34:23 | 10:14,15 24:21 | **percent** 11:10 | 70:16,23 71:3 |
| 84:8,11,15,18 | **operations** | 33:11 34:11,13 | 38:14 | 71:4,9,17,18 |
| 84:19 86:5,11 | 83:16 84:6 | 36:15,24 47:7 | **perform** 86:10 | 71:22 72:4,8 |
| 86:13,14,15,16 | **opinion** 16:20 | 47:10,11,16 | **performance** | 72:21 73:9,13 |
| 86:20 90:14 | 16:22 43:11 | 74:14,17,18 | 86:11,14 | 73:20 75:1 |
| 91:11 92:4,12 | 86:13 | **pages** 6:12 8:2 | **performed** | 79:3 81:21 |
| **officers** 13:24 | **opinions** 16:7,10 | 11:3 25:21 | 35:12 | 82:2,9,12,15 |
| 15:4,13,16 | 16:24 17:4 | 53:12 67:6 | **period** 21:12,12 | 82:16,17,19,24 |
| 21:1 23:19 | 86:19 | 80:17 | 22:8 24:10 | 84:21 90:14,18 |
| 24:12 29:8,13 | **opportunity** | **paper** 75:22 | 32:11 53:24 | 90:22,24 91:7 |
| 79:5 83:12 | 7:21 11:3 73:3 | 78:13 | 57:8 64:8 | 91:11,20 92:3 |
| 85:1,12 87:22 | 86:20 | **paragraph** | 76:14 87:19 | 92:12 95:11 |
| 88:7,10 | **oral** 4:5 | 28:24 30:11,24 | **person** 43:8 | **photo** 91:7,22 |
| **Offices** 2:2,21 | **order** 20:6,18,21 | 31:7 33:1 | 75:13 90:22 | **photographic** |
| **official** 50:4 | 21:2 51:14 | 34:10 40:22 | **personal** 23:4 | 64:2 65:5 |
| **oh** 39:20 | 66:6 83:2,9,14 | 41:9 52:11 | 25:1,7,8,11 | 90:23 |
| **okay** 4:14 6:1,6 | 83:15,18,20,22 | **part** 8:10,14,16 | 56:16 82:17 | **photographs** |
| 6:10,16 7:1,24 | 84:2 | 9:2 14:9,15 | 94:11 | 49:16 55:1 |
| 8:6,12,18,21 | **ordered** 50:24 | 19:15 28:24 | **personally** 14:9 | 68:5 90:17 |
| 9:9 10:16 11:1 | 61:8 73:4 | 34:20 36:14 | 19:15 37:21 | 91:13 |
| | | 37:4 47:8 65:3 | | |

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Edward Grizzle - Taken 7/28/2021

Page 105

photos 55:8,14
68:12 84:19
physical 71:19
72:20
physically 14:24
59:5 63:10
pick 67:6
picked 88:22
pictures 74:24
place 33:4 88:7
91:21 94:13
Plaintiff 1:4,11
2:6,20 93:4
please 8:20 9:11
9:12,18,19,21
10:8,12 41:8
52:8
point 21:18 23:6
31:19 33:20
34:21,23 38:14
38:15 43:16
44:6 47:23
51:3,12 54:17
56:12 57:13
64:9 65:4
73:24 74:4,7
77:22
police 5:13
13:16 14:4
15:4 19:7
20:22 21:8
33:5 34:2 38:6
38:24 39:15
53:13,15 54:5
64:21 78:9
79:5 82:13,17
83:1 84:14,17
86:14,15 87:1
policies 21:7
popped 67:24
porn 84:10
portion 15:13
16:3 28:7 36:3
possession 71:19
72:20 73:19

possibility 92:11
possible 14:21
19:18 31:20,22
34:15,17 90:22
posted 78:12
practice 14:6
preparation
4:15 11:16
prepare 50:22
prepared 46:4,5
46:7
preparing 32:3
present 2:19
14:24 15:4
33:7 43:20
presented 37:2
38:4
preserved 34:22
35:10
president 79:6,7
pretty 18:12
61:11 78:20
81:7
previous 43:17
previously 39:7
69:20 72:11
81:14
Prior 44:2
Pro 22:14
probably 11:15
32:13 68:8
70:18 73:15
problem 79:12
procedure 1:13
5:12,13 65:3
procedures 21:7
process 37:24
69:23 80:6
Proctor 2:7 3:5
8:23,24 9:5,9
9:22 10:3,20
44:12 89:21
90:2,4 92:8,15
produced 6:5
9:1,2 80:18

production 9:3
Professional
1:16 94:6
promoted 87:10
property 6:23
6:23 20:6 21:9
prosecutor
14:12 15:16
17:16,17 27:23
28:17 37:17
38:12 43:6
46:13 89:3
prosecutor's
39:12
provide 48:4,9
provided 93:14
providing 58:4
proximate 28:12
PUBLIC 93:21
pull 45:2,9
pulling 53:18
purpose 21:4,6
purposes 5:20
55:13
pursuant 1:12
1:12 55:22
83:14
put 6:2 22:16
28:6 32:12,18
32:19 35:16
56:6 66:2
71:22 75:22
77:18 81:9
83:8
putting 27:8

Q

question 12:5,7
24:23 35:5
39:24 48:14
52:8,10 73:6
73:16 74:5,9
91:7,10,14,20
91:24
questioning

75:5 79:10
questions 4:12
10:24 11:7
13:1 61:9
63:18 73:13
89:18,23 92:17
quick 28:5 74:11
quickly 45:20
quiet 85:6
quote 28:2,3,11
28:11 29:1,2
29:11,12 30:9
30:12,17 33:12
33:13 47:13,19
52:12 84:9,11
quoted 34:13
36:14

R

rank 61:11
reaction 18:8,11
18:20 19:11,13
59:24
read 5:4 6:9
7:21,22 8:3,10
8:14,16,18,21
10:9 12:3,6,24
16:4 31:16
74:1,4 93:10
reading 9:22
10:1
reads 52:12
ready 45:10
90:1
real 27:3 28:5
realize 73:24
really 7:24
18:10
realm 92:10
reask 52:8 87:23
reason 12:17
13:6 53:4
65:16 72:7
86:19 88:11,16
reasoning 16:18

reasons 37:20
91:22
recall 12:10
14:17,20,22
15:6,8,9,15,23
16:16,18 17:7
17:19 18:16,22
19:6,13,17,18
19:19 21:17
22:19 30:4,6
31:3,18,21
32:1 34:6,14
34:16 36:2,3,7
36:10,16,19
37:16 41:1
42:8 46:17
47:5 48:7,17
48:20,24 49:13
51:12 53:18,24
54:1,18 56:1
56:15 57:20,24
58:9,9,16 60:4
60:12 61:12,22
63:17,17,24
64:13 66:21
70:2 76:5
85:10
receive 28:8
received 59:15
receiving 28:13
recognize 20:15
45:24
recollection
14:24 15:11
17:9 18:24
19:21 21:20
31:24 36:21
48:19 49:4
58:2
recommended
44:3
record 7:10
37:19 93:12
recorded 5:7,12
5:15 11:23

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Edward Grizzle - Taken 7/28/2021

Page 106

50:15
**recording** 5:5
    6:5 11:11,14
    11:20 12:13
    13:2 74:15
**records** 83:10
**reduced** 94:10
**reemerge** 80:5
**refer** 38:2
**reference** 28:10
    52:17,19 53:16
    84:11 85:18
**referenced**
    50:18
**references** 80:14
**referred** 83:9
**referring** 83:20
    83:23
**refers** 21:9
    28:11
**reflected** 22:6
**reflective** 28:16
**refresh** 14:23
    15:10 17:8
    18:23 19:20
    21:20 31:23
    36:20 48:18
    49:3 56:11
    58:1
**refuse** 37:8
**refused** 37:4
**regarding** 16:20
    21:2 42:2
    43:19 48:8,11
    63:12 78:4
    80:14 84:7
    89:15
**Regis** 4:22 5:2,8
    11:9 13:11
    64:10
**Regis's** 75:2
**Registered** 1:16
    94:6
**regulation** 5:16
**Reid** 57:1,4,19

58:5,15 59:2,6
    63:3 82:3 83:4
**related** 25:10
    26:10
**relating** 84:3
**relative** 24:12
    29:2,12 58:6
    94:16,18
**remained** 62:10
**remember** 9:7
    15:21 34:19
    36:6,7,10 47:3
**remove** 42:22
    62:13 63:6,14
**removed** 65:13
**removing** 61:14
**renew** 44:18
**repeat** 84:9
**rephrase** 12:5
    52:9
**report** 4:19 14:4
    25:14 26:3,6
    28:8 30:9,11
    30:16,19,20,21
    31:2,8 32:7
    33:6 34:13
    38:2,6,24
    39:16 40:1,4,7
    40:11,14 41:22
    42:10 43:3
    51:9 53:1,4,10
    53:13,15,20
    56:5,8,10 72:9
    72:12,14 86:11
**reported** 28:2,6
    28:13 32:8,16
    94:9
**reporter** 1:16,16
    6:4 25:19 94:6
    94:6 95:2
**reporting** 7:9
    32:20
**reports** 29:9,12
    38:10 80:14
**represent** 4:11

6:3 25:18
**representative**
    13:12
**represented**
    13:12,14
**reputation** 25:6
**request** 14:2
    81:3,22
**requested** 57:15
**require** 6:12
**requires** 5:17
**reserve** 92:21
**reserved** 94:22
**reset** 71:16
**respect** 24:1,7
    26:15
**rest** 85:18
**restate** 41:8
**retain** 35:2
**retained** 35:14
**review** 11:3
    12:16 13:5
    39:6 46:11
**reviewed** 4:15
    4:18,20 12:11
**reviewing** 8:23
**revision** 20:13
**revisions** 41:14
    46:15
**Reynolds** 2:21
**right** 5:7 8:21
    10:22 17:20
    19:23 26:6
    33:16 38:11
    39:18 60:10
    67:1 69:21
    72:4,19 74:13
    77:17 79:17
    91:19,24
**rightfully** 73:15
**rights** 74:2,5
**risking** 25:5
**River** 2:14
**Road** 2:14
**Roechner** 18:18

19:3,15 43:4
    50:9,22 57:16
    59:6 61:18
    66:2 76:13,22
    80:12,22 81:6
    81:15 82:11,15
    83:5 89:8
**role** 13:21 26:14
    26:16 50:4
**Romper** 64:16
**room** 33:6,7
    34:1 35:10
    36:18 64:16
    72:4,6 85:6,23
    85:23,24
**rooting** 20:2
**Rosemont** 2:15
**Royal** 7:9
**RPR** 95:9
**rules** 1:13 25:9
**ruling** 16:17
**rumor** 64:18
    78:3 84:16
**rumors** 60:21,22
    63:12,16,18,21
    64:11,15,16
    65:3,9 75:3
    76:9 77:9 78:7
    78:19,20 79:5
    79:8 84:13,24
    85:2,3
**run** 89:1
**runs** 45:19

─────────
**S**
─────────
**S** 2:13
**Sabrina** 77:5
**safe** 83:9,12
**sat** 85:19
**save** 90:22
**saved** 33:12,13
    33:17,18 91:6
**savvy** 66:12
**saw** 33:15 43:17
    43:18 70:8

80:19
**saying** 33:21
    40:17 56:15
    68:8 78:4
**says** 25:1 28:15
    32:9 33:6
    47:11
**scanned** 25:21
**schedule** 22:3,7
    22:17
**Schoenstedt**
    44:4,4
**school** 64:16
**scope** 74:2 75:5
    90:18
**screen** 5:24 6:2
    6:8,14 7:6 8:1
    8:3 10:23
    19:24 20:4
    24:16 45:15
    50:6,9 52:12
    56:18 67:4,24
    74:11 80:2,4
**screenshot** 34:9
    52:12 91:2
**screenshots**
    33:12,14,17,18
    33:21,23 34:4
    34:7,12,22
    35:9,20 36:3
    36:12,16 48:1
    48:13,16,22,24
    49:4 68:19
    73:20
**screenshotted**
    36:9
**scroll** 6:13 8:4,4
    8:7,10,12,16
    8:18 20:12
    32:9 47:2
    68:18
**scrolling** 32:23
    68:6
**search** 31:3
    36:23 37:1

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Edward Grizzle - Taken 7/28/2021

Page 107

| | | | | |
|---|---|---|---|---|
| 42:9,12 43:19 | send 10:5,18 | 74:11 79:1 | 72:19,22 74:10 | 46:3 47:14,20 |
| 45:16,24 46:1 | 37:22 81:4,10 | shared 48:22,24 | 74:17 75:18 | 54:20 55:19,22 |
| 46:5,5,7,22 | sensitive 83:10 | 49:4 | 80:20 81:16,19 | 56:22,24 60:22 |
| 51:1,3 54:20 | 83:11 | sharing 6:14 | 89:20 | 62:23 73:20 |
| 69:9 71:2,5,14 | sent 33:22 34:10 | 19:24 24:16 | sit 74:1,4,4 | 79:3 82:16 |
| 74:3 89:6 | 38:22 39:21 | 80:4 | 85:18 | 86:13 90:14,18 |
| 90:19 91:12 | 46:13 49:22 | sheets 93:14 | sits 85:20,23 | 91:11 92:12 |
| 92:12 | 50:15 69:6,22 | shortcomings | sitting 16:22 | Socha-to-Gatlin |
| searching 66:7 | 70:24 71:24 | 6:14 | 17:11 | 31:1 36:15 |
| 69:12 | 73:10 80:11,21 | Shorthand 1:15 | situation 73:13 | 51:22 52:21 |
| second 21:12 | 81:1,2,3,8 | 94:6 95:1 | slowly 45:20 | 53:7 |
| 22:12 30:11 | sentence 38:20 | shortly 43:7 | Socha 1:3 2:20 | somebody 39:15 |
| 43:24 | 41:10 47:13,14 | show 48:15 | 4:12 14:19 | 75:6 |
| secondhand | 47:16 48:6 | 70:23 72:23 | 15:1,5 17:24 | somebody's |
| 17:12 | 52:11 | 73:7,19,20 | 23:22 24:1,7 | 71:12 |
| secretaries | sentences 38:20 | 74:6 | 24:13 25:6 | soon 11:23 |
| 85:14 | separate 35:11 | showed 48:12 | 26:4,10,15 | sorry 9:13 40:12 |
| secured 40:20 | 84:2 85:23,24 | 65:7 67:11,13 | 27:21 28:14,20 | 47:15 |
| see 7:4,22,24 8:7 | September | 67:20 | 29:1,5,12,24 | sort 66:16 |
| 8:12,22 9:11 | 80:21 81:5 | shown 28:2 32:8 | 30:7,10 33:19 | sought 49:14 |
| 9:15,16 12:1,3 | sequence 51:14 | 36:15 80:12 | 33:22 34:10 | South 2:8 |
| 12:6,9 20:4,12 | 51:16 66:5 | sic 68:9 90:5 | 35:21 40:19 | Spano 77:5 |
| 24:19,21,23 | sergeant 1:11 | side 23:11 | 47:12 49:17,19 | speak 43:18 |
| 25:4,17 29:3 | 3:3 4:3,9,11 | sign 37:12,15 | 49:22 50:4,19 | speakerphone |
| 30:14 32:11 | 6:20 7:2,8,16 | signature 92:20 | 56:2 57:18 | 37:18 77:13 |
| 33:12,13,15,16 | 10:22 20:4 | 92:21 94:21 | 58:7,15,24 | specific 9:7 |
| 35:24 36:5 | 23:18 25:16 | 95:1 | 59:20 61:14,16 | 23:16 54:24 |
| 37:10,14 38:18 | 26:3 45:15,21 | significant | 62:3,10,16 | 56:1 58:4 |
| 41:13 42:11,13 | 57:9,10 58:18 | 51:10 | 63:7,13 64:3 | specifically 24:1 |
| 43:15 44:2,3,7 | 59:12,19 60:13 | simply 73:7 | 65:6,13,17,20 | 41:10 83:3 |
| 47:10,14,22 | 61:4 72:7 | single 22:24 | 66:7,20 69:12 | 88:23 |
| 50:20 51:20 | 79:23 87:11 | 70:9 | 69:24 70:10,22 | specified 94:13 |
| 52:15 63:10 | 93:9,17 94:7 | sir 4:10 5:3,9 | 71:9,19 72:6,8 | speculation |
| 80:1,6 85:6,22 | 94:21 | 6:18,21 7:3 | 72:23 73:9,22 | 88:18 92:7 |
| seeing 34:19 | sergeants 88:9 | 10:16 11:12 | 74:24 80:15 | spoke 43:8 |
| 38:1 43:12 | served 71:8 86:5 | 12:15 20:14 | 81:21 82:2,9 | 78:22 89:4 |
| seen 5:6 44:22 | 86:6 87:2 | 23:14 25:3,15 | 82:12,19,23 | spoken 78:16 |
| 48:1 59:5 | serving 70:22 | 25:17 26:9 | 84:11,19 86:5 | SS 94:2 |
| 74:23 80:9 | 71:2,5 | 28:1 29:4 30:8 | 86:11 88:5,12 | staff 43:12 89:8 |
| seize 56:3 71:14 | several-page | 30:13 35:13,22 | 88:16,24 89:12 | 89:15 |
| seized 55:22 | 51:11 | 37:3 41:8 | 91:5 92:4 93:3 | stamped 32:10 |
| 71:9,18 72:4,8 | sexual 84:20 | 42:19 45:17 | Socha's 16:4 | stamps 28:9 |
| 84:21 | share 5:24 6:8 | 46:2,13 47:15 | 17:1,5,13,18 | standard 14:6 |
| seizing 56:14 | 7:6 50:6 56:19 | 47:22 48:3 | 17:23 18:14 | 57:8 |
| 70:23 71:2 | 57:11,11,12 | 49:11 60:16 | 19:3 31:4 42:6 | star 84:10 |

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Edward Grizzle - Taken 7/28/2021

Page 108

start 32:7
started 32:11
starting 45:5
  87:5
starts 8:1
state 93:9 94:2
  95:2
state's 14:2
  43:10
stated 57:17
statement 10:19
  84:9,14
statements 56:1
  84:18
States 1:1,13
  93:1 94:1
stating 81:10
station 54:5 85:5
statuses 76:8,15
stays 30:20
stenographica...
  94:10
step 66:5,9,9
  91:12
stoic 18:11
stop 80:4
store 11:24
Street 1:17 2:3
  95:9
strike 12:12
  16:19 21:22
  35:23 49:5
stuff 19:10 24:9
  32:12 35:2
  43:17 67:22
  70:17 71:17
  78:4
subject 20:5
  28:13 30:10
  50:18 70:10
submit 22:1
submitted 46:12
  47:23 48:21
  49:6,14
SUBSCRIBED

93:18
subset 69:24
substance 7:24
  17:13
subtract 46:16
sucks 84:10
suggest 44:14
suggested 43:23
  44:9
Suite 2:3,14
  95:10
sum 17:13
summary 16:16
  25:14 28:7
  32:18
supervised
  86:22
supervisor 22:2
  26:17 29:8
  75:11
supervisors
  13:24 88:22
supplement
  40:3
supplemental
  9:3
suppose 87:17
supposedly 65:9
sure 26:19 39:19
  48:12 79:19
  88:1
swear 56:11
  73:12
sworn 4:1,5
  85:12 93:18
  94:8
synopsis 51:8,15
  51:17 53:1,9
  53:10,11,12
  72:12
system 22:14
  28:8 31:7,9
  32:19 54:11
  69:9 75:12
systems 62:7

| T |
| --- |

take 6:11 21:11
  24:7,12 33:4
  33:10 59:20
  63:19 66:6
  67:1 70:9,13
  77:7 79:17
  87:14 88:7
  89:1
taken 1:15 59:10
  70:19 94:9,13
takes 45:8
talk 28:22 29:7
  73:11 74:6
talked 46:21
  53:2 54:22
  78:21 89:3
talking 29:16
  40:6 46:23
  47:6 56:8
  78:11,14 83:3
  85:5
talks 76:20
  83:10
Tara 2:21
tech 66:16
technological
  35:2
technology
  66:12
telephone 32:2
  60:15,19
tell 6:13 8:3,5
  11:10 16:3,23
  17:17 19:9
  31:9,12,14
  33:20 34:16,20
  37:15 47:1
  51:15 54:21
  55:7,10 58:11
  59:17 63:15,20
  70:3 71:3,9,15
  71:19 78:24
  85:4 89:24

telling 36:12
ten 79:18
tense 40:13
testified 4:6
  14:19 15:1,5
  30:7
testify 14:7 94:8
testimony 16:5,7
  16:11 17:1,5
  17:13,18,23,24
  18:15 19:3
  30:1,5 93:10
  93:13
text 11:3 28:13
  30:10,17 31:2
  31:12,14,14,16
  33:19 34:4,5
  34:12,19 35:12
  35:20 36:11,15
  47:14,20 48:1
  48:5,11,13,16
  49:21 51:22
  52:13,21 53:7
  54:22,24 55:15
  66:6 67:1,3,5
  67:10,10,16,23
  67:24 68:3,4,7
  68:10,12,16,23
  69:2,11,14,19
  69:23 70:8,10
  70:23 71:10,20
  72:24 73:7,10
  73:21,23 90:16
  90:23 91:3,6
  91:10,10,13,20
texts 35:24
Thank 8:11,13
  8:17,19,20
  10:3 45:12
  89:20 90:2
  92:15
Thanks 10:20
  89:19
thing 6:8,9 12:1
  32:17 43:3

56:15 83:5
things 39:6,7,7
  39:20 41:24
  53:10 66:11
  68:9 72:14,15
  74:6 75:3 85:5
  86:17
think 7:5 9:6
  15:3,12 22:10
  23:5 28:6
  30:12 35:13
  36:22 40:21
  42:11 43:24
  49:8 52:9
  53:15 73:24
  77:1,10 81:14
three 19:14
  72:17
throw 7:6
thumb 56:21,23
time 6:7 10:22
  11:13,22 21:11
  21:12,16,23,24
  22:1,11,20,22
  23:1,4,5 24:6
  28:3,7,12,16
  30:2 31:6 32:8
  32:10,10,16
  39:17 40:2,15
  43:5 44:4,21
  45:6 53:22,24
  54:3,4,18 57:4
  57:8 58:7,18
  59:11 62:11,16
  64:8 65:12
  69:6,9 70:12
  70:13 71:8
  75:24 76:7,14
  77:17,18 78:12
  78:14,17 79:10
  79:14 82:8,11
  85:7,11,17
  87:12 94:13
times 11:19
  47:12 56:12

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Edward Grizzle - Taken 7/28/2021

Page 109

69:13
title 7:20,23
today 4:16
told 17:16 18:11
26:21 31:13
35:19 39:23
47:4 54:19,22
56:2 59:24
63:11,12 65:15
68:22 69:5
71:23 72:8
91:22
tone 61:6,8
top 33:11
topic 45:6
total 87:14
towel 7:6
traffic 35:12
trafficking
63:20
trail 90:6
trained 21:2
75:12,13
training 86:18
transcript 4:20
5:4,6 6:3,19
7:7 8:2,2 9:24
11:4,7,12 13:3
16:4 24:17
74:15 93:10,12
transfer 63:8,15
transferred
11:23 12:2
transmitted
30:10 35:21
71:21 73:22
75:3
TRESSLER 2:7
Tressler's 77:12
trial 14:7,10,13
14:16,19 15:2
15:14,19 16:5
16:8,11,23
17:2,6,14,18
18:1,6,9,15,15

18:18,21 19:3
19:7,12,16
29:22 30:1
58:10
tried 35:5
true 11:6 22:8
23:23 28:14
29:13 30:3
35:21 37:5
54:9 55:2,3
65:18 66:17
68:5 70:20
72:18 86:2,3
93:12
trust 80:4
truth 94:8
try 14:4 19:23
55:3
trying 33:15
42:12 52:4
turner 6:15
twice 11:21
two 23:3 50:16
58:18 77:16
85:14,15 89:8
type 18:11
typewriting
94:10

U
underlying
29:13
understand
40:17 51:18
52:7 92:9
understanding
21:4 62:2,9
90:13
undivided 70:18
unfamiliar
44:24
union's 13:12
United 1:1,13
93:1 94:1
universe 69:14

unwilling 41:3
unwillingness
41:12
upset 72:1 73:2
use 27:15 86:7
usually 85:6

V
vacation 21:11
21:15,24 22:1
22:6,11,20,22
23:1,4,4,13,15
23:23 24:2,6
24:13 41:15
57:23 58:11
59:14 60:8
61:23 62:1,3
64:1 65:12
66:23
vacation-type
23:13
various 82:23
verbatim 16:17
30:9 31:1,13
38:1
verdict 16:1,14
16:21,21 17:21
versa 60:20
versus 23:1
vice 60:20 79:6
victim 29:2,6,10
29:12
video 27:8 49:19
92:2
videoconference
1:10
videos 55:5,10
55:16 84:19,19
90:17
viewed 33:23,24
35:9 36:17
64:2 65:5
voice 57:13
vs 1:5 93:5
VSS 22:14

W
Wacker 2:8
wait 10:17
walk 85:4
walking 78:8
want 7:16 8:4
25:22 26:19
38:17 54:15
57:9 64:14
79:9 92:19
wanted 37:13
51:2 53:10
57:17 59:19
60:23 64:19
wants 89:6
warrant 31:4
36:23 37:1,5
37:21 38:3,5
38:16,21 40:23
41:4,11,12
42:9,12,21
43:19,21 44:8
44:19 45:16,24
46:1,5,6,8,11
46:18,18,22
49:6,6,9,16
51:1,3 54:20
55:22 56:3
70:22 71:2,5,8
71:14 74:3
89:7 90:19
Washington
1:17
wasn't 12:10
28:18 36:4
52:24 53:12
61:4,9 72:1
81:11
way 6:15 7:1
15:8,9 17:19
25:20 30:6
31:6 32:18
34:18,22 35:6
35:10 37:10

38:8 55:20
61:2,15 69:16
73:1 80:17
88:3
we'll 7:18 20:8
45:18 50:11
92:21
we're 11:4 20:2
25:13 46:23
56:18 80:7
we've 53:15 78:1
80:23
week 11:15
12:14
welcome 92:16
went 7:17 43:16
44:1,9 64:1
70:7 87:11
weren't 23:4
witness 1:17 4:1
4:4 8:23 9:10
9:22 10:7
12:22 20:1
26:1 40:9 41:7
43:2 45:4
50:10 52:3
65:1 88:20
89:20,22 90:1
92:4,16,22
94:21 95:1
witnesses 30:1
54:24
woke 31:18
women 85:12,15
words 56:6
work 13:19
25:10 27:7,11
61:20 65:23
worked 85:19
87:3,4 88:14
working 85:8,12
works 27:6
31:10
wouldn't 37:12
37:13,15 73:2

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Edward Grizzle - Taken 7/28/2021

Page 110

| | | | |
|---|---|---|---|
| **write-up** 74:22 | **100** 11:10 38:14 | **2350** 2:3 | **6** 3:11 47:10 |
| **written** 4:20 5:4 | **11** 8:21 24:21 | **24** 10:10 | 79:21 80:7,21 |
| 5:6 37:19 40:7 | **12** 8:22 | **25** 3:9 10:11 | 81:13 |
| **wrong** 68:8 | **12:43** 92:22 | **26** 24:21 | **600** 2:14 |
| **wrote** 30:16 | **13** 9:11 74:16,20 | **27** 10:13 80:21 | **60018** 2:15 |
| ———— | **15** 8:8 9:15 | **28** 1:18 10:14 | **60601** 95:10 |
| **X** | **150** 1:17 | 93:11 94:14 | **60602** 2:4 |
| ———— | **16** 9:16 | **29** 10:15 11:3 | **60606** 2:9 |
| **Y** | **16-1** 20:6 83:2 | | **61st** 2:8 |
| **yeah** 10:3 15:9 | 83:19,19 | ———— | ———— |
| 27:19 28:6,15 | **161** 95:9 | **3** | **7** |
| 32:9,17 35:16 | **16th** 31:11 | **3** 3:9 8:8 25:13 | ———— |
| 37:14 38:17 | **17** 9:17 | 25:22,23 28:4 | **7** 3:8 8:15 47:8 |
| 45:8 47:10 | **17th** 33:2 35:19 | 29:1 30:24 | 47:17 |
| 56:10 65:19 | 36:18 53:22 | 32:3 33:11 | **79** 3:11 |
| 68:4 72:19 | **18** 1:5 50:16 | 36:16,24 38:2 | ———— |
| 76:3 78:19 | 81:15,17 93:5 | 39:16 40:1,22 | **8** |
| 86:3 88:21 | **18th** 42:13 | 40:24 41:15,21 | **8** 24:21 25:1 |
| **years** 46:24 | **19** 9:19 74:14,18 | 50:20 53:16 | 47:8,10,17 |
| 72:17 86:24 | **19th** 42:15 | 56:8 80:19,24 | 74:15,20 |
| 87:10,14 | ———— | **3050** 95:10 | **847.261.0700** |
| **young** 86:16 | **2** | **312.361.8851** | 2:15 |
| ———— | **2** 3:9 8:3 20:8,10 | 95:11 | ———— |
| **Z** | 20:15 21:5 | **312.445.4900** | **9** |
| **Zoom** 2:1,19 | 33:11 36:24 | 2:4 | **9** 8:18 20:13 |
| 94:9 | 43:10 | **312.627.4000** | **9,000** 67:6 |
| ———— | **20** 3:9 9:20 | 2:9 | **9:00** 28:19 |
| **0** | **2014** 20:13 | **33** 2:3 | **9:32** 1:18 94:15 |
| **00212-213** 25:20 | 87:12 | ———— | **90** 3:5 45:19 |
| **05681** 1:5 93:5 | **2016** 86:9 | **4** | **95** 45:19 47:8 |
| **084-004127** | **2018** 20:23 | **4** 3:4,10 8:11 | |
| 95:13 | 21:13 22:21 | 45:22 47:16 | |
| ———— | 24:3 41:16 | 81:14 | |
| **1** | 50:16 80:22 | **45** 3:10 | |
| **1** 3:8 7:7,14,18 | 81:5,15,18 | ———— | |
| 7:20 11:4,6 | 83:24 85:7 | **5** | |
| 12:3,6,11,16 | **2021** 1:18 93:11 | **5** 3:10 8:13 33:6 | |
| 12:24 13:5 | 93:19 94:14 | 33:7 34:1 | |
| 24:16 34:11,13 | 95:2 | 36:18 50:12,13 | |
| 74:15 | **20th** 95:2 | 56:4 | |
| **1-20** 1:7 2:18 | **21** 9:21,22 86:24 | **5/16/2018** 28:16 | |
| 93:7 | **212** 80:18 | **5:00** 54:13 | |
| **10-6** 83:16,23 | **213** 80:18 | **50** 3:10 | |
| **10:30** 33:16 34:1 | **23** 10:9 | **5600** 2:14 | |
| 54:4 | **233** 2:8 | ———— | |
| | | **6** | |

# EXHIBIT 6

STATE OF ILLINOIS
IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
WILL COUNTY, ILLINOIS

*COMPLAINT FOR SEARCH WARRANT*

Joliet Police Department Detective Sergeant Edward Grizzle, Complainant, now appears before the undersigned Judge of the Twelfth Circuit Court and requests the issuance of a search warrant for the purpose of seizing, searching and forensically analyzing the following described instruments, articles, and things:

A. The following described property:

1. Apple iPhone Rose Gold in color with cell phone number 708-717-3652.

B. Complainant requests a search warrant for the purpose of seizing the following described instruments, articles, and things: Harassment via electronic communication, Intimidation and seized, searched, and forensically analyzed therefrom:

Any and all data regarding electronic communications, including dates and times of those communications, digital images or videos, e-mail, voice mail, buddy lists, chat logs, instant messaging or text accounts, forensic data as well as data pertaining to ownership and registration of the device, any and all access logs identifying who utilized said digital storage devices, and any "hidden," erased, compressed, password-protected, or encrypted files.

FORENSIC ANALYSIS: This search warrant shall include authority to analyze and search any media seized for relevant evidence as outlined in this search warrant.

ADDITIONAL AUTHORITY: This search warrant shall include authority to decrypt any encrypted or password-protected data located on these computers that were seized from the above listed residence. This search warrant shall also include the authority to enter any locked folders located in these computers seized in the above listed residence.

RETURN OF SEARCH WARRANT: This search warrant shall be considered formally returned within a reasonable time period by listing all physical items seized pursuant to the warrant. Full search warrant return including the results of all forensic analysis contemplates a reasonable time period in light of the fact that modern hard drives can potentially contain millions of pages of data in a format that is not easily searched.

USE OF UNSWORN PERSONNEL: Forensic analysis of any data obtained from the seized items pursuant to this search warrant may be conducted by employees of law enforcement agencies who are not sworn law enforcement personnel, but are instead civilian employees.

Page 5 of 8

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER          CITY00093

The previously described instruments, articles, and things have been used in the commission of or constitute evidence of the offenses of Harassment via electronic communications, Intimidation.

I, Edward Grizzle, am a police sergeant with the Joliet Police Department currently assigned as a Detective Sergeant in the Investigations Division. I have served as a Police Officer for seventeen (17) years.

Your Complainant has probable cause to believe, based upon the following facts, that the above listed things to be forensically searched and seized are now located within the item described or set forth above.

## INVESTIGATION NARRATIVE

Y/C has knowledge and experience that files that may have been deleted or apparently erased by a cell phone user can often be recovered days, months or even years later either in full or in part through the use of forensic software tools. Special forensic software can examine the and can often find deleted files or files previously placed there by the operating system. This same software can "undelete" files and file fragments utilizing special tools, and said tools exist to analyze information contained on computers and cell phones.

Based on the aforementioned information, Y/C believes that probable cause exists that there is evidence of the offenses of Harassment via electronic communication, Intimidation

Your Complainant (Y/C), I, Detective Sergeant Edward Grizzle, (Y/C) am employed with the Joliet Police Department. Y/C has been continuously employed in good standing as a sworn police officer for the City of Joliet for over 17 years and is currently assigned to the Investigations Division as a Detective Sergeant for over 4 years' experience for the Joliet Police Department, Previously was a Detective for 4 years. Y/C has been involved in no less than 1000 investigations into numerous felony level offenses where Y/C have sought and obtained search warrants and arrest warrants regarding various types of felony and misdemeanor offenses.

On May 16th, 2018 at 2052 hours I Detective Sergeant Grizzle was notified by Appellate Prosecutor Lorinda Lamkin that the witness in Joliet Police Department case 17-0010915 Maria Gatlin F/W DOB; 1/4/67 was contacted by the victim Cassandra Socha F/W DOB: 1/13/85 via text message from phone number 708-717-3652 on May 16th.. Maria Gatlin has been friends with Cassandra Socha for over 15 years and knows this to be her phone number. Maria Gatlin and

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER CITY00094

Cassandra Socha has conversed numerous times over the years with Cassandra using the cell phone number 708-717-3652. A search through law enforcement tools does show this number 708-717-3652 does belong to Cassandra Socha. On May 16th 2018 Maria Gatlin did testify in Will Court House room 400 in the case People vs. Crowley. Cassandra Socha is the victim in this case. Cassandra Socha's text message accuses Maria Gatlin of committing crimes when employed as a Police officer, ridiculing Maria as a mother and not being able to have children along with having a mixed child.

Detective Sergeant Edward Grizzle -Joliet Police Department

Subscribed and sworn to before me this

Friday, May 18, 2018, at __ __ .M.

TWELFTH CIRCUIT JUDGE

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 7

STATE OF ILLINOIS )
                 ) SS.
COUNTY OF WILL )

### IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
### WILL COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS

VS.

IN REGARDS TO A CERTAIN
CRIMINAL INVESTIGATION

STATES ATTORNEYS OFFICE
SEARCH WARRANT NO.

# SEARCH WARRANT

TO ALL PEACE OFFICERS OF THE STATE OF ILLINOIS:

On this day, Friday, May 18th, 2018 Complainant-Affiant Detective Sergeant Edward Grizzle of the Joliet Police Department, has signed and sworn to a complaint for search warrant before me. Upon examination of the written complaint, I find that said complaint on its face states facts sufficient to show probable cause for the issuance of a search warrant, and I therefore command that the following property be searched:

Page 2 of 8

EXHIBIT
A

A. The following described property:

1. Apple iPhone Rose Gold in color with cell phone number 708-717-3652

I further command that the following described instruments, articles and things which have been used in the commission of, or which constitute evidence of the offense of **Harassment via electronic communications, Intimidation** be seized, searched, and forensically analyzed:

> Any and all data regarding electronic communications, including dates and times of those communications, digital images or videos, e-mail, voice mail, buddy lists, chat logs, instant messaging or text accounts, forensic data as well as data pertaining to ownership and registration of the device, any and all access logs identifying who utilized said digital storage devices, and any "hidden," erased, compressed, password-protected, or encrypted files.

FORENSIC ANALYSIS: This search warrant shall include authority to analyze and search any media seized for relevant evidence as outlined in this search warrant.

ADDITIONAL AUTHORITY: This search warrant shall include authority to decrypt any encrypted or password-protected data located on these computers that were seized from the above listed residence. This search warrant shall also include the authority to enter any locked folders located in these computers seized in the above listed residence.

RETURN OF SEARCH WARRANT: This search warrant shall be considered formally returned within a reasonable time period by listing all physical items seized pursuant to the warrant. Full search warrant return including the results of all forensic analysis contemplates a reasonable time period in light of the fact that modern hard drives can potentially contain millions of pages of data in a format that is not easily searched.

USE OF UNSWORN PERSONNEL: Forensic analysis of any data obtained from the seized items pursuant to this search warrant may be conducted by employees of law enforcement agencies who are not sworn law enforcement personnel, but are instead civilian employees.

I further command that a return of any physical items so seized shall be made without unnecessary delay before me or before Judge _____ or before any Court of competent jurisdiction.

Twelfth Circuit Judge

Date of Issuance: May 18th 2018

Time of Issuance: _____

# EXHIBIT 8

10,000/18-7262.NUI

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| CASSANDRA SOCHA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:18-cv-05681 |
| | ) | |
| CITY OF JOLIET, a municipal corporation, | ) | |
| EDWARD GRIZZLE, JOHN DOES 1-20, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## AFFIDAVIT OF EDWARD GRIZZLE

Under penalty of perjury as provided under federal law, I, the undersigned, EDWARD GRIZZLE, state that if called upon to testify, my testimony would be as follows, and the following, unless otherwise indicated, is based upon my first-hand knowledge.

1.      I am over eighteen (18) years of age and competent to testify.

2.      After I seized Plaintiff's i-Phone, I asked Sgt. Botzum to perform an extraction of the data it contained, as I understood that Sgt. Botzum had the training and experience to perform such data extractions from electronic devices.

3.      Further affiant sayeth naught.


_Edward Grizzle_
_____

Edward Grizzle

# EXHIBIT 9



Transcript of the Deposition of
## Sergeant Christopher Botzum
**Case:** Cassandra Socha v. City of Joliet; et al.
**Taken On:** April 30, 2021

Royal Reporting Services, Inc.
Phone:312.361.8851
Email:info@royalreportingservices.com
Website: www.royalreportingservices.com

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CASSANDRA SOCHA,                        )
                                        )
                Plaintiff,              )
                                        )
        vs.                             )   No. 18 CV 05681
                                        )
CITY OF JOLIET, a municipal             )
corporation, EDWARD GRIZZLE,            )
JOHN DOES 1-20,                         )
                                        )
                Defendants.             )

        The deposition of SERGEANT CHRISTOPHER

BOTZUM, called by the Plaintiff for examination, taken

pursuant to notice and pursuant to the Federal Rules of

Civil Procedure for the United States District Courts

pertaining to the taking of depositions, taken before

Monica Kim, Certified Shorthand Reporter via

videoconference, commencing at 12:56 p.m. on April 30th,

2021.

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 2

```
 1   APPEARANCES: (VIA VIDEOCONFERENCE)

 2        LAW OFFICES OF HALL ADAMS, LLC
          MR. HALL ADAMS, III
 3        33 North Dearborn Street
          Suite 2350
 4        Chicago, Illinois 60602
          Phone:  312.445.4900
 5        E-mail: hall@adamslegal.net

 6             On behalf of the Plaintiff;

 7        TRESSLER LLP
          MS. DARCY L. PROCTOR
 8        MR. JAMES J. HESS, JR.
          550 East Boughton Road
 9        Suite 250
          Bolingbrook, Illinois 60440
10        Phone:  630.759.0800
          E-mail: dproctor@tresslerllp.com
11                jhess@tresslerllp.com

12             On behalf of the Defendant the City of
               Joliet;
13
          KNIGHT HOPPE KURNIK & KNIGHT, LTD.
14        MR. MICHAEL J. ATKUS
          5600 North River Road
15        Suite 600
          Rosemont, Illinois 60018
16        Phone:  847.261.0700
          E-mail: matkus@khkklaw.com
17
               On behalf of the Defendant Edward Grizzle.
18
19   ALSO PRESENT:  Ms. Cassandra Socha

20                    *   *   *   *   *   *

21

22

23

24
```

Royal Reporting Services, Inc.
312.361.8851

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 3

1                          I N D E X

2    WITNESS                                        PAGE

3    SERGEANT CHRISTOPHER BOTZUM

4         Examination by Mr. Adams ................   4

5

6
                        E X H I B I T S
7
     BOTZUM DEPOSITION EXHIBIT                       PAGE
8
          No. 1 ...................................   80
9
          No. 2 ...................................   87
10
          No. 3 ...................................   89
11
          No. 4 ...................................   94
12
          No. 5 ...................................   98
13
          No. 6 ...................................  102
14
          No. 7 ...................................  105
15
          No. 8 ...................................  107
16
          No. 9 ...................................  111
17
          No. 10 ..................................  113
18
          No. 11 ..................................  116
19

20

21

22

23

24

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 4

1          (Witness sworn.)
2  WHEREUPON:
3          SERGEANT CHRISTOPHER BOTZUM,
4  called as a witness herein, having been first duly
5  sworn, was examined and testified via videoconference as
6  follows:
7              EXAMINATION
8  BY MR. ADAMS:
9      Q.  Sir, my name is Hall Adams.  I represent the
10  plaintiff, Cassandra Socha.
11          Have you given deposition testimony before?
12     A.  I've been prepped for depositions before.  I
13  don't recall ever giving one.
14     Q.  Okay.  Let's start with the easy questions.
15          What is your name?
16     A.  Christopher Botzum, B-O-T-Z, as in zebra, U-M,
17  as in Mary.
18     Q.  Are you employed by the Joliet Police
19  Department?
20     A.  I am a lieutenant in the internal affairs unit
21  currently.
22     Q.  A couple things I want to tell you about the
23  process, Lieutenant Botzum, is to make sure that you
24  hear and understand every question completely before you

Page 5

1  attempt to answer a question.  That's particularly
2  important ground rule in the Zoom era.
3          If you have any doubts about a question, if
4  you need for it to be repeated, read back, rephrased,
5  explained, say so.  We'll accommodate you as many times
6  as you ask.  If you give an answer to a question, we
7  will all presume that you've heard it completely and
8  understood it completely; is that fair?
9      A.  Yes.
10     Q.  Never guess.  If you don't know the answer to
11  a question, tell us you don't know the answer to the
12  question.  If you can't remember the answer to the
13  question, tell us you can't remember the answer to the
14  question.  But never guess.  Okay?
15     A.  Okay.
16     Q.  All right.  What's your highest level of
17  formal educational?
18     A.  I have about two years of college.
19     Q.  Where?
20     A.  At -- It was currently -- The last place I was
21  at was Lewis University.
22     Q.  How long have you been a police officer?
23     A.  18 years.
24     Q.  All with Joliet?

Page 6

1      A.  Yes.
2      Q.  When were you promoted to lieutenant?
3      A.  I was promoted last year, March of last year.
4      Q.  By whom?
5      A.  By whom?
6      Q.  Yes, sir.
7      A.  By the Joliet Police Department, police and
8  fire board.
9      Q.  Do you know what role, if any, the then, I
10  believe, Chief Al Roechner played in your promotion?
11     A.  The only thing I would think it would be is
12  recommending to the police and fire board for a
13  promotion.
14     Q.  Had he previously recommended you for prior
15  promotions?
16     A.  No.
17     Q.  You're currently in internal affairs?
18     A.  Correct.
19     Q.  How long have you been in internal affairs?
20     A.  About a year.
21     Q.  Before you were a lieutenant in the internal
22  affairs division, what was your rank and what were your
23  duties?
24     A.  I was a sergeant and I was the public

Page 7

1  information officer prior to this position.
2      Q.  How long were you the public information
3  officer?
4      A.  I was there for about a little over a year.
5      Q.  What did you do before that?
6      A.  Before that, I was a tactical sergeant.
7      Q.  How long were you a tactical sergeant?
8      A.  I believe from September of 2016.
9      Q.  In a particular unit or division of the police
10  department?
11     A.  What was that?
12     Q.  A tactical sergeant in any particular unit or
13  division of the police department?
14     A.  That's within our -- our tactical unit.
15     Q.  Generally describe for us what a sergeant in a
16  tactical unit does.
17     A.  Basically, we -- basically, we assist with
18  drug investigations, gang investigations.  We look
19  for -- We deal with the gang members, the gun violence,
20  assist our drug units when it comes to surveillance.
21  And we did search warrants, work informants.
22     Q.  As a tactical officer sergeant --
23          Were you a tactical officer before you became
24  a tactical sergeant?

4 (Pages 4 to 7)

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 8

1    A.  I'm sorry.  What was that?
2    Q.  Were you an officer in the tactical unit
3  before you became a sergeant?
4    A.  I was a tactical officer back in '06, I
5  believe, and then to about '09.
6    Q.  All right.  What did you do before you became
7  a tactical sergeant?
8    A.  I was assigned to investigations.  I was up at
9  the Chicago -- the FBI's regional forensics laboratory
10  up in Chicago.
11    Q.  What did you do there?
12    A.  I did computer forensics.  I did cell phone
13  forensics.  Then I did video forensics.
14    Q.  For what period of time did you do that?
15    A.  I did that from about January of 2009, and
16  then I got promoted in November of 2014.  And then from
17  2014, I was in a -- They consider it an associate status
18  where I wasn't up there full-time anymore but I still
19  worked on cases as needed was doing that for
20  about -- maybe up till about a year ago, maybe a little
21  bit more than that.
22    Q.  And that facility is the Chicago Regional
23  Computer Forensics Laboratory?
24    A.  I'm -- For some reason I'm having trouble

Page 9

1  hearing you.  I'm not sure why.
2    Q.  That facility is known as the Chicago Regional
3  Computer Forensics Laboratory?
4    A.  I believe so.
5    Q.  What, if any, is its affiliation with the FBI?
6    A.  It is overseen by the FBI.  So the training
7  and the budgets comes from the FBI.
8    Q.  Were you trained in computer forensics at the
9  Chicago Regional Computer Forensics Laboratory?
10    A.  The training was -- was done there and around
11  from -- different facilities around the country, but it
12  was organized by the FBI and trained by FBI either
13  personnel or people that they had do their training.
14  But it was organized by them.
15    Q.  So from time to time it's referred to in the
16  Joliet Police Department as the FBI's Regional Computer
17  Forensic Laboratory?
18    A.  Correct, I believe so.
19    Q.  The shorthand for which is RCFL?
20    A.  Yes.
21    Q.  If I refer to the "RCFL" throughout this
22  deposition, you'll know that's what I'm talking about
23  and I'll know that's what you're talking about.  Okay?
24    A.  Okay.

Page 10

1    Q.  Was your first tour at the RCFL the first time
2  you got computer forensic training as a law enforcement
3  officer?
4    A.  Was that my first training?
5    Q.  Yes, sir.
6    A.  Yes.
7    Q.  Specifically what training did you get at
8  RCFL?
9    A.  I've had a lot of training.  I'd have to go
10  through my CV which I don't have in front of me.  But
11  I've had -- I've been sworn in as an expert in several
12  cases.  And I don't want to just throw a number out
13  there, but I've had hour -- hundreds of hours of
14  training.
15    Q.  Do you actually have a formal CV that includes
16  a description of your training and experience as a
17  forensic investigator?
18    A.  I do.
19    Q.  Is it accessible online?
20    A.  Online like at a website?
21    Q.  Right.  If I Googled your name, for example,
22  would I get your CV or do we have to get it through you
23  or your department?
24    A.  Probably through me or the department.  I

Page 11

1  don't think I've ever been posted online.
2    Q.  Have you been trained on a forensic tool known
3  as Cellebrite?
4    A.  Yes.
5    Q.  When were you first trained on Cellebrite?
6    A.  I'd have to look at my CV.  But if I -- It
7  probably may be within -- Probably like maybe a year
8  after starting at the RCFL.
9    Q.  Your CV would reflect that?
10    A.  Yes.  Because I put down the dates and times
11  and the classes of what I took.
12    Q.  And the CV would reflect all the subsequent
13  training you've received on Cellebrite?
14    A.  It would have -- I'm trying to recall what it
15  was, what would be on there.  But it would have -- it
16  would have cell phone training on there that was
17  probably put on from the FBI if I remember correctly,
18  but it should have the training.
19    Q.  The CV would reflect all of your training and
20  experience with Cellebrite?
21    A.  Should, yeah.
22    Q.  Have you been trained on a forensic tool known
23  as Lantern?
24    A.  I have used it.  I -- I used it, I believe,

5  (Pages 8 to 11)

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 12

1    at -- I don't recall if I remember using it at the FBI.
2         I was assigned to two different labs at one
3    point.  And the other lab I was assigned to was at the
4    Will County's lab.  Will County had their own lab.  I
5    think they might even still have it.  And I might have
6    used it there in the past.
7         I'm trying to -- And I'm trying to recall if I
8    used it at the RCFL.  I don't want to sit there and say
9    that I did and I didn't.
10        But I do recall Will County having it.  And
11   it's not -- If I remember correctly, it's been a while
12   since I've seen it.  But it wasn't overly complicated.
13   Once you knew the one, you can understand the other, if
14   I remember correctly.
15        Q.  Do you mean by that once you've been trained
16   on Cellebrite you can understand Lantern?
17        A.  Well, it's the fundamentals of the forensics.
18   So once you understand the fundamentals of the forensics
19   of what -- what you're looking at for a phone, they kind
20   of -- I mean, obviously, you've got different
21   interface -- different user interface, but you can
22   generally understand what you're trying to -- what
23   you're trying to do.
24        MR. ADAMS:  Off the record.

Page 13

1         (Discussion off the record.)
2    BY MR. ADAMS:
3         Q.  Is all of your training and experience with
4    Lantern memorialized on your CV?
5         A.  I do not believe so.
6         Q.  Over what period of time would you estimate
7    you've been working with Lantern from time to time?
8         A.  The Lantern program, not as much as
9    Cellebrite.  So my experience with Lantern is -- would
10   be -- I wouldn't -- I don't know how much to say I -- my
11   exposure to, but it wouldn't -- Cellebrite was mostly
12   what I used.
13        Q.  If you were going to explain to a juror with
14   no training or experience in the field, how would you
15   describe what Cellebrite is and what it can do for a law
16   enforcement investigator?
17        A.  So with a -- with a cell phone or, like,
18   Cellebrite, when you have your cell phone it's like a
19   personal computer.  So the Cellebrite forensic software
20   allows you to access the data within the phone.  And it
21   takes the data and extracts it and it puts it into a --
22   in a format that's easily readable -- they can easily
23   read.
24        So when someone is sitting there looking at

Page 14

1    your phone and say they're trying to find a text message
2    that they might have done a year and a half ago or
3    something, they were having trouble finding it but they
4    knew it was on there, what this does is it allows you to
5    parse out that information and it allows you to search
6    for it quicker than normally going through a phone.
7         And it also allows you to search for deleted
8    information.  So say if you, you know, had a photo or a
9    message or something that you deleted, you have the
10   potential to bring that back up by using some of the
11   software like un- -- undeleting.
12        Q.  Retrieving, in other words?
13        A.  Retrieving, sure.
14        Q.  What, if anything, can Lantern do that
15   Cellebrite cannot do?
16        A.  So through my experience dealing with
17   forensics, it's not -- this is not particular to
18   Lantern.  This is just a -- of a general thing that I
19   experienced and I noticed is when it comes to computer
20   forensics, there's a bunch of different forensic
21   companies that are out there that can pull and extract
22   data from hard drives or whatever might -- And this goes
23   with -- the same for phones.  So -- But the companies
24   are different and they pull information differently and

Page 15

1    then they explain information differently.
2         So from my experience, depending on what
3    you're looking for in an environment, you might use one,
4    two, possibly three different forensic softwares to look
5    for data because sometimes one might not pick it up, the
6    other one would, or it presents it in a format that is
7    easier to read compared to the other ones.  So a lot of
8    it depends on if you're going to use one, two, possibly
9    a third.  You might use several ones on the same visual
10   items.
11        Q.  If I can say, Lieutenant, on the last question
12   and answer -- So your volume on my end at least dropped
13   quite a bit.  I don't know why that occurred.  But it
14   did.  And you're not quite as easy to hear as you were.
15   But we'll just fight on and see what we can do.
16        Was your training on Cellebrite, wherever you
17   happen to be stationed at the time, provided by the
18   Cellebrite company?
19        A.  I believe, if I remember correctly, it was
20   done through the FBI.  I don't think it was done through
21   the company.
22        Q.  Have you ever been trained by Officer German?
23        A.  No.
24        Q.  Have you ever trained Officer German?

6  (Pages 12 to 15)

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 16

1  A.  I have assisted him in cases and shown him
2  different things that I've learned.
3  Q.  As a tactical officer and sergeant, would you
4  from time to time be detailed to the investigations
5  division in order to provide forensic support for their
6  investigative work?
7  A.  Yes.
8  Q.  That happened on a regular basis?
9  A.  It would happen.  Every now and then I would
10  be pulled for certain investigation cases depending on
11  what they were.  Sometimes it's like homicides or bigger
12  cases because of my associate status with the RCFL.
13      So if they had a phone or a computer or a
14  hard- -- or a DVR or something that they needed to be
15  worked on, I could take it up to Chicago and I can work
16  on it myself because I still had my certification
17  through the FBI.
18      So I still had to do a yearly examination or
19  testing that they would do.  They would -- You know, I
20  can't remember what it's called -- proficiency test.
21  They do a proficiency test every year.  And I would have
22  to do that.  So I kept my certification up to do those
23  type of works.  And I would also get called into
24  internal affairs also and do internal affairs cases.

Page 17

1  Q.  As of May of 2018, were you considered within
2  the Joliet Police Department, for lack of a better term,
3  the duty expert on computer forensics?
4  A.  I -- The duty expert?  I was the person that
5  was certified to do it.
6  Q.  As of May of 2018, are you aware of anyone
7  else in the department who had more training and
8  experience doing computer forensic work than you did?
9  A.  Doing computer forensics?
10  Q.  Well, that's a fair question.  I'll narrow it.
11      Doing forensic work with the Cellebrite and/or
12  Lantern relating to the extraction and analysis of data
13  from smartphones.
14  A.  Detective German was doing cell phone
15  extractions, and I thought he was doing some DVR or some
16  video-type stuff.  I -- I know he had training in it,
17  but I don't know the time frame of when he had it.
18  Q.  In the May of 2018 time frame, do you know of
19  anyone on the department who had more training and
20  experience in that specific area of forensics than you
21  on the Joliet Department?
22  A.  I do not because -- I don't recall being
23  trained specifically by Cellebrite.  I believe it was
24  done through the FBI.  It is possible that German -- And

Page 18

1  this is obviously -- You'd have to speak to him on this.
2  But he could have been -- I thought he got trained
3  specifically by Cellebrite.  So if -- There's a
4  possibility that he was trained by the company itself
5  where I don't -- I was not, if that answers your --
6  Q.  Have you reviewed any documents in preparation
7  for today's deposition?
8  A.  I have.
9  Q.  What documents have you reviewed?
10  A.  I reviewed my reports, my -- the report that I
11  did with the extraction -- my initial extraction.
12  Q.  Anything else?
13  A.  I reviewed some memos that I did.
14  Q.  Anything else?
15  A.  An e-mail maybe.  I have it in front of me.
16  So I have some reports, some e-mails, and I think that's
17  about it.
18  Q.  What I'd like you to do, Lieutenant, is just
19  index those for our record.  Give us the date and the to
20  and from and the subject line of each of those documents
21  that you reviewed.  And just go through them one after
22  another.  And I won't interrupt you.
23  A.  Do you want me to do that now?
24  Q.  Yes, sir.

Page 19

1  A.  The first one is -- Do you want me to show it
2  up to the -- How do you want me to do this?
3  Q.  Well, just -- I think we've probably seen them
4  all.  If you name one I haven't seen, we may have --
5  A.  Okay.
6  Q.  -- you share it if you know how to do that.
7  A.  This one is an officer supplement report.
8  This was done on May 18th of 2018 at approximately
9  6:30 p.m.  It's a three-paragraph narrative by -- that I
10  wrote to -- that I wrote.
11      Does that seem -- what you have?
12  Q.  Okay.
13  A.  Then let's see.  I have -- I have an e-mail
14  where -- It's to Chris Regis.  Actually, it was
15  forwarded to me from Roechner.  But basically it states
16  that I was sent to the RCFL to go get reports and bring
17  it back to Regis.
18  Q.  Okay.  What's the date of that e-mail?
19  A.  That one is August 14th of 2020.
20  Q.  Okay.
21  A.  I've got a bunch of different documents here,
22  but these -- I'm not referring to all these.  Are you --
23  What are we -- What are you --
24  Q.  Any documents that you reviewed in preparation

7 (Pages 16 to 19)

Royal Reporting Services, Inc.
312.361.8851

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 20

1  for today's deposition.
2      A.  Okay.  I've got -- There's one that's dated
3  November 7th of 2018.  It's an interoffice memorandum
4  from -- to the chief from me.  It says, "RCFL Update."
5      Q.  Okay.
6      A.  Okay.  I've got one that says, "RCFL Update
7  (Part 2)," which is dated November 9th, 2018.
8      Q.  Okay.
9      A.  And I think that's about all I looked at
10  for -- in preparation for this.
11      Q.  Okay.  How did you get your hands on those in
12  order to review them to prepare for today's deposition?
13      A.  So I had copies of these from -- When I was
14  doing as a PIO, I was doing the FOIAs also.  So there
15  was a FOIA that came in in regards to this.  So I had
16  already had the documents from my historical of FOIAs.
17      Q.  Who submitted FOIA?
18      A.  That's a great question.
19      Q.  Thanks.
20      A.  I could find out.  My -- my thought if --
21  if -- my memory might be wrong, but my thought is it was
22  the Herald-News, but I can -- Like I said, I can find
23  out for certain.
24      MR. ATKUS:  The what?

Page 21

1      THE WITNESS:  The Herald-News.
2      MR. ATKUS:  Okay.  Thank you.
3      THE WITNESS:  You're welcome.
4  BY MR. ADAMS:
5      Q.  Have you spoken with anyone for the purpose of
6  preparing for today's deposition other than the
7  logistics of it, the time, the place, the Zoom
8  information?
9      A.  No.
10      Q.  Have you read ever of the complaint filed in
11  this case by my client, Cassandra Socha?
12      A.  I believe the -- I believe I read it, and I
13  think I only read it once.  And if I remember -- And
14  I -- This is my -- It's been a while.  But at some
15  time -- And I don't remember the date.  But whenever
16  the -- When -- Excuse me.  Whenever the lawsuit was
17  filed, I was part of a meeting.  And I don't know what
18  date this was.  And I'm sure it's -- it's on the -- when
19  the lawsuit was filed.
20      But there was a meeting with me -- I got
21  called into a meeting with Brian Benton; Chris Regis;
22  Hales, the former city manager.  And there were several
23  other people in this meeting.  And I called over the --
24  I believe, from Chief Benton at the time.  And if -- And

Page 22

1  I -- and I could be wrong on this, but this is -- I'm
2  just trying to refresh my memory because sometimes
3  I'm -- and I'm getting old.
4      MS. PROCTOR:  You know what?  I don't want to
5  interrupt the witness.  But to the extent there were
6  attorneys present for this meeting, you know, the
7  conversations may be subject to the attorney-client
8  privilege.  I don't know that, but I just wanted to note
9  that before you went any further.
10      And I didn't mean to get you in the -- before
11  you were finished.  But based on the nature of my -- not
12  an objection, but it's -- it's just I'm raising a
13  concern, you know, whether -- you know, to the extent
14  you could continue with your answer whether it would
15  invoke the attorney-client privilege or call upon
16  attorney-client protected information.
17  BY MR. ADAMS:
18      Q.  You can continue.
19      A.  Okay.  Answer the question?
20      Q.  Yes.
21      A.  Okay.  So -- Yeah.  And I'm trying to recall
22  if I was shown the complaint then.  I don't recall
23  what's in the complaint directly.  But I -- I feel as
24  though the complaint was shown then, but I could be

Page 23

1  wrong on that.
2      MS. PROCTOR:  Okay.  You know what?  Can I just
3  interject?  Because I do think we need an answer to the
4  question whether this witness knows one way or the other
5  whether there were any attorneys present for this
6  meeting.
7      MR. ADAMS:  And so one of the great things about --
8      MS. PROCTOR:  So I think we need an answer to that
9  question before we go further --
10      MR. ADAMS:  So --
11      MS. PROCTOR:  So why don't you ask it?  Or maybe
12  the witness could answer my question.
13      MR. ADAMS:  Two -- two great things about this --
14      MS. PROCTOR:  Okay.
15      MR. ADAMS:  -- I get a chance to ask that myself
16  and you get an at bat too.  I'm not the only one.  So
17  you don't need to interrupt all the time to do that.
18      MS. PROCTOR:  No.  But, Hall, based on -- I think
19  we need to get an answer to this question --
20      MR. ADAMS:  You get a chance to ask --
21      MS. PROCTOR:  -- whether there were attorneys
22  present for this meeting.  If the answer is yes, then I
23  can make my objection.  If it's not, then we can move
24  on.

8  (Pages 20 to 23)

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 24

1     MR. ADAMS:  And you get a chance to ask all the
2  questions you need to ask today.
3     MS. PROCTOR:  No.  But the point is -- And don't be
4  coy with me.
5     The point is if there were attorneys present
6  for this meeting, the meeting could be subject to the
7  attorney-client privilege.  And if you allow the witness
8  to answer that question, he could be disclosing
9  information that would be protected by privilege.  So I
10  am trying to protect and maintain that privilege to the
11  extent it exists.
12     And a practical solution would be to ask the
13  witness now before we go further with any discussions
14  about this meeting whether or not there were any
15  attorneys present associated with the City of Joliet, be
16  that private defense counsel or any members of the
17  City's corporation counsel's office.
18     MR. ADAMS:  You don't represent this witness, do
19  you?
20     MS. PROCTOR:  I do not represent this witness.
21  However, I do represent the City of Joliet.  And to the
22  extent -- this witness may very well be in the
23  control group.  So don't --
24     Let's not play games, Hall.  Why don't you

Page 25

1  just ask this witness or -- whether there were any
2  attorneys present --
3  BY MR. ADAMS:
4     Q.  Mr. Botzum --
5     MS. PROCTOR:  -- because I know you -- Let me
6  finish.
7     I know you, as an officer of the court, would
8  not want to violate the attorney-client privilege.
9  BY MR. ADAMS:
10     Q.  Mr. Botzum --
11     MS. PROCTOR:  But by allowing this witness to
12  continue without just getting to the bottom of this,
13  Hall -- And that's all I ask.
14     MR. ADAMS:  Are you through?
15     MS. PROCTOR:  For the moment.  Will you please ask
16  my question or --
17  BY MR. ADAMS:
18     Q.  Mr. Bot- -- Or, Lieutenant Botzum, were you
19  represented by counsel at that meeting?
20     A.  Chris Regis, I believe, was our corporate
21  counsel at that time, so I'm not sure how this fits into
22  that.  And that's, I believe, why he was brought in.  So
23  it --
24     Q.  You personally weren't represented in your

Page 26

1  individual capacity, true?
2     A.  Me being represented?
3     Q.  Yes, sir.
4     A.  No.
5     MS. PROCTOR:  That's not the standard, Hall, and
6  you know it.  You're playing games.
7     But go ahead.  Let's move on.
8  BY MR. ADAMS:
9     Q.  You mentioned that there were other people
10  present in that meeting.  Can you name any of the other
11  people?
12     A.  At this time, no, I can't.  I don't recall the
13  other people.
14     Q.  Can you estimate the number of other people?
15     A.  I would guess.  Maybe --
16     Q.  I don't want you to guess.  Give me an
17  estimate, a reasonable estimate.
18     A.  An estimate is kind of guessing.  I would say
19  possibly about two other people.
20     MS. PROCTOR:  Okay.  To be clear, because I don't
21  think it's clear from his prior answer -- And I would
22  just like the witness -- You know, we just need an
23  answer to this question.
24     Was Christopher Regis, in his capacity as a

Page 27

1  corporation counsel for the City of Joliet, present for
2  the meeting that you've been speaking of, sir?
3     That is the question that I would like
4  answered now.
5     MR. ADAMS:  He doesn't have to answer it now.
6  You'll get your chance.
7     MS. PROCTOR:  You're playing games, Hall, and I
8  don't appreciate it.
9  BY MR. ADAMS:
10     Q.  Mr. -- I said it again.  Lieutenant --
11     MS. PROCTOR:  It's just it's unclear.  I -- I
12  thought he said he was.  If he was, then we may have an
13  issue.  If he wasn't, then I don't think we do.
14  BY MR. ADAMS:
15     Q.  Lieutenant Botzum, did you make any written
16  records of your own of that meeting?
17     A.  Did I make my own records?
18     Q.  Yes, sir.
19     A.  I did not.
20     Q.  Was there a court reporter present during that
21  meeting?
22     A.  I don't believe so.
23     Q.  Did anyone that you could see make notes or
24  take minutes of that meeting?

                              9  (Pages 24 to 27)

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 28

1    A.  I wasn't -- That wasn't my focus so I can't
2  say yes or no.
3    Q.  Can you tell us when -- either by specific
4  date or month, year or in relationship to when Socha's
5  complaint was filed -- that that meeting occurred?
6    A.  It was -- My understanding, it was the date
7  that was given to the City or the City became aware of
8  it or something to that -- to that effect.
9    Q.  At the time, you were still a sergeant; is
10  that correct?
11    A.  It was in 2018.  So yes, that's correct.
12    Q.  And you were a sergeant in the tactical unit,
13  correct?
14    A.  I could have been in patrol at that time.  I'd
15  have -- I'm not sure on that date.  Oh, no.  You know,
16  no.  I would be -- I'm sorry.  I would be in tactical.
17  That's correct.
18    Q.  There was someone named Hales at that meeting?
19    A.  Correct.
20    Q.  Who is Hales?
21    A.  He's our former city manager.
22    Q.  Was he the then city manager at the time of
23  that meeting?
24    A.  Yes.

Page 29

1    Q.  Where did the meeting take place?
2    A.  It was in city hall.  And I'm -- I'm trying to
3  recall.  I don't know if it was in the city manager's
4  office.  It might have been in there.  I don't recall
5  the exact room, though.  It was somewhere in city hall.
6    Q.  You went to that meeting because Chief Benton
7  told you go to that meeting?
8    A.  If I remember correctly, yes.
9    Q.  When Chief Benton told you to go to that
10  meeting, did he tell you why he wanted you at that
11  meeting?
12    A.  Not -- not beforehand, not that I recall
13  anyways.
14    Q.  Walking into the meeting, did he tell you
15  that?
16    A.  I think -- I believe I found out when I went
17  into the meeting and I sat down.  And I think I was
18  trying to figure out basically why I was there.
19    Q.  Other than that meeting that we've been
20  discussing, have you attended others involving either
21  Joliet Police Department officers and/or City of Joliet
22  officials at which Officer Socha's allegations in this
23  case were discussed?
24    A.  Not that I recall.

Page 30

1    Q.  How long did that meeting at city hall last?
2    A.  By the time I got there -- By the time it was
3  done maybe -- maybe half hour.  There was a meeting that
4  I believe was already in progress prior to me getting
5  there.
6    Q.  At that time, you weren't a policy maker for
7  the Joliet Police Department, were you?
8    A.  I've never been a policy maker.
9    Q.  All right.  At that time, you did not have any
10  control over the direction of the City of Joliet's
11  conduct of this lawsuit, did you?
12    A.  No.
13    Q.  At any time that you were present in that
14  meeting, did Regis articulate what his role was in the
15  meeting?
16    A.  I don't recall whether he said his role or
17  not.  I mean, I remember -- I remember what the context
18  of when I got in there -- what the discussion was about.
19    Q.  What was that?
20    A.  Am I allowed to answer this or ...
21    Q.  Yeah.
22    A.  So, basically, it was -- When I got in there,
23  they were trying to discuss shutting down
24  investigations.  So what they wanted to do -- and I

Page 31

1  believe it was Regis that was stating it -- is they
2  wanted to gather all the computers and shut down and
3  basically take all the computers away from the
4  investigations and basically have them analyzed.
5    Q.  Okay.  You then were involved in that process
6  at some later point, true?
7    A.  There was a discussion back and forth, I
8  believe, with Chief Benton and -- I'm really trying to
9  remember who else.  I know there was other people there.
10    But there was discussions on they can't shut
11  down because they have active homicide investigations
12  and different things going on with these computers.  So
13  there was some back-and-forth going on there.
14    At that point, I -- I came up with an idea
15  that could be -- that could be used to alleviate the
16  issue that they were having.
17    Q.  What was that idea?
18    A.  So working at the RCFL, one of the things that
19  we did on a regular basis especially with the FBI is we
20  always did searches.  And a lot of the searches you
21  would go to a place and you would copy all the digital
22  media that was there preserving it, the evidence, but
23  then not taking it from the place.
24    So I recommended and I advised this to the

10  (Pages 28 to 31)

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 32

1  group that this could be an option if they're worried
2  about trying to keep the functionality of investigations
3  going because we have, obviously, ongoing, you know,
4  criminal things going on and stuff; but preserving
5  everything that occurred -- everything that's on the
6  hard drives and to be analyzed at a later date.
7      Q.  And when you say everything that was on the
8  hard drive, you mean the Cellebrite hard drive and the
9  Lantern hard drive, correct?
10     A.  Any -- any hard drive that would have been in
11 there -- any computer.
12     Q.  Okay.
13     MR. ATKUS:  I just -- You said "in there."  Can we
14 get a clarification in where?
15     THE WITNESS:  In the investigations unit.
16     MR. ATKUS:  Okay.
17 BY MR. ADAMS:
18     Q.  That meeting aside and without regard to
19 whether you did so in preparation for today's
20 deposition, have you discussed the allegations in
21 Socha's complaint with any of your fellow officers?
22     A.  In regards to -- Besides the logistics of it?
23     Q.  Yes, sir.  Besides the logistics.
24     A.  Just my part in just the logistics of what I

Page 33

1  did.
2      Q.  How would you characterize your relationship
3  with Officer Nicholas Crowley?
4      A.  I'm not -- I don't know him that well.  I
5  never really worked with him.  So, I mean, I don't -- I
6  don't have an opinion one way or another.
7      Q.  So you're -- I'm not asking about opinions
8  necessarily.  But you're members of the same police
9  force but, otherwise, you're not particularly involved
10 with Officer Crowley; is that accurate?
11     A.  No.  I never -- I never had the experience of
12 working with him.  I think I've been on maybe some calls
13 with him, but I've never -- Maybe spoken to him a
14 handful of times but --
15     Q.  How would you characterize your relationship
16 with Officer Socha?
17     A.  Fine.  No problems.
18     Q.  Have you had frequent or regular occasion to
19 work with her?
20     A.  She was assigned to us.  When I was in the
21 tactical unit, she was assigned to us, like a
22 cross-training-type platform.  And I think she was up
23 there -- I could be wrong on this, but I thought it was
24 like two to four weeks or something like that and -- No.

Page 34

1  I had a good working relationship with her, no issues.
2      Q.  During whatever exposure you've had to Officer
3  Socha in the performance of her duties as a Joliet
4  police officer, did she impress you as an officer who
5  was committed to her service and who took her job
6  seriously?
7      A.  Yeah.  I mean, when we had her in the
8  cross-training, I thought she did an excellent job in
9  there.  I thought she was our charging -- You know, I
10 mean, it -- It was a situation where -- It was kind of a
11 nice thing that we did at the time because we were doing
12 some cross-training.
13     But if it came up, like, down the road where,
14 like -- having openings in our tactical unit, which
15 doesn't happen as often, she would have been a high
16 contender, in my opinion, at that time to -- to go into
17 the unit.
18     Q.  Did you yourself play any role in the
19 investigation and/or prosecution of Officer Crowley that
20 preceded the Department's investigation of Officer
21 Socha?
22     A.  None.
23     Q.  Have you ever had any conversations with
24 Detective Sergeant Grizzle about his role in the

Page 35

1  investigation and/or prosecution of Crowley?
2      A.  None.
3      Q.  Have you ever had any conversations with
4  Grizzle in which he expressed his views about the role
5  of Socha's testimony in the prosecution of the case
6  against Crowley?
7      A.  No.
8      Q.  You sat for an interview with Regis at one
9  point in connection with this lawsuit?
10     A.  What?  I'm sorry.  What was that?
11     Q.  You sat for an interview with Regis at one
12 point in connection with the issues raised in this
13 lawsuit?
14     A.  Correct.  He -- he requested -- requested
15 or -- I think it was more -- it was ordered or what.
16 But I did sit with him and Sergeant Matt Breen in
17 Regis's office at the time in regards to my part in
18 this.
19     Q.  What, if anything, did you understand Breen's
20 role to be in that meeting?
21     A.  Breen's role -- I -- I went there just to have
22 another person there with me in regards -- There was --
23 There was some issues in the way that it was being
24 presented to us.  Because under -- because under the

11  (Pages 32 to 35)

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 36

1   IPTA, you know, we have certain rights when it comes to
2   giving testimony and --
3       So there was issues with being forced to give
4   statements and then there was talk about those
5   statements being used criminally against you later. And
6   they're like, well, hang on a second; if you're being
7   forced to give statements, you know, they can't be used
8   against you criminally. So there was issues with that.
9   And so just to kind of, like -- as a -- as protection
10  on -- being a union member I had my union rep come and
11  represent me.
12      Q.  So that -- that Breen was the union rep?
13      A.  Correct.
14      Q.  Got it.
15      A.  Sorry. I should have said that.
16      Q.  Was the meeting audio recorded?
17      A.  Yes. I believe Sergeant -- Sergeant Breen
18  audio recorded it.
19      Q.  Have you ever heard that audio recording?
20      A.  I have not.
21      Q.  Have you ever seen a transcript of that audio
22  recording?
23      A.  I have not.
24      Q.  Other than these documents we've talked about

Page 37

1   earlier that you've reviewed in preparation for the
2   deposition, have you yourself given any written
3   statements regarding any of the issues raised in Socha's
4   complaint?
5       A.  No.
6       Q.  Has the union ever called any meetings
7   relating to any of the facts and issues raised by
8   Socha's complaint?
9       A.  Involving me or, like, speaking with me on it?
10      Q.  With the union -- the gathering of union
11  members generally?
12      A.  That, I don't know. I -- I wouldn't be privy
13  to that.
14      Q.  Do you have any plans to leave the Joliet
15  Department in the next few years?
16      A.  No plans.
17      Q.  Okay.
18      A.  No.
19      Q.  So as far as you know right now, if we had to
20  reach you at a trial that was a year, two years, three
21  years out, we could reach you through the Joliet Police
22  Department?
23      A.  Yes.
24      Q.  Did you ever serve in the military?

Page 38

1       A.  No.
2       Q.  In the May, June, and since timeframe, did the
3   Joliet Police Department have rules, regulations, SOPs,
4   or codes of conduct that provided that officers should
5   treat one another professionally?
6       A.  I'm sorry. Was that a question?
7       Q.  Yes, sir.
8       A.  I'm sorry. What was it again?
9       Q.  Beginning -- Since May of 2018 at least, did
10  the Joliet Police Department have rules or regulations
11  or codes of conduct that provided that officers were
12  expected to treat one another professionally and as
13  fellow law enforcement professionals?
14      A.  Yes.
15      Q.  And to treat one another with dignity and with
16  respect?
17      A.  I believe it states something very similar to
18  that.
19      Q.  And not to treat female officers in a sexist
20  or misogynistic way?
21      A.  I believe so, yes.
22      Q.  And not to discriminate against female
23  officers on the basis of their sex?
24      A.  Yes.

Page 39

1       Q.  When Socha was investigated beginning of -- in
2   May of 2018, Joliet Police Department General Order 16-1
3   relating to evidence and property management complied to
4   that investigation?
5       MS. PROCTOR:  I'm just going to object based on
6   form and foundation.
7       MR. ADAMS:  Sure. That's well taken. I'll ask a
8   couple of foundational questions.
9   BY MR. ADAMS:
10      Q.  You're familiar aren't you, Lieutenant Botzum,
11  with General Order 16-1?
12      A.  What is 16-1?
13      Q.  The subject of which is evidence and property
14  management?
15      A.  I'm sure I've reviewed it at some point.
16      Q.  That general order applied to the handling of
17  evidence obtained in the Department's investigation of
18  Socha, didn't it?
19      MS. PROCTOR:  Same objection, form and foundation.
20      You can go ahead and answer, witness, to the
21  extent you can. I just need to make the objections for
22  the record.
23  BY THE WITNESS:
24      A.  Yeah, I believe so.

12  (Pages 36 to 39)

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 40

1    **Q.** Are you familiar with the Joliet Police
2    Department General Order 7-2, the subject of which is
3    complaints against the agency or its employees?
4    **A.** Yes.
5    **Q.** That is central to the work that you now do in
6    internal investigations and internal affairs, correct?
7    **A.** That I'm in investigations -- or internal
8    affairs?
9    **Q.** Yes, sir.
10   **A.** Yes.
11   **Q.** That general order, 7-2, applies to the
12   Department's investigation of Socha?
13   MS. PROCTOR: Objection, form and foundation.
14   BY THE WITNESS:
15   **A.** You're asking me if that's -- I was not in
16   invest- -- or internal affairs at that point nor was I
17   part of any complaint or anything. So that -- I don't
18   have any standing on what was happening or what they
19   were deciding to do at that point.
20   **Q.** And that wasn't exactly my question, but I
21   appreciate what you said.
22        My question was whether that general order,
23   7-2, applied to the Department's investigation of
24   Officer Socha, an employee of the agency.

Page 41

1    MS. PROCTOR: Same objection, form.
2    BY THE WITNESS:
3    **A.** Yeah, I -- I mean, you could sit there and
4    take any complaints -- You know, I mean, I'm not -- I
5    guess I'm not understanding your question. What -- what
6    are you -- Are you trying to have my personal
7    perspective on this complaint back then?
8    **Q.** On whether that general order relating to
9    complaints against the agency and its employees applied
10   to the Department's investigation of Officer Socha.
11   **A.** I don't know. I can speak generally on
12   complaints. I can speak specific on complaints that I'm
13   aware of. I'm not familiar with her complaint
14   specifically, so I can't answer that.
15   **Q.** Just to be clear -- And maybe I -- This is the
16   confusing point. I'm not talking about Socha's
17   complaint in this lawsuit. I'm talking about the
18   Department's investigation of Socha back in May of 2018.
19   **A.** My --
20   **Q.** So I'll reframe the question, if it makes a
21   difference.
22        Did that general order, 7-2, apply to the
23   Department's investigation of Socha?
24   MS. PROCTOR: Same objection, form and foundation.

Page 42

1    MR. ATKUS: Objection, asked and answered.
2    BY MR. ADAMS:
3    **Q.** You can answer it.
4    **A.** I can answer?
5    **Q.** Yes.
6    **A.** Okay. So I was not part of the internal
7    investigation. My part was small as -- as they were
8    asking me to do one part of this. So whether this is
9    the --
10   **Q.** You've gone dark and quiet.
11   MR. ATKUS: We lost Chris.
12   THE WITNESS: Hang on.
13   MR. ADAMS: Lieutenant Botzum, we can't see you or
14   hear you.
15   THE WITNESS: I'm coming back.
16   MR. ADAMS: We still can't see you or hear you.
17   THE WITNESS: Hang on. Can you hear me?
18   MR. ATKUS: Yeah, I can hear you.
19   MR. ADAMS: Yeah.
20   THE WITNESS: For some reason -- I'm not sure what
21   happened. Give me --
22   MS. PROCTOR: Take your time.
23   THE WITNESS: Let me come back in. All right.
24   Well, it says it should be up, but it's not. Huh. But

Page 43

1    you guys can hear me right now?
2    MR. ADAMS: Barely.
3    THE WITNESS: Barely? I can try to answer while I
4    try to figure out -- Or do you guys -- Is it possible
5    for me to exit and come back in really quick or is
6    that ...
7    MR. ADAMS: Yeah, that's fine.
8    MS. PROCTOR: Take your time.
9        (A short break was had.)
10   MR. ADAMS: Can you read back the last question
11   that preceded our technological snafu?
12        (Record read as requested.)
13   BY THE WITNESS:
14   **A.** I don't know.
15   **Q.** Okay. Are you familiar with a lawyer with the
16   state appellate prosecutor's office named Lorinda
17   Lamken, L-A-M-K-E-N?
18   **A.** I am familiar with her in two ways.
19   **Q.** How is that?
20   **A.** I believe either -- I don't know where I heard
21   her name before. I don't know if it was through the
22   press or something like that. But I had to call her in
23   regards to the FOIA that we had.
24   **Q.** The FOIA that you got for information relating

13  (Pages 40 to 43)

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 44

1   to the Socha matter?
2       A.  I believe so.
3       Q.  Do you remember --
4           And did you, in fact, call her and speak to
5   her?
6       A.  I did.
7       Q.  Do you remember when that occurred?
8       A.  I do actually because I actually have it here.
9   October 12th of 2020.
10      Q.  Did you make any record, notes, or memoranda
11  of that conversation?
12      A.  Ironically, I had it here on my -- on my
13  computer.  But, basically, I believe it was in regards
14  to the FOIA request.
15      Q.  What do you recall she saying to you and you
16  saying to her?
17      A.  The only thing, if I recall, is I think it
18  just had to do with what we were authorized to release
19  in regards to the investigation from her standpoint.
20      Q.  You mentioned you knew her a couple ways.
21  That's one of them.  Was there another?
22      A.  Yeah.  And I believe I heard her name or
23  something from, like, the press or something.  I never
24  spoke with her before or had any interaction with her.

Page 45

1       Q.  So that conversation was the one and only time
2   you have spoken with Lamken?
3       A.  Yes.
4       Q.  In that conversation, did Lamken tell you
5   what, if any, role Socha's testimony had played in the
6   outcome of the Crowley trial?
7       A.  He did not.
8       Q.  Did the Crowley case come up at all in that
9   conversation?
10      A.  Not that I recall.
11      Q.  Did Lamken say anything in that conversation
12  about Socha other than as it related to the FOIA?
13      A.  The only thing I recall is -- I believe she
14  said she was not the special -- special -- a prosecutor
15  again, and I thought she said it was someone else who
16  was doing it.  And I don't recall.  I'm sure I have it
17  down in the FOIA because I document it that way.  But I
18  don't recall what specifically was her determination on
19  what went out.  I'd have to sit there and go back on the
20  FOIA and determine what was actually said.
21      Q.  In May and June of 2018, the Department's --
22  the Department had a single Cellebrite terminal?
23      A.  I don't -- I was not in investigations at that
24  point.  I don't recall what they had.

Page 46

1           Are you talking about in 20- -- In what year?
2       Q.  2018.
3       A.  Oh, 2018.  I apologize.  I thought you were
4   talking about 2020.
5           In 2018, from what I recall, they had a
6   Cellebrite computer and then they had a laptop that was
7   a MacBook that ran the Lantern program.
8       Q.  All right.  And they were both located in the
9   investigations division area of the police department
10  offices?
11      A.  Yes.
12      Q.  And the Cellebrite was accessible by a common
13  password?
14      A.  I don't recall, but it's possible.
15      Q.  How about the Lantern?
16      A.  I don't recall.
17      Q.  When -- So all my questions now relate to that
18  same time frame.  When an officer went onto the
19  Cellebrite, how, if at all, would the officer doing that
20  identify himself or herself?
21      A.  What do you mean?
22      Q.  So was it necessary for the officer accessing
23  the data on the Cellebrite to enter any personal
24  identifying information whether that's a name, a badge

Page 47

1   number, a passcode, or any other identification that was
2   personal to that particular officer?
3       A.  Are you talking about viewing or are you
4   talking about doing an extraction?
5       Q.  Viewing.
6       A.  Viewing, if I remember how the Cellebrite
7   works -- It's been a bit.  I believe there is nothing
8   that dictates who was viewing what, if that's -- if I'm
9   understanding your question correctly.
10      Q.  Right.  So if someone -- anyone went on the
11  Cellebrite to view data that had been -- that had
12  already been extracted from a phone, there wasn't
13  anything about the Cellebrite that would capture the
14  identity of that viewer?
15      A.  I don't know.  I don't know the -- the audit
16  capabilities of Cellebrite.
17      Q.  You say the audit, A-U-D-I-T?
18      A.  Audit, A-U-D-I-T.  Correct.
19      Q.  To view data that was extracted from Socha's
20  iPhone while it was on that Cellebrite, walk us through
21  the steps that the viewer would have to go through in
22  order to view the data.
23      A.  So once the phone is -- is extracted and
24  everything is completed, is that what you're asking?

14  (Pages 44 to 47)

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 48

1      Q.  Yeah.  So the extraction is done.  The data
2   that has been extracted from the iPhone is in the
3   Cellebrite.  Walk us through the steps that the viewer
4   now has to go through in order to view the data that was
5   extracted.
6      A.  So just, mind you, I haven't done this in a
7   while, so I'm trying to do this off memory.  But if I
8   remember correctly, once you have an extraction that's
9   completed within Cellebrite, it creates a -- a -- like,
10  a viewer, a reporter which if -- if I'm remembering this
11  correctly again.  It's been a bit.  It will parse out
12  the information.  You have to use a Cellebrite viewer or
13  proprietary software, and it will bring up the
14  extraction again.  And from that point on, you could sit
15  there and go through the data that would be on that
16  extraction.
17     Q.  Okay.  I appreciate -- That's helpful.  But as
18  unfamiliar with it all as I am, I want to do it a little
19  bit more by the numbers.  So I'll try to walk us through
20  that.
21        At any given time the hard drive for the
22  Cellebrite would hold data that had been extracted from
23  computer devices relating to many investigations that
24  were ongoing, true?

Page 49

1      A.  From what it appeared -- Because, like I said,
2   I wasn't doing extractions from there all the time --
3   Actually, really mostly almost never.  There were other
4   extractions that were on that computer.  From my
5   understanding, that is where all of the cell phone
6   extractions were being kept.  And I think it was either
7   tied to a server or something that can store the large
8   amount of data because the Cellebrite -- I'm sorry.
9   These -- The extractions are extremely large in size.
10  So you have to have a good storing house in place to put
11  those extractions.
12        So I believe the data was -- And I'm not sure.
13  Again, not being in there often and not using it and
14  it's been some time -- And probably Detective German
15  would be much more better to answer this question.  But
16  my understanding is there was some sort of storage
17  network drive or storage device or something that was
18  storing all the cell phone extractions due to how large
19  the extractions can be.
20     Q.  All right.  So back to my by-the-numbers
21  step-by-step question, let's take it one at a time.
22        What was the Cellebrite device left powered
23  on?  It was always turned on, electrical power running
24  to the device, or would somebody who wanted to view

Page 50

1   extracted data have to turn it on?
2      A.  I don't know if it's ever been -- If it's
3   turned off, turned on, I don't know because I'm not -- I
4   wasn't in investigations at the time.  I -- You know
5   what?  I don't recall.
6      Q.  Okay.
7      A.  I don't recall if I had to turn it on when I
8   used it, if it was already on.  That, I don't recall.
9      Q.  Okay.  So somebody turns it on.  At some time,
10  it's on.
11        Now, you want to view data that has been
12  extracted in the -- from Socha's iPhone as part of the
13  investigation into Socha's conduct.  You've entered the
14  password, whatever that password was, and that gets you
15  access to the extracted data, correct?
16     A.  What do you mean by "password"?
17     Q.  Well, there was a -- Was there a password that
18  had to be entered in order for an investigator to view
19  data?
20     A.  I don't --
21     MR. ATKUS:  Objection, asked and answered.
22        Go ahead.
23  BY MR. ADAMS:
24     Q.  Go ahead.

Page 51

1      THE WITNESS:  I may answer?
2      MR. ATKUS:  Yes.
3   BY THE WITNESS:
4      A.  Okay.  If you're talking about -- Are you
5   talking about a password to get into the computer or are
6   you talking about a password to get into a phone or are
7   you talking about a password just to view the
8   extraction?
9      Q.  A password just to view the extraction.
10     A.  I don't recall if -- if Cellebrite had its own
11  login.  Each -- each individual extraction would not
12  have its own password, if that's what you're asking.
13     Q.  No.  And I appreciate that -- appreciate the
14  clarification.
15        So just to get into the extractions that are
16  already in Cellebrite -- all of them, not just one
17  particular -- a password was needed, true?
18     A.  I don't -- I don't recall.
19     Q.  So the machine is on.  Whether there was a
20  password required or not, you don't know.  And now we
21  want to find the data that was extracted from the Socha
22  iPhone.  What would be the next step?
23     A.  So, like I said, I'm trying to go from my
24  memory.  There would be a -- And this could have

15  (Pages 48 to 51)

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

---

Page 52

1   changed -- Excuse me. This could have changed by now,
2   but --
3        And, again, if I remember correctly, there was
4   a -- So you had the extraction software that would
5   actually extract the data, and then you would have a --
6   I guess, a report reviewer. I think it was -- I'm
7   trying to remember the name. I think it's called
8   physical analyzer, is --
9        It will parse out the data. And you would use
10  that program to sit there and do your searches. So --
11  And, again, if I'm remembering correctly, every time you
12  opened it up, you would have to reparse out the
13  extraction. And it could take some time to put things
14  into categories within the Cellebrite.
15       Q.  Okay. What -- what would the officer who was
16  attempting to view the data that had been already
17  extracted from Socha's iPhone have to do to make sure
18  that he got access to that data instead of the data from
19  the Jones or the Smith or the Johnson investigations?
20       MS. PROCTOR: I'm just going to object based on
21  form and foundation for the record.
22  BY THE WITNESS:
23       A.  So I -- I can -- I can -- I can articulate
24  on -- on the Socha extraction specifically because

---

Page 53

1   that's the one that I was a part of.
2        Q.  Okay.
3        A.  And I can explain how that was done, but it's
4   going to take a little bit of a -- starting from the
5   beginning if you want to hear it.
6        Q.  So I'm not as interested in the extraction
7   part as in what was necessary to view what had already
8   been extracted from her iPhone.
9        A.  So --
10       MS. PROCTOR: Is there -- is there a question
11  pending?
12       MR. ADAMS: Yes.
13       MS. PROCTOR: What is it? Can you read it back for
14  my benefit? I think we don't have a question.
15           (Record read as requested.)
16       MS. PROCTOR: Same objection, form and foundation.
17  BY MR. ADAMS:
18       Q.  You can answer, Lieutenant.
19       A.  So when -- The best way I can answer this is
20  when I did the extraction, I specifically -- And I don't
21  recall exactly where it was put on -- on the computer.
22  But I remember telling Sergeant Grizzle -- I said --
23       Now, my spot -- my -- my position was not in
24  investigations. I'm not doing the investigation. I was

---

Page 54

1   asked to assist with the extraction from -- of the cell
2   phone because of the warrant.
3        But once the extraction was done, I advised
4   Sergeant Grizzle -- I said -- And I told him because it
5   was very -- I don't know how else to put this but very
6   vanilla. Like, I didn't have her name on there. At
7   least from what I recall, there was nothing on there
8   that stated that was her phone -- her extraction. And
9   -- and I'd have to recall where it was put. But I
10  thought maybe I might have put it under German's name or
11  something to that effect under his -- He did a lot of
12  cell phone extractions and -- And I could be incorrect
13  on that, but my gut tells me it was put in there.
14       And I remember telling Sergeant Grizzle -- I
15  said, "Here's your extraction. Here's where it's at."
16  And I purposely -- Because there was -- He made
17  indiction when he got the phone from Officer Socha that
18  she was very upset. She said there was things that were
19  personal on there and she didn't want people going
20  through her phone. So, obviously, I'm not going to go
21  do that.
22       And when I was advising Sergeant Grizzle, I
23  told him, "This was put in a certain position." I said,
24  "If you need to get back in there for wherever your

---

Page 55

1   investigation is going, this is where it's located." I
2   don't remember the exact location.
3        And I'm not sure if this is answering your
4   question, but this was kind of what -- You know, if a
5   person was going to go in there and look for Officer
6   Socha's phone, they -- they shouldn't be able to find it
7   using her name or anything else like that. And it was
8   put in a particular position or in a particular spot
9   where I advised Sergeant Grizzle that this is where this
10  is at. If you need this later, this is where you can go
11  to do whatever else you need to do as part of this
12  investigation.
13       So that was -- I'm not sure if that answers
14  your question, but it's kind of -- From what you're
15  asking, that's kind of my answer to that, if that helps
16  you.
17       Q.  Okay. I appreciate that. I think we're both
18  trying to get to the same nut of the thing here.
19       When you did the extraction, do you recall how
20  you labeled the data in the Cellebrite system?
21       A.  The only thing -- I don't remember exactly how
22  it was labeled, but I do recall being -- Whatever it was
23  labeled, it was purposely not labeled with her name.
24  And I advised Sergeant Grizzle of that due to the fact

16  (Pages 52 to 55)

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 56

1   of her concerns when the phone was taken from her down
2   in the watch commander's office.
3       Q.   When you extracted the data from Socha's phone
4   onto the Cellebrite, did you do anything to secure it in
5   such a way that only authorized personnel could go in
6   and access that data?
7       A.   I don't believe I had a way to specifically
8   secure it so no one else can get in there.  My
9   understanding -- And, again, not being in the unit and
10  not working on those cases in a unit, my understanding
11  is that -- that Cellebrite was secure on its own, from
12  my understanding, and that it wasn't being used by
13  everyone within investigations.
14      And when I -- when I left or when I was
15  speaking to Sergeant Grizzle, obviously, I explained to
16  him where it was at, where it was located.  And from
17  that point, my understanding or my -- my position on
18  that is this is now his case.  Whatever happens to it
19  is -- goes from there.
20      Q.   Did you tell anyone other than Grizzle how to
21  locate the Socha iPhone data on the Cellebrite?
22      A.   The only person I can think -- if I would have
23  said anything to -- and I'm not even sure if I did --
24  would have been Detective German.  But I don't recall

Page 57

1   ever even saying that to him.  But I don't want to say I
2   didn't because I -- It's possible because I was -- I
3   asked him to do something else for me later on.
4       Q.   Even if you don't remember specifically how
5   you labeled the Socha iPhone data in the Cellebrite, did
6   you label it in some way?
7       A.   I don't recall how it was labeled.  I don't
8   remember if it was auto generated from the Cellebrite,
9   which is very possible.  And I -- Without using it and
10  being familiar with it again, I'd have to sit there and
11  look at the system again, how it does it.  But I do --
12  Like I said, the only thing I could say is I remember
13  specifically not labeling it as Socha's.
14      And I remember advising Sergeant Grizzle of
15  the location and putting it into a position or in a spot
16  where, in my opinion, you know, no one should be -- no
17  one should be looking.  And I -- and I don't recall
18  exactly where that was at.  And maybe Detective German
19  can probably enlighten you more on where it was located,
20  but I don't recall.
21      Q.   Did you put it in a location in the Cellebrite
22  where one would have to know where to look for it?
23      MS. PROCTOR:  Objection, based on form and
24  foundation.

Page 58

1       MR. ATKUS:  Yeah, objection, calls for speculation,
2   I think, too.
3   BY THE WITNESS:
4       A.   Answer?
5       Q.   You can answer.
6       MR. ATKUS:  You can answer.
7   BY THE WITNESS:
8       A.   So -- so my thought on this was -- And, you
9   know, she had a concern when -- when her phone was taken
10  and she had a concern that she had -- the way Sergeant
11  Grizzle was explaining it to me that she had personal
12  things that were on her phone and, you know, just for
13  her own privacy and everything else like that.  And it's
14  a very sensitive, you know, thing for someone to have
15  your phone.
16      I put it somewhere where, in my belief, a
17  normal person or a normal detective would not go, if
18  that answers your question.
19      Q.   And where was that?
20      A.   I don't -- And that's the thing is I don't
21  recall exactly where it was.  I thought maybe -- And I'm
22  trying to remember again.  It's been a while.  It might
23  have been broken up into either people's names or
24  something like that.  Maybe German had his own name with

Page 59

1   his own extractions and different things like that.  I
2   remember putting it somewhere.  I remember showing
3   Sergeant Grizzle it was put here to let him know that,
4   you know, no one -- no one should be able to find this.
5   And if you need it for whatever, your information going
6   forward would need it for, it would be located here.
7       Q.   Okay.
8       A.   And he might be able to, you know, answer that
9   better and Detective German might be able to answer that
10  better because I can't.  I just, unfortunately, don't
11  remember exactly the location.  But I remember purposely
12  doing it and -- Not to bring someone else involved in
13  this, but -- And this person was not part of my
14  extraction.  But I did have a partner that night that
15  was not -- didn't see anything, you know, just kind of
16  standing off in the distance but was there when I did
17  the extraction, if that makes any sense.
18      Q.   Who was that?
19      A.   That was Officer Dave Szymanski.  He was an
20  officer.  He was a tactical officer at the time.  But he
21  wasn't part of it.  He didn't see me do any of the
22  extractions and, you know, or any of that.  He was
23  more --
24      Just for full disclosure, you know, in that

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 60

1    room when we were doing the extraction, it was
2    Sergeant Grizzle; it was me; and it was Officer Dave
3    Szymanski.  And like I said, Dave Szymanski -- I don't
4    blame him -- wanted nothing to do with this, was off in
5    a corner somewhere not even in view of the screen and --
6    But just for openness, that's who else was in the room.
7        Q.  Okay.
8        A.  I'm not trying to bring someone else in this,
9    but that's who was there.
10       Q.  When you did the extraction, did you have any
11   more information about what of a personally sensitive
12   nature to Socha was on that phone?
13       A.  If I recall, it was like either -- she had
14   personal stuff on there that she didn't want people
15   seeing.  I didn't -- Obviously -- And this is coming
16   from Sergeant Grizzle.
17           I didn't want to know.  I didn't want, you
18   know, what -- For what he was asking for me to do, I
19   didn't need to go in and look at pictures or anything.
20   So I was able -- For what he was asking me to do and
21   knowing the software and knowing what I was looking for,
22   I didn't need to sit there and start going through
23   pictures or anything like that.
24       Q.  Did Grizzle tell you that the sensitive

Page 61

1    information were pictures?
2        A.  I don't -- I don't recall if he said it was
3    pictures.  He said it was sensitive things she didn't
4    want people to see.  It could have been pictures --
5        Q.  Any more detail than that?
6        MS. PROCTOR:  Would you let him finish?  You cut
7    him off.
8        BY MR. ADAMS:
9        Q.  Any more detail than that?
10       A.  I don't recall.  Like I said, he could have
11   said pictures.  He could have said videos.  He could
12   have said just personal things.  I don't recall the
13   exact thing.
14           What I do recall is -- was she was upset.  She
15   didn't want -- She initially, I guess, didn't want to
16   give up her phone.  She eventually did.  And she made
17   the statement, I believe, according to Sergeant Grizzle
18   which was in front of Lieutenant Brown, the watch
19   commander's office that she was concerned about the
20   information being shared on her phone and she didn't
21   want either being viewed or something to that effect.
22       Q.  Okay.  At some later point in time, did you
23   come to learn that the extraction included both
24   photographic and videographic images of Officer Socha

Page 62

1    nude and engaged in sexual acts?
2        A.  The only thing I ever heard on that is when
3    the warrant -- or not the warrant -- the lawsuit came
4    out and there was allegations at that point.
5        Q.  Have you heard that from any source other than
6    the allegations in her complaint?
7        A.  No.
8        Q.  Since that complaint was filed, have you heard
9    any other officers talk about the fact that there were
10   nude and sexually explicit images of Officer Socha
11   extracted from her iPhone?
12       A.  The only thing I heard is the rumors that
13   people in investigations had viewed it.  And what they
14   viewed, I'm not sure what it was, images or videos or
15   something to that effect.  And this -- this was after
16   the lawsuit was filed.
17       Q.  Who have you heard viewed those images?
18       A.  The only thing I heard was just people from
19   investigations.  Specifically, I don't recall.  I ...
20       Q.  What have you heard the images viewed by
21   personnel in investigations depicted?
22       A.  I don't know.
23       MS. PROCTOR:  Objection, asked and answered.
24           You just answered again.

Page 63

1            Did you get his -- Did you get the witness's
2    answer, Ms. Court Reporter?  You nodding?
3        THE REPORTER:  Yes, I did.
4        THE WITNESS:  Sorry.  I answered too quick.
5        BY MR. ADAMS:
6        Q.  Have you heard any Joliet officers comment on
7    Socha's appearance in those images?
8        A.  No.
9        Q.  Have you heard any Joliet officers comment on
10   the depictions of Socha engaged in sexual acts in those
11   images?
12       A.  No.
13       Q.  Secondhand, have you heard of such comments?
14       A.  No.
15       Q.  Did you play any role in extracting Socha's
16   iPhone to the other device?  Bear with me.  Not the
17   Cellebrite, but the other one.
18       A.  The Lantern?
19       Q.  Yes, sir.
20       A.  Yes.
21       Q.  And what exactly was your role in that?
22       A.  So it happened the same day.  And I think I
23   may have talked about this earlier.
24           So when you have -- So when I did the

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 64

1    extraction off the Cellebrite and Sergeant Grizzle was
2    looking for a certain text messaging -- a certain phrase
3    in the text messaging to a certain person -- And within
4    the Cellebrite software you can sit there and just go
5    through text messaging and you can -- and you can narrow
6    it down to two people talking.
7            So that's exactly what I did.  I had two phone
8    numbers, extracted it, found the text messaging.  And
9    according to my report, it said that there was two
10   deleted text messages that were on there but they were
11   not the two that Sergeant Grizzle was referring to.
12           Through my experience working on cell phone
13   forensics and stuff like that I'm aware within iPhones
14   there's -- everything is done on a database.  So -- And
15   once you extract, within Cellebrite what it does is it
16   extracts all the databases within that phone.  And
17   within the databases has all the data.  And I know
18   through experience is that, like, Cellebrite does not
19   always gather or -- excuse me -- get all the
20   information -- Losing my voice.
21           So what I ended up doing is I ended up going
22   into the SQL -- using a SQL database.  I'm not sure if
23   you're familiar with SQL, but it reads -- it could read
24   the database.  And it's -- This is the core of what an

Page 65

1    iPhone uses.  And within there there's a thing called
2    SMS, which is basically a store- -- is a storing house
3    of all the text messaging within a cell phone.  And it
4    can keep cell phones that are -- or messages that are
5    deleted and not deleted and so forth like that until
6    some point that a system will actually wipe it out
7    completely and we can't get it at all.  But --
8            So I use the Cellebrite SQLite, which I've
9    used before in other cases.  And I was able to bring up
10   that database.  And within a certain parameter I typed
11   in the text messaging that he was looking for, and I did
12   find remnants of that text message within there.  And I
13   believe I did a screen shot, created a disk, and gave it
14   to Sergeant Grizzle.
15           But with my experience also and knowing I
16   couldn't tell if this message was sent, received, you
17   know, where it came from, date and time, and all that
18   stuff -- So what we've always done on numerous
19   occasions -- and I learned this when I was up in Chicago
20   on the task force -- is you use a different program, you
21   know, and you kind of verify your results.
22           So what I ended up doing at that point is I
23   took the phone and I put it on Lantern.  And at that
24   point, I believe I did another extraction off the

Page 66

1    Lantern, which is off of iMac or on a MacBook,
2    obviously.  So what happened then is it extracted the
3    data from the phone on that one.
4            And then for whatever reason where the
5    Cellebrite was able to parse out the information and put
6    it into a nice report in a fairly quick manner this
7    Lantern program maybe because of the hardware that it
8    was running on was taking much longer and to the point
9    where, you know, it -- I was there for -- And I couldn't
10   tell you the amount of time.  I was there for quite an
11   amount of time waiting for this thing.  It didn't look
12   like it was going to get done for a long time.
13           So at that point, knowing that Detective
14   German has been on -- was on this case prior -- he
15   assisted Sergeant Grizzle with the complainant on this
16   initially or victim or however you want to call her in
17   regards to this complaint -- and plus his knowledge in
18   using this software and everything else, so I called him
19   up and advised him, "Hey, this thing is parsing out,"
20   seeing if he was going to be working the next day.  He
21   stated he was.  I asked him if he can sit there and keep
22   an eye on it and let me know when it finished.
23       Q.  In connection with an extraction of data from
24   an iPhone, does Cellebrite allow you to search for

Page 67

1    specific data like a text message without also
2    displaying other types of data such as e-mails and
3    photographs and videos?
4        A.  Are you asking if you can just search directly
5    for text messaging without having to look at anything
6    else?
7        Q.  Yes, sir.
8        A.  Yes.
9        Q.  Is that true also of Lantern?
10       A.  I don't recall on the Lantern.  And I did not
11   see the final product of the Lantern when it was
12   finished.
13       Q.  On Cellebrite to search for photos must one
14   specifically look for photos?
15       A.  Yes.
16       Q.  In order to search for video images, must one
17   specifically search for video images?
18       A.  You can, yeah.
19       Q.  But I'm not just -- You can.
20           But in order to get video images on
21   Cellebrite, you have to specifically look for video
22   images, don't you?
23       A.  If I remember correctly how the software
24   works, there are categories for photos.  There's

19  (Pages 64 to 67)

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 68

1    categories for videos. And if you're looking in like --
2    And, again, my memory is -- I've got to remember this --
3    certain text messaging or certain apps like -- I don't
4    know -- like TikTok or -- I don't even think -- TikTok's
5    not the right one, but, like, you know, some of the
6    social media apps could imbed pictures in a text
7    messaging stream. So if you had a text message between
8    two people, it could put the images in there too or it
9    can parse out and have its own category of photos.
10       Q. If all you want to look at are text messages,
11   you can -- you can search or query just for text
12   messages?
13       A. Yeah. You can just look at the text messages.
14   And I don't recall if pictures -- if you can just
15   eliminate -- Are you talking like where -- with pictures
16   being shown up also or are you talking about just --
17       Q. It's just text messages, whatever their
18   content. And I get that pictures can be in text
19   messages. But I -- If what you're looking for are text
20   messages, you can search for just text messages, true?
21       A. Yeah. And that's exactly what I did. So I
22   looked for her cell phone and I looked for the other
23   person's cell phone. And I was able to -- There's a
24   way -- It's not called grouping, but you -- you parse

Page 69

1    those out. And that's only two messages that you look
2    in. You can see in the back-and-forth between the two.
3    So that's the -- exactly what I did between those two
4    phone numbers that I had.
5        Q. And your answer just now pretty much addresses
6    my next question. But I want to make it clear --
7        A. Sure.
8        Q. -- that in searching for text messages on
9    Cellebrite, you were also able to further narrow the
10   search to text messages from one cell phone device to
11   another cell phone device, correct?
12       A. Correct.
13       Q. And you were able to search for specific text
14   messages between a sending device and a receiving device
15   without looking for all the other data that was
16   extracted from a cell phone, correct?
17       A. Correct.
18       Q. Was that also true of Lantern?
19       A. I don't recall. Like I said, I -- I was more
20   familiar with Cellebrite. But what I was -- What my
21   understanding of Lantern and, like, I said, the reason
22   why we did it is because it pulls information
23   differently. It can pull up possible dates and times
24   that Cellebrite did not.

Page 70

1        So we've had previous cases that Cellebrite
2    would miss something and, like, Lantern or -- And I'm
3    trying to remember if there was other forensic software
4    used for cell phones at the time. And I've got to
5    remember what they were. But either way they would pull
6    up information differently off -- off the same phone,
7    but those different companies for whatever reason
8    extracted things differently.
9        Q. In using Cellebrite to search for and find the
10   text messages you were asked to search for and find, you
11   did not also have to look through pictures and videos
12   and e-mails, true?
13       A. No.
14       Q. That's correct?
15       A. Correct.
16       Q. In connection with the work that you were
17   asked to do in the Socha investigation, were you ever
18   shown a copy of the search warrant pursuant to which
19   Socha's iPhone was seized and the search of the data on
20   that phone authorized?
21       A. I believe I reviewed it. I believe Sergeant
22   Grizzle gave me a copy of it or had me review it prior
23   to him going down and retrieving the phone from her.
24       Q. In this time frame, the May 2018 time frame,

Page 71

1    was it common for a sergeant in the tactical unit to be
2    involved in an internal investigation of another Joliet
3    officer?
4        A. Yes.
5        Q. And was that role of sergeants in the tactical
6    unit in internal investigations at Joliet officers
7    limited to the forensic IT support like that which you
8    provided in this particular investigation?
9        A. Yeah. So I've been -- There was -- There's
10   been several internal investigations that I got involved
11   in or asked to assist on while I was in -- as a tactical
12   sergeant. And it had to do, I believe, with the fact
13   that I was still an associate member with the FBI's
14   forensic laboratory.
15       And the reason why I was still an associate
16   member is because we didn't put another member up
17   there -- a full-time member until later last year. So
18   we didn't want to lose that position there and the
19   resources that we get from it. So they were using me
20   kind of almost like a holding place for it.
21       And when big things came up and the fact that
22   I was a sergeant, they were using my abilities and I'd
23   even say connections up in Chicago to do certain cases
24   that they needed done that were high priority or

20 (Pages 68 to 71)

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 72

1    sensitive in nature or things like that.
2        Q.  Mark Reid is a fellow officer of yours?
3        A.  He is.  I believe he's retired now, retired
4    lieutenant.
5        Q.  And he was a lieutenant in the internal
6    affairs unit?
7        A.  He was at -- at one point.  It could have been
8    during that time frame.
9        Q.  Was Lieutenant Reid given a copy of the
10   contents of Socha's iPhone?
11       A.  I have no idea.
12       Q.  At some later point, you acted as -- and you
13   can correct my verbiage if I don't have it exactly
14   right -- an intermediary between the department and RCFL
15   in conjunction with the forensic inquiry into the
16   allegations made by Socha in this case, correct?
17       A.  Are you asking if I was like a liaison
18   between --
19       Q.  Yeah.  Liaison.
20       A.  -- RCFL and --
21           Yeah, for the most part.
22       Q.  Who detailed you to that specific -- as you
23   call -- liaison duty?  Was that Roechner?
24       A.  It was Roechner.  I don't recall if it was --

Page 73

1    It was Ben before that.  But I know I did at one point
2    respond to Roechner.
3        Q.  You're familiar with a department -- I guess
4    he's a former department employee named Bergner?
5        A.  Am I familiar with him?
6        Q.  Yes, sir.
7        A.  Yes.
8        Q.  Was he a sworn officer?
9        A.  Yes, he was.
10       Q.  In May of 2018, what did he do for the
11   department?
12       A.  In May of 2019?
13       Q.  '18.
14       A.  '18?  He might have been assigned to records
15   maybe doing IT stuff, I think.  I don't recall.  I'm
16   sorry.
17       Q.  His particular background was IT?
18       A.  Yeah.  So he -- he was a sworn officer, but he
19   was working and doing a lot of the IT stuff around the
20   department.  And I don't know exactly where he was
21   assigned to, but he was kind of like our IT person at
22   that time for the department.
23       Q.  Did you ever have any discussion with Bergner
24   about any IT issues associated with the investigation of

Page 74

1    the contents of Socha's iPhone?
2        A.  No.  I don't recall at all.
3           Are you talking about like -- Are talking
4    about just IT-network-type stuff or are you talking
5    about an actual -- in regards to the -- I -- Because I
6    don't recall ever having any conversation with him.  I
7    just want to make sure I'm answering this correctly.
8        Q.  Fair.  Are you aware of whether he played any
9    role at all in handling IT relating to the Socha
10   investigation in any way, shape, or form?
11       A.  I -- I don't have any memory or any knowledge
12   of him doing that unless there was something in regards
13   to a computer issue or something.  I don't recall.  And
14   not that I can recall unless for some reason ...
15       Q.  In the normal -- I'm sorry.  Are we done?  I
16   didn't want to cut you off.
17       A.  No.  I just -- I just want to make sure I'm
18   answering the question right.  I don't -- I just -- You
19   know, because I only did IT stuff and I don't recall
20   ever -- I know I didn't talk to him about the -- you
21   know, Socha's phone or anything like that.  I just want
22   to make sure I didn't call him on something in regards
23   to -- I don't think I ever -- My only thing is if I ever
24   asked him about the Lantern -- or not the Lantern -- the

Page 75

1    iMac machine running slow, but I don't think I ever did
2    that.
3           And that would be -- And I'm trying to think
4    of any reason why I would ever have to talk to him in
5    regards to anything that we're discussing today, and the
6    only thing if I ever had to discuss anything with him
7    might have been that, but I don't even think I did that,
8    if that, again, answers your question.
9        Q.  In the course of doing forensics investigating
10   work for the Joliet Police Department, does the BEAST --
11           MR. ADAMS:  And, Monica, that's all caps as an
12   acronym.
13   BY MR. ADAMS:
14       Q.  (Continuing) -- evidence chain of custody
15   system apply to devices that are obtained and data on
16   those devices?
17           MS. PROCTOR:  Objection, based on form and
18   foundation for the record.
19   BY THE WITNESS:
20       A.  So you're talking about the -- our -- our
21   evidence control --
22       Q.  Yes, sir.
23       A.  -- called the BEAST?
24       Q.  Yes, sir.

21  (Pages 72 to 75)

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 76

1    A.  And you're asking -- Are you asking
2  specifically in this case or are you asking in general?
3    Q.  Generally.
4    A.  That we put extractions into evidence?
5    Q.  Yes, sir.
6    A.  Certain things -- I believe back at that time
7  certain extractions were not put in evidence due to the
8  large size because we would have phones that were beyond
9  our capabilities of putting onto any type of digital
10  media.  So I think that's why they were stored on that
11  server or whatever they had in investigations, however
12  that system was set up.  But if you had an extraction or
13  a report that was generated, then that could be put into
14  the BEAST.
15    Q.  How about extractions that were copied to
16  storage devices like disks or thumb drives?
17    MS. PROCTOR:  Same objection, form and foundation.
18  BY THE WITNESS:
19    A.  If you're asking if they can be put into the
20  evidence control?
21    Q.  If they're supposed to be put into evidence
22  control.
23    A.  Yeah.  It depends on -- I guess it depends on
24  what you're -- what you're referring to and what case.

Page 77

1  Yes.  Obviously, certain cases you're absolutely going
2  to put into evidence.  If you're sitting there talking
3  about a working product or something like that, you
4  might not put it into evidence until you're done with
5  it.  So --
6    And in regards to this case specifically, I
7  didn't deal with any of that.  So I don't have any
8  knowledge on what would have been or did get put into
9  the BEAST or not.  Everything that I did got handed over
10  to Sergeant Grizzle.
11    Q.  All right.  I'm going to attempt to show you
12  some documents.  I'm going to do it by this screen
13  share.  And I'm no better at it today than I was the day
14  before, but it's -- We'll keep practicing here, and I'll
15  break the code eventually.
16    Can you see on your screen, Lieutenant?
17    A.  Yep.
18    Q.  A document I put up there "Officer Supplement
19  Report."  You got that?
20    A.  Yep.  Yes.
21    Q.  That's a document that you prepared on 17 May
22  2018 at the time shown?
23    A.  I believe it was done on the 18th.  I think
24  the 17th was the date of -- when the original report was

Page 78

1  created.
2    MR. ATKUS:  I'm sorry.  Could I just -- I'm not
3  seeing the document.  What I'm seeing, Hall, is like a
4  list of PDF files with an arrow like you were about to
5  click on it, but I can't see the actual report itself.
6    MS. PROCTOR:  Yeah, you need to open up the PDF.
7    MR. ADAMS:  I don't know how the witness can see
8  that and the rest of you can't.
9    MS. PROCTOR:  Does the witness see it or is he
10  going off the written copy he has in front of him?
11    THE WITNESS:  I just see the list of PDFs.
12  BY MR. ADAMS:
13    Q.  Oh, I thought I'd opened it.  Okay.  Well,
14  here.  Can you see it now?
15    A.  No.  It might be opening it up on a different
16  window for you.
17    MR. ATKUS:  Right click and open.
18    MR. ADAMS:  All right.  I'm going to try to do
19  something a little different.
20    MR. ATKUS:  There we go.
21    MR. ADAMS:  How's that?
22    MR. ATKUS:  You were almost there.  You've got to
23  pick one of those, Hall.  You've got to pick the
24  software you want to open that file in.  So right click

Page 79

1  there.  Now it's going to give you a -- Now do open.  Go
2  down to open and click that.
3    MR. ADAMS:  How's that?
4    MR. ATKUS:  You're not double-clicking it right.
5  It might be where you're -- Here, you're just sharing a
6  window like an Explorer window and not your full screen,
7  was what you're sharing with us.  It could be -- That's
8  not going to be it.
9    THE WITNESS:  No.
10    MR. ADAMS:  Right click.
11    MR. ATKUS:  You might have just e-mailed it to
12  somebody.
13    MR. ADAMS:  Well, right click and open, that's what
14  I've just done.  And nobody can see it.
15    MR. ATKUS:  No.  Are you seeing it on your screen?
16    MR. ADAMS:  Yeah, I am.
17    MR. ATKUS:  Is it on a separate window on a
18  separate side?
19    MR. ADAMS:  I'm going to do this a different way.
20  How about that?
21    THE WITNESS:  No.
22    MR. ADAMS:  This is frustrating.
23    MR. ATKUS:  Seems like that should have worked,
24  from what I could see.

22  (Pages 76 to 79)

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 80

1    MR. ADAMS: Let me get a professional in here.
2    MS. PROCTOR: This is Darcy Proctor. Could we take
3    a five-minute break while you're getting this sorted out
4    just to take five?
5    MR. ADAMS: Sure.
6        (A short break was had.)
7    BY MR. ADAMS:
8    Q.  Lieutenant Botzum, can you hear okay?
9    A.  Yep, I can hear you.
10   Q.  So this particular document, which we'll call
11   Exhibit 1 to today's deposition, was a document you
12   prepared on the 18th of May of 2018 at 6:30 p.m.,
13   correct?
14   A.  I believe that was the -- Yes, it's at the
15   right -- right around that time.
16   Q.  Does this top part of the document refresh
17   your recollection as to any of the identifying data by
18   which Cellebrite might have been searched for the data
19   that was extracted from Socha's iPhone?
20   A.  Are you -- you referring to this serial
21   number? I'm not sure I'm understanding the question.
22   Q.  Is there anything in this document that
23   refreshes your recollection as to the identifying
24   information under which you stored the data extracted

Page 81

1    from Socha's cell phone on the Cellebrite system?
2    A.  No, I don't recall what it was exactly named,
3    how it was named, if that's what you're asking for.
4    Q.  Yeah.
5    A.  No, this does not help me.
6    Q.  Whatever that was, you gave it a specific name
7    for purposes of retrieving that data from the Cellebrite
8    system, right?
9    A.  If I did what now?
10   Q.  You gave it a specific name, right?
11   A.  I -- No. I -- I don't recall if it's auto
12   generated through the Cellebrite.
13   Q.  Okay.
14   A.  And, again, like I said, it's been some time
15   since I've done forensic examinations so I don't recall
16   if it was auto generated from Cellebrite or if it was
17   something that would have been typed in.
18        But what I -- what I recall is regardless of
19   the way that Cellebrite would have done it and if it was
20   typed in or auto generated, I know I didn't put her
21   anywhere in the extraction or any code or any -- sort
22   like that.
23   Q.  However it was done by you or auto- --
24   automatically by the software, it was assigned a name,

Page 82

1    true?
2    A.  There was -- there was something that would
3    have been identifiable. And when I pointed it out to
4    Sergeant Grizzle and I pointed it out to where it was at
5    so he would know where to go back and locate the
6    extraction if he needed to.
7    Q.  And you don't know what that name was, but you
8    do know that it wasn't Socha's name?
9    A.  Correct.
10   Q.  Okay. Do you know where that name might be
11   found today?
12   A.  What -- what name are you referring to?
13   Meaning the extraction name?
14   Q.  Yes, sir.
15   A.  Probably the extraction itself, wherever
16   that -- in evidence or wherever it may be at.
17   Q.  And when you use the -- extraction as a noun
18   like that, you're referring to the universe of data that
19   was pulled off of Socha's iPhone, true?
20   A.  Correct. The one -- And -- and in -- So
21   you're understanding this too so we -- so we're all on
22   the same page -- And I probably said this 100 times.
23   But like I said, it's been a while since I've done
24   these.

Page 83

1        When you do an extraction within the
2    Cellebrite, I believe it creates one big file like an
3    encrypted file. And you have to use their, like,
4    reporting software, which I probably -- I think it's a
5    physical analyzer -- and I believe is what it was
6    called -- to parse out that information every time you
7    run the -- every time you use it. So it's not like you
8    can just sit there --
9        And, again, I could be incorrect on this. And
10   I'm trying to go off memory. But everything is
11   encrypted. You can't just search through like your
12   Windows Explorer and just find pictures. I think you
13   have to use the actual analyzer to do the pictures, I
14   believe, and I -- But I could be wrong on that. And,
15   like I said, it's been a while since I've sat there and
16   used it.
17   Q.  Looking at the first paragraph of the
18   narrative of Exhibit 1 that's on the screen --
19   A.  Yes.
20   Q.  -- you did the extraction and you're able to
21   create a report that showed the text message that had
22   been sent from the Socha phone to the Gatlin phone,
23   true?
24   A.  Yeah. I created a report between that phone

23  (Pages 80 to 83)

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

---

Page 84

1    number and the other phone number, and I believe that
2    name might have been a name that was auto populated
3    within the extraction.
4         Q.  Why did you burn that particular report to a
5    disk, period, question mark?
6         A.  This was all the communication that was on the
7    phone between those two numbers, and that's just to show
8    with the Cellebrite locator.  Sergeant Grizzle stated
9    that there was -- what he was looking for in particular
10   was a certain text messaging that was sent from Officer
11   Socha's phone and -- So this showed that and it showed
12   that there was two deleted text messages, I believe,
13   according to my report.
14        Q.  And when you burned that disk, that was all
15   that you burned to the disk, true?
16        A.  I don't recall everything I burned to the
17   disk.  It could have been a compilation of a couple
18   different things.
19        Q.  What in addition to the two text messages that
20   had been deleted could have been burned to that disk?
21        A.  If you look at the second paragraph where I go
22   into and extract the sms-- sms.db file and I use the
23   SQLite browser, I went into that database and found this
24   wording that Sergeant Grizzle was looking for.  And then

---

Page 85

1    I did a -- I thought I did a screen shot, if I remember
2    correctly.  It should state within -- Yeah.  I took a
3    screen shot of the messages and saved it to an image.
4    So what I burned might have had both of those on there.
5    And I -- and I don't recall what was on the disk, but it
6    might have had both of those on there.
7         Q.  Is it safe to say that on those disks that you
8    burned for Grizzle there were no photographs?
9         A.  Correct.  Besides the screen shot --
10        Q.  No videos?
11        A.  Besides the screen shot that I did of the text
12   messaging out of the SQLite database?
13        Q.  Perfect.  Besides that screen shot.
14        A.  No.  There was no -- there was no -- If you're
15   asking, like, if there was, like, photos, like, that
16   would have came from the cell phone extraction?
17        Q.  Correct.
18        A.  No, none.
19        Q.  Similarly, there were no videos on those disks
20   that you burned for Grizzle, true?
21        A.  True.  No -- There was no videos, correct.
22        Q.  So the third paragraph that begins, "I also
23   used Lantern," and it goes on, why did you use Lantern
24   after you had already extracted the text messages and

---

Page 86

1    burned reports to disks relating to those text messages?
2         A.  So as -- as I was saying before, you know, we
3    use -- sometimes you use second forensic softwares to
4    confirm what we're looking at.  And since we found
5    remnants in the Cellebrite in examination of the text
6    messaging that he was looking for, knowing how forensic
7    softwares work, we used a second one.
8         So Lantern being Apple-based, a different
9    software that had been useful in other cases, it could
10   potentially extract that -- that message that
11   Sergeant Grizzle was looking for with dates and times
12   and who sent it and who received it.  Because from
13   having the database there itself, we didn't have that
14   information readily available.  And I'm not even sure if
15   we would have even been able to determine through the
16   way the Cellebrite extracted the data.
17        So to try to get it as -- as correct
18   information as possible, you use your second forensic
19   tool to confirm the data, which is why Lantern was used.
20        MR. ADAMS:  Okay.  Monica, would you go to the next
21   document, please, which is on the list something called
22   a "Police Department Interoffice Memorandum"?  And this
23   one is dated 18 May 2018.
24        THE REPORTER:  Is it the part one, Hall?

---

Page 87

1         MR. ADAMS:  I didn't hear that.
2         THE REPORTER:  Is it part 1?  I have three
3    different PDF interoffice memorandums.
4         MR. ADAMS:  Yeah, it should be part 1.
5         No.  I'm looking for one that's dated 18 May.
6         THE REPORTER:  Nope.  Hold on.  Okay.  Hold on.
7    This one?
8         MR. ADAMS:  There we go.  We'll call this
9    Exhibit 2.
10        BY MR. ADAMS:
11        Q.  Lieutenant, have you ever seen this document
12   before?
13        A.  I might have seen it when I did the FOIA.  I
14   don't recall off the top of my head.
15        MR. ADAMS:  So, Monica, would you scroll to the
16   very bottom of this document?
17        THE REPORTER:  So all the way -- all the way to the
18   bottom?
19        MR. ADAMS:  To the last paragraph.  Not quite that
20   far.
21        THE REPORTER:  The last.
22        MR. ADAMS:  Okay.  That's fine.
23        BY MR. ADAMS:
24        Q.  So what I'd like you to do is read that last

---

24  (Pages 84 to 87)

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 88

1  paragraph and let us know when you've read it.
2      A.  Do you want me to read it?
3      Q.  To yourself.
4      MS. PROCTOR:  Like silently?
5  BY THE WITNESS:
6      A.  Oh, okay.  Okay.
7      Q.  Have you had a chance to read that paragraph?
8      A.  Yes.
9      Q.  I don't want to deprive you of the opportunity
10  to read the rest of the document if you need to.  If
11  that's the case, tell us.  But my only question for you
12  about this paragraph of Exhibit 2 is, is that consistent
13  with your recollection, that is, that by the 18th of May
14  of 2018 you had completed the extraction and you had
15  given Grizzle the text messages that were on the Socha
16  phone?
17      A.  So somewhat.  So when it says that, you know,
18  I found deleted messages that were sent to Maria's phone
19  from Cassandra, I couldn't determine at that point who
20  sent what.
21      Just for clarification, you know, I found
22  remnants using that SQLite database.  But without
23  running and knowing what Lantern could show, I wasn't
24  sure who sent what, what date and time, and all that

Page 89

1  stuff.
2      But, generally speaking, from reading that and
3  understanding that part, yeah, I just -- as we stated
4  before, is what I gave to Sergeant Grizzle.
5      Q.  After you did that extraction for Grizzle, you
6  were not asked to do anything else in connection with
7  the investigation into Socha until after the -- this
8  complaint and this lawsuit was filed, true?
9      A.  Correct.  Yeah, I wasn't -- I wasn't part of
10  any of this until I was brought in by Chief Benton back
11  when the search -- or the complaint came through for the
12  lawsuit.
13      MR. ADAMS:  Monica, if we go to Exhibit -- We'll
14  call it Exhibit 3, which is the 7 November 2018
15  memorandum.
16      THE REPORTER:  Is this the right one, Hall?  I have
17  a November --
18      MR. ADAMS:  Yes, it is.  And we'll call it
19  Exhibit 3.
20  BY MR. ADAMS:
21      Q.  Lieutenant, you've seen this before?
22      A.  I have.
23      Q.  You authored it?
24      A.  I did.

Page 90

1      Q.  If we look at the second paragraph of -- at
2  the top -- two -- two -- after -- there -- that begins,
3  "Two of the examiners" -- Do you see that paragraph?
4      A.  Correct.
5      Q.  First of all, to what computers are you
6  referring in that first sentence?
7      A.  The reasoning -- To be honest with you, I'm
8  not sure which one I'm referring to exactly on this one.
9  The reasoning before this memo was -- I believe, like,
10  Chief Roechner was asking for an updated or wanted -- or
11  someone wanted a status on where things were at or
12  something to that regards, so -- which is why I -- I
13  penned this memo.  And I don't recall which computers
14  or -- And, obviously, I wasn't that specific in this
15  memo.
16      Q.  How many computers were delivered up to RCFL
17  to examine?
18      A.  I don't recall, but there are documentations
19  of what we brought in.
20      Q.  What, if any, was the significance that you
21  were trying to convey to Chief Roechner when you say
22  that one of the examiners found the Lantern's file name
23  in a log on a computer that was labeled, quote,
24  Cellebrite, close quote, computer?

Page 91

1      A.  I think at that -- If I'm reading this right,
2  is there was a Lantern's file name and a log file, which
3  I think it's just kind of how it states, that there was
4  a Lantern file located on a computer called Cellebrite.
5      Q.  So, again, the first line of the next
6  paragraph that begins, "The last examiner," refers again
7  to the computers as did the preceding paragraph.  Are
8  you able to identify those computers by some identifying
9  feature or whose computers they were?
10      A.  This -- this memo wasn't meant to be specific
11  like that.  It was more of a general, as stated in the
12  title.  It was more of an update of where things were at
13  at -- in -- as I was asked to do.  So no, I -- It's not
14  specifically stating which computers or even which
15  examiners were doing it.
16      Q.  While this work was being done, was the FBI
17  investigating the Joliet Police Department or was this
18  work being done at RCFL because the Joliet Police
19  Department had asked RCFL to do an analysis?
20      A.  My understanding is that the RCFL was doing
21  this at the request of the Joliet Police Department.
22      Q.  Could we scroll to the bottom paragraph on the
23  first page, please?  Do you see the reference in that
24  bottom paragraph to a, quote, case agent, close quote?

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 92

1   A. I do not. Where are we looking at?
2   Q. Well, we're in this bottom paragraph here that
3   begins, "The final reports," and about -- and three
4   lines down the term "case agent" appears.
5   A. "Inform the case agent verbally if anything
6   was found"?
7   Q. Right.
8   A. I thought you said something was in quotes. I
9   apologize.
10  Q. Who was the case agent?
11  A. I think what I was referring to in this is a
12  general statement as to some of the policies within the
13  RCFL. So I don't -- In this particular sentence, it
14  wasn't particularly anyone specifically, if that makes
15  sense.
16  Q. Okay. It does. Okay. I get it.
17     So the next sentence begins, "The final
18  reports." Do you see that?
19  A. Yes.
20  Q. Have you ever seen the final reports generated
21  by RCFL from the analysis it did of the -- of computers
22  that -- at the request of the Joliet Department?
23  A. I -- Yeah. So if we're talking about the
24  completed report that the examiner would write and sign

Page 93

1   a paperwork and do all that --
2   Q. Yes.
3   A. -- I was asked again from Chief Roechner and
4   Chris Regis to get all the documents, all the reports
5   that were up at the RCFL in regards to this case. So --
6   And when it comes -- If you're asking -- If that's what
7   you're asking for, then yes.
8   Q. Do you remember how many so-called final
9   reports there were?
10  A. I -- I do not, but I know they were turned
11  over to Chief Roechner. And I also handed them over to
12  Chris Regis.
13  Q. Did the final reports contain a narrative that
14  described what the examiners and/or case agents at RCFL
15  had found relative to who, if anyone, on the Joliet
16  Police Department had accessed photographic or
17  videographic images from the data extracted from Socha's
18  iPhone?
19  A. What I -- Well, from my understanding of what
20  was -- the way it was written up is they were looking
21  for images or Lantern files that would have been located
22  on the hard drive that were copied from the search that
23  the FBI did at whatever the date was.
24  Q. Do you know which hard drives those were?

Page 94

1   A. No. But they were -- they were documented.
2   So when the RCFL goes and does a search on a site, they
3   label everything. So they'll label the computer.
4   They'll label the hard drive. And there's a tracking
5   order in -- in regards to that. And then you can kind
6   of figure out whose computer was what at that time.
7      MR. ADAMS: All right. Can we go, Monica, to the
8   next exhibit in order? I think we're on 4, which would
9   be identified as the police department memorandum,
10  part 2, dated 9 November 2018.
11  BY MR. ADAMS:
12  Q. All right. This is a document you've seen
13  before?
14  A. Yes.
15  Q. You authored it?
16  A. I did.
17  Q. Were the two computers identified in this memo
18  the only two computers that were turned over to RCFL to
19  examine?
20  A. No. My understanding, every computer that was
21  in investigations was copied. And then Chief Roechner
22  took them all -- Or I think I took him up to the RCFL
23  because I had access to get into the building. And he
24  submitted it as a, you know, case agent or however you

Page 95

1   want to call it but per -- as a point of contact for the
2   case.
3   Q. Okay.
4   A. So my understanding -- I never touched the
5   evidence nor what was copied. So whatever was done at
6   that search was taken up to the RCFL to be examined.
7   Q. Was -- I should say were any personal computer
8   devices of officers in the investigations unit included
9   among those that were delivered up to RCFL to examine?
10  A. I have no idea what was actually examined. So
11  my -- my understanding would be unless you had a search
12  warrant, it should just be government property. If you
13  had a criminal case where, you know, then you need a
14  search warrant or consent or something, then you could
15  do personal stuff. So -- And they -- If they had that,
16  I wasn't aware of it.
17     My understanding is everything was property of
18  the City of Joliet. That was submitted -- That was
19  copied and that was submitted and taken up to the RCFL.
20  And if it's something different, obviously, I wasn't
21  part of the search and I wasn't part of what was
22  determined to be searched or not. So I don't have
23  firsthand knowledge on.
24  Q. Do you know who did make the determination

26  (Pages 92 to 95)

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 96

1  about which computers were delivered up to RCFL to
2  examine?
3      A.  I do not know.  The only thing I do know is I
4  drove Chief Roechner up to the RCFL because, again, if
5  you've ever been up there, it's -- you get -- there's
6  special parking.  There's special access to the
7  building.  And it's much easier when you have someone
8  that can get in there.
9      Q.  And to be precise, what was delivered weren't
10  actual physical computers but the contents of all of the
11  computers that had been extracted for purposes of this
12  analysis, correct?
13      A.  So yeah.  So when -- when you -- When the RCFL
14  goes to a place to do a search like that, what they do
15  is they copy a hard drive bit for bit.  So you're going
16  to get everything.  You're going to get everything
17  deleted -- Everything that would have been on that
18  computer as if you had it -- you know, the original in
19  your hands, would have that within the copy.
20      And the way they verify this -- I'm not
21  try- -- I'm not trying to get too technical here, but
22  it's like a -- it's like a thumbprint or DNA.  It's
23  probably -- DNA is even better, even better than DNA
24  when you really look at it.

Page 97

1      But it's like -- They take an image of the
2  hard drive and they come up with a DNA-type profile of
3  it.  Then they'll copy everything to an additional hard
4  drive using hardware tools and things like that.  And
5  then they verify it, that everything was copied
6  correctly.  And if it comes out with the same
7  identifying number, which is a -- It's like a hash value,
8  which is a very long number.  They use it as numbers and
9  letters and things like that.  Then you know you have
10  the same exact data that was on the original to the
11  copy.
12      And it's so precise that even if you change
13  one -- the littlest thing on the hard drive, the
14  littlest thing, the whole number will change completely.
15  And that's how they verify that you have a
16  forensically -- I don't know if clean copy is the right
17  way, but that you copied everything correctly.  And it's
18  called MD- -- MD5 hash is -- is the acronym or the
19  process that they use when they do this.
20      Q.  Were computers delivered to CRFL -- RCFL,
21  rather, just one time for their examination as part of
22  this investigation?
23      A.  I'd have to look at the intake log.  I want to
24  say that it was taken up there once.  But I want to say

Page 98

1  maybe there was twice.  But my recollection would be one
2  time but possibly two, but I'd have to look at the
3  intake logs.
4      MR. ADAMS:  Can we go, Monica, to the next exhibit
5  which is an RCFL report dated 31 August 2018?
6  BY MR. ADAMS:
7      Q.  You've seen this before?  This is Exhibit 5.
8      A.  I'm sure I have.  There was -- there was some
9  issues as I can tell you right off the bat that they
10  have my name down as the person to send this to.
11      Q.  And it should have been Roechner?
12      A.  Yes.  It should not have been me.
13      Q.  Because Roechner was the one who commissions
14  this examination.
15      A.  Correct.  He's the one -- When you look at the
16  intake log, it's his signature on everything.  It's not
17  mine.  And I don't know if the examiners just because
18  their familiarity with me and -- and -- and putting my
19  name on there -- I'm not sure -- but that my name should
20  not have been on these reports.  And I know -- They're
21  not on all of them, if I remember correctly.  But they
22  are on some of them.  And the reports start -- And some
23  of the reports we're talking about a search warrant.
24  And there was never a search warrant that was done.  It

Page 99

1  was done on consent.  So there was some inaccuracies in
2  some of these reports that I noticed.
3      Q.  This particular exhibit, 5, does not shed any
4  light on the contents of the data on any computer that
5  was submitted for examination, does it?
6      A.  It's not asking for what?
7      Q.  It doesn't shed any light on the content of --
8  the content of any of the devices that were submitted
9  for examination, does it?
10      MS. PROCTOR:  Just to be clear --
11      MR. ATKUS:  Yeah, we can't see the whole document.
12      MS. PROCTOR:  Yeah.  You know --
13      MR. ATKUS:  It looks like we're only seeing about
14  half a page.  Yeah, a little -- Zoom out a little bit
15  more, please.
16  BY THE WITNESS:
17      A.  So this one looks like it was for a cell
18  phone.  So this one would have -- probably would have
19  been an actual cell phone and not a copy of it.
20      Q.  And it doesn't identify whose cell phone it
21  was, correct?
22      A.  It does not.
23      Q.  And --
24      MS. PROCTOR:  You know, just for the record for our

27 (Pages 96 to 99)

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

| Page 100 |
| --- |

1   reference, can the court reporter scroll down and give
2   us a Bates reference in the lower right-hand corner of
3   the first page of this document that's been identified
4   as Exhibit 5? You know, it looks like our photos are
5   kind of cutting off.
6       MR. ADAMS: Yeah, that's fine. It's City 79 and
7   80 --
8       MR. ATKUS: It's City 79 and 80.
9       MS. PROCTOR: Okay. Thank you.
10  BY MR. ADAMS:
11      Q. Does this document, Lieutenant, tell us
12  anything about what was found on the particular cell
13  phone device that was submitted for examination?
14      A. I'd have to look at more of the report. I
15  can't --
16      THE REPORTER: If you just tell me where you
17  want --
18      MR. ADAMS: Let the court reporter know when you'd
19  like her to scroll so that you can read it.
20      THE WITNESS: You can scroll down.
21  BY THE WITNESS:
22      A. But like -- like I said before, I'm -- I'm not
23  the one -- I'm not the case agent on this. I'm not the
24  one that's going to be going through any of this. This

| Page 101 |
| --- |

1   should have been done by someone else besides me, if I'm
2   understanding what you're asking.
3       Q. Does your particular training and experience
4   allow you to construe this particular document?
5       MS. PROCTOR: I'm just going to object based on
6   form and foundation.
7   BY THE WITNESS:
8       A. I'm not sure what -- Are you -- So I'm looking
9   at this report, and I'm not sure exactly what you're
10  asking me. Are you asking me if -- what was found on
11  the phone?
12      Q. Yes.
13      A. It looks like that they dumped the phone, if
14  I'm understanding what's in this report. And if you
15  scroll down more, I'd have to look a little bit more.
16  And I don't -- It does not say where -- Or scroll back
17  up if you don't mind. I apologize.
18      THE REPORTER: More?
19  BY THE WITNESS:
20      A. So as I'm looking --
21      THE WITNESS: Okay. Scroll -- Continue to scroll
22  up a little bit more on the first page just so I can --
23  about right there.
24

| Page 102 |
| --- |

1   BY THE WITNESS:
2       A. So what it looks like with this report with
3   what this examiner did is there was a phone -- they did
4   an extraction of the phone, complete, and then they
5   burned a disk. From what is put in this report, if
6   there was a search done by the examiner, it was not put
7   on here.
8       Q. Can we go to the next exhibit which we'll
9   call 6 which is dated 13 September 2018?
10      MR. ADAMS: And I'll represent for counsel's
11  benefit --
12  BY MR. ADAMS:
13      Q. But we'll still give you the time, Lieutenant,
14  that you need to scroll through --
15      MR. ADAMS: -- that it's City production 226
16  through 230.
17      MS. PROCTOR: Thank you.
18  BY MR. ADAMS:
19      Q. And do tell us -- You know, guide the reporter
20  through the scrolling. My question is going to be the
21  same, Lieutenant, as you're reading this.
22      And that is, does this exhibit tell us what
23  was found as opposed to merely what was done?
24      THE WITNESS: Did we decide to scroll or are we --

| Page 103 |
| --- |

1       MR. ADAMS: Yeah, tell her to scroll as you --
2       THE WITNESS: Okay. Yeah. Please scroll down.
3   Keep going. A little bit more. About right
4   there. That's perfect.
5   BY THE WITNESS:
6       A. It looks like kind of the same as before where
7   they did an examination -- examination on the phone and
8   then burned a disk and presented that as the final
9   report.
10      Q. Do you see the last line where it reads
11  graphics -- I shouldn't say the last line -- the last
12  line on page 3 where it reads, "Graphic and video files
13  within the image file were included in a forensic
14  report"?
15      A. Where? On which page? 3?
16      MS. PROCTOR: Is that shown?
17  BY MR. ADAMS:
18      Q. Well, so go --
19      A. I'm not seeing it.
20      Q. So here, we'll -- Go back to where we were.
21      THE REPORTER: I think the sentence you're talking
22  about is on this page, Hall, in the middle of the page,
23  "Graphic and video files."
24      MR. ADAMS: I see. I see.

28 (Pages 100 to 103)

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

|  | Page 104 |
|---|---|

1 BY THE WITNESS:
2    A. "Graphic and video files within the image file
3 were included in a forensic report."
4    Q. Have you seen such a forensic report?
5    A. I have not seen any of the reports.
6    Q. Okay. So that's --
7    A. Are you talking about the one that was
8 extracted --
9    Q. So that's --
10    MS. PROCTOR: Wait. Let him finish. You cut him
11 off. Let him finish.
12       Were you done with your answer?
13    THE WITNESS: Me?
14    MS. PROCTOR: Yes.
15 BY THE WITNESS:
16    A. Do you want me -- do you want me to wait or do
17 you want me to finish my answer?
18    Q. No. I thought you were complete. Do you have
19 anything more you want to say about that?
20    A. So -- Yeah. So I had never seen any of the
21 examination results from the RCFL. Obviously, I've seen
22 the reports. But, obviously, with the two things with
23 the FOIA -- Or, actually, not that this had to do with
24 FOIAs. But this had more to deal with Chief Roechner at

|  | Page 105 |
|---|---|

1 the time and Chris Regis getting copies of these
2 reports. That's where I've seen these at.
3       But the actual examination, I have no part of.
4 That's not -- This had nothing -- This whole -- What do
5 you want to call it? I don't want to say search -- but
6 investigation, however you want to call it, I'm not part
7 of that. I wasn't part of it and I'm ...
8    Q. And you were never privy to the results that
9 were reported, true?
10    A. Besides what's in -- written in these reports,
11 no.
12    Q. Would you go to Exhibit 6, which is another
13 RCFL report of examination dated 17 September 2018, and
14 take the time that you need to direct Monica to scroll
15 through? My question is going to be the same. Does
16 this particular exhibit tell us what was found in this
17 examination as opposed to just what was done?
18    THE REPORTER: Hall, is this the right one?
19 Because then this is Exhibit 7.
20    MR. ADAMS: Yes. Yes.
21    THE WITNESS: If you could scroll down to the
22 summary.
23 BY THE WITNESS:
24    A. According to the report, it says they used

|  | Page 106 |
|---|---|

1 available forensic tools. Submitted items were
2 processed and examined for along -- for any and all
3 retrievable information along with photos and videos.
4 And then it was made to a forensics report.
5    Q. Okay. So, again, this tells us what was done
6 but not what was found?
7    A. Well, here, one thing -- So when it comes to
8 RCFL reports and -- and maybe this might highlight some
9 things on it. So you have the report which is -- This
10 is like the official report, but you also have your --
11 your notes where our -- a little more detailed in what
12 the actual examiner did. This is more just, like I say,
13 a finalized report. They have their notes that
14 they do on every examination. And, like I said, without
15 sitting there looking at what was on the disk and what
16 they found, you know, I -- I can't really answer with
17 what they did.
18    Q. Okay.
19    A. I mean, obviously, they make a statement up
20 here about Roechner requesting searches for videos
21 and -- and photos of a sexual nature. Without -- Like I
22 said, unless you look at that disk and see what's on
23 there and see what they did or maybe look at their notes
24 or something like that I really can't comment on what

|  | Page 107 |
|---|---|

1 the examiner did because I don't have access and I
2 didn't view the final results.
3       I mean, I'm kind of going off of their report.
4 It's very general. It's very basic. But I can't really
5 articulate whether they found anything or not.
6    Q. Okay. Let's go to the next exhibit, the RCFL
7 report of examination dated November 12th, 2018. Have
8 you seen that before?
9    A. I'm sure I have.
10    MR. ADAMS: Are we on 3.
11       8 now, Monica.
12    THE REPORTER: Yes.
13 BY MR. ADAMS:
14    Q. We'll call this Exhibit 8 and again ask you to
15 scroll as much as necessary.
16    MR. ADAMS: And, Counsel, it's 231 to 234.
17 BY MR. ADAMS:
18    Q. Lieutenant, my question is going to be the
19 same. Does this inform us as to findings and
20 conclusions or merely as to process?
21    A. Your question is -- is -- I'm sorry. In
22 regards to --
23    Q. This Exhibit 8 tells us what was done but not
24 what was found, correct?

29  (Pages 104 to 107)

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 108

1    A.  It states -- You're talking about where --
2  John Dziedzic, lab director?  It says, "No items
3  matching the criteria were located, there would be no
4  review, and the case could be archived and closed."
5       Is that what you're referring to?
6    Q.  Well, it says, "If no items," blah-blah-blah.
7  So what I'm trying to understand is whether this
8  particular document tells us what the examiners found as
9  opposed to what they did.
10    A.  Well, it looks like where it says, "the
11  following observations were documented," it said,
12  "Observed no .lantern file extensions.  Observed no file
13  named 18-00742.  Observed no achieves which referenced
14  18-00742 or lantern."
15       Is that what you're referring to?  That part?
16    Q.  Is that the only part that informs about
17  findings as opposed to --
18    A.  Within this document it seems to be stating
19  that they found no files in reference to Lantern
20  extensions or that report number.
21    Q.  What do those terms mean to you, if anything?
22    A.  Which terms?
23    Q.  "No .lantern file extensions."  What's a
24  Lantern file extension?

Page 109

1       MS. PROCTOR:  I'm just going to object based on
2  form and foundation for the record.
3  BY THE WITNESS:
4    A.  So a Lantern file -- The Lantern file is like
5  a Lantern extraction.
6    Q.  And does the phrase, quote, File named
7  18-000742, close quote, have a particular meaning to
8  you?
9    A.  Yeah.  So when you -- so when you do a
10  forensic exam -- And this one, from looking at the
11  beginning of the report, is on a computer.  So the one
12  thing you can do within a computer examination is a
13  thing called indexing.  So if there was any remnants at
14  all in reference to this number, it would pull it up.
15  Whether it was deleted or anything else or typed in on
16  anything on any type of record whether it was a Word
17  document or something like that, remnants -- remnants of
18  it could be on a computer whether it was deleted and so
19  forth.
20       So, again, without looking at the examiner's
21  notes and things like this, this kind of tells me if I
22  was reading this from being an examiner that they did an
23  index search in reference to that -- that number.
24    Q.  Do you know what piece or category of data

Page 110

1  from the device examiner was identified by 18-000742?
2    A.  What -- what would have been found?
3    Q.  Right.  So they looked for or at a file named
4  18-000742.  Do you know what was contained in that file?
5    A.  I think out of the Lantern extraction file
6  would be my guess, but, again, I haven't been part of
7  this for a while.  And I'm trying to recall.  But if
8  they were looking for a Lantern file extension and then
9  they're looking for a file name 18-00742, that would
10  tell me that they're looking for -- And is that -- Is
11  this the case number for this -- Is -- Or is part of the
12  case number.
13    Q.  Well, it -- So on the header line there's a
14  reference number 18-0007242 [sic].
15       MR. ADAMS:  And, Monica, you can scroll back up to
16  the top of this exhibit.  It shows that.
17  BY MR. ADAMS:
18    Q.  Does that further inform you about what
19  that -- what, if any, data that reference number
20  designates?
21    A.  So that number, if I look back at my -- my
22  notes that I did my follow-up, this appears to be
23  connected to Sergeant Grizzle's initial investigation.
24  Right?  Correct.

Page 111

1       So that number where it says reference number,
2  that is the same number as Sergeant Grizzle's
3  investigation, which appears that this was put under the
4  same case number.
5    Q.  All right.  Would you go to the next exhibit
6  we can call 9, which is an RCFL report of examination
7  dated 4 December 2018?  Have you seen this report
8  before?
9    A.  I'm -- I'm sure I have.
10       MR. ADAMS:  And, Counsel, this is 68 through 89.
11  BY MR. ADAMS:
12    Q.  If you go to the second page where it's -- in
13  the paragraph that contains the sentence, quote, On
14  26 October 2018, Sergeant Chris Botzum reviewed -- Do
15  you see that sentence?
16    A.  I never reviewed any examination results in
17  regards to this case.  Why it was put in there?  That
18  would be a great question to ask the director.  But my
19  only thought is -- And I'd have to read this further.
20  But no, I didn't -- I didn't search or was part of any
21  of these examination results.
22       Like I said, my part in this was very simple.
23  I was a liaison between the department and the RCFL.
24  And I purposely advised multiple times that that's my

Royal Reporting Services, Inc.
312.361.8851

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 112

1    part in this, so I don't -- I'm not doing this.  This is
2    not -- I'm not the case agent, is kind of where I'm
3    going at this.
4         Q.   Is it fair to say that you did not give any
5    direction to RCFL that, quote, No further processing
6    would be needed and that the case should be archived and
7    closed, period, close quote?
8         A.   Any direction -- any direction I would have
9    gave them would have came from someone else such as
10   Roechner.  I wouldn't have made any decision on my own.
11   If I relayed something to -- I believe it was Dziedzic
12   on this -- that came from someone else.
13        Q.   Do you recall relaying that instruction on or
14   about --
15        A.   I don't -- Sorry.
16        Q.   -- on or about 26 October 2018?
17        A.   I don't recall doing that, but it's very
18   possible that whatever course of conversation might have
19   been happening, that I could have relayed those words to
20   Dziedzic from Roechner.
21        Q.   But you don't have a specific recollection?
22        A.   No, I don't.
23        MR. ADAMS:  Would you go to the next page?  And I
24   think this is -- Scroll down a little further, please.

Page 113

1    Not quite that far.  There we go.
2    BY MR. ADAMS:
3         Q.   I think this is just repetition of that
4    earlier revision we were just looking at where it says,
5    "On 26 November 2018 Sergeant Botzum advised that
6    derivative evidence was not required."
7              That wasn't a judgment call that you made,
8    true?
9         A.   On which part here?  I'm sorry.
10        Q.   The sentence that reads, quote, On October 26,
11   2018, Sergeant Botzum advised that derivative evidence
12   was not required, period, close quote.  Do you see that?
13        A.   Yeah.  No, I see it.  If -- if I had made that
14   comment -- And I might have said something like that.
15   But like I stated before, that's coming from someone
16   else like Chief Roechner or someone directing.  So I
17   might have said that to them, but that did not -- that
18   didn't come from -- if that makes sense in regards to
19   this because -- Yeah.
20        Q.   Okay.  Would you look at --
21        MR. ADAMS:  I guess we're on 10, Monica, which is
22   an RCFL report dated 12 December 2018.
23   BY MR. ADAMS:
24        Q.   Have you seen that before at some time?

Page 114

1         A.   I'm sure I have.
2         Q.   If you'll look at near the bottom of page 2 --
3    and this is 235 to 244 -- at the bottom of page 2 near
4    the bottom of the summary section, you're referred to
5    there as having given RCFL a specific direction.
6              Same question, do you recall doing that?
7         A.   This would -- No, I see that.  So this would
8    probably be the same situation where, again, some sort
9    of direction from probably Chief Roechner.  And it's
10   talking to -- I don't know who this examiner was -- or
11   talking to -- John Dziedzic was the director up there --
12   and advising whatever Roechner advised me to tell him.
13             Like I said, not trying -- My whole part in
14   this was to be that liaison between the RCFL and the
15   department in regards to this.  So, like I said, when
16   you look at these reports, it had my name on there in
17   different places which are inaccurate, but no, I did
18   not -- It wasn't my decision or anything like that to
19   sit there and tell the examiners anything in regards to
20   how they were searching, anything that I would have said
21   to them, which would have came from someone higher than
22   me.
23        Q.   Just by accident of stapling at pages 241 to
24   244 is a later date of report of exam -- And we'll keep

Page 115

1    it as part of this exhibit.  There we go.
2              Have you seen this one before?
3         A.   Again, I probably have.
4         Q.   Okay.  If you scroll down to the top of the
5    next page, 242, the first full paragraph there, do you
6    see where you are referenced making certain requests and
7    directions to RCFL?
8         A.   I do.
9         Q.   The same thing -- And that wasn't originating
10   from you.  If, in fact, you gave that direction, it
11   wasn't originating with you.  You may have conveyed
12   Roechner's direction --
13        A.   Correct.
14        Q.   -- but it wasn't you?
15        A.   Correct.  Because I know -- If -- if I'm
16   remembering, there was some concern about the Lantern
17   file.  And it's probably where I've seen a lot of it
18   within these reports.  And, like I said, my direction
19   would have came from Chief Roechner on to what, you
20   know, the examiners to focus on.  Or if something that
21   needed something or some change or whatever, that was my
22   part, which is probably why my name appears on several
23   of these I guess.
24             I don't recall stating this.  But with -- with

31  (Pages 112 to 115)

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 116

1    the way that these reports are written, I mean,
2    that's -- that's the only thing I could think of is ...
3        Q.  All right.  Let's go to the next exhibit.
4        MR. ADAMS:  Which is 11?  Monica, is that right?
5    And this is City 320 to 324.
6        THE REPORTER:  Can you tell me what it's called on
7    your list of documents, Hall?  Is it the notes?
8        MR. ADAMS:  Notes.
9        THE REPORTER:  Notes?  Okay.  Let's try that one.
10   This one?
11   BY MR. ADAMS:
12       Q.  Now, Lieutenant, you have not seen this
13   document before, have you?
14       A.  I have not.
15       Q.  I'll represent to you -- and you don't have to
16   take my word for it -- these are handwritten notes that
17   Regis made of his interview of you.  Okay?
18       A.  Whose interview?
19       Q.  Regis's interview of you.
20       A.  Okay.
21       Q.  We talked about that interview earlier when
22   the union rep was with you?
23       A.  Correct.
24       Q.  Okay.  And I -- Again, I appreciate these

Page 117

1    aren't your notes.  These are somebody else's notes.
2    But I want to see if any of these notes refresh your
3    recollection as to what you may have said to Regis
4    during this meeting.
5        A.  Okay.
6        Q.  A ways down the -- This first page where
7    there's a note that says, quote, Everyone has log-in or
8    own computer, close quote, do you recall making a
9    statement to that effect to Regis in that meeting?
10       A.  Where -- where is this?  I'm not seeing it.
11       Q.  About halfway down in the first page, the
12   first word is "Everyone."
13       A.  Okay.
14       MS. PROCTOR:  And to be clear, Hall, your question
15   suggested that this was a quote, and it's not.  So I
16   think you need to clear that up.
17       MR. ADAMS:  So I was getting -- It was a quote to
18   the extent that I was reading from the note, right?
19   I've made pretty clear that this is somebody else's
20   notes.  And I -- I don't mean to suggest that these are
21   meant to be word for word what came out of this
22   witness's mouth from this meeting with Regis.  I've
23   asked him if he's -- and I'm going to continue to ask
24   him -- whether these refreshed his recollection about

Page 118

1    things that he said to Regis.
2        MS. PROCTOR:  I get it, but I just thought your
3    question was confusing and, you know, unknowingly
4    misleading.
5    BY MR. ADAMS:
6        Q.  Does that line, Lieutenant, refresh your
7    recollection as to what, if anything, you said to Regis
8    about everyone having log-ins of their own computer?
9        A.  It does not, because it can mean -- Everyone
10   has a log-in for own computer.  I'm not sure what he's
11   referring to.
12       Q.  Okay.  I don't -- And I cut you off only to
13   tell you that's totally fair.  That's why I told you and
14   I wanted to acknowledge these aren't your notes.
15   They're someone else's notes.  I'm just trying to see if
16   they prompt a memory of what you said to them.
17       A.  Yeah.  You know what?  And no, it -- it
18   doesn't.  I mean, I don't recall if there was no
19   password on there, if you had to sign on with your own
20   network ID.  I -- I don't recall how it was set up.  I
21   mean, that's the question you're asking, correct?
22       Q.  Correct.
23       A.  Yeah.  I don't recall.
24       Q.  So a little further down is a note that reads,

Page 119

1    quote, Physical dump is encoded in Cellebrite software,
2    close quote.  That's what he wrote.
3        Does that refresh your recollection about
4    anything that you said to Regis?
5        A.  Which -- There's a couple parts where it says
6    physical dump -- physical dump gets app data.  Is that
7    what you're referring to?
8        Q.  I read it as, "Physical dump is encoded in
9    Cellebrite software."
10       MR. ATKUS:  I think we can still be on the first
11   page.
12       THE WITNESS:  Yeah, I'm not seeing that one.  Oh,
13   okay.
14   BY THE WITNESS:
15       A.  Physical dump is encoded in Cellebrite
16   software, right?
17       Q.  Right.
18       A.  Yeah, I think I -- I think I -- I talked about
19   this earlier where when you do the extraction, it puts
20   it into one large file.  Then every time you open it it
21   has to parse it out again.  So I think, if looking at
22   this, just from this statement, it sounds like what I
23   said earlier.
24       And when you extract a cell phone using the

32  (Pages 116 to 119)

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

| Page 120 |
| --- |

1    Cellebrite, it creates one -- one large file that's
2    encoded or encrypted.  And then you have to use a
3    different program to view the data.
4        Q.  In using that different program, you have to
5    go in and query or search for the specific data you're
6    looking for, true?
7        A.  Correct.  Like we were speaking of earlier
8    about -- I think it's called physical analyzer.  Again,
9    I could be incorrect on this, but that's my memory.  And
10   within there it kind of parses out the information and
11   it breaks it up into -- You've got videos, photos, text
12   messages, locations.  And I'm sure there's several other
13   ones I can't think of off the top of my head.
14       Q.  At RCFL in the different reports we looked at
15   there were names of several different examiners involved
16   in the work that Roechner commissioned.  Was there one
17   person there who was in charge of the RCFL's work on
18   this project?
19       A.  Like a -- like a project manager?
20       Q.  Right.
21       A.  Is that kind of what you --
22       Q.  You can call it whatever you want.
23       A.  No.  The way -- the way -- And this is my
24   experience with being up there is we get cases where we

| Page 121 |
| --- |

1    get a large amount of data and basically the -- Well, I
2    guess if you look at the -- the project manager or the
3    person that's kind of in charge of it is ultimately the
4    case agent.  So the case agent is the one that's
5    supposed to guide the examiner in exactly what they're
6    looking for.  So I guess if you -- if you look at it
7    that way, that's the person that really guides the
8    examiner on, you know, over all the case.  Because it
9    can get split up into multiple different examiners
10   because some cases are extremely large.  Within the RCFL
11   itself, no, you don't have a project manager that would
12   be over -- in charge of one examination.
13       Q.  Okay.  What was the case agent -- I'm sorry.
14   You're not done.  I'm sorry.
15       A.  Yeah.  The case agent should be the one that
16   dictates with the examiners on what they're looking at
17   and what to do.
18       Q.  Who was the case agent on this case at RCFL?
19       A.  It should have been Roechner.  I mean, that's
20   my understanding.  His name is on -- He's the one that
21   submitted the evidence.  And from, like I was stating
22   before, being the liaison between the City and the RCFL,
23   that's the person I spoke with.
24       Q.  In the course of your work on the Socha

| Page 122 |
| --- |

1    investigation beginning with the initial extraction and
2    continuing through the internal investigation where you
3    were the liaison with RCFL, did you ever learn whether
4    the data that had been extracted by you from Socha's
5    phone was loaded onto other Joliet Police Department
6    computers?
7        A.  The only thing -- and this came from the
8    reports -- is that he had the Lantern file on a couple
9    different computers and -- was my understanding.
10   Anything beyond that, I'm not aware of.
11       Q.  And as one of your memos indicated, those
12   computers were computers assigned to Grizzle and German?
13       A.  Yeah, I believe that's what my memo stated.
14       Q.  In the course of your work on this case, did
15   you learn from any source the data that you had
16   extracted from Socha's iPhone was subsequently loaded
17   onto any officer's personal computer device of any kind?
18       A.  No.
19       Q.  Other than the disks that you burned for
20   Grizzle, about what you've already told us in your work
21   on this case, did you learn whether the data you
22   extracted from Socha's iPhone was burned to any other
23   storage devices, any disks, USB thumb drives, any other
24   storage devices?

| Page 123 |
| --- |

1        A.  The only thing I was made aware of was that --
2    I don't know if it was before the lawsuit came out or if
3    it was after, but -- And I didn't play a part in this,
4    but they moved or they took the extraction off of
5    Cellebrite or the Lantern or both or something like that
6    and then put it somewhere either in evidence or
7    somewhere else.
8        Q.  That's where it should have been put, was in
9    evidence, correct?
10       MS. PROCTOR:  Objection, based on form and
11   foundation for the record.
12   BY THE WITNESS:
13       A.  Again, it's -- It was -- It's not my case.
14   I -- Whoever -- whoever is in charge of that, that's up
15   to them.
16       Q.  Did anyone ever share with you that that
17   evidence was -- taken from the extractions was stored in
18   personal offices of Joliet police officers?
19       A.  Are you asking me if I knew or -- or if I saw
20   it?
21       Q.  Have you heard that?
22       A.  The only thing recently was -- So we have a
23   new chief right now.  And so Chief Malec was going
24   through -- The chief --

33  (Pages 120 to 123)

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 124

1    Q.  We lost you, Lieutenant.  Lieutenant, we lost
2    you.
3        MS. PROCTOR:  This could be a sign to wrap it up.
4    BY MR. ADAMS:
5        Q.  You're showing as muted, Lieutenant.
6        MS. PROCTOR:  Yeah, I don't even see him on my
7    screen but --
8        MR. ADAMS:  Neither do I.
9    BY THE WITNESS:
10       A.  Am I back?
11       Q.  Yes.  We can hear you.  Now we can see you.
12       A.  Sorry.  I unplugged my camera and muted.  That
13   seemed to help.
14       Q.  Okay.  So --
15       A.  All right.  Let me go back to what I was -- I
16   hope I'm not remembering this wrong.
17          So my understanding is this was recently put
18   into evidence, I believe, when our new chief, Dawn
19   Malec, came in.  And I don't remember if it was in her
20   safe or if it was in Carl Spanlock's (phonetic) safe.
21   But I believe that there was a thumb drive or something
22   that ended up being put into evidence, and I believe --
23          And I take that back.  I'm remembering more
24   now.  With her witnessing we had to make copies of what

Page 125

1    was in there, which was turned over, I believe, to you.
2    Does that sound right?
3        Q.  Well, it's your answer.  I ...
4        A.  All I know is we were doing at the -- At the
5    direction of Dawn Malec, they found, I believe -- I
6    thought it was for you -- or for your office at least to
7    make copies and give them to you and then put the
8    originals that they had into evidence.
9        Q.  Have you ever been tasked with training other
10   detectives in the Joliet Department on the use of this
11   Cellebrite?
12       A.  So when I first got in the RCFL, I did a
13   training class on Cellebrite, but it was not the version
14   that was used in this.  It was a -- it was a hardware
15   version that didn't use a computer.  And I did a class,
16   I guess you could say, with the guys in investigations.
17   I don't even think it was all the guys.  But I don't
18   think that quite would carry over to the new Cellebrite.
19   But that was the -- if you want to say -- official
20   training that I did.  And that was -- I don't even know
21   what year that was.
22          But beyond that, I don't think I did any
23   official training.  If anything, with Detective German,
24   I know he got trained in it.  I probably helped him with

Page 126

1    any questions or anything that he might have had in it,
2    but no official training from the new Cellebrite that
3    was used in regards to this -- this case here.
4        Q.  Do you know how detectives got trained on the
5    Cellebrite that was being used in May of 2018?
6        A.  I don't.  But I believe -- And, again, you'd
7    have to speak to the officers on this or the detectives,
8    but I felt they got trained through a Cellebrite class
9    itself, so through the company.
10          But, again, you're going to have to probably
11   speak to them on that.  That's just kind of going off of
12   recollection.
13       MS. PROCTOR:  Yeah, I'm just going to do a late
14   objection based on form and foundation for the record.
15   BY MR. ADAMS:
16       Q.  Has Detective McKinney ever reached out to you
17   for training on the Cellebrite?
18       A.  Not that I recall.
19       Q.  Have you personally ever observed McKinney
20   doing investigative work on the Cellebrite?
21       A.  Not that I recall.  But, I mean, it is
22   possible.  I could have been in a room when he was doing
23   something in it, but nothing that I would have memorized
24   or would have noticed to a point where I would remember.

Page 127

1        Q.  Do you know whether there was any practice in
2    the investigations division with officers practicing on
3    the Cellebrite without a particular official
4    investigative purpose?
5        MS. PROCTOR:  Objection, based on form and
6    foundation and speculation for the record.
7    BY THE WITNESS:
8        A.  So with me being in -- in the tactical unit,
9    I'm not aware of what they were doing in investigations.
10       Q.  Okay.
11       THE WITNESS:  Could I ask a question on this really
12   quick?
13       MR. ADAMS:  Yes.
14       THE WITNESS:  Do I get a copy of the transcripts on
15   this?
16       MR. ADAMS:  Great question.  And we answer that
17   pretty extensively for you here very shortly at the end.
18   It's sort of the grand finale of this.
19          I don't have any further questions.
20       MS. PROCTOR:  No questions from the City of Joliet.
21       MR. ATKUS:  I don't have any questions either.
22   Sorry.
23       MR. ADAMS:  Okay.  So in the one instance,
24   Lieutenant, where we will answer your question, and that

34  (Pages 124 to 127)

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 128

1    is you do have a right to read and review the transcript
2    of this deposition when it's written, which it will be,
3    and it's not for the purpose of changing any questions
4    or answers, which you can't do --
5        THE WITNESS:  Right.
6        MR. ADAMS:  -- but for the purpose of noting in a
7    separate document any instances in which you believe the
8    transcription is in error in any way.
9        And that is a right that you have, and you can
10   exercise that right or waive that right.  And we do need
11   you to tell us on the record whether you elect to
12   exercise or to waive that right.
13       THE WITNESS:  To have a copy of it, yes.
14       MR. ADAMS:  So we'll show signature is reserved.
15       MS. PROCTOR:  Reserved.
16       MR. ADAMS:  I'm going to write it, Monica, the
17   usual ways.
18       MS. PROCTOR:  Monica, the City of Joliet will take
19   a copy of this one.
20       THE REPORTER:  Okay.
21       What kind of copy?  Ms. Proctor, E-Tran or
22   PDF?
23       MS. PROCTOR:  I'll let you know.
24       THE REPORTER:  Mr. Atkus, do you need a copy?

Page 129

1        MR. ATKUS:  Yeah, we'll do an E.
2        MS. PROCTOR:  I'm going to -- The City of Joliet is
3    going to withdraw its request for the transcript.
4        THE REPORTER:  Okay.  So who -- Am I sending the
5    transcript for signature to which attorney for the
6    witness --
7        MS. PROCTOR:  Oh, you know what?  Why don't you let
8    me get this one, Mike?  I'll get this transcript, okay,
9    on behalf of the City of Joliet, and we'll figure out
10   what we're going to do with getting it to our witness.
11       MR. ATKUS:  Okay.  All right.
12       So I'll withdraw my order then.
13       THE REPORTER:  Okay.
14       (The deposition was concluded
15       at 4:19 p.m.)
16
17
18
19
20
21
22
23
24

35  (Pages 128 to 129)

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 130

```
 1               IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3   CASSANDRA SOCHA,                 )
                                      )
 4                  Plaintiff,        )
                                      )
 5        vs.                         )   No. 18 CV 05681
                                      )
 6   CITY OF JOLIET, a municipal      )
     corporation, EDWARD GRIZZLE,     )
 7   JOHN DOES 1-20,                  )
                                      )
 8                  Defendants.       )

 9

10          I, SERGEANT CHRISTOPHER BOTZUM, state that I

11   have read the foregoing transcript of the testimony

12   given by me at my videoconference deposition on

13   April 30th, 2021, and that said transcript constitutes a

14   true and correct record of the testimony given by me at

15   the said deposition except as I have so indicated on the

16   errata sheets provided herein.

17

18

19                             _____
                               SERGEANT CHRISTOPHER BOTZUM
20

     SUBSCRIBED AND SWORN to
21   before me this _____ day
     of _____, 2021.
22

23   _____
          NOTARY PUBLIC
24
```

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 131

1    UNITED STATES OF AMERICA          )
     NORTHERN DISTRICT OF ILLINOIS     )
2    EASTERN DIVISION                  ) SS.
     STATE OF ILLINOIS                 )
3    COUNTY OF COOK                    )

4

5              I, Monica Kim, Certified Shorthand Reporter,

6    do hereby certify that SERGEANT CHRISTOPHER BOTZUM was

7    first duly sworn by me to testify to the whole truth and

8    that the above videoconference deposition was reported

9    stenographically by me and reduced to typewriting under

10   my personal direction.

11             I further certify that the said deposition was

12   taken at the time and date specified and that the

13   taking of said deposition commenced on April 30th, 2021,

14   at 12:56 p.m.

15             I further certify that I am not a relative or

16   employee or attorney or counsel of any of the parties,

17   nor a relative or employee of such attorney or counsel,

18   nor financially interested directly or indirectly in

19   this action.

20

21

22

23

24

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 132

1          The signature of the witness, SERGEANT

2     CHRISTOPHER BOTZUM, was reserved by agreement of

3     counsel.

4          Witness my signature as a Certified Shorthand

5     Reporter in the State of Illinois, on May 19th, 2021.

6

7

8

9

10

11

12                    _____
                      MONICA KIM, CSR
13                    161 North Clark Street
                      Suite 3050
14                    Chicago, Illinois 60601
                      Phone:  312.361.8851

15

16
      CSR No.  084-004606
17

18

19

20

21

22

23

24

Royal Reporting Services, Inc.
312.361.8851

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 133

**A**
**A-U-D-I-T**
  47:17,18
**abilities** 71:22
**able** 55:6 59:4,8
  59:9 60:20
  65:9 66:5
  68:23 69:9,13
  83:20 86:15
  91:8
**absolutely** 77:1
**access** 13:20
  50:15 52:18
  56:6 94:23
  96:6 107:1
**accessed** 93:16
**accessible** 10:19
  46:12
**accessing** 46:22
**accident** 114:23
**accommodate**
  5:5
**accurate** 33:10
**achieves** 108:13
**acknowledge**
  118:14
**acronym** 75:12
  97:18
**acted** 72:12
**action** 131:19
**active** 31:11
**acts** 62:1 63:10
**actual** 74:5 78:5
  83:13 96:10
  99:19 105:3
  106:12
**Adams** 2:2,2 3:4
  4:8,9 12:24
  13:2 21:4
  22:17 23:7,10
  23:13,15,20
  24:1,18 25:3,9
  25:14,17 26:8
  27:5,9,14

32:17 39:7,9
42:2,13,16,19
43:2,7,10
50:23 53:12,17
61:8 63:5
75:11,13 78:7
78:12,18,21
79:3,10,13,16
79:19,22 80:1
80:5,7 86:20
87:1,4,8,10,15
87:19,22,23
89:13,18,20
94:7,11 98:4,6
100:6,10,18
102:10,12,15
102:18 103:1
103:17,24
105:20 107:10
107:13,16,17
110:15,17
111:10,11
112:23 113:2
113:21,23
116:4,8,11
117:17 118:5
124:4,8 126:15
127:13,16,23
128:6,14,16
**addition** 84:19
**additional** 97:3
**addresses** 69:5
**advised** 31:24
  54:3 55:9,24
  66:19 111:24
  113:5,11
  114:12
**advising** 54:22
  57:14 114:12
**affairs** 4:20 6:17
  6:19,22 16:24
  16:24 40:6,8
  40:16 72:6
**affiliation** 9:5

**agency** 40:3,24
  41:9
**agent** 91:24 92:4
  92:5,10 94:24
  100:23 112:2
  121:4,4,13,15
  121:18
**agents** 93:14
**ago** 8:20 14:2
**agreement**
  132:2
**ahead** 26:7
  39:20 50:22,24
**AI** 6:10
**allegations**
  29:22 32:20
  62:4,6 72:16
**alleviate** 31:15
**allow** 24:7 66:24
  101:4
**allowed** 30:20
**allowing** 25:11
**allows** 13:20
  14:4,5,7
**AMERICA**
  131:1
**amount** 49:8
  66:10,11 121:1
**analysis** 17:12
  91:19 92:21
  96:12
**analyzed** 31:4
  32:6
**analyzer** 52:8
  83:5,13 120:8
**and/or** 17:11
  29:21 34:19
  35:1 93:14
**answer** 5:1,6,10
  5:11,12,13
  15:12 22:14,19
  23:3,8,12,19
  23:22 24:8
  26:21,23 27:5

30:20 39:20
41:14 42:3,4
43:3 49:15
51:1 53:18,19
55:15 58:4,5,6
59:8,9 63:2
69:5 104:12,17
106:16 125:3
127:16,24
**answered** 27:4
  42:1 50:21
  62:23,24 63:4
**answering** 55:3
  74:7,18
**answers** 18:5
  55:13 58:18
  75:8 128:4
**anymore** 8:18
**anyways** 29:13
**apologize** 46:3
  92:9 101:17
**app** 119:6
**appearance** 63:7
**APPEARAN...**
  2:1
**appeared** 49:1
**appears** 92:4
  110:22 111:3
  115:22
**appellate** 43:16
**Apple-based**
  86:8
**applied** 39:16
  40:23 41:9
**applies** 40:11
**apply** 41:22
  75:15
**appreciate** 27:8
  40:21 48:17
  51:13,13 55:17
  116:24
**approximately**
  19:8
**apps** 68:3,6

**April** 1:16
  130:13 131:13
**archived** 108:4
  112:6
**area** 17:20 46:9
**arrow** 78:4
**articulate** 30:14
  52:23 107:5
**aside** 32:18
**asked** 42:1
  50:21 54:1
  57:3 62:23
  66:21 70:10,17
  71:11 74:24
  89:6 91:13,19
  93:3 117:23
**asking** 33:7
  40:15 42:8
  47:24 51:12
  55:15 60:18,20
  67:4 72:17
  76:1,1,2,19
  81:3 85:15
  90:10 93:6,7
  99:6 101:2,10
  101:10 118:21
  123:19
**assigned** 8:8
  12:2,3 33:20
  33:21 73:14,21
  81:24 122:12
**assist** 7:17,20
  54:1 71:11
**assisted** 16:1
  66:15
**associate** 8:17
  16:12 71:13,15
**associated** 24:15
  73:24
**Atkus** 2:14
  20:24 21:2
  32:13,16 42:1
  42:11,18 50:21
  51:2 58:1,6

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 134

78:2,17,20,22
79:4,11,15,17
79:23 99:11,13
100:8 119:10
127:21 128:24
129:1,11
**attempt** 5:1
77:11
**attempting**
52:16
**attended** 29:20
**attorney** 129:5
131:16,17
**attorney-client**
22:7,15,16
24:7 25:8
**attorneys** 22:6
23:5,21 24:5
24:15 25:2
**audio** 36:16,18
36:19,21
**audit** 47:15,17
47:18
**August** 19:19
98:5
**authored** 89:23
94:15
**authorized**
44:18 56:5
70:20
**auto** 57:8 81:11
81:16,20 84:2
**auto-** 81:23
**automatically**
81:24
**available** 86:14
106:1
**aware** 17:6 28:7
41:13 64:13
74:8 95:16
122:10 123:1
127:9

———————
**B**

**B** 3:6
**B-O-T-Z** 4:16
**back** 5:4 8:4
14:10 19:17
31:7 41:7,18
42:15,23 43:5
43:10 45:19
49:20 53:13
54:24 76:6
82:5 89:10
101:16 103:20
110:15,21
124:10,15,23
**back-and-forth**
31:13 69:2
**background**
73:17
**badge** 46:24
**Barely** 43:2,3
**based** 22:11
23:18 39:5
52:20 57:23
75:17 101:5
109:1 123:10
126:14 127:5
**basic** 107:4
**basically** 7:17
7:17 19:15
29:18 30:22
31:3,4 44:13
65:2 121:1
**basis** 16:8 31:19
38:23
**bat** 23:16 98:9
**Bates** 100:2
**Bear** 63:16
**BEAST** 75:10
75:23 76:14
77:9
**beginning** 38:9
39:1 53:5
109:11 122:1
**begins** 85:22
90:2 91:6 92:3

92:17
**behalf** 2:6,12,17
129:9
**belief** 58:16
**believe** 6:10 7:8
8:5 9:4,18
11:24 13:5
15:19 17:23
21:12,12,24
25:20,22 27:22
29:16 30:4
31:1,8 36:17
38:17,21 39:24
43:20 44:2,13
44:22 45:13
47:7 49:12
56:7 61:17
65:13,24 70:21
70:21 71:12
72:3 76:6
77:23 80:14
83:2,5,14 84:1
84:12 90:9
112:11 122:13
124:18,21,22
125:1,5 126:6
128:7
**Ben** 73:1
**benefit** 53:14
102:11
**Benton** 21:21,24
29:6,9 31:8
89:10
**Bergner** 73:4,23
**best** 53:19
**better** 17:2
49:15 59:9,10
77:13 96:23,23
**beyond** 76:8
122:10 125:22
**big** 71:21 83:2
**bigger** 16:11
**bit** 8:21 15:13
47:7 48:11,19

53:4 96:15,15
99:14 101:15
101:22 103:3
**blah-blah-blah**
108:6
**blame** 60:4
**board** 6:8,12
**Bolingbrook** 2:9
**Bot-** 25:18
**bottom** 25:12
87:16,18 91:22
91:24 92:2
114:2,3,4
**Botzum** 1:11 3:3
3:7 4:3,16,23
25:4,10,18
27:15 39:10
42:13 80:8
111:14 113:5
113:11 130:10
130:19 131:6
132:2
**Boughton** 2:8
**break** 43:9
77:15 80:3,6
**breaks** 120:11
**Breen** 35:16
36:12,17
**Breen's** 35:19
35:21
**Brian** 21:21
**bring** 14:10
19:16 48:13
59:12 60:8
65:9
**broken** 58:23
**brought** 25:22
89:10 90:19
**Brown** 61:18
**browser** 84:23
**budgets** 9:7
**building** 94:23
96:7
**bunch** 14:20

19:21
**burn** 84:4
**burned** 84:14,15
84:16,20 85:4
85:8,20 86:1
102:5 103:8
122:19,22
**by-numbers**
49:20

———————
**C**

**call** 22:15 43:22
44:4 66:16
72:23 74:22
80:10 87:8
89:14,18 95:1
102:9 105:5,6
107:14 111:6
113:7 120:22
**called** 1:11 4:4
16:20,23 21:21
21:23 37:6
52:7 65:1
66:18 68:24
75:23 83:6
86:21 91:4
97:18 109:13
116:6 120:8
**calls** 33:12 58:1
**camera** 124:12
**capabilities**
47:16 76:9
**capacity** 26:1,24
**caps** 75:11
**capture** 47:13
**Carl** 124:20
**carry** 125:18
**case** 21:11 29:23
35:5 45:8
56:18 66:14
72:16 76:2,24
77:6 88:11
91:24 92:4,5
92:10 93:5,14

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 135

94:24 95:2,13
100:23 108:4
110:11,12
111:4,17 112:2
112:6 121:4,4
121:8,13,15,18
121:18 122:14
122:21 123:13
126:3
**cases** 8:19 10:12
16:1,10,12,24
56:10 65:9
70:1 71:23
77:1 86:9
120:24 121:10
**Cassandra** 1:3
2:19 4:10
21:11 88:19
130:3
**categories** 52:14
67:24 68:1
**category** 68:9
109:24
**cell** 8:12 11:16
13:17,18 17:14
49:5,18 54:1
54:12 64:12
65:3,4 68:22
68:23 69:10,11
69:16 70:4
81:1 85:16
99:17,19,20
100:12 119:24
**Cellebrite** 11:3
11:5,13,20
12:16 13:9,11
13:15,18,19
14:15 15:16,18
17:11,23 18:3
32:8 45:22
46:6,12,19,23
47:6,11,13,16
47:20 48:3,9
48:12,22 49:8

49:22 51:10,16
52:14 55:20
56:4,11,21
57:5,8,21
63:17 64:1,4
64:15,18 65:8
66:5,24 67:13
67:21 69:9,20
69:24 70:1,9
80:18 81:1,7
81:12,16,19
83:2 84:8 86:5
86:16 90:24
91:4 119:1,9
119:15 120:1
123:5 125:11
125:13,18
126:2,5,8,17
126:20 127:3
**central** 40:5
**certain** 16:10
20:23 36:1
54:23 64:2,2,3
65:10 68:3,3
71:23 76:6,7
77:1 84:10
115:6
**certification**
16:16,22
**certified** 1:15
17:5 131:5
132:4
**certify** 131:6,11
131:15
**chain** 75:14
**chance** 23:15,20
24:1 27:6 88:7
**change** 97:12,14
115:21
**changed** 52:1,1
**changing** 128:3
**characterize**
33:2,15
**charge** 120:17

121:3,12
123:14
**charging** 34:9
**Chicago** 2:4 8:9
8:10,22 9:2,9
16:15 65:19
71:23 132:13
**chief** 6:10 20:4
21:24 29:6,9
31:8 89:10
90:10,21 93:3
93:11 94:21
96:4 104:24
113:16 114:9
115:19 123:23
123:23,24
124:18
**Chris** 19:14
21:21 25:20
42:11 93:4,12
105:1 111:14
**Christopher**
1:10 3:3 4:3,16
26:24 130:10
130:19 131:6
132:2
**city** 1:6 2:12
21:22 24:15,21
27:1 28:7,7,21
28:22 29:2,3,5
29:21 30:1,10
95:18 100:6,8
102:15 116:5
121:22 127:20
128:18 129:2,9
130:6
**City's** 24:17
**Civil** 1:13
**clarification**
32:14 51:14
88:21
**Clark** 132:12
**class** 125:13,15
126:8

**classes** 11:11
**clean** 97:16
**clear** 26:20,21
41:15 69:6
99:10 117:14
117:16,19
**click** 78:5,17,24
79:2,10,13
**client** 21:11
**close** 90:24
91:24 109:7
112:7 113:12
117:8 119:2
**closed** 108:4
112:7
**code** 77:15
81:21
**codes** 38:4,11
**college** 5:18
**come** 36:10
42:23 43:5
45:8 61:23
97:2 113:18
**comes** 7:20 9:7
14:19 36:1
93:6 97:6
106:7
**coming** 42:15
60:15 113:15
**commander's**
56:2 61:19
**commenced**
131:13
**commencing**
1:16
**comment** 63:6,9
106:24 113:14
**comments** 63:13
**commissioned**
120:16
**commissions**
98:13
**committed** 34:5
**common** 46:12

71:1
**communication**
84:6
**companies**
14:21,23 70:7
**company** 15:18
15:21 18:4
126:9
**compared** 15:7
**compilation**
84:17
**complainant**
66:15
**complaint** 21:10
22:22,23,24
28:5 32:21
37:4,8 40:17
41:7,13,17
62:6,8 66:17
89:8,11
**complaints** 40:3
41:4,9,12,12
**complete** 102:4
104:18
**completed** 47:24
48:9 88:14
92:24
**completely** 4:24
5:7,8 65:7
97:14
**complicated**
12:12
**complied** 39:3
**computer** 8:12
8:23 9:3,8,9,16
10:2 13:19
14:19 16:13
17:3,8,9 32:11
44:13 46:6
48:23 49:4
51:5 53:21
74:13 90:23,24
91:4 94:3,6,20
95:7 96:18

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 136

99:4 109:11,12
109:18 117:8
118:8,10
122:17 125:15
**computers** 31:2
31:3,12 90:5
90:13,16 91:7
91:8,9,14
92:21 94:17,18
96:1,10,11
97:20 122:6,9
122:12,12
**concern** 22:13
58:9,10 115:16
**concerned** 61:19
**concerns** 56:1
**concluded**
129:14
**conclusions**
107:20
**conduct** 30:11
38:4,11 50:13
**confirm** 86:4,19
**confusing** 41:16
118:3
**conjunction**
72:15
**connected**
110:23
**connection** 35:9
35:12 66:23
70:16 89:6
**connections**
71:23
**consent** 95:14
99:1
**consider** 8:17
**considered** 17:1
**consistent** 88:12
**constitutes**
130:13
**construe** 101:4
**contact** 95:1
**contain** 93:13

**contained** 110:4
**contains** 111:13
**contender** 34:16
**content** 68:18
99:7,8
**contents** 72:10
74:1 96:10
99:4
**context** 30:17
**continue** 22:14
22:18 25:12
101:21 117:23
**continuing**
75:14 122:2
**control** 24:23
30:10 75:21
76:20,22
**conversation**
44:11 45:1,4,9
45:11 74:6
112:18
**conversations**
22:7 34:23
35:3
**convey** 90:21
**conveyed** 115:11
**COOK** 131:3
**copied** 76:15
93:22 94:21
95:5,19 97:5
97:17
**copies** 20:13
105:1 124:24
125:7
**copy** 31:21
70:18,22 72:9
78:10 96:15,19
97:3,11,16
99:19 127:14
128:13,19,21
128:24
**core** 64:24
**corner** 60:5
100:2

**corporate** 25:20
**corporation** 1:7
24:17 27:1
130:6
**correct** 6:18
9:18 28:10,11
28:13,17,19
32:9 35:14
36:13 40:6
47:18 50:15
69:11,12,16,17
70:14,15 72:13
72:16 80:13
82:9,20 85:9
85:17,21 86:17
89:9 90:4
96:12 98:15
99:21 107:24
110:24 115:13
115:15 116:23
118:21,22
120:7 123:9
130:14
**correctly** 11:17
12:11,14 15:19
29:8 47:9 48:8
48:11 52:3,11
67:23 74:7
85:2 97:6,17
98:21
**counsel** 24:16
25:19,21 27:1
107:16 111:10
131:16,17
132:3
**counsel's** 24:17
102:10
**country** 9:11
**County** 12:4,10
131:3
**County's** 12:4
**couple** 4:22 39:8
44:20 84:17
119:5 122:8

**course** 75:9
112:18 121:24
122:14
**court** 1:1 25:7
27:20 63:2
100:1,18 130:1
**Courts** 1:13
**coy** 24:4
**create** 83:21
**created** 65:13
78:1 83:24
**creates** 48:9
83:2 120:1
**CRFL** 97:20
**criminal** 32:4
95:13
**criminally** 36:5
36:8
**criteria** 108:3
**cross-training**
34:8,12
**cross-training...**
33:22
**Crowley** 33:3,10
34:19 35:1,6
45:6,8
**CSR** 132:12,16
**currently** 4:21
5:20 6:17
**custody** 75:14
**cut** 61:6 74:16
104:10 118:12
**cutting** 100:5
**CV** 1:5 10:10,15
10:22 11:6,9
11:12,19 13:4
130:5

———————
**D**
**D** 3:1
**Darcy** 2:7 80:2
**dark** 42:10
**data** 13:20,21
14:22 15:5

17:12 46:23
47:11,19,22
48:1,4,15,22
49:8,12 50:1
50:11,15,19
51:21 52:5,9
52:16,18,18
55:20 56:3,6
56:21 57:5
64:17 66:3,23
67:1,2 69:15
70:19 75:15
80:17,18,24
81:7 82:18
86:16,19 93:17
97:10 99:4
109:24 110:19
119:6 120:3,5
121:1 122:4,15
122:21
**database** 64:14
64:22,24 65:10
84:23 85:12
86:13 88:22
**databases** 64:16
64:17
**date** 18:19 19:18
21:15,18 28:4
28:6,15 32:6
65:17 77:24
88:24 93:23
114:24 131:12
**dated** 20:2,7
86:23 87:5
94:10 98:5
102:9 105:13
107:7 111:7
113:22
**dates** 11:10
69:23 86:11
**Dave** 59:19 60:2
60:3
**Dawn** 124:18
125:5

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 137

day 63:22 66:20
  77:13 130:21
deal 7:19 77:7
  104:24
dealing 14:16
Dearborn 2:3
December 111:7
  113:22
decide 102:24
deciding 40:19
decision 112:10
  114:18
Defendant 2:12
  2:17
Defendants 1:8
  130:8
defense 24:16
deleted 14:7,9
  64:10 65:5,5
  84:12,20 88:18
  96:17 109:15
  109:18
delivered 90:16
  95:9 96:1,9
  97:20
department
  4:19 6:7 7:10
  7:13 9:16
  10:23,24 17:2
  17:7,19,21
  29:21 30:7
  37:15,22 38:3
  38:10 39:2
  40:2 45:22
  46:9 72:14
  73:3,4,11,20
  73:22 75:10
  86:22 91:17,19
  91:21 92:22
  93:16 94:9
  111:23 114:15
  122:5 125:10
Department's
  34:20 39:17

40:12,23 41:10
  41:18,23 45:21
depending 15:2
  16:10
depends 15:8
  76:23,23
depicted 62:21
depictions 63:10
deposition 1:10
  3:7 4:11 9:22
  18:7 20:1,12
  21:6 32:20
  37:2 80:11
  128:2 129:14
  130:12,15
  131:8,11,13
depositions 1:14
  4:12
deprive 88:9
derivative 113:6
  113:11
describe 7:15
  13:15
described 93:14
description
  10:16
designates
  110:20
detail 61:5,9
detailed 16:4
  72:22 106:11
detective 17:14
  34:24 49:14
  56:24 57:18
  58:17 59:9
  66:13 125:23
  126:16
detectives
  125:10 126:4,7
determination
  45:18 95:24
determine 45:20
  86:15 88:19
determined

95:22
device 49:17,22
  49:24 63:16
  69:10,11,14,14
  100:13 110:1
  122:17
devices 48:23
  75:15,16 76:16
  95:8 99:8
  122:23,24
dictates 47:8
  121:16
difference 41:21
different 9:11
  12:2,20,21
  14:20,24 15:4
  16:2 19:21
  31:12 59:1
  65:20 70:7
  78:15,19 79:19
  84:18 86:8
  87:3 95:20
  114:17 120:3,4
  120:14,15
  121:9 122:9
differently
  14:24 15:1
  69:23 70:6,8
digital 31:21
  76:9
dignity 38:15
direct 105:14
directing 113:16
direction 30:10
  112:5,8,8
  114:5,9 115:10
  115:12,18
  125:5 131:10
directions 115:7
directly 22:23
  67:4 131:18
director 108:2
  111:18 114:11
disclosing 24:8

disclosure 59:24
discriminate
  38:22
discuss 30:23
  75:6
discussed 29:23
  32:20
discussing 29:20
  75:5
discussion 13:1
  30:18 31:7
  73:23
discussions
  24:13 31:10
disk 65:13 84:5
  84:14,15,17,20
  85:5 102:5
  103:8 106:15
  106:22
disks 76:16 85:7
  85:19 86:1
  122:19,23
displaying 67:2
distance 59:16
District 1:1,1,13
  130:1,1 131:1
division 1:2 6:22
  7:9,13 16:5
  46:9 127:2
  130:2 131:2
DNA 96:22,23
  96:23
DNA-type 97:2
document 45:17
  77:18,21 78:3
  80:10,11,16,22
  86:21 87:11,16
  88:10 94:12
  99:11 100:3,11
  101:4 108:8,18
  109:17 116:13
  128:7
documentations
  90:18

documented
  94:1 108:11
documents 18:6
  18:9,20 19:21
  19:24 20:16
  36:24 77:12
  93:4 116:7
doing 8:19 17:8
  17:9,11,14,15
  20:14,14 34:11
  45:16 46:19
  47:4 49:2
  53:24 59:12
  60:1 64:21
  65:22 73:15,19
  74:12 75:9
  91:15,20 112:1
  112:17 114:6
  125:4 126:20
  126:22 127:9
double-clicking
  79:4
doubts 5:3
dproctor@tre...
  2:10
drive 32:8,8,9
  32:10 48:21
  49:17 93:22
  94:4 96:15
  97:2,4,13
  124:21
drives 14:22
  32:6 76:16
  93:24 122:23
dropped 15:12
drove 96:4
drug 7:18,20
due 49:18 55:24
  76:7
duly 4:4 131:7
dump 119:1,6,6
  119:8,15
dumped 101:13
duties 6:23 34:3

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 138

| | | | | |
|---|---|---|---|---|
| **duty** 17:3,4 72:23 | **employee** 40:24 73:4 131:16,17 | 73:20 81:2 90:8 101:9 | 80:11 83:18 87:9 88:12 | 117:18 **extract** 14:21 |
| **DVR** 16:14 17:15 | **employees** 40:3 41:9 | 121:5 **exam** 109:10 | 89:13,14,19 94:8 98:4,7 | 52:5 64:15 84:22 86:10 |
| **Dziedzic** 108:2 112:11,20 114:11 | **encoded** 119:1,8 119:15 120:2 **encrypted** 83:3 | 114:24 **examination** 1:11 3:4 4:7 | 99:3 100:4 102:8,22 105:12,16,19 | 119:24 **extracted** 47:12 47:19,23 48:2 |
| **E** | 83:11 120:2 **ended** 64:21,21 | 15:3 16:18 86:5 97:21 | 107:6,14,23 110:16 111:5 | 48:5,22 50:1 50:12,15 51:21 |
| **E** 3:1,6 129:1 **e-mail** 2:5,10,16 | 65:22 124:22 **enforcement** | 98:14 99:5,9 100:13 103:7,7 | 115:1 116:3 **exists** 24:11 | 52:17 53:8 56:3 62:11 |
| 18:15 19:13,18 **e-mailed** 79:11 | 10:2 13:16 38:13 | 104:21 105:3 105:13,17 | **exit** 43:5 **expected** 38:12 | 64:8 66:2 69:16 70:8 |
| **e-mails** 18:16 67:2 70:12 | **engaged** 62:1 63:10 | 106:14 107:7 109:12 111:6 | **experience** 10:16 11:20 | 80:19,24 85:24 86:16 93:17 |
| **E-Tran** 128:21 **earlier** 37:1 | **enlighten** 57:19 **enter** 46:23 | 111:16,21 121:12 | 13:3,9,14 14:16 15:2 | 96:11 104:8 122:4,16,22 |
| 63:23 113:4 116:21 119:19 | **entered** 50:13 50:18 | **examinations** 81:15 | 17:8,20 33:11 64:12,18 65:15 | **extracting** 63:15 **extraction** 17:12 |
| 119:23 120:7 **easier** 15:7 96:7 | **era** 5:2 **errata** 130:16 | **examine** 90:17 94:19 95:9 | 101:3 120:24 **experienced** | 18:11,11 47:4 48:1,8,14,16 |
| **easily** 13:22,22 **East** 2:8 | **error** 128:8 **especially** 31:19 | 96:2 **examined** 4:5 | 14:19 **expert** 10:11 | 51:8,9,11 52:4 52:13,24 53:6 |
| **EASTERN** 1:2 130:2 131:2 | **estimate** 13:6 26:14,17,17,18 | 95:6,10 106:2 **examiner** 91:6 | 17:3,4 **explain** 13:13 | 53:20 54:1,3,8 54:15 55:19 |
| **easy** 4:14 15:14 **educational** 5:17 | **eventually** 61:16 77:15 | 92:24 102:3,6 106:12 107:1 | 15:1 53:3 **explained** 5:5 | 59:14,17 60:1 60:10 61:23 |
| **Edward** 1:7 2:17 130:6 | **evidence** 31:22 39:3,13,17 | 109:22 110:1 114:10 121:15,8 | 56:15 **explaining** | 64:1 65:24 66:23 76:12 |
| **effect** 28:8 54:11 61:21 62:15 | 75:14,21 76:4 76:7,20,21 | **examiner's** 109:20 | 58:11 **explicit** 62:10 | 81:21 82:6,13 82:15,17 83:1 |
| 117:9 **either** 9:12 28:3 | 77:2,4 82:16 95:5 113:6,11 | **examiners** 90:3 90:22 91:15 | **Explorer** 79:6 83:12 | 83:20 84:3 85:16 88:14 |
| 29:20 43:20 49:6 58:23 | 121:21 123:6,9 123:17 124:18 | 93:14 98:17 108:8 114:19 | **exposure** 13:11 34:2 | 89:5 102:4 109:5 110:5 |
| 60:13 61:21 70:5 123:6 | 124:22 125:8 **exact** 29:5 55:2 | 115:20 120:15 121:9,16 | **expressed** 35:4 **extension** | 119:19 122:1 123:4 |
| 127:21 **elect** 128:11 | 61:13 97:10 **exactly** 40:20 | **example** 10:21 **excellent** 34:8 | 108:24 110:8 **extensions** | **extractions** 17:15 49:2,4,6 |
| **electrical** 49:23 **eliminate** 68:15 | 53:21 55:21 57:18 58:21 | **excuse** 21:16 52:1 64:19 | 108:12,20,23 **extensively** | 49:9,11,18,19 51:15 54:12 |
| **else's** 117:1,19 118:15 | 59:11 63:21 64:7 68:21 | **exercise** 128:10 128:12 | 127:17 **extent** 22:5,13 | 59:1,22 76:4,7 76:15 123:17 |
| **employed** 4:18 | 69:3 72:13 | **exhibit** 3:7 | 24:11,22 39:21 | **extracts** 13:21 |

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 139

64:16
**extremely** 49:9
121:10
**eye** 66:22

**F**

**facilities** 9:11
**facility** 8:22 9:2
**fact** 44:4 55:24
62:9 71:12,21
115:10
**facts** 37:7
**fair** 5:8 17:10
74:8 112:4
118:13
**fairly** 66:6
**familiar** 39:10
40:1 41:13
43:15,18 57:10
64:23 69:20
73:3,5
**familiarity**
98:18
**far** 37:19 87:20
113:1
**FBI** 9:5,6,7,12
9:12 11:17
12:1 15:20
16:17 17:24
31:19 91:16
93:23
**FBI's** 8:9 9:16
71:13
**feature** 91:9
**Federal** 1:12
**feel** 22:23
**fellow** 32:21
38:13 72:2
**felt** 126:8
**female** 38:19,22
**field** 13:14
**fight** 15:15
**figure** 29:18
43:4 94:6

129:9
**file** 78:24 83:2,3
84:22 90:22
91:2,2,4
103:13 104:2
108:12,12,23
108:24 109:4,4
109:6 110:3,4
110:5,8,9
115:17 119:20
120:1 122:8
**filed** 21:10,17,19
28:5 62:8,16
89:8
**files** 78:4 93:21
103:12,23
104:2 108:19
**final** 67:11 92:3
92:17,20 93:8
93:13 103:8
107:2
**finale** 127:18
**finalized** 106:13
**financially**
131:18
**find** 14:1 20:20
20:22 51:21
55:6 59:4
65:12 70:9,10
83:12
**finding** 14:3
**findings** 107:19
108:17
**fine** 33:17 43:7
87:22 100:6
**finish** 25:6 61:6
104:10,11,17
**finished** 22:11
66:22 67:12
**fire** 6:8,12
**first** 4:4 10:1,1,4
11:5 19:1
83:17 90:5,6
91:5,23 100:3

101:22 115:5
117:6,11,12
119:10 125:12
131:7
**firsthand** 95:23
**fits** 25:21
**five** 80:4
**five-minute** 80:3
**focus** 28:1
115:20
**FOIA** 20:15,17
43:23,24 44:14
45:12,17,20
87:13 104:23
**FOIAs** 20:14,16
104:24
**follow-up**
110:22
**following**
108:11
**follows** 4:6
**force** 33:9 65:20
**forced** 36:3,7
**foregoing**
130:11
**forensic** 9:17
10:2,17 11:2
11:22 13:19
14:20 15:4
16:5 17:8,11
70:3 71:7,14
72:15 81:15
86:3,6,18
103:13 104:3,4
106:1 109:10
**forensically**
97:16
**forensics** 8:9,12
8:13,13,23 9:3
9:8,9 12:17,18
14:17,20 17:3
17:9,20 64:13
75:9 106:4
**form** 39:6,19

40:13 41:1,24
52:21 53:16
57:23 74:10
75:17 76:17
101:6 109:2
123:10 126:14
127:5
**formal** 5:17
10:15
**format** 13:22
15:6
**former** 21:22
28:21 73:4
**forth** 31:7 65:5
109:19
**forward** 59:6
**forwarded**
19:15
**found** 29:16
64:8 82:11
84:23 86:4
88:18,21 90:22
92:6 93:15
100:12 101:10
102:23 105:16
106:6,16 107:5
107:24 108:8
108:19 110:2
125:5
**foundation** 39:6
39:19 40:13
41:24 52:21
53:16 57:24
75:18 76:17
101:6 109:2
123:11 126:14
127:6
**foundational**
39:8
**four** 33:24
**frame** 17:17,18
46:18 70:24,24
72:8
**frequent** 33:18

**front** 10:10
18:15 61:18
78:10
**frustrating**
79:22
**full** 59:24 79:6
115:5
**full-time** 8:18
71:17
**functionality**
32:2
**fundamentals**
12:17,18
**further** 22:9
23:9 24:13
69:9 110:18
111:19 112:5
112:24 118:24
127:19 131:11
131:15

**G**

**games** 24:24
26:6 27:7
**gang** 7:18,19
**gather** 31:2
64:19
**gathering** 37:10
**Gatlin** 83:22
**general** 14:18
39:2,11,16
40:2,11,22
41:8,22 76:2
91:11 92:12
107:4
**generally** 7:15
12:22 37:11
41:11 76:3
89:2
**generated** 57:8
76:13 81:12,16
81:20 92:20
**German** 15:22
15:24 17:14,24

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 140

49:14 56:24
57:18 58:24
59:9 66:14
122:12 125:23
**German's** 54:10
**getting** 22:3
  25:12 30:4
  80:3 105:1
  117:17 129:10
**give** 5:6 18:19
  26:16 36:3,7
  42:21 61:16
  79:1 100:1
  102:13 112:4
  125:7
**given** 4:11 28:7
  37:2 48:21
  72:9 88:15
  114:5 130:12
  130:14
**giving** 4:13 36:2
**go** 10:9 18:21
  19:16 23:9
  24:13 26:7
  29:7,9 31:21
  34:16 39:20
  45:19 47:21
  48:4,15 50:22
  50:24 51:23
  54:20 55:5,10
  56:5 58:17
  60:19 64:4
  78:20 79:1
  82:5 83:10
  84:21 86:20
  87:8 89:13
  94:7 98:4
  102:8 103:18
  103:20 105:12
  107:6 111:5,12
  112:23 113:1
  115:1 116:3
  120:5 124:15
**goes** 14:22 56:19

85:23 94:2
96:14
**going** 13:13 14:6
  15:8 31:12,13
  32:3,4 39:5
  52:20 53:4
  54:19,20 55:1
  55:5 59:5
  60:22 64:21
  66:12,20 70:23
  77:1,11,12
  78:10,18 79:1
  79:8,19 96:15
  96:16 100:24
  100:24 101:5
  102:20 103:3
  105:15 107:3
  107:18 109:1
  112:3 117:23
  123:23 126:10
  126:11,13
  128:16 129:2,3
  129:10
**good** 34:1 49:10
**Googled** 10:21
**government**
  95:12
**grand** 127:18
**Graphic** 103:12
  103:23 104:2
**graphics** 103:11
**great** 20:18 23:7
  23:13 111:18
  127:16
**Grizzle** 1:7 2:17
  34:24 35:4
  53:22 54:4,14
  54:22 55:9,24
  56:15,20 57:14
  58:11 59:3
  60:2,16,24
  61:17 64:1,11
  65:14 66:15
  70:22 77:10

82:4 84:8,24
85:8,20 86:11
88:15 89:4,5
122:12,20
130:6
**Grizzle's** 110:23
  111:2
**ground** 5:2
**group** 24:23
  32:1
**grouping** 68:24
**guess** 5:10,14
  26:15,16 41:5
  52:6 61:15
  73:3 76:23
  110:6 113:21
  115:23 121:2,6
  125:16
**guessing** 26:18
**guide** 102:19
  121:5
**guides** 121:7
**gun** 7:19
**gut** 54:13
**guys** 43:1,4
  125:16,17

---

**H**

**H** 3:6
**Hales** 21:22
  28:18,20
**half** 14:2 30:3
  99:14
**halfway** 117:11
**hall** 2:2,2 4:9
  23:18 24:24
  25:13 26:5
  27:7 29:2,5
  30:1 78:3,23
  86:24 89:16
  103:22 105:18
  116:7 117:14
**hall@adamsle...**
  2:5

**handed** 77:9
  93:11
**handful** 33:14
**handling** 39:16
  74:9
**hands** 20:11
  96:19
**handwritten**
  116:16
**hang** 36:6 42:12
  42:17
**happen** 15:17
  16:9 34:15
**happened** 16:8
  42:21 63:22
  66:2
**happening**
  40:18 112:19
**happens** 56:18
**hard** 14:22 32:6
  32:8,8,9,10
  48:21 93:22,24
  94:4 96:15
  97:2,3,13
**hard-** 16:14
**hardware** 66:7
  97:4 125:14
**hash** 97:7,18
**head** 87:14
  120:13
**header** 110:13
**hear** 4:24 15:14
  42:14,16,17,18
  43:1 53:5 80:8
  80:9 87:1
  124:11
**heard** 5:7 36:19
  43:20 44:22
  62:2,5,8,12,17
  62:18,20 63:6
  63:9,13 123:21
**hearing** 9:1
**help** 81:5 124:13
**helped** 125:24

**helpful** 48:17
**helps** 55:15
**Herald-News**
  20:22 21:1
**HESS** 2:8
**Hey** 66:19
**high** 34:15 71:24
**higher** 114:21
**highest** 5:16
**highlight** 106:8
**historical** 20:16
**hold** 48:22 87:6
  87:6
**holding** 71:20
**homicide** 31:11
**homicides** 16:11
**honest** 90:7
**hope** 124:16
**HOPPE** 2:13
**hour** 10:13 30:3
**hours** 10:13
**house** 49:10
  65:2
**How's** 78:21
  79:3
**Huh** 42:24
**hundreds** 10:13

---

**I**

**ID** 118:20
**idea** 31:14,17
  72:11 95:10
**identifiable** 82:3
**identification**
  47:1
**identified** 94:9
  94:17 100:3
  110:1
**identify** 46:20
  91:8 99:20
**identifying**
  46:24 80:17,23
  91:8 97:7
**identity** 47:14

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 141

**III** 2:2
**Illinois** 1:1 2:4,9
2:15 130:1
131:1,2 132:5
132:13
**iMac** 66:1 75:1
**image** 85:3 97:1
103:13 104:2
**images** 61:24
62:10,14,17,20
63:7,11 67:16
67:17,20,22
68:8 93:17,21
**imbed** 68:6
**important** 5:2
**impress** 34:4
**inaccuracies**
99:1
**inaccurate**
114:17
**included** 61:23
95:8 103:13
104:3
**includes** 10:15
**incorrect** 54:12
83:9 120:9
**index** 18:19
109:23
**indexing** 109:13
**indicated** 122:11
130:15
**indiction** 54:17
**indirectly**
131:18
**individual** 26:1
51:11
**inform** 92:5
107:19 110:18
**informants** 7:21
**information** 7:1
7:2 14:5,8,24
15:1 21:8
22:16 24:9
43:24 46:24

48:12 59:5
60:11 61:1,20
64:20 66:5
69:22 70:6
80:24 83:6
86:14,18 106:3
120:10
**informs** 108:16
**initial** 18:11
110:23 122:1
**initially** 61:15
66:16
**inquiry** 72:15
**instance** 127:23
**instances** 128:7
**instruction**
112:13
**intake** 97:23
98:3,16
**interaction**
44:24
**interested** 53:6
131:18
**interface** 12:21
12:21
**interject** 23:3
**intermediary**
72:14
**internal** 4:20
6:17,19,21
16:24,24 40:6
40:6,7,16 42:6
71:2,6,10 72:5
122:2
**interoffice** 20:3
86:22 87:3
**interrupt** 18:22
22:5 23:17
**interview** 35:8
35:11 116:17
116:18,19,21
**invest-** 40:16
**investigated**
39:1

**investigating**
75:9 91:17
**investigation**
16:10 34:19,20
35:1 39:4,17
40:12,23 41:10
41:18,23 42:7
44:19 50:13
53:24 55:1,12
70:17 71:2,8
73:24 74:10
89:7 97:22
105:6 110:23
111:3 122:1,2
**investigations**
7:18,18 8:8
16:4 30:24
31:4,11 32:2
32:15 40:6,7
45:23 46:9
48:23 50:4
52:19 53:24
56:13 62:13,19
62:21 71:6,10
76:11 94:21
95:8 125:16
127:2,9
**investigative**
16:6 126:20
127:4
**investigator**
10:17 13:16
50:18
**invoke** 22:15
**involved** 31:5
33:9 59:12
71:2,10 120:15
**involving** 29:20
37:9
**iPhone** 47:20
48:2 50:12
51:22 52:17
53:8 56:21
57:5 62:11

63:16 65:1
66:24 70:19
72:10 74:1
80:19 82:19
93:18 122:16
122:22
**iPhones** 64:13
**IPTA** 36:1
**Ironically** 44:12
**issue** 27:13
31:16 74:13
**issues** 34:1
35:12,23 36:3
36:8 37:3,7
73:24 98:9
**IT-network-ty...**
74:4
**items** 15:10
106:1 108:2,6

_____
**J**
**J** 2:8,14
**JAMES** 2:8
**January** 8:15
**jhess@tressle...**
2:11
**job** 34:5,8
**John** 1:7 108:2
114:11 130:7
**Johnson** 52:19
**Joliet** 1:6 2:12
4:18 5:24 6:7
9:16 17:2,21
24:15,21 27:1
29:21,21 30:7
34:3 37:14,21
38:3,10 39:2
40:1 63:6,9
71:2,6 75:10
91:17,18,21
92:22 93:15
95:18 122:5
123:18 125:10
127:20 128:18

129:2,9 130:6
**Joliet's** 30:10
**Jones** 52:19
**JR** 2:8
**judgment** 113:7
**June** 38:2 45:21
**juror** 13:13

_____
**K**
**keep** 32:2 65:4
66:21 77:14
103:3 114:24
**kept** 16:22 49:6
**Kim** 1:15 131:5
132:12
**kind** 12:19
26:18 34:10
36:9 55:4,14
55:15 59:15
65:21 71:20
73:21 91:3
94:5 100:5
103:6 107:3
109:21 112:2
120:10,21
121:3 122:17
126:11 128:21
**knew** 12:13 14:4
44:20 123:19
**KNIGHT** 2:13
2:13
**know** 5:10,11
6:9 9:22,23
13:10 14:8
15:13 16:19
17:16,17,18
19:6 21:17
22:4,6,8,13,13
23:2 24:22
25:5,7 26:6,22
28:15 29:3
31:9 32:3 33:4
34:9 36:1,7
37:12,19 41:4

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 142

41:11 43:14,20
43:21 47:15,15
50:2,3,4 51:20
54:5 55:4
57:16,22 58:9
58:12,14 59:3
59:4,8,15,22
59:24 60:17,18
62:22 64:17
65:17,21 66:9
66:22 68:4,5
73:1,20 74:19
74:20,21 78:7
81:20 82:5,7,8
82:10 86:2
88:1,17,21
93:10,24 94:24
95:13,24 96:3
96:3,18 97:9
97:16 98:17,20
99:12,24 100:4
100:18 102:19
106:16 109:24
110:4 114:10
115:15,20
118:3,17 121:8
123:2 125:4,20
125:24 126:4
127:1 128:23
129:7
**knowing** 60:21
60:21 65:15
66:13 86:6
88:23
**knowledge**
66:17 74:11
77:8 95:23
**known** 9:2 11:2
11:22
**knows** 23:4
**KURNIK** 2:13

———————
**L**
———————
**L** 2:7

**L-A-M-K-E-N**
43:17
**lab** 12:3,4,4
108:2
**label** 57:6 94:3,3
94:4
**labeled** 55:20,22
55:23,23 57:5
57:7 90:23
**labeling** 57:13
**laboratory** 8:9
8:23 9:3,9,17
71:14
**labs** 12:2
**lack** 17:2
**Lamken** 43:17
45:2,4,11
**lantern** 11:23
12:16 13:4,7,8
13:9 14:14,18
17:12 32:9
46:7,15 63:18
65:23 66:1,7
67:9,10,11
69:18,21 70:2
74:24,24 85:23
85:23 86:8,19
88:23 91:4
93:21 108:12
108:14,19,23
108:24 109:4,4
109:5 110:5,8
115:16 122:8
123:5
**Lantern's** 90:22
91:2
**laptop** 46:6
**large** 49:7,9,18
76:8 119:20
120:1 121:1,10
**late** 126:13
**law** 2:2 10:2
13:15 38:13
**lawsuit** 21:16,19

30:11 35:9,13
41:17 62:3,16
89:8,12 123:2
**lawyer** 43:15
**learn** 61:23
122:3,15,21
**learned** 16:2
65:19
**leave** 37:14
**left** 49:22 56:14
**let's** 4:14 19:13
24:24 26:7
49:21 107:6
116:3,9
**letters** 97:9
**level** 5:16
**Lewis** 5:21
**liaison** 72:17,19
72:23 111:23
114:14 121:22
122:3
**lieutenant** 4:20
4:23 6:2,21
15:11 18:18
25:18 27:10,15
39:10 42:13
53:18 61:18
72:4,5,9 77:16
80:8 87:11
89:21 100:11
102:13,21
107:18 116:12
118:6 124:1,1
124:5 127:24
**light** 99:4,7
**limited** 71:7
**line** 18:20 91:5
103:10,11,12
110:13 118:6
**lines** 92:4
**list** 78:4,11
86:21 116:7
**little** 7:4 8:20
48:18 53:4

78:19 99:14,14
101:15,22
103:3 106:11
112:24 118:24
**littlest** 97:13,14
**LLC** 2:2
**LLP** 2:7
**loaded** 122:5,16
**locate** 56:21
82:5
**located** 46:8
55:1 56:16
57:19 59:6
91:4 93:21
108:3
**location** 55:2
57:15,21 59:11
**locations** 120:12
**locator** 84:8
**log** 90:23 91:2
97:23 98:16
**log-in** 117:7
118:10
**log-ins** 118:8
**login** 51:11
**logistics** 21:7
32:22,23,24
**logs** 98:3
**long** 5:22 6:19
7:2,7 30:1
66:12 97:8
**longer** 66:8
**look** 7:18 11:6
15:4 55:5
57:11,22 60:19
66:11 67:5,14
67:21 68:10,13
69:1 70:11
84:21 90:1
96:24 97:23
98:2,15 100:14
101:15 106:22
106:23 110:21
113:20 114:2

114:16 121:2,6
**looked** 20:9
68:22,22 110:3
120:14
**looking** 12:19
13:24 15:3
57:17 60:21
64:2 65:11
68:1,19 69:15
83:17 84:9,24
86:4,6,11 87:5
92:1 93:20
101:8,20
106:15 109:10
109:20 110:8,9
110:10 113:4
119:21 120:6
121:6,16
**looks** 99:13,17
100:4 101:13
102:2 103:6
108:10
**Lorinda** 43:16
**lose** 71:18
**Losing** 64:20
**lost** 42:11 124:1
124:1
**lot** 10:9 15:7
31:20 54:11
73:19 115:17
**lower** 100:2

———————
**M**
———————
**MacBook** 46:7
66:1
**machine** 51:19
75:1
**maintain** 24:10
**maker** 30:6,8
**making** 115:6
117:8
**Malec** 123:23
124:19 125:5
**management**

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

39:3,14
**manager** 21:22
28:21,22
120:19 121:2
121:11
**manager's** 29:3
**manner** 66:6
**March** 6:3
**Maria's** 88:18
**mark** 72:2 84:5
**Mary** 4:17
**matching** 108:3
**matkus@khk...**
2:16
**Matt** 35:16
**matter** 44:1
**McKinney**
126:16,19
**MD-** 97:18
**MD5** 97:18
**mean** 12:15,20
22:10 30:17
32:8 33:5 34:7
34:10 41:3,4
46:21 50:16
106:19 107:3
108:21 116:1
117:20 118:9
118:18,21
121:19 126:21
**meaning** 82:13
109:7
**meant** 91:10
117:21
**media** 31:22
68:6 76:10
**meeting** 21:17
21:20,21,23
22:6 23:6,22
24:6,6,14
25:19 26:10
27:2,16,21,24
28:5,18,23
29:1,6,7,10,11

29:14,17,19
30:1,3,14,15
32:18 35:20
36:16 117:4,9
117:22
**meetings** 37:6
**member** 36:10
71:13,16,16,17
**members** 7:19
24:16 33:8
37:11
**memo** 90:9,13
90:15 91:10
94:17 122:13
**memoranda**
44:10
**memorandum**
20:3 86:22
89:15 94:9
**memorandums**
87:3
**memorialized**
13:4
**memorized**
126:23
**memory** 20:21
22:2 48:7
51:24 68:2
74:11 83:10
118:16 120:9
**memos** 18:13
122:11
**mentioned** 26:9
44:20
**merely** 102:23
107:20
**message** 14:1,9
65:12,16 67:1
68:7 83:21
86:10
**messages** 64:10
65:4 68:10,12
68:13,17,19,20
68:20 69:1,8

69:10,14 70:10
84:12,19 85:3
85:24 86:1
88:15,18
120:12
**messaging** 64:2
64:3,5,8 65:3
65:11 67:5
68:3,7 84:10
85:12 86:6
**MICHAEL** 2:14
**middle** 103:22
**Mike** 129:8
**military** 37:24
**mind** 48:6
101:17
**mine** 98:17
**minutes** 27:24
**misleading**
118:4
**misogynistic**
38:20
**moment** 25:15
**Monica** 1:15
75:11 86:20
87:15 89:13
94:7 98:4
105:14 107:11
110:15 113:21
116:4 128:16
128:18 131:5
132:12
**month** 28:4
**mouth** 117:22
**move** 23:23 26:7
**moved** 123:4
**multiple** 111:24
121:9
**municipal** 1:6
130:6
**muted** 124:5,12
_____
**N**
**N** 3:1

**name** 4:9,15
10:21 19:4
26:10 43:21
44:22 46:24
52:7 54:6,10
55:7,23 58:24
81:6,10,24
82:7,8,10,12
82:13 84:2,2
90:22 91:2
98:10,19,19
110:9 114:16
115:22 121:20
**named** 28:18
43:16 73:4
81:2,3 108:13
109:6 110:3
**names** 58:23
120:15
**narrative** 19:9
83:18 93:13
**narrow** 17:10
64:5 69:9
**nature** 22:11
60:12 72:1
106:21
**near** 114:2,3
**necessarily** 33:8
**necessary** 46:22
53:7 107:15
**need** 5:4 23:3,8
23:17,19 24:2
26:22 39:21
54:24 55:10,11
59:5,6 60:19
60:22 78:6
88:10 95:13
102:14 105:14
117:16 128:10
128:24
**needed** 8:19
16:14 51:17
71:24 82:6
112:6 115:21

**Neither** 124:8
**network** 49:17
118:20
**never** 5:10,14
30:8 33:5,11
33:11,13 44:23
49:3 95:4
98:24 104:20
105:8 111:16
**new** 123:23
124:18 125:18
126:2
**nice** 34:11 66:6
**Nicholas** 33:3
**night** 59:14
**nodding** 63:2
**Nope** 87:6
**normal** 58:17,17
74:15
**normally** 14:6
**North** 2:3,14
132:12
**NORTHERN**
1:1 130:1
131:1
**NOTARY**
130:23
**note** 22:8 117:7
117:18 118:24
**notes** 27:23
44:10 106:11
106:13,23
109:21 110:22
116:7,8,9,16
117:1,1,2,20
118:14,15
**notice** 1:12
**noticed** 14:19
99:2 126:24
**noting** 128:6
**noun** 82:17
**November** 8:16
20:3,7 89:14
89:17 94:10

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 144

nude 62:1,10
number 10:12
  26:14 47:1
  80:21 84:1,1
  97:7,8,14
  108:20 109:14
  109:23 110:11
  110:12,14,19
  110:21 111:1,1
  111:2,4
numbers 48:19
  64:8 69:4 84:7
  97:8
numerous 65:18
nut 55:18

**O**

object 39:5
  52:20 101:5
  109:1
objection 22:12
  23:23 39:19
  40:13 41:1,24
  42:1 50:21
  53:16 57:23
  58:1 62:23
  75:17 76:17
  123:10 126:14
  127:5
objections 39:21
observations
  108:11
observed 108:12
  108:12,13
  126:19
obtained 39:17
  75:15
obviously 12:20
  18:1 32:3
  54:20 56:15
  60:15 66:2
  77:1 90:14
  95:20 104:21
  104:22 106:19

occasion 33:18
occasions 65:19
occurred 15:13
  28:5 32:5 44:7
October 44:9
  111:14 112:16
  113:10
office 24:17 29:4
  35:17 43:16
  56:2 61:19
  125:6
officer 5:22 7:1
  7:3,22,23 8:2,4
  10:3 15:22,24
  16:3 19:7 25:7
  29:22 33:3,10
  33:16 34:2,4,4
  34:19,20 40:24
  41:10 46:18,19
  46:22 47:2
  52:15 54:17
  55:5 59:19,20
  59:20 60:2
  61:24 62:10
  71:3 72:2 73:8
  73:18 77:18
  84:10
officer's 122:17
officers 29:21
  32:21 38:4,11
  38:19,23 62:9
  63:6,9 71:6
  95:8 123:18
  126:7 127:2
offices 2:2 46:10
  123:18
official 106:10
  125:19,23
  126:2 127:3
officials 29:22
Oh 28:15 46:3
  78:13 88:6
  119:12 129:7
okay 4:14 5:14

5:15 9:23,24
  19:5,12,18,20
  20:2,5,6,8,11
  21:2 22:19,21
  23:2,14 26:20
  31:5 32:12,16
  37:17 42:6
  43:15 48:17
  50:6,9 51:4
  52:15 53:2
  55:17 59:7
  60:7 61:22
  78:13 80:8
  81:13 82:10
  86:20 87:6,22
  88:6,6 92:16
  92:16 95:3
  100:9 101:21
  103:2 104:6
  106:5,18 107:6
  113:20 115:4
  116:9,17,20,24
  117:5,13
  118:12 119:13
  121:13 124:14
  127:10,23
  128:20 129:4,8
  129:11,13
old 22:3
once 12:13,15,18
  21:13 47:23
  48:8 54:3
  64:15 97:24
ones 15:7,9
  120:13
ongoing 32:3
  48:24
online 10:19,20
  11:1
open 78:6,17,24
  79:1,2,13
  119:20
opened 52:12
  78:13

opening 78:15
openings 34:14
openness 60:6
opinion 33:6
  34:16 57:16
opinions 33:7
opportunity
  88:9
opposed 102:23
  105:17 108:9
  108:17
option 32:1
order 16:5 20:12
  39:2,11,16
  40:2,11,22
  41:8,22 47:22
  48:4 50:18
  67:16,20 94:5
  94:8 129:12
ordered 35:15
organized 9:12
  9:14
original 77:24
  96:18 97:10
originals 125:8
originating
  115:9,11
outcome 45:6
overly 12:12
overseen 9:6

**P**

p.m 1:16 19:9
  80:12 129:15
  131:14
page 3:2,7 82:22
  91:23 99:14
  100:3 101:22
  103:12,15,22
  103:22 111:12
  112:23 114:2,3
  115:5 117:6,11
  119:11
pages 114:23

paperwork 93:1
paragraph
  83:17 84:21
  85:22 87:19
  88:1,7,12 90:1
  90:3 91:6,7,22
  91:24 92:2
  111:13 115:5
parameter
  65:10
parking 96:6
parse 14:5 48:11
  52:9 66:5 68:9
  68:24 83:6
  119:21
parses 120:10
parsing 66:19
part 20:7 21:17
  32:24 35:17
  40:17 42:6,7,8
  50:12 53:1,7
  55:11 59:13,21
  72:21 80:16
  86:24 87:2,4
  89:3,9 94:10
  95:21,21 97:21
  105:3,6,7
  108:15,16
  110:6,11
  111:20,22
  112:1 113:9
  114:13 115:1
  115:22 123:3
particular 7:9
  7:12 14:17
  47:2 51:17
  55:8,8 71:8
  73:17 80:10
  84:4,9 92:13
  99:3 100:12
  101:3,4 105:16
  108:8 109:7
  127:3
particularly 5:1

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 145

33:9 92:14
**parties** 131:16
**partner** 59:14
**parts** 119:5
**passcode** 47:1
**password** 46:13
  50:14,14,16,17
  51:5,6,7,9,12
  51:17,20
  118:19
**patrol** 28:14
**PDF** 78:4,6 87:3
  128:22
**PDFs** 78:11
**pending** 53:11
**penned** 90:13
**people** 9:13
  21:23 26:9,11
  26:13,14,19
  31:9 54:19
  60:14 61:4
  62:13,18 64:6
  68:8
**people's** 58:23
**perfect** 85:13
  103:4
**performance**
  34:3
**period** 8:14 13:6
  84:5 112:7
  113:12
**person** 17:4
  35:22 55:5
  56:22 58:17
  59:13 64:3
  73:21 98:10
  120:17 121:3,7
  121:23
**person's** 68:23
**personal** 13:19
  41:6 46:23
  47:2 54:19
  58:11 60:14
  61:12 95:7,15

122:17 123:18
  131:10
**personally** 25:24
  60:11 126:19
**personnel** 9:13
  56:5 62:21
**perspective** 41:7
**pertaining** 1:14
**phone** 2:4,10,16
  8:12 11:16
  12:19 13:17,18
  13:20 14:1,6
  16:13 17:14
  47:12,23 49:5
  49:18 51:6
  54:2,8,12,17
  54:20 55:6
  56:1,3 58:9,12
  58:15 60:12
  61:16,20 64:7
  64:12,16 65:3
  65:23 66:3
  68:22,23 69:4
  69:10,11,16
  70:6,20,23
  74:21 81:1
  83:22,22,24
  84:1,7,11
  85:16 88:16,18
  99:18,19,20
  100:13 101:11
  101:13 102:3,4
  103:7 119:24
  122:5 132:14
**phones** 14:23
  65:4 70:4 76:8
**phonetic** 124:20
**photo** 14:8
**photographic**
  61:24 93:16
**photographs**
  67:3 85:8
**photos** 67:13,14
  67:24 68:9

85:15 100:4
  106:3,21
  120:11
**phrase** 64:2
  109:6
**physical** 52:8
  83:5 96:10
  119:1,6,6,8,15
  120:8
**pick** 15:5 78:23
  78:23
**pictures** 60:19
  60:23 61:1,3,4
  61:11 68:6,14
  68:15,18 70:11
  83:12,13
**piece** 109:24
**PIO** 20:14
**place** 5:20 21:7
  29:1 31:21,23
  49:10 71:20
  96:14
**places** 114:17
**plaintiff** 1:4,11
  2:6 4:10 130:4
**plans** 37:14,16
**platform** 33:22
**play** 24:24 34:18
  63:15 123:3
**played** 6:10 45:5
  74:8
**playing** 26:6
  27:7
**please** 25:15
  86:21 91:23
  99:15 103:2
  112:24
**plus** 66:17
**point** 12:3 24:3
  24:5 31:6,14
  35:9,12 39:15
  40:16,19 41:16
  45:24 48:14
  56:17 61:22

62:4 65:6,22
  65:24 66:8,13
  72:7,12 73:1
  88:19 95:1
  126:24
**pointed** 82:3,4
**police** 4:18 5:22
  6:7,7,12 7:9,13
  9:16 17:2
  29:21 30:7
  33:8 34:4
  37:21 38:3,10
  39:2 40:1 46:9
  75:10 86:22
  91:17,18,21
  93:16 94:9
  122:5 123:18
**policies** 92:12
**policy** 30:6,8
**populated** 84:2
**position** 7:1
  53:23 54:23
  55:8 56:17
  57:15 71:18
**possibility** 18:4
**possible** 17:24
  43:4 46:14
  57:2,9 69:23
  86:18 112:18
  126:22
**possibly** 15:4,8
  26:19 98:2
**posted** 11:1
**potential** 14:10
**potentially**
  86:10
**power** 49:23
**powered** 49:22
**practical** 24:12
**practice** 127:1
**practicing** 77:14
  127:2
**preceded** 34:20
  43:11

**preceding** 91:7
**precise** 96:9
  97:12
**preparation**
  18:6 19:24
  20:10 32:19
  37:1
**prepare** 20:12
**prepared** 77:21
  80:12
**preparing** 21:6
**prepped** 4:12
**present** 2:19
  22:6 23:5,22
  24:5,15 25:2
  26:10 27:1,20
  30:13
**presented** 35:24
  103:8
**presents** 15:6
**preserving**
  31:22 32:4
**press** 43:22
  44:23
**presume** 5:7
**pretty** 69:5
  117:19 127:17
**previous** 70:1
**previously** 6:14
**prior** 6:14 7:1
  26:21 30:4
  66:14 70:22
**priority** 71:24
**privacy** 58:13
**private** 24:16
**privilege** 22:8
  22:15 24:7,9
  24:10 25:8
**privy** 37:12
  105:8
**probably** 10:24
  11:7,7,17 19:3
  49:14 57:19
  82:15,22 83:4

Case: 1:18-cv-05681 Document #: 256-4 Filed: 11/21/22 Page 183 of 290 PageID #:1878

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 146

professionals 38:13
proficiency 16:20,21
profile 97:2
program 13:8 46:7 52:10 65:20 66:7 120:3,4
progress 30:4
project 120:18 120:19 121:2 121:11
promoted 6:2,3 8:16
promotion 6:10 6:13
promotions 6:15
prompt 118:16
property 39:3 39:13 95:12,17
proprietary 48:13
prosecution 34:19 35:1,5
prosecutor 45:14
prosecutor's 43:16
protect 24:10
protected 22:16 24:9
protection 36:9
provide 16:5
provided 15:17 38:4,11 71:8 130:16
public 6:24 7:2 130:23
pull 14:21,24 69:23 70:5 109:14
pulled 16:10 82:19

96:23 99:18 114:8,9 115:3 115:17,22 125:24 126:10
problems 33:17
Procedure 1:13
process 4:23 31:5 97:19 107:20
processed 106:2
processing 112:5
Proctor 2:7 22:4 23:2,8,11,14 23:18,21 24:3 24:20 25:5,11 25:15 26:5,20 27:7,11 39:5 39:19 40:13 41:1,24 42:22 43:8 52:20 53:10,13,16 57:23 61:6 62:23 75:17 76:17 78:6,9 80:2,2 88:4 99:10,12,24 100:9 101:5 102:17 103:16 104:10,14 109:1 117:14 118:2 123:10 124:3,6 126:13 127:5,20 128:15,18,21 128:23 129:2,7
product 67:11 77:3
production 102:15
professional 80:1
professionally 38:5,12

pulls 69:22
purpose 21:5 127:4 128:3,6
purposely 54:16 55:23 59:11 111:24
purposes 81:7 96:11
pursuant 1:12 1:12 70:18
put 11:10,17 49:10 52:13 53:21 54:5,9 54:10,13,23 55:8 57:21 58:16 59:3 65:23 66:5 68:8 71:16 76:4,7,13,19 76:21 77:2,4,8 77:18 81:20 102:5,6 111:3 111:17 123:6,8 124:17,22 125:7
puts 13:21 119:19
putting 57:15 59:2 76:9 98:18

Q
query 68:11 120:5
question 4:24 5:1,3,6,11,12 5:13,14 15:11 17:10 20:18 22:19 23:4,9 23:12,19 24:8 25:16 26:23 27:3 38:6 40:20,22 41:5 41:20 43:10

47:9 49:15,21 53:10,14 55:4 55:14 58:18 69:6 74:18 75:8 80:21 84:5 88:11 102:20 105:15 107:18,21 111:18 114:6 117:14 118:3 118:21 127:11 127:16,24
questions 4:14 24:2 39:8 46:17 126:1 127:19,20,21 128:3
quick 43:5 63:4 66:6 127:12
quicker 14:6
quiet 42:10
quite 15:13,14 66:10 87:19 113:1 125:18
quote 90:23,24 91:24,24 109:6 109:7 111:13 112:5,7 113:10 113:12 117:7,8 117:15,17 119:1,2
quotes 92:8

R
raised 35:12 37:3,7
raising 22:12
ran 46:7
rank 6:22
RCFL 9:19,21 10:1,8 11:8 12:8 16:12 19:16 20:4,6 31:18 72:14,20

90:16 91:18,19 91:20 92:13,21 93:5,14 94:2 94:18,22 95:6 95:9,19 96:1,4 96:13 97:20 98:5 104:21 105:13 106:8 107:6 111:6,23 112:5 113:22 114:5,14 115:7 120:14 121:10 121:18,22 122:3 125:12
RCFL's 120:17
reach 37:20,21
reached 126:16
read 5:4 13:23 15:7 21:10,12 21:13 43:10,12 53:13,15 64:23 87:24 88:1,2,7 88:10 100:19 111:19 119:8 128:1 130:11
readable 13:22
readily 86:14
reading 89:2 91:1 102:21 109:22 117:18
reads 64:23 103:10,12 113:10 118:24
really 31:8 33:5 43:5 49:3 96:24 106:16 106:24 107:4 121:7 127:11
reason 8:24 42:20 66:4 69:21 70:7 71:15 74:14 75:4
reasonable

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

26:17
**reasoning** 90:7,9
**recall** 4:13 11:14
12:1,7,10
17:22 22:21,22
26:12 29:3,4
29:12,24 30:16
44:15,17 45:10
45:13,16,18,24
46:5,14,16
50:5,7,8 51:10
51:18 53:21
54:7,9 55:19
55:22 56:24
57:7,17,20
58:21 60:13
61:2,10,12,14
62:19 67:10
68:14 69:19
72:24 73:15
74:2,6,13,14
74:19 81:2,11
81:15,18 84:16
85:5 87:14
90:13,18 110:7
112:13,17
114:6 115:24
117:8 118:18
118:20,23
126:18,21
**received** 11:13
65:16 86:12
**receiving** 69:14
**recollection**
80:17,23 88:13
98:1 112:21
117:3,24 118:7
119:3 126:12
**recommended**
6:14 31:24
**recommending**
6:12
**record** 12:24
13:1 18:19

39:22 43:12
44:10 52:21
53:15 75:18
99:24 109:2,16
123:11 126:14
127:6 128:11
130:14
**recorded** 36:16
36:18
**recording** 36:19
36:22
**records** 27:16
27:17 73:14
**reduced** 131:9
**refer** 9:21
**reference** 91:23
100:1,2 108:19
109:14,23
110:14,19
111:1
**referenced**
108:13 115:6
**referred** 9:15
114:4
**referring** 19:22
64:11 76:24
80:20 82:12,18
90:6,8 92:11
108:5,15
118:11 119:7
**refers** 91:6
**reflect** 11:9,12
11:19
**reframe** 41:20
**refresh** 22:2
80:16 117:2
118:6 119:3
**refreshed**
117:24
**refreshes** 80:23
**regard** 32:18
**regarding** 37:3
**regardless** 81:18
**regards** 20:15

32:22 35:17,22
43:23 44:13,19
66:17 74:5,12
74:22 75:5
77:6 90:12
93:5 94:5
107:22 111:17
113:18 114:15
114:19 126:3
**regional** 8:9,22
9:2,9,16
**Regis** 19:14,17
21:21 25:20
26:24 30:14
31:1 35:8,11
93:4,12 105:1
116:17 117:3,9
117:22 118:1,7
119:4
**Regis's** 35:17
116:19
**regular** 16:8
31:19 33:18
**regulations** 38:3
38:10
**Reid** 72:2,9
**relate** 46:17
**related** 45:12
**relating** 17:12
37:7 39:3 41:8
43:24 48:23
74:9 86:1
**relationship**
28:4 33:2,15
34:1
**relative** 93:15
131:15,17
**relayed** 112:11
112:19
**relaying** 112:13
**release** 44:18
**remember** 5:12
5:13 11:17
12:1,11,14

15:19 16:20
21:13,15 29:8
30:17,17 31:9
44:3,7 47:6
48:8 52:3,7
53:22 54:14
55:2,21 57:4,8
57:12,14 58:22
59:2,2,11,11
67:23 68:2
70:3,5 85:1
93:8 98:21
124:19 126:24
**remembering**
48:10 52:11
115:16 124:16
124:23
**remnants** 65:12
86:5 88:22
109:13,17,17
**rep** 36:10,12
116:22
**reparse** 52:12
**repeated** 5:4
**repetition** 113:3
**rephrased** 5:4
**report** 18:10
19:7 52:6 64:9
66:6 76:13
77:19,24 78:5
83:21,24 84:4
84:13 92:24
98:5 100:14
101:9,14 102:2
102:5 103:9,14
104:3,4 105:13
105:24 106:4,9
106:10,13
107:3,7 108:20
109:11 111:6,7
113:22 114:24
**reported** 105:9
131:8
**reporter** 1:15

27:20 48:10
63:2,3 86:24
87:2,6,17,21
89:16 100:1,16
100:18 101:18
102:19 103:21
105:18 107:12
116:6,9 128:20
128:24 129:4
129:13 131:5
132:5
**reporting** 83:4
**reports** 18:10,16
19:16 86:1
92:3,18,20
93:4,9,13
98:20,22,23
99:2 104:5,22
105:2,10 106:8
114:16 115:18
116:1 120:14
122:8
**represent** 4:9
24:18,20,21
36:11 102:10
116:15
**represented**
25:19,24 26:2
**request** 44:14
91:21 92:22
129:3
**requested** 35:14
35:14 43:12
53:15
**requesting**
106:20
**requests** 115:6
**required** 51:20
113:6,12
**reserved** 128:14
128:15 132:2
**resources** 71:19
**respect** 38:16
**respond** 73:2

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 148

rest 78:8 88:10
results 65:21
  104:21 105:8
  107:2 111:16
  111:21
retired 72:3,3
retrievable
  106:3
retrieving 14:12
  14:13 70:23
  81:7
review 20:12
  70:22 108:4
  128:1
reviewed 18:6,9
  18:10,13,21
  19:24 37:1
  39:15 70:21
  111:14,16
reviewer 52:6
revision 113:4
right 5:16 8:6
  10:21 30:9
  37:19 42:23
  43:1 46:8
  47:10 49:20
  68:5 72:14
  74:18 77:11
  78:17,18,24
  79:4,10,13
  80:15,15 81:8
  81:10 89:16
  91:1 92:7 94:7
  94:12 97:16
  98:9 101:23
  103:3 105:18
  110:3,24 111:5
  116:3,4 117:18
  119:16,17
  120:20 123:23
  124:15 125:2
  128:1,5,9,10
  128:10,12
  129:11

right-hand
  100:2
rights 36:1
River 2:14
road 2:8,14
  34:13
Roechner 6:10
  19:15 72:23,24
  73:2 90:10,21
  93:3,11 94:21
  96:4 98:11,13
  104:24 106:20
  112:10,20
  113:16 114:9
  114:12 115:19
  120:16 121:19
Roechner's
  115:12
role 6:9 30:14,16
  34:18,24 35:4
  35:20,21 45:5
  63:15,21 71:5
  74:9
room 29:5 60:1
  60:6 126:22
Rosemont 2:15
rule 5:2
rules 1:12 38:3
  38:10
rumors 62:12
run 83:7
running 49:23
  66:8 75:1
  88:23
_____
        S
S 3:6
safe 85:7 124:20
  124:20
sat 29:17 35:8
  35:11 83:15
saved 85:3
saw 123:19
saying 44:15,16

  57:1 86:2
says 20:4,6
  42:24 88:17
  105:24 108:2,6
  108:10 111:1
  113:4 117:7
  119:5
screen 60:5
  65:13 77:12,16
  79:6,15 83:18
  85:1,3,9,11,13
  124:7
scroll 87:15
  91:22 100:1,19
  100:20 101:15
  101:16,21,21
  102:14,24
  103:1,2 105:14
  105:21 107:15
  110:15 112:24
  115:4
scrolling 102:20
search 7:21 14:5
  14:7 66:24
  67:4,13,16,17
  68:11,20 69:10
  69:13 70:9,10
  70:18,19 83:11
  89:11 93:22
  94:2 95:6,11
  95:14,21 96:14
  98:23,24 102:6
  105:5 109:23
  111:20 120:5
searched 80:18
  95:22
searches 31:20
  31:20 52:10
  106:20
searching 69:8
  114:20
second 36:6
  84:21 86:3,7
  86:18 90:1

  111:12
Secondhand
  63:13
section 114:4
secure 56:4,8,11
see 15:15 19:13
  27:23 42:13,16
  59:15,21 61:4
  67:11 69:2
  77:16 78:5,7,9
  78:11,14 79:14
  79:24 90:3
  91:23 92:18
  99:11 103:10
  103:24,24
  106:22,23
  111:15 113:12
  113:13 114:7
  115:6 117:2
  118:15 124:6
  124:11
seeing 60:15
  66:20 78:3,3
  79:15 99:13
  103:19 117:10
  119:12
seen 12:12 19:3
  19:4 36:21
  87:11,13 89:21
  92:20 94:12
  98:7 104:4,5
  104:20,21
  105:2 107:8
  111:7 113:24
  115:2,17
  116:12
seized 70:19
send 98:10
sending 69:14
  129:4
sense 59:17
  92:15 113:18
sensitive 58:14
  60:11,24 61:3

  72:1
sent 19:16 65:16
  83:22 84:10
  86:12 88:18,20
  88:24
sentence 90:6
  92:13,17
  103:21 111:13
  111:15 113:10
separate 79:17
  79:18 128:7
September 7:8
  102:9 105:13
sergeant 1:10
  3:3 4:3 6:24
  7:6,7,12,15,22
  7:24 8:3,7 16:3
  28:9,12 34:24
  35:16 36:17,17
  53:22 54:4,14
  54:22 55:9,24
  56:15 57:14
  58:10 59:3
  60:2,16 61:17
  64:1,11 65:14
  66:15 70:21
  71:1,12,22
  77:10 82:4
  84:8,24 86:11
  89:4 110:23
  111:2,14 113:5
  113:11 130:10
  130:19 131:6
  132:1
sergeants 71:5
serial 80:20
seriously 34:6
serve 37:24
server 49:7
  76:11
service 34:5
set 76:12 118:20
sex 38:23
sexist 38:19

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

sexual 62:1
  63:10 106:21
sexually 62:10
shape 74:10
share 19:6 77:13
  123:16
shared 61:20
sharing 79:5,7
shed 99:3,7
sheets 130:16
short 43:9 80:6
shorthand 1:15
  9:19 131:5
  132:4
shortly 127:17
shot 65:13 85:1
  85:3,9,11,13
show 19:1 77:11
  84:7 88:23
  128:14
showed 83:21
  84:11,11
showing 59:2
  124:5
shown 16:1
  22:22,24 68:16
  70:18 77:22
  103:16
shows 110:16
shut 31:2,10
shutting 30:23
sic 110:14
side 79:18
sign 92:24
  118:19 124:3
signature 98:16
  128:14 129:5
  132:1,4
significance
  90:20
silently 88:4
similar 38:17
Similarly 85:19
simple 111:22

single 45:22
sir 4:9 6:6 10:5
  18:24 26:3
  27:2,18 32:23
  38:7 40:9
  63:19 67:7
  73:6 75:22,24
  76:5 82:14
sit 12:8 35:16
  41:3 45:19
  48:14 52:10
  57:10 60:22
  64:4 66:21
  83:8 114:19
site 94:2
sitting 13:24
  77:2 106:15
situation 34:10
  114:8
size 49:9 76:8
slow 75:1
small 42:7
smartphones
  17:13
Smith 52:19
sms- 84:22
SMS 65:2
sms.db 84:22
snafu 43:11
so-called 93:8
Socha 1:3 2:19
  4:10 21:11
  33:16 34:3,21
  39:1,18 40:12
  40:24 41:10,18
  41:23 44:1
  45:12 51:21
  52:24 54:17
  56:21 57:5
  60:12 61:24
  62:10 63:10
  70:17 72:16
  74:9 83:22
  88:15 89:7

121:24 130:3
Socha's 28:4
  29:22 32:21
  35:5 37:3,8
  41:16 45:5
  47:19 50:12,13
  52:17 55:6
  56:3 57:13
  63:7,15 70:19
  72:10 74:1,21
  80:19 81:1
  82:8,19 84:11
  93:17 122:4,16
  122:22
social 68:6
software 13:19
  14:11 48:13
  52:4 60:21
  64:4 66:18
  67:23 70:3
  78:24 81:24
  83:4 86:9
  119:1,9,16
softwares 15:4
  86:3,7
solution 24:12
somebody 49:24
  50:9 79:12
somewhat 88:17
SOPs 38:3
sorry 8:1 28:16
  35:10 36:15
  38:6,8 49:8
  63:4 73:16
  74:15 78:2
  107:21 112:15
  113:9 121:13
  121:14 124:12
  127:22
sort 49:16 81:21
  114:8 127:18
sorted 80:3
sound 125:2

sounds 119:22
source 62:5
  122:15
Spanlock's
  124:20
speak 18:1
  41:11,12 44:4
  126:7,11
speaking 27:2
  37:9 56:15
  89:2 120:7
special 45:14,14
  96:6,6
specific 17:20
  28:3 41:12
  67:1 69:13
  72:22 81:6,10
  90:14 91:10
  112:21 114:5
  120:5
specifically 10:7
  17:23 18:3
  41:14 45:18
  52:24 53:20
  56:7 57:4,13
  62:19 67:14,17
  67:21 76:2
  77:6 91:14
  92:14
specified 131:12
speculation 58:1
  127:6
split 121:9
spoke 44:24
  121:23
spoken 21:5
  33:13 45:2
spot 53:23 55:8
  57:15
SQL 64:22,22
  64:23
SQLite 65:8
  84:23 85:12
  88:22

SS 131:2
standard 26:5
standing 40:18
  59:16
standpoint
  44:19
stapling 114:23
start 4:14 60:22
  98:22
starting 11:8
  53:4
state 43:16 85:2
  130:10 131:2
  132:5
stated 54:8
  66:21 84:8
  89:3 91:11
  113:15 122:13
statement 61:17
  92:12 106:19
  117:9 119:22
statements 36:4
  36:5,7 37:3
states 1:1,13
  19:15 38:17
  91:3 108:1
  130:1 131:1
stating 31:1
  91:14 108:18
  115:24 121:21
stationed 15:17
status 8:17
  16:12 90:11
stenographica...
  131:9
step 51:22
step-by-step
  49:21
steps 47:21 48:3
storage 49:16,17
  76:16 122:23
  122:24
store 49:7
store- 65:2

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 150

stored 76:10
80:24 123:17
storing 49:10,18
65:2
stream 68:7
Street 2:3
132:12
stuff 17:16 32:4
60:14 64:13
65:18 73:15,19
74:4,19 89:1
95:15
subject 18:20
22:7 24:6
39:13 40:2
submitted 20:17
94:24 95:18,19
99:5,8 100:13
106:1 121:21
SUBSCRIBED
130:20
subsequent
11:12
subsequently
122:16
suggest 117:20
suggested
117:15
Suite 2:3,9,15
132:13
summary
105:22 114:4
supplement 19:7
77:18
support 16:5
71:7
supposed 76:21
121:5
sure 4:23 9:1
14:13 21:18
25:21 28:15
39:7,15 42:20
45:16 49:12
52:17 55:3,13

56:23 62:14
64:22 69:7
74:7,17,22
80:5,21 86:14
88:24 90:8
98:8,19 101:8
101:9 107:9
111:9 114:1
118:10 120:12
surveillance
7:20
sworn 4:1,5
10:11 73:8,18
130:20 131:7
system 55:20
57:11 65:6
75:15 76:12
81:1,8
Szymanski
59:19 60:3,3

—————————

**T**

T 3:6
tactical 7:6,7,12
7:14,16,22,23
7:24 8:2,4,7
16:3 28:12,16
33:21 34:14
59:20 71:1,5
71:11 127:8
take 16:15 27:24
29:1 31:3 41:4
42:22 43:8
49:21 52:13
53:4 80:2,4
97:1 105:14
116:16 124:23
128:18
taken 1:11,14
39:7 56:1 58:9
95:6,19 97:24
123:17 131:12
takes 13:21
talk 36:4 62:9

74:20 75:4
talked 36:24
63:23 116:21
119:18
talking 9:22,23
41:16,17 46:1
46:4 47:3,4
51:4,5,6,7 64:6
68:15,16 74:3
74:3,4 75:20
77:2 92:23
98:23 103:21
104:7 108:1
114:10,11
task 65:20
tasked 125:9
technical 96:21
technological
43:11
tell 4:22 5:11,13
28:3 29:10,14
45:4 56:20
60:24 65:16
66:10 88:11
98:9 100:11,16
102:19,22
103:1 105:16
110:10 114:12
114:19 116:6
118:13 128:11
telling 53:22
54:14
tells 54:13 106:5
107:23 108:8
109:21
term 17:2 92:4
terminal 45:22
terms 108:21,22
test 16:20,21
testified 4:5
testify 131:7
testimony 4:11
35:5 36:2 45:5
130:11,14

testing 16:19
text 14:1 64:2,3
64:5,8,10 65:3
65:11,12 67:1
67:5 68:3,6,7
68:10,11,13,17
68:18,19,20
69:8,10,13
70:10 83:21
84:10,12,19
85:11,24 86:1
86:5 88:15
120:11
Thank 21:2
100:9 102:17
Thanks 20:19
thing 6:11 14:18
34:11 44:17
45:13 55:18,21
57:12 58:14,20
61:13 62:2,12
62:18 65:1
66:11,19 74:23
75:6 96:3
97:13,14 106:7
109:12,13
115:9 116:2
122:7 123:1,22
things 4:22 16:2
23:7,13 31:12
31:18 32:4
52:13 54:18
58:12 59:1
61:3,12 70:8
71:21 72:1
76:6 84:18
90:11 91:12
97:4,9 104:22
106:9 109:21
118:1
think 6:11 11:1
12:5 15:20
18:16 19:3
20:9 21:13

23:3,8,18
26:21 27:13
29:16,17 33:12
33:22 35:15
44:17 49:6
52:6,7 53:14
55:17 56:22
58:2 63:22
68:4 73:15
74:23 75:1,3,7
76:10 77:23
83:4,12 91:1,3
92:11 94:8,22
103:21 110:5
112:24 113:3
116:2 117:16
119:10,18,18
119:21 120:8
120:13 125:17
125:18,22
third 15:9 85:22
thought 17:15
18:2 20:20,21
27:12 33:23
34:8,9 45:15
46:3 54:10
58:8,21 78:13
85:1 92:8
104:18 111:19
118:2 125:6
three 15:4 37:20
87:2 92:3
three-paragra...
19:9
throw 10:12
thumb 76:16
122:23 124:21
thumbprint
96:22
tied 49:7
TikTok 68:4
TikTok's 68:4
till 8:20
time 8:14 9:15

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 151

9:15 10:1 13:6
13:7,7 15:17
16:4,4 17:17
17:18 21:7,15
21:24 23:17
25:21 26:12
28:9,14,22
30:2,2,6,9,13
34:11,16 35:17
42:22 43:8
45:1 46:18
48:21 49:2,14
49:21 50:4,9
52:11,13 59:20
61:22 65:17
66:10,11,12
70:4,24,24
72:8 73:22
76:6 77:22
80:15 81:14
83:6,7 88:24
94:6 97:21
98:2 102:13
105:1,14
113:24 119:20
131:12
**timeframe** 38:2
**times** 5:5 11:10
33:14 69:23
82:22 86:11
111:24
**title** 91:12
**today** 24:2 75:5
77:13 82:11
**today's** 18:7
20:1,12 21:6
32:19 80:11
**told** 29:7,9 54:4
54:23 118:13
122:20
**tool** 11:2,22
86:19
**tools** 97:4 106:1
**top** 80:16 87:14

90:2 110:16
115:4 120:13
**totally** 118:13
**touched** 95:4
**tour** 10:1
**tracking** 94:4
**trained** 9:8,12
11:2,5,22
12:15 15:22,24
17:23 18:2,4
125:24 126:4,8
**training** 9:6,10
9:13 10:2,4,7,9
10:14,16 11:13
11:16,18,19
13:3,14 15:16
17:7,16,19
101:3 125:9,13
125:20,23
126:2,17
**transcript** 36:21
128:1 129:3,5
129:8 130:11
130:13
**transcription**
128:8
**transcripts**
127:14
**treat** 38:5,12,15
38:19
**TRESSLER** 2:7
**trial** 37:20 45:6
**trouble** 8:24
14:3
**true** 26:1 31:6
48:24 51:17
67:9 68:20
69:18 70:12
82:1,19 83:23
84:15 85:20,21
89:8 105:9
113:8 120:6
130:14
**truth** 131:7

**try** 43:3,4 48:19
78:18 86:17
116:9
**try-** 96:21
**trying** 11:14
12:7,7,22,23
14:1 22:2,21
24:10 29:2,18
30:23 31:8
32:2 41:6 48:7
51:23 52:7
55:18 58:22
60:8 70:3 75:3
83:10 90:21
96:21 108:7
110:7 114:13
118:15
**turn** 50:1,7
**turned** 49:23
50:3,3 93:10
94:18 125:1
**turns** 50:9
**twice** 98:1
**two** 5:18 12:2
15:4,8 23:13
23:13 26:19
33:24 37:20
43:18 64:6,7,9
64:11 68:8
69:1,2,3 84:7
84:12,19 90:2
90:2,3 94:17
94:18 98:2
104:22
**type** 16:23 76:9
109:16
**typed** 65:10
81:17,20
109:15
**types** 67:2
**typewriting**
131:9

---
**U**
---

**U-M** 4:16
**ultimately** 121:3
**un-** 14:11
**unclear** 27:11
**undeleting**
14:11
**understand** 4:24
12:13,16,18,22
35:19 108:7
**understanding**
28:6 41:5 47:9
49:5,16 56:9
56:10,12,17
69:21 80:21
82:21 89:3
91:20 93:19
94:20 95:4,11
95:17 101:2,14
121:20 122:9
124:17
**understood** 5:8
**unfamiliar**
48:18
**unfortunately**
59:10
**union** 36:10,10
36:12 37:6,10
37:10 116:22
**unit** 4:20 7:9,12
7:14,16 8:2
28:12 32:15
33:21 34:14,17
56:9,10 71:1,6
72:6 95:8
127:8
**United** 1:1,13
130:1 131:1
**units** 7:20
**universe** 82:18
**University** 5:21
**unknowingly**
118:3
**unplugged**
124:12

**update** 20:4,6
91:12
**updated** 90:10
**upset** 54:18
61:14
**USB** 122:23
**use** 15:3,8,9
48:12 52:9
65:8,20 82:17
83:3,7,13
84:22 85:23
86:3,3,18 97:8
97:19 120:2
125:10,15
**useful** 86:9
**user** 12:21
**uses** 65:1
**usual** 128:17

---
**V**
---

**value** 97:7
**vanilla** 54:6
**verbally** 92:5
**verbiage** 72:13
**verify** 65:21
96:20 97:5,15
**version** 125:13
125:15
**victim** 66:16
**video** 8:13 67:16
67:17,20,21
103:12,23
104:2
**video-type** 17:16
**videoconference**
1:16 2:1 4:5
130:12 131:8
**videographic**
61:24 93:17
**videos** 61:11
62:14 67:3
68:1 70:11
85:10,19,21
106:3,20

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 152

| | | | | |
|---|---|---|---|---|
| 120:11 | 105:5,5,6 | 87:8 89:13,18 | 101:19,21 | 128:16 |
| **view** 47:11,19,22 | 117:2 120:22 | 102:8,13 | 102:1,24 103:2 | **written** 27:15 |
| 48:4 49:24 | 125:19 | 103:20 107:14 | 103:5 104:1,13 | 37:2 78:10 |
| 50:11,18 51:7 | **wanted** 22:8 | 114:24 128:14 | 104:15 105:21 | 93:20 105:10 |
| 51:9 52:16 | 29:10 30:24 | 129:1,9 | 105:23 109:3 | 116:1 128:2 |
| 53:7 60:5 | 31:2 49:24 | **we're** 55:17 75:5 | 119:12,14 | **wrong** 20:21 |
| 107:2 120:3 | 60:4 90:10,11 | 82:21 86:4 | 123:12 124:9 | 22:1 23:1 |
| **viewed** 61:21 | 118:14 | 92:2,23 94:8 | 127:7,11,14 | 33:23 83:14 |
| 62:13,14,17,20 | **warrant** 54:2 | 98:23 99:13 | 128:5,13 129:6 | 124:16 |
| **viewer** 47:14,21 | 62:3,3 70:18 | 113:21 129:10 | 129:10 132:1,4 | **wrote** 19:10,10 |
| 48:3,10,12 | 95:12,14 98:23 | **we've** 19:3 29:19 | **witness's** 63:1 | 119:2 |
| **viewing** 47:3,5,6 | 98:24 | 36:24 65:18 | 117:22 | |
| 47:8 | **warrants** 7:21 | 70:1 | **witnessing** | **X** |
| **views** 35:4 | **wasn't** 8:18 | **website** 10:20 | 124:24 | **X** 3:1,6 |
| **violate** 25:8 | 12:12 27:13 | **weeks** 33:24 | **word** 109:16 | |
| **violence** 7:19 | 28:1,1 40:20 | **welcome** 21:3 | 116:16 117:12 | **Y** |
| **visual** 15:9 | 47:12 49:2 | **went** 22:9 29:6 | 117:21,21 | **yeah** 11:21 |
| **voice** 64:20 | 50:4 56:12 | 29:16 35:21 | **wording** 84:24 | 22:21 30:21 |
| **volume** 15:12 | 59:21 82:8 | 45:19 46:18 | **words** 14:12 | 34:7 39:24 |
| **vs** 1:5 130:5 | 88:23 89:9,9 | 47:10 84:23 | 112:19 | 41:3 42:18,19 |
| | 90:14 91:10 | **weren't** 25:24 | **work** 7:21 16:6 | 43:7 44:22 |
| **W** | 92:14 95:16,20 | 30:6 96:9 | 16:15 17:8,11 | 48:1 58:1 |
| **wait** 104:10,16 | 95:21 105:7 | **window** 78:16 | 33:19 40:5 | 67:18 68:13,21 |
| **waiting** 66:11 | 113:7 114:18 | 79:6,6,17 | 70:16 75:10 | 71:9 72:19,21 |
| **waive** 128:10,12 | 115:9,11,14 | **Windows** 83:12 | 86:7 91:16,18 | 73:18 76:23 |
| **walk** 47:20 48:3 | **watch** 56:2 | **wipe** 65:6 | 120:16,17 | 78:6 79:16 |
| 48:19 | 61:18 | **withdraw** 129:3 | 121:24 122:14 | 81:4 83:24 |
| **Walking** 29:14 | **way** 23:4 33:6 | 129:12 | 122:20 126:20 | 85:2 87:4 89:3 |
| **want** 4:22 10:12 | 35:23 38:20 | **witness** 3:2 4:1,4 | **worked** 8:19 | 89:9 92:23 |
| 12:8 18:23 | 45:17 53:19 | 21:1,3 22:5 | 16:15 33:5 | 96:13 99:11,12 |
| 19:1,2 22:4 | 56:5,7 57:6 | 23:4,12 24:7 | 79:23 | 99:14 100:6 |
| 25:8 26:16 | 58:10 68:24 | 24:13,18,20,22 | **working** 13:7 | 103:1,2 104:20 |
| 48:18 50:11 | 70:5 74:10 | 25:1,11 26:22 | 31:18 33:12 | 109:9 113:13 |
| 51:21 53:5 | 79:19 81:19 | 32:15 39:20,23 | 34:1 56:10 | 113:19 118:17 |
| 54:19 57:1 | 86:16 87:17,17 | 40:14 41:2 | 64:12 66:20 | 118:23 119:12 |
| 60:14,17,17 | 93:20 96:20 | 42:12,15,17,20 | 73:19 77:3 | 119:18 121:15 |
| 61:4,15,15,21 | 97:17 116:1 | 42:23 43:3,13 | **works** 16:23 | 122:13 124:6 |
| 66:16 68:10 | 120:23,23 | 51:1,3 52:22 | 47:7 67:24 | 126:13 129:1 |
| 69:6 71:18 | 121:7 128:8 | 58:3,7 63:4 | **worried** 32:1 | **year** 6:3,3,20 7:4 |
| 74:7,16,17,21 | **ways** 43:18 | 75:19 76:18 | **wouldn't** 13:10 | 8:20 11:7 14:2 |
| 78:24 88:2,9 | 44:20 117:6 | 78:7,9,11 79:9 | 13:11 37:12 | 16:21 28:4 |
| 95:1 97:23,24 | 128:17 | 79:21 88:5 | 112:10 | 37:20 46:1 |
| 100:17 104:16 | **we'll** 5:5 15:15 | 99:16 100:20 | **wrap** 124:3 | 71:17 125:21 |
| 104:16,17,19 | 77:14 80:10 | 100:21 101:7 | **write** 92:24 | **yearly** 16:18 |

Cassandra Socha v. City of Joliet; et al.
Deposition of Sergeant Christopher Botzum - Taken 4/30/2021

Page 153

**years** 5:18,23
37:15,20,21
**Yep** 77:17,20
80:9

**Z**

**zebra** 4:16
**Zoom** 5:2 21:7
99:14

**0**

**05681** 1:5 130:5
**06** 8:4
**084-004606**
132:16
**09** 8:5

**1**

**1** 3:8 80:11
83:18 86:24
87:2,4
**1-20** 1:7 130:7
**10** 3:17 113:21
**100** 82:22
**102** 3:13
**105** 3:14
**107** 3:15
**11** 3:18 116:4
**111** 3:16
**113** 3:17
**116** 3:18
**12** 113:22
**12:56** 1:16
131:14
**12th** 44:9 107:7
**13** 102:9
**14th** 19:19
**16-1** 39:2,11,12
**161** 132:12
**17** 77:21 105:13
**17th** 77:24
**18** 1:5 5:23
73:13,14 86:23
87:5 130:5
**18-0007242**

110:14
**18-000742** 109:7
110:1,4
**18-00742** 108:13
108:14 110:9
**18th** 19:8 77:23
80:12 88:13
**19th** 132:5

**2**

**2** 3:9 20:7 87:9
88:12 94:10
114:2,3
**20-** 46:1
**2009** 8:15
**2014** 8:16,17
**2016** 7:8
**2018** 17:1,6,18
19:8 20:3,7
28:11 38:9
39:2 41:18
45:21 46:2,3,5
70:24 73:10
77:22 80:12
86:23 88:14
89:14 94:10
98:5 102:9
105:13 107:7
111:7,14
112:16 113:5
113:11,22
126:5
**2019** 73:12
**2020** 19:19 44:9
46:4
**2021** 1:17
130:13,21
131:13 132:5
**226** 102:15
**230** 102:16
**231** 107:16
**234** 107:16
**235** 114:3
**2350** 2:3

**241** 114:23
**242** 115:5
**244** 114:3,24
**250** 2:9
**26** 111:14
112:16 113:5
113:10

**3**

**3** 3:10 89:14,19
103:12,15
107:10
**3050** 132:13
**30th** 1:16 130:13
131:13
**31** 98:5
**312.361.8851**
132:14
**312.445.4900**
2:4
**320** 116:5
**324** 116:5
**33** 2:3

**4**

**4** 3:4,11 94:8
111:7
**4:19** 129:15

**5**

**5** 3:12 98:7 99:3
100:4
**550** 2:8
**5600** 2:14

**6**

**6** 3:13 102:9
105:12
**6:30** 19:9 80:12
**600** 2:15
**60018** 2:15
**60440** 2:9
**60601** 132:13
**60602** 2:4
**630.759.0800**

2:10
**68** 111:10

**7**

**7** 3:14 89:14
105:19
**7-2** 40:2,11,23
41:22
**79** 100:6,8
**7th** 20:3

**8**

**8** 3:15 107:11,14
107:23
**80** 3:8 100:7,8
**847.261.0700**
2:16
**87** 3:9
**89** 3:10 111:10

**9**

**9** 3:16 94:10
111:6
**94** 3:11
**98** 3:12
**9th** 20:7

# EXHIBIT 10





Transcript of the Deposition of
# Detective Jeffrey German
**Case:** Cassandra Socha v. City of Joliet;et al.
**Taken On:** April 28, 2021

Royal Reporting Services, Inc.
Phone:312.361.8851
Email:info@royalreportingservices.com
Website: www.royalreportingservices.com

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CASSANDRA SOCHA,                      )
                                      )
                  Plaintiff,          )
                                      )
            vs.                       )   No. 18 CV 05681
                                      )
CITY OF JOLIET, a municipal           )
corporation; EDWARD GRIZZLE;          )
JOHN DOES 1-20,                       )
                                      )
                  Defendants.         )


            The deposition of DETECTIVE JEFFREY GERMAN,

taken via videoconference, called by the Defendants for

examination, pursuant to notice and pursuant to the

Federal Rules of Civil Procedure for the United States

District Courts pertaining to the taking of depositions,

taken before Tina M. Hickey, Certified Shorthand

Reporter, on April 28th, 2021, at 9:27 a.m.

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

                                                    Page 2

  1    APPEARANCES (via videoconference):
  2         LAW OFFICES OF HALL ADAMS, LLC
            MR. HALL ADAMS, III
  3         MS. TAJA REYNOLDS
            33 North Dearborn Street
  4         Suite 2350
            Chicago, Illinois 60602
  5         Phone:  312.445.4900
            E-mail:  hall@adamslegal.net
  6
                 On behalf of the Plaintiff;
  7
            TRESSLER LLP
  8         MS. DARCY L. PROCTOR
            MR. JAMES J. HESS
  9         550 East Boughton Road
            Suite 250
 10         Bolingbrook, Illinois 60440
            Phone:  630.759.0800
 11         E-mail:  dproctor@tresslerllp.com
                     jhess@tresslerllp.com
 12
                 On behalf of Defendant City of Joliet;
 13
            KNIGHT HOPPE KURNIK & KNIGHT, LTD.
 14         MR. MATTHEW S. CLARK
            5600 North River Road
 15         Suite 600
            Chicago, Illinois 60018
 16         Phone:  847.261.0700
            E-mail:  mclark@khkklaw.com
 17
                 On behalf of Defendant Edward Grizzle.
 18
       ALSO PRESENT:  Cassandra Socha
 19
                          *   *   *   *   *
 20
 21
 22
 23
 24

Royal Reporting Services, Inc.
312.361.8851

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 3

1                    I   N   D   E   X

2  WITNESS                                    PAGE

3  DETECTIVE JEFFREY GERMAN

4       Examination by Mr. Adams.............   4

5

6                  E   X   H   I   B   I   T   S

7  GERMAN DEPOSITION EXHIBIT                    PAGE

8       No. 1................................   71

9       No. 2................................   74

10      No. 3................................   84

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 4

1      (Witness sworn.)
2    WHEREUPON:
3        DETECTIVE JEFFREY GERMAN,
4    called as a witness herein, having been first duly sworn,
5    was examined and testified via videoconference as
6    follows:
7        EXAMINATION
8    BY MR. ADAMS:
9        Q.   It's Officer German, correct?
10       A.   Yes.
11       Q.   My name is Hall Adams.  I represent the
12   plaintiff in this lawsuit, Cassandra Socha.  I'm going to
13   ask you some questions this morning about her case.
14       Have you been deposed before?
15       A.   Yes.
16       Q.   So you have been deposed before?
17       A.   Yes, on different cases.
18       Q.   Approximately how many times?
19       A.   Maybe three or four, approximately.
20       Q.   I'm going to review just a couple ground rules
21   to make the whole process go more smoothly.  The most
22   important is that you make sure you hear and understand
23   every question you're asked before you attempt to give an
24   answer.  If you need to have questions repeated, read

Page 5

1    back, rephrased, say so; we'll accommodate you as many
2    times as you ask.  If you give an answer to a question,
3    we will all assume that you heard the question and
4    understood the question; is that fair?
5        A.   Yes.
6        Q.   Never guess.  If you don't know the answer to
7    a question, you should tell us you don't know the answer
8    to the question.  If you can't remember something you're
9    asked, you should tell us you can't remember what you're
10   asked.  Never guess.  Okay?
11       A.   I got you.
12       Q.   And, of course, the Zoom format can be a
13   little choppy at times.  If you have problems with the
14   technology on your end, say so, and we'll do whatever we
15   need to do to make this coherent.
16       A.   Will do.
17       MS. PROCTOR:  You know, before we begin -- Hello?
18   Can everybody hear me?  This is Darcy Proctor.  I
19   don't -- you guys started a little early.  I thought we
20   were starting at 9:30.
21       MR. ADAMS:  Well, we had somebody from both
22   defendants on.
23       MS. PROCTOR:  Okay.  Well, just to be clear, so the
24   court reporter and the witness knows who's present, good

Page 6

1    morning.  My name is Darcy Proctor.  I'm here today on
2    behalf of the City of Joliet.  And joining me is James
3    Hess from my office, just for the record.  Good morning,
4    everybody.
5        MR. CLARK:  Good morning.
6    BY MR. ADAMS:
7        Q.   Okay.  Officer German, have you reviewed any
8    documents in preparation for this deposition?
9        A.   Yes, the Joliet police reports, the harassment
10   report that was created.
11       Q.   Authored by whom?
12       A.   The initial author was Detective -- Sergeant
13   Grizzle, and then I had two follow-ups and in the report.
14       Q.   Did you review all the reports relative to the
15   department's investigation of Socha?
16       A.   Yes, the original, and I think there were
17   three or four follow-ups.
18       Q.   And did you review anything else in
19   preparation for the deposition?
20       A.   No.
21       Q.   Why did you review the investigative reports?
22       A.   Because they were my reports that I created to
23   document what occurred back in 2018.
24       Q.   In order to prepare for today's deposition,

Page 7

1    have you discussed this case with anyone?
2        A.   No.
3        Q.   Whether in preparation for this deposition or
4    any other purpose, except in conversations with the IG,
5    have you discussed the facts and circumstances of this
6    case with anyone?
7        A.   What do you mean by "IG"?
8        Q.   The Inspector General.
9        A.   Oh, no.  I didn't speak to that person.  I
10   don't know who that is.
11       Q.   Okay.
12       A.   Oh, I'm sorry.  You mean Mr. Regis?
13       Q.   Yes.
14       A.   Okay.  Yes.
15       Q.   Except for that interview, have you discussed
16   the facts and circumstances of this case with anyone,
17   regardless of whether it was to prepare for today's
18   deposition or any other purpose?
19       A.   Would have been --
20           (Whereupon, there was technical
21            difficulty.)
22   BY THE WITNESS:
23       A.   Can you hear me?
24       Q.   We can hear now.  If you said something in the

4  (Pages 4 to 7)

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 8

1   middle, we didn't hear you.
2        A.   It would be Sergeant Grizzle, Officer, who's a
3   lieutenant now, Botzum at the time; Sergeant Gavin, when
4   some -- filed the request to be downloaded.  And then
5   other various detectives throughout the last couple years
6   have spoken about it, you know, in passing.
7        Q.   Do you recall the contents of any of those
8   conversations?
9        A.   So Sergeant Grizzle would have been the
10  initial incident, the extraction of the phone records,
11  assisting him in knowing how to review --
12       Q.   Let me interrupt you because I think we're
13  talking about two different things.  The conversations
14  that you had with those -- the fellow officers you just
15  identified, were those conversations relating to the
16  investigation of Socha?
17       A.   Yeah, Sergeant Grizzle, Sergeant Gavin,
18  Lieutenant Botzum, now, those were involved in the actual
19  criminal investigation.
20       Q.   Other than conversations that related to the
21  Socha investigation when it was ongoing, have you
22  discussed the circumstances of Socha's claims in this
23  case?
24       A.   Yes.

Page 9

1        Q.   Okay.  And with whom?
2        A.   Various detectives throughout the last couple
3   years.
4        Q.   Do you remember the contents of any of those
5   conversations?
6        A.   Other than what was reported in the newspaper
7   about the allegations and things like that.
8        Q.   With whom have you discussed what was reported
9   in the newspapers about the allegations?
10       A.   I don't recall specific conversations with
11  specific detectives.  It would be pretty much every
12  detective that had been in investigation throughout the
13  last -- during that time period would have been present
14  at some point during conversation about what was reported
15  on the news.
16       Q.   Have you ever seen the complaint that was
17  filed on behalf of Officer Socha in this lawsuit?
18       A.   I saw portions of it in the -- I believe the
19  Patch and Herald-News I think had portions of it.  I
20  don't think I ever saw the official documentation.
21       Q.   In any of your conversations with any of the
22  police officers with whom you discussed the claims
23  asserted by Socha in this case, have any ever expressed
24  to you their opinions that those claims were valid?

Page 10

1        A.   No.
2        Q.   Have any expressed to you their opinions that
3   those claims were not valid or factually supported?
4             You're gone.  There we go.
5        A.   Sorry about that.  I must have a bad Zoom
6   connection.  Can you repeat the question?
7        Q.   Sure.  In any of those conversations you had
8   with your fellow officers about the claims asserted by
9   Socha in this case as you understand them from the
10  articles you've read, have any of those officers
11  expressed to you their opinions that Socha's claims are
12  not valid or not factually supported?
13       A.   Nothing direct firsthand knowledge other than
14  not believing if it happened.
15       Q.   You were interviewed by the Joliet Police
16  Department Inspector General --
17       A.   Yes.
18       Q.   -- regarding the circumstances of this
19  lawsuit?
20       A.   Sorry.  Yes, I was.
21       Q.   How long did that interview last?
22       A.   Maybe -- I would say less than an hour.  I
23  don't know exactly.  I didn't keep track, so I don't know
24  how long it was.

Page 11

1        Q.   Where did it take place?
2        A.   I believe it was his office, at City Hall.
3        Q.   Was anyone else present?
4        A.   The union -- one of the union representatives.
5   It might have been Officer DeVito, but I'm not a hundred
6   percent sure.  And then the -- Tamara Cummings, who's the
7   FOP attorney.
8        Q.   Say that again.
9        A.   One of the union representatives for the
10  department, which I believe was Officer DeVito, and then
11  Tamara Cummings I believe is her name.  She's the
12  attorney for the FOP.
13       Q.   Okay.  Did you make any recording of that
14  interview with the IG?
15       A.   I did not.
16       Q.   Did anyone in the room, as far as you could
17  see, make a recording of your interview with the IG?
18       A.   Not that I'm aware of.
19       Q.   All right.  Did you make notes of your own
20  during that interview?
21       A.   I did not.
22       Q.   Did you make any notes or memoranda of the
23  interview after it was completed?
24       A.   I did not.

5  (Pages 8 to 11)

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 12

1    Q.   Do you have any written record of any kind of
2  your interview with the IG?
3    A.   I do not.
4    Q.   Have you ever seen the notes of that interview
5  created by the IG?
6    A.   No, I have not.
7    Q.   Have you ever been interviewed by any law
8  enforcement agency in connection with the claims asserted
9  by Officer Socha in this case?
10   A.   No.
11   Q.   Other than your reports relating to the
12 underlying Socha investigation, have you prepared any
13 written statements in connection with this lawsuit?
14   A.   No, I don't believe I have.
15   Q.   Okay.  Have you met with any of the lawyers in
16 this case?
17   A.   No.
18   Q.   Have you spoken, by telephone, with any of the
19 lawyers in this case other than perhaps to deal with the
20 scheduling and logistics of today's deposition?
21   A.   Just scheduling and logistics.
22   Q.   And only that, correct?
23   A.   Yes.
24   Q.   After Officer Socha filed her complaint in

Page 13

1  this case, were there any meetings held by any group of
2  Joliet police officers to discuss the facts and
3  allegations raised in her complaint?
4    A.   Not that I'm aware of.
5    Q.   Do you have any imminent plans to leave the
6  Joliet Police Department?
7    A.   Here for at least nine years.
8    Q.   Say that again.
9    A.   Here for at least another nine years.
10   Q.   So if we have to find you, for example, to
11 bring you in as a trial witness, we can find you through
12 the department for at least the next nine years?
13   A.   Yes.
14   Q.   What's your highest level of formal education?
15   A.   Graduate of college, a bachelor's degree.
16   Q.   What college?
17   A.   Lewis University.
18   Q.   What year did you graduate?
19   A.   It would have been 2002, I believe.
20   Q.   In what discipline did you take your degree?
21   A.   It's a bachelor's of science in accounting.
22   Q.   Any military service?
23   A.   No.
24   Q.   After you graduated college, what did you do

Page 14

1  for a living?
2    A.   I was -- That year that I graduated, prior to
3  my graduation, I was hired by the Mokena Police
4  Department as a police officer in 2001.
5    Q.   Had you previously been through the police
6  academy?
7    A.   That was my first law enforcement job.
8    Q.   You just froze up and went dark.
9    A.   Sorry about that.  So my first police job was
10 Mokena Police.  I got hired in 2001.  And that's when I
11 was sent to the police academy.
12   Q.   Okay.  Where did you go through the academy?
13   A.   PTI, down at U of I, Champaign.
14   Q.   What year would that have been?
15   A.   June of 2001 is when I started.
16   Q.   How long were you with Mokena?
17   A.   Just under two years.
18   Q.   Where did you go from there?
19   A.   I got hired by Joliet Police in 2000- -- in
20 March of 2003.
21   Q.   What was your rank when you were hired?
22   A.   Patrol officer.
23   Q.   What is your rank now?
24   A.   It's not considered a rank, but I'm a

Page 15

1  detective in the investigations division.
2    Q.   Detective really connotes your role, not your
3  rank, correct?
4    A.   Correct.
5    Q.   Since 2018, May of 2018, to be precise, your
6  rank has been the same as Officer Socha's, correct?
7    A.   I'm not sure what hers is.  I would be
8  considered a master patrol officer.  I believe you have
9  to have at least 9 or 12 years on for that rank.  I'm not
10 sure if she was a master patrol officer at that time or
11 not.
12   Q.   And that status of master patrol officer as
13 distinct from patrol officer would just be a function of
14 seniority?
15   A.   I believe so and pay.
16   Q.   Is that master patrol officer actually a
17 different rank, or is it just a designation of patrol
18 officer?
19   A.   It's probably more of a designation.
20   Q.   When did you first become a detective in the
21 investigations division?
22   A.   I believe it was February of 2013.
23   Q.   2016?
24   A.   '13.

6  (Pages 12 to 15)

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 16

1    Q.   Okay.  Have you continued to serve as a
2  detective in the investigations division since that time?
3    A.   Yes.
4    Q.   Are you familiar with Joliet Police Department
5  General Order 7-2, the subject of which is complaints
6  against the agency or its employees?
7    A.   I've read it once, at least once.
8    Q.   Are you familiar with General Order 16-1 of
9  the Joliet Police Department, the subject of which is
10  evidence and property management?
11    A.   I read it at least once.
12    Q.   As a detective in the investigations
13  department, do you have a duty to be familiar with those
14  two general orders?
15    A.   Yes.
16    Q.   Who was the chief when you were promoted -- or
17  I shouldn't say "promoted" -- when you were made a
18  detective in the investigations division?
19    A.   It might have been Chief Hayes or
20  Chief Benton.  I don't remember when they retired and
21  switched.
22    Q.   Who was the chief in May of 2018?
23    A.   I believe that was Chief Benton.
24    Q.   Say again.

Page 17

1    A.   I believe it was Chief Benton.
2    Q.   What was -- I think it's Al Roechner's rank in
3  the department in May of 2018?
4    A.   I believe at the time he was a deputy chief in
5  investigations.
6    Q.   At that time, who was -- in May of 2018, who
7  was your direct reporting senior?
8    A.   So at least it would have been
9  Sergeant Grizzle in investigations, and it might have
10  been Sergeant Nicodemus, who was also, I believe, a
11  sergeant at that time in investigations.
12    Q.   In connection with the Socha investigation,
13  were you reporting to and being directed by
14  Sergeant Grizzle?
15    A.   Yes.  Also, Sergeant Gavin, I believe, was --
16    Q.   Say again.
17    A.   I believe Sergeant Gavin was also in
18  investigations at that time.
19    Q.   Of those two, was one or the other a lead
20  detective on the Socha investigation?
21    A.   It was my understanding Sergeant Grizzle was
22  the lead on that investigation.
23    Q.   What, if any, role was Sergeant Gavin's on the
24  Socha investigation?

Page 18

1    A.   My only understanding would be when he
2  requested videos to be saved and then deleted off our
3  Cellebrite server.  That's the only knowledge I have of
4  his involvement.
5    Q.   That was a direction you were given by
6  Sergeant Gavin?
7    A.   I know Sergeant Gavin was who I spoke with in
8  person about that request.  I can't remember if anyone
9  higher up was present or was around, but I know it was
10  definitely Sergeant Gavin.
11    Q.   When you call it a request, when a sergeant
12  makes a request of a detective, it's an order, right?
13    A.   Yeah, it would be a lawful order, yes.
14    Q.   Who was senior to Sergeants Grizzle and Gavin
15  in the investigations division in May of 2018?
16    A.   So above them would be the lieutenant.  It's
17  currently Lieutenant Egizio.  It may have been
18  Lieutenant Reid at the time, but I could have my dates
19  confused.  But then Deputy Chief Roechner would have been
20  the lead supervisor in investigations, and above him
21  would be the chief of police.
22    Q.   Do you have a specific recollection of what,
23  if any, roles the two lieutenants you just named played
24  in the Socha investigation?

Page 19

1    A.   I do not.
2    Q.   Has Sergeant Grizzle been involved in any
3  promotion or advancement of yours in the department?
4    A.   He's currently still a sergeant with the
5  Tri-County Auto Theft Task Force, which is a detached
6  unit but still a City of Joliet sergeant.
7    Q.   Any other?
8    A.   Not that I'm aware of.
9    Q.   Has Sergeant Gavin been responsible for any
10  promotion or advancement of yours on the Joliet
11  department?
12    A.   Responsible for mine?
13    Q.   Yes, sir.
14    A.   No.  I've been detective since then.  I
15  haven't changed.
16    Q.   When you were made a detective, what, if any,
17  role did Roechner play?
18    A.   Involved in myself?
19    Q.   Correct.
20    A.   No.  I was a detective, so I never changed any
21  roles.
22    Q.   In May of 2018 and June of 2018, did you have
23  a physical workstation, a place that was your place to
24  work as a detective within the Joliet Police Department?

7  (Pages 16 to 19)

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 20

1    A.   Yes.
2    Q.   Where was that?
3    A.   It's in our main investigations division.
4  It's an open room, big desk assigned to me next to other
5  detectives' desks.
6    Q.   Were all the detectives in the investigations
7  division assigned workstations in that same room in the
8  May/June 2018 time frame?
9    A.   The ones that were not detached units, but
10 yes.
11   Q.   Were any personnel of the department who were
12 not sworn officers assigned to workstations in that room
13 during that time frame?
14   A.   One would be the secretary.
15   Q.   Who was that?
16   A.   It was either Sherri Gregory (phonetic) or
17 Gloria Coyl. I'm not sure what time they switched
18 positions. Gloria was a new secretary. I don't believe
19 she was around back then, but I could be mistaken.
20   Q.   Did a person named Shawn, S-H-A-W-N,
21 Stachelski, S-T-A-C-H-E-L-S-K-I, have a workstation in
22 that investigations room?
23   A.   Yeah. She was a detective at the time.
24   Q.   How about Robert Brown?

Page 21

1    A.   No. He was a -- I think he was a lieutenant
2  at the time. As far as my belief, he was patrol at the
3  time, to my knowledge.
4    Q.   Dave Jackson?
5    A.   He was a detective inside, yes.
6    Q.   Brad McKeon, M-C, capital, K-E-O-N?
7    A.   Yes.
8    Q.   Are you familiar with a Phillip Bergner?
9    A.   Yes.
10   Q.   What, if any, was his role in connection with
11 the department in that May/June 2018 time frame?
12   A.   He was an officer. He was assigned at one
13 point to the FBI Regional Computer Forensic Laboratory.
14 I don't know the exact time period that was, this time
15 period in 2018. But at one point he was assigned there
16 and would have a desk in investigations.
17   Q.   At that time was Roechner's desk in the
18 investigations area?
19   A.   The main division he had a separate office
20 that was secured for him.
21   Q.   Was it an office that opened into the
22 investigations area?
23   A.   Yes.
24   Q.   Was that true also for Lieutenant Reid?

Page 22

1    A.   Yes. There was a separate office for that
2  lieutenant, yes.
3    Q.   In connection with your service as a
4  detective, what, if any, training have you received
5  relating to the gathering, retrieval, and storage of
6  evidence on computers of any kind?
7    A.   This would be entirely, or are you just
8  talking about this specific case?
9    Q.   The entirety. I want to know about any such
10 training that you've had.
11   A.   So training, initial police academy training,
12 training through Tri-River, like a new detective type
13 training. Lead homicide investigations touch on evidence
14 collection and handling. My training as a detective with
15 a -- led by and trained by other detectives when I first
16 became a detective, things of that nature.
17   Q.   So I want to get a term squared away hopefully
18 to save us all some time. If I use the term "computer,"
19 I mean any kind of computer, from a smart cell phone to a
20 laptop to a tablet to a desktop to a main frame computer,
21 any kind of computer unless I otherwise qualify the
22 specific type of computer I mean. Okay?
23   A.   Okay.
24   Q.   When I use the word "computer," you'll

Page 23

1  appreciate that I mean that gamut of devices. Okay?
2    A.   Understand.
3    Q.   May of 2018, the Joliet Police Department
4  investigations division had devices known a Cellebrite,
5  and Lantern respectively, correct?
6    A.   Yes.
7    Q.   Have either of those devices changed since
8  that time, or is the department still using the same
9  Cellebrite and the same Lantern equipment it was using
10 back in the spring and summer of 2018?
11   A.   We have new equipment. Same license with
12 Cellebrite, but now we have two licenses for Cellebrite
13 and other forensic tools.
14   Q.   What is the Cellebrite?
15   A.   It's a company. It's a forensic tool that's
16 used to extract and analyze phone records and computer
17 records and also create viewable reports.
18   Q.   Was the Cellebrite in use in the spring and
19 summer of 2018 equipped to gather and display photo or
20 video images that were taken off of computers obtained
21 during investigations?
22   A.   Yes.
23   Q.   What is the Lantern?
24   A.   It's another different company. I believe the

8  (Pages 20 to 23)

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 24

1    company is called Katana Forensics. They created
2    software called Lantern which works similar to
3    Cellebrite. It can extract phone data, analyze, and also
4    create viewable reports of phone data or from computers
5    and cell phones.
6        Q.    Does Lantern similarly allow for the retrieval
7    and display of photo and/or video images on computers
8    obtained during investigations?
9        A.    Yes.
10       Q.    How, if at all, do the two devices, the
11   Cellebrite and the Lantern, differ from one another in
12   terms of the their capabilities?
13       A.    So they're different companies. They have
14   different technology. Some -- one might be better at
15   retrieving a certain type of data from certain types of
16   phones or computers compared to the other. But with
17   technology, it changes, all the time. So one day, one
18   could work better than another one. One can retrieve
19   more data, more deleted data, than the other one. Back
20   then. Now we don't use Lantern.
21       Q.    You no longer use Lantern at all?
22       A.    We have it. I haven't used it probably for
23   two, three years.
24       Q.    In the May/June 2018 time frame, under what,

Page 25

1    if any, circumstances would you use Lantern instead of
2    Cellebrite?
3        A.    Depends on the case; also depends on what
4    you're looking -- searching for, investigating. And if
5    you know that there's data -- or you believe there to be
6    data on a phone or a computer and Cellebrite may not be
7    able to recover that data, then I would possibly use
8    Lantern to see if they have a better capability to
9    possibly recover that type of data.
10       Q.    Did one or the other; that is, Cellebrite or
11   Lantern, have a better capability for searching and
12   retrieving data of any kind off of Apple iPhones?
13       A.    So I was told that in this case Lantern was
14   able to recover a message -- or messages that Cellebrite
15   wasn't able to parse in the supplementary report and was
16   in a hidden database.
17       Q.    During that time frame, did you have an
18   understanding as to whether Lantern was better suited for
19   retrieving video or photographic images from Apple
20   iPhones?
21             We've lost you.
22   BY THE WITNESS:
23       A.    Sorry. I don't know about images or videos.
24   I just know about the one specific text message.

Page 26

1        Q.    Where did you receive your training in
2    Cellebrite?
3        A.    Through Cellebrite.
4        Q.    Did they come to the police department to
5    conduct the training, or did you go to one of their
6    facilities?
7        A.    I went to different police departments for
8    training conducted by Cellebrite.
9        Q.    When did you do that?
10       A.    I believe it was 2014, and I've taken multiple
11   Cellebrite and other forensic classes since 2014.
12       Q.    Bear with me here while I look for a
13   particular note.
14             Is the Cellebrite device that you've described
15   for us synonymous or the same as something known as the
16   Cellebrite Physical Analyzer, Versions 7.5.0.82?
17       A.    That's a software created by Cellebrite which
18   will parse extracted data from phones and makes it into a
19   viewable format, but it's the same company.
20       Q.    Is that particular software that I just
21   identified different from the -- what I'll call the
22   general Cellebrite software application that's used for
23   investigative purposes?
24       A.    Depends on the device itself, but we also have

Page 27

1    another software and hardware for Cellebrite, which is
2    called the UFED 4PC, which is a PC-based software used to
3    extract phone data from certain types of phones. And
4    there's an adapter that plugs into a computer which is
5    the method of extracting the data from certain types of
6    phones. And that works hand in hand with the physical
7    analyzer which takes that extracted data and makes it
8    into a viewable format that you could review and then
9    make a report on it.
10       Q.    So it's not -- it's not the case that one
11   piece of software can do something that the other can't;
12   it's that they're to be used in conjunction with one
13   another.
14       A.    For Cellebrite, yes. So my phones can be
15   extracted directly through Cellebrite Physical Analyzer
16   without having to use Cellebrite 4PC. And that's
17   through, I think, the advanced logical extraction, which
18   is done from an iPhone directly through Cellebrite
19   Physical Analyzer without the need of using Cellebrite
20   UFED 4PC.
21       MS. PROCTOR: You know -- this is Darcy Proctor.
22   Just for the record, you know, I know we've been getting
23   into some technical questions. And, you know, my
24   understanding is there is a confidentiality order in

9  (Pages 24 to 27)

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 28

1   place. So I would just like for the record just put
2   forth that, you know, specific questions about the City
3   of Joliet Police Department's forensic-evidence-gathering
4   tools -- that the information that will be discussed here
5   today and what we've been touching on already will be
6   subject to the protective order in this case, and I think
7   we can all appreciate that. So, you know, which for the
8   witness's benefit, it's not to be disclosed outside this
9   lawsuit. You're obviously discussing internal things
10  that the City of Joliet Police Department does with
11  respect to gathering evidence and forensic analysis and
12  what tools are available to the department. You know,
13  again, it's the City's position in this case that all of
14  that would be subject to the confidentiality order and
15  protected from disclosure outside the four corners of
16  this lawsuit.
17          So, you know, from time to time -- I mean, I
18  think -- you know, can we have a general understanding of
19  that, or do we need to keep, you know, invoking it as we
20  move throughout it? I mean, I addressed it with respect
21  to this subject matter. So are we all in agreement on
22  that? Hall, Matt, what are your thoughts?
23      MR. ADAMS: The protective order says what it says.
24  We'll deal with -- we'll observe it.

Page 29

1       MS. PROCTOR: Right. But I think my reading of the
2   protective order is that it needs to be set forth on the
3   record during the deposition when you're getting into
4   matters that would be subject to the confidentiality
5   agreement and protective order in place. So if we have
6   that understanding, I may do it from time to time. I
7   mean, I don't want to keep interrupting, but -- so I've
8   said what I needed to for the record, so thanks.
9   BY MR. ADAMS:
10      Q. Describe for us, Officer German, where in the
11  investigations unit you and your fellow detectives would
12  have gone to use the Cellebrite and/or Lantern computers?
13      A. Are you talking about back in May of 2018?
14      Q. Yes, yes.
15      A. There's a desk in investigations where we had
16  a computer that had the licensing for Cellebrite. And
17  that's where the phones were extracted and then analyzed
18  by detectives. The Lantern was on an Apple Mac laptop,
19  separate from the Cellebrite computer.
20      Q. Also in the investigations unit area?
21      A. I believe that might have been in the major
22  case room, which was another room within investigations.
23      Q. What did you call that room?
24      A. At the time it was called a major case room.

Page 30

1   It was a conference room.
2       Q. Was that major case room adjunct to the
3   investigations area?
4       A. Yeah, it was -- Yes. It was within the
5   investigations division room. It was next to, at the
6   time, Deputy Chief Roechner's office.
7       Q. Back at that time, was Officer McKinney in the
8   investigations unit?
9       A. I believe so, yes, yes.
10      Q. Did other personnel; that is, not members of
11  the investigations unit, have physical access to the
12  investigations area within the police department
13  building?
14      A. It was limited access to normal -- the police
15  department, the investigation personnel, supervisors, as
16  far as my understanding.
17      Q. Did General Order 16-1 relating to evidence
18  and property management apply to the Socha investigation?
19      A. Yes.
20      Q. Did General Order 7-2 relating to complaints
21  against the agency or its employees apply to the Socha
22  investigation?
23      A. I believe, yes, any general order would apply.
24      Q. Your earlier answer suggested that sometime

Page 31

1   since the Socha investigation the Cellebrite computer has
2   been moved to some location other than that in which it
3   was used back in May/June of 2018; is that correct?
4       A. Yes. It's been moved about three times or --
5   three or four times.
6       Q. Where was it moved first after that Socha
7   investigation?
8       A. So at some point afterwards, we obtained a
9   second Cellebrite license to work on two different
10  computers, and we had stopped using the original physical
11  computer and used newer computers. And then eventually
12  it got moved into the -- at some point the manager case
13  room, where we had two different licenses. The system
14  then got moved to our old digital forensic lab maybe a
15  couple years ago, and then it currently resides in our
16  new digital forensic lab, which is our old major case
17  room that I mentioned back in 2018.
18      Q. And were those moves each time made simply to
19  additional equipment and capability?
20      A. Yes and evidence that we would have to hold
21  because of forensic -- mobile forensics.
22      Q. In other words, evidence security?
23      A. Yes.
24      Q. How did you, as a detective, access the

10  (Pages 28 to 31)

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 32

1  Cellebrite?
2      A.  It would be logging in to the computer and
3  then using the software on the computer from Cellebrite.
4      Q.  Did you have your own individual password?
5      A.  No.
6      Q.  Was there a single password for all users of
7  the Cellebrite software?
8      A.  Yes.
9      Q.  Where was that password displayed?
10     A.  It wasn't displayed visibly anywhere.  It was
11 just told to detectives who would have access to it.
12     Q.  Was it told to officers other than detectives?
13         We lost you.
14     A.  Not to my knowledge other than investigators
15 and supervisors in investigations.
16     Q.  Did non-sworn officers who worked in the
17 investigations unit have access to the Cellebrite
18 password?
19     A.  Other than possibly the IT department.  Other
20 than that, not to my knowledge.
21     Q.  Likewise, did the Lantern equipment and
22 software have access controlled by passwords?
23     A.  Yes.
24     Q.  A single password or individualized passwords?

Page 33

1      A.  There would be a single password to log on to
2  the laptop.
3      Q.  Was the Cellebrite equipment and software
4  equipped with the capability to log who signed on, when
5  they signed on, when they signed off?
6      A.  The Windows operating system, I believe, would
7  have some type of login log of the general user logging
8  in.  Cellebrite would not have a password itself within
9  the Windows computer.
10     Q.  And if I understand correctly, in May and June
11 of 2018, the computer on which the Cellebrite software
12 was installed was a single computer in the investigations
13 area, correct?
14     A.  Yes, for Cellebrite, yes.
15     Q.  And it ran a Windows operating system and the
16 Cellebrite capability, the Cellebrite license, was
17 accessed by a password, true?
18     A.  The Cellebrite license doesn't have -- does
19 not have a password login.  Just the actual Windows
20 computer to access Cellebrite has a login.
21     Q.  So before -- In accessing and using the
22 Cellebrite, in addition to entering the universal
23 password, you would enter some individualized identifying
24 information that indicated when you were using it and

Page 34

1  when you stopped using it?
2      A.  No.  Only when a report is generated with
3  Cellebrite would the officer -- the detective put in that
4  person's name and who's creating the report, which is a
5  portable report that you view the phone data on other
6  computers.
7      Q.  If no reports were generated, would the system
8  identify and track the logging on and logging off of a
9  particular user?
10     A.  Not at that time, no.  Just the general
11 Windows user, not a not unique ...
12     Q.  So if an individual used the password to log
13 in to the Cellebrite system, in order to view data that
14 was on a computer that was being analyzed as part of an
15 investigation but didn't create a report, the system
16 wouldn't identify that user, true?
17     A.  To my knowledge, correct.
18     Q.  In May and June of 2018, did the Joliet Police
19 Department have any rules, regulations, SOPs, or codes of
20 conducts -- codes of conduct regulating you how officers
21 should treat one another?
22     A.  I believe there is one.
23     Q.  Are officers expected to treat one another
24 professionally?

Page 35

1      A.  I believe so, yes.
2      Q.  Were they expected to treat one another with
3  dignity and respect?
4      A.  I believe so, yes.
5      Q.  Were officers expected not to treat female
6  officers in a sexist or misogynistic way?
7      A.  Yes.
8      Q.  Were officers expected not to discriminate
9  against female officers on the basis of their sex?
10     A.  Yes.
11     Q.  In order to search a computer by means of the
12 Cellebrite back in our time frame of May/June 2018, what
13 would have to be done with the computer being searched?
14     A.  Depending on the make and model and the
15 operating system of the computer, a password may need to
16 be known to unlock the computer and then plug it into the
17 Cellebrite computer for the forensic extraction of the
18 phone data or the computer data.
19     Q.  Plug in with a cord?
20     A.  If there's an iPhone, it would be a lightning
21 cable, which is normally commonly used to charge iPhones.
22     Q.  Does the Lantern work in essentially the same
23 way?
24     A.  Yes.

11  (Pages 32 to 35)

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 36

1    Q.   In May and June of '18, was there any
2    understanding regarding who was permitted to use the
3    Cellebrite and Lantern devices?
4        A.   It would be people trained to use it. It's
5    also used to review phone data that was downloaded from
6    Cellebrite. So any detective who had a case involving a
7    computer or cell phone could potentially use that same
8    computer to review the phone data before or after the
9    report is generated.
10       Q.   A detective in the investigations division who
11   was not working on a particular case would have no reason
12   to use the Cellebrite or Lantern equipment to search or
13   review the content of computers seized in connection with
14   those investigations, correct?
15       A.   Well, many times detectives work on cases
16   together and share knowledge and ask questions, so it's
17   not uncommon for a detective not assigned to a case to
18   assist in multiple cases.
19       Q.   You've answered the question a little
20   differently than the one I asked, and I appreciate that.
21   If a detective didn't have a role, wasn't working on the
22   investigation, that detective would have no reason to
23   access and review the contents of computers seized by
24   using either the Cellebrite or the Lantern equipment,

Page 37

1    correct?
2        A.   Correct, for that specific evidence for that
3    case they're not involved in, they wouldn't have a reason
4    to unless they were assisting in some way.
5        Q.   Okay.
6        A.   Obviously, they can use the same computer to
7    access other evidence for other cases using the same
8    computer.
9        Q.   And I appreciate that, but then they would
10   need only disconnect the computer seized in the
11   investigation they weren't working on and plug in the
12   computer seized or obtained in any investigation on which
13   they were working, correct?
14       A.   No. So, say, for example, the phone with the
15   computer, when it's plugged in, the data is extracted
16   into the Cellebrite system. That phone or computer then
17   can be disconnected, and that data is in the Cellebrite
18   system program on the computer to be reviewed and
19   eventually a report generated without that phone or
20   computer still being connected or the need to have the
21   phone or computer connected.
22       Q.   On Cellebrite -- and I'm thankful for your use
23   of the word "extracted," because I never know the
24   difference between uploaded and downloaded, so I'm going

Page 38

1    to go with your term, which is "extracted."
2        A.   Okay.
3        Q.   When Cellebrite extracts data from a computer
4    that's being searched as part of an investigation, how is
5    the extracted data identified on Cellebrite so as to
6    distinguish it from data extracted from unrelated
7    computers obtained in unrelated investigations?
8        A.   So when the data is initially extracted to the
9    Cellebrite Physical Analyzer software, it will be unique
10   to that name, the file name that the investigator creates
11   to identify that phone or that computer. And in that
12   data, there will be a summary of the device identifying
13   the device -- the name of the device, the serial number,
14   the UD ID, which is the unique device ID that Apple uses
15   to identify phones. It's like a serial number. Name,
16   phone number, all that will be unique to that device
17   that's in the Cellebrite Physical Analyzer software.
18            Now, you can extract data from multiple
19   devices in the same Cellebrite system software, and each
20   device will be different tabs separate in the Cellebrite
21   Physical Analyzer. Once a report is generated through
22   Cellebrite, that report unique to that device can now be
23   accessed by a reader, a Cellebrite reader, which can be
24   used on any computer anywhere to review whatever data

Page 39

1    that the examiner chose to create on the report.
2            Sorry if I'm being confusing.
3        Q.   All right. So let's use the Socha case as an
4    example. The specific computer seized from her was her
5    Apple iPhone. You remember that, true?
6        A.   Yes.
7        Q.   So when the data on her Apple iPhone was
8    extracted by and into the Cellebrite, it would have been
9    stored there under a tab that identified that data as
10   relating to the Socha investigation and/or that specific
11   iPhone, correct?
12       A.   Correct, until the Physical Analyzer program
13   is closed or turned off. And then that stored data is
14   not in the program software itself. It will be stored in
15   our -- the hard drive, the server of the computer, which
16   can also be later reexamined using the Cellebrite
17   Physical Analyzer and reopened.
18       Q.   And once it's stored in the hard drive of the
19   computer, does every detective in the investigations unit
20   have access to it without the necessity of logging on to
21   the Cellebrite equipment with the password?
22       A.   You would have to be able to log in to the
23   Cellebrite -- at the time, you'd have to log in to the
24   Cellebrite computer with the Windows password and know

12  (Pages 36 to 39)

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 40

1    how to use Cellebrite Physical Analyzer and open up that
2    saved data, the phone data, back into the Cellebrite
3    Physical Analyzer unless there was a report generated.
4    And then the person could just download that, open up
5    that report in the Cellebrite reader, which is a portable
6    report that could be used in any computer.
7        Q.   And if a report had been generated, does that
8    then make the extracted data generally accessible to
9    every detectives' computer?
10       A.   No.  You have to get a -- you would have to
11   obtain the -- it's called the UFDR file.  It's the report
12   generated by Cellebrite.  You would need that file to
13   open up in the Cellebrite reader, commonly what we give
14   the prosecutors and defense attorneys and other
15   investigators to review phone data.
16       Q.   Internally, what was done to control access to
17   that file?
18       A.   It would be the investigations division
19   limited access and then the limited access to the
20   specific computer, the Windows computer, and then the
21   knowledge of using Cellebrite.
22       Q.   Was the data extracted from Socha's phone
23   saved in a limited access space in the system?
24       A.   It would be limited access to access of that

Page 41

1    computer itself.
2        Q.   Say that again, please.
3        A.   The limited access would be the access to that
4    computer itself with the Windows password and within the
5    investigations secured division.
6        Q.   So anyone in the investigations division would
7    have access to it?
8        A.   If they knew the password and they knew how to
9    obtain that data from Cellebrite.
10       Q.   And with the password, once they were in the
11   computer, how would they call up the data extracted from
12   Socha's iPhone?
13       A.   There could be two ways.  The simplest way, if
14   the report from Cellebrite was saved, the person would
15   just have to open up the Cellebrite reader which opens up
16   that report that was generated of the phone data.  The
17   other option, the more difficult option, would be to open
18   up the Cellebrite physical Analyzer, find the extracted
19   data, and then what they call parse -- or reparse, which
20   is making something in a viewable format, and reanalyze
21   that same extracted phone data.
22       Q.   In the Cellebrite -- If a report had been
23   generated and the person who logged on with the password
24   called up the report to get at the extracted data, what

Page 42

1    would be their search parameter?  The name Socha, a
2    report number, the identifying information for the
3    computer device from which the data had been extracted,
4    any of the above, none of the above?
5        A.   So it would depend on the examiner who
6    initially extracted the phone data, how that person
7    created the Windows folder in the Cellebrite hard drive
8    to store the data.  Usually it's a case number.
9    Sometimes it's the owner's name.  It could be the
10   detective's name who I believe is detective on the case.
11   Different ways to store it so that we know how to find
12   that data after the fact.
13       Q.   How was the Socha data stored?  That is, was
14   it under Grizzle's name, Socha's name, the Apple iPhone
15   identifying information, a case number, some of the
16   above, all the above?
17       A.   So Lieutenant Botzum, so Sergeant Botzum at
18   the time, had done the extraction of Officer Socha's
19   phone.  He would have chosen a name to save it to.  Back
20   in 2018, I knew.  As of now, all I could think of,
21   possibly, it may have been under the case file for the
22   alleged victim, Ms. -- I believe her name is Gatlin.  To
23   my knowledge I think that's where Socha's case was also
24   saved to, but I'm not a hundred percent sure.

Page 43

1        Q.   And if a report hadn't yet been generated and
2    somebody was looking in the Physical Analyzer for the
3    extracted data, what would be the identifying search
4    terms or criteria?
5        A.   The person would have to open up the
6    Cellebrite Physical Analyzer and open a new download,
7    reparse this phone data; and they would have to know what
8    folder to go to to find that extracted data.
9        Q.   And would it be the officer who did the
10   initial extraction who would label and identify the
11   folders?
12       A.   Yes, the data generated by that examiner -- or
13   that examiner.  And that examiner, when they do the
14   initial extraction, where that initial extracted data is
15   saved to.  And then also the Cellebrite report would have
16   to tell Cellebrite where to save those files to, and that
17   person would need to create a folder in the Cellebrite
18   server, title it in a way that they could know how to
19   find that data later on and then choose to save that data
20   to.
21       Q.   In May and June of 2018, were all of the
22   detectives in the investigations unit trained on how to
23   use Cellebrite?
24       A.   Only a limited were trained on how to extract

13  (Pages 40 to 43)

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 44

1    phone data. And I would say the majority had at least
2    some training through myself or other examiners on how to
3    review the Cellebrite reports, the case reports that are
4    generated, to know how to access Cellebrite -- or use the
5    Cellebrite reader to review their phone data on their
6    cases.
7        Q.   Within the investigations unit, were you
8    considered to be something of an expert on the use of
9    Cellebrite and Lantern devices?
10       A.   Yes, with Lantern, I think I was -- myself and
11   Sergeant Botzum were the only ones, to my knowledge, that
12   had knowledge on how to use Lantern. With Cellebrite,
13   there was more -- a few other detectives that were
14   trained by myself and eventually through Cellebrite to
15   also do extractions.
16       Q.   Do you know who those few others were at the
17   time?
18       A.   It's changed, so Officer Bergner, when he was
19   assigned to the FBI's RCFO office, had been trained
20   through the FBI and possibly through Cellebrite.
21   Detective McKinney and Detective Martinez had been
22   through Cellebrite training through and through
23   Cellebrite. I'm not sure of the exact time frame of
24   when. I know Detectives -- well, Sergeant Landeros now,

Page 45

1    detective at the time; Sergeant Gavin; and a couple --
2    night detectives that used to work night shift, I had
3    shown -- I did a limited training on that, on how to
4    access Cellebrite if I wasn't around or if another
5    detective wasn't around to help him when, you know, we
6    weren't working.
7        Q.   Was McKinney involved in the Socha
8    investigation in any way that you're aware of?
9        A.   Not to my knowledge.
10       Q.   Was McKeon involved in the Socha investigation
11   in any way which you're aware?
12       A.   Not to my knowledge.
13       Q.   How, if at all, was extracted data retrieved
14   and viewed on Lantern differently than Cellebrite?
15       A.   So the Lantern computer only worked on an
16   Apple laptop, which is what we used for Lantern. So the
17   extracted files would be -- the original files would be
18   saved to the laptop hard drive. Normally, I would save a
19   copy to the Cellebrite server on that Cellebrite
20   computer. And generally for most cases, the reports and
21   the data would either be copied onto a DVD or a Blu-ray
22   disc and placed into evidence. Or more recently we use
23   evidence.com to store our digital evidence to Axon
24   evidence.com server. We don't use DVDs and Blu-rays as

Page 46

1    much anymore.
2        Q.   The department was not using evidence.com back
3    in the May and June of 2018 time frame, was it?
4        A.   I don't remember the exact time we got it. It
5    was around that time period. It may have been after, but
6    I don't recall exactly.
7        Q.   In the case of the Socha investigation, where
8    her Apple iPhone was seized and then its contents
9    extracted and examined, how would the BEAST chain of
10   custody protocol apply both to the device and to the
11   contents of the device?
12       A.   So the device would only be in the BEAST if
13   the investigator entered that phone into evidence to
14   hold. If the phone was being given back to the owner,
15   then it would not be entered into the BEAST unless, for
16   example, the detective decided to enter it into evidence,
17   extract the data, and then remove the item from evidence
18   and give it back to the owner. Normally, that's not the
19   case. Usually, it's just collected by the investigator,
20   phone extracted, and the phone given back to the owner of
21   the phone, so there would be no BEAST evidence labels.
22   As far as the phone data itself, the extracted data
23   and/or the report would be either placed on a USB drive,
24   a DVD or a Blu-ray, depending on how big the data file

Page 47

1    is. Or, like I said, now zip the digital files, and we
2    import them into evidence.com for that digital holding of
3    the evidence. And then a BEAST label would be generated
4    for either the media, like the DVD or the Blu-ray disc,
5    or there would be a BEAST label for the cloud storage
6    through evidence.com.
7        Q.   What, if any, was Roechner's role in the Socha
8    investigation?
9        A.   Only to my knowledge, the supervisor in
10   investigations over Sergeant Grizzle.
11       Q.   If the extracted contents of the Socha iPhone
12   were loaded onto a USB or to DVDs or any other physical
13   storage device for that data, those physical storage
14   devices should have been logged into and controlled
15   through the BEAST system?
16       A.   Once they're actually physically entered into
17   evidence and packaged and entered into evidence, that's
18   when there would be a BEAST label created, and then that
19   physical evidence would be held in the evidence division.
20       Q.   And to put a finer point on that, once the
21   data on the cell phone was extracted, whether through
22   Cellebrite or Lantern, and then loaded onto a storage
23   device like a USB or a DVD, those physical storage
24   devices should be placed into the BEAST system, correct?

14  (Pages 44 to 47)

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 48

1    A.   Correct.  It would be logged -- the BEAST is a
2   computer log of the physical evidence, so that it would
3   be entered into the BEAST, and then the physical evidence
4   would be held in the evidence section.
5    Q.   Okay.  Just like any other physical evidence
6   at that point?
7    A.   Correct, like guns, knives, whatever.
8    MR. ADAMS:  Tina, for our record BEAST is an
9   acronym.  It's all caps.
10  BY MR. ADAMS:
11   Q.   And the BEAST system, through its barcoding
12  feature, does track who accesses physical evidence for so
13  long as it's in the custody of the department, correct?
14   A.   Yes.  There's a chain of custody through the
15  BEAST.
16   Q.   Okay.  Is there any way to circumvent the
17  BEAST chain of custody system in order to take possession
18  of physical evidence without the BEAST system tracking
19  that?
20   A.   The only way I could think of would be someone
21  in the evidence section that has access to the evidence
22  could take the evidence and not log it into the BEAST.
23   Q.   And that would be a violation of the general
24  order, correct?

Page 49

1    A.   Yes.
2    Q.   That would be improper?
3    A.   It would be.
4    MS. PROCTOR:  You know, could we just take a
5   five-minute bathroom break?  We've been going a little
6   over an hour.  Just take five.
7    MR. ADAMS:  Sure.  I'm going to just mute and stop
8   my video.
9              (A short break was had.)
10  BY MR. ADAMS:
11   Q.   Once -- and I'll refer to it as -- although
12  it's probably not the right technical term -- transfer
13  data.  That is, data from -- that's extracted from a
14  seized computer into the Cellebrite and/or Lantern
15  systems, and then transferred from those to either a USB
16  or DVD or other storage device, is logged into and
17  maintained in the BEAST system.  The only officers who
18  should access that physical evidence would be those
19  officers performing some role on that particular
20  investigation, correct?
21   A.   Correct, either analyzing the evidence or,
22  say, making copies for court for prosecutors, defense,
23  things like that.
24   Q.   Something germane to the investigation,

Page 50

1   whatever that might be?
2    A.   Yes.
3    Q.   For an officer to go into the evidence storage
4   area, even if properly going through the BEAST steps, and
5   taking physical evidence, if they are not involved in the
6   investigation, that would be improper, wouldn't it?
7    A.   Possibly.  There could be some reasons why,
8   but that -- it could be improper, and it would be only by
9   evidence personnel who have only access to the evidence.
10   Q.   At any time in the May/June 2018 time frame,
11  how would you characterize your personal and/or
12  professional relationship with Officer Socha?
13   A.   Coworker.
14   Q.   Okay.  Any relationship of any kind outside
15  the workplace?
16   A.   No.
17   Q.   Same questions for Officer Crowley?
18   A.   Same with him.
19   Q.   Were you involved in any way in the
20  investigation and/or prosecution of Officer Crowley that
21  preceded this Socha investigation?
22   A.   Not involved with that investigation.
23   Q.   You're aware of it?
24   A.   I'm aware of it, yes.  I guess, technically,

Page 51

1   if that harassment -- alleged harassment of a witness is
2   considered part of that, then yes, but not the actual
3   allegation, the original offense allegation.
4    Q.   I appreciate that.
5        Have you had any contact with a woman named
6   Lorinda Lamken, a lawyer in the Illinois State Appellate
7   Prosecutor's Office?
8    A.   I don't believe I ever spoke or met with her.
9    Q.   Is the Socha investigation ongoing?
10   A.   That, I don't know.  I guess it would -- if
11  it's a misdemeanor, it would not be because that's a year
12  and a half.  If it's a felony, that would be three years,
13  so two -- three years after the date of the offense if it
14  was a felony, it possibly could be but -- for the
15  criminal aspect of it.
16   Q.   Have you ever discussed with Sergeant Grizzle
17  the role and/or effect of Officer Socha's trial testimony
18  in the Crowley prosecution?
19   A.   He spoke about it, yes.
20   Q.   When?
21   A.   On or just shortly after the testimony, I
22  remember speaking about it.
23   Q.   What did he tell you?
24   A.   Just what had occurred, what she had stated,

15  (Pages 48 to 51)

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 52

1  and what the final ruling was.
2      Q.   That Crowley was acquitted?
3      A.   Yes.
4      Q.   What, if anything, did Grizzle say to you
5  about the impact of Socha's testimony at the Crowley
6  trial on that outcome?
7      A.   That her testimony would be -- was favorable
8  to Officer Crowley.
9      Q.   Do you recall anything specific that he said
10  to you about that?
11      A.   The only thing I remember would be that her
12  testimony contradicted her statements -- her original
13  statements to the police investigators about what had
14  occurred.  I can't think of anything else more specific
15  other than just a general what occurred and the outcome.
16      Q.   Okay.  Did he express to you his frustration
17  either with the outcome or the role that Socha's
18  testimony played in that outcome?
19      A.   I wouldn't be able to characterize his
20  emotions other than what he said.
21      Q.   You can characterize his tone or his
22  appearance while he said whatever it was that he said.
23      A.   Nothing in his tone or appearance led me to
24  believe that it affected him emotionally other than just

Page 53

1  a normal conversation.
2      Q.   Sergeant Grizzle had been the lead detective
3  on that Crowley investigation, had he not?
4      A.   I believe so, but I wasn't involved, so I
5  couldn't say a hundred percent for sure.
6      Q.   Have you ever heard Roechner discuss the
7  Crowley trial and Socha's effect on its outcome?
8      A.   I can't remember if he ever spoke to me in
9  person or the investigations with me around.  I don't
10  remember any specific things he may or may not have said.
11  It's possible.  I just don't recall.
12      Q.   Other than Grizzle, have you heard officers in
13  the investigations unit discuss the Crowley trial outcome
14  and/or Socha's role in that outcome?
15      A.   It was discussed throughout the office.  I
16  don't remember exactly who brought it up or what was said
17  by what individuals.  I just know it had been brought up.
18      Q.   Can you identify any other individuals who
19  discussed it?
20      A.   I would say almost every investigator during
21  that time period that would have been in the office was
22  either present or could have discussed it.  I wouldn't
23  say anyone individually, just because I don't want to say
24  somebody that did say something that may not have because

Page 54

1  I don't recall who said what other than it was discussed
2  by the majority of the personnel during that time period.
3      Q.   During those discussions, was it your
4  perception that there was a consensus that the officers
5  in the investigations unit were disappointed in Socha?
6      A.   I don't know their feelings other than what
7  they may or may not have known about the case.  I don't
8  think everybody knew all the details about the case, what
9  was said or what allegedly was said or wasn't said.  So I
10  don't think many investigation personnel were actually
11  involved in that investigation to know what specifically
12  occurred other than what we heard.
13      Q.   Did any express disappointment in the outcome
14  of the trial?
15      A.   Not that I can say disappointment other than
16  just talking about what occurred.  I don't know what they
17  felt other than -- what we heard was that the testimony
18  was different from what she had initially allegedly
19  reported to JPD personnel, which, at least, I would
20  assume most did not agree with, if that was the case,
21  where testimony was different.
22      Q.   When you had the conversation in which Grizzle
23  told you that Socha's testimony had been helpful to
24  Crowley, harmful to the prosecution, in that it had

Page 55

1  differed from statements she had given to investigators
2  prior to the trial, I want to focus on that conversation.
3  Okay?
4      A.   Okay.
5      Q.   Where did that occur?
6      A.   The only conversations I recall would have
7  been in the general investigations division, which is an
8  open area where all the detectives are at.
9      Q.   When did that consider?
10      A.   On and after -- shortly after the trial.
11      Q.   So more than one occasion?
12      A.   I'm sure there was more, a couple of
13  occasions.  I don't recall exactly how many or how long
14  it was.
15      Q.   Would those couple or so occasions have been
16  on the same day as the acquittal and then within the
17  following weeks sometime?
18      A.   I would say that's the best estimate of the
19  time, yes.
20      Q.   Did you have either of those conversations
21  with Grizzle during any facet of the Socha investigation?
22      A.   No, not -- other than just the allegations of
23  the subsequent alleged events.
24      Q.   Okay.  So the conversations in which Grizzle

16  (Pages 52 to 55)

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 56

1 shared with you that Socha's testimony in the Crowley
2 trial had helped Crowley and hurt the prosecution in that
3 it had been different from her pretrial statements
4 occurred before the Socha investigation; is that
5 accurate?
6 A. It would probably be during, because I believe
7 the investigation started the day or the day after the
8 testimony of the female. I don't recall exactly how long
9 Crowley's trial was and what -- when the witness's
10 testimony was in relation to the beginning of the Socha
11 investigation. I would say it was around that same time
12 period. I would say it's more accurate that it did occur
13 sometime during that week time period.
14 Q. Can you be any more precise about the date of
15 either conversation with Grizzle?
16 A. Other than the testimony, I guess, of the --
17 at the conclusion of the trial after the testimonies.
18 Don't recall when their testimonies were involved to the
19 conclusion of the trial, if it was the same day or a
20 whole week. I don't follow the trial that much, so I
21 couldn't say that, you know, especially now, three years
22 later.
23 Q. During either conversation were there other
24 participants to the conversation?

Page 57

1 A. About the trial or the --
2 Q. The Crowley trial.
3 A. Yeah, there would be -- most detectives at
4 some point were likely in the office when people were
5 talking about it in general.
6 Q. I was a little precise. That's my problem.
7 In either of the conversations where you heard Grizzle
8 express his view that the Socha testimony in the Crowley
9 trial helped Crowley and hurt the prosecution and that
10 Socha's testimony in that trial was different than her
11 pretrial statements, were any other people participating
12 in either of those conversations?
13 A. I don't --
14 MR. CLARK: Objection, form.
15 But you can answer.
16 BY THE WITNESS:
17 A. I don't recall any individual detectives that
18 may have overheard or took part.
19 Q. Okay.
20 A. But it is likely many were present at some
21 point.
22 Q. In order to log on to Cellebrite or Lantern
23 for the purpose of viewing data extracted from a computer
24 as part of their investigation, did detectives need

Page 58

1 anyone's permission?
2 A. No.
3 Q. How much time did you spend viewing any data
4 that was extracted from Socha's Apple iPhone?
5 A. Less than, I would say, a minute, just to
6 confirm that the data was extracted and reported and
7 turned over.
8 Q. How would you characterize your role in the
9 extraction, reporting, and transfer and storage of the
10 data from Socha's iPhone during the Socha investigation?
11 A. So the data was extracted by Sergeant Botzum,
12 Lieutenant Botzum now. I was requested by
13 Lieutenant Botzum to generate a report of the Lantern
14 extraction and provide a copy to Sergeant Grizzle. And
15 then Sergeant Grizzle requested a copy of the Cellebrite
16 extraction. And then about a month later, I was ordered
17 by Sergeant Gavin to copy any stored data on either
18 computer and then turn that over to Sergeant Gavin and
19 then delete any saved files on either computer.
20 Q. Who promoted Botzum from sergeant to
21 lieutenant?
22 A. I don't recall when. It may have been under
23 either Chief Roechner, who is now retired Roechner. Or
24 it could have been -- the previous chief was

Page 59

1 Chief Benton. I don't recall the exact time of his
2 promotion.
3 Q. And it's Tab Jensen?
4 A. He was the deputy chief, so Chief -- it was
5 either Chief Roechner or Chief Benton.
6 Q. Benton. I'm sorry.
7 A. Yeah, yeah.
8 Q. At any point have you become aware that nude
9 and/or sexually explicit images, photographic and video
10 images, of Socha were extracted from her Apple iPhone?
11 A. Other than the allegations that there were
12 videos on her device that were in the reports.
13 Q. And to be clear -- and I apologize for doing
14 this. I don't know if it's your volume or mine, but I
15 don't hear the ends of some of your answers, so ...
16 A. It could be my video camera or microphone. It
17 seems like it cuts out every now and then.
18 Q. Or mine. If there's a technological
19 breakdown, there's a high likelihood it's on my end
20 always, so we'll just fight our way through it.
21 Did you say that there was a reference to
22 those images in a report that was generated, or were you
23 referring to the news reports?
24 A. It's both. So the reports of the phone would

17 (Pages 56 to 59)

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 60

1    have had a complete set of her phone data, so any images
2    or videos that she had taken or were sent to the phone at
3    some point prior to the extraction would be on the
4    reports.  I never viewed them myself, so I don't know
5    firsthand that there were nude images or videos.  I just
6    heard that there was based on the allegations.
7        Q.    Okay.  I'm going to use another short-form
8    word to get through -- if I use the word "images," I'm
9    talking about either photographic or videographic images
10   of Socha from that Apple iPhone of hers where she is
11   either nude or that are sexually explicit in nature.
12   Okay?
13       A.    Correct.
14       Q.    When did Cellebrite or Lantern first generate
15   reports that described or identified that such images had
16   been extracted from Socha's iPhone?
17       A.    So the day after Lieutenant Botzum started the
18   extractions, I had generated a report through Lantern.
19   When I came into work that following day, I believe
20   Sergeant Botzum started that night of the extraction.  So
21   I would have generated a Lantern report on the full set
22   of phone data on Officer Socha's phone, which was copied
23   under a USB and turned over to Sergeant Grizzle and then
24   also a copy of the full data from Cellebrite.  The report

Page 61

1    was generated by myself which was entered over also to
2    Sergeant Grizzle I believe that same day.
3        Q.    And the report also generated off of Lantern?
4        A.    If Lantern -- I think it was an HTML report.
5    That would have been generated and given to
6    Sergeant Grizzle to review and then continue the
7    investigation.
8        Q.    Why did you use Lantern as opposed to
9    Cellebrite to generate those particular reports?
10       A.    Lieutenant Botzum used Lantern and Cellebrite
11   to analyze the phone, and I was requested by
12   Sergeant Botzum at the time to complete the Lantern
13   extraction because the phone had been -- the phone data
14   had been extracted from Lantern, but Lantern was still
15   parsing, you know, trying to decode that extracted data
16   into a viewable format.  So he requested me to finish
17   that and then give Sergeant Grizzle a copy so he could
18   review since he was the lead detective or investigator on
19   the case.
20       Q.    And describe to me the contents of those
21   reports that you generate.  Are they narrative in nature,
22   or are they reported in iPhone code or Lantern code?
23   What is reported?
24       A.    So the final report, which Lantern was an HTML

Page 62

1    report that could be viewed on any computer, and it would
2    have -- it would be a Lantern program that one could
3    access.  And everything that it extracted and was able to
4    decode would be viewable, so phone calls, texts.
5        Q.    From that point -- you went dark on us.
6              There we are.  From that point, when you say
7    anyone could access --
8        A.    Anyone that has that report could view it on
9    any computer.
10       Q.    Any computer in the investigation section?
11       A.    No, any computer anywhere that has the final
12   report could view that data.  That's what it's designed
13   for, so that somebody could review it outside of the
14   forensic tool.
15       Q.    To what other computers was that report sent?
16       A.    So the report was saved onto a USB drive with
17   the originals saved in Lantern.  That was turned over to
18   Sergeant Grizzle for his review.  And then he would be
19   responsible for reviewing that data, making whatever
20   appropriate copies are needed for evidence.
21       Q.    So anybody who got their hands on that USB
22   drive could access the images that were extracted from
23   Socha's iPhone, true?
24       A.    It would be everything on the phone, yes.

Page 63

1        Q.    You yourself have never seen the images that
2    were extracted from Socha's iPhone?
3        A.    I have not.
4        Q.    Have any of your colleagues, your fellow
5    officers in the investigations unit, told you that they
6    had seen those images?
7        A.    Not directly.  I heard that Officer --
8    Detective McKeon and McKinney may have.  To how or why, I
9    don't know.
10       Q.    Who told you that?
11       A.    Detective McKinney had told me at one point
12   that he may have seen it at some point accidentally.  I
13   don't know the further detail about that.  And I think
14   Detective McKeon may have seen it with Detective
15   McKinney, but I never spoke directly with
16   Detective McKeon about that.
17       Q.    Have you heard that anyone else in the
18   investigations unit viewed the images that were extracted
19   from Socha's iPhone?
20       A.    I believe Sergeant Grizzle may have during his
21   analysis.  I don't know what particular images or videos
22   he could have seen, but he would have access, and I would
23   expect the investigating officer to review the contents
24   of the phone data and the report.

18  (Pages 60 to 63)

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 64

1      Q.   How about Sergeant Gavin?
2      A.   I don't know if he did or not.
3      Q.   Did Grizzle share with you that he had, in
4   fact, seen the images extracted from Socha's iPhone?
5      A.   He never told me he saw them.  I wouldn't be
6   surprised if he did, just because he was the lead
7   detective.  But he never told me or I never heard that he
8   did.
9      Q.   Have you ever heard that Roechner viewed the
10  images that were extracted from Socha's iPhone?
11     A.   I have not.
12     MS. PROCTOR:  Just for the record, I'm going to
13  just -- and forgive me because I wasn't here.  This again
14  is Darcy Proctor on behalf of the City of Joliet.
15         Detective German, you know, none of the
16  attorneys here today want you to guess or speculate about
17  what someone may or may not have done on any given time.
18     MR. ADAMS:  Counsel, please don't interrupt my
19  deposition.
20     MS. PROCTOR:  I don't know whether he was given
21  those instructions at the beginning of the deposition,
22  and he may have been.  So just want to confirm that he
23  was given those instructions, to not --
24     MR. ADAMS:  He was, and I --

Page 65

1      MS. PROCTOR:  If he was, then --
2      MR. ADAMS:  -- this deposition --
3      MS. PROCTOR:  -- we're good.
4      MR. ADAMS:  -- of the witness.
5   BY MR. ADAMS:
6      Q.   Have you ever discussed the allegations of
7   Socha's complaint with Bergner?
8      A.   I don't believe I have.
9      Q.   Have you ever heard that Roechner directed
10  Bergner to either scrub and/or dispose of one or more
11  computer devices on which Roechner had stored the images
12  that had been extracted from Socha's iPhone?
13     A.   No.
14     Q.   Would there be any investigative purpose of
15  which you're aware that Roechner would have had the
16  images extracted from Socha's iPhone on any of his own
17  personal computer devices?
18     A.   Are you talking about computers in
19  investigations that are signed in personally or his own
20  like home computers?
21     Q.   His own personal devices.
22     A.   Not that I know of, not that I could think of.
23     Q.   Would there be any investigative purpose of
24  which you're aware that Roechner would have had the

Page 66

1   images extracted from Socha's iPhone on his
2   department-issued computer devices?
3      A.   If he was assisting Grizzle in the
4   investigation, I would say that it would be reasonable to
5   have it.
6      Q.   If he did that, it would have been -- Strike
7   that.  If he did that, it should have been logged through
8   the BEAST system, correct?
9      A.   Not necessarily.  It depends on what was
10  entered.  And working copies or copies of the visual
11  evidence would not be in the BEAST.
12     Q.   How would anyone get working copies, as you
13  call them, of the images without going through the BEAST
14  system?
15     A.   The report that -- for example, the Lantern
16  reports, which is one report that has all data from the
17  phone, including videos and images, would have been on
18  the USB drive I turned over to Sergeant Grizzle.  So if,
19  for example, Deputy Chief Roechner was assisting Sergeant
20  Grizzle in that investigation, it's possible he could
21  have had a copy of that to help analyze.
22     Q.   Are you aware of any other Joliet Police
23  Department investigations division officer who had the
24  images extracted from Socha's iPhone on any computer

Page 67

1   device issued to them by the Joliet Police Department?
2      A.   No, other than Sergeant Grizzle who had the
3   copy and then the copies that were on the Lantern and the
4   Cellebrite system.
5      Q.   Grizzle's copy was on a UBS [sic] that was --
6      A.   USB.
7      Q.   And that UBS should have been controlled
8   through the BEAST system, correct?
9      A.   That depends on when he entered that data from
10  the USB into evidence.  It could be copied to a DVD or a
11  Blu-ray or if we had evidence.com uploaded to the system.
12  I don't know what he did with that piece of item.
13     Q.   Are you aware of any Joliet officers who had
14  the images extracted from Socha's iPhone on their own
15  personal computer devices?
16     A.   No.
17     Q.   That would be improper, correct?
18     A.   Likely, unless there's some extenuating
19  circumstance, but I would say improper.
20     Q.   Have you ever heard a Joliet Police Department
21  officer comment on the images that were extracted from
22  Socha's iPhone?
23     A.   No.
24     Q.   Secondhand, what we'd call in the trade

19  (Pages 64 to 67)

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 68

1   hearsay, have you heard of any officers who have
2   commented on the images extracted from Socha's iPhone?
3       A.   No.
4       Q.   Have you ever heard any Joliet officer utter
5   the words, quote, Now I know why Crowley is with her.
6   She sucks cock like a porn star, period, closed quote?
7       A.   No.
8       Q.   Secondhand, have you ever heard that any
9   Joliet officer had made that comment?
10      A.   Nope.
11      Q.   Have you ever heard any Joliet officer utter
12  any comment regarding Socha's physical appearance or
13  sexual behavior as shown on the images extracted from her
14  iPhone?
15      A.   No.
16      Q.   Have you, secondhand, heard that any Joliet
17  officer has made such comments?
18      A.   No.
19      Q.   Such comments about a fellow female officer
20  would be improper, correct?
21      A.   I believe.
22      Q.   Have you ever heard any other Joliet officers
23  express the opinion that the manner in which the images
24  extracted from Socha's iPhone and then handled,

Page 69

1   distributed, and made available to others was improper?
2       A.   I'm sorry.  Can you repeat the first part of
3   that question?
4       Q.   That wasn't much of a question.
5            Have you ever heard any other Joliet officers
6   express criticisms of the way the images on Socha's
7   iPhone were handled by the department after those images
8   were extracted?
9       A.   Just Officer Socha through the complaint.
10      Q.   Any others?
11      A.   No.
12      Q.   Even secondhand?
13      A.   No.
14      Q.   All right.  I'm going to try my first ever
15  here screen share, so bear with me, but I think I'm keyed
16  up to do this properly.  We'll give it a try.
17           All right.  Officer German, can you see on
18  your screen first a document labeled City 00053?
19      A.   I see an e-mail with an attached officer
20  supplement report pdf, entitled like e-mail with an
21  attachment.
22      Q.   Are you able to scroll down the attachment?
23      A.   I think you have to because you're sharing
24  your screen.

Page 70

1       Q.   So I'm going to do the scrolling.  So at the
2   top, what we're looking at is an officer supplement
3   report, and the number is --
4       A.   You might be sharing your wrong screen because
5   all I see is an e-mail with an attachment.
6       MR. CLARK:  That's all I see as well.
7       MS. PROCTOR:  It's an empty e-mail with --
8       MR. ADAMS:  It's open on my --
9       MS. PROCTOR:  It's a pdf attachment.  You have to
10  open it.
11      THE WITNESS:  If you go to your share screen
12  option --
13      MR. ADAMS:  I'm going to back out and start over
14  here.
15      THE WITNESS:  When you're going to share screen,
16  choose which screen you're going to share to, which
17  should be your open document and not your other screen.
18  BY MR. ADAMS:
19      Q.   Can you see it now?
20      A.   Yes.
21      Q.   All right.  So this is a document that you
22  prepared?
23      A.   Yes.
24      Q.   And the date shown here, that's the date you

Page 71

1   prepared the report?
2       A.   Correct, on May 17th.
3       Q.   And judging from the records that I've seen,
4   this does not supplement a prior report of your own but
5   rather one that was generated by Botzum at the start of
6   the process, correct?
7       A.   I believe it was generated by
8   Sergeant Grizzle, and then this would be a follow-up to
9   his original case he generated.
10      Q.   The phone that's described in this particular
11  exhibit --
12      MR. ADAMS:  Which, Tina, we'll call German 1 for
13  identification.
14  BY MR. ADAMS:
15      Q.   -- is the Gatlin phone, correct?
16      A.   Yes.
17      MS. PROCTOR:  For the record, Hall, can you just
18  scroll down and give me the City of Joliet Bates stamp
19  number for this document just for my reference?
20      MR. ADAMS:  Yes.  It's City 00053.
21      MS. PROCTOR:  Thank you.
22  BY MR. ADAMS:
23      Q.   Why did you use the Cellebrite to search the
24  Gatlin phone?

20  (Pages 68 to 71)

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 72

1    A.  Sergeant Grizzle asked me to obtain copies of
2  images that were on Ms. Gatlin's phone of text messages
3  with Officer Socha.  That's the program I always use, is
4  Cellebrite, to extract that limited data.
5    Q.  And did you do that?  Were you able to extract
6  those images?
7    A.  Yes.
8    Q.  And to be precise, they were images of a
9  particular text message from Socha to Gatlin, correct?
10    A.  Yes.
11    Q.  And it was the text message which formed the
12  basis for Gatlin's original complaint that resulted in
13  the Socha investigation, true?
14    A.  Correct.
15    Q.  And after you did this extraction, you and
16  Sergeant Grizzle and anyone else involved in the Socha
17  investigation then had access to that text message,
18  correct?
19    A.  It would be a DVD that had the Cellebrite
20  report with the pictures of the text message.
21    Q.  Okay.
22    A.  Anyone who had access would have that access.
23    Q.  And just to put a finer point, you all had
24  access to the content of that text message, correct?

Page 73

1    A.  Not the message itself but a screenshot image
2  of a text message chain.
3    Q.  But you could read the words in the text
4  message?
5    A.  Yes.
6    Q.  And you could see that it was a text message
7  from Socha or Socha's iPhone to Gatlin?
8    A.  It was to Gatlin.  I don't recall if Socha's
9  name was saved in the context as Socha or if it just had
10  her phone number.  But it was -- I was told it was a
11  message between Officer Socha to this female witness.
12    Q.  At that point, once you had extracted that,
13  the Joliet Police Department had the contents of the text
14  message and knew from whom it had been sent and to whom
15  it had been sent, correct?
16    MS. PROCTOR:  I'm just going to object based on form
17  and foundation.
18       You can go ahead and answer if you can.
19  BY THE WITNESS:
20    A.  I would say not as I would have hoped for in a
21  forensic matter because it was a screenshot of messages
22  and not the actual messages where there's a specific
23  computer log of what phone number is being sent by what
24  and to who.  For example, I could make a contact in my

Page 74

1  phone with your name, send myself a text message from
2  another phone, and it would look like you had sent the
3  message, but I couldn't prove that was sent by you
4  because I don't have the extracted data from an SMS
5  database of the phone or a, say, a call log from AT&T
6  Verizon showing you had, in fact, sent me a text message
7  on my phone.
8    Q.  So I appreciate that.  So at least at this
9  point, the Joliet Police Department had the content of
10  the text message as a screenshot and Gatlin's statement
11  that it had been sent to her phone by Socha's phone?
12    A.  Yes.
13    Q.  I'm going to scroll down now to the next
14  document --
15    MR. ADAMS:  Which, Tina, we'll call German
16  Exhibit 2, City 00055.
17  BY MR. ADAMS:
18    Q.  This is a report that you prepared relating to
19  work that you did on the iPhone that was seized from
20  Socha, true?
21    A.  Yes.
22    Q.  So the work that you did here was work that
23  you were directed to do by Gavin, true?
24    A.  Yes.

Page 75

1    Q.  Did Gavin tell you why he wanted you to do the
2  work that's described here?
3    A.  Other than there was the allegation made by
4  Officer Socha and that they wanted the copies turned over
5  and deleted from the system.
6    Q.  Made against Officer Socha?
7    A.  I think it was the allegations of
8  Officer Socha about the --
9    Q.  I think you said allegations by Officer Socha.
10  I think you misspoke.
11    A.  So to my understanding this would be done
12  because Officer Socha made allegations of somebody
13  viewing her phone data.
14    Q.  Did Gavin explain to you why he wanted the
15  files from Socha's iPhone copied onto a USB device?
16    A.  No, other than since we were deleting files
17  off the system, to my understanding, to make sure there
18  was an accurate copy of those files before they were
19  deleted.
20    Q.  Off of which system were the files copied to
21  the USB device deleted?
22    A.  So both.  So Lantern and the copies of Lantern
23  on the Cellebrite system were both copied individually
24  and then deleted from both computers.

21  (Pages 72 to 75)

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 76

1    Q.    At that point, however, based upon what I
2  understood earlier, because reports had been generated,
3  the images from -- that were extracted from Socha's
4  iPhone would still have been accessible via Cellebrite
5  and/or Lantern, correct?
6    A.    Prior to the deletion, they would be
7  accessible, yes.
8    Q.    Despite the deletion that's referred to in
9  this exhibit, they could still be accessed on Cellebrite,
10 right?
11   A.    Correct.  Before that date, before my deletion
12 or the copy of deletion, they would be on the system
13 accessible.
14   Q.    Even after the deletion, if a report is
15 generated, correct?
16   A.    Then that would be on the USB drive where the
17 data was copied to, so not on the actual Cellebrite
18 system.
19   Q.    Okay.  If after this deletion somebody sat
20 down at the Cellebrite device or the Lantern device,
21 entered a password, and knew how to call up the images,
22 they could be accessed in that way?
23   A.    No.  You would need the original extracted
24 data that was only on now the USB drive unless they were

Page 77

1  placed into evidence or copied on some other media, but
2  the actual stored data on and after June 8th would have
3  been deleted from the Lantern computer and the Cellebrite
4  computer, and so you would have to obtain that original
5  data somehow to reopen up the phone data.
6    Q.    Okay.  And this deletion you did on 8 June
7  2018, correct?
8    A.    Yes.
9    Q.    Did Gavin tell you that he had been directed
10 by anyone else to have the deletion conducted?
11   A.    I don't recall if he did or not, if it was his
12 decision or somebody else.
13   Q.    The second line of the second paragraph, you
14 say that, quote, Sergeant Botzum started the extraction
15 on Lantern and Cellebrite, but due to unknown issues, the
16 report for Lantern hadn't been completed, period, closed
17 quote.
18        Did you ever determine what those issues were?
19   A.    No.  I should have been more clear in my
20 report.  They were completed by me that next morning.
21 Unknown issues would have been Lantern taking a
22 longer-than-expected period of time to finalize Lantern
23 when used by Sergeant Botzum.  That's what I meant by
24 that sentence, that I had to complete the extraction that

Page 78

1  morning and then make the report and get it over to
2  Sergeant Grizzle.
3    Q.    That prior extraction and your generating that
4  report occurred back on 17 May of 2018, correct?
5    A.    Yeah, I believe the night of.
6    Q.    Okay.
7    A.    By Sergeant Botzum.
8    Q.    Long before Gavin told you to delete the
9  contents from Cellebrite and Lantern, true?
10   A.    Yes.
11   Q.    So much earlier in the deposition we talked
12 about which Cellebrite or Lantern was used for particular
13 purposes.  In here, you say, in part, the Apple Mac
14 computer that is solely used for Lantern extractions.
15 You're talking about the computer that was there in the
16 investigations unit that was connected to that used the
17 Lantern software?
18   A.    Correct.
19   Q.    Continuing, you describe that a copy had
20 previously been provided to Sergeant Grizzle of the
21 Lantern and Cellebrite extractions by you at the time of
22 extraction.  That would have been on 17 May of 2018,
23 correct?
24   A.    Could you still hear me?  There we go.

Page 79

1        So I think that would be the 18th, so the day
2  the extraction started, that night, by Sergeant Botzum.
3  That morning when I came into work, that's when the
4  reports were generated and then turned over to
5  Sergeant Grizzle.  So I think it would be the following
6  day when this -- of the initial extraction.
7    Q.    In what form did you provide a copy of the
8  contents of the data extracted from Socha's iPhone on the
9  18th of May?  Did you do it by USB or by a disc?
10   A.    That would be USB for Cellebrite and Lantern.
11   Q.    So the USB device that you created on the
12 8th of June of 2018 was the second such USB device
13 containing the extracted contents of the Socha iPhone?
14   A.    Correct.
15   Q.    Were either entered into and controlled
16 through the BEAST system?
17   A.    I'm not aware.
18   Q.    They should have been, true?
19   A.    For final evidence, yes.
20   Q.    Is the deletion referenced in the first
21 paragraph of this Exhibit 2 a deletion of the V, as in
22 Victor, drive that's referred to in this second
23 paragraph?
24   A.    Correct.  That would be the storage for that

22  (Pages 76 to 79)

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

---

Page 80

1    Cellebrite computer, the V drive.
2        Q.   So after that deletion, the extracted contents
3    of the Socha iPhone were no longer on the Cellebrite,
4    true?
5        A.   Correct, on the June 8th and after.
6        Q.   In the next paragraph, there's a reference to
7    a dump file.  What is the dump file?
8        A.   That's a generic term for the original
9    extracted data that you would need a forensic tool like
10   Cellebrite or Lantern to, what they call, parse or make
11   it viewable to me or you.  So the dump file is just a
12   file system copy of the phone, but that's not something
13   you could actually review and look at text messages,
14   phone calls.  You would need a forensic tool, like
15   Cellebrite or Lantern, to parse or decode into a viewable
16   format.
17       Q.   So all you're doing in this third paragraph is
18   describing in step-by-step detail how you did, what you
19   did as described in the first paragraph, true?
20       A.   Correct.
21       Q.   And in the sentence in the third paragraph it
22   reads, quote, I located the Lantern files which were
23   copied onto a different USB device, period, closed quote.
24   Was that different USB device yet a third one on which

---

Page 81

1    the extracted contents of Socha's iPhone had been loaded?
2        A.   Correct.  One was from the Lantern system, the
3    copy of the files.  The other one is from the Cellebrite
4    server.  Those are on a separate USB due to the size of
5    the files.
6        Q.   And then the third one was this third one that
7    you created at Gavin's direction as reflected in this
8    exhibit?
9        A.   Correct, the copies that were copied on the
10   USB drive, turned over to Gavin, which were the same
11   copies on the server and the Lantern.
12       Q.   Did the Lantern files which were copied onto a
13   different USB device, as recited in that third paragraph,
14   include the images that had been extracted from Socha's
15   iPhone?
16       A.   The entire contents, yes.
17       Q.   So all three USB devices contained those
18   images, correct?
19       A.   They should.  I didn't look at the report, but
20   they should have the entire set of the retrieved data.
21       Q.   Where it says in the last sentence of this
22   paragraph, quote, The original Cellebrite files had
23   already been previously deleted from the V drive after
24   the files were transferred onto external media and given

---

Page 82

1    to Sergeant Grizzle when the extractions were completed,
2    closed quote, can you tell us when that deletion
3    occurred?
4        A.   I believe the same day, on the 8th.
5        Q.   I'm sorry?
6        A.   On the 8th, June 8th.
7        Q.   The 8th of June?
8        A.   Correct.
9        Q.   So that whole third paragraph describes what
10   you did on the 8th of June of 2018?
11       A.   Correct.
12       Q.   Then it says here the USB devices were turned
13   over to Sergeant Gavin.  How many USB devices were turned
14   over to Sergeant Gavin?
15       A.   I believe it was the two, one from Lantern and
16   one from Cellebrite.
17       Q.   And Grizzle already had those which you had
18   created for him back in May, correct?
19       A.   Correct, yes.
20       Q.   All right.  I'm scrolling down now to
21   City 00120, a 9 November 2018 memo from Botzum to
22   Roechner.  I appreciate that you didn't prepare this, but
23   you're referenced in it.  I'm going to ask you a couple
24   questions about it.  Is it the case that every person in

---

Page 83

1    the investigations unit had a Joliet Police Department
2    issued computer of some kind?
3        A.   Yes.
4        Q.   And did some of you have more than one Joliet
5    Police Department issued computer?
6        A.   Some might if they're in the tech units or
7    other units.
8        Q.   Were you in a tech unit?
9        A.   No, investigations.
10       Q.   Okay.  And each computer that was issued to a
11   Joliet Police Department investigations section officer
12   was assigned an identifying number.  Yours was 07?
13       A.   Yes.
14       Q.   In any investigation like this one of Socha,
15   was there any log generated that would document each
16   computer on which data extracted from a computer seized
17   in an investigation was viewed or reviewed?
18       A.   Sorry.  Could you repeat that question?
19       Q.   So was there any protocol or procedure in the
20   investigations division whereby a log or record was
21   created that would document each time extracted data,
22   like the data extracted from Socha's iPhone, was viewed
23   on particular computers?
24       A.   There should be a log, yes.

23  (Pages 80 to 83)

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 84

1    Q.   So if you review extracted data on your
2  Invest 07 computer, how would you log that in?
3    A.   Are you talking about like in a report?
4    Q.   What record would be made of the fact that you
5  did that?
6    A.   I wouldn't have any record other than a
7  follow-up.  The computer itself may have some type of
8  records of files being accessed on a computer.
9    Q.   Do you know what that record would be called?
10    A.   Not specifically, no.
11    Q.   Makes two of us.
12       Are you able to tell from reading this whether
13  his reference here -- Botzum's reference to
14  "Detective German assisted in making copies of the files
15  and taking the files off the forensic machines" refers to
16  the work that you did on the 8th and 9th of May or the
17  work that you did -- the work that you did in May or the
18  work that you did in June or both?
19    A.   It would likely be June.
20    Q.   Okay.  I'm going to scroll down now to a
21  document labeled City 00163.
22    MR. ADAMS:  Tina, we'll call this German number next
23  in order, whatever that is.
24

Page 85

1  BY MR. ADAMS:
2    Q.   Can you see that okay, Officer?
3    A.   Yes.
4    Q.   I'll represent to you -- I just want to go
5  through it, that these are notes of the IG -- of his
6  interview with you.  Okay?
7    A.   Okay.
8    Q.   And I appreciate that you've probably never
9  seen it before, but I want to go through them.
10       You see the third line down that appears, to
11  me, to read, German, Bergner has password?
12    MR. CLARK:  Hall, I'm sorry to interrupt.  Is this
13  German Exhibit No. 4, then?
14    MR. ADAMS:  Yes.
15    MR. CLARK:  And the last one I think we said was
16  German Exhibit 3, the City 00120?
17    MR. ADAMS:  I hope so, but, frankly, I'm counting on
18  Tina to keep track.
19    MR. CLARK:  Okay.  Just wanted to clarify that for
20  the record.  Thanks.
21  BY MR. ADAMS:
22    Q.   Do you recall what you told the IG about
23  German, Bergner having password?
24    A.   Just that he would have access while he was --

Page 86

1    Q.   The password?
2    A.   For the -- I believe I was referring to the
3  Cellebrite computer.
4    Q.   And is that -- did you tell the IG that you
5  and Bergner had the password?
6    A.   I think I would have told him that he did,
7  along with myself and other detectives.
8    Q.   So that was going to be my next questions.
9  Did you tell him that all the detectives had the password
10  for the Cellebrite?
11    A.   I don't remember if I said all or most that
12  use Cellebrite to review phone data.
13    Q.   Do you recall specifying that Bergner had it?
14    A.   I may have just because he was in our -- if my
15  timing is right, if he was in the RCFL, the FBI's
16  computer forensic laboratory, he would have had the
17  ability to also use our mobile system to dump phones --
18  or that could have been the server that was set up for
19  Cellebrite I believe he took part in.  Maybe that's why
20  I'm referencing to Bergner, the V drive.
21    Q.   Further down you see the phrase, it says, "Not
22  on network"?
23    A.   The only thing I could think of that would be
24  as it's not like a drive that, like, patrol or

Page 87

1  nonauthorized people could access.
2    Q.   Meaning that the contents of Cellebrite and
3  Lantern aren't on the general Joliet Police Department
4  computer network?
5    A.   Correct.
6    Q.   The line that reads "vics phone," "vic" is
7  meant to be shorthand for victim?
8    A.   Okay.
9    Q.   I'm asking.  You think -- is that -- If that's
10  the case, that would be a reference to the Gatlin phone?
11    A.   I would imagine.
12    Q.   So you see -- now we're about two-thirds of
13  the way down, the line that reads, quote, A few days
14  later, Grizzle asked for full copy from Cellebrite,
15  closed quote.  You see that?
16    A.   Yes.
17    Q.   Did you actually make two copies of -- two
18  UBSs [sic] for Grizzle in May?
19    A.   So that -- the day in May would have been the
20  Lantern -- that day or the day after extraction.  I
21  had never given him the full set of the report from
22  Cellebrite until that point.
23    Q.   So you had given him a partial USB first and
24  then a full USB the next day?

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 88

1    A.   Two different systems.  One was Lantern.  The
2  other one was Cellebrite.  So Lantern was the day I came
3  in, and then Cellebrite was probably the next day.  I
4  don't remember exactly when.
5    Q.   I see.
6    A.   Two different systems were used to extract the
7  phone data.
8    Q.   So you actually gave Grizzle two different
9  USB's, one that contained data extracted to the
10  Cellebrite system; a second that included data extracted
11  from -- I should say extracted to the Lantern system,
12  correct?
13    A.   Correct.  But just, chronologically, the first
14  one would have been Lantern; the second would have been
15  Cellebrite.
16    Q.   Did both of those USB's contain all of the
17  data that was extracted from the Socha iPhone?
18    A.   Yes.
19    Q.   Including the images?
20    A.   Correct.
21    Q.   Now, about a quarter of the way up from the
22  bottom, there is a line that reads, quote, 6/8-Gavin told
23  him of rumors, closed quote.  Do you see that?
24    A.   Yes.

Page 89

1    Q.   What do you remember telling the IG, if
2  anything, about Gavin telling you about rumors?
3    A.   Other than that there was allegations made by,
4  I believe, Officer Socha that someone had viewed nude
5  images, and he had informed me to copy the data that was
6  saved in both systems and to then delete the data.
7    Q.   Was that the same conversation in which Gavin
8  told you to take the actions described in the earlier
9  exhibit, where you copied files onto a USB drive and
10  deleted the contents of the Cellebrite and the Lantern?
11    A.   Correct.
12    Q.   And is that the way that the conversation
13  went?  Gavin told you about these rumors and then told
14  you to take those actions?
15    A.   Correct, as in one conversation.
16    Q.   And in that conversation, that would have been
17  the sequence?  Gavin told you about the rumors and then
18  told you to take those actions?
19    A.   Correct.
20    Q.   In that conversation did Gavin tell you
21  whether personnel had viewed the images extracted from
22  Socha's iPhone either on the Cellebrite or the Lantern
23  who should not have accessed and viewed those images?
24    A.   No.  I was only told that there were rumors

Page 90

1  but nothing that was known.
2    Q.   Did Gavin tell you why he wanted you to delete
3  from Cellebrite and Lantern?
4    A.   Other than he said the rumors and that they
5  wanted copies deleted from the system and -- after being
6  copied onto external media or USB drives.
7    Q.   The last line of this Exhibit 4 says, quote,
8  Was told he put it in ALS safe, closed quote.  You see
9  that?
10    A.   Yes.
11    Q.   What's the ALS safe?
12    A.   I believe Deputy Chief Roechner's safe in the
13  investigations division.
14    Q.   Oh, so it's Al's safe?
15    A.   I believe that's what it's referencing.
16    Q.   That's what you told the IG?
17    A.   Yes.
18    Q.   And Gavin told you that he, Gavin, had put the
19  new USB that you generated for him on 8 June into Al's
20  safe, correct?
21    A.   I don't know if it was in reference to those
22  copies or the original copies or where those were held at
23  for evidence purposes.
24    Q.   Wouldn't they be properly held in the evidence

Page 91

1  room utilizing the BEAST system?
2    A.   I guess it depends on the case and the
3  investigator, but that's where I put my evidence.
4    Q.   Did Gavin offer you any explanation for why
5  the USB with the data extracted from the Socha iPhone was
6  in Al's safe as opposed to the evidence room?
7    A.   I didn't know if it was in evidence already or
8  not, if that was just a copy, so I don't know what the
9  decision-making was or why.
10    Q.   And Gavin didn't offer you any explanation?
11    A.   I don't recall if he did or not.  I don't
12  recall anything to do with that.
13    Q.   Are you aware, Officer German, of any other
14  instance in which Roechner kept video evidence on a
15  personal computer device, a tablet, for instance?
16    A.   I'm sorry.  I think I missed the first part.
17  Could you repeat the question, please?
18    Q.   Are you aware of any other instance in which
19  Roechner kept video evidence of an open investigation on
20  a personal computer device of his?
21    MS. PROCTOR:  I'm going to object based on the
22  record.  Your question assumes facts not in evidence.  So
23  I'm objecting based on form and foundation.
24

Royal Reporting Services, Inc.
312.361.8851

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 92

1    BY THE WITNESS:
2        A.   I don't know of any other cases he deals with
3    to know that, so I don't know.
4        Q.   Okay.  Did you ever see the warrant that was
5    issued for Socha's iPhone that led to its seizure?
6        A.   I don't know if I saw the signed copy.  I
7    believe I provided Sergeant Grizzle with the formatted of
8    a search warrant that's normally used by us.
9        Q.   When?
10       A.   Prior to the search warrant being drafted.
11       Q.   So it was a draft before it was entered by the
12   Court?
13       A.   Well, any search warrant is created on a Word
14   document and then completed and then sent to the
15   prosecutor for approval and then signed by a judge if
16   authorized.
17       Q.   Okay.  Fair.  I understand.  But did you ever
18   see the warrant that was actually issued, signed by the
19   judge?
20       A.   I don't recall if I did.  I may have.  I don't
21   recall.
22       Q.   We talked before about the text message that
23   led Gatlin to complain in the first place?
24       A.   Yeah, from Gatlin's phone, yes.

Page 93

1        Q.   Were you ever asked to express any opinions in
2    connection with the Socha investigation about whether the
3    contents of that message constituted actionable
4    harassment?
5        A.   No.
6        Q.   That was not a decision for you to make?
7        A.   That was not.
8        Q.   That was not your role in this investigation?
9        A.   Correct.
10       Q.   Did McKinney tell you that he had seen the
11   images that were extracted from Socha's iPhone?
12       A.   He had mentioned he had seen an image, but I
13   don't know exactly what he saw.
14       Q.   Did he comment in any way on the image about
15   which he told you he looked at?
16       A.   No.
17       Q.   Did McKeon tell you that he had seen any of
18   the images that were extracted from Socha's iPhone?
19       A.   No.
20       Q.   Did McKinney tell you how it is that he came
21   to view the images that were extracted from Socha's
22   iPhone?
23       A.   That he was on a Cellebrite computer on
24   something unrelated to that, and he had seen it from that

Page 94

1    unrelated case or reason to be on there.
2        Q.   Did he tell you what his reason for being on
3    the Cellebrite computer at that time was?
4        A.   If he did, I don't recall now exactly why.
5        Q.   Did he tell you how it is that he accessed
6    those images after he entered the password and logged
7    onto the Cellebrite computer?
8        A.   No.
9        Q.   Did he tell you why he accessed and viewed
10   those images?
11       A.   Other than he was on the computer for either
12   an investigation or some other reason to access that
13   computer, which is common.
14       Q.   Did he tell you that he was performing some
15   investigative function associated with the Socha
16   investigation?
17       A.   No.  It would be unrelated.
18       Q.   To your knowledge he was not performing any
19   such role in the Socha investigation, correct?
20       A.   Not to my knowledge.
21       Q.   That's correct?
22       A.   Correct.  I don't have any knowledge of that.
23       Q.   What was Botzum's rank at the time of the
24   Socha investigation?

Page 95

1        A.   I believe he was a sergeant.
2        Q.   Are you aware of any Joliet officer, other
3    than yourself, who performed any work on the Socha
4    investigation who was not of the rank of sergeant or
5    higher?
6        A.   Not that I'm aware of.  I don't know of
7    anybody else.
8        MS. PROCTOR:  You know, Hall and Matt, can I just
9    interject?  I mean, based on your dep notices and the
10   lineup that I know our office helped coordinate, the next
11   witness is here, ready to go.  So I --
12       MR. ADAMS:  I think I'm -- I think I'm done with the
13   exception of follow-up on the other lawyer's questions
14   here.
15       So, Officer German, I appreciate your time
16   here this morning.
17       THE WITNESS:  Thank you.
18       MR. CLARK:  Can we just have a quick five-minute
19   break just to review notes, and I don't think I'll have
20   too much, but --
21       MS. PROCTOR:  Yeah, and I want to just take a -- I
22   mean, I think a quick break would be good.  But to be
23   clear, you know, we're going to move -- once we're
24   completed with Detective German's deposition, we're going

26  (Pages 92 to 95)

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 96

1    to move straight away into McKinney's deposition and not
2    push it back until 1:00?  I know there was some
3    suggestion of that earlier.
4        MR. ADAMS:  Yeah.  That is my intention too, Darcy.
5    I have no place else to go.
6        MR. HESS:  Just so you're aware, we have
7    communication with Officer McKinney.  He is available to
8    start at 1:00, if necessary.  He's just on standby at the
9    moment.  So if you want to start right away, I'll just
10    have him continue to stand by; otherwise, if we want to
11    do it at 1:00, we can do it at 1:00.
12        MR. ADAMS:  I'm ready to go if you're ready to go.
13        MR. HESS:  We'll have him stand by, and we'll move
14    forward when everybody is ready.
15        MS. PROCTOR:  I wouldn't mind taking a break to get
16    a quick bite.  Maybe we could compromise and start at
17    around 12:30-ish.  But let's finish German, and we'll
18    take it up in a moment.  Okay?  Let's take five for now,
19    please.  Thanks.
20            (A short break was had.)
21        MS. PROCTOR:  So, Hall, you were concluded with your
22    questions.
23        MR. ADAMS:  I'm concluded with my questions.
24        MS. PROCTOR:  All right.  And as far as the City of

Page 97

1    Joliet is concerned, we have no questions for this
2    witness, and we want to thank Detective German for
3    presenting here today and participating in this process.
4    So thank you so much.
5        THE WITNESS:  Thank you.
6        MR. CLARK:  On behalf of Defendant Grizzle, I have
7    no questions as well.  Thank you.  Thank you very much.
8        MS. PROCTOR:  As far as signature, we don't
9    represent Detective German, but we -- I mean, he -- Does
10    someone want to explain what signature means?
11        MR. ADAMS:  Detective German, you mentioned you've
12    done this before.  You have the right, under our rules,
13    to read and review the transcript of this deposition in
14    order to note any instances in which you believe the
15    transcript is inaccurate in any way, not to change the
16    content of it, but on a separate document to make a
17    notation of where you believe there may be transcription
18    errors.  That's a right you have, or you can waive that
19    right.  We do need you to tell us on the record whether
20    you intend to exercise or to waive that right.  The
21    choice is, as Darcy said, entirely yours.
22        THE WITNESS:  I could waive that right.
23            (Deposition concluded at 12:17 p.m.)
24

Royal Reporting Services, Inc.
312.361.8851

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 98

```
 1   UNITED STATES OF AMERICA        )
     NORTHERN DISTRICT OF ILLINOIS   )
 2   EASTERN DIVISION                )    SS.
     STATE OF ILLINOIS               )
 3   COUNTY OF COOK                  )

 4

 5              I, Tina M. Hickey, Certified Shorthand

 6   Reporter, do hereby certify that DETECTIVE JEFFREY GERMAN

 7   was first duly sworn via videoconference by me to testify

 8   the whole truth and that the above deposition was

 9   reported stenographically by me and reduced to

10   typewriting under my personal direction.

11              I further certify that the said deposition was

12   taken via videoconference at the time and place specified

13   and that the taking of said deposition commenced on

14   April 28th, 2021, at 9:27 o'clock a.m.

15              The signature of the witness, DETECTIVE JEFFREY

16   GERMAN, was waived by agreement of counsel.

17              I further certify that I am not a relative or

18   employee or attorney or counsel of any of the parties,

19   nor a relative or employee of such attorney or counsel or

20   financially interested directly or indirectly in this

21   action.

22

23

24
```

Royal Reporting Services, Inc.
312.361.8851

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 99

1          Witness my official signature as a Certified

2   Shorthand Reporter in the State of Illinois, on

3   May 18th, 2021.

4

5

6

7

8

9

10              _Tina M. Hickey_

            TINA M. HICKEY, CSR
11          161 North Clark Street
            Suite 3050
12          Chicago, Illinois 60601
            Phone:  312.361.8851
13
    CSR No.  084-003858
14

15

16

17

18

19

20

21

22

23

24

Royal Reporting Services, Inc.
312.361.8851

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 100

| A | | | | |
|---|---|---|---|---|

**A**
**a.m** 1:17 98:14
**ability** 86:17
**able** 25:7,14,15
 39:22 52:19
 62:3 69:22
 72:5 84:12
**academy** 14:6
 14:11,12 22:11
**access** 30:11,14
 31:24 32:11,17
 32:22 33:20
 36:23 37:7
 39:20 40:16,19
 40:19,23,24,24
 41:3,3,7 44:4
 45:4 48:21
 49:18 50:9
 62:3,7,22
 63:22 72:17,22
 72:22,24 85:24
 87:1 94:12
**accessed** 33:17
 38:23 76:9,22
 84:8 89:23
 94:5,9
**accesses** 48:12
**accessible** 40:8
 76:4,7,13
**accessing** 33:21
**accidentally**
 63:12
**accommodate**
 5:1
**accounting**
 13:21
**accurate** 56:5,12
 75:18
**acquittal** 55:16
**acquitted** 52:2
**acronym** 48:9
**action** 98:21
**actionable** 93:3
**actions** 89:8,14

89:18
**actual** 8:18
 33:19 51:2
 73:22 76:17
 77:2
**Adams** 2:2,2 3:4
 4:8,11 5:21 6:6
 28:23 29:9
 48:8,10 49:7
 49:10 64:18,24
 65:2,4,5 70:8
 70:13,18 71:12
 71:14,20,22
 74:15,17 84:22
 85:1,14,17,21
 95:12 96:4,12
 96:23 97:11
**adapter** 27:4
**addition** 33:22
**additional** 31:19
**addressed** 28:20
**adjunct** 30:2
**advanced** 27:17
**advancement**
 19:3,10
**agency** 12:8
 16:6 30:21
**ago** 31:15
**agree** 54:20
**agreement**
 28:21 29:5
 98:16
**ahead** 73:18
**AI** 17:2
**AI's** 90:14,19
 91:6
**allegation** 51:3,3
 75:3
**allegations** 9:7,9
 13:3 55:22
 59:11 60:6
 65:6 75:7,9,12
 89:3
**alleged** 42:22

51:1 55:23
**allegedly** 54:9
 54:18
**allow** 24:6
**ALS** 90:8,11
**AMERICA** 98:1
**analysis** 28:11
 63:21
**analyze** 23:16
 24:3 61:11
 66:21
**analyzed** 29:17
 34:14
**analyzer** 26:16
 27:7,15,19
 38:9,17,21
 39:12,17 40:1
 40:3 41:18
 43:2,6
**analyzing** 49:21
**and/or** 24:7
 29:12 39:10
 46:23 49:14
 50:11,20 51:17
 53:14 59:9
 65:10 76:5
**answer** 4:24 5:2
 5:6,7 30:24
 57:15 73:18
**answered** 36:19
**answers** 59:15
**anybody** 62:21
 95:7
**anymore** 46:1
**anyone's** 58:1
**apologize** 59:13
**appearance**
 52:22,23 68:12
**APPEARAN...**
 2:1
**appears** 85:10
**Appellate** 51:6
**Apple** 25:12,19
 29:18 38:14

39:5,7 42:14
 45:16 46:8
 58:4 59:10
 60:10 78:13
**application**
 26:22
**apply** 30:18,21
 30:23 46:10
**appreciate** 23:1
 28:7 36:20
 37:9 51:4 74:8
 82:22 85:8
 95:15
**appropriate**
 62:20
**approval** 92:15
**approximately**
 4:18,19
**April** 1:17 98:14
**area** 21:18,22
 29:20 30:3,12
 33:13 50:4
 55:8
**articles** 10:10
**asked** 4:23 5:9
 5:10 36:20
 72:1 87:14
 93:1
**asking** 87:9
**aspect** 51:15
**asserted** 9:23
 10:8 12:8
**assigned** 20:4,7
 20:12 21:12,15
 36:17 44:19
 83:12
**assist** 36:18
**assisted** 84:14
**assisting** 8:11
 37:4 66:3,19
**associated** 94:15
**assume** 5:3
 54:20
**assumes** 91:22

**AT&T** 74:5
**attached** 69:19
**attachment**
 69:21,22 70:5
 70:9
**attempt** 4:23
**attorney** 11:7,12
 98:18,19
**attorneys** 40:14
 64:16
**author** 6:12
**Authored** 6:11
**authorized**
 92:16
**Auto** 19:5
**available** 28:12
 69:1 96:7
**aware** 11:18
 13:4 19:8 45:8
 45:11 50:23,24
 59:8 65:15,24
 66:22 67:13
 79:17 91:13,18
 95:2,6 96:6
**Axon** 45:23

**B**
**B** 3:6
**bachelor's** 13:15
 13:21
**back** 5:1 6:23
 20:19 23:10
 24:19 29:13
 30:7 31:3,17
 35:12 40:2
 42:19 46:2,14
 46:18,20 70:13
 78:4 82:18
 96:2
**bad** 10:5
**barcoding** 48:11
**based** 60:6
 73:16 76:1
 91:21,23 95:9

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 101

**basis** 35:9 72:12
**Bates** 71:18
**bathroom** 49:5
**bear** 26:12
  69:15
**BEAST** 46:9,12
  46:15,21 47:3
  47:5,15,18,24
  48:1,3,8,11,15
  48:17,18,22
  49:17 50:4
  66:8,11,13
  67:8 79:16
  91:1
**beginning** 56:10
  64:21
**behalf** 2:6,12,17
  6:2 9:17 64:14
  97:6
**behavior** 68:13
**belief** 21:2
**believe** 9:18
  11:2,10,11
  12:14 13:19
  15:8,15,22
  16:23 17:1,4
  17:10,15,17
  20:18 23:24
  25:5 26:10
  29:21 30:9,23
  33:6 34:22
  35:1,4 42:10
  42:22 51:8
  52:24 53:4
  56:6 60:19
  61:2 63:20
  65:8 68:21
  71:7 78:5 82:4
  82:15 86:2,19
  89:4 90:12,15
  92:7 95:1
  97:14,17
**believing** 10:14
**benefit** 28:8

**Benton** 16:20,23
  17:1 59:1,5,6
**Bergner** 21:8
  44:18 65:7,10
  85:11,23 86:5
  86:13,20
**best** 55:18
**better** 24:14,18
  25:8,11,18
**big** 20:4 46:24
**bite** 96:16
**Blu-ray** 45:21
  46:24 47:4
  67:11
**Blu-rays** 45:24
**Bolingbrook**
  2:10
**bottom** 88:22
**Botzum** 8:3,18
  42:17,17 44:11
  58:11,12,13,20
  60:17,20 61:10
  61:12 71:5
  77:14,23 78:7
  79:2 82:21
**Botzum's** 84:13
  94:23
**Boughton** 2:9
**Brad** 21:6
**break** 49:5,9
  95:19,22 96:15
  96:20
**breakdown**
  59:19
**bring** 13:11
**brought** 53:16
  53:17
**Brown** 20:24
**building** 30:13

_____
**C**
**cable** 35:21
**call** 18:11 26:21
  29:23 41:11,19

  66:13 67:24
  71:12 74:5,15
  76:21 80:10
  84:22
**called** 1:12 4:4
  24:1,2 27:2
  29:24 40:11
  41:24 84:9
**calls** 62:4 80:14
**camera** 59:16
**capabilities**
  24:12
**capability** 25:8
  25:11 31:19
  33:4,16
**capital** 21:6
**caps** 48:9
**case** 4:13 7:1,6
  7:16 8:23 9:23
  10:9 12:9,16
  12:19 13:1
  22:8 25:3,13
  27:10 28:6,13
  29:22,24 30:2
  31:12,16 36:6
  36:11,17 37:3
  39:3 42:8,10
  42:15,21,23
  44:3 46:7,19
  54:7,8,20
  61:19 71:9
  82:24 87:10
  91:2 94:1
**cases** 4:17 36:15
  36:18 37:7
  44:6 45:20
  92:2
**Cassandra** 1:3
  2:18 4:12
**cell** 22:19 24:5
  36:7 47:21
**Cellebrite** 18:3
  23:4,9,12,12
  23:14,18 24:3

  24:11 25:2,6
  25:10,14 26:2
  26:3,8,11,14
  26:16,17,22
  27:1,14,15,16
  27:18,19 29:12
  29:16,19 31:1
  31:9 32:1,3,7
  32:17 33:3,8
  33:11,14,16,16
  33:18,20,22
  34:3,13 35:12
  35:17 36:3,6
  36:12,24 37:16
  37:17,22 38:3
  38:5,9,17,19
  38:20,22,23
  39:8,16,21,23
  39:24 40:1,2,5
  40:12,13,21
  41:9,14,15,18
  41:22 42:7
  43:6,15,16,17
  43:23 44:3,4,5
  44:9,12,14,20
  44:22,23 45:4
  45:14,19,19
  47:22 49:14
  57:22 58:15
  60:14,24 61:9
  61:10 67:4
  71:23 72:4,19
  75:23 76:4,9
  76:17,20 77:3
  77:15 78:9,12
  78:21 79:10
  80:1,3,10,15
  81:3,22 82:16
  86:3,10,12,19
  87:2,14,22
  88:2,3,10,15
  89:10,22 90:3
  93:23 94:3,7
**certain** 24:15,15

  27:3,5
**Certified** 1:16
  98:5 99:1
**certify** 98:6,11
  98:17
**chain** 46:9 48:14
  48:17 73:2
**Champaign**
  14:13
**change** 97:15
**changed** 19:15
  19:20 23:7
  44:18
**changes** 24:17
**characterize**
  50:11 52:19,21
  58:8
**charge** 35:21
**Chicago** 2:4,15
  99:12
**chief** 16:16,19
  16:20,22,23
  17:1,4 18:19
  18:21 30:6
  58:23,24 59:1
  59:4,4,5,5
  66:19 90:12
**choice** 97:21
**choose** 43:19
  70:16
**choppy** 5:13
**chose** 39:1
**chosen** 42:19
**chronologically**
  88:13
**circumstance**
  67:19
**circumstances**
  7:5,16 8:22
  10:18 25:1
**circumvent**
  48:16
**City** 1:6 2:12 6:2
  11:2 19:6 28:2

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 102

28:10 64:14
69:18 71:18,20
74:16 82:21
84:21 85:16
96:24
**City's** 28:13
**Civil** 1:14
**claims** 8:22 9:22
9:24 10:3,8,11
12:8
**clarify** 85:19
**Clark** 2:14 6:5
57:14 70:6
85:12,15,19
95:18 97:6
99:11
**classes** 26:11
**clear** 5:23 59:13
77:19 95:23
**closed** 39:15
68:6 77:16
80:23 82:2
87:15 88:23
90:8
**cloud** 47:5
**cock** 68:6
**code** 61:22,22
**codes** 34:19,20
**coherent** 5:15
**colleagues** 63:4
**collected** 46:19
**collection** 22:14
**college** 13:15,16
13:24
**come** 26:4
**commenced**
98:13
**comment** 67:21
68:9,12 93:14
**commented** 68:2
**comments** 68:17
68:19
**common** 94:13
**commonly** 35:21

40:13
**communication**
96:7
**companies**
24:13
**company** 23:15
23:24 24:1
26:19
**compared** 24:16
**complain** 92:23
**complaint** 9:16
12:24 13:3
65:7 69:9
72:12
**complaints** 16:5
30:20
**complete** 60:1
61:12 77:24
**completed** 11:23
77:16,20 82:1
92:14 95:24
**compromise**
96:16
**computer** 21:13
22:18,19,20,21
22:22,24 23:16
25:6 27:4
29:16,19 31:1
31:11 32:2,3
33:9,11,12,20
34:14 35:11,13
35:15,16,17,18
36:7,8 37:6,8
37:10,12,15,16
37:18,20,21
38:3,11,24
39:4,15,19,24
40:6,9,20,20
41:1,4,11 42:3
45:15,20 48:2
49:14 57:23
58:18,19 62:1
62:9,10,11
65:11,17 66:2

66:24 67:15
73:23 77:3,4
78:14,15 80:1
83:2,5,10,16
83:16 84:2,7,8
86:3,16 87:4
91:15,20 93:23
94:3,7,11,13
**computers** 22:6
23:20 24:4,7
24:16 29:12
31:10,11 34:6
36:13,23 38:7
62:15 65:18,20
75:24 83:23
**concerned** 97:1
**concluded** 96:21
96:23 97:23
**conclusion**
56:17,19
**conduct** 26:5
34:20
**conducted** 26:8
77:10
**conducts** 34:20
**conference** 30:1
**confidentiality**
27:24 28:14
29:4
**confirm** 58:6
64:22
**confused** 18:19
**confusing** 39:2
**conjunction**
27:12
**connected** 37:20
37:21 78:16
**connection** 10:6
12:8,13 17:12
21:10 22:3
36:13 93:2
**connotes** 15:2
**consensus** 54:4
**consider** 55:9

**considered**
14:24 15:8
44:8 51:2
**constituted** 93:3
**contact** 51:5
73:24
**contain** 88:16
**contained** 81:17
88:9
**containing**
79:13
**content** 36:13
72:24 74:9
97:16
**contents** 8:7 9:4
36:23 46:8,11
47:11 61:20
63:23 73:13
78:9 79:8,13
80:2 81:1,16
87:2 89:10
93:3
**context** 73:9
**continue** 61:6
96:10
**continued** 16:1
**Continuing**
78:19
**contradicted**
52:12
**control** 40:16
**controlled** 32:22
47:14 67:7
79:15
**conversation**
9:14 53:1
54:22 55:2
56:15,23,24
89:7,12,15,16
89:20
**conversations**
7:4 8:8,13,15
8:20 9:5,10,21
10:7 55:6,20

55:24 57:7,12
**COOK** 98:3
**coordinate**
95:10
**copied** 45:21
60:22 67:10
75:15,20,23
76:17 77:1
80:23 81:9,12
89:9 90:6
**copies** 49:22
62:20 66:10,10
66:12 67:3
72:1 75:4,22
81:9,11 84:14
87:17 90:5,22
90:22
**copy** 45:19
58:14,15,17
60:24 61:17
66:21 67:3,5
75:18 76:12
78:19 79:7
80:12 81:3
87:14 89:5
91:8 92:6
**cord** 35:19
**corners** 28:15
**corporation** 1:7
**correct** 4:9
12:22 15:3,4,6
19:19 23:5
31:3 33:13
34:17 36:14
37:1,2,13
39:11,12 47:24
48:1,7,13,24
49:20,21 60:13
66:8 67:8,13
68:20 71:2,6
71:15 72:9,14
72:18,24 73:15
76:5,11,15
77:7 78:4,18

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 103

78:23 79:14,24
80:5,20 81:2,9
81:18 82:8,11
82:18,19 87:5
88:12,13,20
89:11,15,19
90:20 93:9
94:19,21,22
**correctly** 33:10
**counsel** 64:18
98:16,18,19
**counting** 85:17
**COUNTY** 98:3
**couple** 4:20 8:5
9:2 31:15 45:1
55:12,15 82:23
**course** 5:12
**court** 1:1 5:24
49:22 92:12
**Courts** 1:15
**Coworker** 50:13
**Coyl** 20:17
**create** 23:17
24:4 34:15
39:1 43:17
**created** 6:10,22
12:5 24:1
26:17 42:7
47:18 79:11
81:7 82:18
83:21 92:13
**creates** 38:10
**creating** 34:4
**criminal** 8:19
51:15
**criteria** 43:4
**criticisms** 69:6
**Crowley** 50:17
50:20 51:18
52:2,5,8 53:3,7
53:13 54:24
56:1,2 57:2,8,9
68:5
**Crowley's** 56:9

**CSR** 99:10,13
**Cummings** 11:6
11:11
**currently** 18:17
19:4 31:15
**custody** 46:10
48:13,14,17
**cuts** 59:17
**CV** 1:5

---

**D**

**D** 3:1
**Darcy** 2:8 5:18
6:1 27:21
64:14 96:4
97:21
**dark** 14:8 62:5
**data** 24:3,4,15
24:19,19 25:5
25:6,7,9,12
26:18 27:3,5,7
34:5,13 35:18
35:18 36:5,8
37:15,17 38:3
38:5,6,8,12,18
38:24 39:7,9
39:13 40:2,2,8
40:15,22 41:9
41:11,16,19,21
41:24 42:3,6,8
42:12,13 43:3
43:7,8,12,14
43:19,19 44:1
44:5 45:13,21
46:17,22,22,24
47:13,21 49:13
49:13 57:23
58:3,6,10,11
58:17 60:1,22
60:24 61:13,15
62:12,19 63:24
66:16 67:9
72:4 74:4
75:13 76:17,24

77:2,5,5 79:8
80:9 81:20
83:16,21,22
84:1 86:12
88:7,9,10,17
89:5,6 91:5
**database** 25:16
74:5
**date** 51:13 56:14
70:24,24 76:11
**dates** 18:18
**Dave** 21:4
**day** 24:17 55:16
56:7,7,19
60:17,19 61:2
79:1,6 82:4
87:19,20,20,24
88:2,3
**days** 87:13
**deal** 12:19 28:24
**deals** 92:2
**Dearborn** 2:3
**decided** 46:16
**decision** 77:12
93:6
**decision-maki...**
91:9
**decode** 61:15
62:4 80:15
**Defendant** 2:12
2:17 97:6
**defendants** 1:8
1:12 5:22
**defense** 40:14
49:22
**definitely** 18:10
**degree** 13:15,20
**delete** 58:19
78:8 89:6 90:2
**deleted** 18:2
24:19 75:5,19
75:21,24 77:3
81:23 89:10
90:5

**deleting** 75:16
**deletion** 76:6,8
76:11,12,14,19
77:6,10 79:20
79:21 80:2
82:2
**dep** 95:9
**department**
10:16 11:10
13:6,12 14:4
16:4,9,13 17:3
19:3,11,24
20:11 21:11
23:3,8 26:4
28:10,12 30:12
30:15 32:19
34:19 46:2
48:13 66:23
67:1,20 69:7
73:13 74:9
83:1,5,11 87:3
**department's**
6:15 28:3
**department-is...**
66:2
**departments**
26:7
**depend** 42:5
**depending**
35:14 46:24
**depends** 25:3,3
26:24 66:9
67:9 91:2
**deposed** 4:14,16
**deposition** 1:11
3:7 6:8,19,24
7:3,18 12:20
29:3 64:19,21
65:2 78:11
95:24 96:1
97:13,23 98:8
98:11,13
**depositions** 1:15
**deputy** 17:4

18:19 30:6
59:4 66:19
90:12
**describe** 29:10
61:20 78:19
**described** 26:14
60:15 71:10
75:2 80:19
89:8
**describes** 82:9
**describing** 80:18
**designation**
15:17,19
**designed** 62:12
**desk** 20:4 21:16
21:17 29:15
**desks** 20:5
**desktop** 22:20
**Despite** 76:8
**detached** 19:5
20:9
**detail** 63:13
80:18
**details** 54:8
**detective** 1:11
3:3 4:3 6:12
9:12 15:1,2,20
16:2,12,18
17:20 18:12
19:14,16,20,24
20:23 21:5
22:4,12,14,16
31:24 34:3
36:6,10,17,21
36:22 39:19
42:10 44:21,21
45:1,5 46:16
53:2 61:18
63:8,11,14,14
63:16 64:7,15
84:14 95:24
97:2,9,11 98:6
98:15
**detective's** 42:10

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 104

detectives 8:5
  9:2,11 20:6
  22:15 29:11,18
  32:11,12 36:15
  43:22 44:13,24
  45:2 55:8 57:3
  57:17,24 86:7
  86:9
detectives' 20:5
  40:9
determine 77:18
device 26:14,24
  38:12,13,13,14
  38:16,20,22
  42:3 46:10,11
  46:12 47:13,23
  49:16 59:12
  67:1 75:15,21
  76:20,20 79:11
  79:12 80:23,24
  81:13 91:15,20
devices 23:1,4,7
  24:10 36:3
  38:19 44:9
  47:14,24 65:11
  65:17,21 66:2
  67:15 81:17
  82:12,13
DeVito 11:5,10
differ 24:11
differed 55:1
difference 37:24
different 4:17
  8:13 15:17
  23:24 24:13,14
  26:7,21 31:9
  31:13 38:20
  42:11 54:18,21
  56:3 57:10
  80:23,24 81:13
  88:1,6,8
differently
  36:20 45:14
difficult 41:17

difficulty 7:21
digital 31:14,16
  45:23 47:1,2
dignity 35:3
direct 10:13
  17:7
directed 17:13
  65:9 74:23
  77:9
direction 18:5
  81:7 98:10
directly 27:15
  27:18 63:7,15
  98:20
disappointed
  54:5
disappointment
  54:13,15
disc 45:22 47:4
  79:9
discipline 13:20
disclosed 28:8
disclosure 28:15
disconnect
  37:10
disconnected
  37:17
discriminate
  35:8
discuss 13:2
  53:6,13
discussed 7:1,5
  7:15 8:22 9:8
  9:22 28:4
  51:16 53:15,19
  53:22 54:1
  65:6
discussing 28:9
discussions 54:3
display 23:19
  24:7
displayed 32:9
  32:10
dispose 65:10

distinct 15:13
distinguish 38:6
distributed 69:1
District 1:1,1,15
  98:1
division 1:2 15:1
  15:21 16:2,18
  18:15 20:3,7
  21:19 23:4
  30:5 36:10
  40:18 41:5,6
  47:19 55:7
  66:23 83:20
  90:13 98:2
document 6:23
  69:18 70:17,21
  71:19 74:14
  83:15,21 84:21
  92:14 97:16
documentation
  9:20
documents 6:8
doing 59:13
  80:17
download 40:4
  43:6
downloaded 8:4
  36:5 37:24
dproctor@tre...
  2:11
draft 92:11
drafted 92:10
drive 39:15,18
  42:7 45:18
  46:23 62:16,22
  66:18 76:16,24
  79:22 80:1
  81:10,23 86:20
  86:24 89:9
drives 90:6
due 77:15 81:4
duly 4:4 98:7
dump 80:7,7,11
  86:17

duty 16:13
DVD 45:21
  46:24 47:4,23
  49:16 67:10
  72:19
DVDs 45:24
  47:12

              E
E 3:1,6
e-mail 2:5,11,16
  69:19,20 70:5
  70:7
earlier 30:24
  76:2 78:11
  89:8 96:3
early 5:19
East 2:9
EASTERN 1:2
  98:2
education 13:14
Edward 1:7
  2:17
effect 51:17 53:7
Egizio 18:17
either 20:16
  23:7 36:24
  45:21 46:23
  47:4 49:15,21
  52:17 53:22
  55:20 56:15,23
  57:7,12 58:17
  58:19,23 59:5
  60:9,11 65:10
  79:15 89:22
  94:11
emotionally
  52:24
emotions 52:20
employee 98:18
  98:19
employees 16:6
  30:21
empty 70:7

ends 59:15
enforcement
  12:8 14:7
enter 33:23
  46:16
entered 46:13
  46:15 47:16,17
  48:3 61:1
  66:10 67:9
  76:21 79:15
  92:11 94:6
entering 33:22
entire 81:16,20
entirely 22:7
  97:21
entirety 22:9
entitled 69:20
equipment 23:9
  23:11 31:19
  32:21 33:3
  36:12,24 39:21
equipped 23:19
  33:4
errors 97:18
especially 56:21
essentially 35:22
estimate 55:18
events 55:23
eventually 31:11
  37:19 44:14
everybody 5:18
  6:4 54:8 96:14
evidence 16:10
  22:6,13 28:11
  30:17 31:20,22
  37:2,7 45:22
  45:23 46:13,16
  46:17,21 47:3
  47:17,17,19,19
  48:2,3,4,5,12
  48:18,21,21,22
  49:18,21 50:3
  50:5,9,9 62:20
  66:11 67:10

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 105

77:1 79:19
90:23,24 91:3
91:6,7,14,19
91:22
evidence.com
45:23,24 46:2
47:2,6 67:11
exact 21:14
44:23 46:4
59:1
exactly 10:23
46:6 53:16
55:13 56:8
88:4 93:13
94:4
examination
1:13 3:4 4:7
examined 4:5
46:9
examiner 39:1
42:5 43:12,13
43:13
examiners 44:2
example 13:10
37:14 39:4
46:16 66:15,19
73:24
exception 95:13
exercise 97:20
exhibit 3:7
71:11 74:16
76:9 79:21
81:8 85:13,16
89:9 90:7
expect 63:23
expected 34:23
35:2,5,8
expert 44:8
explain 75:14
97:10
explanation
91:4,10
explicit 59:9
60:11

express 52:16
54:13 57:8
68:23 69:6
93:1
expressed 9:23
10:2,11
extenuating
67:18
external 81:24
90:6
extract 23:16
24:3 27:3
38:18 43:24
46:17 72:4,5
88:6
extracted 26:18
27:7,15 29:17
37:15,23 38:1
38:5,6,8 39:8
40:8,22 41:11
41:18,21,24
42:3,6 43:3,8
43:14 45:13,17
46:9,20,22
47:11,21 49:13
57:23 58:4,6
58:11 59:10
60:16 61:14,15
62:3,22 63:2
63:18 64:4,10
65:12,16 66:1
66:24 67:14,21
68:2,13,24
69:8 73:12
74:4 76:3,23
79:8,13 80:2,9
81:1,14 83:16
83:21,22 84:1
88:9,10,11,17
89:21 91:5
93:11,18,21
extracting 27:5
extraction 8:10
27:17 35:17

42:18 43:10,14
58:9,14,16
60:3,20 61:13
72:15 77:14,24
78:3,22 79:2,6
87:20
extractions
44:15 60:18
78:14,21 82:1
extracts 38:3

———————————
F
———————————
facet 55:21
facilities 26:6
fact 42:12 64:4
74:6 84:4
facts 7:5,16 13:2
91:22
factually 10:3
10:12
fair 5:4 92:17
familiar 16:4,8
16:13 21:8
far 11:16 21:2
30:16 46:22
96:24 97:8
favorable 52:7
FBI 21:13 44:20
FBI's 44:19
86:15
feature 48:12
February 15:22
Federal 1:14
feelings 54:6
fellow 8:14 10:8
29:11 63:4
68:19
felony 51:12,14
felt 54:17
female 35:5,9
56:8 68:19
73:11
fight 59:20
file 38:10 40:11

40:12,17 42:21
46:24 80:7,7
80:11,12
filed 8:4 9:17
12:24
files 43:16 45:17
45:17 47:1
58:19 75:15,16
75:18,20 80:22
81:3,5,12,22
81:24 84:8,14
84:15 89:9
final 52:1 61:24
62:11 79:19
finalize 77:22
financially
98:20
find 13:10,11
41:18 42:11
43:8,19
finer 47:20
72:23
finish 61:16
96:17
first 4:4 14:7,9
15:20 22:15
31:6 60:14
69:2,14,18
79:20 80:19
87:23 88:13
91:16 92:23
98:7
firsthand 10:13
60:5
five 49:6 96:18
five-minute 49:5
95:18
focus 55:2
folder 42:7 43:8
43:17
folders 43:11
follow 56:20
follow-up 71:8
84:7 95:13

follow-ups 6:13
6:17
following 55:17
60:19 79:5
follows 4:6
FOP 11:7,12
Force 19:5
forensic 21:13
23:13,15 26:11
28:11 31:14,16
31:21 35:17
62:14 73:21
80:9,14 84:15
86:16
forensic-evide...
28:3
forensics 24:1
31:21
forgive 64:13
form 57:14
73:16 79:7
91:23
formal 13:14
format 5:12
26:19 27:8
41:20 61:16
80:16
formatted 92:7
formed 72:11
forth 28:2 29:2
forward 96:14
foundation
73:17 91:23
four 4:19 6:17
28:15 31:5
frame 20:8,13
21:11 22:20
24:24 25:17
35:12 44:23
46:3 50:10
frankly 85:17
froze 14:8
frustration
52:16

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 106

**full** 60:21,24
87:14,21,24
**function** 15:13
94:15
**further** 63:13
86:21 98:11,17

**G**

**gamut** 23:1
**gather** 23:19
**gathering** 22:5
28:11
**Gatlin** 42:22
71:15,24 72:9
73:7,8 87:10
92:23
**Gatlin's** 72:2,12
74:10 92:24
**Gavin** 8:3,17
17:15,17 18:6
18:7,10,14
19:9 45:1
74:23 75:1,14
77:9 78:8
81:10 82:13,14
89:2,7,13,17
89:20 90:2,18
90:18 91:4,10
**Gavin's** 17:23
81:7
**general** 7:8
10:16 16:5,8
16:14 26:22
28:18 30:17,20
30:23 33:7
34:10 48:23
52:15 55:7
57:5 87:3
**generally** 40:8
45:20
**generate** 58:13
60:14 61:9,21
**generated** 34:2

34:7 36:9
37:19 38:21
40:3,7,12
41:16,23 43:1
43:12 44:4
47:3 59:22
60:18,21 61:1
61:3,5 71:5,7,9
76:2,15 79:4
83:15 90:19
**generating** 78:3
**generic** 80:8
**German** 1:11
3:3,7 4:3,9 6:7
29:10 64:15
69:17 71:12
74:15 84:14,22
85:11,13,16,23
91:13 95:15
96:17 97:2,9
97:11 98:6,16
**German's** 95:24
**germane** 49:24
**getting** 27:22
29:3
**give** 4:23 5:2
40:13 46:18
61:17 69:16
71:18
**given** 18:5 46:14
46:20 55:1
61:5 64:17,20
64:23 81:24
87:21,23
**Gloria** 20:17,18
**go** 4:21 10:4
14:12,18 26:5
38:1 43:8 50:3
70:11 73:18
78:24 85:4,9
95:11 96:5,12
96:12
**going** 4:12,20
37:24 49:5,7

50:4 60:7
64:12 66:13
69:14 70:1,13
70:15,16 73:16
74:13 82:23
84:20 86:8
91:21 95:23,24
**good** 5:24 6:3,5
65:3 95:22
**graduate** 13:15
13:18
**graduated** 13:24
14:2
**graduation** 14:3
**Gregory** 20:16
**Grizzle** 1:7 2:17
6:13 8:2,9,17
17:9,14,21
18:14 19:2
47:10 51:16
52:4 53:2,12
54:22 55:21,24
56:15 57:7
58:14,15 60:23
61:2,6,17
62:18 63:20
64:3 66:3,18
66:20 67:2
71:8 72:1,16
78:2,20 79:5
82:1,17 87:14
87:18 88:8
92:7 97:6
**Grizzle's** 42:14
67:5
**ground** 4:20
**group** 13:1
**guess** 5:6,10
50:24 51:10
56:16 64:16
91:2
**guns** 48:7
**guys** 5:19

**H**

**H** 3:6
**half** 51:12
**Hall** 2:2,2 4:11
11:2 28:22
71:17 85:12
95:8 96:21
**hall@adamsle...**
2:5
**hand** 27:6,6
**handled** 68:24
69:7
**handling** 22:14
**hands** 62:21
**happened** 10:14
**harassment** 6:9
51:1,1 93:4
**hard** 39:15,18
42:7 45:18
**hardware** 27:1
**harmful** 54:24
**Hayes** 16:19
**hear** 4:22 5:18
7:23 8:1 59:15
78:24
**heard** 5:3 53:6
53:12 54:12,17
57:7 60:6 63:7
63:17 64:7,9
65:9 67:20
68:1,4,8,11,16
68:22 69:5
**hearsay** 68:1
**held** 13:1 47:19
48:4 90:22,24
**Hello** 5:17
**help** 45:5 66:21
**helped** 56:2 57:9
95:10
**helpful** 54:23
**Herald-News**
9:19
**Hess** 2:8 6:3
96:6,13

**Hickey** 1:16
98:5 99:10
**hidden** 25:16
**high** 59:19
**higher** 18:9 95:5
**highest** 13:14
**hired** 14:3,10,19
14:21
**hold** 31:20 46:14
**holding** 47:2
**home** 65:20
**homicide** 22:13
**hope** 85:17
**hoped** 73:20
**hopefully** 22:17
**HOPPE** 2:13
**hour** 10:22 49:6
**HTML** 61:4,24
**hundred** 11:5
42:24 53:5
**hurt** 56:2 57:9

**I**

**ID** 38:14,14
**identification**
71:13
**identified** 8:15
26:21 38:5
39:9 60:15
**identify** 34:8,16
38:11,15 43:10
53:18
**identifying**
33:23 38:12
42:2,15 43:3
83:12
**IG** 7:4,7 11:14
11:17 12:2,5
85:5,22 86:4
89:1 90:16
**III** 2:2
**Illinois** 1:1 2:4
2:10,15 51:6
98:1,2 99:2,12

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 107

image 73:1
93:12,14
images 23:20
24:7 25:19,23
59:9,10,22
60:1,5,8,9,15
62:22 63:1,6
63:18,21 64:4
64:10 65:11,16
66:1,13,17,24
67:14,21 68:2
68:13,23 69:6
69:7 72:2,6,8
76:3,21 81:14
81:18 88:19
89:5,21,23
93:11,18,21
94:6,10
imagine 87:11
imminent 13:5
impact 52:5
import 47:2
important 4:22
improper 49:2
50:6,8 67:17
67:19 68:20
69:1
inaccurate
97:15
incident 8:10
include 81:14
included 88:10
including 66:17
88:19
indicated 33:24
indirectly 98:20
individual 32:4
34:12 57:17
individualized
32:24 33:23
individually
53:23 75:23
individuals
53:17,18

information
28:4 33:24
42:2,15
informed 89:5
initial 6:12 8:10
22:11 43:10,14
43:14 79:6
initially 38:8
42:6 54:18
inside 21:5
Inspector 7:8
10:16
installed 33:12
instance 91:14
91:15,18
instances 97:14
instructions
64:21,23
intend 97:20
intention 96:4
interested 98:20
interject 95:9
internal 28:9
Internally 40:16
interrupt 8:12
64:18 85:12
interrupting
29:7
interview 7:15
10:21 11:14,17
11:20,23 12:2
12:4 85:6
interviewed
10:15 12:7
Invest 84:2
investigating
25:4 63:23
investigation
6:15 8:16,19
8:21 9:12
12:12 17:12,20
17:22,24 18:24
30:15,18,22
31:1,7 34:15

36:22 37:11,12
38:4 39:10
45:8,10 46:7
47:8 49:20,24
50:6,20,21,22
51:9 53:3
54:10,11 55:21
56:4,7,11
57:24 58:10
61:7 62:10
66:4,20 72:13
72:17 83:14,17
91:19 93:2,8
94:12,16,19,24
95:4
investigations
15:1,21 16:2
16:12,18 17:5
17:9,11,18
18:15,20 20:3
20:6,22 21:16
21:18,22 22:13
23:4,21 24:8
29:11,15,20,22
30:3,5,8,11,12
32:15,17 33:12
36:10,14 38:7
39:19 40:18
41:5,6 43:22
44:7 47:10
53:9,13 54:5
55:7 63:5,18
65:19 66:23
78:16 83:1,9
83:11,20 90:13
investigative
6:21 26:23
65:14,23 94:15
investigator
38:10 46:13,19
53:20 61:18
91:3
investigators
32:14 40:15

52:13 55:1
invoking 28:19
involved 8:18
19:2,18 37:3
45:7,10 50:5
50:19,22 53:4
54:11 56:18
72:16
involvement
18:4
involving 36:6
iPhone 27:18
35:20 39:5,7
39:11 41:12
42:14 46:8
47:11 58:4,10
59:10 60:10,16
61:22 62:23
63:2,19 64:4
64:10 65:12,16
66:1,24 67:14
67:22 68:2,14
68:24 69:7
73:7 74:19
75:15 76:4
79:8,13 80:3
81:1,15 83:22
88:17 89:22
91:5 92:5
93:11,18,22
iPhones 25:12
25:20 35:21
issued 67:1 83:2
83:5,10 92:5
92:18
issues 77:15,18
77:21
item 46:17 67:12

J
J 2:8
Jackson 21:4
James 2:8 6:2
JEFFREY 1:11

3:3 4:3 98:6,15
Jensen 59:3
jhess@tressle...
2:11
job 14:7,9
JOHN 1:7
joining 6:2
Joliet 1:6 2:12
6:2,9 10:15
13:2,6 14:19
16:4,9 19:6,10
19:24 23:3
28:3,10 34:18
64:14 66:22
67:1,13,20
68:4,9,11,16
68:22 69:5
71:18 73:13
74:9 83:1,4,11
87:3 95:2 97:1
JPD 54:19
judge 92:15,19
judging 71:3
June 14:15
19:22 33:10
34:18 36:1
43:21 46:3
77:2,6 79:12
80:5 82:6,7,10
84:18,19 90:19

K
K-E-O-N 21:6
Katana 24:1
keep 10:23
28:19 29:7
85:18
kept 91:14,19
keyed 69:15
kind 12:1 22:6
22:19,21 25:12
50:14 83:2
knew 41:8,8
42:20 54:7,8

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 108

73:14 76:21
**KNIGHT** 2:13
  2:13
**knives** 48:7
**know** 5:6,7,17
  7:10 8:6 10:23
  10:23 18:7,9
  21:14 22:9
  25:5,23,24
  27:21,22,22,23
  28:2,7,12,17
  28:18,19 37:23
  39:24 42:11
  43:7,18 44:4
  44:16,24 45:5
  49:4 51:10
  53:17 54:6,11
  54:16 56:21
  59:14 60:4
  61:15 63:9,13
  63:21 64:2,15
  64:20 65:22
  67:12 68:5
  84:9 90:21
  91:7,8 92:2,3,3
  92:6 93:13
  95:6,8,10,23
  96:2
**knowing** 8:11
**knowledge**
  10:13 18:3
  21:3 32:14,20
  34:17 36:16
  40:21 42:23
  44:11,12 45:9
  45:12 47:9
  94:18,20,22
**known** 23:4
  26:15 35:16
  90:1
**knows** 5:24
**KURNIK** 2:13
———————
        **L**

**L** 2:8
**lab** 31:14,16
**label** 43:10 47:3
  47:5,18
**labeled** 69:18
  84:21
**labels** 46:21
**laboratory**
  21:13 86:16
**Lamken** 51:6
**Landeros** 44:24
**Lantern** 23:5,9
  23:23 24:2,6
  24:11,20,21
  25:1,8,11,13
  25:18 29:12,18
  32:21 35:22
  36:3,12,24
  44:9,10,12
  45:14,15,16
  47:22 49:14
  57:22 58:13
  60:14,18,21
  61:3,4,8,10,12
  61:14,14,22,24
  62:2,17 66:15
  67:3 75:22,22
  76:5,20 77:3
  77:15,16,21,22
  78:9,12,14,17
  78:21 79:10
  80:10,15,22
  81:2,11,12
  82:15 87:3,20
  88:1,2,11,14
  89:10,22 90:3
**laptop** 22:20
  29:18 33:2
  45:16,18
**law** 2:2 12:7
  14:7
**lawful** 18:13
**lawsuit** 4:12
  9:17 10:19

12:13 28:9,16
**lawyer** 51:6
**lawyer's** 95:13
**lawyers** 12:15
  12:19
**lead** 17:19,22
  18:20 22:13
  53:2 61:18
  64:6
**leave** 13:5
**led** 22:15 52:23
  92:5,23
**let's** 39:3 96:17
  96:18
**level** 13:14
**Lewis** 13:17
**license** 23:11
  31:9 33:16,18
**licenses** 23:12
  31:13
**licensing** 29:16
**lieutenant** 8:3
  8:18 18:16,17
  18:18 21:1,24
  22:2 42:17
  58:12,13,21
  60:17 61:10
**lieutenants**
  18:23
**lightning** 35:20
**likelihood** 59:19
**Likewise** 32:21
**limited** 30:14
  40:19,19,23,24
  41:3 43:24
  45:3 72:4
**line** 77:13 85:10
  87:6,13 88:22
  90:7
**lineup** 95:10
**little** 5:13,19
  36:19 49:5
  57:6
**living** 14:1

**LLC** 2:2
**LLP** 2:7
**loaded** 47:12,22
  81:1
**located** 80:22
**location** 31:2
**log** 33:1,4,7
  34:12 39:22,23
  48:2,22 57:22
  73:23 74:5
  83:15,20,24
  84:2
**logged** 41:23
  47:14 48:1
  49:16 66:7
  94:6
**logging** 32:2
  33:7 34:8,8
  39:20
**logical** 27:17
**login** 33:7,19,20
**logistics** 12:20
  12:21
**long** 10:21,24
  14:16 48:13
  55:13 56:8
  78:8
**longer** 24:21
  80:3
**longer-than-e...**
  77:22
**look** 26:12 74:2
  80:13 81:19
**looked** 93:15
**looking** 25:4
  43:2 70:2
**Lorinda** 51:6
**lost** 25:21 32:13
———————
        **M**

**M** 1:16 98:5
  99:10
**M-C** 21:6
**Mac** 29:18 78:13

**machines** 84:15
**main** 20:3 21:19
  22:20
**maintained**
  49:17
**major** 29:21,24
  30:2 31:16
**majority** 44:1
  54:2
**making** 41:20
  49:22 62:19
  84:14
**management**
  16:10 30:18
**manager** 31:12
**manner** 68:23
**March** 14:20
**Martinez** 44:21
**master** 15:8,10
  15:12,16
**Matt** 28:22 95:8
**matter** 28:21
  73:21
**matters** 29:4
**MATTHEW**
  2:14
**May/June** 20:8
  21:11 24:24
  31:3 35:12
  50:10
**McKeon** 21:6
  45:10 63:8,14
  63:16 93:17
**McKinney** 30:7
  44:21 45:7
  63:8,11,15
  93:10,20 96:7
**McKinney's**
  96:1
**mclark@khk...**
  2:16
**mean** 7:7,12
  22:19,22 23:1
  28:17,20 29:7

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 109

95:9,22 97:9
**Meaning** 87:2
**means** 35:11
97:10
**meant** 77:23
87:7
**media** 47:4 77:1
81:24 90:6
**meetings** 13:1
**members** 30:10
**memo** 82:21
**memoranda**
11:22
**mentioned**
31:17 93:12
97:11
**message** 25:14
25:24 72:9,11
72:17,20,24
73:1,2,4,6,11
73:14 74:1,3,6
74:10 92:22
93:3
**messages** 25:14
72:2 73:21,22
80:13
**met** 12:15 51:8
**method** 27:5
**microphone**
59:16
**middle** 8:1
**military** 13:22
**mind** 96:15
**mine** 19:12
59:14,18
**minute** 58:5
**misdemeanor**
51:11
**misogynistic**
35:6
**missed** 91:16
**misspoke** 75:10
**mistaken** 20:19
**mobile** 31:21

86:17
**model** 35:14
**Mokena** 14:3,10
14:16
**moment** 96:9,18
**month** 58:16
**morning** 4:13
6:1,3,5 77:20
78:1 79:3
95:16
**move** 28:20
95:23 96:1,13
**moved** 31:2,4,6
31:12,14
**moves** 31:18
**multiple** 26:10
36:18 38:18
**municipal** 1:6
**mute** 49:7

_____

**N**

**N** 3:1
**name** 4:11 6:1
11:11 34:4
38:10,10,13,15
42:1,9,10,14
42:14,19,22
73:9 74:1
**named** 18:23
20:20 51:5
**narrative** 61:21
**nature** 22:16
60:11 61:21
**necessarily** 66:9
**necessary** 96:8
**necessity** 39:20
**need** 4:24 5:15
27:19 28:19
35:15 37:10,20
40:12 43:17
57:24 76:23
80:9,14 97:19
**needed** 29:8
62:20

**needs** 29:2
**network** 86:22
87:4
**never** 5:6,10
19:20 37:23
60:4 63:1,15
64:5,7,7 85:8
87:21
**new** 20:18 22:12
23:11 31:16
43:6 90:19
**newer** 31:11
**news** 9:15 59:23
**newspaper** 9:6
**newspapers** 9:9
**Nicodemus**
17:10
**night** 45:2,2
60:20 78:5
79:2
**nine** 13:7,9,12
**non-sworn**
32:16
**nonauthorized**
87:1
**Nope** 68:10
**normal** 30:14
53:1
**normally** 35:21
45:18 46:18
92:8
**North** 2:3,14
99:11
**NORTHERN**
1:1 98:1
**notation** 97:17
**note** 26:13 97:14
**notes** 11:19,22
12:4 85:5
95:19
**notice** 1:13
**notices** 95:9
**November** 82:21
**nude** 59:8 60:5

60:11 89:4
**number** 38:13
38:15,16 42:2
42:8,15 70:3
71:19 73:10,23
83:12 84:22

_____

**O**

**o'clock** 98:14
**object** 73:16
91:21
**objecting** 91:23
**Objection** 57:14
**observe** 28:24
**obtain** 40:11
41:9 72:1 77:4
**obtained** 23:20
24:8 31:8
37:12 38:7
**obviously** 28:9
37:6
**occasion** 55:11
**occasions** 55:13
55:15
**occur** 55:5 56:12
**occurred** 6:23
51:24 52:14,15
54:12,16 56:4
78:4 82:3
**offense** 51:3,13
**offer** 91:4,10
**office** 6:3 11:2
21:19,21 22:1
30:6 44:19
51:7 53:15,21
57:4 95:10
**officer** 4:9 6:7
8:2 9:17 11:5
11:10 12:9,24
14:4,22 15:6,8
15:10,12,13,16
15:18 21:12
29:10 30:7
34:3 42:18

43:9 44:18
50:3,12,17,20
51:17 52:8
60:22 63:7,23
66:23 67:21
68:4,9,11,17
68:19 69:9,17
69:19 70:2
72:3 73:11
75:4,6,8,9,12
83:11 85:2
89:4 91:13
95:2,15 96:7
**officers** 8:14
9:22 10:8,10
13:2 20:12
32:12,16 34:20
34:23 35:5,6,8
35:9 49:17,19
53:12 54:4
63:5 67:13
68:1,22 69:5
**OFFICES** 2:2
**official** 9:20
99:1
**Oh** 7:9,12 90:14
**okay** 5:10,23 6:7
7:11,14 9:1
11:13 12:15
14:12 16:1
22:22,23 23:1
37:5 38:2 48:5
48:16 50:14
52:16 55:3,4
55:24 57:19
60:7,12 72:21
76:19 77:6
78:6 83:10
84:20 85:2,6,7
85:19 87:8
92:4,17 96:18
**old** 31:14,16
**once** 16:7,7,11
38:21 39:18

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 110

41:10 47:16,20
49:11 73:12
95:23
ones 20:9 44:11
ongoing 8:21
51:9
open 20:4 40:1,4
40:13 41:15,17
43:5,6 55:8
70:8,10,17
91:19
opened 21:21
opens 41:15
operating 33:6
33:15 35:15
opinion 68:23
opinions 9:24
10:2,11 93:1
opposed 61:8
91:6
option 41:17,17
70:12
order 6:24 16:5
16:8 18:12,13
27:24 28:6,14
28:23 29:2,5
30:17,20,23
34:13 35:11
48:17,24 57:22
84:23 97:14
ordered 58:16
orders 16:14
original 6:16
31:10 45:17
51:3 52:12
71:9 72:12
76:23 77:4
80:8 81:22
90:22
originals 62:17
outcome 52:6,15
52:17,18 53:7
53:13,14 54:13
outside 28:8,15

50:14 62:13
overheard 57:18
owner 46:14,18
46:20
owner's 42:9

—————— P ——————
p.m 97:23
packaged 47:17
PAGE 3:2,7
paragraph
77:13 79:21,23
80:6,17,19,21
81:13,22 82:9
parameter 42:1
parse 25:15
26:18 41:19
80:10,15
parsing 61:15
part 34:14 38:4
51:2 57:18,24
69:2 78:13
86:19 91:16
partial 87:23
participants
56:24
participating
57:11 97:3
particular 26:13
26:20 34:9
36:11 49:19
61:9 63:21
71:10 72:9
78:12 83:23
parties 98:18
passing 8:6
password 32:4,6
32:9,18,24
33:1,8,17,19
33:23 34:12
35:15 39:21,24
41:4,8,10,23
76:21 85:11,23
86:1,5,9 94:6

passwords
32:22,24
Patch 9:19
patrol 14:22
15:8,10,12,13
15:16,17 21:2
86:24
pay 15:15
PC-based 27:2
pdf 69:20 70:9
people 36:4 57:4
57:11 87:1
percent 11:6
42:24 53:5
perception 54:4
performed 95:3
performing
49:19 94:14,18
period 9:13
21:14,15 46:5
53:21 54:2
56:12,13 68:6
77:16,22 80:23
permission 58:1
permitted 36:2
person 7:9 18:8
20:20 40:4
41:14,23 42:6
43:5,17 53:9
82:24
person's 34:4
personal 50:11
65:17,21 67:15
91:15,20 98:10
personally 65:19
personnel 20:11
30:10,15 50:9
54:2,10,19
89:21
pertaining 1:15
Phillip 21:8
phone 2:5,10,16
8:10 22:19
23:16 24:3,4

25:6 27:3 34:5
35:18 36:5,7,8
37:14,16,19,21
38:11,16 40:2
40:15,22 41:16
41:21 42:6,19
43:7 44:1,5
46:13,14,20,20
46:21,22 47:21
59:24 60:1,2
60:22,22 61:11
61:13,13 62:4
62:24 63:24
66:17 71:10,15
71:24 72:2
73:10,23 74:1
74:2,5,7,11,11
75:13 77:5
80:12,14 86:12
87:6,10 88:7
92:24 99:12
phones 24:5,16
26:18 27:3,6
27:14 29:17
38:15 86:17
phonetic 20:16
photo 23:19
24:7
photographic
25:19 59:9
60:9
phrase 86:21
physical 19:23
26:16 27:6,15
27:19 30:11
31:10 38:9,17
38:21 39:12,17
40:1,3 41:18
43:2,6 47:12
47:13,19,23
48:2,3,5,12,18
49:18 50:5
68:12
physically 47:16

pictures 72:20
piece 27:11
67:12
place 11:1 19:23
19:23 28:1
29:5 92:23
96:5 98:12
placed 45:22
46:23 47:24
77:1
plaintiff 1:4 2:6
4:12
plans 13:5
play 19:17
played 18:23
52:18
please 41:2
64:18 91:17
96:19
plug 35:16,19
37:11
plugged 37:15
plugs 27:4
point 9:14 21:13
21:15 31:8,12
47:20 48:6
57:4,21 59:8
60:3 62:5,6
63:11,12 72:23
73:12 74:9
76:1 87:22
police 6:9 9:22
10:15 13:2,6
14:3,4,5,9,10
14:11,19 16:4
16:9 18:21
19:24 22:11
23:3 26:4,7
28:3,10 30:12
30:14 34:18
52:13 66:22
67:1,20 73:13
74:9 83:1,5,11
87:3

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 111

porn 68:6
portable 34:5
  40:5
portions 9:18,19
position 28:13
positions 20:18
possession 48:17
possible 53:11
  66:20
possibly 25:7,9
  32:19 42:21
  44:20 50:7
  51:14
potentially 36:7
preceded 50:21
precise 15:5
  56:14 57:6
  72:8
preparation 6:8
  6:19 7:3
prepare 6:24
  7:17 82:22
prepared 12:12
  70:22 71:1
  74:18
present 2:18
  5:24 9:13 11:3
  18:9 53:22
  57:20
presenting 97:3
pretrial 56:3
  57:11
pretty 9:11
previous 58:24
previously 14:5
  78:20 81:23
prior 14:2 55:2
  60:3 71:4 76:6
  78:3 92:10
probably 15:19
  24:22 49:12
  56:6 85:8 88:3
problem 57:6
problems 5:13

procedure 1:14
  83:19
process 4:21
  71:6 97:3
Proctor 2:8 5:17
  5:18,23 6:1
  27:21,21 29:1
  49:4 64:12,14
  64:20 65:1,3
  70:7,9 71:17
  71:21 73:16
  91:21 95:8,21
  96:15,21,24
  97:8
professional
  50:12
professionally
  34:24
program 37:18
  39:12,14 62:2
  72:3
promoted 16:16
  16:17 58:20
promotion 19:3
  19:10 59:2
properly 50:4
  69:16 90:24
property 16:10
  30:18
prosecution
  50:20 51:18
  54:24 56:2
  57:9
prosecutor
  92:15
Prosecutor's
  51:7
prosecutors
  40:14 49:22
protected 28:15
protective 28:6
  28:23 29:2,5
protocol 46:10
  83:19

prove 74:3
provide 58:14
  79:7
provided 78:20
  92:7
PTI 14:13
purpose 7:4,18
  57:23 65:14,23
purposes 26:23
  78:13 90:23
pursuant 1:13
  1:13
push 96:2
put 28:1 34:3
  47:20 72:23
  90:8,18 91:3

───────

**Q**

qualify 22:21
quarter 88:21
question 4:23
  5:2,3,4,7,8
  10:6 36:19
  69:3,4 83:18
  91:17,22
questions 4:13
  4:24 27:23
  28:2 36:16
  50:17 82:24
  86:8 95:13
  96:22,23 97:1
  97:7
quick 95:18,22
  96:16
quote 68:5,6
  77:14,17 80:22
  80:23 81:22
  82:2 87:13,15
  88:22,23 90:7
  90:8

───────

**R**

raised 13:3
ran 33:15

rank 14:21,23
  14:24 15:3,6,9
  15:17 17:2
  94:23 95:4
RCFL 86:15
RCFO 44:19
read 4:24 10:10
  16:7,11 73:3
  85:11 97:13
reader 38:23,23
  40:5,13 41:15
  44:5
reading 29:1
  84:12
reads 80:22 87:6
  87:13 88:22
ready 95:11
  96:12,12,14
really 15:2
reanalyze 41:20
reason 36:11,22
  37:3 94:1,2,12
reasonable 66:4
reasons 50:7
recall 8:7 9:10
  46:6 52:9
  53:11 54:1
  55:6,13 56:8
  56:18 57:17
  58:22 59:1
  73:8 77:11
  85:22 86:13
  91:11,12 92:20
  92:21 94:4
receive 26:1
received 22:4
recited 81:13
recollection
  18:22
record 6:3 12:1
  27:22 28:1
  29:3,8 48:8
  64:12 71:17
  83:20 84:4,6,9

85:20 91:22
  97:19
recording 11:13
  11:17
records 8:10
  23:16,17 71:3
  84:8
recover 25:7,9
  25:14
reduced 98:9
reexamined
  39:16
refer 49:11
reference 59:21
  71:19 80:6
  84:13,13 87:10
  90:21
referenced
  79:20 82:23
referencing
  86:20 90:15
referred 76:8
  79:22
referring 59:23
  86:2
refers 84:15
reflected 81:7
regarding 10:18
  36:2 68:12
regardless 7:17
Regional 21:13
Regis 7:12
regulating 34:20
regulations
  34:19
Reid 18:18
  21:24
related 8:20
relating 8:15
  12:11 22:5
  30:17,20 39:10
  74:18
relation 56:10
relationship

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 112

50:12,14
relative 6:14
  98:17,19
remember 5:8,9
  9:4 16:20 18:8
  39:5 46:4
  51:22 52:11
  53:8,10,16
  86:11 88:4
  89:1
remove 46:17
reopen 77:5
reopened 39:17
reparse 41:19
  43:7
repeat 10:6 69:2
  83:18 91:17
repeated 4:24
rephrased 5:1
report 6:10,13
  25:15 27:9
  34:2,4,5,15
  36:9 37:19
  38:21,22 39:1
  40:3,5,6,7,11
  41:14,16,22,24
  42:2 43:1,15
  46:23 58:13
  59:22 60:18,21
  60:24 61:3,4
  61:24 62:1,8
  62:12,15,16
  63:24 66:15,16
  69:20 70:3
  71:1,4 72:20
  74:18 76:14
  77:16,20 78:1
  78:4 81:19
  84:3 87:21
reported 9:6,8
  9:14 54:19
  58:6 61:22,23
  98:9
reporter 1:17

5:24 98:6 99:2
reporting 17:7
  17:13 58:9
reports 6:9,14
  6:21,22 12:11
  23:17 24:4
  34:7 44:3,3
  45:20 59:12,23
  59:24 60:4,15
  61:9,21 66:16
  76:2 79:4
represent 4:11
  85:4 97:9
representatives
  11:4,9
request 8:4 18:8
  18:11,12
requested 18:2
  58:12,15 61:11
  61:16
resides 31:15
respect 28:11,20
  35:3
respectively
  23:5
responsible 19:9
  19:12 62:19
resulted 72:12
retired 16:20
  58:23
retrieval 22:5
  24:6
retrieve 24:18
retrieved 45:13
  81:20
retrieving 24:15
  25:12,19
review 4:20 6:14
  6:18,21 8:11
  27:8 36:5,8,13
  36:23 38:24
  40:15 44:3,5
  61:6,18 62:13
  62:18 63:23

80:13 84:1
  86:12 95:19
  97:13
reviewed 6:7
  37:18 83:17
reviewing 62:19
REYNOLDS
  2:3
right 11:19
  18:12 29:1
  39:3 49:12
  69:14,17 70:21
  76:10 82:20
  86:15 96:9,24
  97:12,18,19,20
  97:22
River 2:14
Road 2:9,14
Robert 20:24
Roechner 18:19
  19:17 53:6
  58:23,23 59:5
  64:9 65:9,11
  65:15,24 66:19
  82:22 91:14,19
Roechner's 17:2
  21:17 30:6
  47:7 90:12
role 15:2 17:23
  19:17 21:10
  36:21 47:7
  49:19 51:17
  52:17 53:14
  58:8 93:8
  94:19
roles 18:23
  19:21
room 11:16 20:4
  20:7,12,22
  29:22,22,23,24
  30:1,2,5 31:13
  31:17 91:1,6
rules 1:14 4:20
  34:19 97:12

ruling 52:1
rumors 88:23
  89:2,13,17,24
  90:4

—————————
S

S 2:14 3:6
S-H-A-W-N
  20:20
S-T-A-C-H-E-...
  20:21
safe 90:8,11,12
  90:14,20 91:6
sat 76:19
save 22:18 42:19
  43:16,19 45:18
saved 18:2 40:2
  40:23 41:14
  42:24 43:15
  45:18 58:19
  62:16,17 73:9
  89:6
saw 9:18,20 64:5
  92:6 93:13
says 28:23,23
  81:21 82:12
  86:21 90:7
scheduling
  12:20,21
science 13:21
screen 69:15,18
  69:24 70:4,11
  70:15,16,17
screenshot 73:1
  73:21 74:10
scroll 69:22
  71:18 74:13
  84:20
scrolling 70:1
  82:20
scrub 65:10
search 35:11
  36:12 42:1
  43:3 71:23

92:8,10,13
searched 35:13
  38:4
searching 25:4
  25:11
second 31:9
  77:13,13 79:12
  79:22 88:10,14
secondhand
  67:24 68:8,16
  69:12
secretary 20:14
  20:18
section 48:4,21
  62:10 83:11
secured 21:20
  41:5
security 31:22
see 11:17 25:8
  69:17,19 70:5
  70:6,19 73:6
  85:2,10 86:21
  87:12,15 88:5
  88:23 90:8
  92:4,18
seen 9:16 12:4
  63:1,6,12,14
  63:22 64:4
  71:3 85:9
  93:10,12,17,24
seized 36:13,23
  37:10,12 39:4
  46:8 49:14
  74:19 83:16
seizure 92:5
send 74:1
senior 17:7
  18:14
seniority 15:14
sent 14:11 60:2
  62:15 73:14,15
  73:23 74:2,3,6
  74:11 92:14
sentence 77:24

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 113

separate 21:19
22:1 29:19
38:20 81:4
97:16
sequence 89:17
sergeant 6:12
8:2,3,9,17,17
17:9,10,11,14
17:15,17,21,23
18:6,7,10,11
19:2,4,6,9
42:17 44:11,24
45:1 47:10
51:16 53:2
58:11,14,15,17
58:18,20 60:20
60:23 61:2,6
61:12,17 62:18
63:20 64:1
66:18,19 67:2
71:8 72:1,16
77:14,23 78:2
78:7,20 79:2,5
82:1,13,14
92:7 95:1,4
Sergeants 18:14
serial 38:13,15
serve 16:1
server 18:3
39:15 43:18
45:19,24 81:4
81:11 86:18
service 13:22
22:3
set 29:2 60:1,21
81:20 86:18
87:21
sex 35:9
sexist 35:6
sexual 68:13
sexually 59:9
60:11
share 36:16 64:3
69:15 70:11,15

70:16
shared 56:1
sharing 69:23
70:4
Shawn 20:20
Sherri 20:16
shift 45:2
short 49:9 96:20
short-form 60:7
shorthand 1:16
87:7 98:5 99:2
shortly 51:21
55:10
showing 74:6
shown 45:3
68:13 70:24
sic 67:5 87:18
signature 97:8
97:10 98:15
99:1
signed 33:4,5,5
65:19 92:6,15
92:18
similar 24:2
similarly 24:6
simplest 41:13
simply 31:18
single 32:6,24
33:1,12
sir 19:13
size 81:4
smart 22:19
smoothly 4:21
SMS 74:4
Socha 1:3 2:18
4:12 6:15 8:16
8:21 9:17,23
10:9 12:9,12
12:24 17:12,20
17:24 18:24
30:18,21 31:1
31:6 39:3,10
42:1,13 45:7
45:10 46:7

47:7,11 50:12
50:21 51:9
54:5 55:21
56:4,10 57:8
58:10 59:10
60:10 69:9
72:3,9,13,16
73:7,9,11
74:20 75:4,6,8
75:9,12 79:13
80:3 83:14
88:17 89:4
91:5 93:2
94:15,19,24
95:3
Socha's 8:22
10:11 15:6
40:22 41:12
42:14,18,23
51:17 52:5,17
53:7,14 54:23
56:1 57:10
58:4,10 60:16
60:22 62:23
63:2,19 64:4
64:10 65:7,12
65:16 66:1,24
67:14,22 68:2
68:12,24 69:6
73:7,8 74:11
75:15 76:3
79:8 81:1,14
83:22 89:22
92:5 93:11,18
93:21
software 24:2
26:17,20,22
27:1,2,11 32:3
32:7,22 33:3
33:11 38:9,17
38:19 39:14
78:17
solely 78:14
somebody 5:21

43:2 53:24
62:13 75:12
76:19 77:12
SOPs 34:19
sorry 7:12 10:5
10:20 14:9
25:23 39:2
59:6 69:2 82:5
83:18 85:12
91:16
space 40:23
speak 7:9
speaking 51:22
specific 9:10,11
18:22 22:8,22
25:24 28:2
37:2 39:4,10
40:20 52:9,14
53:10 73:22
specifically
54:11 84:10
specified 98:12
specifying 86:13
speculate 64:16
spend 58:3
spoke 18:7 51:8
51:19 53:8
63:15
spoken 8:6
12:18
spring 23:10,18
squared 22:17
SS 98:2
Stachelski 20:21
stamp 71:18
stand 96:10,13
standby 96:8
star 68:6
start 70:13 71:5
96:8,9,16
started 5:19
14:15 56:7
60:17,20 77:14
79:2

starting 5:20
State 51:6 98:2
99:2
stated 51:24
statement 74:10
statements
12:13 52:12,13
55:1 56:3
57:11
States 1:1,14
98:1
status 15:12
stenographica...
98:9
step-by-step
80:18
steps 50:4
stop 49:7
stopped 31:10
34:1
storage 22:5
47:5,13,13,22
47:23 49:16
50:3 58:9
79:24
store 42:8,11
45:23
stored 39:9,13
39:14,18 42:13
58:17 65:11
77:2
straight 96:1
Street 2:3 99:11
Strike 66:6
subject 16:5,9
28:6,14,21
29:4
subsequent
55:23
sucks 68:6
suggested 30:24
suggestion 96:3
Suite 2:4,9,15
99:11

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 114

suited 25:18
summary 38:12
summer 23:10
  23:19
supervisor
  18:20 47:9
supervisors
  30:15 32:15
supplement
  69:20 70:2
  71:4
supplementary
  25:15
supported 10:3
  10:12
sure 4:22 10:7
  11:6 15:7,10
  20:17 42:24
  44:23 49:7
  53:5 55:12
  75:17
surprised 64:6
switched 16:21
  20:17
sworn 4:1,4
  20:12 98:7
synonymous
  26:15
system 31:13
  33:6,15 34:7
  34:13,15 35:15
  37:16,18 38:19
  40:23 47:15,24
  48:11,17,18
  49:17 66:8,14
  67:4,8,11 75:5
  75:17,20,23
  76:12,18 79:16
  80:12 81:2
  86:17 88:10,11
  90:5 91:1
systems 49:15
  88:1,6 89:6

**T**

T 3:6
tab 39:9 59:3
tablet 22:20
  91:15
tabs 38:20
TAJA 2:3
take 11:1 13:20
  48:17,22 49:4
  49:6 89:8,14
  89:18 95:21
  96:18,18
taken 1:12,16
  23:20 26:10
  60:2 98:12
takes 27:7
talked 78:11
  92:22
talking 8:13
  22:8 29:13
  54:16 57:5
  60:9 65:18
  78:15 84:3
Tamara 11:6,11
Task 19:5
tech 83:6,8
technical 7:20
  27:23 49:12
technically
  50:24
technological
  59:18
technology 5:14
  24:14,17
telephone 12:18
tell 5:7,9 43:16
  51:23 75:1
  77:9 82:2
  84:12 86:4,9
  89:20 90:2
  93:10,17,20
  94:2,5,9,14
  97:19
telling 89:1,2

term 22:17,18
  38:1 49:12
  80:8
terms 24:12 43:4
testified 4:5
testify 98:7
testimonies
  56:17,18
testimony 51:17
  51:21 52:5,7
  52:12,18 54:17
  54:21,23 56:1
  56:8,10,16
  57:8,10
text 25:24 72:2,9
  72:11,17,20,24
  73:2,3,6,13
  74:1,6,10
  80:13 92:22
texts 62:4
thank 71:21
  95:17 97:2,4,5
  97:7,7
thankful 37:22
thanks 29:8
  85:20 96:19
Theft 19:5
thing 52:11
  86:23
things 8:13 9:7
  22:16 28:9
  49:23 53:10
think 6:16 8:12
  9:19,20 17:2
  21:1 27:17
  28:6,18 29:1
  42:20,23 44:10
  48:20 52:14
  54:8,10 61:4
  63:13 65:22
  69:15,23 75:7
  75:9,10 79:1,5
  85:15 86:6,23
  87:9 91:16

95:12,12,19,22
third 80:17,21
  80:24 81:6,6
  81:13 82:9
  85:10
thought 5:19
thoughts 28:22
three 4:19 6:17
  24:23 31:4,5
  51:12,13 56:21
  81:17
time 8:3 9:13
  15:10 16:2
  17:4,6,11,18
  18:18 20:8,13
  20:17,23 21:2
  21:3,11,14,14
  21:17 22:18
  23:8 24:17,24
  25:17 28:17,17
  29:6,6,24 30:6
  30:7 31:18
  34:10 35:12
  39:23 42:18
  44:17,23 45:1
  46:3,4,5 50:10
  50:10 53:21
  54:2 55:19
  56:11,13 58:3
  59:1 61:12
  64:17 77:22
  78:21 83:21
  94:3,23 95:15
  98:12
times 4:18 5:2
  5:13 31:4,5
  36:15
timing 86:15
Tina 1:16 48:8
  71:12 74:15
  84:22 85:18
  98:5 99:10
title 43:18
today 6:1 28:5

64:16 97:3
today's 6:24
  7:17 12:20
told 25:13 32:11
  32:12 54:23
  63:5,10,11
  64:5,7 73:10
  78:8 85:22
  86:6 88:22
  89:8,13,13,17
  89:18,24 90:8
  90:16,18 93:15
tone 52:21,23
tool 23:15 62:14
  80:9,14
tools 23:13 28:4
  28:12
top 70:2
touch 22:13
touching 28:5
track 10:23 34:8
  48:12 85:18
tracking 48:18
trade 67:24
trained 22:15
  36:4 43:22,24
  44:14,19
training 22:4,10
  22:11,11,12,13
  22:14 26:1,5,8
  44:2,22 45:3
transcript 97:13
  97:15
transcription
  97:17
transfer 49:12
  58:9
transferred
  49:15 81:24
treat 34:21,23
  35:2,5
TRESSLER 2:7
Tri-County 19:5
Tri-River 22:12

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 115

**trial** 13:11 51:17
52:6 53:7,13
54:14 55:2,10
56:2,9,17,19
56:20 57:1,2,9
57:10
**true** 21:24 33:17
34:16 39:5
62:23 72:13
74:20,23 78:9
79:18 80:4,19
**truth** 98:8
**try** 69:14,16
**trying** 61:15
**turn** 58:18
**turned** 39:13
58:7 60:23
62:17 66:18
75:4 79:4
81:10 82:12,13
**two** 6:13 8:13
14:17 16:14
17:19 18:23
23:12 24:10,23
31:9,13 41:13
51:13 82:15
84:11 87:17,17
88:1,6,8
**two-thirds** 87:12
**type** 22:12,22
24:15 25:9
33:7 84:7
**types** 24:15 27:3
27:5
**typewriting**
98:10

**U**

**U** 14:13
**UBS** 67:5,7
**UBSs** 87:18
**UD** 38:14
**UFDR** 40:11
**UFED** 27:2,20

**uncommon**
36:17
**underlying**
12:12
**understand** 4:22
10:9 23:2
33:10 92:17
**understanding**
17:21 18:1
25:18 27:24
28:18 29:6
30:16 36:2
75:11,17
**understood** 5:4
76:2
**union** 11:4,4,9
**unique** 34:11
38:9,14,16,22
**unit** 19:6 29:11
29:20 30:8,11
32:17 39:19
43:22 44:7
53:13 54:5
63:5,18 78:16
83:1,8
**United** 1:1,14
98:1
**units** 20:9 83:6,7
**universal** 33:22
**University** 13:17
**unknown** 77:15
77:21
**unlock** 35:16
**unrelated** 38:6,7
93:24 94:1,17
**uploaded** 37:24
67:11
**USB** 46:23
47:12,23 49:15
60:23 62:16,21
66:18 67:6,10
75:15,21 76:16
76:24 79:9,10
79:11,12 80:23

80:24 81:4,10
81:13,17 82:12
82:13 87:23,24
89:9 90:6,19
91:5
**USB's** 88:9,16
**use** 22:18,24
23:18 24:20,21
25:1,7 27:16
29:12 36:2,4,7
36:12 37:6,22
39:3 40:1
43:23 44:4,8
44:12 45:22,24
60:7,8 61:8
71:23 72:3
86:12,17
**user** 33:7 34:9
34:11,16
**users** 32:6
**uses** 38:14
**Usually** 42:8
46:19
**utilizing** 91:1
**utter** 68:4,11

**V**

**V** 79:21 80:1
81:23 86:20
**valid** 9:24 10:3
10:12
**various** 8:5 9:2
**Verizon** 74:6
**Versions** 26:16
**vic** 87:6
**vics** 87:6
**victim** 42:22
87:7
**Victor** 79:22
**video** 23:20 24:7
25:19 49:8
59:9,16 91:14
91:19
**videoconference**

1:12 2:1 4:5
98:7,12
**videographic**
60:9
**videos** 18:2
25:23 59:12
60:2,5 63:21
66:17
**view** 34:5,13
57:8 62:8,12
93:21
**viewable** 23:17
24:4 26:19
27:8 41:20
61:16 62:4
80:11,15
**viewed** 45:14
60:4 62:1
63:18 64:9
83:17,22 89:4
89:21,23 94:9
**viewing** 57:23
58:3 75:13
**violation** 48:23
**visibly** 32:10
**visual** 66:10
**volume** 59:14
**vs** 1:5

**W**

**waive** 97:18,20
97:22
**waived** 98:16
**want** 22:9,17
29:7 53:23
55:2 64:16,22
85:4,9 95:21
96:9,10 97:2
97:10
**wanted** 75:1,4
75:14 85:19
90:2,5
**warrant** 92:4,8
92:10,13,18

**wasn't** 25:15
32:10 36:21
45:4,5 53:4
54:9 64:13
69:4
**way** 35:6,23
37:4 41:13
43:18 45:8,11
48:16,20 50:19
59:20 69:6
76:22 87:13
88:21 89:12
93:14 97:15
**ways** 41:13
42:11
**we'll** 5:1,14
28:24,24 59:20
69:16 71:12
74:15 84:22
96:13,13,17
**we're** 8:12 65:3
70:2 87:12
95:23,23,24
**we've** 25:21
27:22 28:5
49:5
**week** 56:13,20
**weeks** 55:17
**went** 14:8 26:7
62:5 89:13
**weren't** 37:11
45:6
**Windows** 33:6,9
33:15,19 34:11
39:24 40:20
41:4 42:7
**witness** 3:2 4:1,4
5:24 7:22
13:11 25:22
51:1 57:16
65:4 70:11,15
73:11,19 92:1
95:11,17 97:2
97:5,22 98:15

Cassandra Socha v. City of Joliet;et al.
Deposition of Detective Jeffrey German - Taken 4/28/2021

Page 116

| | | | |
|---|---|---|---|
| 99:1 | 95:21 96:4 | **2001** 14:4,10,15 | **60440** 2:10 |
| **witness's** 28:8 | **year** 13:18 14:2 | **2002** 13:19 | **60601** 99:12 |
| 56:9 | 14:14 51:11 | **2003** 14:20 | **60602** 2:4 |
| **woman** 51:5 | **years** 8:5 9:3 | **2013** 15:22 | **630.759.0800** |
| **word** 22:24 | 13:7,9,12 | **2014** 26:10,11 | 2:10 |
| 37:23 60:8,8 | 14:17 15:9 | **2016** 15:23 | |
| 92:13 | 24:23 31:15 | **2018** 6:23 15:5,5 | **7** |
| **words** 31:22 | 51:12,13 56:21 | 16:22 17:3,6 | **7-2** 16:5 30:20 |
| 68:5 73:3 | | 18:15 19:22,22 | **7.5.0.82** 26:16 |
| **work** 19:24 | **Z** | 20:8 21:11,15 | **71** 3:8 |
| 24:18 31:9 | **zip** 47:1 | 23:3,10,19 | **74** 3:9 |
| 35:22 36:15 | **Zoom** 5:12 10:5 | 24:24 29:13 | |
| 45:2 60:19 | | 31:3,17 33:11 | **8** |
| 74:19,22,22 | **0** | 34:18 35:12 | **8** 77:6 90:19 |
| 75:2 79:3 | **00053** 69:18 | 42:20 43:21 | **84** 3:10 |
| 84:16,17,17,18 | 71:20 | 46:3 50:10 | **847.261.0700** |
| 95:3 | **00055** 74:16 | 77:7 78:4,22 | 2:16 |
| **worked** 32:16 | **00120** 82:21 | 79:12 82:10,21 | **8th** 77:2 79:12 |
| 45:15 | 85:16 | **2021** 1:17 98:14 | 80:5 82:4,6,6,7 |
| **working** 36:11 | **00163** 84:21 | 99:3 | 82:10 84:16 |
| 36:21 37:11,13 | **05681** 1:5 | **2350** 2:4 | |
| 45:6 66:10,12 | **07** 83:12 84:2 | **250** 2:9 | **9** |
| **workplace** 50:15 | **084-003858** | **28th** 1:17 98:14 | **9** 15:9 82:21 |
| **works** 24:2 27:6 | 99:13 | | **9:27** 1:17 98:14 |
| **workstation** | | **3** | **9:30** 5:20 |
| 19:23 20:21 | **1** | **3** 3:10 85:16 | **9th** 84:16 |
| **workstations** | **1** 3:8 71:12 | **3050** 99:11 | |
| 20:7,12 | **1-20** 1:7 | **312.361.8851** | |
| **wouldn't** 34:16 | **1:00** 96:2,8,11 | 99:12 | |
| 37:3 50:6 | 96:11 | **312.445.4900** | |
| 52:19 53:22 | **12** 15:9 | 2:5 | |
| 64:5 84:6 | **12:17** 97:23 | **33** 2:3 | |
| 90:24 96:15 | **12:30-ish** 96:17 | | |
| **written** 12:1,13 | **13** 15:24 | **4** | |
| **wrong** 70:4 | **16-1** 16:8 30:17 | **4** 3:4 85:13 90:7 | |
| | **161** 99:11 | **4PC** 27:2,16,20 | |
| **X** | **17** 78:4,22 | | |
| **X** 3:1,6 | **17th** 71:2 | **5** | |
| | **18** 1:5 36:1 | **550** 2:9 | |
| **Y** | **18th** 79:1,9 99:3 | **5600** 2:14 | |
| **yeah** 8:17 18:13 | | | |
| 20:23 30:4 | **2** | **6** | |
| 57:3 59:7,7 | **2** 3:9 74:16 | **6/8-Gavin** 88:22 | |
| 78:5 92:24 | 79:21 | **600** 2:15 | |
| | **2000-** 14:19 | **60018** 2:15 | |

# EXHIBIT 11





Transcript of the Deposition of
# Alan Roechner
**Case:** Cassandra Socha v. City of Joliet; et al.
**Taken On:** June 21, 2021

Royal Reporting Services, Inc.
Phone:312.361.8851
Email:info@royalreportingservices.com
Website: www.royalreportingservices.com

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CASSANDRA SOCHA,                    )

        Plaintiff,               )

        -vs-                     ) No. 18 CV 05681

CITY OF JOLIET, a municipal         )

Corporation, EDWARD GRIZZLE,        )

JOHN DOES 1-20,                     )

        Defendants.              )


     The deposition of ALAN ROECHNER, taken
remotely before Michelle A. Duzan, Certified
Shorthand Reporter and Registered Professional
Reporter, taken pursuant to the provisions of the
Illinois Code of Civil Procedure and the Rules of the
Supreme Court thereof pertaining to the taking of
depositions, commencing at 9:30 a.m. on June 21,
2021.

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 2

```
 1      APPEARANCES: (via videoconference)
 2      LAW OFFICES OF HALL ADAMS, LLC
        MR. HALL ADAMS III
 3      33 North Dearborn Street
        Suite 2350
 4      Chicago, Illinois  60602
        Phone:  312.445.4900
 5      E-mail: hall@adamslegal.net
 6
             On behalf of the Plaintiff,
 7
 8      TRESSLER LLP
        MS. DARCY L. PROCTOR
 9      MR. JAMES J. HESS, Jr.
        550 East Boughton Road
10      Suite 250
        Bolingbrook, Illinois 60440
11      Phone:  630.759.0880
        E-mails:  dproctor@tresslerllp.com
12                jhess@tresslerllp.com
13          On behalf of the Defendant, City of Joliet;
14
        KNIGHT HOPPE KURNIK & KNIGHT, LTD.
15      MR. MATTHEW S. CLARK
        5600 North River Road
16      Suite 600
        Rosemont, Illinois  60018
17      Phone:  847.261.0700
        E-mail: mclark@khkklaw.com
18
             On behalf of the Defendant, Edward Grizzle.
19
     ALSO PRESENT:
20
        Ms. Sabrina Spano, Esq., City of Joliet
21
        Ms. Cassandra Socha, Plaintiff
22
23
24
```

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

```
                                                        Page 3
 1                      I N D E X

 2
     WITNESS                          EXAMINATION
 3
     ALAN ROECHNER
 4
 5   Direct Examination by Mr. Adams          4
     Cross-Examination by Ms. Proctor        94
 6   Redirect Examination by Mr. Adams       99

 7

 8

 9                  E X H I B I T S
     EXHIBIT                          INTRODUCED
10
     No. 2                                 69
11   No. 3                                 78
     No. 5                                 84
12
           (Other exhibits marked but not introduced.)
13

14

15

16

17

18

19

20

21

22

23

24
```

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 4

1          (Whereupon, Deposition
2        Exhibits Nos. 1-8 were marked.)
3          (Witness duly sworn.)
4            ALAN ROECHNER,
5   called as a witness herein, having been first duly
6   sworn, was examined and testified as follows:
7            DIRECT EXAMINATION
8   BY MR. ADAMS:
9       Q.  Good morning, sir.  My name is Hall Adams.
10  I represent Officer Cassandra Socha in this lawsuit.
11  We ask that you do a couple of things this morning.
12  The first and most important is that you make sure
13  you hear and understand every question before you
14  give an answer.  If you need to have questions
15  repeated, rephrased, read back, explained, we'll
16  accommodate you as many times as you ask.  If you
17  give an answer to a question, we will all presume
18  that you heard and understood the question; is that
19  fair?
20      A.  Yes.
21      Q.  Please never guess.  If you don't know the
22  answer to a question, say you don't know.  If you
23  can't remember something you're asked, tell us that
24  you can't remember.  If you can only provide an

Page 5

1   estimate -- and that may be particularly true with
2   dates -- feel free to provide an estimate if you tell
3   us that's what it is, but never guess.  Okay?
4       A.  Yep.
5       Q.  Have you reviewed any documents in order to
6   prepare for your deposition today?
7       A.  No.
8       Q.  Have you spoken with anyone in order to
9   prepare for your deposition today?
10      A.  No.
11      Q.  How many times in your life have you been
12  deposed?
13      A.  Approximately three.
14      Q.  When most recently?
15      A.  I don't know the exact date.  But less than
16  six months ago was the last one.
17      Q.  Have you ever read any version of the
18  complaint filed by Officer Socha in this lawsuit?
19      A.  The lawsuit, you're talking about, itself?
20      Q.  Yes, sir.
21      A.  Yes.
22      Q.  When did you first do that?
23      A.  Back when -- when it was issued, so a couple
24  of years ago.

Page 6

1       Q.  How did it reach you?
2       A.  How did it reach me?
3       Q.  Yes, sir.
4       A.  Because it was against the sergeant that
5   worked for me.  So through the chief.
6       Q.  At the time it was filed, you were a deputy
7   chief --
8       A.  Correct.
9       Q.  -- of investigations?
10      A.  Correct.
11      Q.  And the individual named in the complaint
12  was Detective Sergeant Grizzle?
13      A.  Correct.
14      Q.  Have you reviewed the complaint since the
15  first time you did so?
16      A.  I may have, but not any time, you know,
17  recent or anything like that.
18      Q.  When you first reviewed the complaint, did
19  you make any written record of having done so,
20  whether notes, a memo, a letter to anyone?
21      A.  Not that I recall.
22      Q.  Did you discuss the contents of the
23  complaint with anyone around the time that you first
24  read it?

Page 7

1       A.  Exactly who, I don't know.  But probably
2   with the chief at the time.
3       Q.  Do you have a specific recollection of
4   having discussed the contents of the complaint with
5   the chief?
6       A.  Probably when he showed it to me.
7       Q.  Okay.  Do you remember in that conversation
8   where it took place?
9       A.  Somewhere at the PD.  Maybe his office.
10      Q.  In that conversation, do you remember what
11  he said to you and what you said to him about the
12  contents of Officer Socha's complaint?
13      A.  No, I do not recall.
14      Q.  Did you make any written record, notes, or
15  memoranda or letters or e-mails or of any other type,
16  regarding that conversation with the chief about the
17  contents of Officer Socha's complaint?
18      A.  I -- I may have.  I don't recall.
19      Q.  Have you ever discussed the allegations in
20  Officer Socha's complaint with Detective Sergeant
21  Grizzle?
22      A.  I'm sure we've had discussion.  Exactly, you
23  know, what, I don't know, but I'm sure.
24      Q.  How many?

                                    4  (Pages 4 to 7)

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 8

1    A.  I -- it would have been back then.  So I --
2  I -- I don't know.  Maybe one or two.  I don't know.
3    Q.  Did you make any written record of those
4  discussions?
5    A.  I -- I don't -- I don't recall if I did.
6    Q.  Back at or around the time that you first
7  reviewed Officer Socha's complaint, did you discuss
8  its contents with any other Joliet Police Department
9  officers?
10   A.  Not specific, no.
11   Q.  Has -- oh, that's a different -- strike --
12 I'll withdraw that.
13        Until the time that you were appointed
14 interim chief and then chief, did Officer Socha ever
15 serve in your chain of command?
16   A.  I mean, everyone serves in my chain of
17 command in the department at that level.
18   Q.  Well, so that -- that's why I qualified the
19 question.  Before you became interim chief or chief,
20 did Officer Socha ever serve in your chain of
21 command?
22   A.  I guess the best answer is not directly.  I
23 mean, if we were on a scene and something needed to
24 be done, then, yes, they would be in my chain of

Page 9

1  command, but specifically, no.
2    Q.  Did you ever prepare any written performance
3  evaluations or ratings or reviews of her performance
4  as a police officer?
5    A.  I mean, as -- I don't know any specific, but
6  as -- as commander of operations, I would sign off on
7  all -- all performance evaluations.
8    Q.  After they were prepared by some other
9  supervising police officer?
10   A.  Yeah.  Correct.
11   Q.  Let me rephrase my question then.
12   A.  Sure.
13   Q.  Were you ever the original author of any
14 performance evaluation of Officer Socha?
15   A.  Not that I can recall, no.
16   Q.  Did you ever take issue with any other
17 officer's performance evaluation of Officer Socha?
18   A.  Not that I recall, no.
19   Q.  Based upon your review from time to time of
20 written performance evaluations or ratings of Officer
21 Socha, which you had to sign off, do you have any
22 opinions about her qualities as a police officer with
23 the Joliet Police Department?
24   A.  Like I said, I don't recall her evaluations

Page 10

1  to make that answer.  I don't know.
2    Q.  Fair to say then if we were to go to trial
3  tomorrow, you wouldn't have any such opinions?
4    A.  Not based off the evaluations, no.
5    Q.  You never -- you never directly supervised
6  her and you don't have any independent recollection
7  of evaluations offered by others of her performance,
8  correct?
9    A.  Yeah.  Not that I recall, no.
10   Q.  Did you attend the criminal trial of Officer
11 Nicholas Crowley?
12   A.  No.
13   Q.  Did you attend any part of it?
14   A.  I don't recall.  I mean, I know I was out in
15 the hallway.  I don't know if -- you know, so...
16   Q.  Were you out in the hallway for the whole
17 trial?
18   A.  No.
19   Q.  Were you in the courthouse where Officer
20 Crowley was tried when Officer Socha testified at
21 that trial?
22   A.  I don't recall that.
23   Q.  Were you in the courtroom watching and
24 listening to Officer Socha testify at Crowley's

Page 11

1  trial?
2    A.  I don't recall.
3    Q.  Did you detail any other Joliet officer to
4  attend that trial for purposes of reporting to you on
5  what was taking place?
6    A.  Detail, no.
7    Q.  I'll pick another word and say, did you
8  order anyone to do that?
9    A.  Order, no.
10   Q.  How about assign?
11   A.  No.  Not that I recall, no.
12   Q.  Was there any Joliet officer who attended
13 the Crowley trial who did, in fact, report back to
14 you on trial events?
15   A.  I mean, without, I mean, remembering
16 specifically, I'm sure whoever handled the case did
17 from investigations.
18   Q.  Do you remember who that was?
19   A.  Well, I mean, it would -- it would have been
20 Sergeant Grizzle.
21   Q.  Did Sergeant Grizzle provide you with daily
22 reports of what was taking place in the Crowley trial
23 as it was ongoing?
24   A.  He -- I mean, I don't recall specifically.

5 (Pages 8 to 11)

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 12

1  I know he did give me some information.  Whether it
2  was daily or not, I don't know.
3      Q.  Why?
4      A.  Why -- why what?
5      Q.  Why did he provide you with information
6  about Crowley's trial as it was ongoing?
7      A.  Well, because all the detectives give us
8  summaries of their trials when they're -- when you're
9  in charge of the unit, plus it also involved officers
10  from our department.
11      Q.  Well, even if it wasn't something that you
12  had ordered or assigned Grizzle to do, it was
13  something that he was expected by you to do?
14      A.  Correct.
15      Q.  Did Grizzle provide you with any report of
16  Officer Socha's testimony at the Crowley criminal
17  trial?
18      A.  Not that I can recall.
19      Q.  Were you present in court when the verdict
20  was rendered in Crowley's criminal trial?
21      A.  I don't believe I was.
22      Q.  Did Grizzle report to you on the verdict of
23  the Crowley trial?
24      A.  I'm -- I'm sure he did.  I don't recall,

Page 13

1  though.
2      Q.  Well, my next question was going to be, what
3  do you recall him reporting to you?
4      A.  That -- whatever -- I mean, it was the not
5  guilty verdict, I guess.
6      Q.  In any way did Grizzle ever communicate to
7  you his personal opinions about that verdict?
8      A.  Not that I recall.
9      Q.  Did Grizzle ever report to you his personal
10  opinions about the role that Socha's testimony played
11  in the outcome of that trial?
12      A.  Not that I recall.
13      Q.  Did you ever discuss the trial with Lorinda
14  Lamken from the state appellate prosecutors' office?
15      A.  Not that I recall.
16      Q.  What is your status with the Joliet Police
17  Department?
18      A.  I'm retired.
19      Q.  When did you retire?
20      A.  January 21st of 2021.
21      Q.  From what position did you retire?
22      A.  Chief of police.
23      Q.  Was the retirement a voluntary decision?
24      A.  I guess yes and no.

Page 14

1      Q.  Okay.  Well, explain to me, if you would,
2  each of those three answers to that one question.  In
3  what sense was it voluntary and in what sense was it
4  not voluntary?
5      A.  Well, I mean, I -- I signed the paperwork,
6  so I chose to.  So I guess that's voluntary.
7      Q.  In what sense was it other than voluntary?
8      A.  Well, the city manager stated that the mayor
9  didn't want me there anymore because he couldn't
10  control me.  So when the new city manager came, then
11  he was going to fire me.  So there'd be the
12  unvoluntary part of it.
13      Q.  Who was the city manager who communicated
14  that ultimatum to you?
15      A.  That would be Jim Hock.
16      Q.  Who was the new city manager to whom Jim
17  Hock was referring?
18      A.  Jim Capparelli.
19      Q.  And who was the mayor to whom the city
20  manager Hawk was referring?
21      A.  Mayor O'Dekirk.
22      Q.  How long did you serve as chief?
23      A.  For two years -- a little over two years.
24      Q.  Before that period, did you serve as interim

Page 15

1  chief?
2      A.  Yes.
3      Q.  For how long before you became chief were
4  you the interim chief?
5      A.  From August to December.
6      Q.  Of what year?
7      A.  Of '18.  So -- wait.  Yeah, '18.
8      Q.  And you replaced Chief Benton when you
9  became interim chief?
10      A.  Correct.
11      Q.  Prior to that, you were the deputy chief of
12  investigations?
13      A.  Correct.
14      Q.  How long were you the deputy chief of
15  investigations?
16      A.  Close to three or four years it was.
17  Exactly, I don't have the dates.
18      Q.  You were the deputy chief of investigations
19  when --
20      A.  When --
21      Q.  -- Crowley was tried?
22      A.  Correct.
23      Q.  You were the deputy chief of investigations
24  when the department investigated Officer Socha?

6  (Pages 12 to 15)

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 16

1      **A.** Correct.
2      **Q.** What role did you hold before you became
3   deputy chief of investigations?
4      **A.** Commander of operations.
5      **Q.** How long did you hold that position?
6      **A.** A little over five years.
7      **Q.** And what position did you hold before that?
8      **A.** Lieutenant of the tactical narcotics unit.
9      **Q.** How long did you hold that position?
10     **A.** Maybe a couple years. I don't know exact.
11     **Q.** What did you do -- what position did you
12   hold before that?
13     **A.** Lieutenant in operations, patrol.
14     **Q.** How long did you hold that position?
15     **A.** Maybe four years. I don't know exact.
16     **Q.** And what position did you hold before that?
17     **A.** Sergeant of the tactical unit.
18     **Q.** What position did you hold before that?
19     **A.** Sergeant of operations.
20     **Q.** Before that?
21     **A.** Tactical officer.
22     **Q.** Before that?
23     **A.** NOPT officer, neighborhood policing.
24     **Q.** Before that?

Page 17

1      **A.** Patrol officer.
2      **Q.** How long were you a patrol officer?
3      **A.** Before I got in NOPT. Probably four, five
4   years.
5      **Q.** Was patrol officer your first position with
6   the department?
7      **A.** Correct.
8      **Q.** When did you start with the department?
9      **A.** 1991.
10     **Q.** Was that your first job in policing?
11     **A.** Yes.
12     **Q.** What's your highest level of formal
13   education?
14     **A.** A bachelor's degree in business
15   administration.
16     **Q.** From what institution?
17     **A.** Illinois Benedictive University.
18     **Q.** And what year did you achieve that?
19     **A.** I want to say 2017.
20     **Q.** Did you personally author any of the --
21     **A.** I'm sorry. I'm sorry. That would have been
22   before that. I apologize. It would have been maybe
23   2013. I don't know exactly. I could get that for
24   you, though.

Page 18

1      **Q.** Did you personally author any of the
2   department's general orders?
3      **A.** Not -- not -- well, not personally author,
4   no.
5      **Q.** Did you personally revise or update any of
6   the department's general orders?
7      **A.** Yes, I was involved in the revision of some
8   general orders.
9      **Q.** Which?
10     **A.** I -- I don't know exact. They're revised a
11   lot, so...
12     **Q.** In what position or positions were you
13   involved in revising or updating general orders?
14     **A.** I mean, it could go all the way to when I
15   was a patrolman. I helped revised them. So just all
16   different positions.
17     **Q.** While you were with the department, was
18   there a specific process by which general orders were
19   drafted, updated, or revised?
20     **A.** Yeah. I mean, it's -- it's all different.
21   There's new laws that they have to put in there, so
22   that happens with new laws. Just updated stuff that
23   just has to be, you know, put to the new time frame,
24   stuff like that. So nothing specific. Just when

Page 19

1   they need to be updated, then -- then we'd have our
2   CALEA officer review other departments' general
3   orders for the best practices and update them.
4      **Q.** Beginning say in January of 2018, was there
5   any particular officer or established group of
6   officers tasked with drafting, updating, or revising
7   general orders?
8      **A.** Nobody specific, no. But the research would
9   be done by our CALEA officer.
10     **Q.** By what kind of officer?
11     **A.** CALEA, our accreditation officer.
12     **Q.** In the year 2018, who was that officer?
13     **A.** It would be Officer Coleman.
14     **Q.** Are you familiar with a General Order 16-1,
15   the subject of which is evidence and property
16   management, that was in effect at the Joliet Police
17   Department beginning at least by 1 May of 2018 and
18   continuing through that calendar year?
19     **A.** Not offhand after -- no, I haven't looked at
20   it in a long time, so, no, I don't know.
21     **Q.** What was the BEAST --
22        MR. ADAMS: And that, Michelle, is all caps.
23   It's an acronym.
24   BY MR. ADAMS:

7 (Pages 16 to 19)

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 20

1    Q.  -- bar coding and evidence handling system?
2    A.  Is that a question or description?
3    Q.  That's a question.
4    A.  Well, you just described what it is.  It's
5  an evidence bar coding.
6    Q.  What's the purpose of the BEAST bar coding
7  and evidence handling system?
8    A.  To keep track of evidence.
9    Q.  Are you aware generally, even if you're not
10  aware of any of the specific terms, that in May of
11  2018, General Order 16-1 relating to evidence and
12  property management was in effect at the Joliet
13  Police Department?
14    A.  I'm sure there was a policy on it, correct.
15    Q.  When did you first learn that the department
16  was investigating Officer Socha?
17    A.  I don't have the date.  I don't know.
18    Q.  How did you first learn that?
19    A.  From Sergeant Grizzle.
20    Q.  How did Sergeant Grizzle first communicate
21  that fact to you?
22    A.  I'm guessing in person.
23    Q.  Was anyone else present when he communicated
24  that fact to you for the first time?

Page 21

1    A.  I don't remember.
2    Q.  What did he tell you?
3    A.  Just that a special prosecutor wanted me to
4  get a search warrant for her phone due to text
5  message threats.
6    Q.  Prior to that, had you any information about
7  the text messages or the special prosecutor's
8  interest in investigating Officer Socha?
9    A.  No, not that I recall.
10    Q.  Did Grizzle come to you to approve the
11  issuance of a warrant?
12    A.  No.
13    Q.  What did he come to you for?
14    A.  To keep me informed that she wanted him to
15  get a warrant.
16    Q.  Within the department, was Grizzle required
17  to obtain approval from anyone in order to seek such
18  a warrant?
19    A.  From the judge.
20    Q.  Okay.  I mean, I -- that's a bad question by
21  me.  Before he approached the judge with an
22  application for a warrant, was he required to get any
23  clearance from anyone in the department?
24    A.  No, not clearance.  I mean, just inform me,

Page 22

1  just like anybody else with an ongoing case, what's
2  going on.
3    Q.  Was he required to follow the direction of
4  the so-called special prosecutor or Lorinda Lamken in
5  this case?
6    A.  Yes.
7    Q.  When Grizzle came to you and told you that
8  Lamken wanted him to obtain a search warrant, of what
9  was he to obtain a search warrant?
10    A.  For her cell phone.
11    Q.  For anything else?
12    A.  Not that I recall.
13    Q.  Did he give you any factual background
14  regarding the events leading to the special
15  prosecutor's direction to obtain a warrant for
16  Officer Socha's cell phone?
17    A.  I'm sure he did.  Specifically, I -- and
18  what, I don't.
19    Q.  How long did that conversation last in which
20  Grizzle first informed you that the special
21  prosecutor had directed him to attempt to obtain a
22  search warrant for Officer Socha's phone?
23    A.  Just as long as it would take him to tell
24  me.  So I don't know.  A minute or two.

Page 23

1    Q.  Did you make any written record of that
2  conversation?
3    A.  Not that I recall.
4    Q.  Did you direct Grizzle to make any written
5  record of that conversation?
6    A.  It's part of his case file, so, yeah, he
7  would make a record of it.
8    Q.  Is that something that you specifically
9  recall directing him to do, or is that something that
10  you would have expected him to --
11    A.  Are you talking about -- I'm sorry.  Are you
12  talking about a record of her telling me to get the
13  warrant?  Is that what you mean?  I'm sorry.
14    Q.  Of that conversation that he had when he
15  came to --
16    A.  Oh, with me?
17    Q.  -- to you.  Yes, sir.
18    A.  No.  It doesn't have to -- I mean, he
19  doesn't have to make a written record of that.
20    Q.  Do you recall when in relationship to the
21  execution of the warrant that was ultimately
22  obtained, Grizzle first came to you and told you that
23  the special prosecutor had directed him to seek a
24  warrant for Officer Socha's phone?

8  (Pages 20 to 23)

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 24

1          A.  A day or two maybe.
2          Q.  After that, what is the next event about
3   which you recall learning in the sequence of the
4   events of the department's investigation of Officer
5   Socha?
6          A.  Probably that he served a warrant and got
7   the phone, about -- probably the next.
8          Q.  At the time these events were occurring, as
9   a detective sergeant in the investigations division,
10  Grizzle reported directly to you?
11         A.  There's a lieutenant.
12         Q.  Who was that lieutenant?
13         A.  Lieutenant Mike Batis.
14         Q.  Is there a reason of which you're aware that
15  Grizzle first approached you with the information
16  that the special prosecutor had directed him to
17  obtain -- attempt to obtain a warrant for Socha's
18  phone rather than going through Batis?
19         A.  I don't know that he didn't go through
20  Batis, so I can't answer that.
21         Q.  Did Batis ever report that fact to you?
22         A.  Yeah, we discussed it.
23         Q.  When?
24         A.  I -- at the time that it was told to me.

Page 25

1          Q.  At the time Grizzle told you about it?
2          A.  I -- yeah, I believe so.  It might have been
3   before that.  I don't know exactly, but yeah.
4          Q.  What -- what did Batis tell you?
5          A.  The same -- same information.
6          Q.  Did Batis tell you how he knew that the
7   special prosecutor had directed Grizzle to attempt to
8   obtain a warrant for Socha's phone?
9          A.  I don't recall if he told me.  I don't think
10  I asked.
11         Q.  Did you make any written record of your
12  conversation with Batis about that?
13         A.  No.
14         Q.  Did Batis ever make any written record of
15  that conversation that you would have seen?
16         A.  No, I haven't seen anything.
17         Q.  When you learned that the search warrant had
18  been obtained and executed and that Detective
19  Sergeant Grizzle had taken Socha's cell phone into
20  custody, who told you that?
21         A.  I -- I believe Grizzle would have told me
22  that.
23         Q.  What, if anything, did he tell you about the
24  circumstances of the execution of the warrant and the

Page 26

1   seizure of the phone?
2          A.  I don't recall exactly what he said.  Just
3   that he has it.
4          Q.  Did you make any record of that
5   conversation?
6          A.  Not that I recall.
7          Q.  Did -- have you ever seen any record of that
8   conversation in which Grizzle told you he had seized
9   Socha's phone that was prepared by Grizzle?
10         A.  I don't remember.
11         Q.  Have you ever seen any written record of
12  that conversation prepared by anyone else who
13  participated in the conversation?
14         A.  Not that I remember.
15         Q.  Have you ever seen any written record of
16  anyone other than Grizzle memorializing the facts and
17  circumstances of the execution of the warrant and the
18  seizure of the phone?
19         A.  Not that I remember.
20         Q.  Have you ever discussed those events with
21  then Lieutenant, now Deputy Chief Brown?
22         A.  No.
23         Q.  Did Grizzle tell you that there was anything
24  noteworthy about the circumstances of the execution

Page 27

1   of the warrant and the seizure of Socha's phone?
2          A.  Not that I recall.
3          Q.  Did he tell you anything about the manner in
4   which she responded to the issuance of -- I should
5   say, the service of the warrant and the direction
6   that she surrender her phone?
7          A.  I don't -- not that I can recall or
8   specifics, no.
9          Q.  When Grizzle told you that he had executed
10  the warrant and seized the phone, what, if anything,
11  did he tell you he intended to do with it?
12         A.  What the search warrant says, search it, I
13  believe.
14         Q.  What, if anything, did he tell you about how
15  he intended to do that?
16         A.  I don't believe he did.  I don't know if he
17  did.
18         Q.  Did you give him any particular direction
19  about how to search the phone or for what on the
20  phone to search it?
21         A.  No, I would not know how.
22         Q.  At that time were you trained on and facile
23  with the use of the Cellebrite computer?
24         A.  No.

9  (Pages 24 to 27)

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 28

1    Q.  At that time were you trained on or facile
2  with the use of the Lantern computer?
3    A.  No.
4    Q.  At that time who, if anyone, did you
5  consider to be the department's duty experts relating
6  to using the Cellebrite and/or the Lantern computers
7  to search phones?
8    A.  I'd say Detective German had the training --
9    Q.  Anyone else?
10    A.  -- through our major crimes task force.
11    Q.  Anyone else?
12    A.  For the Lantern?  Gosh.  No, I think he'd be
13  the one considered.
14    Q.  At that time in May of 2018, what, if any,
15  was the state of Detective McKinney's training and
16  capabilities with the Cellebrite computer?
17    A.  I don't know.  Without his training records,
18  I really don't know.
19    Q.  Of what did a Joliet police officer's
20  training record consist in the May of 2018 time
21  frame?
22    A.  Rephrase that again.  I'm sorry.
23    Q.  Of what did an officer's training record
24  consist in the May of 2018 time frame?  Put

Page 29

1  differently, what kinds of information was kept in an
2  officer's training record?
3    A.  Yeah.  It'd be trainings they've attended,
4  either in state, out of state, stuff like that,
5  throughout their career.
6    Q.  Is the training record a discrete piece of
7  information in an officer's personnel file?
8    A.  Discrete?
9    Q.  A specific different either document or part
10  of a document in the larger personnel record.
11    A.  It's probably in their personnel record, but
12  there's also a search engine that has it.
13    Q.  So you believe that an officer's training
14  record could be queried specifically without need for
15  calling up all of the officer's personnel record?
16    A.  Yeah.  You could query their training.
17  There's a -- it's in employee records.  Now, is it
18  accurate and up-to-date?  I mean, I can't answer that
19  question.  If someone forgets to put something in,
20  you know what I mean?  I can't say it's exact, but
21  that most of their training records -- they should
22  all be in there, but most of them are.
23    Q.  In officers' records, how are disciplinary
24  records compiled?

Page 30

1    A.  Disciplinary would be -- there's -- like
2  sustained discipline would be in their file and then
3  just discipline -- of all discipline?  Like any
4  discipline incident would be in the internal affairs
5  computer.
6    Q.  Would you expect any formal discipline that
7  was meted out to an officer to be in both the
8  personnel record and the internal affairs computer
9  system?
10    A.  Yeah, it would be, and I don't know -- I
11  know there's an expungement period for some of those
12  records.  You'd have to ask someone in IA for that.
13    Q.  Prior to May of 2018, did you ever have
14  reason to initiate disciplinary proceedings against a
15  Detective McKinney relating to his accessing or
16  disseminating information?
17    A.  I may have if it's there.  I don't know the
18  exact dates or anything like that.
19    Q.  Do you have a specific recollection of
20  having done so?
21    A.  I know there's an investigation, yes, of him
22  doing so.
23    Q.  Do you remember when that investigation
24  occurred?

Page 31

1    A.  I -- I do not know when the date was on
2  that, no.
3    Q.  What do you remember about the subject and
4  particulars of that investigation?
5    A.  Gosh.  It was -- I don't know -- remember
6  specifics, but information about another officer,
7  that he was kind of using -- making fun of, I guess,
8  the officer, stuff like that, just inappropriate.
9    Q.  Was the information that McKinney used
10  inappropriately or the inappropriate information
11  sexual in nature?
12    A.  I don't recall exactly what it was.  I do
13  not know.
14    Q.  That is to say, what -- what officer
15  initiated the disciplinary proceedings against
16  McKinney?
17    A.  Say that again.  I'm sorry.
18    Q.  Who, meaning which officer or officers,
19  initiated the disciplinary proceedings?
20    A.  Oh, man.  Oh, man, I don't recall who the
21  officer was that did.  I just -- I just -- it might
22  come to me.  I'm sorry.  I just don't recall right
23  now.
24    Q.  Who was the officer or officers who

10  (Pages 28 to 31)

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 32

1  ultimately imposed discipline on McKinney?
2      A.  The final discipline would be from me.
3      Q.  Do you recall that in this instance with
4  McKinney, there was some final discipline imposed?
5      A.  I believe there was, yes.
6      Q.  Was that discipline suspension?
7      A.  Boy, I -- possibly.  I don't...
8      Q.  While you were deputy chief of
9  investigations, did you ultimately impose discipline
10  on any other detective based upon the improper
11  accessing or dissemination of information?
12      A.  I mean, I would not impose any discipline.
13  It's up to the chief to impose the discipline.
14      Q.  So you believe that when you, as you said, I
15  think, earlier ultimately imposed discipline on
16  McKinney, you were the chief at the time?
17      A.  Yes.
18      Q.  While you were the deputy chief of
19  investigations, you would certainly know about
20  discipline that was imposed on the detectives you
21  supervised, true?
22      A.  Sometimes.  Not always.
23      Q.  During that time, was any detective other
24  than McKinney disciplined for improperly accessing or

Page 33

1  disseminating information?
2      A.  I do not recall.
3      Q.  After Grizzle told you that he had executed
4  the search warrant for Socha's phone and seized the
5  phone, did he later tell you what, if anything, he
6  did with the contents of the phone?
7      A.  Searched -- searched the contents, I guess.
8      Q.  Did he tell you that he did that by
9  downloading the contents of the cell phone onto the
10  Cellebrite computer?
11      A.  Oh, yeah.  It would have had to have been
12  downloaded.  I just don't recall who -- if he did it
13  or had someone else do it for him.
14      Q.  Based upon what Grizzle told you, did you
15  understand that the entire contents of Socha's phone
16  were downloaded onto the Cellebrite computer?
17      A.  If that's the process, then, yes.  Like I
18  said, I -- I'm not familiar with the work using the
19  Cellebrite or the Lantern.  I was never trained in
20  it.  So if that's how it has to be done, then -- then
21  I guess it's correct.
22      Q.  Did Grizzle tell you -- separate and apart
23  from how you understand Cellebrite to work, did
24  Grizzle tell you whether he had downloaded all or

Page 34

1  less than all of the contents of Socha's phone onto
2  the Cellebrite?
3      A.  He just said he downloaded the phone.  I
4  don't know -- I don't know if he ever said Cellebrite
5  or what.  Just that it was downloaded.
6      Q.  Was that in a separate conversation from the
7  conversation in which he told you that he had seized
8  the phone?
9      A.  It would have had to have been, correct.
10      Q.  Where did the conversation in which Grizzle
11  told you that he had downloaded the contents of
12  Socha's phone onto the Cellebrite occur?
13      A.  Probably in the PD.
14      Q.  Can you be more specific about where in the
15  PD?
16      A.  Well, I don't remember when it was.  We were
17  probably in investigations, I'm guessing, my office
18  usually.
19      Q.  Was anyone else present?
20      A.  Not that I recall, no.
21      Q.  Did you make any written record of that
22  conversation?
23      A.  Not that I remember.
24      Q.  Have you ever seen any written record of

Page 35

1  that conversation generated by Detective Sergeant
2  Grizzle?
3      A.  If it's in the -- I mean, I'm sure I read
4  the police report back then.  So if it's in the
5  report, then yeah.
6      Q.  Incidentally, what are you doing now that
7  you're retired from the Joliet Police Department?
8      A.  Whatever my wife tells me to do.  I mean...
9      Q.  Are you -- are you gainfully employed in
10  your retired status?
11      A.  Right now, no.
12      Q.  Have you spoken with Detective Sergeant
13  Grizzle since your retirement?
14      A.  Yeah.  Yeah.  Uh-huh.
15      Q.  When?
16      A.  Sure.  A couple times since I've been gone.
17  And then I wished him happy Father's Day this week,
18  like I did with a bunch of people.
19      Q.  Did you reach out to him specifically for
20  that purpose?
21      A.  Yeah.
22      Q.  Is Detective Sergeant Grizzle a person with
23  whom you socialize from time to time?
24      A.  Talk to.  Not socialize.

11  (Pages 32 to 35)

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 36

1    Q.  Would you consider him to be a close
2  personal friend?
3    A.  No.
4    Q.  How many people did you call and wish happy
5  Father's Day to?
6    A.  Probably 30.
7    Q.  What was the next event in the Socha
8  investigation about which you learned or in which you
9  yourself participated?
10    A.  Was -- what time frame?
11    Q.  Sure.  The next event.  So Grizzle has told
12  you now that he has downloaded the contents of
13  Socha's phone onto the Cellebrite computer.  What is
14  the next event in sequence in the Socha investigation
15  that you can recall being told about or in which you
16  yourself participated?
17    A.  I know -- I know he showed me that he found
18  the text message that they were looking for, that
19  part.  I guess that would be next.
20    Q.  When did that occur?  I guess when did he
21  show you that he had found the text message they were
22  looking for in relationship to the conversation in
23  which he told you that he had downloaded the contents
24  of Socha's phone onto the Cellebrite?

Page 37

1    A.  I don't -- I don't know exactly.
2    Q.  When Grizzle told you that -- so he actually
3  showed you text messages that were downloaded from
4  Socha's phone, correct?
5    A.  Correct.
6    Q.  How many text messages did she -- did he
7  show you?
8    A.  Just a -- just a few, nothing...
9    Q.  Where were you when he showed you those text
10  messages?
11    A.  I believe at his desk.
12    Q.  On what computer device were you viewing
13  those text messages?
14    A.  It'd be his computer.
15    Q.  How, if you know, had the contents of
16  Socha's cell phone gotten from the Cellebrite
17  computer to Grizzle's computer?
18    A.  Flash drive.
19    Q.  Did you yourself at that time see the flash
20  drive?
21    A.  Yes.
22    Q.  And --
23    A.  I guess -- I don't know if it was at that
24  time, but I saw it, yes.

Page 38

1    Q.  When you refer to Grizzle's computer as,
2  quote, his computer, close quote, do you mean one
3  that he personally owned or a computer assigned to
4  him by the Joliet Police Department?
5    A.  A computer assigned to him by the Joliet
6  Police Department.
7    Q.  Did he have a personal computer device of
8  any kind with him while he was conducting the Socha
9  investigation?  And by personal, I mean one that he
10  owned, not that was assigned to him by the Joliet
11  department.  And by computer device, I mean of any
12  kind, phone, a desktop, a laptop, a tablet, any sort
13  of computer device.
14    A.  Not that I know of.
15    Q.  Did you ever view those text messages
16  directly on the Cellebrite computer terminal?
17    A.  No.
18    Q.  Was anyone present -- anyone other than you
19  and Grizzle present when you viewed the text messages
20  on Grizzle's computer?
21    A.  I don't believe so, no.
22    Q.  And was that at his desk in the
23  investigations unit?
24    A.  Correct.

Page 39

1    Q.  Was that a desktop, a laptop, a tablet?
2  What kind of computer device was that in which you
3  viewed --
4    A.  It's a desktop.
5    Q.  Say it again.
6    A.  A desktop, I believe -- yeah, a desktop is
7  what he had.
8    Q.  How many text messages from Socha's phone
9  did you review?
10    A.  I -- I said a couple maybe.  I don't -- just
11  the one in question really.
12    Q.  Beyond those text messages, at that time did
13  you review any other data that had been downloaded
14  from Socha's phone?
15    A.  No.
16    Q.  When Grizzle showed you those couple of text
17  messages, was it your understanding that he had
18  downloaded the contents of Socha's cell phone onto
19  the Cellebrite and then downloaded the contents of
20  Socha's phone from the Cellebrite to that flash drive
21  that he then put into his Joliet department-issued
22  desktop for viewing?
23    A.  I believe it was -- it was -- the only copy
24  was on that flash drive.

12  (Pages 36 to 39)

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 40

1    Q.  And that -- that copy had -- what I'm trying
2  to get straight is --
3    A.  Yeah, go ahead.
4    Q.  -- the sequence was Socha's phone was
5  seized.  Its contents were downloaded onto the
6  Cellebrite, and then Grizzle downloaded the contents
7  of Socha's phone from the Cellebrite to this thumb
8  drive.  And when he showed you these text messages
9  that had come from her phone, it was off of the thumb
10  drive that he loaded from the Cellebrite?
11    A.  That's what I believe, yes.
12    Q.  At that time -- strike that.
13      When was your viewing those text messages in
14  relationship to the seizure of the phone?
15    A.  I don't recall exactly when it was.
16    Q.  Do you have any understanding of the time
17  that elapsed between the seizure of the phone and the
18  download of its contents onto the Cellebrite?
19    A.  No.  I wasn't there for that.  I don't know.
20    Q.  How much time elapsed between the download
21  of Socha's phone onto the Cellebrite and Grizzle's
22  subsequent downloading of those same contents onto
23  this flash drive from which he showed you text
24  messages on his desktop?

Page 41

1    A.  I don't know.
2    Q.  Are the intervals between those events
3  matters of hours or days or weeks?
4    A.  It depends on how long to download all that.
5  I don't know.  You'd have to ask the guys that do
6  that.
7    Q.  How long did it take for Grizzle to show you
8  the text messages that he had downloaded onto this
9  flash drive from Socha's phone?
10    A.  Seconds.  I don't know.  He just showed me
11  the screen.  It was there, so...
12    Q.  What did Grizzle tell you about the
13  whereabouts of that flash drive between the time that
14  he had downloaded the contents of Socha's phone onto
15  it and showing you the text messages from Socha's
16  phone that were on that flash drive?
17    A.  I'm trying to remember, but I think -- I
18  think -- you'd have to ask Grizzle, but he -- he gave
19  me the flash drive, and it was in my office in the
20  locked cabinet.  Now, I may be mistaken.  It may --
21  it may have been downloaded on his computer right
22  away and then he gave me the flash drive right away
23  because it was locked in my office.  It was the only
24  copy of anything, so -- the reason I'm saying flash

Page 42

1  drive, because that's the only thing I know it to be
2  on because I have it, you know, or had it in my
3  office, locked in there so no one can view it, so...
4      You see what I mean?  I'm trying to
5  pinpoint.  He may have given it to me right after it
6  was downloaded, and he may have put it on his
7  computer before he did, and it might be -- I know it
8  was on his computer once the -- the RCFL, other
9  things.  So it might have already been on there.  You
10  know what I mean?  You'd have to ask him on the total
11  time frame of that.
12    Q.  Okay.  Well, I'm -- I'm asking you, and I --
13  I -- as I indicated at the outset, if the answer is,
14  I don't know, that's a fair answer.  So I'm trying
15  to --
16    A.  Yeah.
17    Q.  -- get what you remember and don't remember,
18  what you know and what you don't know.
19    A.  Correct.
20    Q.  So what I'm trying to understand is --
21    A.  Sure.
22    Q.  -- Grizzle downloaded the contents of
23  Socha's phone from the Cellebrite to this flash
24  drive.

Page 43

1    A.  Right.
2    Q.  And he showed you text messages that were
3  part of that download with that thumb drive in his
4  own desktop.
5    A.  I might -- that's what I'm saying.  I'm
6  saying I may be mistaken on that.  He may have just
7  shown me off his computer now.  It's been a long
8  time, so I'm trying to -- you know, I just want to be
9  correct on this.  That's all.
10    Q.  Do you know one way or another whether when
11  you viewed the text messages on Grizzle's desktop,
12  they were loaded onto that desktop already or whether
13  Grizzle was showing you from this thumb drive that he
14  had created?
15    A.  I guess the best to say, I don't know.
16    Q.  At some point, you understood that Grizzle
17  downloaded the contents of Socha's phone onto his own
18  desktop, correct?
19    A.  Correct.
20    Q.  Whether he -- strike that.
21      And you don't know whether that occurred
22  before or after he first showed you the text messages
23  that were part of that download, correct?
24    A.  That's fair, yeah.

13  (Pages 40 to 43)

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 44

1    **Q.** At some point, you took control of the thumb
2  drive that had been in Grizzle's possession, correct?
3    **A.** Correct.
4    **Q.** Who gave that thumb drive to you?
5    **A.** Grizzle.
6    **Q.** Why did he give it to you?
7    **A.** To lock in my office.
8    **Q.** Did he do that at your direction?
9    **A.** Probably. I mean, I don't recall exactly
10 how the conversation went, but yeah.
11   **Q.** Was that an oral direction, or did you give
12 him a written order to do that?
13   **A.** No. It was oral, in person.
14   **Q.** During the time that the download from
15 Socha's phone was on Grizzle's desktop, how did
16 Grizzle secure his desktop?
17   **A.** I mean, they're all password protected,
18 encrypted, all that. You have to ask our IT people
19 on that.
20   **Q.** Where specifically in your office did you
21 store the flash drive that Grizzle gave you?
22   **A.** In a locked cabinet.
23   **Q.** Where in the -- in the office was that
24 locked cabinet?

Page 45

1    **A.** Let's see. So -- southwest corner, I
2  believe.
3    **Q.** Was the locked cabinet labeled in any way?
4    **A.** No.
5    **Q.** Was it a key lock, a padlock --
6    **A.** Key lock.
7    **Q.** -- punch code?
8       Who had keys to that lock?
9    **A.** I did.
10   **Q.** Did the Joliet chief of police have a key to
11 that lock?
12   **A.** No.
13   **Q.** Did Lieutenant Batis have a key to that
14 lock?
15   **A.** No.
16   **Q.** Did anyone else at the Joliet Police
17 Department have a key to that lock?
18   **A.** Not that I'm aware of, no.
19   **Q.** Did anyone else on the planet that you're
20 aware of have a key to that --
21   **A.** Not that I'm aware of.
22   **Q.** Other than that flash drive, at the time you
23 put the flash drive in that cabinet, in that locked
24 cabinet, what else did you keep there?

Page 46

1    **A.** There was other -- other evidence and case
2  files from other officer incidents in that cabinet,
3  from previous deputy chiefs in that office.
4    **Q.** Had you yourself put any other evidence in
5  that locked cabinet, that is, other than this flash
6  drive on which Socha's -- the contents of Socha's
7  phone had been loaded?
8    **A.** The -- all the hard drives are in there from
9  computer downloads and phone downloads.
10   **Q.** Stored how?
11   **A.** What do you mean, stored how?
12   **Q.** The hard drives, you mean the actual
13 computer devices as opposed to a storage device like
14 a disc or a flash drive?
15   **A.** Hard drives -- yeah. Hard drives that were
16 copied by the RCFL.
17   **Q.** And to be clear, I'm talking about at the
18 moment in time that you first put the flash drive
19 with the contents of Socha's phone --
20   **A.** Just the flash drive at that point.
21   **Q.** What flash drive?
22   **A.** What you just said.
23   **Q.** Okay. So when you put that flash drive in
24 the cabinet, that was the only thing in there?

Page 47

1    **A.** No. I said there was evidence in there from
2  other officer incidents from previous deputy chiefs
3  in that cabinet.
4    **Q.** Okay. Any time we're not communicating like
5  this, under the rules --
6    **A.** No, it's okay.
7    **Q.** -- it's my fault, not your fault.
8    **A.** No, no. It's okay.
9    **Q.** At the time you put this flash drive into
10 that cabinet --
11   **A.** Yes.
12   **Q.** -- was there any other -- anything else in
13 that cabinet that you had put there?
14   **A.** There may have been other things. I don't
15 know. But there was other evidence, I know, in there
16 from other officer cases. So, yes, there's other
17 stuff in there.
18   **Q.** And other than by describing it in that
19 general way, other stuff, you can't identify it with
20 any particularity, that is, the -- this evidence
21 relating to the investigation of that officer or so
22 forth, because you didn't put it there?
23   **A.** Right. Right. I got what you're saying.
24   **Q.** Is that correct?

14 (Pages 44 to 47)

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 48

1    A. The other evidence, yeah, I didn't review
2  the other stuff that's in there, no.
3    Q. You were the deputy chief of investigations
4  when Crowley was investigated?
5    A. Yes. Correct.
6    Q. Before you put the flash drive with the
7  contents of Socha's phone into that cabinet for
8  the first time, had you ever done anything to
9  inventory or clear out that cabinet of old, stale,
10  unneeded materials?
11    A. Not that I recall, no.
12    Q. Who was the deputy chief of investigations
13  who you succeeded?
14    A. Brian Benton.
15    Q. How long had he been in that post before he
16  became chief?
17    A. I don't know exact. Maybe four years. Four
18  or five years. Maybe even less.
19    Q. In May of 2018, was there any written
20  authority promulgated by the Joliet Police Department
21  that authorized the deputy chief of investigations to
22  keep any evidence in a cabinet in his own office of
23  which he and no one else held a key?
24    A. I don't know if there's anything written.

Page 49

1    Q. Before you took that flash drive and put it
2  in that cabinet, was it logged into the BEAST
3  evidence management system?
4    A. I -- I don't know if it was or not.
5    Q. After you took that flash drive from
6  Grizzle, did you ever log it into the BEAST evidence
7  management system?
8    A. No.
9    Q. Did you ever direct anyone else at the
10  police department to do that?
11    A. No.
12    Q. Why didn't you log that flash drive into the
13  BEAST evidence management system or direct some
14  subordinate to do it?
15    A. Because it was sensitive information about
16  an officer, so it's kept in my office, like, you
17  know, previous cases with officers.
18    Q. Was there any written authority within the
19  Joliet Police Department that authorized the deputy
20  chief of investigations to store evidence about
21  investigations of other officers in that cabinet?
22    A. Written, you said? I don't know. I just --
23  I don't know.
24    Q. Did you take control of that flash drive at

Page 50

1  the same time that you viewed the text messages that
2  you viewed that had been downloaded from Socha's
3  phone on Grizzle's desktop?
4    A. Well, like I explained, I -- I said I was
5  mistaken with that, and I said I believe I got it
6  from him right after it was downloaded and after he
7  put it on his computer. So it'd be just on his
8  computer.
9    Q. And I appreciate that you made that
10  correction. And what I'm trying to get at is, did
11  all that happen at one time in one meeting where you
12  didn't --
13    A. I don't think it -- I don't think it was all
14  at the same time, no. No.
15    Q. So by the time you viewed these text
16  messages on Grizzle's desktop, on some prior
17  occasion, you had already taken custody and control
18  of the flash drive, correct?
19    A. Yes, that's correct.
20    Q. Okay.
21    A. There you go. Yes.
22    Q. How long before you viewed the image -- the
23  text messages on his desktop, had you taken control
24  of the flash drive?

Page 51

1    A. Like I said, I don't recall exactly when,
2  and there may be -- like you said, there may be --
3  Grizzle would probably know when he gave it to me.
4  There might be a memo to it. I don't know. I don't
5  have access.
6    Q. Can you give an estimate as to whether it
7  was hours, days, weeks?
8    A. I wouldn't say probably more -- more -- more
9  than hours. I would say probably maybe days or so
10  just to go through stuff.
11    Q. At the point in time that you took control
12  of that first flash drive that Grizzle told you
13  contained the download from Socha's phone, what, if
14  anything, did Grizzle tell you about whether there
15  were other copies of the download on other storage
16  devices, flash drives or discs?
17    A. Well, that's the only one he said that there
18  was.
19    Q. Did he tell you why he had saved the
20  contents of the -- Socha's phone to his desktop and
21  to this flash drive?
22    A. Yeah. He saved it to his desktop because
23  he's -- the case agent has to review it for the case,
24  and he saved it to the flash drive, in case something

15  (Pages 48 to 51)

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 52

1    happened to his computer, then he'd still have it.
2        Q.   Is that something you told him to do?
3        A.   No.
4        Q.   Is that something that is prescribed by any
5    written authority in the Joliet Police Department?
6        A.   I don't know if it's that or if it's in
7    their Cellebrite training or that. I don't know.
8        Q.   Did Grizzle tell you why he was showing you
9    the text messages that had been downloaded from
10   Socha's phone?
11       A.   Because it was part of the search warrant we
12   was looking for.
13       Q.   But he told you that he already executed and
14   downloaded the contents of the phone and found the
15   text messages, correct?
16       A.   When he showed it to me is when he told me
17   he found it.
18       Q.   Were you personally directing that
19   investigation?
20       A.   No. Over- -- overseeing, I guess, as the --
21   as the deputy chief, but not directing nothing, no.
22       Q.   Did you ask to see the text messages, or did
23   Grizzle in some way get your attention to show them
24   to you?

Page 53

1        A.   No, I don't recall, but I'm sure when he
2    found them, he -- he told me he found them.
3        Q.   And did you then ask to see them, or did he
4    wave you over and somehow get your attention and have
5    you look at the text messages?
6        A.   I don't -- I don't know. He may have -- I
7    mean, he probably came to my office and said he found
8    them and then went and looked at them.
9        Q.   Was there any law enforcement purposes
10   related to the Socha investigation that you needed to
11   see those text messages?
12       A.   Yeah. I'm in charge of investigations, so,
13   yeah, definitely.
14       Q.   So I appreciate that's your role there.
15       A.   Yeah.
16       Q.   So as far as the ongoing direction of the
17   investigation is concerned, was there any particular
18   purpose for you reviewing those text messages?
19       A.   Just to prove the search warrant was valid.
20       Q.   You were not the one who would be making any
21   charging decisions, were you?
22       A.   No.
23       Q.   Did Grizzle show you the contents of any of
24   his warrant application materials before they were

Page 54

1    presented to any Will County judge?
2        A.   No.
3        Q.   Wasn't the time to determine whether the
4    warrant was valid before it was executed?
5        A.   Well, yeah. That's why the judge signed it.
6        Q.   Was there any other particular purpose for
7    which you viewed the text messages that were
8    downloaded from Socha's phone?
9        A.   Yeah, because I'm his boss and I oversee all
10   the investigations, just like I view evidence in
11   other crimes.
12       Q.   And you've already told us that, and I
13   appreciate that. And that's why I asked -- phrased the
14   question about a particular purpose. Was there some
15   specific role in that investigation that you would
16   dictate next steps or in some way -- some follow-up
17   that you would initiate based upon your review of
18   those text messages?
19       A.   No. Probably more so to the fact that I
20   have a boss that I have to report to, and I'm sure I
21   told the chief that he found the text messages on the
22   phone, so...
23       Q.   Is there any other particular reason that
24   you needed to see those text messages?

Page 55

1        A.   Just that my people are -- were in charge of
2    the investigation.
3        Q.   I get that. And that's all in our records.
4    So I'm just trying to determine whether there's any
5    other particular reason for you to have looked at
6    those text messages.
7        A.   No. I mean, just -- I'm his boss, and
8    that's what -- I mean, I do it on every case, so --
9    you know, I go to all their crime scenes. Any time
10   there's a shooting, a homicide, I'm on the scene. I
11   mean, it's part of being a boss.
12       Q.   So it'd be fair to say that the only reason
13   for you to look at those text messages was in
14   relationship to your supervisory role?
15       A.   Correct.
16            MS. PROCTOR: You know, I'm going to lodge a
17   late objection. That misstates the witness's prior
18   testimony.
19   BY MR. ADAMS:
20       Q.   What do you recall your next involvement in
21   the Socha investigation, if any, being?
22       A.   It would probably be when the lawsuit was
23   filed.
24       Q.   Was Grizzle's computer or its contents

16  (Pages 52 to 55)

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 56

1    logged into the BEAST system?
2        A.   His computer, no.
3        Q.   Sometime after you viewed the text messages
4    on Grizzle's computer, did you communicate with
5    Deputy Chief Jensen in reference to Officer Socha
6    telling him that she had heard that officers in your
7    department had been sharing photos and videos that
8    had been downloaded from her phone with one another?
9        MS. PROCTOR:  I'm just -- I'm going to lodge
10   an objection based on lack of foundation and form.
11       MR. CLARK:  I'll join in that objection.
12       MR. ADAMS:  You can answer.
13       MR. CLARK:  Hall, also --
14       MS. PROCTOR:  Let's explain to -- yeah, I
15   think it would be helpful to explain to the witness
16   how objections work.  Mr. Roechner --
17       MR. CLARK:  Sir --
18   BY MR. ADAMS:
19       Q.   These lawyers can object all they want, and
20   you can still go ahead and answer the questions.  So
21   you can answer that question.
22       MS. PROCTOR:  Assuming you can, obviously.
23       THE WITNESS:  Right.  And what was the
24   question again?

Page 57

1    BY MR. ADAMS:
2        Q.   Was there a point after Grizzle showed you
3    the text messages on his computer, the text messages
4    that had been downloaded from Socha's cell phone,
5    where you were contacted by Deputy Chief Jensen in
6    reference to Officer Socha telling him that she,
7    Officer Socha, had heard that investigations
8    personnel had been sharing personal pictures or
9    videos that were on Socha's phone?
10       A.   No to that, but he did contact me to say
11   that it was still on the Cellebrite computer, the
12   contents of the phone.
13       MR. CLARK:  Hey -- hey, Hall, it sounds like
14   you're about to start another topic area.  Would it
15   be possible to take like just a couple minute
16   restroom break?
17       MR. ADAMS:  That's fair.  So we can all go
18   mute and silence, dark on the screen.  Keep your line
19   open.
20       MS. PROCTOR:  Let's take five.
21       MR. ADAMS:  Keep your line open, and we'll
22   all reconvene here and come back on in five minutes.
23   Okay?
24       THE WITNESS:  Okay.

Page 58

1        MR. CLARK:  Thank you.
2        (Whereupon, a break was taken,
3            after which the following
4            proceedings were had:)
5    BY MR. ADAMS:
6        Q.   All right.  You all set, Mr. Roechner?
7        A.   Yeah.
8        MR. ADAMS:  Could you read back the last
9    question, Michelle, just so we can queue up to the
10   right place?
11       (Whereupon, the record
12           was read as requested.)
13       MR. ADAMS:  Did you answer that question?
14       THE COURT REPORTER:  He did.
15       THE WITNESS:  Yeah.  So -- okay.  So like I
16   said, at first he called -- when he called, he said
17   it was on the Cellebrite, and, you know, when I said
18   it couldn't be on the Cellebrite because I have the
19   only copy in my office, and I said, why is he asking?
20   And then that's when he said that she had made
21   accusations that some of the detectives had been
22   sharing her pictures and videos.
23   BY MR. ADAMS:
24       Q.   Okay.  Do you recall when Deputy Chief

Page 59

1    Jensen called you and said those things to you?
2        A.   I do not.
3        Q.   Do you recall when he did that in reference
4    to when you took control of the one flash drive that
5    was given to you by Detective Sergeant Grizzle that
6    you then put in the cabinet in your office?
7        A.   It would have been well after that.  I don't
8    know when.
9        Q.   Did you say well after?
10       A.   Yeah, yeah.  Like, you know, definitely
11   after.
12       Q.   Was it also after you had viewed the text
13   messages from Socha's phone on Detective Sergeant
14   Grizzle's desktop computer?
15       A.   It may have been.
16       Q.   And did Deputy Chief Jensen tell you that he
17   had learned from Socha that she had heard that
18   investigations personnel had been sharing personal
19   pictures and videos from her cell phone?
20       A.   Yeah.  When he called it, it was on his
21   Cellebrite, like I said, yes.
22       Q.   And just to be clear, Deputy Chief Jensen
23   told you that he had heard that from Socha?
24       A.   I believe so.

17  (Pages 56 to 59)

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 60

1    Q.  Did he tell you that he had heard it from
2  anyone else?
3    A.  I -- I -- not that I know of.
4    Q.  And what did you say when he told you that?
5    A.  Well, he said it was on the Cellebrite.  I
6  said it's not possible because I have the only copy
7  in my office, so...
8    Q.  And what did he say to you?
9    A.  He said that it was.  It was on there, I
10  mean.
11    Q.  Did you take any steps yourself to determine
12  whether the contents of Socha's cell phone were or
13  were not still accessible on the Cellebrite computer?
14    A.  No.  I was out of town.  The -- Deputy Chief
15  Jensen was taking care of that.
16    Q.  What did Deputy Chief Jensen tell you he
17  intended to do to take care of that?
18    A.  Get it taken off of there.
19    Q.  Did he tell you who he intended to have take
20  the contents of Socha's phone off of the Cellebrite?
21    A.  I don't know if he said who he intended, but
22  I think it would end up being Sergeant Gavin at the
23  time that did it for him.
24    Q.  Did Jensen tell you why Gavin as opposed to,

Page 61

1  for example, German or Botzum?
2    A.  I don't -- I don't know if he couldn't get
3  ahold of them or not.  I don't -- I don't recall.
4  I'm sure there's a reason.
5    Q.  Did Jensen tell you with any more
6  specificity how it was that he intended to get the
7  contents of Socha's phone off of the Cellebrite?
8    A.  No.  Just that he was going to have it done.
9    Q.  Between the time that -- strike that.
10    Up until that time, was it your
11  understanding that the contents of Socha's phone were
12  removed from the Cellebrite when they were downloaded
13  by Grizzle onto that flash drive that Grizzle then
14  gave to you that you then put into the cabinet in
15  your office?
16    A.  Yeah.  My belief was it was only on the
17  flash drive and on Grizzle's computer.
18    Q.  Had Grizzle said anything to you to give you
19  that belief?
20    A.  Well, yeah.  When I -- I got the flash
21  drive, he said it was the only copy.  So, yeah, I
22  mean, in my mind that was the only copy besides on
23  his computer, so...
24    Q.  Did Grizzle say anything to you of an

Page 62

1  affirmative nature, that in downloading the contents
2  of Socha's phone from the Cellebrite to that flash
3  drive that he then gave to you, he had removed the
4  contents of Socha's phone from the Cellebrite, or did
5  you just infer that from what he told you?
6    A.  I don't believe we -- he told me he did, so
7  I believe I must have inferred that.
8    Q.  Up until the time that Jensen contacted you,
9  did you have any understanding one way or the other
10  about whether when contents of evidence that had been
11  downloaded to the Cellebrite were then downloaded
12  onto another storage device like a flash drive or a
13  disc, that that subsequent downloading operated to
14  remove them from the Cellebrite?
15    A.  I mean, that's -- that's what I had thought.
16  I mean, like I said, I'm not versed in it, though,
17  so...
18    Q.  When the downloaded contents of any computer
19  device were on the Cellebrite, how was access to that
20  downloaded information controlled?
21    A.  I don't know.
22    Q.  And that's because you yourself are
23  insufficiently familiar with how Cellebrite operated
24  to say, true?

Page 63

1    A.  I've never been trained, correct.
2    Q.  Okay.  When Jensen called you and told you
3  that Socha had come to her with her concerns about
4  the sharing of photos and videos from her phone, had
5  Jensen already -- did Jensen tell you whether he had
6  already taken the corrective action, or did he tell
7  you what he planned to do prospectively?
8    A.  I don't recall which -- whether it was
9  before or after.  I don't remember.
10    Q.  Whether before or after, did Jensen say
11  whether that corrective action included making
12  another copy of the contents of Socha's cell phone
13  from the data that was still in the Cellebrite?
14    A.  Yes, I believe it did, yes.
15    Q.  So assuming that whatever Gavin did to
16  remove the contents of Socha's phone from the
17  Cellebrite actually effectively did that, and that
18  what he did involved creating another copy of the
19  contents of Socha's cell phone onto a storage device,
20  whether a flash drive or a disc, at that point there
21  would have been three copies of the contents of
22  her phone in the investigations unit.  One was the
23  one in the cabinet in your office, the second one was
24  that on Grizzle's computer, and the third would have

18  (Pages 60 to 63)

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 64

1    been the one created by Gavin when he did what Jensen
2    asked him to do, correct?
3        A.   That's fair, yeah.
4        Q.   Do you have an understanding about the type
5    of storage device that Gavin used to store all of the
6    contents of Socha's phone that were still on the
7    Cellebrite, whether that was a flash drive or a disc
8    or any other?
9        A.   Flash drive.
10       Q.   Was that flash drive that was created by
11   Gavin -- well, let me strike that and go further.
12           How did you learn that, that it was a flash
13   drive?
14       A.   Because it was given to me to lock in the --
15   in the cabinet with the other one.
16       Q.   By whom?
17       A.   You know what, I don't recall if it was --
18   it was Gavin or Jensen, one of them.
19       Q.   They would have given it to you after you
20   got back from your vacation?
21       A.   After I got back to work, yeah, so...
22       Q.   How long was that after Jensen had first
23   called you to tell you that this was taking place?
24       A.   It would -- I don't know because I don't

Page 65

1    remember the exact date that happened, but it would
2    have been probably the next day, or a couple of days,
3    if that, if it was a weekend.  I don't recall.
4        Q.   During that time, until you came back to the
5    office, where was that flash drive that Gavin had
6    created stored?
7        A.   You would have to ask Deputy Chief Jensen
8    that.
9        Q.   Was that second flash drive ever logged into
10   and tracked with the BEAST system?
11       A.   No.
12       Q.   Why not?
13       A.   It was locked in my office.
14       Q.   Where was Grizzle when Jensen called you to
15   tell you about the concerns with which he had been
16   contacted by Socha?
17       A.   I don't know where he was.
18           MR. CLARK:  Objection, foundation.
19           You can answer.
20           THE WITNESS:  I don't know where he was.
21   BY MR. ADAMS:
22       Q.   Do you know whether he was on duty?
23       A.   I don't -- I know he wasn't at work.  So I
24   don't know where he was.

Page 66

1        Q.   Do you know whether he too was out on
2    vacation?
3        A.   I don't know where he was.
4        Q.   Did Grizzle ever subsequently express to you
5    concerns about the fact that the contents of Socha's
6    phone had been deleted from the Cellebrite?
7        A.   Not that I recall.
8        Q.   Did anyone report to you that Grizzle had
9    expressed such concerns to Gavin or to Deputy Chief
10   Jensen?
11       A.   Not that I recall.
12       Q.   When you learned from Jensen that Socha had
13   communicated her concerns about the handling of the
14   photos and videos that were downloaded from her cell
15   phone, did you order or initiate an internal
16   investigation?
17       A.   No.
18       Q.   Why not?
19       A.   It wasn't reported to me.
20       Q.   And Deputy Chief Jensen's call didn't
21   constitute a report?
22       A.   No.  I mean, a report?  What do you mean a
23   report?  He informed me what was on there, that he
24   was having it taken off.

Page 67

1        Q.   Well, specifically what he told you was that
2    Socha had expressed to him concerns that personal
3    pictures and videos from her cell phone were being
4    shared by personnel in the investigations unit,
5    correct?
6        A.   Correct.
7        Q.   Why did that report from Deputy Chief Jensen
8    not cause you to order or initiate an internal
9    investigation?
10       A.   It would have been Deputy Chief Jensen's
11   call.  It was reported to him.  I don't know what the
12   conversation was.
13       Q.   Have you yourself viewed personal photos or
14   videos from the contents of Socha's phone that were
15   downloaded pursuant to the -- strike that -- that
16   were downloaded to the Cellebrite and then to these
17   flash drives and to Grizzle's desktop?
18       A.   No.
19       Q.   Has any Joliet police officer told you that
20   they have seen such images, either photo or video?
21       A.   No.
22       Q.   Have you ever heard any Joliet officer
23   discussing such images?
24       A.   No.

19  (Pages 64 to 67)

Royal Reporting Services, Inc.
312.361.8851

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 68

1    Q.  Have you ever heard any Joliet officer
2  describe what those personal photos or videos
3  depicted?
4    A.  No.
5    Q.  In your office, you had a desktop computer?
6    A.  I have a computer, yes.
7    Q.  Just one?
8    A.  Yes, one computer.
9    Q.  Was it a personal computer or one that was
10 property of the Joliet Police Department?
11   A.  It was a City of Joliet Police Department
12 computer.
13   Q.  In your office when you were present in your
14 office, did you have a cell phone?
15   A.  Yes.
16   Q.  Just one?
17   A.  Yes.
18   Q.  Was it a personal cell phone, or was it a
19 property of Joliet Police Department cell phone?
20   A.  The City of Joliet phone.
21   Q.  Did you have any personal cell phone of your
22 own for personal use?
23   A.  No.
24   Q.  Did you have in your office any other

Page 69

1  computer devices, laptops, tablets, any other
2  computer devices?
3    A.  Just the city computer.
4    Q.  Did you ever have occasion to view any of
5  the contents of the data that was downloaded from
6  Socha's phone onto the Cellebrite and then onto at
7  least these two flash drives on your own office
8  desktop?
9    A.  No.
10   Q.  Were the contents of her cell phone ever
11 downloaded from either of those flash drives onto
12 your desktop?
13   A.  No.
14   Q.  Separate and apart from the desktop in your
15 office and your Joliet Police Department issued cell
16 phone, did you own any computer devices?
17   A.  No.
18      MR. ADAMS:  Michelle, do you have Exhibit 2?
19      THE COURT REPORTER:  I have the exhibits,
20 yeah.
21      (Whereupon, a discussion
22       was had off the record.)
23 BY MR. ADAMS:
24   Q.  So let's look here at Exhibit 2.  Do you see

Page 70

1  the exhibit sticker down there?
2    A.  Sure.  Yep, I see.
3    Q.  And working from bottom to top, that's your
4  signature?
5    A.  Yes.
6    Q.  And that date, 3 August, 2018, is the date
7  that you signed this document?
8    A.  Correct.
9    Q.  Number 7 --
10   A.  Yes.
11   Q.  -- was your star number or employee number
12 or officer number when you signed?
13   A.  Star number, yep.
14   Q.  This is a memo from you to then Chief
15 Benton, correct?
16   A.  Correct.
17   Q.  And it describes generally the events which
18 took place in the -- over the time frame 18 to 24 May
19 of 2018, correct?
20   A.  That's what it says, yes.
21   Q.  Why did you wait until August of 2018 to
22 compose this memo?
23   A.  I don't -- I don't recall why.
24   Q.  Did Chief Benton ask you to send him a

Page 71

1  written recap of these events as you recall them?
2    A.  I don't -- I don't know if he did, but I
3  sent it to him.
4    Q.  All of this was true and to the best of your
5  recollection when you authored and signed and sent it
6  to your chief?
7    A.  As far as I know, yes.  I mean...
8    Q.  Do you see the sentence that begins, quote,
9  I have viewed?
10   A.  Right.  And I explained it to you.
11   Q.  Okay.  I'm going to get to that.
12      So when you use the phrase in that sentence,
13 quote, some of the cell phone contents, close
14 quote --
15   A.  Uh-huh.
16   Q.  -- what were those contents?
17   A.  The text message he was looking for, like I
18 said.
19   Q.  Any others?
20   A.  No.
21   Q.  When Deputy Chief Jensen explained to you
22 that the phone download was still on the Cellebrite
23 computer, and that detectives have access, that was
24 news to you, correct?

20  (Pages 68 to 71)

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 72

1    A.   Correct.
2    Q.   You didn't understand that that was how the
3  Cellebrite computer worked, correct?
4    A.   I didn't understand why it was still on
5  there, correct.
6    Q.   Where the sentence begins, On 5-24-18, I was
7  contacted by Deputy Chief Jensen in reference to
8  Officer Socha telling him, do you see that?
9    A.   Okay.
10   Q.   And we've talked about that, correct?
11   A.   You asked, yes.
12   Q.   Deputy Chief Jensen never told you that
13  Gavin approached him to report that he, Gavin, had
14  heard that there were rumors of photos or videos from
15  Socha's phone being viewed by personnel in the
16  investigations division, did he?
17   A.   No.
18   Q.   If he had, you would have reported that in
19  this memo to your chief, wouldn't you?
20   A.   I believe I would have.  It was at that
21  phone call, yes.
22   Q.   Do you recall when in relation to the dates
23  cited in Exhibit 2 your vacation from the office
24  began and ended?

Page 73

1    A.   No, I do not.
2    Q.   Was it your understanding that the download
3  of the contents of Socha's phone onto the Cellebrite
4  computer occurred on or about 18 May, 2018?
5    A.   I don't know if that's when he did.  It
6  doesn't say that's when he did.
7    Q.   Do you have a recollection?
8    A.   No, I don't.
9    Q.   For how many days were the contents of
10  Socha's cell phone on the Cellebrite computer to
11  which detectives in the investigations unit had
12  access before being removed by Gavin at Jensen's
13  direction?
14   A.   I don't know.
15   Q.   Can you estimate based upon the timeline
16  that's laid out here?
17   A.   Well, I don't know when he exactly
18  downloaded it to the computer, so it'd be hard to do
19  that.
20   Q.   Okay.  Do you know when in relation to that
21  24 May, 2018 call from Jensen that's referenced here
22  that Gavin copied everything from Socha's phone off
23  the Cellebrite and deleted it from the Cellebrite?
24   A.   I don't know.

Page 74

1    Q.   So as of 3 August, 2018, you report to your
2  Chief Benton that, quote, all working copies are
3  locked up in a cabinet in my office.  How many at
4  that time were all the copies?
5    A.   Say it again.  How many what now?
6    Q.   So that sentence begins, quote, all working
7  copies.  Do you see that sentence?
8    A.   Yeah.
9    Q.   As of 3 August, 2018, how many working
10  copies were there locked up in a cabinet in your
11  office?
12   A.   Just those two.
13   Q.   Is there a reason you use the word all as
14  opposed to both?
15   A.   Because both are all.  I mean, I don't...
16   Q.   As of 3 August, 2018, had any other officer
17  made a copy of the download from Socha's phone other
18  than those two that were locked up in the cabinet in
19  your office?
20   A.   No.  And that's why I say all, because that
21  is all there was.
22   Q.   You use the modifier working copies.
23   A.   Yes.
24   Q.   Why modify it?  Were there other copies that

Page 75

1  weren't working copies?
2    A.   No.
3    Q.   In the last line of the memo to your chief,
4  you use the phrase, quote, sensitive information,
5  close quote.  To what information were you referring
6  as to sensitive?
7    A.   Well, after this happened, I advised all my
8  supervisors that any -- any information about any of
9  our officers they're investigating should not be left
10  on the computer.  That's what I mean, sensitive.
11   Q.   At any point between the 24th of May of 2018
12  and the 3rd of August of 2018, did you ever log those
13  two flash drives into the BEAST evidence management
14  system?
15   A.   No.
16   Q.   Did anyone tell you that Detective McKinney
17  had viewed photographic images of Officer Socha that
18  were downloaded from her cell phone on the
19  Cellebrite?
20   A.   No.
21   Q.   Is that a fact you had ever heard before
22  today?
23   A.   Rumor, but haven't heard fact, no.
24   Q.   When did you first hear the rumor?

21  (Pages 72 to 75)

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 76

1    A.  I don't -- I don't recall when.  I think
2  maybe Regis was doing his investigation.
3    Q.  From whom did you first hear the rumor?
4    A.  It may have been from Regis.
5    Q.  Do you recall with respect to the text
6  messages that were downloaded from Socha's phone that
7  you viewed on Grizzle's desktop, from and to whom
8  those text messages were?
9    A.  No, I don't recall.
10   Q.  Do you recall the contents of those text
11 messages?
12   A.  I do not recall.
13   Q.  At some point an investigation of the --
14 some of the computer equipment in the investigations
15 unit was conducted by the Regional Crime Forensics
16 Lab relative to Socha's concerns about the handling
17 of the data from her phone; is that correct?
18   A.  That we called the RCFL in, yes, that's
19 correct.
20   Q.  Who initiated that, that forensic work?
21   A.  Chief Benton, I believe.
22   Q.  And were you consulted before Chief Benton
23 initiated that forensic work?
24   A.  No.

Page 77

1    Q.  When the regional lab personnel arrived at
2  the Joliet Police Department to take possession of
3  certain computer devices, did you know that they were
4  coming?
5    A.  Yes.
6    Q.  Who had told you that?
7    A.  Chief Benton.
8    Q.  How far in advance of the arrival of the
9  forensics lab personnel did you learn that from Chief
10 Benton?
11   A.  Probably a couple of days before.
12   Q.  After you learned before the regional lab
13 folks showed up at the police department, did you
14 tell anyone else in the investigations unit that they
15 would be coming?
16   A.  No.
17   Q.  When Chief Benton told you that he had
18 initiated this forensics lab work, what did he tell
19 you was the reason he had done so?
20   A.  To prove there was nothing on any of the
21 computers, disprove the allegations.
22   Q.  Did he tell you there was any other reason
23 for doing so?
24   A.  Not that I recall.

Page 78

1    Q.  Do you have Exhibit 3 up on your screen?
2    A.  Sure.
3    Q.  That's a memo that you signed when you were
4  the interim chief?  And if it helps, I'll try to
5  center it so you can get dates and so forth a little
6  more clearly.  If you need -- if you need me to move
7  it around, say so.
8    A.  Okay.
9    Q.  Is that your signature at the bottom?
10   A.  Correct.
11   Q.  As of 31 August, 2018, what exactly was your
12 status?  And I ask that because you sign as interim
13 chief, but in the text of the memo, you refer to
14 yourself as deputy chief.  And it was, according to
15 you, then Chief Benton who had initiated this
16 process, and he's referred to in here as the chief.
17 So I'm trying to get some understanding of who held
18 what ranks and positions when this occurred.
19   A.  Well, on -- on that morning, Chief -- Chief
20 Benton was still there as the chief, and I believe it
21 was his last day.  And I was called over to the city
22 manager's office at about -- a little after 9:00 and
23 was told that I was interim chief.  So it's correct
24 all the way around actually.

Page 79

1    Q.  So this all occurs right in the middle of
2  the line change, right?
3    A.  Yeah, exactly.
4    Q.  Okay.  Were the personnel in the
5  investigations division asked to turn over only their
6  city-issued computer devices to the RCFL team?
7    A.  City-issued computer and cell phones, yes.
8    Q.  Only city-issued devices, correct?
9    A.  Correct.
10   Q.  Who determined that the investigations
11 division personnel would be directed to turn over
12 only city-issued devices, you or Chief Benton?
13   A.  It was Chief -- it wasn't me.  Chief Benton
14 and I think the city manager and the city attorneys,
15 I believe.
16   Q.  Did any of those people ever communicate to
17 you why it was that investigations division personnel
18 were being directed to turn over their city-issued
19 devices and not their own personal devices?
20   A.  Because the City owns those.  You would
21 need -- there's laws against searching personal stuff
22 without a warrant.
23   Q.  Was any effort made to obtain a warrant to
24 get the personal devices of any of the investigations

22  (Pages 76 to 79)

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 80

1   division personnel so that they could be forensically
2   examined by the RCFL?
3       A.   No.  There was no probable cause for that.
4       Q.   That wasn't a determination you made, was
5   it?
6       A.   It'd be the determination they made.  There
7   still wasn't.
8       Q.   I'm not asking for your opinion.  I'm
9   asking, who made the determination not to seek a
10  warrant?
11      A.   It wouldn't have been me, but don't know.
12      Q.   Who got Sergeant Botzum involved in this
13  process that's described here in Exhibit 3?
14      A.   I believe he was involved from the beginning
15  with Chief Benton.
16      Q.   Were you aware of Botzum's involvement
17  before the RCFL team arrived at the police department
18  on 24 August?
19      A.   Yes.
20      Q.   How did you learn that?
21      A.   From Chief Benton.
22      Q.   Why did you yourself actually go to RCFL
23  with all these devices?
24      A.   Because I was put in charge of it, handling

Page 81

1   it, from the chief and the city manager and Tressler
2   Law.
3       Q.   Why did you copy John O'Driscoll on this
4   memo?
5       A.   He's the law firm handling it.
6       Q.   When did the RCFL forensic examination of
7   the devices that were turned over to it for forensics
8   examination end?
9       A.   Which -- which part are we talking about?
10      Q.   The whole scope of work.
11      A.   I -- I don't recall when it ended.
12      Q.   Had it concluded by the time you retired?
13      A.   Oh, yeah.
14      Q.   Who decided that it would be concluded?
15      A.   The RCFL.
16      Q.   Did you give a direction to terminate any
17  portion of the RCFL's forensic work?
18      A.   No.
19      Q.   Did you ever obtain any of RCFL's final
20  forensic reports?
21      A.   Yes.
22      Q.   When?
23      A.   At various times.
24      Q.   When you were deputy chief of

Page 82

1   investigations --
2           MR. ADAMS:  I'll take us out of screen
3   share.
4           There we go.
5   BY MR. ADAMS:
6       Q.   While you were deputy chief of
7   investigations, were any police officers other than
8   Crowley or Socha investigated by the Joliet Police
9   Department?
10      A.   I -- I don't recall.  I don't know.
11      Q.   In connection with the investigation of
12  Crowley that led to the criminal trial, what physical
13  evidence was collected by the Joliet Police
14  Department?
15      A.   I don't know.
16      Q.   Can you remember any physical evidence that
17  was collected by the Joliet Police Department?
18      A.   I'm sure there was photos taken of the
19  scene.
20      Q.   Anything else?
21      A.   I don't know.
22      Q.   Do you have a recollection of whether any
23  computer devices, meaning, again, cell phones,
24  desktops, laptops, tablets, were obtained and

Page 83

1   searched in the Crowley investigation?
2       A.   I don't know.
3       Q.   Was any evidence at all relating to the
4   Crowley investigation stored in the cabinet in your
5   office where you put the two flash drives containing
6   the download of the contents of Socha's phone?
7       A.   No.
8       Q.   Why not?
9       A.   Because we were not called out for that
10  investigation.  Patrol handled it.
11      Q.   Grizzle led that investigation, didn't he?
12      A.   No.  He -- he got it after it was complete.
13      Q.   After the sequence of events that started
14  with Jensen telling you that Socha had come to him
15  with her concerns about investigation division
16  personnel viewing personal photos and videos from her
17  cell phone, did you issue any written order regarding
18  deleting information from the Cellebrite computer
19  after the Cellebrite computer was used to download or
20  to extract information from other computer devices
21  seized during investigations?
22      A.   Any written?
23      Q.   Yes, sir.
24      A.   Is that what you said?

23  (Pages 80 to 83)

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 84

1    No.
2    **Q.** Did the department issue any such written
3    directives?
4    **A.** I don't -- I don't recall.
5    **Q.** Did you recommend to the department that it
6    issue such written directives?
7    **A.** No, not that I recall.
8    **Q.** I'm going to try to screen share again here.
9    Do you have the exhibit in front of you?
10   **A.** No.
11   **Q.** I have to replicate what I did last time,
12   which was just dumb luck.
13   So you see this is a memo from you to
14   somebody named Craig Golucki dated 1 November, 2018,
15   correct?
16   **A.** Correct.
17   **Q.** And although Golucki is identified as being
18   with the Chicago Police Department, he was as of that
19   date working with the same forensic lab?
20   **A.** RCFL, correct.
21   **Q.** There were no attachments to this exhibit
22   the way it was produced to us. So what pictures or
23   in your parlance down in the second half, your reply,
24   what photos did you transmit to him?

Page 85

1    **A.** The police photos -- hire photos of Officer
2    Socha and Crowley.
3    **Q.** Photos showing what, just head shots or
4    their identifying photographs?
5    **A.** Head shots, yes.
6    **Q.** And so the purpose of this was so that as
7    RCFL did its work, they would be able to identify
8    Socha and Crowley if they saw images of either on the
9    computer devices they were examining?
10   **A.** Or phones, correct.
11   MR. ADAMS: Okay. You can take us out of
12   that.
13   BY MR. ADAMS:
14   **Q.** I'm going to try to come back in here. Let
15   me do something right quick.
16   Of course not -- there we go.
17   All right. And you've already told us that
18   there was no written authority for you to store these
19   flash drives in your cabinet in your office. Can you
20   tell us otherwise on what, if any, authority you kept
21   evidence of police criminal investigations, that is,
22   investigations of officers, in a cabinet in your
23   office, which you held the only key?
24   **A.** Why, you want to ask?

Page 86

1    **Q.** Not why. What authority?
2    **A.** Because I -- as the deputy chief of
3    investigations, I am the custodian of all evidence.
4    I have access to all of it. And until the
5    investigation is complete, we don't want it down
6    there where evidence techs can view it.
7    **Q.** Who's the we? That's just a decision that
8    you made.
9    **A.** Me and the chief, who's the we.
10   **Q.** Did Chief Benton tell you to do that before
11   you did it, or did you tell him after the fact?
12   **A.** I don't recall.
13   **Q.** And there's no memo or other writing from
14   Chief Benton to you authorizing you to do that in
15   advance or, for lack of a better term, blessing or
16   acquiescing in your doing it after the fact, is
17   there?
18   **A.** Well, like I stated before, there's evidence
19   in there from other cases involving officers from
20   other deputy chiefs, and it doesn't become evidence
21   unless they're being charged with something. There
22   still has not been a charge in this, so it's still
23   there.
24   **Q.** That's -- I appreciate that, but that's not

Page 87

1    the question I asked. I asked, after the fact, Chief
2    Benton never issued any writing in which he approved
3    of this handling of the flash drives, did he?
4    **A.** In writing, no. Not that I know of. I
5    don't know.
6    **Q.** I asked you earlier if you had issued any
7    direction that the RCFL terminate its forensic
8    examination. You answered that question. I want to
9    ask a somewhat different question.
10   Did you ever issue a direction to or make a
11   request of RCFL that it terminate or suspend any part
12   of its forensic examination due to time constraint?
13   **A.** Not that I recall, no.
14   **Q.** Did you ever direct anyone else in the
15   department, including particularly Botzum, to issue
16   such a direction or make such a request of RCFL?
17   **A.** I had him check and see where they were at
18   in the investigation, if that's what you mean, but
19   just do it thorough and get it done.
20   **Q.** Did you ever direct Botzum to communicate to
21   RCFL that it should terminate or suspend any part of
22   its work for any reason, including due to a time
23   constraint?
24   **A.** Not that I recall, no.

24  (Pages 84 to 87)

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 88

1    Q.  Did you ever during your career with the
2  department have video evidence of a homicide
3  investigation where the homicide occurred at an
4  Izzy's, I Z Z Y, apostrophe, S, Bar on your own
5  personal iPad device?
6    A.  No.
7    Q.  Did you ever have any evidence of that
8  homicide investigation on any personally-owned
9  computer devices of yours?
10    A.  No.
11    Q.  Did you ever have such evidence on any
12  portable computer device that was issued to you by
13  the Joliet department?
14    A.  I don't believe so.
15    Q.  Did any Joliet officer ever report to you
16  having heard Gavin comment on Socha's performance of
17  any sex act depicted in the videos that were
18  downloaded from her cell phone?
19    A.  No.
20    MR. ADAMS:  I believe those are all the
21  questions I have at this time.  I appreciate your
22  patience with me.
23    THE WITNESS:  Thank you.
24    MS. PROCTOR:  I have a few, but let's -- if

Page 89

1  we could, could we just take another five-minute
2  break?
3    THE WITNESS:  Sure.
4    MS. PROCTOR:  Thank you.
5        (Whereupon, a break was taken,
6         after which the following
7         proceedings were had:)
8    MR. ADAMS:  You know, I don't know who's
9  next.  I'm going to -- so as to not disrupt this,
10  I've got a few more questions.
11    MS. PROCTOR:  Okay.  Go ahead.
12    MR. ADAMS:  Michelle, are we good to go?
13    THE COURT REPORTER:  Yeah.
14    MR. ADAMS:  Mr. Roechner?
15    THE WITNESS:  Yeah.
16  BY MR. ADAMS:
17    Q.  I'm going to give you some names of officers
18  who I believe were investigated by the Joliet
19  department, whether you were -- while you were the
20  deputy chief of investigations, interim chief, or
21  chief, and I'd like you to just confirm that for us.
22  Javier Esqueda?
23    A.  Yes.
24    Q.  Dennis McWherter?

Page 90

1    A.  Yes.
2    Q.  Dave Jackson?
3    A.  Yes.
4    Q.  David Blackmore?
5    A.  Yes.
6    Q.  Ryan Nagra, N A G R A?
7    A.  Yes.
8    Q.  And now I want to try to understand what
9  your position was when each was investigated by the
10  department.  Esqueda, were you chief or deputy chief?
11    A.  Chief.
12    Q.  McWherter, chief or deputy chief?
13    A.  Chief -- either interim or chief, but,
14  yeah, chief.
15    Q.  Jackson?
16    A.  Chief.
17    Q.  Blackmore?
18    A.  That was -- that was probably before my time
19  as chief and -- and to my time as chief, I guess,
20  so...
21    Q.  Nagra?
22    A.  Before -- before chief and then as chief.
23    Q.  And were each of those officers investigated
24  by the investigations division?

Page 91

1    A.  It depends on the case -- which case, I
2  guess, is the way to look at that.
3    Q.  Well, let's do one at a time.  How about
4  Esqueda?
5    A.  Yes.
6    Q.  McWherter?
7    A.  Yes.
8    Q.  Jackson?
9    A.  For the domestic, yes.
10    Q.  Blackmore?
11    A.  No.  I think that was just an internal.  I
12  don't -- I don't recall exactly on that one.
13    Q.  Nagra?
14    A.  Yes.
15    Q.  With respect to -- I guess excluding only
16  Blackmore, with respect to the investigations of
17  Esqueda, McWherter, Blackmore, and Nagra, was
18  evidence gathered by the investigations division in
19  connection with any of those investigations stored in
20  this cabinet in the office of the deputy chief of
21  investigations without being logged into the BEAST
22  evidence handling and management system?
23    A.  Not in that cabinet because that was no
24  longer the deputy chief's office, so...

25  (Pages 88 to 91)

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 92

1      Q.  All right then.  In each of those
2   investigations, was evidence relating to those
3   investigations maintained in the deputy chief's
4   office, wherever it was, without being logged into
5   and managed using the BEAST system?
6      A.  Well, it's not really a fair question
7   because those other investigations were completed the
8   day they happened.  So there was no reason to -- to
9   hold it because there were charges right away.  So
10  without going over each individually, it's hard to
11  answer that question.
12     Q.  Okay.  Well, let's -- let's do that, I
13  guess, then.
14     A.  I don't have it in front of me, though, to
15  do that --
16     Q.  Okay.
17     A.  -- each case.
18     Q.  Let's just -- if the answer is I can't
19  remember, that's the answer.
20     A.  Got you.
21     Q.  The Esqueda case, was any of the evidence
22  relating to his case stored in the deputy chief
23  of investigations office without being logged into and
24  managed by the BEAST system?

Page 93

1      A.  Yes, I believe it was.
2      Q.  What evidence?
3      A.  The police reports, the handwritten reports,
4   stuff like that, and -- and video.
5      Q.  Who was the lead investigator on that case?
6      A.  The lead on that, I believe, is Lieutenant
7   Egizio.
8      Q.  How about McWherter?
9      A.  McWherter, no.  He was -- he was arrested
10  that day.
11     Q.  How about Jackson?
12     A.  He was arrested that night.
13     Q.  Why does the date of arrest determine how
14  the evidence is handled?
15     A.  Because it's already out in the public.
16  It's out there already.
17     Q.  I see.
18     A.  It's to protect the officer.  If you don't
19  find anything, then you don't want it out there.
20     Q.  How about Blackmore?
21     A.  There was no criminal that I know of.
22     Q.  And how about Nagra?
23     A.  Nagra was before my time, as even deputy
24  chief.  Actually, I'm sorry.  Actually, it was -- the

Page 94

1   commander of operations was involved in that one,
2   that investigation.  Not me, so -- sorry about that.
3          MR. ADAMS:  Those are all the questions I
4   have.
5          THE WITNESS:  Thank you.
6              CROSS-EXAMINATION
7   BY MS. PROCTOR:
8      Q.  I just -- I just have a few for you --
9      A.  Sure.
10     Q.  -- Mr. Roechner.
11     A.  Yeah.
12     Q.  You were asked earlier about a conversation
13  that you had with Tab Jensen in which you learned
14  that the Cellebrite -- well, that the contents of
15  Officer Socha's cell phone were on the Cellebrite
16  system.  Do you remember that line of questioning
17  from earlier?
18     A.  Yes.
19     Q.  Okay.  To be clear, did you have only one
20  conversation with Tab Jensen in which the removal of
21  the contents of Officer Socha's cell phone from the
22  Cellebrite system were discussed?
23     A.  I don't know exactly, but I'm sure it was
24  more than one because I had to get it -- get the

Page 95

1   contents from either him or Darrell.  So, yeah, I had
2   to have more than one conversation.
3      Q.  Okay.  Well, maybe my question should be --
4      A.  I'm sorry.
5      Q.  -- more focused then.
6      A.  Sure.  Go ahead.
7      Q.  The day you learned that the information in
8   question was still on the Cellebrite system from Tab
9   Jensen, was the -- to the best of your knowledge,
10  were the contents removed the same day of that
11  conversation with D.C. Jensen?
12     A.  Yes.
13     Q.  Okay.  There was no delay in the --
14     A.  No.
15     Q.  -- removal of that information once you
16  learned that the information was, in fact, at least
17  according to Jensen, still on the Cellebrite system,
18  correct?
19     A.  Correct.
20     Q.  Okay.  Now, earlier you were asked questions
21  that -- well, to your knowledge, do you know who
22  actually handled the removal of the contents of
23  Officer Socha's cell phone, who handled the removal
24  from the Cellebrite system once Tab Jensen notified

26  (Pages 92 to 95)

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 96

1    you of the fact that the information was still on the
2    system?  Who handled it?
3        A.  I don't know for a -- for a fact without
4    looking, you know, at old notes and stuff.  I believe
5    it was Sergeant Gavin, I believe.
6        Q.  Okay.  Well, we -- you know, we've deposed
7    Detective German in this case.
8        A.  Sure.  Sure.
9        Q.  And according to Detective German, at the
10   direction of Gavin, he is the one who, in fact,
11   handled the technical aspects of the removal --
12       A.  Got you.  Sure.
13       Q.  -- and -- and subsequent deletion of the
14   contents of officer's cell phone from the Cellebrite
15   system.  Does that -- does that --
16       A.  No, that --
17       MR. ADAMS:  I'll object to the --
18   BY MS. PROCTOR:
19       Q.  -- trigger your memory?
20       MR. ADAMS:  -- form.  I'll --
21       THE WITNESS:  Well, I mean, it makes sense
22   to the fact that -- huh?  I'm sorry.
23   BY MS. PROCTOR:
24       Q.  It makes sense?

Page 97

1        A.  It makes sense to the fact that Tab told
2    Darrell to do it.  I don't know how -- who he used,
3    yeah, exactly.  So it makes sense, sure.
4        Q.  Okay.  Because do you know whether Gavin was
5    trained in how to use the Cellebrite system?
6        A.  I do not know.
7        Q.  Okay.  And according to Detective German, he
8    removed the information and deleted it from the
9    Cellebrite on June 8th of 2018.  Okay?
10       A.  Okay.
11       Q.  So I'm going to ask you just to accept that
12   date as correct.  Okay?  We have no reason to --
13       A.  Okay.
14       Q.  -- dispute that --
15       A.  Sure.  No, no problem.
16       Q.  -- date.
17       A.  Right.
18       Q.  So my question to you is, you -- you wrote a
19   memo some months later, a couple of months later on
20   August 3rd of 2018, Chief Roechner, where you
21   indicate that the contents were removed on the --
22   following your conversation with chief -- Deputy
23   Chief Jensen and that that conversation took place on
24   May 24th of 2018.  Do you remember being asked about

Page 98

1    that date?
2        A.  Yeah, I do remember being asked about it.
3        Q.  All right.  So would you agree that
4    May 24th, 2018, is an incorrect date, that the more
5    likely date you had the conversation with Jensen
6    about the removal that was done that same day would
7    be --
8        A.  Sure.
9        Q.  -- June 8th, 2018, correct?
10       A.  Yeah.  It could --
11       MR. ADAMS:  Object to form.
12       THE WITNESS:  It could be a typo.  No
13   problem.
14   BY MS. PROCTOR:
15       Q.  Okay.  And, you know, and in fairness to
16   you, you prepared this memo to Chief Benton on -- you
17   know, some months, almost two -- almost two
18   months after --
19       A.  Well, I should --
20       Q.  -- the event took place?
21       A.  Well, actually, that's when I signed it.  I
22   don't know if it -- it might have been given to him
23   before that, and he asked me to sign it -- sign my
24   signature on it.  So that might be the day I signed

Page 99

1    it.
2        Q.  Okay.
3        A.  You know, I do recall that, so...
4        MS. PROCTOR:  I don't believe I have any
5    further questions.
6        THE WITNESS:  Thank you.
7        MS. PROCTOR:  Thank you, sir.
8        MR. CLARK:  I don't have any questions.
9    Thank you for your time.  I appreciate it.
10       THE WITNESS:  Thank you.
11       MR. ADAMS:  I have a follow-up.
12       Michelle, could you put Exhibit 2 back up on
13   the screen?
14          REDIRECT EXAMINATION
15   BY MR. ADAMS:
16       Q.  Mr. Roechner, can you see the exhibit?
17       A.  Yes, I can.
18       Q.  When you prepared this memo, did you do it
19   from any notes or other documents?  Were you
20   referring to anything else?
21       A.  I don't recall that if I was.
22       Q.  Had you made any notes or other written
23   records of the events described in Exhibit 2 before
24   you prepared Exhibit 2?

27  (Pages 96 to 99)

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 100

1   A. No. Huh-uh. Not that I know of, huh-uh.
2   Q. And you believe -- so you prepared Exhibit 2
3   at the time you prepared it from memory; is that
4   correct?
5   A. Correct.
6   Q. And --
7   A. Sorry. As far as I can recall. You know,
8   it's been awhile.
9   Q. And when you reported these events to your
10  chief, it was -- the statements you made in here were
11  true and accurate to the very best of your ability at
12  the time, correct?
13  A. To the best of my knowledge, yes.
14  Q. Now, you've indicated to us just now that
15  you may have signed the document sometime after you
16  prepared it. Do you recall that testimony just now?
17  A. Correct.
18  Q. Okay. When did you prepare the document?
19  A. Well, you'd have to -- I mean, it'd be an
20  e-mail record. You'd have to look. I don't know.
21  Q. Can you give any reasonable estimate that's
22  not just a wild guess as to how long before the date
23  in which you signed it you actually prepared it?
24  A. No, I can't. If -- if I put the wrong date

Page 101

1   on there, it's hard to do that, so I can't.
2   Q. Do you have a specific recollection of Chief
3   Benton directing you to sign Exhibit 2 on the 3rd of
4   August of 2018, some date after you had actually
5   prepared and submitted it to him?
6   A. Right. Like I said, I believe it was
7   e-mailed to him, which doesn't have a signature, so
8   he wanted me to make sure I signed it, so correct.
9       MR. ADAMS: Would you scroll up, Michelle,
10  so that we can see the top of this?
11  BY MR. ADAMS:
12  Q. So on this exhibit, Mr. Roechner, there's no
13  e-mail header. There's no to, from, or date or
14  subject line. Do you see that?
15  A. On that paper, yes, I see it.
16  Q. Yet, you believe that this was as originally
17  transmitted, formatted as an e-mail?
18  A. I said I don't know, but it may have been.
19  Q. Was there any other medium through which you
20  transmitted written memos like this to your chief
21  that were typed?
22  A. Sure. On the computer, I'm sure. I'm sure
23  there was.
24  Q. Where you would just type up a document and

Page 102

1   print it and deliver it to him?
2   A. Possibly, yes. It's been done.
3   Q. When you typed this Exhibit 2 and
4   transmitted it to your chief, the events described
5   here were still reasonably fresh in your mind?
6   A. I believe so, yes.
7   Q. When you did that, had you any doubt about
8   the dates, you would have said so in the memo,
9   correct?
10  A. Yeah, I guess I would have.
11  Q. If you were doing your best to approximate
12  dates, as opposed to reporting to your chief the
13  specific dates on which the events described
14  occurred, you would have in this memo told him
15  approximately this date or on or about that date,
16  instead of on this date and on that date, correct?
17  A. I -- I don't know why the date is what it
18  is. I can't recall from -- at this point, so it's
19  hard to answer that question.
20  Q. I guess you've answered a little different
21  question than I asked. If when you typed and
22  transmitted this memo to Chief Benton, you weren't
23  certain that the first date was 18 May, 2018, but you
24  believed it was around that time, you would have

Page 103

1   communicated your uncertainty by saying on
2   approximately 18 May, 2018, or on or about 18 May,
3   2018. You would not have told your chief
4   definitively that that was the date on which those
5   events occurred, correct?
6   A. I don't understand the question. You want
7   the 5-18 date? What about it?
8   Q. So --
9   A. That was the day he got the search warrant.
10  That's when it's signed, so that's...
11  Q. And where the next date is concerned, the 24
12  May --
13  A. Yeah.
14  Q. -- 2018 date, if you were uncertain of that
15  date when you sent this memo to your chief, you could
16  have said on approximately 5-24-18 or you could have
17  said on or about 5-24-18, true?
18  A. I could have. I could have put 6-8 on there
19  too. I don't know why -- I got the wrong date. I
20  don't -- I can't answer that question.
21  Q. As you sit here today, you don't know that
22  it's the wrong date, do you?
23  A. Well, no, I -- I don't definitively because
24  I don't know -- I mean, I wasn't the one that did the

28  (Pages 100 to 103)

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 104

1   taking off and all that stuff, so I -- I don't know.
2   But the phone records would probably show it.
3       Q.   And you just know that when you prepared
4   this memo, you were being as accurate as possible
5   based upon these events that were then much fresher
6   in your memory, correct?
7       A.   That's what I believe, yes.
8           MR. ADAMS:  Those are all the questions I
9   have.
10          Michelle, you can take it down.
11          THE WITNESS:  Thank you.
12          MS. PROCTOR:  And nothing else from the
13  City.
14          THE WITNESS:  Thank you.
15          MR. CLARK:  No questions.  Thank you very
16  much.
17          MR. ADAMS:  So you have a right under our
18  rules to review the transcript of this deposition
19  when it's written in order to note any instance in
20  which you believe the transcription is in error on a
21  separate form.  Or you can waive that right.
22          The choice is entirely yours.  We ask only
23  that you tell us on the record whether you elect to
24  exercise or to waive that right.

Page 105

1           THE WITNESS:  To review it?
2           MR. ADAMS:  Show signature as reserved.  And
3   we'll write.  And the City's lawyers will figure out
4   how to get it to you to review.  Okay?
5           THE WITNESS:  Thank you.
6           THE COURT REPORTER:  Are you ordering it?
7           MR. ADAMS:  Yes.
8           MS. PROCTOR:  Our office will order a copy,
9   Tressler's office.
10          MR. CLARK:  I'm okay.  Thank you.
11              WITNESS EXCUSED AT 12:29 p.m.
12
13
14
15
16
17
18
19
20
21
22
23
24

29  (Pages 104 to 105)

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

                                                    Page 106

1              UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3    CASSANDRA SOCHA,                    )

4              Plaintiff,               )

5              -vs-                     ) No. 18 CV 05681

6    CITY OF JOLIET, a municipal        )

7    Corporation, EDWARD GRIZZLE,       )

8    JOHN DOES 1-20,                    )

9              Defendants.              )

10          I hereby certify that I have read the
     foregoing transcript of my deposition given at the
11   time and place aforesaid, consisting of Pages 1 to
     108, inclusive, and I do again subscribe and make
12   oath that the same is a true, correct and complete
     transcript of my deposition so given as aforesaid,
13   and includes changes, if any, so made by me.

14                        ALAN ROECHNER
     SUBSCRIBED AND SWORN TO
15   Before me this      day
     of            , A.D. 2021.
16        Notary Public

17

18

19

20

21

22

23

24

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 107

1   STATE OF ILLINOIS  )
                        )  SS:
2   COUNTY OF MACON     )

3

4           I, Michelle A. Duzan, CSR No. 084-004270, a

5   Notary Public within and for the County of Macon,

6   State of Illinois, and a Certified Shorthand Reporter

7   of said state, do hereby certify:

8           That previous to the commencement of the

9   examination of the witness, the witness was duly

10  sworn to testify the whole truth concerning the

11  matters herein;

12          That the foregoing deposition transcript was

13  reported stenographically by me, was thereafter

14  reduced to typewriting under my personal direction

15  and constitutes a true record of the testimony given

16  and the proceedings had;

17          That the said deposition was taken before me

18  at the time and date specified;

19          That I am not a relative or employee or

20  attorney or counsel, nor a relative or employee of

21  such attorney or counsel for any of the parties

22  hereto, nor interested directly or indirectly in the

23  outcome of this action.

24          IN WITNESS WHEREOF, I do hereunto set my

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 108

1    hand and affix my seal of office at Forsyth,

2    Illinois, this 8th day of July, 2021.

3

4

5

6

7

8

9                    *Michelle Duzan*

10            Notary Public, Macon County, Illinois.

11            My commission expires 10/23/21.

12

13

14

15

16

17

18

19

20

21

22

23

24

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 109

**A**

A.D 106:15
a.m 1:17
ability 100:11
able 85:7
accept 97:11
access 51:5
  62:19 71:23
  73:12 86:4
accessible 60:13
accessing 30:15
  32:11,24
accommodate
  4:16
accreditation
  19:11
accurate 29:18
  100:11 104:4
accusations
  58:21
achieve 17:18
acquiescing
  86:16
acronym 19:23
act 88:17
action 63:6,11
  107:23
actual 46:12
Adams 2:2,2 3:5
  3:6 4:8,9 19:22
  19:24 55:19
  56:12,18 57:1
  57:17,21 58:5
  58:8,13,23
  65:21 69:18,23
  82:2,5 85:11
  85:13 88:20
  89:8,12,14,16
  94:3 96:17,20
  98:11 99:11,15
  101:9,11 104:8
  104:17 105:2,7
administration
  17:15

advance 77:8
  86:15
advised 75:7
affairs 30:4,8
affirmative 62:1
affix 108:1
aforesaid 106:11
  106:12
agent 51:23
ago 5:16,24
agree 98:3
ahead 40:3
  56:20 89:11
  95:6
ahold 61:3
ALAN 1:11 3:3
  4:4 106:14
allegations 7:19
  77:21
and/or 28:6
answer 4:14,17
  4:22 8:22 10:1
  24:20 29:18
  42:13,14 56:12
  56:20,21 58:13
  65:19 92:11,18
  92:19 102:19
  103:20
answered 87:8
  102:20
answers 14:2
anybody 22:1
anymore 14:9
apart 33:22
  69:14
apologize 17:22
apostrophe 88:4
APPEARAN...
  2:1
appellate 13:14
application
  21:22 53:24
appointed 8:13
appreciate 50:9

53:14 54:13
  86:24 88:21
  99:9
approached
  21:21 24:15
  72:13
approval 21:17
approve 21:10
approved 87:2
approximate
  102:11
approximately
  5:13 102:15
  103:2,16
area 57:14
arrest 93:13
arrested 93:9,12
arrival 77:8
arrived 77:1
  80:17
asked 4:23
  25:10 54:13
  64:2 72:11
  79:5 87:1,1,6
  94:12 95:20
  97:24 98:2,23
  102:21
asking 42:12
  58:19 80:8,9
aspects 96:11
assign 11:10
assigned 12:12
  38:3,5,10
assuming 56:22
  63:15
attachments
  84:21
attempt 22:21
  24:17 25:7
attend 10:10,13
  11:4
attended 11:12
  29:3
attention 52:23

53:4
attorney 107:20
  107:21
attorneys 79:14
August 15:5
  70:6,21 74:1,9
  74:16 75:12
  78:11 80:18
  97:20 101:4
author 9:13
  17:20 18:1,3
authored 71:5
authority 48:20
  49:18 52:5
  85:18,20 86:1
authorized
  48:21 49:19
authorizing
  86:14
aware 20:9,10
  24:14 45:18,20
  45:21 80:16
awhile 100:8

**B**

B 3:9
bachelor's 17:14
back 4:15 5:23
  8:1,6 11:13
  35:4 57:22
  58:8 64:20,21
  65:4 85:14
  99:12
background
  22:13
bad 21:20
bar 20:1,5,6
  88:4
based 9:19 10:4
  32:10 33:14
  54:17 56:10
  73:15 104:5
Batis 24:13,18
  24:20,21 25:4

25:6,12,14
  45:13
BEAST 19:21
  20:6 49:2,6,13
  56:1 65:10
  75:13 91:21
  92:5,24
began 72:24
beginning 19:4
  19:17 80:14
begins 71:8 72:6
  74:6
behalf 2:6,13,18
belief 61:16,19
believe 12:21
  25:2,21 27:13
  27:16 29:13
  32:5,14 37:11
  38:21 39:6,23
  40:11 45:2
  50:5 59:24
  62:6,7 63:14
  72:20 76:21
  78:20 79:15
  80:14 88:14,20
  89:18 93:1,6
  96:4,5 99:4
  100:2 101:6,16
  102:6 104:7,20
believed 102:24
Benedictive
  17:17
Benton 15:8
  48:14 70:15,24
  74:2 76:21,22
  77:7,10,17
  78:15,20 79:12
  79:13 80:15,21
  86:10,14 87:2
  98:16 101:3
  102:22
best 8:22 19:3
  43:15 71:4
  95:9 100:11,13

Case: 1:18-cv-05681 Document #: 256-4 Filed: 11/21/22 Page 274 of 290 PageID #:1969

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 110

102:11
**better** 86:15
**Beyond** 39:12
**Blackmore** 90:4
90:17 91:10,16
91:17 93:20
**blessing** 86:15
**Bolingbrook**
2:10
**boss** 54:9,20
55:7,11
**bottom** 70:3
78:9
**Botzum** 61:1
80:12 87:15,20
**Botzum's** 80:16
**Boughton** 2:9
**Boy** 32:7
**break** 57:16
58:2 89:2,5
**Brian** 48:14
**Brown** 26:21
**bunch** 35:18
**business** 17:14

**C**

**cabinet** 41:20
44:22,24 45:3
45:23,24 46:2
46:5,24 47:3
47:10,13 48:7
48:9,22 49:2
49:21 59:6
61:14 63:23
64:15 74:3,10
74:18 83:4
85:19,22 91:20
91:23
**CALEA** 19:2,9
19:11
**calendar** 19:18
**call** 36:4 66:20
67:11 72:21
73:21

**called** 4:5 58:16
58:16 59:1,20
63:2 64:23
65:14 76:18
78:21 83:9
**calling** 29:15
**capabilities**
28:16
**Capparelli**
14:18
**caps** 19:22
**care** 60:15,17
**career** 29:5 88:1
**case** 11:16 22:1
22:5 23:6 46:1
51:23,23,24
55:8 91:1,1
92:17,21,22
93:5 96:7
**cases** 47:16
49:17 86:19
**Cassandra** 1:3
2:21 4:10
106:3
**cause** 67:8 80:3
**cell** 22:10,16
25:19 33:9
37:16 39:18
57:4 59:19
60:12 63:12,19
66:14 67:3
68:14,18,19,21
69:10,15 71:13
73:10 75:18
79:7 82:23
83:17 88:18
94:15,21 95:23
96:14
**Cellebrite** 27:23
28:6,16 33:10
33:16,19,23
34:2,4,12
36:13,24 37:16
38:16 39:19,20

40:6,7,10,18
40:21 42:23
52:7 57:11
58:17,18 59:21
60:5,13,20
61:7,12 62:2,4
62:11,14,19,23
63:13,17 64:7
66:6 67:16
69:6 71:22
72:3 73:3,10
73:23,23 75:19
83:18,19 94:14
94:15,22 95:8
95:17,24 96:14
97:5,9
**center** 78:5
**certain** 77:3
102:23
**certainly** 32:19
**Certified** 1:12
107:6
**certify** 106:10
107:7
**chain** 8:15,16,20
8:24
**change** 79:2
**changes** 106:13
**charge** 12:9
53:12 55:1
80:24 86:22
**charged** 86:21
**charges** 92:9
**charging** 53:21
**check** 87:17
**Chicago** 2:4
84:18
**chief** 6:5,7 7:2,5
7:16 8:14,14
8:19,19 13:22
14:22 15:1,3,4
15:8,9,11,14
15:18,23 16:3
26:21 32:8,13

32:16,18 45:10
48:3,12,16,21
49:20 52:21
54:21 56:5
57:5 58:24
59:16,22 60:14
60:16 65:7
66:9,20 67:7
67:10 70:14,24
71:6,21 72:7
72:12,19 74:2
75:3 76:21,22
77:7,9,17 78:4
78:13,14,15,16
78:19,19,20,23
79:12,13,13
80:15,21 81:1
81:24 82:6
86:2,9,10,14
87:1 89:20,20
89:21 90:10,10
90:11,12,12,13
90:13,14,16,19
90:19,22,22
91:20 92:22
93:24 97:20,22
97:23 98:16
100:10 101:2
101:20 102:4
102:12,22
103:3,15
**chief's** 91:24
92:3
**chiefs** 46:3 47:2
86:20
**choice** 104:22
**chose** 14:6
**circumstances**
25:24 26:17,24
**cited** 72:23
**city** 1:6 2:13,20
14:8,10,13,16
14:19 68:11,20
69:3 78:21

79:14,14,20
81:1 104:13
106:6
**City's** 105:3
**city-issued** 79:6
79:7,8,12,18
**Civil** 1:15
**CLARK** 2:15
56:11,13,17
57:13 58:1
65:18 99:8
104:15 105:10
**clear** 46:17 48:9
59:22 94:19
**clearance** 21:23
21:24
**clearly** 78:6
**close** 15:16 36:1
38:2 71:13
75:5
**code** 1:15 45:7
**coding** 20:1,5,6
**Coleman** 19:13
**collected** 82:13
82:17
**come** 21:10,13
31:22 40:9
57:22 63:3
83:14 85:14
**coming** 77:4,15
**command** 8:15
8:17,21 9:1
**commander** 9:6
16:4 94:1
**commencement**
107:8
**commencing**
1:17
**comment** 88:16
**commission**
108:8
**communicate**
13:6 20:20
56:4 79:16

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 111

87:20
**communicated**
14:13 20:23
66:13 103:1
**communicating**
47:4
**compiled** 29:24
**complaint** 5:18
6:11,14,18,23
7:4,12,17,20
8:7
**complete** 83:12
86:5 106:12
**completed** 92:7
**compose** 70:22
**computer** 27:23
28:2,16 30:5,8
33:10,16 36:13
37:12,14,17,17
38:1,2,3,5,7,11
38:13,16,20
39:2 41:21
42:7,8 43:7
46:9,13 50:7,8
52:1 55:24
56:2,4 57:3,11
59:14 60:13
61:17,23 62:18
63:24 68:5,6,8
68:9,12 69:1,2
69:3,16 71:23
72:3 73:4,10
73:18 75:10
76:14 77:3
79:6,7 82:23
83:18,19,20
85:9 88:9,12
101:22
**computers** 28:6
77:21
**concerned** 53:17
103:11
**concerning**
107:10

**concerns** 63:3
65:15 66:5,9
66:13 67:2
76:16 83:15
**concluded** 81:12
81:14
**conducted** 76:15
**conducting** 38:8
**confirm** 89:21
**connection**
82:11 91:19
**consider** 28:5
36:1
**considered**
28:13
**consist** 28:20,24
**consisting**
106:11
**constitute** 66:21
**constitutes**
107:15
**constraint** 87:12
87:23
**consulted** 76:22
**contact** 57:10
**contacted** 57:5
62:8 65:16
72:7
**contained** 51:13
**containing** 83:5
**contents** 6:22
7:4,12,17 8:8
33:6,7,9,15
34:1,11 36:12
36:23 37:15
39:18,19 40:5
40:6,18,22
41:14 42:22
43:17 46:6,19
48:7 51:20
52:14 53:23
55:24 57:12
60:12,20 61:7
61:11 62:1,4

62:10,18 63:12
63:16,19,21
64:6 66:5
67:14 69:5,10
71:13,16 73:3
73:9 76:10
83:6 94:14,21
95:1,10,22
96:14 97:21
**continuing**
19:18
**control** 14:10
44:1 49:24
50:17,23 51:11
59:4
**controlled** 62:20
**conversation** 7:7
7:10,16 22:19
23:2,5,14
25:12,15 26:5
26:8,12,13
34:6,7,10,22
35:1 36:22
44:10 67:12
94:12,20 95:2
95:11 97:22,23
98:5
**copied** 46:16
73:22
**copies** 51:15
63:21 74:2,4,7
74:10,22,24
75:1
**copy** 39:23 40:1
41:24 58:19
60:6 61:21,22
63:12,18 74:17
81:3 105:8
**corner** 45:1
**Corporation** 1:7
106:7
**correct** 6:8,10
6:13 9:10 10:8
12:14 15:10,13

15:22 16:1
17:7 20:14
33:21 34:9
37:4,5 38:24
42:19 43:9,18
43:19,23 44:2
44:3 47:24
48:5 50:18,19
52:15 55:15
63:1 64:2 67:5
67:6 70:8,15
70:16,19 71:24
72:1,3,5,10
76:17,19 78:10
78:23 79:8,9
84:15,16,20
85:10 95:18,19
97:12 98:9
100:4,5,12,17
101:8 102:9,16
103:5 104:6
106:12
**correction** 50:10
**corrective** 63:6
63:11
**counsel** 107:20
107:21
**County** 54:1
107:2,5 108:7
**couple** 4:11 5:23
16:10 35:16
39:10,16 57:15
65:2 77:11
97:19
**course** 85:16
**court** 1:1,16
12:19 58:14
69:19 89:13
105:6 106:1
**courthouse**
10:19
**courtroom**
10:23
**Craig** 84:14

**created** 43:14
64:1,10 65:6
**creating** 63:18
**crime** 55:9 76:15
**crimes** 28:10
54:11
**criminal** 10:10
12:16,20 82:12
85:21 93:21
**Cross-Examin...**
3:5 94:6
**Crowley** 10:11
10:20 11:13,22
12:16,23 15:21
48:4 82:8,12
83:1,4 85:2,8
**Crowley's** 10:24
12:6,20
**CSR** 107:4
108:10,11
**custodian** 86:3
**custody** 25:20
50:17
**CV** 1:5 106:5

**D**

**D** 3:1
**D.C** 95:11
**daily** 11:21 12:2
**DARCY** 2:8
**dark** 57:18
**Darrell** 95:1
97:2
**data** 39:13 63:13
69:5 76:17
**date** 5:15 20:17
31:1 65:1 70:6
70:6 84:19
93:13 97:12,16
98:1,4,5
100:22,24
101:4,13
102:15,15,16
102:16,17,23

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 112

103:4,7,11,14
103:15,19,22
107:18
**dated** 84:14
**dates** 5:2 15:17
30:18 72:22
78:5 102:8,12
102:13
**Dave** 90:2
**David** 90:4
**day** 24:1 35:17
36:5 65:2
78:21 92:8
93:10 95:7,10
98:6,24 103:9
106:15 108:2
**days** 41:3 51:7,9
65:2 73:9
77:11
**Dearborn** 2:3
**December** 15:5
**decided** 81:14
**decision** 13:23
86:7
**decisions** 53:21
**Defendant** 2:13
2:18
**Defendants** 1:9
106:9
**definitely** 53:13
59:10
**definitively**
103:4,23
**degree** 17:14
**delay** 95:13
**deleted** 66:6
73:23 97:8
**deleting** 83:18
**deletion** 96:13
**deliver** 102:1
**Dennis** 89:24
**department** 8:8
8:17 9:23
12:10 13:17

15:24 17:6,8
18:17 19:17
20:13,15 21:16
21:23 35:7
38:4,6,11
45:17 48:20
49:10,19 52:5
56:7 68:10,11
68:19 69:15
77:2,13 80:17
82:9,14,17
84:2,5,18
87:15 88:2,13
89:19 90:10
**department's**
18:2,6 24:4
28:5
**department-is...**
39:21
**departments'**
19:2
**depends** 41:4
91:1
**depicted** 68:3
88:17
**deposed** 5:12
96:6
**deposition** 1:11
4:1 5:6,9
104:18 106:10
106:12 107:12
107:17
**depositions** 1:17
**deputy** 6:6
15:11,14,18,23
16:3 26:21
32:8,18 46:3
47:2 48:3,12
48:21 49:19
52:21 56:5
57:5 58:24
59:16,22 60:14
60:16 65:7
66:9,20 67:7

67:10 71:21
72:7,12 78:14
81:24 82:6
86:2,20 89:20
90:10,12 91:20
91:24 92:3,22
93:23 97:22
**describe** 68:2
**described** 20:4
80:13 99:23
102:4,13
**describes** 70:17
**describing** 47:18
**description** 20:2
**desk** 37:11
38:22
**desktop** 38:12
39:1,4,6,6,22
40:24 43:4,11
43:12,18 44:15
44:16 50:3,16
50:23 51:20,22
59:14 67:17
68:5 69:8,12
69:14 76:7
**desktops** 82:24
**detail** 11:3,6
**detective** 6:12
7:20 24:9
25:18 28:8,15
30:15 32:10,23
35:1,12,22
59:5,13 75:16
96:7,9 97:7
**detectives** 12:7
32:20 58:21
71:23 73:11
**determination**
80:4,6,9
**determine** 54:3
55:4 60:11
93:13
**determined**
79:10

**device** 37:12
38:7,11,13
39:2 46:13
62:12,19 63:19
64:5 88:5,12
**devices** 46:13
51:16 69:1,2
69:16 77:3
79:6,8,12,19
79:19,24 80:23
81:7 82:23
83:20 85:9
88:9
**dictate** 54:16
**different** 8:11
18:16,20 29:9
87:9 102:20
**differently** 29:1
**direct** 3:5 4:7
23:4 49:9,13
87:14,20
**directed** 22:21
23:23 24:16
25:7 79:11,18
**directing** 23:9
52:18,21 101:3
**direction** 22:3
22:15 27:5,18
44:8,11 53:16
73:13 81:16
87:7,10,16
96:10 107:14
**directives** 84:3,6
**directly** 8:22
10:5 24:10
38:16 107:22
**disc** 46:14 62:13
63:20 64:7
**disciplinary**
29:23 30:1,14
31:15,19
**discipline** 30:2,3
30:3,4,6 32:1,2
32:4,6,9,12,13

32:15,20
**disciplined**
32:24
**discrete** 29:6,8
**discs** 51:16
**discuss** 6:22 8:7
13:13
**discussed** 7:4,19
24:22 26:20
94:22
**discussing** 67:23
**discussion** 7:22
69:21
**discussions** 8:4
**disprove** 77:21
**dispute** 97:14
**disrupt** 89:9
**disseminating**
30:16 33:1
**dissemination**
32:11
**DISTRICT** 1:1
1:1 106:1,1
**division** 1:2 24:9
72:16 79:5,11
79:17 80:1
83:15 90:24
91:18 106:2
**document** 29:9
29:10 70:7
100:15,18
101:24
**documents** 5:5
99:19
**doing** 30:22 35:6
76:2 77:23
86:16 102:11
**domestic** 91:9
**doubt** 102:7
**download** 40:18
40:20 41:4
43:3,23 44:14
51:13,15 71:22
73:2 74:17

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 113

83:6,19
**downloaded**
33:12,16,24
34:3,5,11
36:12,23 37:3
39:13,18,19
40:5,6 41:8,14
41:21 42:6,22
43:17 50:2,6
52:9,14 54:8
56:8 57:4
61:12 62:11,11
62:18,20 66:14
67:15,16 69:5
69:11 73:18
75:18 76:6
88:18
**downloading**
33:9 40:22
62:1,13
**downloads** 46:9
46:9
**dproctor@tre...**
2:11
**drafted** 18:19
**drafting** 19:6
**drive** 37:18,20
39:20,24 40:8
40:10,23 41:9
41:13,16,19,22
42:1,24 43:3
43:13 44:2,4
44:21 45:22,23
46:6,14,18,20
46:21,23 47:9
48:6 49:1,5,12
49:24 50:18,24
51:12,21,24
59:4 61:13,17
61:21 62:3,12
63:20 64:7,9
64:10,13 65:5
65:9
**drives** 46:8,12

46:15,15 51:16
67:17 69:7,11
75:13 83:5
85:19 87:3
**due** 21:4 87:12
87:22
**duly** 4:3,5 107:9
**dumb** 84:12
**duty** 28:5 65:22
**Duzan** 1:12
107:4 108:10

—————
**E**
**E** 3:1,9
**e-mail** 2:5,17
100:20 101:13
101:17
**e-mailed** 101:7
**e-mails** 2:11
7:15
**earlier** 32:15
87:6 94:12,17
95:20
**East** 2:9
**EASTERN** 1:2
106:2
**education** 17:13
**Edward** 1:7
2:18 106:7
**effect** 19:16
20:12
**effectively** 63:17
**effort** 79:23
**Egizio** 93:7
**either** 29:4,9
67:20 69:11
85:8 90:13
95:1
**elapsed** 40:17,20
**elect** 104:23
**employed** 35:9
**employee** 29:17
70:11 107:19
107:20

**encrypted** 44:18
**ended** 72:24
81:11
**enforcement**
53:9
**engine** 29:12
**entire** 33:15
**entirely** 104:22
**equipment**
76:14
**error** 104:20
**Esq** 2:20
**Esqueda** 89:22
90:10 91:4,17
92:21
**established** 19:5
**estimate** 5:1,2
51:6 73:15
100:21
**evaluation** 9:14
9:17
**evaluations** 9:3
9:7,20,24 10:4
10:7
**event** 24:2 36:7
36:11,14 98:20
**events** 11:14
22:14 24:4,8
26:20 41:2
70:17 71:1
83:13 99:23
100:9 102:4,13
103:5 104:5
**evidence** 19:15
20:1,5,7,8,11
46:1,4 47:1,15
47:20 48:1,22
49:3,6,13,20
54:10 62:10
75:13 82:13,16
83:3 85:21
86:3,6,18,20
88:2,7,11
91:18,22 92:2

92:21 93:2,14
**exact** 5:15 16:10
16:15 18:10
29:20 30:18
48:17 65:1
**exactly** 7:1,22
15:17 17:23
25:3 26:2
31:12 37:1
40:15 44:9
51:1 73:17
78:11 79:3
91:12 94:23
97:3
**examination** 3:2
3:5,6 4:7 81:6
81:8 87:8,12
99:14 107:9
**examined** 4:6
80:2
**examining** 85:9
**example** 61:1
**excluding** 91:15
**EXCUSED**
105:11
**executed** 25:18
27:9 33:3
52:13 54:4
**execution** 23:21
25:24 26:17,24
**exercise** 104:24
**exhibit** 3:9
69:18,24 70:1
72:23 78:1
80:13 84:9,21
99:12,16,23,24
100:2 101:3,12
102:3
**exhibits** 3:12 4:2
69:19
**expect** 30:6
**expected** 12:13
23:10
**experts** 28:5

**expires** 108:8
**explain** 14:1
56:14,15
**explained** 4:15
50:4 71:10,21
**express** 66:4
**expressed** 66:9
67:2
**expungement**
30:11
**extract** 83:20

—————
**F**
**facile** 27:22 28:1
**fact** 11:13 20:21
20:24 24:21
54:19 66:5
75:21,23 86:11
86:16 87:1
95:16 96:1,3
96:10,22 97:1
**facts** 26:16
**factual** 22:13
**fair** 4:19 10:2
42:14 43:24
55:12 57:17
64:3 92:6
**fairness** 98:15
**familiar** 19:14
33:18 62:23
**far** 53:16 71:7
77:8 100:7
**Father's** 35:17
36:5
**fault** 47:7,7
**feel** 5:2
**figure** 105:3
**file** 23:6 29:7
30:2
**filed** 5:18 6:6
55:23
**files** 46:2
**final** 32:2,4
81:19

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 114

| | | | | |
|---|---|---|---|---|
| **find** 93:19 | 106:10 107:12 | 66:9 72:13,13 | 6:12 7:21 | **guys** 41:5 |
| **fire** 14:11 | **forensic** 76:20 | 73:12,22 88:16 | 11:20,21 12:12 | |
| **firm** 81:5 | 76:23 81:6,17 | 96:5,10 97:4 | 12:15,22 13:6 | **H** |
| **first** 4:5,12 5:22 | 81:20 84:19 | **general** 18:2,6,8 | 13:9 20:19,20 | **H** 3:9 |
| 6:15,18,23 8:6 | 87:7,12 | 18:13,18 19:2 | 21:10,16 22:7 | **half** 84:23 |
| 17:5,10 20:15 | **forensically** 80:1 | 19:7,14 20:11 | 22:20 23:4,22 | **Hall** 2:2,2 4:9 |
| 20:18,20,24 | **forensics** 76:15 | 47:19 | 24:10,15 25:1 | 56:13 57:13 |
| 22:20 23:22 | 77:9,18 81:7 | **generally** 20:9 | 25:7,19,21 | **hall@adamsle...** |
| 24:15 43:22 | **forgets** 29:19 | 70:17 | 26:8,9,16,23 | 2:5 |
| 46:18 48:8 | **form** 56:10 | **generated** 35:1 | 27:9 33:3,14 | **hallway** 10:15 |
| 51:12 58:16 | 96:20 98:11 | **German** 28:8 | 33:22,24 34:10 | 10:16 |
| 64:22 75:24 | 104:21 | 61:1 96:7,9 | 35:2,13,22 | **hand** 108:1 |
| 76:3 102:23 | **formal** 17:12 | 97:7 | 36:11 37:2 | **handled** 11:16 |
| **five** 16:6 17:3 | 30:6 | **give** 4:14,17 | 38:19 39:16 | 83:10 93:14 |
| 48:18 57:20,22 | **formatted** | 12:1,7 22:13 | 40:6 41:7,12 | 95:22,23 96:2 |
| **five-minute** 89:1 | 101:17 | 27:18 44:6,11 | 41:18 42:22 | 96:11 |
| **flash** 37:18,19 | **Forsyth** 108:1 | 51:6 61:18 | 43:13,16 44:5 | **handling** 20:1,7 |
| 39:20,24 40:23 | **forth** 47:22 78:5 | 81:16 89:17 | 44:16,21 49:6 | 66:13 76:16 |
| 41:9,13,16,19 | **found** 36:17,21 | 100:21 | 51:3,12,14 | 80:24 81:5 |
| 41:22,24 42:23 | 52:14,17 53:2 | **given** 42:5 59:5 | 52:8,23 53:23 | 87:3 91:22 |
| 44:21 45:22,23 | 53:2,7 54:21 | 64:14,19 98:22 | 57:2 59:5 | **handwritten** |
| 46:5,14,18,20 | **foundation** | 106:10,12 | 61:13,13,18,24 | 93:3 |
| 46:21,23 47:9 | 56:10 65:18 | 107:15 | 65:14 66:4,8 | **happen** 50:11 |
| 48:6 49:1,5,12 | **four** 15:16 16:15 | **go** 10:2 18:14 | 83:11 106:7 | **happened** 52:1 |
| 49:24 50:18,24 | 17:3 48:17,17 | 24:19 40:3 | **Grizzle's** 37:17 | 65:1 75:7 92:8 |
| 51:12,16,21,24 | **frame** 18:23 | 50:21 51:10 | 38:1,20 40:21 | **happens** 18:22 |
| 59:4 61:13,17 | 28:21,24 36:10 | 55:9 56:20 | 43:11 44:2,15 | **happy** 35:17 |
| 61:20 62:2,12 | 42:11 70:18 | 57:17 64:11 | 50:3,16 55:24 | 36:4 |
| 63:20 64:7,9 | **free** 5:2 | 80:22 82:4 | 56:4 59:14 | **hard** 46:8,12,15 |
| 64:10,12 65:5 | **fresh** 102:5 | 85:16 89:11,12 | 61:17 63:24 | 46:15 73:18 |
| 65:9 67:17 | **fresher** 104:5 | 95:6 | 67:17 76:7 | 92:10 101:1 |
| 69:7,11 75:13 | **friend** 36:2 | **going** 13:2 14:11 | **group** 19:5 | 102:19 |
| 83:5 85:19 | **front** 84:9 92:14 | 22:2 24:18 | **guess** 4:21 5:3 | **Hawk** 14:20 |
| 87:3 | **fun** 31:7 | 55:16 56:9 | 8:22 13:5,24 | **head** 85:3,5 |
| **focused** 95:5 | **further** 64:11 | 61:8 71:11 | 14:6 31:7 33:7 | **header** 101:13 |
| **folks** 77:13 | 99:5 | 84:8 85:14 | 33:21 36:19,20 | **hear** 4:13 75:24 |
| **follow** 22:3 | | 89:9,17 92:10 | 37:23 43:15 | 76:3 |
| **follow-up** 54:16 | **G** | 97:11 | 52:20 90:19 | **heard** 4:18 56:6 |
| 99:11 | **G** 90:6 | **Golucki** 84:14 | 91:2,15 92:13 | 57:7 59:17,23 |
| **following** 58:3 | **gainfully** 35:9 | 84:17 | 100:22 102:10 | 60:1 67:22 |
| 89:6 97:22 | **gathered** 91:18 | **good** 4:9 89:12 | 102:20 | 68:1 72:14 |
| **follows** 4:6 | **Gavin** 60:22,24 | **Gosh** 28:12 31:5 | **guessing** 20:22 | 75:21,23 88:16 |
| **force** 28:10 | 63:15 64:1,5 | **gotten** 37:16 | 34:17 | **held** 48:23 78:17 |
| **foregoing** | 64:11,18 65:5 | **Grizzle** 1:7 2:18 | **guilty** 13:5 | 85:23 |

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 115

helped 18:15
helpful 56:15
helps 78:4
hereto 107:22
hereunto 107:24
HESS 2:9
hey 57:13,13
highest 17:12
hire 85:1
Hock 14:15,17
hold 16:2,5,7,9
16:12,14,16,18
92:9
homicide 55:10
88:2,3,8
HOPPE 2:14
hours 41:3 51:7
51:9
huh 96:22
huh-uh 100:1,1

I

IA 30:12
identified 84:17
identify 47:19
85:7
identifying 85:4
III 2:2
Illinois 1:1,15
2:4,10,16
17:17 106:1
107:1,6 108:2
108:7
image 50:22
images 67:20,23
75:17 85:8
important 4:12
impose 32:9,12
32:13
imposed 32:1,4
32:15,20
improper 32:10
improperly
32:24

inappropriate
31:8,10
inappropriately
31:10
incident 30:4
Incidentally
35:6
incidents 46:2
47:2
included 63:11
includes 106:13
including 87:15
87:22
inclusive 106:11
incorrect 98:4
independent
10:6
indicate 97:21
indicated 42:13
100:14
indirectly
107:22
individual 6:11
individually
92:10
infer 62:5
inferred 62:7
inform 21:24
information
12:1,5 21:6
24:15 25:5
29:1,7 30:16
31:6,9,10
32:11 33:1
49:15 62:20
75:4,5,8 83:18
83:20 95:7,15
95:16 96:1
97:8
informed 21:14
22:20 66:23
initiate 30:14
54:17 66:15
67:8

initiated 31:15
31:19 76:20,23
77:18 78:15
instance 32:3
104:19
institution 17:16
insufficiently
62:23
intended 27:11
27:15 60:17,19
60:21 61:6
interest 21:8
interested
107:22
interim 8:14,19
14:24 15:4,9
78:4,12,23
89:20 90:13
internal 30:4,8
66:15 67:8
91:11
intervals 41:2
introduced 3:9
3:12
inventory 48:9
investigated
15:24 48:4
82:8 89:18
90:9,23
investigating
20:16 21:8
75:9
investigation
24:4 30:21,23
31:4 36:8,14
38:9 47:21
52:19 53:10,17
54:15 55:2,21
66:16 67:9
76:2,13 82:11
83:1,4,10,11
83:15 86:5
87:18 88:3,8
94:2

investigations
6:9 11:17
15:12,15,18,23
16:3 24:9 32:9
32:19 34:17
38:23 48:3,12
48:21 49:20,21
53:12 54:10
57:7 59:18
63:22 67:4
72:16 73:11
76:14 77:14
79:5,10,17,24
82:1,7 83:21
85:21,22 86:3
89:20 90:24
91:16,18,19,21
92:2,3,7,23
investigator
93:5
involved 12:9
18:7,13 63:18
80:12,14 94:1
involvement
55:20 80:16
involving 86:19
iPad 88:5
issuance 21:11
27:4
issue 9:16 83:17
84:2,6 87:10
87:15
issued 5:23
69:15 87:2,6
88:12
it'd 29:3 37:14
50:7 55:12
73:18 80:6
100:19
Izzy's 88:4

J

J 2:9
Jackson 90:2,15

91:8 93:11
JAMES 2:9
January 13:20
19:4
Javier 89:22
Jensen 56:5 57:5
59:1,16,22
60:15,16,24
61:5 62:8 63:2
63:5,5,10 64:1
64:18,22 65:7
65:14 66:10,12
67:7 71:21
72:7,12 73:21
83:14 94:13,20
95:9,11,17,24
97:23 98:5
Jensen's 66:20
67:10 73:12
jhess@tressle...
2:12
Jim 14:15,16,18
job 17:10
John 1:8 81:3
106:8
join 56:11
Joliet 1:6 2:13
2:20 8:8 9:23
11:3,12 13:16
19:16 20:12
28:19 35:7
38:4,5,10
39:21 45:10,16
48:20 49:19
52:5 67:19,22
68:1,10,11,19
68:20 69:15
77:2 82:8,13
82:17 88:13,15
89:18 106:6
Jr 2:9
judge 21:19,21
54:1,5
July 108:2

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 116

**June** 1:17 97:9
98:9

**K**
**keep** 20:8 21:14
45:24 48:22
57:18,21
**kept** 29:1 49:16
85:20
**key** 45:5,6,10,13
45:17,20 48:23
85:23
**keys** 45:8
**kind** 19:10 31:7
38:8,12 39:2
**kinds** 29:1
**knew** 25:6
**KNIGHT** 2:14
2:14
**know** 4:21,22
5:15 6:16 7:1
7:23,23 8:2,2
9:5 10:1,14,15
10:15 12:1,2
16:10,15 17:23
18:10,23 19:20
20:17 22:24
24:19 25:3
27:16,21 28:17
28:18 29:20
30:10,11,17,21
31:1,5,13
32:19 34:4,4
36:17,17 37:1
37:15,23 38:14
40:19 41:1,5
41:10 42:1,2,7
42:10,14,18,18
43:8,10,15,21
47:15,15 48:17
48:24 49:4,17
49:22,23 51:3
51:4 52:6,7
53:6 55:9,16

58:17 59:8,10
60:3,21 61:2
62:21 64:17,24
65:17,20,22,23
65:24 66:1,3
67:11 71:2,7
73:5,14,17,20
73:24 77:3
80:11 82:10,15
82:21 83:2
87:4,5 89:8,8
93:21 94:23
95:21 96:3,4,6
97:2,4,6 98:15
98:17,22 99:3
100:1,7,20
101:18 102:17
103:19,21,24
104:1,3
**knowledge** 95:9
95:21 100:13
**KURNIK** 2:14

**L**
**L** 2:8
**lab** 76:16 77:1,9
77:12,18 84:19
**labeled** 45:3
**lack** 56:10 86:15
**laid** 73:16
**Lamken** 13:14
22:4,8
**Lantern** 28:2,6
28:12 33:19
**laptop** 38:12
39:1
**laptops** 69:1
82:24
**larger** 29:10
**late** 55:17
**law** 2:2 53:9
81:2,5
**laws** 18:21,22
79:21

**lawsuit** 4:10
5:18,19 55:22
**lawyers** 56:19
105:3
**lead** 93:5,6
**leading** 22:14
**learn** 20:15,18
64:12 77:9
80:20
**learned** 25:17
36:8 59:17
66:12 77:12
94:13 95:7,16
**learning** 24:3
**led** 82:12 83:11
**left** 75:9
**let's** 45:1 56:14
57:20 69:24
88:24 91:3
92:12,12,18
**letter** 6:20
**letters** 7:15
**level** 8:17 17:12
**lieutenant** 16:8
16:13 24:11,12
24:13 26:21
45:13 93:6
**life** 5:11
**line** 57:18,21
75:3 79:2
94:16 101:14
**listening** 10:24
**little** 14:23 16:6
78:5,22 102:20
**LLC** 2:2
**LLP** 2:8
**loaded** 40:10
43:12 46:7
**lock** 44:7 45:5,6
45:8,11,14,17
64:14
**locked** 41:20,23
42:3 44:22,24
45:3,23 46:5

65:13 74:3,10
74:18
**lodge** 55:16 56:9
**log** 49:6,12
75:12
**logged** 49:2 56:1
65:9 91:21
92:4,23
**long** 14:22 15:3
15:14 16:5,9
16:14 17:2
19:20 22:19,23
41:4,7 43:7
48:15 50:22
64:22 100:22
**longer** 91:24
**look** 53:5 55:13
69:24 91:2
100:20
**looked** 19:19
53:8 55:5
**looking** 36:18,22
52:12 71:17
96:4
**Lorinda** 13:13
22:4
**lot** 18:11
**luck** 84:12

**M**
**Macon** 107:2,5
108:7
**maintained** 92:3
**major** 28:10
**making** 31:7
53:20 63:11
**man** 31:20,20
**managed** 92:5
92:24
**management**
19:16 20:12
49:3,7,13
75:13 91:22
**manager** 14:8

14:10,13,16,20
79:14 81:1
**manager's** 78:22
**manner** 27:3
**marked** 3:12 4:2
**materials** 48:10
53:24
**matters** 41:3
107:11
**MATTHEW**
2:15
**mayor** 14:8,19
14:21
**McKinney**
30:15 31:9,16
32:1,4,16,24
75:16
**McKinney's**
28:15
**mclark@khk...**
2:17
**McWherter**
89:24 90:12
91:6,17 93:8,9
**mean** 8:16,23
9:5 10:14
11:15,15,19,24
13:4 14:5
18:14,20 21:20
21:24 23:13,18
29:18,20 32:12
35:3,8 38:2,9
38:11 42:4,10
44:9,17 46:11
46:12 53:7
55:7,8,11
60:10 61:22
62:15,16 66:22
66:22 71:7
74:15 75:10
87:18 96:21
100:19 103:24
**meaning** 31:18
82:23

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 117

medium 101:19
meeting 50:11
memo 6:20 51:4
  70:14,22 72:19
  75:3 78:3,13
  81:4 84:13
  86:13 97:19
  98:16 99:18
  102:8,14,22
  103:15 104:4
memoranda
  7:15
memorializing
  26:16
memory 96:19
  100:3 104:6
memos 101:20
message 21:5
  36:18,21 71:17
messages 21:7
  37:3,6,10,13
  38:15,19 39:8
  39:12,17 40:8
  40:13,24 41:8
  41:15 43:2,11
  43:22 50:1,16
  50:23 52:9,15
  52:22 53:5,11
  53:18 54:7,18
  54:21,24 55:6
  55:13 56:3
  57:3,3 59:13
  76:6,8,11
meted 30:7
Michelle 1:12
  19:22 58:9
  69:18 89:12
  99:12 101:9
  104:10 107:4
  108:10
middle 79:1
Mike 24:13
mind 61:22
  102:5

minute 22:24
  57:15
minutes 57:22
misstates 55:17
mistaken 41:20
  43:6 50:5
modifier 74:22
modify 74:24
moment 46:18
months 5:16
  97:19,19 98:17
  98:18
morning 4:9,11
  78:19
move 78:6
municipal 1:6
  106:6
mute 57:18

_____
N
_____

N 3:1 90:6
Nagra 90:6,21
  91:13,17 93:22
  93:23
name 4:9
named 6:11
  84:14
names 89:17
narcotics 16:8
nature 31:11
  62:1
need 4:14 19:1
  29:14 78:6,6
  79:21
needed 8:23
  53:10 54:24
neighborhood
  16:23
never 4:21 5:3
  10:5,5 33:19
  63:1 72:12
  87:2
new 14:10,16
  18:21,22,23

news 71:24
Nicholas 10:11
night 93:12
NOPT 16:23
  17:3
North 2:3,15
NORTHERN
  1:1 106:1
Nos 4:2
Notary 106:16
  107:5 108:7
note 104:19
notes 6:20 7:14
  96:4 99:19,22
noteworthy
  26:24
notified 95:24
November 84:14
number 70:9,11
  70:11,12,13

_____
O
_____

O'Dekirk 14:21
O'Driscoll 81:3
oath 106:12
object 56:19
  96:17 98:11
objection 55:17
  56:10,11 65:18
objections 56:16
obtain 21:17
  22:8,9,15,21
  24:17,17 25:8
  79:23 81:19
obtained 23:22
  25:18 82:24
obviously 56:22
occasion 50:17
  69:4
occur 34:12
  36:20
occurred 30:24
  43:21 73:4
  78:18 88:3

  102:14 103:5
occurring 24:8
occurs 79:1
offered 10:7
offhand 19:19
office 7:9 13:14
  34:17 41:19,23
  42:3 44:7,20
  44:23 46:3
  48:22 49:16
  53:7 58:19
  59:6 60:7
  61:15 63:23
  65:5,13 68:5
  68:13,14,24
  69:7,15 72:23
  74:3,11,19
  78:22 83:5
  85:19,23 91:20
  91:24 92:4,23
  105:8,9 108:1
officer 4:10 5:18
  7:12,17,20 8:7
  8:14,20 9:4,9
  9:14,17,20,22
  10:10,19,20,24
  11:3,12 12:16
  15:24 16:21,23
  17:1,2,5 19:2,5
  19:9,10,11,12
  19:13 20:16
  21:8 22:16,22
  23:24 24:4
  30:7 31:6,8,14
  31:18,21,24
  46:2 47:2,16
  47:21 49:16
  56:5 57:6,7
  67:19,22 68:1
  70:12 72:8
  74:16 75:17
  85:1 88:15
  93:18 94:15,21
  95:23

officer's 9:17
  28:19,23 29:2
  29:7,13,15
  96:14
officers 8:9 12:9
  19:6 31:18,24
  49:17,21 56:6
  75:9 82:7
  85:22 86:19
  89:17 90:23
officers' 29:23
OFFICES 2:2
oh 8:11 23:16
  31:20,20 33:11
  81:13
okay 5:3 7:7
  14:1 21:20
  42:12 46:23
  47:4,6,8 50:20
  57:23,24 58:15
  58:24 63:2
  71:11 72:9
  73:20 78:8
  79:4 85:11
  89:11 92:12,16
  94:19 95:3,13
  95:20 96:6
  97:4,7,9,10,12
  97:13 98:15
  99:2 100:18
  105:4,10
old 48:9 96:4
once 42:8 95:15
  95:24
ongoing 11:23
  12:6 22:1
  53:16
open 57:19,21
operated 62:13
  62:23
operations 9:6
  16:4,13,19
  94:1
opinion 80:8

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

opinions 9:22
  10:3 13:7,10
opposed 46:13
  60:24 74:14
  102:12
oral 44:11,13
order 5:5,8 11:8
  11:9 19:14
  20:11 21:17
  44:12 66:15
  67:8 83:17
  104:19 105:8
ordered 12:12
ordering 105:6
orders 18:2,6,8
  18:13,18 19:3
  19:7
original 9:13
originally
  101:16
outcome 13:11
  107:23
outset 42:13
Over- 52:20
oversee 54:9
overseeing
  52:20
owned 38:3,10
owns 79:20

**P**
p.m 105:11
padlock 45:5
Pages 106:11
paper 101:15
paperwork 14:5
parlance 84:23
part 10:13 14:12
  23:6 29:9
  36:19 43:3,23
  52:11 55:11
  81:9 87:11,21
participated
  26:13 36:9,16

particular 19:5
  27:18 53:17
  54:6,14,23
  55:5
particularity
  47:20
particularly 5:1
  87:15
particulars 31:4
parties 107:21
password 44:17
patience 88:22
patrol 16:13
  17:1,2,5 83:10
patrolman
  18:15
PD 7:9 34:13,15
people 35:18
  36:4 44:18
  55:1 79:16
performance
  9:2,3,7,14,17
  9:20 10:7
  88:16
period 14:24
  30:11
person 20:22
  35:22 44:13
personal 13:7,9
  36:2 38:7,9
  57:8 59:18
  67:2,13 68:2,9
  68:18,21,22
  79:19,21,24
  83:16 88:5
  107:14
personally 17:20
  18:1,3,5 38:3
  52:18
personally-ow...
  88:8
personnel 29:7
  29:10,11,15
  30:8 57:8

59:18 67:4
  72:15 77:1,9
  79:4,11,17
  80:1 83:16
pertaining 1:16
phone 2:4,11,17
  21:4 22:10,16
  22:22 23:24
  24:7,18 25:8
  25:19 26:1,9
  26:18 27:1,6
  27:10,19,20
  33:4,5,6,9,15
  34:1,3,8,12
  36:13,24 37:4
  37:16 38:12
  39:8,14,18,20
  40:4,7,9,14,17
  40:21 41:9,14
  41:16 42:23
  43:17 44:15
  46:7,9,19 48:7
  50:3 51:13,20
  52:10,14 54:8
  54:22 56:8
  57:4,9,12
  59:13,19 60:12
  60:20 61:7,11
  62:2,4 63:4,12
  63:16,19,22
  64:6 66:6,15
  67:3,14 68:14
  68:18,19,20,21
  69:6,10,16
  71:13,22 72:15
  72:21 73:3,10
  73:22 74:17
  75:18 76:6,17
  83:6,17 88:18
  94:15,21 95:23
  96:14 104:2
phones 28:7
  79:7 82:23
  85:10

photo 67:20
photographic
  75:17
photographs
  85:4
photos 56:7 63:4
  66:14 67:13
  68:2 72:14
  82:18 83:16
  84:24 85:1,1,3
phrase 71:12
  75:4
phrased 54:13
physical 82:12
  82:16
pick 11:7
pictures 57:8
  58:22 59:19
  67:3 84:22
piece 29:6
pinpoint 42:5
place 7:8 11:5
  11:22 58:10
  64:23 70:18
  97:23 98:20
  106:11
Plaintiff 1:4 2:6
  2:21 106:4
planet 45:19
planned 63:7
played 13:10
Please 4:21
plus 12:9
point 43:16 44:1
  46:20 51:11
  57:2 63:20
  75:11 76:13
  102:18
police 8:8 9:4,9
  9:22,23 13:16
  13:22 19:16
  20:13 28:19
  35:4,7 38:4,6
  45:10,16 48:20

49:10,19 52:5
  67:19 68:10,11
  68:19 69:15
  77:2,13 80:17
  82:7,8,13,17
  84:18 85:1,21
  93:3
policing 16:23
  17:10
policy 20:14
portable 88:12
portion 81:17
position 13:21
  16:5,7,9,11,14
  16:16,18 17:5
  18:12 90:9
positions 18:12
  18:16 78:18
possession 44:2
  77:2
possible 57:15
  60:6 104:4
possibly 32:7
  102:2
post 48:15
practices 19:3
prepare 5:6,9
  9:2 100:18
prepared 9:8
  26:9,12 98:16
  99:18,24 100:2
  100:3,16,23
  101:5 104:3
prescribed 52:4
present 2:19
  12:19 20:23
  34:19 38:18,19
  68:13
presented 54:1
presume 4:17
previous 46:3
  47:2 49:17
  107:8
print 102:1

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 119

prior 15:11 21:6
30:13 50:16
55:17
probable 80:3
probably 7:1,6
17:3 24:6,7
29:11 34:13,17
36:6 44:9 51:3
51:8,9 53:7
54:19 55:22
65:2 77:11
90:18 104:2
problem 97:15
98:13
Procedure 1:15
proceedings
30:14 31:15,19
58:4 89:7
107:16
process 18:18
33:17 78:16
80:13
Proctor 2:8 3:5
55:16 56:9,14
56:22 57:20
88:24 89:4,11
94:7 96:18,23
98:14 99:4,7
104:12 105:8
produced 84:22
Professional
1:13
promulgated
48:20
property 19:15
20:12 68:10,19
prosecutor 21:3
22:4,21 23:23
24:16 25:7
prosecutor's
21:7 22:15
prosecutors'
13:14
prospectively

63:7
protect 93:18
protected 44:17
prove 53:19
77:20
provide 4:24 5:2
11:21 12:5,15
provisions 1:14
public 93:15
106:16 107:5
108:7
punch 45:7
purpose 20:6
35:20 53:18
54:6,14 85:6
purposes 11:4
53:9
pursuant 1:14
67:15
put 18:21,23
28:24 29:19
39:21 42:6
45:23 46:4,18
46:23 47:9,13
47:22 48:6
49:1 50:7 59:6
61:14 80:24
83:5 99:12
100:24 103:18

Q
qualified 8:18
qualities 9:22
queried 29:14
query 29:16
question 4:13,17
4:18,22 8:19
9:11 13:2 14:2
20:2,3 21:20
29:19 39:11
54:14 56:21,24
58:9,13 87:1,8
87:9 92:6,11
95:3,8 97:18

102:19,21
103:6,20
questioning
94:16
questions 4:14
56:20 88:21
89:10 94:3
95:20 99:5,8
104:8,15
queue 58:9
quick 85:15
quote 38:2,2
71:8,13,14
74:2,6 75:4,5

R
R 90:6
ranks 78:18
ratings 9:3,20
RCFL 42:8
46:16 76:18
79:6 80:2,17
80:22 81:6,15
84:20 85:7
87:7,11,16,21
RCFL's 81:17
81:19
reach 6:1,2
35:19
read 4:15 5:17
6:24 35:3 58:8
58:12 106:10
really 28:18
39:11 92:6
reason 24:14
30:14 41:24
54:23 55:5,12
61:4 74:13
77:19,22 87:22
92:8 97:12
reasonable
100:21
reasonably
102:5

recall 6:21 7:13
7:18 8:5 9:15
9:18,24 10:9
10:14,22 11:2
11:11,24 12:18
12:24 13:3,8
13:12,15 21:9
22:12 23:3,9
23:20 24:3
25:9 26:2,6
27:2,7 31:12
31:20,22 32:3
33:2,12 34:20
36:15 40:15
44:9 48:11
51:1 53:1
55:20 58:24
59:3 61:3 63:8
64:17 65:3
66:7,11 70:23
71:1 72:22
76:1,5,9,10,12
77:24 81:11
82:10 84:4,7
86:12 87:13,24
91:12 99:3,21
100:7,16
102:18
recap 71:1
recollection 7:3
10:6 30:19
71:5 73:7
82:22 101:2
recommend
84:5
reconvene 57:22
record 6:19 7:14
8:3 23:1,5,7,12
23:19 25:11,14
26:4,7,11,15
28:20,23 29:2
29:6,10,11,14
29:15 30:8
34:21,24 58:11

69:22 100:20
104:23 107:15
records 28:17
29:17,21,23,24
30:12 55:3
99:23 104:2
Redirect 3:6
99:14
reduced 107:14
refer 38:1 78:13
reference 56:5
57:6 59:3 72:7
referenced
73:21
referred 78:16
referring 14:17
14:20 75:5
99:20
regarding 7:16
22:14 83:17
regional 76:15
77:1,12
Regis 76:2,4
Registered 1:13
related 53:10
relating 20:11
28:5 30:15
47:21 83:3
92:2,22
relation 72:22
73:20
relationship
23:20 36:22
40:14 55:14
relative 76:16
107:19,20
remember 4:23
4:24 7:7,10
11:18 21:1
26:10,14,19
30:23 31:3,5
34:16,23 41:17
42:17,17 63:9
65:1 82:16

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 120

92:19 94:16
97:24 98:2
**remembering**
11:15
**remotely** 1:12
**removal** 94:20
95:15,22,23
96:11 98:6
**remove** 62:14
63:16
**removed** 61:12
62:3 73:12
95:10 97:8,21
**rendered** 12:20
**repeated** 4:15
**rephrase** 9:11
28:22
**rephrased** 4:15
**replaced** 15:8
**replicate** 84:11
**reply** 84:23
**report** 11:13
12:15,22 13:9
24:21 35:4,5
54:20 66:8,21
66:22,23 67:7
72:13 74:1
88:15
**reported** 24:10
66:19 67:11
72:18 100:9
107:13
**Reporter** 1:13
1:14 58:14
69:19 89:13
105:6 107:6
**reporting** 11:4
13:3 102:12
**reports** 11:22
81:20 93:3,3
**represent** 4:10
**request** 87:11,16
**requested** 58:12
**required** 21:16

21:22 22:3
**research** 19:8
**reserved** 105:2
**respect** 76:5
91:15,16
**responded** 27:4
**restroom** 57:16
**retire** 13:19,21
**retired** 13:18
35:7,10 81:12
**retirement**
13:23 35:13
**review** 9:19 19:2
39:9,13 48:1
51:23 54:17
104:18 105:1,4
**reviewed** 5:5
6:14,18 8:7
**reviewing** 53:18
**reviews** 9:3
**revise** 18:5
**revised** 18:10,15
18:19
**revising** 18:13
19:6
**revision** 18:7
**right** 31:22
35:11 41:21,22
42:5 43:1
47:23,23 50:6
56:23 58:6,10
71:10 79:1,2
85:15,17 92:1
92:9 97:17
98:3 101:6
104:17,21,24
**River** 2:15
**Road** 2:9,15
**Roechner** 1:11
3:3 4:4 56:16
58:6 89:14
94:10 97:20
99:16 101:12
106:14

**role** 13:10 16:2
53:14 54:15
55:14
**Rosemont** 2:16
**RPR** 108:10
**rules** 1:15 47:5
104:18
**rumor** 75:23,24
76:3
**rumors** 72:14
**Ryan** 90:6

---

**S**

**S** 2:15 3:9 88:4
**Sabrina** 2:20
**saved** 51:19,22
51:24
**saw** 37:24 85:8
**saying** 41:24
43:5,6 47:23
103:1
**says** 27:12 70:20
**scene** 8:23 55:10
82:19
**scenes** 55:9
**scope** 81:10
**screen** 41:11
57:18 78:1
82:2 84:8
99:13
**scroll** 101:9
**seal** 108:1
**search** 21:4 22:8
22:9,22 25:17
27:12,12,19,20
28:7 29:12
33:4 52:11
53:19 103:9
**searched** 33:7,7
83:1
**searching** 79:21
**second** 63:23
65:9 84:23
**Seconds** 41:10

**secure** 44:16
**see** 37:19 42:4
45:1 52:22
53:3,11 54:24
69:24 70:2
71:8 72:8 74:7
84:13 87:17
93:17 99:16
101:10,14,15
**seek** 21:17 23:23
80:9
**seen** 25:15,16
26:7,11,15
34:24 67:20
**seized** 26:8
27:10 33:4
34:7 40:5
83:21
**seizure** 26:1,18
27:1 40:14,17
**send** 70:24
**sense** 14:3,3,7
96:21,24 97:1
97:3
**sensitive** 49:15
75:4,6,10
**sent** 71:3,5
103:15
**sentence** 71:8,12
72:6 74:6,7
**separate** 33:22
34:6 69:14
104:21
**sequence** 24:3
36:14 40:4
83:13
**sergeant** 6:4,12
7:20 11:20,21
16:17,19 20:19
20:20 24:9
25:19 35:1,12
35:22 59:5,13
60:22 80:12
96:5

**serve** 8:15,20
14:22,24
**served** 24:6
**serves** 8:16
**service** 27:5
**set** 58:6 107:24
**sex** 88:17
**sexual** 31:11
**share** 82:3 84:8
**shared** 67:4
**sharing** 56:7
57:8 58:22
59:18 63:4
**shooting** 55:10
**Shorthand** 1:13
107:6
**shots** 85:3,5
**show** 36:21 37:7
41:7 52:23
53:23 104:2
105:2
**showed** 7:6
36:17 37:3,9
39:16 40:8,23
41:10 43:2,22
52:16 57:2
77:13
**showing** 41:15
43:13 52:8
85:3
**shown** 43:7
**sign** 9:6,21
78:12 98:23,23
101:3
**signature** 70:4
78:9 98:24
101:7 105:2
**signed** 14:5 54:5
70:7,12 71:5
78:3 98:21,24
100:15,23
101:8 103:10
**silence** 57:18
**sir** 4:9 5:20 6:3

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 121

23:17 56:17
83:23 99:7
**sit** 103:21
**six** 5:16
**so-called** 22:4
**Socha** 1:3 2:21
4:10 5:18 8:14
8:20 9:14,17
9:21 10:20,24
15:24 20:16
21:8 24:5 36:7
36:14 38:8
53:10 55:21
56:5 57:6,7
59:17,23 63:3
65:16 66:12
67:2 72:8
75:17 82:8
83:14 85:2,8
106:3
**Socha's** 7:12,17
7:20 8:7 12:16
13:10 22:16,22
23:24 24:17
25:8,19 26:9
27:1 33:4,15
34:1,12 36:13
36:24 37:4,16
39:8,14,18,20
40:4,7,21 41:9
41:14,15 42:23
43:17 44:15
46:6,6,19 48:7
50:2 51:13,20
52:10 54:8
57:4,9 59:13
60:12,20 61:7
61:11 62:2,4
63:12,16,19
64:6 66:5
67:14 69:6
72:15 73:3,10
73:22 74:17
76:6,16 83:6

88:16 94:15,21
95:23
**socialize** 35:23
35:24
**somebody** 84:14
**somewhat** 87:9
**sorry** 17:21,21
23:11,13 28:22
31:17,22 93:24
94:2 95:4
96:22 100:7
**sort** 38:12
**sounds** 57:13
**southwest** 45:1
**Spano** 2:20
**special** 21:3,7
22:4,14,20
23:23 24:16
25:7
**specific** 7:3 8:10
9:5 18:18,24
19:8 20:10
29:9 30:19
34:14 54:15
101:2 102:13
**specifically** 9:1
11:16,24 22:17
23:8 29:14
35:19 44:20
67:1
**specificity** 61:6
**specifics** 27:8
31:6
**specified** 107:18
**spoken** 5:8
35:12
**SS** 107:1
**stale** 48:9
**star** 70:11,13
**start** 17:8 57:14
**started** 83:13
**state** 13:14
28:15 29:4,4
107:1,6,7

**stated** 14:8
86:18
**statements**
100:10
**STATES** 1:1
106:1
**status** 13:16
35:10 78:12
**stenographica...**
107:13
**steps** 54:16
60:11
**sticker** 70:1
**storage** 46:13
51:15 62:12
63:19 64:5
**store** 44:21
49:20 64:5
85:18
**stored** 46:10,11
65:6 83:4
91:19 92:22
**straight** 40:2
**Street** 2:3
**strike** 8:11
40:12 43:20
61:9 64:11
67:15
**stuff** 18:22,24
29:4 31:8
47:17,19 48:2
51:10 79:21
93:4 96:4
104:1
**subject** 19:15
31:3 101:14
**submitted** 101:5
**subordinate**
49:14
**subscribe**
106:11
**SUBSCRIBED**
106:14
**subsequent**

40:22 62:13
96:13
**subsequently**
66:4
**succeeded** 48:13
**Suite** 2:3,10,16
**summaries** 12:8
**supervised** 10:5
32:21
**supervising** 9:9
**supervisors** 75:8
**supervisory**
55:14
**Supreme** 1:16
**sure** 4:12 7:22
7:23 9:12
11:16 12:24
20:14 22:17
35:3,16 36:11
42:21 53:1
54:20 61:4
70:2 78:2
82:18 89:3
94:9,23 95:6
96:8,8,12 97:3
97:15 98:8
101:8,22,22,22
**surrender** 27:6
**suspend** 87:11
87:21
**suspension** 32:6
**sustained** 30:2
**sworn** 4:3,6
106:14 107:10
**system** 20:1,7
30:9 49:3,7,13
56:1 65:10
75:14 91:22
92:5,24 94:16
94:22 95:8,17
95:24 96:2,15
97:5

─────────

**T**

─────────

**T** 3:9
**Tab** 94:13,20
95:8,24 97:1
**tablet** 38:12
39:1
**tablets** 69:1
82:24
**tactical** 16:8,17
16:21
**take** 9:16 22:23
41:7 49:24
57:15,20 60:11
60:17,19 77:2
82:2 85:11
89:1 104:10
**taken** 1:11,14
25:19 50:17,23
58:2 60:18
63:6 66:24
82:18 89:5
107:17
**Talk** 35:24
**talked** 72:10
**talking** 5:19
23:11,12 46:17
81:9
**task** 28:10
**tasked** 19:6
**team** 79:6 80:17
**technical** 96:11
**techs** 86:6
**tell** 4:23 5:2 21:2
22:23 25:4,6
25:23 26:23
27:3,11,14
33:5,8,22,24
41:12 51:14,19
52:8 59:16
60:1,16,19,24
61:5 63:5,6
64:23 65:15
75:16 77:14,18
77:22 85:20
86:10,11

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 122

104:23
**telling** 23:12
  56:6 57:6 72:8
  83:14
**tells** 35:8
**term** 86:15
**terminal** 38:16
**terminate** 81:16
  87:7,11,21
**terms** 20:10
**testified** 4:6
  10:20
**testify** 10:24
  107:10
**testimony** 12:16
  13:10 55:18
  100:16 107:15
**text** 21:4,7 36:18
  36:21 37:3,6,9
  37:13 38:15,19
  39:8,12,16
  40:8,13,23
  41:8,15 43:2
  43:11,22 50:1
  50:15,23 52:9
  52:15,22 53:5
  53:11,18 54:7
  54:18,21,24
  55:6,13 56:3
  57:3,3 59:12
  71:17 76:5,8
  76:10 78:13
**Thank** 58:1
  88:23 89:4
  94:5 99:6,7,9
  99:10 104:11
  104:14,15
  105:5,10
**thereof** 1:16
**thing** 42:1 46:24
**things** 4:11 42:9
  47:14 59:1
**think** 25:9 28:12
  32:15 41:17,18

50:13,13 56:15
60:22 76:1
79:14 91:11
**third** 63:24
**thorough** 87:19
**thought** 62:15
**threats** 21:5
**three** 5:13 14:2
  15:16 63:21
**thumb** 40:7,9
  43:3,13 44:1,4
**time** 6:6,15,16
  6:23 7:2 8:6,13
  9:19,19 18:23
  19:20 20:24
  24:8,24 25:1
  27:22 28:1,4
  28:14,20,24
  32:16,23 35:23
  35:23 36:10
  37:19,24 39:12
  40:12,16,20
  41:13 42:11
  43:8 44:14
  45:22 46:18
  47:4,9 48:8
  50:1,11,14,15
  51:11 54:3
  55:9 60:23
  61:9,10 62:8
  65:4 70:18
  74:4 81:12
  84:11 87:12,22
  88:21 90:18,19
  91:3 93:23
  99:9 100:3,12
  102:24 106:11
  107:18
**timeline** 73:15
**times** 4:16 5:11
  35:16 81:23
**today** 5:6,9
  75:22 103:21
**told** 22:7 23:22

24:24 25:1,9
25:20,21 26:8
27:9 33:3,14
34:7,11 36:11
36:15,23 37:2
51:12 52:2,13
52:16 53:2
54:12,21 59:23
60:4 62:5,6
63:2 67:1,19
72:12 77:6,17
78:23 85:17
97:1 102:14
103:3
**tomorrow** 10:3
**top** 70:3 101:10
**topic** 57:14
**total** 42:10
**town** 60:14
**track** 20:8
**tracked** 65:10
**trained** 27:22
  28:1 33:19
  63:1 97:5
**training** 28:8,15
  28:17,20,23
  29:2,6,13,16
  29:21 52:7
**trainings** 29:3
**transcript**
  104:18 106:10
  106:12 107:12
**transcription**
  104:20
**transmit** 84:24
**transmitted**
  101:17,20
  102:4,22
**Tressler** 2:8
  81:1
**Tressler's** 105:9
**trial** 10:2,10,17
  10:21 11:1,4
  11:13,14,22

12:6,17,20,23
13:11,13 82:12
**trials** 12:8
**tried** 10:20
  15:21
**trigger** 96:19
**true** 5:1 32:21
  62:24 71:4
  100:11 103:17
  106:12 107:15
**truth** 107:10
**try** 78:4 84:8
  85:14 90:8
**trying** 40:1
  41:17 42:4,14
  42:20 43:8
  50:10 55:4
  78:17
**turn** 79:5,11,18
**turned** 81:7
**two** 8:2 14:23,23
  22:24 24:1
  69:7 74:12,18
  75:13 83:5
  98:17,17
**type** 7:15 64:4
  101:24
**typed** 101:21
  102:3,21
**typewriting**
  107:14
**typo** 98:12

_____
**U**
**Uh-huh** 35:14
  71:15
**ultimately** 23:21
  32:1,9,15
**ultimatum**
  14:14
**uncertain**
  103:14
**uncertainty**
  103:1

**understand** 4:13
  33:15,23 42:20
  72:2,4 90:8
  103:6
**understanding**
  39:17 40:16
  61:11 62:9
  64:4 73:2
  78:17
**understood** 4:18
  43:16
**unit** 12:9 16:8
  16:17 38:23
  63:22 67:4
  73:11 76:15
  77:14
**UNITED** 1:1
  106:1
**University** 17:17
**unneeded** 48:10
**unvoluntary**
  14:12
**up-to-date** 29:18
**update** 18:5
  19:3
**updated** 18:19
  18:22 19:1
**updating** 18:13
  19:6
**use** 27:23 28:2
  68:22 71:12
  74:13,22 75:4
  97:5
**usually** 34:18

_____
**V**
**vacation** 64:20
  66:2 72:23
**valid** 53:19 54:4
**various** 81:23
**verdict** 12:19,22
  13:5,7
**versed** 62:16
**version** 5:17

Royal Reporting Services, Inc.
312.361.8851

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 123

| | | | | |
|---|---|---|---|---|
| **video** 67:20 88:2<br>93:4<br>**videoconference**<br>2:1<br>**videos** 56:7 57:9<br>58:22 59:19<br>63:4 66:14<br>67:3,14 68:2<br>72:14 83:16<br>88:17<br>**view** 38:15 42:3<br>54:10 69:4<br>86:6<br>**viewed** 38:19<br>39:3 43:11<br>50:1,2,15,22<br>54:7 56:3<br>59:12 67:13<br>71:9 72:15<br>75:17 76:7<br>**viewing** 37:12<br>39:22 40:13<br>83:16<br>**voluntary** 13:23<br>14:3,4,6,7<br>**vs-** 1:5 106:5<br><br>**W**<br><br>**wait** 15:7 70:21<br>**waive** 104:21,24<br>**want** 14:9 17:19<br>43:8 56:19<br>85:24 86:5<br>87:8 90:8<br>93:19 103:6<br>**wanted** 21:3,14<br>22:8 101:8<br>**warrant** 21:4,11<br>21:15,18,22<br>22:8,9,15,22<br>23:13,21,24<br>24:6,17 25:8<br>25:17,24 26:17<br>27:1,5,10,12 | 33:4 52:11<br>53:19,24 54:4<br>79:22,23 80:10<br>103:9<br>**wasn't** 12:11<br>40:19 54:3<br>65:23 66:19<br>79:13 80:4,7<br>103:24<br>**watching** 10:23<br>**wave** 53:4<br>**way** 13:6 18:14<br>43:10 45:3<br>47:19 52:23<br>54:16 62:9<br>78:24 84:22<br>91:2<br>**we'll** 4:15 57:21<br>105:3<br>**we're** 47:4<br>**we've** 7:22 72:10<br>96:6<br>**week** 35:17<br>**weekend** 65:3<br>**weeks** 41:3 51:7<br>**went** 44:10 53:8<br>**weren't** 75:1<br>102:22<br>**whereabouts**<br>41:13<br>**WHEREOF**<br>107:24<br>**wife** 35:8<br>**wild** 100:22<br>**wish** 36:4<br>**wished** 35:17<br>**withdraw** 8:12<br>**witness** 3:2 4:3,5<br>56:15,23 57:24<br>58:15 65:20<br>88:23 89:3,15<br>94:5 96:21<br>98:12 99:6,10<br>104:11,14 | 105:1,5,11<br>107:9,9,24<br>**witness's** 55:17<br>**word** 11:7 74:13<br>**work** 33:18,23<br>56:16 64:21<br>65:23 76:20,23<br>77:18 81:10,17<br>85:7 87:22<br>**worked** 6:5 72:3<br>**working** 70:3<br>74:2,6,9,22<br>75:1 84:19<br>**wouldn't** 10:3<br>51:8 72:19<br>80:11<br>**write** 105:3<br>**writing** 86:13<br>87:2,4<br>**written** 6:19<br>7:14 8:3 9:2,20<br>23:1,4,19<br>25:11,14 26:11<br>26:15 34:21,24<br>44:12 48:19,24<br>49:18,22 52:5<br>71:1 83:17,22<br>84:2,6 85:18<br>99:22 101:20<br>104:19<br>**wrong** 100:24<br>103:19,22<br>**wrote** 97:18<br><br>**X**<br><br>**X** 3:1,9<br><br>**Y**<br><br>**Y** 88:4<br>**yeah** 9:10 10:9<br>15:7 18:20<br>23:6 24:22<br>25:2,3 29:3,16<br>30:10 33:11 | 35:5,14,14,21<br>39:6 40:3<br>42:16 43:24<br>44:10 46:15<br>48:1 51:22<br>53:12,13,15<br>54:5,9 56:14<br>58:7,15 59:10<br>59:10,20 61:16<br>61:20,21 64:3<br>64:21 69:20<br>74:8 79:3<br>81:13 89:13,15<br>90:14 94:11<br>95:1 97:3 98:2<br>98:10 102:10<br>103:13<br>**year** 15:6 17:18<br>19:12,18<br>**years** 5:24 14:23<br>14:23 15:16<br>16:6,10,15<br>17:4 48:17,18<br>**yep** 5:4 70:2,13<br><br>**Z**<br><br>**Z** 88:4,4<br><br>**0**<br><br>**05681** 1:5 106:5<br>**084-004270**<br>107:4 108:11<br><br>**1**<br><br>**1** 19:17 84:14<br>106:11<br>**1-20** 1:8 106:8<br>**1-8** 4:2<br>**10/23/25** 108:8<br>**108** 106:11<br>**12:29** 105:11<br>**16-1** 19:14 20:11<br>**18** 1:5 15:7,7<br>70:18 73:4<br>102:23 103:2,2 | 106:5<br>**1991** 17:9<br><br>**2**<br><br>**2** 3:10 69:18,24<br>72:23 99:12,23<br>99:24 100:2<br>101:3 102:3<br>**2013** 17:23<br>**2017** 17:19<br>**2018** 19:4,12,17<br>20:11 28:14,20<br>28:24 30:13<br>48:19 70:6,19<br>70:21 73:4,21<br>74:1,9,16<br>75:11,12 78:11<br>84:14 97:9,20<br>97:24 98:4,9<br>101:4 102:23<br>103:2,3,14<br>**2021** 1:18 13:20<br>106:15 108:2<br>**21** 1:17<br>**21st** 13:20<br>**2350** 2:3<br>**24** 70:18 73:21<br>80:18 103:11<br>**24th** 75:11 97:24<br>98:4<br>**250** 2:10<br><br>**3**<br><br>**3** 3:11 70:6 74:1<br>74:9,16 78:1<br>80:13<br>**30** 36:6<br>**31** 78:11<br>**312.445.4900**<br>2:4<br>**33** 2:3<br>**3rd** 75:12 97:20<br>101:3<br><br>**4** |

Royal Reporting Services, Inc.
312.361.8851

Cassandra Socha v. City of Joliet; et al.
Deposition of Alan Roechner - Taken 6/21/2021

Page 124

**4** 3:5

_____
**5**

**5** 3:11
**5-18** 103:7
**5-24-18** 72:6
  103:16,17
**550** 2:9
**5600** 2:15

_____
**6**

**6-8** 103:18
**600** 2:16
**60018** 2:16
**60440** 2:10
**60602** 2:4
**630.759.0880**
  2:11
**69** 3:10

_____
**7**

**7** 70:9
**78** 3:11

_____
**8**

**84** 3:11
**847.261.0700**
  2:17
**8th** 97:9 98:9
  108:2

_____
**9**

**9:00** 78:22
**9:30** 1:17
**94** 3:5
**99** 3:6

# EXHIBIT 12

Cassandra,

I want to let you know after a search warrant was executed on your cell phone what is being talked about and has been SHARED by the **investigator, internal affairs,** with several members throughout the Police department including the staff. Cassandra only you know what is or was on your cell phone but you and Nick's sex life and all the pictures and videos of you both having sex has been viewed by **multiple** individuals throughout the department. Pictures of you giving Nick head, deep throating Nick's Penis, Spitting on his Penis while giving him head, fucking him, naked pictures of you and so much more all have been viewed by several members, supervisors, internal affairs throughout the department. Comments are said that you fuck like a porn star and the way you give Nick head and fuck, Nick or no man should ever leave you alone. The search warrant should have never revealed any of this information it should have only been for text messages and phone calls. This information is coming to you because you need to know what is going on with your private information and how it's being passed around and shared throughout the department, *__what you choose to do is up to you and Nick but you both need to no.__*   VERY UNPROFESSIONAL INVESTIGATION