UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CASSANDRA SOCHA, | ) |
| Plaintiff, | ) |
| v. | ) No. 1:18-cv-05681 |
| CITY OF JOLIET, a municipal corporation, EDWARD GRIZZLE, JOHN DOES 1-20, | ) |
| Defendants. | ) |

**PLAINTIFF'S LOCAL RULE 56(b)(3)
STATEMENT OF ADDITIONAL MATERIAL FACTS**

Plaintiff, Cassandra Socha, by her attorney, Hall Adams, and pursuant to Fed. R. Civ. P. 56 and LR 56(b)(3) states as follows for her Local Rule 56(b)(3) Statement of Additional Material Facts:[1]

**LIST OF EXHIBITS[2]**

1. Exhibit A – Transcript of 16 May 2018 Proceeding in *State of Illinois v. Nicholas Crowley*, 17 CF 1422, Circuit Court of 12th Judicial Circuit, Will County, IL

2. Exhibit B – Michael Batis Deposition

3. Exhibit C – David Jackson Deposition

---

[1] The facts recited herein are in addition to those recited in the Statements of Fact filed by both defendant City of Joliet (Doc 253) and defendant Edward Grizzle (Doc 256) and are to be considered with plaintiff's opposition to the Motions for Summary Judgment of both defendants (Docs 251 and 254, respectively)

[2] If supporting evidentiary material has already been filed, references to it in this Statement of Additional Facts are to the ECF docket numbers. Citations to deposition testimony already in the ECF record are followed by citations to specific ECF pagination and then to the page and line of the transcripts. If evidentiary material is filed for the first time with this Statement of Additional Facts, it is referenced by an alphabetic exhibit designation.

4. Exhibit D – Brad McKeon Deposition

5. Exhibit E – Tab Jensen Deposition

6. Exhibit F – Darrell Gavin Deposition

7. Exhibit G – Shawn Stachelski Deposition

8. Exhibit H – Nicholas Crowley Deposition

9. Exhibit I – Carlos Matlock Deposition

10. Exhibit J – Mike DeVito Deposition

## STATEMENT OF ADDITIONAL FACTS

1. Plaintiff has been employed continuously as a patrol officer by the Joliet Police Department ("JPD") since 14 April 2014. (Doc 253-1, 17:6-10) She still serves on the JPD. (Doc 253-1, p. 1131, 22:9-14)

2. At the time Grizzle obtained a warrant to seize and search, then seized and searched Plaintiff's iPhone, he was an experienced detective. (Doc 253-2, pp. 1229, 86:23-87:16)

3. In the bench trial of *State of Illinois v. Nicholas Crowley*, 17 CF 1422, Circuit Court of 12th Judicial Circuit, Will County, Illinois ("Crowley trial") the evidence closed, counsel gave closing arguments, and the court took the matter under advisement on 16 May 2018. (Ex. A, pp. 48-49)

4. Plaintiff transmitted the single text message to Gatlin that is referenced in defendants' Statements of Fact *after* the close of evidence and arguments of counsel in the *Crowley* criminal trial proceedings had concluded and the court taken the matter under advisement on 16 May 2016. (Doc 253-1, p. 1141, 63:7-14)

2

5. Grizzle was and is of the opinion that plaintiff did not testify truthfully during the *Crowley* trial, in which Grizzle was JPD's assigned investigator, an opinion he has expressed to others. (Ex. B, 13:6 – 15:1; Ex. C, 86:4 – 87:8)

6. The *sole* purpose for searching plaintiff's iPhone was to verify that the text message, of which defendants were already in possession (from Gatlin) was sent to Gatlin by plaintiff from plaintiff's phone and not from someone else. (Doc 253-14, p. 1571, ¶ 10-11; Doc 253-2, p. 1226, pp. 49:14-50:2, p. 1221, 54:19-55:18)

7. It was possible to search Socha's iPhone for this purpose by searching only for text message transmissions from that phone without also searching for photographic or video files, which required clicking on icons that identified them as such. (Doc 253-6, pp.1326-1327, 66:23 – 67:8, 68:10 – 69:17) This is, in fact, exactly what Grizzle claims to have done. (Grizzle's SoF, Doc 256, p. 1602, ¶¶ 45-47)

8. In the *Complaint for Search Warrant* that Grizzle prepared and submitted to Hon. Sarah Jones, Cir. Court of Will County, Illinois, Grizzle did not inform Judge Jones that the search could be so limited. Instead, he drafted that *Complaint For Search Warrant* and the *Search Warrant* itself to provide for an unfettered search of plaintiff's iPhone, including "all digital images and videos" and "any media" on the iPhone, even though he knew that search of such images or any media other than the single text message for which he was looking was unnecessary. (Doc 253-3, pp. 1250-1259)

9. Defendants knew from the time that plaintiff's iPhone was seized that it contained sensitive personal information. At the time Grizzle seized plaintiff's iPhone pursuant to the Search Warrant, plaintiff informed Grizzle that her iPhone contained sensitive personal information. (Grizzle's SoF, ¶ 32; Doc 253-2, p. 1222, 56:13-14) During the process of the

extraction of contents of plaintiff's iPhone, Grizzle confirmed his awareness that those contents included "personal" things on her phone that were "very sensitive" and may have acknowledged that this information included photos and/or videos of a personal or sensitive nature. (Doc 253-6, p. 1323, 54:14-20, p. 1324, 58:8-15, p. 1325, 60:10 – 61:21) Dep. Chief of Investigations Roechner was also aware that that the contents of Socha's iPhone included "sensitive information about an officer." (Doc 253-7, 49:12-17)

10. After Botzum performed the extraction of the data on plaintiff's iPhone to the Cellebrite computer, he stored it on the Cellebrite computer under label/file name that he created/assigned to it. To then locate and access that data on the Cellebrite computer, a user would necessarily have to know and search for/locate it under the identifying label/file name that Botzum assigned to it. Neither Botzum (nor any other witness who was asked) could recall what that label/file name was. Botzum recalled only that, because of the sensitivity of the data extracted from plaintiff's iPhone, he purposely assigned it a "very vanilla" (i.e., non-descriptive) name that was not plaintiff's name where "a normal person or a normal detective would not go" and where "no one [without that information] should be able to find this" (i.e., the data from plaintiff's iPhone stored on the Cellebrite computer). Defendants have characterized the data extracted from plaintiff's iPhone as thusly "encrypted." (Grizzle SoF, ¶ 39) Botzum then directed Grizzle where/how/under what label/name plaintiff's iPhone data could be found on the Cellebrite computer. Botzum may also have communicated this information to German. (Doc 253-6, pp. 1323-1324, 52:15 – 59:6, p. 1330, 81:6 – 82:9; See Doc , pp. 1272-1273, 38:2 – 42:24 regarding what steps are generally required to access data extracted from any particular computer device by/stored on the Cellebrite computer)

11. The search of plaintiff's iPhone for the purpose of locating the single text message she sent to Gatlin was accomplished in approximately one hour. (Grizzle SoF, Doc 256, p. 1602, ¶¶ 44-45)

12. Data saved to the Cellebrite computer was accessible by a single, universal password for all users. The password was communicated to investigators (i.e., Detectives) and supervisors in JPD's Investigations Division. (Doc 253-5, pp. 1270-1271, 31:24 – 32:15) During May – June 2018, the password was JOLIET. (Doc 253-9, p. 1447, 16:13-17) No individualized identification information (i.e., "User ID") was needed to access data save to the Cellebrite computer. (Doc 253-5, p. 1271, 34:12-17; Doc 253-9, p. 1450, 21:20-24)

13. In May – June 2018, the Cellebrite computer was accessible to any person in the Investigations Division area of the JPD in which approximately 20 people had workstations. (Doc 253-9, p. 1448, 14:17, 15:4-7)

14. Data extracted from computer devices, including plaintiff's iPhone, to the Cellebrite computer could be accessed by anyone in the Investigations Division who knew the universal password and under which file name/label to find the data. (Doc 253-5, p. 1273, 41:6-9) During May – June 2018, the majority of JPD's detectives had been trained to do this. (Doc 253-5, p. 1273, 43:21 – 44:6)

15. Detectives were not required to obtain permission to log onto the Cellebrite computer to review data stored on it. (Doc 253-5, p. 1277, 57:22-58:2)

16. The Cellebrite computer was not equipped so that only authorized persons could access the data stored on it. (Doc 253-6, p. 56:3-8)

17. Nor was the Cellebrite computer capable of recording when or by whom data stored on it was accessed. (Doc 253-6, p. 1321, 46:22 – 47:9; Doc 253-5, p. 1271, 34:12-17)

18. A detective who did not have an official role in and was not working on a particular investigation would have no reason to access and review the contents of computers seized by using either the Cellebrite or Lantern computers. (Doc 253-5, p. 1272, 36:21 – 37:4)

19. McKinney knew before he viewed the nude image of plaintiff on the Cellebrite computer that he had accessed and was trawling through the extraction of plaintiff's iPhone. He could not have accessed the data without knowing under which name/label to search for it in the Cellebrite computer. See generally, ¶ 10, above.

20. McKinney called McKeon's attention to that nude image *before* McKinney displayed any other image of plaintiff's face on the Cellbrite computer monitor. When McKinney did this, he identified the nude image to McKeon as that of plaintiff. (Ex. D, 21:3 – 23:22, 34:6 – 35:7)

21. Neither McKinney nor McKeon were assigned to or had an official role in the JPD's investigation of plaintiff or law enforcement purpose/reason to access the extraction of plaintiff's iPhone that was stored on the Cellebrite computer. (Ex. D, 30:10-15; Doc 253-9, p. 1447, 11:5-9; Doc 253-2, p. 1220, 50:3-5)

22. When McKinney accessed data from plaintiff's iPhone that was stored on the Cellbrite computer, he consciously elected to access data relating to an open case in which he was not involved instead of a training file of his own stored in the Cellebrite computer. (Doc 253-9, p. 1451, 24:21 – 25-12)

23. To get to the nude image of plaintiff that he viewed and then displayed to McKeon, McKinney consciously "clicked through" the data from plaintiff's iPhone, scrutinized the different media icons/tabs from which he was able to differentiate between those by which to access documents from those by which to access images and purposely clicked on an images tab

anticipating that this would result in photos being displayed, which is what then occurred. (Doc 253-9, pp. 1451-1452, 25:13 – 28:4)

24. There are two competing versions of how the data from plaintiff's iPhone finally came to be removed from the Cellebrite (and Lantern) computers on 8 June 2018. We refer to them here as the "Jensen version" and "Gavin version."

a) *Jensen Version*

During the period May – July 2018, when he retired from JPD, Tab Jensen served as Dep. Chief of Administration, up through which JPD's Internal Affairs Division reported (to Chief of Police, then Benton). (Ex. E, 6:4 – 7:8) Gavin reported to Jensen that there had been reports that "detectives or persons from investigations may have been viewing some photos, explicit photos from basically the Socha case" that depicted plaintiff. (Ex. E, 19:7-15, 20:1-3) Jensen took these to be "nude photos or something sexual in nature." (Ex. E, 20:13-18) Jensen concluded that these images were on the Cellebrite computer. (Ex. E, 21:5-13) He was already aware that JPD had seized plaintiff's iPhone. (Ex. E, 21:14 – 22:20, 23:7 – 24:8) At the time, neither German nor Roechner were present in JPD's offices. (Ex. E, 28:18-22; 34:13-16) Jensen directed Gavin to supervise the removal (by German) of plaintiff's iPhone extraction from the Cellebrite computer. (Ex. E, 34:13 – 35:11; 36:11 – 18) Jensen expected that plaintiff's iPhone extraction would be removed from the Cellebrite computer, saved to a disk or thumb-drive and put into evidence, by which he expected it would be handled in conformity with JPD's G.O. 16.1 and tracked via JPD's BEAST system. (Ex. E, 37:5-12, 40:23 – 41:11) Roechner overrode Jensen on this point and told Jensen that he, Roechner, would take possession of this new copy of plaintiff's iPhone extraction, which he did. (Ex. E: 37:13-17, 40:9-12, 43:7-23)

7

b) *Gavin Version*

Gavin was directed by Chief Benton to have German remove the plaintiff's iPhone extraction from the Cellebrite and Lantern computers, save it to another device ("Put it on whatever you can put it on. And then put it in evidence.") (Ex. F, 24:20 – 26:22, 30:4-13) Jensen did not give this directive to Gavin. (Ex. F, 31:11-15) German removed the data from both computers and stored the data to two separate USB drives, which Gavin took to his own office (with one USB still in the Lantern computer while it completed the purge) (Ex. F, 34:18 – 36:16) Roechner than to these devices. (Ex. F, 37:20 – 38:24)

25. The two new USB drives created when the plaintiff's iPhone data was removed from the Cellebrite computer and the Lantern computer on 8 June 2018, respectively, were never entered into JPD evidence and conformity with G.O. 16-1 and were not tracked via JPD's BEAST system.

26. Roechner admitted to Det. Dave Jackson that Roechner had loaded the contents of the data extracted from plaintiff's iPhone onto Roechner's own JPD desktop computer located in Roechner's office. (Ex. C, 35:16-36:4)

27. Lt. Robert Brown admitted to Det. Jackson that Brown had been present in a JPD Watch Commander's office when Sgt. Gavin said to a small group of officers assembled there discussing the data extracted from plaintiff's iPhone: "Now I know why Crowley's with her. She sucks dick like a porn star." ("porn star remark") Brown later told Jackson that Brown would lie about this if Brown was ever questioned about it. (Ex. C, 14:16-15:1, 21:9 -13) Carlos Matlock reported to a friend/fellow JPD officer that he had heard Gavin utter the porn star remark. (Ex. G, 33:16 – 38:23, 39:6-23, 56:1-15, 68:4-10) Matlock also reported to Det. Jackson and to Off.

8

Crowley that Brown had admitted to Matlock that Brown was present and heard Gavin utter the porn star remark. (Ex. H, 72:14 – 75:12)

28. The porn star remark became a specific subject of "rumors" about the contents of the data extracted from plaintiff's iPhone that were circulated widely and were heard by numerous JPD officers during the period that JPD possessed multiple copies of the data extracted from plaintiff's iPhone. (Ex. B, 37:21-38:21; Ex. I, 16:2-20:18; Ex. J, 16:23-20:23; SoF ¶¶ 55-56)

29. On or around 23 August of 2018, Chief Benton commissioned a Chicago RCFL investigation of computer equipment issued to JPD Investigations Department personnel. (City SoF, ¶ 43) By that time, the data extracted from plaintiff's iPhone had been copied to at least 5 USB drives, had been stored on both the Cellebrite and Lantern computers from 18 May – 8 June 2018, and had also been loaded onto Grizzle's and Roechner's desk-top computers. (City SoF, ¶¶ 26, 36, 40-41; Grizzle SoF, ¶¶ 26, 39-44, 49; and ¶¶ 24, above). The RCFL investigation also found plaintiff's phone data on German's computer. (City SoF, ¶ 44)

30. After Roechner learned of Chief Benton's initiation of the RCFL investigation, Roechner directed JPD's IT Officer, Phillip Bergner, to dispose of one of Roechner's phones and that Bergner had complied with this order and disposed of one of Roechner's phones. (Ex. G, 23:16 – 27:2) Roechner and Bergner both deny this.

31. Roechner himself, once promoted to Chief of JPD, directed that the RCFL investigation be terminated before it was completed. (Doc. 253-6, p. 1338, 112:4-114:22)

32. Once data extracted from a computer device like plaintiff's iPhone has been copied to a storage device like a USB drive, those storage devices should be entered into evidence in conformity with G.O. 16-1 and the handling of such evidence tracked via JPD's

9

BEAST system like any other physical evidence ("like guns, knives, whatever"), the circumvention of which would be a violation of the General Order and improper. (Doc 253-5, pp. 1274-1275, 47:11 – 49:3) Yet, none of the copies of the data extracted from plaintiff's iPhone and saved to USB drives were entered into JPD evidence or tracked via the BEAST system. (City SoF, ¶ 32)

33. Plaintiff intended that the nude and sexual photos and videos on her iPhone be and remain private and has limited end transmission to herself and her then fiancé (now husband), Crowley, the only other person depicted in those images and their respective phones. (Doc 253-1, p. 1144, 74:14-75:10, p.1151, 102:13-105:4)

34. JPD Internal Affairs Division never opened an internal affairs investigation of plaintiff relating to the text message plaintiff sent to Gatlin at the conclusion of the Crowley trial. (Ex. I, 28:20-23)

35. Plaintiff was never charged with any crime relating to the text message she sent to Gatlin. The statute of limitation for the offense suggested by the *Search Warrant* and *Complaint for Search Warrant* for plaintiff's iPhone, 720 ILCS 5/32-4a (a), was/is three years and has expired.

Respectfully submitted,

CASSANDRA SOCHA

By: /s/ Hall Adams  
    Attorney for Plaintiff

Hall Adams  
Law Offices of Hall Adams  
33 North Dearborn Street, Suite 2350  
Chicago, Illinois 60602  
T: (312)445-4900  
F: (312) 445-4901  
Attorneys I.D. #6194886