1   STATE OF ILLINOIS    )
                     ) SS:
2   COUNTY OF W I L L  )

3       THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT

4                 WILL COUNTY, ILLINOIS

5   PEOPLE OF THE STATE OF ILLINOIS,)
                           )
6         Plaintiff,        )
                           )
7          -vs-            )  No.  2017 CF 1422
                           )
8   NICHOLAS CROWLEY,      )
                           )
9         Defendant.        )

10

11          Report of proceedings had in the

12   above-entitled cause before the Honorable DAN KENNEDY,

13   Judge of the Circuit Court of Will County, Illinois, on

14   the 16th day of May, 2018.

15

16          A P P E A R A N C E S :

17        Lorinda Lamken
          Assistant Appellate Prosecutor
18        on behalf of the State of Illinois;

19        Jeff Tomczak
          Attorney at Law
20        on behalf of the Defendant.

21

22   JULIE A. ENRIGHT  C.S.R.,
      LICENSE NO. 084-004518
23   COURT REPORTER
      WILL COUNTY COURTHOUSE
24   JOLIET, ILLINOIS 60432

Ex A

1          (Proceedings had in open Court)

2          THE COURT:  Back on the record on People versus

3     Nicholas Crowley.  State, are you ready?

4          MS. LAMKEN:  Yes.

5          THE COURT:  Defense?

6          MR. TOMCZAK:  Yes, we are.  Thank you.

7          THE COURT:  There are no witnesses in the gallery?

8          MS. LAMKEN:  Only the one that I am calling right

9     now.

10          THE COURT:  Okay.  Call your next please.

11          MS. LAMKEN:  We call Marie Gatlin.

12                    Marie Gatlin,

13     called as a witness herein, having been first duly

14     sworn, was examined upon oral interrogatories and

15     testified as follows:

16          THE COURT:  Please take the witness stand.

17                    DIRECT EXAMINATION

18                    by Ms. Lamken:

19     Q     Can you state and spell your last name for the

20     record?

21     A     Maria Gatlin, g-a-t-l-i-n.

22     Q     What is your current occupation?

23     A     I am a retired police officer.

24     Q     And how long were you a police officer?

1     A    16 years.

2     Q    16?

3     A    16.

4     Q    Where did you work as a police officer?

5     A    Summit Police Department.

6     Q    What type of job duties did you do as a police

7   officer?

8     A    All of the required, patrolling, citations,

9   going to Court, arresting people, fighting.

10    Q    That includes doing DUI stops, that type of

11   thing?

12    A    DUI, domestics, juveniles.

13    Q    So a cross section of everything that comes in

14   with the job?

15    A    Everything.

16    Q    Are you familiar with the person by the name

17   of Cassandra Socha?

18    A    Yes.

19    Q    How do you know Cassandra?

20    A    Myself, my children, my four boys have been

21   friends with Cassandra.  We all grew up -- they all

22   grew up in the neighborhood in Summit.  They were

23   friends for -- we have known them for about over 25

24   years.

1    Q    Up to July 16th, of 2017, what type of

2    relationship did you have with Cassandra?

3    A    Cassandra and I have been so close that she

4    has referred to me as her second mom.

5    Q    Does that include spending holidays together

6    and that type of thing?

7    A    Some.

8    Q    July 16th of 2017, did you have any type of

9    contact with Cassandra Socha?

10   A    Yes.

11   Q    Can you tell me when on July 16th that first

12   started?

13   A    In the early hours kind of in the middle of

14   the night to early, early morning hours.

15   Q    Do you recall what the first contact was?

16   A    First contact was -- well, I received numerous

17   phone calls from Cassandra, but I did not hear my

18   phone.  Then I received a call from my daughter-in-law

19   telling me that Cassandra has been trying to get a

20   hold --

21   MR. TOMCZAK:  Objection to hearsay, Judge, unless

22   not being offered for the proof --

23   THE COURT:  That's correct?

24   MS. LAMKEN:  Correct.

```
1          MR. TOMCZAK:   Thank you.

2          THE COURT:   Overruled.

3          MS. LAMKEN:   Thank you, Judge.

4          Q     Go ahead.

5          A     My daughter-in-law informed me that she

6     received a call from Cassandra and they really have no

7     contact.  They are not close or anything.  But telling

8     me it is an emergency and you need to get a hold of

9     Cassandra.

10          MR. TOMCZAK:   Objection.

11          THE COURT:   Sustained.

12          MS. LAMKEN:   Q     What time of day or night was this

13     at this point?

14          A     Approximately 5:00 in the morning.

15          Q     Would it have been normal or usual for you to

16     receive phone calls from Cassandra at 5:00 o'clock in

17     the morning?

18          A     Absolutely not.

19          Q     Have you ever received a phone call at 5:00

20     o'clock in the morning from Cassandra?

21          A     Not unless I was working the midnight shift

22     and she was working the midnight shift and we might

23     have a conversation.

24          Q     Have you ever been contacted by Cassandra
```

1    through your sister-in-law -- or sorry your

2    daughter-in-law?

3         A    I reached back out to Cassandra after I

4    received the call from my daughter-in-law Michelle.

5         Q    When I say the contacts that were attempted

6    through like you received this call from your

7    daughter-in-law, has anything like that ever happened

8    before?

9         A    Never.

10        Q    Did you come -- did you learn at that point

11   that she had attempted to get ahold of you through

12   anyone else?

13        A    Yes.

14        Q    What did you find out?

15        A    She tried to contact my husband, Bruce,

16   numerous times.

17        MR. TOMCZAK:  I will object to the foundation of

18   how she knows this.

19        THE WITNESS:  Because --

20        THE COURT:  Sustained.  Rephrase the question.

21        MR. TOMCZAK:  Thank you, your Honor.

22        MS. LAMKEN:  Q    From your personal knowledge did

23   you learn that there were any other contacts that were

24   attempted, did you see any phone calls or missed calls

1    or anything to that effect?

2         A    Yes.

3         Q    And what did you see?

4         A    Numerous calls on my husband's phone who was

5    laying right next to me in bed.  He also did not hear

6    the phone calls.  My autistic 15 year old son who was

7    sleeping, he had missed phone calls from Cassandra.  As

8    well as my son who is now currently in California and

9    was Cassandra's ex-boyfriend at one point.

10        Q    Were all of those attempts in the early

11   morning hours of July 17th?

12        A    Yes.

13        Q    When you were notified by your

14   daughter-in-law, what did you do based on that

15   notification?

16        A    I immediately called Cassandra.

17        Q    Did you get ahold of her?

18        A    Yes.

19        Q    How did you get ahold of her?  Was that by

20   phone?

21        A    By phone.

22        Q    What happened once -- I'm going to -- I will

23   start this by saying without telling me what she said,

24   did you have a conversation with her?

1      A    Yes.

2      Q    And based on that conversation what did you

3  do?

4      A    I woke my husband up and I said we have to go

5  to Cassie's house.  I refer to her as Cassie,

6  Cassandra's house.

7      Q    Did you know where Cassandra lived?

8      A    I have never been to her home before.

9      Q    When you went there, how did you know where to

10  go?

11      A    She gave me the address on the phone.

12      Q    Do you know approximately what time you

13  arrived?

14      A    Approximately 6:00 o'clock-ish.

15      Q    Okay.  Was anyone else there at her townhouse

16  on her side of the townhouse at the time you arrived to

17  your knowledge?

18      A    No.

19      Q    When you arrived, tell me what you observed?

20      A    Cassandra was sitting or standing against her

21  vehicle which the garage door was open.  She was just

22  total disarray.  She was red all over, extremely shaken

23  up and just crying profusely.

24      Q    Have you ever seen her dog before Gia?

1      A      Yes.

2      Q      Was her dog with her at the time?

3      A      Her dog was in the house.

4      Q      When you said complete disarray, you are

5      talking about Cassandra herself, right?

6      A      Correct.

7      Q      Anything about the garage that you observed

8      was in disarray?

9      A      There was a lot of garbage laying in different

10     places, glass, pictures, things like that.

11     Q      Okay.  What did you do after you saw her in

12     the garage?

13     A      We walked into the house which we could barely

14     get into because there was so much belongings

15     everywhere.

16     Q      Describe to me exactly what you observed?

17     A      Broken glass everywhere, hole in the wall,

18     clothes everywhere, some type of liquid thrown all over

19     the place.  It was in just total disarray where we

20     could barely walk a path through the home.

21     Q      And was that on the first floor when you

22     enter?

23     A      It was the first floor and was, I mean,

24     everything was laying on the stairs going up to the top

1    floor.  It was like you could not walk without having

2    to move and make a path to get in.

3         Q    You said that Gia was in the house.  When did

4    you first see Gia?

5         A    I believe she was locked in the laundry room.

6         Q    You said that there was a hole in the wall.

7    Did you notice anything else about the walls?

8         A    There was blood on the floor, blood on the

9    walls.

10        Q    You also indicated that you went upstairs?

11        A    Yes.

12        Q    What did you observe upstairs if anything?

13        A    A completely shattered TV, busted dressers,

14   there was glass, just clothes thrown about everywhere,

15   stuff knocked on the floor, glass, it was just a total

16   mess.

17        Q    You said that Gia was locked in the laundry

18   room?

19        A    Yes.

20        Q    At some point did you have contact with Gia?

21        A    Gia was brought in and out to go outside,

22   things like that.

23        Q    Did you ever observe Gia acting aggressive in

24   any way?

1    A    Other than barking.

2    Q    Did you feel threatened by that?  When you say

3    barking, was it an aggressive barking?

4    A    It was more because there was people in the

5    house and she couldn't see I think, because she was

6    behind a closed door.  So she didn't know who was in

7    the house.

8    Q    Did you ever see her lunge at anybody or

9    anything like that?

10    A    No.

11    Q    Did you have a conversation with Cassandra?

12    A    Yes.

13    Q    Can you -- can you explain to me -- you saw

14    her in the garage and she was in disarray.  Can you

15    describe to me exactly what you observed about her

16    person without telling me what she said?

17    A    She was wearing a sweater which was very odd

18    because it was July and she could barely speak.  She

19    was so extremely upset, crying on and off, on and off.

20    When I would ask her questions, she would put her head

21    down and be like, she's at fault for something, at

22    fault for some type of -- whatever happened here.

23    Q    You said that the house was in disarray.  Did

24    you do anything in regards to that disarray?

1      A      I actually cleaned the entire house up.

2      Q      At some point was the police called?

3      A      Yes.

4      Q      Were you there when that phone call was made?

5      A      Yes.

6      Q      First I will ask you the clean up of the

7    house.  Was that before or after the police arrived?

8      A      Some of it started before but then I stopped

9    when -- I mean, I am talking just little pieces so that

10   we could get through.  I knew the police were coming

11   and I was like, leave it where it is at.

12     Q      Was anyone else to your knowledge called prior

13   to the police?

14     A      Yes.

15     Q      Who was called?

16     MR. TOMCZAK:  Objection as to foundation again,

17   Judge.

18     THE COURT:  Sustained.  Maybe a little bit more

19   foundation.

20     MS. LAMKEN:  Q   How long had you been there before

21   someone else was called?

22     A      Approximately two hours.

23     Q      And in that two hour period what were you

24   doing?

1    A    I was trying to get her to get the police out

2    there, her supervisors, because they needed to be

3    notified and being that I am a police officer retired

4    and my husband was a current police officer at the

5    time.  He is now retired.  We are like we are not

6    leaving here with this knowledge and not -- not calling

7    the authorities.

8    Q    You said after two hours someone was called?

9    A    Yes.

10   Q    Who called and who did they call?

11   MR. TOMCZAK:  Again, foundation, Judge.

12   THE COURT:  As to time.  Sustained.  Just a little

13   more foundation.

14   MS. LAMKEN:  Q   You said after two hours?

15   A    Correct.

16   Q    You said you arrived at what time

17   approximately?

18   A    5:00 -- sorry, 6:00.

19   Q    So you arrived at 6:00 and this was

20   approximately 8:00 o'clock?

21   A    Correct.

22   Q    Who was called and who called them?

23   A    Cassandra is sitting in front of me and called

24   her mother at my insistence.

1      Q   When she made that phone call, without telling

2  me what she said, what was her emotional demeanor that

3  you observed, if any?

4      A   She says, hi, mom, how are you doing.

5      MR. TOMCZAK:  Judge, object.

6      THE COURT:  Sustained.  Her demeanor, ma'am, not

7  what she said.

8      THE WITNESS:  She was extremely upset and couldn't

9  speak and handed me the phone.

10     MS. LAMKEN:  Q   Did you have a conversation with

11  her mother?

12     A   Yes.

13     Q   Subsequent to that phone call did her mother

14  come to the home?

15     A   After the phone call, yes.

16     Q   And do you know how much time passed before

17  her mother arrived?

18     A   Maybe about another 30 to 45 minutes.

19     Q   We are talking right before 9:00 o'clock?

20     A   Approximately.

21     Q   Did anyone else arrive and if so, who was the

22  next person?

23     A   That would have been Victoria.

24     Q   Was she there before or after the police?

1     A    I believe before.  I could be wrong, though.

2     Q    So you are not sure?

3     A    I am not sure about that.

4     Q    Who is Victoria to your knowledge?

5     A    Victoria is Cassandra's best friend.

6     Q    In regards to the police, you said you were
7 present when there was a call made to the police there?

8     A    Yes.

9     Q    Who made that call?

10    A    Patricia Socha, her mom.

11    Q    Was it to your knowledge a 9-1-1 call?

12    A    No, it was not.

13    Q    You said you were present right there?

14    A    Yes.

15    Q    How do you know it was not -- first of all,
16 what time was this?

17    A    Approximately maybe another hour after her mom
18 got there.

19    Q    How do you know it was not a 9-1-1 call?

20    A    Because we were discussing the phone number to
21 go directly to one of Cassandra's superiors.

22    Q    Did you know that inside line phone number?

23    A    No.

24    Q    Do you have any knowledge as to her mother

1      being in any type of law enforcement or do you know

2      where that inside line phone number came from?

3          A     Well, we started searching it on our phones

4      and then Cassandra finally gave her mom the phone

5      number to call.

6          Q     Did the police then respond and come to the

7      house?

8          A     Yes.

9          Q     You were present when they arrived?

10         A     Yes.

11         Q     How much had been cleaned up in the house by

12     the time the police arrived?

13         A     Not a lot.

14         Q     Okay.  Was there anything that had been

15     cleaned up?

16         A     There were things that were as I said, I

17     started picking up clothes, putting them over the couch

18     just to make room for people to come in.

19         Q     Do you know how long the police were there?

20         A     Hours.

21         Q     Were you there the whole time?

22         A     Yes.

23         Q     And did you stay after they had left?

24         A     Yes.

1      Q      When did you leave the house?

2      A      Approximately 2:00 o'clock.  My husband had to

3      go to work so he was on shift.  He was late for work.

4      I packed -- he dropped me off at home.  I packed a bag

5      and I got my car and came back to Cassandra's house.

6      Q      And that was that same day?

7      A      Yeah.

8      Q      When you packed the bag and came back, why did

9      you come back?

10     A      Because Nick had not been found yet and she

11     was extremely terrified to be there alone and her

12     mother couldn't stay with her and I said I had no

13     problem and I stayed overnight with her.

14     Q      So you stayed until the next day?

15     A      Correct.

16     Q      How long did you stay in the house at that

17     point?

18     A      Until the morning when some of the Joliet

19     higher-up authorities showed up.  I don't know if it

20     was the deputy chief or whoever and they needed to talk

21     to her down at the station and then I packed up and

22     then she left on her own and I went home because I knew

23     that her mother had said she would be coming back later

24     that day to stay with her.

1       Q    So once you left at that point, did you stay

2  anymore at the house after that?

3       A    No.

4       Q    Did it appear to you when you arrived that

5  Cassandra appeared to be intoxicated or under the

6  influence of alcohol or drugs at that point?

7       A    Yes.

8       Q    And how impaired -- you have been trained as a

9  police officer?

10      A    Yes.

11      Q    Describe to me -- when you say yes, describe

12  to me what you observed to be her impairment?

13      A    She had some slurred speech, just very

14  nervous, kind of repeating things over, just kind of

15  typical, not full out drunk but maybe coming out of it.

16      Q    Okay.  Did she appear to be aware what was

17  going on around her?

18      A    Yes.

19      Q    And that was at I believe you said you arrived

20  at around 6:00?

21      A    Correct.

22      Q    Did she still appear that way when the police

23  arrived at 9:00 or 9:00-ish, around then?

24      A    Not really.

1  Q What is your relationship with Cassandra now?

2  A There is none.

3  Q And since when has there been no relationship?

4  MR. TOMCZAK: Judge, I will object as to relevance.

5  THE COURT: What's the relevancy?

6  MS. LAMKEN: I will withdraw the question, Judge.

7  THE COURT: Question is withdrawn.

8  MS. LAMKEN: Q I have nothing further with this

9 witness, your Honor.

10  THE COURT: Cross?

11  MR. TOMCZAK: Just very briefly, your Honor.

12       CROSS EXAMINATION

13       by Mr. Tomczak:

14  Q So it is clear, ma'am, the nature of your

15 relationship with Cassie with your son was they had a

16 dating relationship?

17  A Yes.

18  Q How long was that for?

19  A How long did it last or how long did --

20  Q How long did they date each other?

21  A I can't be for sure.

22  Q All right. Prior to this particular day when

23 was the last time you were in the presence of Cassie?

24 In other words, the two of you guys were together,

1     lunch, dinner, your physical presence?

2        A   I believe it was my birthday in May.

3        Q   It would have been May so a couple of months

4     before this?

5        A   I believe so.

6        Q   Do you remember where you were?

7        A   She came to my house.

8        Q   Okay.  All right.  Just a couple of things, as

9     far as the call to the police that was at your

10    insistence, is that correct?

11       A   At first it was and then --

12       Q   Okay.  I will take that.

13       A   -- then from Patricia.

14       Q   That is a yes?

15    MS. LAMKEN:  Objection, your Honor.  She was trying

16    to answer and be allowed to say her own answer.

17    THE COURT:  Overruled.

18    MR. TOMCZAK:  Thank you, your Honor.

19       Q   Bottom line is if Cassandra's mom didn't call,

20    you or your husband were going to make that call to the

21    Joliet Police Department?

22       A   Correct.

23       Q   And you made that clear to everybody, correct?

24       A   Of course.

```
 1          Q       It was your suggestion to have Cassie's mom

 2     call?

 3          A       No, Cassie's mom insisted on it.

 4          Q       She insisted on it?

 5          A       Yes.

 6          Q       Just like you were insisting on them being

 7     called, right?

 8          A       Yes.

 9          Q       And Cassie was definitely coming off being

10     intoxicated is your testimony under oath, correct?

11          A       Yeah.

12          Q       That is based on a lot of experience as a law

13     enforcement officer?

14          A       Yes.

15          Q       Is that correct?

16          A       Yes.

17          Q       You did retire from the police department,

18     ma'am?

19          A       Yes.

20          MR. TOMCZAK:  I have no further question.

21          THE COURT:  Any redirect subject to what he asked?

22          MS. LAMKEN:  No, your Honor.

23          THE COURT:  You are excused.  Thank you.

24               (Marie Gatlin exits courtroom)
```

1          MS. LAMKEN:  Your Honor, I don't have any further

2     witnesses subject to a stipulation that Mr. Tomczak and

3     I discussed.  I was going to call the second crime

4     scene technician to discuss -- and that would be Ryan

5     Meyers from the Joliet Police Department.  If he were

6     called to testify, he would state that he did go to the

7     townhouse the next day in an attempt to recover the

8     bullet in the wall that was in the master bedroom and

9     in examining the wall there is a determination that was

10     made that they would need to take down a large portion

11     of the wall to recover that bullet.  So it was not

12     recovered.

13          MR. TOMCZAK:  So stipulated.

14          THE COURT:  The only thing I require is that

15     stipulation be written out and marked as an exhibit.

16          MR. TOMCZAK:  We will do that, your Honor.

17          THE COURT:  You want to do that and I will take a

18     brief break.

19          MS. LAMKEN:  Sure.

20          THE COURT:  I guess you are going to rest after

21     that?

22          MS. LAMKEN:  Sure.  Thank you, Judge.

23               (a brief recess was taken)

24          THE COURT:  I have the trial stipulation signed by

1    the defendant and both parties.

2         MR. TOMCZAK:  Yes, your Honor.

3         THE COURT:  That is admitted.  Okay.  State?

4         MS. LAMKEN:  Your Honor, the State rests.

5         THE COURT:  One further issue, I know the witness

6    that just testified is still in the Court and so is

7    the --

8         MR. TOMCZAK:  I have no objection to that.

9         THE COURT:  You have no objection?

10        MR. TOMCZAK:  No.

11        THE COURT:  And no objection to Ms. Socha being

12   here too.

13        MR. TOMCZAK:  No, I don't.

14        THE COURT:  State?

15        MS. LAMKEN:  That's correct.

16        MR. TOMCZAK:  I would like to make a motion on

17   behalf of the defendant for a directed finding.

18        THE COURT:  Argument.

19        MR TOMCZAK:  May it please the Court, counsel,

20   Nick, Judge.  First I want to spend a few minutes

21   talking about the cases that we did cite.  I know your

22   Honor is familiar with them and I don't want to spend a

23   lot of time with them.  I will only talk about these in

24   relation to the comparison to the facts that we have

1    before your Honor.  We have two Third District cases,

2    Moreno.

3         THE COURT:  These are the cases that you

4    previously --

5         MR. TOMCZAK:  You got them.  It is the same ones.

6    I will not spend a lot of time talking about them, but

7    the facts are interesting.  Collins is the key, but to

8    kind of run it down, every single one of these cases is

9    very -- and Collins is 214 Ill.2d --

10        THE COURT:  You gave me that one.

11        MR. TOMCZAK:  You got it, Judge.  A .9 millimeter

12   AR-47, whatever that is, being fired off on New Year's

13   Eve, of course.  That is the fact regarding that case.

14   Watkins, neighbor firing a Glock up in the air four

15   times.  These are either cases where the policemen saw

16   them firing or there was an admission by the defendant

17   of multiple rounds being fired into the air.

18           Moreno is another January 1st shooting.  That

19   is actually a Judge Rozak original case, but there is

20   another case where we have got multiple rounds being

21   fired consciously.  Moreno is the one where the guy

22   shot into the ground and it ricocheted.  Bottom line,

23   Judge, and every one of those cases and your Honor

24   knows the definition of recklessness and it is

1     important and Collins really -- the Supreme Court

2     really gives us some wonderful guidance on Collins.

3     Judge, if you turn to page 9 of 13 on Collins.

4          THE COURT:  She has all my cases.

5          MR. TOMCZAK:  I have an extra.

6          THE COURT:  I have enough cases.  I don't need any

7     more.  I don't want anymore cases.

8          MR. TOMCZAK:  Sorry about that.  I will wait for

9     you, Judge.

10         THE COURT:  You are reading from Collins?

11         MR. TOMCZAK:  I am.  I am on page 9 of 13.

12         THE COURT:  Okay.

13         MR. TOMCZAK:  Here is where I am at.  In this

14    particular paragraph, what the Supreme Court is doing

15    they are looking for the legislative intent.  They are

16    going back talking about the statement of

17    representative Homer actually who I believe was the

18    sponsor of this particular bill.  Here is what it says,

19    under current law a person possesses a firearm in a

20    motor vehicle and even shoots it up in the air while

21    driving around, that would still be a Class A

22    misdemeanor; reckless conduct.  If a person fires it at

23    somebody or shoots it into a building that is occupied,

24    under current law it would be a Class 1 felony because

1    it would be aggravated discharge of a firearm.  What

2    happens if somebody just recklessly discharges a

3    firearm, doesn't necessarily aim it at someone or aims

4    it at an occupied building but goes around town or out

5    in the country or wherever and is shooting off a gun

6    recklessly with reckless abandonment.  Under the

7    current law, that would be a Class A misdemeanor

8    reckless conduct.  So the gentleman says we should have

9    some middle ground here and call it reckless discharge

10   of a firearm.  The key component to that statement,

11   Judge, is the definition of recklessness.  That is what

12   I think is the key to this case as far as a motion for

13   directed finding is concerned.  The definition of

14   recklessness involves -- and this is the key, Judge --

15        THE COURT:  What case is this now?

16        MR. TOMCZAK:  Collins.  It is a conscious disregard

17   for the safety of others.  I guess the word conscious

18   is the key.  It's the intentional firing of the weapon

19   in circumstances that put other folks in danger of

20   being injured.  It is a conscious nature of the firing

21   of the weapon that is the key component here.  The

22   bottom line, Judge, is the state of the record at the

23   close of the State's case -- I don't believe -- here is

24   my argument in essence, Judge, you can take the fact in

```
 1    the light most favorable to the State and still grant
 2    the motion for directed finding.  There is two
 3    interpretation you can look at -- two arguments you can
 4    look at as far as this case.  It is kind of one or the
 5    other.  Cassandra Socha, if your Honor found her to be
 6    a credible witness, then her testimony should drive the
 7    boat and what her testimony is if you boil it all down
 8    she said based on everything that she saw and the
 9    totality of the circumstances it was an accidental
10    discharge.  That is the person on the scene.  That is
11    the person closest to it.  That is the person that is
12    there.  That is the State's case.  So if you believe
13    Cassandra Socha was telling you the truth, I believe in
14    the light most favorable to the State, accept her
15    testimony and grant the motion for directed finding
16    because the state of the case is it was an accidental
17    discharge.  There has been no impeachment of a
18    substantive nature that is important for the Court to
19    think about.  None of the impeachment comes in
20    substantive if you consider it impeachment.  If you
21    believe her based on Collins and the other cases, it is
22    an accidental discharge and it wasn't a conscious
23    disregard for the safety of others.  That is the best
24    evidence that you have in the light most favorable to
```

1    the State.  The motion should be granted.

2          Let's look at it on the other hand.  I kind of

3    get the feeling that the State may come up and say, you

4    know what, maybe Cassandra wasn't truthful in front of

5    you, but then what do we have and what are we left

6    with.  If that is the case, then the State's case is

7    built on non-credible evidence.  You can't have it both

8    ways.  You cannot say she is credible and then not

9    credible.  If she is not credible, Judge, that is their

10   case and she is their witness and you cannot fill in

11   the blanks if you find her not to be credible.  The

12   Court, as you know, cannot fill in the blanks as to

13   what may or may not have the happened.  It has to be

14   testimony.  So in this particular case for some reason

15   and the State's argues or your Honor finds her not to

16   be a credible witness, I think the motion is still well

17   taken.  The motion for directed finding should be

18   granted.  Even in the light most favorable to the State

19   the motion should be granted.

20         Judge, that is the gist of my argument either

21   way, whether you find her to be credible or whether you

22   find her to be not credible, based on the case law the

23   case law does not support a finding of one single

24   accidental shot resulting in reckless discharge.  It

1    has to be a conscious disregard and I don't think the

2    State in the evidence even in the light most favorable

3    to the State goes in that direction.  In the

4    alternative if for some reason you found that she was

5    not a credible witness in some way, then of course,

6    Judge, the State's case is built on non-credible

7    evidence and I would ask you to grant the motion.

8    Thank you for listening.

9        THE COURT:  Thank you.  State, response?

10       MS. LAMKEN:  Judge, first of all I would like to --

11       THE COURT:  Wait.  Before we go any further,

12   Mr. Tomczak, the three cases that you are citing to me

13   are Collins, Watkins and Moreno?

14       MR. TOMCZAK:  Collins, Watkins and Moreno, yes.

15       THE COURT:  Those are the only three dealing with

16   the issues that we are dealing with at hand?

17       MR. TOMCZAK:  Yes, that is it.  Two Third District

18   cases and --

19       THE COURT:  Just so it limits my reading.

20       MR. TOMCZAK:  You got it, Judge.

21       MS. LAMKEN:  The first thing I would like to state

22   is I dispute Mr. Tomczak's characterization that her

23   prior statements do not come in as substantive

24   evidence.  They do come in because they were tape

1    recorded so they come under --

2         THE COURT:  The exception.

3         MS. LAMKEN:  -- 10.1.  It is an exception to her

4    prior inconsistent statements.  In regards to -- and

5    just if there is an appellate issue I want to be clear,

6    the IA statement which was tape recorded and Grand Jury

7    which was sworn testimony I believe any inconsistent

8    statements that were pointed out do come in

9    substantively in regards to that; no other statements.

10   I don't want any record to be muddy.

11        In regards to his arguments and issues

12   regarding the reckless discharges, I have three cases

13   that I would like to submit.  One was Collins so I will

14   not regive that to you.  I believe that there is People

15   v. Thomas.  I have a copy for both and Olivieri.

16        I will start out with Collins because he

17   talked about Collins and that is a Supreme Court case.

18   I think the facts of Collins is very important for the

19   Court to consider.  In Collins police officers were on

20   patrol and they hear shots fired and this is just

21   driving along.  They approach an alley and they see

22   three men standing in a backyard.  They see flashes of

23   light and two guns being fired into the air.  The

24   officers stop and they stopped their car 25 to 30 feet

1    away from where the men were firing their guns.  The

2    facts of the case are also that they are outside one of

3    the defendant's houses and there is two women inside of

4    that house a short distance away from where they are

5    firing outside of the house.  The trial Court found the

6    defendant guilty of reckless discharge of a firearm.

7    The case was reversed on appeal and based on issues

8    that they felt this was not reckless and that it didn't

9    meet the definition and said that, specifically the

10    State failed to present any evidence the bullets fired

11    from the defendant's weapon presented any danger to any

12    individual, was what the Appellate Court's reasoning

13    was.  The case was taken out by the Supreme Court and

14    the Supreme Court reversed that case or that decision

15    and stated in it, there is lengthy discussion regarding

16    the definition of endanger; specifically to bring in

17    danger or peril or probable harm or loss or to create a

18    dangerous situation.  The Court first pointed out a

19    distinction between aggravated discharge which requires

20    knowingly or intentionally discharging a firearm in the

21    direction of another person which the defendant

22    incorrectly argued was applicable with the reckless

23    discharge.  The Court noted that requiring this would

24    render aggravated discharge statute basically wouldn't

1     mean anything which obviously was not the legislative

2     intent.  The Court concludes that shooting a gun in the

3     air is precisely the type of conduct the legislature

4     intended to criminalize with the statute.

5              Secondly, the Court addressed defendant's

6     reckless conduct created a dangerous situation such

7     that an individual was in peril, probable harm, or

8     loss.  State is not required to show that the bullet

9     fell near the ground where the officers were nor any

10    angles or directions nor any velocity of falling

11    bullets.  The Supreme Court examined whether there was

12    an individual in the vicinity of the discharge and

13    concluded the discharge in the presence of the officers

14    who were 25 to 30 feet away was sufficient to establish

15    defendant's reckless conduct and endanger an

16    individual.  I also thought it was very important that

17    the Court noted that there was evidence of other

18    individuals who were placed in danger and they

19    specifically talk about the two women inside of the

20    house which was not even brought up or there was no

21    charges based on that, but the Supreme Court brings up

22    the fact that there was two women inside of the house a

23    short distance away.

24             The defendant wants you to believe that the

1    conscious disregard is the fact that he is making an

2    intentional pulling of the trigger.  I disagree with

3    that.  The conscious disregard the State is arguing is

4    the totality of the circumstances and the incident that

5    is occurring.  That is his conscious disregard of

6    bringing a weapon and having a weapon in that

7    situation, not -- and there is no case that

8    specifically says that the conscious disregard is

9    pulling that trigger intentionally which the Court

10   specifically notes the difference between those

11   statutes.

12          People versus Thomas is a case where it states

13   the shooting of a gun and the Court indicates that --

14   sorry, I should state for the record, People versus

15   Thomas is 8 Ill.App.3d 690.  It is a mere pulling of a

16   loaded gun from a pocket in a crowded tavern

17   constitutes a reckless act committed an utter disregard

18   of the safety of others.  Defendant contends he did not

19   intend to shoot anyone but involuntary manslaughter is

20   an offense in which death results from acts performed

21   recklessly even though there was no intent to inflict

22   injury.  Also, a person shooting need not know that he

23   may injure some particular person or knowledge that he

24   may injure any person.  So in that case there is no

1    evidence that the defendant actually intended on

2    shooting the gun.  It was merely bringing out that gun

3    in the middle of a bar and it ended up going off and

4    did obviously injure someone and hurt them.

5         The other one which I have cited is Olivieri.

6    It is actually -- I brought that out to show that

7    opposed to.  It was established at trial in the

8    Olivieri case that the defendant who was charged

9    accidently pulled the trigger while attempting to

10   unload the pistol.  The situation was he went through

11   -- he had received his FOID card.  He went through

12   conceal carry classes and he had went to his bathroom

13   and he indicated -- he lives in an apartment.  He

14   indicated that he had went to the bathroom and he was

15   attempting to clear the gun as he had been taught in

16   these classes recently to make sure that the gun was

17   unloaded and make it more safe.  When he did that, the

18   gun discharged and it went through the wall of the

19   apartment and went in to a neighboring apartment.

20   There was a lady that was present during that.  He was

21   convicted in a trial Court and it was reversed because

22   they said that in this situation and in effect of the

23   totality of the circumstances he was actually doing

24   something in an attempt to clear the gun and make it

1    more safe and make sure it was unloaded.  This was not

2    a situation where he had been drinking.  He is in the

3    middle of an argument and he pulls out a gun

4    threatening to shoot a dog which is a very different

5    set of circumstances.  I believe that shows the

6    inapplicability of the arguments of defense counsel.

7         I have another case that I had that I thought

8    I printed out and I didn't, but it is People versus

9    Franklin, 189 Ill.App.3d 425.  In that case the

10   defendant has been drinking, got into an argument and

11   shot a person although there is no evidence that he

12   specifically meant to shoot this victim.  The victim

13   came at him, picked up a gun and threatened the person

14   but then says he indicated he stumbled back because of

15   his intoxication and caused the gun to discharge and

16   stated before the Court it was an accident.  The

17   defendant was convicted and there is differences drawn

18   out from the other cases saying that no, in this

19   situation that was a reckless act.  The Court

20   indicated, an accident is not to be equated with

21   recklessness but when alcohol is involved, the Court

22   draws a distinction and talks about the facts of the

23   circumstances.  I believe and I state that there are

24   cases where there could be an accidental pulling of a

1     trigger such as the case in Olivieri and we wouldn't be

2     looking at the same thing but the cases that are cited

3     and the discussions within the cases if you go beyond

4     the head notes and look into the actual facts of the

5     cases, the Court's are absolutely looking at the

6     totality of the circumstances. I would ask that you

7     deny his motion for a directed verdict.

8         MR. TOMCZAK: Just a brief response, Judge.

9         THE COURT: Yes.

10         MR. TOMCZAK: Franklin stands for a proposition

11     that an accident is not to be equated with

12     recklessness.

13         THE COURT: Do I have the Franklin case?

14         MR. TOMCZAK: No.

15         THE COURT: I keep hearing about Franklin but I

16     don't see it.

17         MR. TOMCZAK: I know. I know. Here. It is there,

18     but I don't have it either.

19         THE COURT: You guys want to make copies of that?

20         MR. TOMCZAK: We will print it out for you.

21         THE COURT: I would like to have the cases --

22         MS. LAMKEN: Judge, I thought I printed it out. I

23     was at the hotel.

24         THE COURT: These cases will help be determine of

1    how I rule in this.  Make a couple of copies.

2        MR. TOMCZAK:  We sure will, Judge.  I will have Ms.

3    Kalkanis right now get that.

4        THE COURT:  Okay.

5        MR. TOMCZAK:  Judge, just an a couple other points

6    I did want to make while she is copying that case.

7    Judge, the State of the record in this case is such

8    that the accidental discharge, totality of the

9    circumstance.  We are dealing with one shot and within

10   a second of the shot going off, the testimony on the

11   record is either, oh shit or oh fuck being uttered

12   which is indicative of it being an accident.

13        Judge, the bottom line is this conscious

14   disregard according to the Franklin and the other

15   cases, you have to consciously shoot the gun in order

16   to fall into this specific category.  Here is the point

17   I guess I want to end it with though, your Honor.  We

18   are talking and we are trying to expand reckless

19   discharge to accidental discharge of a firearm.  That

20   is what in essence is being argued here.  There was no

21   argument relative to the credibility or lack thereof of

22   Socha.  But here is what we have; in every one of these

23   cases you have direct evidence of what the prosecutor

24   is arguing.  The mere pulling out of a gun in an open

1    bar is a reckless act.  Judge, there is no evidence on

2    the record of how and when or if a gun was handled.

3    The only witness that you have in this courtroom did

4    not see any handling of a gun whatsoever.  That is not

5    the same -- these cases are not the same as what you

6    have before you.  There is no evidence of it.  Evidence

7    of intoxication, we tried to get Socha or counsel tried

8    to get Socha to say that he was intoxicated, but that

9    didn't come out on the record.  What I am saying, your

10   Honor, is this; if you are going to discharge a gun in

11   a reckless manner and consciously you don't say, oh,

12   shit after it goes off.  You might say, take that, you

13   know what I mean, like, pow, take that.  When you are

14   consciously firing a weapon to expand a Class 4 felony

15   for a person who maybe drops a gun and it goes off is

16   that a reckless discharge of a firearm.  If you are

17   following counsel's argument I think it honestly would

18   be, Judge.  So you mishandle it and dropped it and the

19   gun went off, well, reckless discharge of a firearm

20   even though you did not consciously do it.  That is

21   just my argument, Judge.

22        THE COURT:  Thank you.  At this stage in the

23   proceedings, I don't look at what the burden of

24   reasonable doubt is.  I have to look at the evidence

1    most favorable to the State.  So therefore I will deny

2    your motion for directed finding.  Are you presenting

3    any evidence?

4         MR. TOMCZAK:  No, we rest, your Honor.

5         THE COURT:  Okay.  Before we go further,

6    Mr. Crowley, you understand you have a right to

7    testify?

8         THE DEFENDANT:  Yes, your Honor.

9         THE COURT:  Your counsel has gone through that with

10   you?

11        THE DEFENDANT:  Yes.

12        THE COURT:  You also have a 5th Amendment right not

13   to testify.

14        THE DEFENDANT:  Yes.

15        THE COURT:  If you don't testify, me as the trier

16   of fact, I cannot hold it against you.

17        THE DEFENDANT:  Yes, your Honor.

18        THE COURT:  Having that in mind you wish not to

19   testify?

20        THE DEFENDANT:  That's correct, I do not.

21        THE COURT:  Thank you.  Defense rests?

22        MR. TOMCZAK:  We do.

23        THE COURT:  All right.  Are we going to have

24   closings?

1          MR. TOMCZAK:  Your Honor --

2          THE COURT:  You made your closings except for the

3     Franklin case.

4          MR. TOMCZAK:  Right.

5          THE COURT:  State?

6          MS. LAMKEN:  I do have a few points I would like to

7     make at closing, yes.

8          THE COURT:  Okay.

9          MS. LAMKEN:  I would also ask that you actually

10    read the Franklin because I believe --

11         THE COURT:  That is why I need a copy.  I will read

12    all of these.

13         MS. LAMKEN:  I believe it was misstated because it

14    says the defendant intentionally shot and he did not.

15    He stumbled and the gun went off and so that is in

16    effect this exact type of circumstance.  So there was

17    no intentional pulling of the trigger.

18              Your Honor, in regards to this, I just have a

19    few points.  I'm not going to reiterate testimony.  If

20    this was a jury trial, we would have a much different

21    situation.  You were sitting here.  But I would like to

22    make few points.  There is no evidence this dog was

23    agitated prior to this argument.  The defendant

24    indicated in his answer to discovery that he was

1    claiming self defense or defense of others.  But in

2    those type of arguments, you can't create the

3    situation.  In this situation the only evidence is, is

4    the dog was agitated because of this argument.  There

5    is no evidence -- in fact, there is contradictory

6    evidence that this defendant (sic) has ever been

7    physically aggressive to this defendant or to Ms.

8    Socha.  So, the verbal argument and the I will say

9    physical argument in regards to the items in the home

10   and certainly the Court can make it's own conclusion as

11   to what was going on beyond that.  Obviously there are

12   no charges pending before the Court in that but I

13   believe the Court is allowed to look at the totality of

14   the circumstances including the inconsistent statements

15   that come in.  Cassandra repeatedly describes the dog

16   as being protective of her.  I ask this Court why does

17   this dog need to be protective of her.  She talks about

18   how much she loves this dog and this dog obviously

19   loves her and so there is some reason why this dog is

20   feeling protective of her and agitated and acting

21   protective.  It is because of the defendant's action at

22   that time.  The Cassandra Socha says she is sitting on

23   the floor with the dog.  So certainly she is not up

24   throwing things and causing the situation.  It is the

1   defendant that is doing that.  This dog that she loves

2   so desperately he threatens to kill this dog in the

3   middle of this argument in the midst of it.  There is

4   no testimony that the dog has been aggressive towards

5   this defendant prior to.  There is no evidence this dog

6   leaped at him or did anything like that.  There is no

7   testimony that the dog is viciously attacking her on

8   the floor and the defendant is grabbing his service

9   revolver or any other gun trying get the dog off of

10  her.  There is no testimony to that whatsoever.  There

11  is no testimony that the defendant rushed forward

12  trying to pull the dog off her.  The story regarding

13  any injuries on her face and this whole situation is

14  all about the dog being aggressive towards her does not

15  make any logical sense whatsoever.

16          The shot discharges and what does he do.  Does

17  he try to go and see if where the bullet went and if it

18  projectile through the floor or perhaps other people

19  are in jeopardy.  No, she somehow gets locked out of

20  the house which there seems to be a mystery as to how

21  that happened and she is proceeding to at 4:00 in the

22  morning walk around her house and videotape the

23  defendant with her phone from outside of the house.

24  And in regards to that, is there any one attempting to

1    find out.  No.  He is at that point trying to fix the

2    projectile hole in the ceiling of the dining room.  I

3    believe that is evidence of guilt and he knew he did

4    something wrong.  Why would you do that at 4:00 o'clock

5    in the morning.  This is not about the dog acting

6    aggressively or that he is trying to protect Cassandra

7    Socha, from this dog.  This case is about that dog

8    acting in defense of others.  The dog is trying to

9    defend Cassandra against this defendant.

10        The defendant points out there was no 9-1-1

11   call but an inside line.  This person, Cassandra Socha

12   wanted the police to be there.  She gives her mother

13   and Marie Gatlin the inside line to call.  Why else are

14   the police there.  Are they there because the dog

15   nipped her face.  It makes no sense as to why they

16   would go and spend hours in regards to that.  Why would

17   they elicit the police to be there.  It is substantive

18   evidence that Cassandra Socha described Nicholas as

19   being buzzed that night and also talks about the fact

20   that he had been drinking throughout the night.

21        Last but not least, the next door neighbors.

22   The reckless conduct not only do I believe it applies,

23   the reckless discharge of a firearm does apply to

24   Cassandra Socha herself but the case law specifically

1    supports that it also applies to Betty and Wayne

2    Howard.  Betty Howard indicates that she is awake.  She

3    is awakened by a boom.  Then she hears shouting and

4    pounding.  She cannot hear what they are saying but she

5    is aware that there is something going on.  She knows

6    it is going on for a while and then she says she hears

7    the gunshot.  She recognizes the gunshot because there

8    is a range.  The defense counsel tried to in one of his

9    arguments put those together as the boom, beating, and

10   gunshot.  No.  She said she had been awake and was

11   listening to what was going on prior to that gunshot.

12   She recognizes the gunshot and is alarmed.  She wakes

13   up her husband at 4:00 o'clock in the morning to tell

14   him that she thinks she heard a gunshot and she felt it

15   go into the wall.  He at that point, like most typical

16   husbands, tells her she is crazy and doesn't know what

17   she is talking about.  She indicates she was frightened

18   when this happened but those things are not a

19   requirement.  But it does show and if you look at the

20   pictures, People's Exhibit No. 21, the master bedroom

21   where the hole is is about it appears to me about five

22   inches above the headboard.

23        You heard testimony from Wayne Howard that

24   their bed is the way the set up of the townhouse is

1    which -- he has been over in that townhouse, that the

2    head or that bed is directly like headboard to

3    headboard in relation with a wall in between.  It is

4    not surprising that Betty Howard can tell you that she

5    felt that go into the wall.  That is directly where it

6    would go into the wall based on that picture.  There is

7    not a question that Betty and Wayne Howard were in

8    danger from this projectile.

9         And, again, I would ask for a close

10   examination of the cases and not just the head notes

11   that the defendant is reading.  I will tell you the

12   Court is actually looking at the totality of the

13   circumstances.  I would ask that you find the defendant

14   guilty of both counts although I would state that I

15   believe the one crime one act would apply.  So I

16   believe technically a conviction could only be entered

17   into one case if you find him guilty.

18        THE COURT:  Let's see what I have.  Franklin.  I

19   have Collins.  I have Moreno.  I have got Olivieri.

20   Thomas and what is the other one?

21        MR. TOMCZAK:  Moreno.

22        THE COURT:  Watkins.  I don't have that.

23        MR. TOMCZAK:  I have that right here.  I have a

24   brief argument.

1        THE COURT:  Your response?

2        MR. TOMCZAK:  Yes, I do.

3        THE COURT:  Okay.

4        MR. TOMCZAK:  Judge, I think it was an interesting

5    argument that counsel made and I would like to draw

6    your attention to the part of her argument where she

7    indicates there was no testimony regarding a number of

8    things.  I think she went over four or five things.

9    That is what is important to think about in this case.

10   There is no testimony about what this defendant did in

11   handling a firearm.  There is no testimony of that.  We

12   cannot create that testimony.  There is no testimony

13   about how the gun was handled.  It is just not here in

14   this case.  There is no testimony about how the dog was

15   acting or whether he was protecting her from the dog or

16   the dog was attacking him.  Here is the important

17   point, Judge, when you have a prosecutor who stands in

18   front of you and gives you a litany of things that

19   there is no testimony about, we have to remember it is

20   their case and it is their evidence.  It is their

21   burden.

22       So they are looking at you and saying we do

23   not have that in this case.  We don't have all of these

24   things in this case and you have to infer it.  I would

1    submit to your Honor, do not infer in this case.  Do

2    not fill in the blanks that the State has not filled

3    them in.

4           The 9-1-1 call, if Socha wanted the cops there

5    so bad, I think she knows the number 9-1-1.  I think

6    she would have been able to make that call if she felt

7    she needed the police to be there.  It was the witness

8    Gatlin that forced the phone call to go through.

9           The important thing in this case is not to

10   fill in the blanks for the State's case.  I ask you not

11   to do that.  There is not sufficient evidence here to

12   prove the defendant guilty beyond a reasonable doubt.

13   There is a whole absence of evidence as to how this gun

14   discharged.  That is just not part of the case.  Thank

15   you.

16   MS. LAMKEN:  Briefly, your Honor, if this was a

17   jury trial, I would be going into a whole explanation

18   of circumstantial evidence.  I believe the Court knows

19   and understands it and can apply it.  Several times

20   Cassandra was asked was there anyone else in this

21   townhouse and did she pull a weapon and/or did she

22   discharge a gun and the answer several times in the

23   past testimony that came in -- well, it didn't come in

24   substantively.  She was not inconsistent on that, but

1    she indicated in Court that she did not pull a weapon,

2    discharge a weapon at any point in this incident and

3    there was no one else in this townhouse.

4    Circumstantially you can infer it was the defendant.

5        THE COURT:  Okay.

6        MR. TOMCZAK:  Thank you.

7        THE COURT:  Done?

8        MR. TOMCZAK:  Yes, your Honor.

9        THE COURT:  Okay.  I will take this under

10   advisement.  Both counsel worked hard on this case.  I

11   think I should take my time and read these cases.

12        MR. TOMCZAK:  Yes, Judge.

13        THE COURT:  What date do you want to come back?

14        MS. LAMKEN:  Judge --

15        THE COURT:  You are coming from Springfield.

16        MS. LAMKEN:  I have a jury trial scheduled in

17   DeKalb next Monday for jury trial and I am actually

18   going to be going up to DeKalb on Monday.  Can we come

19   back Monday?

20        MR. TOMCZAK:  Oh, let me just make sure.  Sorry,

21   Judge.

22        THE COURT:  I was thinking more like the 29th or

23   the 30th of May.

24        MR. TOMCZAK:  30th is better for me.

1          MS. LAMKEN:  I am down state all day.  I am

2     conducting a training.

3          THE COURT:  Because then I go on vacation.

4          MS. LAMKEN:  Judge, would it be better -- well, I

5     could be up here Tuesday morning.

6          THE COURT:  Tuesday of next week?

7          MS. LAMKEN:  Yes, the 22nd.

8          MR. TOMCZAK:  That works for me.

9          THE COURT:  All right.  We will do Tuesday.  That

10     will give me a few more days to read this.

11          MR. TOMCZAK:  5-22 and what time?

12          THE COURT:  Counsel, what time can you get here?  I

13     will be here all morning long.

14          MS. LAMKEN:  I can be here at 9:00.

15          MR. TOMCZAK:  10:30.

16          MS. LAMKEN:  10:30 is fine.

17          THE COURT:  Thank you.

18          MS. LAMKEN:  Thank you.

19               (Which were all the proceedings had)

20

21

22

23

24

```
 1        THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
                      WILL COUNTY, ILLINOIS
 2

 3

 4            I, JULIE A. ENRIGHT, court reporter for the

 5    Circuit Court of Will County, Twelfth Judicial Circuit

 6    of Illinois, do hereby certify that I reported in

 7    shorthand the proceedings had on the hearing in the

 8    aforementioned cause; that I thereafter caused the

 9    foregoing to be transcribed into typewriting, which I

10    hereby certify to be a true and accurate transcript of

11    the proceedings had before the Honorable DAN KENNEDY,

12    Judge of said Court.

13

14

15                               _____

16                               JULIE A. ENRIGHT C.S.R
                                 License No. 084-004518

17

18

19    DATED this 30th day
      of July, 2021
20

21

22

23

24
```