





Transcript of the Deposition of
**Detective Dave Jackson**
**Case:** Cassandra Socha v. City of Joliet; et al.
**Taken On:** June 2, 2021



Ex. C

Royal Reporting Services, Inc.
Phone:312.361.8851
Email:info@royalreportingservices.com
Website: www.royalreportingservices.com

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Dave Jackson - Taken 6/2/2021

Page 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

```
CASSANDRA SOCHA,                )
                                )
              Plaintiff,        )
                                )
         vs.                    ) No. 1:18-cv-05681
                                )
CITY OF JOLIET, a municipal     )
corporation, EDWARD             )
GRIZZLE, JOHN DOES 1-20,        )
                                )
              Defendants.       )
```

The deposition of DETECTIVE DAVE JACKSON,
called by the Plaintiff for examination, taken pursuant
to notice and pursuant to the Federal Rules of Civil
Procedure for the United States District Courts
pertaining to the taking of depositions, taken via
videoconference before Margaret Maggie Orton, Certified
Shorthand Reporter and Registered Professional Reporter,
commencing at 9:30 a.m. on June 2, 2021.

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Dave Jackson - Taken 6/2/2021

Page 2

```
 1   APPEARANCES:  (via videoconference)

 2        LAW OFFICES OF HALL ADAMS, LLC
          MR. HALL ADAMS, III
 3        33 North Dearborn Street
          Suite 2350
 4        Chicago, Illinois 60602
          Phone:  312.445.4900
 5        E-mail: hall@adamslegal.net

 6            On behalf of the Plaintiff;

 7

          TRESSLER LLP
 8        MS. DARCY L. PROCTOR
          MR. JAMES J. HESS, Jr.
 9        550 East Boughton Road
          Suite 250
10        Bolingbrook, Illinois 60440
          Phone:  312.759.0800
11        E-mail: dproctor@tresslerllp.com
                  jhess@tresslerllp.com
12            On behalf of the Defendant City of Joliet;

13

          KNIGHT HOPPE KURNIK & KNIGHT, LTD.
14        MR. MATTHEW S. CLARK
          5600 North River Road
15        Suite 600
          Rosemont, Illinois 60018
16        Phone:  847.261.0700
          E-mail: mclark@khkklaw.com
17
              On behalf of the Defendant Edward Grizzle;
18

19        VUCKO LAW LLP
          MR. JOSEPH W. VUCKO
20        2208 Midwest Road
          Suite 104
21        Oak Brook, Illinois 60523
          Phone:  312.522.2517
22        E-mail: jvucko@vuckolaw.com

23            On behalf of the Deponent.

24
```

Royal Reporting Services, Inc.
312.361.8851

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Dave Jackson - Taken 6/2/2021

Page 3

1                    I N D E X

2   WITNESS                                      PAGE

3   DETECTIVE DAVE JACKSON

4        Direct Examination by Mr. Adams............  4

5        Cross-Examination by Ms. Proctor..........  44

6        Cross-Examination by Mr. Clark............  66

7        Redirect Examination by Mr. Adams.........  84

8

9

10                  E X H I B I T S

11

12              (NO EXHIBITS MARKED)

13

14

15

16

17

18

19

20

21

22

23

24

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Dave Jackson - Taken 6/2/2021

---

Page 4

1          (Witness sworn.)
2          MS. PROCTOR: Before we begin, this is Darcy
3     Proctor, on behalf of the City of Joliet. Who's all
4     present for today's Zoom deposition?
5          MR. VUCKO: This is Joey Vucko. I'm counsel for
6     Dave Jackson.
7          MS. PROCTOR: Okay. Now, you're present as an
8     observer today, or what is your role in this deposition?
9          MR. VUCKO: I represent Dave Jackson. So if
10    there's objections to be made, I'll be making them.
11         MS. PROCTOR: Very well. Thank you.
12         MR. ADAMS: All right. You did swear the witness.
13         THE STENOGRAPHER: Yes.
14         MR. ADAMS: I'll go ahead.
15    WHEREUPON:
16              DETECTIVE DAVE JACKSON,
17    called as a witness herein, having been first duly
18    sworn, was examined and testified as follows:
19              DIRECT EXAMINATION
20    BY MR. ADAMS:
21         Q.  Officer Jackson, my name is Hall Adams. I
22    represent Officer Cassandra Socha. I'm going to ask you
23    some questions about her lawsuit this morning.
24         Have you ever given a deposition before?

---

Page 5

1         A.  Yes, sir.
2         Q.  I'll go over a couple ground rules real quick
3     so that we have a clear record today. It's important,
4     Officer, that you hear and understand every question
5     that I ask before you attempt to give an answer.
6     Especially in the Zoom era, you need to be vigilant
7     about that. If you need for questions to be repeated,
8     rephrased, read back by our court reporter, explained by
9     the lawyers, whatever the case, we'll accommodate you as
10    many times as you ask. If you give an answer to a
11    question, we'll presume that you heard the question and
12    understood the question. Is that fair?
13         A.  Yes, sir.
14         Q.  Great.
15         Never guess. If you don't know the answer to
16    a question, tell us you don't know. If you can't
17    remember something you were asked, tell us you can't
18    remember, but never guess. Okay?
19         A.  Yes, sir.
20         Q.  All right. You are currently employed as a
21    police officer by the City of Joliet, Illinois?
22         A.  Yes.
23         Q.  How long have you been so employed?
24         A.  26 and a half years.

---

Page 6

1         Q.  What is your current rank?
2         A.  Currently, I don't have a rank, but my current
3     assignment is a general assignment detective within the
4     investigations division of the Joliet Police Department.
5         Q.  How long have you been assigned as a general
6     assignments detective with the investigation division?
7         A.  I've done two separate stints in
8     investigations. The first stint was from 2000 to 2007
9     and I did an undercover unit, went back to patrol. Then
10    in 2016, I returned back to the investigations division
11    as a general assignment detective.
12         Q.  And you have been employed in that division
13    continuously since that time?
14         A.  That's correct, sir.
15         Q.  In that position, do you maintain an office or
16    a desk in the investigation division?
17         A.  Yes, I do.
18         Q.  And has that been true since 2016?
19         A.  Correct.
20         Q.  Who is your current immediate supervisor or
21    senior officer in your chain of command?
22         A.  My first-line supervisor -- I mean, we have
23    many supervisors, but my first-line supervisor is Tizoc
24    Landeros.

---

Page 7

1         Q.  How long has he or she been your first-line
2     supervisor?
3         A.  I don't want to guess, but I can give you an
4     approximate time.
5         Q.  Approximate time would be fine.
6         A.  Okay. When I initially came back to
7     investigations in 2016, Tizoc Landeros was a supervisor
8     on the -- I'm sorry, he was a detective on the night
9     shift. So I believe that he's only been a supervisor
10    one or two years.
11         Q.  When you first came back to the investigation
12    division in 2016, who was your first-line reporting
13    senior?
14         A.  Again, I want to say it was either Sergeant
15    Grizzle or Sergeant Nicodemus.
16         Q.  At some point since 2016, Sergeant Grizzle has
17    been your first-line reporting senior?
18         A.  Yes, I believe he has been. Yes, sir.
19         Q.  Was that on a particular shift?
20         A.  Yes, sir. We have -- You know, since I've
21    been back in investigations, we have an A rotation and a
22    B rotation. So one of those rotations, I've been on;
23    and then we have permanent assignments like as that were
24    financial crimes, computer crimes, different things like

---

4 (Pages 4 to 7)

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Dave Jackson - Taken 6/2/2021

Page 8

1    that. So I've been on either an A shift or a B shift
2    rotation; and, you know, we have three supervisors up
3    here.
4         So, you know, I'm not exactly sure at which
5    point I probably worked, you know, but one of them I've
6    worked for probably over my tenure up here.
7         Q. Before I forget to ask, what is your highest
8    level of formal education?
9         A. High school education.
10        Q. All right. And where did you attend the
11   police academy?
12        A. Illinois State Police Academy.
13        Q. How long ago was that?
14        A. 1995.
15        Q. Do you recall who your first-line reporting
16   senior was during the period May of 2018 through, say,
17   Labor Day of 2018?
18        A. No, sir, I do not.
19        Q. Okay. My understanding is that there was some
20   period of time in 2018 when you were out, off work, due
21   to a disability, leave of absence; is that correct?
22        A. Yes, sir.
23        Q. What were the time parameters of that leave of
24   absence?

Page 9

1         A. You know, I don't remember exactly, but I
2    think I scanned it into my -- into my computer. So
3    maybe at one of our breaks, I can take a look at that
4    and that could probably refresh my memory. I think I
5    have my doctors' notes and different things like that in
6    there, but I think I was gone for approximately six
7    weeks. And then my return to work note, I think, I
8    scanned in there. So we can probably get some kind of a
9    time frame when I was off.
10        Q. Okay. Are you acquainted with a Joliet police
11   officer named Nicholas Crowley?
12        A. Yes, sir, I am.
13        Q. How long have you known Crowley?
14        A. I was here -- Back then, I think I was the
15   field training officer his first day here. So I've
16   known him since his first day on the job.
17        Q. You are aware that he was investigated by the
18   Joliet Police Department in -- beginning in 2017 and
19   into 2018?
20        A. Yes.
21        Q. Did you have any personal official involvement
22   in that investigation?
23        A. No, sir.
24        Q. You're aware generally that my client, Officer

Page 10

1    Socha, was investigated by the Joliet Police Department
2    sometime in the spring and summer of 2018?
3         A. Yes, sir.
4         Q. Did you have any personal official role in
5    that investigation of Officer Socha?
6         A. No, sir.
7         Q. How long have you known Officer Socha?
8         A. Oh, again, since her first day. I was field
9    training officer. I didn't have her as a recruit; but I
10   think I may have done some training, you know, at the
11   police station. So I've known her since her first day
12   here.
13        Q. How long have you known the current Deputy
14   Chief Brown?
15        A. Oh, since his first day here. So whatever day
16   that was, I think I was in an undercover unit when he
17   started. So I've known him since his first day here.
18        Q. Up until recent that that's relating to your
19   respective roles as witnesses giving depositions in this
20   particular case, how would you characterize your
21   relationship with Deputy Chief Brown?
22        A. Very good. I mean, he's been to my house,
23   barbecue, brings the kids over to swim in my pool. I
24   mean, it's, you know, a typical friendship. Besides

Page 11

1    what I would call a coworker relationship, you know,
2    it's been a very, very good friendship.
3         Q. And I'm going to miss on some of these ranks
4    and to all those officers whose ranks I get wrong, I
5    apologize in advance.
6         What is Matlock's current rank?
7         A. He is, I guess, my head supervisor. He's the
8    deputy chief of investigations right now.
9         Q. How long have you been acquainted with Deputy
10   Chief Matlock?
11        A. Since 1995 when I started here.
12        Q. How would you characterize your relationship
13   with Deputy Chief Matlock, again prior to the events
14   leading to your, quote, being asked to give depositions
15   in this case?
16        A. Great friends. I mean, close enough like
17   brothers.
18        Q. Harrison is a lieutenant, true?
19        A. Yes.
20        Q. How long have you known Lieutenant Harrison?
21        A. Probably since he started here.
22        Q. Prior to both of you being asked to give
23   depositions in this lawsuit, how would you characterize
24   your relationship with Lieutenant Harrison?

5 (Pages 8 to 11)

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Dave Jackson - Taken 6/2/2021

Page 12

1    A.  Not very well.  You know, we've, you know --
2  You know, we don't have a good relationship anymore
3  because, you know, from recent, you know, media events
4  that was in the paper here about Lieutenant Harrison
5  and, you know, I've heard from, you know, people here
6  that he was going around saying that I lied, you know,
7  about, you know, comments or something like that.  So we
8  don't have a good relationship at all anymore.
9    Q.  Okay.  And you say anymore.  Before -- Even
10  before the events leading up to your and being asked
11  to give depositions in this case, was the relationship
12  different then?
13    A.  Oh, absolutely.  We had a great relationship.
14    Q.  Again, prior to you and in this instance
15  Sergeant Powers being asked to give depositions in this
16  case, did you know Powers?
17    A.  Yes.
18    Q.  How would you characterize your relationship
19  with him prior to those events?
20    A.  You know what?  It hasn't been good in years.
21    Q.  Okay.  How about Detective Sergeant Grizzle?
22  You know him, of course?
23    A.  Yes.
24    Q.  How would you characterize your relationship

Page 13

1  with him prior to the events leading up to this lawsuit?
2    A.  He's a friend of mine.  I mean, we've gone
3  out, done things off -- you know, away from work.  So,
4  yeah, I consider him, you know, now and then, and, you
5  know, hopefully even after all of this to still be a
6  friend.
7    Q.  And how about Detective Sergeant Gavin?  Do
8  you know him?
9    A.  Yes.
10    Q.  Prior to the events leading up to the recent
11  deposition subpoenas in this case, how would you
12  characterize your relationship with Detective Sergeant
13  Gavin?
14    A.  A good friend.
15    Q.  Since Deputy Chief Brown learned that he would
16  be giving a deposition in this case, has he discussed
17  that with you?
18    A.  Yes.
19    Q.  Approximately when did you have a discussion
20  with him about this?
21    A.  I can't tell you the day, but I could tell you
22  it was relatively after or it could have been the same
23  day that Sergeant Grizzle received some type of
24  discovery in this case that I was walking by the watch

Page 14

1  commander's office, and I saw Sergeant Grizzle and
2  Lieutenant Brown in the watch commander's office talking
3  and I didn't think anything about it.  I was just going
4  about my day, but later I received a phone call from
5  Lieutenant Brown upset with me.
6    Q.  And at the time he was still lieutenant, had
7  not yet been promoted to deputy chief?
8    A.  That's correct.
9    Q.  And in that phone call, what did now Deputy
10  Chief Brown say to you?
11    A.  He asked me if I had made any statements to --
12  I don't know if it was to counsel for Socha or if it was
13  to Nicholas Crowley about him making a comment or
14  witnessing a comment that was made by Deputy Chief
15  Gavin; and I told him, yes, I said it.
16    Q.  And did Brown repeat for you what it was that
17  he understood you to have said?
18    A.  I can't recall if he repeated it, but
19  definitely I did re- -- you know, reiterate what it was
20  and I -- you know, it was words to the effect that
21  Sergeant Gavin had walked into the watch commander's
22  office and, you know, stated aloud to the individuals
23  that were inside the watch commander's office that
24  Socha -- excuse my language -- sucked dick like a porn

Page 15

1  star.
2    Q.  And we'll come back to that event, but I want
3  to stay on this telephone conversation between you and
4  Brown.
5    Did Brown say anything else to you in that
6  conversation?
7    A.  Yeah.  He, you know, told me basically that he
8  was angry with me, that, you know, he thought the
9  conversation was between he and I and that, you know, he
10  really didn't care much about, you know, Socha and my
11  end of it.  I sensed that I thought that Socha was a
12  victim, that, you know, it was our duty, you know,
13  basically to, you know -- you know, we didn't create
14  this but just to say what we know.
15    Q.  Okay.  When Brown called you on the telephone,
16  did Brown acknowledge that he was aware that you had
17  identified him, Brown, as being in the watch commander's
18  office when Gavin said what you told us a moment ago?
19    A.  Yes.
20    Q.  How did you initially learn about that event
21  in the watch commander's office?
22    A.  I believe initially I learned about it from
23  Deputy Chief, then it was -- I believe it was Matlock.
24  Okay, it was Matlock told me about it and -- You know,

Royal Reporting Services, Inc.
312.361.8851

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Dave Jackson - Taken 6/2/2021

Page 16

1  and then once he told me, I think that we even set up a
2  meeting with Nick Crowley and we sat down. And, you
3  know, this was, you know, related to Nick Crowley, and I
4  think it was subsequently turned over in discovery.
5      Q.  Okay. When did you have that conversation
6  with Matlock?
7      A.  You know what? I don't recall. It had to be
8  somewhere that I was made aware of it close to when
9  these events took place.
10     Q.  I'm sorry. I couldn't hear you.
11     A.  It had to be somewhere around the time when
12 these events took place.
13     Q.  Okay.
14     A.  So it was relatively, I believe -- I can't
15 remember the exact date and time. So approximately
16 sometime around when these events took place.
17     Q.  And when you say these events, you're
18 referring to this conversation in the watch commander's
19 office where Gavin walked in, as you understood, and said
20 words to the effect that Socha sucks dick like a porn
21 star?
22     A.  Yes. Yeah. And, you know, I think there was
23 another part to that too, that -- that -- you know, that
24 they see or someone sees why she's with Nick, why Nick

Page 17

1  is with her. Okay? So something to the effect of that.
2      Q.  Was anyone else present when you and Matlock
3  discussed those events?
4      A.  Not initially; but like I said, when -- you
5  know, sometime after this, we did sit down and speak
6  with Nick Crowley.
7      Q.  All right. Was this conversation between you
8  and Matlock a face-to-face in-person conversation, or
9  was it over the telephone?
10     A.  Mr. Adams, I don't recall, you know, if it was
11 face-to-face or over the phone.
12     Q.  Do you recall who initiated the conversation?
13     A.  I don't recall; but I would probably, you
14 know, make the assumption that, you know, this
15 information was relayed to me -- it would probably be
16 Carlos, Detective Chief Matlock, or Detective Matlock at
17 the time.
18     Q.  Outside of the police department official
19 world, is Matlock Carlos to you on a first-name basis?
20     A.  Yes, he is.
21     Q.  And is that true of Deputy Chief Brown whose
22 first name I don't even remember?
23     A.  Yes. His first name is Rob, sir. Yes, sir.
24     Q.  Same with Harrison?

Page 18

1      A.  I don't have that informal relationship with
2  Jeremy like that; but, yeah, I will call Jeremy by his
3  first name as I recall.
4      Q.  Okay. So let me go back to the conversation
5  with Matlock. When Matlock told you about this event in
6  the watch commander's office where Gavin said what you
7  described, did Matlock tell you who else was in the
8  watch commander's office at the time?
9      A.  Yes, I was made aware, yes.
10     Q.  Who did he say was in the watch commander's
11 office when Gavin said those things?
12     A.  From what I recall, it was Jeremy Harrison,
13 Rob Brown, and Tim Powers.
14     Q.  Was it your understanding that Matlock was
15 there at the time?
16     A.  No, he wasn't -- I don't believe -- He wasn't
17 a supervisor. So inside that watch commander's office
18 would have been, you know, supervisors.
19     Q.  Did Matlock inform you about how it was that
20 he came to learn about that event in the watch
21 commander's office if he himself was not present to see
22 and hear it?
23     A.  It was through Lieutenant Brown.
24     Q.  And what did Matlock tell you he learned from

Page 19

1  Lieutenant Brown?
2      A.  The aforementioned statements that I've
3  already said about, you know, the words that Sergeant
4  Gavin uttered.
5      Q.  Did Matlock tell you how it was or in what
6  context it came to pass that Brown told Matlock about
7  those events in the watch commander's office?
8      A.  No. I didn't get the context, you know,
9  but -- you know, and time frame. I believe it was
10 relatively close to when the phone was extracted or
11 dumped. That was common terminology for a phone
12 extraction. So it was relatively close in time frame, I
13 believe, to that.
14     Q.  Can you comfortably be any more precise? When
15 you say close, was it within days or weeks or months?
16 Can you narrow down that time frame in any way?
17     A.  Can't. You know, I can't.
18     Q.  Okay. After Matlock told you what he had
19 learned from Brown about Gavin's statements in the watch
20 commander's office, did you ever discuss those events
21 with Brown?
22     A.  I did. It was that phone conversation we
23 spoke of earlier.
24     Q.  Okay. And that's the phone conversation when

7 (Pages 16 to 19)

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Dave Jackson - Taken 6/2/2021

Page 20

1  Brown called you to express his, you know, concern or
2  disappointment at having been identified and called in
3  to give a deposition in the case?
4      A.  Yes, sir.
5      Q.  What specifically did Brown say to you in that
6  phone conversation about his awareness of these events
7  in the watch commander's office when Gavin made the
8  comment about how Socha sucked dick?
9      A.  He said to me that he wasn't going to
10  testi-- that he wasn't going to testify, he will never
11  repeat any of that, that, you know ...
12          And truthfully, you know, I let him go on and
13  on.  I mean, he was pretty irate with this, and I let
14  him go on and on.  And the fact of the matter was, is
15  that he never had a conversation with me.  But I didn't
16  want to tell him that, you know, I learned this
17  information from, you know, then Detective Matlock
18  because now he was a supervisor inside of the same watch
19  commander's office where they had to work close
20  together.
21      Q.  So this was sort of a one-sided telephone, I
22  say, conversation; but, really, it was Brown doing the
23  talking to you during this telephone call?
24      A.  Well, you know what?  I was able to say the

Page 21

1  things that I needed to say, that -- you know, that I
2  believe that Socha was the victim and we should treat
3  her just like any other victim; and, you know, I was
4  able to tell him I'm sorry that he felt that way and you
5  know what, maybe I should have talked to him before, you
6  know, any of this was disclosed to make sure that he
7  wanted his name in there.  So I apologized to him for
8  that.
9      Q.  And did he -- that is, Brown -- acknowledge
10  during this conversation that he had, in fact, been in
11  the watch commander's office when Gavin said the things
12  that you've described about how Socha sucked dick?
13      A.  He did.
14      Q.  Do you recall specifically what he said that
15  you took to be his acknowledgment of having been present
16  when Gavin said those things in the watch commander's
17  office?
18      A.  He said that he wasn't going to ever repeat
19  that, that he wasn't going to come in and testify to the
20  fact of -- you know, of that conversation, that -- you
21  know, that words to the effect that he would never, you
22  know, ever, you know, say that.
23      Q.  Did he tell you in so many words that he would
24  deny that he was present when that occurred?

Page 22

1      A.  Correct.
2      Q.  And that he would deny that he ever heard such
3  a thing come out of Gavin's mouth?
4      A.  Correct.
5      Q.  All right.  Has Matlock reached out to you in
6  the same way that Brown did since Matlock learned that
7  he would be called to give a deposition in this case?
8      A.  No.
9      Q.  Has any other Joliet police officer reached
10  out to you in the same way that Brown did after learning
11  that they would be called to give depositions in this
12  case?
13      A.  No.  But, you know, verbally Brown was the
14  only one that verbalized anything; but nonverbally, you
15  know, that, you know, we have people that associated
16  with Jeremy Harrison and his close friends, you know,
17  they don't talk to you, they create a certain hostile
18  environment.
19          I mean, so, yeah, you know, they do not in a
20  verbal sense; but in a nonverbal sense, you know, they
21  make it known that they're upset.
22      Q.  Now, after Matlock told you what he had
23  learned from Brown about the events in the watch
24  commander's office and in particular Gavin's statement

Page 23

1  in the watch commander's office, you and Matlock had
2  occasion to meet with Nick Crowley to relay those things
3  to him?
4      A.  Yes, sir.
5      Q.  Was that a face-to-face meeting?
6      A.  Yes, sir.
7      Q.  And it was you and Matlock and Crowley?
8      A.  Yes, sir.
9      Q.  Where did it take place?
10      A.  It took place at a Wendy's restaurant on
11  Center Street and Jefferson.
12      Q.  When approximately did that take place?
13      A.  You know what?  I can't tell you approximately
14  when that took place.  You know -- You know, Officer
15  Crowley may have a better idea, or Officer Matlock, but
16  I can't tell you.  I can't remember the time frame.
17      Q.  Who convened or called the meeting?
18      A.  I think it was either me or Matlock.
19      Q.  Did the meet-- Even if Matlock didn't
20  convene the meeting, did the two of you, you and
21  Matlock, agree to jointly sit down and talk with Crowley
22  about these events you've described?
23      A.  Oh, absolutely, yes, sir.
24      Q.  How long did the sit-down at the Wendy's last?

8  (Pages 20 to 23)

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Dave Jackson - Taken 6/2/2021

Page 24

1    A.  Approximately 30 to 45 minutes.
2    Q.  And during that meeting, who did most of the
3  talking?
4    A.  It was Matlock.
5    Q.  And did Matlock describe for you and Crowley
6  during that meeting the events that had transpired in
7  the watch commander's office and Gavin's statement about
8  Socha sucking dick that he made in that watch
9  commander's office episode as you've described them
10 already for us?
11   A.  Yes, sir.
12   Q.  During that meeting at the Wendy's, did
13 Matlock explain to you and Crowley that he, Matlock, had
14 learned those things from Brown?
15   A.  Yes, sir.  I don't know -- I'm sorry.  Let me
16 correct that answer.  I want to correct the record here.
17      I'm not exactly sure if he said that at that
18 meeting, but I could tell you this, that, you know --
19 You know, I'm 95 percent that Officer Crowley was taking
20 notes when we sat down in there.  So he might be a
21 better person to say if he did say that; but, you know,
22 I'm not exactly sure but Officer Crowley did take notes.
23   Q.  Okay.  Did you take notes?
24   A.  No, sir.

Page 25

1    Q.  Did Matlock take notes?
2    A.  No, sir.
3    Q.  When Matlock was conveying to Crowley what he
4  had learned from Brown about these events in the watch
5  commander's office, was Matlock reading off any notes
6  that you could see?
7    A.  No, sir.
8    Q.  He was doing it from memory?
9    A.  Yes, sir.
10   Q.  You have never discussed these events directly
11 with Officer Socha, have you?
12   A.  No, sir.
13   Q.  Why did you and Matlock determine to reach out
14 to and meet with Crowley to discuss these events as
15 opposed to Officer Socha?
16   A.  Well, Crowley is a member of the BPOA, the
17 Black Police Officers Association, and has been one for
18 a while.  You know, I could tell you that for me, you
19 know, Crowley and I have always had, you know, a
20 relationship where we go up and talk to each other and
21 all that and I can't tell you that with Officer Socha
22 that, you know, that relationship is the same where I go
23 up and, you know, we have those same conversations, you
24 know, like Officer Crowley and I.  But, like, he's part

Page 26

1  of the BPOA.  He gets our, you know, e-mails.  He gets
2  everything.  So he's part of our organization that we
3  run.
4    Q.  Okay.  And the Black Patrol Officers
5  Association is an organization within the Joliet Police
6  Department of which you are a current officer?
7    A.  That's correct, sir.
8    Q.  What is your title with the Black Police
9  Officers Association?
10   A.  President.
11   Q.  How long have you been the president of that
12 association?
13   A.  Approximately since 2018; but even before
14 that, I was having a leadership role.  But yeah.  So
15 formally probably since around 2018.
16   Q.  How long has that organization existed?
17   A.  Long before I've been a police officer.  So I
18 think it goes back to the early 1970s.
19   Q.  Is Matlock a member of that organization?
20   A.  Yes, sir.
21   Q.  Is Brown a member of that organization?
22   A.  Yes, sir.
23   Q.  And I take it from Crowley's membership, that
24 race isn't a membership requirement?

Page 27

1    A.  That's correct.
2    Q.  What is the purpose of the organization
3  broadly?  You don't have to get into the details.
4    A.  You know what?  The easiest way that I'd say
5  is that we follow the mission and the mission is
6  fairness.  It's about equality.  It's about, you know,
7  going in and trying to do the right thing.  It's about
8  community involvement.  It's about bridging, I'm going
9  to say, relationships.  Bringing up, you know, equities
10 within the police department and within the community.
11      I mean, so -- I mean, we do, I feel like, a
12 lot of real good things that help with the police
13 department and give a great positive message to
14 underserved communities and to, you know, all
15 communities within our -- you know, I'm going to say the
16 city limits within Will County within the state of
17 Illinois.
18   Q.  Okay.  Back to this meeting at the Wendy's,
19 while Matlock was relating the things he had learned
20 from Brown about the meeting in the watch commander's
21 office and Gavin's statements in that meeting, what, if
22 anything, do you recall Crowley saying or asking of
23 Matlock or of you for that matter?
24   A.  I don't remember him asking anything.  I

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Dave Jackson - Taken 6/2/2021

Page 28

1  believe that from what I recall, he was just soaking in
2  everything just like a sponge, he was taking notes and,
3  you know, he was, you know, just learning more
4  information about what had taken place.  That's what I
5  recall about that.
6      Q.   Okay.  At some point in time after the
7  investigation of Socha was initiated by the Joliet
8  Police Department and the contents of her phone
9  extracted, did you come to learn from any source in any
10 way that the contents of that phone included both
11 photographic and videographic images of Socha either
12 nude or engaged in sexual conduct with Crowley?
13     A.   Yes, sir.
14     Q.   How did you yourself come to learn that?
15     A.   I believe that I was off when all this was
16 going on, and I believe I learned about it from maybe
17 the rumor mill around the police department; and then
18 subsequently I believe that Detective Matlock and I had
19 a conversation, and he told me, you know, even more
20 information about it.
21     Q.   Okay.  When you say you were off, that was
22 that disability leave of absence we talked about
23 earlier?
24     A.   No, it wasn't -- That wasn't, like, an on-duty

Page 29

1  injury.  It was -- At that time it was an injury that --
2  you know, that I did while off duty.  So it was like
3  a -- It was a back injury.  So it wasn't a disability
4  where the City was paying for it.  It was my own injury.
5      Q.   Okay.  But a medical leave of absence?
6      A.   Yes, that's perfect.
7      Q.   Okay.
8      A.   That's perfect.
9      Q.   Do you recall what specifically Matlock told
10 you about these -- and I'm just going to call -- I'm
11 going to use the term images to refer to the nude and/or
12 sexually explicit photos or videos of Socha that were
13 extracted from that phone.  When I use the term images,
14 you'll understand that's what I mean?
15     A.   Yes, sir.
16     Q.   What did Matlock tell you about the images?
17     A.   The only thing that I've ever heard about this
18 is from the initial statement that I said about Gavin.
19 That's the only thing that I've heard from Matlock; and
20 I have never heard any other thing about any other
21 images other than what I, you know, had said earlier.
22 Because I -- You know, I've never seen them.  I never,
23 you know ...
24          You know, so, no, I don't know anything about

Page 30

1  other than what I testified earlier that was said and
2  that was said that I learned from Matlock.
3      Q.   Has Matlock told you whether he himself has
4  seen the images?
5      A.   No.  No, he said he has not seen the images.
6      Q.   Has Brown told you whether he has seen the
7  images?
8      A.   I don't -- I don't recall Brown ever telling
9  me he's ever seen the images on there.  I'm just trying
10 to remember.  I don't -- Yeah, I don't think he ever
11 said he saw the images.
12     Q.   Has he ever affirmatively denied having seen
13 the images?
14     A.   I've never heard even the rumor mill that
15 Brown had seen the images.  I've never heard, you know,
16 of anything he's ever told me personally that he's seen
17 them.  So I don't -- You know, I can't tell you that I
18 even, you know, witnessed or heard anything like that.
19     Q.   Have you personally heard any Joliet officer
20 say that he or she have seen the images?
21     A.   No.
22     Q.   Through the rumor mill, have you heard other
23 officers identified by name as having seen the images?
24     A.   Yes.

Page 31

1      Q.   Whose names have you heard in that context
2  through the rumor mill?
3      A.   I've heard the -- my coworkers, Don McKinney
4  and Brad McKeon, and I believe I heard that through a
5  rumor from the -- you know, from the IG's office from
6  the City of Joliet and then also a rumor mill that --
7  you know, that the entire midnight shift, you know, had
8  saw it.
9          So those are the rumors that I heard about
10 people who saw it outside of what I previously testified
11 to.
12     Q.   Do you recall, Officer Jackson, the source of
13 the rumor that the entire midnight shift had seen the
14 images?
15     A.   I do not, sir.  I do not recall that.
16     Q.   In Joliet Police Department --
17     A.   I'm sorry.  Can I clarify that answer?  I'm
18 sorry to cut you off.  I want to clarify --
19     Q.   Yes, sir.
20     A.   -- the midnight shift.  The entire midnight
21 shift investigation shift.  Okay.  So --
22     Q.   Okay.
23     A.   Okay.  So I'm sorry.  I needed to clarify that
24 when you said midnight shift because the midnight shift

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Dave Jackson - Taken 6/2/2021

Page 32

1  in patrol was a whole different entity than the night
2  shift in investigation.
3      Q.  And did this rumor mill provide any
4  information about when the midnight shift in the
5  investigations unit viewed the images?
6      A.  No, sir.
7      Q.  In Joliet Police Department terms, what hours
8  encompass the midnight shift?
9      A.  That usually is 6:00 o'clock at night till, I
10 want to say, 2:00 in the morning ten-hour shift.  So ...
11     So that's when we had it.  That was the shift.
12     Q.  Has any Joliet officer told you that they had
13 copies of the images that were loaded on to either what
14 are called thumb drives or disks?
15     A.  Yes, sir.
16     Q.  Who?
17     A.  Sergeant Grizzle, his desk is probably about,
18 I don't know, three feet away from mine, approximately.
19 And when all of this started to come to light, he had
20 said that he made copies of the contents of the cell
21 phone and put what I'm going to call as portable hard
22 drives, and he described that he had a working copy
23 because he was in charge of it.  He said that Deputy
24 Chief, at the time, Roechner had one and he also

Page 33

1  provided one to Lieutenant Reid in internal affairs.
2      Q.  And this would have been approximately when in
3  relation to the original seizure of and extraction from
4  Socha's phone, days, weeks, months?
5      A.  You know, since I was off.  But I can tell you
6  that this was relatively when this became public and
7  they were talking about the inspector general doing an
8  investigation.  So this was right around that time frame
9  because, you know, it was like a big to-do.
10     Q.  And was -- Were these statements that Grizzle
11 made to you or that you overheard him making to others?
12     A.  No, they were to me.
13     Q.  In what context did he say these things to
14 you?
15     A.  Like I said, it was like when this was
16 starting to become public and there was going to be an
17 investigation, and then it was -- I don't know if it was
18 a lawsuit filed or not.  I'm not sure about that.  But
19 he had this conversation with me.
20     Q.  How did it come up?
21     A.  I believe it was due to the fact of the
22 investigation that was ongoing.
23     Q.  Okay.
24     A.  So it was within the content of, you know, if

Page 34

1  I remember right, the -- you know, that the IG or that
2  the RCSO was coming in, they were getting ready to
3  start, you know, an investigation.
4      Q.  Did Grizzle tell you why a copy of the data
5  that was extracted from Socha's phone was provided to
6  Roechner?
7      A.  He did not then, you know.  And I definitely
8  had questions.  I mean, I've been a detective a long
9  time.  I mean, at no point did I ever, ever recall a
10 deputy chief having any evidence or images of any of the
11 cases I worked in his office.
12     Q.  Did Grizzle provide any explanation as to why
13 Reid was provided with a separate copy of the data that
14 was extracted from Socha's phone?
15     A.  Yeah.  I believe that he told me; and, again,
16 this is -- you know, that in case there was internal --
17 an internal investigation, that Reid had a copy.  So I
18 believe that that was, you know, similar or words to
19 that effect.
20     Q.  As a detective, you are familiar with the
21 Joliet Police Department general order regarding
22 evidence and property management specifically General
23 Order 16.1?
24     A.  Well, I'm going to tell you we have a lot of

Page 35

1  general orders, sir, and that, you know, sometimes that
2  we've got to go back and look at them; but, yeah, for
3  all intents and purposes that, you know, for generality,
4  you know, yes, sir.
5      Q.  Based on your understanding of the
6  department's general order respecting evidence and
7  property management, was there any proper reason for
8  Roechner to have been given a copy of the data extracted
9  from Socha's phone?
10     A.  Not that I could understand, not that I know
11 of.  And, you know, just to that point, you know, I had
12 a conversation even with Deputy Chief Roechner and
13 Deputy Chief Roechner stated that the contents of that
14 phone was on his desktop in his computer also in his
15 office, and that really raised a red flag.
16     Q.  So not just on a storage device like a thumb
17 drive or a disk, but Roechner told you that the contents
18 of Socha's phone had been loaded on to his own desktop
19 computer?
20     A.  Yes, sir.
21     Q.  And when he told you that, did he point to it?
22     A.  It was right outside of his office, we were
23 having a conversation.  And he didn't point to it.  I
24 mean, he told me.  And to put it in the proper context,

                          11  (Pages 32 to 35)

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Dave Jackson - Taken 6/2/2021

Page 36

1    this was right after we were informed that the RCO --
2    RCO was coming in to take the computers, the hard
3    drives, all of that. So he did make that utterance to
4    say that.
5        Q.  Was that device that he was referring to that
6    you characterize it as a desktop, was it, in fact, a
7    desktop type of computer or was it a laptop that was on
8    a desk?
9        A.  You know what? I'm not exactly sure. Some of
10   the administration have laptops that have two monitors
11   on it; but from what I can recall -- you know, I wasn't
12   in his office very much -- but from what I can recall in
13   there, that it appeared to be a desktop, not a laptop,
14   you know, with the two monitors.
15       Q.  When Roechner said that, did he offer any
16   explanation as to why the data that had been extracted
17   from Socha's phone was on his own desktop computer?
18       A.  No.
19       Q.  Did any officer, Grizzle, Roechner, Brown,
20   Matlock, any of those you've named, ever tell you
21   whether the images extracted from Socha's phone and then
22   copied on to storage devices were logged into the
23   BEAST -- and, Margaret, that's all caps, an acronym,
24   B-E-A-S-T -- the BEAST Evidence Management System?

Page 37

1        A.  No, I never got told.
2            And, you know, if I could too, sir, can I put
3    this, Mr. Adams, in proper context that when we have an
4    investigation going on on officers, this is all
5    supervisors that are working this. So, you know, for a
6    detective to have general knowledge on evidence that's
7    in there, it wouldn't be our pattern and practice that I
8    would say. That, you know, this would be sergeant level
9    and higher up that's dealing with, you know, this type
10   of case.
11           So the average detective probably wouldn't
12   have any involvement in this. I didn't have any
13   involvement; and even when they started taking our
14   computer and desktops and our cell phones, I mean, why
15   are they looking at our cell phones. So I take it that
16   this was, you know, a supervisory thing.
17       Q.  Did any officer ever tell you that the images
18   extracted from Socha's phone had been loaded on to their
19   own personal telephone devices or computer devices?
20       A.  No.
21       Q.  Did you ever speak directly with McKinney
22   about how it was he had come to view certain images
23   extracted from Socha's phone?
24       A.  No.

Page 38

1        Q.  Have you heard anything from anyone else about
2    how McKinney came to view such images?
3        A.  No.
4        Q.  Have you spoken with McKeon about how either
5    he or McKinney came to view images that had been
6    extracted from Socha's phone?
7        A.  No.
8        Q.  When Grizzle told you about the copies of the
9    data extracted from Socha's phone that had been made and
10   to whom they had been distributed, did he tell you about
11   the images?
12       A.  No.
13       Q.  Did at any time Grizzle ever describe the
14   images that were extracted from Socha's phone to you?
15       A.  No.
16       Q.  Has Gavin ever described that?
17       A.  I've never had a conversation with Gavin, so
18   no.
19       Q.  Has Harrison ever told you whether he viewed
20   the images that were extracted from Socha's phone?
21       A.  No.
22       Q.  Have you heard from any source in the
23   department that he did view those images?
24       A.  Outside what's been previously stated, the

Page 39

1    only other thing that, you know, I learned was that
2    Harrison went to Officer Socha and said that I was a
3    liar and that he never did view anything; and that, you
4    know, that was the only thing that I've heard.
5        Q.  When did Harrison do that?
6        A.  You know, I'm not exactly sure; but I can
7    remember, you know, it was, you know, a day I got a call
8    from Officer Socha and she was just, you know -- and
9    hopefully I'm not violating her confidence -- but, you
10   know, she was really upset at work and she just needed
11   someone to hear her. And, you know, I listened to her,
12   you know, for about an hour. And then, you know, she
13   went back in, you know, to work, you know, so -- and she
14   was having a hard day.
15           So it was some point around that day, you
16   know, that -- you know, that -- you know, I'm sure
17   coming to work was just hard for her. I think it's hard
18   for a lot of people to stand up.
19       Q.  Since the time of the extraction of data from
20   Socha's phone, have you heard other officers in the
21   Joliet Police Department talk about her in connection
22   with the images that we've described?
23       A.  No. I mean, you know, people are guarded,
24   I've got to say, you know, around me within the police

12  (Pages 36 to 39)

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Dave Jackson - Taken 6/2/2021

Page 40

1  department so -- because if you come and you're able to
2  tell the truth or you're able to do those things, people
3  aren't going to, you know, say things. So I can't tell
4  you I've heard people talk about the images on the
5  phone.
6      Q.  Earlier this year, you and I spoke on the
7  telephone?
8      A.  Yes, sir.
9      Q.  And the nature of that telephone conversation
10 was that I asked you a number of questions about this
11 conversation you and Matlock had with Crowley?
12     A.  Yes, sir.
13     Q.  We spoke again on the telephone briefly last
14 week?
15     A.  Yes, sir.
16     Q.  And then I asked you some questions about the
17 falling out that you've had with Brown since he was
18 asked to give a deposition in this case?
19     A.  Yes, sir.
20     Q.  Those are the only two times you and I have
21 spoken?
22     A.  That's correct.
23     Q.  We've never met face-to-face before today's
24 Zoom?

Page 41

1      A.  That's correct.
2      Q.  And you have never provided me with any
3  written or recorded statements of your recollections
4  about the Socha matter?
5      A.  No, sir.
6      Q.  At any time, Officer Jackson, did you report
7  what you had learned from Matlock to an Officer DeVito
8  in his capacity as the union representative?
9      A.  I believe I have, yeah. I'm not -- I believe
10 we had a conversation about that.
11     Q.  Okay.
12     A.  And I think that he may have already heard
13 some rumors to the effect of that. So -- You know, so I
14 believe that we were talking. I believe that we did
15 have conversations like that.
16     Q.  Do you recall when that occurred?
17     A.  I do not.
18     Q.  Was anyone else present when you had that
19 conversation with DeVito?
20     A.  Not that I recall.
21     Q.  Was that in person or over the phone?
22     A.  I believe in person.
23     Q.  You were interviewed by Regis, the inspector
24 general?

Page 42

1      A.  Yes, sir.
2      Q.  Other than perhaps with your own lawyer, have
3  you had any discussions about what I'll broadly refer to
4  as the Socha matter that we haven't discussed yet today?
5      A.  I haven't had any discussions, but I can
6  recall a conversation that I had with Sergeant Grizzle
7  and it was about the video or the images or the
8  downloads of Socha's phone and he stated to me that he
9  was on vacation and that Tab Jensen or Deputy Chief
10 Jensen, I think, at the time had ordered that the images
11 be removed off of the -- I don't know if I know it
12 right. I'm not one of the guys that download phones,
13 but ...
14     Q.  The Cellebrite?
15     A.  The Cellebrite computer, yeah. So the big
16 computer, he had ordered it to be removed off that. And
17 then Grizzle had told me that he was upset about that
18 because he felt in his mind that -- you know, that
19 Deputy Chief Jensen was interfering in his
20 investigation; and he told me himself that he thought
21 that Deputy Chief Jensen could be subject to, you know,
22 criminal charges such as obstructing an investigation
23 and obstructing justice.
24     Q.  When did that conversation with Grizzle occur?

Page 43

1      A.  I'm not exactly sure, but it was during that
2  time frame when he was on vacation; and when he came
3  back, you know, we had that conversation. So, I mean,
4  his time sheets probably from that time would probably
5  be able to tell you right around the time.
6      Q.  Did that conversation occur before or after
7  the conversation in which Grizzle told you about the
8  three copies of the extracted data had been made with
9  the copy he kept, the copy that Roechner got, and the
10 copy that Reid got, did the conversation regarding
11 Jensen purging the Cellebrite occur before or after the
12 conversation with Grizzle about the copies that were
13 made?
14     A.  I'm not exactly sure, Mr. Adams, the
15 chronological order and those conversations. So, I
16 mean, I'm not exactly sure, but we had them.
17     MR. ADAMS:  Those are all the questions I have at
18 this time. Some of the other lawyers may have some
19 further questions for you, Officer. I appreciate your
20 time.
21     MS. PROCTOR:  This is Darcy Proctor on behalf of
22 the City of Joliet. I definitely have some questions
23 but I'd like to take a short break, maybe a five-minute
24 break if we could.

13  (Pages 40 to 43)

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Dave Jackson - Taken 6/2/2021

Page 44

1      MR. ADAMS: Sure.
2           (A short break was had.)
3           CROSS-EXAMINATION
4  BY MS. PROCTOR:
5      Q.  Good morning, sir.  And your current rank is
6  what, are you -- you're a detective sergeant, detective,
7  what would you prefer, Mr.?
8      A.  You can call me Dave, but my current rank is
9  I'm a patrol officer; but I'm assigned to investigation
10 at the detectives, general assignment.
11     Q.  Okay.
12     A.  Call me Dave.
13     Q.  Okay.  Now, Mr. Jackson, so you are still
14 employed by the Joliet Police Department, correct?
15     A.  Yes.
16     Q.  All right.  And you're represented here today
17 by your counsel, Mr. Vucko, correct?
18     A.  Yes.
19     Q.  On break between when you were giving
20 testimony before and us going back on the record now,
21 did you speak with anybody on break other than perhaps
22 your attorney, Mr. Vucko?
23     A.  No.
24     Q.  Now, earlier you testified to, I think it was,

Page 45

1  two separate telephone conversations that you had with
2  Mr. Hall Adams; do you recall that testimony?
3      A.  Yes.
4      Q.  Okay.  And you understood during both of those
5  conversations that Mr. Adams represented and is
6  representing Cassandra Socha in her lawsuit against the
7  City, correct?
8      A.  Yes.
9      Q.  Okay.  And other than what you have testified
10 to earlier concerning this alleged meeting in the watch
11 commander's office that you heard about thirdhand, did
12 you share any other information regarding Socha or the
13 allegations in her lawsuit with Mr. Adams --
14     A.  No.
15     Q.  -- at any point in time?
16     A.  No.
17     Q.  So let's talk about when you were on leave.
18 According to the information I have, you were on medical
19 leave from May 16th, 2018, until June 25th of 2018.
20     Do you have any reason to dispute that time
21 period as accurate?
22     A.  I don't recall, but that could have been
23 accurate.
24     Q.  Okay.  Well, if I told you that that is when

Page 46

1  you told the inspector general with respect to the dates
2  you were on leave from May 16th to June 25th, 2018,
3  would you have any reason to dispute that information
4  today?
5      MR. ADAMS: Object to form.
6      MR. VUCKO: Objection, form.
7  BY MS. PROCTOR:
8      Q.  You can go ahead and answer.  Unless your
9  lawyer instructs you not to answer, Mr. Jackson, you
10 have to go ahead and answer to the best of your ability.
11 Okay?
12     MR. VUCKO: If you understand.
13 BY MS. PROCTOR:
14     Q.  Yeah, if you understand.  And, of course if at
15 any time you do not understand a question -- and I
16 thought that was probably clear; I hope it was from the
17 onset -- please let us know.  Okay?  Lawyers often ask
18 some really dumb and confusing questions.
19     A.  Could you have the court reporter read that
20 question back to me again?
21          (Record read as requested.)
22     MR. VUCKO: I'm sorry, Court Reporter, your mike
23 was cutting out.
24     MS. PROCTOR: It was hard for me to hear as well.

Page 47

1      THE STENOGRAPHER: Oh, sorry.
2      MS. PROCTOR: You know what?  Let's do this, why
3  don't we strike it and I'll try it again.  Okay?
4      THE WITNESS: Okay.
5  BY MS. PROCTOR:
6      Q.  To the best of your knowledge, Mr. Jackson,
7  were you on medical leave from May 16th, 2018, to and
8  including June 25th of 2018?
9      A.  That sounds about right.  So, yeah, I know I
10 was out with a medical condition.
11     Q.  Okay.  And so you returned to work after
12 June 25th of 2018, correct?
13     A.  Again, I mean, we can do approximate dates.
14 I'm not -- I don't have that information.  I'm also not
15 looking at my time frame; but, yes, I was off for
16 approximately six weeks with a medical condition.  Then
17 I returned back to work, that's correct.
18     Q.  Okay.  So when you say you went out, it means
19 you were completely out and you weren't reporting into
20 work for any of your work duties, correct?
21     A.  Yes.
22     Q.  During that time frame?
23     A.  Yes.
24     Q.  That's correct?  Okay.

14  (Pages 44 to 47)

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Dave Jackson - Taken 6/2/2021

Page 48

1    So would it be fair to say that this
2  conversation that you testified to earlier with Matlock
3  concerning these alleged events in the watch commander's
4  office would have occurred after you returned to work
5  following medical leave in 2018?
6    A.  No, that's not correct.  I mean, even when I
7  was off, Detective Matlock and I speak constantly every
8  day.  So, you know, no, I wouldn't -- I wouldn't say
9  that.  It could have happened in that time frame.  It
10  could have happened after it.  So I'm not exactly sure.
11    Q.  Okay.  Fair enough.
12    So to be clear, you do not know the date on
13  which you had this alleged conversation with Mr. Matlock
14  that you testified to earlier, correct?
15    A.  Correct.
16    Q.  And you yourself have no personal knowledge
17  concerning any events that happened in person in the
18  workplace when you were out on medical leave, correct?
19    MR. VUCKO:  Objection, form.
20  BY MS. PROCTOR:
21    Q.  Do you understand the question, or should I
22  rephrase it?
23    A.  Re-rephrase it.
24    Q.  Okay.  So this alleged meeting, okay, and I

Page 49

1  don't -- that you were told about from Carlos Matlock,
2  you were not present in person for that meeting,
3  correct?
4    A.  We're speaking of a meeting, and I'm not -- if
5  I testified to the fact that there was a meeting, I
6  don't -- I don't recall that.  But I don't know if there
7  was a meeting or not.  So, you know, you keep saying a
8  meeting.
9    Q.  Okay.  Well, let me go back and look at --
10    A.  Okay.
11    Q.  -- a little more precisely what you said.
12    All right.  I'm going to rephrase it.  Do you
13  recall you told us earlier about a conversation that you
14  had with Matlock concerning a conversation that he
15  allegedly had with Brown concerning a conversation
16  amongst Harrison, Brown, Powers, and Gavin concerning
17  matters of sexual content from Officer Socha's cell
18  phone?
19    Did you follow all that?
20    A.  Yeah, I followed it.  Yes, ma'am.
21    Q.  Okay.  And my point was if there were a
22  conversation amongst the folks that you've told us
23  about, Brown, Gavin, Powers -- and I don't think I'm
24  leaving anybody out -- you were not physically present

Page 50

1  for that conversation, correct?
2    A.  Yes, I was not.
3    Q.  And your only knowledge of it would be based
4  on what you heard from Carlos Matlock, who in turn
5  allegedly heard that information from Lieutenant Robert
6  Brown, correct?
7    A.  Yes.
8    Q.  Do you recall when you were interviewed by the
9  inspector general?
10    A.  I do not recall the exact date, no.
11    Q.  Do you know whether it was before or after
12  Ms. Socha filed her lawsuit against the City?
13    A.  I don't know the time frame, no, ma'am.
14    Q.  Was it your understanding that the inspector
15  general was investigating allegations concerning the
16  matters set forth in Officer Socha's lawsuit?
17    MR. ADAMS:  Object to foundation and to form.
18    MR. VUCKO:  And objection, it's speculative.
19    MS. PROCTOR:  Well, all right.  I'll re- -- you
20  know --
21  BY MS. PROCTOR:
22    Q.  Well, can you answer the question,
23  Mr. Jackson?
24    A.  I'm going to say I don't know what the scope

Page 51

1  of the IG's investigation was.  I don't know what his
2  parameters were.  I don't know what was looked into.  I
3  don't know.  I just know that I was ordered to go over
4  there and I had to talk to him.  So I can't tell you any
5  of the other substantive facts, and it was in reference
6  to Ms. Socha's phone.
7    Q.  Okay.  Let me rephrase it differently, then.
8  And that's fair.
9    Do you know why the inspector general
10  interviewed you?
11    A.  From my understanding, I believe everyone in
12  investigations were being interviewed.
13    Q.  About what generally?
14    A.  As previously stated, Officer Socha's phone.
15    Q.  Okay.  And in your interview with the
16  inspector general, did you share with him -- and that
17  would be Chris Regis -- any information along the lines
18  that you've testified to here today?
19    A.  I believe I told him the rumors that I heard.
20  I believe that, you know -- You know, he asked if he can
21  look at my personal phone.  I unlocked the phone and I
22  gave it to him.  He scrolled through my phone.  I don't
23  know if he went through the gallery or I put it on the
24  gallery.  He went through it.  It was an open process.

15  (Pages 48 to 51)

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Dave Jackson - Taken 6/2/2021

Page 52

1    I believe my interview, after I told him that I had been
2    off, you know, for the period of times that he told me
3    there or for the six weeks for my medical condition, it
4    was a, you know, pretty brief interview. But, yeah, I
5    told him as much as I knew at the time, you know, yes.
6        Q. Okay. Is it your testimony that -- Well, let
7    me ask you this: Your conversation with Carlos Matlock,
8    which, again, you don't recall when that occurred, but
9    did that occur before or after you were interviewed by
10   the inspector general?
11       A. As previously stated, ma'am, I don't recall
12   when this conversation was.
13       Q. So it could have been after you were
14   interviewed by the inspector general, correct?
15       A. I don't want to speculate with you one way or
16   other.
17       Q. Do you have any written document as to when
18   this conversation occurred?
19       A. No, ma'am.
20       Q. All right. And you also testified about a
21   meeting that you say occurred between you, Officer
22   Crowley, and Carlos Matlock where you say Matlock shared
23   the same information that you testified to earlier.
24   Okay? Do you understand -- Do you recall the meeting

Page 53

1    I'm ref- -- the Wendy's, the Wendy's sit-down; I guess
2    we can call it that. Are you with me?
3        A. Yes, ma'am.
4        Q. Okay. Can you be any more specific with
5    respect to the date that the Wendy's sit-down occurred
6    with you, Matlock, and Officer Crowley?
7        A. I cannot be more specific with that, no.
8        Q. Do you know whether it was before or after the
9    inspector general's interview of you?
10       A. You know what? I don't -- I don't recall.
11   I'm not exactly sure.
12       Q. You told us earlier that Officer Crowley took
13   notes about that interview. Did I get that correctly?
14       A. Yes, you did.
15       Q. Okay. And if I told you that Officer Crowley
16   said that he met with you on March 2nd, 2020, would you
17   have any reason to dispute that date?
18       MR. ADAMS: Object to form and to foundation.
19   BY THE WITNESS:
20       A. No, I can't tell you when the date was, you
21   know, right now.
22       Q. Well, how many private conversations did you
23   have with Officer Crowley concerning the subject of
24   Officer Socha's cell phone and the -- Well, let's just

Page 54

1    leave it at that. When I say that, you understand what
2    I'm talking about, correct?
3        MR. VUCKO: Objection, form.
4    BY THE WITNESS:
5        A. I didn't catch that. With Officer Crowley,
6    was that your question, ma'am?
7        Q. Yes.
8        A. You know, to --
9        Q. To discuss -- like, specifically to discuss
10   what information you had concerning the contents of
11   Officer Socha's cell phone.
12       A. Okay. Are you talking other than the time at
13   Wendy's with Deputy Chief -- I'm sorry, with Detective
14   Matlock and myself or any other time or ...
15           I guess I don't understand your question.
16       Q. That's a good question.
17           So other than the Wendy's sit-down, did you,
18   Crowley, and Carlos Matlock -- did you have any
19   additional private conversations with Crowley concerning
20   that same subject matter or the contents of Officer
21   Socha's cell phone?
22       A. No, not that I recall.
23       Q. So to be clear, there was only one
24   conversation with you and Officer Crowley concerning

Page 55

1    your -- the information you had concerning the contents
2    of her cell phone being the subject of a discussion,
3    okay, at the Joliet PD, there was only one conversation,
4    correct?
5        A. You kind of phrased that question wrong. It
6    was Detective Matlock, myself, and Officer Crowley at
7    Wendy's. So, yeah, if that was the way that you're
8    trying to phrase that and that's for that fact, yes,
9    that's the answer.
10       Q. Okay. Well, just to be clear -- and I
11   appreciate your -- that you're listening to the question
12   and you want to be sure that the answers are accurate.
13       A. Yes.
14       Q. So let's just ask one last time. Is the only
15   time that you spoke to Officer Crowley regarding the
16   subject of Officer Socha's cell phone was the Wendy's
17   sit-down meeting with you, Crowley, and Carlos Matlock?
18       A. Yes. To the best of my knowledge, yes.
19       Q. How many conver- -- you talked about one --
20   Change of subject now. I want to focus on conversations
21   with Officer Socha. Okay.
22           Other than the conversation that you already
23   told us about earlier today, do you recall any other
24   conversations with Officer Socha about her lawsuit, the

16 (Pages 52 to 55)

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Dave Jackson - Taken 6/2/2021

Page 56

1    allegations in her lawsuit, the contents of her cell
2    phone, any information that you may have heard first-,
3    second-, or thirdhand concerning the Socha matters as
4    described by her attorney earlier today?
5        A.   No, ma'am.
6        Q.   So you've only had one conversation with
7    Officer Socha, correct?
8        A.   Well, I'm going to tell you, I'm certain that
9    I spoke to Officer Socha in the greeting of the day.
10   I'm certain that I spoke with Officer Socha, how are you
11   doing?  You know, I always offer words of encouragement
12   to Officer Socha, let her know that you know what, she's
13   going to be okay.
14           So, you know, outside of talking anything
15   about this lawsuit or anything, you know, I don't have
16   any memory of ever -- she and I ever speaking about
17   this.
18       Q.   About the matters which are involved in her
19   lawsuit, correct?
20       A.   That's correct.  You know, the one time that I
21   testified earlier to today when, you know, she just
22   needed someone to hear, you know, I was there for her.
23       Q.   And refresh my memory, did she call you or did
24   you call her?

Page 57

1        A.   You know what?  I don't believe I have Officer
2    Socha's phone number.  So I'm going to think that she
3    called me.  So, yes.  So ...
4            And I think that she was working the desk at
5    the time.  When I say the desk, the front desk, the
6    records section when you initially walk in the police
7    department.  So I believe that she was working up there
8    and she has just, you know, called and asked if she
9    could have a -- you know, talk, and she was just really
10   emotional.
11       Q.   Was this conversation with Officer Socha, was
12   that before or after your sit-down at Wendy's with
13   Officer Crowley?
14       A.   You know what?  I don't -- I don't know.  I
15   don't know the timeline.
16       Q.   Have you ever put anything in writing
17   concerning any information you had concerning the
18   contents of Officer Socha's cell phone?
19       A.   Can you rephrase that question?
20       Q.   Okay.  Let me try it a little differently.
21   Have you ever put anything in writing concerning any
22   information you had concerning private images or the
23   sharing of private images from Officer Socha's cell
24   phone?  Have you ever put anything on that subject

Page 58

1    matter in writing?
2        A.   No.
3        Q.   Have you ever written Officer Socha a letter?
4        A.   No.
5        Q.   Are you aware of anyone else associated with
6    the Joliet Police Department that may have written
7    Officer Socha a letter concerning the subject that we've
8    been discussing today?
9            MR. VUCKO:  Objection, form, speculation.
10   BY THE WITNESS:
11       A.   No.
12       Q.   Not to your knowledge?
13       A.   No.
14       Q.   Do you have any other information,
15   Mr. Jackson, that you haven't told us about today
16   concerning any of the allegations in Officer Socha's
17   complaint or more generally anything related to the
18   contents of her cell phone or the sharing of her
19   contents -- of those contents with any member of the
20   Joliet Police Department beyond what you have shared
21   with us earlier today?
22       A.   No.
23       Q.   Thank you, and I appreciate you taking some
24   time to think about that.

Page 59

1            You testified to earlier about a conversation
2    that you had with Officer DeVito regarding the events
3    that you testified to earlier.  Do you remember that,
4    sir?
5        A.   Yes.
6        Q.   Who is DeVito?
7        A.   DeVito is a Joliet police officer.
8        Q.   Okay.  And in what capacity were you having
9    this conversation with Officer DeVito concerning the
10   events that you testified to here today?
11       A.   I guess I don't understand that question.
12   You're asking me what capacity we were having a
13   conversation?
14       Q.   Well, let's just like -- like -- Yes.  In
15   what -- I mean, other than being a Joliet police
16   officer, does he serve any other -- DeVito serve any
17   other role, if you know, within the Joliet Police
18   Department?
19       A.   He's the union president.
20       Q.   Okay.  Were you speaking to Officer DeVito in
21   his role as a union president?
22       A.   I don't recall.
23       Q.   When you --
24       A.   I'm sorry.  Go ahead and finish your question.

17  (Pages 56 to 59)

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Dave Jackson - Taken 6/2/2021

Page 60

1  I thought you were done.
2      Q.  Well, I actually interrupted you.
3          I mean, do you know one way or the other?
4      A.  I don't know one way or the other.  I mean, he
5  and I have coffee quite a bit, so I have no idea.
6      Q.  Okay.  Well, what exactly did you share with
7  Officer DeVito concerning the events in question?
8      A.  Well, I don't know if that was the exact
9  testimony that came out, is that Officer DeVito had
10  heard rumors similar to what I've heard too.  And I
11  think that we were just talking about the rumors that we
12  heard.
13      Q.  Can you be any more specific than that?
14      A.  How so?
15      Q.  Well, let's -- What do you recall DeVito
16  sharing with you concerning the rumors he may have
17  heard?
18      A.  I don't recall the conversation one way or the
19  other; but I remember he and I did have a conversation
20  about, you know, what Mr. Adams categorized as the Socha
21  incident.  Okay.  It was probably one morning over
22  coffee.
23      Q.  Okay.  Okay.  And, again, when you say Socha
24  incident, we're referring to this alleged comment made

Page 61

1  by Mr. Gavin in the presence of others, including Brown,
2  Powers, and Harrison, correct?  Is that the incident
3  we're referring to or something else?
4      A.  I think we can probably lump in the whole
5  totality of all of that, you know, from the searching of
6  the phone, from the dissemination of, you know,
7  evidence.  I mean, it could have been the totality of
8  the whole thing.
9          So like I said to you, I don't remember the
10  exact conversation that he and I had.
11      Q.  Okay.  And that's fair, and I appreciate that.
12          And, again, to be clear, you don't know when
13  you had this conversation with DeVito, correct?
14      A.  No, I don't, ma'am.
15      Q.  Do you recall where the conversation occurred?
16      A.  I don't.  I don't recall where exactly it was.
17      Q.  Also to be clear, was there anyone else
18  present for this conversation other than you and DeVito?
19      A.  Again, I don't -- I don't recall.
20      Q.  Was there more than one conversation with
21  DeVito concerning the events as described earlier?
22      A.  It may have been.
23      Q.  Do you have any memory of when those
24  conversations were, where they took place, or whether

Page 62

1  anybody else was present?
2      A.  No.
3      Q.  Did you document any of those conversations?
4      A.  No.
5      Q.  Do you know whether Officer DeVito documented
6  any of those conversations?
7      A.  It's unknown.
8      Q.  You know, I'm sorry, I didn't actually hear
9  your last answer.
10      A.  I said it's unknown.
11      Q.  Unknown.  Okay.  Thank you.
12          How would you describe your present
13  relationship with Carlos Matlock?
14      A.  He and I are extremely close.
15      Q.  Is Matlock aware that you have shared his
16  conversation with you and Officer Crowley?  I'm
17  referring to the Wendy's sit-down.
18      A.  I'm sorry.  One more time with that question.
19      Q.  Okay.  Do you know whether Matlock is aware
20  that you have shared any conversations that you have had
21  with Carlos Matlock concerning the events in question,
22  okay?  I mean, I don't want to keep going through it;
23  but you understand what I mean by that, the Socha
24  matters as described earlier?

Page 63

1      MR. VUCKO:  I'm going to object as to form.
2  BY MS. PROCTOR:
3      Q.  Do you understand the question?  It's probably
4  not -- Let me strike it and I'll try again.
5          Is Matlock aware that you -- Actually, let me
6  strike that.
7          Did you talk with Matlock before coming to
8  your deposition today at any point?
9      A.  I talk to Matlock probably about three or four
10  times a day.
11      Q.  Okay.  So you're that close.
12          Okay.  Does Matlock know you intended to share
13  the -- give testimony today concerning the Wendy's --
14  you know, like, the Wendy's sit-down meeting with
15  Crowley and yourself?
16      MR. ADAMS:  Object to form and foundation about
17  what Matlock knows.
18      MS. PROCTOR:  Yeah.  Well ...
19      MR. VUCKO:  Share in those objections.
20  BY THE WITNESS:
21      A.  The only thing that Matlock and I spoke about
22  was that I was going to testify truthfully.
23      Q.  But you didn't discuss any specifics, correct?
24      A.  The only thing we spoke about, ma'am, was that

18  (Pages 60 to 63)

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Dave Jackson - Taken 6/2/2021

Page 64

1    I was going to testify truthfully.
2        Q.  Did you understand that Matlock has given a
3    deposition?
4        A.  Do I understand that?
5        Q.  Yes.
6        A.  Yes, I do.
7        Q.  Did Matlock tell you what his deposition
8    testimony was concerning --
9        A.  No.
10       Q.  -- the Socha matters?
11       A.  No, ma'am.  We didn't go into any of Matlock's
12   testimony.
13       Q.  Okay.  And how would you describe your present
14   relationship with Robert Brown?
15       A.  Well --
16       MR. VUCKO:  Asked and answered.
17   BY MS. PROCTOR:
18       Q.  Did --
19       MS. PROCTOR:  You know, Mr. Vucko, I didn't hear
20   your objection.
21       MR. VUCKO:  Asked and answered.
22       MS. PROCTOR:  Oh, okay.
23   BY MS. PROCTOR:
24       Q.  Which means you can -- you know, you can --

Page 65

1        MR. VUCKO:  You can still answer it.
2    BY MS. PROCTOR:
3        Q.  -- still go ahead and answer it, sir.  Yeah,
4    no one -- unless someone instructs you not to answer.
5        A.  Okay.
6        Q.  Your present relationship.
7        A.  Yeah.  No, it's -- I believe it's been
8    strained ever since Grizzle went to him with the -- you
9    know, whatever discovery was turned over, you know, and
10   whatever statements were in there.  So it's been
11   strained.  So ...
12       Q.  To be clear, Mr. Jackson, you have no personal
13   knowledge regarding what, if any, images were viewed or
14   shared amongst any members of the investigation unit
15   concerning the content of Officer Socha's cell phone,
16   correct?
17       MR. ADAMS:  Object to form.  You mean firsthand
18   knowledge.
19   BY THE WITNESS:
20       A.  I have no knowledge, that's correct.
21       Q.  Okay.
22       MS. PROCTOR:  I think that's all I have.  Thank
23   you, Mr. Jackson, for your patience.
24       THE WITNESS:  Okay.

Page 66

1        MS. PROCTOR:  Now I'm going to turn it over to my
2    codefendant.
3        MR. CLARK:  Good morning, Mr. Jackson.  My name is
4    Matthew Clark.  I represent defendant Ed Grizzle in this
5    case.  I just have a few questions for you today.  Thank
6    you again for your time and patience.
7                CROSS-EXAMINATION
8    BY MR. CLARK:
9        Q.  You indicated that Ed Grizzle was your
10   supervisor; is that correct?
11       A.  Yes, at some point, you know, it's my belief
12   that Sergeant Grizzle was my supervisor.  But the way
13   that our division works, Mr. Clark, is this, it's that
14   if there's a sergeant up here, we basically work for all
15   of them.  Any one of them can tell us what to do.  So,
16   yeah, I've worked for Ed Grizzle in that capacity but
17   we're assigned specific teams.  But our sergeant might
18   not be here, so it's a complicated thing.
19       Q.  Fair enough.
20       Do you know about how long of a time period
21   that complicated thing was where Ed Grizzle may or may
22   not have been your direct sergeant or supervisor at the
23   time?
24       A.  Well, I'm going to say it's not complicated to

Page 67

1    me.  Because he's a sergeant --
2        Q.  Okay.
3        A.  -- I've got to do what he says.  It might be
4    complicated to be able to explain to everyone that we
5    have multi- -- we have two different teams.  We have
6    permanent people, so each boss is assigned a group of
7    guys.
8        Q.  Okay.  Do you know about how long a period of
9    time that you were assigned to Ed's team?
10       A.  I don't recall, Mr. Clark.  I'm not even sure
11   if he was my direct supervisor or Sergeant Nicodemus
12   was.  I mean, it's going back a little bit; but, yeah,
13   you know, at some point I think that he was my direct
14   supervisor.
15       Q.  Okay.  Do you have any opinions of Ed Grizzle
16   as a supervisor?
17       A.  Yeah.  I mean, I believe that Sergeant Grizzle
18   is a -- You know, I personally like him, I mean.  So
19   yeah.
20       Q.  Personal like aside, what about as a sergeant
21   for the Joliet Police Department?  Do you have any
22   opinions as to his performance as a sergeant?
23       A.  Yeah.  Well, I can tell you this, I believe
24   that he does a great job; he treats us all good.  I

19  (Pages 64 to 67)

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Dave Jackson - Taken 6/2/2021

Page 68

1    mean, you know, the only issue I would tell you,
2    Mr. Clark, I've ever thought, you know, that, you know,
3    Sergeant Grizzle could have did better was failing to
4    secure this evidence in this case.  Okay?  So that's the
5    only thing I would tell you that, you know, giving you a
6    fair assessment of it, is that the evidence in this case
7    should have been secured and that outside of that, you
8    know, I'm going to tell you I think that, you know,
9    Sergeant Grizzle is, you know -- you know, he's always
10   been a good boss.
11       Q.   When you say that the evidence was failed to
12   be secured in this case, what do you mean by that?
13       A.   Well, you know, failing to secure evidence is
14   this.  It's, you know, I've been a detective a long time
15   and that when you have something that -- like this is
16   that the best practice of the pattern and practice of
17   this would be to probably download that and put that
18   down in evidence, okay, and not to have the deputy chief
19   having it on his desktop, not to have, you know, the
20   lieutenant in internal affairs who does the admin
21   investigation is one who has it.  Not, you know -- So,
22   you know, and I guess him having it on his desktop, he's
23   working the case.  Okay?  So I look at it from a
24   detective or someone that is assigned to the

Page 69

1    investigation.  So that, you know, and to remove it
2    immediately off of that, you know, I'm going to say the
3    public computer.  Okay?  And to secure that evidence to
4    be able to protect.  You know, and I'm not just going to
5    say just because this is an officer.  I'm going to say
6    any victim's privacy, okay?  So I think it's important
7    for us to be able to do that for everyone.
8        Q.   If a deputy chief orders you to provide a copy
9    of the evidence, would you provide him with a copy of
10   that evidence?
11       A.   At that point it's a lawful order, no matter
12   how ridiculous it might be, yeah, you have to do it.
13       Q.   Okay.  You have some testimony about a
14   conversation you had with Lieutenant Brown or Deputy
15   Chief Brown, and you had mentioned that you observed
16   Brown and Grizzle together and you thought it was the
17   same day that he received discovery.  By he, I mean
18   Grizzle received discovery.
19           Do you recall that testimony?
20       A.   Yes, sir.
21       Q.   Okay.  How do you know it may have been the
22   same day that Grizzle received discovery?
23       A.   Well, I think it was during the conversation
24   that Brown said that.  It was during that phone

Page 70

1    conversation a little bit heated at times.
2        Q.   And did Brown provide any additional
3    information about the nature of the discovery?
4        A.   It was statements to the effect of what I had
5    said or what was alleged in the lawsuit, no.  So I don't
6    know exactly what it was.
7        Q.   Okay.
8        A.   It was some kind of statements that were
9    turned over to the City of Joliet in discovery, I
10   believe, from the defense.
11       Q.   Did you have an understanding that was a
12   statement that Nick Crowley had turned over with respect
13   to a conversation that you had with him?
14       A.   I've never -- I'm going to say, you know, I
15   was never told that it was a statement from Nick
16   Crowley.  You know, I was never told what statement it
17   was.  I would say, you know, basically, when I got the
18   phone call that, you know, Brown was, you know, upset
19   with me.
20       Q.   Did you ever become aware that Nick Crowley
21   submitted a statement based on the conversation that you
22   had with him?
23       A.   Was it that I had or was it from the testimony
24   earlier at Wendy's with Matlock and myself?  I'm not

Page 71

1    exactly -- You know, the testimony that I gave earlier
2    was that we had a conversation over at Wendy's with
3    Matlock and myself.
4        Q.   Okay.  And so it'd be fair to say that you
5    have never reviewed any kind of statement that Nick
6    Crowley has provided regarding any conversation that you
7    had with him concerning the Socha matters; is that fair?
8        A.   Yes, sir.
9        Q.   And it was during your conversation with
10   Matlock that you learned about Gavin's statement about
11   Socha sucking dick like a porn star; is that right?
12       A.   Yes, sir.
13       Q.   And you're not sure of the exact time frame of
14   when that conversation took place, but it was generally
15   around when the events came to the public's knowledge;
16   is that right?
17       A.   Yes, sir.
18       Q.   Did you ever ask Ed Grizzle about that video?
19       A.   No.
20       Q.   Did you ever ask Socha about that video?
21       A.   No.
22       Q.   Did you ever ask Nick Crowley about that
23   video?
24       A.   No.

                                      20  (Pages 68 to 71)

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Dave Jackson - Taken 6/2/2021

Page 72

1      Q.  Did you ever tell anyone that Gavin had made
2  those comments that you learned from Matlock?
3      A.  No, I don't recall.  I don't recall.
4      Q.  Okay.  It's possible it's come up in
5  conversation since?
6      A.  Since when?
7      Q.  Since your conversation with Matlock.
8      A.  I don't know.  It could have come up.  I'm
9  not -- I'm not exactly sure.
10      Q.  It's fair to say that as we sit here today,
11  you don't recall ever telling anyone about that
12  conversation that Matlock related to you --
13      A.  No, I didn't --
14      Q.  -- is that fair?
15      A.  No, I didn't -- That's not what my testimony
16  is, is that -- you know, that I remember we sat down
17  with Nick and talking with -- I spoke with Nick, and I
18  may or may not even, you know, have known about it at
19  the time of the IG interview, okay, that you, know,
20  this, you know, was, you know, going around.  So, you
21  know, it was a lot of rumors going around at that time.
22      Q.  Okay.  You also testified about a conversation
23  that you had with Ed Grizzle about Jensen and Jensen
24  ordering all the images and materials off of the cell

Page 73

1  phone; is that right?
2      A.  Yes.
3      Q.  And that conversation with Ed Grizzle, was it
4  your understanding that the entire contents of Socha's
5  phone was removed from Celebrex [sic]?
6      A.  Yes, it was the -- It was my understanding
7  from that conversation that everything was taken off by
8  and given to Deputy Chief Gavin.
9      Q.  Okay.  And I think maybe your answer your
10  first time around you used the word images, and I know
11  we've testified or we talked about the images during
12  this deposition otherwise.  But is it fair to say that
13  Grizzle made no specific mention about nude photos or
14  videos of a sexual act at that time?
15      A.  That's correct.
16          And, Mr. Clark, can I just clarify what you
17  said about images?
18      Q.  Sure, absolutely.
19      A.  When you download or dump the phone is we take
20  a copy of what's on that phone and we put it on a hard
21  drive.  So, you know, so if I'm talking about images, it
22  wasn't that I know what kind of pictures or videos were
23  on there.  It was that when we -- You know, we basically
24  copied someone's -- you know, the hard drive in their

Page 74

1  phone and make a copy of it.
2      Q.  That's fair enough, and that's what I wanted
3  to clarify --
4      A.  Okay.
5      Q.  -- and I think we've used images a couple of
6  different ways --
7      A.  Right.
8      Q.  -- and I'm just trying to make sure.
9          Outside of those conversations with Ed Grizzle
10  that you testified during Mr. Adams' questions and maybe
11  it was raised with Ms. Proctor, do you recall any other
12  conversations with Ed Grizzle about Ms. Socha?
13      A.  We had, I believe, you know, many
14  conversations.  You know, some of them -- You know, I
15  don't think that he really wanted to -- the inspector
16  general to look into this matter.  So I remember us
17  having a conversation about that; but the rest of them,
18  I believe, were just, you know, insignificant.  You
19  know, basically, I can't really recall that much about
20  it, but I remember that he did have some issues with the
21  inspector general looking into this matter.
22      Q.  What did Ed Grizzle testify -- or I'm sorry,
23  what did Ed Grizzle tell you about the conver-- about
24  the inspector general's investigation?

Page 75

1      A.  It was a couple of things.  He -- You know, he
2  wasn't in our chain of command and, you know, which is
3  true, you know, and that the inspector general really
4  didn't have, you know, power to have oversight of this
5  investigation.  So -- You know, so it was a couple of,
6  you know, things that Sergeant Grizzle did was some --
7  you know, some issues with the IG looking into this
8  matter.
9      Q.  Was that part of the same conversation when
10  Jensen was referenced, or was that a separate
11  conversation?
12      A.  It was probably separate.  He and I spoke a
13  lot.  So ...
14      Q.  In terms of the separate conversation with Ed
15  Grizzle you just testified to, do you recall when that
16  conversation occurred?
17      A.  No, sir.
18      Q.  Do you recall who else was present, if anyone?
19      A.  You know what?  I don't recall anyone else
20  being present.  Like I -- you know, I testified to,
21  Mr. Clark, he and I would talk, you know, a lot, you
22  know, and he, you know -- Yeah, we would talk a lot.
23      Q.  Do you recall when that conversation took
24  place?

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Dave Jackson - Taken 6/2/2021

Page 76

1      A.  No, sir.
2      Q.  Do you think it was before or after the
3  conversation about Jensen?
4      A.  I don't recall, sir.
5      Q.  Okay.  Fair enough.
6          It is my understanding that you currently have
7  a lawsuit filed against the City of Joliet; is that
8  correct?
9      A.  That's correct, sir.
10     Q.  And what is the -- just generally, what's the
11  nature of the allegation?
12     A.  Oh, it's a bunch of them, Mr. Clark.
13     Q.  Can you summarize them for me or ...
14     A.  Discrimination, under, I believe, Title 7,
15  1983 false arrest.  I mean, it's a bunch of allegations
16  or a bunch of things in the complaint.
17     Q.  Okay.  And when you say discrimination, is
18  that based on race?
19     A.  Absolutely, yes, sir.
20     Q.  Okay.  And in terms of the events that -- or
21  the facts that gave rise to this lawsuit, does that have
22  to do with your arrest and being charged with domestic
23  battery by the Crest Hill Police Department in 2019?
24     A.  To your point, I have to say that --

Page 77

1      MR. VUCKO:  Object to the form.
2      THE WITNESS:  I'm sorry.  Go ahead with your
3  objection, sir.
4      MR. VUCKO:  You can answer.
5  BY THE WITNESS:
6      A.  Okay.  To your point, I disagree with what you
7  said.  You said the Crest Hill Police Department, and
8  I'm going to tell you it was the Joliet Police
9  Department along with the Crest Hill Police Department
10  and command staff.  So yes to that.
11     Q.  Fair enough.
12         And it's my understanding that no charges
13  were -- that charges related to that arrest were
14  dropped; is that correct?
15     A.  Yes, sir.  The case was nolle prosequi, yes.
16     Q.  And in terms of that lawsuit, does that
17  lawsuit still remain pending?
18     A.  Yes, sir.
19     Q.  Have you given a deposition in connection with
20  that lawsuit?
21     A.  Yes, sir.
22     Q.  With respect to those allegations in that
23  lawsuit, is Ed Grizzle involved whatsoever?
24     A.  Not at all.

Page 78

1      Q.  Which officers with the Joliet Police
2  Department are involved with that lawsuit?
3      MR. VUCKO:  Objection, calls for speculation.
4  BY MR. CLARK:
5      Q.  Go ahead.
6      A.  Mr. Clark, are you talking about named
7  individuals?
8      Q.  Yeah, let's start with that.  Who are the
9  other named individuals in that lawsuit?
10     A.  Okay.  Deputy Chief Roechner, Deputy Chief
11  Perona, and Deputy Chief Joe Rosado.
12     Q.  Are there any other lawsuits you have filed
13  against the City of Joliet?
14     A.  It's a workmen's comp.
15     Q.  Has that been resolved, or is that still
16  ongoing?
17     A.  Still ongoing.
18     Q.  Are you aware of any other lawsuits that other
19  City of Joliet police officers have filed?
20     A.  I'm not aware of them right now.
21     Q.  Do you recall having a conversation with Nick
22  Crowley at Wendy's that other members of the Joliet
23  Police Department have filed civil rights lawsuits
24  against the City?

Page 79

1      A.  You know what?  It could have came up.  As I
2  sit here right now, Lionel -- I believe Lionel Allen
3  filed a lawsuit too, discrimination lawsuit.  So, yeah,
4  I testified in that one too.
5      Q.  Can you spell that officer's name for me?
6      A.  Lionel Allen.  I think it's L-I-O-N-A-L [sic],
7  Allen, A-L-L-E-N.
8      Q.  Do you know if Mr. Allen's lawsuit has any
9  connection to Ed Grizzle, if you know?
10     A.  I don't know.  I don't think so.
11     Q.  Okay.  Ed Grizzle -- Is it your understanding
12  that Ed Grizzle is reassigned to the Tri-County Auto
13  Theft Task Force?
14     A.  Yes, sir.
15     Q.  Do you view that was a promotion?
16     A.  I would say yes.
17     Q.  And why do you view that as a promotion?
18     A.  He's the director of the unit over there.  I
19  mean, he might be getting sergeant state but he runs the
20  whole unit.  Everyone reports to him.  He has people up
21  under him.  So, you know, I would tell you that is -- in
22  my opinion, I believe it's a promotion.
23     Q.  Have you ever talked with -- I'm sorry.
24     A.  Yeah.  So, yeah, just as to that point, I

22  (Pages 76 to 79)

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Dave Jackson - Taken 6/2/2021

Page 80

1    mean, he's the director of a multi-jurisdictional task
2    force. So ...
3        Q. Have you ever talked with Ed Grizzle about
4    that transfer of assignments to the Tri-County Auto
5    Theft Task Force?
6        A. Never.
7        Q. Are you aware who on the Joliet Police
8    Department Ms. Socha is friends with?
9        A. You know, I'm not, Mr. Clark. You know -- You
10   know, I would tell you, I'm a lot closer with Mr. Nick
11   Crowley than I am with Ms. Socha.
12       Q. Okay. Would you describe yourself as friends
13   with Nick Crowley?
14       A. I would say yes.
15       Q. Are you aware of any other friends that Nick
16   Crowley has on the Joliet Police Department?
17       A. I would consider, you know, just about
18   everyone in the BPOA as his friend. So ...
19       Q. You had made reference to a conversation with
20   Mr. Hall Adams during your testimony. That took place
21   earlier this year?
22       A. Yes, sir.
23       Q. I'm sorry. I didn't hear that.
24       A. I said yes, sir.

Page 81

1        Q. Okay. During that conversation, was there any
2    reference to your conversation with -- I'm sorry --
3    yeah, your conversation with Mr. Matlock or Officer
4    Matlock?
5        A. I guess I didn't understand that question.
6    Any reference to anything that -- everything I
7    previously testified to or ...
8        Q. When you and Mr. Adams, I think you had a
9    phone conversation, did you describe yourself meeting
10   with Nick Crowley?
11       A. Yes.
12       Q. All right. Did you discuss that Officer
13   Matlock was present?
14       A. Yes.
15       Q. In terms of the -- I know you don't know the
16   exact time you had the initial conversation with Officer
17   Matlock, but I think you said it was around the time of
18   when the incident came out; is that right?
19       A. I don't -- You know, I'm sure Carlos and I
20   probably talked around that time, before that time,
21   after that time. Like I said, he and I speak, you know,
22   two, three times a day, sometimes four or five times a
23   day. So ...
24       Q. Fair enough.

Page 82

1        And you're aware that the rumors of the
2    incident came out in 2018, right?
3        A. Yes.
4        Q. Okay. And your conversation with Matlock and
5    Nick Crowley took place in March of 2020?
6        A. I'm not exactly sure when it took place.
7    So ...
8        Q. If Nick Crowley said it was March 2nd, 2020,
9    you wouldn't dispute that, would you?
10       MR. ADAMS: Object to form.
11   BY THE WITNESS:
12       A. It could have been, yes, sir.
13       Q. Okay. Does that seem right, that about a year
14   and a half to two years passed between the time that you
15   first heard you had a conversation with Matlock about
16   the statements that Gavin made and you talked to Nick
17   Crowley?
18       A. I'm not -- Again, you know, I know that, you
19   know, maybe it could be frustrating; but, you know, I've
20   testified, you know, constantly and continuously that
21   I'm not exactly sure of the timeline.
22       Q. I think you testified that you sat fairly
23   close to Ed Grizzle in the investigations department; is
24   that right?

Page 83

1        A. It could have been one time that we spoke.
2        Q. Okay.
3        A. So if -- You're talking about Matlock, okay.
4    So ...
5        Q. Oh, okay.
6        A. That could have been one time. So, you know,
7    and the meeting with Crowley only took place one time.
8        Q. Okay. How many desks are in the
9    investigations room?
10       A. How many what?
11       Q. How many desks or spots are there in the
12   investigation room?
13       A. Quite a few.
14       Q. Okay. And the Celebrex computer is also in
15   the investigation room back in 2018?
16       A. Yes, sir.
17       Q. Did you ever see anyone looking to observe any
18   videos or photos of Socha during that time frame?
19       A. Mr. Clark, I could tell you where my desk is.
20   I'm not close to where the Cellebrite computer was, nor
21   did I know how to, you know, go on there to find things.
22   So I wouldn't know if someone was sitting down at that
23   computer doing it, but no one verbally had told me that
24   they're in there looking for pictures of Officer Socha

23  (Pages 80 to 83)

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Dave Jackson - Taken 6/2/2021

Page 84

1  or anyone else.
2      **Q.**  Okay.  It's fair to say that you're not aware
3  of anyone -- Or strike that.
4          It's fair to say that you're not aware of
5  anyone first- -- with your own firsthand knowledge that
6  anyone viewed any nude photos or videos of Socha; is
7  that right?
8      **A.**  Yes, sir.
9      MR. CLARK:  I don't have any further questions.
10         Thank you.  I appreciate your time.
11     MR. ADAMS:  I have just a few follow-up questions
12  and I'll make them quick.
13         REDIRECT EXAMINATION
14  BY MR. ADAMS:
15     **Q.**  You talk to DeVito --
16     MR. ADAMS:  And, Margaret, that's
17  D-E capital V-I-T-O.
18  BY MR. ADAMS:
19     **Q.**  You talk to DeVito on a fairly regular basis,
20  don't you?
21     **A.**  Yes, sir, I do.
22     **Q.**  And that's mostly in connection with your work
23  as president of the black patrolman's organization for
24  the most part, correct?

Page 85

1      **A.**  Yes.  I mean, he and I speak about, you
2  know -- you know, matters, you know, in the community.
3  We speak about a lot of different things and he is the
4  president of the Fraternal Order of Police Patrolman's
5  Union.  I'm the president of the Black Police Officers
6  Association.  So we try to work hand in hand together.
7      **Q.**  The conversation that you described having had
8  with DeVito regarding these what I'll call the Socha
9  matters generally could have been part of a conversation
10  in which you discussed any number of issues and that was
11  just one of them?
12     **A.**  Yes, sir.
13     **Q.**  Has Grizzle ever discussed with you the
14  department's investigation which he led of Officer
15  Crowley?
16     **A.**  Again, I want to be sure that I understand
17  this, Mr. Adams.  So are we talking about the criminal
18  investigation that he --
19     **Q.**  Correct.
20     **A.**  Okay.
21     **Q.**  Correct.
22     **A.**  So, no, sir, he's never once had a
23  conversation with me about that.
24     **Q.**  Has Grizzle ever discussed with you the

Page 86

1  criminal trial of the case against Officer Crowley?
2      **A.**  I can't tell you.  I don't believe he ever did
3  talk to me about that.
4      **Q.**  Has he ever said anything to you about Socha's
5  role in that trial as a witness?
6      **A.**  Yes, sir.  I believe it was a conversation to
7  the effect, that he didn't believe that she was truthful
8  in her testimony.
9      **Q.**  Grizzle told you that he did not think Socha
10  what was truthful in her testimony --
11     **A.**  Yes.
12     **Q.**  -- in the Crowley trial; is that correct?
13     **A.**  Yes, sir.
14     **Q.**  Do you recall when Grizzle said that to you?
15     **A.**  I do not.
16     **Q.**  Was it around the time of the trial of
17  Crowley?
18     **A.**  I'm sure it was.
19     **Q.**  When he said that to you, was his tone one of
20  disappointment or frustration or some other way that you
21  would characterize his tone?
22     MR. CLARK:  Objection, speculation.
23  BY THE WITNESS:
24     **A.**  You know, he said it; and I want to put in the

Page 87

1  proper content, is that I believe when we were speaking
2  of this that he was disappointed that he had lost a
3  criminal case --
4          (Phone interruption.)
5  BY THE WITNESS:
6      **A.**  -- that he was disappointed that he had lost
7  the criminal case and that, you know, he was just
8  frustrated and I believe that he was venting.
9      MR. ADAMS:  I have no further questions.
10         Darcy?
11     MS. PROCTOR:  None from the City of Joliet.  Thank
12  you.
13     MR. ADAMS:  Matt?
14     MR. CLARK:  No questions.
15     MR. ADAMS:  Officer Jackson, you have the right, if
16  you choose to exercise it, to review the transcript of
17  this deposition when it's written in order to note any
18  instances where you believe the transcription is in
19  error in any way, not to change testimony questions or
20  answers but to separately note any instance where you
21  believe the transcript is not accurate.  Or you can
22  waive that right.  We ask only that you inform us on the
23  record of your intentions.
24     MR. VUCKO:  We're going to reserve signature.

24  (Pages 84 to 87)

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Dave Jackson - Taken 6/2/2021

Page 88

1      MR. ADAMS:  All right.  Then we'll show signature
2  as reserved.
3          Officer Jackson, thanks very much for your
4  time here today.
5      THE WITNESS:  Thank you, sir.
6      MS. PROCTOR:  Thank you, all.
7              (Deposition concluded at 11:47 a.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

25  (Page 88)

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Dave Jackson - Taken 6/2/2021

Page 89

```
 1              UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                   EASTERN DIVISION

 3
     CASSANDRA SOCHA,                )
 4                                   )
                    Plaintiff,       )
 5                                   )
               vs.                   ) No. 1:18-cv-05681
 6                                   )
     CITY OF JOLIET, a municipal     )
 7   corporation, EDWARD             )
     GRIZZLE, JOHN DOES 1-20,        )
 8                                   )
                    Defendants.      )
 9

10

11              I, DETECTIVE DAVE JACKSON, state that I have

12   read the foregoing transcript of the testimony given by

13   me at my deposition on June 2, 2021, and that said

14   transcript constitutes a true and correct record of the

15   testimony given by me at the said deposition except as I

16   have so indicated on the errata sheets provided herein.

17
                         _____
18                       DETECTIVE DAVE JACKSON

19   No corrections (Please initial)_____

20   Number of errata sheets submitted_____(pgs.)

21
     SUBSCRIBED AND SWORN to
22   before me this _____ day
     of _____, 2021.
23

24   _____
```

Royal Reporting Services, Inc.
312.361.8851

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Dave Jackson - Taken 6/2/2021

Page 90

1   UNITED STATES OF AMERICA        )
    NORTHERN DISTRICT OF ILLINOIS   )
2   EASTERN DIVISION                )   SS.
    STATE OF ILLINOIS               )
3   COUNTY OF COOK                  )

4

5           I, Margaret Maggie Orton, Certified Shorthand

6   Reporter and Registered Professional Reporter, do hereby

7   certify that DETECTIVE DAVE JACKSON was first duly sworn

8   by me to testify to the whole truth and that the above

9   deposition was reported stenographically by me and

10  reduced to typewriting under my personal direction.

11          I further certify that the said deposition was

12  taken via videoconference at the time and date

13  specified and that the taking of said deposition

14  commenced on June 2, 2021, at 9:30 a.m.

15          I further certify that I am not a relative or

16  employee or attorney or counsel of any of the parties,

17  nor a relative or employee of such attorney or counsel,

18  nor financially interested directly or indirectly in

19  this action.

20

21

22

23

24

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Dave Jackson - Taken 6/2/2021

Page 91

1              In witness whereof, I have hereunto set my

2     hand this 22nd day of June, 2021.

3

4

5

6

7

8

9              MARGARET MAGGIE ORTON, CSR, RPR
              License No. 084-004046
10             161 North Clark Street
              Suite 3050
11             Chicago, Illinois 60601
              312.361.8851

12

13

14

15

16

17

18

19

20

21

22

23

24

Royal Reporting Services, Inc.
312.361.8851

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Dave Jackson - Taken 6/2/2021

Page 92

| A | | | | |
|---|---|---|---|---|
| **A-L-L-E-N** 79:7 | 70:2 | 49:24 62:1 | **assumption** | 2:23 4:3 43:21 |
| **a.m** 1:18 88:7 | **admin** 68:20 | **anymore** 12:2,8 | 17:14 | **belief** 66:11 |
| 90:14 | **administration** | 12:9 | **attempt** 5:5 | **believe** 7:9,18 |
| **ability** 46:10 | 36:10 | **apologize** 11:5 | **attend** 8:10 | 15:22,23 16:14 |
| **able** 20:24 21:4 | **advance** 11:5 | **apologized** 21:7 | **attorney** 44:22 | 18:16 19:9,13 |
| 40:1,2 43:5 | **affairs** 33:1 | **APPEARAN...** | 56:4 90:16,17 | 21:2 28:1,15 |
| 67:4 69:4,7 | 68:20 | 2:1 | **Auto** 79:12 80:4 | 28:16,18 31:4 |
| **absence** 8:21,24 | **affirmatively** | **appeared** 36:13 | **average** 37:11 | 33:21 34:15,18 |
| 28:22 29:5 | 30:12 | **appreciate** | **aware** 9:17,24 | 41:9,9,14,14 |
| **absolutely** 12:13 | **aforementioned** | 43:19 55:11 | 15:16 16:8 | 41:22 51:11,19 |
| 23:23 73:18 | 19:2 | 58:23 61:11 | 18:9 58:5 | 51:20 52:1 |
| 76:19 | **ago** 8:13 15:18 | 84:10 | 62:15,19 63:5 | 57:1,7 65:7 |
| **academy** 8:11 | **agree** 23:21 | **approximate** 7:4 | 70:20 78:18,20 | 67:17,23 70:10 |
| 8:12 | **ahead** 4:14 46:8 | 7:5 47:13 | 80:7,15 82:1 | 74:13,18 76:14 |
| **accommodate** | 46:10 59:24 | **approximately** | 84:2,4 | 79:2,22 86:2,6 |
| 5:9 | 65:3 77:2 78:5 | 9:6 13:19 | **awareness** 20:6 | 86:7 87:1,8,18 |
| **accurate** 45:21 | **allegation** 76:11 | 16:15 23:12,13 | | 87:21 |
| 45:23 55:12 | **allegations** | 24:1 26:13 | **B** | **best** 46:10 47:6 |
| 87:21 | 45:13 50:15 | 32:18 33:2 | **B** 3:10 7:22 8:1 | 55:18 68:16 |
| **acknowledge** | 56:1 58:16 | 47:16 | **B-E-A-S-T** | **better** 23:15 |
| 15:16 21:9 | 76:15 77:22 | **arrest** 76:15,22 | 36:24 | 24:21 68:3 |
| **acknowledgm...** | **alleged** 45:10 | 77:13 | **back** 5:8 6:9,10 | **beyond** 58:20 |
| 21:15 | 48:3,13,24 | **aside** 67:20 | 7:6,11,21 9:14 | **big** 33:9 42:15 |
| **acquainted** 9:10 | 60:24 70:5 | **asked** 5:17 | 15:2 18:4 | **bit** 60:5 67:12 |
| 11:9 | **allegedly** 49:15 | 11:14,22 12:10 | 26:18 27:18 | 70:1 |
| **acronym** 36:23 | 50:5 | 12:15 14:11 | 29:3 35:2 | **black** 25:17 26:4 |
| **act** 73:14 | **Allen** 79:2,6,7 | 40:10,16,18 | 39:13 43:3 | 26:8 84:23 |
| **action** 90:19 | **Allen's** 79:8 | 51:20 57:8 | 44:20 46:20 | 85:5 |
| **Adams** 2:2,2 3:4 | **aloud** 14:22 | 64:16,21 | 47:17 49:9 | **Bolingbrook** |
| 3:7 4:12,14,20 | **AMERICA** 90:1 | **asking** 27:22,24 | 67:12 83:15 | 2:10 |
| 4:21 17:10 | **and/or** 29:11 | 59:12 | **barbecue** 10:23 | **boss** 67:6 68:10 |
| 37:3 43:14,17 | **angry** 15:8 | **assessment** 68:6 | **based** 35:5 50:3 | **Boughton** 2:9 |
| 44:1 45:2,5,13 | **answer** 5:5,10 | **assigned** 6:5 | 70:21 76:18 | **BPOA** 25:16 |
| 46:5 50:17 | 5:15 24:16 | 44:9 66:17 | **basically** 15:7 | 26:1 80:18 |
| 53:18 60:20 | 31:17 46:8,9 | 67:6,9 68:24 | 15:13 66:14 | **Brad** 31:4 |
| 63:16 65:17 | 46:10 50:22 | **assignment** 6:3 | 70:17 73:23 | **break** 43:23,24 |
| 80:20 81:8 | 55:9 62:9 65:1 | 6:3,11 44:10 | 74:19 | 44:2,19,21 |
| 82:10 84:11,14 | 65:3,4 73:9 | **assignments** 6:6 | **basis** 17:19 | **breaks** 9:3 |
| 84:16,18 85:17 | 77:4 | 7:23 80:4 | 84:19 | **bridging** 27:8 |
| 87:9,13,15 | **answered** 64:16 | **associated** 22:15 | **battery** 76:23 | **brief** 52:4 |
| 88:1 | 64:21 | 58:5 | **BEAST** 36:23 | **briefly** 40:13 |
| **Adams'** 74:10 | **answers** 55:12 | **association** | 36:24 | **Bringing** 27:9 |
| **additional** 54:19 | 87:20 | 25:17 26:5,9 | **beginning** 9:18 | **brings** 10:23 |
| | **anybody** 44:21 | 26:12 85:6 | **behalf** 2:6,12,17 | **broadly** 27:3 |

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Dave Jackson - Taken 6/2/2021

Page 93

42:3
**Brook** 2:21
**brothers** 11:17
**Brown** 10:14,21
13:15 14:2,5
14:10,16 15:4
15:5,15,16,17
17:21 18:13,23
19:1,6,19,21
20:1,5,22 21:9
22:6,10,13,23
24:14 25:4
26:21 27:20
30:6,8,15
36:19 40:17
49:15,16,23
50:6 61:1
64:14 69:14,15
69:16,24 70:2
70:18
**bunch** 76:12,15
76:16

**C**

**call** 11:1 14:4,9
18:2 20:23
29:10 32:21
39:7 44:8,12
53:2 56:23,24
70:18 85:8
**called** 1:12 4:17
15:15 20:1,2
22:7,11 23:17
32:14 57:3,8
**calls** 78:3
**capacity** 41:8
59:8,12 66:16
**capital** 84:17
**caps** 36:23
**care** 15:10
**Carlos** 17:16,19
49:1 50:4 52:7
52:22 54:18
55:17 62:13,21

81:19
**case** 5:9 10:20
11:15 12:11,16
13:11,16,24
20:3 22:7,12
34:16 37:10
40:18 66:5
68:4,6,12,23
77:15 86:1
87:3,7
**cases** 34:11
**Cassandra** 1:3
4:22 45:6 89:3
**catch** 54:5
**categorized**
60:20
**Celebrex** 73:5
83:14
**cell** 32:20 37:14
37:15 49:17
53:24 54:11,21
55:2,16 56:1
57:18,23 58:18
65:15 72:24
**Cellebrite** 42:14
42:15 43:11
83:20
**Center** 23:11
**certain** 22:17
37:22 56:8,10
**Certified** 1:16
90:5
**certify** 90:7,11
90:15
**chain** 6:21 75:2
**change** 55:20
87:19
**characterize**
10:20 11:12,23
12:18,24 13:12
36:6 86:21
**charge** 32:23
**charged** 76:22
**charges** 42:22

77:12,13
**Chicago** 2:4
91:11
**chief** 10:14,21
11:8,10,13
13:15 14:7,10
14:14 15:23
17:16,21 32:24
34:10 35:12,13
42:9,19,21
54:13 68:18
69:8,15 73:8
78:10,10,11
**choose** 87:16
**Chris** 51:17
**chronological**
43:15
**city** 1:6 2:12 4:3
5:21 27:16
29:4 31:6
43:22 45:7
50:12 70:9
76:7 78:13,19
78:24 87:11
89:6
**civil** 1:13 78:23
**clarify** 31:17,18
31:23 73:16
74:3
**Clark** 2:14 3:6
66:3,4,8,13
67:10 68:2
73:16 75:21
76:12 78:4,6
80:9 83:19
84:9 86:22
87:14 91:10
**clear** 5:3 46:16
48:12 54:23
55:10 61:12,17
65:12
**client** 9:24
**close** 11:16 16:8
19:10,12,15

20:19 22:16
62:14 63:11
82:23 83:20
**closer** 80:10
**codefendant**
66:2
**coffee** 60:5,22
**come** 15:2 21:19
22:3 28:9,14
32:19 33:20
37:22 40:1
72:4,8
**comfortably**
19:14
**coming** 34:2
36:2 39:17
63:7
**command** 6:21
75:2 77:10
**commander's**
14:1,2,21,23
15:17,21 16:18
18:6,8,10,17
18:21 19:7,20
20:7,19 21:11
21:16 22:24
23:1 24:7,9
25:5 27:20
45:11 48:3
**commenced**
90:14
**commencing**
1:18
**comment** 14:13
14:14 20:8
60:24
**comments** 12:7
72:2
**common** 19:11
**communities**
27:14,15
**community** 27:8
27:10 85:2
**comp** 78:14

**complaint** 58:17
76:16
**completely**
47:19
**complicated**
66:18,21,24
67:4
**computer** 7:24
9:2 35:14,19
36:7,17 37:14
37:19 42:15,16
69:3 83:14,20
83:23
**computers** 36:2
**concern** 20:1
**concerning**
45:10 48:3,17
49:14,15,16
50:15 53:23
54:10,19,24
55:1 56:3
57:17,17,21,22
58:7,16 59:9
60:7,16 61:21
62:21 63:13
64:8 65:15
71:7
**concluded** 88:7
**condition** 47:10
47:16 52:3
**conduct** 28:12
**confidence** 39:9
**confusing** 46:18
**connection**
39:21 77:19
79:9 84:22
**consider** 13:4
80:17
**constantly** 48:7
82:20
**constitutes**
89:14
**content** 33:24
49:17 65:15

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Dave Jackson - Taken 6/2/2021

87:1
**contents** 28:8,10
32:20 35:13,17
54:10,20 55:1
56:1 57:18
58:18,19,19
73:4
**context** 19:6,8
31:1 33:13
35:24 37:3
**continuously**
6:13 82:20
**convene** 23:20
**convened** 23:17
**conver-** 55:19
74:23
**conversation**
15:3,6,9 16:5
16:18 17:7,8
17:12 18:4
19:22,24 20:6
20:15,22 21:10
21:20 28:19
33:19 35:12,23
38:17 40:9,11
41:10,19 42:6
42:24 43:3,6,7
43:10,12 48:2
48:13 49:13,14
49:15,22 50:1
52:7,12,18
54:24 55:3,22
56:6 57:11
59:1,9,13
60:18,19 61:10
61:13,15,18,20
62:16 69:14,23
70:1,13,21
71:2,6,9,14
72:5,7,12,22
73:3,7 74:17
75:9,11,14,16
75:23 76:3
78:21 80:19

81:1,2,3,9,16
82:4,15 85:7,9
85:23 86:6
**conversations**
25:23 41:15
43:15 45:1,5
53:22 54:19
55:20,24 61:24
62:3,6,20 74:9
74:12,14
**conveying** 25:3
**COOK** 90:3
**copied** 36:22
73:24
**copies** 32:13,20
38:8 43:8,12
**copy** 32:22 34:4
34:13,17 35:8
43:9,9,10 69:8
69:9 73:20
74:1
**corporation** 1:7
89:7
**correct** 6:14,19
8:21 14:8 22:1
22:4 24:16,16
26:7 27:1
40:22 41:1
44:14,17 45:7
47:12,17,20,24
48:6,14,15,18
49:3 50:1,6
52:14 54:2
55:4 56:7,19
56:20 61:2,13
63:23 65:16,20
66:10 73:15
76:8,9 77:14
84:24 85:19,21
86:12 89:14
**corrections**
89:19
**correctly** 53:13
**counsel** 4:5

14:12 44:17
90:16,17
**County** 27:16
90:3
**couple** 5:2 74:5
75:1,5
**course** 12:22
46:14
**court** 1:1 5:8
46:19,22 89:1
**Courts** 1:14
**coworker** 11:1
**coworkers** 31:3
**create** 15:13
22:17
**Crest** 76:23 77:7
77:9
**crimes** 7:24,24
**criminal** 42:22
85:17 86:1
87:3,7
**Cross-Examin...**
3:5,6 44:3 66:7
**Crowley** 9:11,13
14:13 16:2,3
17:6 23:2,7,15
23:21 24:5,13
24:19,22 25:3
25:14,16,19,24
27:22 28:12
40:11 52:22
53:6,12,15,23
54:5,18,19,24
55:6,15,17
57:13 62:16
63:15 70:12,16
70:20 71:6,22
78:22 80:11,13
80:16 81:10
82:5,8,17 83:7
85:15 86:1,12
86:17
**Crowley's** 26:23
**CSR** 91:9

**current** 6:1,2,20
10:13 11:6
26:6 44:5,8
**currently** 5:20
6:2 76:6
**cut** 31:18
**cutting** 46:23

_____

**D**

**D** 3:1
**D-E** 84:17
**Darcy** 2:8 4:2
43:21 87:10
**data** 34:4,13
35:8 36:16
38:9 39:19
43:8
**date** 16:15 48:12
50:10 53:5,17
53:20 90:12
**dates** 46:1 47:13
**Dave** 1:11 3:3
4:6,9,16 44:8
44:12 89:11,18
90:7
**day** 8:17 9:15,16
10:8,11,15,15
10:17 13:21,23
14:4 39:7,14
39:15 48:8
56:9 63:10
69:17,22 81:22
81:23 89:22
91:2
**days** 19:15 33:4
**dealing** 37:9
**Dearborn** 2:3
**defendant** 2:12
2:17 66:4
**Defendants** 1:8
89:8
**defense** 70:10
**definitely** 14:19
34:7 43:22

**denied** 30:12
**deny** 21:24 22:2
**department** 6:4
9:18 10:1
17:18 26:6
27:10,13 28:8
28:17 31:16
32:7 34:21
38:23 39:21
40:1 44:14
57:7 58:6,20
59:18 67:21
76:23 77:7,9,9
78:2,23 80:8
80:16 82:23
**department's**
35:6 85:14
**Deponent** 2:23
**deposition** 1:11
4:4,8,24 13:11
13:16 20:3
22:7 40:18
63:8 64:3,7
73:12 77:19
87:17 88:7
89:13,15 90:9
90:11,13
**depositions** 1:15
10:19 11:14,23
12:11,15 22:11
**deputy** 10:13,21
11:8,9,13
13:15 14:7,9
14:14 15:23
17:21 32:23
34:10 35:12,13
42:9,19,21
54:13 68:18
69:8,14 73:8
78:10,10,11
**describe** 24:5
38:13 62:12
64:13 80:12
81:9

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Dave Jackson - Taken 6/2/2021

described 18:7
21:12 23:22
24:9 32:22
38:16 39:22
56:4 61:21
62:24 85:7
desk 6:16 32:17
36:8 57:4,5,5
83:19
desks 83:8,11
desktop 35:14
35:18 36:6,7
36:13,17 68:19
68:22
desktops 37:14
details 27:3
detective 1:11
3:3 4:16 6:3,6
6:11 7:8 12:21
13:7,12 17:16
17:16 20:17
28:18 34:8,20
37:6,11 44:6,6
48:7 54:13
55:6 68:14,24
89:11,18 90:7
detectives 44:10
determine 25:13
device 35:16
36:5
devices 36:22
37:19,19
DeVito 41:7,19
59:2,6,7,9,16
59:20 60:7,9
60:15 61:13,18
61:21 62:5
84:15,19 85:8
dick 14:24 16:20
20:8 21:12
24:8 71:11
different 7:24
9:5 12:12 32:1
67:5 74:6 85:3

differently 51:7
57:20
direct 3:4 4:19
66:22 67:11,13
direction 90:10
directly 25:10
37:21 90:18
director 79:18
80:1
disability 8:21
28:22 29:3
disagree 77:6
disappointed
87:2,6
disappointment
20:2 86:20
disclosed 21:6
discovery 13:24
16:4 65:9
69:17,18,22
70:3,9
discrimination
76:14,17 79:3
discuss 19:20
25:14 54:9,9
63:23 81:12
discussed 13:16
17:3 25:10
42:4 85:10,13
85:24
discussing 58:8
discussion 13:19
55:2
discussions 42:3
42:5
disk 35:17
disks 32:14
dispute 45:20
46:3 53:17
82:9
dissemination
61:6
distributed
38:10

District 1:1,1,14
89:1,1 90:1
division 1:2 6:4
6:6,10,12,16
7:12 66:13
89:2 90:2
doctors' 9:5
document 52:17
62:3
documented
62:5
doing 20:22 25:8
33:7 56:11
83:23
domestic 76:22
Don 31:3
download 42:12
68:17 73:19
downloads 42:8
dproctor@tre-
2:11
drive 35:17
73:21,24
drives 32:14,22
36:3
dropped 77:14
due 8:20 33:21
duly 4:17 90:7
dumb 46:18
dump 73:19
dumped 19:11
duties 47:20
duty 15:12 29:2

**E**

E 3:1,10
E-mail 2:5,11,16
2:22
e-mails 26:1
earlier 19:23
28:23 29:21
30:1 40:6
44:24 45:10
48:2,14 49:13

52:23 53:12
55:23 56:4,21
58:21 59:1,3
61:21 62:24
70:24 71:1
80:21
early 26:18
easiest 27:4
East 2:9
EASTERN 1:2
89:2 90:2
Ed 66:4,9,16,21
67:15 71:18
72:23 73:3
74:9,12,22,23
75:14 77:23
79:9,11,12
80:3 82:23
Ed's 67:9
education 8:8,9
Edward 1:7
2:17 89:7
effect 14:20
16:20 17:1
21:21 34:19
41:13 70:4
86:7
either 7:14 8:1
23:18 28:11
32:13 38:4
emotional 57:10
employed 5:20
5:23 6:12
44:14
employee 90:16
90:17
encompass 32:8
encouragement
56:11
engaged 28:12
entire 31:7,13
31:20 73:4
entity 32:1
environment

22:18
episode 24:9
equality 27:6
equities 27:9
era 5:6
errata 89:16,20
error 87:19
Especially 5:6
event 15:2,20
18:5,20
events 11:13
12:3,10,19
13:1,10 16:9
16:12,16,17
17:3 19:7,20
20:6 22:23
23:22 24:6
25:4,10,14
48:3,17 59:2
59:10 60:7
61:21 62:21
71:15 76:20
evidence 34:10
34:22 35:6
36:24 37:6
61:7 68:4,6,11
68:13,18 69:3
69:9,10
exact 16:15
50:10 60:8
61:10 71:13
81:16
exactly 8:4 9:1
24:17,22 36:9
39:6 43:1,14
43:16 48:10
53:11 60:6
61:16 70:6
71:1 72:9 82:6
82:21
examination
1:12 3:4,7 4:19
84:13
examined 4:18

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Dave Jackson - Taken 6/2/2021

Page 96

excuse 14:24
exercise 87:16
EXHIBITS 3:12
existed 26:16
explain 24:13
  67:4
explained 5:8
explanation
  34:12 36:16
explicit 29:12
express 20:1
extracted 19:10
  28:9 29:13
  34:5,14 35:8
  36:16,21 37:18
  37:23 38:6,9
  38:14,20 43:8
extraction 19:12
  33:3 39:19
extremely 62:14

_____ F _____
face-to-face 17:8
  17:11 23:5
  40:23
fact 20:14 21:10
  21:20 33:21
  36:6 49:5 55:8
facts 51:5 76:21
failed 68:11
failing 68:3,13
fair 5:12 48:1,11
  51:8 61:11
  66:19 68:6
  71:4,7 72:10
  72:14 73:12
  74:2 76:5
  77:11 81:24
  84:2,4
fairly 82:22
  84:19
fairness 27:6
falling 40:17
false 76:15

familiar 34:20
Federal 1:13
feel 27:11
feet 32:18
felt 21:4 42:18
field 9:15 10:8
filed 33:18 50:12
  76:7 78:12,19
  78:23 79:3
financial 7:24
financially
  90:18
find 83:21
fine 7:5
finish 59:24
first 4:17 6:8
  7:11 9:15,16
  10:8,11,15,17
  17:22,23 18:3
  73:10 82:15
  90:7
first- 56:2 84:5
first-line 6:22,23
  7:1,12,17 8:15
first-name 17:19
firsthand 65:17
  84:5
five 81:22
five-minute
  43:23
flag 35:15
focus 55:20
folks 49:22
follow 27:5
  49:19
follow-up 84:11
followed 49:20
following 48:5
follows 4:18
force 79:13 80:2
  80:5
foregoing 89:12
forget 8:7
form 46:5,6

48:19 50:17
53:18 54:3
58:9 63:1,16
65:17 77:1
82:10
formal 8:8
formally 26:15
forth 50:16
foundation
  50:17 53:18
  63:16
four 63:9 81:22
frame 9:9 19:9
  19:12,16 23:16
  33:8 43:2
  47:15,22 48:9
  50:13 71:13
  83:18
Fraternal 85:4
friend 13:2,6,14
  80:18
friends 11:16
  22:16 80:8,12
  80:15
friendship 10:24
  11:2
front 57:5
frustrated 87:8
frustrating
  82:19
frustration
  86:20
further 43:19
  84:9 87:9
  90:11,15

_____ G _____
gallery 51:23,24
Gavin 13:7,13
  14:15,21 15:18
  16:19 18:6,11
  19:4 20:7
  21:11,16 29:18
  38:16,17 49:16

49:23 61:1
72:1 73:8
82:16
Gavin's 19:19
  22:3,24 24:7
  27:21 71:10
general 6:3,5,11
  33:7 34:21,22
  35:1,6 37:6
  41:24 44:10
  46:1 50:9,15
  51:9,16 52:10
  52:14 74:16,21
  75:3
general's 53:9
  74:24
generality 35:3
generally 9:24
  51:13 58:17
  71:14 76:10
  85:9
getting 34:2
  79:19
give 5:5,10 7:3
  11:14,22 12:11
  12:15 20:3
  22:7,11 27:13
  40:18 63:13
given 4:24 35:8
  64:2 73:8
  77:19 89:12,15
giving 10:19
  13:16 44:19
  68:5
go 4:14 5:2 18:4
  20:12,14 25:20
  25:22 35:2
  46:8,10 49:9
  51:3 59:24
  64:11 65:3
  77:2 78:5
  83:21
goes 26:18
going 4:22 11:3

12:6 14:3 20:9
20:10 21:18,19
27:7,8,15
28:16 29:10,11
32:21 33:16
34:24 37:4
40:3 44:20
49:12 50:24
56:8,13 57:2
62:22 63:1,22
64:1 66:1,24
67:12 68:8
69:2,4,5 70:14
72:20,21 77:8
87:24
good 10:22 11:2
  12:2,8,20
  13:14 27:12
  44:5 54:16
  66:3 67:24
  68:10
great 5:14 11:16
  12:13 27:13
  67:24
greeting 56:9
Grizzle 1:7 2:17
  7:15,16 12:21
  13:23 14:1
  32:17 33:10
  34:4,12 36:19
  38:8,13 42:6
  42:17,24 43:7
  43:12 65:8
  66:4,9,12,16
  66:21 67:15,17
  68:3,9 69:16
  69:18,22 71:18
  72:23 73:3,13
  74:9,12,22,23
  75:6,15 77:23
  79:9,11,12
  80:3 82:23
  85:13,24 86:9
  86:14 89:7

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Dave Jackson - Taken 6/2/2021

Page 97

ground 5:2
group 67:6
guarded 39:23
guess 5:15,18
  7:3 11:7 53:1
  54:15 59:11
  68:22 81:5
guys 42:12 67:7

**H**

H 3:10
half 5:24 82:14
Hall 2:2,2 4:21
  45:2 80:20
hall@adamsle...
  2:5
hand 85:6,6
  91:2
happened 48:9
  48:10,17
hard 32:21 36:2
  39:14,17,17
  46:24 73:20,24
Harrison 11:18
  11:20,24 12:4
  17:24 18:12
  22:16 38:19
  39:2,5 49:16
  61:2
head 11:7
hear 5:4 16:10
  18:22 39:11
  46:24 56:22
  62:8 64:19
  80:23
heard 5:11 12:5
  22:2 29:17,19
  29:20 30:14,15
  30:18,19,22
  31:1,3,4,9 38:1
  38:22 39:4,20
  40:4 41:12
  45:11 50:4,5
  51:19 56:2

60:10,10,12,17
  82:15
heated 70:1
help 27:12
hereunto 91:1
HESS 2:8
High 8:9
higher 37:9
highest 8:7
Hill 76:23 77:7,9
hope 46:16
hopefully 13:5
  39:9
HOPPE 2:13
hostile 22:17
hour 39:12
hours 32:7
house 10:22

**I**

idea 23:15 60:5
identified 15:17
  20:2 30:23
IG 34:1 72:19
  75:7
IG's 31:5 51:1
III 2:2
Illinois 1:1 2:4
  2:10,15,21
  5:21 8:12
  27:17 89:1
  90:1,2 91:11
images 28:11
  29:11,13,16,21
  30:4,5,7,9,11
  30:13,15,20,23
  31:14 32:5,13
  34:10 36:21
  37:17,22 38:2
  38:5,11,14,20
  38:23 39:22
  40:4 42:7,10
  57:22,23 65:13
  72:24 73:10,11

73:17,21 74:5
immediate 6:20
immediately
  69:2
important 5:3
  69:6
in-person 17:8
incident 60:21
  60:24 61:2
  81:18 82:2
included 28:10
including 47:8
  61:1
indicated 66:9
  89:16
indirectly 90:18
individuals
  14:22 78:7,9
inform 18:19
  87:22
informal 18:1
information
  17:15 20:17
  28:4,20 32:4
  45:12,18 46:3
  47:14 50:5
  51:17 52:23
  54:10 55:1
  56:2 57:17,22
  58:14 70:3
informed 36:1
initial 29:18
  81:16 89:19
initially 7:6
  15:20,22 17:4
  57:6
initiated 17:12
  28:7
injury 29:1,1,3,4
inside 14:23
  18:17 20:18
insignificant
  74:18
inspector 33:7

41:23 46:1
  50:9,14 51:9
  51:16 52:10,14
  53:9 74:15,21
  74:24 75:3
instance 12:14
  87:20
instances 87:18
instructs 46:9
  65:4
intended 63:12
intentions 87:23
intents 35:3
interested 90:18
interfering
  42:19
internal 33:1
  34:16,17 68:20
interrupted 60:2
interruption
  87:4
interview 51:15
  52:1,4 53:9,13
  72:19
interviewed
  41:23 50:8
  51:10,12 52:9
  52:14
investigated
  9:17 10:1
investigating
  50:15
investigation 6:6
  6:16 7:11 9:22
  10:5 28:7
  31:21 32:2
  33:8,17,22
  34:3,17 37:4
  42:20,22 44:9
  51:1 65:14
  68:21 69:1
  74:24 75:5
  83:12,15 85:14
  85:18

investigations
  6:4,8,10 7:7,21
  11:8 32:5
  51:12 82:23
  83:9
involved 56:18
  77:23 78:2
involvement
  9:21 27:8
  37:12,13
irate 20:13
issue 68:1
issues 74:20
  75:7 85:10
it'd 71:4

**J**

J 2:8
Jackson 1:11
  3:3 4:6,9,16,21
  31:12 41:6
  44:13 46:9
  47:6 50:23
  58:15 65:12,23
  66:3 87:15
  88:3 89:11,18
  90:7
JAMES 2:8
Jefferson 23:11
Jensen 42:9,10
  42:19,21 43:11
  72:23,23 75:10
  76:3
Jeremy 18:2,2
  18:12 22:16
jhess@tressle...
  2:11
job 9:16 67:24
Joe 78:11
Joey 4:5
JOHN 1:7 89:7
jointly 23:21
Joliet 1:6 2:12
  4:3 5:21 6:4

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Dave Jackson - Taken 6/2/2021

Page 98

| | | | | |
|---|---|---|---|---|
| 9:10,18 10:1 | 17:10,14,14 | 63:14 64:19,24 | 7:7 | 78:8 |
| 22:9 26:5 28:7 | 18:18 19:3,8,9 | 65:9,9 66:11 | **language** 14:24 | **letter** 58:3,7 |
| 30:19 31:6,16 | 19:17 20:1,11 | 66:20 67:8,13 | **laptop** 36:7,13 | **level** 8:8 37:8 |
| 32:7,12 34:21 | 20:12,16,17,24 | 67:18 68:1,2,2 | **laptops** 36:10 | **liar** 39:3 |
| 39:21 43:22 | 21:1,3,5,6,20 | 68:5,8,8,9,9,13 | **LAW** 2:2,19 | **License** 91:9 |
| 44:14 55:3 | 21:21,22,22 | 68:14,19,21,22 | **lawful** 69:11 | **lied** 12:6 |
| 58:6,20 59:7 | 22:13,15,15,16 | 69:1,2,4,21 | **lawsuit** 4:23 | **lieutenant** 11:18 |
| 59:15,17 67:21 | 22:19,20 23:13 | 70:6,14,16,17 | 11:23 13:1 | 11:20,24 12:4 |
| 70:9 76:7 77:8 | 23:14,14 24:15 | 70:18,18 71:1 | 33:18 45:6,13 | 14:2,5,6 18:23 |
| 78:1,13,19,22 | 24:18,19,21 | 72:8,16,18,19 | 50:12,16 55:24 | 19:1 33:1 50:5 |
| 80:7,16 87:11 | 25:18,19,19,22 | 72:20,20,21 | 56:1,15,19 | 68:20 69:14 |
| 89:6 | 25:23,24 26:1 | 73:10,21,22,23 | 70:5 76:7,21 | **light** 32:19 |
| **JOSEPH** 2:19 | 27:4,6,9,14,15 | 73:24 74:13,14 | 77:16,17,20,23 | **limits** 27:16 |
| **Jr** 2:8 | 28:3,3,19 29:2 | 74:14,18,19 | 78:2,9 79:3,3,8 | **lines** 51:17 |
| **June** 1:18 45:19 | 29:21,22,23,24 | 75:1,2,3,4,5,6 | **lawsuits** 78:12 | **Lionel** 79:2,2,6 |
| 46:2 47:8,12 | 29:24 30:15,17 | 75:7,19,20,21 | 78:18,23 | **listened** 39:11 |
| 89:13 90:14 | 30:18 31:5,7,7 | 75:22,22 79:1 | **lawyer** 42:2 46:9 | **listening** 55:11 |
| 91:2 | 32:18 33:5,9 | 79:8,9,10,21 | **lawyers** 5:9 | **little** 49:11 |
| **justice** 42:23 | 33:17,24 34:1 | 80:9,9,10,17 | 43:18 46:17 | 57:20 67:12 |
| **jvucko@vuck...** | 34:3,7,16,18 | 81:15,15,19,21 | **leadership** 26:14 | 70:1 |
| 2:22 | 35:1,3,4,10,11 | 82:18,18,19,19 | **leading** 11:14 | **LLC** 2:2 |
| | 35:11 36:9,11 | 82:20 83:6,21 | 12:10 13:1,10 | **LLP** 2:7,19 |
| **K** | 36:14 37:2,5,8 | 83:21,22 85:2 | **learn** 15:20 | **loaded** 32:13 |
| **keep** 49:7 62:22 | 37:9,16 39:1,4 | 85:2,2 86:24 | 18:20 28:9,14 | 35:18 37:18 |
| **kept** 43:9 | 39:6,7,7,8,10 | 87:7 | **learned** 13:15 | **logged** 36:22 |
| **kids** 10:23 | 39:11,12,12,13 | **knowledge** 37:6 | 15:22 18:24 | **long** 5:23 6:5 7:1 |
| **kind** 9:8 55:5 | 39:13,16,16,16 | 47:6 48:16 | 19:19 20:16 | 8:13 9:13 10:7 |
| 70:8 71:5 | 39:23,24 40:3 | 50:3 55:18 | 22:6,23 24:14 | 10:13 11:9,20 |
| 73:22 | 41:13 42:11,11 | 58:12 65:13,18 | 25:4 27:19 | 23:24 26:11,16 |
| **knew** 52:5 | 42:18,21 43:3 | 65:20 71:15 | 28:16 30:2 | 26:17 34:8 |
| **KNIGHT** 2:13 | 46:17 47:2,9 | 84:5 | 39:1 41:7 | 66:20 67:8 |
| 2:13 | 48:8,12 49:6,7 | **known** 9:13,16 | 71:10 72:2 | 68:14 |
| **know** 5:15,16 | 50:11,13,20,24 | 10:7,11,13,17 | **learning** 22:10 | **look** 9:3 35:2 |
| 7:20 8:2,4,5 | 51:1,2,3,3,9,20 | 11:20 22:21 | 28:3 | 49:9 51:21 |
| 9:1 10:10,24 | 51:20,23 52:2 | 72:18 | **leave** 8:21,23 | 68:23 74:16 |
| 11:1 12:1,1,2,3 | 52:4,5 53:8,10 | **knows** 63:17 | 28:22 29:5 | **looked** 51:2 |
| 12:3,5,5,6,7,16 | 53:21 54:8 | **KURNIK** 2:13 | 45:17,19 46:2 | **looking** 37:15 |
| 12:20,22 13:3 | 56:11,12,12,14 | | 47:7 48:5,18 | 47:15 74:21 |
| 13:4,5,8 14:12 | 56:15,20,21,22 | **L** | 54:1 | 75:7 83:17,24 |
| 14:19,20,22 | 57:1,8,9,14,14 | **L** 2:8 | **leaving** 49:24 | **lost** 87:2,6 |
| 15:7,8,9,10,12 | 57:15 59:17 | **L-I-O-N-A-L** | **led** 85:14 | **lot** 27:12 34:24 |
| 15:12,13,13,14 | 60:3,4,8,20 | 79:6 | **let's** 45:17 47:2 | 39:18 72:21 |
| 15:24 16:3,3,7 | 61:5,6,12 62:5 | **Labor** 8:17 | 53:24 55:14 | 75:13,21,22 |
| 16:22,23 17:5 | 62:8,19 63:12 | **Landeros** 6:24 | 59:14 60:15 | 80:10 85:3 |

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Dave Jackson - Taken 6/2/2021

Page 99

**lump** 61:4

**M**

**ma'am** 49:20
50:13 52:11,19
53:3 54:6 56:5
61:14 63:24
64:11
**Maggie** 1:16
90:5 91:9
**maintain** 6:15
**making** 4:10
14:13 33:11
**management**
34:22 35:7
36:24
**March** 53:16
82:5,8
**Margaret** 1:16
36:23 84:16
90:5 91:9
**MARKED** 3:12
**materials** 72:24
**Matlock** 11:10
11:13 15:23,24
16:6 17:2,8,16
17:16,19 18:5
18:5,7,14,19
18:24 19:5,6
19:18 20:17
22:5,6,22 23:1
23:7,15,18,19
23:21 24:4,5
24:13,13 25:1
25:3,5,13
26:19 27:19,23
28:18 29:9,16
29:19 30:2,3
36:20 40:11
41:7 48:2,7,13
49:1,14 50:4
52:7,22,22
53:6 54:14,18
55:6,17 62:13

62:15,19,21
63:5,7,9,12,17
63:21 64:2,7
70:24 71:3,10
72:2,7,12 81:3
81:4,13,17
82:4,15 83:3
**Matlock's** 11:6
64:11
**Matt** 87:13
**matter** 20:14
27:23 41:4
42:4 54:20
58:1 69:11
74:16,21 75:8
**matters** 49:17
50:16 56:3,18
62:24 64:10
71:7 85:2,9
**Matthew** 2:14
66:4
**McKeon** 31:4
38:4
**McKinney** 31:3
37:21 38:2,5
**mclark@khk...**
2:16
**mean** 6:22 10:22
10:24 11:16
13:2 20:13
22:19 27:11,11
29:14 34:8,9
35:24 37:14
39:23 43:3,16
47:13 48:6
59:15 60:3,4
61:7 62:22,23
65:17 67:12,17
67:18 68:1,12
69:17 76:15
79:19 80:1
85:1
**means** 47:18
64:24

**media** 12:3
**medical** 29:5
45:18 47:7,10
47:16 48:5,18
52:3
**meet** 23:2 25:14
**meet-** 23:19
**meeting** 16:2
23:5,17,20
24:2,6,12,18
27:18,20,21
45:10 48:24
49:2,4,5,7,8
52:21,24 55:17
63:14 81:9
83:7
**member** 25:16
26:19,21 58:19
**members** 65:14
78:22
**membership**
26:23,24
**memory** 9:4
25:8 56:16,23
61:23
**mention** 73:13
**mentioned**
69:15
**message** 27:13
**met** 40:23 53:16
**midnight** 31:7
31:13,20,20,24
31:24 32:4,8
**Midwest** 2:20
**mike** 46:22
**mill** 28:17 30:14
30:22 31:2,6
32:3
**mind** 42:18
**mine** 13:2 32:18
**minutes** 24:1
**mission** 27:5,5
**moment** 15:18
**monitors** 36:10

36:14
**months** 19:15
33:4
**morning** 4:23
32:10 44:5
60:21 66:3
**mouth** 22:3
**multi-** 67:5
**multi-jurisdic...**
80:1
**municipal** 1:6
89:6

**N**

**N** 3:1
**name** 4:21 17:22
17:23 18:3
21:7 30:23
66:3 79:5
**named** 9:11
36:20 78:6,9
**names** 31:1
**narrow** 19:16
**nature** 40:9 70:3
76:11
**need** 5:6,7
**needed** 21:1
31:23 39:10
56:22
**never** 5:15,18
20:10,15 21:21
25:10 29:20,22
29:22 30:14,15
37:1 38:17
39:3 40:23
41:2 70:14,15
70:16 71:5
80:6 85:22
**Nicholas** 9:11
14:13
**Nick** 16:2,3,24
16:24 17:6
23:2 70:12,15
70:20 71:5,22

72:17,17 78:21
80:10,13,15
81:10 82:5,8
82:16
**Nicodemus** 7:15
67:11
**night** 7:8 32:1,9
**nolle** 77:15
**nonverbal** 22:20
**nonverbally**
22:14
**North** 2:3,14
91:10
**NORTHERN**
1:1 89:1 90:1
**note** 9:7 87:17
87:20
**notes** 9:5 24:20
24:22,23 25:1
25:5 28:2
53:13
**notice** 1:13
**nude** 28:12
29:11 73:13
84:6
**number** 40:10
57:2 85:10
89:20

**O**

**o'clock** 32:9
**Oak** 2:21
**object** 46:5
50:17 53:18
63:1,16 65:17
77:1 82:10
**objection** 46:6
48:19 50:18
54:3 58:9
64:20 77:3
78:3 86:22
**objections** 4:10
63:19
**observe** 83:17

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Dave Jackson - Taken 6/2/2021

Page 100

| | | | | |
|---|---|---|---|---|
| observed 69:15 | 56:7,9,10,12 | 57:20 59:8,20 | outside 17:18 | 67:6 |
| observer 4:8 | 57:1,11,13,18 | 60:6,21,23,23 | 31:10 35:22 | Perona 78:11 |
| obstructing | 57:23 58:3,7 | 61:11 62:11,19 | 38:24 56:14 | person 24:21 |
| 42:22,23 | 58:16 59:2,7,9 | 62:22 63:11,12 | 68:7 74:9 | 41:21,22 48:17 |
| occasion 23:2 | 59:16,20 60:7 | 64:13,22 65:5 | overheard 33:11 | 49:2 |
| occur 42:24 43:6 | 60:9 62:5,16 | 65:21,24 67:2 | oversight 75:4 | personal 9:21 |
| 43:11 52:9 | 65:15 69:5 | 67:8,15 68:4 | _____ | 10:4 37:19 |
| occurred 21:24 | 81:3,12,16 | 68:18,23 69:3 | **P** | 48:16 51:21 |
| 41:16 48:4 | 83:24 85:14 | 69:6,13,21 | PAGE 3:2 | 65:12 67:20 |
| 52:8,18,21 | 86:1 87:15 | 70:7 71:4 72:4 | paper 12:4 | 90:10 |
| 53:5 61:15 | 88:3 | 72:19,22 73:9 | parameters 8:23 | personally 30:16 |
| 75:16 | officer's 79:5 | 74:4 76:5,17 | 51:2 | 30:19 67:18 |
| offer 36:15 | officers 11:4 | 76:20 77:6 | part 16:23 25:24 | pertaining 1:15 |
| 56:11 | 25:17 26:4,9 | 78:10 79:11 | 26:2 75:9 | pgs 89:20 |
| office 6:15 14:1 | 30:23 37:4 | 80:12 81:1 | 84:24 85:9 | phone 2:4,10,16 |
| 14:2,22,23 | 39:20 78:1,19 | 82:4,13 83:2,3 | particular 7:19 | 2:21 14:4,9 |
| 15:18,21 16:19 | 85:5 | 83:5,8,14 84:2 | 10:20 22:24 | 17:11 19:10,11 |
| 18:6,8,11,17 | OFFICES 2:2 | 85:20 | parties 90:16 | 19:22,24 20:6 |
| 18:21 19:7,20 | official 9:21 | on-duty 28:24 | pass 19:6 | 28:8,10 29:13 |
| 20:7,19 21:11 | 10:4 15:18 | once 16:1 85:22 | passed 82:14 | 32:21 33:4 |
| 21:17 22:24 | Oh 10:8,15 | one-sided 20:21 | patience 65:23 | 34:5,14 35:9 |
| 23:1 24:7,9 | 12:13 23:23 | ongoing 33:22 | 66:6 | 35:14,18 36:17 |
| 25:5 27:21 | 47:1 64:22 | 78:16,17 | patrol 6:9 26:4 | 36:21 37:18,23 |
| 31:5 34:11 | 76:12 83:5 | onset 46:17 | 32:1 44:9 | 38:6,9,14,20 |
| 35:15,22 36:12 | okay 4:7 5:18 | open 51:24 | patrolman's | 39:20 40:5 |
| 45:11 48:4 | 7:6 8:19 9:10 | opinion 79:22 | 84:23 85:4 | 41:21 42:8 |
| officer 4:21,22 | 12:9,21 15:15 | opinions 67:15 | pattern 37:7 | 49:18 51:6,14 |
| 5:4,21 6:21 | 15:24 16:5,13 | 67:22 | 68:16 | 51:21,21,22 |
| 9:11,15,24 | 17:1 18:4 | opposed 25:15 | paying 29:4 | 53:24 54:11,21 |
| 10:5,7,9 22:9 | 19:18,24 24:23 | order 34:21,23 | PD 55:3 | 55:2,16 56:2 |
| 23:14,15 24:19 | 26:4 27:18 | 35:6 43:15 | pending 77:17 | 57:2,18,24 |
| 24:22 25:11,15 | 28:6,21 29:5,7 | 69:11 85:4 | people 12:5 | 58:18 61:6 |
| 25:21,24 26:6 | 31:21,22,23 | 87:17 | 22:15 31:10 | 65:15 69:24 |
| 26:17 30:19 | 33:23 41:11 | ordered 42:10 | 39:18,23 40:2 | 70:18 73:1,5 |
| 31:12 32:12 | 44:11,13 45:4 | 42:16 51:3 | 40:4 67:6 | 73:19,20 74:1 |
| 36:19 37:17 | 45:9,24 46:11 | ordering 72:24 | 79:20 | 81:9 87:4 |
| 39:2,8 41:6,7 | 46:17 47:3,4 | orders 35:1 69:8 | percent 24:19 | phones 37:14,15 |
| 43:19 44:9 | 47:11,18,24 | organization | perfect 29:6,8 | 42:12 |
| 49:17 50:16 | 48:11,24,24 | 26:2,5,16,19 | performance | photographic |
| 51:14 52:21 | 49:9,10,21 | 26:21 27:2 | 67:22 | 28:11 |
| 53:6,12,15,23 | 51:7,15 52:6 | 84:23 | period 8:16,20 | photos 29:12 |
| 53:24 54:5,11 | 52:24 53:4,15 | original 33:3 | 45:21 52:2 | 73:13 83:18 |
| 54:20,24 55:6 | 54:12 55:3,10 | Orton 1:16 90:5 | 66:20 67:8 | 84:6 |
| 55:15,16,21,24 | 55:21 56:13 | 91:9 | permanent 7:23 | phrase 55:8 |

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Dave Jackson - Taken 6/2/2021

Page 101

phrased 55:5
physically 49:24
pictures 73:22
    83:24
place 16:9,12,16
    23:9,10,12,14
    28:4 61:24
    71:14 75:24
    80:20 82:5,6
    83:7
Plaintiff 1:4,12
    2:6 89:4
please 46:17
    89:19
point 7:16 8:5
    28:6 34:9
    35:11,21,23
    39:15 45:15
    49:21 63:8
    66:11 67:13
    69:11 76:24
    77:6 79:24
police 5:21 6:4
    8:11,12 9:10
    9:18 10:1,11
    17:18 22:9
    25:17 26:5,8
    26:17 27:10,12
    28:8,17 31:16
    32:7 34:21
    39:21,24 44:14
    57:6 58:6,20
    59:7,15,17
    67:21 76:23
    77:7,8,9 78:1
    78:19,23 80:7
    80:16 85:4,5
pool 10:23
porn 14:24
    16:20 71:11
portable 32:21
position 6:15
positive 27:13
possible 72:4

power 75:4
Powers 12:15,16
    18:13 49:16,23
    61:2
practice 37:7
    68:16,16
precise 19:14
precisely 49:11
prefer 44:7
presence 61:1
present 4:4,7
    17:2 18:21
    21:15,24 41:18
    49:2,24 61:18
    62:1,12 64:13
    65:6 75:18,20
    81:13
president 26:10
    26:11 59:19,21
    84:23 85:4,5
presume 5:11
pretty 20:13
    52:4
previously 31:10
    38:24 51:14
    52:11 81:7
prior 11:13,22
    12:14,19 13:1
    13:10
privacy 69:6
private 53:22
    54:19 57:22,23
probably 8:5,6
    9:4,8 11:21
    17:13,15 26:15
    32:17 37:11
    43:4,4 46:16
    60:21 61:4
    63:3,9 68:17
    75:12 81:20
Procedure 1:14
process 51:24
Proctor 2:8 3:5
    4:2,3,7,11

43:21,21 44:4
    46:7,13,24
    47:2,5 48:20
    50:19,21 63:2
    63:18 64:17,19
    64:22,23 65:2
    65:22 66:1
    74:11 87:11
    88:6
Professional
    1:17 90:6
promoted 14:7
promotion
    79:15,17,22
proper 35:7,24
    37:3 87:1
property 34:22
    35:7
prosequi 77:15
protect 69:4
provide 32:3
    34:12 69:8,9
    70:2
provided 33:1
    34:5,13 41:2
    71:6 89:16
public 33:6,16
    69:3
public's 71:15
purging 43:11
purpose 27:2
purposes 35:3
pursuant 1:12
    1:13
put 32:21 35:24
    37:2 51:23
    57:16,21,24
    68:17 73:20
    86:24

Q
question 5:4,11
    5:11,12,16
    46:15,20 48:21

50:22 54:6,15
    54:16 55:5,11
    57:19 59:11,24
    60:7 62:18,21
    63:3 81:5
questions 4:23
    5:7 34:8 40:10
    40:16 43:17,19
    43:22 46:18
    66:5 74:10
    84:9,11 87:9
    87:14,19
quick 5:2 84:12
quite 60:5 83:13
quote 11:14

R
race 26:24 76:18
raised 35:15
    74:11
rank 6:1,2 11:6
    44:5,8
ranks 11:3,4
RCO 36:1,2
RCSO 34:2
re- 14:19 50:19
Re-rephrase
    48:23
reach 25:13
reached 22:5,9
read 5:8 46:19
    46:21 89:12
reading 25:5
ready 34:2
real 5:2 27:12
really 15:10
    20:22 35:15
    39:10 46:18
    57:9 74:15,19
    75:3
reason 35:7
    45:20 46:3
    53:17
reassigned

79:12
recall 8:15 14:18
    16:7 17:10,12
    17:13 18:3,12
    21:14 27:22
    28:1,5 29:9
    30:8 31:12,15
    34:9 36:11,12
    41:16,20 42:6
    45:2,22 49:6
    49:13 50:8,10
    52:8,11,24
    53:10 54:22
    55:23 59:22
    60:15,18 61:15
    61:16,19 67:10
    69:19 72:3,3
    72:11 74:11,19
    75:15,18,19,23
    76:4 78:21
    86:14
received 13:23
    14:4 69:17,18
    69:22
recollections
    41:3
record 5:3 24:16
    44:20 46:21
    87:23 89:14
recorded 41:3
records 57:6
recruit 10:9
red 35:15
Redirect 3:7
    84:13
reduced 90:10
ref- 53:1
refer 29:11 42:3
reference 51:5
    80:19 81:2,6
referenced
    75:10
referring 16:18
    36:5 60:24

Royal Reporting Services, Inc.
312.361.8851

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Dave Jackson - Taken 6/2/2021

61:3 62:17
**refresh** 9:4
56:23
**regarding** 34:21
43:10 45:12
55:15 59:2
65:13 71:6
85:8
**Regis** 41:23
51:17
**Registered** 1:17
90:6
**regular** 84:19
**Reid** 33:1 34:13
34:17 43:10
**reiterate** 14:19
**related** 16:3
58:17 72:12
77:13
**relating** 10:18
27:19
**relation** 33:3
**relationship**
10:21 11:1,12
11:24 12:2,8
12:11,13,18,24
13:12 18:1
25:20,22 62:13
64:14 65:6
**relationships**
27:9
**relative** 90:15
90:17
**relatively** 13:22
16:14 19:10,12
33:6
**relay** 23:2
**relayed** 17:15
**remain** 77:17
**remember** 5:17
5:18 9:1 16:15
17:22 23:16
27:24 30:10
34:1 39:7 59:3

60:19 61:9
72:16 74:16,20
**remove** 69:1
**removed** 42:11
42:16 73:5
**repeat** 14:16
20:11 21:18
**repeated** 5:7
14:18
**rephrase** 48:22
49:12 51:7
57:19
**rephrased** 5:8
**report** 41:6
**reported** 90:9
**reporter** 1:17,17
5:8 46:19,22
90:6,6
**reporting** 7:12
7:17 8:15
47:19
**reports** 79:20
**represent** 4:9,22
66:4
**representative**
41:8
**represented**
44:16 45:5
**representing**
45:6
**requested** 46:21
**requirement**
26:24
**reserve** 87:24
**reserved** 88:2
**resolved** 78:15
**respect** 46:1
53:5 70:12
77:22
**respecting** 35:6
**respective** 10:19
**rest** 74:17
**restaurant**
23:10

**return** 9:7
**returned** 6:10
47:11,17 48:4
**review** 87:16
**reviewed** 71:5
**ridiculous** 69:12
**right** 4:12 5:20
8:10 11:8 17:7
22:5 27:7 33:8
34:1 35:22
36:1 42:12
43:5 44:16
47:9 49:12
50:19 52:20
53:21 71:11,16
73:1 74:7
78:20 79:2
81:12,18 82:2
82:13,24 84:7
87:15,22 88:1
**rights** 78:23
**rise** 76:21
**River** 2:14
**Road** 2:9,14,20
**Rob** 17:23 18:13
**Robert** 50:5
64:14
**Roechner** 32:24
34:6 35:8,12
35:13,17 36:15
36:19 43:9
78:10
**role** 4:8 10:4
26:14 59:17,21
86:5
**roles** 10:19
**room** 83:9,12,15
**Rosado** 78:11
**Rosemont** 2:15
**rotation** 7:21,22
8:2
**rotations** 7:22
**RPR** 91:9
**rules** 1:13 5:2

**rumor** 28:17
30:14,22 31:2
31:5,6,13 32:3
**rumors** 31:9
41:13 51:19
60:10,11,16
72:21 82:1
**run** 26:3
**runs** 79:19

_____
**S**
**S** 2:14 3:10
**sat** 16:2 24:20
72:16 82:22
**saw** 14:1 30:11
31:8,10
**saying** 12:6
27:22 49:7
**says** 67:3
**scanned** 9:2,8
**school** 8:9
**scope** 50:24
**scrolled** 51:22
**searching** 61:5
**second-** 56:3
**section** 57:6
**secure** 68:4,13
69:3
**secured** 68:7,12
**see** 16:24 18:21
25:6 83:17
**seen** 29:22 30:4
30:5,6,9,12,15
30:16,20,23
31:13
**sees** 16:24
**seizure** 33:3
**senior** 6:21 7:13
7:17 8:16
**sense** 22:20,20
**sensed** 15:11
**separate** 6:7
34:13 45:1
75:10,12,14

**separately** 87:20
**sergeant** 7:14,15
7:16 12:15,21
13:7,12,23
14:1,21 19:3
32:17 37:8
42:6 44:6
66:12,14,17,22
67:1,11,17,20
67:22 68:3,9
75:6 79:19
**serve** 59:16,16
**set** 16:1 50:16
91:1
**sexual** 28:12
49:17 73:14
**sexually** 29:12
**share** 45:12
51:16 60:6
63:12,19
**shared** 52:22
58:20 62:15,20
65:14
**sharing** 57:23
58:18 60:16
**sheets** 43:4
89:16,20
**shift** 7:9,19 8:1,1
31:7,13,20,21
31:21,24,24
32:2,4,8,10,11
**short** 43:23 44:2
**Shorthand** 1:17
90:5
**show** 88:1
**sic** 73:5 79:6
**signature** 87:24
88:1
**similar** 34:18
60:10
**sir** 5:1,13,19
6:14 7:18,20
8:18,22 9:12
9:23 10:3,6

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Dave Jackson - Taken 6/2/2021

Page 103

17:23,23 20:4
23:4,6,8,23
24:11,15,24
25:2,7,9,12
26:7,20,22
28:13 29:15
31:15,19 32:6
32:15 35:1,4
35:20 37:2
40:8,12,15,19
41:5 42:1 44:5
59:4 65:3
69:20 71:8,12
71:17 75:17
76:1,4,9,19
77:3,15,18,21
79:14 80:22,24
82:12 83:16
84:8,21 85:12
85:22 86:6,13
88:5
sit 17:5 23:21
72:10 79:2
sit-down 23:24
53:1,5 54:17
55:17 57:12
62:17 63:14
sitting 83:22
six 9:6 47:16
52:3
soaking 28:1
Socha 1:3 4:22
10:1,5,7 14:12
14:24 15:10,11
16:20 20:8
21:2,12 24:8
25:11,15,21
28:7,11 29:12
39:2,8 41:4
42:4 45:6,12
50:12 55:21,24
56:3,7,9,10,12
57:11 58:3,7
60:20,23 62:23

64:10 71:7,11
71:20 74:12
80:8,11 83:18
83:24 84:6
85:8 86:9 89:3
Socha's 33:4
34:5,14 35:9
35:18 36:17,21
37:18,23 38:6
38:9,14,20
39:20 42:8
49:17 50:16
51:6,14 53:24
54:11,21 55:16
57:2,18,23
58:16 65:15
73:4 86:4
someone's 73:24
sorry 7:8 16:10
21:4 24:15
31:17,18,23
46:22 47:1
54:13 59:24
62:8,18 74:22
77:2 79:23
80:23 81:2
sort 20:21
sounds 47:9
source 28:9
31:12 38:22
speak 17:5
37:21 44:21
48:7 81:21
85:1,3
speaking 49:4
56:16 59:20
87:1
specific 53:4,7
60:13 66:17
73:13
specifically 20:5
21:14 29:9
34:22 54:9
specifics 63:23

specified 90:13
speculate 52:15
speculation 58:9
78:3 86:22
speculative
50:18
spell 79:5
spoke 19:23
40:6,13 55:15
56:9,10 63:21
63:24 72:17
75:12 83:1
spoken 38:4
40:21
sponge 28:2
spots 83:11
spring 10:2
SS 90:2
staff 77:10
stand 39:18
star 15:1 16:21
71:11
start 34:3 78:8
started 10:17
11:11,21 32:19
37:13
starting 33:16
state 8:12 27:16
79:19 89:11
90:2
stated 14:22
35:13 38:24
42:8 51:14
52:11
statement 22:24
24:7 29:18
70:12,15,16,21
71:5,10
statements
14:11 19:2,19
27:21 33:10
41:3 65:10
70:4,8 82:16
States 1:1,14

89:1 90:1
station 10:11
stay 15:3
STENOGRA...
4:13 47:1
stenographica...
90:9
stint 6:8
stints 6:7
storage 35:16
36:22
strained 65:8,11
Street 2:3 23:11
91:10
strike 47:3 63:4
63:6 84:3
subject 42:21
53:23 54:20
55:2,16,20
57:24 58:7
submitted 70:21
89:20
subpoenas
13:11
SUBSCRIBED
89:21
subsequently
16:4 28:18
substantive 51:5
sucked 14:24
20:8 21:12
sucking 24:8
71:11
sucks 16:20
Suite 2:3,9,15,20
91:10
summarize
76:13
summer 10:2
supervisor 6:20
6:22,23 7:2,7,9
11:7 18:17
20:18 66:10,12
66:22 67:11,14

67:16
supervisors 6:23
8:2 18:18 37:5
supervisory
37:16
sure 8:4 21:6
24:17,22 33:18
36:9 39:6,16
43:1,14,16
44:1 48:10
53:11 55:12
67:10 71:13
72:9 73:18
74:8 81:19
82:6,21 85:16
86:18
swear 4:12
swim 10:23
sworn 4:1,18
89:21 90:7
System 36:24

                    T

T 3:10
Tab 42:9
take 9:3 23:9,12
24:22,23 25:1
26:23 36:2
37:15 43:23
73:19
taken 1:12,15
28:4 73:7
90:12
talk 22:17 23:21
25:20 39:21
40:4 45:17
51:4 57:9 63:7
63:9 75:21,22
84:15,19 86:3
talked 21:5
28:22 55:19
73:11 79:23
80:3 81:20
82:16

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Dave Jackson - Taken 6/2/2021

Page 104

talking 14:2
  20:23 24:3
  33:7 41:14
  54:2,12 56:14
  60:11 72:17
  73:21 78:6
  83:3 85:17
task 79:13 80:1
  80:5
team 67:9
teams 66:17
  67:5
telephone 15:3
  15:15 17:9
  20:21,23 37:19
  40:7,9,13 45:1
tell 5:16,17
  13:21,21 18:7
  18:24 19:5
  20:16 21:4,23
  23:13,16 24:18
  25:18,21 29:16
  30:17 33:5
  34:4,24 36:20
  37:17 38:10
  40:2,3 43:5
  51:4 53:20
  56:8 64:7
  66:15 67:23
  68:1,5,8 72:1
  74:23 77:8
  79:21 80:10
  83:19 86:2
telling 30:8
  72:11
ten-hour 32:10
tenure 8:6
term 29:11,13
terminology
  19:11
terms 32:7 75:14
  76:20 77:16
  81:15
testi- 20:10

testified 4:18
  30:1 31:10
  44:24 45:9
  48:2,14 49:5
  51:18 52:20,23
  56:21 59:1,3
  59:10 72:22
  73:11 74:10
  75:15,20 79:4
  81:7 82:20,22
testify 20:10
  21:19 63:22
  64:1 74:22
  90:8
testimony 44:20
  45:2 52:6 60:9
  63:13 64:8,12
  69:13,19 70:23
  71:1 72:15
  80:20 86:8,10
  87:19 89:12,15
Thank 4:11
  58:23 62:11
  65:22 66:5
  84:10 87:11
  88:5,6
thanks 88:3
Theft 79:13 80:5
thing 22:3 27:7
  29:17,19,20
  37:16 39:1,4
  61:8 63:21,24
  66:18,21 68:5
things 7:24 9:5
  13:3 18:11
  21:1,11,16
  23:2 24:14
  27:12,19 33:13
  40:2,3 75:1,6
  76:16 83:21
  85:3
think 9:2,4,6,7
  9:14 10:10,16
  14:3 16:1,4,22

23:18 26:18
  30:10 39:17
  41:12 42:10
  44:24 49:23
  57:2,4 58:24
  60:11 61:4
  65:22 67:13
  68:8 69:6,23
  73:9 74:5,15
  76:2 79:6,10
  81:8,17 82:22
  86:9
thirdhand 45:11
  56:3
thought 15:8,11
  42:20 46:16
  60:1 68:2
  69:16
three 8:2 32:18
  43:8 63:9
  81:22
thumb 32:14
  35:16
till 32:9
Tim 18:13
time 6:13 7:4,5
  8:20,23 9:9
  14:6 16:11,15
  17:17 18:8,15
  19:9,12,16
  23:16 28:6
  29:1 32:24
  33:8 34:9
  38:13 39:19
  41:6 42:10
  43:2,4,4,5,18
  43:20 45:15,20
  46:15 47:15,22
  48:9 50:13
  52:5 54:12,14
  55:14,15 56:20
  57:5 58:24
  62:18 66:6,20
  66:23 67:9

68:14 71:13
  72:19,21 73:10
  73:14 81:16,17
  81:20,20,21
  82:14 83:1,6,7
  83:18 84:10
  86:16 88:4
  90:12
timeline 57:15
  82:21
times 5:10 40:20
  52:2 63:10
  70:1 81:22,22
title 26:8 76:14
Tizoc 6:23 7:7
to-do 33:9
today 4:8 5:3
  42:4 44:16
  46:4 51:18
  55:23 56:4,21
  58:8,15,21
  59:10 63:8,13
  66:5 72:10
  88:4
today's 4:4
  40:23
told 14:15 15:7
  15:18,24 16:1
  18:5 19:6,18
  22:22 28:19
  29:9 30:3,6,16
  32:12 34:15
  35:17,21,24
  37:1 38:8,19
  42:17,20 43:7
  45:24 46:1
  49:1,13,22
  51:19 52:1,2,5
  53:12,15 55:23
  58:15 70:15,16
  83:23 86:9
tone 86:19,21
totality 61:5,7
training 9:15

10:9,10
transcript 87:16
  87:21 89:12,14
transcription
  87:18
transfer 80:4
transpired 24:6
treat 21:2
treats 67:24
TRESSLER 2:7
Tri-County
  79:12 80:4
trial 86:1,5,12
  86:16
true 6:18 11:18
  17:21 75:3
  89:14
truth 40:2 90:8
truthful 86:7,10
truthfully 20:12
  63:22 64:1
try 47:3 57:20
  63:4 85:6
trying 27:7 30:9
  55:8 74:8
turn 50:4 66:1
turned 16:4 65:9
  70:9,12
two 6:7 7:10
  23:20 36:10,14
  40:20 45:1
  67:5 81:22
  82:14
type 13:23 36:7
  37:9
typewriting
  90:10
typical 10:24

        U
undercover 6:9
  10:16
underserved
  27:14

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Dave Jackson - Taken 6/2/2021

Page 105

understand 5:4
29:14 35:10
46:12,14,15
48:21 52:24
54:1,15 59:11
62:23 63:3
64:2,4 81:5
85:16
understanding
8:19 18:14
35:5 50:14
51:11 70:11
73:4,6 76:6
77:12 79:11
understood 5:12
14:17 16:19
45:4
union 41:8
59:19,21 85:5
unit 6:9 10:16
32:5 65:14
79:18,20
United 1:1,14
89:1 90:1
unknown 62:7
62:10,11
unlocked 51:21
upset 14:5 22:21
39:10 42:17
70:18
use 29:11,13
usually 32:9
utterance 36:3
uttered 19:4

V

V-I-T-O 84:17
vacation 42:9
43:2
venting 87:8
verbal 22:20
verbalized 22:14
verbally 22:13
83:23

victim 15:12
21:2,3
victim's 69:6
video 42:7 71:18
71:20,23
videoconference
1:16 2:1 90:12
videographic
28:11
videos 29:12
73:14,22 83:18
84:6
view 37:22 38:2
38:5,23 39:3
79:15,17
viewed 32:5
38:19 65:13
84:6
vigilant 5:6
violating 39:9
vs 1:5 89:5
Vucko 2:19,19
4:5,5,9 44:17
44:22 46:6,12
46:22 48:19
50:18 54:3
58:9 63:1,19
64:16,19,21
65:1 77:1,4
78:3 87:24

W

W 2:19
waive 87:22
walk 57:6
walked 14:21
16:19
walking 13:24
want 7:3,14 15:2
20:16 24:16
31:18 32:10
52:15 55:12,20
62:22 85:16
86:24

wanted 21:7
74:2,15
wasn't 18:16,16
20:9,10 21:18
21:19 28:24,24
29:3 36:11
73:22 75:2
watch 13:24
14:2,21,23
15:17,21 16:18
18:6,8,10,17
18:20 19:7,19
20:7,18 21:11
21:16 22:23
23:1 24:7,8
25:4 27:20
45:10 48:3
way 19:16 21:4
22:6,10 27:4
28:10 52:15
55:7 60:3,4,18
66:12 86:20
87:19
ways 74:6
we'll 5:9,11 15:2
88:1
we're 49:4 60:24
61:3 66:17
87:24
we've 12:1 13:2
35:2 39:22
40:23 58:7
73:11 74:5
week 40:14
weeks 9:7 19:15
33:4 47:16
52:3
Wendy's 23:10
23:24 24:12
27:18 53:1,1,5
54:13,17 55:7
55:16 57:12
62:17 63:13,14
70:24 71:2

78:22
went 6:9 39:2,13
51:23,24 65:8
weren't 47:19
whatsoever
77:23
whereof 91:1
witness 3:2 4:1
4:12,17 47:4
53:19 54:4
58:10 63:20
65:19,24 77:2
77:5 82:11
86:5,23 87:5
88:5 91:1
witnessed 30:18
witnesses 10:19
witnessing
14:14
word 73:10
words 14:20
16:20 19:3
21:21,23 34:18
56:11
work 8:20 9:7
13:3 20:19
39:10,13,17
47:11,17,20,20
48:4 66:14
84:22 85:6
worked 8:5,6
34:11 66:16
working 32:22
37:5 57:4,7
68:23
workmen's
78:14
workplace 48:18
works 66:13
world 17:19
wouldn't 37:7
37:11 48:8,8
82:9 83:22
writing 57:16,21

58:1
written 41:3
52:17 58:3,6
87:17
wrong 11:4 55:5

X

X 3:1,10

Y

yeah 13:4 15:7
16:22 18:2
22:19 26:14
30:10 34:15
35:2 41:9
42:15 46:14
47:9 49:20
52:4 55:7
63:18 65:3,7
66:16 67:12,17
67:19,23 69:12
75:22 78:8
79:3,24,24
81:3
year 40:6 80:21
82:13
years 5:24 7:10
12:20 82:14

Z

Zoom 4:4 5:6
40:24

0

084-004046 91:9

1

1-20 1:7 89:7
1:18-cv-05681
1:5 89:5
104 2:20
11:47 88:7
16.1 34:23
161 91:10
16th 45:19 46:2

Cassandra Socha v. City of Joliet; et al.
Deposition of Detective Dave Jackson - Taken 6/2/2021

Page 106

47:7
**1970s** 26:18
**1983** 76:15
**1995** 8:14 11:11

**2**
**2** 1:18 89:13
  90:14
**2:00** 32:10
**2000** 6:8
**2007** 6:8
**2016** 6:10,18 7:7
  7:12,16
**2017** 9:18
**2018** 8:16,17,20
  9:19 10:2
  26:13,15 45:19
  45:19 46:2
  47:7,8,12 48:5
  82:2 83:15
**2019** 76:23
**2020** 53:16 82:5
  82:8
**2021** 1:18 89:13
  89:22 90:14
  91:2
**2208** 2:20
**22nd** 91:2
**2350** 2:3
**250** 2:9
**25th** 45:19 46:2
  47:8,12
**26** 5:24
**2nd** 53:16 82:8

**3**
**30** 24:1
**3050** 91:10
**312.361.8851**
  91:11
**312.445.4900**
  2:4
**312.522.2517**
  2:21

**312.759.0800**
  2:10
**33** 2:3

**4**
**4** 3:4
**44** 3:5
**45** 24:1

**5**
**550** 2:9
**5600** 2:14

**6**
**6:00** 32:9
**600** 2:15
**60018** 2:15
**60440** 2:10
**60523** 2:21
**60601** 91:11
**60602** 2:4
**66** 3:6

**7**
**7** 76:14

**8**
**84** 3:7
**847.261.0700**
  2:16

**9**
**9:30** 1:18 90:14
**95** 24:19