



Transcript of the Deposition of
# Tab Jensen
**Case:** Cassandra  Socha v. City of Joliet; et al.
**Taken On:** June 10, 2021

Ex. E

Royal Reporting Services, Inc.
Phone:312.361.8851
Email:info@royalreportingservices.com
Website: www.royalreportingservices.com

Cassandra Socha v. City of Joliet; et al.
Deposition of Tab Jensen - Taken 6/10/2021

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CASSANDRA SOCHA,                    )
                                    )
            Plaintiff,              )
                                    )
        -vs-                        )   No. 18 CV 05681
                                    )
CITY OF JOLIET, a municipal         )
corporation; EDWARD GRIZZLE; and    )
JOHN DOES 1-20,                     )
                                    )
            Defendants.             )

        The deposition of TAB JENSEN, taken

pursuant to the Federal Rules of Civil Procedure of

the United States District Courts pertaining to the

taking of depositions, taken via videoconference

before KRISTA R. DOLGNER, Registered Professional

Reporter and Certified Shorthand Reporter of the

State of Illinois, on Thursday, June 10, 2021, at

10:30 a.m.

Cassandra  Socha v. City of Joliet; et al.
Deposition of Tab Jensen - Taken 6/10/2021

Page 2

```
 1   APPEARANCES (via videoconference):

 2        LAW OFFICES OF HALL ADAMS, LLC
          MR. HALL ADAMS, III
 3        33 North Dearborn Street
          Suite 2350
 4        Chicago, Illinois 60602
          Phone:  312.445.4900
 5        E-mail:  hall@adamslegal.net

 6            on behalf of Plaintiff;

 7        TRESSLER LLP
          MS. DARCY L. PROCTOR
 8        MR. JAMES J. HESS, Jr.
          550 East Boughton Road
 9        Suite 250
          Bolingbrook, Illinois 60440
10        Phone:  630.759.0800
          E-mail: dproctor@tresslerllp.com
11        E-mail: jhess@tresslerllp.com

12            on behalf of Defendant City of
              Joliet;
13
          KNIGHT HOPPE KURNIK & KNIGHT, LTD.
14        MR. MICHAEL J. ATKUS
          5600 North River Road
15        Suite 600
          Rosemont, Illinois 60018
16        Phone:  847.261.0700
          E-mail: matkus@khkklaw.com
17
              on behalf of Defendant Edward
18            Grizzle.

19   ALSO PRESENT:

20        MS. CASSANDRA SOCHA,
          MS. TAJA REYNOLDS.
21

22

23

24
```

Royal Reporting Services, Inc.
312.361.8851

Cassandra  Socha v. City of Joliet; et al.
Deposition of Tab Jensen - Taken 6/10/2021

Page 3

1                    I N D E X

2    WITNESS                                        PAGE

3    TAB JENSEN

4         Examination By Mr. Adams ....................4

5         Examination By Ms. Proctor .................60

6         Examination By Mr. Atkus ...................62

7         Further Examination By Mr. Adams ...........64

8

9                 (No exhibits marked.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Cassandra Socha v. City of Joliet; et al.
Deposition of Tab Jensen - Taken 6/10/2021

Page 4

1           (Witness sworn.)
2    WHEREUPON:
3           TAB JENSEN,
4    called as a witness herein, having been first duly
5    sworn, was examined and testified via videoconference
6    as follows:
7           EXAMINATION
8    BY MR. ADAMS:
9       Q.  Sir, my name is Hall Adams.  I represent
10   Officer Socha in a lawsuit.  I'm going to ask you
11   some questions this morning, and so too may the
12   other lawyers.  Have you given deposition testimony
13   before?
14      A.  I have.
15      Q.  About how many times would you estimate?
16      A.  Probably between five and ten maybe.
17      Q.  I'm going to review a couple ground rules
18   to make sure that our record reads the way we all
19   want it to.  The most important is that you make
20   sure that you hear completely and understand
21   completely all the questions that are asked of you
22   before you attempt to give an answer.  If you need
23   to have questions repeated, read back, rephrased,
24   explained, say so; and we'll accommodate you as many

Page 5

1    times as you ask.  If you give an answer to a
2    question, we will all presume that you heard it and
3    understood it.  Is that fair?
4       A.  Yes.
5       Q.  Okay.  The second thing I would ask of you
6    is that you never guess.  If you don't know the
7    answer to a question, tell us you don't know.  If
8    you can't remember the answer to a question, tell us
9    you can't remember.  But never guess.  Okay?
10      A.  Yes.
11      Q.  It's all right if you estimate provided
12   you let us know that that's what you're doing, but
13   never guess.
14          What is your current employment status?
15      A.  I am retired from the City of Joliet, but
16   I work part-time for the Will County Sheriff's
17   Department.
18      Q.  What position do you hold with the
19   Will County Sheriff's Department?
20      A.  It is a part-time sworn, and my position
21   is titled court security officer.
22      Q.  How long have you held that position?
23      A.  It's going on two years.
24      Q.  All right.  In that capacity, the

Page 6

1    position, it rather describes the duties.  Do you
2    supervise courtroom security, or do you yourself
3    provide it?
4       A.  So the unit basically provides security at
5    different Will County government buildings such as
6    the courthouse, the annex building where the state's
7    attorney's office is and probation and the River
8    Valley; and then we do some prisoner transports, and
9    also one of my duties is to provide security for the
10   judge that does other court.
11      Q.  What was the last position that you held
12   before retiring from the City of Joliet?
13      A.  I was a deputy chief for administration.
14      Q.  Of the police department?
15      A.  Yes.
16      Q.  How long did you hold that position?
17      A.  I believe I got it in October of '14,
18   retired in July of '18, so just shy of four years.
19      Q.  Fair enough.  What were the duties of the
20   deputy chief of administration?
21      A.  A big part of my duties were the budget,
22   preparing the budget, tracking the budget, preparing
23   sheets for spending, tracking all that.  Internal
24   affairs, I oversaw that, where I had a lieutenant

Page 7

1    and a sergeant that basically did the investigation
2    part, but they were under my umbrella.  The training
3    units, accreditation, and I also did some of the
4    civilian hiring where I review applications and do
5    interviews with some of the other employees; and
6    then other administrative duties that the chief
7    would assign.
8           In January of '18, another deputy chief
9    had retired.  So I had to take over a lot of his
10   duties, which included overseeing the communications
11   division and records division.
12      Q.  In 2018, the chief to whom you reported
13   was Benton?
14      A.  Correct.
15      Q.  Were you still around when Roechner became
16   chief or interim chief?
17      A.  No.  I was retired by then.
18      Q.  All right.  As deputy chief of
19   administration, did you have the authority to
20   initiate or open internal investigations?
21      A.  Yes.  Usually with the direction or the --
22   you know, informing the chief of doing so.
23      Q.  The lieutenant who worked for internal
24   investigations and reported to you in that capacity

4  (Pages 4 to 7)

Cassandra  Socha v. City of Joliet; et al.
Deposition of Tab Jensen - Taken 6/10/2021

Page 8

1  in 2018 would have been Reid?
2      A.  Correct.
3      Q.  Who was the sergeant?
4      A.  Sergeant Rouse, R-O-U-S-E.
5      Q.  What, if any, official duties did you
6  perform relative to the investigations department or
7  division when you were the deputy chief of admin?
8      A.  Usually what would happen is when a
9  complaint comes in or investigation is began or
10  started or opened, the sergeant and the lieutenant
11  would inform me.  They would do the actual --
12  usually do the investigation process of it, the
13  reporting, the interviews, all that.  And then I
14  would review that with them and then turn over any
15  findings to the chief.
16      Q.  And are you talking just about internal
17  investigations?
18      A.  Internal, yes.
19      Q.  Did you have any role with respect to --
20  the opposite of internal is external -- external
21  investigations of people who were not employees of
22  the police department?
23      A.  Well, if it was -- if it was an internal
24  investigation, so such as an employee, you know,

Page 9

1  yes.  That would go through internal affairs.  If it
2  was a criminal, then that would be through
3  investigations.
4      Q.  Were you the deputy chief of admin in
5  2017?
6      A.  I was.
7      Q.  What, if any, official role did you play
8  in connection with the investigation and/or
9  prosecution of Officer Nick Crowley?
10      A.  When that incident occurred, the chief at
11  the time, Benton, requested that myself and
12  Lieutenant Reid speak with Officer Socha.  The
13  reason I think I got involved was because
14  Sergeant Rouse I believe was not available or he was
15  off.  So usually in a case like that, you would like
16  to have two people doing interviews for anything
17  like that.  So that's kind of how I got involved.
18  So I had to -- myself and Lieutenant Reid -- assist
19  Lieutenant Reid with starting that investigation.
20      Q.  Did you interact with Detective Sergeant
21  Grizzle during that investigation?
22      A.  I think we've had some -- I think we had
23  conversations, but I don't recall exactly what they
24  would have been.  It may have been more

Page 10

1  Lieutenant Reid because he's the one that usually
2  does the main investigation part.
3      Q.  Did you take any written or recorded
4  statements from Socha as part of the Crowley
5  investigation?
6      A.  Yes.  Myself and Lieutenant Reid, I
7  believe, did an interview with Officer Socha; and it
8  would have been recorded.
9      Q.  Audio recorded?
10      A.  Yes.
11      Q.  When in relation to the events that gave
12  rise to the investigation in the first place did you
13  conduct that interview and take that statement?
14      A.  I believe that was the day after the
15  incident.  Well, I guess the incident happened early
16  morning.  So I don't know the exact date.  So it
17  would have been that morning.
18      Q.  Was that the one and only time you
19  interviewed or took a statement from her in
20  connection with the Crowley investigation?
21      A.  I believe it was.
22      Q.  In connection with the Crowley
23  investigation, did you communicate at all with
24  Lorinda Lamken from the Illinois appellate

Page 11

1  prosecutor's office known in the parlance as the
2  special prosecutor?
3      A.  No.  I believe Lieutenant Reid, if
4  anything, would have had more of a hand in that.
5      Q.  Did you attend any of the criminal trial
6  of Officer Crowley?
7      A.  I did not.
8      Q.  Before we go further, give us a recap of
9  your training and experience as a police officer up
10  to the time you became deputy chief of admin.
11      A.  You want me to go all the way back to the
12  academy?
13      Q.  Yeah.
14      A.  So I attended the academy in -- Well, I
15  got hired in July of '91, I believe.  So I
16  attended -- I think it's a 10- or 12-week academy at
17  the State Police in Springfield.  Then it's about a
18  four-month training program with an FTO at the City
19  of Joliet.  So throughout that, you know, time of
20  year I was with, I believe, three different training
21  officers.
22          After you pass that, then you go out on
23  your own.  I was in patrol for maybe three years or
24  four years, something like that.  Obviously, you

5  (Pages 8 to 11)

Cassandra Socha v. City of Joliet; et al.
Deposition of Tab Jensen - Taken 6/10/2021

<table>
<tr><td>

Page 12

1   know, we do the annual training that they, you know,
2   do like law updates, qualification, that kind of
3   stuff.
4          I became a school -- what was the name of
5   the program? -- Safe School officer, which is kind
6   of a neighborhood program where I was in a
7   neighborhood that had a school. So I was assigned
8   to both. So I had some community service training,
9   community policing training courses that I took
10  there. I think that was mostly put on by the
11  captain of that unit. After there, I think I was a
12  DARE officer too through there. So I took training
13  as a DARE officer.
14         From there I went to the tact unit, the
15  tactical unit, for about seven years, had a lot of
16  different training, law updates, drug enforcement,
17  training like that. And then all the annual
18  training that the department makes you do. I had
19  interview and interrogation training through there.
20  From the tactical unit, I became a sergeant, had
21  numerous supervision training classes. Some were
22  one week. Some were two weeks.
23         I became a lieutenant, a watch commander.
24  Again, a lot of annual training there. Went to the

</td><td>

Page 14

1          MS. PROCTOR: No, that's inappropriate. Come
2   on. This is a long, long narrative. Ask a
3   question.
4          MR. ADAMS: I asked him for a narrative.
5          MS. PROCTOR: Well, it's inappropriate. I'm
6   objecting based on narrative.
7          MR. ADAMS: All right. You've objected --
8          MS. PROCTOR: Give the witness some courtesy,
9   please.
10         MR. ADAMS: All right. You objected.
11         You can continue, if you have more you
12  want to add.
13  BY THE WITNESS:
14      A. There is -- if you want, there is a list
15  that is kept of all the training usually through the
16  department. So other than that, like I said, as
17  deputy chief, you know, there's just annual
18  training. And that's pretty much it.
19      Q. Okay. What's your highest level of formal
20  education?
21      A. I have a bachelor's degree in social
22  science.
23      Q. From what institution?
24      A. Illinois State for my bachelor's, and then

</td></tr>
<tr><td>

Page 13

1   neighborhood policing unit as a lieutenant, more
2   community policing training. I became a captain. I
3   was a captain for about five years. I did some
4   training on special events because that was part of
5   my duties were special events like the NASCAR races,
6   the track, Taste of Joliet. So I did some NASCAR
7   summit training.
8          When I became a deputy chief, I did have
9   a -- maybe it was a three- or four-day internal
10  affairs training in Michigan. I had some other -- I
11  think you have to do 20 hours of training as a
12  deputy chief, you know. So I would take -- like, a
13  lot of law update classes I would try to take. I
14  believe I had another internal affairs training
15  course that was local.
16         MS. PROCTOR: You know, can I just -- This is
17  Darcy Proctor on behalf of the City of Joliet. Can
18  we -- you know, while we appreciate the long
19  narrative, can we have a question? I mean, I don't
20  think it's fair to this witness to have him recite
21  years of training and his employment history. I
22  think -- I'm going to object. We need a question
23  from plaintiff's counsel, please.
24         MR. ADAMS: You can keep going.

</td><td>

Page 15

1   Moraine Valley was my general studies as an
2   associate.
3       Q. In what year did you get your bachelor's
4   degree?
5       A. 1990.
6       Q. Did you ever serve as a detective?
7       A. I did not.
8       Q. Did you ever serve in any direct capacity
9   in the investigations division?
10      A. Not in the investigations division, no.
11      Q. Were you trained on the Cellebrite
12  computer?
13      A. I was not.
14      Q. Fair to say that you did not know how to
15  use that device either to extract data from other
16  computer devices or to view extracted data?
17      A. I do not have any knowledge of how to use
18  any of that Cellebrite stuff.
19      Q. In the spring of 2018 through summer of
20  2018 time frame, who, if any, were considered to be
21  what I'll characterize as duty experts in the
22  department on the use of the Cellebrite computer?
23      A. Experts, I don't know.
24      Q. Did you from time to time have occasion to

</td></tr>
</table>

6  (Pages 12 to 15)

Cassandra  Socha v. City of Joliet; et al.
Deposition of Tab Jensen - Taken 6/10/2021

Page 16

1  ask other officers on the Joliet Department to
2  either extract or view extracted data using the
3  Cellebrite computer?
4      A.  There was just one time that I had asked a
5  sergeant to find an officer to extract information
6  from Cellebrite.
7      Q.  And who was that sergeant?
8      A.  Sergeant Gavin.
9      Q.  Did you have any personal official
10  involvement in the department's investigation of
11  Officer Socha?
12      A.  No.
13      Q.  At some point in time you became aware
14  that the department was investigating Officer Socha?
15      A.  Yes.
16      Q.  When did you learn that?
17      A.  I couldn't give you an exact date.
18      Q.  Can you give us an approximate date?
19      A.  Maybe late May, early June.
20      Q.  Of 2018?
21      A.  Correct.
22      A.  Incidentally, I forgot to mention at the
23  beginning of your deposition:  Have you reviewed any
24  documents in order to prepare for today's

Page 17

1  deposition?
2      A.  No.  I've been retired for three years.
3  So I don't have the ability to see any documents.
4      Q.  Have you spoken with anyone in order to
5  prepare for today's deposition?
6      A.  No.  The only thing I had reached out to
7  was Grizzle to find out a date when he was on
8  vacation.
9      Q.  And when did you reach out to him to find
10  out the date of his vacation?
11      A.  I had gotten notice -- I could have -- It
12  was earlier this year when I had gotten notice that
13  the City attorney was looking to do an interview.
14      Q.  Did you give an interview to the City
15  attorney in this case?
16      A.  I did not.
17      Q.  Whenever it was that you reached out to
18  Grizzle, did you make contact with him in order to
19  ask him about the dates of his vacation?
20      A.  I did.
21      Q.  And specifically what you were asking him
22  about was the dates of a vacation he took in that
23  May, June 2018 time frame?
24      A.  Yeah, June.  It was June of '18.

Page 18

1      Q.  And what did he tell you when you spoke to
2  him?
3      A.  I believe he said he was gone that week of
4  June -- like the first week of June into the second
5  week of June.
6      Q.  And why did you call him for that
7  information?
8      A.  Because that was when -- the time I had to
9  have Sergeant Gavin extract the information off
10  Cellebrite because Sergeant Grizzle was on vacation,
11  and I could not reach him.
12      Q.  And that was the one and only instance you
13  referred to earlier that you had occasion to ask
14  someone to do that, correct?
15      A.  Correct.
16      Q.  How is it that you determined that Gavin
17  was the person you should ask to do that in
18  Grizzle's absence?
19      A.  Actually, it was Sergeant Gavin that came
20  to me on that date to inform me that he had heard a
21  rumor that people in investigations were viewing
22  information in reference to that case.
23      Q.  When you say "that date," to what date are
24  you referring to?

Page 19

1      A.  The closest I can figure is that it was a
2  Friday, either the first or second Friday in June
3  when Sergeant Grizzle was gone because the chief was
4  gone; the deputy chief was gone, and I believe it
5  was a Friday.  So I think it may have been around
6  June 8th.
7      Q.  When Gavin came to you and told you about
8  these rumors, what specifically did he say to you?
9      A.  Well, honestly, I can't say specifics; I
10  can just generalize because it was three years ago.
11  But it was in reference to he had heard a rumor
12  that -- I don't know if it was detectives or people
13  in investigations may have been viewing some photos,
14  explicit photos from basically the Socha
15  investigation.
16      Q.  Did Gavin tell you from whom he had heard
17  this rumor or these rumors?
18      A.  If he did, I don't remember.
19      Q.  And when you referred to explicit photos,
20  did Gavin provide you with any more detail about
21  what those explicit photos depicted?
22      A.  No.  I don't remember his exact verbiage
23  of what he said.  So I couldn't recall exactly what
24  he said.

7 (Pages 16 to 19)

Cassandra  Socha v. City of Joliet; et al.
Deposition of Tab Jensen - Taken 6/10/2021

Page 20

1    Q.  Did he tell you who was depicted in the
2  explicit photos?
3    A.  I believe it was of Officer Socha.
4    Q.  And when you recount what Grizzle shared
5  with you about these rumors, when you say
6  "explicit," you mean sexually explicit?
7    MR. ATKUS:  I'm going to object to the
8  mischaracterization.  You said what Grizzle told
9  you.  The testimony has been of Gavin.
10   MR. ADAMS:  That's fair.  I misspoke.  So let
11 me rephrase the question.
12 BY MR. ADAMS:
13   Q.  When you recounted for us what Gavin told
14 you about rumors regarding others in investigations
15 viewing explicit photos, by that you understood him
16 to mean sexually explicit photos?
17   A.  Yes.  That's what I assumed them to be,
18 either nude photos or something sexual in nature.
19   Q.  Did Gavin say anything more to you about
20 that specifically, whether the explicit photos were
21 of a sexually explicit nature or nude or otherwise?
22   A.  I don't remember his exact verbiage.
23   Q.  Okay.  Did Gavin say anything to you when
24 he came to you with this report about explicit

Page 21

1  video?
2    A.  I don't remember saying video or images,
3  just -- You know, I don't know if it was supposed to
4  be pictures, videos.  I don't know.
5    Q.  Okay.  And did Gavin tell you where the
6  sexually explicit or nude photos or other images had
7  come from?
8    A.  I don't remember if it was that -- if he
9  said that they were viewing it from the Cellebrite
10 or if that's what we just figured because we -- I
11 knew that that's how, you know, where they were
12 extracting information from was using that program
13 or software or tool.
14   Q.  Fair.  Did Gavin make clear to you from
15 what device or devices these explicit images had
16 been extracted?
17   A.  No.  I just -- I mean, I knew that the
18 phone had been taken.  So that's -- you know, I
19 think I just assumed it was probably from the phone.
20   Q.  You knew that before Gavin came to you?
21   A.  I knew that the phone had been seized.
22   Q.  Right.  How did you learn that?
23   A.  I learned it after it happened.  But I
24 don't know if I heard it in a staff meeting that we

Page 22

1  have with the command staff.  So I'm not exactly
2  sure if it was from that meeting.
3    Q.  How long before Gavin came to you with
4  this report of rumors was it that you learned that
5  Socha's phone had been seized?
6    A.  I think I had just learned it had been
7  seized shortly before that, I mean, not months or
8  anything like that; but I couldn't give you a
9  specific time, but probably, you know, maybe in May.
10   Q.  Can you be any more specific about when in
11 May?
12   A.  No.
13   Q.  When did you learn that the department was
14 investigating Socha?
15   A.  It probably was around that time in May
16 because, like I said, I didn't know about that
17 until -- I think I found out about the same time
18 that the phone was taken, they had gotten a search
19 warrant for the phone.  I didn't learn that until
20 after.
21   Q.  I'm sorry.  It's a pitfall of this Zoom
22 thing.  I don't mean to cut off.  Are you through?
23   A.  Yes, I'm done.
24   Q.  How did you learn that Socha was being

Page 23

1  investigated and/or that her phone had been seized
2  as part of that investigation?
3    A.  I can't say for sure, but it may have
4  been, again, during a staff meeting that we have
5  where we try to talk about what's going on with the
6  department.
7    Q.  Okay.  When you learned that Socha was
8  being investigated, what did you learn about the
9  reason for the investigation?
10   A.  I had -- I believe I had been told, again,
11 not word for word, but that it was going to possibly
12 be for intimidation of a witness.  So it was -- and
13 I don't remember her friend's name, but supposedly
14 intimidating her friend for cooperating in the
15 investigation.
16   Q.  Who conveyed that information to you?
17   A.  Again, I'm not sure who it was, you know,
18 within the staff meeting, the command staff meeting.
19   Q.  So you knew sometime before Gavin came to
20 you and reported these rumors that Socha was under
21 investigation and that her phone had been seized,
22 correct?
23   A.  Correct.  I think -- I want to say I
24 probably learned that almost about the same time,

8  (Pages 20 to 23)

Cassandra Socha v. City of Joliet; et al.
Deposition of Tab Jensen - Taken 6/10/2021

Page 24

1  during when the phone was seized, that she was being
2  under investigation.
3      Q.  And based on that prior knowledge, when
4  Gavin reported to you that there were rumors
5  circulating that explicit images were being viewed
6  by others in investigations, you understood those
7  images to have come from Socha's phone?
8      A.  Correct.
9      Q.  What, if any, questions did you ask of
10  Gavin when he came to you with this information?
11     A.  I don't know what questions I asked him.
12  Like I said, it was so long ago.
13     Q.  At the time did you outrank Gavin?
14     A.  I did.
15     Q.  Did Gavin tell you why he had come to you
16  with this information as opposed to anyone else in
17  the department?
18     A.  He is in the administration department,
19  and the chief at that time was not at work.  He
20  might have been on vacation.  So his office is down
21  the office from mine.  So he technically would
22  report to me or the chief.
23     Q.  Before I forget to ask, since you raised
24  these chain of command issues, did Socha ever serve

Page 25

1  in your chain of command?
2      A.  As a deputy chief?
3      Q.  As anything, in your career.
4      A.  I can't -- Can I ask when she was hired
5  because that might help me refresh.  Because I'm
6  trying to think if I was ever her watch commander,
7  but I don't think I was.
8      Q.  One of the great things about this format
9  is that we get to ask all the questions.
10     A.  Okay.
11     Q.  The reason that's great is that I don't
12  have to embarrass myself by not knowing something
13  that I should be able to tell you.  In any event, do
14  you recall ever writing a performance evaluation, a
15  fitness report, or a job rating about Socha?
16     A.  No.  When she was on light duty, she
17  would, you know, report to me for scheduling and
18  assignments; but as far as her performance on the
19  street and all that, I never did a performance
20  review on her.
21     Q.  Do you believe that you have adequate
22  information upon which to express an opinion about
23  what kind of police officer she is?
24     A.  I do not, since she basically did not work

Page 26

1  for me directly.  I don't think she ever did work
2  for me directly.
3      Q.  Fair to say then if we were going to trial
4  anytime soon, you would not be rendering opinions
5  about her qualities as a police officer.  Fair?
6      A.  That's fair.
7      Q.  Okay.  When Gavin came to you with this
8  information, did he tell you whether he had
9  communicated it to anyone else in the department?
10     A.  He did not tell me, I don't think, no.
11     Q.  Did he tell you whether he was aware of
12  specific instances of specific, particular officers
13  viewing the explicit images that had been extracted
14  from Socha's phone?
15     A.  No, he did not tell me specifically who.
16     Q.  Did you ask?
17     A.  No, because during that time, like I said,
18  it was a rumor.  So he was not -- he did not come to
19  me saying that he had heard "so and so" was looking
20  at it; he just said individuals or people in
21  investigations.
22     Q.  Did you ask Gavin from whom he had heard
23  such rumors?
24     A.  I don't know.

Page 27

1      Q.  Did you personally take any steps to get
2  to the bottom of those rumors?
3      A.  No.
4      Q.  Did you detail any officer with that task?
5      A.  No.
6      Q.  Why not?
7      A.  I was -- at that point it was a rumor.  So
8  we were -- again, it's a rumor at that point.  So
9  until we discuss with the chief and figure out if
10  this rumor was actually true or not, we didn't start
11  an investigation.  Plus, I had no complaint.  It was
12  a rumor.  It was not a complaint.  So normally -- I
13  could investigate rumors all day long, but I don't.
14  Usually we investigate complaints.
15     Q.  Did you ever subsequently yourself take
16  any steps to determine whether these rumors that
17  were reported to you by Gavin were actually true?
18     A.  No.
19     Q.  Did you ever task anyone with doing so?
20     A.  No.
21     Q.  When Gavin came to you and reported these
22  rumors, what he reported was that officers, plural,
23  in investigations were rumored to have been viewing
24  these explicit images, correct?

9 (Pages 24 to 27)

Cassandra Socha v. City of Joliet; et al.
Deposition of Tab Jensen - Taken 6/10/2021

Page 28

1    A.  Yes, I believe so.
2    Q.  Did he say how many were rumored to have
3  been viewing the images?
4    A.  No.
5    Q.  Did he indicate to you that officers in
6  the investigations division who were not involved in
7  any official capacity in the investigation of Socha
8  had been viewing these images?
9    A.  Can you repeat that?
10   Q.  Sure.  When Gavin came to you and reported
11  that officers, plural, in the investigations
12  division had been viewing explicit images extracted
13  from Socha's phone, did Gavin make clear that these
14  included officers who were not involved in any
15  official capacity in the department's investigation
16  of Socha?
17   A.  No.
18   Q.  Did you form any conclusions about that?
19   A.  No.  The only thing that I knew is that it
20  was -- Sergeant Grizzle was the one conducting the
21  investigation to my understanding, and he was not at
22  the department at that time.
23   Q.  How did you know that Grizzle was the one
24  conducting the investigation?

Page 29

1    A.  He was the one that was -- Well, he was
2  the one that was tasked with, I believe, the
3  investigation.  I don't know who told -- who had him
4  do it, but -- I don't know who told me it was.
5  Like, again, it could have been a command staff
6  meeting, but I don't know specifically who told me.
7    Q.  If officers not involved in an official
8  capacity in the department's investigation viewed
9  the explicit images extracted from her phone, that
10  would be improper; wouldn't it?
11   A.  It would.
12   Q.  It would have been a violation of the
13  department's policy regarding evidence handling;
14  wouldn't it?
15   A.  It would.
16   Q.  Bear with me.  Did you ever discuss these
17  rumors with Grizzle?
18   A.  I did.
19   Q.  When?
20   A.  When he came back from vacation, but I
21  don't know the exact date.
22   Q.  Was it a face-to-face discussion?
23   A.  It was.
24   Q.  Initiated by you or by Grizzle?

Page 30

1    A.  I believe by me.
2    Q.  Anyone else present?
3    A.  I know it was in my office, but I can't
4  recall if there was anybody else there.  I want to
5  say no.
6    Q.  What did you say to Grizzle?
7    A.  I informed him when he came back from
8  investigation [SIC] of what Sergeant Gavin had told
9  me, and I explained to him the steps that I took and
10  why I took them to extract the information from
11  there, from the Cellebrite machine; and he assured
12  me that it was locked and that nobody could extract
13  the information or view the information.
14   Q.  When you called Grizzle in for this
15  meeting, did you tell him that Socha had heard and
16  complained that personnel in investigations had been
17  sharing personal pictures or videos that were on her
18  cell phone?
19   A.  No.  I didn't say Socha because I didn't
20  know that Socha -- where the rumors came from.
21   Q.  What did Grizzle say to you when you told
22  him about the rumors?
23   A.  Again, he told me that the Cellebrite was
24  locked and that nobody else should have been able to

Page 31

1  get to the information, so should not have been able
2  to view it.
3    Q.  Prior to that conversation with Grizzle,
4  had you determined whether, in fact, that was the
5  case, that the Cellebrite was locked such that no
6  one could view these images?
7    A.  I was not able to determine it at that
8  time.
9    Q.  Prior to the conversation with Grizzle,
10  what had you done to determine whether that was the
11  case, if anything?
12   A.  I couldn't.  I tried to contact Sergeant
13  Botzum, who is kind of our tech, you know, sergeant,
14  I believe.  I can't remember if he was actually in
15  investigations at that time or if he was with the
16  FBI, but he has knowledge on a lot of technology
17  because I was looking for him at first to see about
18  removing that information from the Cellebrite.
19   Q.  In that meeting with Grizzle, what, if
20  anything, did he tell you about whether copies of
21  the data that had been extracted from Socha's phone
22  had been made?
23   A.  No, he said it was locked and that people
24  shouldn't have been able to view it.  So he didn't

10  (Pages 28 to 31)

Cassandra  Socha v. City of Joliet; et al.
Deposition of Tab Jensen - Taken 6/10/2021

Page 32

1  tell me anything about copies being made.
2      Q.  Did he say anything about whether he
3  himself had made copies?
4      A.  He did not.
5      Q.  Did Sergeant Grizzle say anything -- let
6  me strike that and ask a predicate question.
7          Was this the first conversation you had
8  with Grizzle after Gavin reported the rumors to you?
9      A.  Yes.
10     Q.  Is this the first time that you had ever
11 discussed with Grizzle the extraction of data from
12 Socha's phone?
13     A.  Yes.
14     Q.  In the same conversation with Grizzle,
15 what did he tell you about what, if anything, he had
16 done to secure the data extracted from Socha's phone
17 before he went on this vacation?
18     A.  Again, what he had told me was that the
19 information was locked in the Cellebrite.
20     Q.  Did he tell you whether he had done
21 anything else to secure that information?
22     A.  No.
23     Q.  After he told you that, what, if anything,
24 did you say to him?

Page 33

1      A.  I basically explained to him why I removed
2  the information from the Cellebrite, because of the
3  rumors, that if it was actually true, I did not want
4  anybody having access to it; and that's basically
5  it.  I mean, not verbatim, but explained to him why
6  I had to do it.  Because of the rumors, if they were
7  true, I just did not want people viewing them.
8      MR. ATKUS:  Can I interrupt for a second?  I'm
9  sorry.  I had a glitch with my Zoom, and I missed
10 the first part of his answer.
11     MR. ADAMS:  Could you read it back, Krista?
12     MR. ATKUS:  Yeah.  I'm sorry.
13         (Record read.)
14     MR. ATKUS:  Thank you so much.  I apologize.
15 BY MR. ADAMS:
16     Q.  Did you have any communications with
17 Grizzle while he was on his vacation?
18     A.  No.
19     Q.  And you did not have any communication
20 with Grizzle about the data that was extracted from
21 Socha's phone before he left on his vacation,
22 correct?
23     A.  No.
24     Q.  That is correct?

Page 34

1      A.  Correct.
2      Q.  I'm going to get up and turn on a light.
3  Excuse me for just a second.
4          Do you recall how long it was after Gavin
5  came to you with his report about the rumors that
6  Grizzle returned from his vacation?
7      A.  I think it was the week after.  So it was
8  that Friday, and he returned that following week.
9  So I don't know if it was that Monday.
10     Q.  Let's go back to your conversation with
11 Gavin for a moment.
12     A.  Uh-huh.
13     Q.  After Gavin reported the rumors to you,
14 what, if anything, did you do?
15     A.  Deputy Chief Roechner, who oversees
16 investigations, was off that day.  I knew Grizzle
17 was on vacation.  I tried to contact Deputy Chief
18 Roechner since it was his division and overseeing,
19 you know, his investigation.  I believe I texted him
20 to let him know to give me a call.  And then while
21 we were trying to extract the information from the
22 Cellebrite, Deputy Chief Roechner did call me.
23     Q.  Who was the "we"?  When you say "we were
24 trying to extract the information from the

Page 35

1  Cellebrite," who was that?
2      A.  Well, I instructed Sergeant Gavin to have
3  Officer German extract it.  We found out -- So the
4  sergeant that I wanted to have do it, he was a
5  supervisor who knew how to do it.  If he was not
6  around, Sergeant Gavin found out that Investigator
7  German has the ability to do it, and he was working.
8  So I informed Sergeant Gavin to supervise
9  Officer German, extract the information from the
10 Cellebrite, as long as he didn't -- as long as he
11 couldn't view what was being extracted.
12     Q.  "He" being Gavin or German?
13     A.  Both.  As long as -- you know, I told
14 Gavin as long as it couldn't be viewed while it's
15 being extracted, to have Investigator Gavin -- or
16 Investigator German remove the information and to
17 have Sergeant Gavin supervise it.
18     Q.  Were you present while that was being
19 done?
20     A.  I was not.
21     Q.  When was that done?
22     A.  That day that Sergeant Gavin informed me.
23 And also to make it clear, Sergeant Gavin came from
24 investigations.  So he was, you know, familiar too

11  (Pages 32 to 35)

Cassandra Socha v. City of Joliet; et al.
Deposition of Tab Jensen - Taken 6/10/2021

Page 36

1  with the Cellebrite, maybe not being able to access
2  it, but I believe familiar with the -- you know,
3  that they have it.
4       Q.  After Gavin -- first let me ask a
5  different question.  Between the time that Gavin
6  first reported the rumor to you, how much time
7  elapsed before you actually did reach Deputy Chief
8  Roechner?
9       A.  He probably called back within a few --
10  you know, within a few hours, if not less.
11      Q.  By that time had you ordered German under
12  Gavin's supervision to extract from the Cellebrite
13  the data that had been extracted from Socha's phone?
14      A.  I did.  Since Deputy Chief Roechner was
15  not working at that time, I felt that something
16  should be done.  Like I said, if the rumors were
17  true, I just didn't want to be the person that
18  didn't do anything about it.
19      Q.  When you finally did speak with Roechner,
20  I assume he was returning your call?
21      A.  He was.
22      Q.  So this was a phone conversation?
23      A.  Yes.  I believe he called me.
24      Q.  And you explained to him the report that

Page 37

1  Gavin had made to you about the rumors of the
2  viewing of data extracted from Socha's phone?
3       A.  Yes, I did.
4       Q.  What did Roechner say to you?
5       A.  Well, I had informed him what I had heard
6  and what we were doing.  And I told him that we were
7  taking the information and -- I don't know if it's
8  put on a disk or a thumb drive, you know, how it's
9  removed.  But we, myself and Sergeant Gavin,
10  determined that we were going to put it into
11  evidence so we would have, like, a chain of custody
12  for it.
13          Deputy Chief Roechner said he was on his
14  way and that he would take possession of it and
15  make sure that it was secure since it was the
16  investigation department's investigation and their
17  evidence or information.
18      Q.  In that telephone call with Roechner, did
19  you tell him that Officer Socha had reported to you
20  that she had heard that investigations personnel had
21  been sharing personal pictures or videos that had
22  been extracted from her cell phone?
23      A.  No, Officer Socha never approached me and
24  told me that.

Page 38

1       Q.  Did you report to Roechner that
2  Officer Socha had complained to anyone that
3  investigations personnel had been sharing some
4  personal pictures or videos that had been extracted
5  from her cell phone?
6       A.  No.  I believe I just told him what I had
7  said, that Gavin told me that there were rumors that
8  investigations may have been looking at some photos
9  or information.
10      Q.  Did Roechner in that same conversation
11  tell you that it would not be possible for others in
12  investigations to have viewed those images from
13  Socha's phone because the Cellebrite extraction had
14  already been downloaded to a flash drive that was
15  secured in his, Roechner's, own office?
16      A.  No, I don't believe he told me that.
17      Q.  In that conversation, did you confirm for
18  Roechner that, in fact, the data extracted from
19  Socha's phone onto the Cellebrite was still on the
20  Cellebrite and accessible there?
21      A.  No, I did not.  I actually don't know what
22  information was on it.  So I don't know how the
23  system works or what information was in it or if it
24  was -- if there was actually information on it, so

Page 39

1  no.
2       Q.  In that phone conference, did Roechner
3  tell you whether he himself had a flash drive with
4  the data extracted from Socha's phone on it?
5       A.  No, I don't believe so.
6       MR. ATKUS:  I'm sorry.  I missed the question.
7  I heard the, "No, I don't think so."  But I didn't
8  get the question.
9          (Record read.)
10      MR. ATKUS:  Thank you.
11  BY MR. ADAMS:
12      Q.  In that phone call -- strike that.
13          By the time you had this phone
14  conversation with Roechner, had you already ordered
15  the data extracted from the Cellebrite?
16      A.  Prior to the phone conversation, yes.
17      Q.  Prior to the phone conversation, had that
18  already occurred?  By "that," I mean had the
19  extraction of the data that was on the Cellebrite
20  that had originated on Socha's phone that you had
21  ordered been completed?
22      A.  I believe it was in the process.
23      Q.  Do you know how far along in the process?
24      A.  I don't.

12  (Pages 36 to 39)

Cassandra Socha v. City of Joliet; et al.
Deposition of Tab Jensen - Taken 6/10/2021

Page 40

1    Q. Now let's go back to the conversation, the
2  face-to-face conversation -- well, before we go on,
3  let me make sure.
4       Did anything else relative to these images
5  that had originated on Socha's phone -- was anything
6  else discussed about that between you and Roechner
7  in this telephone call?
8    A. I don't believe so.
9    Q. All right. Did Roechner take any issue
10 with the way that you had handled the matter?
11   A. If he did, he didn't say so. The only
12 thing he didn't want me to do was put it in
13 evidence, that he would take chain of custody or
14 possession of the information.
15   Q. Did he explain to you why he was doing
16 that?
17   A. No, I think it was just another option
18 instead of putting it in evidence. Like I said, the
19 reason it was going to be put into evidence was
20 because I didn't want to keep possession of it and
21 it needed to stay with investigations since it was
22 their investigation.
23   Q. When you say quote, put into evidence,
24 closed quote, you mean logged into and secured in

Page 41

1  conformity with the department's General Order 16.1
2  regarding evidence and property management, correct?
3    A. Yes.
4    Q. And that general order establishes a
5  protocol for both securing and tracking the handling
6  of evidence, correct?
7    A. It does.
8    Q. And the tracking system is referred to by
9  the acronym BEAST?
10   A. Yes, they do have the BEAST system or they
11 did.
12   Q. When Roechner told you not to put the data
13 extracted from the Cellebrite into evidence, did you
14 question him?
15   A. No.
16   Q. Did you take and voice any issue with that
17 direction?
18   A. No, because it's their investigation.
19 It's their information. It was their evidence.
20   Q. In terms of rank at the time, you and
21 Roechner were peers; you were both deputy chiefs?
22   A. Correct.
23   Q. Is there anything about that telephone
24 conversation with Roechner as it bears on the data

Page 42

1  that came from Socha's phone that you can recall
2  that we have not already discussed?
3    A. Nothing that I can recall.
4    Q. Did you ever discuss the subject with
5  Roechner again?
6    A. It was brought up at the command staff
7  meeting.
8    Q. When?
9    A. I want to say we usually have them Monday
10 mornings. So it should have been that following
11 Monday after that weekend.
12   Q. Brought up by whom?
13   A. By probably myself since the chief is in
14 there; I know Deputy Chief Roechner was in there,
15 and I don't know if the other deputy chief was in
16 there present or not.
17   Q. And what, if anything -- When you say, "It
18 was brought up," who brought it up?
19   A. I believe I did just so we could inform
20 the chief of what had transpired.
21   Q. And what did you say in that meeting?
22   A. Basically that Sergeant Gavin came to me
23 and informed me of the rumor, again, not verbatim,
24 but that possibly people in investigations may have

Page 43

1  been viewing data from this investigation. I
2  explained to him what I did, why I did it probably,
3  and basically everything that -- what we did and
4  what transpired.
5    Q. What, if anything, did Roechner say?
6    A. I don't know exactly what he said.
7    Q. Did Roechner say in that meeting that he
8  had copies of the data extracted from Socha's phone
9  in his own office?
10   A. Just the copy -- I believe, just the copy
11 I gave him. I don't recall him saying anything
12 about any other copies.
13   Q. And when you say the copy you gave him,
14 that would have been the copy that German had
15 extracted under Gavin's supervision at your
16 direction, correct?
17   A. Correct. And, again, not that -- yes, and
18 that when Roechner came in that Friday to get it, I
19 don't recall actually who gave it to him, if he went
20 into investigations while it was still downloading
21 and got it from Officer German or if he got it from
22 Sergeant Gavin. But, yes, that's the only copy that
23 I was aware of.
24   Q. And that copy was on a flash drive or a

                              13 (Pages 40 to 43)

Cassandra  Socha v. City of Joliet; et al.
Deposition of Tab Jensen - Taken 6/10/2021

Page 44

1   thumb drive?
2       A.   I don't know what kind of drive it was on.
3       Q.   Did Roechner say anything in that command
4   meeting with the chief -- And the chief was Benton,
5   right?
6       A.   It was.
7       Q.   Did Roechner say anything in that meeting
8   about having loaded a copy of the data extracted
9   from Socha's phone onto his own desktop computer?
10      A.   No.  Not that I'm aware of, no.
11      Q.   Did Roechner say in that meeting that he
12  himself had viewed the data extracted from Socha's
13  phone, and more specifically, the explicit images
14  extracted from it?
15      A.   No, he did not.
16      Q.   Is that the only other instance in which
17  you have heard Roechner discuss the handling of the
18  data that was extracted from Socha's phone?
19      A.   Yes, I believe so.
20      Q.   Okay.  By the time of that command
21  meeting, had Grizzle returned from his vacation?
22      A.   I believe he returned on that Monday.
23      Q.   Did you have the face-to-face conversation
24  with Grizzle that we began to talk about earlier

Page 45

1   before or after the command meeting?
2       A.   I believe I had it before the command
3   meeting because I believe when I went into the
4   command meeting, I had the information that Grizzle
5   told me that the information was locked.
6       Q.   Locked where?
7       A.   On the Cellebrite, that it was not
8   accessible.
9       Q.   When you had the meeting with Grizzle, how
10  long did it last?
11      A.   I couldn't tell you exactly how long it
12  lasted.  You know, I mean, less than an hour,
13  probably less than a half hour.
14      Q.   How would you characterize Grizzle's tone?
15      A.   His tone was fine.  He was concerned, I
16  know, about this affecting the investigation.  But,
17  I mean, I'm his superior, so his tone was fine with
18  me.
19      Q.   What about the effects on the
20  investigation did he express concern about?
21      A.   Well, because he thought it was -- you
22  know, assumed it was locked or knew it was locked,
23  so removing any information from the Cellebrite --
24  didn't know if it had any kind of effect on the

Page 46

1   investigation, that no one else, you know, should
2   have access to it; as well as I was concerned on the
3   same point was that it is a possible criminal
4   investigation, and nobody should be viewing it
5   because it could affect the investigation.
6       Q.   Have you ever in that meeting or
7   otherwise, ever in the annals of time, discussed
8   with Grizzle Socha's role in the criminal trial of
9   Crowley?
10      A.   No, I don't believe so.  I think during
11  that conversation it was mostly about the
12  information from the Cellebrite.
13      Q.   Have you ever heard Grizzle express any
14  opinions about the result of the criminal trial of
15  Officer Crowley?
16      A.   That I don't recall.
17      Q.   In the meeting with Grizzle, did he take
18  any specific issue with your decision to have German
19  download the data from Socha's phone off the
20  Cellebrite?
21      A.   I don't want to say "issue."  I mean, I
22  think it was concern.  And, obviously, once I
23  explained the reason for it, I think he understood
24  my side and my reasoning.

Page 47

1       Q.   Did Grizzle tell you that it was his
2   belief before he left for vacation that the data
3   extracted from Socha's phone onto the Cellebrite was
4   "locked" and thus secured on the Cellebrite
5   computer?
6       A.   I don't believe I had a conversation with
7   him prior to leaving about him locking anything.
8       Q.   It's my fault.  I asked a crummy question.
9   When you spoke with him after his vacation, did he
10  express to you his understanding that the data
11  extracted from Socha's phone was locked and secured
12  on the Cellebrite itself?
13      A.   Yes.
14      Q.   And did he express to you his
15  understanding that it was therefore not necessary to
16  further extract that data from the Cellebrite in
17  order to secure that data in some other way or
18  place?
19      A.   Yes, that was his opinion, that it was
20  locked, so it shouldn't have needed to be extracted.
21      Q.   Did Grizzle tell you what, if anything, he
22  had done to ensure that the data extracted from
23  Socha's phone was locked and secured onto the
24  Cellebrite such that no one who was not involved in

                              14  (Pages 44 to 47)

Cassandra Socha v. City of Joliet; et al.
Deposition of Tab Jensen - Taken 6/10/2021

Page 48

1    the investigation of Socha could access it?
2        A.  He just told me that it was locked and
3    they shouldn't have been able to -- that it was
4    locked and no one should be able to access it that
5    wasn't involved.
6        Q.  Did he tell you how it was he came to that
7    understanding?
8        A.  No.  Like I said, I don't know the system
9    at all.  So I'm not sure how he locks it or -- so,
10   no.
11       Q.  Did he tell you that he himself had locked
12   it in that way?
13       A.  That's how I understood it, is that he
14   secured it or locked it.
15       Q.  Did he say anything else about what had to
16   be done after he had locked it on the Cellebrite in
17   order to access it?
18       A.  I don't recall him telling me anything.
19       Q.  When Gavin reported the rumors to you, did
20   he provide any more specific detail about the
21   content of the rumors?
22       A.  No, not that I recall.
23       Q.  After Gavin came to you with his report of
24   these rumors, did you ever make any written report

Page 49

1    of Gavin's report to you or of any of the steps that
2    you took or initiated in response to Gavin's report
3    to you?
4        A.  And I thought I had.  I had retired.  So
5    my documents are not with me.  Because a lot of
6    times when I would have interviews or meet with
7    somebody that's relevant, I would document it on a
8    To/From.  That I cannot find, and I don't have
9    access, obviously, to the computer I was using.  So
10   I can't show any proof of it.
11       Q.  Separate and apart from your present
12   ability to show proof of it, do you have a specific
13   recollection of having made such a written record or
14   report?
15       A.  Like I said, I believe -- I thought I had
16   done like an interoffice memorandum to myself just
17   for documentation like I've done in the past, but
18   that I don't have.  So I can't prove that.
19       Q.  And an interoffice memo to yourself, at
20   the time of your retirement from the Joliet Police
21   Department, where and how would that memo have been
22   stored?
23       A.  I probably would have typed it up on my
24   computer, my work computer.  So it would have been

Page 50

1    either stored there -- sometimes I do make a printed
2    copy and have a file in my desk, so -- but it would
3    have been typed up on my computer, my work computer.
4        Q.  And stored how in the computer?  If we
5    wanted to try to find that, we would look under what
6    in the computer?
7        A.  Well, we have a personal drive.  Each
8    person, I believe, from the department that has a
9    computer has a personal drive that they -- they call
10   it the Z drive or something like that.
11   Unfortunately, like I said, I don't have any access
12   to that.
13       Q.  When you left the department, your
14   computer stayed there?
15       A.  It did.
16       Q.  Did you take any steps before you retired
17   to purge the contents of your personal drive from
18   that computer?
19       A.  I did, just so -- there were certain
20   things, you know, obviously, that were not needed
21   that -- for the next person that took over that
22   computer; and I remember taking stuff off to give to
23   different supervisors that were going to be taking
24   over my duties.

Page 51

1        Q.  When did you learn that Socha had filed a
2    lawsuit?
3        A.  Well, I don't know.  I couldn't tell you.
4        Q.  Did that occur before or after you
5    retired?
6        A.  I retired basically right when this
7    transpired.  So I was gone -- my retirement date I
8    think was officially July 20th, but I was gone prior
9    to that.
10       Q.  How much earlier?
11       A.  I had taken at least a week prior to that.
12   And then I had taken I know like the 4th of July
13   days off, so -- and I had taken some days late in
14   June on and off.  But I think I was officially gone
15   like on the 12th of July with, you know, sporadic
16   days that I wasn't there.
17       Q.  Did you learn prior to your retirement
18   that the department had taken steps to initiate a
19   forensic examination or investigation of the
20   handling of these -- of the data that was extracted
21   from Socha's phone?
22       A.  I did learn of it.  I just can't remember
23   the dates.  I know during the command staff meeting
24   with the chief, that weekend after I had informed

15  (Pages 48 to 51)

Cassandra Socha v. City of Joliet; et al.
Deposition of Tab Jensen - Taken 6/10/2021

Page 52

1  what happened and discussed about doing some type of
2  investigation. At that point I know -- I think that
3  D.C. Roechner was going to look into some things,
4  and I know at some point the chief did order some
5  forensic investigation into computers and other
6  devices, but I don't know exactly when it was.
7      Q. And all that happened -- you learned about
8  all that before you retired and left?
9      A. I can't remember if it was that week that
10 I was completely -- because like I said, my official
11 date wasn't until the 20th, if I had learned about
12 it while I was gone, you know, unofficially or if it
13 was afterwards. I can't remember.
14     Q. From that first command staff meeting that
15 you described for us earlier, you knew that this
16 issue of the handling of the data extracted from
17 Socha's phone was on the radar of the chief and
18 Deputy Chief Roechner?
19     A. It was, yes, because, I mean, the chief
20 obviously had to be informed, and I notified him,
21 you know, obviously right when he came back.
22     Q. And this to yourself memo that you believe
23 you prepared was something that you prepared in the
24 line of duty in your official capacity to

Page 53

1  memorialize the events in which you had been
2  involved relating to the data on Socha's phone,
3  correct?
4      A. Yes. Obviously, you know to -- as a
5  reminder of what I did, basically.
6      Q. Was that memo stored in the computer
7  system anywhere other than on your personal drive?
8      A. I don't believe so.
9      Q. Would this memo have referenced any file
10 number, investigation number, any other reference
11 data?
12     A. No, it probably would have just been a
13 synopsis of that day.
14     Q. "That day" being when Gavin came to you?
15     A. Correct.
16     Q. Did the memo copy anyone, courtesy copy,
17 the chief? Gavin? German? anyone in the department?
18     A. No.
19     Q. Why not?
20     A. Because it's just a refresher for myself.
21 Like I said, just documentation of what I had done.
22     Q. If you had printed it out in the normal
23 course of your retaining these memos to yourself,
24 where and how would you have filed it?

Page 54

1      A. If I would have filed it, it would have
2  just been in my desk drawer where I have folder
3  files. I've had other ones there before with some
4  other, you know, conversations I have had with
5  people.
6      Q. When you retired and left the department,
7  what did you do with the memos to yourself that were
8  kept in your desk drawers?
9      A. Anything that was pertinent for -- at that
10 time there was no deputy chief taking over for me,
11 but anything that was pertinent I would have left
12 there. Anything that wasn't I either shredded or
13 took with me. And like I said, I can't find it. I
14 did look in my personal, but I don't have it.
15     Q. You mean in connection with this case,
16 this deposition, you looked for it among your own
17 personal papers?
18     A. I did.
19     Q. Do you know whether the data from -- that
20 was extracted from Socha's phone was ever entered
21 into evidence in accordance with the department's
22 general order related to evidence handling?
23     A. I don't know. Like I said, the
24 information -- I don't even know if the information

Page 55

1  was extracted. I don't know what's on it. I don't
2  know if the information was ever even on there or if
3  it was put into evidence by Grizzle or D.C.
4  Roechner. So I don't know.
5      Q. When all this happened -- and beginning
6  with Gavin coming to you with the rumors, at that
7  time were you what we used to call in the Marine
8  Corps a short-timer in that your departure was
9  planned and had been announced and people were aware
10 of it?
11     A. People were aware of it, yes.
12     Q. Did you initiate an internal investigation
13 relating to the specific issue of the department's
14 handling of the data that was extracted from Socha's
15 phone and/or whether that data was viewed by
16 officers not involved in investigating Socha?
17     A. No, because, like I said, we had a staff
18 meeting shortly after that and discussed the rumors
19 that were going around; and at that time there was
20 not a -- there was no complaint and that they were
21 rumors. So they had to -- at that time I think
22 D.C. Roechner was looking into it, and then I was
23 leaving. So if one was opened shortly after I left,
24 I don't know.

16  (Pages 52 to 55)

Cassandra  Socha v. City of Joliet; et al.
Deposition of Tab Jensen - Taken 6/10/2021

Page 56

1    Q.  Up until the time you retired and actually
2  left the premises for the last time, did anyone ever
3  tell you the specific identity of particular
4  officers or officer, singular, who had, in fact,
5  viewed the explicit images that were extracted from
6  Socha's phone?
7    A.  No.
8    Q.  Before you retired and left, did you
9  initiate any follow-up inquiry about that
10  specifically?  That is, identifying whether and who
11  specifically had viewed such images?
12    A.  No.  At that time all of my duties were
13  basically finish up anything I had currently, and
14  all of my other duties had started being reassigned.
15    Q.  What was Officer -- and I'm going to ask
16  because I don't know -- the rank of Officer Batis at
17  the time of these events?
18    A.  Lieutenant Batis.
19    Q.  Was he a lieutenant then?
20    A.  Yes.
21    Q.  And what was his duty assignment then?
22    A.  He was a lieutenant in investigations at
23  that time.
24    Q.  Did you ever discuss any of these events

Page 57

1  with Lieutenant Batis?
2    A.  I'm not for sure, but I don't think so.
3    Q.  Did Grizzle tell you whether he himself
4  had viewed explicit images extracted from Socha's
5  phone?
6    A.  He did not.
7    Q.  Did he ever deny having done so?
8    A.  I never asked him.  So I don't know if he
9  did or not.
10    Q.  And I want to make sure the record is
11  clear on this point.  Did he ever -- whether you
12  asked him or not, did he ever say "I have never seen
13  such images" or words to that effect?
14    A.  I don't think he told me that, no.  He
15  never told me either way, no.
16    Q.  Has Gavin ever told you that he viewed
17  explicit images that were extracted from Socha's
18  phone?
19    A.  No.
20    Q.  Has he ever explicitly denied having done
21  so?
22    A.  It never came up, no.
23    Q.  Did Roechner ever tell you that he had
24  viewed explicit images extracted from Socha's phone?

Page 58

1    A.  No.
2    Q.  Did he ever deny having done so?
3    A.  Like I said, I never asked him.  So I
4  don't know.
5    Q.  In that command meeting with Chief Benton
6  that you described for us earlier, was Roechner
7  asked specifically whether he had viewed explicit
8  images that had been extracted from Socha's phone?
9    A.  I do not believe so.
10    Q.  Have you ever discussed the handling of
11  the -- handling or the viewing of the explicit
12  images extracted from Socha's phone with then
13  Lieutenant, now Deputy Chief Brown?
14    A.  No.
15    Q.  Have you ever discussed those topics
16  with -- I think then Lieutenant, now Deputy Chief
17  Matlock?
18    A.  No.
19    Q.  Have you ever discussed those topics with
20  Lieutenant Reid?
21    A.  Since -- he probably was informed.  I
22  don't know when because I don't think he was working
23  that day either.  I don't know when he was informed
24  of the issue that came up.  But, yeah, he was

Page 59

1  probably shared with it since he was my lieutenant
2  in internal affairs.
3    Q.  Informed by whom?
4    A.  I'm assuming myself.  I can't say for
5  sure, but he was probably made aware, yes.
6    Q.  Has Reid ever denied having viewed
7  explicit images that were extracted from Socha's
8  phone?
9    A.  No.  And, like I said, he wasn't there.
10  He's not in investigations.  So I wouldn't even
11  think that he would have, you know, the ability or
12  access to do it.
13    Q.  When Gavin came to you to report the
14  rumors that officers, plural, had viewed explicit
15  images that had been extracted from Socha's phone,
16  did he quantify in any way with a specific number or
17  an estimate the number of officers who had done so?
18    A.  No.
19    Q.  And I can't remember whether I asked you
20  this or not.  When he came to you with that to
21  report the rumors, did you ask him, "Who told you
22  that?  Where did you hear that"?
23    A.  I don't remember.
24    Q.  Were the circumstances of your retirement

17  (Pages 56 to 59)

Cassandra Socha v. City of Joliet; et al.
Deposition of Tab Jensen - Taken 6/10/2021

Page 60

1  entirely voluntary and at your initiative?
2      A.  Yeah.  It was probably planned for almost
3  a year.
4      MR. ADAMS:  Okay.  When we go off the record,
5  you'll have to tell me how you managed that.
6      I don't think I have any further questions
7  at this time.  And I know you're kind of jammed up
8  for time, and I want to make sure counsel has an
9  opportunity to get their chance.
10     MS. PROCTOR:  Real quick.  We won't take a
11 break because I want to be mindful of the witness's
12 time.
13              EXAMINATION
14 BY MS. PROCTOR:
15     Q.  Just again, sir, I introduced myself off
16 the record before we got started.  I'm Darcy
17 Proctor, and I'm here today on behalf of the City of
18 Joliet.  I just have a couple quick questions for
19 you.  And I just want to clarify when you retired
20 from the Joliet Police Department.
21     A.  Okay.  My official retirement date I
22 believe was July 20th of '18.  But I had a vacation
23 planned already prior to that.  So I was -- you
24 know, I left the department and didn't return

Page 61

1  probably somewhere around the 12th or the 14th.
2      Q.  So you were not physically present at work
3  from -- I'm a little unclear on the time frame
4  there.
5      A.  Yeah.  So probably somewhere around
6  July 12th I was no longer at the department
7  physically.
8      Q.  Okay.  And your official retirement date
9  was July 20, 2018?
10     A.  I believe it was.
11     Q.  So my question to you was:  Did you ever
12 return at any point to the Joliet Police Department
13 physically, if you will, between July 12th and your
14 official retirement date on July 20th, 2018?
15     A.  Just I stopped by there for -- this year
16 to have something certified, but, no.  I mean, not
17 in a work-related capacity, no.
18     Q.  No.  Actually my question wasn't -- and
19 that's on me.  My question is not whether you ever
20 returned after the date of your official retirement
21 on July 20th, 2018; although it sounds like you may
22 have on one occasion that you just testified to,
23 correct?
24     A.  Correct, yeah.

Page 62

1      Q.  All right.  My question to you is, between
2  July 12th and July 20th, 2018, did you ever report
3  in or physically go to the Joliet police station
4  during that time period?
5      A.  No, I don't believe I did.  I think I was
6  out of state.
7      MS. PROCTOR:  Okay.  I have no further
8  questions.  Thank you, sir.
9              EXAMINATION
10 BY MR. ATKUS:
11     Q.  Hi, I just have one question.  My name is
12 Michael Atkus.  I represent Ed Grizzle in this case.
13     A.  Uh-huh.
14     Q.  You testified about what you referred to
15 as command staff meetings.
16     A.  Correct.
17     Q.  And just so the record is clear, command
18 staff meetings would have included the chief and the
19 deputy chiefs, correct?
20     A.  Correct.
21     Q.  Anyone else they would have included?
22     A.  Usually not, unless we invite somebody in
23 to, you know, for whatever reason, you know, to
24 clarify or to have a meeting with somebody.  But,

Page 63

1  generally, they are just with command staff.
2      Q.  All right.  Do you have any specific
3  recollection of anyone other than the chief or the
4  deputy chiefs being present at any of the command
5  staff meetings that you discussed in your testimony
6  today?
7      A.  That one command staff meeting to where we
8  discussed the incidence with the information on the
9  Cellebrite, I think it was just the command staff.
10     Q.  What about the -- you said you -- I think
11 you testified that you may have learned about the
12 seizure of Socha's phone and the department's
13 investigation into her potential criminal conduct
14 during a command staff meeting.  Do you recall that
15 testimony?
16     A.  I do.
17     Q.  Do you recall, would that command staff
18 meeting have been limited to yourself, the other
19 deputy chiefs, and the chief at the time, or do you
20 have any recollection of anyone else being present
21 at that meeting?
22     A.  I don't have a recollection for sure who
23 would have been in that meeting.
24     Q.  Is your best recollection that it would

18  (Pages 60 to 63)

Cassandra  Socha v. City of Joliet; et al.
Deposition of Tab Jensen - Taken 6/10/2021

Page 64

1  have just been, you know, you and the deputy chiefs
2  and the chief?
3      **A.**  If I had to guess, yes.
4      **Q.**  If you had to guess.  Okay.  Do you
5  specifically recall any of your -- obviously, you
6  were there.  Do you specifically recall either the
7  chief or any of the other deputy chiefs not being
8  present at that meeting?
9      **A.**  Well, the chief would have been there.
10  Because otherwise we wouldn't have had a command
11  staff meeting.  Deputy Chief Roechner probably would
12  have been there.  I don't know if the patrol deputy
13  chief was there or not.  And the deputy chief of the
14  technical service had retired already by then.
15      MR. ATKUS:  Okay.  That's all I have.
16      MR. ADAMS:  I have just a couple quick
17  follow-up.
18          FURTHER EXAMINATION
19  BY MR. ADAMS:
20      **Q.**  Were minutes or any other written record
21  of command staff meetings typically kept?
22      **A.**  No.
23      **Q.**  Did you have any personal practice of
24  going back to your office and creating these memos

Page 66

1      And, sir, we'll make sure that you -- you
2  know, we'll make arrangements to get it to you when
3  the time comes.  That's all.
4      MR. ATKUS:  Thanks a lot for your time.
5      MS. PROCTOR:  Thank you for your time and good
6  luck making your appointment.
7      THE WITNESS:  Thank you.
8      MR. ATKUS:  Thank you.
9          (Proceedings concluded at
10      12:34 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 65

1  to self in order to recap command staff meetings?
2      **A.**  No.
3      **Q.**  Do you know whether Chief Benton had such
4  a practice?
5      **A.**  I don't know.
6      MR. ADAMS:  Those are all the questions I have.
7  And if there's no follow-up, I need to let you know
8  that you have the right as a witness to review the
9  transcript of this deposition when it's written in
10  order to note separately any instances where you
11  believe the transcription is not accurate.  You
12  can't change questions or answers, but you can
13  separately note any instances where you believe it's
14  inaccurate.  Or you can waive that right.  You need
15  to tell us on the record whether you wish to reserve
16  that right and exercise it or to waive it.
17      THE WITNESS:  Oh, yes, I wish to exercise that
18  right.
19      MR. ADAMS:  Fair enough.  Show signature is
20  reserved, and the City's counsel can get the
21  transcript to you to look at once it's ready to go.
22  And, Krista, we are going to write this.
23      MS. PROCTOR:  Yes.  And the City of Joliet will
24  take a copy of it.

19  (Pages 64 to 66)

Cassandra Socha v. City of Joliet; et al.
Deposition of Tab Jensen - Taken 6/10/2021

Page 67

1           IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3
    CASSANDRA SOCHA,                    )
4                                       )
                    Plaintiff,          )
5                                       )
              -vs-                      )   No. 18 CV 5681
6                                       )
    CITY OF JOLIET, a municipal         )
7   corporation; EDWARD GRIZZLE, and    )
    JOHN DOES 1-20,                     )
8                                       )
                    Defendants.         )
9

10          I hereby certify that I have read the

11   foregoing transcript of my deposition given at the

12   time and place aforesaid, consisting of pages 1 to

13   68, inclusive, and I do again subscribe and make

14   oath that the same is a true, correct, and complete

15   transcript of my deposition so given as aforesaid

16   and includes changes, if any, so made by me.

17   _____
            TAB JENSEN
18
    SUBSCRIBED AND SWORN TO
19   before me this _____ day
    of _____, A.D. 2021.
20
21   _____
            Notary Public
22

23

24

Royal Reporting Services, Inc.
312.361.8851

Cassandra Socha v. City of Joliet; et al.
Deposition of Tab Jensen - Taken 6/10/2021

Page 68

1    STATE OF ILLINOIS  )
                        )  SS:
2    COUNTY OF C O O K  )

3            I, KRISTA R. DOLGNER, a Certified
     Shorthand Reporter within and for the State of
4    Illinois, do hereby certify:

5            That previous to the commencement of the
     examination of the witness, the witness was duly
6    sworn to testify the whole truth concerning the
     matters herein;

7
             That the foregoing videoconference
8    deposition was reported stenographically by me, was
     thereafter reduced to a computerized transcript by
9    me, and constitutes a true record of the testimony
     given and the proceedings had;

10
             That the said deposition was taken before
11   me at the date and time specified;

12           That the reading and signing by the
     witness of the deposition transcript was agreed upon
13   as stated herein;

14           That I am not a relative or employee or
     attorney or counsel, nor a relative or employee of
15   such attorney or counsel for any of the parties
     hereto, nor interested directly or indirectly in the
16   outcome of this action.

17           IN WITNESS WHEREOF, I do hereunto set my
     hand at Chicago, Illinois.

18

19
                      Krista R Dolgner
20                    Krista R. Dolgner, CSR, RPR
                      161 North Clark Street
21                    Suite 3050
                      Chicago, Illinois 60601
22                    312.361.8851

23   CSR License No. 084-002878

24

Royal Reporting Services, Inc.
312.361.8851

Cassandra Socha v. City of Joliet; et al.
Deposition of Tab Jensen - Taken 6/10/2021

**A**

A.D 67:19
a.m 1:17
ability 17:3 35:7
49:12 59:11
able 25:13 30:24
31:1,7,24 36:1
48:3,4
absence 18:18
academy 11:12
11:14,16
access 33:4 36:1
46:2 48:1,4,17
49:9 50:11
59:12
accessible 38:20
45:8
accommodate
4:24
accreditation
7:3
accurate 65:11
acronym 41:9
action 68:16
actual 8:11
Adams 2:2,2 3:4
3:7 4:8,9 13:24
14:4,7,10
20:10,12 33:11
33:15 39:11
60:4 64:16,19
65:6,19 66:4
add 14:12
adequate 25:21
admin 8:7 9:4
11:10
administration
6:13,20 7:19
24:18
administrative
7:6
affairs 6:24 9:1
13:10,14 59:2
affect 46:5

**aforesaid** 67:12
67:15
ago 19:10 24:12
agreed 68:12
and/or 9:8 23:1
55:15
annals 46:7
annex 6:6
announced 55:9
annual 12:1,17
12:24 14:17
answer 4:22 5:1
5:7,8 33:10
answers 65:12
anybody 30:4
33:4
anytime 26:4
apart 49:11
apologize 33:14
APPEARAN...
2:1
appellate 10:24
applications 7:4
appointment
66:6
appreciate
13:18
approached
37:23
approximate
16:18
arrangements
66:2
asked 4:21 14:4
16:4 24:11
47:8 57:8,12
58:3,7 59:19
asking 17:21
assign 7:7
assigned 12:7
assignment
56:21
assignments
25:18

**assist** 9:18
associate 15:2
assume 36:20
assumed 20:17
21:19 45:22
assuming 59:4
assured 30:11
Atkus 2:14 3:6
20:7 33:8,12
33:14 39:6,10
62:10,12 64:15
66:8
attempt 4:22
attend 11:5
attended 11:14
11:16
attorney 17:13
17:15 68:14,15
attorney's 6:7
Audio 10:9
authority 7:19
available 9:14
aware 16:13
26:11 43:23
44:10 55:9,11
59:5

**B**

bachelor's 14:21
14:24 15:3
back 4:23 11:11
29:20 30:7
33:11 34:10
36:9 40:1
52:21 64:24
based 14:6 24:3
basically 6:4 7:1
19:14 25:24
33:1,4 42:22
43:3 51:6 53:5
56:13
Batis 56:16,18
57:1
Bear 29:16

**bears** 41:24
BEAST 41:9,10
began 8:9 44:24
beginning 16:23
55:5
behalf 2:6,12,17
13:17 60:17
belief 47:2
believe 6:17
9:14 10:7,14
10:21 11:3,15
11:20 13:14
18:3 19:4 20:3
23:10 25:21
28:1 29:2 30:1
31:14 34:19
36:2,23 38:6
38:16 39:5,22
40:8 42:19
43:10 44:19,22
45:2,3 46:10
47:6 49:15
50:8 52:22
53:8 58:9
60:22 61:10
62:5 65:11,13
Benton 7:13
9:11 44:4 58:5
65:3
best 63:24
big 6:21
Bolingbrook 2:9
bottom 27:2
Botzum 31:13
Boughton 2:8
break 60:11
brought 42:6,12
42:18,18
Brown 58:13
budget 6:21,22
6:22
building 6:6
buildings 6:5

**C**

C 68:2
call 18:6 34:20
34:22 36:20
37:18 39:12
40:7 50:9 55:7
called 4:4 30:14
36:9,23
capacity 5:24
7:24 15:8 28:7
28:15 29:8
52:24 61:17
captain 12:11
13:2,3
career 25:3
case 9:15 17:15
18:22 31:5,11
54:15 62:12
CASSANDRA
1:3 2:20 67:3
cell 30:18 37:22
38:5
Cellebrite 15:11
15:18,22 16:3
16:6 18:10
21:9 30:11,23
31:5,18 32:19
33:2 34:22
35:1,10 36:1
36:12 38:13,19
38:20 39:15,19
41:13 45:7,23
46:12,20 47:3
47:4,12,16,24
48:16 63:9
certain 50:19
certified 1:15
61:16 68:3
certify 67:10
68:4
chain 24:24 25:1
37:11 40:13
chance 60:9
change 65:12

Cassandra Socha v. City of Joliet; et al.
Deposition of Tab Jensen - Taken 6/10/2021

Page 70

changes 67:16
characterize
15:21 45:14
Chicago 2:4
68:17,21
chief 6:13,20 7:6
7:8,12,16,16
7:18,22 8:7,15
9:4,10 11:10
13:8,12 14:17
19:3,4 24:19
24:22 25:2
27:9 34:15,17
34:22 36:7,14
37:13 42:13,14
42:15,20 44:4
44:4 51:24
52:4,17,18,19
53:17 54:10
58:5,13,16
62:18 63:3,19
64:2,7,9,11,13
64:13 65:3
chiefs 41:21
62:19 63:4,19
64:1,7
circulating 24:5
circumstances
59:24
City 1:6 2:12
5:15 6:12
11:18 13:17
17:13,14 60:17
65:23 67:6
City's 65:20
Civil 1:11
civilian 7:4
clarify 60:19
62:24
Clark 68:20
classes 12:21
13:13
clear 21:14
28:13 35:23

57:11 62:17
closed 40:24
closest 19:1
come 14:1 21:7
24:7,15 26:18
comes 8:9 66:3
coming 55:6
command 22:1
23:18 24:24
25:1 29:5 42:6
44:3,20 45:1,2
45:4 51:23
52:14 58:5
62:15,17 63:1
63:4,7,9,14,17
64:10,21 65:1
commander
12:23 25:6
commencement
68:5
communicate
10:23
communicated
26:9
communication
33:19
communicatio...
7:10 33:16
community 12:8
12:9 13:2
complained
30:16 38:2
complaint 8:9
27:11,12 55:20
complaints
27:14
complete 67:14
completed 39:21
completely 4:20
4:21 52:10
computer 15:12
15:16,22 16:3
44:9 47:5 49:9
49:24,24 50:3

50:3,4,6,9,14
50:18,22 53:6
computerized
68:8
computers 52:5
concern 45:20
46:22
concerned 45:15
46:2
concerning 68:6
concluded 66:9
conclusions
28:18
conduct 10:13
63:13
conducting
28:20,24
conference 39:2
confirm 38:17
conformity 41:1
connection 9:8
10:20,22 54:15
considered
15:20
consisting 67:12
constitutes 68:9
contact 17:18
31:12 34:17
content 48:21
contents 50:17
continue 14:11
conversation
31:3,9 32:7,14
34:10 36:22
38:10,17 39:14
39:16,17 40:1
40:2 41:24
44:23 46:11
47:6
conversations
9:23 54:4
conveyed 23:16
cooperating
23:14

copies 31:20
32:1,3 43:8,12
copy 43:10,10
43:13,14,22,24
44:8 50:2
53:16,16 65:24
corporation 1:7
67:7
Corps 55:8
correct 7:14 8:2
16:21 18:14,15
23:22,23 24:8
27:24 33:22,24
34:1 41:2,6,22
43:16,17 53:3
53:15 61:23,24
62:16,19,20
67:14
counsel 13:23
60:8 65:20
68:14,15
County 5:16,19
6:5 68:2
couple 4:17
60:18 64:16
course 13:15
53:23
courses 12:9
court 1:1 5:21
6:10 67:1
courtesy 14:8
53:16
courthouse 6:6
courtroom 6:2
Courts 1:12
creating 64:24
criminal 9:2
11:5 46:3,8,14
63:13
Crowley 9:9
10:4,20,22
11:6 46:9,15
crummy 47:8
CSR 68:20,23

current 5:14
currently 56:13
custody 37:11
40:13
cut 22:22
CV 1:5 67:5

D

D 3:1
D.C 52:3 55:3
55:22
Darcy 2:7 13:17
60:16
DARE 12:12,13
data 15:15,16
16:2 31:21
32:11,16 33:20
36:13 37:2
38:18 39:4,15
39:19 41:12,24
43:1,8 44:8,12
44:18 46:19
47:2,10,16,17
47:22 51:20
52:16 53:2,11
54:19 55:14,15
date 10:16 16:17
16:18 17:7,10
18:20,23,23
29:21 51:7
52:11 60:21
61:8,14,20
68:11
dates 17:19,22
51:23
day 10:14 27:13
34:16 35:22
53:13,14 58:23
67:19
days 51:13,13,16
Dearborn 2:3
decision 46:18
Defendant 2:12
2:17

Cassandra Socha v. City of Joliet; et al.
Deposition of Tab Jensen - Taken 6/10/2021

**Defendants** 1:8
  67:8
**degree** 14:21
  15:4
**denied** 57:20
  59:6
**deny** 57:7 58:2
**department**
  5:17,19 6:14
  8:6,22 12:18
  14:16 15:22
  16:1,14 22:13
  23:6 24:17,18
  26:9 28:22
  49:21 50:8,13
  51:18 53:17
  54:6 60:20,24
  61:6,12
**department's**
  16:10 28:15
  29:8,13 37:16
  41:1 54:21
  55:13 63:12
**departure** 55:8
**depicted** 19:21
  20:1
**deposition** 1:10
  4:12 16:23
  17:1,5 54:16
  65:9 67:11,15
  68:8,10,12
**depositions** 1:13
**deputy** 6:13,20
  7:8,18 8:7 9:4
  11:10 13:8,12
  14:17 19:4
  25:2 34:15,17
  34:22 36:7,14
  37:13 41:21
  42:14,15 52:18
  54:10 58:13,16
  62:19 63:4,19
  64:1,7,11,12
  64:13

**described** 52:15
  58:6
**describes** 6:1
**desk** 50:2 54:2,8
**desktop** 44:9
**detail** 19:20 27:4
  48:20
**detective** 9:20
  15:6
**detectives** 19:12
**determine** 27:16
  31:7,10
**determined**
  18:16 31:4
  37:10
**device** 15:15
  21:15
**devices** 15:16
  21:15 52:6
**different** 6:5
  11:20 12:16
  36:5 50:23
**direct** 15:8
**direction** 7:21
  41:17 43:16
**directly** 26:1,2
  68:15
**discuss** 27:9
  29:16 42:4
  44:17 56:24
**discussed** 32:11
  40:6 42:2 46:7
  52:1 55:18
  58:10,15,19
  63:5,8
**discussion** 29:22
**District** 1:1,1,12
  67:1,1
**division** 1:2 7:11
  7:11 8:7 15:9
  15:10 28:6,12
  34:18 67:2
**document** 49:7

**documentation**
  49:17 53:21
**documents**
  16:24 17:3
  49:5
**doing** 5:12 7:22
  9:16 27:19
  37:6 40:15
  52:1
**Dolgner** 1:14
  68:3,20
**download** 46:19
**downloaded**
  38:14
**downloading**
  43:20
**dproctor@tre...**
  2:10
**drawer** 54:2
**drawers** 54:8
**drive** 37:8 38:14
  39:3 43:24
  44:1,2 50:7,9
  50:10,17 53:7
**drug** 12:16
**duly** 4:4 68:5
**duties** 6:1,9,19
  6:21 7:6,10 8:5
  13:5 50:24
  56:12,14
**duty** 15:21
  25:16 52:24
  56:21

———— **E** ————
**E** 3:1
**E-mail** 2:5,10,11
  2:16
**earlier** 17:12
  18:13 44:24
  51:10 52:15
  58:6
**early** 10:15
  16:19

**East** 2:8
**EASTERN** 1:2
  67:2
**Ed** 62:12
**education** 14:20
**Edward** 1:7
  2:17 67:7
**effect** 45:24
  57:13
**effects** 45:19
**either** 15:15
  16:2 19:2
  20:18 50:1
  54:12 57:15
  58:23 64:6
**elapsed** 36:7
**embarrass**
  25:12
**employee** 8:24
  68:14,14
**employees** 7:5
  8:21
**employment**
  5:14 13:21
**enforcement**
  12:16
**ensure** 47:22
**entered** 54:20
**entirely** 60:1
**establishes** 41:4
**estimate** 4:15
  5:11 59:17
**evaluation** 25:14
**event** 25:13
**events** 10:11
  13:4,5 53:1
  56:17,24
**evidence** 29:13
  37:11,17 40:13
  40:18,19,23
  41:2,6,13,19
  54:21,22 55:3
**exact** 10:16
  16:17 19:22

  20:22 29:21
**exactly** 9:23
  19:23 22:1
  43:6 45:11
  52:6
**examination** 3:4
  3:5,6,7 4:7
  51:19 60:13
  62:9 64:18
  68:5
**examined** 4:5
**Excuse** 34:3
**exercise** 65:16
  65:17
**exhibits** 3:9
**experience** 11:9
**experts** 15:21,23
**explain** 40:15
**explained** 4:24
  30:9 33:1,5
  36:24 43:2
  46:23
**explicit** 19:14,19
  19:21 20:2,6,6
  20:15,16,20,21
  20:24 21:6,15
  24:5 26:13
  27:24 28:12
  29:9 44:13
  56:5 57:4,17
  57:24 58:7,11
  59:7,14
**explicitly** 57:20
**express** 25:22
  45:20 46:13
  47:10,14
**external** 8:20,20
**extract** 15:15
  16:2,5 18:9
  30:10,12 34:21
  34:24 35:3,9
  36:12 47:16
**extracted** 15:16
  16:2 21:16

Cassandra Socha v. City of Joliet; et al.
Deposition of Tab Jensen - Taken 6/10/2021

Page 72

26:13 28:12
29:9 31:21
32:16 33:20
35:11,15 36:13
37:2,22 38:4
38:18 39:4,15
41:13 43:8,15
44:8,12,14,18
47:3,11,20,22
51:20 52:16
54:20 55:1,14
56:5 57:4,17
57:24 58:8,12
59:7,15
**extracting** 21:12
**extraction** 32:11
38:13 39:19

_____
**F**
**face-to-face**
29:22 40:2
44:23
**fact** 31:4 38:18
56:4
**fair** 5:3 6:19
13:20 15:14
20:10 21:14
26:3,5,6 65:19
**familiar** 35:24
36:2
**far** 25:18 39:23
**fault** 47:8
**FBI** 31:16
**Federal** 1:11
**felt** 36:15
**figure** 19:1 27:9
**figured** 21:10
**file** 50:2 53:9
**filed** 51:1 53:24
54:1
**files** 54:3
**finally** 36:19
**find** 16:5 17:7,9
49:8 50:5

54:13
**findings** 8:15
**fine** 45:15,17
**finish** 56:13
**first** 4:4 10:12
18:4 19:2
31:17 32:7,10
33:10 36:4,6
52:14
**fitness** 25:15
**five** 4:16 13:3
**flash** 38:14 39:3
43:24
**folder** 54:2
**follow-up** 56:9
64:17 65:7
**following** 34:8
42:10
**follows** 4:6
**foregoing** 67:11
68:7
**forensic** 51:19
52:5
**forget** 24:23
**forgot** 16:22
**form** 28:18
**formal** 14:19
**format** 25:8
**found** 22:17
35:3,6
**four** 6:18 11:24
**four-day** 13:9
**four-month**
11:18
**frame** 15:20
17:23 61:3
**Friday** 19:2,2,5
34:8 43:18
**friend** 23:14
**friend's** 23:13
**FTO** 11:18
**further** 3:7 11:8
47:16 60:6
62:7 64:18

_____
**G**
**Gavin** 16:8 18:9
18:16,19 19:7
19:16,20 20:9
20:13,19,23
21:5,14,20
22:3 23:19
24:4,10,13,15
26:7,22 27:17
27:21 28:10,13
30:8 32:8 34:4
34:11,13 35:2
35:6,8,12,14
35:15,17,22,23
36:4,5 37:1,9
38:7 42:22
43:22 48:19,23
53:14,17 55:6
57:16 59:13
**Gavin's** 36:12
43:15 49:1,2
**general** 15:1
41:1,4 54:22
**generalize** 19:10
**generally** 63:1
**German** 35:3,7
35:9,12,16
36:11 43:14,21
46:18 53:17
**give** 4:22 5:1
11:8 14:8
16:17,18 17:14
22:8 34:20
50:22
**given** 4:12 67:11
67:15 68:9
**glitch** 33:9
**go** 9:1 11:8,11
11:22 34:10
40:1,2 60:4
62:3 65:21
**going** 4:10,17
5:23 13:22,24
20:7 23:5,11

26:3 34:2
37:10 40:19
50:23 52:3
55:19 56:15
64:24 65:22
**good** 66:5
**gotten** 17:11,12
22:18
**government** 6:5
**great** 25:8,11
**Grizzle** 1:7 2:18
9:21 17:7,18
18:10 19:3
20:4,8 28:20
28:23 29:17,24
30:6,14,21
31:3,9,19 32:5
32:8,11,14
33:17,20 34:6
34:16 44:21,24
45:4,9 46:8,13
46:17 47:1,21
55:3 57:3
62:12 67:7
**Grizzle's** 18:18
45:14
**ground** 4:17
**guess** 5:6,9,13
10:15 64:3,4

_____
**H**
**half** 45:13
**Hall** 2:2,2 4:9
**hall@adamsle...**
2:5
**hand** 11:4 68:17
**handled** 40:10
**handling** 29:13
41:5 44:17
51:20 52:16
54:22 55:14
58:10,11
**happen** 8:8
**happened** 10:15

21:23 52:1,7
55:5
**hear** 4:20 59:22
**heard** 5:2 18:20
19:11,16 21:24
26:19,22 30:15
37:5,20 39:7
44:17 46:13
**held** 5:22 6:11
**help** 25:5
**hereto** 68:15
**hereunto** 68:17
**HESS** 2:8
**Hi** 62:11
**highest** 14:19
**hired** 11:15 25:4
**hiring** 7:4
**history** 13:21
**hold** 5:18 6:16
**honestly** 19:9
**HOPPE** 2:13
**hour** 45:12,13
**hours** 13:11
36:10

_____
**I**
**identifying**
56:10
**identity** 56:3
**III** 2:2
**Illinois** 1:1,16
2:4,9,15 10:24
14:24 67:1
68:1,4,17,21
**images** 21:2,6,15
24:5,7 26:13
27:24 28:3,8
28:12 29:9
31:6 38:12
40:4 44:13
56:5,11 57:4
57:13,17,24
58:8,12 59:7
59:15

Cassandra Socha v. City of Joliet; et al.
Deposition of Tab Jensen - Taken 6/10/2021

important 4:19
improper 29:10
inaccurate
  65:14
inappropriate
  14:1,5
incidence 63:8
incident 9:10
  10:15,15
Incidentally
  16:22
included 7:10
  28:14 62:18,21
includes 67:16
inclusive 67:13
indicate 28:5
indirectly 68:15
individuals
  26:20
inform 8:11
  18:20 42:19
information
  16:5 18:7,9,22
  21:12 23:16
  24:10,16 25:22
  26:8 30:10,13
  30:13 31:1,18
  32:19,21 33:2
  34:21,24 35:9
  35:16 37:7,17
  38:9,22,23,24
  40:14 41:19
  45:4,5,23
  46:12 54:24,24
  55:2 63:8
informed 30:7
  35:8,22 37:5
  42:23 51:24
  52:20 58:21,23
  59:3
informing 7:22
initiate 7:20
  51:18 55:12
  56:9

initiated 29:24
  49:2
initiative 60:1
inquiry 56:9
instance 18:12
  44:16
instances 26:12
  65:10,13
institution 14:23
instructed 35:2
interact 9:20
interested 68:15
interim 7:16
internal 6:23
  7:20,23 8:16
  8:18,20,23 9:1
  13:9,14 55:12
  59:2
interoffice 49:16
  49:19
interrogation
  12:19
interrupt 33:8
interview 10:7
  10:13 12:19
  17:13,14
interviewed
  10:19
interviews 7:5
  8:13 9:16 49:6
intimidating
  23:14
intimidation
  23:12
introduced
  60:15
investigate
  27:13,14
investigated
  23:1,8
investigating
  16:14 22:14
  55:16
investigation 7:1

8:9,12,24 9:8
9:19,21 10:2,5
10:12,20,23
16:10 19:15
23:2,9,15,21
24:2 27:11
28:7,15,21,24
29:3,8 30:8
34:19 37:16,16
40:22 41:18
43:1 45:16,20
46:1,4,5 48:1
51:19 52:2,5
53:10 55:12
63:13
investigations
  7:20,24 8:6,17
  8:21 9:3 15:9
  15:10 18:21
  19:13 20:14
  24:6 26:21
  27:23 28:6,11
  30:16 31:15
  34:16 35:24
  37:20 38:3,8
  38:12 40:21
  42:24 43:20
  56:22 59:10
Investigator
  35:6,15,16
invite 62:22
involved 9:13,17
  28:6,14 29:7
  47:24 48:5
  53:2 55:16
involvement
  16:10
issue 40:9 41:16
  46:18,21 52:16
  55:13 58:24
issues 24:24

———— J ————
J 2:8,14

JAMES 2:8
jammed 60:7
January 7:8
JENSEN 1:10
  3:3 4:3 67:17
jhess@tressle...
  2:11
job 25:15
JOHN 1:7 67:7
Joliet 1:6 2:12
  5:15 6:12
  11:19 13:6,17
  16:1 49:20
  60:18,20 61:12
  62:3 65:23
  67:6
Jr 2:8
judge 6:10
July 6:18 11:15
  51:8,12,15
  60:22 61:6,9
  61:13,14,21
  62:2,2
June 1:16 16:19
  17:23,24,24
  18:4,4,5 19:2,6
  51:14

———— K ————
K 68:2
keep 13:24
  40:20
kept 14:15 54:8
  64:21
kind 9:17 12:2,5
  25:23 31:13
  44:2 45:24
  60:7
knew 21:11,17
  21:20,21 23:19
  28:19 34:16
  35:5 45:22
  52:15
KNIGHT 2:13

2:13
know 5:6,7,12
  7:22 8:24
  10:16 11:19
  12:1,1 13:12
  13:16,18 14:17
  15:14,23 19:12
  21:3,3,4,11,18
  21:24 22:9,16
  23:17 24:11
  25:17 26:24
  28:23 29:3,4,6
  29:21 30:3,20
  31:13 34:9,19
  34:20 35:13,24
  36:2,10 37:7,8
  38:21,22 39:23
  42:14,15 43:6
  44:2 45:12,16
  45:22,24 46:1
  48:8 50:20
  51:3,12,15,23
  52:2,4,6,12,21
  53:4 54:4,19
  54:23,24 55:1
  55:2,4,24
  56:16 57:8
  58:4,22,23
  59:11 60:7,24
  62:23,23 64:1
  64:12 65:3,5,7
  66:2
knowing 25:12
knowledge
  15:17 24:3
  31:16
known 11:1
Krista 1:14
  33:11 65:22
  68:3,20
KURNIK 2:13

———— L ————
L 2:7

Royal Reporting Services, Inc.
312.361.8851

Cassandra Socha v. City of Joliet; et al.
Deposition of Tab Jensen - Taken 6/10/2021

Page 74

**Lamken** 10:24
**lasted** 45:12
**late** 16:19 51:13
**law** 2:2 12:2,16
  13:13
**lawsuit** 4:10
  51:2
**lawyers** 4:12
**learn** 16:16
  21:22 22:13,19
  22:24 23:8
  51:1,17,22
**learned** 21:23
  22:4,6 23:7,24
  52:7,11 63:11
**leaving** 47:7
  55:23
**left** 33:21 47:2
  50:13 52:8
  54:6,11 55:23
  56:2,8 60:24
**let's** 34:10 40:1
**level** 14:19
**License** 68:23
**lieutenant** 6:24
  7:23 8:10 9:12
  9:18,19 10:1,6
  11:3 12:23
  13:1 56:18,19
  56:22 57:1
  58:13,16,20
  59:1
**light** 25:16 34:2
**limited** 63:18
**line** 52:24
**list** 14:14
**little** 61:3
**LLC** 2:2
**LLP** 2:7
**loaded** 44:8
**local** 13:15
**locked** 30:12,24
  31:5,23 32:19
  45:5,6,22,22

47:4,11,20,23
48:2,4,11,14
48:16
**locking** 47:7
**locks** 48:9
**logged** 40:24
**long** 5:22 6:16
  13:18 14:2,2
  22:3 24:12
  27:13 34:4
  35:10,10,13,14
  45:10,11
**longer** 61:6
**look** 50:5 52:3
  54:14 65:21
**looked** 54:16
**looking** 17:13
  26:19 31:17
  38:8 55:22
**Lorinda** 10:24
**lot** 7:9 12:15,24
  13:13 31:16
  49:5 66:4
**luck** 66:6

— **M** —
**machine** 30:11
**main** 10:2
**making** 66:6
**managed** 60:5
**management**
  41:2
**Marine** 55:7
**marked** 3:9
**matkus@khk...**
  2:16
**Matlock** 58:17
**matter** 40:10
**matters** 68:6
**mean** 13:19 20:6
  20:16 21:17
  22:7,22 33:5
  39:18 40:24
  45:12,17 46:21

52:19 54:15
61:16
**meet** 49:6
**meeting** 21:24
  22:2 23:4,18
  23:18 29:6
  30:15 31:19
  42:7,21 43:7
  44:4,7,11,21
  45:1,3,4,9 46:6
  46:17 51:23
  52:14 55:18
  58:5 62:24
  63:7,14,18,21
  63:23 64:8,11
**meetings** 62:15
  62:18 63:5
  64:21 65:1
**memo** 49:19,21
  52:22 53:6,9
  53:16
**memorandum**
  49:16
**memorialize**
  53:1
**memos** 53:23
  54:7 64:24
**mention** 16:22
**Michael** 2:14
  62:12
**Michigan** 13:10
**mindful** 60:11
**mine** 24:21
**minutes** 64:20
**mischaracteri...**
  20:8
**missed** 33:9 39:6
**misspoke** 20:10
**moment** 34:11
**Monday** 34:9
  42:9,11 44:22
**months** 22:7
**Moraine** 15:1
**morning** 4:11

10:16,17
**mornings** 42:10
**municipal** 1:6
  67:6

— **N** —
**N** 3:1
**name** 4:9 12:4
  23:13 62:11
**narrative** 13:19
  14:2,4,6
**NASCAR** 13:5,6
**nature** 20:18,21
**necessary** 47:15
**need** 4:22 13:22
  65:7,14
**needed** 40:21
  47:20 50:20
**neighborhood**
  12:6,7 13:1
**never** 5:6,9,13
  25:19 37:23
  57:8,12,15,22
  58:3
**Nick** 9:9
**normal** 53:22
**normally** 27:12
**North** 2:3,14
  68:20
**NORTHERN**
  1:1 67:1
**Notary** 67:21
**note** 65:10,13
**notice** 17:11,12
**notified** 52:20
**nude** 20:18,21
  21:6
**number** 53:10
  53:10 59:16,17
**numerous** 12:21

— **O** —
**O** 68:2,2
**oath** 67:14

**object** 13:22
  20:7
**objected** 14:7,10
**objecting** 14:6
**obviously** 11:24
  46:22 49:9
  50:20 52:20,21
  53:4 64:5
**occasion** 15:24
  18:13 61:22
**occur** 51:4
**occurred** 9:10
  39:18
**October** 6:17
**office** 6:7 11:1
  24:20,21 30:3
  38:15 43:9
  64:24
**officer** 4:10 5:21
  9:9,12 10:7
  11:6,9 12:5,12
  12:13 16:5,11
  16:14 20:3
  25:23 26:5
  27:4 35:3,9
  37:19,23 38:2
  43:21 46:15
  56:4,15,16
**officers** 11:21
  16:1 26:12
  27:22 28:5,11
  28:14 29:7
  55:16 56:4
  59:14,17
**OFFICES** 2:2
**official** 8:5 9:7
  16:9 28:7,15
  29:7 52:10,24
  60:21 61:8,14
  61:20
**officially** 51:8
  51:14
**Oh** 65:17
**Okay** 5:5,9

Cassandra Socha v. City of Joliet; et al.
Deposition of Tab Jensen - Taken 6/10/2021

14:19 20:23
21:5 23:7
25:10 26:7
44:20 60:4,21
61:8 62:7 64:4
64:15
once 46:22
65:21
ones 54:3
open 7:20
opened 8:10
55:23
opinion 25:22
47:19
opinions 26:4
46:14
opportunity
60:9
opposed 24:16
opposite 8:20
option 40:17
order 16:24 17:4
17:18 41:1,4
47:17 48:17
52:4 54:22
65:1,10
ordered 36:11
39:14,21
originated 39:20
40:5
outcome 68:16
outrank 24:13
oversaw 6:24
overseeing 7:10
34:18
oversees 34:15

**P**

p.m 66:10
PAGE 3:2
pages 67:12
papers 54:17
parlance 11:1
part 6:21 7:2

10:2,4 13:4
23:2 33:10
part-time 5:16
5:20
particular 26:12
56:3
parties 68:15
pass 11:22
patrol 11:23
64:12
peers 41:21
people 8:21 9:16
18:21 19:12
26:20 31:23
33:7 42:24
54:5 55:9,11
perform 8:6
performance
25:14,18,19
period 62:4
person 18:17
36:17 50:8,21
personal 16:9
30:17 37:21
38:4 50:7,9,17
53:7 54:14,17
64:23
personally 27:1
personnel 30:16
37:20 38:3
pertaining 1:12
pertinent 54:9
54:11
phone 2:4,10,16
21:18,19,21
22:5,18,19
23:1,21 24:1,7
26:14 28:13
29:9 30:18
31:21 32:12,16
33:21 36:13,22
37:2,22 38:5
38:13,19 39:2
39:4,12,13,16

39:17,20 40:5
42:1 43:8 44:9
44:13,18 46:19
47:3,11,23
51:21 52:17
53:2 54:20
55:15 56:6
57:5,18,24
58:8,12 59:8
59:15 63:12
photos 19:13,14
19:19,21 20:2
20:15,16,18,20
21:6 38:8
physically 61:2
61:7,13 62:3
pictures 21:4
30:17 37:21
38:4
pitfall 22:21
place 10:12
47:18 67:12
Plaintiff 1:4 2:6
67:4
plaintiff's 13:23
planned 55:9
60:2,23
play 9:7
please 13:23
14:9
plural 27:22
28:11 59:14
Plus 27:11
point 16:13 27:7
27:8 46:3 52:2
52:4 57:11
61:12
police 6:14 8:22
11:9,17 25:23
26:5 49:20
60:20 61:12
62:3
policing 12:9
13:1,2

policy 29:13
position 5:18,20
5:22 6:1,11,16
possession 37:14
40:14,20
possible 38:11
46:3
possibly 23:11
42:24
potential 63:13
practice 64:23
65:4
predicate 32:6
premises 56:2
prepare 16:24
17:5
prepared 52:23
52:23
preparing 6:22
6:22
present 2:19
30:2 35:18
42:16 49:11
61:2 63:4,20
64:8
presume 5:2
pretty 14:18
previous 68:5
printed 50:1
53:22
prior 24:3 31:3
31:9 39:16,17
47:7 51:8,11
51:17 60:23
prisoner 6:8
probably 4:16
21:19 22:9,15
23:24 36:9
42:13 43:2
45:13 49:23
53:12 58:21
59:1,5 60:2
61:1,5 64:11
probation 6:7

Procedure 1:11
proceedings
66:9 68:9
process 8:12
39:22,23
Proctor 2:7 3:5
13:16,17 14:1
14:5,8 60:10
60:14,17 62:7
65:23 66:5
Professional
1:14
program 11:18
12:5,6 21:12
proof 49:10,12
property 41:2
prosecution 9:9
prosecutor 11:2
prosecutor's
11:1
protocol 41:5
prove 49:18
provide 6:3,9
19:20 48:20
provided 5:11
provides 6:4
Public 67:21
purge 50:17
pursuant 1:11
put 12:10 37:8
37:10 40:12,19
40:23 41:12
55:3
putting 40:18

**Q**

qualification
12:2
qualities 26:5
quantify 59:16
question 5:2,7,8
13:19,22 14:3
20:11 32:6
36:5 39:6,8

Cassandra Socha v. City of Joliet; et al.
Deposition of Tab Jensen - Taken 6/10/2021

Page 76

41:14 47:8
61:11,18,19
62:1,11
**questions** 4:11
4:21,23 24:9
24:11 25:9
60:6,18 62:8
65:6,12
**quick** 60:10,18
64:16
**quote** 40:23,24

**R**

**R** 1:14 68:3,20
**R-O-U-S-E** 8:4
**races** 13:5
**radar** 52:17
**raised** 24:23
**rank** 41:20
56:16
**rating** 25:15
**reach** 17:9 18:11
36:7
**reached** 17:6,17
**read** 4:23 33:11
33:13 39:9
67:10
**reading** 68:12
**reads** 4:18
**ready** 65:21
**Real** 60:10
**reason** 9:13 23:9
25:11 40:19
46:23 62:23
**reasoning** 46:24
**reassigned**
56:14
**recall** 9:23 19:23
25:14 30:4
34:4 42:1,3
43:11,19 46:16
48:18,22 63:14
63:17 64:5,6
**recap** 11:8 65:1

**recite** 13:20
**recollection**
49:13 63:3,20
63:22,24
**record** 4:18
33:13 39:9
49:13 57:10
60:4,16 62:17
64:20 65:15
68:9
**recorded** 10:3,8
10:9
**records** 7:11
**recount** 20:4
**recounted** 20:13
**reduced** 68:8
**reference** 18:22
19:11 53:10
**referenced** 53:9
**referred** 18:13
19:19 41:8
62:14
**referring** 18:24
**refresh** 25:5
**refresher** 53:20
**regarding** 20:14
29:13 41:2
**Registered** 1:14
**Reid** 8:1 9:12,18
9:19 10:1,6
11:3 58:20
59:6
**related** 54:22
**relating** 53:2
55:13
**relation** 10:11
**relative** 8:6 40:4
68:14,14
**relevant** 49:7
**remember** 5:8,9
19:18,22 20:22
21:2,8 23:13
31:14 50:22
51:22 52:9,13

59:19,23
**reminder** 53:5
**remove** 35:16
**removed** 33:1
37:9
**removing** 31:18
45:23
**rendering** 26:4
**repeat** 28:9
**repeated** 4:23
**rephrase** 20:11
**rephrased** 4:23
**report** 20:24
22:4 24:22
25:15,17 34:5
36:24 38:1
48:23,24 49:1
49:2,14 59:13
59:21 62:2
**reported** 7:12
7:24 23:20
24:4 27:17,21
27:22 28:10
32:8 34:13
36:6 37:19
48:19 68:8
**Reporter** 1:15
1:15 68:3
**reporting** 8:13
**represent** 4:9
62:12
**requested** 9:11
**reserve** 65:15
**reserved** 65:20
**respect** 8:19
**response** 49:2
**result** 46:14
**retaining** 53:23
**retired** 5:15
6:18 7:9,17
17:2 49:4
50:16 51:5,6
52:8 54:6 56:1
56:8 60:19

64:14
**retirement**
49:20 51:7,17
59:24 60:21
61:8,14,20
**retiring** 6:12
**return** 60:24
61:12
**returned** 34:6,8
44:21,22 61:20
**returning** 36:20
**review** 4:17 7:4
8:14 25:20
65:8
**reviewed** 16:23
**REYNOLDS**
2:20
**right** 5:11,24
7:18 14:7,10
21:22 40:9
44:5 51:6
52:21 62:1
63:2 65:8,14
65:16,18
**rise** 10:12
**River** 2:14 6:7
**Road** 2:8,14
**Roechner** 7:15
34:15,18,22
36:8,14,19
37:4,13,18
38:1,10,18
39:2,14 40:6,9
41:12,21,24
42:5,14 43:5,7
43:18 44:3,7
44:11,17 52:3
52:18 55:4,22
57:23 58:6
64:11
**Roechner's**
38:15
**role** 8:19 9:7
46:8

**Rosemont** 2:15
**Rouse** 8:4 9:14
**RPR** 68:20
**rules** 1:11 4:17
**rumor** 18:21
19:11,17 26:18
27:7,8,10,12
36:6 42:23
**rumored** 27:23
28:2
**rumors** 19:8,17
20:5,14 22:4
23:20 24:4
26:23 27:2,13
27:16,22 29:17
30:20,22 32:8
33:3,6 34:5,13
36:16 37:1
38:7 48:19,21
48:24 55:6,18
55:21 59:14,21

**S**

**Safe** 12:5
**saying** 21:2
26:19 43:11
**scheduling**
25:17
**school** 12:4,5,7
**science** 14:22
**search** 22:18
**second** 5:5 18:4
19:2 33:8 34:3
**secure** 32:16,21
37:15 47:17
**secured** 38:15
40:24 47:4,11
47:23 48:14
**securing** 41:5
**security** 5:21 6:2
6:4,9
**see** 17:3 31:17
**seen** 57:12
**seized** 21:21

Cassandra Socha v. City of Joliet; et al.
Deposition of Tab Jensen - Taken 6/10/2021

Page 77

22:5,7 23:1,21
24:1
seizure 63:12
self 65:1
Separate 49:11
separately 65:10
65:13
sergeant 7:1 8:3
8:4,10 9:14,20
12:20 16:5,7,8
18:9,10,19
19:3 28:20
30:8 31:12,13
32:5 35:2,4,6,8
35:17,22,23
37:9 42:22
43:22
serve 15:6,8
24:24
service 12:8
64:14
set 68:17
seven 12:15
sexual 20:18
sexually 20:6,16
20:21 21:6
shared 20:4 59:1
sharing 30:17
37:21 38:3
sheets 6:23
Sheriff's 5:16,19
short-timer 55:8
Shorthand 1:15
68:3
shortly 22:7
55:18,23
show 49:10,12
65:19
shredded 54:12
shy 6:18
SIC 30:8
side 46:24
signature 65:19
signing 68:12

singular 56:4
sir 4:9 60:15
62:8 66:1
Socha 1:3 2:20
4:10 9:12 10:4
10:7 16:11,14
19:14 20:3
22:14,24 23:7
23:20 24:24
25:15 28:7,16
30:15,19,20
37:19,23 38:2
48:1 51:1
55:16 67:3
Socha's 22:5
24:7 26:14
28:13 31:21
32:12,16 33:21
36:13 37:2
38:13,19 39:4
39:20 40:5
42:1 43:8 44:9
44:12,18 46:8
46:19 47:3,11
47:23 51:21
52:17 53:2
54:20 55:14
56:6 57:4,17
57:24 58:8,12
59:7,15 63:12
social 14:21
software 21:13
somebody 49:7
62:22,24
soon 26:4
sorry 22:21 33:9
33:12 39:6
sounds 61:21
speak 9:12
36:19
special 11:2 13:4
13:5
specific 22:9,10
26:12,12 46:18

48:20 49:12
55:13 56:3
59:16 63:2
specifically
17:21 19:8
20:20 26:15
29:6 44:13
56:10,11 58:7
64:5,6
specifics 19:9
specified 68:11
spending 6:23
spoke 18:1 47:9
spoken 17:4
sporadic 51:15
spring 15:19
Springfield
11:17
SS 68:1
staff 21:24 22:1
23:4,18,18
29:5 42:6
51:23 52:14
55:17 62:15,18
63:1,5,7,9,14
63:17 64:11,21
65:1
start 27:10
started 8:10
56:14 60:16
starting 9:19
state 1:16 11:17
14:24 62:6
68:1,3
state's 6:6
stated 68:13
statement 10:13
10:19
statements 10:4
States 1:1,12
67:1
station 62:3
status 5:14
stay 40:21

stayed 50:14
stenographica...
68:8
steps 27:1,16
30:9 49:1
50:16 51:18
stopped 61:15
stored 49:22
50:1,4 53:6
street 2:3 25:19
68:20
strike 32:6
39:12
studies 15:1
stuff 12:3 15:18
50:22
subject 42:4
subscribe 67:13
SUBSCRIBED
67:18
subsequently
27:15
Suite 2:3,9,15
68:21
summer 15:19
summit 13:7
superior 45:17
supervise 6:2
35:8,17
supervision
12:21 36:12
43:15
supervisor 35:5
supervisors
50:23
supposed 21:3
supposedly
23:13
sure 4:18,20
22:2 23:3,17
28:10 37:15
40:3 48:9 57:2
57:10 59:5
60:8 63:22

66:1
sworn 4:1,5 5:20
67:18 68:6
synopsis 53:13
system 38:23
41:8,10 48:8
53:7

─────────────
T
TAB 1:10 3:3
4:3 67:17
tact 12:14
tactical 12:15,20
TAJA 2:20
take 7:9 10:3,13
13:12,13 27:1
27:15 37:14
40:9,13 41:16
46:17 50:16
60:10 65:24
taken 1:10,13
21:18 22:18
51:11,12,13,18
68:10
talk 23:5 44:24
talking 8:16
task 27:4,19
tasked 29:2
Taste 13:6
tech 31:13
technical 64:14
technically
24:21
technology
31:16
telephone 37:18
40:7 41:23
tell 5:7,8 18:1
19:16 20:1
21:5 24:15
25:13 26:8,10
26:11,15 30:15
31:20 32:1,15
32:20 37:19

Cassandra Socha v. City of Joliet; et al.
Deposition of Tab Jensen - Taken 6/10/2021

38:11 39:3
45:11 47:1,21
48:6,11 51:3
56:3 57:3,23
60:5 65:15
telling 48:18
ten 4:16
terms 41:20
testified 4:5
61:22 62:14
63:11
testify 68:6
testimony 4:12
20:9 63:5,15
68:9
texted 34:19
Thank 33:14
39:10 62:8
66:5,7,8
Thanks 66:4
thing 5:5 17:6
22:22 28:19
40:12
things 25:8
50:20 52:3
think 9:13,22,22
11:16 12:10,11
13:11,20,22
19:5 21:19
22:6,17 23:23
25:6,7 26:1,10
34:7 39:7
40:17 46:10,22
46:23 51:8,14
52:2 55:21
57:2,14 58:16
58:22 59:11
60:6 62:5 63:9
63:10
thought 45:21
49:4,15
three 11:20,23
17:2 19:10
three- 13:9

thumb 37:8 44:1
Thursday 1:16
time 9:11 10:18
11:10,19 15:20
15:24,24 16:4
16:13 17:23
18:8 22:9,15
22:17 23:24
24:13,19 26:17
28:22 31:8,15
32:10 36:5,6
36:11,15 39:13
41:20 44:20
46:7 49:20
54:10 55:7,19
55:21 56:1,2
56:12,17,23
60:7,8,12 61:3
62:4 63:19
66:3,4,5 67:12
68:11
times 4:15 5:1
49:6
titled 5:21
To/From 49:8
today 60:17 63:6
today's 16:24
17:5
told 19:7 20:8,13
23:10 29:3,4,6
30:8,21,23
32:18,23 35:13
37:6,24 38:6,7
38:16 41:12
45:5 48:2
57:14,15,16
59:21
tone 45:14,15,17
tool 21:13
topics 58:15,19
track 13:6
tracking 6:22,23
41:5,8
trained 15:11

training 7:2
11:9,18,20
12:1,8,9,12,16
12:17,18,19,21
12:24 13:2,4,7
13:10,11,14,21
14:15,18
transcript 65:9
65:21 67:11,15
68:8,12
transcription
65:11
transpired
42:20 43:4
51:7
transports 6:8
TRESSLER 2:7
trial 11:5 26:3
46:8,14
tried 31:12
34:17
true 27:10,17
33:3,7 36:17
67:14 68:9
truth 68:6
try 13:13 23:5
50:5
trying 25:6
34:21,24
turn 8:14 34:2
two 5:23 9:16
12:22
type 52:1
typed 49:23 50:3
typically 64:21

U
Uh-huh 34:12
62:13
umbrella 7:2
unclear 61:3
understand 4:20
understanding
28:21 47:10,15

48:7
understood 5:3
20:15 24:6
46:23 48:13
Unfortunately
50:11
unit 6:4 12:11
12:14,15,20
13:1
United 1:1,12
67:1
units 7:3
unofficially
52:12
update 13:13
updates 12:2,16
use 15:15,17,22
usually 7:21 8:8
8:12 9:15 10:1
14:15 27:14
42:9 62:22

V
vacation 17:8,10
17:19,22 18:10
24:20 29:20
32:17 33:17,21
34:6,17 44:21
47:2,9 60:22
Valley 6:8 15:1
verbatim 33:5
42:23
verbiage 19:22
20:22
video 21:1,2
videoconference
1:13 2:1 4:5
68:7
videos 21:4
30:17 37:21
38:4
view 15:16 16:2
30:13 31:2,6
31:24 35:11

viewed 24:5
29:8 35:14
38:12 44:12
55:15 56:5,11
57:4,16,24
58:7 59:6,14
viewing 18:21
19:13 20:15
21:9 26:13
27:23 28:3,8
28:12 33:7
37:2 43:1 46:4
58:11
violation 29:12
voice 41:16
voluntary 60:1
vs- 1:5 67:5

W
waive 65:14,16
want 4:19 11:11
14:12,14 23:23
30:4 33:3,7
36:17 40:12,20
42:9 46:21
57:10 60:8,11
60:19
wanted 35:4
50:5
warrant 22:19
wasn't 48:5
51:16 52:11
54:12 59:9
61:18
watch 12:23
25:6
way 4:18 11:11
37:14 40:10
47:17 48:12
57:15 59:16
we'll 4:24 66:1,2
we've 9:22
week 12:22 18:3
18:4,5 34:7,8

Cassandra Socha v. City of Joliet; et al.
Deposition of Tab Jensen - Taken 6/10/2021

51:11 52:9
**weekend** 42:11
  51:24
**weeks** 12:22
**went** 12:14,24
  32:17 43:19
  45:3
**WHEREOF**
  68:17
**wish** 65:15,17
**witness** 3:2 4:1,4
  13:20 14:8,13
  23:12 65:8,17
  66:7 68:5,5,12
  68:17
**witness's** 60:11
**word** 23:11,11
**words** 57:13
**work** 5:16 24:19
  25:24 26:1
  49:24 50:3
  61:2
**work-related**
  61:17
**worked** 7:23
**working** 35:7
  36:15 58:22
**works** 38:23
**wouldn't** 29:10
  29:14 59:10
  64:10
**write** 65:22
**writing** 25:14
**written** 10:3
  48:24 49:13
  64:20 65:9

**X**

**X** 3:1

**Y**

**yeah** 11:13
  17:24 33:12
  58:24 60:2

61:5,24
**year** 11:20 15:3
  17:12 60:3
  61:15
**years** 5:23 6:18
  11:23,24 12:15
  13:3,21 17:2
  19:10

**Z**

**Z** 50:10
**Zoom** 22:21
  33:9

**0**

**05681** 1:5
**084-002878**
  68:23

**1**

**1** 67:12
**1-20** 1:7 67:7
**10** 1:16
**10-** 11:16
**10:30** 1:17
**12-week** 11:16
**12:34** 66:10
**12th** 51:15 61:1
  61:6,13 62:2
**14** 6:17
**14th** 61:1
**16.1** 41:1
**161** 68:20
**18** 1:5 6:18 7:8
  17:24 60:22
  67:5
**1990** 15:5

**2**

**20** 13:11 61:9
**2017** 9:5
**2018** 7:12 8:1
  15:19,20 16:20
  17:23 61:9,14
  61:21 62:2

**2021** 1:16 67:19
**20th** 51:8 52:11
  60:22 61:14,21
  62:2
**2350** 2:3
**250** 2:9

**3**

**3050** 68:21
**312.361.8851**
  68:22
**312.445.4900**
  2:4
**33** 2:3

**4**

**4** 3:4
**4th** 51:12

**5**

**550** 2:8
**5600** 2:14
**5681** 67:5

**6**

**60** 3:5
**600** 2:15
**60018** 2:15
**60440** 2:9
**60601** 68:21
**60602** 2:4
**62** 3:6
**630.759.0800**
  2:10
**64** 3:7
**68** 67:13

**7**

**8**

**847.261.0700**
  2:16
**8th** 19:6

**9**

**91** 11:15