Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CASSANDRA SOCHA,              )
                             )
        Plaintiff,           )
                             )
           vs.               )
                             ) No. 18 CV 05683
CITY OF JOLIET, a municipal  )
corporation, EDWARD GRIZZLE, )
JOHN DOES 1-20,              )
                             )
        Defendants.          )

        The deposition of OFFICER NICHOLAS CROWLEY

called by the Defendants for examination in Joliet,

Illinois, commencing at 10:00 a.m. on the 17th day of

June, A.D., 2021.  It is taken pursuant to notice and

pursuant to the Federal Rules of Civil Procedure for the

United States District Courts pertaining to the taking

of depositions, taken before Sharon A. Jerndt, Certified

Shorthand Reporter and Registered Professional Reporter,

appearing remotely via videoconferencing.

Ex. H



Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 2..5

---

Page 2

1  APPEARANCES: (remotely via videoconference)
2        LAW OFFICES OF HALL ADAMS
         MR. HALL ADAMS
3        33 North Dearborn Street
         Suite 2350
4        Chicago, Illinois 60602
         Phone:  (312) 445-4900
5        E-mail:  hall@adamslegal.net
6             On behalf of the Plaintiff;
7        TRESSLER, LLP
         MS. DARCY L. PROCTOR
8        550 East Boughton Road
         Suite 250
9        Bolingbrook, Illinois 60440
         Phone:  (630) 759-0800
10       E-mail:  dproctor@tresslerllp.com
11            On behalf of the Defendants City of Joliet
              and John Does 1-20;
12
         KNIGHT, HOPPE, KURNIK & KNIGHT, LTD.
13       MR. MATTHEW CLARK
         5600 North River Road
14       Suite 600
         Rosemont, Illinois 60018
15       Phone:  (847) 261-0714
         E-mail:  mclark@khkklaw.com
16
              On behalf of the Defendant Edward Grizzle.
17
18
19  ALSO PRESENT:
20       Sabrina Spano - City of Joliet
         (via videoconference)
21
22
23
24

---

Page 3

1              I N D E X
2  WITNESS                              PAGE
3  OFFICER NICHOLAS CROWLEY
4       Direct Examination By Ms. Proctor      5
5       Cross-Examination By Mr. Clark       148
6       Redirect Examination By Ms. Proctor  180
7
              E X H I B I T S
8           (No exhibits were marked.)
9         C E R T I F I E D  Q U E S T I O N S
10      Q.   At about 3 in the morning on       174
11           July 15, 2017, police officers
             were called to your and Officer
             Socha's home; right?
12
13      A.   So in regards to this incident
             and this night I'm not going to
             answer any questions about that.
14
15      Q.   Why is that?                       174
16      A.   I don't believe it has any relevance
             to the lawsuit and I'm just
             going to respectfully decline to
17           answer any questions.
18      Q.   Okay.  Let's do this in two parts  174
             then. The first part I want to ask
19           you about the events leading up to
             that night.  Officer Socha testified
20           that you were at a bar with
             other officers.
21
22      A.   Again, I'm not going to answer any
             questions that have to do with
23           that night.
24      Q.   And why is that?   174

---

Page 4

1   A.   I believe that it doesn't have any
         relevance on this lawsuit and I'm
2        just going to respectfully decline
         to answer any questions.
3
4   Q.   Okay.  And it's your understanding    174
         that I can ask a series of questions
         and you can be compelled by court
5        order and sanction?
6   A.   Yes.
7   Q.   Okay.  And the basis for your refusal  175
         to answer any questions about that
8        evening is relevancy; is that right?
9   A.   Yes.
10  Q.   And you've been acquitted of these    175
         crimes; is that correct?
11
12  A.   That's correct.
13  Q.   So let me see if I can do this in an  175
         orderly fashion.  With respect to
14       anything that occurred on July 15,
         16 or 17 of 2017, related to your --
15       criminal charges filed against you
         for reckless discharge of a firearm,
16       domestic battery or destruction of
         property, is your position that you
17       refuse to answer those questions; is
         that fair?
18  A.   That's fair.
19  Q.   And you refuse to answer these        176
         questions based upon you don't think
20       they're relevant to the case?
21  A.   That's correct.
22  Q.   And your officer -- I'm sorry --      176
         your attorney has not instructed
23       you not to answer these questions;
         is that right?
24
         A.   That's correct.  It's my own decision.

---

Page 5

1       MS. REPORTER:  The deposition of Officer Nick
2  Crowley is being conducted remotely via LegalView.
3  Today's date is June 17, 2021 and the time is 10:00 a.m.
4            The witness is located in Joliet, Illinois.
5  My name is Sharon Jerndt.
6            At the conclusion of today's deposition I will
7  ask that counsel place their orders on the record.
8            Thank you.
9            Can you raise your right hand, please.
10               (Witness sworn.)
11  WHEREUPON:
12            OFFICER NICHOLAS CROWLEY,
13  called as a witness herein, having been first duly
14  sworn, was examined and testified as follows:
15            DIRECT EXAMINATION
16  BY MS. PROCTOR:
17      Q.   Officer Crowley, would you please state and
18  spell your name for the record.
19      A.   Nicholas Crowley, N-I-C-H-O-L-A-S,
20  C-R-O-W-L-E-Y.
21      Q.   Have you ever been known by any other names?
22      A.   Just Nick.
23      Q.   Are you taking any meditation today that might
24  impair your memory to remember any of the events at

---



Page 6

1  issue in this lawsuit?
2      A.    No.
3      Q.    Did you review any documents before today's
4  deposition?
5      A.    No.
6      Q.    Did you speak with anyone in preparation for
7  today's deposition?
8      A.    Just my attorney.
9      Q.    And who is your attorney?
10     A.    Hall Adams.
11     Q.    And when did you retain Mr. Adams to represent
12  you in these proceedings?
13     A.    I believe it was a couple of weeks ago.
14     Q.    Was that after you were told you were
15  requested to give a deposition in this case?
16     A.    That's correct.
17     Q.    So you would have retained him sometime in May
18  of 2021?
19     A.    Yes.
20     Q.    Do you have a written retainer agreement with
21  Mr. Adams?
22     A.    No.
23     Q.    Is Mr. Adams representing you in any other
24  legal proceedings?

Page 7

1      A.    No.
2      Q.    You are aware that Mr. Adams is also
3  representing Cassandra Socha; correct?
4      A.    Yes.
5      Q.    What is your date of birth?
6      A.    08/12/80.
7               (Dogs barking.)
8      MS. PROCTOR:  Is that on your end, Mr. Crowley, by
9  chance?
10     THE WITNESS:  Yeah, it is.
11               (Short break was taken.)
12  BY MS. PROCTOR:
13     Q.    Officer Crowley, other than speaking with your
14  attorney, Mr. Adams, did you speak with anybody else in
15  preparation for today's deposition?
16     A.    No.
17     Q.    Did you speak with your now wife, Cassandra
18  Socha?
19     A.    I just told her that I was being deposed.
20     Q.    But you didn't discuss any of the issues in
21  her lawsuit; is that right?
22     A.    That's correct.
23     Q.    What is your date of birth, Mr. Crowley?
24     A.    08/12/80.

Page 8

1      Q.    And where do you currently live?
2      A.    In Joliet.
3      Q.    What is your address in Joliet?
4      A.    3727 Mustang Road.
5      Q.    How long have you lived at that address?
6      A.    Since about 2005.
7      Q.    And who do you currently live there with?
8      A.    I live here with Cassie, our two sons, and I
9  have two daughters from a previous marriage that are
10  here on our days off.
11     Q.    Okay.  And when you say "Cassie," are you
12  referring to Cassandra Socha?
13     A.    Yes.
14     Q.    And how old are your two sons?
15     A.    Jackson is four months and Jacob just turned
16  two years old.
17     Q.    Congratulations.
18     A.    Thanks.
19     Q.    And those are children with Cassandra Socha;
20  correct?
21     A.    Yes.
22     Q.    Now, your two other daughters, how old are
23  they?
24     A.    12 and 9.

Page 9

1      Q.    Okay.  And what is the name of their mother?
2      A.    Britney Long.
3      Q.    Can you spell the last name?
4      A.    L-O-N-G.
5      Q.    And where does Britney live?
6      A.    In Bourbonnais.
7      Q.    And who has custody of your daughters from
8  your marriage with Ms. Long?
9      A.    She has residential custody, but we have joint
10  visitation.
11     Q.    Okay.  And when did you -- did you divorce
12  Ms. Long?
13     A.    Yes.
14     Q.    When did that divorce take place?
15     A.    2013.
16     Q.    Where was the divorce case filed?
17     A.    Kankakee County.
18     Q.    Have you ever been divorced at all -- before
19  your marriage to Ms. Long?
20     A.    No.
21     Q.    Have you ever been married before?
22     A.    No.
23     Q.    How long were you married to Britney Long?
24     A.    I would say five years.



Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 10..13

Page 10

1    Q.    What is your highest level of education?
2    A.    I have an associate's degree.
3    Q.    And before we get into your education, Officer
4  Crowley, I just want to ask you -- just give me a
5  moment.  Hold on.  I just want to check one thing.
6          Thank you for that pause.  How would you
7  describe your current relationship with Britney Long?
8    A.    It's amicable, you know.  We have children
9  together, so it's good.
10   Q.    Where did you receive your associate's degree?
11   A.    Kankakee County Community College.
12   Q.    What was the associate's degree in?
13   A.    Criminal justice.
14   Q.    When did you receive it?
15   A.    I believe it would have been 2004.
16   Q.    Do you hold any other degrees?
17   A.    No.
18   Q.    Where did you attend high school?
19   A.    Grant Park High School, Grant Park, Illinois.
20   Q.    Where is Grant Park, Illinois?
21   A.    It's way down yonder.  It's just south of
22 Beecher, Illinois.  It's on the northeastern side of
23 Kankakee County.  It borders Indiana.  It's a small
24 town.

Page 11

1    Q.    Is that where you were essentially born and
2  raised?
3    A.    No.
4    Q.    Where were you born?
5    A.    I was born and raised in South Holland,
6  Illinois and then we moved to Grant Park going into my
7  freshman year of high school.
8    Q.    Of high school.  Okay.  Do you hold any
9  certifications?
10   A.    Yes.
11   Q.    In what?
12   A.    Certifications in law enforcement.
13   Q.    Okay.  Can you tell me what some of those are?
14   A.    I'm a certified field training officer, a
15 certified SWAT operator, a certified school resource
16 officer, a certified pressure point control tactics
17 instructor, and I believe that's it.
18   Q.    Were those certifications received through the
19 city of Joliet Police Department?
20   A.    Not all of them, but some of them.
21   Q.    What is your current position with the Joliet
22 Police?
23   A.    Patrolman.
24   Q.    And how long have you held that position?

Page 12

1    A.    Eight years.
2    Q.    When did you join the Joliet Police
3  Department?
4    A.    February of 2013.
5    Q.    When did you graduate high school?
6    A.    May of 1998.
7    Q.    Can you just give -- tell me, what was your
8  employment right out of high school?
9    A.    I graduated in May and then I left for the
10 United States Marine Corps in August and I was -- I
11 served in the marines for four years.
12   Q.    Okay.  And where did you do your duty with the
13 Marines?
14   A.    I was primarily stationed in Camp Pendleton,
15 California.
16   Q.    And you said that you did that for four years,
17 so did that bring you to 2002?
18   A.    Yes.
19   Q.    Were you discharged from the Marines?
20   A.    Yes.
21   Q.    Was it an honorable discharge?
22   A.    Yes.
23   Q.    What did you do after your tour with the
24 Marines?

Page 13

1    A.    After the Marine Corps I started going to
2  school and I was a bartender while I was in school.
3    Q.    And was the school the schooling we talked
4  about or some other schooling?
5    A.    It was at Kankakee Community College.
6    Q.    Okay.  And where were you a bartender?
7    A.    TGI Fridays in Bradley, Illinois.
8    Q.    And that's the next town over from
9  Bourbonnais?
10   A.    Yes.
11   Q.    And how long did you do that?
12   A.    Until I became a police officer in Grant Park
13 in 2005.
14   Q.    And was that a full-time position with the
15 Grant Park Police?
16   A.    Yes.
17   Q.    How long did you work with Grant Park?
18   A.    Six months, maybe.
19   Q.    Did you receive any police training, basic
20 police training, in order to join the Grant Park Police?
21   A.    Yes.
22   Q.    Where did you receive your training?
23   A.    The Police Training Institute in Springfield,
24 Illinois.



Page 14

1    Q.    And when did you do that training?

2    A.    I entered the police academy September 11,

3    2005.

4    Q.    And what was your next job in law enforcement

5    following your work with Grant Park?

6    A.    I then got hired by the Bourbonnais Police

7    Department.

8    Q.    How long did you work for the Village of

9    Bourbonnais?

10    A.    Approximately seven and a half years.

11    Q.    What was the highest rank you received while

12    working at the Village of Bourbonnais?

13    A.    Patrolman.

14    Q.    Okay.  Getting back to Grant Park, did you

15    have any disciplinary issues when you were an employee

16    there?

17    A.    No.

18    Q.    And you said you worked for Bourbonnais for

19    seven and a half years.  So when did you leave their

20    employment?

21    A.    When I got hired by the Joliet Police

22    Department in February of 2013.

23    Q.    And was that a voluntarily resignation from

24    the Village of Bourbonnais?

Page 15

1    A.    Yes.

2    Q.    Did you receive any discipline while employed

3    at Bourbonnais?

4    A.    Yes.

5    Q.    Tell us about that.

6    A.    I took a ten-day suspension for writing in a

7    cake.

8    Q.    I'm sorry, for?

9    A.    I can tell you the story behind it.  I took a

10    ten-day suspension.  I wrote a word in a cake that was

11    made by an employee.

12    Q.    What was the word?

13    A.    It said "I love Chris."

14    Q.    Without getting into the full story, why did

15    that result in discipline, whether you agreed with it or

16    not?

17    A.    It was meant as a joke for another officer.

18    They didn't take that as a joke.  They took offense to

19    it so I got suspended for it.

20    Q.    And what was the grounds of the suspension?

21    A.    I don't remember.  It could have been conduct

22    unbecoming.  Usually it's -- I don't really recall what

23    the wording was.

24    Q.    Was the officer who took offense to it a male

Page 16

1    or a female?

2    A.    Female.

3    Q.    Was there any sexual harassment component to

4    the reason for the discipline?

5    A.    No.

6    Q.    Was that deemed conduct unbecoming an officer

7    or what was the rule violation, if you --

8    A.    I don't remember.

9    Q.    Okay.  Other than that discipline, were you

10    disciplined in any other way while at Bourbonnais?

11    A.    No.

12    Q.    Who was your chief of police in the years you

13    worked at Bourbonnais?

14    A.    Chief Joe Beard.

15    Q.    Was he the chief the entire time?

16    A.    No.

17    Q.    Can you spell the chief's last name for us?

18    A.    B, as in boy, E-A-R-D.

19    Q.    And the first name again?

20    A.    Joe.

21    Q.    How long was Joe Beard the chief of police

22    when you worked with Bourbonnais?

23    A.    The majority of the time, about six and a half

24    years.

Page 17

1    Q.    Was he the chief when you received the

2    discipline you just spoke of?

3    A.    Yes.

4    Q.    Did you work under any other chiefs of police

5    while employed at Bourbonnais?

6    A.    Yes.

7    Q.    Can you tell me his or her name?

8    A.    Jim Phelps, P-H-E-L-P-S.

9    Q.    And Phelps is still the chief of police at

10    Bourbonnais; correct?

11    A.    Yes.

12    Q.    Okay.  Let's turn to just your -- a little bit

13    about your -- before we get -- I want to talk a little

14    bit more about when you joined Joliet, but you said

15    you've lived at 3727 Mustang since about 2015.  Did I

16    get that right?

17    A.    Yes.

18    Q.    Is that a single-family home?

19    A.    It's a townhome.

20    Q.    Who owns the home?

21    A.    Cassandra Socha.

22    Q.    And how long has Ms. Socha owned the home, to

23    your knowledge?

24    A.    She maybe was here about a year before I moved



Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021                                    Pages 18..21

Page 18

1  in.  I'm not really sure though.
2      Q.    And when -- okay.  You moved in sometime in
3  2015; correct?
4      A.    I believe so, yes.
5      Q.    Can you be any more specific on when you moved
6  in?
7      A.    I think it was the summertime in 2015, but I
8  couldn't give you an exact date.
9      Q.    Where did you live before you moved in with
10 Cassandra Socha in 2015?
11     A.    I was living with my parents.
12     Q.    And did you -- where did your parents live?
13     A.    52 Lake -- and I can spell this for you --
14 M-E-T-O-N-G-A, Metonga.  And that's in Grant Park,
15 Illinois.
16     Q.    And how long did you live with your parents in
17 Grant Park, Illinois?
18     A.    Since my divorce in 2013.
19     Q.    Okay.  And what are your parents' names?
20     A.    Robert and Cynthia Crowley.
21     Q.    Do they still live in Grant Park, Illinois?
22     A.    Yes.
23     Q.    When you joined the Joliet Police Department
24 were you required to do any additional police training?

Page 19

1      A.    No.
2      MS. PROCTOR:  Let me just put you on mute.
3                    (Brief pause.)
4      MS. PROCTOR:  All right.  Back on the record.
5  Thank you for the pause, Officer.
6  BY MS. PROCTOR:
7      Q.    How many -- were you hired in the same class
8  of hires as Cassandra Socha?
9      A.    So she was hired maybe like -- maybe a year
10 after me, six months, but we were on the same hiring
11 list.
12     Q.    What does that mean?
13     A.    So, a police department will put out a list of
14 potential hires, I believe there are between one to two
15 hundred persons on that list, and then they will hire in
16 batches.  So I was in the first batch to be hired; I
17 believe Cassie came in maybe the third or fourth batch
18 off that list.
19     Q.    Had you known Cassandra before working with
20 her at Joliet?
21     A.    No.
22     Q.    And who was your supervisor when you first
23 came on board?
24     A.    His -- it was Chief Trafton.

Page 20

1      Q.    Can you spell that for us?
2      A.    T-R-A-F-T-O-N.
3      Q.    Did you also have a field training officer
4  when you first started with the department?
5      A.    I had several, yes.
6      Q.    Did they rotate?
7      A.    Yes.
8      Q.    Can you give us the names of your field
9  training officers?
10     A.    Sure.  The first one was Dennis Carrol,
11 C-A-R-R-O-L.  I don't remember the order after this, but
12 I can just throw out some names for you.
13     Q.    That's fine.
14     A.    John Williams, W-I-L-L-I-A-M-S.  Marc
15 Weitting -- I'm going to guess at the spell of the last
16 name -- W-E-I-T-T-I-N-G.  And, oh, Kevin Robertson,
17 R-O-B-E-R-T-S-O-N.
18     Q.    Who hired you?
19     A.    The city of Joliet.
20     Q.    Were there certain individuals on the panel
21 that interviewed you for the job?
22     A.    Yes, but they did not work for the city of
23 Joliet.
24     Q.    Who was the chief of police when you were

Page 21

1  hired?
2      A.    Chief Trafton.
3      Q.    And since you've been a Joliet police officer,
4  how many different chiefs of police have you worked
5  under?
6      A.    It would be four, as of today.
7      Q.    Can you give me those names?
8      A.    Sure.  Besides Chief Trafton, it was Chief
9  Brian Benton, Chief Alan Roechner.  I don't know how to
10 spell his name.  And then today it's Chief Dawn Malec,
11 M-A-L-E-C.
12     Q.    And how many years did you work under the
13 leadership of Chief Benton?
14     A.    Gosh, I'd have to say maybe five of those
15 years.
16     Q.    And same question for Chief Roechner.  How
17 many years did you work under his leadership?
18     A.    He was chief for about two, two and a half
19 years.
20     Q.    How would you describe your relationship with
21 Chief Benton?
22     A.    Didn't really have one.  He was the chief; I
23 was a midnight patrol officer.  Didn't really have any
24 interaction with him, other than that.



Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021
Pages 22..25

Page 22

1    Q.    Same question for Chief Roechner. What was
2  your relationship, if any, with Chief Roechner?
3    A.    Same answer.
4    Q.    Now, as a patrol officer were you assigned to
5  the patrol division?
6    A.    Yes.
7    Q.    Can you tell us, just generally, what your
8  responsibilities include as a patrol officer?
9    A.    Respond to crimes in progress. Proactively
10  patrol your sector looking for anything suspicious,
11  speaking with citizens, making citizen contacts,
12  investigating suspicious activities, answering 911
13  calls, traffic monitoring and enforcement.
14    Q.    Have you always worked the midnight shift?
15    A.    No.
16    Q.    What's your current shift?
17    A.    Day shift.
18    Q.    Day shift, which is? What are the hours
19  currently for the day shift?
20    A.    7 a.m. to 7 p.m.
21    Q.    Have you ever worked the same shift as
22  Cassandra?
23    A.    Yes.
24    Q.    And how long did you do that?

Page 23

1    A.    We work together for a few years. I think
2  maybe like three.
3    Q.    In the years that you've been employed, would
4  that be more at the beginning, middle or more current?
5    A.    In the beginning.
6    Q.    Okay. Who are your current supervisors?
7    A.    I would -- so my watch commander, right now
8  there's two. I have Lieutenant Steve Breen, B-R-E-E-N,
9  and Lieutenant Joe Rosado, R-O-S-A-D-O.
10    Q.    Focusing your attention, Officer Crowley, on
11  May and June of 2018, do you recall who your supervisors
12  were during that time frame?
13    A.    I don't -- I was a relief car so there's --
14  you can be put in a sector, in a district, or you can be
15  a relief car. A relief car would bounce around
16  districts and sectors and shifts. If somebody is on
17  vacation or somebody calls off you're plugging their
18  position. So I had -- in each district -- in each area
19  of districts will have different sergeants, and then an
20  overall watch commander for that area.
21        So I know that -- I believe Lieutenant --
22  she's now the chief -- but Lieutenant Dawn Malec was one
23  of the watch commanders. I really don't recall.
24    Q.    You don't recall. Okay. Let's just focus on

Page 24

1  2018. How many police officers were employed by the
2  city of Joliet, if you know, roughly?
3    A.    I would say approximately 300 at that time.
4    Q.    Has that number -- I'm sorry, I didn't --
5    A.    Three zero zero at that time, approximately.
6    Q.    Has that number remained pretty steady during
7  the years that you've been employed there?
8    A.    Yes, until recently.
9    Q.    Okay. What has happened recently?
10    A.    Recently, due to -- well, started with COVID
11  but then we've had a lot of -- we've been on a hiring
12  freeze and a lot of retirees have since retired and
13  those positions have not been filled. So I think we're
14  between 40 to 50 officers short of what we're allotted
15  to have.
16    Q.    During your years coming up in the department,
17  who would you say your best friends were from work?
18    A.    I don't know. I would have a couple -- I
19  wouldn't say best friend, but I've had some associates.
20  Matt Campos was my partner when we first started,
21  C-A-M-P-O-S. Officer Bill Busse, B-U-S-S-E, was a
22  friend of mine. Alana Costa. I've had several.
23    Q.    Currently who are your closest friends in the
24  department?

Page 25

1    A.    I mean, I really don't associate with anyone
2  outside of work right now. I just -- you know, I go
3  into work and just kind of get along with everybody
4  there.
5    Q.    Okay. What about in 2018, at or near the time
6  of the event, which are the subject of this lawsuit,
7  which fellow officers were you closest with, during
8  those years?
9    A.    I mean, you know, I worked on a shift where I
10  worked on a shift with -- I think we had, like, 25, 26,
11  every night. So I would -- you know, wherever I would
12  bounce around at, you know, I would get along with
13  everybody at work, but I don't know. I can tell you
14  kind of who would work a shift with me, if that helps.
15    Q.    Sure.
16    A.    Well, like I said, my partner Matt Campos,
17  Officer Mike Cagle, Officer Bill Busse, Officer Alana
18  Costa, Officer Socha -- gosh -- Officer Mauer, Officer
19  Meyer.
20    Q.    Are those the names that come to mind?
21    A.    Those are the names that come to mind, yes.
22    Q.    Other than Cassandra, do you socialize with
23  any of those officers outside of work?
24    A.    Not currently, no.



Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 26..29

Page 26

1    Q.    Focusing more on 2018, 2019 years?
2    A.    Yeah, I mean, we would have shift parties, you
3  know, Christmas parties, Halloween parties and the shift
4  would just be there.  So it would be mainly the group
5  that you work with would be the group that you kind of
6  hang out with.
7    Q.    Now, you mentioned you were a relief car.
8  Would you work alone or did you have a partner?
9    A.    It would depend on the sector.  Not every
10  sector is a two-man unit.  So when I would be in a
11  two-man unit I would have a partner, but if I was
12  working in a one-man unit, I wouldn't.
13    Q.    Officer Crowley, you may have told me already,
14  but I neglected to write it down.  What shift are you
15  currently working?
16    A.    Day shift, 7 A to 7 P.
17    Q.    Now, when did you start dating Cassandra
18  Socha?
19    A.    2014, roughly.
20    Q.    So would it be fair to say you dated about a
21  year and then you --
22    A.    Yeah, that sounds about right.
23    Q.    -- began to live together around 2015?
24    A.    Yeah.

Page 27

1    Q.    Can you be any more specific when in 2015 you
2  began living together?
3    A.    Like I said, I believe the summertime, but I
4  don't know the exact month.
5    Q.    Okay.  Thank you.  Now, do you currently have
6  any ownership interest in the house on Mustang?
7    A.    No.
8    Q.    Did you have to pass a physical and
9  psychological test in order to be hired at the Joliet
10  Police Department?
11    A.    Yes.
12    Q.    Do you know what the results of both of those
13  tests were?
14    A.    Assuming I passed.
15    Q.    Have you ever received any discipline while
16  employed at the Joliet Police Department?
17    A.    Yes.
18    Q.    Tell us about those.
19    A.    I received a written reprimand.  This would
20  have been 2014, 2015-ish.  I received a five-day
21  suspension, possibly in 2016.  And then I received a
22  30-day suspension in 2018.
23    Q.    What was the written reprimand for, going back
24  to 2014-15 that you just mentioned?

Page 28

1    A.    That was for -- I don't remember how they
2  titled these, like what the official thing was, but I
3  responded to an email that -- inappropriately, a
4  department email.
5    Q.    What was the subject of the email?
6    A.    There was a department email that got sent out
7  that one of the fingerprint machines wasn't working and
8  I responded, "big surprise."
9    Q.    Was that the extent of the response?
10    A.    Yes.
11    Q.    Okay.  What did you mean by that?
12    A.    It just -- because the fingerprint machine
13  never worked.  I just responded, "big surprise."
14    Q.    And that was the reason for the written
15  reprimand?
16    A.    Yes.
17    Q.    Let's talk about the five-day suspension,
18  going back to 2016.  What did that involve?
19    A.    That was involving missing a court date.
20    Q.    Was that on one of your cases?
21    A.    Yes.
22    Q.    And what happened there?
23    A.    I received a five-day suspension for it.
24    Q.    Did you dispute that you missed the court

Page 29

1  date?
2    A.    No.
3    Q.    What was the reason for missing it?
4    A.    I don't really recall why I missed it.
5    Q.    Okay.  At some point did Cassandra become your
6  fiancee?
7    A.    Yes.
8    Q.    When did that occur?
9    A.    That was in the winter of 2017, maybe.  I
10  don't really remember when that was.
11    Q.    And you are currently married to Cassandra;
12  correct?
13    A.    Yes.
14    Q.    And what was the day you were married?
15    A.    April 19, 2019.
16    Q.    And where did you get married?  In what
17  county?
18    A.    Du Page County.
19    Q.    Did you have a formal ceremony?
20    A.    No.
21    Q.    Who married you in Du Page County?
22    A.    It was a judge.  I don't remember the judge's
23  name.
24    Q.    Did you publicly disclose at work that you and



Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 30..33

Page 30

1 Cassandra were married on April 19 of 2019?

2    A.    Can you explain what you mean by "publicly"?

3    Q.    Well, did you tell anybody, other than family,
4 that you and Cassandra had married on April 19, 2019?

5    A.    We have to update our personnel files with the
6 HR department.  That also includes insurance and all
7 that kind of stuff, so we had to do that.

8    Q.    Other than internal paperwork, did you share
9 the fact that you and Cassandra had married in 2019 with
10 any of your fellow officers or friends?

11    A.    Yes, a few people.

12    Q.    Who did you share it with?

13    A.    I know I told my friend, Bill.

14    Q.    Is that Bill Busse?

15    A.    Yes.  I believe I told Phil Empf, E-M-P-F
16 (sic).  I can't really remember who else I told.

17    Q.    Why did you chose -- you told Bill Busse and
18 is it Bill Empf (sic) is the last name?

19    A.    Yeah, Empf, E-M-P-F (sic).

20    Q.    Are those two Bills, are they -- were they
21 your closest friends?

22    A.    Yes.

23    Q.    And is Bill Busse still an officer with
24 Joliet?

Page 31

1    A.    No.

2    Q.    Okay.  And when did he leave?

3    A.    I believe his last day -- his last pay period
4 was this last June.

5    Q.    Of 2020?

6    A.    2021.

7    Q.    Oh, 2021.  Thank you.  And what about Bill
8 Empf, did he ever work at Joliet?

9    A.    His first name is Phil, P-H-I-L, and yeah, he
10 still works here.

11    Q.    Okay.  I'm sorry.  I misheard you.  Okay.  And
12 what is Phil Empf's position?

13    A.    He's a patrol officer.

14    Q.    And was he hired at or near the same time as
15 you were?

16    A.    No, he was there before I got there.

17    Q.    Okay.  Now Officer Crowley, you're aware that
18 this lawsuit involves allegations that certain images
19 from Cassandra's cell phone were shared with members of
20 the Joliet Police Department.  Do you understand that?

21    A.    Yes.

22    Q.    Have you ever reviewed the actual, like,
23 written allegations in Cassandra's lawsuit?

24    A.    Yes.

Page 32

1    Q.    Okay.  And when did you review those?

2    A.    I believe when the lawsuit was made public.

3    Q.    And when, to your knowledge, was the lawsuit
4 made public?

5    A.    I don't -- was that 2000 -- no, that couldn't
6 have been.  2018?  2019?  I don't really remember.

7    Q.    Did you review any of the allegations that are
8 contained in the written documents that are connected
9 with the lawsuit, before the actual lawsuit was filed?

10    A.    Can you ask that another way?

11    Q.    Sure.  Well, let me put it this way:  In order
12 to initiate a lawsuit, you have to file a written
13 document that is called a civil complaint.  Do you just
14 generally understand that concept?

15    A.    Yes.

16    Q.    So my question to you is:  Did you ever review
17 the civil complaint, even a draft of it, before it was
18 actually filed by Cassandra's lawyer with the federal
19 court?

20    A.    No.

21    Q.    Okay.  Can you tell the -- what is your
22 understanding of the allegations in Cassandra's lawsuit?

23    A.    It's my understanding that there was a search
24 warrant that was served on Cassandra's cell phone.  That

Page 33

1 the entire cell phone contents were downloaded to a
2 computer in investigations and that there was officers
3 that accessed that computer, viewed private images and
4 videos that were on that cell phone.

5    I also understand that there were copies that
6 were made of the contents of her phone and were
7 distributed amongst other police officers in the police
8 department.

9    Q.    Do you, Officer Crowley, have any personal
10 knowledge regarding any of those alleged events?

11    A.    No.

12    Q.    Do you dispute that there were nude
13 photographs and sex videos on Cassandra's cell phone?

14    A.    No.

15    Q.    How do you know that?

16    A.    I was the one that took some of those
17 photographs and took the videos from the cell phone.

18    Q.    Let's put the photographs aside for a moment.
19 I just want to focus on the video.  To your knowledge
20 was this more than one sex video on Cassandra's cell
21 phone?

22    A.    Yes.

23    Q.    How many such videos were on her cell phone as
24 of May or June of 2018?



Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 34..37

Page 34

1    A.    I don't know.
2    Q.    Did you guys -- did you and Cassandra engage
3 in recording your sexual activities on more than one
4 occasion?
5    A.    Yes.
6    Q.    Is that something that you do frequently?
7    A.    No.
8    Q.    Do you have a rough estimate of the number of
9 sex videos that may have been on Cassandra's cell phone?
10    A.    I would say no more than three, no more than
11 four.
12    Q.    Because it is the subject of this lawsuit,
13 Officer Crowley, I hope you understand why I have to ask
14 you these questions.  It's not something I relish, but
15 I'm doing my job.  I hope you understand that.
16    A.    I understand.  I appreciate that.
17    Q.    Your best estimate is that there were probably
18 three or four sex videos contained on Cassandra's cell
19 phone as of May of 2018; can we agree on that?
20    A.    Yes.
21    Q.    Let's just take -- well, of those three or
22 four sex videos, can you describe the content with any
23 particularity of those videos?
24    A.    Yes.  We were engaged in oral sex.  We were

Page 35

1 engaged in intercourse.  I think that's it.
2    Q.    And how did you record those activities?
3    A.    With her cell phone.
4    Q.    Is your face visible on any of those videos?
5    A.    No, they are not.  I don't believe so.
6    Q.    Is Cassandra's face visible on any of those
7 videos?
8    A.    Yes.
9    Q.    Do you know, of the three or four videos, how
10 many of those her face is visible on?
11    A.    I believe just one.
12    Q.    Which one, in particular?
13    A.    When she is performing oral sex on me.
14    Q.    Let's focus on the oral sex video, if I could.
15 Why did you video that?
16    A.    You know, we were young.  It was a private
17 intimate moment that we were consensually sharing with
18 each other.  That's my answer.
19    Q.    Was it your idea to video that, the oral sex
20 between you two?
21    A.    It was both of our idea.
22    Q.    Did Cassandra consent to you videoing that
23 activity?
24    A.    Yes.

Page 36

1    Q.    Did you record any sexual activity between you
2 and Cassandra on any other device, other than her cell
3 phone, as you just described?
4    A.    No.
5    Q.    Did you share the sex videos that you've just
6 described with anyone other than Cassandra?
7    A.    No.
8    Q.    To your knowledge did Cassandra share any of
9 those sex videos with you on any of your devices?
10    A.    No.
11    Q.    Let's talk about the nude photographs.  How
12 many nude photographs, to your knowledge, were on
13 Cassandra's cell phone in May of 2018?
14    A.    I couldn't give you an number, but I mean,
15 more than ten.
16    Q.    Do you know what the content of those nude
17 photographs depicted?
18    A.    Nude images of her.  Nude images of myself.
19    Q.    Can you be more specific?
20    A.    As to body parts?
21    Q.    Right.  What -- you know, what was depicted in
22 those images?
23    A.    There was pictures of us having sex, there was
24 pictures of her naked, pictures of me naked.

Page 37

1    Q.    Who took those photographs?
2    A.    I took some and she took some.
3    Q.    Why did you take those photographs?
4    A.    Same answer as I gave before, private intimate
5 movement between the two of us.
6    Q.    Do you regret having taken those photographs?
7    A.    No.
8    Q.    Do you know whether Sandra (sic) regrets
9 having taking those photographs?
10    A.    I don't think Cassandra regrets taking those
11 photographs.
12    Q.    Do you regret recording the sex acts that you
13 just described on video?
14    A.    No.
15    Q.    Do you know whether Sandra (sic) has any
16 regrets?
17    A.    Cassandra doesn't have any regrets.  I don't
18 think so, no.
19    Q.    Would you do it again?
20    A.    Yes.
21    Q.    Have you done it since the allegations in this
22 lawsuit have come to light?
23    A.    No.
24    Q.    Why not?



Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021                                    Pages 38..41

Page 38

1    A.    Probably not a good idea right about now. I
2  certainly don't think she would be okay with that. I
3  don't think I would either. I mean...
4    Q.    Why would it not be a good idea right about
5  now?
6    A.    Well, I just don't think that we both would
7  want to do that right now, given the set of
8  circumstances that are currently going on.
9    Q.    What set of circumstances are you referring
10  to? Can you be more specific?
11   A.    Well, this lawsuit that's out there. We also
12  have children in the house now, so that probably
13  wouldn't work out very well. Probably not in the stars
14  for us right now.
15   Q.    The photographs that we spoke of, did you ever
16  share those photographs with anyone other than
17  Cassandra?
18   A.    No.
19   Q.    But did you say some were taken on your cell
20  phone and some were taken on -- using her cell phone;
21  correct?
22   A.    No.
23   Q.    Oh, please correct me, where I got that wrong.
24   A.    They were just on her phone. I meant I would

Page 39

1  take them, meaning I would take them from her phone and
2  then she would also take some from her phone.
3    Q.    And thank you for clarifying that.
4        Did Cassandra ever share those photographs
5  with you?
6    A.    You mean showing me or sending me?
7    Q.    Let's start with showing you.
8    A.    Yes.
9    Q.    And when was that done?
10   A.    I don't understand. Like when did we take the
11  pictures or --
12   Q.    No, when did she show those to you?
13   A.    When she would take them. I mean, I would be
14  there when she would take them, or when I came home.
15   Q.    Okay. To be -- well, just to clarify, would
16  those photographs be shared with you at or near the time
17  they were taken?
18   A.    Yes.
19   Q.    And did she ever text you copies of those
20  photographs to your phone or any other device?
21   A.    No.
22   Q.    Do you know whether Cassandra ever shared any
23  of those photographs, or sex videos -- I may have asked
24  you this earlier -- with anyone else, other than you?

Page 40

1    A.    I don't think so, no.
2    Q.    Not to your knowledge?
3    A.    Correct.
4    Q.    Can you be sure of that?
5    A.    Yes.
6    Q.    What do you base that on?
7    A.    Trust.
8    Q.    Officer Crowley, did you ever share any of
9  those photographs or the sex videos with anyone, at any
10  time, other than Cassandra?
11   A.    No.
12   Q.    Did you ever speak of those photographs or sex
13  videos with anyone, other than Cassandra?
14   A.    No.
15   Q.    Have you ever taken those similar sexual
16  photographs and videos in any of your other
17  relationships?
18   A.    No.
19   Q.    What about Cassandra, has she ever done that,
20  to the best of your knowledge?
21   A.    I don't know.
22   Q.    Do you know whether Cassandra still has any of
23  the nude photographs and sexual videos that we've been
24  discussing on her cell phone?

Page 41

1    A.    No.
2    Q.    To be clear -- and probably a bad question on
3  my part -- do any of these photographs and sexual videos
4  still exist on Cassandra's cell phone or any other
5  device, to your knowledge?
6    A.    I believe they would exist on the phone that
7  they were on. She doesn't have that phone anymore.
8  That would be my answer for that.
9    Q.    When did she get a new phone, I'm presuming?
10   A.    I don't know when she got a new phone. I
11  don't remember.
12   Q.    Do you know -- okay. So you don't know when
13  she no longer used that phone?
14   A.    Correct.
15   Q.    The physical phone, right? And it was an
16  iPhone; correct?
17   A.    Yes.
18   Q.    Do you know which version of the iPhone it was
19  back in 2018?
20   A.    I don't know.
21   Q.    Was that a personal phone?
22   A.    Yes.
23   Q.    Do you know who Cassandra's mobile phone
24  carrier was in 2018?



Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 42..45

Page 42

1   A.   No, I don't.
2   Q.   Do you know what her telephone number was in
3   2018, for that specific phone?
4   A.   I'm assuming it stayed the same.
5   Q.   And what is that number?
6   A.   (708) 717-3652.
7   Q.   Did Cassandra have a work-issued cell phone?
8   A.   No.
9   Q.   Did you have a work-issued cell phone back in
10  2018?
11  A.   No.
12  Q.   And did you have a personal cell phone in
13  2018?
14  A.   Yes.
15  Q.   What was your telephone number?
16  A.   The same as it is today.
17  Q.   What is your telephone number?
18  A.   (815) 791-4154.
19  Q.   Do you know whether any of the photographs and
20  sex videos that we've been discussing were uploaded into
21  the Cloud?  Do you understand what I mean by that?
22  A.   Sort of, but I have no idea.
23  Q.   So there is a possibility that these photos
24  and sex videos may still exist, but they are being

Page 43

1   stored in the Cloud?  Can we agree on that?
2   MR. ADAMS:  I'm going to object to lack of
3   foundation.  Based on his prior answer and particularly
4   because that can be done by the intermediary, so that's
5   not necessarily something this witness or the owner of
6   the cell phone would do and so it is an additional
7   objection.
8   MS. PROCTOR:  And I appreciate the objection.  I
9   appreciate that your objection is foundation, but I
10  would ask that you not engage in speaking objections
11  because, as you know, that's not appropriate.
12  BY MS. PROCTOR:
13  Q.   Just a word about objections, Officer Crowley,
14  and there may be some more as we go through this.
15  Unless your attorney, Mr. Adams, instructs you not to
16  answer, you have to answer the question to the best of
17  your ability.  Do you understand that?
18  A.   Yes, I do.
19  Q.   Okay.  And also, have you ever given a
20  deposition before?
21  A.   Yes.
22  Q.   Just to be clear, if at any time you are asked
23  a question by me or any of the other attorneys who will
24  be asking questions today, that you do not understand,

Page 44

1   you have to please let us know so that you are certain
2   you're answering a question that is understandable.  Is
3   that fair?
4   A.   Yes.
5   Q.   Okay.  Have I asked you any questions thus far
6   in this deposition that you did not understand?
7   A.   The last one is a little confusing, but other
8   than that I believe I got them all.
9   Q.   Thank you.  And perhaps I can clean that up.
10  Do you know, one way or the other, Officer
11  Crowley, whether any of the photographs and videos that
12  we've been discussing are stored in the Cloud or
13  anywhere else?
14  A.   I don't know.
15  Q.   Do you have hard copies of any of those
16  photographs or videos?
17  A.   No.
18  Q.   Have you retained electronic copies of any of
19  those photographs or videos for your own personal
20  record?
21  A.   No.
22  Q.   Other than doing these things that we have
23  been discussing with Cassandra privately, have you guys
24  ever engaged in any of the same type of activity with

Page 45

1   others?
2   A.   No.
3   Q.   Have you ever engaged in that same type of
4   activity with others, other than Cassandra?
5   MR. ADAMS:  Let me object to form.  Same type of
6   activities being taping, photographing or --
7   MS. PROCTOR:  Right.  The practice -- thank you,
8   Paul.
9   BY MS. PROCTOR:
10  Q.   The practice of photographing your sexual
11  activities, either taking photographs or video recording
12  those events.  Have you ever engaged in that practice or
13  activity with anyone other than Cassandra?
14  A.   No.
15  Q.   And the same question for Cassandra, if you
16  know?
17  A.   I don't know.
18  Q.   Did you ever post any of those photographs or
19  sexual videos on any social media or other posting
20  platform?
21  A.   No.
22  Q.   Do you know whether Cassandra has ever posted
23  the photographs or sexual videos on any other social
24  media or other such platform?



Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 46..49

Page 46

1    A.    Not to my knowledge.

2    Q.    Clarify for me, what is your understanding of
3 what Cassandra did with the photographs and sexual
4 videos that are the subject of this lawsuit?

5    A.    She didn't do anything with them.

6    Q.    Well, they've been destroyed; correct?

7    A.    I don't have any knowledge that they've been
8 destroyed.

9    Q.    Well, they would be still on her phone;
10 correct?

11    A.    Her -- the phone that it was originally taken
12 on, I'm assuming they would be on there, but I don't
13 know if they're on there or not.

14    Q.    Do you know whether they're stored on her
15 current phone in any way, shape or form, to the best of
16 your knowledge?

17    A.    To the best of my knowledge, no.

18    Q.    How do you know that?

19    A.    I don't really know that.  I just would --
20 because there was from an old phone, so I don't know how
21 they would be on her current phone.

22    Q.    Well, have you ever -- like you've never -- do
23 you own an iPhone?

24    A.    Yes.

Page 47

1    Q.    And have you -- how many iPhones have you
2 owned?

3    A.    Probably four, five different ones.

4    Q.    And when was the last time you switched
5 iPhones?

6    A.    I just got this new one for my birthday -- or,
7 yeah, my birthday.

8    Q.    And when was your birthday?

9    A.    August of last year.

10    Q.    Okay.  And where did you get the phone?

11    A.    Cassie bought it for me for my birthday.

12    Q.    Okay.  So when you got your new phone, did you
13 transfer the photographs or videos, whatever you had on
14 your old phone, did you transfer that to the new phone?

15    A.    Yes.

16    Q.    Now, getting back to -- so you understand that
17 process; right?  You have done it yourself; correct?

18    A.    Yes.

19    Q.    All right.  Now, focusing on Cassandra's cell
20 phone and the photographs and sex videos, which are the
21 subject of this lawsuit -- are you with me?

22    A.    I'm with you.

23    Q.    My question to you is, to your knowledge was
24 any of that content transferred from Sandra's (sic) old

Page 48

1 phone to her new phone?

2    A.    Not to my knowledge.

3    Q.    And how do you know that?

4    A.    I don't know that.  To my knowledge, I don't
5 know.

6    Q.    And you may have told me this before, but I
7 neglected to write it down, Officer.

8          Who was your cell phone provider back in 2018?

9    A.    Oh, jeez, Verizon potentially.

10    Q.    Do you pay your own cell phone bill?

11    A.    Yes.

12    Q.    Is it like a direct withdrawal from your
13 credit card or --

14    A.    No, I just pay the bill once a month.

15    Q.    So you believe -- have you always had your
16 mobile service or cellular service through Verizon?

17    A.    So I have AT&T now.  So I know I switched,
18 but --

19    Q.    Do you know when you switched?

20    A.    I don't recall when I did that, no.

21    Q.    Okay.  Have you testified in any criminal
22 trials?

23    A.    Yes.

24    Q.    How many, over the years?

Page 49

1    A.    I mean, I've been a police officer for 16
2 years so I've had quite a few times I've had to testify
3 in court.

4    Q.    Have you ever worked in the investigations
5 unit at the Joliet Police Department?

6    A.    No.

7    Q.    Are you trained in the use of the Cellebrite
8 System?

9    A.    No.

10    Q.    Are you friends with any of the folks in the
11 investigations unit at the Joliet PD, currently?

12    A.    No.

13    Q.    What about back in 2018, were you friendly
14 with any of the officers assigned to the investigations
15 unit?

16    A.    No.

17    Q.    Would you know how to operate the Cellebrite
18 computer system?

19    A.    No.

20    Q.    Other than Cassandra and your attorney, as of
21 May of 2021, Hall Adams, have you ever discussed the
22 allegations in this lawsuit with anyone else?

23    A.    No.

24    Q.    How would you describe your relationship with



Page 50

1 David Jackson?

2     A.    We are co-workers, members of the BPOA. We

3 get along.

4     Q.    What is the BPOA?

5     A.    The Black Police Officers Association.

6     Q.    And what is the purpose of that association?

7 What's its mission?

8     A.    Its purpose is to kind of gather community

9 partnership. It's to gather police officers, not just

10 minority police officers, but anybody can be a member

11 there. It just kind of bridges the gap between the

12 community and the police department.

13     Q.    And how long have you been a member of that

14 association?

15     A.    A couple of years.

16     Q.    A couple. Can you be more specific than that

17 maybe?

18     A.    Maybe two, two years.

19     Q.    Well, let's -- were you a member of that

20 association in 2018?

21     A.    No.

22     Q.    Same question for 2019?

23     A.    I think sometime in 2019, like, late 2019 I

24 think maybe. I don't remember when.

Page 51

1     Q.    How did you get involved with the association?

2     A.    You just sign up for it. It's a volunteer

3 thing.

4     Q.    Do you hold -- like, did anyone in particular

5 encourage you to join the group?

6     A.    No. I think, like, once a year they would put

7 a thing in your mailbox if anybody is interested in

8 joining the BPOA, just sign this form, and so I did.

9     Q.    Do you hold any positions within the

10 organization?

11     A.    No.

12     Q.    Does David Jackson hold any position within

13 the organization?

14     A.    He's the president.

15     Q.    And how long has he been the president of that

16 group?

17     A.    I don't know.

18     Q.    Can you tell us the names of any other

19 officers who hold leadership positions in the

20 organization?

21     A.    I believe Carlos Matlock is the vice

22 president. That's the only other leadership positions

23 that I'm aware of.

24     Q.    Do you know how long Matlock has held the

Page 52

1 position as vice president?

2     A.    I don't know.

3     Q.    How would you describe your relationship with

4 Matlock?

5     A.    Don't really have one. He's a deputy chief of

6 investigations.

7     Q.    How would you describe your relationship with

8 Gavin?

9     A.    I don't have one.

10     Q.    Do you know who he is?

11     A.    Yes.

12     Q.    Who is he?

13     A.    He was a sergeant in investigations but --

14 well, actually then he became a deputy chief, but since

15 retired.

16     Q.    Have you ever had any conversations with Gavin

17 concerning the allegations in this lawsuit?

18     A.    No.

19     Q.    Have you ever had any conversations with Al

20 Roechner concerning the allegations in this lawsuit?

21     A.    No.

22     Q.    Have you ever had any conversations with

23 Officer Mike DeVito concerning the allegations in this

24 lawsuit?

Page 53

1     A.    No.

2     Q.    Have you ever had any conversations with

3 DeVito concerning Cassandra Socha and the issues that

4 are at play in this lawsuit?

5     A.    No.

6     Q.    Do you know who Mike DeVito is?

7     A.    Yes.

8     Q.    Have you ever had any involvement with him

9 concerning any union issue, on your own behalf or on

10 behalf of someone else?

11     A.    Yes.

12     Q.    Can you tell us about that?

13     A.    When you're disciplined in the police

14 department the union represents you, so it goes through

15 them.

16     Q.    So the discipline that you mentioned earlier,

17 that would have been essentially your only interaction

18 with DeVito while a Joliet police officer?

19     A.    Yes.

20     Q.    Other than yourself, Officer Crowley, do you

21 have any personal knowledge as to whether or not any

22 officers on the Joliet Police Department have seen these

23 nude photographs and sexual videos from Cassandra's cell

24 phone?



Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 54..57

Page 54

1    A.    No.
2         Q.    Do you have any personal knowledge as to
3    whether or not any supervisors or members of the command
4    staff at Joliet Police Department have ever seen or
5    viewed any nude photographs and sex videos from
6    Cassandra's cell phone?
7         A.    Can we just back up?  When you mean "personal
8    knowledge" are you saying did I witness or did I see
9    this happen?
10        Q.    Yes.
11        A.    No, I didn't witness this and I did not see
12   this happen.
13        Q.    Did you hear about it from someone?
14        A.    Yes.
15        Q.    When did you first hear about this allegation?
16        A.    I believe it was March of 2020.  I was
17   approached by Dave Jackson.
18        Q.    Where were you when Jackson approached you?
19        A.    In the police station.
20        Q.    What did he say to you?
21        A.    He asked me if he could speak to me privately
22   for a minute and so we went into an office and that's
23   when we spoke.
24        Q.    Was it just you and David Jackson present for

Page 55

1    this conversation?
2         A.    Yes.
3         Q.    How long did it last?
4         A.    Oh, I would say no more than a half hour.
5         Q.    And what do you recall about the conversation?
6    What did he say to you?  Let's start there.
7         A.    He told me he had information regarding
8    Cassandra's lawsuit and I asked him what that was and he
9    told me.
10        Q.    And what did he tell you?
11        A.    He told me that on the night that Cassandra's
12   phone was searched that Darrell Gavin had come down into
13   the watch commander's office and told Rob Brown, Jeremy
14   Harrison and Tim Powers that he knows why -- quote was,
15   "I know why Crowley is with Socha, because she sucks
16   dick like a porn star."
17        Q.    Did he tell you anything else that you recall
18   as you sit here today?
19        A.    Yes.
20        Q.    What else did he tell you?
21        A.    He told me that Al Roechner had videos on his
22   personal laptop.  He told me that Phil Bergner -- that
23   Al Roechner had approached Phil Bergner, who was like
24   the IT officer at the time, and I can't -- it was either

Page 56

1    asked him to issue him a new cell phone or erase his
2    current cell phone, and that Phil Bergner was
3    uncomfortable with that and that he approached another
4    officer named -- a female officer named Shawn -- I'm
5    going to butcher her last name.  I think it's
6    Stachelski, or something like that.  I can't really know
7    her last name.  But he approached her and that he was
8    uncomfortable with that and he wanted advice as to what
9    to do.
10        He told me that there were several copies made
11   from the Celebrex (sic).  Well, that Tab Jensen had
12   ordered the removal of the contents of the phone from
13   the Celebrex (sic) system and that copies were made --
14   before erasing it they made copies and that those copies
15   were given to Al Roechner and that Al Roechner asked for
16   all the copies and kept them in his personal office, and
17   that none of these ever made it into evidence.
18        At this time that's all I can recall, but if
19   something pops later, I'll let you know.
20        Q.    Did David Jackson tell you how he obtained
21   this information?  In other words, what the source of
22   this alleged information was?
23        A.    No.  Well, I had another meeting with him
24   later on.

Page 57

1         Q.    Okay.  And we can talk more about that.  So in
2    terms of your first meeting with him at the Joliet
3    police station, I believe that was sometime in March of
4    2020?
5         A.    Yes.
6         Q.    Do I have that right?
7         A.    Yes.
8         Q.    And it took about half an hour.  What, if
9    anything, did you say in response to the information
10   shared with you by David Jackson?
11        A.    So I first asked him why he's coming to me and
12   why he's telling me this.  I specifically asked him if
13   he's looking for money out of this or, you know, because
14   a lawsuit potentially has -- you know, there's a lawsuit
15   potentially.  And I just wanted to clear that right off
16   the table because I would have walked out the door,
17   that's fine, and I'm not trying to do all that.  I just
18   asked him, why are you telling me this?
19        Q.    And what did he say?
20        A.    He responded that he knows what's right is
21   right and what's wrong is wrong and that, you know, he
22   knows that this stuff is wrong and, you know, it
23   shouldn't be done to anyone.  And if this happened to
24   one of his loved ones he would hope that someone



Page 58

1  would -- if they had knowledge of it, would tell him.
2  And that was the reason that he provided me.  He
3  specifically told me he's not looking for any type of
4  compensation for this whatsoever.
5      Q.    Do you recall anything else about your
6  conversation with Jackson that we've been discussing?
7      A.    Yes, he told me specifically with Al
8  Roechner's laptop that Al Roechner told him,
9  specifically, that these videos were on his personal
10  laptop.
11      Q.    Did he tell you when Al Roechner allegedly
12  told him that?
13      A.    No.
14      Q.    Did he say whether anyone else was present
15  during this alleged conversation between himself and
16  Roechner?
17      A.    No.
18      Q.    I just want to clarify.  I want to go back to
19  something that you said.  Your testimony that Jackson
20  told you that Roechner went to -- I think it is Shawn
21  Stachelski?
22      A.    No.  Phil Bergner went to Shawn Stachelski and
23  said that Al Roechner went to Phil Bergner and asked him
24  to either issue him a new cell phone or erase the

Page 59

1  contents of his current phone.  I don't remember which
2  one.
3      Q.    So this was an alleged conversation between
4  Bergner and Stachelski; correct?
5      A.    Yes.
6      Q.    Do you know if there was anyone present for
7  that conversation?
8      A.    I don't know.
9      Q.    Was Jackson present for that conversation?
10      A.    I don't know.
11      Q.    Do you know how Jackson came about that
12  information?
13      A.    I don't know that either.
14      Q.    And the same question for everything else that
15  Jackson shared with you in this half-hour conversation
16  in March of 2020 at the station.  Do you know how
17  Jackson came about any of this information?
18      A.    I can -- I don't know specifically, but I know
19  that Detective Jackson is a detective.  That everyone
20  involved in this case is either a detective or, you
21  know, a detective sergeant, a commander of the
22  investigations unit at the time.  So I took him to be
23  credible because he works in the office with everyone
24  that you mentioned, outside of Phil Bergner.

Page 60

1      Q.    So you made an assumption, but really had no
2  understanding of how Jackson came about this
3  information?
4      A.    That's correct.
5      THE WITNESS:  Did you guys lose me for a minute?
6      MS. PROCTOR:  I can hear you okay.
7          Actually, you know, what, we've been going for
8  a little over an hour.  Can we just take a short
9  five-minute break?
10              (Short break was taken.)
11  BY MS. PROCTOR:
12      Q.    Officer Crowley, was there ever a time you did
13  not live together with Cassandra?
14      A.    Like when we were together in --
15      Q.    Well --
16      MR. ADAMS:  Ever?
17  BY MS. PROCTOR:
18      Q.    Yeah, just to be clear, after you started your
19  relationship with Cassandra, my question to you is, was
20  there ever a time where the two of you did not live
21  together under the same roof?
22      A.    Yes, when we were first dating I lived with my
23  parents and she lived here.
24      Q.    Okay.  But beyond that, once you started

Page 61

1  living together in 2015, I believe it was, from that
2  point to the present was there ever a time when the two
3  of you did not live together?
4      A.    No.
5      Q.    Were you ever separated or did you ever take
6  any time away from each other, from 2015 to the present?
7      A.    Oh, I'm sorry.  Yes, there was a time that I
8  was not allowed to live here and that's -- I lived down
9  with my parents.
10      Q.    Did that have to do with the no contact order?
11      A.    Yes.
12      Q.    Okay.  Have you ever taken any trips out of
13  state with any other Joliet police officers during your
14  time with the department?
15      A.    No.
16      Q.    Have you ever taken a trip to Las Vegas with
17  anyone from the Joliet PD, at any time?
18      A.    Cassandra and I went to Vegas for her cousin's
19  wedding, but that's all.  I mean, she works there, so
20  other than her, no.
21      Q.    Have you ever done any type of social outings
22  with anyone from the Joliet Police Department?
23      A.    Can you define "social outings?"
24      Q.    Look, do you have a close circle of friends



Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 62..65

Page 62

1  from work, from the Joliet PD?
2      A.    Not really.  I mean, I don't really associate
3  outside of work with many people.
4      Q.    Was that always the case?
5      A.    I mean, I would -- there would be times when
6  we would go out for a drink or two outside of work,
7  every now and then.  Like I said, there would be shift
8  parties, Christmas parties, there would be certain
9  events, department events, that we would go to, kid
10  Christmas party, an FOP Christmas party, but that's
11  about the extent.
12      Q.    So you don't -- other than Busse and that Emph
13  person that you named earlier, are those your only two
14  buddies, if you will, from the Joliet Police Department
15  in 16 years of working there?
16      A.    I've only worked here for eight years.  I am
17  on my ninth years now.  Yeah.
18      Q.    Okay, I'm sorry.  I thought you were there
19  longer.  But what I'm trying to understand is, like, who
20  your friends were on the force, other than the people
21  that you've already mentioned?
22      A.    Yeah, I keep a small circle.  I don't --
23      Q.    And who's in the small circle?
24      A.    The officers that I mentioned before.  With

Page 63

1  this department there's a lot of opportunities here, so
2  a lot of the officers that I got hired with they moved
3  on to other things and I don't really see them that
4  often.  I just -- you work with the officers that are on
5  your shift, that you see day in and day out.  You
6  develop relationships with them, but there is -- you
7  know, there's just a few guys that I, you know, will
8  talk on the phone with every now and then, but I
9  don't -- you know, I have four children.  I've got a
10  household.  I don't really do anything outside of work
11  with any of those people.
12      Q.    The few guys who you do talk with --
13      A.    Yes.
14      Q.    -- who are they?
15      A.    I'm sorry?
16      Q.    The few guys that you mentioned that you do
17  talk with --
18      A.    Yes.
19      Q.    -- who are they?
20      A.    Like I said, Bill.  I talk to Bill Busse, but
21  he doesn't work here anymore.  Phil, he works on my
22  shift.  I go to jujitsu with a couple of guys, Alana
23  Costa, Casey and Ryan Killian go there, but I don't
24  really go out with them.  They're younger.

Page 64

1      Q.    What is it that you mentioned you do?  Is it
2  some type of martial arts?
3      A.    Yeah, jujitsu.
4      Q.    And you mentioned Ryan and Casey?
5      A.    Killian, K-I-L-L-I-A-N.
6      Q.    Are they brothers?
7      A.    Yes.
8      Q.    Okay.  What about in 2018, did you have a
9  close circle of friends in 2018?
10      A.    I wouldn't say a close circle of friends.
11  There were just officers that, you know, you work with
12  on the shift that, like I said, occasionally we would
13  meet out.  And when I say "we," Cassie and I.  Shift
14  party or two, but again, that was before her and I had
15  children.  So when we would have our days off and I
16  didn't have my girls, it was just the two us, so we had
17  more free time back then.
18      Q.    Well, I understand, when you have children
19  your life changes completely.  But when you could go out
20  socially, you know, before children and the commitments
21  of family, who would you hang out with?  You said you
22  would meet out with some people.  Are there any other
23  names that we haven't already covered?
24      A.    I don't think so.

Page 65

1      Q.    Who did you work with on your shift in 2018?
2      A.    I think I went over that list already.  I
3  mean, I can tell you the officers that worked in some of
4  the districts that I did work in.
5      Q.    Okay.  And I don't really want -- you know, I
6  don't really need you to go over names that you've
7  already given me, Officer, so is there anybody that you
8  haven't mentioned?
9      A.    Not that I can recall.
10      Q.    Okay.  You know, getting back to the sex
11  photographs and videos, why did you use Cassandra's cell
12  phone and not your own?
13      A.    My guess would be her phone was right there, I
14  just grabbed it, but I don't -- there's no specific
15  reason for that.
16      Q.    And is it your testimony that you've never
17  used your own cell phone, or any other device, to record
18  your sex acts with Cassandra?
19      A.    No.
20      Q.    Why were you recording these events?
21      MR. ADAMS:  Objection.  Asked and answered.
22      MS. PROCTOR:  I don't know that I specifically
23  asked that, and if I did, I'll ask it again and we can
24  move on.



Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 66..69

Page 66

1    MR. ADAMS:  You did and my objection is that you
2  have asked and answered.
3    MS. PROCTOR:  But he can go ahead and answer it.
4  BY THE WITNESS:
5    A.    It was just a private intimate moment that I
6  had shared with her.
7    Q.    But why document it?  I mean, I don't get it.
8  Why record it?
9    MR. ADAMS:  Object to form.
10  BY THE WITNESS:
11    A.    As I said, it was just a private moment that
12  her and I shared together.
13    Q.    Back in 2018, did Sandra have -- was her
14  iPhone password protected, if you know?
15    A.    I don't know.
16    Q.    So you don't know whether she had a password
17  or not?
18    A.    I would assume that she did, but I don't know.
19    Q.    Did you have access to the password to her
20  phone in 2018?
21    A.    No.
22    Q.    Have you ever had access to the password on
23  her phone?
24    A.    If I needed to get into her phone for

Page 67

1  something I would ask her the password and she would
2  give to me, but I don't know it off the top of my head.
3    Q.    But you had access to it if you wanted to go
4  on her phone; would that be fair?
5    A.    I would have to ask her for the password, yes.
6    Q.    Have you read or seen any of the deposition
7  testimony that has been taken so far in this litigation?
8    A.    No.
9    Q.    I want to get back to -- I think we were at
10  the March 2020 meeting with David Jackson --
11    A.    Okay.
12    Q.    -- right?  And I think you exhausted your
13  memory on your conversation with Jackson, so let's --
14  that's where we're going to start this next line of
15  questioning.
16    What, if anything, did you do after that
17  conversation with Jackson?
18    A.    I documented that conversation.  I took
19  written notes.  I then informed Cassie, Cassandra, of
20  the conversation that I just had.  And then I
21  composed -- I recomposed those notes in an email to her
22  and I told her she needed to get these over to her
23  attorney.
24    Q.    Okay.  So when did you take the written notes

Page 68

1  of your conversation with Jackson in March of 2020?
2    A.    As he was speaking to me.
3    Q.    How -- what did you use to take the notes?
4    A.    A notepad and a pen.
5    Q.    Do you still have those notes?
6    A.    I do not.
7    Q.    Have you ever turned those notes over to
8  Cassandra's attorney in this lawsuit?
9    A.    No, I just composed them in an email to have
10  her send those to her attorney.  I believe she just
11  forwarded that email to him.  I don't really know
12  specifically, but the handwritten notes, I believe I
13  just threw away that day.
14    Q.    And when you say you recomposed the notes, did
15  you create an email based on those notes?
16    A.    Yes.
17    Q.    What device did you use to create the email?
18    A.    I think it was my phone.
19    Q.    And so I am clear on this, you used your phone
20  to compose an email; correct?
21    A.    Yes.
22    Q.    And that email was sent to Cassandra who you
23  believe in turn forwarded that same email to attorney
24  Hall Adams, who is representing you here today; correct?

Page 69

1    A.    Correct.
2    Q.    Did anyone assist you in composing the email?
3    A.    No.
4    Q.    Did you talk with anybody about your meeting
5  with Jackson before you composed that email?
6    A.    No.
7    Q.    Did you talk to Cassandra about your
8  conversation with Jackson before you composed the email?
9    A.    Yes.
10    Q.    And when did you have the conversation with
11  Cassandra?
12    A.    Immediately after the sit-down with Dave
13  Jackson.
14    Q.    How did you have that discussion?  In other
15  words, was it by phone or in person?
16    A.    Through text message.
17    Q.    Did you save those texts?
18    A.    No.
19    Q.    Do you know whether Cassandra saved those
20  texts?
21    A.    I don't know.
22    Q.    Okay.  How much information or detail did you
23  include in those texts?
24    A.    I just said Dave Jackson spoke with me.  I am



Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021                                    Pages 70..73

Page 70

1 going to send you an email about how our conversation
2 went. You need to get that over to your attorney.
3      Q.    Why did you believe she needed to get the
4 information over to her attorney?
5      A.    I believe the information that I was provided
6 was compelling and that her attorney needed to be aware
7 of what I was just told.
8      Q.    Do you know whether Cassandra forwarded your
9 email to Hall Adams?
10     A.    I believe she did, yes.
11     Q.    Were you copied on that email?
12     A.    No.
13     Q.    Do you know when she forwarded the email to
14 Mr. Adams?
15     A.    No.
16     Q.    Did you ever speak with Mr. Adams concerning
17 the content of your email?
18     A.    No.
19     Q.    At any time?
20     A.    No.
21     Q.    Including up to today?
22     A.    No, I don't think so.
23     Q.    So to be clear, you never had a conversation
24 with Hall Adams concerning the content of your email

Page 71

1 documenting your March 2020 meeting with Jackson; is
2 that correct?
3      A.    To my knowledge.
4      MR. ADAMS:  I am going to object and assert the
5 prior communication privileged as to any communications
6 since the time that he engaged me to be his lawyer in
7 conjunction with this deposition, although I'm not sure
8 that it matters.
9 BY MS. PROCTOR:
10     Q.    Okay. Well, just to be clear, you didn't hire
11 Mr. Adams to represent you until May of 2020 of this
12 year; correct?
13     A.    That's correct.
14     Q.    So my question to you is directed at any time
15 from March 2020 up until the time that you retained
16 Mr. Adams in May of 2021, did you ever discuss the
17 content of your email documenting your conversation with
18 Jackson with Mr. Adams?
19     A.    No.
20     Q.    Did you ever discuss the content of that email
21 with anyone other than Cassandra?
22     A.    No.
23     Q.    Did you review the email in written form
24 before today's deposition?

Page 72

1      A.    No.
2      Q.    I'll share with you, Officer Crowley, that a
3 copy of that email was provided to us by Cassandra's
4 counsel, okay? And I'm looking at it and it's dated
5 March 2 of 2020.
6      A.    Okay.
7      Q.    In other words, it begins "On March 2, 2020, I
8 was approached by Detective Jackson." Okay?
9      A.    Okay.
10     Q.    So my question to you is, was your meeting
11 with David Jackson on March 2 of 2020?
12     A.    If that's what it says, yes. I have no reason
13 to dispute otherwise.
14     Q.    Okay. Now, I believe you testified earlier
15 that you had another meeting with Jackson?
16     A.    Yes.
17     Q.    When did that meeting occur?
18     A.    I believe it was a couple of months after
19 that. I know it was before June of 2020, only because I
20 was still working the desk at the time of the second
21 meeting and I went back on the street sometime in June.
22 So I'm going to guess and say it was perhaps May of
23 2020.
24     Q.    Was anybody else present for the May 2020

Page 73

1 meeting with Dave Jackson?
2      A.    Yes.
3      Q.    Who was present for that meeting?
4      A.    Carlos Matlock.
5      Q.    And where did that meeting occur?
6      A.    It occurred at a Wendy's restaurant in Joliet.
7      Q.    Other than you, Matlock and Jackson, was there
8 anybody else present for that meeting?
9      A.    No.
10     Q.    How long did the meeting last?
11     A.    Again, probably about a half hour, 45 minutes.
12     Q.    How was the meeting initiated?
13     A.    I believe Jackson asked me if I could meet him
14 for lunch. He said that Carlos was going to be with him
15 and that they had some information for me. So I said,
16 okay, where do you want to meet?
17     Q.    And what do you recall about the May 2020
18 meeting with Jackson?
19     A.    That one I really didn't learn any more
20 specific information from the first time we met. There
21 was no, you know, new information that I wasn't aware
22 of. The only thing that kind of stuck out in my mind in
23 that meeting was that in regards to Darrell Gavin coming
24 down into the watch commander's office and making his



Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 74..77

Page 74

1  comment, Carlos Matlock told me specifically that Rob
2  Brown told him, told Carlos, about this comment that
3  Darrell Gavin had made.
4      Q.    Okay.  So that's the only -- new information,
5  if you will, that you learned concerning the topics that
6  were previously discussed with Detective Jackson;
7  correct?
8      A.    Yes, there was that and Carlos had also told
9  me that he heard from Ed Grizzle's mouth, that Ed
10 Grizzle, when he was -- Ed Grizzle apparently was -- I'm
11 going to use his words -- like gloating up in
12 investigations office.  That he went across the street
13 and got interviewed by Chris Regis, the inspector
14 general, and that yeah, quote, you know, I told them
15 everything.  I told them that I made copies of the cell
16 phone and I told them that I gave copies out of the cell
17 phone because I was ordered to do that.  So that's what
18 he had told me.
19     Q.    Okay.  Do you remember anything else about
20 that conversation that you hadn't heard before from
21 Jackson?
22     A.    No, just that Carlos told me, hey, I'll
23 testify to all this stuff.  So if you need me to I'll
24 tell the truth.  I have no problem doing that.  I said

Page 75

1  okay.
2      Q.    Has that exhausted your memory of your meeting
3  with Jackson and Matlock in May of 2020?
4      A.    At this time, yes.
5      Q.    So to be clear, let me see if I have this
6  straight.  Matlock told you that Brown told him that
7  Gavin allegedly made the comment regarding the sex video
8  showing Cassandra giving you oral sex; correct?
9      A.    Yes, that Rob Brown was present when Darrell
10 Gavin said it.  So Rob Brown told Matlock, this is what
11 Gavin said when he came down into the watch commander's
12 office.
13     Q.    And the second piece that you mentioned,
14 Matlock -- was it Matlock who said -- who reported this
15 alleged conversation with Ed Grizzle that you just
16 testified to?
17     A.    Yes.
18     Q.    And was it your understanding from Matlock
19 that this was a conversation between Grizzle and
20 Matlock?
21     A.    From my understanding it was just a group
22 conversation, because Matlock told me his desk was right
23 next to Ed Grizzle's at the time and that Ed Grizzle was
24 just openly talking about how he did go across the

Page 76

1  street, was interviewed by Chris Regis and that he told
2  him, yes, I did make copies of her cell phone and, yes,
3  I did distribute those copies of her cell phone.  And he
4  said I gave it to Marc Reid, I gave it to Al Roechner,
5  so, that's just what he had told me.
6      Q.    So this is Matlock allegedly overhearing
7  something Grizzle said; correct?
8      A.    Yes.
9      Q.    Did Matlock give you a time frame of this
10 alleged statement from Grizzle?
11     A.    No, but I heard that it was either the day of
12 or around when Ed Grizzle was interviewed by Chris
13 Regis.
14     Q.    Do you know what the date of that occurrence,
15 if it occurred, happened?
16     A.    I don't know.
17     Q.    Was it before or after Cassandra filed her
18 lawsuit?
19     A.    It would have been after.
20     Q.    And same goes for your initial meeting with
21 Jackson and then the second meeting in May of 2020.
22 That was after Cassandra filed the lawsuit; correct?
23     A.    Yes.
24     Q.    Were you aware, during either of those

Page 77

1  meetings, that David Jackson had filed his own lawsuit
2  against the city?
3      A.    Yes.
4      Q.    What, if anything, do you know about the
5  allegations in Jackson's lawsuit against the city?
6      A.    I just know what's been publicly been made
7  available through media.  I never read it personally.  I
8  just read it, whatever came through the media.
9      Q.    What is your understanding of the allegations
10 in his lawsuit involved, if you know?
11     A.    From my understanding he's suing them.  I
12 believe it's a discrimination lawsuit, but I don't
13 really know the nuts and bolts of it.
14     Q.    Have you ever discussed with Jackson his
15 lawsuit against the city?
16     A.    No.
17     Q.    Before your meeting with Jackson in March of
18 2020, did you receive any information from anybody about
19 the alleged sharing of the nude photographs and sex
20 video from Cassandra's cell phone amongst members of the
21 Joliet Police Department?
22     A.    The only thing that was, I guess you could say
23 shared, was when Cassandra received a letter in her
24 mailbox.



Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021
Pages 78..81

Page 78

1    Q.   Have you seen the letter Cassandra received in
2 her mailbox?
3    A.   Yes.
4    Q.   Do you know about when she received it?
5    A.   I don't know.  I don't know.  I know that we
6 were both on midnight shift.  It could have been
7 sometime in 2018, but I don't know.
8    Q.   Was it before or after she filed the lawsuit?
9    A.   Oh, before.
10   Q.   Do you know when that was in relation to when
11 her phone was searched, if you know?
12   A.   It was after her phone was searched.
13   Q.   Do you know how long after?  Days?  Weeks?
14 Months?  If you know.
15   A.   I don't know.
16   Q.   Did you read the letter?
17   A.   Yes.
18   Q.   Do you recall what the letter said?
19   A.   Yes.
20   Q.   What is your memory of what the letter said?
21   A.   The letter -- it was typed and it just said
22 that there has been -- I'm summarizing here, but there's
23 members of -- there's detectives and supervisors that
24 watched a sex video.  And then it gave a specificity of

Page 79

1 the actions that were occurring and that these were
2 being passed around by members of the investigations
3 division and that we needed to do something about it.
4    Q.   And what was the specificity you mentioned?
5    A.   Pardon my language, but it specifically made
6 mentioning of "deep throating."
7    Q.   What does that mean?
8    A.   A form of oral sex.
9    Q.   That phrase was used in the letter?
10   A.   Yes.
11   Q.   Do you know when Cassandra told you about the
12 letter?  Was it at or near the time she received it?
13   A.   Yeah, she told me the night that she received
14 it.  We were working together that night, just in
15 different districts, and she called me and told me that
16 she got this letter in her mailbox.
17   Q.   About what time was that?
18   A.   That she called me?
19   Q.   Yes.
20   A.   Our shift started at either 6 or 7 p.m. that
21 night, so it was shortly thereafter.
22   Q.   And what did she say to you in the
23 conversation?
24   A.   She just told me she got this weird letter in

Page 80

1 her mailbox and she read it to me.
2    Q.   And what else was discussed in that
3 conversation with Cassandra about the letter or her
4 response?
5    A.   She just asked what do I do with this?  What
6 is this about?  Stuff like that.
7    Q.   Was that the first time, to your knowledge,
8 that Cassandra learned that information from her cell
9 phone was allegedly being shared?
10   A.   Yes.
11   Q.   Do you have any idea who wrote that letter?
12   A.   No.
13   Q.   Do you have any -- would you venture a guess
14 of who wrote that letter?
15   A.   No.
16   Q.   Did anyone ever tell you who wrote that
17 letter?
18   A.   No.
19   Q.   And I just want to clarify, was this the only
20 letter that Cassandra ever received concerning the
21 contents of her cell phone?
22   MR. ADAMS:  Objection.  Foundation.
23 BY THE WITNESS:
24   A.   She received another letter in her mailbox but

Page 81

1 all it was was an attorney like -- it looked like it
2 might have been from a website from an attorney's
3 office.  And I can't remember if it said, you should
4 contact this person, they can help you with this, or if
5 it was just in there.  Like, you know, like a
6 suggestion.  Here is an attorney that can help you with
7 that.
8    Q.   Do you know when she received that document?
9    A.   I don't recall.  I know it was after the first
10 one, but I don't recall when.
11   Q.   Can you be anymore specific of the timeline
12 between the first letter and then hearing about this
13 other document?  Was it days, weeks or months, if you
14 know?
15   A.   It would have been weeks, but I don't recall
16 exactly when.
17   Q.   Did you actually read the document?
18   A.   The first one?
19   Q.   No, this second -- well, this document that
20 you mentioned --
21   A.   I did, yes.
22   Q.   -- with the attorney information on it?
23   A.   Yes.
24   Q.   Do you recall the name of the attorney on the



Page 82

1  document?
2      A.    I recall it was a female attorney, but I don't
3  recall the name.
4      Q.    Other than containing attorney information did
5  it -- do you remember anything else about what the
6  document said?
7      A.    No.
8      Q.    Did Cassandra keep that document?
9      A.    I believe so.
10     Q.    Do you know what, if anything, Cassandra did
11 with that document?
12     A.    I assume she gave it to her attorney, but I
13 don't know.
14     Q.    Getting back to your meeting in May with
15 Matlock and Jackson, have you now told me about all your
16 meetings, in-person meetings with Jackson and/or Matlock
17 concerning the allegations in this lawsuit?
18     A.    Yes.
19     Q.    Have you met with any other member of the
20 Joliet Police Department concerning any issues that
21 touch upon the allegations in this lawsuit?
22     A.    No.
23     Q.    Did you ever hear any rumors within the Joliet
24 Police Department concerning the nude photographs or

Page 83

1  sexual videos from Cassandra's cell phone?
2      A.    No, other than what I was told by Jackson,
3  Matlock and the letter, no.
4      Q.    So if there were rumors you did not hear any
5  of them; correct?
6      A.    Correct.
7      Q.    The first letter that you mentioned that
8  Cassandra found in her mailbox, was that typed or
9  handwritten, if you recall?
10     A.    Typed.
11     Q.    Did you recognize the writing style?
12     A.    I mean, it was on a computer.  Like Times New
13 Roman or something like that.  I don't know.  It just
14 looked like a basic -- like a Word document.  Somebody
15 opened up a Word document, typed it and then put it in
16 her mailbox.
17     MR. ADAMS:  I'll object to form.  If it's helpful,
18 Nick, I think she meant the prose, not the font.  The
19 use of the language, not the particular font.
20     THE WITNESS:  Okay.
21 BY MS. PROCTOR:
22     Q.    So with that in mind, was there anything about
23 the letter that was familiar to you?  By writing --
24 that's what I meant by writing style.

Page 84

1      MS. PROCTOR:  Thank you, Hall.
2  BY THE WITNESS:
3      A.    No, no.
4      Q.    Have you ever had conversations with anyone
5  who admitted to seeing private images, the photographs
6  and the sex videos that we've been discussing here
7  today, which are the subject of this lawsuit?
8      A.    No.
9      Q.    What knowledge or information, if any, do you
10 have that any member of the Joliet Police Department
11 either viewed the nude photographs or viewed the sex
12 videos from Cassandra's cell phone, other than what you
13 testified to here today?
14     A.    None.
15     Q.    Are you aware that Cassandra sued 20
16 defendants identified as John Doe defendants in this
17 lawsuit?
18     A.    Yes.
19     Q.    Do you know the identities of any of those Doe
20 defendants?
21     A.    No.
22     Q.    What knowledge or information, if any, do you
23 have that Darrell Gavin either viewed the nude
24 photographs or sex videos from Cassandra's cell phone?

Page 85

1      A.    Other than what I've discussed here today?
2      Q.    Yes.
3      A.    None.  Just what I've testified here to today.
4      Q.    So other than the hearsay from David Jackson,
5  you have no other information which indicates that
6  Darrell Gavin either -- that Darrell Gavin viewed the
7  nude photographs or sex videos from Cassandra's cell
8  phone; correct?
9      A.    Correct.
10     Q.    What knowledge or information, if any, do you
11 have that Marc Reid viewed the nude photographs or sex
12 videos from Cassandra's cell phone?
13     A.    I don't have any.
14     Q.    Do you have any knowledge or information that
15 Phillip Bergner viewed the nude photographs or sexual
16 videos from Cassandra's cell phone?
17     A.    No.
18     Q.    Do you have any knowledge or information that
19 Mike Batis viewed the nude photographs or sex videos
20 from Cassandra's cell phone?
21     A.    No.
22     Q.    Do you have any knowledge or information that
23 Tim Powers viewed the nude photographs and sex videos
24 from Cassandra's cell phone?

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 86..89

Page 86

1    A.    No.
2    Q.    Do you have any knowledge or information that
3  Carlos Matlock viewed the nude photographs or sex videos
4  from Cassandra's cell phone?
5    A.    No.
6    Q.    Do you have any knowledge or information that
7  Donald McKinney viewed any nude photographs or sex
8  videos from Cassandra's cell phone?
9    A.    No.
10    Q.    Do you have any knowledge that Brad McKeon
11  viewed any of the nude photographs or sex videos from
12  Cassandra's cell phone?
13    A.    No.
14    Q.    Do you have any knowledge or information that
15  Alan Roechner viewed any of the nude photographs or sex
16  videos from Cassandra's cell phone?
17    A.    No.
18    Q.    Do you have any knowledge or information that
19  Edward Grizzle viewed any of the nude photographs or sex
20  videos from Cassandra's cell phone?
21    A.    No.
22    Q.    Do you have any knowledge or information that
23  Tab Jensen viewed any of the nude photographs or sex
24  videos from Cassandra's phone?

Page 87

1    A.    No.
2    Q.    Do you have any knowledge or information that
3  Brian Benton viewed any of the nude photographs or sex
4  videos from Cassandra's cell phone?
5    A.    No.
6    Q.    Do you have any knowledge that Sergeant Shawn
7  Stachelski either viewed or heard that nude photographs
8  and sex videos from Cassandra's cell phone had been
9  viewed by members of the Joliet Police Department?
10    A.    No.
11    Q.    Have you had any conversations with any of the
12  Doe defendants in this lawsuit?
13    A.    I don't know who they are, so I don't.
14    Q.    Okay.  Well, it's the list I just went
15  through, including Matlock and Jackson.
16    A.    Other than the conversations that I testified
17  to here today, no.
18    Q.    Did you keep a copy of the email that you
19  forwarded to Sandra -- or that you sent to Sandra to
20  forward to her attorney concerning your March 2, 2020
21  meeting with Dave Jackson?
22    A.    I would have to go -- I don't -- I don't know.
23  I could potentially find that.  I'd have to dig it up.
24  It is old, so I don't know if it's automatically

Page 88

1  deleted.  I delete my emails so it could have been
2  deleted.  I don't know.
3    Q.    So is this a personal email that you used or
4  a, you know -- well, let's start there.
5    A.    Yes.
6    Q.    Okay.  And what is your email address?
7    A.    G-U-C-K-C-O-P at Yahoo dot com.
8    Q.    Okay.  And does Cassandra have a personal
9  email address?
10    A.    She does, but I don't know it off the top of
11  my head.
12    Q.    Okay.  Well, I want to go through your email.
13  Okay?  And it indicates here that in your meeting with
14  Dave Jackson on March 2, 2020, that, it states:
15  "Jackson told me that several members of JPD currently
16  have civil rights lawsuits against the city and against
17  JPD command staff, including racial and sexual
18  orientation discrimination, period.  All of these claims
19  have been made while Alan Roechner has been chief of
20  police," period.
21    Is that a correct reading of the first
22  paragraph of your email?
23    A.    Yes.
24    MR. ADAMS:  Object to form because he doesn't have

Page 89

1  it in front of him.
2  BY MS. PROCTOR:
3    Q.    Well, does that sound true and correct, to the
4  best of your knowledge?
5    A.    Yes.
6    Q.    I'm representing to you that I'm reading the
7  email that Cassandra's lawyer sent us in this lawsuit.
8  So did you write that?
9    A.    Yes.
10    Q.    Did anyone help you write the email or you
11  wrote it on your own?
12    A.    I wrote it on my own.
13    Q.    Was anyone with you when you drafted it?
14    A.    No.
15    Q.    Did you confer with anybody as you were
16  drafting the email?
17    A.    No.
18    Q.    Okay.  I'm sorry.  I didn't mean to cut you
19  off.
20    A.    No.
21    Q.    Were you finished?
22    A.    Yes.
23    Q.    Paragraph two of your email states:  "Jackson
24  told me if we all work together and share information



Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021
Pages 90..93

Page 90

1 between our attorneys and somehow combined all our
2 lawsuits into one class action civil rights lawsuit
3 against the city, comma, it could be more effective
4 rather than individual lawsuits," period.
5        Is that a statement that you made in the
6 email?
7    A.   Yes.
8    Q.   Where did you receive that information?
9    A.   David Jackson told me that.
10   Q.   And you prepared your notes at or near the
11 time of your meeting with Jackson; correct?
12   A.   Correct.
13   Q.   And did you prepare this email documenting
14 your meeting with Dave Jackson from the notes at or near
15 the time the notes were taken?
16   MR. ADAMS: I'm going to object again to form.
17   MS. PROCTOR: That might have been confusing. I'll
18 withdraw it.
19   MR. ADAMS: Just the objection is to form. The way
20 to ask this question --
21   MS. PROCTOR: You know what, you don't have to tell
22 me the way to do anything. Your objection to form is
23 noted. I'm going to continue with my questions to the
24 witness. I'm withdrawing my question. You have nothing

Page 91

1 to say. There's no question, Hall.
2    MR. ADAMS: He's entitled to see the document.
3    MS. PROCTOR: He's not entitled to see anything.
4 He's not.
5    MR. ADAMS: You're asking --
6    MS. PROCTOR: I'm sorry. I disagree.
7    MR. ADAMS: If you're asking if the document reads
8 in a particular way, he's entitled to see the document.
9 I could -- of all people, why you wouldn't want to
10 screen share it, it's a pain in the neck.
11   MS. PROCTOR: What's your objection? Form. Noted.
12 We need to move on.
13   MR. ADAMS: Form. He's entitled to see the
14 document about which you're asking him to confirm the
15 contents.
16   MS. PROCTOR: I disagree.
17 BY MS. PROCTOR:
18   Q.   Officer Crowley, the notes that you prepared
19 during your meeting with David Jackson, were those done
20 contemporaneously or at the same time as your meeting
21 with David Jackson?
22   A.   Yes.
23   Q.   And I know you did them on a notepad and you
24 said you threw them out the same day. And the email

Page 92

1 that you prepared and sent to Cassandra, who in turn
2 sent it to her lawyer, that email was prepared within --
3 you know, was it prepared the same day, based on your
4 notes that -- was it prepared the same day that the
5 notes were created?
6    A.   Yes.
7    Q.   Okay. So in your email it indicates that
8 Jackson told you he has very detailed and intimate
9 knowledge of Cassandra's case and asked me, quote, what
10 do you need from me? How can I help you? End quote.
11       Is that a true or false statement, based on
12 your meeting with David Jackson?
13   A.   That's true.
14   Q.   And again, that's based on information that
15 Jackson gave you; correct?
16   A.   Yes.
17   Q.   Okay. Your statement also indicates that you
18 asked Jackson what kind of information did he have and
19 then he told you several things. Does that sound
20 familiar?
21   MR. ADAMS: Object to form. It is totally unfair
22 to examine this witness about the document.
23 BY MS. PROCTOR:
24   Q.   Did we already discuss that earlier in today's

Page 93

1 deposition, Officer Crowley, you asking him what kind of
2 information he had?
3    A.   Yes.
4    Q.   Okay. So according to your email, Jackson
5 first told you the night that Cassandra's cell phone was
6 taken and downloaded Deputy Chief Darrell Gavin, rank of
7 detective sergeant at the time, came from the
8 investigations office into the watch commander's office
9 and stated, quote, Socha sucks dick like a porn star.
10 No wonder Crowley is with her. Period. End quote.
11       Did you provide that information to Sandra to
12 provide to her attorney in this case?
13   A.   Yes.
14   Q.   And that statement came from David Jackson;
15 correct?
16   A.   Yes.
17   Q.   Your email also indicates that Jackson stated
18 they found a video on Cassandra's phone and encouraged
19 those in the room to go watch it. Period.
20       Is that information that Jackson gave you?
21   A.   Yes.
22   Q.   And you have no independent way to verify
23 whether that's true or false; correct?
24   A.   Correct.



Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 94..97

Page 94

1    Q.    Your email further states that Jackson told
2  you that in the room when Gavin made those comments were
3  Lieutenant Rob Brown, Lieutenant Jeremy Harrison and
4  Sergeant Tim Powers.
5          Is that information you received from David
6  Jackson on March 3, 2020?
7    A.    Yes.
8    Q.    And again, you would have no way to
9  independently verify the truth or falsity of that
10 statement; correct?
11   A.    That's correct.
12   Q.    Your email also indicates that Jackson stated
13 there was someone in that room that will testify as to
14 the validity of those comments, but didn't tell you who.
15   A.    That's correct.
16   Q.    Is that a correct statement that Jackson made
17 to you?
18   A.    Yes.
19   Q.    Do you have any information, as you sit here
20 today, who the person in that room was according to
21 Jackson?
22   A.    I would later learn that it was Rob Brown.
23   Q.    And how did you later learn that information?
24   A.    During the second meeting with Carlos at the

Page 95

1  Wendy's.
2    Q.    Thank you.  Reading on, your email states that
3  Jackson said at that moment, Harrison left the room and
4  he believed he went and watched the video, meaning
5  Harrison.
6          Now, Jackson wasn't there for that meeting;
7  correct?
8    A.    Which meeting?
9    Q.    This alleged meeting of watch commanders;
10 correct?
11   A.    I don't know if he was there or not.  I don't
12 know.
13   Q.    So you have no way of verifying this
14 information, whether Harrison was there or whether
15 Harrison went and watched the video; correct?
16   A.    Correct.
17   Q.    Okay.  Your email further states that Jackson
18 told you that Grizzle made hard copies of the video and
19 gave them to Department Chief Marc Reid, Deputy Chief
20 Tab Jensen, retired, and Police Chief Alan Roechner,
21 upon their request.  Period.
22          Did I read that statement correctly?
23   A.    Yes, I believe so.
24   Q.    Is that information that Jackson shared with

Page 96

1  you in your March 2, 2020 meeting?
2    A.    Yes.
3    Q.    Your statement, or your email to Cassandra
4  also states that Jackson said in the days leading up to
5  the FBI raid of the investigations office, Roechner went
6  to Officer Philip Bergner and asked him to clean his
7  phone.  Period.
8          Again, is that information given to you by
9  David Jackson?
10   A.    Yes.
11   Q.    And again, you have no way to independently
12 verify the truth of that statement?
13   A.    Correct.
14   Q.    Your email further indicates that Bergner was
15 the IT officer for the department and would have the
16 knowledge of how to do such a thing.
17          Again, is that information that David Jackson
18 gave you?
19   A.    Yes.
20   Q.    Your email further states that Bergner wasn't
21 able to clean the phone, but he was able to give
22 Roechner a new phone and that was the phone the FBI
23 seized.
24          That factual piece, is that based on

Page 97

1  information that David Jackson provided you in your
2  March 2, 2020 meeting?
3    A.    Yes.
4    Q.    You have no way to independently verify the
5  truth or the falsity of that allegation; correct?
6    A.    That's correct.
7    Q.    Your email further states that Jackson said
8  Harrison once had asked Chris Botzum to clean his phone
9  during an internal investigation.  Period.
10         Again, is that information from David Jackson?
11   A.    Yes.
12   Q.    Your email states that Chris Botzum was, at
13 the time, assigned to the FBI cyber crimes tasks force
14 and had the knowledge of how to do such a thing.
15 Period.
16         Information given to you by Detective Jackson?
17   A.    Yes.
18   Q.    And then your email further states, point
19 being, comma, officers know whom to go to in the event
20 they need a cell phone clean at the Joliet Police
21 Department and have done so in the past.  Period.
22         Is that something you wrote in the email to
23 Cassandra concerning your March 2, 2020 meeting with
24 Jackson?



Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021                                    Pages 98..101

Page 98

1    A.    Yes.
2    Q.    And is that information that Jackson gave you?
3    A.    Yes.
4    Q.    As you sit here today you have no way to
5    independently verify the truth or falsity of such a
6    statement; correct?
7    A.    Correct.
8    Q.    Officer Crowley, when you were preparing this
9    email, based on the notes, did you prepare it in one
10   sitting or did you prepare some and come back to it?
11   How did you actually write it?
12   A.    I just composed the email when I was done with
13   the meeting and sent it over, just in one sitting.
14   Q.    And again, you're certain that no one else,
15   including Hall Adams, Cassandra, or anyone else had any
16   input into the content of this email?
17   MR. ADAMS:  Asked and answered.
18   BY MS. PROCTOR:
19   Q.    You're certain of that?
20   A.    Certain.
21   Q.    Okay.  Paragraph 10 indicates that -- and
22   we're getting toward the end, I assure you, Paragraph
23   10 -- well, did you -- first of all, this is numbered.
24   Did you number the paragraphs in your email?

Page 99

1    A.    Yes.
2    Q.    Why did you do that?
3    A.    To separate the points, just to clear
4    penmanship, I guess, if you want to call it.
5    Q.    So Paragraph 10 of your email indicates, it
6    should be noted that at the time of all of this, the
7    officers that either had copies of the video, watched
8    the video or helped conceal evidence of the video all
9    were either promoted and/or reassigned to highly sought
10   after and prestigious police units of their choice
11   afterwards.  Period.
12        That entry in this email, is that your thought
13   or --
14   A.    Yes.
15   Q.    -- is that something that Jackson told you?
16   A.    No, that's mine.
17   Q.    And you wanted Cassandra's lawyer to be aware
18   of that?
19   A.    Yes.
20   Q.    Why?
21   A.    I think that's noteworthy.  From the
22   information that I was just given from Dave Jackson and
23   those officers that were named, I just took note that
24   there was a connection between their potential

Page 100

1    involvement in this incident and their later and
2    subsequent promotions, given specifically by Al
3    Roechner.
4    Q.    So for that reason you believed it was
5    important to note that for Cassandra's lawyer and her
6    lawsuit; correct?
7    A.    Yes.
8    Q.    Okay.  And then you go through a list of
9    people identifying their promotions.  Do you recall
10   doing that?
11   A.    Yes.
12   Q.    And that included Gavin, Grizzle, Bergner,
13   Reid, Harrison, Batis and Powers?
14   A.    Yes.
15   Q.    You went through what they were promoted to.
16   What did you base that information on?  Just -- like how
17   did you come to know that information?
18   A.    How did I come to know what they were promoted
19   into or?
20   Q.    Yeah.  Well, let's do it this way.  Darrell
21   Gabin, lieutenant of investigations promoted to deputy
22   chief of investigation.  How did you come to know that
23   information?
24   A.    It's general information.

Page 101

1    Q.    Common knowledge?
2    A.    Yeah.  I mean, they send out department emails
3    when people get promoted or assigned to different
4    assignments.
5    Q.    Okay.  You also indicate that Edward Grizzle
6    JPD, of course, meaning Joliet Police Department,
7    detective sergeant of investigations was reassigned to
8    the tri-county auto theft task force.
9         And how did you come about that information?
10   A.    Again, general information sent out in a
11   department email.
12   Q.    You also indicate that Philip Bergner, IT
13   officer, reassigned to the FBI cyber crimes unit.
14        How did you come about that information?
15   A.    Same answer as the last.
16   Q.    Marc Reid, internal affairs, lieutenant,
17   promoted to deputy chief.  Same answer?
18   A.    Yes.
19   Q.    Lieutenant -- well, Jeremy Harrison,
20   lieutenant on midnight patrol, reassigned to lieutenant
21   of the Joliet narcotics unit.
22   A.    Same answer.
23   Q.    Common knowledge?
24   A.    Yes.



Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 102..105

Page 102

1    Q.    Mike Batis, lieutenant of investigations,
2    promoted to deputy chief.  Same answer?
3    A.    Same answer, yes.
4    Q.    Tim Powers, midnight patrol sergeant,
5    reassigned to the tactical unit?
6    A.    Same answer.
7    Q.    Is that considered a promotion, in your
8    opinion?
9    A.    Yes.
10   Q.    Okay.  There are -- we just went through the
11   first ten paragraphs of your email.  There is a total of
12   19 paragraphs.  How long did it take you to actually
13   type all of this up?
14   A.    I don't know.
15   Q.    What is your best estimate?
16   A.    I mean, the notes were already written so I
17   just kind of copied them into the email and sent the
18   email over.  I don't know about a time limit.  Less than
19   an hour.
20   Q.    Okay.  Paragraph 11 of your email describes --
21   it says, Jackson stated the standard procedure of
22   downloading contents of a cell phone are, and then there
23   are four solid bullets which describe the Cellebrite
24   system.

Page 103

1          Do you recall drafting that information?
2    A.    Yes.
3    Q.    So any information regarding how the
4    Cellebrite worked would have been provided to you by
5    David Jackson; correct?
6    A.    That's correct.
7    Q.    Okay.  You, yourself, knew nothing of the
8    Cellebrite system or how it operated; correct?
9    A.    That's correct.
10   Q.    Okay.  Paragraph 12 of your email indicates
11   that Jackson said, in Cassandra's case the contents of
12   her phone were not deleted from the system for some time
13   and he believes they were only deleted just prior to the
14   FBI raid.
15         Again, is that information given to you by
16   Jackson?
17   A.    Yes.
18   Q.    Do you know how he came about that
19   information?
20   A.    No, I don't.
21   Q.    You have no way of verifying the truth or
22   falsity of this information; correct?
23   A.    That's correct.
24   Q.    Your email in Paragraph 13 states, by not

Page 104

1    deleting the contents of the phone, the video was able
2    to be viewed by anyone who wanted to view it.  Period.
3          Do you remember writing that in your email?
4    A.    Yes.
5    Q.    Again, was that information provided to you by
6    David Jackson?
7    A.    Yes.
8    Q.    Do you know how he came about that
9    information?
10   A.    No, I do not.
11   Q.    Do you know whether that's true or false?
12   A.    I don't know.
13   Q.    Paragraph 14 of your email indicates, Jackson,
14   and it said Detective Don McKinney, recorded the video
15   to his phone and was showing other detectives.
16         Do you recall including that information in
17   your email to Cassandra?
18   A.    Yes.
19   Q.    To be clear, that was information provided to
20   you by David Jackson; correct?
21   A.    Correct.
22   Q.    And as you sit here today you do not know how
23   Detective Jackson came about that information; correct?
24   A.    Correct.

Page 105

1    Q.    Nor do you know whether the statement or that
2    information was true or false; correct?
3    A.    Correct.
4    Q.    Paragraph 15 of your email indicates, it
5    should be noted McKinney was recently suspended for an
6    incident involving an officer who, prior to being an
7    officer, starred in a pornography video in which
8    McKinney was showing the video to other officers.
9    Period.
10         Do you remember including that information in
11   your email to Cassandra to give to her lawyer?
12   A.    Yes.
13   Q.    This information, in particular, what is the
14   source of that information?
15   A.    I actually know that officer so I had
16   knowledge that already had occurred.  And I
17   believe -- usually when officers get suspended there's a
18   department email that comes out that says, this officer
19   was suspended for violation of department rules and
20   regulations.  It doesn't get into the specific nature of
21   that suspension, but I already had knowledge of that
22   information.
23   Q.    Who is this other officer referenced in your
24   email?



Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 106..109

Page 106

1    A.   The one that was in this video?

2    Q.   Yes.

3    A.   His name is Officer Pete Ranstead.

4 R-A-N-S-T-E-A-D.

5    Q.   And is Officer Ranstead currently with the

6 Joliet Police Department?

7    A.   Yes.

8    Q.   How did you learn about the facts, if you

9 will, which led to McKinney's suspension?

10    A.   Officer Ranstead told me about them.

11    Q.   Okay.  Did you ever see this pornography

12 video?

13    A.   No.

14    Q.   Did he describe the pornography video?

15    A.   Yes.

16    Q.   Tell us about his description of the content

17 of the video.

18    A.   From my understanding Pete was -- it was in

19 like a show, like a reality show on Playboy TV.  This

20 was prior to him being a police officer.  And somehow

21 somebody got ahold of this episode that he stared in and

22 Don McKinney got ahold of it and was passing it around.

23    Q.   When did this occur, if you know?

24    A.   Gosh, I don't recall when that occurred.

Page 107

1    Q.   Well, to your knowledge was this alleged

2 occurrence involving McKinney and this video, was it

3 before or after the search warrant was issued for

4 Cassandra's cell phone?

5    A.   Oh, it was after.

6    Q.   Do you know -- do you have any more details

7 about that alleged incident?

8    A.   Just that I know that there was no contact

9 orders issued in the police department between Officer

10 Ranstead and Officer McKinney.  I know that Officer

11 Ranstead had made a complaint about Officer McKinney

12 because apparently Officer McKinney was showing this

13 around the police department.

14         Officer Ranstead told me that there was a -- I

15 think it was at a golf outing, so this might have been

16 at summertime.  That Officer Ranstead was standing in

17 line with his wife to get something and Officer McKinney

18 was playing the video behind them.  Apparently Officer

19 Ranstead's wife wasn't aware of this video so that kind

20 of sparked off Ranstead to file a complaint on Officer

21 McKinney.

22    Q.   What was shown in this video?  I might have

23 missed that.  I know you described it as pornography.

24    A.   That I don't know.  I just know it was Officer

Page 108

1 Ranstead having sex with another woman, but this was

2 like on a cable -- like a -- like a -- I think it was

3 Playboy TV.

4    Q.   Now, were you close with Officer Ranstead?

5    A.   I am.

6    Q.   And is that why he chose to share the

7 information with you?  That's rather private

8 information, isn't it?

9    A.   It is, but, like, everybody knew about it.  I

10 had heard about it prior to Officer Ranstead telling me

11 about it and then he had just called me and reached out

12 to me and was just, you know, talking about it.

13    Q.   But you're certain that -- I'm just trying to

14 get a time frame on, like, you believe it was after --

15 would it have been after Cassandra's lawsuit was filed?

16    A.   Yes.

17    Q.   The rumors and then this conversation with --

18 like, the rumors regarding McKinney's alleged, I guess,

19 sharing of this video and the conversations with

20 Ranstead were all after Cassandra filed her lawsuit;

21 correct?

22    A.   Yes.

23    Q.   All right.  But you have no personal knowledge

24 regarding any of those events; correct?

Page 109

1    A.   Which events?

2    Q.   The McKinney/Ranstead issues.

3    A.   Other than what Officer Ranstead told me.

4    Q.   Did you ever talk to McKinney about it to get

5 his side of the story?

6    A.   No.

7    Q.   And you've had no way to independently verify

8 the truth or falsity of those facts; correct?

9    A.   All I know is that Officer McKinney was

10 suspended for that incident.

11    Q.   Do you know for how long?

12    A.   I don't recall for how long, but it would have

13 been in the department email.

14    Q.   Okay.  Moving on, your email indicates that, I

15 have been told by several officers at different times

16 that McKinney is going to, quote, fall on the sword, end

17 quote, for this case and admit to being the one who

18 downloaded the video and passed the video around in

19 order to protect higher level officers in exchange for a

20 promotion, slash, assignment to unit of choice.  Period.

21         Is that you making that statement where it

22 says, "I have been told"?

23    A.   I think what I meant -- I think I was

24 reiterating what Dave Jackson had told me.  I've never

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 110..113

Page 110

1 personally been told that so that's potentially a typo
2 or a clerical error on my part, but I was never
3 personally told that by anybody.
4      Q.   So you believe it should -- it would be more
5 accurate to say Jackson told you that several officers
6 had told him that McKinney is going to fall on his
7 sword, et cetera?
8      A.   Yes.
9      Q.   Okay.  Again, that's not information that
10 anyone has ever told you, personally, directly; correct?
11      A.   Correct.
12      Q.   All right.  Your email further states that,
13 Jackson stated the Joliet Inspector General, Chris
14 Regis, conducted an internal investigation into this
15 matter in which several detectives did admit to either
16 watching the video or had knowledge as to whom had
17 copies of the video.  It should be noted that only,
18 quote, blue shirt, end quote, detectives were questioned
19 by Regis and no supervisor or command level officers
20 were.
21      Let's talk about that.  The information that I
22 just read, is that information that was provided to you
23 by David Jackson or --
24      A.   Yes, by David Jackson.

Page 111

1      Q.   Okay.  So you, yourself, had no personal
2 knowledge regarding any of that information; correct?
3      A.   That is correct.
4      Q.   And you have no way of verifying the truth or
5 falsity of that information; correct?
6      A.   Correct.
7      Q.   Paragraph 18 of your email indicates that,
8 Jackson stated he can provide information as to which
9 officers should be deposed because of their personal
10 firsthand knowledge of the incident and because of their
11 willingness to tell the truth if put under oath.  It is
12 unknown if Jackson can, slash, will be deposed, due to
13 his current pending lawsuit.
14      Again, is that information provided to you by
15 David Jackson?
16      A.   Yes.
17      Q.   And Paragraph 19, and it's the final paragraph
18 of your email, indicates that, Jackson highly
19 recommended that Cassandra's attorney send preservation
20 letters to the department because he believes Roechner's
21 phone and some of the hard copies of the video are still
22 somewhere in the department, but acknowledge some time
23 has passed and those items could have been destroyed.
24 Period.

Page 112

1      A.   That's correct.
2      Q.   Okay.  The information that I just read, the
3 sole source of that information is Dave Jackson;
4 correct?
5      A.   Yes.
6      Q.   And you, yourself, have no independent means
7 or way of verifying the truth or falsity of that
8 information; correct?
9      A.   Correct.
10      MS. PROCTOR:  Okay.  This could be a good time for
11 a five-minute break.  I think I'm almost concluded with
12 my portion of the questions.  We've been going awhile,
13 so I don't know how we want to handle it, and I'm sure
14 Matt Clark has some questions as well.
15      So do we want to take a short break or keep
16 going?
17      THE WITNESS:  I'm good with whatever you guys want
18 to do.
19      MS. PROCTOR:  I'm flexible, too.
20      MR. CLARK:  I'm good with just going on.
21      MS. PROCTOR:  So let's just take a quick just,
22 like, a five-minute break and resume.
23               (Short break was taken.)
24

Page 113

1 BY MS. PROCTOR:
2      Q.   All right.  Officer Crowley, we are back on
3 the record and I just wanted to ask you a couple
4 different questions.
5      The email that you prepared that we've been
6 discussing earlier, do you know whether Cassandra read
7 it before she sent it to her attorney?
8      A.   I don't know for sure.  I'm assuming she did,
9 but I don't know.
10      Q.   Okay.  Other than your email, Officer Crowley,
11 do you know whether anyone ever told Cassandra to
12 preserve her cell phone and the contents, which are the
13 subject of this lawsuit?
14      A.   I don't know.
15      Q.   How long did you say that it actually took you
16 to type up this 19 paragraph single-spaced email?
17      MR. ADAMS:  Objection.  Asked and answered.
18 BY MS. PROCTOR:
19      Q.   And if you did, I'm sorry.  I didn't get it.
20      A.   I don't remember.  Less than an hour.  I don't
21 really know.
22      Q.   Okay.  And were there any other drafts, other
23 than the email you sent to Cassandra who in turn gave it
24 to her lawyer?

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 114..117

Page 114

1    A.    No.

2    Q.    So this was just one continuing email.  It
3  wasn't saved or, you know, there weren't other versions
4  of it?

5    A.    No.

6    Q.    And you don't know whether you retained the
7  original email?

8    A.    I would have to look.  I don't know.

9    Q.    Okay.  You know, we're going to ask -- we can
10  put it in a letter if you like, but on the record I just
11  want to make a formal request that we get the actual
12  email, not the cut and paste of the email, but the email
13  from Mr. Adams.  So we'll be following up on that.  And
14  we'd ask that you not delete or permanently destroy any
15  of your emails, and in particular, this one.

16         Did you make any revisions to the email after
17  it had been sent to Cassandra?

18    A.    No.

19    Q.    Did you make any revisions to your email dated
20  March 2, 2020 -- I mean, it's not actually the date the
21  email was sent, but it indicates -- my understanding was
22  your email was prepared and sent the same day as your
23  first meeting with David Jackson, which was on March 2,
24  2020.

Page 115

1         Do I have that right?  Was this all done on
2  the same day, Officer Crowley?

3    A.    Yes.

4    Q.    Okay.  So your email dated March 2, 2020, to
5  Cassandra, were there any revisions to that at any point
6  in time after it was sent to her initially?

7    A.    No.

8    Q.    Did you show that email to anyone other than
9  Cassandra and then perhaps her lawyer?

10    A.    No.

11    Q.    To be clear, Mr. Adams or anybody else didn't
12  have any input into the content of your email dated
13  March 2, 2020; right?

14    MR. ADAMS:  Objection.  Asked and answered for the
15  fourth time.

16  BY MS. PROCTOR:

17    Q.    Yeah, I want to clarify it.  Do I have that
18  right?

19    A.    That's correct.

20    Q.    Why did you chose to join the Black Police
21  Officers Association or Organization, you know, in 2020
22  and not before?

23    A.    No reason in particular.  I just -- like I
24  said, every year they put something out or every couple

Page 116

1  of years or something like that they put a flyer in
2  everybody's mailbox asking if they want to join, so I
3  decided to join.

4    Q.    Just because?

5    A.    I support what they do.  I support their work.
6  I support the officers that are a part of that
7  organization and I just wanted to be a part of that.

8    Q.    And Jackson is part of that organization?

9    A.    He's the president.

10    Q.    And was he president at the time of your
11  meetings in March and May of 2020 concerning the
12  allegations which are the subject of your wife's
13  lawsuit?

14    A.    Yes.

15    Q.    And he currently holds that position?

16    A.    Yes.

17    Q.    Is that an elected position?

18    A.    Yes.

19    Q.    In other words, like you're a member of that
20  organization and then you would have input -- you'd vote
21  on who gets to be the president?  Is that how it works
22  or --

23    A.    Yes.

24    Q.    -- tell me.

Page 117

1    A.    Yes.

2    Q.    Do you know how long -- like, what the
3  election cycle is, if you will, for that position?

4    A.    I do not know.

5    Q.    Okay.  Did you ever have to vote in an
6  election in support of Jackson?

7    A.    No.

8    Q.    Do you know whether or not David Jackson has a
9  reputation for trustworthiness within the Joliet Police
10  Department, if you know?

11    MR. ADAMS:  Objection to foundation.

12  BY THE WITNESS:

13    A.    I don't know.

14    Q.    You don't know one way or the other?

15    A.    I don't know.

16    Q.    Do you know whether or not Jackson is
17  trustworthy?

18    MR. ADAMS:  You are asking for his opinion?

19    MS. PROCTOR:  Yeah, his opinion.

20  BY THE WITNESS:

21    A.    I trust him, yeah.  I don't have a reason not
22  to trust him.

23    Q.    Well, what do you base the trust on?

24    A.    I mean, his reputation in the police



Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021                                    Pages 118..121

Page 118

1 department, as far as I know, is -- you know, he's a
2 detective. He's solved several high-profile homicides
3 in the city. He's held several different positions in
4 undercover work. So I just based it off of that.
5    Q.    You based it off his work experience and work
6 results?
7    A.    Yes.
8    Q.    I mean, you have no way of knowing whether
9 David Jackson -- the information that he was feeding you
10 was true or not; correct?
11   MR. ADAMS: Objection. Asked and answered.
12 BY THE WITNESS:
13   A.    That's correct. I have no way of verifying
14 anything.
15   Q.    But you believed what he told you; correct?
16   A.    I don't have any way of verifying it. I was
17 just passing the information along, you know.
18   Q.    Did you believe that the information may be
19 helpful to Cassandra's lawsuit?
20   A.    Yes.
21   Q.    And I think you mentioned earlier that this
22 lawsuit, you know, could be potentially expensive,
23 something along those lines. Do you remember saying
24 that before?

Page 119

1    A.    Yes.
2    Q.    What did you mean by that?
3    A.    Well, when the lawsuit was initially filed I
4 believe there was like a price for every single -- I
5 mean, like a hundred thousand dollars or something like
6 that per count. And when you added them up it was like
7 close to $1.5 million. So that's what I meant by that.
8    Q.    So it is your understanding, and I realize you
9 are not a lawyer, but it's your understanding that the
10 value of this lawsuit could potentially be $1.5 million
11 if Cassandra is ultimately successful?
12   A.    Yes.
13   Q.    Did you encourage Cassandra to move forward
14 with this lawsuit?
15   A.    We discussed what she should do.
16   Q.    And what were your discussions?
17   A.    Well, we discussed reporting this to internal
18 affairs. We discussed consulting with attorneys. And
19 we ultimately -- well, we, you know, discussed all of
20 those options and she chose to consult with an attorney.
21   Q.    Did Cassandra report any of these issues that
22 came to her attention to the office of internal affairs
23 within the Joliet Police Department?
24   A.    No.

Page 120

1    Q.    Why not?
2    A.    Because the information that she was provided
3 in her letter indicated officers that were a part of the
4 internal affairs investigation and officers that had
5 high ranking authority in the Joliet Police Department.
6 And we both agreed that it would not be a good idea to
7 report that because if this is true, they are directly
8 involved in this and they're not going to properly
9 investigate that.
10   Q.    That was an assumption both you and Cassandra
11 made; correct? Right or wrong you made; right?
12   A.    Right.
13   Q.    Now, the officers in internal affairs who
14 were, as you say, were potentially involved in this were
15 who?
16   A.    Lieutenant Marc Reid.
17   Q.    Anyone else from internal affairs or is that
18 it?
19   A.    There's two in internal affairs, I believe.
20 At the time it was -- I think Sergeant Rouse was the
21 other officer in internal affairs. But since, you know,
22 Marc Reid was the lieutenant and ultimately in charge of
23 internal affairs, his name was given to us in that
24 letter and then, you know, subsequent meeting that I had

Page 121

1 with Dave Jackson, and Carlos Matlock, his name was also
2 brought up. So it just was decided that that wouldn't
3 be a good idea, if this is in fact true.
4    Q.    And the high ranking people in authority that
5 you mentioned a reason for not reporting this internally
6 were who?
7    A.    Al Roechner, Tab Jensen, Brian Benton, Marc
8 Reid.
9    Q.    Is that it?
10   A.    Yes.
11   Q.    Did you consider reporting it to -- you know,
12 outside of the department to, for example, the State
13 Police, the Department of Justice, FBI, some other
14 agency outside of the city of Joliet? Was that
15 considered?
16   A.    Yes.
17   Q.    And why didn't you do that?
18   A.    Well, we decided that it would be best to just
19 consult with an attorney as to what our options would
20 be. I mean, you know, it just seemed like, you know,
21 the right way to go, I guess.
22   Q.    When you say we consulted with an attorney to
23 see what our options would be, do you mean your and
24 Cassandra's legal options?

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 122..125

Page 122

1    A.    Yes.  Hers mostly, yes.
2        Q.    Is there some reason you are not a plaintiff
3    in this lawsuit?
4        A.    I don't know.  I didn't -- you know, at first,
5    you know, my name is mentioned in there and it's a video
6    that I'm in and, you know, so that's why we were both in
7    talks about that, but I don't know.
8        Q.    So you don't know why you're not a plaintiff?
9        A.    That's correct.
10       Q.    Is that right?  Would you like to be a
11   plaintiff in this lawsuit?
12       A.    No police officer wants to be involved in
13   anything other than what we already have to be involved
14   with.  So, you know, this is her lawsuit and I'm just
15   here to support her.
16       Q.    The attorney that you say we consulted with,
17   other than Hall Adams, did you consult with any other
18   attorneys?  I do not want to know what you discussed.  I
19   just want you to answer that narrow question which is,
20   did you and/or Cassandra consult with any other
21   attorneys?
22       A.    Yes.
23       Q.    Can you identify the names of those attorneys?
24   Again, I do not want to know any discussions.

Page 123

1        A.    Jeff Tomczak.
2        Q.    And who is Jeff Tomczak?
3        A.    He is an attorney that represented me in my
4    case.
5        Q.    Were you present for the discussions with
6    Cassandra and Attorney Tomczak?
7        A.    No.
8        Q.    And have you ever been present for any
9    discussions between Cassandra and her attorney in this
10   civil lawsuit, Hall Adams?
11       A.    Just the initial first time we met with
12   Mr. Adams.
13       Q.    Okay.  And when was that?
14       A.    I don't recall when that was.  It would have
15   been shortly after she received the letter in her
16   mailbox, probably within weeks of that.
17       Q.    And how did you get Paul Adams' name?
18       MR. ADAMS:  Objection.  Instruct him not to answer
19   where the source of the information came from.
20       MS. PROCTOR:  You are dead wrong.  You are dead
21   wrong.  This is not subject to the attorney/client
22   privilege.  So I ask you, counsel, do you want to
23   reconsider your instructing this witness not to answer?
24       MR. ADAMS:  No.

Page 124

1    BY MS. PROCTOR:
2        Q.    Do you understand the question, Officer
3    Crowley?
4        A.    No.  Can you say it again?
5        Q.    My question is how did you get -- well, how
6    did you get the name or who -- well, who gave you the
7    name of Hall Adams as a potential layer to discuss your
8    and Cassandra's legal options?
9        MR. ADAMS:  My specific objection is if it was a
10   referral from a lawyer to whom you had gone for legal
11   advice, it is protected as such, and you should not
12   answer the question.
13       MS. PROCTOR:  Okay.  But I'm just laying a
14   foundation.
15   BY MS. PROCTOR:
16       Q.    Do you understand the question?  I'm not
17   asking you to answer it.
18       A.    I do.
19       Q.    And are you refusing to answer the question on
20   advice of your counsel, Mr. Adams?
21       A.    Yes.
22       Q.    The actual civil complaint in this case,
23   Officer Crowley, was filed on August 21 of 2018, for
24   point of reference.  So my question to you is, when did

Page 125

1    you and Cassandra meet with Hall Adams?  You said you
2    were present for the initial meeting and that was it,
3    right?  So my question is, when did that meeting take
4    place?
5        A.    Then it must have been sometime either in late
6    July or early August.
7        Q.    So it was shortly before the civil lawsuit was
8    filed; correct?
9        A.    Yes.
10       Q.    Were you aware that when the lawsuit was filed
11   that your name would be included in the filing and made
12   part of the public record available to the whole free
13   world?  Were you aware of that?
14       A.    Yes.
15       Q.    And were you also aware that the descriptions
16   contained in the civil complaint prepared by legal
17   counsel, that explicit descriptions of videos of a
18   sexual nature being on Cassandra's phone, that that
19   fact -- that those private facts would be publicly
20   disclosed in a civil lawsuit that would be available and
21   accessible to the whole free world?  Were you aware of
22   that?
23       A.    Yes.
24       Q.    Was Cassandra aware of that?



Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 126..129

Page 126

1    MR. ADAMS:  Objection.  Lack of foundation.
2  BY MS. PROCTOR:
3       Q.    If you know.
4       A.    I don't know.  I would assume she would be.
5       Q.    And despite your and Cassandra being aware of
6  that, you went ahead and did it anyway?
7       A.    Yes.
8       Q.    And you are aware that as a result of the
9  civil lawsuit being filed incorporating some very
10 private facts about your life and Cassandra's life, your
11 sex lives in particular, that as a result of that legal
12 document being filed in the public record that that
13 document was reported on by various newspaper outlets,
14 including -- well, various newspapers.  Were you aware
15 of that?
16      A.    Yes.
17      Q.    Did you anticipate that that could happen if
18 the lawsuit was filed in such a way, using everybody's
19 real names and putting all the dirty little details out
20 there in the public domain?
21      MR. ADAMS:  Objection to form.  It's argumentative.
22 BY MS. PROCTOR:
23      Q.    Did you understand that that could happen?
24      A.    Yes.

Page 127

1       Q.    Did that give you or Cassandra any pause or
2  cause for concern before you went ahead and authorized
3  it?
4       MR. ADAMS:  Object to form and foundation as to
5  Cassandra.
6  BY THE WITNESS:
7       A.    I can't answer for her, but I was aware of it,
8  yes.
9       Q.    Did that give you any pause?
10      A.    No.
11      Q.    Did you think by including private facts in
12 the public record would keep them private or make them
13 more public?
14      A.    I don't understand your question.
15      Q.    I mean, did you understand by having private
16 facts -- well, have you actually read the allegations in
17 the complaint?
18      A.    Yes.
19      Q.    And did you review them before the actual
20 civil complaint was filed and made part of the public
21 record by your lawyer in Cassandra's lawsuit?
22      A.    No.
23      Q.    You didn't have an opportunity to do that
24 beforehand?

Page 128

1       A.    I didn't.  I don't know if Cassandra did or
2  not, but I didn't.
3       Q.    Okay.  Would you agree that by filing the
4  lawsuit, which included some very explicit private facts
5  about your life, Cassandra's life, your sex life, that
6  by including that in the public record that that
7  actually helped facilitate the publication of that
8  information?
9       MR. ADAMS:  Object to form and to foundation.
10 BY THE WITNESS:
11      A.    Is your question -- are you asking me if the
12 fact of the details of this case helped it become more
13 public, like, a better read for the media to report on?
14      Q.    Well, it would disclose to the media in the
15 first instance.
16      A.    I guess I don't understand your question.  I
17 understand that by -- I did understand that, you know,
18 this was going to be made public and, yes, details were
19 going to come out.  Yes, I was well aware of that and so
20 was Cassandra.
21      Q.    Officer Crowley, Paragraph 29 of Cassandra's
22 lawsuit states or alleges that upon information and
23 belief senior leaders and/or supervisors of the city's
24 department of police have been aware of and acquiesced

Page 129

1  and participated in the viewing, dissemination and
2  rerecording of the private images on plaintiff's iPhone,
3  but have not been disciplined any of the police
4  officers -- but have not disciplined any of the police
5  officers or staff involved.  That's from Paragraph 29 of
6  the complaint.
7            And my question to you is, what knowledge or
8  information, if any, do you have that senior leaders
9  and/or supervisors of the city's department of police
10 were aware of or acquiesced in or participated in the
11 viewing, dissemination and rerecording of the nude
12 photographs and sex videos that we've been discussing
13 here today?
14      MR. ADAMS:  Object to form.
15      MS. PROCTOR:  You can go ahead and answer.
16 BY THE WITNESS:
17      A.    The same answer I gave with the other
18 questions about the information Dave Jackson gave me.  I
19 don't have any knowledge of that.
20      Q.    And the additional allegations in Cassandra's
21 complaint, specifically at Paragraphs 33, 34 and 35,
22 where they talk about the search and seizure of
23 plaintiff Cassandra's iPhone, that that was done without
24 probable cause and that it violated her Fourth Amendment



Page 130

1  rights.
2          What is the source of that information, if you
3  know, Officer Crowley?
4          MR. ADAMS:  Object to form and to foundation.
5          MS. PROCTOR:  I can rephrase it.
6  BY MS. PROCTOR:
7      Q.    What, if any, factual information do you have
8  that there was an unlawful search and seizure of
9  Cassandra's cell phone and subsequent publication,
10  republication, dissemination of the private images we've
11  been discussing, by any of the potential John Doe
12  defendants named in this lawsuit?
13          MR. ADAMS:  Object to form, to foundation and it
14  calls for a legal conclusion.
15  BY THE WITNESS:
16      A.    So are you asking my opinion of that bullet
17  point in the complaint, the lawsuit?
18      Q.    That's a good question and actually I'm not.
19  I'm asking what, if any, factual information do you have
20  to support that any of the John Doe defendants named in
21  this lawsuit viewed, publicized, shared, disseminated
22  any of the private images from Cassandra's cell phone
23  that we've been discussing here today?
24      A.    I don't have any.

Page 131

1      Q.    How would you describe your relationship with
2  your mother-in-law, Patricia Socha?
3          MR. ADAMS:  Is this relevant?
4          MS. PROCTOR:  This is a discovery deposition.
5  What's the basis of your objection?  Relevance?  It's
6  not --
7          MR. ADAMS:  It would be relevance.
8          MS. PROCTOR:  So noted.
9  BY MS. PROCTOR:
10      Q.    You can answer the question, Officer Crowley.
11      A.    I love my mother-in-law.
12      Q.    In 2017, 2018, before you were married, how
13  would you describe your relationship with Cassandra's
14  mother, Patricia?  I'm not asking whether you love her.
15  I'm asking you to describe your relationship with her,
16  focusing on those years, 2017, 2018.
17          MR. ADAMS:  Objection.  Relevance.
18  BY THE WITNESS:
19      A.    It was great.
20      Q.    No issues?
21      A.    No.
22      Q.    Officer Crowley, can you tell us what impact,
23  if any, the events which are the subject of this lawsuit
24  had on your relationship with Cassandra?

Page 132

1      A.    Our -- with our relationship in specific?
2      Q.    Yes.
3      A.    You know, this incident has taken a toll on
4  her and -- which has essentially taken a toll on us.
5  You know, I -- our intimacy -- I have to, you know, I
6  have to talk her through a lot of things sometimes, when
7  it comes to this.  I've seen a dramatic change in her
8  motivation, in her character, in her trustworthy of
9  where we work and who we work for.  I have seen a lack
10  of motivation for her, you know, in this career.  I've
11  seen just a change, in a negative way.  It impacted her
12  greatly and has affected our relationship.
13      Q.    Give me more specific about -- I'm going to
14  talk -- I want to talk a little bit more about your
15  observations about Cassandra.  So just kind of put those
16  aside, part of this conversation.  What -- can you be
17  more specific about how these events have impacted your
18  relationship?
19          MR. ADAMS:  Object to form.  Ask him a better
20  question.
21  BY MS. PROCTOR:
22      Q.    Do you understand the question, Officer
23  Crowley?
24      A.    Yes.  It's just -- it's taken its toll.  It's

Page 133

1  something that I -- you know, she's experiencing that I
2  don't experience.  She's a female police officer in a
3  male dominated profession and she -- she's objectified
4  now and she has to take orders from these individuals.
5          When we became pregnant she had to report
6  directly to Darrell Gavin and inform him that she's
7  pregnant and that she requested light duty.  And she
8  just would -- she just was a mess.  She'd cry and she
9  didn't want to do that.  She wished she didn't have to
10  do that.  She regularly had to have contact with him
11  about, you know, her status as being pregnant.  And I
12  cannot imagine what that must have been like for her.
13  And as her husband, and as just a police officer that
14  works there, you know, I had to -- I had to support her
15  on that, you know.
16      Q.    So maybe I'm a little unclear.  What does the
17  fact that she was pregnant and had to request light duty
18  or request some work accommodations from Gavin have to
19  do with the allegations or the subject matter of this
20  lawsuit?  Help me understand that.
21      A.    Well, if the allegations are true, Darrell
22  Gavin made a pretty inappropriate comment about her,
23  seeing her in some pretty private matters and now she
24  has to tell him that she's pregnant.  I don't think I



Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 134..137

Page 134

1 have to go into any more further description other than
2 that. That's -- I can't imagine having to do that.
3     Q.   To tell him that she's pregnant? What, proof
4 that she had sex? I mean, I don't get it. I mean, you
5 know, tell me -- and I suppose what's most important
6 here is what your understanding of why that was an issue
7 for Cassandra. That's the most important thing here and
8 what I'm trying to get to the bottom of here.
9     MR. ADAMS: Objection to form. It's argumentative.
10 BY MS. PROCTOR:
11     Q.   So can you articulate for us why, other than
12 what you've already testified to, that was an issue for
13 Cassandra and then we can move on?
14     A.   Yeah, I don't really have anything more to say
15 than that.
16     Q.   Okay. Well, you also said later that she is
17 objectified now. Can you explain what you mean by that?
18     A.   I said she feels objectified.
19     Q.   Okay.
20     A.   She feels objectified.
21     Q.   What does that mean though, to feel
22 objectified?
23     A.   Well, I mean, as far as a female is concerned,
24 this is her explaining these things, you know, she

Page 135

1 believes that this happened, and so do I, and now she
2 has to be at work with these male co-workers, superiors,
3 that order her around, that she has to take orders from,
4 that seen her in a private, intimate, sexual moment with
5 me. And in her -- you know, and this is just what she
6 has told me, you know, that just -- it takes away her
7 ability to do her job the right way. She feels
8 objectified. She feels that these individuals that seen
9 her pictures and videos, that's what they see of her
10 now. Not a female police officer trying to do her job
11 effectively but as, you know, how they seen her in the
12 videos and pictures.
13     Q.   And these people, individuals, that you've
14 mentioned, can you identify them by name?
15     A.   Al Roechner, Marc Reid, Ed Grizzle, Darrell
16 Gavin.
17     Q.   Are any of them still working at the Joliet
18 Police Department?
19     A.   Ed Grizzle is.
20     Q.   Other than Ed, are any of these individuals
21 that you just mentioned still employed at the Joliet
22 Police Department?
23     A.   Don McKinney is, Brad McKeon is, Mike Batis.
24     Q.   Let's just take -- well, let's -- like

Page 136

1 Grizzle, McKinney, McKeon, Batis, who you just
2 mentioned, these are people that on information from
3 Dave Jackson you and Cassandra believe that these
4 officers were involved in and had seen her -- seen the
5 nude photographs and sex videos on her phone. All
6 right? So what, if any, interactions has Cassandra had
7 with any of these individual since this all came to
8 light?
9     A.   The ones that still work here, specifically?
10     Q.   Well, no, at any time. From when the lawsuit
11 was filed or whenever Cassandra learned about all of
12 this. When -- like, how much interaction has she had
13 with any of the people that you rattled off? And you
14 already talked about Gavin. We'll put him aside.
15     A.   So Al Roechner was our chief of police up
16 until just recently.
17     Q.   Let's take him. On a daily basis what, if
18 any, interaction would she have with Chief Roechner?
19     A.   She would see him routinely when she was
20 working the desk on light duty when she was pregnant.
21 He would wave to her. He would ask her how her day is
22 going.
23     She had to attend training classes that Ed
24 Grizzle would teach and they were mandated training that

Page 137

1 she couldn't get out of. She had to sit in a room while
2 Ed Grizzle was teaching.
3     She would run into like Darrell Gavin, again,
4 when she was on light duty and being pregnant, and have
5 to reach out to him and give him updates on her
6 pregnancy, and things of that nature.
7     Q.   Okay. With respect to Gavin, did she ever
8 request the opportunity to report to someone other than
9 Gavin concerning her light duty requests and any
10 accommodation that she needed due to her pregnancy?
11     A.   It doesn't work that way. There's -- officers
12 are in charge of certain functions in the police
13 department and those are the officers that you have to
14 go to for certain things. And he was that individual in
15 charge of light -- officers on light duty, so she didn't
16 have anyone else to go to.
17     Q.   Of the people who you mentioned, has Cassandra
18 ever told you that any of these individuals did or said
19 anything to her to make her feel objectified or
20 uncomfortable in any way?
21     A.   No.
22     Q.   I know we've talked somewhat about the changes
23 that you've noticed in Cassandra. Other than what
24 you've already testified to, is there anything else that



Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 138..141

Page 138

1 strikes you as different about Cassandra, which you
2 relate to the events in question?
3    A.    I would just probably repeat what I said
4 earlier.
5    Q.    Has Sandra received professional help for
6 working through these feelings?
7    A.    Yes.
8    Q.    And has she received continuous counseling
9 since these issues came to light to the present day; if
10 you know?
11    MR. ADAMS:  Object to form.
12 BY MS. PROCTOR:
13    Q.    You kind of cut out a little bit on me,
14 Officer Crowley.
15    A.    Yes, I know she was seeing two counselors for
16 some time and then I know she stopped seeing one of them
17 because that was a psychiatrist or psychologist that was
18 prescribing her medicine to deal with these issues, but
19 we became pregnant so she couldn't be on those anymore
20 so I believe she stopped seeing her.
21    Q.    Do you know the name of that counselor?  And
22 you may or may not.
23    A.    Yes, it's Deb Delrey, D-E-L-R-E-Y.
24    Q.    Okay.  And she's with Edgewood?

Page 139

1    A.    Yes, Edgewood Clinical Services.
2    Q.    Okay.  And do you know when the last time
3 she's received -- Cassandra has received services from
4 anyone at Edgewood?
5    A.    I do not know.
6    Q.    Has she received mental health or counseling
7 services, whatever we want to call it, from any other
8 provider, to your knowledge, during the entire time of
9 your relationship?
10    A.    Yes.
11    Q.    And who else did she receive counseling from?
12    A.    Nicole Johnson.
13    Q.    And who is Nicole Johnson?
14    A.    She's the counselor also with Edgewood.
15    Q.    Okay.  What's, if you know, the difference
16 between the counseling that Debbie Delrey provided and
17 Nicole Johnson provided to Cassandra, if you know?
18    A.    So Nicole Johnson wasn't able to prescribe
19 medicine, so she referred Cassandra to Deb Delrey, who
20 was able to prescribe medicine.
21    Q.    Is Deb Delrey a nurse practitioner?  Is that
22 it, if you know?
23    A.    I don't know what her titles are, but I just
24 know she's able to write prescriptions.

Page 140

1    Q.    What kind of medicine was Sandra prescribed
2 and when, if you know?
3    A.    I don't know.
4    Q.    Do you know if Sandra was taking any
5 medications, antidepressants, or mental-health-related
6 medications before May or June of 2018?
7    A.    I don't know.
8    Q.    You don't know that one way or the other?
9    A.    No, I don't know.
10    Q.    And has Cassandra resumed taking the
11 medication?
12    A.    I -- no, because she's breast feeding.
13    Q.    And Cassandra is currently on maternity leave?
14    A.    Yes.
15    Q.    When does that end?
16    A.    I believe in -- it's soon.  I don't know an
17 exact date.  I think it's sometime in July.
18    Q.    Has she been off -- is it the 12 weeks, give
19 or take?
20    A.    Yes.
21    Q.    Okay.  And this is -- and this is -- she also
22 was on leave during the birth of your first child;
23 correct?
24    A.    Yes.

Page 141

1    Q.    For about the same amount of time?
2    A.    Yes, about.
3    Q.    Have you read any of the newspaper articles
4 concerning the lawsuit?
5    A.    Yes.
6    Q.    When was the first time you read a newspaper
7 article concerning the lawsuit?
8    A.    It would have been when the lawsuit became
9 public.
10    Q.    Okay.  So that was -- it was filed on August
11 21, 2018, so at or near that time?
12    A.    Yes.
13    Q.    In total, to the present date, how many times
14 have you read about Cassandra's lawsuit, the events in
15 question, in a newspaper article?
16    A.    Whenever they -- whenever they're published.
17 I don't know how many.  I think there maybe -- maybe
18 been like four or five since the lawsuit, but I don't
19 know how many.
20    Q.    Did you and Cassandra keep copies of those
21 articles?
22    A.    No.  They're --
23    Q.    Okay.  You're reading them on line, I see.
24 And which publications are you reading them from?  The



Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 142..145

Page 142

1 local paper or --
2    A.    I believe it's the Daily Herald.  It's the
3 Joliet Herald, whatever it's called, and then the Joliet
4 Patch.
5    Q.    So there have been articles in both the Daily
6 Herald and the Joliet Patch.  Does Cassandra also read
7 those articles or hear about those articles?
8    A.    She hears about them, but I don't know if she
9 reads them or not.  I know she kind of doesn't like
10 that, so I don't know if she reads them or not.
11    Q.    What impact, if any, do these newspaper
12 articles have on Cassandra?
13    A.    A lot.
14    Q.    Well, how does she hear about them if she
15 doesn't read them?
16    A.    Well, sometimes some of her friends will text
17 her, hey, you're in the Patch again or somebody will
18 just send her the article to her phone.  I'll inform her
19 usually like first off, like, hey, you're famous today.
20 So she can know, so she won't see it for herself or
21 whatever.
22    Q.    You give her a heads up?
23    A.    Yes.
24    Q.    Okay.  And how does she -- she's upset, but

Page 143

1 does she -- you know, how does she deal with it?
2    A.    I know, you know, specifically when she is
3 working the street she tells me she covers her name up.
4 She tries to cover her vest with her name on it so
5 people don't see who she is and recognize her and
6 associate her with, you know, the incident that is going
7 on.
8    Q.    Do you have any knowledge regarding
9 Cassandra's psychological history before you met her?
10    A.    No.
11    Q.    To your knowledge has Cassandra ever applied
12 for any kind of a promotion within the Joliet Police
13 Department?
14    A.    No.
15    Q.    Why not?
16    A.    I don't think -- so a sergeant's test is like
17 every three years, I believe.  You cannot apply when
18 you're on light duty.  So she's been on light duty with
19 the pregnancies for about two years now, not
20 continuously.  And prior to that, you know, we were
21 new -- newer here and we were not ready for that yet.
22    Q.    You're not ready for the additional
23 responsibility that goes along with being a sergeant; is
24 that fair to say?

Page 144

1    A.    When we were younger, when we were newer here
2 it's just not appropriate to do that.  You've got to get
3 your feet wet first.
4    Q.    What about you, have you ever taken a
5 sergeant's exam?
6    A.    Not yet, no.
7    Q.    Is that something that you intend to do in the
8 future?
9    A.    The next one that comes out I am, yes.
10    Q.    When is the next one, if you know?
11    A.    I believe this current list that is out
12 expires in 2023.  So 2023 and then I'm going to apply
13 for it then.
14    Q.    Has Cassandra explored employment
15 opportunities outside of the Joliet Police Department?
16    A.    I don't believe she has explored them.
17    Q.    Is that something that you and her have ever
18 discussed as an option?
19    A.    Yes.
20    Q.    And is there some reason why she hasn't
21 explored other employment opportunities?
22    A.    I don't know.
23    Q.    Before you and Cassandra were married did you
24 and her attend couples counseling through Edgewood?

Page 145

1    A.    Yes.
2    Q.    And during what time period did you do that?
3    A.    It was when we first started -- I believe it's
4 when I moved in or shortly thereafter, possibly before,
5 but kind of when, you know, we realized that this was
6 going to be -- we were going to give it a go, as you
7 might say.
8    Q.    And just what was the nature of the issues
9 that you were dealing with in the couples counseling;
10 just generally speaking?
11    A.    There was no issues.  Cassandra had come to me
12 because I was -- you know, I'm divorced and I had two
13 children.  So Cassie came to me and just wanted to
14 proactively seek a counselor's advice and kind of guide,
15 more her, how to do this now.  You know, how do we bring
16 children into -- because this was the first time that I
17 was doing that, too, so we just wanted to proactively
18 seek guidance on how to do this the right way so we
19 could be prepared for that.
20    Q.    Was it helpful?
21    A.    Yes.
22    Q.    Since May or June of 2018 have you and
23 Cassandra attended any other counseling?
24    A.    Yes.

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021
Pages 146..149

Page 146

1    Q.    When was that?
2    A.    I attended counseling around that time, 2018,
3  2019, and I believe we did together also around that
4  time also.
5    Q.    Was it -- did you attend individual
6  counseling --
7    A.    Both.
8    Q.    -- around that time?
9    A.    Yes, both.  We both did and then we did
10  couples counseling also.
11    Q.    Okay.  I know, you know, I thought -- can you
12  be any more specific in terms of the time frame that
13  you've just been speaking of?  Was it before or after
14  May of 2018?
15    A.    After.
16    Q.    Do you know how long after?  Was it days,
17  weeks, months --
18    A.    Oh, months.
19    Q.    -- years?
20    A.    Months.
21    Q.    And what was the nature of the -- you know,
22  why was counseling sought, generally speaking?
23    A.    Well, I mean, you know, there was -- my case
24  is what sparked that.

Page 147

1    Q.    Your criminal matter?
2    A.    Yes.
3    Q.    Okay.  But any other reason you and Sandra,
4  either individually or as a couple, a unit, went to
5  counseling after May of 2018?
6    A.    No.
7    Q.    Other than what we've already discussed here
8  today, Officer Crowley, have you observed any other
9  differences or changes or impact, in your view, you
10  believe the incidents in question have had on Cassandra?
11    A.    Not anything more than I've already discussed.
12    MS. PROCTOR:  Okay.  I believe that concludes my
13  questions for the moment, Officer Crowley.  Thank you
14  for your time and I'll put it out to the group.  Do we
15  want to take a short break or keep going?  I'll leave
16  that up to my codefendant.
17    MR. CLARK:  Officer Crowley, do you need a break?
18  I probably have about, I don't know, maybe 30 minutes or
19  so and then I don't know if your attorney will have any
20  questions.
21    THE WITNESS:  I'm good with that.
22    MR. CLARK:  Do you want to keep going or do you
23  need a break?
24    THE WITNESS:  I don't need a break.

Page 148

1    MR. CLARK:  Well, I'll go ahead and we'll see where
2  we go.  Okay?
3                 CROSS-EXAMINATION
4  BY MR. CLARK:
5    Q.    Officer Crowley, as I indicated, I'm an
6  attorney representing Ed Grizzle in this matter and I'll
7  certainly try not to repeat any of counsel's questions,
8  but I do have some follow-up of things she asked you and
9  just a few others.
10    I think you testified that you've been deposed
11  before?
12    A.    Yes.
13    Q.    How many times have you been deposed?
14    A.    Like three or four.
15    Q.    And the three or four times you've been
16  deposed, are those for criminal matters or civil
17  matters?
18    A.    Civil.
19    Q.    When was the last time you were deposed?
20    A.    Just the other day.
21    Q.    Okay.  Within the past week you mean?
22    A.    Yes.
23    Q.    Okay.  And why were you deposed in the past
24  week or so?

Page 149

1    A.    I'm involved in a civil lawsuit through work.
2    Q.    Are you currently a party to a lawsuit through
3  work?
4    A.    Yes, two of them.
5    Q.    Okay.  Can you tell me about the first lawsuit
6  that you've been involved with at your work?
7    A.    It's a lawsuit involving an incident that I
8  was involved in at work and the subject is suing me and
9  another officer involved.
10    Q.    And what is the name of the subject?
11    A.    His name is Christopher Simenson.  I don't
12  know how to spell that.
13    Q.    And it is your understanding that that lawsuit
14  is still ongoing?
15    A.    Yes.
16    Q.    And what about the second incident in which
17  you are a party to a lawsuit?
18    A.    The plaintiff's last name, I think it's Nobert
19  Waters.  It could be Albert Waters also or Water or
20  something like that.  That's also an ongoing lawsuit
21  involving me and other officers also.
22    Q.    Okay.  And then you've indicated that there
23  are one or two other occasions that you were deposed
24  civilly.  Can you tell me about those occasions?

Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 150..153

Page 150

1    A.    The other one was for a car accident that -- I
2  was the reporting officer on a car accident and I took a
3  deposition for that.
4    Q.    Okay.  And was there one other?
5    A.    I don't think so.
6    Q.    Okay.  Any of those occasions or lawsuits that
7  you're involved with did you receive any type of
8  discipline as a result of those allegations?
9    A.    No.
10   Q.    Is it your understanding that those two
11 lawsuits are in federal court?
12   A.    Yes.
13   Q.    You have testified about various supervisors
14 that you've had through the years.  Was Ed Grizzle one
15 of your supervisors?
16   A.    Yes.
17   Q.    When was Ed Grizzle one of your supervisors?
18   A.    At a point he was a midnight sergeant and when
19 I would work in the district that he was assigned to he
20 would be my supervisor.
21   Q.    And do you know what time frame that may have
22 been, what year?
23   A.    It was fairly new when I started here so
24 sometime in 2014, 2015 timeframe.

Page 151

1    Q.    Did you have any opinions of Ed Grizzle as a
2  supervisor?
3    A.    No.
4    Q.    No opinion whatsoever?  He was fine?  He was
5  bad?  He was good?
6    A.    I had no problem with him.
7    Q.    Okay.  And did you ever have a problem with Ed
8  Grizzle being a member of the Joliet Police Department?
9    A.    No.
10   Q.    As we sit here today, do you have any problems
11 with Ed Grizzle?
12   A.    No.
13   Q.    It is your understanding that Ed Grizzle was
14 part of your criminal investigation; is that correct?
15   A.    Yes.
16   Q.    Do you know what role Ed Grizzle played in
17 that investigation?
18   A.    He was assigned as the investigator in my
19 case.
20   Q.    And you were charged in that case, criminally
21 charged?
22   A.    Yes.
23   Q.    What were you charged with?
24   A.    I was charged with criminal damage to

Page 152

1  property, reckless discharge of a firearm and domestic
2  battery.
3    Q.    Okay.  And was it Ed Grizzle that transported
4  you to the sheriff's jail?
5    A.    Him and another detective, yes.
6    Q.    Do you have any hard feelings associated with
7  Ed Grizzle's participation in your federal prosecution?
8    A.    No.
9    Q.    Why not?
10   A.    Just business.
11   Q.    He was doing his job?
12   A.    Yep.
13   Q.    Do you have any complaints or criticisms about
14 the job that Ed Grizzle did with respect to your
15 criminal prosecution?
16   A.    No.
17   Q.    You testified that you had received a 30-day
18 suspension in 2018 --
19   A.    Yes.
20   Q.    -- is that right?
21   A.    Yes.
22   Q.    And what was the -- why were you suspended for
23 30 days?
24   A.    It was for that matter.

Page 153

1    Q.    And when you say "that matter" it was for
2  the -- strike that.
3          When you say "for that matter," what do you
4  mean?
5    A.    The matter that we were just discussing, the
6  incident that Detective Grizzle was assigned to.
7    Q.    Okay.  And it's my understanding that you were
8  acquitted of all crimes; is that correct?
9    A.    That's correct.
10   Q.    So you weren't given a 30-day suspension for
11 being acquitted; right?
12   A.    No.
13   Q.    Okay.  So why were you given a 30-day
14 suspension?
15   A.    Well, so there's -- in an internal
16 investigation there's administrative and then there's
17 the criminal part.  So the administrative is where I
18 sustained the suspension for.
19   Q.    And are there allegations or charges that the
20 internal investigation is reviewing?
21   A.    It's closed.
22   Q.    Okay.  But that was the result -- that's how
23 you got a 30-day suspension; correct?
24   A.    Yes.



Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 154..157

Page 154

1    Q.    And do you recall the findings or the reasons
2  they gave you for a 30-day suspension?
3    A.    They were sustained, was the findings.  The
4  titles -- I don't recall what they titled them, but they
5  were sustained.
6    Q.    Okay.  And do they have to deal with the
7  discharge of your weapon?
8    A.    Yes.
9    Q.    Did it have to do with your actions taken
10 toward Ms. Socha?
11   A.    Yes.
12   Q.    Do you recall if it had to deal with damage of
13 property?
14   A.    Yes.
15   Q.    Did you ever -- strike that.
16         Who conducted that internal investigation?
17   A.    Lieutenant Marc Reid.
18   Q.    Were you interviewed as part of that internal
19 investigation?
20   A.    Yes.
21   Q.    And was your criminal defense attorney
22 present?
23   A.    No.
24   Q.    Did you have a union representative present?

Page 155

1    A.    Yes.
2    Q.    Who was that union representative?
3    A.    Mike DeVito.
4    Q.    And do you recall when that investigation
5  occurred?
6    A.    May of 2018, I believe, or somewhere around
7  that time.
8    Q.    Was it after you were acquitted?
9    A.    No.
10   Q.    Did you ever see a copy of the internal
11 investigation report?
12   A.    Well, no.  So I wouldn't have been provided
13 with one, but one later became public knowledge and was
14 printed in the media.
15   Q.    In what media?
16   A.    I believe it was both the Joliet Patch and the
17 Joliet Herald.
18   Q.    Is that the kind of information that is kept
19 in your personnel file?
20   A.    I believe so.
21   Q.    Did you ever get like a 30-day suspension -- a
22 written document?
23   A.    Meaning like explaining what you're suspended
24 for?

Page 156

1    Q.    Yes.
2    A.    Yes.
3    Q.    And do you recall when you received that?
4    A.    I don't.  It would have been after the
5  criminal trial.
6    Q.    This all took place in 2018; is that fair to
7  say?
8    A.    Yes.
9    Q.    I believe you said your criminal defense
10 attorney was Jeff Tomczak?
11   A.    Yes.
12   Q.    Is that right?
13   A.    Yes.
14   MR. CLARK:  I think we just lost your attorney.
15             (Short break was taken.)
16 BY MR. CLARK:
17   Q.    Let me ask you a different question, Officer
18 Crowley.  As a part of your 30-day suspension were you
19 required to take anger management classes or go to
20 counseling?
21   A.    No.
22   Q.    And I think you testified that your criminal
23 defense attorney was Jeff Tomczak; is that right?
24   A.    Yes.

Page 157

1    Q.    And I don't want to know anything about what
2  the two of you talked about, your private
3  attorney/client conversation, but are you aware of
4  whether or not Cassandra Socha ever had conversations
5  with Jeff Tomczak about your criminal prosecution?
6    A.    I don't know.
7    Q.    Did Officer Socha ever tell you that she had
8  conversations with Jeff Tomczak about your criminal
9  prosecution?
10   A.    I don't think so.  I don't think so.
11   Q.    Do you know if Jeff Tomczak was ever Officer
12 Socha's attorney?
13   A.    No.
14   Q.    No, you don't know or, no, he wasn't?
15   A.    No, he was never her attorney.
16   Q.    Did you -- strike that.
17         Have you ever had conversations with Ed
18 Grizzle about your criminal investigation and
19 prosecution?
20   A.    No.
21   Q.    Have you ever had conversations with Ed
22 Grizzle about any private images, naked photos or videos
23 that are subject to this lawsuit?
24   A.    No.



Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 158..161

Page 158

1    Q.    Have you ever had conversations with Ed
2  Grizzle about the search warrant for Officer Socha's
3  cell phone?
4    A.    No.
5    Q.    Are you aware what role Ed Grizzle played in
6  obtaining a search warrant for Officer Socha's cell
7  phone?
8    A.    Yes.
9    Q.    What role did he obtain?
10   A.    He obtained the search warrant from the judge.
11   Q.    How do you know that?
12   A.    Well, from the criminal complaint and then I
13 know that he executed the search warrant that night on
14 her phone.
15   Q.    When did you become first aware of Ed Grizzle
16 executing the search warrant on Officer Socha's phone?
17   A.    The night that it was executed.
18   Q.    And how did you find out?
19   A.    Officer Socha told me.
20   Q.    And what did Officer Socha tell you?
21   A.    That Grizzle put her in the watch commander's
22 office, showed her a warrant for her phone and then took
23 her phone and dumped it.
24   Q.    Okay.  Did she indicate that any other

Page 159

1  officers were present?
2    A.    Lieutenant Rob Brown.
3    Q.    Did Officer Socha tell you about any
4  conversation that was had between Ed Grizzle and
5  herself?
6    A.    Yes.  She just told me that she stressed her
7  frustration with the search warrant.  She said, this is
8  unfair.  I believe she tried walking out and that he
9  threatened her with arrest for obstructing the
10 investigation.  And then he had her turn over her cell
11 phone.
12   Q.    Did Officer Socha indicate to you that the
13 basis was a text that she sent Maria Gatlin?
14   A.    Yes.
15   Q.    Who is Maria Gatlin?
16   A.    Maria Gatlin is -- so from my understanding it
17 is her ex-boyfriend's mother, or adopted mother, but I
18 understand that she had a relationship with her prior to
19 dating her son.
20   Q.    Were Officer Socha and Maria Gatlin friends?
21   A.    At one time, yes.
22   Q.    Were you and Maria Gatlin friends at one time?
23   A.    I've never met her.
24   Q.    Are you -- strike that.

Page 160

1    Q.    Did Officer Socha indicate to you that she had
2  sent Maria Gatlin a text?
3    A.    Yes.
4    Q.    And do you know what the text read or the
5  subject matter of that text?
6    A.    I later learned it, yes.
7    Q.    When you say you later learned it, do you
8  recall when "later" is?
9    A.    Whenever the lawsuit was filed, that's when I
10 learned about -- Cassandra had told me what it said, but
11 I never read it verbatim.
12   Q.    Was Maria Gatlin a witness in your criminal
13 trial?
14   A.    Yes.
15   Q.    Was Officer Socha a witness in your criminal
16 prosecution trial?
17   A.    Yes.
18   Q.    In terms of the subject matter, I think you
19 just told me that you didn't learn about the subject
20 matter until after this civil lawsuit was filed; is that
21 right?
22   A.    I learned of the subject matter when Cassandra
23 told me about it, but I didn't like -- I wasn't able to
24 ever read it.

Page 161

1    Q.    Okay.  When did Officer Socha tell you about
2  the subject matter of the text?
3    A.    When she sent it.
4    Q.    And do you know when she sent the text?
5    A.    I don't recall when that was.
6    Q.    That was during your criminal trial; right?
7    A.    Yes.
8    Q.    And did Officer Socha tell you why she sent
9  the text?
10   A.    No.  She just told me that she -- she told me
11 that she was composing a text message and that she had
12 inadvertently sent it to her and it wasn't completed.
13   Q.    Did Officer Socha indicate to you that she
14 indicated or texted that Maria Gatlin had committed a
15 felony?
16   A.    Can you repeat that again?
17   Q.    Sure.  Did Officer Socha tell you, at that
18 time, that the text included allegations that Maria
19 Gatlin had committed a felony?
20   A.    No.
21   Q.    When did you first learn that?
22   A.    I guess I didn't know that.
23   Q.    After -- when Officer Socha told you about the
24 search warrant that Ed Grizzle served upon her, outside



Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021                                    Pages 162..165

Page 162

1  of what you already told me about the (indiscernible)
2  did Ed Grizzle say anything in addition that was
3  reported to you?
4      A.   No, not that I can recall.
5      Q.   Did you express any opinions about the
6  signature of the search warrant issued to Cassandra
7  Socha?
8      A.   Yes.
9      Q.   What did you say and what was your opinion?
10     A.   I just -- I disagreed with how it went down.
11 I -- I -- to this day I don't think that they should
12 have done that when she was at work.
13     Q.   Are you aware whether or not it is Joliet
14 Police Department policy to serve warrants on officers
15 while at work?
16     A.   I don't believe there's a policy on that.
17     Q.   Do you believe there's a practice on that?
18     A.   I've never known an officer to have a warrant
19 served on them, so I don't know.
20     Q.   Have you had any subsequent conversations with
21 Officer Socha about that search warrant?
22     A.   Yes.
23     Q.   About how many?
24     A.   A lot.

Page 163

1      Q.   Okay.  Do you have any firsthand knowledge
2  about the contents of that search warrant?
3      A.   No.
4      Q.   Do you know what Ed Grizzle informed the judge
5  that issued the warrant?
6      A.   No.
7      Q.   Do you know who Lorinda Lamken is?
8      A.   Yes.
9      Q.   Who is she?
10     A.   She was the prosecutor that prosecuted my
11 case.
12     Q.   Do you know if Lorinda Lamken -- strike that.
13          Do you know about any conversations between Ed
14 Grizzle and Lorinda Lamken concerning the search warrant
15 on Officer Socha's cell phone?
16     A.   No.
17     Q.   I think you testified that the first time that
18 you had heard any rumors about the video of you having
19 sexual acts with Cassandra Socha, or naked photos, was
20 when Ms. Socha received an anonymous letter; is that
21 right?
22     A.   That's right.
23     Q.   The second time you heard any information
24 about any videos of the two of you performing sex acts

Page 164

1  or naked photos was from Dave Jackson in March of 2020?
2      A.   No.  The next time that I learned that
3  information when Cassandra told me that Mike DeVito
4  informed her of these rumors that he was hearing also.
5      Q.   Do you recall when that conversation between
6  Officer Socha and Mike DeVito was?
7      A.   I do not.  It was after the initial letter was
8  found in her box, but I don't recall when that was.
9      Q.   Do you recall if the conversation between
10 Officer Socha and Mike DeVito was before the lawsuit was
11 filed?
12     A.   It was before the lawsuit was filed.
13     Q.   Do you know where that conversation took
14 place?
15     A.   I don't.  I wasn't there.
16     Q.   Did Officer Socha indicate to you where the
17 conversation took place?
18     A.   She might have, but I don't remember.  It
19 could have been in the union office.  It's kind of where
20 all that stuff happens.
21     Q.   And what did Officer Socha tell you that Mike
22 DeVito told her?
23     A.   Basically the exact same thing that the letter
24 had said, that there was, you know, rumors that

Page 165

1  detectives and supervisors were watching these videos
2  and that there was a cover up and things of that nature.
3      Q.   Is that when you decided to start consulting
4  with attorneys for a possible lawsuit?
5      A.   I think we had already done that prior to Mike
6  DeVito speaking with her.
7      Q.   Do you recall if Officer Socha indicated that
8  Mike DeVito indicated who had seen naked videos or
9  photographs of the two of you or of her?
10     A.   Yes.
11     Q.   Who was that?
12     A.   She related to me that Al Roechner, Ted
13 Grizzle, Darrell Gavin, Marc Reid, Jeremy Harrison, I
14 think that's it.  Oh, John McKinney.  Yeah, that's it.
15     Q.   Would it surprise you then that Officer Socha
16 indicated that she was unaware of Ed Grizzle ever seeing
17 naked photos of her?
18     MR. ADAMS:  Object to form.
19     THE WITNESS:  Can you repeat that question?
20 BY MR. CLARK:
21     Q.   Sure.  Would it surprise you then if Officer
22 Socha testified that she was unaware that Ed Grizzle had
23 ever saw any naked photos or videos?
24     MR. ADAMS:  Same objection.



Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 166..169

Page 166

1 BY THE WITNESS:
2     A.    That wouldn't surprise me.
3     Q.    That wouldn't surprise you?
4     A.    No.
5     Q.    Did you have discuss -- strike that.
6           What else did Officer Socha indicate that Mike
7  DeVito informed her during that conversation?
8     A.    That's basically it.  Just that.
9     Q.    What did Officer Socha tell you or what was
10 her opinion about what was shared with her by Mike
11 DeVito?
12    A.    You know, we both discussed that there's --
13 you know, there's -- why is this happening?  Like why
14 are these people -- why are we getting letters in the
15 box?  Why is the union president coming to you and
16 telling you about this?  That indicates to us that
17 something had to have happened.  You know, that just
18 kind of gave further credit to us, you know, to the
19 claim.
20    Q.    Did you ever ask any other officer if they had
21 heard those rumors?
22    A.    No.
23    Q.    Why not?
24    A.    I don't believe it was my place to do that.  I

Page 167

1  didn't want to become -- I was already involved so I
2  didn't want to reach out and ask anybody that.  We were
3  both in agreement that we're just going to keep quiet
4  and whoever is going to come to us is going to come to
5  us, but we're not going to be actively seeking
6  information in the police department.  That wouldn't be
7  appropriate.
8     Q.    Why not?
9     A.    I don't know.  That's just what we agreed to.
10 It's, you know, part of the -- it's not what we're
11 supposed to do when we go to work.  I don't know.  If
12 somebody was going to come to me, they are going to come
13 to me, but I wasn't going to go actively seeking it.
14    Q.    Yeah, but you have a duty to report sexual
15 harassment; correct?
16    A.    Yes.
17    Q.    But you didn't report this to anyone?
18    A.    Well, we have a duty to report sexual
19 harassment, you know, if we know about it or see about
20 it, but in this particular case the people that we were
21 supposed to report that to were directly involved in
22 sexually harassing her so we were kind of stuck between
23 a rock and a hard spot.
24    Q.    Did you ever reach out to anyone at the

Page 168

1  village administrator?
2     A.    No.
3     Q.    Or city administrator, I should say.
4     A.    No.
5     Q.    Okay.  So there was the anonymous letter, the
6  conversation with DeVito and your conversation with
7  Jackson.  Any other occasions that you can recall in
8  which any type of rumors were described to you?
9     A.    The only other thing was that secondary letter
10 that she received in her box that had like a female
11 attorney on it, and that's it.
12    Q.    Okay.  So other than those four incidents, you
13 don't recall any other occasion in which you heard about
14 a rumor about Officer Socha and yourself in naked videos
15 or videos performing sex acts and --
16    A.    You included the secondary meeting with Dave
17 Jackson and Carlos Matlock; correct?
18    Q.    I didn't, but thank you for pointing it out.
19    A.    Other than that, no.
20    Q.    You indicated at that second meeting, I
21 believe, that Carlos Matlock said that he had overheard
22 various remarks after being interviewed by the Inspector
23 General Regis.  That he told them everything because --
24 he told them everything; right?

Page 169

1     A.    Yes.
2     Q.    And I -- but what exactly did Carlos Matlock
3  say that Ed Grizzle said?
4     A.    He said that Ed Grizzle was indicating that he
5  went across the street and told them that he made copies
6  of Cassie's cell phone and that he distributed those
7  copies to Marc Reid and Al Roechner.
8     Q.    And Marc Reid was lieutenant of internal
9  affairs?
10    A.    That's correct.
11    Q.    So if Lieutenant Reid ordered you to make a
12 copy and provide you with it, if there's a lawful order,
13 you have to do so; right?
14    A.    Yes.
15    Q.    Roechner was the chief of police at the time.
16 If Chief Roechner provided you with a lawful order you
17 would have to follow that order; true?
18    A.    Yes.
19    Q.    (Indiscernible) is there anything else that
20 Grizzle said at that time?
21    A.    I don't believe so.  You know -- strike that.
22 Yes.  He indicated that there was a conversation between
23 Ed Grizzle and Tab Jensen and that Ed Grizzle had
24 threatened to arrest or criminally arrest Tab Jensen for



Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 170..173

Page 170

1 obstructing the investigation when Tab Jensen ordered
2 the removal of the contents of the cell phone from the
3 Cellebrite System.
4    Q.    Okay.  When did that conversation -- I'm
5 sorry.  Strike that.
6          That's what Officer Matlock told you?
7    A.    Yes.
8    Q.    And it's your understanding that Ed Grizzle
9 was criminally investigating Officer Socha?
10   A.    Yes.
11   Q.    The removal of evidence from the computer,
12 that's potentially obstruction of justice; no?
13   A.    I mean, we'd have to look at the whole
14 situation behind that.  I mean, I couldn't answer that
15 right now.  I don't -- this is all things that I've just
16 been told, you know.  Obstruction of evidence is a crime
17 though, yes.
18   Q.    If you had an investigation going on and
19 someone destroyed evidence of your investigation you
20 would be upset?
21   A.    Sure, yes.
22   Q.    With respect to either of the anonymous
23 letters, did you tell anyone about the anonymous
24 letters?

Page 171

1    A.    Yes.
2    Q.    Who did you tell?
3    A.    Jeff Tomczak.
4    Q.    What about any of your friends on the force?
5    A.    No.
6    Q.    You never shared this information with Bill?
7    A.    With whom?
8    Q.    Bill.
9    A.    No.
10   Q.    You never shared the information with Phil?
11   A.    No.
12   Q.    You indicated that Ed Grizzle had been
13 transferred to tri-city duties?
14   A.    The tri-county, yes.
15   Q.    Tri-county.  Thank you.  Is that a promotion?
16   A.    I don't know about a paid promotion, but it is
17 a -- you know, in the police world there's paid
18 promotions and then there's jobs that are held in high
19 regard that are somewhat difficult to get and only given
20 to, you know, officers -- you know, not everybody gets
21 them, is what I'm saying.
22   Q.    You're implying that position is a preferred
23 position?
24   A.    I'm sorry?

Page 172

1    Q.    In your opinion that position was a preferred
2 position?
3    A.    Yes.
4    Q.    Why?
5    A.    If you are passed out of the police
6 department, you are put in charge of a task force, a
7 multi-agency task force, so that's --
8    Q.    I think you testified that there was no way to
9 verify the Jackson information told to you; is that
10 correct?
11   A.    Correct.
12   Q.    And why couldn't you ask Lieutenant Brown
13 about it?
14   A.    That would have not been appropriate for me to
15 do that.
16   Q.    Why?
17   A.    I'm a patrol officer.  He's a lieutenant, you
18 know, these things -- I believe at that point the
19 lawsuit was already filed so, you know, it's an ongoing
20 civil lawsuit.  It's just not my place to do so.  I was
21 just passing the information along.
22   Q.    It is fair to say that you could have verified
23 it, but you chose not to because you didn't think it was
24 appropriate because the lawsuit was pending; is that

Page 173

1 fair?
2    A.    I could have spoken to those individuals,
3 that's true, yes, but I chose not to.
4    Q.    Didn't you want to know if they'd seen the
5 video of you?
6    A.    Umm...
7    Q.    I mean engaged in sex acts?
8    A.    Right.  You know, like I said, I was not going
9 to approach a lieutenant with a question like that.  I
10 don't think that that would have been appropriate.
11   Q.    Do you think it's appropriate to sue Ed
12 Grizzle?
13   A.    I'm not suing Ed Grizzle.
14   Q.    Officer Socha is?
15   A.    She is.
16   Q.    Do you think it's appropriate that Officer
17 Socha is suing Ed Grizzle?
18   A.    If these allegations are correct, yes.
19   Q.    Prior to the complaint there's a lot of
20 allegations surrounding what occurred on July 5, 2017.
21 Just to let you know, I need to ask you a few questions
22 about that evening.  Okay?
23   A.    Okay.
24   Q.    At about 3 in the morning on July 15, 2017,



Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 174..177

Page 174

1  police officers were called to your and Officer Socha's
2  home; right?
3       A.   So in regards to this incident and this night
4  I'm not going to answer any questions about that.
5       Q.   Why is that?
6       A.   I don't believe it has any relevance to the
7  lawsuit and I'm just going to respectfully decline to
8  answer any questions.
9       Q.   Okay.  Let's do this in two parts then.  The
10  first part is I want to ask you about the events leading
11  up to that night.  Officer Socha testified that you were
12  at a bar with other officers.
13       MR. ADAMS:  Object to form.
14  BY THE WITNESS:
15       A.   Again, I'm not going to answer any questions
16  that have to do with that night.
17       Q.   And why is that?
18       A.   I believe that it doesn't have any relevance
19  on this lawsuit and I'm just going to respectfully
20  decline to answer any questions.
21       Q.   Okay.  And it's your understanding that I can
22  ask a series of questions and you can be compelled by
23  court order and sanction?
24       A.   Yes.

Page 175

1       Q.   Okay.  And the basis for your refusal to
2  answer any questions about that evening is relevancy; is
3  that right?
4       A.   Yes.
5       Q.   And you've been acquitted of these crimes; is
6  that correct?
7       A.   That's correct.
8       Q.   And you indicated that you saw the lawsuit
9  that was filed in this case?
10       A.   Can you repeat that, please?
11       Q.   You testified that you saw the allegations of
12  Officer Socha's complaint?
13       A.   Yes.
14       Q.   And you're aware that allegations surrounding
15  that criminal case are part of this lawsuit?
16       A.   Yes.
17       Q.   And the events that took place are part of
18  your criminal lawsuit -- are part of the criminal case
19  against you; true?
20       A.   Yes.
21       Q.   So let me see if I can do this in an orderly
22  fashion.  With respect to anything that occurred on July
23  15, 16 or 17 of 2017, related to your -- criminal
24  charges filed against you for reckless discharge of a

Page 176

1  firearm, domestic battery or destruction of property, is
2  your position that you refuse to answer those questions;
3  is that fair?
4       A.   That's fair.
5       Q.   And you refuse to answer these questions based
6  upon you don't think they're relevant to the case?
7       A.   That's correct.
8       Q.   And your officer -- I'm sorry -- your attorney
9  has not instructed you not to answer these questions; is
10  that right?
11       A.   That's correct.  It's my own decision.
12       Q.   Okay.
13       MR. CLARK:  Court reporter, if you could please
14  certify those questions.
15       THE REPORTER:  Sure.
16  BY MR. CLARK:
17       Q.   You indicated that you love your mother-in-law
18  and have a great relationship with her; correct?
19       A.   That's correct.
20       Q.   Were you aware that she's the one that called
21  the police on the night of July 15, 2017?
22       A.   Yes.
23       MR. ADAMS:  I'll object to the relevance of that
24  question.

Page 177

1  BY THE WITNESS:
2       A.   I'm aware of that.
3       Q.   And no hard feelings to her calling the
4  police?
5       A.   Absolutely not.
6       MR. ADAMS:  Same objection.
7  BY MR. CLARK:
8       Q.   Have police ever been called -- strike that.
9            Prior to July 16, 2017, has there ever been a
10  complaint of domestic violence or abuse directed toward
11  you by Officer Socha?
12       MR. ADAMS:  Same objection.  Relevancy.
13  BY THE WITNESS:
14       A.   No, there hasn't.
15       Q.   Had the police ever been -- strike that.
16            Had the police ever been called to Officer
17  Socha's home in connection with any dispute between the
18  two of you?
19       MR. ADAMS:  Same objection.
20  BY THE WITNESS:
21       A.   No.
22       Q.   Do you have any knowledge or facts to support
23  the allegation that Officer Socha's testimony was
24  generally helpful to your criminal defense?



Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021                                    Pages 178..181

Page 178

1    A.    Can you repeat that?
2    Q.    Sure.  Do you have any knowledge or facts or
3  information to support the allegation that Officer
4  Socha's testimony was generally helpful to your criminal
5  defense?
6    MR. ADAMS:  Objection to form and to foundation.
7  BY THE WITNESS:
8    A.    No.
9    Q.    Do you have any knowledge or facts or
10 information to support the allegation that your
11 acquittal was much to the chagrin of Ed Grizzle?
12   A.    No.
13   Q.    Do you know if officer -- strike that.
14         Do you have any knowledge or fact or
15 information to support that officers' testimony resulted
16 in your acquittal?
17   A.    No.
18   Q.    Do you have any knowledge or facts or
19 information to support the allegation that Ed Grizzle
20 wanted to settle a score with Officer Socha and obtained
21 the search warrant?
22   A.    No.
23   Q.    Do you have any facts, knowledge or
24 information to support the allegation that the search

Page 179

1  warrant obtained by Ed Grizzle was substantially false
2  or incomplete?
3    A.    No.
4    Q.    Do you have any facts knowledge or information
5  to support the allegation that Ed Grizzle want to
6  embarrass Officer Socha?
7    A.    No.
8    Q.    Do you have any facts, information or
9  knowledge that Ed Grizzle was privy to private images
10 and naked photos and videos that we've been discussing
11 as part of the lawsuit?
12   A.    No.
13   MR. CLARK:  Okay.  I think I'm almost done here,
14 but if I could just have like a five-minute break and --
15 a few minute break and we can hopefully finish up.
16   MS. PROCTOR:  You know what, I actually had just a
17 couple cleanup.  I can do them now or I can wait.
18   THE WITNESS:  I'm good.
19              (Short break was taken.)
20   MR. CLARK:  Okay, Officer Crowley, I don't have any
21 further questions at this time.  I'm just going to pass
22 along the questions.  Thank you for your time.
23   MS. PROCTOR:  I just have a few follow up, Officer
24 Crowley.

Page 180

1                REDIRECT EXAMINATION
2  BY MS. PROCTOR:
3    Q.    Did a nonlawyer put you in touch with attorney
4  Hall Adams?
5    A.    No.
6    Q.    Can you describe the nature of the atmosphere
7  at the Joliet Police Department?
8    A.    Currently?
9    Q.    Currently.
10   MR. ADAMS:  I'll object to the form.
11 BY THE WITNESS:
12   A.    The atmosphere?
13   Q.    Well, here, let me rephrase it.  Let's focus
14 on 2018, 2019, okay?  Would you describe the atmosphere
15 at the Joliet Police Department as professional,
16 overall?
17   MR. ADAMS:  Same objection to form.
18 BY THE WITNESS:
19   A.    From my experience of it, yes, at that time.
20   Q.    Have you ever reported any other Joliet police
21 officers for not being professional or not complying
22 with the departmental rules, during your time as an
23 officer there?
24   A.    No.

Page 181

1    Q.    Did you or Cassandra talk to the media about
2  the allegations in this lawsuit, either before or after
3  it was filed?
4    A.    No.
5    Q.    Did you authorize attorney Hall Adams to talk
6  to the media about this lawsuit on your behalf or on
7  Cassandra's behalf?
8    MR. ADAMS:  Object.  That would be privileged.
9  Don't answer.
10 BY THE WITNESS:
11   A.    I didn't, no.
12   Q.    Do you know the name of Cassandra's family
13 doctor?
14   A.    No.
15   Q.    Does she have a family doctor or a primary
16 care physician?  Do you understand what I mean by that?
17 Not a counselor or therapist, but just general doctor.
18   A.    I know the name of her gynecologist because
19 she birthed the children we have, but other than that,
20 no, I don't know.
21   Q.    Did she deliver her babies through the West
22 Suburban --
23   A.    Yes.
24   Q.    West Suburban practice?



Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

Pages 182..185

Page 182

1    A.    Yes.

2    Q.    What is the name of her baby doctor?

3    A.    Yeah, Carla -- I can't think of her last name.
4 I can't think of it right now.  It is Carla -- Dr. Carla
5 is kind of what I -- I can't think of her last name.

6    Q.    Okay.  Has Cassandra ever applied for
7 disability during her employment with the Joliet Police
8 Department?

9    A.    No.

10    Q.    What about before her employment at Joliet?

11    A.    No.

12    Q.    Were you aware that attorney Hall Adams has
13 spoken to journalists or reporters concerning the
14 allegations in Cassandra's lawsuit?

15    A.    Yes.

16    Q.    And do you know who initiated those
17 conversations?  Was it Mr. Adams or the journalists, if
18 you know?

19    A.    I don't know.

20    MS. PROCTOR:  I have no further questions.  Thank
21 you, Officer Crowley.

22    THE WITNESS:  Thank you.

23    MR. ADAMS:  Matt?

24    MR. CLARK:  No additional questions.

Page 183

1         For the record, I'm not going to go through
2 the list of questions at this time regarding what you
3 have described as not relevant, Officer Crowley.  I'm
4 reserving the right to recall you if and when that
5 information becomes relevant and/or court order
6 necessary, but for the time being no additional
7 questions.

8    MR. ADAMS:  Show signature as reserved.

9    MR. CLARK:  Go ahead.

10    MR. ADAMS:  If this is ordered, Sharon, what I
11 would like to get, please, is a condensed hard copy and
12 a PDF of the very same thing.  I do not want a full-size
13 transcript in any form.

14    THE REPORTER:  Okay.

15    MR. CLARK:  And, Sharon, I will order that.  Can I
16 have an email, full and condensed.

17         (AND FURTHER DEPONENT SAITH NAUGHT)

18
19
20
21
22
23
24

Page 184

1         UNITED STATES DISTRICT COURT
         NORTHERN DISTRICT OF ILLINOIS
2            EASTERN DIVISION

3 CASSANDRA SOCHA,              )
                              )
4    Plaintiff,                )
                              )
5    vs.                       )
                              ) No. 18 CV 5681
6 CITY OF JOLIET, a municipal   )
 corporation, EDWARD GRIZZLE,  )
7 JOHN DOES 1-20,               )
                              )
8    Defendants.               )
9
         I, OFFICER NICHOLAS CROWLEY, state that I have
10 read the foregoing transcript of the testimony given by
 me at my deposition on the 17th day of June, 2021, and
11 that said transcript constitutes a true and correct
 record of the testimony given by me at the said
12 deposition except as I have so indicated on the errata
 sheets provided herein.

13
14    _____
         OFFICER NICHOLAS CROWLEY
15
16
No corrections (Please initial)_____
17 Number of errata sheets submitted_____(pgs.)
18
19 SUBSCRIBED AND SWORN to
 before me this _____ day
20 of _____, 2021.
21
         NOTARY PUBLIC
22
23
24

Page 185

1 UNITED STATES OF AMERICA
 NORTHERN DISTRICT OF ILLINOIS
2 EASTERN DIVISION
 STATE OF ILLINOIS
3 COUNTY OF COOK

4     I, Sharon A. Jerndt, Certified Shorthand
5 Reporter, and Registered Professional Reporter, do
6 hereby certify THAT OFFICER NICHOLAS CROWLEY, was first
7 duly sworn by me to testify to the whole truth and that
8 the above videoconferenced deposition was reported
9 stenographically by me and reduced to typewriting under
10 my personal direction.

11     I further certify that the said
12 videoconferenced deposition was taken at the time and
13 place specified and that the taking of said
14 videoconferenced deposition commenced on the 17th day of
15 June, A.D., 2021, at 10:00 a.m.

16     I further certify that I am not a relative or
17 employee or attorney or counsel of any of the parties,
18 nor a relative or employee of such attorney or counsel,
19 nor financially interested directly or indirectly in
20 this action.

21
22
23
24



Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021                                          Pages 186..187

```
                                                    Page 186
1              Witness my official signature on this 15th day
2  of July, A.D., 2021.
3
4
5
6
7
8                    Sharon A. Jerndt
                     SHARON A. JERNDT, CSR, RPR
9                    180 North LaSalle Street
                     Suite 2800
10                   Chicago, Illinois 60601
                     Phone:  (312) 236-6936
11
12
13
   CSR No. 084-004044
14
15
16
17
18
19
20
21
22
23
24
```

```
                                                    Page 187
1  Errata Sheet
2
3  NAME OF CASE: Socha vs City of Joliet
4  DATE OF DEPOSITION: 06/17/2021
5  NAME OF WITNESS: Officer Nick Crowley
6
7  Page _____ Line _____ Reason _____
8  From _____ to _____
9  Page _____ Line _____ Reason _____
10 From _____ to _____
11 Page _____ Line _____ Reason _____
12 From _____ to _____
13 Page _____ Line _____ Reason _____
14 From _____ to _____
15 Page _____ Line _____ Reason _____
16 From _____ to _____
17 Page _____ Line _____ Reason _____
18 From _____ to _____
19 Page _____ Line _____ Reason _____
20 From _____ to _____
21 Page _____ Line _____ Reason _____
22 From _____ to _____
23
24 _____
   SIGNATURE OF DEPONENT
```



Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021                                                                1

**$**

**$1.5** 119:7,10

---

**0**

**08/12/80** 7:6,24

---

**1**

**10** 98:21,23 99:5

**10:00** 5:3

**11** 14:2 102:20

**12** 8:24 103:10 140:18

**13** 103:24

**14** 104:13

**15** 105:4 173:24 175:23 176:21

**16** 49:1 62:15 175:23 177:9

**17** 5:3 175:23

**18** 111:7

**19** 29:15 30:1,4 102:12 111:17 113:16

**1998** 12:6

---

**2**

**2** 72:5,7,11 87:20 88:14 96:1 97:2,23 114:20,23 115:4, 13

**20** 84:15

**2000** 32:5

**2002** 12:17

**2004** 10:15

**2005** 8:6 13:13 14:3

**2013** 9:15 12:4 14:22 18:18

**2014** 26:19 27:20 150:24

**2014-15** 27:24

**2015** 17:15 18:3,7, 10 26:23 27:1 61:1,6 150:24

**2015-ish** 27:20

**2016** 27:21 28:18

**2017** 29:9 131:12, 16 173:20,24 175:23 176:21 177:9

**2018** 23:11 24:1 25:5 26:1 27:22 32:6 33:24 34:19 36:13 41:19,24 42:3,10,13 48:8 49:13 50:20 64:8,9 65:1 66:13,20 78:7 124:23 131:12,16 140:6 141:11 145:22 146:2,14 147:5 152:18 155:6 156:6 180:14

**2019** 26:1 29:15 30:1,4,9 32:6 50:22,23 146:3 180:14

**2020** 31:5 54:16 57:4 59:16 67:10 68:1 71:1,11,15 72:5,7,11,19,23,24 73:17 75:3 76:21 77:18 87:20 88:14 94:6 96:1 97:2,23 114:20,24 115:4, 13,21 116:11 164:1

**2021** 5:3 6:18 31:6, 7 49:21 71:16

**2023** 144:12

**21** 124:23 141:11

**25** 25:10

**26** 25:10

**29** 128:21 129:5

---

**3**

**3** 94:6 173:24

**30** 147:18 152:23

**30-day** 27:22 152:17 153:10,13, 23 154:2 155:21 156:18

**300** 24:3

**33** 129:21

**34** 129:21

**35** 129:21

**3727** 8:4 17:15

---

**4**

**40** 24:14

**45** 73:11

---

**5**

**5** 173:20

**50** 24:14

**52** 18:13

---

**6**

**6** 79:20

---

**7**

**7** 22:20 26:16 79:20

**708 717-3652** 42:6

---

**8**

**815 791-4154** 42:18

---

**9**

**9** 8:24

**911** 22:12

---

**A**

**a.m.** 5:3 22:20

**ability** 43:17 135:7

**Absolutely** 177:5

**abuse** 177:10

**academy** 14:2

**access** 66:19,22 67:3

**accessed** 33:3

**accessible** 125:21

**accident** 150:1,2

**accommodation** 137:10

**accommodations** 133:18

**accurate** 110:5

**acknowledge** 111:22

**acquiesced** 128:24 129:10

**acquittal** 178:11, 16

**acquitted** 153:8, 11 155:8 175:5

**action** 90:2

**actions** 79:1 154:9

**actively** 167:5,13

**activities** 22:12 34:3 35:2 45:6,11

**activity** 35:23 36:1 44:24 45:4,13

**acts** 37:12 65:18 163:19,24 168:15 173:7

**actual** 31:22 32:9 114:11 124:22 127:19

**Adams** 6:10,11, 21,23 7:2,14 43:2, 15 45:5 49:21 60:16 65:21 66:1,9 68:24 70:9,14,16, 24 71:4,11,16,18 80:22 83:17 88:24 90:16,19 91:2,5,7,

13 92:21 98:15,17 113:17 114:13 115:11,14 117:1, 18 118:11 122:17 123:10,12,18,24 124:7,9,20 125:1 126:1,21 127:4 128:9 129:14 130:4,13 131:3,7, 17 132:19 134:9 138:11 165:18,24 174:13 176:23 177:6,12,19 178:6 180:4,10,17 181:5, 8 182:12,17,23 183:8,10

**Adams'** 123:17

**added** 119:6

**addition** 162:2

**additional** 18:24 43:6 129:20 143:22 182:24 183:6

**address** 8:3,5 88:6,9

**administrative** 153:16,17

**administrator** 168:1,3

**admit** 109:17 110:15

**admitted** 84:5

**adopted** 159:17

**advice** 56:8 124:11,20 145:14

**affairs** 101:16 119:18,22 120:4, 13,17,19,21,23 169:9

**affected** 132:12

**agency** 121:14

**agree** 34:19 43:1 128:3

**agreed** 15:15 120:6 167:9

**agreement** 6:20 167:3



Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

2

**ahead** 66:3 126:6 127:2 129:15 148:1 183:9

**ahold** 106:21,22

**Alan** 21:9 86:15 88:19 95:20

**Alana** 24:22 25:17 63:22

**Albert** 149:19

**allegation** 54:15 97:5 177:23 178:3, 10,19,24 179:5

**allegations** 31:18, 23 32:7,22 37:21 49:22 52:17,20,23 77:5,9 82:17,21 116:12 127:16 129:20 133:19,21 150:8 153:19 161:18 173:18,20 175:11,14 181:2 182:14

**alleged** 33:10 56:22 58:15 59:3 75:15 76:10 77:19 95:9 107:1,7 108:18

**allegedly** 58:11 75:7 76:6 80:9

**alleges** 128:22

**allotted** 24:14

**allowed** 61:8

**Amendment** 129:24

**amicable** 10:8

**amount** 141:1

**and/or** 82:16 99:9 122:20 128:23 129:9 183:5

**anger** 156:19

**anonymous** 163:20 168:5 170:22,23

**answering** 22:12 44:2

**anticipate** 126:17

**antidepressants** 140:5

**anymore** 41:7 63:21 81:11 138:19

**apparently** 74:10 107:12,18

**applied** 143:11 182:6

**apply** 143:17 144:12

**approach** 173:9

**approached** 54:17,18 55:23 56:3,7 72:8

**approximately** 14:10 24:3,5

**April** 29:15 30:1,4

**area** 23:18,20

**argumentative** 126:21 134:9

**arrest** 159:9 169:24

**article** 141:7,15 142:18

**articles** 141:3,21 142:5,7,12

**articulate** 134:11

**arts** 64:2

**assert** 71:4

**assigned** 22:4 49:14 97:13 101:3 150:19 151:18 153:6

**assignment** 109:20

**assignments** 101:4

**assist** 69:2

**associate** 25:1 62:2 143:6

**associate's** 10:2, 10,12

**associates** 24:19

**association** 50:5, 6,14,20 51:1 115:21

**assume** 66:18 82:12 126:4

**assuming** 27:14 42:4 46:12 113:8

**assumption** 60:1 120:10

**assure** 98:22

**AT&T** 48:17

**atmosphere** 180:6,12,14

**attend** 10:18 136:23 144:24 146:5

**attended** 145:23 146:2

**attention** 23:10 119:22

**attorney** 6:8,9 7:14 43:15 49:20 67:23 68:8,10,23 70:2,4,6 81:1,6,22, 24 82:2,4,12 87:20 93:12 111:19 113:7 119:20 121:19,22 122:16 123:3,6,9 147:19 148:6 154:21 156:10,14,23 157:12,15 168:11 176:8 180:3 181:5 182:12

**attorney's** 81:2

**attorney/client** 123:21 157:3

**attorneys** 43:23 90:1 119:18 122:18,21,23 165:4

**August** 12:10 47:9 124:23 125:6 141:10

**authority** 120:5 121:4

**authorize** 181:5

**authorized** 127:2

**auto** 101:8

**automatically** 87:24

**aware** 7:2 31:17 51:23 70:6 73:21 76:24 84:15 99:17 107:19 125:10,13, 15,21,24 126:5,8, 14 127:7 128:19, 24 129:10 157:3 158:5,15 162:13 175:14 176:20 177:2 182:12

**awhile** 112:12

---

**B**

**B-R-E-E-N** 23:8

**B-U-S-S-E** 24:21

**babies** 181:21

**baby** 182:2

**back** 14:14 19:4 27:23 28:18 41:19 42:9 47:16 48:8 49:13 54:7 58:18 64:17 65:10 66:13 67:9 72:21 82:14 98:10 113:2

**bad** 41:2 151:5

**bar** 174:12

**barking** 7:7

**bartender** 13:2,6

**base** 40:6 100:16 117:23

**based** 43:3 68:15 92:3,11,14 96:24 98:9 118:4,5 176:5

**basic** 13:19 83:14

**basically** 164:23 166:8

**basis** 131:5 136:17 159:13 175:1

**batch** 19:16,17

**batches** 19:16

**Batis** 85:19 100:13 102:1 135:23 136:1

**battery** 152:2 176:1

**Beard** 16:14,21

**Beecher** 10:22

**began** 26:23 27:2

**beginning** 23:4,5

**begins** 72:7

**behalf** 53:9,10 181:6,7

**belief** 128:23

**believed** 95:4 100:4 118:15

**believes** 103:13 111:20 135:1

**Benton** 21:9,13,21 87:3 121:7

**Bergner** 55:22,23 56:2 58:22,23 59:4,24 85:15 96:6,14,20 100:12 101:12

**big** 28:8,13

**bill** 24:21 25:17 30:13,14,17,18,23 31:7 48:10,14 63:20 171:6,8

**Bills** 30:20

**birth** 7:5,23 140:22

**birthday** 47:6,7,8, 11

**birthed** 181:19

**bit** 17:12,14 132:14 138:13

**Black** 50:5 115:20

**blue** 110:18

**board** 19:23

**body** 36:20

**bolts** 77:13

**borders** 10:23



**born** 11:1,4,5

**bottom** 134:8

**Botzum** 97:8,12

**bought** 47:11

**bounce** 23:15
25:12

**Bourbonnais** 9:6
13:9 14:6,9,12,18,
24 15:3 16:10,13,
22 17:5,10

**box** 164:8 166:15
168:10

**boy** 16:18

**BPOA** 50:2,4 51:8

**Brad** 86:10 135:23

**Bradley** 13:7

**break** 7:11 60:9,10
112:11,15,22,23
147:15,17,23,24
156:15 179:14,15,
19

**breast** 140:12

**Breen** 23:8

**Brian** 21:9 87:3
121:7

**bridges** 50:11

**bring** 12:17
145:15

**Britney** 9:2,5,23
10:7

**brothers** 64:6

**brought** 121:2

**Brown** 55:13 74:2
75:6,9,10 94:3,22
159:2 172:12

**buddies** 62:14

**bullet** 130:16

**bullets** 102:23

**business** 152:10

**Busse** 24:21
25:17 30:14,17,23
62:12 63:20

**butcher** 56:5

---

**C**

**C-A-M-P-O-S**
24:21

**C-A-R-R-O-L**
20:11

**C-R-O-W-L-E-Y**
5:20

**cable** 108:2

**Cagle** 25:17

**cake** 15:7,10

**California** 12:15

**call** 99:4 139:7

**called** 5:13 32:13
79:15,18 108:11
142:3 174:1
176:20 177:8,16

**calling** 177:3

**calls** 22:13 23:17
130:14

**Camp** 12:14

**Campos** 24:20
25:16

**car** 23:13,15 26:7
150:1,2

**card** 48:13

**care** 181:16

**career** 132:10

**Carla** 182:3,4

**Carlos** 51:21 73:4,
14 74:1,2,8,22
86:3 94:24 121:1
168:17,21 169:2

**carrier** 41:24

**Carrol** 20:10

**case** 6:15 9:16
59:20 62:4 92:9
93:12 103:11
109:17 123:4
124:22 128:12
146:23 151:19,20
163:11 167:20
175:9,15,18 176:6

**cases** 28:20

**Casey** 63:23 64:4

**Cassandra** 7:3,17
8:12,19 17:21
18:10 19:8,19
22:22 25:22 26:17
29:5,11 30:1,4,9
34:2 35:22 36:2,6,
8 37:10,17 38:17
39:4,22 40:10,13,
19,22 42:7 44:23
45:4,13,15,22 46:3
49:20 53:3 60:13,
19 61:18 65:18
67:19 68:22 69:7,
11,19 70:8 71:21
75:8 76:17,22
77:23 78:1 79:11
80:3,8,20 82:8,10
83:8 84:15 88:8
92:1 96:3 97:23
98:15 104:17
105:11 108:20
113:6,11,23
114:17 115:5,9
119:11,13,21
120:10 122:20
123:6,9 125:1,24
126:5 127:1,5
128:1,20 131:24
132:15 134:7,13
136:3,6,11 137:17,
23 138:1 139:3,17,
19 140:10,13
141:20 142:6,12
143:11 144:14,23
145:11,23 147:10
157:4 160:10,22
162:6 163:19
164:3 181:1 182:6

**Cassandra's**
31:19,23 32:18,22,
24 33:13,20 34:9,
18 35:6 36:13
41:4,23 47:19
53:23 54:6 55:8,11
65:11 68:8 72:3
77:20 83:1 84:12,
24 85:7,12,16,20,
24 86:4,8,12,16,
20,24 87:4,8 89:7
92:9 93:5,18 99:17
100:5 103:11
107:4 108:15
111:19 118:19

**cases** 121:24 124:8
125:18 126:10
127:21 128:5,21
129:20,23 130:9,
22 131:13 141:14
143:9 181:7,12
182:14

**Cassie** 8:8,11
19:17 47:11 64:13
67:19 145:13

**Cassie's** 169:6

**Celebrex** 56:11,13

**cell** 31:19 32:24
33:1,4,13,17,20,23
34:9,18 35:3 36:2,
13 38:19,20 40:24
41:4 42:7,9,12
43:6 47:19 48:8,10
53:23 54:6 56:1,2
58:24 65:11,17
74:15,16 76:2,3
77:20 80:8,21 83:1
84:12,24 85:7,12,
16,20,24 86:4,8,
12,16,20 87:4,8
93:5 97:20 102:22
107:4 113:12
130:9,22 158:3,6
159:10 163:15
169:6 170:2

**Cellebrite** 49:7,17
102:23 103:4,8
170:3

**cellular** 48:16

**ceremony** 29:19

**certifications**
11:9,12,18

**certified** 11:14,15,
16

**certify** 176:14

**cetera** 110:7

**chagrin** 178:11

**chance** 7:9

**change** 132:7,11

**character** 132:8

**charge** 120:22
137:12,15 172:6

**charged** 151:20,
21,23,24

**charges** 153:19
175:24

**check** 10:5

**chief** 16:12,14,15,
21 17:1,9 19:24
20:24 21:2,8,9,10,
13,16,18,21,22
22:1,2 23:22 52:5,
14 88:19 93:6
95:19,20 100:22
101:17 102:2
136:15,18 169:15,
16

**chief's** 16:17

**chiefs** 17:4 21:4

**child** 140:22

**children** 8:19 10:8
38:12 63:9 64:15,
18,20 145:13,16
181:19

**choice** 99:10
109:20

**chose** 30:17 108:6
115:20 119:20
172:23 173:3

**Chris** 15:13 74:13
76:1,12 97:8,12
110:13

**Christmas** 26:3
62:8,10

**Christopher**
149:11

**circle** 61:24 62:22,
23 64:9,10

**circumstances**
38:8,9

**citizen** 22:11

**citizens** 22:11

**city** 11:19 20:19,22
24:2 77:2,5,15
88:16 90:3 118:3
121:14 168:3

**city's** 128:23
129:9



**civil** 32:13,17
88:16 90:2 123:10
124:22 125:7,16,
20 126:9 127:20
148:16,18 149:1
160:20 172:20

**civilly** 149:24

**claim** 166:19

**claims** 88:18

**clarify** 39:15 46:2
58:18 80:19
115:17

**clarifying** 39:3

**Clark** 112:14,20
147:17,22 148:1,4
156:14,16 165:20
176:13,16 177:7
179:13,20 182:24
183:9,15

**class** 19:7 90:2

**classes** 136:23
156:19

**clean** 44:9 96:6,21
97:8,20

**cleanup** 179:17

**clear** 41:2 43:22
57:15 60:18 68:19
70:23 71:10 75:5
99:3 104:19
115:11

**clerical** 110:2

**Clinical** 139:1

**close** 61:24 64:9,
10 108:4 119:7

**closed** 153:21

**closest** 24:23 25:7
30:21

**Cloud** 42:21 43:1
44:12

**co-workers** 50:2
135:2

**codefendant**
147:16

**College** 10:11
13:5

**combined** 90:1

**comma** 90:3
97:19

**command** 54:3
88:17 110:19

**commander** 23:7,
20 59:21

**commander's**
55:13 73:24 75:11
93:8 158:21

**commanders**
23:23 95:9

**comment** 74:1,2
75:7 133:22

**comments** 94:2,
14

**commitments**
64:20

**committed**
161:14,19

**Common** 101:1,
23

**communication**
71:5

**communications**
71:5

**community** 10:11
13:5 50:8,12

**compelled** 174:22

**compelling** 70:6

**compensation**
58:4

**complaint** 32:13,
17 107:11,20
124:22 125:16
127:17,20 129:6,
21 130:17 158:12
173:19 175:12
177:10

**complaints**
152:13

**completed**
161:12

**completely** 64:19

**complying**
180:21

**component** 16:3

**compose** 68:20

**composed** 67:21
68:9 69:5,8 98:12

**composing** 69:2
161:11

**computer** 33:2,3
49:18 83:12
170:11

**conceal** 99:8

**concept** 32:14

**concern** 127:2

**concerned**
134:23

**concluded**
112:11

**concludes** 147:12

**conclusion** 5:6
130:14

**condensed**
183:11,16

**conduct** 15:21
16:6

**conducted** 5:2
110:14 154:16

**confer** 89:15

**confirm** 91:14

**confusing** 44:7
90:17

**Congratulations**
8:17

**conjunction** 71:7

**connected** 32:8

**connection** 99:24
177:17

**consensually**
35:17

**consent** 35:22

**considered** 102:7
121:15

**consult** 119:20
121:19 122:17,20

**consulted** 121:22

122:16

**consulting**
119:18 165:3

**contact** 61:10
81:4 107:8 133:10

**contacts** 22:11

**contained** 32:8
34:18 125:16

**contemporaneou
sly** 91:20

**content** 34:22
36:16 47:24 70:17,
24 71:17,20 98:16
106:16 115:12

**contents** 33:1,6
56:12 59:1 80:21
91:15 102:22
103:11 104:1
113:12 163:2
170:2

**continue** 90:23

**continuing** 114:2

**continuous** 138:8

**continuously**
143:20

**control** 11:16

**conversation**
55:1,5 58:6,15
59:3,7,9,15 67:13,
17,18,20 68:1
69:8,10 70:1,23
71:17 74:20 75:15,
19,22 79:23 80:3
108:17 132:16
157:3 159:4 164:5,
9,13,17 166:7
168:6 169:22
170:4

**conversations**
52:16,19,22 53:2
84:4 87:11,16
108:19 157:4,8,17,
21 158:1 162:20
163:13 182:17

**copied** 70:11
102:17

**copies** 33:5 39:19
44:15,18 56:10,13,

14,16 74:15,16
76:2,3 95:18 99:7
110:17 111:21
141:20 169:5,7

**copy** 72:3 87:18
155:10 169:12
183:11

**Corps** 12:10 13:1

**correct** 6:16 7:3,
22 8:20 17:10 18:3
29:12 38:21,23
40:3 41:14,16
46:6,10 47:17 59:4
60:4 68:20,24 69:1
71:2,12,13 74:7
75:8 76:7,22 83:5,
6 85:8,9 88:21
89:3 90:11,12
92:15 93:15,23,24
94:10,11,15,16
95:7,10,15,16
96:13 97:5,6 98:6,
7 100:6 103:5,6,8,
9,22,23 104:20,21,
23,24 105:2,3
108:21,24 109:8
110:10,11 111:2,3,
5,6 112:1,4,8,9
115:19 118:10,13,
15 120:11 122:9
125:8 140:23
151:14 153:8,9,23
167:15 168:17
169:10 172:10,11
173:18 175:6,7
176:7,11,18,19

**correctly** 95:22

**Costa** 24:22 25:18
63:23

**counsel** 5:7 72:4
123:22 124:20
125:17

**counsel's** 148:7

**counseling** 138:8
139:6,11,16
144:24 145:9,23
146:2,6,10,22
147:5 156:20

**counselor** 138:21
139:14 181:17

**counselor's**



145:14

**counselors**
138:15

**count** 119:6

**county** 9:17
10:11,23 29:17,18,
21

**couple** 6:13 24:18
50:15,16 63:22
72:18 113:3
115:24 147:4
179:17

**couples** 144:24
145:9 146:10

**court** 28:19,24
32:19 49:3 150:11
174:23 176:13
183:5

**cousin's** 61:18

**cover** 143:4 165:2

**covered** 64:23

**covers** 143:3

**COVID** 24:10

**create** 68:15,17

**created** 92:5

**credible** 59:23

**credit** 48:13
166:18

**crime** 170:16

**crimes** 22:9 97:13
101:13 153:8
175:5

**criminal** 10:13
48:21 147:1
148:16 151:14,24
152:15 153:17
154:21 156:5,9,22
157:5,8,18 158:12
160:12,15 161:6
175:15,18,23
177:24 178:4

**criminally** 151:20
169:24 170:9

**criticisms** 152:13

## CROSS-EXAMINATION
148:3

**Crowley** 5:2,12,
17,19 7:8,13,23
10:4 18:20 23:10
26:13 31:17 33:9
34:13 40:8 43:13
44:11 53:20 55:15
60:12 72:2 91:18
93:1,10 98:8
113:2,10 115:2
124:3,23 128:21
130:3 131:10,22
132:23 138:14
147:8,13,17 148:5
156:18 179:20,24
182:21 183:3

**cry** 133:8

**current** 10:7 11:21
22:16 23:4,6
46:15,21 56:2 59:1
111:13 144:11

**custody** 9:7,9

**cut** 89:18 114:12
138:13

**cyber** 97:13
101:13

**cycle** 117:3

**Cynthia** 18:20

---

## D

**D-E-L-R-E-Y**
138:23

**daily** 136:17
142:2,5

**damage** 151:24
154:12

**Darrell** 55:12
73:23 74:3 75:9
84:23 85:6 93:6
100:20 133:6,21
135:15 137:3
165:13

**date** 5:3 7:5,23
18:8 28:19 29:1
76:14 114:20
140:17 141:13

**dated** 26:20 72:4
114:19 115:4,12

**dating** 26:17
60:22 159:19

**daughters** 8:9,22
9:7

**Dave** 54:17 69:12,
24 73:1 87:21
88:14 90:14 99:22
109:24 112:3
121:1 129:18
136:3 164:1
168:16

**David** 50:1 51:12
54:24 56:20 57:10
67:10 72:11 77:1
85:4 90:9 91:19,21
92:12 93:14 94:5
96:9,17 97:1,10
103:5 104:6,20
110:23,24 111:15
114:23 117:8
118:9

**Dawn** 21:10 23:22

**day** 22:17,18,19
26:16 29:14 31:3
63:5 68:13 76:11
91:24 92:3,4
114:22 115:2
136:21 138:9
148:20 162:11

**days** 8:10 64:15
78:13 81:13 96:4
146:16 152:23

**dead** 123:20

**deal** 138:18 143:1
154:6,12

**dealing** 145:9

**Deb** 138:23
139:19,21

**Debbie** 139:16

**decided** 116:3
121:2,18 165:3

**decision** 176:11

**decline** 174:7,20

**deemed** 16:6

**deep** 79:6

**defendants**
84:16,20 87:12
130:12,20

**defense** 154:21
156:9,23 177:24
178:5

**define** 61:23

**degree** 10:2,10,12

**degrees** 10:16

**delete** 88:1 114:14

**deleted** 88:1,2
103:12,13

**deleting** 104:1

**deliver** 181:21

**Delrey** 138:23
139:16,19,21

**Dennis** 20:10

**department** 11:19
12:3 14:7,22 18:23
19:13 20:4 24:16,
24 27:10,16 28:4,6
30:6 31:20 33:8
49:5 50:12 53:14,
22 54:4 61:14,22
62:9,14 63:1 77:21
82:20,24 84:10
87:9 95:19 96:15
97:21 101:2,6,11
105:18,19 106:6
107:9,13 109:13
111:20,22 117:10
118:1 119:23
120:5 121:12,13
128:24 129:9
135:18,22 137:13
143:13 144:15
151:8 162:14
167:6 172:6 180:7,
15 182:8

**departmental**
180:22

**depend** 26:9

**depicted** 36:17,21

**DEPONENT**
183:17

**deposed** 7:19
111:9,12 148:10,
13,16,19,23

149:23

**deposition** 5:1,6
6:4,7,15 7:15
43:20 44:6 67:6
71:7,24 93:1 131:4
150:3

**deputy** 52:5,14
93:6 95:19 100:21
101:17 102:2

**describe** 10:7
21:20 34:22 49:24
52:3,7 102:23
106:14 131:1,13,
15 180:6,14

**describes** 102:20

**description**
106:16 134:1

**descriptions**
125:15,17

**desk** 72:20 75:22
136:20

**destroy** 114:14

**destroyed** 46:6,8
111:23 170:19

**destruction** 176:1

**detail** 69:22

**detailed** 92:8

**details** 107:6
126:19 128:12,18

**detective** 59:19,
20,21 72:8 74:6
93:7 97:16 101:7
104:14,23 118:2
152:5 153:6

**detectives** 78:23
104:15 110:15,18
165:1

**develop** 63:6

**device** 36:2 39:20
41:5 65:17 68:17

**devices** 36:9

**Devito** 52:23 53:3,
6,18 155:3 164:3,
6,10,22 165:6,8
166:7,11 168:6

**dick** 55:16 93:9



**difference** 139:15

**differences** 147:9

**difficult** 171:19

**dig** 87:23

**direct** 5:15 48:12

**directed** 71:14 177:10

**directly** 110:10 120:7 133:6 167:21

**dirty** 126:19

**disability** 182:7

**disagree** 91:6,16

**disagreed** 162:10

**discharge** 12:21 152:1 154:7 175:24

**discharged** 12:19

**disciplinary** 14:15

**discipline** 15:2,15 16:4,9 17:2 27:15 53:16 150:8

**disciplined** 16:10 53:13 129:3,4

**disclose** 29:24 128:14

**disclosed** 125:20

**discovery** 131:4

**discrimination** 77:12 88:18

**discuss** 7:20 71:16,20 92:24 124:7 166:5

**discussed** 49:21 74:6 77:14 80:2 85:1 119:15,17,18, 19 122:18 144:18 147:7,11 166:12

**discussing** 40:24 42:20 44:12,23 58:6 84:6 113:6 129:12 130:11,23 153:5 179:10

**discussion** 69:14

**discussions** 119:16 122:24 123:5,9

**dispute** 28:24 33:12 72:13 177:17

**disseminated** 130:21

**dissemination** 129:1,11 130:10

**distribute** 76:3

**distributed** 33:7 169:6

**district** 23:14,18 150:19

**districts** 23:16,19 65:4 79:15

**division** 22:5 79:3

**divorce** 9:11,14, 16 18:18

**divorced** 9:18 145:12

**doctor** 181:13,15, 17 182:2

**document** 32:13 66:7 81:8,13,17,19 82:1,6,8,11 83:14, 15 91:2,7,8,14 92:22 126:12,13 155:22

**documented** 67:18

**documenting** 71:1,17 90:13

**documents** 6:3 32:8

**Doe** 84:16,19 87:12 130:11,20

**dogs** 7:7

**dollars** 119:5

**domain** 126:20

**domestic** 152:1 176:1 177:10

**dominated** 133:3

**Don** 104:14 106:22 135:23

**Donald** 86:7

**door** 57:16

**dot** 88:7

**downloaded** 33:1 93:6 109:18

**downloading** 102:22

**draft** 32:17

**drafted** 89:13

**drafting** 89:16 103:1

**drafts** 113:22

**dramatic** 132:7

**drink** 62:6

**Du** 29:18,21

**due** 24:10 111:12 137:10

**duly** 5:13

**dumped** 158:23

**duties** 171:13

**duty** 12:12 133:7, 17 136:20 137:4,9, 15 143:18 167:14, 18

---

### E

**E-A-R-D** 16:18

**E-M-P-F** 30:15,19

**earlier** 39:24 53:16 62:13 72:14 92:24 113:6 118:21 138:4

**early** 125:6

**Ed** 74:9,10 75:15, 23 76:12 135:15, 19,20 136:23 137:2 148:6 150:14,17 151:1,7, 11,13,16 152:3,7, 14 157:17,21 158:1,5,15 159:4 161:24 162:2

**Edgewood** 138:24 139:1,4,14 144:24

**education** 10:1,3

**Edward** 86:19 101:5

**effective** 90:3

**effectively** 135:11

**elected** 116:17

**election** 117:3,6

**electronic** 44:18

**email** 28:3,4,5,6 67:21 68:9,11,15, 17,20,22,23 69:2, 5,8 70:1,9,11,13, 17,24 71:17,20,23 72:3 87:18 88:3,6, 9,12,22 89:7,10, 16,23 90:6,13 91:24 92:2,7 93:4, 17 94:1,12 95:2,17 96:3,14,20 97:7, 12,18,22 98:9,12, 16,24 99:5,12 101:11 102:11,17, 18,20 103:10,24 104:3,13,17 105:4, 11,18,24 109:13, 14 110:12 111:7, 18 113:5,10,16,23 114:2,7,12,16,19, 21,22 115:4,8,12 183:16

**emails** 88:1 101:2 114:15

**embarrass** 179:6

**Empf** 30:15,18,19 31:8

**Empf's** 31:12

**Emph** 62:12

**employed** 15:2 17:5 23:3 24:1,7 27:16 135:21

**employee** 14:15 15:11

**employment** 12:8 14:20 144:14,21 182:7,10

**encourage** 51:5 119:13

**encouraged** 93:18

**end** 7:8 92:10 93:10 98:22 109:16 110:18 140:15

**enforcement** 11:12 14:4 22:13

**engage** 34:2 43:10

**engaged** 34:24 35:1 44:24 45:3,12 71:6 173:7

**entered** 14:2

**entire** 16:15 33:1 139:8

**entitled** 91:2,3,8, 13

**entry** 99:12

**episode** 106:21

**erase** 56:1 58:24

**erasing** 56:14

**error** 110:2

**essentially** 11:1 53:17 132:4

**estimate** 34:8,17 102:15

**evening** 173:22 175:2

**event** 25:6 97:19

**events** 5:24 33:10 45:12 62:9 65:20 108:24 109:1 131:23 132:17 138:2 141:14 174:10 175:17

**everybody's** 116:2 126:18



**evidence** 56:17 99:8 170:11,16,19

**ex-boyfriend's** 159:17

**exact** 18:8 27:4 140:17 164:23

**exam** 144:5

**EXAMINATION** 5:15 180:1

**examine** 92:22

**examined** 5:14

**exchange** 109:19

**executed** 158:13, 17

**executing** 158:16

**exhausted** 67:12 75:2

**exist** 41:4,6 42:24

**expensive** 118:22

**experience** 118:5 133:2 180:19

**experiencing** 133:1

**expires** 144:12

**explain** 30:2 134:17

**explaining** 134:24 155:23

**explicit** 125:17 128:4

**explored** 144:14, 16,21

**express** 162:5

**extent** 28:9 62:11

**F**

**face** 35:4,6,10

**facilitate** 128:7

**fact** 30:9 121:3 125:19 128:12 133:17 178:14

**facts** 106:8 109:8

125:19 126:10 127:11,16 128:4 177:22 178:2,9,18, 23 179:4,8

**factual** 96:24 130:7,19

**fair** 26:20 44:3 67:4 143:24 156:6 172:22 173:1 176:3,4

**fairly** 150:23

**fall** 109:16 110:6

**false** 92:11 93:23 104:11 105:2 179:1

**falsity** 94:9 97:5 98:5 103:22 109:8 111:5 112:7

**familiar** 83:23 92:20

**family** 30:3 64:21 181:12,15

**famous** 142:19

**fashion** 175:22

**FBI** 96:5,22 97:13 101:13 103:14 121:13

**February** 12:4 14:22

**federal** 32:18 150:11 152:7

**feeding** 118:9 140:12

**feel** 134:21 137:19

**feelings** 138:6 152:6 177:3

**feels** 134:18,20 135:7,8

**feet** 144:3

**fellow** 25:7 30:10

**felony** 161:15,19

**female** 16:1,2 56:4 82:2 133:2 134:23 135:10 168:10

**fiancee** 29:6

**field** 11:14 20:3,8

**file** 32:12 107:20 155:19

**filed** 9:16 32:9,18 76:17,22 77:1 78:8 108:15,20 119:3 124:23 125:8,10 126:9,12,18 127:20 136:11 141:10 160:9,20 164:11,12 172:19 175:9,24 181:3

**files** 30:5

**filing** 125:11 128:3

**filled** 24:13

**final** 111:17

**find** 87:23 158:18

**findings** 154:1,3

**fine** 20:13 57:17 151:4

**fingerprint** 28:7, 12

**finish** 179:15

**finished** 89:21

**firearm** 152:1 176:1

**firsthand** 111:10 163:1

**five-day** 27:20 28:17,23

**five-minute** 60:9 112:11,22 179:14

**flexible** 112:19

**flyer** 116:1

**focus** 23:24 33:19 35:14 180:13

**focusing** 23:10 26:1 47:19 131:16

**folks** 49:10

**follow** 169:17 179:23

**follow-up** 148:8

**font** 83:18,19

**FOP** 62:10

**force** 62:20 97:13 101:8 171:4 172:6, 7

**form** 45:5 46:15 51:8 66:9 71:23 79:8 83:17 88:24 90:16,19,22 91:11, 13 92:21 126:21 127:4 128:9 129:14 130:4,13 132:19 134:9 138:11 165:18 174:13 178:6 180:10,17 183:13

**formal** 29:19 114:11

**forward** 87:20 119:13

**forwarded** 68:11, 23 70:8,13 87:19

**found** 83:8 93:18 164:8

**foundation** 43:3,9 80:22 117:11 124:14 126:1 127:4 128:9 130:4, 13 178:6

**fourth** 19:17 115:15 129:24

**frame** 23:12 76:9 108:14 146:12 150:21

**free** 64:17 125:12, 21

**freeze** 24:12

**frequently** 34:6

**freshman** 11:7

**Fridays** 13:7

**friend** 24:19,22 30:13

**friendly** 49:13

**friends** 24:17,23 30:10,21 49:10 61:24 62:20 64:9, 10 142:16 159:20, 22 171:4

**front** 89:1

**frustration** 159:7

**full** 15:14 183:16

**full-size** 183:12

**full-time** 13:14

**functions** 137:12

**future** 144:8

**G**

**G-U-C-K-C-O-P** 88:7

**Gabin** 100:21

**gap** 50:11

**gather** 50:8,9

**Gatlin** 159:13,15, 16,20,22 160:2,12 161:14,19

**gave** 37:4 74:16 76:4 78:24 82:12 92:15 93:20 95:19 96:18 98:2 113:23 124:6 129:17,18 154:2 166:18

**Gavin** 52:8,16 55:12 73:23 74:3 75:7,10,11 84:23 85:6 93:6 94:2 100:12 133:6,18, 22 135:16 136:14 137:3,7,9 165:13

**general** 74:14 100:24 101:10 110:13 168:23 181:17

**generally** 22:7 32:14 145:10 146:22 177:24 178:4

**get along** 25:3,12 50:3

**girls** 64:16

**give** 6:15 10:4 12:7 18:8 20:8 21:7 36:14 67:2 76:9 96:21 105:11 127:1,9 132:13



137:5 140:18
142:22 145:6

**giving** 75:8

**gloating** 74:11

**golf** 107:15

**good** 10:9 38:1,4
112:10,17,20
120:6 121:3
130:18 147:21
151:5 179:18

**gosh** 21:14 25:18
106:24

**grabbed** 65:14

**graduate** 12:5

**graduated** 12:9

**Grant** 10:19,20
11:6 13:12,15,17,
20 14:5,14 18:14,
17,21

**great** 131:19
176:18

**greatly** 132:12

**Grizzle** 74:10
75:15,19,23 76:7,
10,12 86:19 95:18
100:12 101:5
135:15,19 136:1,
24 137:2 148:6
150:14,17 151:1,8,
11,13,16 152:3,14
153:6 157:18,22
158:2,5,15,21
159:4 161:24
162:2 163:4,14
165:13,16,22
169:3,4,20,23
170:8 171:12
173:12,13,17
178:11,19 179:1,5,
9

**Grizzle's** 74:9
75:23 152:7

**grounds** 15:20

**group** 26:4,5 51:5,
16 75:21 147:14

**guess** 20:15 65:13
72:22 77:22 80:13
99:4 108:18

121:21 128:16
161:22

**guidance** 145:18

**guide** 145:14

**guys** 34:2 44:23
60:5 63:7,12,16,22
112:17

**gynecologist**
181:18

---

## H

**half** 14:10,19
16:23 21:18 55:4
57:8 73:11

**half-hour** 59:15

**Hall** 6:10 49:21
68:24 70:9,24 84:1
91:1 98:15 122:17
123:10 124:7
125:1 180:4 181:5
182:12

**Halloween** 26:3

**hand** 5:9

**handle** 112:13

**handwritten**
68:12 83:9

**hang** 26:6 64:21

**happen** 54:9,12
126:17,23

**happened** 24:9
28:22 57:23 76:15
135:1 166:17

**happening**
166:13

**harassing** 167:22

**harassment** 16:3
167:15,19

**hard** 44:15 95:18
111:21 152:6
167:23 177:3
183:11

**Harrison** 55:14
94:3 95:3,5,14,15
97:8 100:13
101:19 165:13

**head** 67:2 88:11

**heads** 142:22

**health** 139:6

**hear** 54:13,15 60:6
82:23 83:4 142:7,
14

**heard** 74:9,20
76:11 87:7 108:10
163:18,23 166:21
168:13

**hearing** 81:12
164:4

**hears** 142:8

**hearsay** 85:4

**held** 11:24 51:24
118:3 171:18

**helped** 99:8 128:7,
12

**helpful** 83:17
118:19 145:20
177:24 178:4

**helps** 25:14

**Herald** 142:2,3,6
155:17

**hey** 74:22 142:17,
19

**high** 10:18,19
11:7,8 12:5,8
120:5 121:4
171:18

**high-profile**
118:2

**higher** 109:19

**highest** 10:1
14:11

**highly** 99:9 111:18

**hire** 19:15 71:10

**hired** 14:6,21 19:7,
9,16 20:18 21:1
27:9 31:14 63:2

**hires** 19:8,14

**hiring** 19:10 24:11

**history** 143:9

**hold** 10:5,16 11:8

51:4,9,12,19

**holds** 116:15

**Holland** 11:5

**home** 17:18,20,22
39:14 174:2
177:17

**homicides** 118:2

**honorable** 12:21

**hope** 34:13,15
57:24

**hour** 55:4 57:8
60:8 73:11 102:19
113:20

**hours** 22:18

**house** 27:6 38:12

**household** 63:10

**HR** 30:6

**hundred** 19:15
119:5

**husband** 133:13

---

## I

**idea** 35:19,21
38:1,4 42:22 80:11
120:6 121:3

**identified** 84:16

**identify** 122:23
135:14

**identifying** 100:9

**identities** 84:19

**Illinois** 5:4 10:19,
20,22 11:6 13:7,24
18:15,17,21

**images** 31:18 33:3
36:18,22 84:5
129:2 130:10,22
157:22 179:9

**imagine** 133:12
134:2

**Immediately**
69:12

**impact** 131:22
142:11 147:9

**impacted** 132:11,
17

**impair** 5:24

**implying** 171:22

**important** 100:5
134:5,7

**in-person** 82:16

**inadvertently**
161:12

**inappropriate**
133:22

**inappropriately**
28:3

**incident** 100:1
105:6 107:7
109:10 111:10
132:3 143:6 149:7,
16 153:6 174:3

**incidents** 147:10
168:12

**include** 22:8
69:23

**included** 100:12
125:11 128:4
161:18 168:16

**includes** 30:6

**including** 70:21
87:15 88:17 98:15
104:16 105:10
126:14 127:11
128:6

**incomplete** 179:2

**incorporating**
126:9

**independent**
93:22 112:6

**independently**
94:9 96:11 97:4
98:5 109:7

**Indiana** 10:23

**indicating** 169:4

**indiscernible**
162:1 169:19

**individual** 90:4
136:7 137:14
146:5



**individually** 147:4

**individuals** 20:20 133:4 135:8,13,20 137:18 173:2

**inform** 133:6 142:18

**information** 55:7 56:21,22 57:9 59:12,17 60:3 69:22 70:4,5 73:15,20,21 74:4 77:18 80:8 81:22 82:4 84:9,22 85:5, 10,14,18,22 86:2, 6,14,18,22 87:2 89:24 90:8 92:14, 18 93:2,11,20 94:5,19,23 95:14, 24 96:8,17 97:1, 10,16 98:2 99:22 100:16,17,23,24 101:9,10,14 103:1, 3,15,19,22 104:5, 9,16,19,23 105:2, 10,13,14,22 108:7, 8 110:9,21,22 111:2,5,8,14 112:2,3,8 118:9, 17,18 120:2 123:19 128:8,22 129:8,18 130:2,7, 19 136:2 155:18 163:23 164:3 167:6 171:6,10 172:9,21 178:3,10, 15,19,24 179:4,8 183:5

**informed** 67:19 163:4 164:4 166:7

**initial** 76:20 123:11 125:2 164:7

**initially** 115:6 119:3

**initiate** 32:12

**initiated** 73:12 182:16

**input** 98:16 115:12 116:20

**inspector** 74:13

110:13 168:22

**instance** 128:15

**Institute** 13:23

**Instruct** 123:18

**instructed** 176:9

**instructing** 123:23

**instructor** 11:17

**instructs** 43:15

**insurance** 30:6

**intend** 144:7

**interaction** 21:24 53:17 136:12,18

**interactions** 136:6

**intercourse** 35:1

**interest** 27:6

**interested** 51:7

**intermediary** 43:4

**internal** 30:8 97:9 101:16 110:14 119:17,22 120:4, 13,17,19,21,23 153:15,20 154:16, 18 155:10 169:8

**internally** 121:5

**interviewed** 20:21 74:13 76:1, 12 154:18 168:22

**intimacy** 132:5

**intimate** 35:17 37:4 66:5 92:8 135:4

**investigate** 120:9

**investigating** 22:12 170:9

**investigation** 97:9 100:22 110:14 120:4 151:14,17 153:16, 20 154:16,19 155:4,11 157:18 159:10 170:1,18, 19

**investigations** 33:2 49:4,11,14 52:6,13 59:22 74:12 79:2 93:8 96:5 100:21 101:7 102:1

**investigator** 151:18

**involve** 28:18

**involved** 51:1 59:20 77:10 120:8, 14 122:12,13 129:5 136:4 149:1, 6,8,9 150:7 167:1, 21

**involvement** 53:8 100:1

**involves** 31:18

**involving** 28:19 105:6 107:2 149:7, 21

**iphone** 41:16,18 46:23 66:14 129:2, 23

**iphones** 47:1,5

**issue** 6:1 53:9 56:1 58:24 134:6, 12

**issued** 107:3,9 162:6 163:5

**issues** 7:20 14:15 53:3 82:20 109:2 119:21 131:20 138:9,18 145:8,11

**items** 111:23

——————————

**J**

**Jackson** 8:15 50:1 51:12 54:17, 18,24 56:20 57:10 58:6,19 59:9,11, 15,17,19 60:2 67:10,13,17 68:1 69:5,8,13,24 71:1, 18 72:8,11,15 73:1,7,13,18 74:6, 21 75:3 76:21 77:1,14,17 82:15, 16 83:2 85:4

87:15,21 88:14,15 89:23 90:9,11,14 91:19,21 92:8,12, 15,18 93:4,14,17, 20 94:1,6,12,16,21 95:3,6,17,24 96:4, 9,17 97:1,7,10,16, 24 98:2 99:15,22 102:21 103:5,11, 16 104:6,13,20,23 109:24 110:5,13, 23,24 111:8,12,15, 18 112:3 114:23 116:8 117:6,8,16 118:9 121:1 129:18 136:3 164:1 168:7,17 172:9

**Jackson's** 77:5

**Jacob** 8:15

**jail** 152:4

**jeez** 48:9

**Jeff** 123:1,2 156:10,23 157:5,8, 11 171:3

**Jensen** 56:11 86:23 95:20 121:7 169:23,24 170:1

**Jeremy** 55:13 94:3 101:19 165:13

**Jerndt** 5:5

**Jim** 17:8

**job** 14:4 20:21 34:15 135:7,10 152:11,14

**jobs** 171:18

**Joe** 16:14,20,21 23:9

**John** 20:14 84:16 130:11,20 165:14

**Johnson** 139:12, 13,17,18

**join** 12:2 13:20 51:5 115:20 116:2, 3

**joined** 17:14 18:23

**joining** 51:8

**joint** 9:9

**joke** 15:17,18

**Joliet** 5:4 8:2,3 11:19,21 12:2 14:21 17:14 18:23 19:20 20:19,23 21:3 24:2 27:9,16 30:24 31:8,20 49:5,11 53:18,22 54:4 57:2 61:13, 17,22 62:1,14 73:6 77:21 82:20,23 84:10 87:9 97:20 101:6,21 106:6 110:13 117:9 119:23 120:5 121:14 135:17,21 142:3,6 143:12 144:15 151:8 155:16,17 162:13 180:7,15,20 182:7, 10

**journalists** 182:13,17

**JPD** 88:15,17 101:6

**judge** 29:22 158:10 163:4

**judge's** 29:22

**jujitsu** 63:22 64:3

**July** 125:6 140:17 173:20,24 175:22 176:21 177:9

**June** 5:3 23:11 31:4 33:24 72:19, 21 140:6 145:22

**justice** 10:13 121:13 170:12

——————————

**K**

**K-I-L-L-I-A-N** 64:5

**Kankakee** 9:17 10:11,23 13:5

**Kevin** 20:16

**kid** 62:9

**Killian** 63:23 64:5



Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

10

**kind** 25:3,14 26:5 30:7 50:8,11 73:22 92:18 93:1 102:17 107:19 132:15 138:13 140:1 142:9 143:12 145:5,14 155:18 164:19 166:18 167:22 182:5

**knew** 103:7 108:9

**knowing** 118:8

**knowledge** 17:23 32:3 33:10,19 36:8,12 40:2,20 41:5 46:1,7,16,17 47:23 48:2,4 53:21 54:2,8 58:1 71:3 80:7 84:9,22 85:10,14,18,22 86:2,6,10,14,18,22 87:2,6 89:4 92:9 96:16 97:14 101:1, 23 105:16,21 107:1 108:23 110:16 111:2,10 129:7,19 139:8 143:8,11 155:13 163:1 177:22 178:2,9,14,18,23 179:4,9

---

**L**

**L-O-N-G** 9:4

**lack** 43:2 126:1 132:9

**Lake** 18:13

**Lamken** 163:7,12, 14

**language** 79:5 83:19

**laptop** 55:22 58:8, 10

**Las** 61:16

**late** 50:23 125:5

**law** 11:12 14:4

**lawful** 169:12,16

**lawsuit** 6:1 7:21 25:6 31:18,23

32:2,3,9,12,22 34:12 37:22 38:11 46:4 47:21 49:22 52:17,20,24 53:4 55:8 57:14 68:8 76:18,22 77:1,5, 10,12,15 78:8 82:17,21 84:7,17 87:12 89:7 90:2 100:6 108:15,20 111:13 113:13 116:13 118:19,22 119:3,10,14 122:3, 11,14 123:10 125:7,10,20 126:9, 18 127:21 128:4, 22 130:12,17,21 131:23 133:20 136:10 141:4,7,8, 14,18 149:1,2,5,7, 13,17,20 157:23 160:9,20 164:10, 12 165:4 172:19, 20,24 174:7,19 175:8,15,18 179:11 181:2,6 182:14

**lawsuits** 88:16 90:2,4 150:6,11

**lawyer** 32:18 71:6 89:7 92:2 99:17 100:5 105:11 113:24 115:9 119:9 124:10 127:21

**layer** 124:7

**laying** 124:13

**leaders** 128:23 129:8

**leadership** 21:13, 17 51:19,22

**leading** 96:4 174:10

**learn** 73:19 94:22, 23 106:8 160:19 161:21

**learned** 74:5 80:8 136:11 160:6,7,10, 22 164:2

**leave** 14:19 31:2 140:13,22 147:15

**led** 106:9

**left** 12:9 95:3

**legal** 6:24 121:24 124:8,10 125:16 126:11 130:14

**Legalview** 5:2

**letter** 77:23 78:1, 16,18,20,21 79:9, 12,16,24 80:3,11, 14,17,20,24 81:12 83:3,7,23 114:10 120:3,24 123:15 163:20 164:7,23 168:5,9

**letters** 111:20 166:14 170:23,24

**level** 10:1 109:19 110:19

**lieutenant** 23:8,9, 21,22 94:3 100:21 101:16,19,20 102:1 120:16,22 154:17 159:2 169:8,11 172:12, 17 173:9

**life** 64:19 126:10 128:5

**light** 37:22 133:7, 17 136:8,20 137:4, 9,15 138:9 143:18

**limit** 102:18

**lines** 118:23

**list** 19:11,13,15,18 65:2 87:14 100:8 144:11 183:2

**litigation** 67:7

**live** 8:1,7,8 9:5 18:9,12,16,21 26:23 60:13,20 61:3,8

**lived** 8:5 17:15 60:22,23 61:8

**lives** 126:11

**living** 18:11 27:2 61:1

**local** 142:1

**located** 5:4

**long** 8:5 9:2,8,12, 19,23 10:7 11:24 13:11,17 14:8 16:21 17:22 18:16 22:24 50:13 51:15, 24 55:3 73:10 78:13 102:12 109:11,12 113:15 117:2 146:16

**longer** 41:13 62:19

**looked** 81:1 83:14

**Lorinda** 163:7,12, 14

**lose** 60:5

**lost** 156:14

**lot** 24:11,12 63:1,2 132:6 142:13 162:24 173:19

**love** 15:13 131:11, 14 176:17

**loved** 57:24

**lunch** 73:14

---

**M**

**M-A-L-E-C** 21:11

**M-E-T-O-N-G-A** 18:14

**machine** 28:12

**machines** 28:7

**made** 15:11 32:2,4 33:6 56:10,13,14, 17 60:1 74:3,15 75:7 77:6 79:5 88:19 90:5 94:2,16 95:18 107:11 120:11 125:11 127:20 128:18 133:22 169:5

**mailbox** 51:7 77:24 78:2 79:16 80:1,24 83:8,16 116:2 123:16

**majority** 16:23

**make** 76:2 114:11, 16,19 127:12 137:19 169:11

**making** 22:11 73:24 109:21

**male** 15:24 133:3 135:2

**Malec** 21:10 23:22

**management** 156:19

**mandated** 136:24

**Marc** 20:14 76:4 85:11 95:19 101:16 120:16,22 121:7 135:15 154:17 165:13 169:7,8

**March** 54:16 57:3 59:16 67:10 68:1 71:1,15 72:5,7,11 77:17 87:20 88:14 94:6 96:1 97:2,23 114:20,23 115:4, 13 116:11 164:1

**Maria** 159:13,15, 16,20,22 160:2,12 161:14,18

**Marine** 12:10 13:1

**marines** 12:11,13, 19,24

**marriage** 8:9 9:8, 19

**married** 9:21,23 29:11,14,16,21 30:1,4,9 131:12 144:23

**martial** 64:2

**maternity** 140:13

**Matlock** 51:21,24 52:4 73:4,7 74:1 75:3,6,10,14,18, 20,22 76:6,9 82:15,16 83:3 86:3 87:15 121:1 168:17,21 169:2 170:6

**Matt** 24:20 25:16 112:14 182:23



**matter** 110:15
133:19 147:1
148:6 152:24
153:1,3,5 160:5,
18,20,22 161:2

**matters** 71:8
133:23 148:16,17

**Mauer** 25:18

**Mckeon** 86:10
135:23 136:1

**Mckinney** 86:7
104:14 105:5,8
106:22 107:2,10,
11,12,17,21 109:4,
9,16 110:6 135:23
136:1 165:14

**Mckinney's** 106:9
108:18

**Mckinney/
ranstead** 109:2

**meaning** 39:1
95:4 101:6 155:23

**means** 112:6

**meant** 15:17 38:24
83:18,24 109:23
119:7

**media** 45:19,24
77:7,8 128:13,14
155:14,15 181:1,6

**medication**
140:11

**medications**
140:5,6

**medicine** 138:18
139:19,20 140:1

**meditation** 5:23

**meet** 64:13,22
73:13,16 125:1

**meeting** 56:23
57:2 67:10 69:4
71:1 72:10,15,17,
21 73:1,3,5,8,10,
12,18,23 75:2
76:20,21 77:17
82:14 87:21 88:13
90:11,14 91:19,20
92:12 94:24 95:6,
8,9 96:1 97:2,23

98:13 114:23
120:24 125:2,3
168:16,20

**meetings** 77:1
82:16 116:11

**member** 50:10,13,
19 82:19 84:10
116:19 151:8

**members** 31:19
50:2 54:3 77:20
78:23 79:2 87:9
88:15

**memory** 5:24
67:13 75:2 78:20

**mental** 139:6

**mental-health-
related** 140:5

**mentioned** 26:7
27:24 53:16 59:24
62:21,24 63:16
64:1,4 65:8 75:13
79:4 81:20 83:7
118:21 121:5
122:5 135:14,21
136:2 137:17

**mentioning** 79:6

**mess** 133:8

**message** 69:16
161:11

**met** 73:20 82:19
123:11 143:9
159:23

**Metonga** 18:14

**Meyer** 25:19

**middle** 23:4

**midnight** 21:23
22:14 78:6 101:20
102:4 150:18

**Mike** 25:17 52:23
53:6 85:19 102:1
135:23 155:3
164:3,6,10,21
165:5,8 166:6,10

**million** 119:7,10

**mind** 25:20,21
73:22 83:22

**mine** 24:22 99:16

**minority** 50:10

**minute** 54:22 60:5
179:15

**minutes** 73:11
147:18

**misheard** 31:11

**missed** 28:24 29:4
107:23

**missing** 28:19
29:3

**mission** 50:7

**mobile** 41:23
48:16

**moment** 10:5
33:18 35:17 66:5,
11 95:3 135:4
147:13

**money** 57:13

**monitoring** 22:13

**month** 27:4 48:14

**months** 8:15
13:18 19:10 72:18
78:14 81:13
146:17,18,20

**morning** 173:24

**mother** 9:1 131:14
159:17

**mother-in-law**
131:2,11 176:17

**motivation** 132:8,
10

**mouth** 74:9

**move** 65:24 91:12
119:13 134:13

**moved** 11:6 17:24
18:2,5,9 63:2
145:4

**movement** 37:5

**Moving** 109:14

**multi-agency**
172:7

**Mustang** 8:4
17:15 27:6

**mute** 19:2

---

**N**

**N-I-C-H-O-L-A-S**
5:19

**naked** 36:24
157:22 163:19
164:1 165:8,17,23
168:14 179:10

**named** 56:4 62:13
99:23 130:12,20

**names** 5:21 18:19
20:8,12 21:7
25:20,21 51:18
64:23 65:6 122:23
126:19

**narcotics** 101:21

**narrow** 122:19

**nature** 105:20
125:18 137:6
145:8 146:21
165:2 180:6

**NAUGHT** 183:17

**necessarily** 43:5

**neck** 91:10

**needed** 66:24
67:22 70:3,6 79:3
137:10

**negative** 132:11

**neglected** 26:14
48:7

**newer** 143:21
144:1

**newspaper**
126:13 141:3,6,15
142:11

**newspapers**
126:14

**Nicholas** 5:12,19

**Nick** 5:1,22 83:18

**Nicole** 139:12,13,
17,18

**night** 25:11 55:11
79:13,14,21 93:5
158:13,17 174:3,

11,16 176:21

**ninth** 62:17

**Nobert** 149:18

**nonlawyer** 180:3

**northeastern**
10:22

**note** 99:23 100:5

**noted** 90:23 91:11
99:6 105:5 110:17
131:8

**notepad** 68:4
91:23

**notes** 67:19,21,24
68:3,5,7,12,14,15
90:10,14,15 91:18
92:4,5 98:9 102:16

**noteworthy** 99:21

**noticed** 137:23

**nude** 33:12 36:11,
12,16,18 40:23
53:23 54:5 77:19
82:24 84:11,23
85:7,11,15,19,23
86:3,7,11,15,19,23
87:3,7 129:11
136:5

**number** 24:4,6
34:8 36:14 42:2,5,
15,17 98:24

**numbered** 98:23

**nurse** 139:21

**nuts** 77:13

---

**O**

**oath** 111:11

**object** 43:2 45:5
66:9 71:4 83:17
88:24 90:16 92:21
127:4 128:9
129:14 130:4,13
132:19 138:11
165:18 174:13
176:23 180:10
181:8

**objectified** 133:3
134:17,18,20,22



135:8 137:19

**objection** 43:7,8,9
65:21 66:1 80:22
90:19,22 91:11
113:17 115:14
117:11 118:11
123:18 124:9
126:1,21 131:5,17
134:9 165:24
177:6,12,19 178:6
180:17

**objections** 43:10,
13

**observations**
132:15

**observed** 147:8

**obstructing**
159:9 170:1

**obstruction**
170:12,16

**obtain** 158:9

**obtained** 56:20
158:10 178:20
179:1

**obtaining** 158:6

**occasion** 34:4
168:13

**occasionally**
64:12

**occasions**
149:23,24 150:6
168:7

**occur** 29:8 72:17
73:5 106:23

**occurred** 73:6
76:15 105:16
106:24 155:5
173:20 175:22

**occurrence** 76:14
107:2

**occurring** 79:1

**offense** 15:18,24

**office** 54:22 55:13
56:16 59:23 73:24
74:12 75:12 81:3
93:8 96:5 119:22
158:22 164:19

**officer** 5:1,12,17
7:13 10:3 11:14,16
13:12 15:17,24
16:6 19:5 20:3
21:3,23 22:4,8
23:10 24:21 25:17,
18 26:13 30:23
31:13,17 33:9
34:13 40:8 43:13
44:10 48:7 49:1
52:23 53:18,20
55:24 56:4 60:12
65:7 72:2 91:18
93:1 96:6,15 98:8
101:13 105:6,7,15,
18,23 106:3,5,10,
20 107:9,10,11,12,
14,16,17,18,20,24
108:4,10 109:3,9
113:2,10 115:2
120:21 122:12
124:2,23 128:21
130:3 131:10,22
132:22 133:2,13
135:10 138:14
147:8,13,17 148:5
149:9 150:2
156:17 157:7,11
158:2,6,16,19,20
159:3,12,20 160:1,
15 161:1,8,13,17,
23 162:18,21
163:15 164:6,10,
16,21 165:7,15,21
166:6,9,20 168:14
170:6,9 172:17
173:14,16 174:1,
11 175:12 176:8
177:11,16,23
178:3,13,20 179:6,
20,23 180:23
182:21 183:3

**officers** 20:9 24:1,
14 25:7,23 30:10
33:2,7 49:14 50:5,
9,10 51:19 53:22
61:13 62:24 63:2,4
64:11 65:3 97:19
99:7,23 105:8,17
109:15,19 110:5,
19 111:9 115:21
116:6 120:3,4,13
129:4,5 136:4
137:11,13,15
149:21 159:1
162:14 171:20

**174:**1,12 180:21

**officers'** 178:15

**official** 28:2

**one-man** 26:12

**ongoing** 149:14,
20 172:19

**opened** 83:15

**openly** 75:24

**operate** 49:17

**operated** 103:8

**operator** 11:15

**opinion** 102:8
117:18,19 130:16
151:4 162:9
166:10 172:1

**opinions** 151:1
162:5

**opportunities**
63:1 144:15,21

**opportunity**
127:23 137:8

**option** 144:18

**options** 119:20
121:19,23,24
124:8

**oral** 34:24 35:13,
14,19 75:8 79:8

**order** 13:20 20:11
27:9 32:11 61:10
109:19 135:3
169:12,16,17
174:23 183:5,15

**ordered** 56:12
74:17 169:11
170:1 183:10

**orderly** 175:21

**orders** 5:7 107:9
133:4 135:3

**organization**
51:10,13,20
115:21 116:7,8,20

**orientation** 88:18

**original** 114:7

**originally** 46:11

**outing** 107:15

**outings** 61:21,23

**outlets** 126:13

**overheard** 168:21

**overhearing** 76:6

**owned** 17:22 47:2

**owner** 43:5

**ownership** 27:6

**owns** 17:20

---

**P**

**P-H-E-L-P-S** 17:8

**P-H-I-L** 31:9

**p.m.** 22:20 79:20

**paid** 171:16,17

**pain** 91:10

**panel** 20:20

**paper** 142:1

**paperwork** 30:8

**paragraph** 88:22
89:23 98:21,22
99:5 102:20
103:10,24 104:13
105:4 111:7,17
113:16 128:21
129:5

**paragraphs** 98:24
102:11,12 129:21

**Pardon** 79:5

**parents** 18:11,12,
16 60:23 61:9

**parents'** 18:19

**Park** 10:19,20 11:6
13:12,15,17,20
14:5,14 18:14,17,
21

**part** 41:3 110:2
116:6,7,8 120:3
125:12 127:20
132:16 151:14
153:17 154:18
156:18 167:10
174:10 175:15,17,

18 179:11

**participated**
129:1,10

**participation**
152:7

**particularity**
34:23

**parties** 26:2,3
62:8

**partner** 24:20
25:16 26:8,11

**partnership** 50:9

**parts** 36:20 174:9

**party** 62:10 64:14
149:2,17

**pass** 27:8 179:21

**passed** 27:14 79:2
109:18 111:23
172:5

**passing** 106:22
118:17 172:21

**password** 66:14,
16,19,22 67:1,5

**past** 97:21 148:21,
23

**paste** 114:12

**Patch** 142:4,6,17
155:16

**Patricia** 131:2,14

**patrol** 21:23 22:4,
5,8,10 31:13
101:20 102:4
172:17

**Patrolman** 11:23
14:13

**Paul** 45:8 123:17

**pause** 10:6 19:3,5
127:1,9

**pay** 31:3 48:10,14

**PD** 49:11 61:17
62:1

**PDF** 183:12

**pen** 68:4



Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

13

**pending** 111:13
172:24

**Pendleton** 12:14

**penmanship** 99:4

**people** 30:11 62:3,
20 63:11 64:22
91:9 100:9 101:3
121:4 135:13
136:2,13 137:17
143:5 166:14
167:20

**performing** 35:13
163:24 168:15

**period** 31:3 88:18,
20 90:4 93:10,19
95:21 96:7 97:9,
15,21 99:11 104:2
105:9 109:20
111:24 145:2

**permanently**
114:14

**person** 62:13
69:15 81:4 94:20

**personal** 33:9
41:21 42:12 44:19
53:21 54:2,7 55:22
56:16 58:9 88:3,8
108:23 111:1,9

**personally** 77:7
110:1,3,10

**personnel** 30:5
155:19

**persons** 19:15

**Pete** 106:3,18

**Phelps** 17:8,9

**Phil** 30:15 31:9,12
55:22,23 56:2
58:22,23 59:24
63:21 171:10

**Philip** 96:6 101:12

**Phillip** 85:15

**phone** 31:19
32:24 33:1,4,6,13,
17,21,23 34:9,19
35:3 36:3,13
38:20,24 39:1,2,20
40:24 41:4,6,7,9,
10,13,15,21,23

42:3,7,9,12 43:6
46:9,11,15,20,21
47:10,12,14,20
48:1,8,10 53:24
54:6 55:12 56:1,2,
12 58:24 59:1 63:8
65:12,13,17 66:20,
23,24 67:4 68:18,
19 69:15 74:16,17
76:2,3 77:20
78:11,12 80:9,21
83:1 84:12,24
85:8,12,16,20,24
86:4,8,12,16,20,24
87:4,8 93:5,18
96:7,21,22 97:8,20
102:22 103:12
104:1,15 107:4
111:21 113:12
125:18 130:9,22
136:5 142:18
158:3,7,14,16,22,
23 159:11 163:15
169:6 170:2

**photographing**
45:6,10

**photographs**
33:13,17,18 36:11,
12,17 37:1,3,6,9,
11 38:15,16 39:4,
16,20,23 40:9,12,
16,23 41:3 42:19
44:11,16,19 45:11,
18,23 46:3 47:13,
20 53:23 54:5
65:11 77:19 82:24
84:5,11,24 85:7,
11,15,19,23 86:3,
7,11,15,19,23
87:3,7 129:12
136:5 165:9

**photos** 42:23
157:22 163:19
164:1 165:17,23
179:10

**phrase** 79:9

**physical** 27:8
41:15

**physician** 181:16

**pictures** 36:23,24
39:11 135:9,12

**piece** 75:13 96:24

**place** 5:7 9:14
125:4 156:6
164:14,17 166:24
172:20 175:17

**plaintiff** 122:2,8,
11 129:23

**plaintiff's** 129:2
149:18

**platform** 45:20,24

**play** 53:4

**Playboy** 106:19
108:3

**played** 151:16
158:5

**playing** 107:18

**plugging** 23:17

**point** 11:16 29:5
61:2 97:18 115:5
124:24 130:17
150:18 172:18

**pointing** 168:18

**points** 99:3

**police** 11:19,22
12:2 13:12,15,19,
20,23 14:2,6,21
16:12,21 17:4,9
18:23,24 19:13
20:24 21:3,4 24:1
27:10,16 31:20
33:7 49:1,5 50:5,9,
10,12 53:13,18,22
54:4,19 57:3
61:13,22 62:14
77:21 82:20,24
84:10 87:9 88:20
95:20 97:20 99:10
101:6 106:6,20
107:9,13 115:20
117:9,24 119:23
120:5 121:13
122:12 128:24
129:3,4,9 133:2,13
135:10,18,22
136:15 137:12
143:12 144:15
151:8 162:14
167:6 169:15
171:17 172:5
174:1 176:21
177:4,8,15,16

180:7,15,20 182:7

**policy** 162:14,16

**pops** 56:19

**porn** 55:16 93:9

**pornography**
105:7 106:11,14
107:23

**portion** 112:12

**position** 11:21,24
13:14 23:18 31:12
51:12 52:1 116:15,
17 117:3 171:22,
23 172:1,2 176:2

**positions** 24:13
51:9,19,22 118:3

**possibility** 42:23

**possibly** 27:21
145:4

**post** 45:18

**posted** 45:22

**posting** 45:19

**potential** 19:14
99:24 124:7
130:11

**potentially** 48:9
57:14,15 87:23
110:1 118:22
119:10 120:14
170:12

**Powers** 55:14
85:23 94:4 100:13
102:4

**practice** 45:7,10,
12 162:17 181:24

**practitioner**
139:21

**preferred** 171:22
172:1

**pregnancies**
143:19

**pregnancy** 137:6,
10

**pregnant** 133:5,7,
11,17,24 134:3
136:20 137:4
138:19

**preparation** 6:6
7:15

**prepare** 90:13
98:9,10

**prepared** 90:10
91:18 92:1,2,3,4
113:5 114:22
125:16 145:19

**preparing** 98:8

**prescribe** 139:18,
20

**prescribed** 140:1

**prescribing**
138:18

**prescriptions**
139:24

**present** 54:24
58:14 59:6,9 61:2,
6 72:24 73:3,8
75:9 123:5,8 125:2
138:9 141:13
154:22,24 159:1

**preservation**
111:19

**preserve** 113:12

**president** 51:14,
15,22 52:1 116:9,
10,21 166:15

**pressure** 11:16

**prestigious** 99:10

**presuming** 41:9

**pretty** 24:6
133:22,23

**previous** 8:9

**previously** 74:6

**price** 119:4

**primarily** 12:14

**primary** 181:15

**printed** 155:14

**prior** 43:3 71:5
103:13 105:6
106:20 108:10
143:20 159:18
165:5 173:19
177:9



**private** 33:3 35:16
37:4 66:5,11 84:5
108:7 125:19
126:10 127:11,12,
15 128:4 129:2
130:10,22 133:23
135:4 157:2,22
179:9

**privately** 44:23
54:21

**privilege** 123:22

**privileged** 71:5
181:8

**privy** 179:9

**proactively** 22:9
145:14,17

**probable** 129:24

**problem** 74:24
151:6,7

**problems** 151:10

**procedure** 102:21

**proceedings**
6:12,24

**process** 47:17

**PROCTOR** 5:16
7:8,12 19:2,4,6
43:8,12 45:7,9
60:6,11,17 65:22
66:3 71:9 83:21
84:1 89:2 90:17,21
91:3,6,11,16,17
92:23 98:18
112:10,19,21
113:1,18 115:16
117:19 123:20
124:1,13,15 126:2,
22 129:15 130:5,6
131:4,8,9 132:21
134:10 138:12
147:12 179:16,23
180:2 182:20

**profession** 133:3

**professional**
138:5 180:15,21

**progress** 22:9

**promoted** 99:9
100:15,18,21
101:3,17 102:2

**promotion** 102:7
109:20 143:12
171:15,16

**promotions**
100:2,9 171:18

**proof** 134:3

**properly** 120:8

**property** 152:1
154:13 176:1

**prose** 83:18

**prosecuted**
163:10

**prosecution**
152:7,15 157:5,9,
19 160:16

**prosecutor**
163:10

**protect** 109:19

**protected** 66:14
124:11

**provide** 93:11,12
111:8 169:12

**provided** 58:2
70:5 72:3 97:1
103:4 104:5,19
110:22 111:14
120:2 139:16,17
155:12 169:16

**provider** 48:8
139:8

**psychiatrist**
138:17

**psychological**
27:9 143:9

**psychologist**
138:17

**public** 32:2,4
125:12 126:12,20
127:12,13,20
128:6,13,18 141:9
155:13

**publication** 128:7
130:9

**publications**
141:24

**publicized** 130:21

**publicly** 29:24
30:2 77:6 125:19

**published** 141:16

**purpose** 50:6,8

**put** 19:2,13 23:14
32:11 33:18 51:6
83:15 111:11
114:10 115:24
116:1 132:15
136:14 147:14
158:21 172:6
180:3

**putting** 126:19

---

**Q**

**question** 21:16
22:1 32:16 41:2
43:16,23 44:2
45:15 47:23 50:22
59:14 60:19 71:14
72:10 90:20,24
91:1 122:19 124:2,
5,12,16,19,24
125:3 127:14
128:11,16 129:7
130:18 131:10
132:20,22 138:2
141:15 147:10
156:17 165:19
173:9 176:24

**questioned**
110:18

**questioning**
67:15

**questions** 34:14
43:24 44:5 90:23
112:12,14 113:4
129:18 147:13,20
148:7 173:21
174:4,8,15,20,22
175:2 176:2,5,9,14
179:21,22 182:20,
24 183:2,7

**quick** 112:21

**quiet** 167:3

**quote** 55:14 74:14
92:9,10 93:9,10
109:16,17 110:18

---

**R**

**R-A-N-S-T-E-A-D**
106:4

**R-O-B-E-R-T-S-
O-N** 20:17

**R-O-S-A-D-O**
23:9

**racial** 88:17

**raid** 96:5 103:14

**raise** 5:9

**raised** 11:2,5

**rank** 14:11 93:6

**ranking** 120:5
121:4

**Ranstead** 106:3,
5,10 107:10,11,14,
16,20 108:1,4,10,
20 109:3

**Ranstead's**
107:19

**rattled** 136:13

**reach** 137:5 167:2,
24

**reached** 108:11

**read** 67:6 77:7,8
78:16 80:1 81:17
95:22 110:22
112:2 113:6
127:16 128:13
141:3,6,14 142:6,
15 160:4,11,24

**reading** 88:21
89:6 95:2 141:23,
24

**reads** 91:7 142:9,
10

**ready** 143:21,22

**real** 126:19

**reality** 106:19

**realize** 119:8

**realized** 145:5

**reason** 16:4 28:14
29:3 58:2 65:15

72:12 100:4
115:23 117:21
121:5 122:2
144:20 147:3

**reasons** 154:1

**reassigned** 99:9
101:7,13,20 102:5

**recall** 15:22 23:11,
23,24 29:4 48:20
55:5,17 56:18 58:5
65:9 73:17 78:18
81:9,10,15,24
82:2,3 83:9 100:9
103:1 104:16
106:24 109:12
123:14 154:1,4,12
155:4 156:3 160:8
161:5 162:4 164:5,
8,9 165:7 168:7,13
183:4

**receive** 10:10,14
13:19,22 15:2
77:18 90:8 139:11
150:7

**received** 11:18
14:11 17:1 27:15,
19,20,21 28:23
77:23 78:1,4
79:12,13 80:20,24
81:8 94:5 123:15
138:5,8 139:3,6
152:17 156:3
163:20 168:10

**recently** 24:8,9,10
105:5 136:16

**reckless** 152:1
175:24

**recognize** 83:11
143:5

**recommended**
111:19

**recomposed**
67:21 68:14

**reconsider**
123:23

**record** 5:7,18 19:4
35:2 36:1 44:20
65:17 66:8 113:3
114:10 125:12
126:12 127:12,21



128:6 183:1

**recorded** 104:14

**recording** 34:3
37:12 45:11 65:20

**REDIRECT** 180:1

**reference** 124:24

**referenced**
105:23

**referral** 124:10

**referred** 139:19

**referring** 8:12
38:9

**refusal** 175:1

**refuse** 176:2,5

**refusing** 124:19

**regard** 171:19

**Regis** 74:13 76:1,
13 110:14,19
168:23

**regret** 37:6,12

**regrets** 37:8,10,
16,17

**regularly** 133:10

**regulations**
105:20

**Reid** 76:4 85:11
95:19 100:13
101:16 120:16,22
121:8 135:15
154:17 165:13
169:7,8,11

**reiterating** 109:24

**relate** 138:2

**related** 165:12
175:23

**relation** 78:10

**relationship** 10:7
21:20 22:2 49:24
52:3,7 60:19
131:1,13,15,24
132:1,12,18 139:9
159:18 176:18

**relationships**
40:17 63:6

**relevance** 131:5,
7,17 174:6,18
176:23

**relevancy** 175:2
177:12

**relevant** 131:3
176:6 183:3,5

**relief** 23:13,15
26:7

**relish** 34:14

**remained** 24:6

**remarks** 168:22

**remember** 5:24
15:21 16:8 20:11
28:1 29:10,22
30:16 32:6 41:11
50:24 59:1 74:19
81:3 82:5 104:3
105:10 113:20
118:23 164:18

**remotely** 5:2

**removal** 56:12
170:2,11

**repeat** 138:3
148:7 161:16
165:19 175:10
178:1

**rephrase** 130:5
180:13

**report** 119:21
120:7 128:13
133:5 137:8
155:11 167:14,17,
18,21

**reported** 75:14
126:13 162:3
180:20

**reporter** 5:1
176:13,15 183:14

**reporters** 182:13

**reporting** 119:17
121:5,11 150:2

**represent** 6:11
71:11

**representative**
154:24 155:2

**represented**
123:3

**representing**
6:23 7:3 68:24
89:6 148:6

**represents** 53:14

**reprimand** 27:19,
23 28:15

**republication**
130:10

**reputation** 117:9,
24

**request** 95:21
114:11 133:17,18
137:8

**requested** 6:15
133:7

**requests** 137:9

**required** 18:24
156:19

**rerecording**
129:2,11

**reserved** 183:8

**reserving** 183:4

**residential** 9:9

**resignation** 14:23

**resource** 11:15

**respect** 137:7
152:14 170:22
175:22

**respectfully**
174:7,19

**Respond** 22:9

**responded** 28:3,
8,13 57:20

**response** 28:9
57:9 80:4

**responsibilities**
22:8

**responsibility**
143:23

**restaurant** 73:6

**result** 15:15 126:8,
11 150:8 153:22

**resulted** 178:15

**results** 27:12
118:6

**resume** 112:22

**resumed** 140:10

**retain** 6:11

**retained** 6:17
44:18 71:15 114:6

**retainer** 6:20

**retired** 24:12
52:15 95:20

**retirees** 24:12

**review** 6:3 32:1,7,
16 71:23 127:19

**reviewed** 31:22

**reviewing** 153:20

**revisions** 114:16,
19 115:5

**rights** 88:16 90:2
130:1

**Road** 8:4

**Rob** 55:13 74:1
75:9,10 94:3,22
159:2

**Robert** 18:20

**Robertson** 20:16

**rock** 167:23

**Roechner** 21:9,16
22:1,2 52:20
55:21,23 56:15
58:8,11,16,20,23
76:4 86:15 88:19
95:20 96:5,22
100:3 121:7
135:15 136:15,18
165:12 169:7,15,
16

**Roechner's** 58:8
111:20

**role** 151:16 158:5,
9

**Roman** 83:13

**roof** 60:21

**room** 93:19 94:2,

13,20 95:3 137:1

**Rosado** 23:9

**rotate** 20:6

**rough** 34:8

**roughly** 24:2
26:19

**Rouse** 120:20

**routinely** 136:19

**rule** 16:7

**rules** 105:19
180:22

**rumor** 168:14

**rumors** 82:23 83:4
108:17,18 163:18
164:4,24 166:21
168:8

**run** 137:3

**Ryan** 63:23 64:4

---

**S**

**SAITH** 183:17

**sanction** 174:23

**Sandra** 37:8,15
66:13 87:19 93:11
138:5 140:1,4
147:3

**Sandra's** 47:24

**save** 69:17

**saved** 69:19 114:3

**school** 10:18,19
11:7,8,15 12:5,8
13:2,3

**schooling** 13:3,4

**score** 178:20

**screen** 91:10

**search** 32:23
107:3 129:22
130:8 158:2,6,10,
13,16 159:7
161:24 162:6,21
163:2,14 178:21,
24



Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021                                                                                        16

**searched** 55:12
78:11,12

**secondary** 168:9,
16

**sector** 22:10
23:14 26:9,10

**sectors** 23:16

**seek** 145:14,18

**seeking** 167:5,13

**seized** 96:23

**seizure** 129:22
130:8

**send** 68:10 70:1
101:2 111:19
142:18

**sending** 39:6

**senior** 128:23
129:8

**separate** 99:3

**separated** 61:5

**September** 14:2

**sergeant** 52:13
59:21 87:6 93:7
94:4 101:7 102:4
120:20 143:23
150:18

**sergeant's**
143:16 144:5

**sergeants** 23:19

**series** 174:22

**serve** 162:14

**served** 12:11
32:24 161:24
162:19

**service** 48:16

**services** 139:1,3,
7

**set** 38:7,9

**settle** 178:20

**sex** 33:13,20 34:9,
18,22,24 35:13,14,
19 36:5,9,23 37:12
39:23 40:9,12
42:20,24 47:20

54:5 65:10,18
75:7,8 77:19 78:24
79:8 84:6,11,24
85:7,11,19,23
86:3,7,11,15,19,23
87:3,8 108:1
126:11 128:5
129:12 134:4
136:5 163:24
168:15 173:7

**sexual** 16:3 34:3
36:1 40:15,23 41:3
45:10,19,23 46:3
53:23 83:1 85:15
88:17 125:18
135:4 163:19
167:14,18

**sexually** 167:22

**shape** 46:15

**share** 30:8,12
36:5,8 38:16 39:4
40:8 72:2 89:24
91:10 108:6

**shared** 31:19
39:16,22 57:10
59:15 66:6,12
77:23 80:9 95:24
130:21 166:10
171:6,10

**sharing** 35:17
77:19 108:19

**Sharon** 5:5
183:10,15

**Shawn** 56:4 58:20,
22 87:6

**She'd** 133:8

**sheriff's** 152:4

**shift** 22:14,16,17,
18,19,21 25:9,10,
14 26:2,3,14,16
62:7 63:5,22
64:12,13 65:1 78:6
79:20

**shifts** 23:16

**shirt** 110:18

**short** 7:11 24:14
60:8,10 112:15,23
147:15 156:15
179:19

**shortly** 79:21
123:15 125:7
145:4

**show** 39:12
106:19 115:8
183:8

**showed** 158:22

**showing** 39:6,7
75:8 104:15 105:8
107:12

**shown** 107:22

**sic** 30:16,18,19
37:8,15 47:24
56:11,13

**side** 10:22 109:5

**sign** 51:2,8

**signature** 162:6
183:8

**Simenson** 149:11

**similar** 40:15

**single** 119:4

**single-family**
17:18

**single-spaced**
113:16

**sit** 55:18 94:19
98:4 104:22 137:1
151:10

**sit-down** 69:12

**sitting** 98:10,13

**situation** 170:14

**slash** 109:20
111:12

**small** 10:23 62:22,
23

**Socha** 7:3,18
8:12,19 17:21,22
18:10 19:8 25:18
26:18 53:3 55:15
93:9 131:2 154:10
157:4,7 158:19,20
159:3,12,20 160:1,
15 161:1,8,13,17,
23 162:7,21
163:19,20 164:6,
10,16,21 165:7,15,

22 166:6,9 168:14
170:9 173:14,17
174:11 177:11
178:20 179:6

**Socha's** 157:12
158:2,6,16 163:15
174:1 175:12
177:17,23 178:4

**social** 45:19,23
61:21,23

**socialize** 25:22

**socially** 64:20

**sole** 112:3

**solid** 102:23

**solved** 118:2

**son** 159:19

**sons** 8:8,14

**Sort** 42:22

**sought** 99:9
146:22

**sound** 89:3 92:19

**sounds** 26:22

**source** 56:21
105:14 112:3
123:19 130:2

**south** 10:21 11:5

**sparked** 107:20
146:24

**speak** 6:6 7:14,17
40:12 54:21 70:16

**speaking** 7:13
22:11 43:10 68:2
145:10 146:13,22
165:6

**specific** 18:5 27:1
36:19 38:10 42:3
50:16 65:14 73:20
81:11 105:20
124:9 132:1,13,17
146:12

**specifically** 57:12
58:3,7,9 59:18
65:22 68:12 74:1
79:5 100:2 129:21
136:9 143:2

**specificity** 78:24
79:4

**spell** 5:18 9:3
16:17 18:13 20:1,
15 21:10 149:12

**spoke** 17:2 38:15
54:23 69:24

**spoken** 173:2
182:13

**spot** 167:23

**Springfield** 13:23

**Stachelski** 56:6
58:21,22 59:4 87:7

**staff** 54:4 88:17
129:5

**standard** 102:21

**standing** 107:16

**star** 55:16 93:9

**stared** 106:21

**starred** 105:7

**stars** 38:13

**start** 26:17 39:7
55:6 67:14 88:4
165:3

**started** 13:1 20:4
24:10,20 60:18,24
79:20 145:3
150:23

**state** 5:17 61:13
121:12

**stated** 93:9,17
94:12 102:21
110:13 111:8

**statement** 76:10
90:5 92:11,17
93:14 94:10,16
95:22 96:3,12 98:6
105:1 109:21

**states** 12:10 88:14
89:23 94:1 95:2,17
96:4,20 97:7,12,18
103:24 110:12
128:22

**station** 54:19 57:3
59:16



**stationed** 12:14

**status** 133:11

**stayed** 42:4

**steady** 24:6

**Steve** 23:8

**stopped** 138:16, 20

**stored** 43:1 44:12 46:14

**story** 15:9,14 109:5

**straight** 75:6

**street** 72:21 74:12 76:1 143:3 169:5

**stressed** 159:6

**strike** 153:2 154:15 157:16 159:24 163:12 166:5 169:21 170:5 177:8,15 178:13

**strikes** 138:1

**stuck** 73:22 167:22

**stuff** 30:7 57:22 74:23 80:6 164:20

**style** 83:11,24

**subject** 25:6 28:5 34:12 46:4 47:21 84:7 113:13 116:12 123:21 131:23 133:19 149:8,10 157:23 160:5,18,19,22 161:2

**subsequent** 100:2 120:24 130:9 162:20

**substantially** 179:1

**Suburban** 181:22, 24

**successful** 119:11

**sucks** 55:15 93:9

**sue** 173:11

**sued** 84:15

**suggestion** 81:6

**suing** 77:11 149:8 173:13,17

**summarizing** 78:22

**summertime** 18:7 27:3 107:16

**superiors** 135:2

**supervisor** 19:22 110:19 150:20 151:2

**supervisors** 23:6, 11 54:3 78:23 128:23 129:9 150:13,15,17 165:1

**support** 116:5,6 117:6 122:15 130:20 133:14 177:22 178:3,10, 15,19,24 179:5

**suppose** 134:5

**supposed** 167:11, 21

**surprise** 28:8,13 165:15,21 166:2,3

**surrounding** 173:20 175:14

**suspended** 15:19 105:5,17,19 109:10 152:22 155:23

**suspension** 15:6, 10,20 27:21,22 28:17,23 105:21 106:9 152:18 153:10,14,18,23 154:2 155:21 156:18

**suspicious** 22:10, 12

**sustained** 153:18 154:3,5

**SWAT** 11:15

**switched** 47:4 48:17,19

**sword** 109:16 110:7

**sworn** 5:10,14

**system** 49:8,18 56:13 102:24 103:8,12 170:3

---

**T**

**T-R-A-F-T-O-N** 20:2

**Tab** 56:11 86:23 95:20 121:7 169:23,24 170:1

**table** 57:16

**tactical** 102:5

**tactics** 11:16

**takes** 135:6

**taking** 5:23 37:9, 10 45:11 140:4,10

**talk** 17:13 28:17 36:11 57:1 63:8, 12,17,20 69:4,7 109:4 110:21 129:22 132:6,14 181:1,5

**talked** 13:3 136:14 137:22 157:2

**talking** 75:24 108:12

**talks** 122:7

**taping** 45:6

**task** 101:8 172:6,7

**tasks** 97:13

**teach** 136:24

**teaching** 137:2

**Ted** 165:12

**telephone** 42:2, 15,17

**telling** 57:12,18 108:10 166:16

**tells** 143:3

**ten** 36:15 102:11

**ten-day** 15:6,10

**terms** 57:2 146:12 160:18

**test** 27:9 143:16

**testified** 5:14 48:21 72:14 75:16 84:13 85:3 87:16 134:12 137:24 148:10 150:13 152:17 156:22 163:17 165:22 172:8 174:11 175:11

**testify** 49:2 74:23 94:13

**testimony** 58:19 65:16 67:7 177:23 178:4,15

**tests** 27:13

**text** 39:19 69:16 142:16 159:13 160:2,4,5 161:2,4, 9,11,18

**texted** 161:14

**texts** 69:17,20,23

**TGI** 13:7

**theft** 101:8

**therapist** 181:17

**thing** 10:5 28:2 51:3,7 73:22 77:22 96:16 97:14 134:7 164:23 168:9 183:12

**things** 44:22 63:3 92:19 132:6 134:24 137:6,14 148:8 165:2 170:15 172:18

**thought** 62:18 99:12 146:11

**thousand** 119:5

**threatened** 159:9 169:24

**threw** 68:13 91:24

**throating** 79:6

**throw** 20:12

**Tim** 55:14 85:23 94:4 102:4

**time** 5:3 16:15,23 23:12 24:3,5 25:5 31:14 39:16 40:10 43:22 47:4 55:24 56:18 59:22 60:12, 20 61:2,6,7,14,17 64:17 70:19 71:6, 14,15 72:20 73:20 75:4,23 76:9 79:12,17 80:7 90:11,15 91:20 93:7 97:13 99:6 102:18 103:12 108:14 111:22 112:10 115:6,15 116:10 120:20 123:11 136:10 138:16 139:2,8 141:1,6,11 145:2, 16 146:2,4,8,12 147:14 148:19 150:21 155:7 159:21,22 161:18 163:17,23 164:2 169:15,20 179:21, 22 180:19,22 183:2,6

**timeframe** 150:24

**timeline** 81:11

**times** 49:2 62:5 83:12 109:15 141:13 148:13,15

**titled** 28:2 154:4

**titles** 139:23 154:4

**today** 5:23 21:6,10 42:16 43:24 55:18 68:24 70:21 84:7, 13 85:1,3 87:17 94:20 98:4 104:22 129:13 130:23 142:19 147:8 151:10

**today's** 5:3,6 6:3, 7 7:15 71:24 92:24

**told** 6:14 7:19 26:13 30:13,15,16, 17 48:6 55:7,9,11, 13,21,22 56:10



Socha vs City of Joliet
Officer Nick Crowley - 06/17/2021

18

58:3,7,8,12,20
67:22 70:7 74:1,2,
8,14,15,16,18,22
75:6,10,22 76:1,5
79:11,13,15,24
82:15 83:2 88:15
89:24 90:9 92:8,19
93:5 94:1 95:18
99:15 106:10
107:14 109:3,15,
22,24 110:1,3,5,6,
10 113:11 118:15
135:6 137:18
158:19 159:6
160:10,19,23
161:10,23 162:1
164:3,22 168:23,
24 169:5 170:6,16
172:9

**toll** 132:3,4,24

**Tomczak** 123:1,2,
6 156:10,23 157:5,
8,11 171:3

**top** 67:2 88:10

**topics** 74:5

**total** 102:11
141:13

**totally** 92:21

**touch** 82:21 180:3

**tour** 12:23

**town** 10:24 13:8

**townhome** 17:19

**traffic** 22:13

**Trafton** 19:24
21:2,8

**trained** 49:7

**training** 11:14
13:19,20,22,23
14:1 18:24 20:3,9
136:23,24

**transcript** 183:13

**transfer** 47:13,14

**transferred** 47:24
171:13

**transported**
152:3

**tri-city** 171:13

**tri-county** 101:8
171:14,15

**trial** 156:5 160:13,
16 161:6

**trials** 48:22

**trip** 61:16

**trips** 61:12

**true** 89:3 92:11,13
93:23 104:11
105:2 118:10
120:7 121:3
133:21 169:17
173:3 175:19

**trust** 40:7 117:21,
22,23

**trustworthiness**
117:9

**trustworthy**
117:17 132:8

**truth** 74:24 94:9
96:12 97:5 98:5
103:21 109:8
111:4,11 112:7

**turn** 17:12 68:23
92:1 113:23
159:10

**turned** 8:15 68:7

**TV** 106:19 108:3

**two-man** 26:10,11

**type** 44:24 45:3,5
58:3 61:21 64:2
102:13 113:16
150:7 168:8

**typed** 78:21 83:8,
10,15

**typo** 110:1

_____

**U**

**ultimately** 119:11,
19 120:22

**Umm** 173:6

**unaware** 165:16,
22

**unbecoming**
15:22 16:6

**unclear** 133:16

**uncomfortable**
56:3,8 137:20

**undercover** 118:4

**understand** 31:20
32:14 33:5 34:13,
15,16 39:10 42:21
43:17,24 44:6
47:16 62:19 64:18
124:2,16 126:23
127:14,15 128:16,
17 132:22 133:20
159:18 181:16

**understandable**
44:2

**understanding**
32:22,23 46:2 60:2
75:18,21 77:9,11
106:18 114:21
119:8,9 134:6
149:13 150:10
151:13 153:7
159:16 170:8
174:21

**unfair** 92:21 159:8

**union** 53:9,14
154:24 155:2
164:19 166:15

**unit** 26:10,11,12
49:5,11,15 59:22
101:13,21 102:5
109:20 147:4

**United** 12:10

**units** 99:10

**unknown** 111:12

**unlawful** 130:8

**update** 30:5

**updates** 137:5

**uploaded** 42:20

**upset** 142:24
170:20

_____

**V**

**vacation** 23:17

**validity** 94:14

**Vegas** 61:16,18

**venture** 80:13

**verbatim** 160:11

**verified** 172:22

**verify** 93:22 94:9
96:12 97:4 98:5
109:7 172:9

**verifying** 95:13
103:21 111:4
112:7 118:13,16

**Verizon** 48:9,16

**version** 41:18

**versions** 114:3

**vest** 143:4

**vice** 51:21 52:1

**video** 33:19,20
35:14,15,19 37:13
45:11 75:7 77:20
78:24 93:18 95:4,
15,18 99:7,8
104:1,14 105:7,8
106:1,12,14,17
107:2,18,19,22
108:19 109:18
110:16,17 111:21
122:5 163:18
173:5

**videoing** 35:22

**videos** 33:4,13,17,
23 34:9,18,22,23
35:4,7,9 36:5,9
39:23 40:9,13,16,
23 41:3 42:20,24
44:11,16,19 45:19,
23 46:4 47:13,20
53:23 54:5 55:21
58:9 65:11 83:1
84:6,12,24 85:7,
12,16,19,23 86:3,
8,11,16,20,24
87:4,8 125:17
129:12 135:9,12
136:5 157:22
163:24 165:1,8,23
168:14,15 179:10

**view** 104:2 147:9

**viewed** 33:3 54:5

**viewing** 129:1,11

**village** 14:8,12,24
168:1

**violated** 129:24

**violation** 16:7
105:19

**violence** 177:10

**visible** 35:4,6,10

**visitation** 9:10

**voluntarily** 14:23

**volunteer** 51:2

**vote** 116:20 117:5

_____

**W**

**W-E-I-T-T-I-N-G**
20:16

**W-I-L-L-I-A-M-S**
20:14

**wait** 179:17

**walked** 57:16

**walking** 159:8

**wanted** 56:8 57:15
67:3 99:17 104:2
113:3 116:7
145:13,17 178:20

**warrant** 32:24
107:3 158:2,6,10,
13,16,22 159:7
161:24 162:6,18,
21 163:2,5,14
178:21 179:1

**warrants** 162:14

**watch** 23:7,20,23
55:13 73:24 75:11
93:8,19 95:9
158:21

**watched** 78:24
95:4,15 99:7

**watching** 110:16
165:1



**Water** 149:19

**Waters** 149:19

**wave** 136:21

**weapon** 154:7

**website** 81:2

**wedding** 61:19

**week** 148:21,24

**weeks** 6:13 78:13
  81:13,15 123:16
  140:18 146:17

**weird** 79:24

**Weitting** 20:15

**Wendy's** 73:6
  95:1

**West** 181:21,24

**wet** 144:3

**whatsoever** 58:4
  151:4

**wife** 7:17 107:17,
  19

**wife's** 116:12

**Williams** 20:14

**willingness**
  111:11

**winter** 29:9

**wished** 133:9

**withdraw** 90:18

**withdrawal** 48:12

**withdrawing**
  90:24

**woman** 108:1

**word** 15:10,12
  43:13 83:14,15

**wording** 15:23

**words** 56:21 69:15
  72:7 74:11 116:19

**work** 13:17 14:5,8
  17:4 20:22 21:12,
  17 23:1 24:17
  25:2,3,13,14,23
  26:5,8 29:24 31:8
  38:13 62:1,3,6
  63:4,10,21 64:11

65:1,4 89:24 116:5
118:4,5 132:9
133:18 135:2
136:9 137:11
149:1,3,6,8 150:19
162:12,15 167:11

**work-issued**
  42:7,9

**worked** 14:18
  16:13,22 21:4
  22:14,21 25:9,10
  28:13 49:4 62:16
  65:3 103:4

**working** 14:12
  19:19 26:12,15
  28:7 62:15 72:20
  79:14 135:17
  136:20 138:6
  143:3

**works** 31:10 59:23
  61:19 63:21
  116:21 133:14

**world** 125:13,21
  171:17

**write** 26:14 48:7
  89:8,10 98:11
  139:24

**writing** 15:6
  83:11,23,24 104:3

**written** 6:20
  27:19,23 28:14
  31:23 32:8,12
  67:19,24 71:23
  102:16 155:22

**wrong** 38:23
  57:21,22 120:11
  123:20,21

**wrote** 15:10 80:11,
  14,16 89:11,12
  97:22

---

**Y**

---

**Yahoo** 88:7

**year** 11:7 17:24
  19:9 26:21 47:9
  51:6 71:12 115:24
  150:22

**years** 8:16 9:24
  12:1,11,16 14:10,

19 16:12,24 21:12,
15,17,19 23:1,3
24:7,16 25:8 26:1
48:24 49:2 50:15,
18 62:15,16,17
116:1 131:16
143:17,19 146:19
150:14

**yonder** 10:21

**young** 35:16

**younger** 63:24
  144:1

