UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CASSANDRA SOCHA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 1:18-cv-05681 ) |
| CITY OF JOLIET, a municipal corporation, EDWARD GRIZZLE, JOHN DOES 1-20, | ) ) ) ) |
| Defendants. | ) ) ) |

**PLAINTIFF'S RESPONSE TO CITY OF JOLIET'S LOCAL RULE 56.1 STATEMENT OF UNCONTESTED MATERIAL FACTS IN SUPPORT OF ITS <u>MOTION FOR SUMMARY JUDGMENT</u>**

Plaintiff, Cassandra Socha, by her attorney, Hall Adams, and pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1(e), states as follows for her Response to Defendant, CITY OF JOLIET, Local Rule 56.1 Statement of Uncontested Material Facts in Support of Its Motion for Summary Judgment (Doc. 253):

**<u>LIST OF EXHIBITS</u>[1]**

1.  Jurisdiction and venue are not disputed as this action is properly before this Court. ECF. No. 66, ¶¶ 5-6.

    **RESPONSE: Admitted.**

2.  Plaintiff is employed by the City of Joliet's Department of Police as a Patrol Officer. [*See* Plaintiff's Deposition Transcript, ("Exhibit A") at 22: 9-11].

    **RESPONSE: Admitted.**

3.  The City of Joliet is a local governmental entity. ECF. No. 66, ¶ 2.

    **RESPONSE: Admitted.**

---

[1] Exhibits to City's Statement of Facts are referenced in this Response by their ECF docket number. References to Plaintiff's Statement of Facts are to PSoF.

4.      Defendant Edward Grizzle is employed by the City of Joliet's Department of Police as a Detective. ECF. No. 66, ¶ 10.

**RESPONSE: Admitted.**

5.      Plaintiff and another patrol officer employed by the City's Department of Police named Nicholas Crowley ("Crowley") were "affianced" and "cohabited." ECF. No. 66, ¶¶ 8-9.

**RESPONSE: Admitted, for the period up to 19 April 2019, when Plaintiff and Crowley were married and since which time they have remained married and parented two sons together. (Doc 253-1, 10:2-10)**

6.      Plaintiff met Nick Crowley when she first became employed at the Joliet Police Department. When the Plaintiff first began a relationship with Nick Crowley, they were both patrol officers with the City. [Ex. A, 16: 12-15; 27: 4-14].

**RESPONSE: Admitted.**

7.      On or about July 16, 2017, Plaintiff and Nick Crowley got into an argument at the Plaintiff's home. During the argument, the television and refrigerator broke, and as a result of that evening, Nick Crowley was charged with reckless discharge of a firearm in Will County after a bullet was found in the ceiling. [Ex. A, 40: 6-24; 44: 11-14].

**RESPONSE: Admitted, except as to the characterization of the home as "Plaintiff's home," which is denied. At the time of the events described, it was also Crowley's home. (Doc 253-1, 27:15 – 23)**

8.      Plaintiff's neighbor, Maria Gatlin, provided a statement to the Joliet police supportive of these criminal charges, and gave testimony against Nick Crowley in his criminal trial. [Ex. A, 4-11; Ex. D, 35: 18-22].

**RESPONSE: Plaintiff admits that Gatlin provided a statement to the Joliet police in its investigation of Crowley and testified in the State's case-in-chief in its prosecution of Crowley. Plaintiff denies the City's subjective characterizations of the Gatlin statement to the Joliet police as "supportive" of criminal charges against Crowley or that her testimony in the criminal trial was "against" Crowley.**

9.      Defendant Edward Grizzle ("Grizzle") was the detective assigned by the City to

2

investigate the matter alleged in Crowley's criminal case. [Ex. A, 40: 5-8].

**RESPONSE: Admitted.**

10. Plaintiff was called to testify in the criminal case on May 14, 2018. After she testified on May 14, 2018, but prior to Crowley's acquittal on May 22, Plaintiff sent a threatening text message to Maria Gatlin. [Ex. A, 63-68].

**RESPONSE: Admitted, except as to the City's subjective characterization of the text message as "threatening," which plaintiff denies.**

11. On May 17, 2018, Gatlin arrived at the Joliet police department and met with Detective Grizzle, showing him a screenshot of the text message. In order to obtain forensic evidence of the text message, including verifying that Plaintiff sent it, Gatlin volunteered to allow her phone to be forensically examined by the JPD and Detective Jeffrey German performed a forensic download of Gatlin's phone using the Cellebrite forensic tool to obtain the original text message received by Gatlin from Plaintiff. [Ex. B, 34: 4-24].

**RESPONSE: Admitted.**

12. Based upon the text messages she sent to another witness during the trial of Crowley, Grizzle, as the detective assigned to investigate the matter, worked with Appellate Prosecutor Lorinda Lamken to obtain a search warrant on May 18, 2018 from the Hon. Sarah Jones of the Will County Circuit Court who authorized the search of the Plaintiff's cell phone from which the text message was sent. [Ex. B, 27: 19-24; Ex. C].

**RESPONSE: Admitted, except the statement that Grizzle worked with Lamken to obtain a search warrant "based on the text messages [plaintiff] sent to [Gatlin] during the trial of Crowley," which is denied. The stated basis for undertaking to obtain the search warrant was a single text message – not "messages". (City's SoF, ¶ 11 and Doc. 253-4). At the time that single text message was transmitted, the evidence in the Crowley trial had been closed, the parties had given closing arguments, and, except for the trial judge's announcement of his verdict, the trial was already over. (PSoF, ¶¶ 4-5)**

13. In support of the search warrant approved by Judge Jones, Grizzle submitted a

detailed affidavit which also attached and incorporated the contents of the criminal complaint relevant to plaintiff and set forth facts to establish: (1) probable cause to believe that the primary user of the phone had engaged in the charged criminal offense; and (2) that the cell phone contained or constituted evidence, fruits, or instrumentalities of those crimes. [Ex. D].

**RESPONSE: Admitted, except for the City's subjective characterization of Grizzle's affidavit as "detailed," which plaintiff denies. Grizzle's affidavit omitted important details bearing on the issuance and scope of the warrant, including the facts that he (and Lamken) already had the allegedly offending text message from Gatlin's phone and therefore needed to search plaintiff's phone, if at all, for the sole purpose of confirming that the text message had originated from plaintiff's phone. (Doc 253-14, ¶¶10-11; Doc 253-2, 49:21 – 50:2; PSoF, ¶¶ 6-7)**

14. The supporting affidavit of Grizzle highlighted Plaintiff's use of the cell phone as part of, and in furtherance of, the crimes under investigation. In particular, the supporting affidavit advised as to the specific terms of a text message sent from plaintiff to the witness in an ongoing grand jury indictment in Will County. [Ex. D].

**RESPONSE: Admitted, except the implication that Grizzle's affidavit "advised as to" all of the "specific terms of a text message a text message sent from plaintiff to the witness [Gatlin]" or that Gatlin was a witness "in an ongoing grand jury indictment," which are denied (Compare Doc 253-1, 64:15 – 66:5 with Doc 253-4 regarding incompleteness of Grizzle's affidavit's description of the text-message; the Crowley prosecution had, by this point, moved beyond grand jury indictment, and evidence and argument in the criminal trial had concluded. PSoF, ¶¶ 3-4)**

15. The supporting affidavit requested that the court issue the search warrant allowing for the search for specified material on plaintiff's rose gold Apple iPhone, namely, "evidence of the offense of harassment via electronic communications, intimidation…" Among the categories of information to be extracted and analyzed, the search warrant authorizes electronic communications, digital images or videos, e-mails, voice mail, buddy lists, chat logs, instant messaging, and text messages. [Ex. C].

**RESPONSE: Admitted.**

16. Hon. Sarah Jones reviewed and authorized the search warrant for Plaintiff's cell

4

phone. [Ex. C].

**RESPONSE: Admitted.**

17. Appellate Prosecutor Lamken subsequently provided an affidavit supporting both the pursuit of the search warrant as well as the materials sought. [Ex. N].

**RESPONSE: Plaintiff objects to this purported "statement of material fact." Lamken's affidavit 28 July 2021 affidavit runs 4 pages, includes 19 paragraphs containing dozens of specific averments. It is not a discrete fact that plaintiff can admit or deny. Plaintiff denies that the 28 July 2021 Lamken affidavit "support[ed] both the pursuit of the search warrant as well as the materials sought" since the affidavit was issued years after the warrant was sought or issued. Plaintiff further denies that the 28 July 2021 Lamken affidavit retrospectively supports either "pursuit of the search warrant [or] the materials sought," which is an argument not a fact.**

18. Cellebrite is a forensic tool used to extract and analyze phone records and computer records. Cellebrite was used by the City in the Spring of 2018 to view data taken from phones during investigations. [Ex. E, 23: 14-22].

**RESPONSE: Admitted.**

19. Lantern is a software made by Katana Forensics which works similarly to Cellebrite. It can extract phone data, analyze, and also create viewable reports. Lantern was used in conjunction with Cellebrite in the Spring of 2018. [Ex. E, 23-24: 1-9].

**RESPONSE: Admitted.**

20. At the time, the City had a single Cellebrite system that was located on a computer in the investigations unit area and Lantern was on an Apple Mac laptop that was separate from the Cellebrite computer, located in the major case room. [Ex. E, 29- 31; 1-24].

**RESPONSE: Admitted.**

21. Both the Cellebrite and Lantern machines were kept within a secure area of the investigation's unit, which was not accessible to anyone other than investigators and supervisors. [Ex. E, 32: 2-24; 33: 1-20].

**RESPONSE: Plaintiff denies that either the desk-top computer on which the Cellebrite software was loaded or the lap-top computer on which the Lantern software was loaded were "kept within a secure area of the investigations unit." These devices were accessible to anyone in the area of the Joliet Police Department in which the investigations unit worked. They were not otherwise "secure." (PSoF, ¶ 13)**

22. The investigations room required keycode access and both machines were password protected. The forensic machines were not connected to any common network drives, and the data stored on each respective machine could only be accessed by physically accessing the machines. In May-June 2018, only investigators, supervisors, and IT would have the password to access the Cellebrite system. [Ex. E, 30: 10-16; 33: 1-24].

**RESPONSE: Admitted, except that access to the Cellebrite was "protected" in any meaningful sense by password, which Plaintiff denies. Plaintiff specifically admits that, in May – June 2018, access to data on Cellebrite was available to all investigators, supervisors and IT, by a single common password, "Joliet," that did not identify or record by whom or when data on Cellebrite was accessed. (PSoF, ¶¶ 12-17)**

23. Cellebrite Physical Analyzer is a computer program that is used to process cellular device extractions and create reports on notable items located within the digital evidence. The physical analyzer also supports the extractions of iPhones and at the time of this event was the standard process for extracting iPhone digital data. [Ex. E, 27: 1-24; Ex. F, 46: 3-7].

**RESPONSE: Admitted.**

24. When data is extracted to the Cellebrite Physical Analyzer Software, it will be unique to that device and there will be a summary identifying the device, the name of the device, the serial number, and the unique ID that Apple uses to identify the phone. [Ex. E, 38: 3-24].

**RESPONSE: Admitted.**

25. Detective Jeffrey German and Lt. Chris Botzum were the only two detectives formally trained in the Cellebrite system in May 2018. The formal training sessions were conducted by Cellebrite at various police stations across Illinois. [Ex. E, 26: 1-11; 44: 7-15].

**RESPONSE: Denied as stated. Plaintiff admits that German and Botzum were the**

**only detectives trained to perform *extractions* from seized computers onto the Cellbrite computer, but states further that numerous detectives were trained to search and view data once extracted by and stored on the Cellbrite computer. (PSoF, ¶ 14)**

26. On May 18, 2018, pursuant to a lawful search warrant, Detective Christopher Botzum conducted a forensic download of Plaintiff's cellphone using the Cellebrite and Lantern systems. The physical analyzer software parsed the data into categories including text messages, photographs, and videos from Plaintiff's phone, and the data was saved in a place on the Cellebrite to which only a few limited individuals had access to. [Ex. F, 52: 23-24; 57: 3-24].

**RESPONSE: Admitted, except as to City's characterization of the search warrant as "lawful," which is a legal conclusion to which plaintiff objects not statement of uncontested fact, and City's assertion that "only a few limited individuals had access to" data extracted onto and saved on the desk-top computer that was used to run the Cellebrite software, which plaintiff denies. Such data could be viewed on or downloaded from that desk-top computer to other storage devices such as USB drives (i.e., "zip," "flash"or "thumb" drives) from which the data could then be viewed on other computer devices. (PSoF, ¶¶ 12-14, 30)**

27. There was no ability for only "part" of the data to be downloaded (i.e. only downloading text messages). Once downloaded, the forensic programs allowed for a reader report to be run that would parse out the data (separate into text messages, images, videos, applications, etc.) to allow for the user to effectively navigate and review the data. [Ex. E, 41-43; 80].

**RESPONSE: Admitted.**

28. To protect Plaintiff's privacy, Detective Botzum purposefully did not include Plaintiff's name on the file containing the contents of her phone. [Ex. F, 54: 3-21].

**RESPONSE: Plaintiff denies the fact asserted, while admitting that Botzum so testified. Neither Botzum nor anyone else could identify the name of the file containing the contents of the extraction from plaintiff's iPhone and there is no documentation that confirmed Botzum's testimony to this effect. Plaintiff also denies that the manner in which the contents of plaintiff's phone was stored in the Cellbrite computer effectively prevented others from finding and viewing it on that computer. (PSoF, ¶¶ 12-14, 30)**

29. Once phone data was extracted using the Cellebrite or Lantern machines, the cell phone would either be returned to its owner or retained for further investigation. Phones that were retained by the police department would be stored subject JPD's applicable general orders. [Ex.

7

O].

**RESPONSE: Admitted.**

30. The City had in place a general order that outlined the collection and storage of physical evidence – General Order 16-1. For the Plaintiff's investigation, the original physical evidence (Plaintiff's iPhone) was returned to her when the extraction was completed. [Ex. O].

**RESPONSE: Admitted.**

31. Once data is extracted, only those who had the computer password AND know how to use Cellebrite would be capable to open saved data and run a report. Once a report is generated, it is not accessible to every detective's computer. Access to data is limited to access of the specific computer (including access to investigations room) and then knowledge of using Cellebrite or Lantern. [Ex. E; 32-34].

**RESPONSE: Admitted but only with respect to viewing extracted data on the desk-top computer on which the Cellebrite software was installed but denied as to the ability to access and view such data on other computers from a USB drive (or other storage device) once it was downloaded from the desk-top computer on which the Cellebrite software was downloaded to, copied and stored to such a storage device. (See Doc 253, ¶ 35)**

32. Data from extractions, also known as the "digital evidence", was stored on the computers housing the forensic programs and would not be entered into the BEAST system, or physical central evidence. [Ex. E, 46:12-24, 47: 1-19].

**RESPONSE: Plaintiff denies that storage of such digital evidence was limited to the computers housing the forensic programs but otherwise admits the allegations of this paragraph. Such digital evidence was also downloaded, copied and stored onto USB drives. As many as 5 copies of the data extracted from plaintiff's iPhone were downloaded, copied and stored onto USB drives. (PSoF, ¶ 30; Doc 253, ¶ 35)**

33. Joliet Police Department General Order 10-6, in place at the time of Plaintiff's investigation, covered departmental policies related to criminal investigation organization and administration (the division that handled Plaintiff's investigation). [Ex. O, pg. 2].

**RESPONSE: Admitted.**

34. Section 4 of GO 10-6 allowed for the investigator assigned to the case to have access to the investigative files, which includes "working copies" of phone extractions. Specifically, Section 4.2 of GO 10-6 reads "Investigative case files shall only be accessible to law enforcement personnel at the discretion of the assigned investigator or an investigation supervisor." [ Ex. O, pg. 3].

**RESPONSE: Plaintiff denies the matters as recited in ¶ 33. "Allowed" is a legal conclusion, not a fact. More, the Sections of G.O. 10-6 are mischaracterized. These sections do not relieve the JPD from otherwise handling and documenting its handling of evidence, including "working copies" of phone extractions, in compliance with the department's evidence handling procedures as embodied in G.O. 16-1. (PSoF, ¶¶ 25, 35)**

35. The data extracted from Plaintiff's phone onto the Cellebrite could be copied onto a flash drive, DVD, or Blu-ray. [Ex. E, 67: 8-12].

**RESPONSE: Admitted.**

36. A flash drive was created on or about May 18, 2018 for Grizzle with the contents of the data extracted from Plaintiff's phone. Grizzle downloaded the contents of the flash drive onto his computer in order to complete his investigation with the extraction data on his computer. [Ex. B, 65: 20-24; 66: 1-4].

**RESPONSE: Admitted.**

37. Section 4.3 of GO 10-6 allowed for the storage of evidence in special circumstances. Specifically, GO 10-6, Section 4.3 reads: "It is recognized that some criminal investigations contain sensitive information, which may compromise the eventual outcome of the inquiry. The Investigation Division Deputy Chief may authorize that original reports involving such cases are maintained within the Investigation Division safe. The Investigations Division Deputy Chief is responsible for the auditing and return to the Records Section any cases maintained in this fashion". [Ex. O, pg. 3].

**RESPONSE: Denied as to what was "allowed" as a legal conclusion, not a fact.**

9

**Plaintiff otherwise admits that the passage of the document referenced is accurately quoted.**

38. After downloading the flash drive of the extracted data onto his computer, Grizzle gave a flash drive containing the contents of Plaintiff's phone to Alan Roechner who served in a supervisory capacity as Deputy Chief of Investigations at the time. [Ex. G, 44: 1-10].

**RESPONSE: Admitted.**

39. Pursuant to Section 4.3 of GO 10-6, Deputy Chief Roechner kept the flash drive in a locked cabinet in his office to protect Plaintiff's privacy while the investigation was pending. This was consistent with past practice at the City for criminal investigations involving police officers and no one except the Deputy Chief himself had access to the password to gain access to his cabinet. [Ex. G, 41-46].

**RESPONSE: Denied. Roechner's purported storage of the flash drive in a locked cabinet in his office did not protect plaintiff's privacy, was inconsistent with GO 10-6 (and GO 16-1), and was not documented. (PSoF, ¶ 33) Nor was any such "past practice" documented.**

40. Plaintiff's data was then deleted from the Cellebrite on or about June 8, 2018. At which point, the images, data, and videos could no longer be accessed on Cellebrite. The only way to access the extracted data from Plaintiff's phone after it was deleted was from the flash drive. [Ex. E, 76: 1-24, 77: 1-8].

**RESPONSE: Admitted, except the statement for the statement that "The only way the to access the extracted data from Plaintiff's phone after it was deleted was from the flash drive," which plaintiff denies. By the time the data was finally deleted from the desk-top computer on which the Cellebrite software operated, the data had been copied to numerous USB from which it could be accessed and viewed from any USB compatible computer device. (PSoF, ¶ 30)**

41. Prior to deleting the extracted data from Cellebrite, another flash drive was made by Detective Gavin in order to preserve the data. Similarly, this second flash drive was presented to Deputy Chief Roechner and locked in his cabinet. [Ex. G, 63: 1-24; 64: 1-18].

10

**RESPONSE: Denied. There are numerous conflicting accounts of what was done with the flash drive made by Gavin and it was not necessary to make any other flash drives since all of the data extracted from plaintiff's iPhone had already been loaded to and was still stored on Grizzle's own desk-top and on the flash drive of which Roechner claims to have taken possession and on German's computer. (PSoF, ¶ 24)**

42. On August 2, 2018, more than two months after the City took steps to remove the Data from its computers, Plaintiff raised issue with her phone data with the City for the first time, when Plaintiff asked her supervisor for permission to leave work early because she had heard rumors related to the contents of her phone data. Ex. H, 20: 16-24; 21: 1-12].

**RESPONSE: Admitted, except the suggestion that this was the "first time" plaintiff had raised issue with her phone data with the City, which plaintiff denies. Plaintiff vociferously "raised concern with her phone data with the City" at the time her phone was seized by Grizzle, which she expressed specific concerns about personal data on the phone. (PSoF, ¶ 9)**

43. On August 23, 2018, the JPD requested the Chicago Regional Crime laboratory ("RCFL") to investigate the presence of Plaintiff's data on JPD electronic devices. On August 24, RCFL personnel came to JPD and "imaged" the hard drives and electronic devices in the investigations unit. [Ex. G, 76: 13-19; 79].

**RESPONSE: Admitted.**

44. The RCFL's reports indicated that Plaintiff's phone data was located on only two devices – Grizzle's and German's computers. There were no phones that showed any evidence of ever containing Plaintiff's phone data. [Ex. F, 56: 7-54, Ex. K, pg. 8].

**RESPONSE: Admitted.**

45. Plaintiff used her phone to take sexually explicit photographs and videos of both her and Crowley. The videos depicted the Plaintiff performing various sex acts. [Ex. A, 136: 20-24; 137: 1-3].

**RESPONSE: Admitted.**

46. At the time the data was extracted from Plaintiff's phone, Detective McKinney was

11

a relatively new Detective working for the City who had received informal training from Detective German on the Cellebrite and would routinely work on the system to better familiarize himself with it. [Ex. I, 13: 20-24; 14: 1-7; 21: 1-10).

**RESPONSE: Plaintiff admits that McKinney was a Detective employed by City/JPD during the relevant time frame and that he knew how to access data extracted from phones onto the desk-top computer on which the Cellebrite software was installed. Plaintiff denies the balance of the matters asserted by City in ¶. (46). There is no documentation in McKinney's personnel/training record that documents his having received any training, formal or informal, or having worked with the Cellebrite software prior to 8 June 2018. His testimony to this effect is a pretext intended to excuse the fact of his unauthorized accessing and viewing of images, including nude images of plaintiff that had been extracted from her iPhone onto the desk-top computer on which the Cellebrite software was installed. (PSoF, ¶¶ 18-23)**

  47. Given Officer McKinney's inexperience with the Cellebrite system, he would be encouraged to engage in informal and independent self-education on the Cellebrite program as often as possible in order to gain experience with the program. This includes opening older extractions, running a report via the physical analyzer, and exploring the contents of the phone data by utilizing Cellebrite's various functions. [Ex. K, pg. 15].

**RESPONSE: Plaintiff admits that, during the relevant time frame, McKinney accessed digital evidence stored on the desk-top computer on which Cellebrite was installed, including phone extractions obtained in investigations to which he was not assigned and in which he had no investigative role. McKinney had a designated training file loaded on the Cellbrite computer that he was able/supposed to use for training. Plaintiff denies the opinion testimony of City's retained expert, Kein, regarding McKinney's level of experience or motivations for doing so. (PSoF, ¶¶ 18-23)**

  48. Detective German was aware that McKinney was beginning the process of engaging in formal Cellebrite training to become Cellebrite certified and that McKinney would use the Cellebrite computer for an investigation or other reasons, which included training. [Ex. E, 44: 16-24].

**RESPONSE: Plaintiff admits that German (and others in JPD) knew that McKinney would use the Cellebrite computer to view evidence, including phone extractions, that had been obtained in cases to which McKinney was not assigned and no investigative role.**

49. Detective German gave McKinney the Cellebrite password. [Ex. I, 15: 1-3].

**RESPONSE: Admitted.**

50. At some point between May-June 2018, Detective McKinney opened an unidentified media folder containing Plaintiff's images and viewed a photograph which depicted nude breasts from the shoulders down. [Ex. I, 32: 10-23].

**REPONSE: Plaintiff admits that McKinney opened a media folder containing plaintiff's images and viewed a nude photo of plaintiff. Plaintiff denies the media folder was unidentified, as the entire extraction from Socha's iPhone was identified and to access it, McKinney necessarily knew how it was identified. (PSoF, ¶ 10)**

51. Detective McKeon, who was on the phone, was sitting directly next to Detective McKinney at the time and Detective McKinney called McKeon's attention to the photograph of naked breasts. [Ex. I, 33: 1-22].

**RESPONSE: Admitted.**

52. Detective McKinney then viewed a second photograph, which depicted Plaintiff's face. Upon realizing the photograph belonged to the Plaintiff, Detective McKinney immediately closed out and logged off Cellebrite. [Ex. I, 35: 7-24].

**RESPONSE: Plaintiff denies the sequence alleged. McKinney knew that the nude image he had pulled up and viewed was of Socha before he called McKeon's attention to the nude image. (PSoF, ¶¶ 19-23)**

53. Detective McKinney and Detective McKeon are the only two employees from the City who have admitted to seeing a sexually explicit photograph from Plaintiff's personal phone. Neither one of these detectives reviewed any additional photographs and never reviewed any videos contained on Plaintiff's phone. [Ex. I, 38: 13-17].

**RESPONSE: Plaintiff admits that Dets. McKinney and McKeon are the only two City employees who have admitted to seeing a sexually explicit photo from plaintiff's phone. Otherwise, denied. McKinney's testimony on this point is self-serving and his description of how he accessed the nude image of plaintiff that McKeon observed him viewing is implausible. (PSoF, ¶¶ 19-23)**

13

54. Rather than protect the Plaintiff's privacy and file under a "Doe," the original complaint, as filed by Plaintiff's counsel, lists Plaintiff's full name as Cassandra Socha. Plaintiff is aware that this lawsuit is now a matter of public record. [Ex. A, 221: 1-8].

**RESPONSE: Plaintiff objects to the matter asserted as immaterial and argumentative. More, as the Court is aware, anonymous filings are exceptional and disfavored. See Rule 10(9), Fed.R.Civ.P. requiring that a complaint name all of the parties. Further, by the time plaintiff filed suit, the extraction from her iPhone had been copied onto numerous JPD desk-top computers, at least one lap-top (the computer on which the Lantern software was installed) and 5 USB drives, the handling of which was not in compliance with GO 16-1 or otherwise documented. (PSoF, ¶ 30) Even if plaintiff had been permitted by the Court to file her complaint anonymously, the damage to her privacy in the JPD community with which she was most concerned was already done.**

55. Officer Michael Devito had a meeting in July 2018 with Detective David Jackson regarding concerns centered on the treatment of a female subordinate and the mishandling of evidence where Jackson shared rumors of sexual/nude images from Plaintiff's cell phone. [Ex. J, 8: 6-21].

**RESPONSE: Plaintiff admits the meeting between Devito and Jackson but denies that Jackson shared only "rumors" with Devito, as Jackson also shared at least one first-hand account of mishandling of the sexual/nude images from plaintiff's iPhone. (PSoF, ¶ 27)**

56. Shortly after the meeting with Detective Jackson, Officer Devito advised Plaintiff in person about rumors circulating regarding images and videos on her cell phone. [Ex. J, 37: 19-23].

**RESPONSE: Admitted.**

57. Plaintiff received two anonymous letters in her work mailbox at the police department containing rumors and allegations that intimate videos and photographs were being viewed and shared by members of the department. The author(s) of letters remains unknown, and the letters could not be authenticated. [Ex. A, 126: 8-34; 127: 1-12; 130: 4-11; 135, 9-17].

**RESPONSE: Admitted, except for the suggestion that the letters could not be "authenticated," which is denied. The letters were "authenticated," for what they purport to be, even though their authorship remains unknown. These letters are, as a practical matter, immaterial.**

14

58. Officer McKinney and Officer McKeon are the only two individuals to physically see Plaintiff's photographs at the Joliet Police Department. [Ex. E, 63: 1-24; Ex. I].

**RESPONSE: Denied, although plaintiff admits that they are the only two JPD officers who have admitted this. (PSoF, ¶ 30)**

59. Plaintiff did not share the anonymous letter with anyone at the Joliet Police Department and she did not make a formal report to Deputy Chief Roechner or anyone else at the City nor did she address these concerns directly with Detective Grizzle. [Ex. A, 140: 1-23].

**RESPONSE: Plaintiff objects to the matter asserted as immaterial. Further responding, plaintiff admits the matters asserted.**

60. Plaintiff has no first-hand knowledge that anyone has ever seen private images that were on her cell phone at the Joliet Police Department. [Ex. A, 105: 14-20].

**RESPONSE: Denied. As City's foregoing SoF recites, McKinney and McKeon have both testified under oath that they have seen such private images.**

61. Other than the events alleged, she has not experienced any interaction with any member, past or current, of the Joliet Police Department in which she was not treated professionally or with respect. [Ex. A, 224: 1-16].

**RESPONSE: Plaintiff objects to the matter asserted as immaterial. Further responding, plaintiff admits the matter asserted.**

62. Forensic examination of the Plaintiff's phone data confirmed the following:

   a. The cell phone data (sms data) disclosed in discovery has not been altered, damaged or destroyed since it was originally extracted from Plaintiff's cell phone in May of 2018.

   b. Plaintiff's phone contained twenty-six (26) images of Plaintiff in various stages of undress.

   c. Plaintiff's phone contained four (4) videos of Plaintiff in various stages of undress

15

or involved in sexual activity.

d. Plaintiff sent nineteen (19) images or videos of herself in various stages of undress or engaged in sexual activity via outgoing text message on thirty-one (31) occasions.

e. Plaintiff received nine (9) images or videos of herself in various stages of undress or engaged in sexual activity via incoming text message on ten (10) occasions.

f. The images or videos originated on four (4) different phone devices: an iPhone 5. iPhone SE, iPhone 6, and iPhone 7 plus.

g. All images or videos described herein was created prior to May 17, 2018 (date of JPD's seizure of Plaintiff's phone).

h. Every transmission (outgoing or incoming) of the images or videos occurred prior to May 17, 2018 (date of JPD's seizure of Plaintiff's phone).

[Ex. K, pg. 9].

**RESPONSE: (a) – (h) inclusive – Admitted. Responding further, the different phones and/or transmissions referenced in sub-¶¶ (f) and (h) above were exclusively on/to plaintiff's and/or Crowley's phones. (PSoF, ¶ 34)**

63. Deputy Chief Robert Brown was a watch commander on the night B shift from May-June 2018. He has been employed with the City for 21 years and is currently the Chief of Police for the City. [Ex. L, 7: 9-14].

**RESPONSE: Admitted.**

64. Chief Brown has no personal knowledge regarding any of the allegations in this lawsuit as he has not seen any of the personal photographs or videos of Plaintiff, nor does he personally know that any of the detectives in the investigations unit viewed or shared any private photographs from Plaintiff's cell phone. [Ex. L, 10: 1-10].

**RESPONSE: Denied. (PSoF, ¶ 27)**

65. Sgt. Tim Powers worked for the Joliet Police Department for twenty-four years. During this time, he supervised both the Plaintiff and Crowley. [Ex. M, 9: 1-24].

**RESPONSE: Admitted.**

66. Both Chief Brown and Sgt. Powers denied any knowledge of a watch commander meeting taking place at or near the time of the Plaintiff's Investigation in May or June 2018. [Ex. M, 14-18].

**RESPONSE: Admitted that they both denied this.**

Respectfully submitted,

/s/ Hall Adams

**Law Offices of Hall Adams LLC**
33 N. Dearborn Street, Suite 2350
Chicago, Illinois 60602
T: (312) 445-4900
F: (312) 445-4901
hall@adamslegal.net
Attorney No.: 6194886

## **CERTIFICATE OF SERVICE**

I hereby certify that on, I electronically filed the foregoing paper with the Clerk of the Court using the ECF System which will send notification to all counsel of record via the Court's CM/ECF system.

/s/ Hall Adams

**Law Offices of Hall Adams LLC**
33 N. Dearborn Street, Suite 2350
Chicago, Illinois 60602
T: (312) 445-4900
F: (312) 445-4901
hall@adamslegal.net
Attorney No.: 6194886